135

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF NEW YORK
2

3    STEVEN SCHREIBER,        ) Civil Action
                           ) No. 15-6861 (CBA-JO)
4             Plaintiff,   )
                           ) EVIDENTIARY HEARING
5    vs.                   ) (Day 2)
                           )
6    EMIL FRIEDMAN, et al.,   ) Brooklyn, New York
                           ) Date:  July 7, 2016
7           Defendants.  ) Time:  9:30 a.m.

8   ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

        TRANSCRIPT OF EVIDENTIARY HEARING (Day 2)
9                 HELD BEFORE
     THE HONORABLE MAGISTRATE JUDGE JAMES ORENSTEIN
10           UNITED STATES MAGISTRATE JUDGE

11   ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

            A P P E A R A N C E S
12

13   For the Plaintiff:           Jay Philip Nelkin, Esq.
                               Carol Nelkin, Esq.
14

15   For Defendants Emil Friedman    Paul Hans Schafhauser, Esq.
   and New York Best Coffee, Inc.:
16

17   For Defendants E&I Investors   David B. Grantz, Esq.
   Group, LLC, E&J Funding Co., LLC,
18   E&J Management Inc., and
   E & Jeryg Management Corp., LLC:
19

20

21   Proceedings reported by machine shorthand, transcript produced
   by computer-aided transcription.
22   ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

23   Court Reporter:         Michele D. Lucchese, CSR, RPR
                          Official Court Reporter
24                     United States Courthouse, Room N375
                          225 Cadman Plaza East
25                     Brooklyn, New York  11201
                          718-613-2272

1   APPEARANCES (Cont'd):

2
    For Defendant 24 Hour Oil          David Grantz, Esq.
3   Delivery Corp., MB Fuel
    Transport, MB Fuel Transport
4   I, Associated Fuel Oil Corp.,
    Light Trucking Corp.; 165 Street
5   Realty Corp.; Park Avenue Associates:

6
    For Defendants Sylvia Ezell,       Richard Avery Finkel, Esq.
7   Sonia Rivera, and Jorge Salcedo:

8
    For Defendants Michael Devine      Richard Bruce Feldman, Esq.
9   and Michael Devine, CPA:

10
    For Defendants Geoffrey Hersko     Andrew W. Gefell, Esq.
11  and Geoffrey S. Hersko, P.C.:

12
    For Defendants Solomon Birnbaum,   Maurice Heller, Esq.
13  Single Serve Beverages Distribution,
    Crazy Cups, 26 Flavors, LLC,
14  Office Coffee Services, LLC, and
    Two Rivers Coffee, LLC:

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                137

1          (In open court.)

2          THE COURT:  Good morning, everybody.  I hope you had

3    a good night.

4          Ms. Ezell, could I ask you to resume the stand.

5          MR. SCHAFHAUSER:  Just to report to Your Honor.  I

6    saw Your Honor's docket entry this morning about binders.

7          THE COURT:  No, just what I said last night.

8          MR. SCHAFHAUSER:  I understand.  We had looseleaves,

9    but I saw the order and my colleague is actually completing

10   the binders and we will have them, you know, at the first

11   break.

12         THE COURT:  You're not going to be presenting

13   evidence?

14         MR. SCHAFHAUSER:  No, but I wanted to comply and

15   that's what I was doing.

16         THE COURT:  Thank you.  I appreciate that.

17         MR. NELKIN:  Your Honor, I had just five exhibits

18   that I wanted to share with the Court and with them as well.

19   Should I hand them out now?

20         THE COURT:  Sure.  Why not.

21         (Witness the witness stand.)

22         THE COURT:  Have a seat.  Of course you know that

23   you are still under oath.

24         Anytime you are ready, Mr. Finkel.

25         MR. FINKEL:  Yes, Your Honor.  Are we waiting for

1   the exhibits?

2          THE COURT:  No.

3   **SYLVIA EZELL,**

4       called as a witness, having been previously duly

5       sworn, was examined and testified as follows:

6   CROSS EXAMINATION CONTINUES

7   BY MR. FINKEL:

8   Q   Good morning, Ms. Ezell.

9   A   Good morning.

10  Q   Do you have the binder of exhibits?

11  A   Yes, I do.

12  Q   Okay.  The next exhibit that was discussed is Exhibit

13  No. 35.  I'd ask you to take a look at that exhibit, please.

14          Before yesterday, when Mr. Nelkin asked you to look

15  at that exhibit, had you ever seen this before?

16  A   No, I have not.

17  Q   Of your own knowledge, do you know what this is?

18  A   I do not.

19  Q   Okay.  I direct your attention to the fifth line, which

20  has your name on it.

21  A   Yes.

22  Q   Does it have a phone number for you?

23  A   Yes, it does.

24  Q   And you testified that that's the wrong phone number?

25  A   Yes, it is.

1   Q    Okay.  Does it have an e-mail address for you?

2   A    Yes, it does.

3   Q    Is that the Brooklyn Beans e-mail address?

4   A    No, that's my own e-mail.

5   Q    And that's the Silver red --

6   A    The silverrred@aol.com. S-i-l-v-e-r-r-r-e-d.

7   Q    And you testified that there were a number of names that

8   you were not familiar with; correct?

9   A    That's correct.

10  Q    If -- before December the 14th, if someone had asked you

11  to -- asked you whether these people were Two Rivers'

12  employees or not, how would you go about determining that?

13  A    How would I go about determining that?

14  Q    Yes.  Whether these -- I think seven people that you --

15  the names of which you were not familiar with, if you were

16  asked to determine whether they are or were Two Rivers'

17  employees, how would you go about doing that?

18  A    I would ask Sonia.

19  Q    And why would you do that?

20  A    If it was asked of me, if I could identify them, but --

21  because I don't have access to the computer.

22  Q    Okay.  And by the computer, you mean what?

23  A    The Two Rivers Launch.

24  Q    I direct your attention now to Exhibit 37.  Can you tell

25  us what this document is?

1   A    Well, it is dated May 31st, which I know for a fact Sonia

2   wasn't in that day because that's her wedding anniversary and

3   she always takes off that weekend, and it -- I made a transfer

4   from Office Coffee Services to Two Rivers in the amount of

5   $58,932.64, and I e-mailed it to Mr. Larsen at Signature Bank.

6   Q    And do you know why you made that transfer?  Can you tell

7   from this exhibit?

8   A    Well, apparently I was told to do so, or I recognized,

9   being that I was doing printouts, that there was a deposit

10  error, but I don't remember writing these notes.  I mean, it

11  looks like there was a deposit error, but I don't recall this

12  particular transaction.

13  Q    And if it was a deposit error, that would mean what?

14  A    It means that I must have saw it on the printouts of

15  Office Coffee and Two Rivers, that the 58,000 actually

16  belonged to Office Coffee and not to Two Rivers, so I made a

17  transfer.

18  Q    The 58,000 was deposited -- was transferred into which

19  account?

20  A    It was most likely first put into Two Rivers in error and

21  then I transferred it to Office Coffee, where it originally

22  belonged.  But, again, I don't recall.  It is just my own

23  summation.

24         MR. NELKIN:  Objection.

25         THE COURT:  To what?

1        MR. NELKIN:  The document says which way it is

2  transferred.

3        THE COURT:  This is her understanding.

4        MR. FINKEL:  I am going to ask her that.

5  Q    I would ask you to take another look at the document to

6  determine which account, according to this, received the

7  58,000.

8  A    Two Rivers Coffee received the amount.

9  Q    So it was taken out of Office Coffee --

10 A    And put into Two Rivers.

11       THE COURT:  I am going to ask you, Mr. Finkel, she

12 has just said the opposite.  Look --

13       THE WITNESS:  Okay.

14       THE COURT:  -- if you want to correct yourself, you

15 realize you said something that is incorrect, that's fine.

16 Are you sure that's right is not a question that I find is

17 very useful if you have heard one thing and you believe it to

18 be something else.

19 Q    Are you correcting your prior statement?

20       THE COURT:  This is for you for future reference,

21 Mr. Finkel.  I don't appreciate that kind of questioning.  I

22 am sure I will not hear again it.

23       MR. FINKEL:  I will try not to, Your Honor.

24       THE COURT:  Instead of saying that you will try and

25 winking, just tell me that you won't.

1          MR. FINKEL:  I will do my best.

2          THE COURT:  Good.

3    Q    Having looked at the document again, did you change your

4    prior testimony?

5    A    The funds went into Two Rivers Coffee.

6    Q    I direct your attention to Exhibit 30, which was the next

7    exhibit discussed.

8    A    Okay.

9    Q    And these are a series of e-mails; is that correct?

10   A    Yes, that's correct.

11   Q    Between you and who?

12   A    Jordan Napolitano.

13   Q    Okay.  And you identified her as an assistant to Ms.

14   Rivera; correct?

15   A    Correct.

16   Q    Do you know whether -- she was an assistant in

17   bookkeeping; correct?

18   A    To my knowledge, yes.

19   Q    Do you know whether she was an experienced bookkeeper?

20   A    I do not know this.

21   Q    Do you know whether she was a professional bookkeeper

22   prior to working at Two Rivers?

23   A    I do not know that.

24   Q    Do you know as of December 14, 2015 whether she was still

25   employed at Two Rivers?

1   A    I do not that.

2   Q    Okay.  And these e-mails, can you tell us why, if you can

3   recall or tell from this document, why Jordan Napolitano was

4   sending questions to you?

5   A    Again, the date is August 12, 2014.  Sonia most likely

6   was on vacation, so I was telling -- I was instructing her on

7   which deposits to put into each account.

8            And the second e-mail, okay, I have never done

9   Office Coffee deposit, so I'm guessing it's the same.  And

10  then she asked me what does PR mean.  And then I respond I'm

11  putting in the once for Two Rivers.  You wrote debit next to

12  or does that mean take out?

13           She was just questioning me on some of my

14  terminology on PR or debit.  So that was the reason for the

15  back and forth.  I was explaining to her what I meant.

16  Q    So would her lack of knowledge of what PR or debit meant

17  mean anything to you as to her understanding of bookkeeping?

18  A    Yes.  I guess she didn't have much experience.

19  Q    Okay.  I'd now direct your attention to Exhibit 92.  And

20  am I correct that you testified, in answer to Mr. Nelkin's

21  questions, that this was an e-mail with attachments and your

22  attachments were your allocations of credit card charges?

23  A    That is correct.

24  Q    Okay.  I'd ask you to go to the second page of that

25  exhibit and ask you as to -- now, the second page, you

1   prepared this; is that correct?

2   A    Yes, I did.

3   Q    And I'd ask you if you can tell us to which company the

4   credit card charges on the second page were allocated to?

5   A    Two Rivers Coffee.

6   Q    And those were charges that were incurred by which

7   people?

8   A    The company.

9   Q    What does that mean?

10  A    The company meant that Two Rivers was responsible for

11  those charges, the gas charge and basically all the computer

12  charges.

13  Q    Okay.  And which people --

14  A    And the second one is Eugene Schreiber.

15  Q    Okay.  And what was the amount of money that was

16  allocated to Two Rivers that had been charged by Eugene

17  Schreiber?

18  A    $4,497.14.

19  Q    And the prior charges that you referred to as charged to

20  the company was what amount?

21  A    $1,219.24.

22  Q    And the third allocation is to whom?

23  A    Jorge Salcedo.

24  Q    And how much was that charge?

25  A    $538.93.

1              THE COURT:  May I interrupt the question so I better

2    understand the exhibit.

3              This is allocated within Two Rivers by the person

4    carrying the card or whose name is on the card?

5              THE WITNESS:  Yes.

6              THE COURT:  As between companies, because there are

7    different companies on this report --

8              THE WITNESS:  Correct.

9              THE COURT: -- who decides which company to put a

10   charge under?

11             THE WITNESS:  Let me explain, Your Honor.

12             THE COURT:  Yes.

13             THE WITNESS:  Emil Friedman is responsible for all

14   of the credit cards.  He allocated to different companies

15   different individuals.

16             THE COURT:  So that you understand my question, to

17   get on this report, somebody had to --

18             THE WITNESS:  Okay.  Had to tell me or give me a

19   receipt.  That's how I would know.

20             THE COURT:  They would give you a receipt, but how

21   would you know which company to put the receipt on?

22             THE WITNESS:  Well, it depends on -- in other words,

23   Eugene, Steve -- I knew it was Two Rivers because they were

24   employed there; they are part of Two Rivers.

25             THE COURT:  Okay.

Ezell - cross - Finkel                    146

1          THE WITNESS:  If I did a charge for the company, I
2     knew it would either be MB or 24 Hour.
3          THE COURT:  So for that you would make the decision
4     about which company to put it under?
5          THE WITNESS:  Yes, because basically I would have
6     knowledge of who it belonged to.
7          THE COURT:  All right.  If it was Mr. Friedman's
8     card --
9          THE WITNESS:  I would ask him.
10          THE COURT:  You would ask him?
11          THE WITNESS:  I would ask individuals.
12          THE COURT:  So some combination of asking the
13     individuals and your own personal knowledge?
14          THE WITNESS:  Right, but more than likely I would
15     ask the individual.
16          THE COURT:  Okay.  Go ahead.  Sorry to interrupt.
17          MR. FINKEL:  That's quite all right.
18     Q     To continue with His Honor's question, we discussed --
19     there were questions yesterday concerning the need for the
20     backup paperwork.  Was that also considered by you in
21     determining which company should get the allocation?
22     A     Yes.
23     Q     Okay.  The next entry was for credit card charges by
24     which person?  That would be on the bottom of the second page
25     going on to the third page.

1   A    Steve Schreiber.

2   Q    And how much was that allocution?

3   A    $1,432.80.

4   Q    Okay.

5            Now, I'm sorry, I missed a page.  I'm sorry.  My

6   fault.  The second page of this exhibit says, at the top,

7   credit card Chase 4390.  That's part of your allocution;

8   correct?

9   A    That's the account number for the charge.

10  Q    And the first series of charges that you allocated on

11  that page were to which company?

12  A    The first was Two Rivers Coffee.

13  Q    Well, the bottom of the page says page one of three, and

14  this is Exhibit 92, page one of three on the bottom left.

15  A    This is the first page?

16  Q    Yes.

17  A    The first page is Emil's personal charge.

18  Q    And how much was that charge?

19  A    $205.47.

20  Q    The next allocation under that was to which company?

21  A    Office Coffee.

22  Q    How much was the allocation to Office Coffee?

23           THE COURT:  There is a lot to get through, Mr.

24  Finkel.  Instead of going through all of the individual

25  entries, which you can argue in post hearing briefings, let's

1    move on.

2         MR. FINKEL:  Can she just answer that one question

3    and then I will move on.

4         THE COURT:  Why don't we move on to the next item,

5    please.  We have a lot to get through, please, and I don't

6    think individual charges will help me understand the point of

7    this hearing.

8    Q    Okay.  Exhibit 93 then.  This is similar to 92; is that

9    correct?

10   A    Yes, it is.

11   Q    Okay.  And you allocated charges to Two Rivers and to

12   Office Coffee and to MB Fuel; is that correct?

13   A    Yes.

14   Q    Okay.

15        MR. FINKEL:  I will dispense with future questions

16   on this exhibit as you requested, Your Honor.

17        THE COURT:  Thank you.

18   Q    I would ask you to go to Exhibit 77.  Is that a snapshot

19   of your computer screen?

20   A    No it's not.

21   Q    Okay.  Now, I direct your attention on this particular

22   exhibit to the third icon from the bottom in the right-hand

23   column, which says, Launch Perfect Samplers.  Do you see that?

24   A    Yes.

25   Q    Do you have that icon on your computer?

1   A    No, I don't.

2   Q    And the icon above that says Launch Coffee -- I'm sorry,

3   Launch Office Coffee Old.  Do you have that icon on your

4   computer?

5   A    No, I do not.

6   Q    And the one above that says Launch Office Coffee New.  Do

7   you have that icon on your computer?

8   A    No, I do not.

9   Q    And the one above that says Launch 26 Flavors, do you

10  have that icon on your computer?

11  A    No, I do not.

12  Q    Do you have access to any of those Launch programs?

13  A    No, I do not.

14  Q    I direct your attention to Exhibit 90.

15  A    Okay.

16  Q    Do you have that exhibit?

17  A    Yes, I do.

18  Q    And this is first e-mail correspondence between you and

19  Jordan Napolitano; correct?

20  A    Yes.

21  Q    Can you tell us, by looking at this exhibit, why Ms.

22  Napolitano was communicating with you rather than Sonia

23  Rivera?

24  A    Because it's July and Sonia was on vacation.

25  Q    Okay.  If Sonia was available, meaning she was not out

1   sick or on vacation, would Jordan Napolitano have any reason

2   to contact you?

3   A    No.

4   Q    Now, I direct your attention to the third page of that

5   exhibit, which says account activity Signature Bank at the

6   top.

7   A    Okay.

8   Q    Okay.  You obtained this information; is that correct?

9   A    Yes, I did.

10  Q    Did you obtain this information from the Launch program

11  for Two Rivers?

12  A    No.

13  Q    Where did you obtain this information?

14  A    I have to go into internet banking Signature New York.

15  Q    Would you please turn to Exhibit 100?

16  A    Okay.

17  Q    Did you prepare this?

18  A    No, I did not.

19  Q    Do you know who prepared this?

20  A    I do not.

21  Q    Okay.  And the information on this particular document,

22  would you have access to this information?

23  A    No, I would not.

24  Q    I direct your attention to Exhibit 16.

25  A    Okay.

Ezell - cross - Finkel                    151

1    Q    This is an e-mail that you sent with information

2    concerning wire transfers; is that correct?

3    A    That is correct.

4    Q    And you obtained -- withdrawn.

5         Did you obtain the information about wire transfers

6    yourself?

7    A    No, I did -- I obtained it.  It was in July.  Again,

8    Sonia was on vacation and I sent the e-mail to Steven and

9    Cindy, so Steven probably requested that I do this wire

10   transfer because Sonia wasn't there.

11   Q    Okay.  And to do this wire transfer, did you need to have

12   access to the Two Rivers Launch system?

13   A    No.  I could obtain this right from internet Signature

14   banking.  I was letting them aware of the wires that were

15   coming in.

16   Q    You were notifying them of wires that came in?

17   A    Correct.

18   Q    You did not do a wire transfer?

19   A    No.

20   Q    Do you recall being in this courtroom before Judge

21   Orenstein on December 14, 2015?

22   A    Yes.

23   Q    And when you left this courtroom on December 14, 2015,

24   did you receive any instructions concerning recordkeeping?

25   A    Yes.

1  Q    Can you tell us what those instructions were?

2  A    Not to delete or sabotage any computer or any records,

3  any information.

4  Q    Okay.  And since that date, since December 14, 2015, did

5  you delete any Two Rivers' information?

6  A    No, I did not.

7  Q    Did you destroy any Two Rivers' records?

8  A    No, I did not.

9  Q    Did you shred or throw away any Two Rivers records?

10 A    No, I did not.

11 Q    Why not?

12 A    Because I was told not to.

13 Q    And have you ever intentionally concealed information

14 about Two Rivers from anyone?

15 A    No.

16          MR. FINKEL:  I don't have any further questions,

17 Your Honor.

18          THE COURT:  Thank you.  Anybody else

19 cross-examining?

20          MR. SCHAFHAUSER:  Yes, your Honor.

21          THE COURT:  Okay.

22 CROSS EXAMINATION

23 BY MR. SCHAFHAUSER:

24 Q    Ms. Ezell, can you please turn to Exhibit 92.  It's an

25 exhibit that you were asked by plaintiff, your counsel and by

1   the Court as well.

2   A    Okay.

3   Q    Mr. Finkel, a few moments ago asked you about, on the

4   second page, the top of the second page, it says credit card

5   Chase 4390.  Do you see that?

6   A    Yes.

7   Q    Whose account was that?

8   A    Emil Friedman.

9   Q    So just so that I understand this exhibit, is it correct

10  that all of these credit cards on this document were being

11  advanced by Emil Friedman's account?

12  A    Yes.

13  Q    So what was this?  A line of credit?  What was --

14  A    It's a credit card that he has an extended amount of

15  credit on, but it is all under his name, his account, his

16  Social Security number, his home address.  It is his personal

17  accounts.

18  Q    And he was using his credit to have these various credit

19  cards issued in these various names; right?

20  A    Correct.

21  Q    And when you did the allocations -- we talked about it in

22  this exhibit and other exhibits.  When you did the

23  allocations, you were doing that from Mr. Friedman's account;

24  right?

25  A    Correct.

1    Q    Could you please take a look on Exhibit 8.

2    A    Exhibit 8?

3    Q    Yes.  Let's start with the first page.  The typewritten

4    information, who typed that?

5    A    It looks like it was a pre-typed form from the New Jersey

6    Department of Labor.

7    Q    I mangled the question.  Let me try again.  If you look,

8    for instance, at the words Two Rivers Coffee, LLC.  Do you see

9    where that's typed in?

10   A    Yes.

11   Q    My question is:  Were those words typed in when you

12   received this document?

13   A    Yes, it was.

14   Q    They were.  Now, who typed those words, just to stay on

15   this?

16          THE COURT:  What typed it at the New Jersey

17   Department?

18          MR. SCHAFHAUSER:  No.

19          THE COURT:  Move on.  I am sure you don't know who

20   typed it at the New Jersey Department?

21          THE WITNESS:  No.

22          THE COURT:  Okay.

23          MR. SCHAFHAUSER:  That wasn't the question.  I don't

24   think that -- well, okay.

25   Q    Do you have an understanding Ms. -- I'm not talking about

1    the form.

2    A    Okay.

3              MR. SCHAFHAUSER:  I will move on.  The Court has

4    directed me to move on.  I'll move on.

5    Q    The second page, the focus is --

6    A    Okay.

7    Q    There is handwriting and then there is typewritten

8    information.  So, for instance, just to be more specific, it

9    says order ending and then it is 3/31/13.  Do you see that?

10   A    Yes.

11   Q    And then to the left there are a number of dates that are

12   typewritten in there; right?

13   A    Yes.

14   Q    Who typed in that information?

15   A    The form is all -- it all comes from the New Jersey

16   Department of Labor.  These -- this is how it comes.  It comes

17   all pre-typed in.

18   Q    I understand.  So everything that's typewritten was not

19   typed by you; correct?

20   A    No.

21   Q    Now, at the bottom of the page -- the only thing that you

22   insert are the items in hand; is that right?

23   A    Correct.

24   Q    At the bottom of the page you say official position

25   bookkeeper; correct?

Ezell - cross - Schafhauser                    156

1   A     Yes.

2   Q     Now, did you designate for which entity you were a

3   bookkeeper?

4          THE COURT:  Look.  I'm sorry, but I really don't

5   want to have cumulative cross on the same subject.

6          MR. SCHAFHAUSER:  Very well.  I will move on, Your

7   Honor.

8   Q     Please take a look at Exhibit 15.

9   A     Okay.

10  Q     The first date, February 2, 2016, you see at the top

11  right; right?

12  A     Yes.

13  Q     At that time you were represented by counsel in this

14  case; right?

15  A     That is correct.

16  Q     I wasn't clear on your answer you gave.  Do you have any

17  recollection of sending this e-mail on that date?

18  A     No, I do not.

19  Q     Let me move on.  Thank you.

20         Exhibit 35.  Exhibit 35.  Your name is listed, and

21  then to the right under role name, it says, Executive

22  director.  Do you see that?

23  A     Yes, I do.

24  Q     Do you have any idea what that refers to?

25  A     No, I don't.

1  Q    Did you ever have a title of executive director with any

2  entity?

3  A    No, I did not.

4  Q    Do you know who put that there?

5  A    I do not.

6  Q    You were asked about the Two Rivers Launch Coffee system,

7  and I believe that you testified that you had no access to

8  that ever; correct?

9  A    No, I did not.

10 Q    Did you ever have any communications with Steven

11 Schreiber about the Two Rivers Launch Coffee system or any

12 information on that?

13 A    Not to my recollection, no.

14 Q    Did you ever have any communications with Eugene

15 Schreiber or Mayer Koenig about the Two Rivers Launch Coffee,

16 the system?

17 A    Not that I could recall.

18 Q    Did you ever have any communications with Mr. Yossi

19 Rogosnitzky about the Two Rivers Launch Coffee system?

20 A    No, I did not.

21 Q    Mr. Finkel asked you a couple of moments ago about you

22 being in court on December 14th and receiving instructions,

23 I'm not going to repeat that, but I am going to ask one other

24 question, which I don't think he asked.  As of that date, did

25 you have what you understood to be books and records of Two

1  Rivers?

2  A    Did I have?

3  Q    Yes.

4  A    No.

5  Q    Do you, sitting here today, have any books and records of

6  Two Rivers?

7  A    No.

8  Q    Did you ever, to your knowledge, withhold any books and

9  records of Two Rivers?

10 A    No.

11 Q    Please take a look, if you would --

12          THE COURT:  I'm sorry, but so I understand, the

13 documents that were made on your computer were PDFs that have

14 Two Rivers' correspondence and --

15          THE WITNESS:  It's just things that I scanned, Your

16 Honor.

17          THE COURT:  Right.  So that you don't consider those

18 things that refer to the business of Two Rivers to be records

19 of Two Rivers?  That's the basis of your understanding?

20          THE WITNESS:  That's my understanding, yes.

21          THE COURT:  Okay.  So you didn't look for Two Rivers

22 records on your computer because even though there was stuff

23 about Two Rivers on your computer, you didn't consider that

24 Two Rivers' records?

25          THE WITNESS:  Right.

Ezell - cross - Schafhauser                 159

1          THE COURT:  Okay.  I understand your testimony.
2  Very well.  Go on, sir.
3          MR. SCHAFHAUSER:  Thank you, Your Honor.
4  Q    Please take a look at Exhibit 140, which is one of the
5  two affidavits submitted.  Do you have that exhibit in front
6  of you?
7  A    Yes, I do.
8  Q    You were asked by Mr. Finkel about paragraph 10.  I don't
9  think that he asked you this question, so let me ask you.
10  Paragraph 10, is the statement set forth in paragraph 10 true?
11  A    Yes.
12  Q    And you were also asked about your son's --
13          THE COURT:  May I see you at sidebar, Counsel?
14  Please come up.
15          (Sidebar.)
16          THE COURT:  To reiterate.  Let's not go over the
17  same things that have been gone over.  We have a lot to get
18  through to complete this hearing.  The question, for the third
19  time, is a part of an affidavit that you swore to be true.  It
20  is not helpful for me to make the decision that I need to
21  make.  It is a waste of time.  I think you know that.  Please
22  avoid it if you are planning on cumulative cross.  Keep that
23  in mind as well.
24          MR. SCHAFHAUSER:  Thank you.
25          THE COURT:  Thank you, folks.

1           MR. SCHAFHAUSER:  Your Honor, may I have 30 seconds

2    to review my notes?

3           THE COURT:  Yes.

4           MR. SCHAFHAUSER:  Thank you, Ms. Ezell, nothing

5    further.

6           THE COURT:  Anybody else cross-examine?

7           MR. NELKIN:  Your Honor --

8           THE COURT:  You want redirect?

9           MR. NELKIN:  Yes.

10          THE COURT:  Very briefly, please.

11   REDIRECT EXAMINATION

12   BY MR. NELKIN:

13   Q    Ms. Ezell, could you please turn to Exhibit 37 that Mr.

14   Fink asked you about?

15   A    Okay.

16   Q    At the bottom, the is a handwritten thing, I put in

17   inventory credit re deposit error.  Could you tell me what

18   that means?

19          MR. GRANTZ:  Objection to form.

20          THE COURT:  We have been over this.

21   A    As I said yesterday, I really do not recall that.  I

22   don't remember writing that or what it is in referenced to.

23   Q    But did you put it into your computer or did someone

24   else?

25   A    It wasn't in the computer.  It was handwritten.

1    Q     Isn't inventory credit some sort of bookkeeping entry?

2    A     I don't remember this is to be honest.

3              (Continued on next page.)

Ezell - redirect - Nelkin                      162

1   MR. NELKIN:

2   Q    When Ms. Rivera wasn't there, did you access her

3   computer?

4   A    No.  This was probably from Signature Bank.  I got this

5   off the internet banking.

6   Q    What I am asking you is when Ms. Rivera wasn't in and you

7   were covering for her did you access her computer or did you

8   get stuff through your computer?

9   A    Not through my computer.  I don't have access to this.

10  Q    I'm not asking about this exhibit any more.  I'm asking

11  generally.  You said you covered for Ms. Rivera when she was

12  not there.  I'm asking you did you use your computer or her

13  computer to access whatever information?

14  A    I couldn't access the Launch system because I didn't even

15  know how to get into it.

16  Q    Did you access other information off of her computer or

17  off of your computer?

18  A    Neither computer.

19          THE COURT:  Not for this transaction.

20          THE WITNESS:  In general?

21          THE COURT:  In general.  You've testified to long

22  periods of time when Ms. Rivera is away and you're covering.

23  She has a computer?

24          THE WITNESS:  Yes.

25          THE COURT:  Do you use it in her absence?

Ezell - redirect - Nelkin                    163

1          THE WITNESS:  I did not use it.  I did not use it in

2     the Launch system.  I might have used it in corporate checking

3     but that was a while ago.

4     Q    When Jordan e-mailing you --

5     A    I was just e-mailing her deposits.  I did not go on the

6     computer.

7     Q    Where was Sonia's computer?

8     A    In her office.

9     Q    And which office?

10    A    In her own office.

11    Q    The office at 431 or the office --

12    A    In 431.

13    Q    Ms. Rivera was not in 431 for some extended period of

14    time; is that correct?

15    A    Yes.

16    Q    So how did you get information to or from her at that

17    point?

18    A    To Jordan?  Only through the internet banking.  That's

19    the only kind of transactions I was going back and forth with.

20    Q    I'm asking:  Ms. Rivera at some point moved from the

21    Bronx and moved to South Plainfield, New Jersey.  At that

22    point in time, when you are not in the same office, how did

23    you exchange information?

24    A    Exchange information to who?

25    Q    Between you and Sonia.

Ezell - redirect - Nelkin                164

1    A    I didn't exchange information between me and Sonia when

2    she was on vacation.

3    Q    Not when she was on vacation.  She spent a year away from

4    the Bronx.  Mr. Finkel asked you where you got information

5    from.  You testified you would have gotten it from Sonia?

6    A    Correct.  She would e-mail me or fax me or send me

7    information.  I didn't access through the computer.

8    Q    Okay.

9    A    She would send it to me.

10   Q    And that included by e-mail?

11   A    E-mail, fax or messenger.

12   Q    Okay.  You were asked about Mr. Ahearn's mini computer?

13   A    Yes.

14   Q    I think it was Exhibit 13.  And there was some discussion

15   as to whether that computer related to Office Coffee or not.

16   Can you clarify whether that computer related to Office Coffee

17   or not?

18   A    It did not relate to Office Coffee.  That's an e-mail.

19   It's just on the e-mail, but had nothing to do with Office

20   Coffee.  Office Coffee was about a receipt I believe for

21   payment.  That was a totally different issue.

22        THE COURT:  You're referring -- I see -- to a

23   document.  Can you identify which document?

24        THE WITNESS:  It's on Exhibit 13.  And this bottom

25   e-mail had nothing to do with me asking him to repair Jack's

Ezell - redirect - Nelkin                    165

1    computer.  It was just probably sent on the same e-mail but

2    had nothing to do with -- it had nothing to do with Office

3    Coffee and the computer.  That's what I am trying to say.

4    It's a different issue.

5    Q    It didn't relate to Mr. Nussbaum sending you something he

6    wanted you to print and you couldn't print?

7    A    No.  It had nothing to do with that, absolutely not.

8    Q    Completely unrelated?

9    A    Completely unrelated.

10   Q    Thank you.

11        Your bookkeeping for MB Fuel, did that include

12   logging in checks that are taken in by MB Fuel.

13   A    Sure, posting checks of MB Fuel, sure.

14   Q    What computer records recorded that?  Corporate checking?

15   Q    If Two Rivers payroll checks were cashed by MB Fuel,

16   would that be in your corporate system?

17   A    I don't believe so.  I don't know what you are referring

18   to.

19   Q    Do you know if Two Rivers checks were ever cashed by MB

20   Fuel?

21   A    Not to my knowledge.

22   Q    If I can show you a document.  It's one of the exhibits?

23        MR. SCHAFHAUSER:  Your Honor, we have not seen this

24   exhibit.

25        THE COURT:  Has he turned it over?

Ezell - redirect - Nelkin                    166

1          MR. NELKIN:  This is one of the ones I mentioned at

2     the beginning of the hearing.

3          THE COURT:  I told you to hand them over; did you?

4          MR. NELKIN:  No.  I didn't want to interrupt

5     Mr. Finkel.

6          THE COURT:  Please, hand them over.

7          MR. NELKIN:  Okay.

8          MR. GRANTZ:  I have an objection to this line of

9     questioning.  It is redirect.  It doesn't relate to anything

10    that was covered on cross-examination.

11         THE COURT:  I won't know until I hear the question.

12         MR. NELKIN:  I will not be asking her about them,

13    your Honor.

14    Q    Do you see these?  These are five checks and I believe

15    that they are deposited into the Signature Banking account of

16    MB Fuel transport.

17    A    Okay.

18    Q    And these are Two Rivers checks made out to a number of

19    people.  First off, do you recognize the names of any of those

20    people?

21         MR. GRANTZ:  Objection.

22         MR. SCHAFHAUSER:  I join in the objection.  This is

23    three years before the complaint was filed and has no

24    relevance to this inquiry and certainly beyond the scope of

25    cross-examination.

1          THE COURT:  Give me a proffer.

2          MR. NELKIN:  My question is what computer systems

3    would record these checks be logged in.  She testified she

4    would have logged them in into corporate I believe.

5          THE COURT:  The objection is overruled.

6          MR. FINKEL:  That's not the testimony.  The

7    testimony was not about logging in checks.  The testimony was

8    about posting checks and they are very different.

9          THE COURT:  That needs to be clarified and I'll

10   allow the questioning.

11   A    Can you repeat the question to me?

12   Q    It's my understanding that you said that you would have

13   posted checks into the corporate system and I'm asking where

14   would that system reside and where would we find that

15   information?

16   A    In corporate checking.

17   Q    That's something on your computer?

18   A    Yes.

19   Q    Is it somewhere else in your office as well or only on

20   your computer?

21   A    It's only on my computer.

22         THE COURT:  So I understand:  The logging in of

23   these checks would be on your computer?

24         THE WITNESS:  It would probably be a total deposit.

25   This is endorsed by MB Fuel Service.

Ezell - redirect - Nelkin                    168

1          THE COURT:  It's a check by Two Rivers, the first

2    one is Two Rivers to Edgar Patricio Guambana Quinde.

3          THE COURT:  That's what you have?

4          THE WITNESS:  Yes.

5          THE COURT:  That would be logged in on your

6    computer?

7          THE WITNESS:  The deposit would be put in.  I don't

8    think these individual names.  I don't recognize these

9    individuals.

10   Q    Now, one other question:  Your affidavit says that you

11   couldn't use your iPhone or your computer to log into the

12   corporate system?

13   A    No.

14   Q    The Launch system.  Sorry?

15          Could you use LogMein to log into those systems.

16   A    I've never used LogMein.

17   Q    Can I clarify that your testimony in your affidavit is

18   the same, that you never did as opposed that it can't be done?

19   A    Both.  I never did it, so I don't know if it could be

20   done.

21   Q    But you can't exclude the possibility that it could be

22   done?

23          MR. FINKEL:  Objection, your Honor.

24          THE COURT:  Overruled.  It's a simple question.  The

25   lawyers are trying to make it much more difficult than it

Ezell - redirect - Nelkin                    169

1  needs to be.  You know that you never did it?

2          THE WITNESS:  Right.

3          THE COURT:  You don't know if it can be done or

4  can't be done?

5          THE WITNESS:  It can't be done, from my iPhone to a

6  Launch system, no.

7          THE COURT:  Do you know if it can't be done?

8          THE WITNESS:  It can't be done.  Nobody ever

9  installed it.  How would it be done?

10         THE COURT:  Because it's not on your iPhone?

11         THE WITNESS:  Right.

12         THE COURT:  If it's on your iPhone and later

13 deleted, while it's on your iPhone it can be done, you don't

14 the know how?

15         THE WITNESS:  I can honestly say with respect to

16 computers I don't have a clue.

17         THE COURT:  On both sides let's not try to ask

18 Ms. Ezell things that she does not know about.  It's not

19 helping me in the decision you're asking me to make.

20 Q     The credit card that you testified about, did it have a

21 corporate name on it?

22 A     To my knowledge it might have had.  I don't remember all

23 the credit cards.  They are familiar to me.  But which ones

24 there are I don't remember offhand.

25 Q     How many credit cards did you allocate with respect to

1  Two Rivers, more than one?

2  A    There's Eugene, Steve.

3  Q    No.  I'm asking how many accounts.

4  A    How many credit cards?

5  Q    How many credit card accounts were involved?  I

6  understand there may be multiple cardholders.  I'm asking how

7  many accounts.  There's a credit card account that may have

8  multiple cardholders?

9  A    Okay.

10  Q    I'm not asking how many cardholders.  There may have been

11  one or 20.  I'm asking how many credit card accounts there

12  were.

13  A    There are several.

14  Q    Were you responsible for allocating among those?  Did

15  anyone else have responsibility for those credit cards?

16  A    No.

17  Q    And you don't know how many there were, roughly?

18  A    Can you be a little -- explain the question to me.

19  Q    I'm asking how many credit cards --

20  A    How many credit cards were used by Two Rivers?

21  Q    How many credit card accounts were used by Two Rivers

22  that you allocated charges on to them?

23         MR. SCHAFHAUSER:  Objection to the form.

24         THE COURT:  I can't understand either.  Maybe it

25  will help if you write down the question you want to ask.  You

1    tried several times and I can't understand it.

2            MR. NELKIN:  I was asking her if there was more than

3    one credit card account that Two Rivers had charges allocated

4    to it from.  I understand the answer to that is yes.

5            THE COURT:  I don't.  Because I don't understand the

6    question.

7            MR. NELKIN:  She testified there was one credit card

8    that was Mr. Friedman's personal card, a line of credit or a

9    card that he had access to.

10           THE WITNESS:  Well, it was that was the particular

11   one that was asked me, Chase 4390.

12   Q    Besides Chase, how many others like Chase 4390 were

13   there?

14   A    There were several.

15   Q    I'm asking you if you know how many.

16   A    Four or five.

17           THE COURT:  Did others, other than 4390, have cards

18   for which charges to Two Rivers could be allocated?

19           THE WITNESS:  Sometimes we used other credit cards

20   for charges, but they were not allocated to individuals.  They

21   were only Mr. Friedman's.

22   Q    But somehow Two Rivers was charged for them, for a

23   expense on them?

24   A    If the expense was used by Two Rivers, yes.

25   Q    Do you remember the numbers of those accounts?

```
                  Rivera - direct - Nelkin              172
```

1   A     No, I don't remember.

2           THE COURT:  Where would one find that?

3           THE WITNESS:  On those transactions.

4           THE COURT:  Okay.

5           Thank you Mr. Nelkin.

6           Anyone have any recross-examination?

7           THE WITNESS:  Your Honor, does this stay here?

8           THE COURT:  Yes.

9           Anybody intend to recall Ms. Ezell on the defense

10  side later?

11          MR. SCHAFHAUSER:  I don't believe so at this time,

12  your Honor.

13          THE COURT:  Okay.  So you are excused.  You are of

14  course welcome to stay at the hearing because you are a party.

15  Don't feel you have to.

16          Thank you.  Have a good day.

17          (Witness excused.)

18          THE COURT:  Your next witness.

19          MR. NELKIN:  Ms. Rivera.

20  **SONIA RIVERA**,

21      called as a witness, having been previously duly sworn,

22      was examined and testified as follows:

23          THE COURT:  Have a seat, Ms. Rivera.

24          You may inquire.

25  DIRECT EXAMINATION

Rivera - direct - Nelkin                                    173

1   BY MR. NELKIN:

2   Q    Ms. Rivera, what's your full name?

3   A    Sonia Rivera.

4   Q    Where do you reside?

5   A    1562 A Bogart Avenue.

6   Q    Who do you reside with?

7   A    My spouse and my son.

8   Q    What's your spouse's name?

9   A    Gilberto Santos.

10  Q    What's your son's name?

11  A    Randy Santos.

12  Q    How long have you resided at that address?

13  A    More than eight years.

14  Q    Do you own that or rent that residence?

15  A    Rent.

16  Q    Who do you rent it from?

17  A    John Ahearn.

18  Q    Ms. Rivera, who is Edward Rivera?

19  A    State the name.

20  Q    Edward Rivera.

21  A    I believe that's one of MB's truck drivers.

22  Q    Does he live at Bogart as well?

23  A    Next door.

24  Q    Ms. Rivera, how long have you worked -- when did you

25  start working for any of the defendants?

```
                    Rivera - direct - Nelkin              174
```

1    A    I've been working for them for over 20 years.

2    Q    Since 1996 or before then?

3    A    I don't remember the year.

4    Q    Are you currently employed by one of the defendants now?

5    A    Yes.

6    Q    Which defendant is that?

7    A    Emil Friedman.

8    Q    You work for him personally?

9    A    Coffee company.

10   Q    Which coffee company?

11   A    26 Flavors.

12   Q    But is that company owned solely by Emil Friedman?

13   A    Shlomo also.

14   Q    You said you worked for Emil Friedman?

15   A    Also.

16   Q    Does Emil Friedman control that company?

17   A    He's one of the owners.

18   Q    But is he the deciding -- does he make the decisions in

19   the company?

20        MR. SCHAFHAUSER:  Objection, your Honor.

21   A    They both do.

22        THE COURT:  Overruled.

23        I'm sorry, Mr. Finkel, is there a problem?

24        MR. FINKEL:  I'm sorry.

25        THE COURT:  You were reacting.  Is there a problem?

Rivera - direct - Nelkin                    175

1  I thought I missed something from you.  If not, that's fine.

2  Were you trying to get my attention?  That's all I'm asking.

3          MR. FINKEL:  No, your Honor.

4          THE COURT:  Go ahead.

5  Q    When did you start working for that company?

6  A    What company?

7  Q    26 Flavors.

8  A    I don't recall the year exactly.

9  Q    Was it before December of 2015?

10 A    Yes, I believe so.

11 Q    Did they pay you?

12 A    Yes.

13 Q    How did they pay you?

14 A    By check.

15 Q    Have you ever worked for Two Rivers?

16 A    Yes.

17 Q    When did you work for Two Rivers?

18 A    I don't recall the year.

19 Q    Did you work for Two Rivers in 2015?

20 A    Yes.

21 Q    Did you work for them in 2014?

22 A    Yes.

23 Q    Did you work for them in 2013?

24 A    I don't recall.

25 Q    Did you work for them -- is it that you can't recall your

Rivera - direct - Nelkin                    176

1   exact start date?

2   A    Correct.

3   Q    But you didn't start and stop working for Two Rivers; is

4   that correct?

5   A    Excuse me.

6   Q    Did you stop and start working or did you have one

7   continuous period of employment?

8   A    Can you rephrase the question?  What are you asking?

9   Q    I'm just asking you if you ever worked for Two Rivers for

10  more than -- did you start working for Two Rivers and then

11  stop and never work for them again?

12  A    Yes.

13  Q    Okay.  And you never -- but you only did that once; is

14  that correct?  You didn't work for them at two points?

15  A    No.

16            MR. GRANTZ:  Objection to form.

17            THE COURT:  Sustained.

18            He's trying to find out if you worked at different

19  periods for Two Rivers with other jobs in between.  Do you

20  understand?  Did you go back and forth?

21            THE WITNESS:  With other companies?

22            THE COURT:  Yes.

23            THE WITNESS:  At the same time, yes.

24            THE COURT:  It might be easier if you just sort of

25  walk us through the time -- you spent about 20 plus years with

Rivera - direct - Nelkin                    177

1  Mr. Friedman?

2          THE WITNESS:  Yes.

3          THE COURT:  Walk us through the jobs you've had with

4  him during that time.

5          THE WITNESS:  I started with MB Service, working in

6  the oil company.  Then Siri started training me in the

7  bookkeeping to help me assist her.  Then Mr. Friedman and

8  Eugene Schreiber and Steven asked me if I can help them with

9  the bookkeeping in the coffee and I said yes.  And that's it.

10          THE COURT:  Okay.  Was it a change of jobs during

11  these periods or just you worked for one or the other based on

12  where they needed you?

13          THE WITNESS:  Change of jobs and both, wherever they

14  need me.

15          THE COURT:  Go ahead.

16  BY MR. NELKIN:

17  Q    While you were working at Two Rivers did you work for

18  other defendants?

19  A    I might have helped, yes, Sylvia in the oil company, the

20  girl, if they needed me in anything.

21  Q    What about the coffee company?

22  A    Office Coffee.

23  Q    What about 26 Flavors?

24  A    Same thing.

25  Q    Do you view 26 Flavors and Office Coffee as one company

Rivera - direct - Nelkin                          178

1    or two companies?

2    A    I view them as two.

3    Q    Can you tell me what they do that's different?

4         MR. FELDMAN:  Objection, your Honor.

5         THE COURT:  Overruled.

6    A    I don't see anything different.  It's a coffee company.

7    Q    Do they have the same owners?

8    A    I believe so.

9    Q    Do they have the same business?

10        MR. FELDMAN:  Objection.

11        THE COURT:  Overruled.

12   A    It's coffee.

13   Q    Do they have the same personnel?

14   A    Personnel meaning?

15   Q    You're the bookkeeper for 26 Flavors?

16   A    Now I am.

17   Q    The payroll for them, is that all one?  Are there people

18   who are paid as 26 Flavors employees and as Office Coffee

19   employees or are they one or the other?  Let me rephrase.

20        The payroll that you do, do you do it for both

21   companies or just for one company.

22   A    One.

23   Q    Which company is that?

24   A    26 Flavors.

25   Q    So Office Coffee Service has no payroll?

1    A    Not currently.

2    Q    Even though this is a separate company?

3    A    Correct.

4    Q    I would like to discuss where you worked, the location of

5    where you worked.  You when you started working for Two Rivers

6    where did you work?  Where was your office located?

7    A    Bronx office.

8    Q    At some point did that location change from the Bronx?

9    A    Yes.

10   Q    Where did it change to?

11   A    South Plainfield.

12   Q    And did it change from South Plainfield at some point?

13   A    Yes.

14   Q    Where did they go?

15   A    Bronx office.

16   Q    Has there been any other place?

17   A    No.

18   Q    Now, when you started at the Bronx you had a computer?

19   A    Yes.

20   Q    What type of computer did you have?  Do you remember the

21   name?

22   A    No.

23   Q    And what happened to that computer when you left the

24   Bronx?

25   A    That computer?

```
                    Rivera - direct - Nelkin              180
```

1   Q     Yes.

2   A     When I left the Bronx?

3   Q     Yes.

4   A     To South Plainfield?

5   Q     Yes.

6   A     Took it to South Plainfield.

7   Q     And did you have more than one computer in the Bronx?

8   A     Yes.

9   Q     Okay.  What computers did you have in the Bronx?

10  A     The corporate computer.

11  Q     Corporate computer.  And on that corporate computer did

12  you -- what companies did you use that for?

13  A     24 Hour Oil, MB Service, MB trucking.

14  Q     What about Two Rivers?

15  A     Only through LogMein.

16  Q     But you did use it for Two Rivers?

17  A     To login remote.

18  Q     That computer stayed in the Bronx?

19  A     Correct.

20  Q     Besides that computer and the one you took to South

21  Plainfield, did you have any other computers?

22  A     No.

23  Q     When you used that computer to LogMein, what were you

24  logging into, the one you left?

25              MR. SCHAFHAUSER:  Objection to form.

Rivera - direct - Nelkin                    181

1     THE COURT:  Do you understand the question?

2  A    Which computer are you referring to?

3  Q    You said you had a computer in the Bronx that you left in

4  the Bronx that you used for Two Rivers' purposes using LogMein

5  and I'm asking you where did you-- when you went to that

6  computer and you used LogMein, what were you accessing?

7  A    Computer in South Plainfield.

8  Q    Okay.  And then in South Plainfield what -- did you use

9  LogMein on that computer?  Sorry.  Did you use that computer

10 in South Plainfield to log into other computers?

11 A    There was no need to.  I was in South Plainfield.

12 Q    Now, it's been represented to us that you used that

13 computer in South Plainfield to access information remotely

14 and that there wouldn't be a lot of information on it as a

15 result and I'm asking you what if anything did you access

16 remotely using that computer?

17     MR. FELDMAN:  Objection to form.

18     THE COURT:  Just ask the question.

19 Q    Did you ever use that computer in South Plainfield to

20 access another computer remotely?

21     MR. GRANTZ:  Objection, asked and answered.

22     THE COURT:  Overruled.

23 A    What are you asking me again?

24 Q    The computers in South Plainfield, did that have the

25 Launch system on it?

Rivera - direct - Nelkin                    182

1    A    Yes.

2    Q    Did it have the Launch coffee system on it?

3    A    Yes.

4    Q    Did it have any other Launch systems on it?

5    A    It had the Launch System.  That's it.

6    Q    When you got to South Plainfield how many computers did

7    you have in South Plainfield?

8    A    One.

9    Q    Did you ever use a Dell computer in South Plainfield?

10   A    I have no idea what model.  I don't know.

11   Q    Ms. Rivera, who trained you on the Launch System?

12   A    Who trained me?

13   Q    Yes.

14   A    Yossi.

15   Q    What about Ben Nussbaum?

16   A    Also.

17   Q    Do you remember who installed the Launch System on your

18   computer?

19   A    No.

20   Q    Do you have access to any Launch computer system now?

21   A    Yes.

22   Q    Which Launch System do you have access to now?

23   A    26 Flavors.

24   Q    And on what computer do you have access to that?

25   A    What computer?

Rivera - direct - Nelkin                    183

1   Q     Yes.

2   A     The computer I have in the Bronx.

3   Q     And do you have any other computers in the Bronx now

4   besides that one?

5   A     There's a new computer that was purchased recently, which

6   I don't use.  It's just sitting there.

7   Q     Ms. Rivera, do you use your iPhone for Two Rivers'

8   purposes?

9              MR. GRANTZ:  Objection to form.

10             THE COURT:  Overruled.

11  A     Only if I happen not to be in the office and they happen

12  to text or call me, ask me a question, I would log in to my

13  e-mail.

14  Q     So your e-mail is on your phone?

15  A     Well, I would log in.  I don't keep it on the phone.  I

16  would just log into Yahoo.

17             THE COURT:  You said you respond to texts?

18             THE WITNESS:  Well, if Steve or one of the owners

19  would text me, if they needed for me to call them or ask me a

20  question.

21             THE COURT:  I think I misunderstood your answer.  If

22  you get a text, you respond by text?

23             THE WITNESS:  Yes.

24             THE COURT:  Okay.  Got it.  Go ahead.

25  BY MR. NELKIN:

1    Q    When you worked for Two Rivers, Ms. Rivera, were you

2    salaried employee or an hourly employee?

3    A    I believe I was hourly.

4    Q    Did you bill Two Rivers for overtime?

5    A    Billed?

6              MR. FINKEL:  Objection, your Honor.

7              THE COURT:  Overruled.  She can answer.

8    Q    Did they pay you overtime?

9    A    If I had overtime, yes.

10   Q    Did you have to clock in?

11   A    Yes.

12   Q    Ms. Rivera, what were your job responsibilities for Two

13   Rivers?

14   A    Basic bookkeeping duties.

15   Q    Can you elaborate or what type of bookkeeping duties you

16   had?

17   A    Mainly accounts payable.

18   Q    Did you do accounts receivable?

19   A    Yes.

20             THE COURT:  Ms. Rivera, just so you understand, I,

21   for instance, know nothing about bookkeeping.  I asked you if

22   you would tell the whole truth.  If you are asked to describe

23   something and there are many things that are responsive, list

24   all of them rather than making somebody ask you and what else

25   and what else, because that way I'll know you are telling me

Rivera - direct - Nelkin                           185

1    the whole truth.

2          Start from the beginning.  Describe your duties as a

3    bookkeeper.

4          THE WITNESS:  Daily balances, wire payments were

5    needed, incoming wires, pay vendors, payroll.

6          THE COURT:  That's it?

7          THE WITNESS:  Basically it.

8    Q    Did your job involve check printing?

9    A    Accounts payable is check printing.

10   Q    And where were those checks printed?  What computer did

11   you use to print those checks?

12   A    Wherever I was stationed.

13   Q    You could have printed them in the Bronx or you could

14   have printed them in South Plainfield?

15   A    Correct.

16   Q    Was this a network that allowed you to be in South

17   Plainfield and print in the Bronx?  Did you have to be at the

18   same location as the check?

19   A    No.

20   Q    So you could sit at a location like the Bronx, request a

21   check to be printed and it would print on some other computer?

22   A    Printer.

23   Q    Printer.  Sorry.

24   A    Yes.

25   Q    And what printers were hooked into that system?

Rivera - direct - Nelkin                    186

1    A    The Bronx and Jersey.

2    Q    Was there just one check printer at each location?

3    A    Where I was printing, there was one in the Bronx and one

4    in Jersey.

5    Q    Was the printer in New Jersey in your office or in

6    someone else's office?

7    A    You are asking -- where am I situated at the moment?  You

8    are asking me a question.  Where am I when you are asking this

9    question?

10   Q    When you were located in South Plainfield and your office

11   was in South Plainfield, was the check printer in your office?

12   A    Yes.

13   Q    Do you know of any other location in South Plainfield

14   where a check printer was hooked up to a computer that you

15   were telling it to print a check besides your office?

16            MR. GRANTZ:  Objection to form.

17            MR. NELKIN:  I'm sorry.  I'll withdraw that

18   question.

19            THE COURT:  Yes.

20   Q    Ms. Rivera, I would like you to turn to Exhibit 35?

21            MR. GRANTZ:  Judge, can we a two-minute break?

22            THE COURT:  Yes.  Let's make it a ten-minute break.

23            (Recess taken.)

24            (Continued on next page.)

25

Rivera - direct - J. Nelkin                187

1          MR. PARNESS:  As I announced on the first day, I'm

2     representing two of the third-party witnesses who were

3     subpoenaed and I'm standing by as representative of the

4     company.  It's the view of this side of the room I'm not

5     serving much purpose here today and I'd identify ask the

6     Court's permission to be excused with the consent of the

7     parties

8          THE COURT:  Anyone think we'll get to Mr. Parness'

9     witnesses today?

10         MR. SCHAFTHAUSER:  It's his show.  It doesn't seem

11    like it, your Honor.

12         THE COURT:  Okay.

13         MR. SCHAFTHAUSER:  I would just like to raise one

14    issue, with respect.  It's my understanding that counsel

15    represented Two Rivers in the past and interacted with

16    Mr. Friedman in that capacity, dealt with Mr. Friedman.  I

17    question whether there's a conflict that would preclude him.

18         THE COURT:  When that question turns into a request

19    for relief, I'll hear you.

20         But you're excused for now.

21         MR. PARNESS:  Thank you.

22         THE COURT:  In terms of the schedule, you guys

23    listed a whole lot of witnesses.  I don't see how we're

24    getting through it in the time we've allotted, so we're going

25    to need to return at the end of the day to scheduling issues

1   as to how to continue.

2          And on the schedule, I don't know if you've got

3   issues with Sabbath observance tomorrow, but my intention is

4   to go to 3:45 and then stop.

5          Mr. Nelkin, you may continue.

6   BY MR. NELKIN:

7   Q    Ms. Rivera, if you could turn to Exhibit 35, do you

8   recognize what computer system that's a screen shot from?

9   A    No.

10  Q    You don't recognize that as a Launch Coffee screen?

11  A    I've never seen this before.

12  Q    Look at the top right by where it's hole-punched, you'll

13  see purchases and expenses, payroll, loans, management report

14  tab at the top?

15  A    Okay, I see that.

16  Q    Does that recollect your memory as to --

17  A    Yes.

18  Q    So, is this a Launch Coffee screen?

19  A    It can be a tab, but I've never been in it.

20  Q    But does Launch Coffee have those similar tabs at the

21  top?

22  A    On the top, yes.

23  Q    So, it's your recollection that you've never seen this

24  screen before?

25  A    Never been on this tab before.

1  Q    Ms. Rivera, on this thing it has an e-mail listed for
2  you?
3  A    My personal e-mail.
4  Q    How many e-mails do you have?
5  A    I have the Two Rivers.
6  Q    What is that e-mail?
7  A    Soniatworivercoffe@yahoo.com.
8  Q    Is coffee spelled fully out?
9  A    With one "E".
10 Q    Do you have any other e-mails besides that one and the
11 one listed here?
12 A    No.
13 Q    Do you have any knowledge of the names where it says
14 "role names," such as administrator, executive director, what
15 that means within the Launch system?
16 A    Excuse me?
17 Q    Do you have any knowledge as to what it means to be an
18 executive director in the Launch system?
19 A    No.
20 Q    Ms. Rivera, is that your phone number next to --
21 A    That's my cell phone.
22 Q    Ms. Rivera, who else had access to the Launch Coffee
23 system that you're aware of?
24 A    When you say who else?
25 Q    Please tell me the names of each person that you know who

1   could access the Launch Coffee system.

2   A    Emil Friedman, Eugene Schreiber, Steven Schreiber, Israel

3   Koenig, Vincent Papa, Isaac.

4   Q    Do you know what Isaac's last name is?

5   A    No.

6   Q    Anyone else?

7   A    Jordan.

8   Q    What about Chris Yaede?

9   A    I don't know if she had access.

10  Q    What about Michelle Rosado?

11       I'm not asking you based on this document, I'm just

12  asking if you knew Michelle Rosado had --

13  A    Yes.

14  Q    Ms. Rivera, do you know if people had different levels of

15  access within Launch, meaning could some people see a larger

16  part of the system and other people see a smaller part of the

17  system?

18  A    I don't know.

19  Q    You have no idea as to -- could you see the entire Launch

20  Coffee system?

21  A    I could see where if I hit the tabs, where I was allowed

22  to -- wherever I had to go do part of my job duties.  I didn't

23  explore the system.

24  Q    Was there any time that you were denied access to the

25  system or to any...

1    A    I don't recall.

2    Q    Was there any part of the system that you remember being

3    denied access to?

4    A    I don't recall.

5    Q    Could you turn to Exhibit 77, please?

6    A    You said 77?

7    Q    Yes.  Do you recognize that screen shot?

8    A    I recognize the icons.

9    Q    What are the icons on the right column, starting from the

10   top?

11   A    26 Flavors, Office Coffee New, Office Coffee Old, Perfect

12   Samplers.

13   Q    Let me be more specific.  The first one, the Launch 26

14   Flavors, what does that access?

15   A    The company 26 Flavors.

16   Q    The Launch system for them?

17   A    For them.

18   Q    And what kind of records would we find on the Launch

19   system?

20        Would they be the same type of records for each

21   company?

22        MR. SCHAFTHAUSER:  Objection, your Honor.

23        THE COURT:  I don't understand the objection.

24        What's the problem with the question?

25        MR. SCHAFTHAUSER:  The objection -- well, the

1   objection is the same type of form of records or same

2   information on the records?  That's the objection.

3          THE COURT:  Do you understand what he's asking?

4          THE WITNESS:  No.

5   Q    Did each Launch Coffee system have the same tabs on it?

6          MR. FINKEL:  Objection, your Honor.

7          THE COURT:  Overruled.

8   A    I'm not sure.

9          THE COURT:  Have you used multiple versions of

10  Launch for these different companies?

11         THE WITNESS:  I mean, it's the Launch system, but

12  right now I can't remember if we had the same tabs or not.

13         THE COURT:  Is it essentially the same?

14         THE WITNESS:  It's similar, yeah.

15         THE COURT:  To the extent you know, what's different

16  from one company's Launch to another company's Launch, if

17  there's any difference?

18         THE WITNESS:  Two Rivers might have inventory,

19  whereas probably 26 Flavors Office might not.

20         THE COURT:  Why not?

21         THE WITNESS:  I don't know if they took inventory or

22  not.

23         THE COURT:  Okay.

24         THE WITNESS:  I know Two Rivers had a warehouse

25  downstairs, pretty sure they had inventory.

Rivera - direct - J. Nelkin                    193

1          THE COURT:  Okay.

2    Q    Could you access the 26 -- the first one for those, was

3    that on your computer, Launch 26 Flavors, that icon?

4          MR. FINKEL:  Your Honor, objection.  Can we have a

5    time frame please?

6          THE COURT:  Ever.

7    A    Can you ask the question again?

8    Q    I believe you testified that you recognized the first

9    icon, Launch 26 Flavors, and I'm asking if that was on your

10   computer.

11   A    When?

12   Q    Ever.

13   A    I remember logging into Office Coffee.

14         THE COURT:  You know, it's somewhat difficult to

15   understand what the problem is here.  He's asking if you've

16   ever had that Launch on the computer.  By asking "when," the

17   suggestion to me at least is well, I know I had it at some

18   point.  I want to know what time period you're asking about.

19         So, if you could just give a straight answer yeah,

20   I've had it, here's when I did, here's when I didn't, it would

21   be helpful because I'm just trying to figure out what's going

22   on here.

23         THE WITNESS:  Okay.

24         THE COURT:  Why don't you try again?

25   Q    Did you ever of Launch 26 Flavors, the icon, on your

1    computer?

2    A    Yes.

3    Q    Do you remember when you had it?

4    A    No.

5    Q    Do you remember when that started?

6    A    No.

7    Q    Did you have it when you were working for Two Rivers?

8    A    I don't recall.

9    Q    Can you tell me what the difference is between Launch

10   Office Coffee New and Launch Office Coffee Old, which are the

11   next two icon?

12   A    Launch Office Coffee Old was information brought from the

13   corporate computer.  Launch Coffee New was the one that I was

14   working currently on.

15   Q    And did you have both of those icons on your computer

16   ever?

17   A    Now.

18   Q    What about when you were at Two Rivers?

19   A    I don't recall.

20   Q    One of those is a Two Rivers Office Launch, isn't it?

21   A    Excuse me?

22         MR. FINKEL:  Objection to form.

23         THE COURT:  Overruled.

24   Q    What coffee Launch system did you use at Two Rivers?

25   A    The Launch Two Rivers.  It's not displayed on this

1    exhibit.

2    Q    Okay.  So that's a separate one for Launch Two Rivers?

3    A    Correct.

4    Q    Was there a separate old and new for Two Rivers?

5    A    No.

6    Q    So, there's only one Two Rivers launch.

7    A    Yes.

8    Q    Did Two Rivers ever use corporate's?

9    A    Corporate?  Yes.

10   Q    So, in the Two Rivers system both corporate's and was on

11   the Launch system in one unit?

12           MR. GRANTZ:  Objection to the form.

13           THE COURT:  Rephrase that, please, because I didn't

14   understand.

15   Q    You're telling me Launch Office Coffee New and Launch

16   Office Coffee Old, one was the corporate systems and one was a

17   new system; is that correct?

18           MR. GRANTZ:  Objection, your Honor.

19           THE WITNESS:  I don't understand what he's asking.

20           MR. GRANTZ:  I think it was a mischaracterization of

21   the testimony.

22           THE COURT:  What's the difference between old and

23   new for the Launch Coffee?

24           THE WITNESS:  Launch Coffee Old, the information was

25   transferred from the corporate system, the old corporate

1   bookkeeping that I used to use.  That was for Office Coffee

2   only.

3            And the Office Coffee New was when I started the

4   books for Office Coffee, the new books.

5            THE COURT:  Which was about when, roughly?

6            THE WITNESS:  2014.

7            THE COURT:  Go ahead.

8   Q    So, in 2014 you were doing the books for Office Coffee?

9   A    Entering deposits.

10  Q    Were you doing anything else for them?

11  A    Wire payments.

12  Q    Were you doing the same things that you did for Two

13  Rivers in 2014?

14  A    Not all.

15  Q    What were you not doing for Office Coffee that you were

16  doing for Two Rivers?

17  A    I wasn't doing payroll at the beginning, no invoicing,

18  partial billing, I entered deposits, I entered wires.

19  Q    Was Two Rivers -- did Two Rivers use corporate?

20  A    Yes.

21  Q    Was Two Rivers corporate information ever transferred to

22  another system the way Office Coffee's corporate's information

23  was?

24  A    Yes.

25  Q    And when they did that, did they create two icons like

1    they did for an old and a new?

2            MR. GRANTZ:  Objection to form.

3            THE COURT:  Overruled.

4    A    I don't recall two icons.

5            THE COURT:  So, old information and new information

6    could be accessed from a single icon.

7            THE WITNESS:  Yes.

8            THE COURT:  Do you know what the name of the icon

9    was?

10           THE WITNESS:  I believe it said Two Rivers.

11           THE COURT:  Go ahead.

12   Q    And when you -- how did you access Launch Coffee?

13           Did you just press the icon?  Do you have to put a

14   password in?

15   A    I press the icon.

16   Q    There was no password associated with it?

17   A    Then it would ask for -- I believe it asked for a user

18   ID.

19   Q    What was your user ID?

20   A    I haven't been allowed to use it in so long.  I think it

21   was Sonia.

22   Q    Do you remember what your password was?

23   A    Cafe9474.

24   Q    Did you have a LogMeIn password?

25   A    Yes.

1  Q     Did you have a LogMeIn user name?

2  A     I believe I did.

3  Q     Do you remember what either of those were?

4  A     No.

5  Q     Did you use any other system besides the Launch, the Two

6  Rivers Launch system, to do your bookkeeping work?

7  A     Before the Launch?

8  Q     Yes.

9  A     Corporate.

10 Q     Did you do -- did you create any reports when you did

11 that?

12 A     Yes.

13 Q     And how did you save those reports?

14 A     In the corporate, you wasn't able to save the reports,

15 you printed them.  It's an old system.

16 Q     If you wanted to send a corporate report to somebody, how

17 would you do that?

18 A     Scan.

19 Q     And then send it as an attachment?

20 A     Correct.

21 Q     Did you do that?

22 A     Yes.

23 Q     And did you save hard copies of it when you did that?

24 A     Yes.

25 Q     And what did you do with the copies that you saved?

1    A    After I went over with the owners individually what they

2    wanted me to pay, shred them.

3    Q    So, then, the only remnant would be the electronic

4    versions that you saved?

5    A    Really didn't save.

6    Q    Well, you said that you scanned them to your computer.

7    A    Yes, but I would override that for the next report.  I

8    didn't keep opening files to save the report; I would

9    override, use the same file.

10   Q    Ms. Rivera, wouldn't you save it as a PDF file?

11   A    Yes.  But you can select the file, file name, and I would

12   override the same one and use the same one.

13   Q    So that you would replace the file?

14   A    Correct.

15   Q    When you sent it, did you send it by e-mail?

16   A    Yes.

17   Q    So a record of that would be in the e-mail traffic; is

18   that correct?

19   A    If you go under "sent," yes.

20            THE COURT:  Sorry if this is a digression.

21            Just out of curiosity, why are you not saving this

22   information in some more readily accessible form?

23            Don't you need to go back and look over these

24   records just for tax purposes or other reasons from time to

25   time?

1   A    Each individual to have a copy of it, it would be 20 to

2   30 pages.  After they would notify me and tell me which vendor

3   they wanted me to pay, I would issue a check and then shred

4   the report.  There was no need for me to keep it.

5            It might have stayed around the office somewhere.

6            THE COURT:  But you didn't want to have --

7            THE WITNESS:  So much paper for what?

8            THE COURT:  You're not able to look back to see

9   transactions in any way?  Like we paid So-and-so so much?

10           THE WITNESS:  You can go into the system and see who

11  you paid, when you paid.

12           THE COURT:  So, it does maintain --

13           THE WITNESS:  It maintains it, stores it yes.

14  Q    Was that your standard practice at Two Rivers, to

15  override the reports you generated?

16  A    I would send the reports weekly, yes.

17  Q    So, each week you would discard or override the report?

18  A    Yes.

19  Q    I'd like you to turn to Exhibit 46.

20           Do you recognize that screen?

21  A    No.

22  Q    Do you see above the place where you type in your name it

23  says Sonia?

24  A    Right below Dell?

25  Q    Yes.

1    A    That's not how I spell my name.

2    Q    I understand it's not how you spell your name, but did

3    you ever use a log-in or any other computer-related accessing

4    point where you used it?

5    A    No.

6    Q    You never used the name -- there was nothing at Two

7    Rivers or any other company where your name was misspelled as

8    S-O-N-Y-A?

9    A    I don't recall.

10   Q    Can you turn to Exhibit 113?

11        Ms. Rivera, I'll represent to you that this is taken

12   on a computer that was assigned to you.

13   A    Okay.

14   Q    Does that screen look familiar to you?

15   A    No.

16   Q    You have no idea what Park Ave. Associates/Sonia is

17   logged on?

18   A    No.

19   Q    Were there any other Sonias at Two Rivers that you're

20   aware of?

21        MR. SCHAFTHAUSER:  Your Honor, I have to object.

22   The representation, is there a date on which this was done?

23        THE COURT:  She's answered the question.  He's

24   asking a new one.

25        MR. SCHAFTHAUSER:  Very well.

Rivera - direct - J. Nelkin                202

1  Q    Was there any other Sonia that you're aware of at Two

2  Rivers?

3  A    No.

4  Q    Was there any other Sonia at any of the defendants that

5  you're aware of?

6  A    No.

7  Q    You did payroll for Two Rivers, correct?

8  A    Correct.

9  Q    And you don't remember a Sonia.

10        Did anybody else have the ability to log in to your

11  computer remotely?

12  A    Remotely?

13  Q    Yes.

14  A    No.

15  Q    So, you're the only one that could log in to your

16  computer remotely?

17  A    Remotely?  Yeah, me.

18  Q    And you testified you had to have a password to log in --

19  did you have to have a password to log into your computer?

20  A    No.  You needed a user ID and a password for the Launch

21  system.

22  Q    If you could turn to the next page, you have no

23  recollection of this screen?

24  A    No, only the LogMeIn.  But the bottom, no.

25  Q    What do you remember about the LogMeIn?

Rivera - direct - J. Nelkin                    203

1   A    It was an icon on the computer in the Bronx that said

2   LogMeIn and I would just enter the user ID and password.

3        But I couldn't see what's here, what you see here.

4   Q    Okay.  Turn to the next page.

5        Do you have any recollection of your computer

6   looking the way this screen looks?

7   A    No.

8   Q    Turn to the next page, please.

9        Do you recognize that screen shot?

10  A    Yes.

11  Q    I didn't hear you.

12  A    Yes.

13  Q    What is this?

14  A    Office Coffee Service, the bank transaction list.

15  Q    And is this in the -- which system is this in?

16  A    Office Coffee Launch.

17  Q    Old or new?

18  A    I wouldn't know.

19  Q    Do they look the same?

20  A    Similar.

21  Q    And did you have access to Office Coffee Service through

22  Launch?

23  A    Yes.

24  Q    And did you have it while you were at Two Rivers?

25  A    Yes.

Rivera - direct - J. Nelkin                204

1   Q    If you can turn two more pages, you'll start seeing dates

2   at the top that say South Plainfield.

3          In January 28, 2015, was your office located in

4   South Plainfield or in the Bronx?

5   A    South Plainfield.

6   Q    Did you ever log in to your computer from the Bronx --

7   I'm sorry, did you ever log in to your computer remotely, your

8   South Plainfield computer remotely?

9          When your office was located in South Plainfield,

10  did you log into that computer remotely?

11  A    Why would I log in remotely if I'm sitting -- I don't

12  understand what you're asking.

13          THE COURT:  The question is when you had a computer

14  in South Plainfield, did you ever log in remotely to that

15  South Plainfield computer?

16          THE WITNESS:  No.

17          THE COURT:  Okay.

18          THE WITNESS:  I mean, the icon is there.  You just

19  click on it and go.

20  Q    Did you ever work from home?

21  A    No.

22  Q    If you could turn to Exhibit 118, I'd like you to turn to

23  the third page -- I'm sorry, yeah, the third page.

24          Do you recognize that screen shot?

25  A    We're looking where it says:  Payroll, Sonia Rivera?

1   Q    Yes.  You recognize that screen shot?

2   A    Yes.

3   Q    What is that?

4   A    Payroll record.

5   Q    For which company?

6   A    Two Rivers.

7   Q    And if you look at the last entry under applied dates --

8   it's the second column --

9   A    Applied dates?

10  Q    Yes.

11         -- how many hours did you bill on that day?

12  A    I didn't bill anything.  These are my clock-in hours.

13         THE COURT:  I'm sorry, I don't understand the

14  answer.

15         THE WITNESS:  He said what did I bill.

16         THE COURT:  No.  What's the difference between

17  billing and clocking in?

18         THE WITNESS:  Billing is when you bill someone for

19  something specific.  This is payroll.  I don't consider this

20  billing.

21         THE COURT:  But you were paying being paid for a

22  certain number of hours worked, right?

23         THE WITNESS:  Correct.

24         THE COURT:  How many?

25         THE WITNESS:  Total here, 46.78.

1   Q    Tell me what you billed on Christmas Eve, 12/24?

2   A    8.03.

3   Q    And, so, it's your testimony you would have to clock in

4   and clock out to do that?

5   A    Correct.

6   Q    Did you ever work after Two Rivers was closed?

7        I mean where the office had an official closing

8   time, did you stay late?

9        MR. FINKEL:  Objection, your Honor.

10       MR. GRANTZ:  Relevance.

11       MR. FINKEL:  It's outside the scope of the hearing.

12       THE COURT:  What's the relevance?

13       MR. NELKIN:  I'm just trying to get into how the

14  clocking system worked.

15       THE COURT:  That's what I figured.

16  Q    If Two Rivers happened to close that day at 2 o'clock for

17  instance, could you have stayed later and clocked out

18  afterwards?

19  A    I would only have stayed if they asked me to do something

20  for them.

21  Q    I guess my question really is did you have the ability to

22  stay after the building closed and clock out?

23  A    Yes.

24  Q    Now, the clock system, was it automatic or did you have

25  to key it into Launch somehow?

1          How did the clock hours get into Launch?

2    A    I had nothing to do with the clock.

3          THE COURT:  Maybe walk me through it.  You're

4    clocking in and clocking out.  Physically, what do you do?

5          How do you let somebody or the computer system know

6    when you're clocked in and when you're clocked out?

7          THE WITNESS:  By finger.

8          THE COURT:  There's a device you put your

9    fingerprint on?

10         THE WITNESS:  Exactly.

11   Q    How did the information get into the Launch system?  Who

12   entered that?

13   A    Excuse me?

14   Q    Who entered the information into the Launch system for

15   payroll?

16   A    Mr. Friedman.

17   Q    Mr. Friedman.  Okay.

18         And you then used that to generate payroll?

19   A    Correct.

20   Q    Was there an ability to alter an entry if you felt it was

21   incorrect?

22   A    I don't know.  All I did was generate payroll.

23   Q    So, you never --

24   A    I click on a tab that says generate payroll and that was

25   it.

1  Q    You never adjusted the hours?

2  A    No, I didn't adjust hours.

3  Q    Do you know if anyone did adjust hours?

4  A    I don't know.

5  Q    Do you know what computer the time information was kept

6  on?

7  A    Excuse me?

8  Q    What information -- what computer was the time

9  information recorded on?

10        Like, there's a clock and it's gathering

11  information.  How is it stored?

12        MR. GRANTZ:  Objection.

13  A    I don't know.

14  Q    If you could just turn to the last page -- sorry, second

15  to last page of Exhibit 118, does this show you were out of

16  the office on January 28?

17  A    If it shows that I was out of the office?

18  Q    Well, there's clock-in time for all of the other places

19  but there's not a clock-in time for -- clock-in or -out for

20  January 28 for you.

21  A    I don't know if I was out of the office.  I might have

22  forgot to clock in or out, but I don't know.

23  Q    Well, let me ask you this:  If you didn't clock in and

24  you didn't clock out and yet it's recording 10 hours and 30

25  minutes for your work time, how did that work time get

1    entered?

2    A    We would only notify Mr. Friedman of our -- if we forgot

3    to clock in or out.

4    Q    And then what would he do?

5    A    I don't know.

6    Q    So, it's your testimony that you cannot say for sure that

7    you were in or out of the office on the 28th?

8    A    No.

9    Q    You said that you were paid hourly.  Did you have any

10   vacation time?

11        MR. FINKEL:  I'm sorry, didn't hear that.

12   Q    Did you have any vacation time?

13   A    I had days.

14   Q    How many days did you have per year?

15   A    I was entitled to four weeks.

16   Q    Was that from Two Rivers?

17   A    That was the agreement when I came from MB Service.

18   Q    How is that vacation time allocated among the companies?

19   A    Among which companies?

20        MR. GRANTZ:  Objection to form, foundation.

21        THE COURT:  Lay a foundation.

22   Q    When you were at Two Rivers, did you have vacation time

23   from any other company?

24   A    When I was physically in South Plainfield?

25   Q    Yes.

Rivera - direct - J. Nelkin                210

1    A    From any other company?  No.  Two Rivers.

2    Q    Now, I'm a little confused.  You said that you were at

3    Two Rivers but you were doing work for other companies while

4    you were at Two Rivers, and I believe you testified earlier

5    that you were paid by other companies as well.

6         Can you explain how you allocated your time?

7    A    There was an agreement between Mr. Friedman and Eugene.

8    Q    And what was that agreement, as you understood it?

9    A    You have to speak to them.

10        THE COURT:  He's asking what you understood the

11   agreement to be.

12        THE WITNESS:  That I could help other companies as

13   they would need me.  We worked together as a team.  If Sylvia

14   needed me, I would help her; if the girls at the auto company

15   would need me, I would help them.  Eugene and Steve were aware

16   of that at all times.

17   Q    Ms. Rivera, I'd like to ask you about an exhibit that was

18   handed up beforehand.  I don't know if it's still there, 135?

19   A    135.

20   Q    You said you were in charge of payroll for Two Rivers?

21   A    Correct.

22   Q    Was there anyone else who had any payroll

23   responsibilities at Two Rivers?

24   A    What type of responsibilities?

25   Q    Did anyone else do anything related to payroll at Two

1   Rivers or did you handle it all?

2   A    Mr. Friedman handled the hours.

3   Q    Who handled the check writing?

4   A    I did.

5   Q    Do you recognize the names on these checks?

6   A    Yes.

7   Q    Who were those people?

8   A    Employees of Two Rivers.

9   Q    Do you know what they did for Two Rivers?

10  A    I believe these were the gentlemen that did the

11  construction in South Plainfield.

12  Q    And how long did the construction last; do you know?

13  A    No.

14  Q    Ms. Rivera, where were the payroll records for Two Rivers

15  stored?

16  A    The computer.

17  Q    Were there hard copies of those records?

18  A    Payroll reports, yes.

19  Q    Where were those stored?

20  A    South Plainfield.

21  Q    I'd like you to turn to Exhibit 61, if you could.

22       Ms. Rivera, do you recognize the address 33 Saint

23  Nicholas Avenue?

24  A    Yes.

25  Q    Whose address is that?

1   A    Mr. Friedman's.

2   Q    Is it also Two Rivers' address?

3   A    Mailing purposes.

4   Q    Mailing purposes.

5         When you have say "mailing purposes," what do you

6   mean?

7   A    When they were in Passaic and they moved, the agreement

8   was that Mr. Friedman would put his address so we wouldn't

9   lose the mail until the construction was done, and he had some

10  documents mailed to his home address.

11  Q    Do you know if it was the registered address, the

12  official registered address with the state?

13  A    I don't know.

14  Q    Can you turn to the second page?

15        I'll represent to you that this is something -- I'm

16  not going to read it to you, but, basically, it's --

17        THE COURT:  Forget the representations, please.  If

18  you have a question, ask it.

19        MR. NELKIN:  Fine, fine.

20  Q    Where does it say the location of the payroll records

21  will be maintained?

22  A    340 Fifth Avenue.

23  Q    At whose office?

24  A    Michael Devine's.

25  Q    Do you know if that was actually done?

1  A    He had weekly payroll records I would forward to him on a

2  weekly basis.

3           THE COURT:  This is what we were talking about

4  before about giving me complete answers.

5           THE WITNESS:  Yes, they were in both.

6           THE COURT:  Going forward, please, if you have

7  something in your mind to answer, give me the whole answer

8  because, otherwise, I think why didn't she tell me that

9  before?

10          And I know you're trying your best.  So, please give

11  me the whole answer each time okay.

12          THE WITNESS:  I see.  Yes.

13          THE COURT:  Thanks.

14  Q    Just walk me through the payroll process and how records

15  were sent to Devine and how records were stored at Devine.

16  A    I would run a weekly report on payroll, I would keep a

17  copy in the file for Two Rivers, and I would forward him a

18  copy.

19  Q    When you say you would keep a file, a copy in the file,

20  is that a hard copy?

21  A    Yes.

22  Q    And what about on your computer?

23  A    If it was scanned, yes.  If it was forwarded from the

24  system itself through Outlook, it's in the system.

25  Q    And do you know what Mr. Devine did with those records?

Rivera - direct - J. Nelkin                214

1    A    No.

2    Q    Who assisted at Mr. Devine's office in the payroll

3    process?

4    A    Sophie.

5    Q    And what did she do?  What was her contribution to the

6    process?

7    A    She was Mr. Devine's assistant, or is.

8    Q    What task did she perform and what tasks did you perform?

9    A    I cc her in most of the e-mails from Michael Devine.  And

10   if she needed to ask me anything regarding payroll or anything

11   regarding the employees, she would e-mail me.

12   Q    Now, those records, did you overwrite those as well?

13   A    If they were scanned, yes.

14

15              (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Rivera - direct - Nelkin                              215

1   DIRECT EXAMINATION CONTINUES

2   BY MR. NELKIN:

3   Q    When someone had a payroll issue, like they work an hour,

4   a regulatory issue, who did you contact -- were you contacted

5   about that?

6   A    What type of issue?

7   Q    Well, did payroll -- were there ever regulatory payroll

8   issues?

9   A    What type of issues?

10  Q    Did the State ever contact Two Rivers about anything

11  related to payroll?

12  A    If I would receive in the mail a letter from the

13  Department of Buildings, at the beginning I didn't know much

14  about it, I would ask for Sylvia's assistance.

15  Q    Okay.  And what did Sylvia do for you?

16  A    She would fill out the answers for me and forward it to

17  me and give it to me and then I would mail it out.

18  Q    Ms. Rivera, did you ever have iPad?

19  A    Yes.

20  Q    Do you use that for Two Rivers' purposes?

21  A    If they happened to text me or call me or e-mail me and I

22  was out of the office at the time, I would like log in and try

23  to answer their questions.

24  Q    And what happened to that iPad?

25  A    I think it broke or I got rid of it by 2015.

Rivera - direct - Nelkin                    216

1   Q    And did you save the information that was on it in any

2   way?

3   A    No, I just logged in to look at the e-mail or forwarded

4   anything that they needed.

5   Q    Was it in 2015 or --

6   A    It might have been around the summer of 2015.

7         THE COURT:  Excuse me for a moment.  When you say

8   log in, you would log in to the Yahoo e-mail account?

9         THE WITNESS:  Yes.

10         THE COURT:  But you are not logging into a computer

11   system at the company?

12         THE WITNESS:  No.

13         THE COURT:  Go ahead, Mr. Nelkin.

14   Q    Ms. Rivera, what computers do you have at your house?

15   A    Computers?

16   Q    Yes.

17   A    My son has a laptop, a Mac, an Apple.

18   Q    Do you ever use that computer?

19   A    No.

20   Q    So do you -- you have no other computers at your house?

21   A    No.

22   Q    Ms. Rivera, do you know if Mr. Friedman had an iPad?

23   A    No.

24   Q    If you could turn to Exhibit 84.

25   A    84?

Rivera - direct - Nelkin                              217

1  Q     I apologize.  Exhibit 98.

2           THE COURT:  Did you say 98?

3           MR. NELKIN:  Wait one second.  I apologize.

4  Exhibit 83.

5  Q     Ms. Rivera, can you tell me what -- is that your e-mail?

6  A     Yes.

7  Q     Is this -- the way that I read this is that you have been

8  asked about a charge and you are explaining this from Emil's

9  iPad; is that correct?

10 A     Correct.

11 Q     Does that jog your recollection as to whether Mr.

12 Friedman had an iPad?

13 A     When Eugene asked me this, I called Emil and asked him

14 and he said tell them it's my iPad.  So that's what I wrote,

15 Emil's iPad.

16 Q     Okay.

17          THE COURT:  I'm sorry, I got lost.  But you said

18 before Mr. Friedman didn't have an iPad.

19          THE WITNESS:  Never seen him.  But in this e-mail,

20 Eugene was asking about a charge.

21          THE COURT:  Okay, but you don't think -- it was

22 referring to something that wasn't an iPad?

23          THE WITNESS:  I have no idea.

24          THE COURT:  He told you the iPad --

25          THE WITNESS:  He just told me it was for my iPad.

Rivera - direct - Nelkin                    218

1          THE COURT:  Okay.  Got it.

2    Q    Now, were you responsible for paying Two Rivers'

3    expenses?

4    A    Yes.

5    Q    So did you pay for this expense?

6    A    Yes.

7    Q    So Two Rivers was paying for Mr. Friedman's iPad?

8          MR. SCHAFHAUSER:  Objection to form.

9          THE COURT:  Overruled.

10   Q    Do you know what dates they were paying for Mr.

11   Friedman's iPad?

12   A    No.

13   Q    Ms. Rivera, it is very small and I apologize, but I have

14   a blow up of this document, if -- the insert that -- on

15   Exhibit 56, sorry.  It is small, I apologize.  Do you know who

16   Dov Sandberg is?

17   A    Emil's partner.

18   Q    Do you know if he is related to Mr. Friedman?

19   A    No.

20         THE COURT:  A partner in which business?

21         THE WITNESS:  I don't know.

22         THE COURT:  Go ahead.

23   Q    Do you do any bookkeeping for any of the real estate

24   companies in Brooklyn?

25   A    No.

Rivera - direct - Nelkin                        219

1    Q    All right.  But I will -- this is the same e-mail as
2    before, it just has an attachment to it.
3    A    Uh-hum.
4    Q    Okay.  So would that be Mr. Schreiber sending you a
5    screen shot and asking you what the charge was?
6    A    Could have been.
7    Q    Okay.  I'll represent to you that that was --
8              MR. FINKEL:  Objection.
9              MR. SCHAFHAUSER:  Objection.
10             THE COURT:  Just ask the question.
11   Q    I'll represent to you that that was a $30 charge to a
12   credit card for Dov Sandberg that ended in 6966.
13             MR. SCHAFHAUSER:  Again, objection based on hearsay
14   and lack of foundation.
15             THE COURT:  Do you know what it is?
16             MR. NELKIN:  Yes, it is a --
17             THE COURT:  No.  Do you know what it is?  Do you
18   want to show her something?
19             MR. NELKIN:  I will show her.
20             THE COURT:  Come on.
21             MR. NELKIN:  I apologize.
22             MR. FINKEL:  Can we see that exhibit?
23             MR. NELKIN:  Yes, I'm giving it to everybody.
24   A    The credit card entry for $30, computer expense.
25   Q    Do you know any other Dov Sandberg charges that were

Rivera - direct - Nelkin                    220

1    billed to Two Rivers, any other charges on Dov Sandberg's

2    credit card?

3            MR. FINKEL:  Objection, Your Honor.

4            THE COURT:  Overruled.

5    A    Related to these, probably.

6    Q    Okay.  Do you have any recollection of a $30

7    computer-related charge being billed to Two Rivers?

8    A    I don't. . .

9    Q    Do you remember paying --

10   A    These.  I remember these.

11   Q    You remember these?

12   A    Yeah.

13   Q    Okay.  And were they monthly?

14   A    So many charges, I don't know.

15   Q    Fair enough.

16           Do you remember what years they were in or what time

17   period?

18   A    No.

19   Q    If you could turn to Exhibit 84.

20   A    Excuse me?

21   Q    If you could turn to Exhibit 84.  If you look, you'll see

22   the charges start on line 621.

23   A    I can't see this.  What are you -- is this. . .

24           It's not a clear copy.

25   Q    From 621 to 631 -- 33.

Rivera - direct - Nelkin                221

1   A    That's halfway through the page?

2   Q    Yes.

3   A    Okay.

4   Q    Do you see there is a charge for AMEX 6966 under the --

5   A    You know what?  I can't see the numbers.

6   Q    I will represent to you it says AMEX 6966 and there are

7   charges and that the charges run until July of 2015?

8           MR. GRANTZ:  Objection to the form.

9           MR. SCHAFHAUSER:  Objection.

10          MR. GRANTZ:  There is no basis for the --

11          THE COURT:  The objection is overruled.  He is

12   reading to her what's plainly on the paper but what is

13   difficult to read.

14          Do you have an objection to that, sir?

15          MR. GRANTZ:  No.

16   Q    Do you recognize the screen itself?

17   A    The screen itself?

18   Q    Yes.

19   A    No.

20   Q    If you could turn to the next page.

21          THE COURT:  Could you please explain to me, Mr.

22   Nelkin, the connection between this line of inquiry and the

23   purpose of the hearing?

24          MR. NELKIN:  Mr. Friedman said that his iPad was

25   destroyed in 2013.

Rivera - direct - Nelkin                                    222

1        THE COURT:  Okay.

2   Q    If you could look at the next page.  Do you recognize

3   that screen?

4   A    Yes.

5   Q    What is that?

6   A    It is a check payment for credit card.

7   Q    Okay.  Can you tell what type of expense it was?

8   A    Computer.

9   Q    Okay.  Can you tell is it for the Dov Sandberg credit

10  card again?

11  A    Yes.

12  Q    And the check date?

13  A    6/18/2015.

14  Q    Okay.  And you have testified that there were a number of

15  these; correct?

16  A    Yes.

17  Q    Okay.  That's all that I wanted to . . . and these were

18  paid by Two Rivers; correct?

19  A    Correct.

20  Q    Ms. Rivera, did you ever go to Mr. Friedman's home?

21  A    No.

22  Q    Can you tell me what offices that Mr. Friedman had that

23  you are aware of?

24  A    Brooklyn office.

25  Q    Did you ever go there?

1    A    No.

2    Q    Okay.

3    A    And the Bronx office.

4    Q    Okay.

5    A    And South Plainfield.

6    Q    Did you ever go to the Bronx office?

7    A    I work in the Bronx office.

8    Q    Okay.  Does he have a computer there?

9    A    Yes.

10   Q    Okay.  Has he had a computer there since you started

11   working there?

12   A    Yes.

13   Q    And in South Plainfield, did he have a computer in the

14   office?

15   A    Yes.

16   Q    Okay.  How many computers does he have in the South

17   Plainfield office?

18   A    I'll say one.

19   Q    And how many printers does he have in the South

20   Plainfield office?

21   A    I remember one.

22   Q    Did he have that computer from the time you started

23   working at the South Plainfield office?

24   A    I don't know.

25   Q    Do you know if he had a computer in the Brooklyn office?

Rivera - direct - Nelkin                              224

1   A    I don't know.

2   Q    Did you ever see him with a laptop?

3   A    I don't recall.

4   Q    Did you ever see him with iPad?

5   A    I don't recall.

6   Q    Do you know if he used an iPhone to communicate with you?

7   A    To call me, yes.

8   Q    How frequently did Mr. Friedman travel outside of the

9   country?

10  A    I don't know.

11  Q    Well, you worked in the same office as he did; correct?

12  A    Yes.

13  Q    Okay.  And you were responsible for paying his travel

14  expenses?

15  A    Most of his travel expenses were on the credit card.

16  Q    Does that mean that someone else had responsibility for

17  paying for them?

18  A    If they were part of Two Rivers and I received them from

19  Sylvia, I paid them.

20  Q    Do you know if he traveled to China a lot for Two Rivers?

21  A    At the beginning, yes.

22  Q    Okay.  When was the last time you remember him going to

23  China?

24  A    I don't recall.

25  Q    All right.  Do you ever remember communicating with him

Rivera - direct - Nelkin                          225

1    when he was out of town?

2    A    Yes.

3    Q    Okay.  How did you communicate with him?

4    A    He would call.

5    Q    What about by computer, by e-mail?

6    A    Might have been, yes.

7    Q    Okay.  What about on weekends?

8    A    On weekends?

9    Q    Yes.  Did you ever communicate with him by computer on

10   weekends?

11   A    Not that I recall.

12   Q    Did you ever work on Jewish holidays?

13   A    Jewish holidays?

14   Q    Yes.

15   A    For the oil company, yes.

16   Q    Did you ever do that while you were working for Two

17   Rivers?

18   A    If I was working for Jack and Larry, yes.

19   Q    Was Two Rivers opened or closed on Jewish holidays?

20   A    Closed.

21   Q    So you wouldn't have done any work for them on a Jewish

22   holiday?

23   A    I might have prepped reports or -- but mainly oil.

24   Q    Where would you prep reports for them if they were

25   closed?

Rivera - direct - Nelkin                    226

1   A    Well, not reports.  Just go through e-mails.

2   Q    I thought you just said you might have prepped reports.

3   A    You know, I would like forward an open invoice and go

4   through the vendor files, like what they owe.

5   Q    Okay.  And where would you have done that from?

6   A    I e-mail it to myself in Two Rivers.

7             THE COURT:   I think he was asking where would you

8   be located when you were doing these things.

9             THE WITNESS:  Oh, in the Bronx.

10  Q    Your computer was at Two Rivers; correct?

11  A    Correct.

12  Q    So what computer were you using in the Bronx when you

13  were doing that?

14  A    The corporate.

15  Q    Corporate's computer.  Tell me about the corporate

16  computer.

17  A    Tell you what?

18  Q    What is it?

19  A    Corporate computer was the one I used to LogMeIn.

20  Q    And where is that computer located?

21  A    In the Bronx.

22  Q    In whose office?

23  A    Mine.

24  Q    And how long has that computer existed that you are aware

25  of?

Rivera - direct - Nelkin                    227

1  A    I don't recall.

2         THE COURT:  Are you talking about a different

3  computer now when you talk about corporate's computer, a

4  different computer than they usually use?

5         THE WITNESS:  No, the first computer I used for Two

6  Rivers.

7         THE COURT:  I'm sorry, is it one computer that you

8  have been using throughout?

9         THE WITNESS:  No, two.

10         THE COURT:  Two.  This is a second one that you are

11  talking about when you say the corporate one?

12         THE WITNESS:  The corporate is one of the two.

13         THE COURT:  And that was located at the Two Rivers'

14  office in the Bronx?

15         THE WITNESS:  In the Bronx, yes.

16         THE COURT:  Go ahead.

17  Q    Tell me again what you would have done on that computer.

18  A    Check my e-mails.

19  Q    And you mentioned some other tasks?

20  A    LogMeIn.

21  Q    You didn't have to use LogMeIn to get your e-mails?

22  A    No.  You would just go through the e-mail, Yahoo.

23  Q    What type of files did you maintain at Two Rivers in hard

24  copy?  Did you have file drawers?

25  A    Where in Two Rivers?

Rivera - direct - Nelkin                          228

1   Q    Well, did you have some in your office?

2   A    Which office?

3   Q    How many offices did you have at Two Rivers?

4   A    I don't understand what you're asking me.

5   Q    I'm asking you if you had more than one office at Two

6   Rivers.

7   A    When I was in South Plainfield, I worked in South

8   Plainfield, the files were there.

9   Q    I'm not asking that question.  I'm asking you did you

10  have an office at South Plainfield?

11  A    Yes.

12  Q    Did you have more than one office at South Plainfield?

13  A    No.

14  Q    Did you have files in that office?

15  A    South Plainfield, yes.

16  Q    Okay.  What files did you have there?

17  A    Files for Two Rivers.

18  Q    Okay.  And what types of files?  Were they vendor files?

19  Were they --

20  A    Vendor files.

21  Q    Were they banking files?

22  A    Banking files.

23       THE COURT:  And you understand the conversation we

24  had before about giving a complete answer so that he doesn't

25  have to --

Rivera - direct - Nelkin                                229

1                THE WITNESS:  Yes.

2    A    All vendor files, all bank files, all payroll files.

3    Q    And it was your responsibility to keep those files?

4    A    Correct.

5    Q    And did you have files anywhere else outside of your

6    office at the South Plainfield facility?

7    A    No.

8    Q    When you left South Plainfield and returned to the Bronx,

9    did you maintain any files over there?

10   A    When I left South Plainfield?

11   Q    Yes.

12   A    I left the files for Two Rivers at South Plainfield.

13   Q    I understand that, but when you went to the Bronx, you

14   still had the same responsibility?

15   A    Yes.

16   Q    So wouldn't you had to have the same types of files in

17   the Bronx?

18   A    I created new files.

19   Q    And where are those files now?

20   A    On December 14th, I was told I had to give the files.  I

21   think it was December 14th.  I'm not sure.  I boxed them and

22   they took them.

23   Q    Okay.  And would those files match the same types of

24   files that were previously at Two Rivers?

25   A    Not all.

Rivera - direct - Nelkin                    230

1    Q    What would the differences be?

2    A    You would only have partial because I was only there for

3    several months when I was asked to give the files up.  Most of

4    the files for Two Rivers were at South Plainfield.

5    Q    I guess my question is, if your job function remained the

6    same, shouldn't you have created the same types of files in

7    the Bronx that you were previously creating in South

8    Plainfield?

9    A    No, I created as I -- as I worked on a file, I created

10   the file.  If I paid a vendor, then I created that file for

11   that vendor.

12   Q    What about banking files?

13   A    Yes.

14   Q    So did you return banking files?

15   A    I don't remember what was in the box right now, but I

16   went through Signature banking, so I didn't have to print them

17   anymore; I could just log in.

18   Q    How many months were you in the Bronx after you left Two

19   Rivers?

20   A    I want to say eight or nine months.

21   Q    Okay.  And how many boxes did you return to Two Rivers?

22   A    I'm not sure if it was two or three.

23   Q    Could it have been one or two?

24   A    Maybe.

25   Q    So you're telling me that all of Two Rivers documents for

Rivera - direct - Nelkin                    231

1    nine months that you were the bookkeeper would fit into three

2    or less boxes?

3    A    Yes.

4    Q    Would that have been all of their vendor documents?

5    A    No.

6    Q    Where would those be?

7    A    I left them in South Plainfield.

8    Q    And who was responsible for doing the bookkeeping for

9    those?

10   A    I don't understand what you're asking.

11   Q    Let me go back.  Were you the bookkeeper for Two Rivers?

12   A    Yes.

13   Q    Were there any other bookkeepers for Two Rivers?

14   A    No.

15   Q    So you were the sole bookkeeper for Two Rivers?

16   A    Yes.

17   Q    Okay.  So if you were previously maintaining those types

18   of files and you went to the Bronx, weren't you maintaining

19   those files in the Bronx?

20   A    I didn't take the files from Two Rivers when I moved from

21   South Plainfield to the Bronx, so I didn't have all the files

22   with me.

23   Q    I guess what I am saying is wouldn't there be new files

24   created in the nine months, new vendors --

25   A    I only created new files as I needed, like if I received

Rivera - direct - Nelkin                          232

1    an invoice and I had to pay that vendor, I would like create a

2    file for that vendor, so I only had files for the incoming

3    mail or vendors whom I paid after I left.

4    Q    How many vendors did Two Rivers have in those nine

5    months?

6    A    I have no idea.

7    Q    But you're the bookkeeper.

8    A    I don't know.

9         THE COURT:  Can you give a ballpark estimate?

10        MR. FINKEL:  I'm sorry.  I didn't hear Your Honor's

11   question.

12        THE COURT:  I asked if she could give a ballpark

13   estimate since she is unable to give an exact number.

14        THE WITNESS:  Maybe 50.

15   Q    What was the volume of the payroll records?

16   A    Volume, meaning?

17   Q    Two Rivers had how many employees?

18   A    I believe over 100.

19   Q    Over 100.  So what was the volume of the payroll records

20   for those nine months?

21   A    Weekly.

22   Q    Did you return any of those payroll records?

23   A    I don't recall what was in the box.

24   Q    Well, I guess the records are either in the box or not in

25   the box, but I'm asking you did you return payroll records?

```
                    Rivera - direct - Nelkin              233
```

1   A    Everything I had, I returned.

2   Q    Mrs. L --

3             THE COURT:  Ms. Rivera.

4   A    Ms. Rivera.

5   Q    I apologize.  Ms. Rivera, what type of reports did you

6   generate on the financial side?

7   A    Balances.

8   Q    Balances.  Any other reports?

9   A    Bank recs.

10  Q    When you say recs, what do you mean?

11  A    Bank reconciliations for Michael Devine, the accountant.

12  Q    What did a bank reconciliation look like?  What type of

13  information would be in it?  Would it be a report?  Would it

14  have attachments?  Would there be checks?  What would be in

15  there?

16  A    Everything was through internet banking, so.

17  Q    Would there be things that you printed out?

18  A    For Michael Devine, I would like just forward it to him.

19  Q    But what would you be forwarding?

20  A    The bank reconciliation.

21  Q    Is that something that you printed out and scanned?  Is

22  that something that you prepared on the computer?

23  A    No.  In the Launch system you could e-mail directly to

24  Michael Devine.

25  Q    And did you save any copies of those?

1   A    I don't remember saving.  I don't remember.

2   Q    What type of records were kept of the Two Rivers' checks

3   that were paid?

4   A    What type of record was kept --

5   Q    Of the Two Rivers checks that were printed.

6   A    I kept a copy stub with the invoice.

7   Q    Okay.  Was that a hard copy?

8   A    I kept it if it was printed in the Bronx.

9   Q    So for the nine months in the Bronx, all the pay stubs

10  were printed; is that correct?

11  A    If they were printed in the Bronx, I had it, I kept it.

12  If they were printed in South Plainfield, Vincent, whoever was

13  doing it over there, kept it.

14  Q    Now, it is your testimony that you used your one computer

15  directly and another one you used to log into that first

16  computer; is that correct?

17  A    Correct.

18  Q    Okay.  So if that computer was being viewed by the

19  systems that you were using, it would be the first computer;

20  is that correct?

21  A    Excuse me?

22  Q    You're -- when you log into your -- the computer that you

23  call my computer, the one that you used directly --

24  A    Uh-hum.

25  Q    -- you're accessing that computer, you're using the first

Rivera - direct - Nelkin                    235

1   computer as a portal, is your testimony; correct?

2           MR. GRANTZ:  Objection to form.

3   A    I don't understand what you're asking.

4   Q    Let's look at your affidavit.  It is Exhibit 70 -- one

5   second.

6   A    What number?

7   Q    Let's look at 198.  No.  No.

8           THE COURT:  I'm sorry, what?

9           MR. NELKIN:  I'm sorry, it is Exhibit 107.  Sorry.

10  I was looking at the wrong . . . I apologize, I was looking at

11  the wrong line.

12  Q    Can you look at paragraph 8 of 106.  It says, I used the

13  computer in the Bronx office merely as a portal to access my

14  computer through the LogMeIn program because all of my

15  bookkeeping work during this limited time was actually on my

16  computer.

17  A    That was the corporate computer.

18  Q    I understand that.  But what I am saying is you were

19  basically using your corporate computer to control your --

20  A    To log into South Plainfield.

21  Q    And, so, basically, you were working on the South

22  Plainfield computer; is that correct?

23  A    Through LogMeIn.

24  Q    Okay.  All right.  So, basically, you weren't using the

25  -- I withdraw the question.

Rivera - direct - Nelkin                                236

1          Ms. Rivera, was there any other computer that you

2    had that was hooked up to the Launch system?

3    A    The South Plainfield and the corporate computer.

4    Q    The South Plainfield -- the corporate computer was hooked

5    up to the Launch system?

6    A    Through LogMeIn.

7    Q    I'm not asking through LogMeIn.  I'm just asking through

8    not LogMeIn.  Were there any other computers connected to the

9    Launch system that you are aware of?

10   A    For Two Rivers?

11   Q    Yes.

12   A    No.

13   Q    Okay.  If you could turn to Exhibit 44.  Do you recognize

14   that computer screen?

15   A    44?

16   Q    Yes.

17   A    Okay.

18   Q    Do you recognize that screen?

19   A    Yes.

20   Q    What is that screen?

21   A    Check screen.

22   Q    Okay.  Who does it show as the user there?

23   A    Sonia Rivera.

24   Q    And who does it show the computer is?

25   A    Who it shows what?

Rivera - direct - Nelkin                      237

1  Q    What computer is listed there?  Next to your -- the next

2  column over from your name.

3  A    Where it says computer?

4  Q    Yes.

5  A    It says server office . . . I think that's a C.

6  Q    I think so too.

7         Do you know what that refers to?

8  A    No.

9  Q    Okay.  Looking at the names, sort of if you just draw a

10  line down from your name at the bottom, Emilio Segundo, or

11  Emil Friedman right below the box.  Do you know if this is --

12         THE COURT:  Do you see the part that he is talking

13  about on the bottom of the page?

14         THE WITNESS:  No.  I was saying could I get up

15  because my back.

16         THE COURT:  Of course.  If you need to stand up to

17  stretch, feel free to do so.

18  A    You're asking me where the names are listed?

19  Q    Yes.

20  A    Okay.

21  Q    Do you recognize the name Emilio Segundo?

22  A    Yes.

23  Q    Who is that?

24  A    One of the construction workers.

25  Q    Is this a Two Rivers Launch Coffee screen?

Rivera - direct - Nelkin                 238

1   A    Yes.

2   Q    It shows that you are working from a computer called

3   Server Office C; is that correct?

4   A    That's what it shows.

5   Q    Okay.  If you could turn to the next one.

6        THE COURT:  The next page.

7        MR. NELKIN:  Next page or 45?

8        THE WITNESS:  Did he say next page?

9        THE COURT:  Next page.

10  Q    Next page in the exhibit, the second page of Exhibit 44.

11  A    Uh-hum.

12  Q    In the box, do you see the user name?

13  A    Yes.

14  Q    It has the name Server Office C for the workstation name?

15  A    Right.

16  Q    Then it has a printer name, Canon.  Did you have a Canon

17  printer?  Do you remember?

18  A    I don't recall.

19  Q    Okay.  And looking at the bottom again of the names where

20  it says Emilio Segundo, is this a Two Rivers' screen?

21  A    Correct.

22  Q    Okay.  When you say this is a check screen, is this

23  showing a check that you printed?

24  A    I'm assuming, yes.

25  Q    All right.  If you turn to the next page within the same

Rivera - direct - Nelkin                    239

1   exhibit.  If you look at the payee, it is Emil Friedman.  If

2   you look at the memo, it says October 15th interest, or INT,

3   which I assume is interest.  You can see the amount.  Is that

4   a check that you remember?

5   A    Yes.

6   Q    Was that a Two Rivers' check?

7   A    Yes.

8   Q    Okay.  If you look at the check number, it says, I think,

9   24228 at the top.

10  A    I see it as 24223.

11  Q    Okay.  It could be.  If you turn back the page, does it

12  have the same check number on this page before?

13  A    Uh-hum.

14  Q    Okay.  So is it your understanding these are screens

15  within the Two Rivers' Launch Coffee system?

16  A    Yes.

17  Q    They are showing different aspects of the check; is that

18  correct?

19  A    Yes.

20  Q    All right.  If we can skip to the next exhibit,

21  Exhibit 45.  All right.  If you can look at the bottom of it,

22  you see the name Edgar Patricio Guambana Quinde?

23  A    Yes.

24  Q    I believe you testified that that was a Two Rivers'

25  construction person?

Rivera - direct - Nelkin                          240

1    A     Yes.

2    Q     So would this been a Two Rivers page?

3    A     Yes.

4    Q     Okay.  Now, if you look there it says, under the user

5    name, Sonia Rivera?

6    A     Yes.

7    Q     And it shows Office HP under the workstation name?

8    A     Uh-hum.

9    Q     And it says you are connected to the Bronx check printer?

10   A     Okay.

11             (Continued on following page.)

Rivera - direct - J. Nelkin                 241

1    BY MR. NELKIN:

2    Q    I guess my question is if you only used a single

3    computer as the actual computer that was hooked up to the

4    Launch system, then why does it show two work station names

5    for you?

6    A    I don't know.

7    Q    Do you know if you had an HP computer?

8    A    No, I don't know.

9    Q    So, you don't know what type of computer has been --

10   A    I don't.  I just work there, I don't look at the

11   computers.

12   Q    Ms. Rivera, if you could, turn to Exhibit 99.

13        THE COURT:  Which exhibit number, sir?

14        MR. NELKIN:  Exhibit 99.

15   Q    Do you recognize that report?

16   A    Open vendor invoices, yes.

17   Q    Who prepared that type of report?

18   A    I would prepare these.

19   Q    And what system would you use to prepare them?

20   A    The Launch.

21   Q    And what would you do with this report?

22   A    E-mail Emil, Eugene, Steve, Mayer.

23   Q    And with this report, did you save any hard copies?

24   A    From the Launch system, I might have saved.  I saved to

25   go over it with them.

Rivera - direct - J. Nelkin                242

1   Q    I didn't hear that last answer.

2   A    I would save a copy for myself to go over it with the

3   owners.

4   Q    And where would you save it?

5   A    By my desk.

6   Q    And what would you do with it?

7        Would you file it?

8   A    I don't remember filing.  I mean, after I would -- I

9   mean, it could have sit by a desk or anywhere, but...

10  Q    How would you go over it with the Schreibers after

11  they -- you left for the Bronx?

12  A    Sometimes I would e-mail it to myself, then forward it to

13  them in case they would call me, tell me to pay someone.

14       THE COURT:  Mr. Nelkin, I'm going to ask, is this a

15  convenient breaking point?

16       MR. NELKIN:  If we could have one more exhibit.

17  It's very similar questions.

18       THE COURT:  Okay.

19  Q    If you could just turn to Exhibit 100.

20       Do you recognize that report?

21  A    Yes.

22  Q    What type of report is that?

23  A    Open invoices.

24  Q    It looks different than the other one.

25  A    Correct.

Rivera - direct - J. Nelkin                243

1    Q    The first one actually said "open vendor invoices" and

2    this one says "list outstanding invoices."

3    A    Same thing.

4    Q    What system was used to do this?

5    A    Corporate.

6    Q    And the same question:  Would you save this report?

7    A    This report couldn't be saved on the corporate system.

8    Q    When you say "the corporate system," is that something

9    besides your computer?

10   A    No -- what do you mean besides?

11   Q    You said system as opposed to the corporate computer.

12   A    It was on the corporate computer.  It was the corporate

13   software bookkeeping.

14           MR. NELKIN:  Thank you.  We can take a break.

15           THE COURT:  We'll take our lunch break.  We'll

16   reconvene at 2 o'clock.

17           (Luncheon recess taken.)

18

19

20

21

22

23

24

25

244

1                    AFTERNOON SESSION

2          THE COURT:  You can come back to the stand,

3    Ms. Rivera.

4             Everybody ready?

5    DIRECT EXAMINATION

6    BY MR. NELKIN:  (Cont'd)

7    Q    Ms. Rivera, I believe you testified you work for 26

8    Flavors now, correct?

9    A    Correct.

10   Q    Where is 26 Flavors located?

11   A    The physical?

12   Q    Their offices.

13   A    Their physical address is at 29 Riverside.

14   Q    Do they have any employees besides you in the Bronx?

15   A    Myself.

16   Q    And 29 Riverside is in what city?

17   A    Newark.

18   Q    Do they have any other facilities that you are aware of?

19   A    Not that I know of.

20   Q    Okay.  And do you know who owns the building that you're

21   in or who actually is responsible for your office?

22   A    Where I am now?

23   Q    Yes.  Like whose place is that?

24   A    Who are the owners?

25   Q    I mean does 26 Flavors pay rent for that space or do you

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

245

1    know who has control of the space that you are in?

2    A    No.

3    Q    Who has custody and control of your computer?

4            MR. SCHAFHAUSER:  Objection.

5            MR. NELKIN:  I'm sorry.

6    Q    I believe in your affidavit you say that one of your

7    computers has been taken out of service?

8    A    Hmm.

9    Q    The one you referred to as my computer?

10   A    Correct.

11   Q    Who has custody and control of that computer?

12           MR. SCHAFHAUSER:  Objection.  Asks for a legal

13   conclusion.

14           THE COURT:  What's your understanding of who has it?

15           THE WITNESS:  It's in Emil Friedman's office.

16   Q    When you say Emil Friedman's office, at what location?

17   A    In the Bronx.

18           THE COURT:  As far as you know he can put his hands

19   on it and give it to somebody?

20           THE WITNESS:  Yes.  It's in the office.

21   Q    Do you know if that office has a lock on it?

22   A    They are locked.

23   Q    How do you communicate with 26 Flavors personnel?

24   A    Phone or e-mail.

25   Q    All right.  And the second computer, the one that you use

246

1    as a portal to the first computer, has that one been taken out

2    of the service?

3    A    Yes.

4    Q    When was that one taken out of service?

5    A    I believe it was December.

6    Q    And who has custody and control of that computer?

7    A    It's in Emil Friedman's office.

8    Q    When you say his office, you mean --

9    A    In the Bronx.

10    Q    The one that he physically sits in?

11    A    Yes.

12    Q    As opposed to the building?

13    A    Correct.

14    Q    And I believe in your affidavit you said that a new

15    computer was purchased?

16    A    Yes.

17    Q    And I believe you said that that purchase was in

18    February?

19    A    I don't recall.

20    Q    Well, let's look at your affidavit.  I believe it's

21    Exhibit 106.  It's paragraph 11.  The new computer purchased

22    approximately three months ago is located in my work area in

23    the Bronx office.  This computer has never been used in

24    relation to the business of Two Rivers.

25    A    Correct.

247

1   Q    Okay.  And your affidavit is signed the 13 of May 2016?

2   A    Correct.

3   Q    And so three months before that I assume would be

4   February of 2016?

5   A    Correct.

6   Q    My question is:  In December and January, when your other

7   two computers were out of service, what computer were you

8   using?

9   A    The oil computer.

10  Q    When you say the oil computer, what computer is that?

11  A    The one I'm using for 26 Flavors.

12  Q    I thought that's the one that was purchased in February?

13  A    No.  That computer was installed there.  I don't use it.

14  Q    I would like you to look at Mr. Nussbaum's affidavit,

15  which is -- it's 204.  I'm sorry.  110.  I apologize.  On page

16  three of that, there's an oil computer that's listed.  Is that

17  the one you're talking about?

18  A    Hmm.

19  Q    How long has that computer been one that you utilized?

20  A    When I got back from the South Plainfield office, I used

21  that one for the oil to help the girls.

22  Q    So you were using that -- when did you return from South

23  Plainfield?

24  A    I believe in March 2015.

25  Q    So from March until February of 2016 you were using that

248

1   computer?

2   A    Correct.

3   Q    Do you still use that computer?

4   A    Yes.

5   Q    And then there's a new computer I believe that you just

6   testified was bought in February?

7   A    Hmm.

8   Q    And that one, according to Mr. Nussbaum, is used both for

9   the oil companies and the coffee companies?

10  A    I didn't get to use it.  It was installed but I don't use

11  it.  It doesn't have the Launch System on it.

12  Q    Okay.  So this is your office?

13  A    Yes.

14  Q    Who else uses that office?

15  A    The girls from the oil company sometimes come in if they

16  need to print anything or go on the internet.  They have

17  access to it.

18  Q    Where do they normally sit?

19  A    In another office.

20  Q    Do they have computers there?

21  A    Yes.

22  Q    Why do they need to come into your office to use the

23  internet?

24  A    Because their computer systems are very old and sometimes

25  they need to make copies, xerox copies, so they use the

249

1  printer that's there.

2  Q    There's a printer in your office as well?

3  A    Yes.

4  Q    And then the old corporate computer that's -- is that the

5  one you talked about being in Mr. Friedman's office?

6  A    Correct.

7  Q    So is Mr. Nussbaum wrong that it's in your office?

8  A    Well, it was in my office and then it was moved to

9  Mr. Friedman's.  I mean I had to take it out of the way.  It

10  was not being used.  I couldn't use it.

11  Q    If he says to the best of my knowledge as of May 2016 the

12  following computer devices were located in the Bronx facility

13  and then he testified that it's in your office.  Is the

14  affidavit wrong in that respect?

15  A    I don't know.

16          THE COURT:  Where is the computer?

17          THE WITNESS:  It was in my office and then it was

18  moved to Emil's office.  You know, it was in my way.

19  Q    When was it moved to Mr. Friedman's office?

20  A    I don't recall.

21  Q    So it was outside of Mr. Friedman's custody and control

22  after December?

23  A    I think it was in my office and then -- I don't know when

24  it was moved.  I can't remember.

25  Q    Well, on the date that you signed your affidavit, was it

250

1  in your office?

2  A    I can't remember.

3  Q    You can't remember if it was in May of 2015 it was in

4  your office or not?

5  A    I mean it's in the same building, so I might have

6  considered in my office, his office is in the same building.

7  So, I don't know.

8  Q    Ms. Rivera, I asked you where it was located and you told

9  me it was in Mr. Friedman's office?

10 A    I know it's in Mr. Friedman's office now.

11 Q    Okay.  When do you think it was moved there?

12 A    I don't recall.

13 Q    It says there was also a computer moved from active use

14 and preserved for safekeeping after the court order, used for

15 the coffee companies and/or Two Rivers.  How many old

16 corporate computers did you have?

17 A    It was an old corporate and then there was another one

18 that we used for the coffee company and the Two Rivers, which

19 was -- I was told not to use either.  So it was two of them,

20 the old and the one that was with the coffee companies and Two

21 Rivers.

22 Q    Where is that computer?

23 A    Mr. Friedman's office.

24 Q    Okay.  So how many computers are in Mr. Friedman's office

25 as we talk here?

251

1   A     They were mine, two.

2   Q     Two of yours.  And how many are in your office now?

3   A     Just the new one and the oil.

4   Q     Okay.  Fine?

5         Now, prior to December were you told not to take

6   anything out of your office?

7   A     Yes.

8   Q     When were you told not to remove anything from the

9   computer, what date?

10  A     I don't recall the date.  But I recall Mr. Friedman

11  letting me know not to make any changes or, you know, delete,

12  shred, don't do anything with Two Rivers, you know, leave

13  everything as is.

14  Q     And do you remember when that was?

15  A     I don't recall.

16  Q     Was it in 2015 or 2016?

17  A     Probably 2015.

18  Q     Was it close to when you moved to the new facility, back

19  to the Bronx?

20  A     I don't recall.

21  Q     But you testified that you weren't keeping much and that

22  you were overwriting your programs.  When did that practice

23  stop?

24  A     When did -- I don't understand the question.

25  Q     If Mr. Friedman told you not to shred anything and not to

252

1   delete anything, when did you stop your prior practice of

2   overwriting programs?

3          MR. SCHAFHAUSER:  Objection.

4          THE COURT:  Why don't you lay a foundation.

5          MR. NELKIN:  Okay.

6   Q    You testified earlier I believe that you didn't save

7   programs, that you would delete them and that you would -- and

8   that you would also overwrite them I believe?

9          MR. GRANTZ:  Objection to form.

10         THE COURT:  Overruled.

11  A    The same PDF files that I would scan and overwrite, you

12  can retrieve from the system at any time, over and over again.

13  You can just enter the dates you want it, which was the

14  quarterly wages, which was a sheet or two.  That was it.  It

15  wasn't reports 40, 20 pages.  It was just the quarterly wages

16  that you can get at any time from the reports.

17  Q    Can we do that now?

18  A    Yes.

19  Q    And so where are those?

20  A    I e-mailed them to Vincent weekly and Michael Devine.

21  Q    I'm asking you where can you retrieve them from today?

22  A    From the e-mails.

23         THE COURT:  No.  Look.  Earlier you said you

24  overwrote everything?

25         THE WITNESS:  Yes.

253

```
 1           THE COURT:  Now you are saying that despite that
 2    there's still some way you can retrieve them?
 3           THE WITNESS:  Retrieve them in the Launch System.
 4           THE COURT:  Where would you go to retrieve them?
 5           THE WITNESS:  In the Launch System.
 6    Q    You have access to the Launch System?
 7    A    No.
 8    Q    When did you stop having access to the Launch System?
 9    A    December of 2015 they told me I was not allowed to get
10    into the system or login.
11    Q    Can you get into the system using your computer?
12    A    Now?
13    Q    Yes.
14           MR. FINKEL:  Objection, your Honor.
15           THE COURT:  Overruled.
16           MR. FINKEL:  Which computer?
17    Q    Any of your computers.
18    A    For Two Rivers?
19    Q    Any of the computers that you have, whether they are in
20    your office now or Mr. Friedman's office.
21    A    Yes, you can get in.
22    Q    Would you say that there are Two Rivers' records located
23    on those systems?
24    A    Well, the icons are there.
25    Q    But you testified that they are retrievable, the
```

254

1   documents you mentioned?

2   A    Yes.  You log into the Launch System.

3   Q    And would you use your password to do that or some other

4   password?

5   A    You can use mine, Steve can use his, Eugene can use his,

6   Mayer can use his.

7   Q    Would we need a Windows password to get into your

8   computer?

9   A    I don't recall having a Windows password.

10  Q    When you first logged on to your computer, there wasn't

11  some sort of password?

12  A    Not that I recall.  You can just click on the icon and

13  use the user ID and the password.

14  Q    Do you have any knowledge as to whether after -- in the

15  present time anyone at Two Rivers can access the Launch

16  computer system?

17  A    Excuse me.

18  Q    Do you know -- do you have any knowledge as to whether

19  any Two Rivers personnel can access the Launch System now?

20  A    Now?

21  Q    Yes.

22  A    Steven, Vincent, Eugene.

23  Q    How do you know that they can access it?

24  A    Because they had logins.  They were able to view and see

25  what we were entering, what I was posting, when I had to issue

255

1    a check.

2    Q    Do you know if those logins still work?

3    A    Oh.  I have no idea.

4    Q    So if they can't, would the only way to be able to access

5    it be through your computer?

6              MR. SCHAFHAUSER:  Objection.

7              MR. FINKEL:  Objection.

8    A    I don't know.  I provided the passwords you requested.

9    Q    Your office in South Plainfield, how is that set up?

10   Were you the only person in the office?

11   A    At the beginning, yes.

12   Q    Did that change?

13   A    Yes.

14   Q    How did it change?

15   A    They hired Jordan.

16   Q    So there was two desks in the office?

17   A    Yes.

18   Q    Did Jordan have a computer?

19   A    Yes.

20   Q    Okay.  When you walked in the door, who was the first

21   person -- how was the office arranged?

22   A    Jordan to my left.

23   Q    Was Jordan closer to the door?

24   A    Yes.

25   Q    Were your desks shaped like a T or were they like one in

256

1    front of the other running in the same direction?

2    A    Side, corner like this.

3    Q    Like a L?

4    A    Hmm.

5    Q    What did Jordan do?

6    A    She helped me.

7    Q    How did she help you?

8    A    Post invoices and create PO's.

9    Q    And was she on the Two Rivers' payroll?

10   A    Yes.

11   Q    Who hired her?

12   A    I believe Mr. Friedman.

13   Q    Do you know what experience she had?

14   A    No.

15   Q    Do you know how old she was?

16   A    I'm not sure.

17   Q    Did she work for any -- do work for any other companies

18   while she was sharing the office with you?

19   A    To help me, yes.

20   Q    Do you know what companies she helped you with?

21   A    26 Flavors.

22   Q    And what about the other coffee companies?

23   A    There's mainly Office Coffee and 26 Flavors.

24   Q    Were there any others?

25   A    Two Rivers.

257

1   Q    What about the oil companies?

2   A    The oil companies?  No.  I don't recall.

3   Q    Did you do work for the oil companies while you were in

4  the South Plainfield office?

5   A    If the girls called me and they needed help, yes.

6   Q    And how would you -- would you use your computer or would

7  you use some other computer to do that work?

8   A    There was mainly questions about a customer, how to

9  charge a customer, where to apply the money to.  I would just

10  tell them.

11   Q    Would you ever use your computer in South Plainfield to

12  remotely access any other computer in the Bronx?

13   A    Yes.

14   Q    Now, did you store any records for the other companies at

15  Two Rivers?

16   A    Yes.

17   Q    When you left did you take any of those records with you?

18   A    I took Office Coffee and 26 Flavors.

19   Q    Was it -- how many boxes of documents was it?

20   A    I don't recall.

21   Q    When did you do that?

22   A    I believe the beginning of March of 2015.

23   Q    Did anyone help you?

24   A    Yes.

25   Q    Who?

258

1    A    Jorge Salcedo.

2    Q    Did you do it together?

3    A    What do you mean together?

4    Q    I mean did you and him remove the boxes at the same time.

5    A    No.  I boxed what I wanted to take and I asked for help

6    because I have back problems and he helped me.

7    Q    So he did it without you there?

8    A    No.  I was there.

9    Q    Do you know when he did it, I mean what date?

10   A    I believe it was -- I don't know if it was the end of

11   February of 2015 or the beginning of March of 2015.  I don't

12   know the exact date.

13   Q    Okay.

14        THE COURT:  Sorry.  Counsel, I have to ask your

15   indulgence for one minute.  Be right back.

16        (Pause.)

17        THE COURT:  Sorry for the interruption.  Please have

18   a seat and go ahead.

19   Q    Ms. Rivera, when you left Two Rivers, you took the Office

20   Coffee records with you and you took the oil company records

21   with you; is that correct?

22   A    I took the 26 Flavors records and Office Coffee records.

23   Q    What about the oil company records?

24   A    We didn't have oil records.

25   Q    Okay.  Now, Ms. Rivera, why wouldn't you take the Two

259

1    Rivers records with you since you were the bookkeeper?

2    A    I didn't take them because Eugene and Steve were arguing

3    back and forth and Mayer with Emil.  I knew there was

4    arguments between the companies and I didn't feel comfortable

5    working there any more.  They were constantly coming into my

6    office screaming and yelling and I felt the right thing to do

7    was to remove myself because I didn't want to be in between

8    them with the bickering and I felt the right thing for me to

9    do was leave the Two Rivers records behind.  I didn't want to

10   take anything with me.

11   Q    Did you discuss which records to take with anybody?

12   A    I spoke to Emil about it.

13   Q    He told you which records to take and which records to

14   leave?

15   A    He just agreed with me.

16   Q    He was your boss?

17   A    One of them.

18   Q    Okay.  Can you turn to Exhibit 121, the first page.  Do

19   you recognize that picture?

20   A    Yes.

21   Q    Can you tell me what that picture is?

22   A    It was a bin I had behind my chair in the office in South

23   Plainfield.

24   Q    What's the top one say?

25   A    Oil.

260

1   Q    So what would have happened to documents that fit into

2   the category of oil?

3   A    If Emil came by the office and he needed to give anything

4   to the girls, anything that had to do with oil, since he knew

5   I drove every day back and forth to the Bronx, he would leave

6   it there and he would give it to me.  If there was anything

7   there, I would remember to take it to the Bronx office.

8   Q    Is it your testimony that there were no oil records

9   stored --

10   A    No.  There might have been a note or message or oil

11   ticket.

12   Q    But no files?

13   A    Not that I remember.

14   Q    And the Office Coffee records, 26 flavor records and Two

15   Rivers flavors were those intermingled or were they stored in

16   separate file cabinets?

17   A    Say that again.

18   Q    Were they in separate file drawers or were they all mixed

19   together?

20   A    I tried to keep them separated.

21   Q    There would be like a Two Rivers drawer and like an

22   Office Coffee drawer?

23   A    Yes.

24   Q    Can you turn the page.  Can you read what that says?  I'm

25   talking perhaps the middle of the three white boxes?

261

1    A    The Perfect Fuel and Clickable Oil.

2    Q    Yes.  Do you know what those companies are?

3    A    Those are the oil companies.

4    Q    Are those oil company files?

5    A    I don't know.  They look like labels to me.  I mean this

6    looks like a label to me.  If there are files I have no idea.

7    It looks just like a label.

8    Q    I actually think it might be a bankers box.

9    A    I don't know.

10   Q    You wouldn't know about boxes?

11   A    Boxes, no.

12   Q    Can you turn to the next page.  Does that look like your

13   files?

14   A    Yes.

15   Q    Can you read the first of the green folder that's

16   standing up from the bottom?

17   A    I can't see the lettering.

18   Q    Does it say Office Coffee 2000 and something deposits?

19   A    Yes.  Those are the deposit slips.

20   Q    Can you look behind it, the next one standing up.

21   A    Two Rivers.

22   Q    Correct.  And then right behind it does it say Office

23   Coffee open invoices?

24   A    Yes.

25   Q    So does that suggest to you that maybe the files were

262

1    intermingled, notwithstanding your prior testimony?

2              MR. SCHAFHAUSER:  Objection.

3              THE COURT:  Overruled.

4    A    Jordan did assist me.  She might have put them in the

5    wrong file cabinet.  I tried to keep the vendors separated.

6    These were just deposits, not vendors.

7    Q    Who had responsibility for payroll?

8    A    Myself.

9    Q    Did Jordan have any responsibility for payroll?

10   A    No.

11   Q    Turn the page, please?

12             If you look at the next page and there are two

13   things that are sort of not obscured.  One says O C F, E M P L

14   W-4 and the other one says --

15             THE COURT:  What page?

16             MR. NELKIN:  It's the next page after the file --

17   two pages after the one we were looking at.  I apologize.

18             THE COURT:  Start the question over again.

19   Q    Do you see this picture that has -- it says O C F, E M P

20   L period W-4?

21   A    Right.

22   Q    Do you believe that O C F stands for Office Coffee

23   Services?

24   A    Correct.

25   Q    That would be the W-4's for that company?

263

1    A    Yes.

2    Q    If you look down about two files, they are saying T R C E

3    M --

4    A    Correct.

5    Q    Would that be Two Rivers coffee employees?

6    A    Correct.

7    Q    These would be payroll documents, right?

8    A    Yes.

9    Q    Again, you just testified that you were responsible for

10   payroll and Jordan didn't have any responsibility for that,

11   correct?

12   A    Correct.

13   Q    Does this suggest to you that perhaps your files were

14   intermingled?

15   A    Yes.  When you asked me I thought you were asking me

16   about vendors.

17   Q    So some of your files were intermingled and some of them

18   were not?

19   A    Could have been.

20   Q    Do you remember which ones were intermingled and which

21   ones were not?

22   A    Not exactly.

23   Q    So when you gathered up the stuff, how did you gather up

24   the files you were going to take?

25   A    The vendor files that I had in Office Coffee, I took a

264

1   look at the vendor files in Office Coffee and 26 Flavors and

2   those are the files that I took.

3   Q    Now, did Office Coffee and Two Rivers or 26 Flavors and

4   Two Rivers do business together?

5   A    They did at once.

6   Q    And they bought from each other and sold to each other?

7   A    I believe so.

8   Q    How would you decide whether that file stayed or when?

9   Would you?

10  A    If Two Rivers was a vendor of Office Coffee or 26

11  Flavors, then I would, you know, I would have taken the file.

12  Q    So it's in Two Rivers' office and it relates to Two

13  Rivers and you would have taken it with you?

14  A    If Two Rivers is a vendor of Office Coffee or 26 Flavors,

15  I would take the file because it belongs to the billing in

16  Office Coffee or 26 Flavors.

17  Q    Where are those files today?

18  A    I have them.

19  Q    Where do you have them?

20  A    In the Bronx office.

21  Q    Okay.  Where in the Bronx office?

22  A    431 East 165.

23  Q    Are they in your physical office, the space you have your

24  computers and where you sit?

25  A    Yes.

265

1    Q    Are they in files?

2    A    Yes.

3    Q    If you look down on that same picture it says Launch

4    System.  What does Launch System mean to you?

5    A    The system that I was working on.

6    Q    Okay.  For which company?

7    A    That was just probably notes on how to work on the

8    system.

9    Q    What type of notes were there as to how to work on the

10   system?

11   A    I don't recall.

12   Q    Who generated those notes?

13   A    I don't recall what's in the file.

14   Q    Well, where would we get those notes?

15   A    I don't know.

16   Q    Well --

17   A    I can't remember what was in that file.

18   Q    And do you know if you took that file with you or not?

19   A    No, I don't recall.

20   Q    If you got something related to Launch, who would you

21   have possibly received it from?

22   A    If I -- I don't understand.

23   Q    If you were trying -- who were the possible people who

24   could have provided you with information as to how to use the

25   Launch System?

266

1    A    Yossi.

2    Q    Anyone else?

3    A    Ben.

4    Q    Okay.  Anyone else?

5    A    No.

6    Q    Do you know if when you left 26 Flavors had filed a

7    lawsuit against Two Rivers?

8    A    I heard something about a lawsuit regarding the samplers.

9    Q    You knew that there were problems between the partners

10   because you said you thought it was the right thing to leave

11   some files behind, is that correct?

12   A    I knew it was right -- I didn't feel comfortable.  There

13   was a lot of bickering between the owners and I just thought

14   it was right for me to just remove myself.  I didn't want to

15   be between them.

16   Q    Do you know what the bickering was about?

17   A    Most of the time, no, because they were speaking their

18   own language.

19   Q    Was it anything that related to you and your work?

20   A    I have no idea.  They would just come screaming up a

21   storm.

22   Q    Did they ever -- were you aware of any complaints as to

23   the fact that you were working for companies besides Two

24   Rivers?

25   A    They didn't bring it to my attention.

267

1  Q    Did anyone ever tell you not to work for companies

2  besides Two Rivers?

3  A    Not to work?

4  Q    Yes.  Did anyone say stop working for those other

5  companies?

6  A    I don't recall.

7  Q    There were no complaints about the fact that you were

8  billing Two Rivers for overtime while working for other

9  companies?

10  A    No.  I don't recall.

11  Q    Okay.  Ms. Rivera, I want to go back to something you

12  testified about earlier.  You testified that you had -- I

13  believe that 133 St. Nicholas address was used for mailing

14  because they wanted to make sure when they transferred that

15  the mail got to where it was supposed to go, is that correct?

16  A    Correct.

17  Q    Okay.  Was it ever converted back to the Kentile address?

18  A    Was it ever --

19  Q    Once they moved into the facility?

20  A    When I would receive mail from vendors, whenever Steve

21  would decide to give me the mail, some would say the P.O. Box,

22  some would say 101 Kentile.

23  Q    Did any say 133 Nicholas?

24  A    Ones that Emil would bring me.

25  Q    Turn to Exhibit 68.  Ms. Ezell, when --

268

```
 1              THE COURT:  Ms. Rivera.

 2   Q    Ms. Rivera, which P.O. Box did you mean?

 3   A    I don't remember the number of the P.O. box.

 4   Q    Was there more than one P.O. box that was used?

 5   A    P.O. box he assigned, Steven.

 6   Q    Did any of Two Rivers' records go to the Brooklyn office?

 7   A    Excuse me.

 8   Q    Did any of the record for Two Rivers get mailed to

 9   Brooklyn?

10   A    I'm not sure.  I don't recall.

11   Q    What about the banking records?

12   A    The banking records I would retrieve on line.

13   Q    Where did the hard copies get sent?

14   A    I don't recall where the hard copies were sent.  But --

15   because after I logged on line for Signature Bank I can just

16   retrieve on line.

17              THE COURT:  Terribly sorry to do this.  I'm going to

18   have to ask your indulgence for one more moment.

19              (Pause.)

20              (Continued on next page.)

21

22

23

24

25
```

1    THE COURT:  My apologies again for the interruption,

2    continue.

3    DIRECT EXAMINATION

4    BY MR. NELKIN:

5    Q    Ms. Rivera, do you have Exhibit 68?

6    A    Yes.

7    Q    Now, I'm looking at the middle of these three e-mails.

8    It appears to be Steve Schreiber asking what address can I

9    mail you things.  I'm sorry, I'm on the second page.

10   Actually, the first page will work too.  It says I will mail

11   it to you.  What is the address?  You tell him 33 St. Nicholas

12   Avenue.

13   A    Correct.

14   Q    And the date of that is March of 2015?

15   A    Correct.

16   Q    So why are you having things that are going to you mailed

17   to St. Nicholas Avenue?

18   A    Because I knew that it was -- if Emil Friedman would

19   receive the mail, I would receive it.

20   Q    Okay.  So, basically, you're having things sent to you

21   for Two Rivers sent to St. Nicholas Avenue?

22   A    Correct.

23   Q    Okay.  And then Mr. Friedman would what, take that mail

24   and deliver it to you?

25   A    Yes.

Rivera - direct - Nelkin                    270

1    Q    And he would deliver that to the Bronx?

2    A    Correct.

3    Q    And why would things like this not be e-mailed?

4    A    What, the mail?  I don't know what Steve was sending.

5    Q    I think we can go to the next page and see what he was

6    sending, perhaps.  I take it back.  We can't.  It is something

7    else related.

8             Now, Ms. Rivera, you were aware that 33 St. Nicholas

9    Avenue was Mr. Friedman's address; correct?

10   A    Yes.

11   Q    And it was his residence; right?

12   A    Correct.

13   Q    And you were in charge of payroll; correct?

14   A    Correct.

15   Q    I'd like you to look at Exhibit 137, which I have already

16   delivered to them and I will give you.

17            THE COURT:  Okay.

18   Q    Now, do you recognize this type of document?

19            MR. GRANTZ:  I'll object to that.

20            Judge, we don't have markings on it.  Which one?

21            MR. NELKIN:  It's the one for Segundo Mora Pintado.

22   Q    Do you recognize this type of document?

23   A    Yes.

24   Q    What is this document?

25   A    It's the payroll information for Segundo Mora Pintado.

Rivera - direct - Nelkin                    271

1   Q    But I was talking about what type of document is this?

2   Is this a payroll program?

3   A    Payroll.

4   Q    Is this the one that you used to prepare payroll?

5   A    No.

6   Q    Well, what type of -- who used this program to prepare

7   payroll?

8   A    From what I recall from this document, just to figure out

9   the earnings for the payroll to enter it on our system for tax

10  purposes.

11  Q    Well, who generated this document?

12  A    That I don't recall.

13  Q    Well, you were in charge of payroll.

14  A    Correct, but I don't recall.

15  Q    Well --

16  A    I did the payroll on the Launch system.

17  Q    Well, who else did payroll activities?  You don't know?

18  A    I did the payroll.

19  Q    Okay.  And you recognize this document is a type of

20  payroll document?

21  A    Yes.

22  Q    And I'm asking you who would have prepared this type of

23  document?  Who else had any involvement in the Two Rivers'

24  payroll process?

25  A    The only person I would ask before setting up payroll on

Rivera - direct - Nelkin                    272

1   the Launch system as far as tax purposes would be Michael

2   Devine, the accountant.

3   Q    I thought you mentioned that there was someone in his

4   office that you worked with, Sophia --

5   A    Sophie.

6   Q    Sophie?

7   A    Yeah.  Sophie.

8   Q    Would you talk to both Mr. Devine --

9   A    Mr. Devine and Sophie regarding tax purposes.

10  Q    So you're saying that this is a document that they --

11  A    I don't recall.

12  Q    Well, did you receive this type of document on a routine

13  basis?

14  A    No.

15  Q    Now, I'm just curious.  Do you know who Segundo Mora

16  Pintado is?

17  A    Yes.

18  Q    Who is that?

19  A    One of the construction workers that helped built Two

20  Rivers.

21  Q    Did he live with Mr. Friedman?

22  A    No.

23  Q    Do you have any idea why his address is listed as Mr.

24  Friedman's address?

25  A    I'm assuming that it was just entered to get the tax

Rivera - direct - Nelkin                 273

1   purpose -- you know, the tax rates and amounts for the Launch

2   system.

3   Q    Who is in charge of the W-4's for the company?

4   A    I am.

5   Q    Okay.  And would you have had a W-4 for Mr. Pintado?

6   A    I would either have a W-4 or a -- I don't -- I don't

7   remember the name of -- just the form for the tax ID.

8   Q    But it's --

9   A    The working number.

10  Q    But it's your testimony that its Intuit payroll program

11  was not one that you utilized or was on your computer; is that

12  correct?

13  A    Correct.

14  Q    And you believe that it was in Mr. Devine's office?

15  A    I can't say for sure, but if I had any questions

16  regarding payroll or regarding the taxes, I would ask Michael

17  Devine or Sophie.

18  Q    Now, how long did Mr. Segundo work at Two Rivers?

19  A    I don't know for sure.

20  Q    But you would have been the one who prepared his checks?

21  A    Payroll checks, correct.

22  Q    Would they have had this 33 St. Nicholas Avenue address

23  on them?

24  A    I don't recall the address.

25  Q    And the check stubs and things of that related to these

Rivera - direct - Nelkin                    274

1    types of things would be stored where?

2    A    The check stubs, I printed the checks and they were

3    provided to the employees.

4    Q    And then what would you do with the stubs?

5    A    Vincent got the stubs.

6    Q    And what did you do with the stubs once you moved to the

7    Bronx?

8    A    If they were payroll checks, they were printed in South

9    Plainfield, either Nicole had them or Vincent.

10   Q    How many construction workers were there?

11   A    I don't know.

12   Q    Did you have access to QuickBooks on your computer?

13   A    In my computer no, not that I recall.

14   Q    So you only had access to Launch?

15   A    Yes.

16   Q    And corporate?

17   A    And corporate.

18   Q    And you had two separate computers.  Was there one

19   computer that only had Launch and one computer that only had

20   corporate or was there --

21   A    I don't recall.

22   Q    Ms. Rivera, who is Michelle Rosado?

23   A    She was an employee.

24   Q    Did she share office space with you?

25   A    After Jordan left, yes.

Rivera - direct - Nelkin                                              275

1    Q    So when Jordan left, Michelle took over her space?

2    A    Correct.

3    Q    And she took over her computer?

4    A    I believe so.

5    Q    And who left first, you or Ms. Rosado?

6    A    Out of South Plainfield?

7    Q    Yes.

8    A    The day I left, she left.

9    Q    Did she go to the Bronx?

10   A    No.

11   Q    Why did she leave on the same day as you?

12   A    Because she was helping me, and with all of the bickering

13   that was going on, I wasn't going to leave her there.

14   Q    So where did she go?

15   A    She went nowhere.  She stood out of a job.

16   Q    So she just quit?

17   A    (No response.)

18        THE COURT:  Would you please answer out loud if

19   there is a question, otherwise we don't have an answer?  The

20   question was she just quit.

21   A    Yes.

22   Q    And do you know if -- where Jordan went when she left?

23   A    She left -- she was going to go to college.

24   Q    Did she go to any of the defendants and work there for

25   any period of time?

Rivera - direct - Nelkin                    276

1  A    Not that I recall.

2  Q    Do you know who prepared invoices for the oil companies?

3  A    Invoices?  What type of invoices?

4  Q    Invoices for Two Rivers.

5  A    No.

6  Q    Did you ever see invoices from the oil companies to Two

7  Rivers?

8  A    I don't recall at the time.

9  Q    You don't recall today?

10  A    I don't recall right now.

11  Q    If we were to image your computer, what materials would

12  we expect to find there, or what documents would still be

13  there?

14         MR. SCHAFHAUSER:  Objection.  Calls for speculation.

15         THE COURT:  Not in the slightest.  Whose objection?

16         MR. SCHAFHAUSER:  My objection.

17         THE COURT:  No.  It doesn't call for speculation; it

18  calls for her knowledge of what would be found.

19  A    Can you ask the question?

20  Q    What type of materials would we find on your computer?

21  And by your computer, I first mean the My Computer, if we were

22  to image it.

23  A    Documents, probably whatever I scanned and the Launch

24  system and the corporate system.

25  Q    Okay.  You just testified before that you weren't sure --

Rivera - direct - Nelkin                    277

1   well, I withdraw the question.

2   A    You said computers, so I'm telling you what you would

3   find on both computers.

4   Q    I'm talking about the one called My Computer.  The one

5   that you said that you used for Two Rivers' purposes.

6   A    In South Plainfield?

7   Q    Yes.

8   A    Whatever was scanned, any documents that might have been

9   scanned and anything regarding the Two Rivers.

10  Q    What about other companies' documents?

11  A    If I scanned it, yes.

12  Q    Were you in court on December 14th?

13  A    Yes.

14  Q    Okay.  It was represented to us that there was a lot of

15  other companies' materials on your computer.  Do you remember

16  that discussion in court?

17  A    No.

18  Q    It has been represented to us that some of your data was

19  stored in the cloud.  Do you know about any cloud?

20  A    No.

21  Q    Do you remember accessing anything in the cloud?

22       Do you know what the cloud means?

23  A    No.

24  Q    Do you know where your data was backed up?

25  A    Where my data was backed up?

Rivera - direct - Nelkin                    278

1    Q    What --

2    A    I have no idea.

3    Q    Was your computer backed up to a hard drive?

4    A    I have no idea, anything about that.

5    Q    Okay.  Now, when you were in the Bronx, was Jack Ahearn

6    in the Bronx after you moved back?

7    A    No.

8    Q    Do you remember the last time you saw Jack Ahearn in the

9    Bronx?

10   A    Maybe three or five years ago.

11   Q    Okay.  And why is it three to five years ago?

12   A    He was really sick.

13   Q    So he just hasn't been in since then?

14   A    Correct.

15   Q    Okay.  Before he got sick, did you ever see him with a

16   mini computer?

17   A    A laptop.

18   Q    You saw him with a laptop.  What about a mini computer?

19   A    That's what they called it.

20   Q    But that was three to five years ago?

21   A    Yes.

22   Q    And do you -- now, there was some discussion that John or

23   Jack Ahearn has a father.

24              THE COURT:  Pretty much everyone does.

25              MR. NELKIN:  But I am saying who also -- right, I

Rivera - direct - Nelkin                          279

1   apologize.

2   Q    Who also had the same name?

3   A    John Ahearn.

4   Q    Did you ever meet him?

5   A    Yes.

6   Q    And when did you last see him?

7   A    About two weeks ago.

8   Q    Where did you see him?

9   A    The Bronx office.

10  Q    Okay.  And what does he do?

11  A    He just came to visit on a Friday.

12  Q    Does he work there?

13  A    No, not to my knowledge.

14  Q    Has he ever worked there?

15  A    Before, when they had the other companies, yes.

16  Q    How long ago was that?

17  A    Three years ago.

18  Q    More than five years ago?

19  A    Two or three years ago.

20  Q    Now, what did he do at the company?

21  A    He just helped.  His son, John and Larry just gave him

22  little odds and ends just to keep him busy.  They wanted him

23  to keep moving around at his age.  He would just come and

24  visit if they needed copies, you know.

25  Q    But the two sons were the ones that were the owners of

Rivera - direct - Nelkin                    280

1   the company?

2   A    Correct.

3   Q    Okay.  And they were -- were they your boss in any way?

4   A    When I worked for MB Service.

5   Q    And that ended when again?

6   A    When Eugene, Steve and Emil asked me to work for Two

7   Rivers.

8   Q    All right.  Now, did you do any work for Single Serve

9   Beverage Distribution?

10  A    That's a d/b/a for 26 Flavors.

11  Q    What about Crazy Cups?

12  A    D/b/a for 26 Flavors.

13  Q    What about Park Avenue, the defendant Park Avenue?

14  A    No.

15  Q    Do you know if Park Avenue has any operations?

16  A    I don't know.

17  Q    Have you ever heard of Park Avenue?

18  A    I've heard of it.

19  Q    Do you know what it did?

20  A    No.

21  Q    Do you know if it's in existence?

22  A    No.

23            MR. SCHAFHAUSER:  Judge, just objection.

24            I think we are moving far afield for purposes of the

25  hearing.

Rivera - direct - Nelkin                    281

1          THE COURT:  What's the point?

2          MR. NELKIN:  I was trying to figure out which

3    companies she did work.

4    Q    My main question is which defendants have you done work

5    for while work at Two Rivers?

6    A    MB Service before Two Rivers and any other company

7    affiliated with Emil, John and Larry that needed help from me.

8    As a team group, I would help Sylvia or the girls at the oil

9    company.

10   Q    So it could have been any of the defendants?

11   A    Mainly MB Service and 24 Hour.

12   Q    Ms. L, all right, let me go through the list of --

13          THE COURT:  Ms. Rivera.

14   Q    Ms. Rivera, let me go through the list of the people with

15   you.  Did you do any work for Park Avenue?

16   A    No.

17   Q    Did you work for Light Trucking?

18   A    No.

19   Q    MB -- the MB without the one, MB --

20   A    No.

21   Q    The one with the one?

22   A    No.

23   Q    165th Street Realty?

24   A    No.

25   Q    What about the -- strike it.  One second.  Associated

Rivera - direct - Nelkin                           282

1    Fuel?

2    A    Associated Fuel, many years ago.

3    Q    I'm specifically asking while you were working for Two

4    Rivers.

5    A    Oh, no.

6    Q    24 Hour Oil Delivery?

7    A    While working for -- just to help the girls.

8            THE COURT:  I am sorry to do this one more time, I

9    really apologize.  I will be back in one moment.

10           (Recess taken.)

11           THE COURT:  Please continue.

12           THE WITNESS:  Your Honor, can I go to the ladies'

13   room?

14           THE COURT:  Of course.

15           Everyone else, take a break.

16           MR. SCHAFHAUSER:  Thank you.

17           (Recess taken.)

18           (Continued on following page.)

19

20

21

22

23

24

25

Rivera - direct - Nelkin                    283

1           (In open court.)

2           THE COURT:  Is everybody ready?

3           MR. NELKIN:  Yes.

4           THE COURT:   You're about to wrap up?

5           MR. NELKIN:  Very close.

6           THE COURT:  A few minutes, please.  We're making

7    such slow progress.  I'm loath to impose time limits.  It's

8    going to get to that point quickly.

9    BY MR. NELKIN:

10   Q    Ms. Riviera, why did you not use a Brooklyn Beans e-mail

11   account when you were in Brooklyn?

12   A    Because I had already opened the Sonia Two Rivers coffee

13   at Yahoo.

14   Q    You interfaced with vendors using a nonBrooklyn Beans

15   account?

16   A    Correct.

17   Q    Did other people use personal e-mails in Brooklyn Beans?

18   A    I don't know.

19   Q    Beside Mr. Friedman, do you know of anyone else who

20   didn't use a Brooklyn Beans e-mail account?

21   A    Steve, Mayer and Eugene.

22   Q    Did not?

23   A    They used other e-mails.

24   Q    Ms. Rivera, did they do that for Two Rivers business?

25   A    Yes.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Rivera - direct - Nelkin                    284

1   Q    Now, Ms. Rivera, where did Two Rivers bank?

2   A    Excuse me.

3   Q    What bank did they use?

4   A    Signature Bank.

5   Q    Does that bank have any branches in New Jersey?

6   A    I don't know.

7   Q    Do you know who handled deposits into Signature Bank for

8   Two Rivers?

9   A    Deposits?

10  Q    Yes.

11  A    If they were physical checks, Steven.

12  Q    Steve deposited things --

13  A    Through I think some electronic machine he had in his

14  office or something.

15  Q    Was there any pink deposit slips that you had ever seen?

16  A    That too.

17  Q    Where were those from?

18  A    Those were from Signature Bank.

19  Q    And were those for deposits made at the branch?

20  A    Deposits also.

21  Q    Who is in charge of keeping records of those in-person

22  deposits?

23  A    I would keep them.

24  Q    Who would make those in-person deposits?

25  A    I would give them to Mr. Friedman.

Rivera - direct - Nelkin                    285

1    Q    And Mr. Friedman made all the in-person deposits?

2    A    I give them to him.  I don't know if he did them or he

3    gave them to someone else.  I gave them to him.

4    Q    Who gave you back the pink slips?

5    A    Sometimes he would.

6    Q    Did anyone else?

7    A    Not that I recall.

8    Q    And what would you do with those slips?

9    A    I would get them and I would attach them to the copies of

10   the deposit slips.

11   Q    And then where would you file those?

12   A    Two Rivers files.

13   Q    Now, once you went to the Bronx, where would you file

14   those?

15   A    I really had none.

16   Q    There were no in-person deposits after --

17   A    From what I recall, no, because they were getting all the

18   mail.  Steven.

19   Q    This is not a mail thing.  This is something that someone

20   hands you back.  You just said Mr. Friedman handed that stuff

21   back to you?

22   A    If I did a deposit, which I don't recall making deposits

23   in the Bronx.  Steven did the deposits electronically.  So

24   there was no slip.

25   Q    You're saying that in the nine months that you were in

Rivera - direct - Nelkin                286

1   the Bronx there were no in-person deposits at Signature Bank?

2   A    That I recall, I don't remember making a deposit for Two

3   Rivers.  I can't remember.

4   Q    I'm not asking you if you made it.  I'm asking you if you

5   know if Mr. Friedman or anyone --

6   A    I don't know.  A lot of the payments were incoming wires

7   and if there were checks Steven set up to get them in the P.O.

8   and he had access to the P.O., not Mr. Friedman.

9   Q    But you didn't have any in the Bronx?

10  A    Not that I recall.

11  Q    Okay.  So you didn't return any to Two Rivers?

12  A    I don't remember.  Whatever I had I put in the box and I

13  submitted it.

14  Q    Ms. Rivera, when you sent your things from your iPhone

15  did it indicate that it was coming from your iPhone?

16  A    I'm pretty sure it did.

17  Q    And what about your iPad?

18  A    I'm pretty sure it did.

19  Q    If we saw documents that were not marked with iPhone or

20  iPad, can we assume they came form your computer, yes?

21         MR. SCHAFHAUSER:  Objection.

22         MR. FINKEL:  Objection.

23         THE COURT:  Overruled.

24  Q    Did you work on Sunday?

25  A    On Sunday?

Rivera - direct - Nelkin                    287

1   Q     Yes.

2   A     I don't recall working on a Sunday.

3   Q     Do you ever recall working in Two Rivers' facility on

4   Sunday?

5   A     On a Sunday?  I don't recall.

6   Q     Did you have a card key to get into Two Rivers?

7   A     South Plainfield?

8   Q     Yes.

9   A     Yes.

10  Q     Ms. Rivera, do you have the ability to transfer funds

11  using your computer between Office Coffee and Two Rivers?

12  A     With the transfer request form, if Emil had signed it,

13  yes.

14  Q     So you did have that ability?

15  A     I would scan it and send it.

16  Q     You could make a -- those accounts were linked?

17  A     The accounts were not linked.  That's why you had to

18  request to transfer funds, so the bank could do it for you.

19  Q     And what type of request would you send to the bank?

20        MR. SCHAFHAUSER:  Objection, your Honor.  I thought

21  we went through this already with this witness, this very same

22  question about transfers.

23        THE COURT:  I recall it was Ms. Ezell.

24        MR. SCHAFHAUSER:  If I'm mistaken, I apologize.

25        THE COURT:  Okay.

Rivera - direct - Nelkin                    288

1   Q    So your testimony is that you couldn't use your computer

2   to transfer funds between the two accounts?

3   A    Office and Two Rivers?

4   Q    Yes.

5   A    You had to submit a request form signed by Mr. Friedman

6   through the bank.

7   Q    Did you obtain records for those transfers?

8   A    Once I scanned them, yes.

9   Q    Could we find those on your computer or in your files?

10  A    You could find them in the computer.  They were scanned.

11  Q    Did you ever use your phone or iPad to use LogMein?

12  A    LogMein, no.

13  Q    Ms. Rivera, I asked you before about your neighbor

14  William Rivera, are you related to him?

15  A    Who?

16  Q    I'm sorry.  Edward Rivera.

17  A    If I'm related to him?

18  Q    Yes.

19  A    No.

20  Q    Just your neighbor?

21  A    Yes.

22       MR. NELKIN:  Your Honor, if I check my notes for two

23  minutes and then I think we're done.

24       (Pause.)

25  Q    Ms. Rivera, how many e-mail accounts of Mr. Friedman's

Rivera - direct - Nelkin                    289

1    did you communicate with?

2    A    Associatefuel@yahoo.com.  Emil@tworiverscoffe.com.

3    Q    What about Emil 1193?

4    A    He didn't use that one.

5    Q    He could communicate with you using those different

6    e-mails?

7    A    Mainly associatedfuel@yahoo.com and Emil Two Rivers.

8    Q    Was there any reason he would use one or the other?

9    A    I have no idea.

10   Q    I meant by the nature of the communication.

11   A    I don't know.

12   Q    Ms. Rivera, you said that Mr. Salcedo help you move the

13   record, correct?

14   A    Yes.

15   Q    Now, it's my understanding that Mr. -- that you left in

16   March sometime 2015, is that correct?

17   A    Correct.

18   Q    Now, it's my understanding Mr. Salcedo was let go on

19   March 1 or 2?

20   A    I don't recall what date.

21   Q    Do you know if he was allowed in the facility when he was

22   helping you remove the records?

23   A    I don't know.

24   Q    Do you know how he got into the facility?

25   A    No.

Rivera - direct - Nelkin                    290

1    Q    Did you let him into the facility?

2    A    No.

3    Q    Do you know what time of day the records were removed?

4    A    I know it was in the afternoon, late evening.

5    Q    Do you know if Mr. Koenig was in the building?

6    A    I don't recall him being in the building.

7    Q    Do you know if Mr. Schreiber, the plaintiff, was in the

8    building?

9    A    No.

10   Q    Do you know if Eugene Schreiber was in the building?

11   A    No.

12   Q    And when you say no, you mean you don't know?

13   A    I don't remember seeing them in the building.

14   Q    What about Mr. Friedman?

15   A    No.

16   Q    Ms. Rivera, do you know any instances where Two Rivers

17   employees were paid in cash?

18   A    Two Rivers were paid in cash?

19   Q    Yes.

20   A    No.

21   Q    So you didn't keep any records of any employees being

22   paid in cash?

23   A    No.

24        MR. FINKEL:  Objection.

25        THE COURT:  Overruled.

Rivera - direct - Nelkin                    291

1   Q    Ms. Rivera, did you have any role in endorsing anyone

2   else's Two Rivers' check besides your own?

3   A    Endorsing checks?

4   Q    Yes.

5   A    No.

6   Q    Do you know if anyone else endorsed other people's

7   checks?

8   A    No.

9   Q    What about vendor checks?

10  A    Vendor checks?

11  Q    Yes.  Do you know of any instances where a vendor check

12  was endorsed to someone besides the vendor?

13  A    Besides the vendor?  No.

14  Q    Ms. Rivera, who paid for your iPhone?

15  A    My iPhone?  24 Hour.

16  Q    It was a company phone?

17  A    I'm not sure if it was 24 Hour.  The oil company.

18  Q    Is that still the case?

19  A    Yes.

20  Q    Even though you work for 26 Flavors?

21  A    Yes.

22  Q    And was that true when you worked at Two Rivers?

23  A    Yes.

24  Q    So it's always been the 24 Hour?

25  A    Let me rephrase.

Rivera - direct - Nelkin                    292

1          I don't know for a fact who pays.  But when I
2   received the company phone I was working for MB Service.  I'm
3   assuming it's the oil company.  I don't know for sure who pays
4   for that bill.
5   Q    Besides your salary are there any other perks or benefits
6   that you receive from any of the defendants or from Two
7   Rivers?
8   A    Besides my salary?
9   Q    A car, an iPad?
10  A    There was an agreement between Emil and Eugene for my
11  car.
12  Q    Now that you are no longer with Two Rivers, how is that
13  working?  Who pays for the car now?
14  A    I give the invoice to Mr. Friedman and Sylvia.
15  Q    Prior to that it was on the Two Rivers books?
16  A    Yes.
17  Q    Would it have been input into Launch Coffee or a
18  different system?
19  A    It was paid by Two Rivers.
20  Q    I'm asking what system recorded it.
21  A    The Launch System.
22          THE COURT:  Which Launch System?
23          THE WITNESS:  Two Rivers.
24          THE COURT:  Go ahead.  Sorry.
25  Q    And besides the car and your phone -- did they pay the

Rivera - direct - Nelkin                    293

1  monthly phone bill?

2  A    I'm assuming, yes.  I don't know which company.

3  Q    You wouldn't happen to know if they paid for Ms. Ezell's

4  phone?

5  A    I don't know.

6         MR. SCHAFHAUSER:  Objection.  Who is they?

7         THE COURT:  She doesn't know.

8  Q    What about internet service or anything else?  Was there

9  anything else they paid for you?

10        THE COURT:  They who?

11 Q    I meant any of the defendants.

12 A    I don't know.

13 Q    Do you have internet service at home?

14 A    At home?

15 Q    Yes.

16 A    Yes.

17 Q    And who pays for that?

18 A    I do.

19 Q    Okay.  That's what I was asking.

20        MR. NELKIN:  I have nothing further, your Honor.

21        THE COURT:  Are you going to go first, Mr. Finkel.

22        MR. FINKEL:  Yes.

23        THE COURT:  Do you need a break or are you ready to

24 go?

25        MR. FINKEL:  Two minutes.

1          THE COURT:  Feel free to get up for a couple of

2    minutes.  I'll be right back.

3          (Recess.)

4          THE COURT:  Are you ready?

5          MR. FINKEL:  Yes, your Honor.

6    CROSS-EXAMINATION

7    BY MR. FINKEL:

8    Q    Good afternoon, Ms. Rivera.

9    A    Good afternoon.

10          MR. FINKEL:  Your Honor, excuse me.  I'm having some

11    discomfort.

12          THE COURT:  Do you need a moment?

13          MR. FINKEL:  Since lunch, I'm not really feeling

14    well.  If I ask you -- okay.

15          THE COURT:  I'll accommodate you as needed.

16          MR. FINKEL:  I'll be all right.

17    Q    Ms. Rivera, you testified in answer to numerous questions

18    about two computers that you used in some way with regard to

19    Two Rivers; is that correct?

20    A    Correct.

21    Q    I would like to try to take you through that so that we

22    can clarify which computer was what and when and where.

23    A    Okay.

24    Q    When you first began to work as a bookkeeper for Two

25    Rivers, you were working in the Bronx, is that correct?

Rivera - cross - Finkel                    295

1   A    Correct.

2   Q    And you used a computer, is that correct?

3   A    That's correct.

4   Q    And that computer and your work at that time was before

5   the Launch Coffee program started; is that correct?

6   A    Correct.

7   Q    And there was another bookkeeping program that was used?

8   A    That's correct.

9   Q    And what was the name or what did you all call that

10  computer?

11  A    The corporate computer.

12  Q    So let's refer to the computer you used as the corporate

13  computer as the corporate computer.  Okay?

14  A    Okay.

15  Q    That's the computer you used in the beginning in the

16  Bronx for Two Rivers?

17  A    Correct.

18  Q    Then there came a time that your work station, if you

19  will, was relocated to South Plainfield, New Jersey?

20  A    Correct.

21  Q    And when you working as a bookkeeper in South Plainfield

22  did you use that corporate computer?

23  A    I used another computer.

24  Q    Another computer.  A second device?

25  A    A second device.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Rivera - cross - Finkel                    296

1  Q    And on that device did it have the Launch Coffee software

2  program on that computer?

3  A    Correct.

4  Q    That's when you began to use Launch Coffee; is that

5  correct?

6  A    That's correct.

7  Q    A the corporate computer, the first computer, the

8  corporate computer, that computer remained in the Bronx, did

9  not go with you to New Jersey?

10 A    No.

11 Q    Stayed in the Bronx?

12 A    Stayed in the Bronx.

13 Q    And so for the period of time that you were working in

14 South Plainfield as a bookkeeper for Two Rivers, you did not

15 use the first corporate computer unit, correct?

16 A    Correct.

17 Q    Now, the second computer, the Launch computer, if you

18 will, that's the computer you referred to in your affidavits

19 as "my computer for convenience purposes"?

20 A    My computer, correct.

21 Q    That's the second Launch computer, yes?

22 A    Correct.

23 Q    And at sometime when you began to use this Launch

24 computer the Launch System had data, information, that had

25 been on the old corporate system carried over and transferred

Rivera - cross - Finkel                          297

1   to the newer Launch System; is that correct?

2   A    Correct.

3   Q    Now, next there came a time that you relocated from South

4   Plainfield back to the Bronx; is that correct?

5   A    Correct.

6   Q    And when you did that immediately did the second

7   computer, the Launch computer, move back to the Bronx with

8   you?

9   A    No.

10  Q    So when you got to the Bronx how did you access the

11  Launch program?

12  A    I used a corporate computer through LogMein to log into

13  the computer, my computer, in South Plainfield.

14  Q    Again the South Plainfield computer is the Launch

15  computer?

16  A    Correct.

17  Q    And this first computer, still in the Bronx, that we call

18  the corporate computer, you used the LogMein program to access

19  Launch?

20  A    Correct.

21  Q    And while you did that it's my understanding that the

22  first corporate computer was merely a portal, an access point,

23  in order to get to your Launch computer, correct?

24  A    Correct.

25  Q    And am I correct that all the material -- withdrawn.

Rivera - cross - Finkel                    298

1          That all your work was really being done on the

2    second Launch System?

3    A    Correct.

4    Q    Now, then there came a time that the second computer, the

5    Launch computer, was moved to you from South Plainfield, New

6    Jersey, up to the Bronx, correct?

7    A    Correct.

8    Q    Why was that done?

9    A    Because it was my computer.

10   Q    Did you ask for that to be done?

11   A    Yes.

12   Q    Is there any particular reason you did that?

13   A    I was comfortable with that computer and I wanted to work

14   on that computer instead of using LogMein.

15   Q    Was LogMein as convenient as working directly on your

16   computer?

17   A    No.

18   Q    And so did you ask someone to move the computer up to the

19   Bronx for you?

20   A    I asked Emil.

21   Q    And that's how it transpired?

22   A    Yes.

23          THE COURT:  What was different about LogMein?

24          THE WITNESS:  It was faster, the speed.

25          THE COURT:  How long had you been using LogMein

Rivera - cross - Finkel                    299

1  before you made that change?

2         THE WITNESS:  I can't recall the time.

3         THE COURT:  Days, months, years?

4         THE WITNESS:  Probably months.

5         THE COURT:  Go ahead.

6         MR. FINKEL:  Thank you, your Honor.

7  BY MR. FINKEL:

8  Q    As of today, now, both the first computer, the corporate

9  computer, and the second, the Launch computer, they are up in

10 the Bronx, correct?

11 A    Correct.

12 Q    And since -- withdrawn.

13        Did there come a time that you received instructions

14 to stop using the second Launch computer?

15 A    December 14, 2015.

16 Q    And how did those instructions come about?

17 A    I received them from you.  But I was in the court that

18 day.

19 Q    That was because of what transpired in court?

20 A    Correct.

21 Q    In fact, when you got back to the Bronx after that court

22 proceeding on December 14, what, if anything, happened to that

23 computer, this number two Launch computer?

24 A    I unplugged them.

25 Q    As far as you know, -- withdrawn.

Rivera - cross - Finkel                    300

1      Have you used that computer at any time for any
2  purpose since that unplugging on the 14th?
3  A    No.
4  Q    Now, did there come a time -- withdrawn.
5      Since December 14, 2015, did you use or have you
6  used the first computer, the corporate computer?
7  A    No.
8  Q    And those two computers, can you tell us where they are
9  now?
10  A    Mr. Friedman's office.
11  Q    And was there a purpose that they were put in
12  Mr. Friedman's office?
13  A    Yes.  They were interfering with my sitting arrangement.
14  You know, they were underneath my desk.
15  Q    Was that done for any security purposes?
16  A    I just didn't want them -- I was not using them.  I can't
17  have access to them.  I didn't want them there.  There was no
18  need for me to have them there.
19  Q    As of right now, do you know whether your second
20  computer, the Launch computer, could actually access, gain
21  information to or from the Launch -- the Two Rivers Launch
22  System?
23  A    They can gain access?  I don't know.
24  Q    Now, did there come a time that you were asked to give up
25  your password to the Launch System?

Rivera - cross - Finkel                                301

1    A    Yes.

2    Q    And, in fact, did you do that?

3    A    Yes.  I provided you the user ID and the password.

4    Q    I direct your attention to Exhibit 101.  Before you do

5    that, can you tell us do you recall what your password was?

6    A    I think it was Sonia user ID.

7    Q    Yes.

8    A    And the password I think it was Cafe 9474.

9    Q    Now, could you direct your attention to Exhibit 101.  Is

10   that an e-mail that discloses your password to plaintiff's

11   counsel, Mr. Nelkin?

12   A    Yes.

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Rivera - cross - Finkel                           302

1   BY MR. FINKEL:

2   Q    And the date of that e-mail was?

3   A    December 15, 2015.

4   Q    And that's the date immediately --

5   A    The very next day after the court date.

6   Q    And have you used that -- withdrawn.

7        Have you used that password for any purposes since

8   December 14?

9   A    No.

10  Q    And both these computers in the Bronx have been powered

11  down, have not been connected to electricity since that date,

12  December 14?

13  A    Correct.

14  Q    Now, can you go back to when you were working in South

15  Plainfield?

16       Can you tell us why you were moved, your work space

17  was moved back to the Bronx, why that happened?

18  A    I spoke to Mr. Friedman.  I called him and I told him I

19  was not comfortable there because Steven and Eugene were

20  constantly coming into my office, slamming the door and

21  arguing back and forth, arguing with me, sometimes in their

22  own language, and I felt they were, like, harassing me.  I

23  didn't feel comfortable there anymore.

24  Q    And when you say "their own language," do you mean

25  Yiddish?  Jewish?

Rivera - cross - Finkel                    303

1    A    I'm assuming.  I have no idea what they were speaking.

2          It wasn't English and it wasn't Spanish.  Those are

3    the only two I know.

4    Q    And prior to that move back to New Jersey, did your

5    responsibilities or your duties as bookkeeper begin to change?

6    A    Yes.

7    Q    Can you tell us what that change or changes were?

8    A    I didn't have much communication with them.

9    Q    By "them" you mean?

10   A    With Eugene and Steven.

11         I had more communication with Mayer, known as Israel

12   Koenig.  And I wasn't receiving much information from the

13   vendors any longer.

14   Q    Do you know why that was so?

15   A    I asked Nicole --

16         THE COURT:  You asked who?

17         THE WITNESS:  Nicole.  I don't recall her last name.

18   They hired her.  They hired Nicole after I left and they had

19   her running the books, she told me, in Quickbooks.

20   Q    Did you learn whether some personnel at Two Rivers had

21   communicated with vendors and instructed them not to

22   communicate with you?

23   A    Yes.

24         MR. NELKIN:  Objection.

25         THE COURT:  Overruled.

LAM      OCR      RPR

Rivera - cross - Finkel                              304

1   Q    And do you know how that communication was achieved?

2   A    Nicole told me she called some vendors and e-mailed them,

3   not to forward me any invoices or bills, that she was in

4   charge, not me.

5   Q    And did that instruction to vendors occur before you

6   moved back to the Bronx?

7   A    After.

8   Q    And did that change the volume of the work that you did

9   for Two Rivers?

10  A    Definitely.

11  Q    In what way?

12  A    I didn't have as many vendor files or bills, invoices,

13  backup anymore because I wasn't receiving anything from the

14  vendors.

15  Q    And would you say that the majority of the vendors no

16  longer communicated with you?

17  A    Correct.

18  Q    The vast majority of vendors?

19  A    Most of the vendors weren't communicating with me any

20  longer.

21  Q    And during this same period of time, was a separate, a

22  new bookkeeping system established by some people at Two

23  Rivers?

24  A    They had -- Steve and Vincent Papa had been running the

25  books on Quickbooks before this.

Rivera - cross - Finkel                            305

1  Q     Okay.  And did you have access to this Quicks bookkeeping
2  system for Two Rivers?
3  A     No.
4  Q     And at that same time, were you still the bookkeeper of
5  Two Rivers?
6  A     Correct.
7  Q     Did the plaintiff Mr. Schreiber, Steven Schreiber, have
8  access to the Two Rivers Launch system at that time?
9  A     Yes.
10 Q     And did Mr. Papa also have access to the Two Rivers
11 Launch system at that time?
12 A     Yes.
13 Q     So, my understanding is they had access to both the
14 Quickbooks and the Two Rivers Launch system but you only had
15 the Two Rivers Launch system?
16 A     Correct.
17 Q     So, is my understanding correct that there are really two
18 parallel bookkeeping systems running?
19 A     Correct.
20 Q     Now, did you ever provide anyone with information that
21 you used, that you obtained, in your role as the Two Rivers
22 bookkeeper to be transferred to the Quickbooks system that the
23 other people were running?
24 A     Yes.
25 Q     And how did that happen?

Rivera - cross - Finkel                                306

1   A    I would provide all the information that was entered on

2   my system to Vincent Papa.

3   Q    And how often did you provide information --

4   A    Whenever they would ask.  But, again, they had access to

5   the Launch system, so they could just copy everything over.

6   Q    Did anyone actually ask you to transfer or to provide

7   information that you had from the Launch system to them for

8   the Quicks system?

9   A    Vincent asked.

10  Q    And how often did he ask?

11  A    Weekly.

12  Q    Weekly?

13  A    Yes.

14  Q    And did you ever ask for the information they had,

15  Mr. Papa had, on the Quickbooks system to be input into the

16  Launch system?

17  A    Not at all.

18  Q    So, is it fair to conclude that --

19          THE COURT:  Let's leave the conclude argument to

20  later.  Let's stay with factual matters, okay?

21          MR. FINKEL:  I believe I am, most respectfully, your

22  Honor.

23          THE COURT:  Whatever it's fair to conclude he'll

24  argue to me.

25          Next question.

LAM      OCR      RPR

Rivera - cross - Finkel                    307

1          MR. FINKEL:  Thank you.  I won't argue.

2   Q    Now, while you were at the South Plainfield location, did

3   you -- how many printers did you use?

4   A    One I had in my office.

5   Q    And when you moved back to the Bronx and you were working

6   on Two Rivers, how many printers did you use?

7   A    I had one in that office.

8   Q    And did you use another printer remotely that was in

9   another location?

10  A    Yes.

11  Q    And where was that other printer located?

12  A    The one I left in my office in South Plainfield.

13  Q    And, so, you were able to print to the printer in your

14  office in the Bronx or the printer in the old office in South

15  Plainfield?

16  A    Correct.

17  Q    Did you, in fact, use both printers?

18  A    Correct.

19  Q    What, if any, documents did you print to the printer in

20  South Plainfield?

21  A    Checks.

22  Q    What kind of checks?

23  A    Payroll checks.

24  Q    And --

25  A    And vendor checks.

Rivera - cross - Finkel                    308

1   Q    And what kind of documents, if any, did you print to the

2   printer in the Bronx office?

3   A    Reports or checks.

4   Q    Would you say that you printed more to one printer than

5   the other?

6   A    Yes.

7   Q    Which printer received the most use during that period of

8   time?

9   A    South Plainfield.

10  Q    Significantly more use?

11  A    Yes.

12  Q    After documents were printed, after any material was

13  printed to the printer in South Plainfield, did you ever get

14  those papers back to you in the Bronx?

15  A    Checks?  No.  It was mainly checks.  No, I never received

16  any -- no checks that I printed over there or anything, not

17  even the stubs.

18  Q    During that period of time when you were in the Bronx

19  using the two printers, did you ever have difficulties with

20  the printers?

21  A    Yes, I did.

22  Q    And was there a person or persons that you called for

23  assistance to resolve the difficulty?

24  A    For payroll checks?

25  Q    For any kind of printing.

Rivera - cross - Finkel                               309

1   A    I would call Nicole.  And if it had to do with payroll
2   checks, I'd call Chris Yaede.
3   Q    Were the difficulties ever computer/mechanical-type of
4   difficulties?
5   A    Might have been, yes.
6   Q    And who would you have called for that kind of a problem?
7   A    Ben.
8   Q    Anyone else?
9   A    That I recall, no.
10  Q    Would you have called Yossi?
11           MR. NELKIN:  Objection.
12           THE COURT:  Overruled.
13  A    I might have once or twice, I'm not sure.  I don't
14  remember.
15  Q    Let's return to shortly after the court appearance here
16  on December 14, 2015, if we can.  As a result of that court
17  appearance, did you do anything in your Bronx office with
18  regard to paper records, hard copy records?
19  A    On that day coming -- returning from the --
20  Q    Yes.
21  A    I boxed the files that I had from -- for Two Rivers.
22  That's what I was told.
23  Q    And what did you do with those -- withdrawn.
24           You boxed them yourself, personally?
25  A    Personally.

Rivera - cross - Finkel                    310

1  Q    And did you go through all your files to make sure you

2  had accumulated all the Two Rivers documents?

3  A    Yes.

4  Q    And what did you do with those materials?

5  A    I boxed them and covered them and waited for someone to

6  pick them up.

7  Q    And why were they being picked up?

8  A    Because I was told that they were going to pick up the

9  files and take them.  I was not allowed to have them any

10 longer.

11 Q    And where were they going to be taking these files?

12 A    That, I don't recall.

13 Q    Do you know whether these files were supposed to be

14 provided to the plaintiff, to Mr. Nelkin?

15 A    Yes.

16 Q    Now, you testified in answer to a number of Mr. Nelkin's

17 questions that you left certain hard copy documents, papers,

18 in the South Plainfield office that you didn't take up to the

19 Bronx; is that correct?

20 A    Correct.

21 Q    Those documents that were left in South Plainfield, after

22 you moved back to the Bronx did you ever have access to those

23 documents again?

24 A    No.

25 Q    And do you know where those documents are now?

Rivera - cross - Finkel                         311

1  A    I left them in South Plainfield.  I don't know if they

2  removed them.  I just left them there.  I don't know anything

3  after that.

4  Q    So, the last you know of them --

5  A    I left them in the cabinets in my office in South

6  Plainfield.

7  Q    In answer to questions previously, you talked about

8  mailing addresses.

9  A    Correct.

10  Q    And you talked about a post office box that Steven

11  Schreiber had established.

12  A    Correct.

13  Q    If you know, what happened to the mail that went to that

14  post office box?

15  A    The mail that -- what happened to the mail?

16  Q    Yes.

17  A    You'll find it scattered on his desk somewhere.

18           THE COURT:  You indicated "his" desk.  Whose desk?

19           THE WITNESS:  Steven Schreiber.

20           MR. FINKEL:  I'm sorry, your Honor.

21           THE COURT:  Go ahead.

22  Q    Were you ever provided with the materials that were

23  received to that post office box?

24  A    Not all the time.

25  Q    And after you left South Plainfield, after you left South

Rivera - cross - Finkel                          312

1    Plainfield and went back to the Bronx, did you ever receive

2    any of that mail that was delivered to the post office box

3    that Steven Schreiber established?

4    A    Some, yes.

5    Q    Now, you testified that on occasion you communicated with

6    various people -- the Schreibers, Mr. Friedman, Mayer -- after

7    you left the office or were out of the office with your iPhone

8    or iPad; is that correct?

9    A    Correct.

10   Q    How would that -- what kind of communication would that

11   be?

12   A    They would ask me anything about a balance or a vendor

13   payment.

14   Q    My poor question.  Did you use it as a telephone or an

15   e-mail or a text?

16        What was the nature is what I meant.

17   A    I would use an e-mail to reply back.

18   Q    And in order to get into your e-mail when you opened up

19   your iPad or your iPhone, was the e-mail automatically

20   accessible or did you have to log in with a password?

21   A    I would log in to Yahoo, enter my user ID, enter my

22   password, and answer.

23   Q    At any time did you save data from Two Rivers on your

24   iPhone?

25   A    No.

Rivera - cross - Finkel                    313

1   Q    And at any time did you save data from Two Rivers on your
2   iPad?
3   A    No.
4   Q    If I gave you my -- well, I don't have an iPhone, I have
5   a Droid.  If I gave you my phone --
6          MR. FINKEL:  My minicomputer that's in my pocket,
7   your Honor.
8   Q    -- if I give you that device, you could log in on my
9   phone into Yahoo and bring up your e-mails, correct?
10  A    Correct.
11  Q    And you could do that on His Honor's computer at the
12  bench as well?
13  A    Yes.
14         MR. FINKEL:  Excuse me one moment.  I'm looking for
15  an exhibit, I apologize.
16  Q    I'd ask you to look at Exhibit 46, Ms. Rivera.  This is
17  apparently a screen shot of a computer.
18         Is this screen the way you recall your screen on the
19  Launch computer, Computer 2?  Is this the way the screen
20  looked?
21  A    No.
22         THE COURT:  For using Launch or for logging in to
23  the computer itself?
24         MR. FINKEL:  I'm sorry, your Honor?
25         THE COURT:  Are you asking about logging in to

LAM     OCR     RPR

Rivera - cross - Finkel                          314

1    Launch or for logging in to the computer itself?

2              MR. FINKEL:  Any screen.

3              THE COURT:  Do you recognize this at all?

4              THE WITNESS:  No.

5              THE COURT:  Okay.

6              MR. FINKEL:  Thank you.

7    Q    Now, do you recall on the second computer, the Launch

8    computer, whether your name was spelled with a "Y"?

9    A    I don't recall.

10   Q    Is that something that you would recall, if it was

11   spelled improperly?

12   A    Yes.

13   Q    Now, you've testified that since December 14, 2015 that

14   computer, the Launch computer, Computer 2, has been powered

15   down, correct?

16   A    Correct.

17   Q    And as far as you know, has anyone used that computer for

18   any purposes?

19   A    No.

20   Q    Do you think that anyone has used that computer for any

21   purposes?

22   A    No.

23   Q    And when it was put -- when it was unplugged and later

24   put in Mr. Friedman's office, that was done to make sure it

25   wouldn't be used; is that correct?

Rivera - cross - Finkel                          315

1   A    Correct.

2         THE COURT:  I'm sorry, I thought you said you moved

3   it because it was in your way.

4         THE WITNESS:  Yeah, and I didn't want anyone, you

5   know, having access to any of it or touching it or anything.

6   And it was in my way.

7         THE COURT:  I just recalled you saying something

8   other than the question that your counsel asked the second

9   time.

10         THE WITNESS:  It is correct.

11  Q    Now, I direct your attention to Exhibit 113, please.

12  That's another screen shot; is that correct.

13  A    Correct.

14  Q    Is that familiar to you in any way?

15  A    No.

16  Q    Okay.  Do you recall at any time when you were unlocking

17  your computer -- withdrawn.

18         In order to get into Computer No. 2, the Launch

19  computer, you had to turn it on and put in a password to

20  unlock it; is that correct?

21  A    I had to put in a password?

22  Q    Did you have to --

23  A    I would just click on the icons and start working.

24  Q    So, the computer remained on at all times, essentially,

25  yes?

Rivera - cross - Finkel                          316

1   A    Yes.

2   Q    And to start working, you would click an icon?

3   A    Correct.

4   Q    And if the icon was the Launch program for Two Rivers,

5   then you would have to put in your user ID and the password?

6   A    And the password.

7   Q    So, this screen that we're looking at in Exhibit 113, did

8   you have anything that looked like this on your computer?

9   A    No.

10  Q    On that computer?

11  A    No.

12  Q    And on the computer that you used, did it say Park Avenue

13  Associates?

14  A    No.

15  Q    So, would it be fair to say that this exhibit has nothing

16  to do with the computer that you used?

17  A    Correct.

18          MR. NELKIN:  Objection.

19          THE COURT:  You don't recognize it?

20          THE WITNESS:  No, I don't recognize it.

21          THE COURT:  Once again, leave what's fair to say to

22  the post-hearing arguments.

23          MR. FINKEL:  Yes, your Honor.

24  Q    I ask you to turn to the second page of this exhibit,

25  another screen shot.  Do you recognize this screen shot?

LAM       OCR       RPR

Rivera - cross - Finkel                         317

1    A     Only the LogMeIn remote session.

2    Q     But this says more than that.  It says:  This computer is

3    being remotely controlled by Park Avenue Associates/Sonya,

4    with a "Y."

5          Have you ever seen that on any computer you used?

6    A     No.

7

8          (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAM      OCR      RPR

Rivera - cross - Finkel                          318

1   CROSS EXAMINATION

2   BY MR. FINKEL:

3   Q     And then it says something below that, OOL-4B63, and some

4   other numbers dot static dot optline dot net.  Do you know

5   what that means?

6   A     No.

7   Q     Do you ever use optline dot net for any purposes?

8   A     Not that I recall, no.

9   Q     Do you know what that is?

10  A     No.

11  Q     So these screens were not taken on any computer that was

12  ever assigned to you; is that correct?

13  A     Correct.

14  Q     Now, if you had, far lack of a better term, I guess,

15  mechanical difficulties with your computer, you testified

16  earlier that you might have reached out to either Ben Nussbaum

17  or Yossi, I can't pronounce his last name, for assistance; is

18  that correct?

19  A     Correct.

20  Q     At any time did they, either of them, or both of them,

21  ever log into your computer in order to help you fix or to try

22  to fix the problem?

23  A     Yes.

24  Q     Now, you testified in response to a question by Mr.

25  Nelkin, he asked you whether you ever worked at home.  Do you

Rivera - cross - Finkel                              319

1   remember that question?

2   A    Yes.

3   Q    Do you remember your response?

4   A    I said no.

5   Q    Okay.  And -- but at home, is it fair to say that if you

6   received a phone call about Two Rivers from Mr. Friedman or

7   Eugene Schreiber or the plaintiff, you would speak to them;

8   correct?

9   A    I would, yes.

10  Q    From home?

11  A    From home.

12  Q    And you would respond to an e-mail, if you could;

13  correct?

14          MR. NELKIN:  Objection.

15  A    Correct.

16          THE COURT:  Overruled.

17  Q    And you would respond to a text message?

18          MR. NELKIN:  Objection.

19  A    Correct.

20          THE COURT:  What's the objection?

21          MR. NELKIN:  I just thought that he was leading the

22  witness.

23          THE COURT:  Yes, it is cross-examination.

24          MR. NELKIN:  But it is his --

25          THE COURT:  It is cross-examination.  I will allow

1   it.  If you don't want opposing counsel to lead his own

2   client, don't call his own client as a witness on direct

3   examination.

4              MR. NELKIN:  Fair enough.  I will withdraw future --

5              THE COURT:  Excellent.

6              MR. FINKEL:  Thank you, Your Honor.

7              THE COURT:  Let's go.

8   Q    In addition to Mr. Nussbaum and Yossi, do you know if

9   anyone else had the ability to log into your computer?

10  A    No.

11  Q    You don't know or no one did?  What's the answer?

12  A    I don't know.

13  Q    Now, when you worked -- withdrawn.

14             When you responded to inquiries of the Schreibers or

15  Mr. Friedman or anyone else with regard to Two Rivers and you

16  were not in Two Rivers' office, did you put in the time you

17  spent doing that into the system so that you would be paid for

18  that time?

19  A    Not at all.

20  Q    I direct your attention to Exhibit 44.  This is another

21  screen shot; correct?

22  A    Correct.

23  Q    Do you recognize this one?

24  A    Yes.

25  Q    And this is a screen shot of the Launch of the -- of the

Rivera - cross - Finkel                    321

1    Two Rivers' Launch program; correct?

2    A    Correct.

3    Q    Of a portion of the program that is involved with making

4    and recording checks; correct?

5    A    Correct.

6    Q    Now, you have testified that you have not had access to

7    the Launch Two Rivers system since December 14, 2015; is that

8    correct?

9    A    Correct.

10   Q    Did you make this printout or this screen shot?

11   A    No.

12   Q    Do you know who did?

13   A    No.

14   Q    Do you know if this screen shot was made from the

15   computer that is secured in the Bronx now, the Launch system

16   computer number two, do you know if it was made from that

17   computer?

18   A    No.

19   Q    Do you know the date that this screen shot was made?

20   A    No.

21   Q    Hypothetically, if we had a computer here and we could

22   get access to the Launch system, the Two Rivers' Launch system

23   now, could you bring this up on the screen?

24   A    Sure.

25   Q    Now, I direct your attention to the box in the middle

Rivera - cross - Finkel                    322

1  under the audit tab.  It says date and then description, edit

2  account checks.  Do you see that?

3  A    Yes.

4  Q    Could you tell us if you know what that means?

5  A    No, I don't.

6  Q    Do you recall using that particular portion of the

7  program, edit account checks?

8  A    No.  I would have no reason going there.

9  Q    Okay.  It says in the next box user name and it has your

10 name.

11 A    Correct.

12 Q    Spelled correctly this time.

13 A    Yes.

14 Q    And then it says computer, and below that it says

15 server-office-C.  Do you know what that means?

16 A    No.

17 Q    Now, during the time that you were the bookkeeper for Two

18 Rivers the only direct access point that you used for the

19 Launch system was the second computer, the Launch system

20 computer, either directly or remotely; is that correct?

21 A    Correct.

22 Q    Did you ever use any other computer?

23 A    No.

24 Q    Never?

25 A    Never.

Rivera - cross - Finkel                          323

1   Q     Okay.  Now, I'd ask you to go the next exhibit, Exhibit

2   No. 45.  That appears to be another screen shot from the Two

3   Rivers Launch system; correct?

4   A     Correct.

5   Q     Okay.  Again, I would direct your attention to the box

6   that is sort of in the center right, under the tab printing

7   history.  Do you know what printing history means?

8   A     Printing history?

9   Q     Yes.  That's the tab that is being used in this shot.

10  A     I guess it's providing the information of when the check

11  was printed.

12  Q     At a later date?

13  A     At a later date.

14          THE COURT:  Don't guess.  Do you know?

15          THE WITNESS:  Yes.

16          THE COURT:  You do know?

17          THE WITNESS:  Yes.

18          THE COURT:  You have used this?

19          THE WITNESS:  The printing history tab?

20          THE COURT:  Yes.

21          THE WITNESS:  Yes.

22  Q     Under that it has a box printing time and there are two

23  lines under that.  The first one looks highlighted.  Can you

24  read the date in that box?

25  A     I can't read it.

Rivera - cross - Finkel                              324

1   Q     Nor can I.

2         And then the next box to the right says user name.

3   On the first line, who is the user name that is entered there?

4   A     It says admin.

5   Q     Did you have the ability to use the admin user name on

6   the Launch system?

7   A     No.

8   Q     Beneath that is the user name Sonia Rivera.

9   A     Correct.

10  Q     That's how would you log into the system; correct?

11  A     Correct.

12  Q     Now, the next box to the right, it is entitled

13  workstation name and then both boxes below that says

14  office-HP.  Do you know what that means?

15  A     No.

16  Q     Is that a designation of some device that you are

17  familiar with at all?

18  A     No.

19  Q     And then the next box to the right says printer name and

20  it says Bronx check printer.  Is that a printer that you would

21  have been using in the Bronx?

22  A     Correct.

23  Q     Is that the only printer that you used in the Bronx?

24  A     For Two Rivers.

25              THE COURT:  So you would use other printers in the

Rivera - cross - Finkel                                325

1  Bronx for other companies?

2         THE WITNESS:  Oil company has its own.

3         MR. FINKEL:  I'm sorry.  I didn't hear your

4  question, Your Honor.

5         THE COURT:  I asked her if she would use other

6  computers in the Bronx for other companies and she said oil

7  companies.

8         MR. FINKEL:  Thank you.

9         THE COURT:  Are you moving to another exhibit?

10         MR. FINKEL:  Yes, I am.

11         THE COURT:  Before you do that, since the lawyers

12  already asked you about that, I noticed, in both of these

13  exhibits, 44 and 45, below the box where it has the printer

14  history, there is a box that says Passaic check printer.  Do

15  you see that?

16         THE WITNESS:  Correct.

17         THE COURT:  What does that mean?

18         THE WITNESS:  You can select which printer you want

19  the check to print to.

20         THE COURT:  Is that the same as one of the other

21  printers that we have already talked about?

22         THE WITNESS:  Passaic would be the one in South

23  Plainfield.

24         THE COURT:  Got it.  Thank you.

25  Q    And if you selected Passaic, it is supposed to print in

Rivera - cross - Finkel                                326

1   South Plainfield?

2   A    Correct.

3   Q    If you selected the Bronx, it was supposed to print in

4   the Bronx?

5   A    Correct.

6   Q    And you used both?

7   A    Correct.

8   Q    Now, you testified earlier in response to questions from

9   Mr. Nelkin that there came a time that Mr. Friedman told you

10  don't destroy anything with regard to Two Rivers, don't delete

11  anything with regard to Two Rivers; is that correct?

12  A    Correct.

13  Q    Do you recall whether that time that he gave you that

14  instruction was before the court appearance here on

15  December 14, 2015?

16  A    Yes.

17  Q    If I could refresh your recollection, because you said

18  you couldn't remember the precise date, do you recall whether

19  that occurred immediately or shortly after a lawsuit was

20  started in New Jersey?  Does that help refresh your

21  recollection?

22  A    Yes.

23  Q    Is that when Mr. Friedman or why Mr. Friedman told you NO

24  deletions, no destructions?

25  A    Yes, after a lawsuit regarding the samplers.

1  Q    Okay.  Directing your attention to Exhibit 121.  It is a

2  multipage exhibit.  Let's look at the first page first.  Do

3  you see it?

4  A    Yes.

5  Q    The first picture is desktop trays; is that correct?

6  A    Did you say 121?

7  Q    121.

8  A    Correct.  Uh-hum.

9  Q    That's a picture of what?

10  A    Yeah.  That's like the desktop tray to put files or

11  anything.

12  Q    Okay.  And is this an accurate picture of something that

13  was on your desk in South Plainfield?

14  A    Yes.

15  Q    And when you left South Plainfield and moved back to the

16  Bronx, did you leave that there?

17  A    Yes.

18  Q    You didn't take that with you?

19  A    I don't recall taking it with me.

20  Q    And you said that the top tray, the oil -- the tray that

21  is marked oil was documents that Mr. Friedman would leave for

22  you to take back to the Bronx; is that correct?

23  A    To Sylvia or to the girls, uh-hum.

24  Q    That was easy for you because you lived in the Bronx;

25  correct?

Rivera - cross - Finkel                    328

1   A     Correct.

2   Q     And you lived right near Sylvia; correct?

3   A     Correct.

4   Q     So my understanding is you could take those documents

5   home with you, give them to Sylvia and they would appear in

6   the office in the Bronx?

7   A     Correct.

8   Q     Is that what happened?

9   A     Yes.  I wanted to just separate them.

10  Q     Let me go back a step, if I may.  Talking about the

11  checks that you were printing, when you were in the Bronx and

12  you selected the Passaic printer and the checks were printed

13  in New Jersey, did they have to be physically signed by

14  someone?

15  A     Yes.

16  Q     So the printing didn't have a printed signature on the

17  signature line?

18  A     No.

19  Q     Okay.  Do you know who signed the checks that you printed

20  out in Passaic?

21  A     No.

22  Q     Do you know what happened to those checks?

23  A     When I would print them?

24  Q     Yes.  When they would be printed in New Jersey, what

25  happened then?

Rivera - cross - Finkel                          329

1  A    I usually would call Nicole and advise her when I was
2  going to start printing so she can go into the office and
3  retrieve them.
4  Q    And then what, if anything, happened to those checks?
5  A    I don't know.  She took them.  I don't know what they did
6  with them.
7  Q    If they were payroll checks, do you know who distributed
8  them to employees?
9  A    Well, I had very poor communication after I left, so they
10 wouldn't give me much information after that.
11 Q    So your answer is I don't know?
12 A    They would e-mail me and tell me payroll was ready for me
13 to print.  I would print.  I would let them know that the
14 checks were ready and that was it.
15 Q    So they would prepare the payroll and then tell you to
16 make up the checks and print them?
17 A    No.
18 Q    Tell me then.
19 A    Mr. Friedman would go over the hours and when the hours
20 were transferred into the Launch system, I would create the
21 payroll checks.
22 Q    Let's go back to Exhibit 121, the second page.  It is
23 another photograph.  Do you recognize that photograph?
24 A    No.  I mean, I recognize the names.
25 Q    Do you know where that photograph was taken?

Rivera - cross - Finkel                                330

1   A     No.

2   Q     Do you know what this is a photograph of?

3   A     No.

4   Q     Directing your attention to the next page, page three.

5   This is a color photograph of a file drawer.

6              Now, Mr. Nelkin asked you a number of questions

7   about this photograph.  Do you recall your file drawer or a

8   file drawer in your office looking like that?

9   A     At the beginning, yes.  Uh-hum.

10  Q     What do you mean at the beginning?

11  A     They needed space access, so I had to put some of the

12  files together.

13  Q     And when you left South Plainfield and moved back to work

14  in the Bronx, do you know if your file drawer looked like

15  this?

16  A     I don't recall.

17  Q     By looking at this picture, can you tell us whether this

18  is, in fact, a photograph of the file drawer or a file drawer

19  in your office as you left it?

20  A     I have to say one thing, when I was working in Two

21  Rivers, Steven would come into the room and just start

22  snapping pictures.

23             THE COURT:  I'm going to ask you to wait for a

24  question.

25             THE WITNESS:  So I don't know if --

Rivera - cross - Finkel                                    331

1       THE COURT:  Excuse me.  The lawyers ask the

2   questions that they think will be useful for me to understand

3   and you will answer.  It can be sometimes frustrating, but I'm

4   going to ask you to answer the questions and not reply what

5   you think --

6       THE WITNESS:  All right.

7       THE COURT:  Thank you.

8       MR. FINKEL:  Thank you, Your Honor.

9   Q    You actually presumed a question that I was going to ask

10  in a minute or two, so I will ask it now.  By looking at this

11  picture, can you tell us when this photograph was taken?

12  A    I believe it was taken while I was working at Two Rivers.

13  Q    Okay.  Now, Mr. Nelkin said that this suggested to you

14  that this photograph establishes that files were, and I

15  believe his word was intermingled.  Do you remember those

16  questions?

17  A    Yes.

18  Q    Now, as Mr. Nelkin did, I ask you to look closely at the

19  photograph.  Do you see a folder in the front marked --

20  actually what appears the second section marked Office Coffee

21  2013 deposits?

22  A    Yes.

23  Q    Okay.  And can you see documents within that section?

24  A    Yes.

25  Q    Let me interrupt myself.  I've never seen this, but this

1    looks to me like one of those hanging folders.

2    A    Correct.

3    Q    Where you have these green devices that hang on hooks on

4    the sides; is that correct?

5    A    Correct.

6    Q    And this section again, Office Coffee, 2013 deposits,

7    now, you testified that when you left South Plainfield you

8    took some files with you?

9    A    Correct.

10   Q    This would have been one of the files that you would have

11   taken with you; correct?

12   A    Yes.

13   Q    So this suggests, or that suggests that what you

14   testified to a few minutes ago, that this was done while you

15   were still in South Plainfield, this photograph?

16   A    Yes.

17   Q    Okay.  Now, let's look closely at that section.  Do you

18   see some pink slips mixed in?

19   A    Deposit slips.

20   Q    Deposit slips.  And they're mixed in with what appears

21   otherwise to be white papers; is that correct?

22   A    Correct.

23   Q    Can you tell us what that is?  What those are?

24   A    Those are copies of the checks that were deposited.

25   Q    Stapled to the deposit slip?

Rivera - cross - Finkel                                          333

1    A    To the deposit slip.

2    Q    Okay.  At the very front, on the right-hand side, right

3    after that green section begins there is a typed tag.  Can you

4    read what it says?

5    A    Which one?

6    Q    Well, if we were going from bottom to top --

7    A    Okay.

8    Q    -- the first clear delineation is the end of a red

9    folder.  Do you see that?  A red line, a red folder.

10             THE COURT:  Why don't you come and --

11             MR. FINKEL:  May I?

12             THE COURT:  Yes.

13             MR. FINKEL:  Thank you, Your Honor.

14   Q    I direct your attention to this red folder line.

15   A    Uh-hum.

16   Q    That's another one of the hanging folders?

17   A    Correct.

18   Q    And then there is the next section that says Office

19   Coffee 2013 deposits?

20   A    Correct.

21   Q    And then in the front of that section there's this tag on

22   the right, right after the red line.  Can you read what that

23   says?

24   A    I can't see it.

25   Q    Okay.

Rivera - cross - Finkel                    334

1   A    It's too small.

2   Q    Okay.  And then there is, right after the folder that

3   says Office Coffee 2013 deposits, there is another section

4   with a blue tab.  Can you tell us if you can recall what that

5   tab says?

6   A    Deposits.

7   Q    And does it say something before deposits that you might

8   remember that's at least partially obscured?

9        THE COURT:  He's asking if you remember it since you

10  can't see it.

11       THE WITNESS:  No, I don't remember.

12  Q    Okay.  Now, the section that says Office Coffee 2013

13  deposits, that would include only Office Coffee 2013 deposits;

14  correct?

15  A    Correct.

16  Q    It wouldn't be intermingled with something else, would

17  it?

18  A    No.

19  Q    And then the next section that we can read, there are

20  several other sections.  There is the blue tag that looks like

21  something see deposits, and then there is a yellow folder, and

22  then there is a pink line, and then sticking up, it says Two

23  Rivers 2013 deposits; correct?

24  A    Yes.

25  Q    And that was another separate folder; is that correct?

Rivera - cross - Finkel                    335

1   A    Yes.  I kept them separate.

2   Q    And what would be in that folder?

3   A    The deposits for Two Rivers Coffee.

4   Q    And just that?

5   A    And just that.

6   Q    And if we went through all of the other sections, each

7   one would have documents that are defined by the title on that

8   particular folder; correct?

9   A    Correct.

10  Q    Who prepared those folder titles?

11  A    Myself.

12  Q    And you did that to segregate each of the different

13  items; correct?

14  A    Correct.

15       THE COURT:  This is a very persuasive job at

16  explaining the two different senses of the word intermingled.

17  I think you are safe to move on.

18       MR. FINKEL:  Thank you.

19  Q    Just looking at the next two pages, which are other

20  portions of that file or other drawers in the filing cabinets.

21  If I asked you the same questions about the divisions, the

22  answers would be the same; is that correct?

23  A    The same, correct.

24  Q    Okay.

25            (Continued on following page.)

Rivera - cross - Finkel                                336

1   BY MR. FINKEL:

2   Q    I direct your attention to Exhibit 137.  That was one of

3   the extra exhibits.  I don't know if it's in the binder.

4   A    Yes.

5   Q    Before I get to that, with regard to the photos that we

6   just looked at you said that you recall someone taking

7   photographs in your office?

8   A    Yes.

9   Q    Who was taking those photographs?

10  A    Steven with his phone.

11  Q    And do you know -- do you remember when he started to do

12  that?

13  A    After the bickering over the samplers with 26 Flavors.

14  Q    After the lawsuit?

15  A    After the lawsuit.

16  Q    And do you know what the purpose of taking those

17  photographs were?

18  A    I never asked.  He would come into the office, open my

19  drawers, snap pictures at my screen or whatever he wanted,

20  cabinets.  I didn't ask.  The folders were not mine.  They

21  belonged to the company.

22  Q    And the same with the screen?

23  A    The same with the screen.

24  Q    And the same with the computer?

25  A    The same with the computer.

Rivera - cross - Finkel                337

1   Q    Okay?

2        Now, getting back to Exhibit 137.  Is this a

3   document that you prepared.

4   A    No.

5   Q    And do you know what program was used to prepare this?

6   A    No.

7   Q    Does it look to you like something that was taken from

8   the Two Rivers Launch program?

9   A    No.

10  Q    I direct your attention to the lower-right-hand corner

11  and it's actually repeated about three inches above that.

12  There's a section that says or a phrase that says powered by

13  Intuit Payroll.  Do you know what that is?

14  A    No.

15  Q    Do you know if that's a program that you ever used?

16  A    That I used, no.

17  Q    Now, there was some discussion or testimony concerning

18  Jordan Napolitano.  When she was hired her position -- hired

19  by Two Rivers -- her position was to help you; is that

20  correct?

21  A    Correct.

22  Q    And when she began helping you, to your recollection, did

23  she really know the process and the duties of what a

24  bookkeeper does?

25  A    No.

Rivera - cross - Finkel                                    338

1   Q    And who, if anybody, trained her?

2   A    I did.

3   Q    Okay.  If she had questions about what to do, who would

4   she ask?

5   A    Myself.

6   Q    And what if you were away, who would she ask?

7   A    Sylvia.

8   Q    Why would she ask Sylvia?

9   A    Sylvia had more knowledge of bookkeeping and Sylvia was

10  the one who trained me.

11  Q    Is May 31 particularly important day to you?

12  A    It's the weekend of my anniversary.

13  Q    And around that time would you generally take off?

14  A    Yes.

15  Q    Would you always take off?

16  A    I would try to, yes.

17  Q    Is there another period of time that you generally took

18  your four weeks vacation?

19  A    Yes.  I would normally take the end of June, beginning of

20  July or the beginning of August.

21  Q    And so is it fair to say that during those periods you

22  were not available to answer questions for Jordan Napolitano?

23  A    Correct.

24  Q    And it's during those times if she had questions she

25  would, therefore, ask Sylvia Ezell?

Rivera - cross - Finkel                    339

1   A    Correct.

2   Q    Do you know how she would communicate with Sylvia Ezell

3   with questions?

4   A    E-mails.

5   Q    And if she wanted to call Sylvia on the phone, was she

6   able to do that?

7   A    Yes.

8   Q    Now, when you began to work again in the Bronx you

9   testified that vendors were instructed not to communicate with

10  you?

11  A    Yes.

12  Q    And, therefore, your workload decreased?

13  A    Correct.

14  Q    Is that a reason that you were, therefore, assigned to do

15  work for other businesses, as well?

16  A    Yes.

17  Q    And when you boxed up all the records -- withdrawn?

18       When you boxed up the records in December of 2015,

19  after the court appearance here, did you box up all of the Two

20  Rivers records that you found?

21  A    Yes.

22  Q    Did you withhold any records whatsoever?

23  A    No.

24       THE COURT:  Since we'll be finishing with this

25  witness today, let's try and wrap it up.

Rivera - cross - Finkel                     340

1      MR. FINKEL:  Yes, your Honor.

2  Q    Now, Mr. Nelkin asked you about where the data that you

3  recorded in the Launch System was stored and then he used the

4  phrase a word called the cloud.  Do you know what that means?

5  A    No.

6      THE COURT:  It would help to finish up today, as I

7  intend for us to do with this witness, not to have her say a

8  second time that she doesn't know something.

9      MR. FINKEL:  I wanted to follow up on my question,

10 your Honor.

11     THE COURT:  I see.  What's the question?

12 Q    Did there come a time that you were informed that when

13 you saved data to the Launch System nothing gets saved on your

14 computer itself and that the data goes somewhere else?

15 A    Only on that date.

16 Q    On which date?

17 A    The date of the court date.

18 Q    December 14, 2015?

19 A    December 14, 2015.

20 Q    And how did you learn that?

21 A    I asked Ben.

22 Q    And when did you ask Ben, Ben Nussbaum?

23 A    Ben Nussbaum.

24 Q    And when did you ask him?  Was it during the court

25 appearance?

Rivera - cross - Schafhauser                    341

1   A    No.

2   Q    Was it after the court appearance, if you remember?

3   A    No.  It wasn't during.

4   Q    Since December 14, 2015, did you delete any Two Rivers

5   documents from any computer system?

6   A    No.

7   Q    Since Mr. Friedman gave you an instruction not to destroy

8   or delete sometime before that, did you delete any computer

9   documents?

10  A    No.

11  Q    And during those same periods of time, did you destroy or

12  shred or throw out any documents of Two Rivers?

13  A    No.

14  Q    Have you made your best efforts to comply with the orders

15  of this court?

16  A    Yes.

17          MR. FINKEL:  I have no further questions.

18          THE COURT:  Anyone else?

19          MR. SCHAFHAUSER:  Yes, your Honor.  Thank you.

20          THE COURT:  Very, very briefly, please.

21          MR. SCHAFHAUSER:  Yes, your Honor.

22  CROSS-EXAMINATION

23  BY MR. SCHAFHAUSER:

24  Q    Ms. Rivera, you were asked on direct if your computer or

25  computers were imaged today whether you could access the

Rivera - cross - Schafhauser                           342

1   Launch.  Do you remember that line of questions?

2   A    Yes.

3   Q    The computer that had the Two Rivers Launch program on

4   it, you have not used since December 2014, correct?

5   A    Correct.

6   Q    And at that time the passwords that you had for Launch

7   were given to Vince Pappa of Two Rivers, correct?

8   A    The very next day.

9   Q    And since that time you have not accessed Two Rivers

10  Launch, correct?

11  A    No.

12  Q    Therefore, you're not able to state, based on personal

13  knowledge, whether --

14        THE COURT:  If she's not, let's move on to something

15  else.  Anything else?

16        MR. SCHAFHAUSER:  Yes, your Honor.

17  Q    You were asked about the vendors.  How do you know that

18  the vendors were told not to work with you or send e-mail, how

19  do you know that after you returned to the Bronx?

20  A    I noticed I wasn't receiving e-mails from the vendors,

21  the bills to be paid.  And I spoke to Emil about it and then I

22  started requesting through e-mail for the bills to be paid and

23  the vendors were replying that they were told by Nicole for

24  them not to e-mail me the invoices or bills any more, that she

25  was in charge, that I was no longer in charge.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Rivera - cross - Schafhauser                343

1   Q    Now, did you when you returned to the Bronx, did you

2   continue interacting with Mr. Pappa and Nicole about Two

3   Rivers business?

4   A    If I received e-mails from -- any questions regarding any

5   e-mails from certain vendors I would forward them to Vincent.

6   Q    And did Vincent at that time, before this lawsuit

7   commenced, did he complain to you about any lack of

8   information based on files that related to Two Rivers that you

9   had?  Did he complain to you before this case started?

10  A    No, not at all.

11  Q    You testified that -- did Nicole complain about a lack of

12  information regarding Two Rivers before this case started?

13  A    No.  I think they hired Nicole after I left.

14  Q    And you testified that Vincent Pappa had a parallel

15  QuickBooks system, correct?

16  A    Correct.

17  Q    What's your understanding as to the type of information

18  that was available on the QuickBooks system utilized by

19  Mr. Pappa?

20  A    Excuse me.

21  Q    What information, if you know, was accessible on

22  QuickBooks to Mr. Pappa?

23  A    I don't understand what you are asking me.  He had access

24  to QuickBooks.  I didn't.

25          THE COURT:  She doesn't know.  Move on.

Rivera - cross - Schafhauser                    344

1   Q     Was there an Isaac with whom you worked at Two Rivers?

2   A     Yes.

3   Q     What was Isaac's role?

4   A     Isaac was entering all the vendor information into

5   QuickBooks.  He was taking the information from the Launch and

6   entering it in QuickBooks.

7   Q     At whose direction was Isaac doing that, if you know?

8   A     Vincent.

9   Q     He was working with Vincent?

10  A     He was working with Vincent.

11  Q     And Isaac was taking the information that existed on

12  Launch and transferring it into this QuickBooks program?

13  A     QuickBooks, yes.

14  Q     And did Isaac ever tell you before this litigation

15  commenced that there was any information that he lacked to

16  transfer onto the QuickBooks program utilized by Two Rivers?

17  A     Excuse me.

18  Q     Did he ever complain to you that he didn't have the

19  information necessary for his QuickBooks work?

20  A     No.  He had access and he had all the information.  If he

21  had any questions I would answer them for him.

22          MR. SCHAFHAUSER:  Your Honor, I'm just checking my

23  notes.  I may be close to the finish line.

24          THE COURT:  I'm sure you are.

25          (Pause.)

Rivera - cross - Schafhauser                345

1   Q    Ms. Rivera, you testified earlier about the corporate

2   system.  Do you remember that testimony?

3   A    Yes.

4   Q    When did you last use the corporate system in connection

5   with Two Rivers?

6   A    I want to say about 2012.

7   Q    Very well?

8         We talked -- by the way, do you know whether other

9   people used the corporate system subsequently to 2012 or was

10  that when the system was discontinued?

11  A    Other people?

12  Q    Let me rephrase the question.  In my haste to try to move

13  this along I messed it up.  Let me try again.

14        Did the corporate system become inactive at or

15  around the period of time when you last used it.

16  A    Yes.

17  Q    The gentleman Isaac that you mentioned, did you answer

18  all of Isaac's questions regarding data he needed to transfer

19  to the QuickBooks?

20  A    Yes.

21  Q    Did you answer all of Mr. Pappa's questions regarding

22  information and data that he needed for his QuickBooks?

23  A    Yes.

24  Q    Was there any information relating to Two Rivers that you

25  withheld from either Mr. Pappa or Isaac or the Schreibers, for

Rivera - redirect - Nelkin                    346

1   that matter?

2   A    No.

3          MR. SCHAFHAUSER:  Thank you.  I have no further

4   questions.

5          THE COURT:  Anyone else from the defense side?

6          MR. GRANTZ:  No, your Honor.

7          THE COURT:  Mr. Nelkin.

8   REDIRECT EXAMINATION

9   BY MR. NELKIN:

10  Q    Ms. Rivera, you were asked about Exhibit 45 and you were

11  asked about the Passaic printer?

12  A    You are asking me to look at something?

13  Q    Yes, Exhibit 45?

14         (Pause.)

15  Q    Do you know when Two Rivers moved into its facility in

16  South Plainfield?

17  A    When did it move in?

18  Q    Yes.

19  A    No.

20  Q    Do you know it was in a previous facility before then,

21  before it moved into --

22  A    Yes.

23  Q    Do you know where that was?

24  A    Somewhere in Passaic.

25  Q    Okay.  Can you tell me the date of the check -- I'll tell

Rivera - redirect - Nelkin                    347

1    you it.  It says 11/2013?

2    A    Okay.

3    Q    If it turned out they were not in the new building in

4    South Plainfield in 2013, in November, then what would you

5    understand the Passaic check printer to mean?

6    A    The label Passaic check printers were never changed when

7    they moved to Kentile.  Passaic was Jersey.  I already knew

8    that.  If I was in Kentile, I chose the printer check Passaic

9    check printer and if I wanted the check to go to the Bronx I

10   would select Bronx check printer.

11   Q    Before it moved to South Plainfield, was that printer in

12   their previous office?

13   A    There was a printer, yes, in Passaic.

14   Q    In Passaic?

15   A    Yes.

16   Q    Ms. Rivera, one last question.  If you can turn to

17   Exhibit 118.

18   A    118?

19   Q    Yes?

20        If it turned out --

21   A    Can I get there?

22   Q    Yes.

23        (Pause.)

24   A    Okay.

25   Q    If it turned out that there were login times for your

1   hours for any of the days that you said you were on vacation,

2   would that change your recollection as to whether you were on

3   vacation that day?

4              MR. SCHAFHAUSER:  Objection.

5              THE COURT:  Overruled.

6              MR. FINKEL:  Objection, your Honor.

7              THE COURT:  Overruled.

8   A    What are you asking?

9   Q    You testified that you were on vacation on certain days?

10  A    Correct.

11  Q    If it turned out that there was a time record that showed

12  that you were actually working for Two Rivers for that date,

13  would that change your recollection as to whether or not you

14  were on vacation?

15  A    I don't understand what you are asking.

16             THE COURT:  In other words, if you see a record for

17  working hours on the date that you had previously assumed that

18  you were on vacation, would that make you second guess whether

19  you were on vacation or would your memory that you had been on

20  vacation say, no, that's it, even though it says I worked on

21  that date?

22             THE WITNESS:  These hours were entered when I was in

23  the Bronx.  So I didn't have access to the time clock.

24             THE COURT:  In other words, if the paper says you

25  worked hours on a certain date but you recollect thinking that

349

1    you were on vacation --

2           THE WITNESS:  If I look at the date I can remember

3    if I was on vacation.  I can recollect.

4           THE COURT:  You think you were on vacation but there

5    was a paper that says you were working which is correct, the

6    recollection that you were on vacation or the paper that says

7    you worked that day?

8           THE WITNESS:  Either or.  He would enter for the

9    vacation pay, the flat rate.  Mr. Friedman would have to enter

10   a total of hours in order to issue a check for my vacation

11   pay.

12          THE COURT:  It's paid vacation?

13          THE WITNESS:  Yes, your Honor.

14   Q    If you were on vacation, would it have shown overtime or

15   would it have just been a flat rate for the day?

16   A    Usually I would get 45.  That would be like salary.  That

17   was the norm.  I worked 45 to 50 hours.

18          THE COURT:  So whether or not you were at the office

19   or not, if it was vacation, you would get that?

20          THE WITNESS:  That was the agreement he had with

21   Eugene.

22          THE COURT:  Thank you.  You are excused.

23          THE WITNESS:  Thank you.

24          (Witness excused.)

25          THE COURT:  Let's talk about where we stand.  Who is

350

1    next for tomorrow?

2          MR. NELKIN:  That depends on whether or not we're

3    going to continue straight or not.  Some people are not

4    available at certain times.

5          THE COURT:  You said continue straight.  You mean

6    past tomorrow?

7          MR. NELKIN:  Yes.

8          THE COURT:  We'll continue on Monday.

9          MR. FINKEL:  Your Honor, next week I will be out of

10   the country.  It's my 35 wedding anniversary.  I had made

11   reservations month ago.  They are already paid for.

12         THE COURT:  When are you leaving?

13         MR. FINKEL:  Sunday morning approximately 6:00 a.m.

14   and I'm coming back the following Saturday, midday sometime.

15         THE COURT:  All right.

16         MR. FINKEL:  My wife has already put in for vacation

17   and it's been approved by her employer.

18         THE COURT:  All right.  You have to work faster.  We

19   can't spend weeks on this.  After Mr. Finkel gets back, that

20   following morning, that's when we'll be continuing and we'll

21   go day-to-day until it's done.  It's going to wreak havoc on

22   my schedule as well as many of yours I'm sure.  That's what

23   we're going to do.  Have a good night.  I'll see you in the

24   morning.

25         MR. SCHAFHAUSER:  I had a planned vacation the

351

1    following week.

2            THE COURT:  Well, I'm open to suggestions about

3    whose vacation -- if you want to reach an agreement about

4    which of the two weeks we'll go on, I'll hear from you.

5            MR. SCHAFHAUSER:  Very well.

6            Your Honor, a couple of issues.  You asked earlier,

7    your Honor did, about tomorrow afternoon.  My client lives in

8    Lakewood.  He's worried about New York traffic.  He requests

9    that perhaps we could finish at 3:00 o'clock.

10           THE COURT:  We can go to 3:45 as I had mentioned.

11   My understanding Shabbat does not start until about 8:00

12   o'clock.

13           MR. E. FRIEDMAN:  It's 6:30.  From here it's almost

14   three and a half hours.  And the traffic on Friday is crazy.

15           THE COURT:  3:30.

16           Look, Mr. Friedman, and all of you, this doesn't

17   need to take so long.  I'm trying to get this done so that you

18   can return to your lives.  We all have better things to do.

19           MR. GRANTZ:  Your Honor, we would like you to

20   reconsider the ruling from yesterday and the order you entered

21   this morning on the imaging of the computer.  Yesterday the

22   stipulation that was asked for by Mr. Finkel was conditioned

23   on it being the same stipulation that we entered into in

24   December and we have a couple of concerns about Sylvia's

25   computer specifically, which is that computer is being used

352

1    and it has e-mail on it which probably contains attorney

2    client privileged e-mail that shouldn't be disclosed in an

3    image to our adversaries.

4              THE COURT:  Privileged material is included and you

5    have had plenty of time to work this out.  I'm terribly

6    frustrated you have not.  On that basis, no.

7              MR. FINKEL:  There's no effective way to call back

8    attorney-client privilege matter.  If it was competition

9    matter, there's case law, but not attorney-client privilege.

10             THE COURT:  You want to work on it until Monday to

11   turn it over to tell them what to stay away from, that's fine.

12   Otherwise I'm not reconsidering.  Have a good night everybody.

13             (Case adjourned to Friday, July 8, 2016 at 9:30

14   a.m.)

15

16

17

18

19

20

21

22

23

24

25

353

1                           <u>I N D E X</u>

2

3    <u>WITNESS</u>                                              <u>PAGE</u>

4

5       **SYLVIA EZELL**

6          CROSS EXAMINATION CONTINUES

7          BY MR. FINKEL                                  138

8          CROSS EXAMINATION

9          BY MR. SCHAFHAUSER                             152

10         REDIRECT EXAMINATION

11         BY MR. NELKIN                                  160

12      **SONIA RIVERA**

13         DIRECT EXAMINATION

14         BY MR. NELKIN                                  172

15         CROSS-EXAMINATION

16         BY MR. FINKEL                                  294

17         REDIRECT EXAMINATION

18         BY MR. NELKIN                                  346

19

20

21

22

23

24

25