354

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF NEW YORK
2

3    STEVEN SCHREIBER,               ) Civil Action
                                     ) No. 15-6861 (CBA-JO)
4              Plaintiff,            )
                                     ) EVIDENTIARY HEARING
5    vs.                             ) (Day 3)
                                     )
6    EMIL FRIEDMAN, et al.,          ) Brooklyn, New York
                                     ) Date:  July 8, 2016
7              Defendants.           ) Time:  9:30 a.m.
    _____

8
          TRANSCRIPT OF EVIDENTIARY HEARING (Day 3)
9                      HELD BEFORE
      THE HONORABLE MAGISTRATE JUDGE JAMES ORENSTEIN
10             UNITED STATES MAGISTRATE JUDGE
    _____

11
                  A P P E A R A N C E S
12

13   For the Plaintiff:            Jay Philip Nelkin, Esq.
                                    Carol Nelkin, Esq.
14

15   For Defendants Emil Friedman    Paul Hans Schafhauser, Esq.
     and New York Best Coffee, Inc.:
16

17   For Defendants E&I Investors    David B. Grantz, Esq.
     Group, LLC, E&J Funding Co., LLC,
18   E&J Management Inc., and
     E & Jeryg Management Corp., LLC:
19

20

21   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.
22   _____

23   Court Reporter:           Michele D. Lucchese, CSR, RPR
                               Official Court Reporter
24                             United States Courthouse, Room N375
                               225 Cadman Plaza East
25                             Brooklyn, New York  11201
                               718-613-2272

355

1    APPEARANCES (Cont'd):

2

3    For Defendant 24 Hour Oil         David Grantz, Esq.
     Delivery Corp., MB Fuel
     Transport, MB Fuel Transport
4    I, Associated Fuel Oil Corp.,
     Light Trucking Corp.; 165 Street
5    Realty Corp.; Park Avenue Associates:

6

7    For Defendants Sylvia Ezell,      Richard Avery Finkel, Esq.
     Sonia Rivera, and Jorge Salcedo:

8

9    For Defendants Michael Devine     Richard Bruce Feldman, Esq.
     and Michael Devine, CPA:

10

11   For Defendants Geoffrey Hersko    Andrew W. Gefell, Esq.
     and Geoffrey S. Hersko, P.C.:

12

13   For Defendants Solomon Birnbaum,  Maurice Heller, Esq.
     Single Serve Beverages Distribution,
     Crazy Cups, 26 Flavors, LLC,
14   Office Coffee Services, LLC, and
     Two Rivers Coffee, LLC:

15

16

17

18

19

20

21

22

23

24

25

1           (In open court.)

2           THE COURT:  Good morning, everybody.  Have a seat.

3           Mr. Nelkin, who is your next witness?

4           MR. NELKIN:  Emil Friedman.

5           THE COURT:  Before we get started, here is what I am

6    thinking.  We will go until 3 o'clock.  I'm going to count on

7    everybody to finish this witness and we will shave 15 minutes

8    off of lunch time to get a little more time in.  We will

9    excuse Mr. Friedman at 3:00 and we will all talk about where

10   we are going from here in terms of scheduling.  Okay?

11          MR. SCHAFHAUSER:  We appreciate that.

12          One other thing.  I left the binder.  What I didn't

13   do -- these three boxes, and counsel has all of this from

14   yesterday, these three boxes are actually Exhibit 1, but I

15   didn't want to put them in the way of the --

16          THE COURT:  Fair enough.  Please come to the witness

17   box.

18          (Witness takes the witness stand.)

19          (The witness sworn/affirmed by the Court.)

20   **EMIL FRIEDMAN**,

21       called as a witness, having been duly

22       affirmed, was examined and testified as follows:

23   DIRECT EXAMINATION

24   BY MR. NELKIN:

25   Q    Mr. Friedman, please state your full name for the record.

1   A    Emil Friedman.  33 St. Nicholas Avenue, Lakewood, New

2   Jersey 08701.

3   Q    33 St. Nicholas Avenue, is that your residence?

4   A    Yes.

5   Q    And how long have you resided there?

6   A    Reside, I'd say maybe seven years, eight years.

7   Q    Okay.  Do you have any other residences?

8   A    No.

9   Q    What about in Florida?

10  A    I'm sorry, I meant here.  Yes.

11  Q    What do you have in Florida?

12  A    I have a condominium, two condominium in West Palm Beach.

13  Q    When you say two condominiums, what do you mean?

14  A    Apartment.

15  Q    Is it two or is it one?

16  A    It's two.

17  Q    There are two separate units?

18  A    Two separate units.

19  Q    Okay.  Do you live in both of them or --

20  A    Not really, no.  Just one.

21  Q    What is in the other one?

22  A    Empty for the kids, everybody, whoever comes.

23  Q    Okay.  Now, Mr. Friedman, in connection with this

24  hearing, you provided two affidavits; is that correct?

25  A    Yes.

Friedman - direct - Nelkin                    358

1   Q    I'd like you to look at the first one, which is

2   Exhibit 102.  I'd like for you to look at the signature page.

3   It is right after page 8.

4   A    Page?

5   Q    It is right after page 8.  It is the page after.

6   A    Yeah.

7   Q    You signed this on the 2nd of May?

8   A    Yes.

9   Q    And that's your signature above it?

10  A    That's my signature, yes.

11  Q    Do you have any other signatures you use?

12  A    No.

13  Q    So that's the way your signature looks?

14  A    Yes.

15  Q    Okay.  Can you turn to exhibit -- well, first off, before

16  you signed this affidavit, had you read it?

17  A    Yes.

18  Q    Did you read it right before signing it?

19  A    Yes.

20  Q    Your second affidavit, did you read that one?

21       THE COURT:  I'm going to assume that everybody read,

22  understood, and swore to the truth of their affidavits.  Let's

23  keep in mind there is no jury here.

24  Q    Okay.  If you can turn to Exhibit 109 and turn to where

25  you signed that affidavit.  That's your second affidavit.

1   A    Yes.

2   Q    Is that your signature?

3   A    Yes.

4   Q    But you just told me that you only had one signature and

5   it looked like the other one?

6   A    I signed both the same ways.  It's the same signature.

7   Q    Mr. Friedman, they look considerably different to me?

8           THE COURT:  If you want to make an argument about

9   that, you'll you will make it later.  Move on.

10          MR. NELKIN:  Okay.

11  Q    If we can turn back to Exhibit 102.

12          Now, in this exhibit, Mr. Friedman, you talk about

13  your house and you say you did no Two Rivers' work at your

14  house; is that correct?

15  A    Yes.

16  Q    Is that true?

17  A    That I don't do work in my house?

18  Q    That you don't conduct Two Rivers' business from your

19  house?

20  A    I conduct e-mails from my house.

21  Q    What about receive Two Rivers' mail from your house?

22  A    Yes.

23  Q    What about receive bills at your house?

24  A    Yes.

25  Q    What about receive government regulations -- regulatory

1   information at your house?

2   A    Yes.

3   Q    Okay.  Can you tell me what the registered address of Two

4   Rivers is?

5        THE WITNESS:  Can I explain something, Your Honor,

6   if I may.

7        THE COURT:  You can answer the question, is what you

8   can do.

9        THE WITNESS:  Okay.

10  A    Can you repeat again one more time the question?

11  Q    Do you receive government regulatory information at your

12  house?

13  A    Yes.

14  Q    And what is the registered address of Two Rivers, the

15  official registered address of Two Rivers?

16  A    I think it was -- I think it was my house, at first, I

17  think it was South Plainfield, I'm not sure, but I know it was

18  my house after.

19  Q    What is it today?

20  A    I have not done anything since the lawsuit started.

21  Q    Do you still receive mail at your house for Two Rivers?

22  A    Very rarely.

23  Q    What do you do with that when you receive it?

24  A    It's laying there.

25  Q    So Two Rivers has no way of knowing whether or not --

Friedman - direct - Nelkin                    361

1   A     I'm not allowed to touch anything.  I'm not allowed to do

2   anything.

3            THE COURT:  Who said you are not allowed to touch

4   it?

5            THE WITNESS:  They told me nothing to do with Two

6   Rivers since the -- I understood.

7            THE COURT:  That's not the instruction that you gave

8   him, I'm sure, that he can't touch mail, Mr. Schafhauser?

9            MR. SCHAFHAUSER:  No.

10           THE COURT:  Okay.  Mr. Schafhauser at a break will

11  explain to you why that's incorrect and why you are required

12  to do otherwise.

13           Go ahead, please.

14           MR. SCHAFHAUSER:  I will --

15           THE COURT:  We will go ahead with the questioning

16  now.

17           MR. SCHAFHAUSER:  Very well.

18  Q     Mr. Friedman, is it fair to assume that you still have

19  Two Rivers' documents at your house?

20  A     Yes.

21  Q     Did anyone ever come to your house to collect documents?

22  A     No.

23  Q     Did you ever search your house for any Two Rivers'

24  documents?

25  A     It's all -- okay.  I'm sorry.  You asked me did I ever

Friedman - direct - Nelkin                    362

1  came to search.  I miss said about --

2  Q    Wait.  Wait.  Let's stop there.

3          THE COURT:  He's trying to correct his answer.  Let

4  him do so.

5          MR. NELKIN:  Okay.

6  A    I think it was after or before, I don't recall the date.

7  We had about four attorneys come to our house and they took

8  apart everything in my house and checked everything.

9          THE COURT:  When was that?

10          THE WITNESS:  I think it was -- I don't remember if

11  it was after the first appearance in court.  I'm sure it was

12  after the first appearance.

13          THE COURT:  So soon after the December appearance.

14          THE WITNESS:  Correct.

15          THE COURT:  Go ahead.

16  Q    Did they find anything?

17  A    They find a couple of boxes.  Whatever they found, they

18  took it away.

19  Q    When you say a couple of boxes, how many boxes?

20  A    I really don't recall.

21  Q    More than one?

22  A    Yes.

23  Q    More than two?

24  A    I think also, yeah.

25  Q    More than three?

1   A    I don't know.  I know for sure quite a few boxes, but I

2   don't know.  Two, three.  I'm not sure.

3   Q    Did they collect documents from any other place that you

4   have an office?

5   A    Yes.  They did the same thing; they came to the Bronx.

6   They were there for two days.  I wasn't really there and they

7   took quite a few boxes.  I don't know how many again.

8         And also went to my Brooklyn office, the same story.

9   And they also collected -- I also wasn't there and they

10  collected everything, whatever they felt was necessary.

11  Q    And who assisted them in that collection?

12  A    I left it open for them.  I had nothing to hide.  I left

13  it open everywhere.

14  Q    And how big is your office in Brooklyn?

15  A    The office in Brooklyn is maybe about 1,100 square foot,

16  900 square foot.

17  Q    How many offices?

18  A    One second.  One, two . . . I think about five, if I am

19  not mistaken.

20  Q    Okay.  Did anyone search your computer at your house for

21  documents?

22  A    Yes.

23  Q    Who did that?

24  A    Again, I --

25         THE COURT:  Answer, sir.

1    A     Just me.  Only me.

2    Q     And what did you find?

3    A     Nothing.  I never . . . the only thing I did is e-mails.

4    I never did anything else in my office or anywhere else.  I

5    just physically -- I never dealt with any customers.  I never

6    dealt with any vendors really.  In the three years of business

7    I may have had maybe, maybe 20 direct e-mails with vendors or

8    something maybe.

9    Q     How big is your office in the Bronx?

10   A     Maybe 12 by 10.

11   Q     How big is the building?

12   A     The building is a whole block.  It's basically going from

13   165th Street to 166th Street.  The big part is warehouse, is

14   warehouse, and I just have one office there.

15   Q     Okay.  Did you do any searches there?

16   A     Yes.

17   Q     What did you search for over there?

18   A     Again, I didn't have nothing.  I barely go there since --

19   the past four, five years.  I barely go there and I never did

20   anything.

21   Q     Did you search any computers there?

22   A     Only my personal computer there.

23   Q     And did you find anything on that computer?

24   A     No, besides an e-mail maybe.

25   Q     So you -- but you used that a computer in the office for

Friedman - direct - Nelkin                    365

1   the same way, to get e-mails and things?

2   A    Only receive e-mails.  Like I said, I barely send back

3   e-mails, or e-mails from the attorney back and forth, constant

4   e-mails from the attorneys, whether it was Paul or Jack

5   Hirschfeld, but that's about it.  Maybe my accountant.

6   Q    You're saying you only used your e-mail to receive and

7   send e-mails to attorneys?

8   A    No.  I said mostly that's what I have.  I don't -- I

9   don't -- I explained to you, unfortunately I'm -- I'm not good

10  at writing, I definitely not, and I'm embarrassed sometimes

11  the way I do it, so I don't really send e-mails.

12  Q    Do you receive e-mails?

13  A    Yes.

14  Q    Do you receive Two Rivers' e-mails?

15  A    Yes.

16  Q    Do you save those e-mails?

17  A    I think, yes, it's there.

18  Q    So if someone sent you a Two Rivers-related e-mail, then

19  it --

20  A    It should be there, yes.

21  Q    Both at your home computer and in the Bronx?

22  A    Yes, it should be there.

23  Q    What about your computers in Brooklyn, did you search

24  those?

25  A    It's the same e-mail, so I don't -- again, I don't have

1    an office in Brooklyn specially.  In Brooklyn, I don't have an

2    office.  I just sit in the conference.  I don't have an office

3    there.

4    Q    We will return to your various offices in a moment.

5            Let me just ask you this:  Do you know if -- you

6    gave all of your documents to -- well, all of your documents

7    were either given by you or collected by the attorneys?

8    A    Basically, in the Brooklyn office, I was clearly

9    instructed, clearly to everybody, somebody is going to come

10   there.  I didn't know how many, and they can open up all the

11   file cabinets, everything, and they did.  Very, very clear.

12   They were there -- I don't know, I think twice.  Whatever they

13   found, they found.

14   Q    Was there anyone to guide them in looking?

15   A    No.  We just gave it open.  We told them they can go

16   anywhere they want.

17   Q    Okay.  We will come back to that.

18           On your first affidavit -- let's go back to that

19   one.  You talked about there was a -- you mentioned the

20   different computers that you had, but I don't believe you

21   mentioned any of these computers in the Bronx or in Brooklyn.

22   Why is that?

23   A    I mentioned -- say it again.  I didn't understand the

24   question.  One more time.

25   Q    You were asked, I believe, to provide a list of all of

1   your computers and you only listed a couple of computers and

2   today you just listed several more.  I'm just wondering why

3   those weren't --

4   A    I have Benzion and he -- unfortunately, I don't know

5   nothing about computers, very, very little, almost nothing.

6   Q    Let me stop you there.

7   A    No, I just want to understand.  So I gave Benzion -- he

8   sets up all of my computers, wherever it was.  I don't know

9   how to set it up.  I asked him to go through all of my places,

10  please go there.  Whatever he gave it, that's what I have.

11  Q    That's the second affidavit, I believe, that you're

12  talking about.  I'm talking about in your first one where you

13  were asked to list different computing devices.

14  A    Right.

15  Q    You listed your home computer?

16  A    Right.

17  Q    And you listed the office computer at Two Rivers?

18  A    Okay.

19  Q    I don't believe you listed any other computers for you.

20  Okay.

21  A    If I didn't, I can only say that it's a mistake.  I never

22  used anything for Two Rivers or anything, or any other

23  business.  The only thing really there is basically for the

24  oil and my e-mail.

25  Q    Now, all right.  You also didn't mention your iPad or

1  your iPhone.  Can you tell me why those weren't mentioned?

2  A    I mean, the first time that I learned about it, I think

3  it was in here by Your Honor, the iPad and iPhone is the same

4  as a computer, number one.  And number two, I don't have it --

5  I don't have -- I make a mistake with iPhone and iPad always.

6  The only thing I have is the Verizon iPhone, what I have, six.

7  Today it is called number six.  I don't have no iPad anymore,

8  years.  I don't have a laptop.  All of these, I don't have.  I

9  used to have only for personal -- in the beginning, I bought

10 it because it was a gimmick and --

11            THE COURT:  Wait, wait, wait.

12            THE WITNESS:  Sorry.  Sorry.

13            THE COURT:  You are saying you do have others that

14 you consider personal?

15            THE WITNESS:  No.  I had one iPad and I had one

16 laptop.

17 Q    Okay.  What happened to those two items?

18 A    My laptop was very, very old, big.  It was big.  It was

19 big, and the last time that I came back from trying to -- I

20 don't remember, two, three years ago, whenever I came back,

21 somehow the battery fell down, fell off, I don't know, on the

22 plane somewhere, and I realized when I came home I didn't have

23 it.  Right after this, I was trying to get one.  Basically, I

24 couldn't.  I found it was too expensive, so I -- basically,

25 that was ended.

1    Q    Now, I think in your affidavit you said that you thought

2    it was two or three years ago that you lost the laptop?

3    A    Yes.  I said the last time when I came back from China,

4    two or three years ago approximately.

5    Q    Could it have been less than that?

6    A    No.

7    Q    Do you remember getting any proposals for the sale or the

8    purchase of Two Rivers?

9    A    Yes.

10   Q    Do you remember getting those while you were in China?

11   A    No, not at all.

12   Q    Do you know who you were traveling to China with?

13   A    Yes.

14   Q    Who?

15   A    Eugene.

16   Q    Have you traveled to China since then?

17   A    No.

18   Q    So the last time that you traveled to China Eugene was

19   with you?

20   A    Correct.

21   Q    So we can, I'm sure, date that.

22        Let me ask you a question:  What did you do with the

23   laptop?

24   A    Basically, threw it out.  It was -- it was worthless.  I

25   have never -- I never did anything on it.  You know people

1    keep stuff, information.  I never did anything.  The whole

2    thing was worthless for me.  I never did anything.

3    Q    Did you safe the data on it in any way?

4    A    Nothing.  Nothing.

5    Q    You just throughout the --

6    A    Everything.

7    Q    Did you do take any steps to protect the security of the

8    information that might be on there?

9    A    First of all, I don't know how to save it, number one.

10   Number two is I didn't have anything there to be saved.

11   Q    Now, you testified that you lost the battery.  The

12   battery just fell out of it?

13   A    Yes.

14   Q    Now, the laptops that I've had typically have a plug that

15   you can plug in.

16   A    I tried it.  It didn't work.  I have tried it.  That's

17   exactly correct.  The battery goes out.  It didn't work.

18   Q    So your testimony is you couldn't use the computer

19   without the battery?

20   A    That's correct.

21   Q    And that the plug was useless?

22   A    That's correct.

23   Q    Do you remember the manner in which you threw out the

24   laptop?

25   A    What do you mean by manner?

1    Q    Did you just put it in the garbage?  Did you give it

2    away?

3    A    No, I just threw it out.  I really don't recall.

4    Q    How often do you travel?

5    A    How often do I travel?  I would say maybe three times a

6    year maybe.  Twice a year.

7    Q    I think just in the past month you have gone out of the

8    country at least once or twice; isn't that true?

9    A    I haven't been out for the past year and a half or

10   something.  That's true.

11   Q    Now, you travel among many different offices; is that

12   correct?

13   A    You're talking about here?

14   Q    Here.

15   A    I only travel two offices.

16   Q    Well, historically, you used to travel to three, didn't

17   you?  Two Rivers, the Bronx, and Brooklyn?

18   A    Two Rivers, Bronx, and Brooklyn, yes.

19   Q    And now you travel to two?

20   A    Yes.  Brooklyn. . . .

21   Q    And you don't find the need for a laptop when you travel?

22   A    Not at all.  First of all, today it's much easier, you

23   can -- in every hotel you can open up the e-mail there and you

24   can look at your e-mail anywhere you want.

25   Q    What about saving documents and things like that?

Friedman - direct - Nelkin                372

1    A    I don't have.

2    Q    Okay.

3            THE WITNESS:  If I may, Your Honor, say something.

4            THE COURT:  You have answered the question.  Your

5    lawyer may ask you some things to clarify, but wait for

6    lawyers to ask you questions.

7            THE WITNESS:  Thank you.

8    Q    I believe, in your affidavit, you said that you lost your

9    iPad in 2002 or in -- 2012 or 2013?

10   A    I don't think I said I lost it.

11           What you mean by iPad, you're talking about --

12   again, just --

13   Q    Let me ask you what happened to your iPad?

14   A    The glass broke and it was old one.  It must have been

15   old.  So I had it for five days, maybe four days.  Again, they

16   charged me $200 to fix it.  We bought a new one.  I never used

17   it.  I don't even know how to use it unfortunately.  I wish I

18   would, and that was the end of it.

19   Q    But you did use it, isn't that correct, to send Two

20   Rivers e-mails and things?

21   A    Very, very rarely.  The only time I went, even to China,

22   I didn't know how to use it.  I used to go to Eugene and say

23   please set it up for me, to make sure why it doesn't work.  I

24   would have been lost completely without him if I was there by

25   myself.

1   Q    Do you remember if anyone ever set up a keyboard for your

2   iPad?

3   A    I think, yes.

4   Q    Who did that?

5   A    Again, I think Mayer set it up me.  I was trying to use

6   it.  Mayer bought me like a keypad attachment, right, but I

7   could never use it also.

8   Q    That would be Mayer Koenig?

9   A    Yeah.  I think he bought it to make my life more easy,

10  but it was impossible.

11  Q    Where was he setting up that keyboard for you?

12  A    He set it up for me in the Bronx.  I'm sorry, no, I think

13  it was maybe South Plainfield.

14  Q    That's a Two Rivers' office?

15  A    Yes.

16  Q    Was that connected in any way to the Two Rivers' computer

17  systems?

18  A    I don't think so.

19  Q    How --

20  A    I couldn't connect it.  For this one I would have needed

21  what's his name.  I don't -- I would have needed computer guys

22  to set it up for me over there, if any, and I don't believe it

23  was set up.

24  Q    Do you know who paid for the iPad?

25  A    I don't know.

1  Q    Do you know if Two Rivers paid for it?

2  A    I really have no idea.  I don't know.

3  Q    Do you know if Two Rivers was paying a monthly charge for

4  your iPad?

5  A    When I have it, I don't know, but possibly.  I don't

6  know.

7  Q    When they had it, it's possible that they were paying for

8  it?

9  A    It's possible.

10 Q    Okay.  Would it -- well, let me ask you this:  If they

11 were paying -- they wouldn't have paid for it if you didn't

12 have it; is that correct?

13          MR. SCHAFHAUSER:  Objection.

14          THE COURT:  Overruled.

15 A    I don't know.  I really don't know.  I was never hooked

16 up to Two Rivers even, so I don't know.  I don't believe for a

17 second it was on Two Rivers' account or Two Rivers' something,

18 I don't believe.

19 Q    Now, did you have credit card charges allocated among the

20 different companies that you have an interest in?

21 A    Yes.

22 Q    And were charges allocated to Two Rivers?

23 A    Again, I didn't do it.  I gave them -- I gave my personal

24 credit card free for them to use it because one of the things

25 -- they did use their own card.  The second thing was due to

Friedman - direct - Nelkin                    375

1  my line of credit, we would have half-a-million-dollar work to

2  pay the bills, maybe five weeks, six weeks, as long as they

3  were able to -- as long as they were paying it, they had

4  credit, credit line.

5            THE COURT:  You are going to have to slow down your

6  speech so we can record it.  You have to make an effort, sir.

7            THE WITNESS:  Okay.

8  Q    Who made the decision as to which company to allocate a

9  charge to?

10  A    What happened was Sonia -- Sylvia, I'm sorry, not Sonia.

11  Sylvia goes in automatically every morning to each of my

12  credit cards to any charges to make sure there is no fraud or

13  anybody saying -- and she knows the charges.  So if she sees

14  card number five is a charge, then she knows who it belongs,

15  whether it's Two Rivers, whether it's Schreiber, whether it's

16  me.  And then she will call up and say please make sure you

17  send me a backup to it, the receipt of the things.  That's how

18  we know.

19  Q    But who makes the decision as to which company it goes

20  to?

21  A    Whatever they need it -- remember, this card is used for

22  not only for them but for other people.  So whenever there's

23  money, I mean not -- if there's a line available, credit,

24  that's what they use.  It's usually the same one.  Nobody

25  makes a specific decision.

1  Q    I'm not understanding your answer.  There is one credit

2  card account that has a lot of charges that could go to many

3  different companies?

4  A    Right.

5  Q    Who decides which company it goes to?  It can only be

6  correct for one company.  One company either incurred the

7  charge or didn't incur the charge.  I want to know how you

8  decide which company actually incurred the charge.  Who would

9  make that decision?

10  A    If I understand, if I'm giving you a credit card, right,

11  and you're number shows up as a charge, I know it is you.

12  There's no decision to be made.

13          THE COURT:  Let's try it this way:  If there is a

14  charge to on your card personally, your name, who makes the

15  decision about which company to put it on?

16          THE WITNESS:  If I go outside and make a charge on

17  it, on this card, if I -- if I would have bought it for any

18  other company, then I would -- when the Sylvia sees there's a

19  charge Emil Friedman, then she says is this for you or for the

20  company.

21          THE COURT:  So you make the decision?

22          THE WITNESS:  Only on mine.  Every person makes on

23  his own.  Every person makes on his own.

24          THE COURT:  So Ezell is communicating with every

25  cardholder?

Friedman - direct - Nelkin                377

1      THE WITNESS:  That's exactly correct.  Right.

2      THE COURT:  That's t testimony.  Let's move on.

3  Q    Dov Sandberg, what company did he work for?

4  A    What happens is --

5      THE COURT:  What company did he work for?

6      THE WITNESS:  Dov Sandberg works for -- is a partner

7  in the real estate.

8  Q    Okay.  Well, so -- I will move on.  Let me show you

9  Exhibit 84.  I'd like you to look at the second page of that.

10 Now, do you see on the upper left, about an inch or so below

11 the top it says Dov Sandberg?

12 A    Yes.

13 Q    And it says 6966 next to --

14 A    Yes.

15 Q    Okay.  Is that a Dov Sandberg credit card?

16 A    Yes.

17 Q    If you can look down at the actual big box where it has

18 the charge, it has a $30 computer charge.

19 A    Yes.

20 Q    Okay.  And the date on the second one is 4/13/2015?

21 A    Yes.

22 Q    Okay.  If you turn back the page, you will see a number

23 of charges to that same number.  They are all either 30 or

24 $40, starting in --

25 A    Let me explain what it is so that you know.  The company

1  allows everybody to pay a certain amount for the phone.  I --

2  my phone -- the management has approximately, maybe about 40,

3  50 phones, I'm not sure, altogether from all of our thing

4  because we have a deal with Verizon.  I think it came to

5  average $30, $40 each phone a charge a month.  This one gives

6  us a free calls, free data, free whatever it is.  So what I

7  understood was many times -- most of the time, like what I

8  previously described, the company was paying $300 some odd for

9  a telephone.  I didn't do it weekly.  So many times I would

10  tell Dov just give me $30, $40 and I would tell the company to

11  pay it.

12         THE COURT:  Mr. Friedman, this is the second time or

13  third time that I have had to explain it to you, let me be

14  clearer.  To accommodate your interest in leaving earlier than

15  I otherwise planned, I'm trying to keep things orderly so that

16  you are responding questions rather than making speeches that

17  you think are appropriate.  The lawyers are trained to ask the

18  questions that will elicit the answers that will help me to

19  make a decision that I have to make.  It only lengthens the

20  time that you are going to be here, probably past when you

21  hope to leave.

22         THE WITNESS:  I apologize.

23         THE COURT:  For you to ignore that rule and make

24  speeches of your own.  I trust that you do understand now.  Do

25  you --

1          THE WITNESS:  I apologize.

2          THE COURT:  Do you understand?

3          THE WITNESS:  Yes.

4          THE COURT:  Let's proceed from this point forward

5     with question-and-answer format.  Go ahead, sir.

6     Q    So what is it that you are saying this charge was for?

7     A    It's only charge for telephone, for telephone.

8     Q    If you could turn back to page 2 of this same exhibit,

9     Exhibit 84.

10    A    Yes.

11    Q    Can you tell me what it says under charge source?

12    A    Yes.  It says computer.

13    Q    Okay.  And can you tell me what it says on the next page,

14    under expense group?

15    A    It says also computer.

16    Q    Okay.  And I will represent to you that the next couple

17    match that and say computer on it.  Can you tell me why it

18    would say computer if it was not for a computer?

19    A    I did not put which category it goes in, I wouldn't even

20    know how to do it.  It's basically Sonia.

21    Q    If you could turn back to Exhibit 56, please.  This is an

22    e-mail exchange between Gene Schreiber and Sonia Rivera where

23    Eugene Schreiber is questioning a particular charge, $30

24    computer charge like the ones we were looking at.

25    A    Yes.

1  Q    He says -- he asked what this bill is for and her answer

2  is it's for Emil's iPad.  Now, do you understand there is a

3  difference between an iPad and iPhone?

4  A    Yes.

5  Q    Okay.  Do you have any reason to -- well, do you know why

6  she would say it was for an iPad if it was not for iPad?

7  A    I said before, I make sometimes mistakes between iPhone

8  and iPad, so it could have been very possibly she called me up

9  about the card, she asked me what is this charge?  She usually

10  calls me or texts me or e-mails, I'm not sure myself.  She

11  tells me what is the charges of this $40?  I say whatever you

12  want, say it's a phone, iPad, whatever you want, it's for me.

13  Q    So would that mean that Two Rivers was paying for your

14  iPhone?

15  A    I only have an iPhone.  It had to be only an iPhone.

16  Q    Who was paying for it?

17  A    Two Rivers paying for this, my iPhone.

18  Q    So that would be a company phone?  You're saying that

19  this is a company phone then?

20  A    No.  It's not a company phone.  They allow a certain

21  amount of charges that you're allowed to send and the company

22  pays it back, but it doesn't mean that it's the company's

23  phone.

24  Q    Now, Gene Schreiber was a partner in the company; right?

25  A    Yes.

Friedman - direct - Nelkin                    381

1    Q    Wasn't he entitled to know what the correct charge was

2    for?

3    A    Yes.

4    Q    So were you just making up the --

5    A    No.  I wasn't making up.  Like I said, it wasn't a

6    regular basis that I took my monthly -- my allowance on

7    monthly charge.  I didn't took regular, so whenever. . . .

8    Q    So it's your testimony you could just decide when to put

9    expenses on the Two Rivers --

10   A    No, not at all.

11   Q    What guidelines were there?

12   A    I was allowed to charge every month $30 or $40, whatever

13   they allowed us to do.  I think it was more than 40.  I was

14   allowed to charge $40.  The fact that I did not take it every

15   month doesn't mean that I can't do it.

16   Q    Were there any other computing-related devices that you

17   charged Two Rivers for, whether regularly or intermittently?

18   A    I don't know.

19   Q    When the Judge asked you to report all of your computing

20   devices, what did you do?

21   A    I told Paul -- I basically -- I'm sorry.

22            MR. SCHAFHAUSER:  I just want to caution the witness

23   about the attorney-client privilege.

24            THE COURT:  Please don't instruct the witness how to

25   answer.  He has been asked what he did.  He is going to tell

1  us what he did.

2       MR. SCHAFHAUSER:  All right.

3  A    I basically stopped him in using anything and I basically

4  told they can come and check my computers, they can do

5  whatever they wanted.  There was nothing there.

6  Q    I thought you testified earlier that you are the one that

7  checked the computers?

8  A    I checked the computers, correct.  You asked me what did

9  I do.  That's correct.

10 Q    I just want to be clear.  Did you tell people to come

11 check your computers and they didn't or did you say I'll check

12 my computer myself?

13 A    No.  I have nothing on my computer that I thought about

14 somebody coming to check it or something.  So, basically,

15 whatever is there is there.  I just looked through on my cell

16 phone just in case maybe I have something, or a letter or

17 something, that I saved something or anything.

18 Q    You have now given me several different answers.  I think

19 you told me that you told people they can come and look on

20 your computers.  You also told me at one point that you

21 yourself checked your computers and I think you just said that

22 there wasn't anything --  that whatever is there is still

23 there.  What I would like to know is what steps you took to

24 review the information on your computers to determine if there

25 was any Two Rivers-related information on it.

1  A    Only because the fact I didn't do any business in the Two

2  Rivers, anything besides any e-mail receiving or coming, I

3  didn't do anything else.

4  Q    But did you check or did you ask anyone else to check?

5            MR. GRANTZ:  Objection to form.

6            THE COURT:  Overruled.

7  A    I checked.  I don't remember.  I checked them.  There was

8  nothing there.  We never did any business.

9            THE COURT:  When you checked, did you find anything

10  to turn over?

11            THE WITNESS:  Wherever I know where to go inside,

12  let's put it this way, I opened all of them.  Whatever I did,

13  I opened.

14            THE COURT:  Did you find anything to turn it over?

15            THE WITNESS:  No.

16            THE COURT:  And that's how you satisfied the order,

17  by looking into the things that you knew how to look into?

18            THE WITNESS:  Correct.

19            THE COURT:  Did you ask anyone to help you determine

20  what else might be there that you wouldn't know how to find?

21  Did you ask anyone to help you do that?

22            THE WITNESS:  Yes.

23            THE COURT:  Who did you ask?

24            THE WITNESS:  No.  On my e-mail I wanted to check if

25  there is anything there.  So I asked Benzion to check on the

Friedman - direct - Nelkin                    384

1    e-mail if there is any e-mails that I did something.

2              THE COURT:  So it wasn't just you?  You also gave it

3    to --

4              THE WITNESS:  Yeah, on the e-mail.

5              THE COURT:  When did you do that?

6              THE WITNESS:  A long time ago.  Right at the

7    beginning.  I don't remember.  Right after this.  Yeah.

8              THE COURT:  Go ahead, please.

9    Q    And how did Mr. Nussbaum do that?  Did he come to your

10   house?

11   A    I don't think so.  I think he logged?

12   Q    How did he --

13   A    He has -- again, unfortunately I'm very -- I can call him

14   20 times a day, I got stuck, I don't know how to get out.  I

15   want to print.  I can't print.  I forgot my password.  It's

16   unfortunately.  He automatically -- if I have a problem, I

17   call him up and he will log in or something and he will try to

18   help me or fix it.

19   Q    When you say log in, do you mean log into your e-mail?

20   A    He has my passwords.  Yes.  He logs into all of my -- he

21   logs into my computer and then he opens up my computer.

22   Q    So you have a full-time IT person who you call all the

23   time even though you don't use your computer?

24   A    Unfortunately.  I will use it again only for e-mail.

25   Q    Okay.  Now, Mr. Nussbaum, who does he work for?  Does he

1  work for you or does he work for someone else?

2  A    No.  He's an independent contractor.

3  Q    And who employs him?

4  A    I guess -- if I have a problem in any of the offices, we

5  will call him up and that office he goes, wherever he goes to.

6  Q    Has Two Rivers paid him for his services?

7  A    Yes.

8  Q    Can you turn to tab 50?  Actually, I'm sorry.  I have the

9  wrong tab.  Let me come back to that question.  Mr. Nussbaum,

10  what services did he provide for Two Rivers?

11  A    I really can't say exactly what, because, again, I really

12  don't understand.  The base of what I understood he set up the

13  computers.  He set up the internet.

14  Q    Did he deal with the servers?

15  A    I don't know.

16  Q    Okay.  Now, you testified earlier that you -- not

17  testified.  In your affidavit you said that you used your

18  laptop to remotely access the Two Rivers' server.  Can you

19  explain how you did that?

20  A    Yes.  I have -- what I have in -- if I -- I have a --

21  what do you call it, log in or something that I can . . . like

22  a -- whatever it is called.  Anyway, I go inside there and

23  then -- I make two -- I have to press an icon and one more

24  thing and then I can go inside and check my e-mail or whatever

25  I have to do.         (Continued on next page.)

Friedman - direct - J. Nelkin                386

1    BY MR. NELKIN:

2    Q    Why would you -- what would you be logging into the

3    server for?  Your e-mail, I assume, you could get at your

4    computer wherever you were.

5    A    But if I have to go inside to -- for example, oil

6    company, if somebody gets stuck on the --

7              THE COURT:  Slow down.  Nobody can understand.

8              THE WITNESS:  I'm sorry.

9    A    The oil program, for example, if somebody has a problem,

10   whether it's in a bill, whether it's a charge, I would log in

11   to make sure I understand what they're telling me, and I would

12   answer to them.

13   Q    And what would you be logging in to?

14   A    Into the computer from the oil company, whoever calls me

15   has a problem.

16   Q    So, you could log into anybody's computer.

17   A    I could log into almost -- to the ones that I'm involved

18   in, yes.

19   Q    That would be all the real estate companies.

20   A    No, the real estate I think only one.  There is one girl

21   name is Rosie, who is also, unfortunately, like pen and

22   pencil.  So, if something get stuck in anything, then I will

23   log in and see what the problem is and I will tell somebody to

24   help them or whatever.

25   Q    So even, though you're not savvy with computers, you

Friedman - direct - J. Nelkin                    387

1   would log in to help other people with their computer
2   problems.
3   A     No, I can't help on the computer problem, but I can see
4   what the problem is and basically tell who should help them or
5   what.
6   Q     You could log in to all the oil company computers?
7   A     Not all of them.
8   Q     Which ones?
9   A     Two of them I think I can log in.
10  Q     Which two?
11  A     There's two employees there.  Basically, these two only.
12  Q     There's only two employees at the oil companies?
13  A     Yes.
14  Q     Who are they?
15  A     One of them is Kathy and one of them is Dorothy.
16  Q     What about Sylvia?
17  A     I cannot -- Sylvia, I can't log in to her, I don't think
18  I can log into her.  I don't have anything for her to help
19  with something.
20  Q     Isn't she the bookkeeper for a number of the companies?
21  A     Right.  But I talk to her on the phone.  There's nothing
22  I think that I can help her with there's nothing that I can do
23  for her.  If she has a problem, I say call Benzion or call.
24  Q     Again, that's logging in, I assume, to their computers.
25  But you in your affidavit talk about logging in to the server.

1  A    I don't know which one the server is to say log into the

2  server.

3  Q    Why did you sign your affidavit if you didn't understand

4  that?

5  A    I think, again, I must have -- I think it maybe goes to

6  the server, from the server to her.  I don't know exactly how

7  it works, I don't get into it.

8  Q    If you do turn to Tab 120, please.

9  A    Which one?

10 Q    Tab 120.

11        THE COURT:  One two zero.

12 Q    Now, these are Two Rivers checks to Benzion Nussbaum; is

13 that correct?

14 A    Yes.

15 Q    And there are a number of them, one, two, three, four,

16 five, six; is that correct?

17 A    Yes, correct.

18 Q    So, Mr. Nussbaum was repeatedly paid by Two Rivers by

19 check.

20 A    Yes.

21 Q    And he was an independent contractor?

22 A    Yes.

23 Q    And you were the tax partner; is that correct?

24 A    I was what?

25 Q    You were the tax partner for Two Rivers; is that correct?

1    A    Tax part?

2    Q    Were you in charge of the tax matters for Two Rivers?

3    A    You're talking taxes?

4    Q    Taxes.

5    A    No.  Why should I be in charge on taxes?

6    Q    The operating agreement specifies that you're the tax

7    partner; doesn't it?

8    A    I don't know if I'm the tax -- in terms of paying taxes,

9    I'm tax partner?

10   Q    Yes.  Does the operating agreement designate you as the

11   partner in charge of tax-related matters?

12   A    I don't recall.

13   Q    Do you know if Mr. Nussbaum got a 1099 from Two Rivers?

14   A    I have no idea.

15   Q    Do you know where the tax records of Two Rivers would be?

16   A    I have no idea.  I think maybe by Mike Devine, the

17   accountant.  I don't know.

18   Q    So, any 1099s that Two Rivers issued would be with Mike

19   Devine?

20   A    I guess he's the one who sends it out or...

21   Q    Who certified that it was correct?

22            MR. GRANTZ:  Objection.

23            THE COURT:  Overruled.

24            Specify the "it."

25   Q    Any 1099 that was sent out.

Friedman - direct - J. Nelkin                    390

1   A    The only thing that I could think of is between Vincent

2   Papa and Mike Devine because they were constantly working

3   together on tax returns, on profit and losses, because they

4   tried to sell the company.

5   Q    Did you ever pay any cash to Mr. Nussbaum?

6   A    No.

7   Q    Did any of your companies?

8   A    No.

9   Q    Can you explain why all of these -- first off, do you

10  recognize the account numbers at the bottom of the checks?

11  A    Oh, I recognize the account numbers?

12  Q    How about the third one, the one that ends in 3051?

13  A    3051 is mine.

14  Q    Can you explain why the transaction with Benjamin

15  Nussbaum would endorse a check over to you and it would be

16  deposited in your account?

17  A    Yes, he may have asked if I could cash him the check, so

18  I cashed him the check.

19  Q    Then wouldn't you have given him cash?

20  A    No.  I gave him a check still.  We paid him a check and

21  then he asked me:  Are you going to cash it?  Can you please

22  cash mine?

23         And I will cash it and put it into my bank.

24  Q    Did you do that more than once?

25  A    I don't know how many times but it's possible.

1  Q    So, he's an independent contractor who may or may not

2  have gotten a 1099 and all of his checks are deposited into

3  accounts that you control?

4           MR. SCHAFHAUSER:  Objection to form.

5           MR. GRANTZ:  Objection.

6           THE COURT:  Overruled.

7  A    I don't know.  I don't recognize the accounts, I only

8  know 3051 is mine for sure.

9  Q    3051?

10 A    I know my last four numbers is 3051.  I'm not sure which

11 account they are.

12          But it's possible the guy ask me to cash it and we

13 have done it for him.

14 Q    Let me ask you this:  Take a look at Check No. 12140.

15 The check number is at the top right.

16          THE COURT:  Fourth page in.

17 Q    They're not numbered, but I think the fourth page.

18 A    You said Check NO. 12140, right?

19 Q    Yes.

20          And that account is your account?

21 A    Yes.

22 Q    This is a check for 10,100 --

23 A    I wouldn't have cashed it for sure, not this amount of

24 money.  But I have no idea why this came to my account.  I

25 have no idea.  Maybe we --

1   Q    Well, if it went into your account, you got the money for

2   it; didn't you?

3   A    I just don't know why -- I can't recall, I really don't

4   know.

5   Q    But you wouldn't have cashed it?

6   A    No, definitely not.

7   Q    And you wouldn't -- so, you wouldn't have been doling out

8   $10,138.40.

9   A    Definitely not.

10  Q    If someone asked you to cash a check, would you give them

11  the exact change, 83 cents?

12  A    Would I give him it?  I don't know.

13          THE COURT:  I didn't hear your answer.

14          THE WITNESS:  I don't think so.  I don't know.

15  Q    Do you know if other Two Rivers payroll checks went into

16  your account for people besides yourself?

17  A    It's possible I've checked cash for peoples and that may

18  have gone into my account.  It's possible.

19  Q    How many people?

20  A    I don't know.

21  Q    And how are those records kept?

22          Were there records kept about this?

23  A    What do you mean, how to account?

24  Q    Well, you've now got a $10,000 check coming into your

25  account.

Friedman - direct - J. Nelkin                393

1   A     Right.

2   Q     Did you perform any services for Mr. Nussbaum?

3   A     I really don't recall this.  I don't know.

4   Q     So, I'm just asking you what type of records we would

5   look for and where would we look.

6   A     First, I would have to check how did the $10,000, what's

7   the invoice for the $10,000, why would we gave him $10,000,

8   understand?

9   Q     Well, why would that matter?

10  A     Because it sounds a tremendous big amount, $10,000, that

11  Two Rivers wrote him a check, and I would really like to see

12  it.

13  Q     Who signed the checks?

14  A     I've signed it, but most probably must have been some

15  kind of a backup.  I would not sign a check just like this.

16  There's no way that we would -- that it would allow me or we

17  would write a check if we don't have any backup or something.

18  Q     And where would we find that backup?

19  A     It should all be in the Two Rivers in South Plainfield or

20  in the computer there.

21  Q     In what system?

22  A     Launch Coffee.

23  Q     But they don't have access to Launch Coffee right now.

24          MR. SCHAFHAUSER:  Objection, lack of foundation.

25          THE COURT:  Sustained.

1   Q    Do they have access to Launch Coffee?

2   A    I understood right now you don't have access, but I don't

3   know why.  It would have nothing to do with me.

4   Q    Do you have access to Launch Coffee?

5   A    No.

6   Q    Do you have access to the Launch system?

7   A    I'm sorry, I should go back.

8          Do I have any access?  I haven't used it to say I

9   have access.  I don't know.  I haven't used it -- a year maybe

10  I haven't used it.

11  Q    Do you have access to any Launch computer system?

12  A    I have only access to the one from the 26 Flavors.

13  Q    What about the ones for the oil companies?

14  A    No.

15  Q    Now, you said for 26 Flavors.  Does Office Coffee have

16  one?

17  A    It's one, I'm almost sure.  Again, I really don't use the

18  computer.  I'm almost sure that 26 Flavors and Office I think

19  is the same.  I'm not sure.  I don't really remember that.

20  Q    Where does the Launch system exist?

21  A    All this I've learned in the last -- since the litigation

22  started.  I learn about computer, there's such thing as cloud,

23  there's such a thing as server.  Such a thing I never really

24  knew anything about it.  I always thought it was permit

25  somewhere.  It's the first time I learn all this stuff.

Friedman - direct - J. Nelkin                    395

1   Q    The systems you have access to, where are they now?

2   A    I don't know.

3   Q    Who manages them?

4   A    There's nothing to manage.  What do you mean "manage"?

5        We just go to the computer and you use it.  If I'm

6   stuck, I call something like Benzion or Benzion might tell me:

7   It's not up to me, you have to call Yossi.

8   Q    Do you pay anyone for those systems?

9   A    Yes.

10       MR. GRANTZ:  Objection to form.

11       THE COURT:  Overruled.

12  Q    Who do you pay?

13       THE COURT:  I'm sorry, sir, what is it?

14       MR. GRANTZ:  I'm trying to figure out what systems.

15       THE COURT:  All right.  If you have something to say

16  to me, please say it in a way that I can hear it so I can make

17  a ruling.

18       MR. GRANTZ:  I'm objecting to the form because he's

19  not being clear as to which systems he's talking about.

20       THE COURT:  All right.  You can explore it on

21  cross-examination.

22  A    I'm sorry?

23  Q    Who do you pay for your computer system?

24  A    Again, if it's the company, if it's anything to do with

25  wiring or setting up or buying a computer, usually goes to

1    Benzion.  If it's anything doing that I want to change a

2    program or it's anything doing with somebody will get stuck or

3    something or to write something, then usually we will call

4    Yossi, or I will call Yossi.

5    Q    Who is Yossi?

6    A    Yossi Rogosnitzky, something like that, I can't pronounce

7    it.  He's a guy in Israel who's a computer program, I think

8    it's called.

9    Q    Can you turn to Tab 86?

10              Who set up the Launch system?

11   A    When you mean "set up," you mean -- what do you mean by

12   this?

13   Q    Well, who created it?

14   A    You mean writing the program; is this correct?  That's

15   what you mean?

16   Q    Yes.

17   A    Yossi Rogosnitzky.

18   Q    Did you buy that program from him?

19   A    Once I'm finished paying, then it belongs -- then I would

20   buy it, yes.

21   Q    Did you finish paying for it?

22   A    No.

23   Q    Then you still owe him some money?

24   A    Yes -- not me, I'm sorry.  I mean Two Rivers.  Me, I

25   don't owe him.

Friedman - direct - J. Nelkin                    397

1   Q    Who was in charge of hiring him?

2          MR. SCHAFHAUSER:  Objection to form.

3          THE COURT:  Overruled.

4   A    I don't think so there were ever, I think, exactly who

5   was in charge or who was not in charge.  But I was one of them

6   who basically pushed for it because the program that they had,

7   felt it was really -- it wasn't -- it was very basic things,

8   very, very basic.

9   Q    So, instead of having an off-the-shelf program, like

10  Quickbooks, you had a custom one built?

11  A    Yes.

12  Q    Now, did that system save data or did it override the

13  data?

14  A    I have no idea.

15  Q    Well, you told me earlier that you said that all the data

16  would be, the receipts and the backup, would be accessible.

17  So, did it save data or overwrite it?

18  A    Did I say this?  I don't think so.

19  Q    I asked you where we would find the backup --

20         THE COURT:  Look, if there's some dispute about

21  that, why don't you ask the question that you want to ask?

22         MR. NELKIN:  Okay.

23  Q    Where would the backup data for the Mr. Nussbaum's checks

24  be?

25  A    That's what I said, Two Rivers would have it.  Two Rivers

LAM      OCR      RPR

1   would have every invoice ever available whether for Launch

2   Coffee or in the folder or -- it's going to be somewhere.

3   Q    Who was Two Rivers bookkeeper?

4   A    At that time, it was Sonia.

5   Q    And when did that end?

6   A    I don't think officially she was fired so far.  So, when

7   you say "end," I think she stopped working completely I think

8   was a good couple of months after the lawsuit, I think.

9   Q    So, she was still doing work for Two Rivers after the

10  lawsuit was filed?

11  A    I don't remember.  Was it before the lawsuit?

12  Whenever -- let me think exactly so I can tell you.  Give me a

13  minute.

14        It was -- I'm trying to remember.

15  Q    The lawsuit was filed in December 2015.

16  A    Then couldn't have been then.  Had to be before, much

17  before then.

18  Q    Did she stop before the lawsuit or right at the lawsuit?

19  A    I don't recall, but I think it must have been before.

20  Q    In 2014, was she the bookkeeper?

21  A    I think yes.

22  Q    You think yes.

23  A    I'm not sure.

24  Q    Who else would it have been?

25  A    What's his name?  They hired over there Nicole.  Nicole

1  was in there for about quite a few times -- while Sonia still

2  be there, Nicole is there.

3  Q    Do you know the name of Mr. Rogosnitzky's company?

4  A    No.

5  Q    Could it have been JR IT Consulting?

6  A    Possibly.

7  Q    Could you turn to Tab 87?

8        Do you know who Elisheva Rogosnitzky is?

9  A    I think it could be his wife or...

10  Q    And she's having a wire sent to Canada or Two Rivers is

11  sending her a wire to Canada.

12        Do you know why that was done?

13  A    I think yes.  A wire was done, I think his brother or

14  whoever was in Canada and they called maybe I could do a favor

15  if I could wire money over there to them.

16  Q    But you're the one that wired the money to Canada?

17  A    We must have wired the money, yes.

18  Q    And, again, you were tax partner.  Do you know who got

19  the 1099 or whatever for this job?

20  A    Again, I don't know, but I would assume it's

21  automatically that Vincent Papa, who's the CFO, would

22  automatically, the same as he gives everybody else would give

23  1099.  There's no reason that I would tell anybody not to do

24  it.  I have no idea.

25  Q    As tax partner, did you review the tax-related matters?

1   A    Not at all.

2   Q    Who signed the tax returns?

3              THE COURT:  For which company?

4              MR. NELKIN:  For Two Rivers.

5   A    I don't know, I really don't know.

6              MR. NELKIN:  Can I approach the witness?

7              THE COURT:  Yes.

8   Q    This is the operating agreement of Two Rivers.

9              THE COURT:  Is it marked as an exhibit?

10             MR. NELKIN:  No.

11             I was just going to ask if it refreshed his memory

12  that he was tax matters partner.

13  A    I'm sorry, I do not recall.

14  Q    Do you know where the Two Rivers signed tax returns might

15  be?

16  A    One more time?

17  Q    Do you know where the signed tax returns for Two Rivers

18  might be located?

19  A    I would assume, again, Mike would have it or Vincent Papa

20  because they try, Vincent and Mike and the Schreibers and

21  Mayer, all of them were involved in trying to sell the

22  company.  So, they were all working together on tax returns

23  and so forth.  So, I assume it's by them.  I don't know.

24  Q    Do you have any recollection of signing the tax returns?

25  A    No.

Friedman - direct - J. Nelkin                    401

1   Q    Do you have any recollection of mailing in the tax

2   returns?

3   A    When you say "mailing in," to who what?

4   Q    To the IRS.

5   A    I would assume it would be done by Mike again.

6   Q    Could you turn to Tab 88?  It's Exhibit 88.

7        Do you recognize that invoice?

8   A    Yes.

9   Q    What is that invoice?

10  A    He used to charge me a monthly $4,000 'til basically we

11  would pay off, I think, the whole thing.

12  Q    When you say "he"?

13  A    I meant Yossi, I'm sorry.

14  Q    It says Joseph Rogosnitzky.  Is Joseph Yossi?

15  A    Yes.

16  Q    And the fact that his name is right under JR IT

17  Consulting, does that recollect your memory that JR was his

18  company?

19  A    I would assume, yes.

20  Q    And how are these invoices received?

21  A    I would assume, again, he must e-mail it or -- I don't --

22  I really don't recall.  I assume he e-mail it to Sylvia or

23  Sonia.  I assume to Sonia, if I had to guess.

24  Q    And if you could turn two more pages, there's a Signature

25  Bank form.  Whose signature is at the bottom?

1   A    Mine.

2   Q    Does that appear to be paying the $4,000 charge, the

3   amount at the top left?

4   A    Yes.

5   Q    And you said that you understood that Yossi was still

6   owed money?

7   A    Yes.

8   Q    How much?

9   A    I mean, I think around $60,000.

10  Q    When was the last bill that you remember seeing?

11  A    I don't think so.  I got a bill every month from him,

12  regular something.  I don't recall.

13  Q    What happened when you got the bills?

14  A    Usually, I think I may have to put it into the system

15  or -- I think so.

16  Q    And which system would that be?

17  A    I would assume in South Plainfield in the Launch system,

18  I presume.

19  Q    What about the Quickbooks system?

20  A    Again, I have no idea about Quickbooks.  I, again, never,

21  ever hope to entertain it.  I have no idea.

22  Q    If you can turn to the first page of Exhibit 88 again,

23  can you just read me what the description of professional

24  services is?

25  A    Professional service stage planning design of new bespoke

Friedman - direct - J. Nelkin                    403

1   ERP accounting system.

2   Q     And the date is August 2014?

3   A     August 2014, right.

4   Q     Was there a contract for this program?

5   A     The answer is no.

6   Q     So, how do we know the amount of the contract?

7         How do we know the amount that was owed or the

8   services?

9         What do we know about this relationship?

10        MR. GRANTZ:  Objection to form.

11        THE COURT:  Try again.

12        MR. NELKIN:  I'll rephrase.

13  Q     Who interacted with Yossi?

14  A     Most of time I spoke to him, but he had many, many

15  conversations with Vincent Papa.  He had conversations, I

16  think, with a guy by the name Isaac.  I can't remember his

17  last name --

18  Q     Let me stop you.

19        Who negotiated the contract to build this system?

20  A     I assume me.

21  Q     And what documentation did you have associated with that?

22  A     There was no documentation --

23        THE WITNESS:  Can I say?

24        THE COURT:  He asked you what documentation.

25        There was none?

                    LAM     OCR     RPR

Friedman - direct - J. Nelkin                404

1              THE WITNESS:  There was none.

2              THE COURT:  Okay.

3              Next question?

4    Q    Was he building the system for Two Rivers or was he

5    building it for everybody, all your companies?

6    A    Original was only for Two Rivers and nobody else.

7    Q    Okay.  But those other companies are now using it.

8    A    That's correct, but we -- first of all, the same system,

9    it's not exactly the same between Two Rivers and any other

10   companies.  And each other company is part from it.

11             For example, Two Rivers is a manufacturer, Two

12   Rivers an inventory, Two Rivers has a lot of stuff versus the

13   other one that are just buying and selling.

14   Q    Did the other companies pay anything for the system?

15   A    Sure.  They didn't get it for nothing.

16   Q    Who did they pay for it?

17   A    They basically charged us for that also, just like any

18   other system.  Once you order, it's not as expensive, but,

19   obviously, he charged us for what we -- that he sold the

20   program again.  So, instead of paying 100, it was much less,

21   obviously, because the program was written already.  That's

22   correct.

23   Q    So, the amount for this program for Two Rivers was

24   $100,000?

25   A    It was approximately $100,000, yes, pretty much.

LAM      OCR      RPR

Friedman - direct - J. Nelkin                    405

1   Q    Do you know the exact amount?

2   A    I don't remember it now.

3   Q    At the time that they did that, they were a startup

4   company, weren't they?

5   A    That's correct.

6   Q    Was there cheaper software available?

7   A    I never -- originally, it wasn't supposed to go to this

8   number nowhere.  But as the company grew and the company

9   developed more technical stuff, we needed much more what the

10  standard is.  Obviously, this went up also, you understand.

11  Q    Is it also your testimony --

12            THE COURT:  Excuse me, Mr. Nelkin.  We do have

13  limited time, and I'm not sure, as interesting as this may be

14  and relevant to claims in the complaint, I'm not sure that

15  this line of inquiry goes to the purpose of this hearing.

16            MR. NELKIN:  Your Honor, it's my understanding that

17  the defendants intend to claim that the system was cut off

18  because Two Rivers didn't pay a bill related to it.  And,

19  so...

20            THE COURT:  So, how other companies got access to it

21  is relevant?

22            MR. NELKIN:  No.  I really wanted to explore whether

23  there were any bills that were ever sent to Two Rivers for it.

24            THE COURT:  Why don't you ask that question, then?

25            MR. NELKIN:  Okay.

1          THE COURT:  We're spending a lot of time on things

2     that seem quite relevant to the underlying claims in the case

3     but not necessarily to this hearing.

4          MR. NELKIN:  Okay.

5     Q    If you could turn back to Tab 86, do you recognize this

6     document?

7     A    I think; I'm not sure, but I think.  I think it's

8     accounts payable document; is this correct?

9     Q    And is it an entry for JR IT Consulting?

10    A    Yes.

11    Q    And is the last bill that's listed there September 5,

12    2014?

13    A    Yes.

14    Q    And the date at the top left, is that from a couple of

15    days ago, June 29, 2016?

16    A    Yes.

17    Q    And do you have any bills for JR IT Consulting?

18    A    No.

19    Q    Do you have any bills that postdate 2014 from JR

20    Consulting?

21    A    I have nothing, again.

22    Q    Now, Mr. Friedman, who had authority to write a check for

23    $50,000 or more at Two Rivers?

24    A    I think my right was only to write -- I don't know if it

25    was 50, I think it was 20.  But whatever number it was, it was

1   only for the regular business.

2   Q    But my question is could the other three partners write a

3   check for more than $25,000 without your approval?

4   A    The answer is no.

5   Q    Could you write a check for more than $25,000 without

6   their approval?

7   A    I think on the operating agreement, yes, but I think it's

8   only related to the regular -- let's say a company to regular

9   buy, coffee regular buy, not something --

10  Q    My question is if there was a bill for more than $25,000

11  for JR Consulting, were you the only one who could write the

12  check without the other partners?

13          MR. SCHAFHAUSER:  Objection.

14          At what point in time?  Because the preliminary

15  injunction, I think --

16          MR. NELKIN:  Up to the time of the preliminary

17  injunction.

18          MR. SCHAFHAUSER:  Thanks.

19          THE COURT:  With that understanding, overruled.

20  A    Up to where?

21  Q    Up to the date when you were separated from the company?

22  A    I think yes, I think yes.

23  Q    Let's move to -- have you read Mr. Nussbaum's affidavit?

24  A    Yes.

25  Q    When did you read it?

1    A    I don't recall, but I read it.

2    Q    How many days before your affidavit was signed?

3    A    I don't recall.  I mean, it's only we're talking about --

4    I think the whole thing with a short time.  I don't recall.

5    Q    Okay.  In your affidavit, you say that you reviewed

6    Mr. Nussbaum's information and sought to independently verify

7    the computer information that he described.

8            Could you tell me what steps you took to

9    independently verify it?

10   A    Just one more time, I apologize.  Please clarify me the

11   question.  It's unclear.

12   Q    If you could turn to Exhibit 109, and if you could turn

13   to Paragraph 19 on Page 7 of that exhibit, it says:  I

14   attempted to independently verify the facts set forth in the

15   Nussbaum declaration by independently observing the computer

16   devices located at the Bronx facility and the Brooklyn

17   facility.  Based on my independent observations and the facts

18   set forth in the Nussbaum declaration about computer devices

19   are consistent with my understanding.

20           I want to know what you did to independently verify

21   them, the facts.

22   A    When I was in Brooklyn, for sure I checked.  I remember I

23   checked to make sure of:  Do we have the same amount of

24   computers that he said it?

25           I even asked him on the phone:  Which one do you

Friedman - direct - J. Nelkin                409

1  identify belongs to Rosie?  Which one you identify belongs to

2  whatever?

3              I also in the Bronx, definitely also.  I was there

4  and I also basically checked what computer, which one.  It's

5  only one to it's owner.  I definitely did check and have that

6  discussion with him.

7  Q    Besides count the number of computers, did you do

8  anything to check the nature of the information on the

9  computers?

10  A    I don't know nothing about computer.  I really, really

11  don't know nothing.

12              THE COURT:  Just so I understand, what you're saying

13  in this Paragraph 19, your independent review was counting

14  computers.

15              THE WITNESS:  Yes.  You sure this belongs to Sonia?

16  You sure this belongs to me?

17              THE COURT:  And that's it.

18              THE WITNESS:  Yeah.  I know nothing, I really know

19  nothing.  People ask me, but I don't.

20              THE COURT:  Okay.

21  Q    Do you know what Mr. Nussbaum did to check and determine

22  who used what computer for which companies?

23              MR. GRANTZ:  Objection; calls for speculation.

24              THE COURT:  No, it does not.  It calls for what he

25  knows and I think that was clear from the question.  So, it's

                    LAM      OCR      RPR

1    overruled.

2    A    I can't exactly what it is, but I'm sure he went to

3    everywhere because I specific told him go to each of them,

4    make sure what's on the computer, make sure it special to one.

5    And I know he did it.  He was everywhere.

6    Q    And what instructions did you given him as far as his

7    assignment?

8    A    Just the only instruction he got was to check and

9    identify which one belonged to who, so if we need for an image

10   or to give information, make sure we give right one and not a

11   different one.

12   Q    Did Ms. Ezell work for different companies?

13   A    Yes.

14   Q    Did Ms. Rivera work for different companies?

15   A    Yes.

16   Q    Did they use the same computer to do that?

17   A    Ms. Ezell -- Sylvia, you can call her if you want --

18   Sylvia has one computer only and that's basically what she

19   works on.

20           Sonia had, as far as I know, two computers, I think,

21   always.  That's what I know about it.

22   Q    Well, Mr. Nussbaum said that she had more than that.

23   A    I said it's possible.  I don't know.

24   Q    Did Mr. Nussbaum work on these computers?

25   A    Mr. Nussbaum is the one who basically any time when we

Friedman - direct - J. Nelkin                411

1  buy a computer or we have to move a computer, he's the one

2  basically who sets it up, he runs the wires.  That's basically

3  what he does, you understand.

4  Q    If you wanted to add a user to the Launch system, who

5  would set that up?

6  A    I am not sure.  I don't know if Nussbaum or Yossi, I

7  don't know.  Whatever I needed, it was always try go to

8  Nussbaum he was able to get hold of Yossi better than me.

9  Q    If Mr. Nussbaum worked on all these computers, why did

10 you have to tell him which computers to go to?

11 A    Because I wanted to make sure.  I don't want to come and

12 he'll take computer and it doesn't belong there and I be

13 accused I do this, I do that.  I want to make sure.

14 Q    How long did you spend independently observing what

15 Mr. Nussbaum said in his affidavit?

16      THE COURT:  I didn't understand the question.

17      MR. NELKIN:  He said he went to each office and

18 independently --

19      THE COURT:  Not reviewing the affidavit, how long

20 did you spend observing Mr. Nussbaum?

21      THE WITNESS:  I would say maybe -- the offices are

22 not so big, so it's not something -- oh, I would say between

23 talking to him, making sure everything, I would say maybe half

24 an hour.

25 Q    In each office?

LAM     OCR     RPR

Friedman - direct - J. Nelkin                    412

1    A    In each office, yes.

2    Q    Do you have any idea how long Mr. Nussbaum spent?

3    A    I have no idea.

4    Q    Did Mr. Nussbaum --

5              THE COURT:  Would you look for a breaking point in

6    the next few minutes?

7              MR. NELKIN:  We can actually take a break now.

8              THE COURT:  We'll take ten minutes.

9              THE WITNESS:  Thank you.

10             (Recess taken.)

11             (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (Continuing after recess - in open court.)

2    EXAMINATION CONTINUES

3    BY MR. NELKIN:

4    Q    Mr. Friedman, I am at Tab 109, Exhibit 109, and I am on

5    page 5.  And I am looking at the bottom paragraph, the last

6    two bottom, full bottom lines, it says:  I asked Benzion

7    Nussbaum an information technology consultant -- basically, it

8    says that you asked Benzion Nussbaum to identify the computer

9    devices in the custody, possession and control of those

10   businesses in the Bronx and Brooklyn.

11               And I have looked at Mr. Nussbaum's affidavit and I

12   don't think he specifies the name of any companies.  And so

13   now I am going to ask you since you independently verified it,

14   which companies controlled which computers in Mr. Nussbaum's

15   affidavit, which is paragraph -- at Tab 110, Exhibit 110?

16               MR. SCHAFHAUSER:  Objection to the form because we

17   are talking about a number -- the question should be, I think,

18   more specific as to which computer.

19               THE COURT:  I certainly understood it.  I do not see

20   anything objectionable about it.

21   Q    And I am on page 3 of that.  You can start with the first

22   one.  It says under some --

23   A    110 you said to me?

24   Q    Yes, 100.

25   A    Mine is you said on five, correct, so the last four

Friedman - direct - Nelkin                414

1    lines?

2    Q    No, no, let's go to Tab 110, Exhibit 110.

3              THE COURT:  Let's make it easy.

4              You verified that Mr. Nussbaum did the work that you

5    wanted him to do?

6              THE WITNESS:  Correct.

7              THE COURT:  Which companies' computers did he

8    review?

9              THE WITNESS:  As far as I understood, all of them

10   that they have -- all of them that I am involved with, the oil

11   company --

12             THE COURT:  What?

13             THE WITNESS:  The oil company.  I understood the one

14   from Two Rivers.  Basically, that's all Sonia who works with,

15   the Two River, but it was the Two River, you understand, and

16   this was Silvia's computer.  There is -- everything else is

17   completely different, different system, different --

18             THE COURT:  So your understanding is that

19   Mr. Nussbaum looked at two computers, Ms. Ezell's and --

20             THE WITNESS:  No, I don't know two computers.  I

21   understood anything that belongs --

22             THE COURT:  Three computers, one from --

23             THE WITNESS:  I don't know how many computers.  I

24   don't know.

25             THE COURT:  Well, of course, you do because you said

SAM      OCR      RMR      CRR      RPR

Friedman - direct - Nelkin                415

1    that you observed him doing it.  So just tell me --

2              THE WITNESS:  But he asked which company.

3              THE COURT:  Yes.  Which companies' computers, and

4    for my edification, how many computers, all right?  So let's

5    start with how many computers.

6              You saw him do it.  How many did he look at?

7              THE WITNESS:  I didn't say I saw him do it.

8              THE COURT:  You said that you observed him doing it.

9    You spent half an hour watching it.

10             THE WITNESS:  No, I said a half -- I misunderstood.

11   The question was how did I check the computers, what do I do

12   to it.  I said I went to each office and I have -- I was

13   checking it and talking to him.  Is that correct?  That's what

14   I said.

15             THE COURT:  So you do not know what he did?

16             THE WITNESS:  I don't know -- I only know what -- I

17   wasn't there when he did it.  I said it clear.

18             THE COURT:  What do you know that he did?

19             THE WITNESS:  I gave him instructions, whatever I

20   gave him instructions.

21             THE COURT:  What instructions did you give him, sir?

22             THE WITNESS:  I gave him instructions to go to each

23   place and to check all the computers that we have over there

24   and to who it belongs to and whose this and what is it for.

25             THE COURT:  So if there is a computer in South

SAM      OCR      RMR      CRR      RPR

Friedman - direct - Nelkin                416

1   Plainfield or in the Bronx --

2              THE WITNESS:  Not South Plainfield, they were not

3   allowed to go.

4              THE COURT:  He didn't go to South Plainfield?

5              THE WITNESS:  South Plainfield, no.

6              THE COURT:  So the Bronx.  Anywhere else?

7              THE WITNESS:  The Bronx and Brooklyn.

8              THE COURT:  The Bronx and Brooklyn.  He looked at

9   every computer in those two places?

10             THE WITNESS:  As far as I know, yes.

11             THE COURT:  Does that answer your question?

12             MR. NELKIN:  Well, actually, what I was asking was

13  Mr. Nussbaum refers to the oil companies and he refers to the

14  trucking companies and he refers to the real estate companies.

15  BY MR. NELKIN:

16  Q    And I am just asking which companies control which

17  computers?

18             Mr. Nussbaum on page 3 lists a number of computers

19  and he refers to the oil companies, but there are like four or

20  five oil companies and there is a bunch of --

21  A    No, there is only -- there is maybe -- there is only,

22  basically, one oil company that we all work on it.  There is

23  no four or five oil companies.  There may be four or five

24  d/b/a companies, but it's basically one oil company, one --

25  it's one or two companies.  There is one -- one program, one

1   every computer is the same thing.  It's not this computer is

2   only 24 Hour, this computer is only this -- no, it's basically

3   that.

4   BY MR. NELKIN:

5   Q    So is it use your testimony that 24 Hour Oil --

6   A    Right.

7   Q    Does 24 Hour Oil have --

8   A    24 Hour Associate -- the Associates, but even if it's

9   different thing, but it's one -- it's one computer.

10  Q    Okay, what about Park Avenue Associates?

11  A    Park Avenue Associate -- Park Avenue I don't know if

12  they're existing now.  I think it doesn't exist since 2002

13  anymore, I think.

14  Q    Okay, but Two Rivers was given a lot of invoices and paid

15  a lot of checks to Park Avenue?

16  A    It was paid to d/b/a what is MB Fuel.

17  Q    So you are saying that Park Avenue does not exist and is

18  just a d/b/a for MB Fuel?

19  A    Yes.

20  Q    And what about Associated Fuel Corp.?

21  A    Associated Fuel is a company by itself, but it's all --

22  it's all -- when you write to the computer and you -- a

23  customer of Associates will pick up it will just say

24  Associate, but it's the same thing.  If a customer of 24 Hour

25  will call, it's gonna -- it's always the same number, the same

Friedman - direct - Nelkin                  418

1   thing.  You gonna know right away for which company belongs,

2   discuss which company it belong to.

3   Q    And MB Fuel?

4   A    MB Fuel is -- there is no -- it doesn't show MB Fuel, it

5   doesn't show up.  I mean it shows up, but they don't even have

6   customers, MB Fuel.  I think that was the main company.

7   Q    And Ms. Ezell testified she worked for MB Fuel?

8   A    Right, but I said it's not -- on this it will not show

9   up.  It's not -- it's not -- how can I say it?  This -- I know

10  when you open up as Oil Company, any customer that's the same

11  will show up over there, you understand.  MB Fuel --

12            THE COURT:  You've got to slow down, sir.

13            THE WITNESS:  I'm sorry, it's just --

14            THE COURT:  You are making --

15            THE WITNESS:  I understand.

16            THE COURT:  -- it so we are not going to get through

17  your testimony by 3 o'clock.  We are going to have to repeat

18  things.

19            THE WITNESS:  I'm trying, Your Honor.  I'm trying.

20            THE COURT:  Please slow down.

21            THE WITNESS:  Okay.

22  BY MR. NELKIN:

23  Q    I just want to know of the defendants who is in the

24  universe of the oil companies.  And let me just, tell me if I

25  have left anyone out.

1              Is MB Fuel Transport an oil company?

2    A    MB Fuel Transport is -- it's a company, yes, but it's not

3    an oil company like 24 Hour Associates.  24 Associates is

4    mostly retails, completely different.  It's a retail company.

5    MB Fuel is not a retail company.  It used to be the trucking,

6    used to be the whatever else, wholesale.  It's not --

7    Q    And is MB Transport and MB Transport I the same?

8    A    No.

9    Q    Okay.

10             There is no computer identified for MB Transport I.

11   What computer did they use?

12   A    Because they have completely different, an old program,

13   God knows, to make for a company, I have no idea what it is

14   even.  I never even been in it.  It's completely isolated.

15   It's nothing.

16   Q    But what computer is it?

17   A    I have no idea.

18   Q    Is it one of the ones listed on this page?

19   A    No, because we have nothing to do with it.  We never --

20   nobody has anything to do with it.  I never --

21   Q    Well, are you a member of it?

22   A    Of MB Fuel, yes.  Not One, One is nothing to do.  One is

23   a completely different person.

24             What happened about two years ago, I think,

25   approximately, the trucking company was, basically, was going

1    out of business and we gave it to some --

2    Q     When you say the trucking company --

3    A     I meant MB Fuel, okay.  And somebody, basically, we --

4    there is no sale really, but he was basically doing for us the

5    trucking and for the MB Fuel I, whatever the number One is.

6    Q     So MB Fuel ceased to exist?

7    A     Pardon?

8    Q     MB Fuel ceased to exist, you said it was going out of

9    business?

10   A     It exist, yeah, but there's no activity, no.

11   Q     So is Ms. Ezell said she worked for MB Transport?

12   A     She did.  It's still existing.  There's still things

13   going on there.  That's exactly correct.

14   Q     Does MB Transport Fuel exist or not?

15   A     MB Fuel Transport still exist, the company still exists,

16   yes, but there is no activity really.  It's just -- there is

17   no real activity in it.

18   Q     So then what does Ms. Ezell do?

19   A     She -- she does all the bookkeeping for everything.

20   Q     So she does the bookkeeping --

21   A     MB Fuel, basically, is paying her for -- for whatever she

22   does over there.  Mostly -- she was always mostly working

23   private for me, private for Jack, Mayer for private, for the

24   companies, that's what it is.

25   Q     And if it has no operations, where does it get the money

Friedman - direct - Nelkin                421

1   to pay her?

2   A    There is still -- there is still money coming in from --

3   from -- we give out a lot of this work to wherever we get, we

4   give it out on MB Fuel I, so they basically paying us.

5   Q    Does Associated Fuel have any other offices?

6            THE COURT:  Wait, wait, I didn't understand.

7            MB I Fuel pays you --

8            THE WITNESS:  We give out the work.

9            THE COURT:  No, I have to understand this because I

10  have to make a decision, sir.

11           MB I Fuel pays you and that's the money that pays

12  for Ms. Ezell's services?

13           THE WITNESS:  No.  MB Fuel -- basically, what

14  happened was we were originally a trucking for Hess, for many,

15  many years.  Hess went out of business, sold the company.

16  Sold everything to -- I think Cathy was the first one.  Then

17  in the last five, six years this company was sold four or five

18  times.  So, basically, we fell out slowly on doing the --

19           THE COURT:  MB Fuel pays Ms. Ezell?

20           THE WITNESS:  MB Fuel Transport, not the One.

21           THE COURT:  Transport, not the One.

22           THE WITNESS:  Right.

23           THE COURT:  That's who pays Ms. Ezell?

24           THE WITNESS:  Correct.

25           THE COURT:  But it doesn't do any business.

SAM     OCR     RMR     CRR     RPR

```
                    Friedman - direct - Nelkin              422
```

 1          THE WITNESS:  No, doesn't do any business.

 2          THE COURT:  Doesn't have any activity?

 3          THE WITNESS:  Yes.  What it does --

 4          THE COURT:  I am trying to understand.

 5          THE WITNESS:  I'm sorry.

 6          THE COURT:  Let me say the question, sir.

 7          The money that comes in to pay for Ms. Ezell's

 8   salary comes from where?

 9          THE WITNESS:  From number One.

10          THE COURT:  From MB I?

11          THE WITNESS:  Right.

12          THE COURT:  And you have no involvement in that?

13          THE WITNESS:  I have no involvement in that, no.

14          THE COURT:  So somebody is running the company that

15   has no relation to you?

16          THE WITNESS:  Correct.

17          THE COURT:  And is paying Ms. Ezell to do work for

18   companies other than --

19          THE WITNESS:  No.

20          THE COURT:  -- that company?

21          THE WITNESS:  No, sir.  The company, the way I

22   understood, MB Fuel I is paying because trucks doesn't belong

23   to them.  MB Fuel is leasing the trucks to -- to MB Fuel I.

24   And MB Fuel I is paying rent on the trucks to MB Fuel.

25          THE COURT:  Go ahead, please.

1   BY MR. NELKIN:

2   Q     Who are the trucking companies?

3   A     Who is the -- who does the trucking?  Mostly Larry is the

4   one takes care of all of it.

5   Q     When Mr. Nussbaum refers to the trucking companies --

6   A     Right.

7   Q     -- who is he referring to?

8   A     I'm not sure.

9   Q     Then how could you independently verify what he said?

10  A     Again, I am sure that he means these same computers we

11  talking about it.  I would be sure -- I'm sure that's what

12  he's talking about it.  Maybe he means service computers, I'm

13  not sure, but I think that's what they are.

14            THE COURT:  But you don't know?

15            THE WITNESS:  No.

16            THE COURT:  You swore to the truth in an

17  affidavit where you said --

18            THE WITNESS:  No, no, no.

19            THE COURT:  I'm asking, you swore to the truth of an

20  affidavit where you said you knew what he was talking about

21  now you are saying you are not sure.

22            THE WITNESS:  No, I am sure.  It's these computers,

23  these five or six computers, or seven what's there, but I'm

24  not sure exactly.

25  Q     I'm not asking about the computers, I am just asking who

```
                    Friedman - direct - Nelkin              424
```

1    the trucking companies are.  That's all I want to know.

2    A    You're asking which trucking -- what the truck is and I'm

3    telling you.  Trucking company has its own system completely.

4    Q    I just want to know what their name is.

5         What's the name of the trucking companies?

6    A    I'm almost sure it's MB Fuel I or --

7    Q    But you're not sure, and he refers to companies plural,

8    so it's got to be more than one.

9    A    Right.  I'm sorry, I must be -- I am a little bit lost.

10        THE COURT:  I think you have exhausted the subject.

11        MR. NELKIN:  Okay.

12        THE COURT:  And I think we have exhausted his

13   ability to explain what is in his affidavit.

14        MR. NELKIN:  Okay.

15        THE COURT:  Why don't we move on?

16        MR. NELKIN:  I'll move on.

17   BY MR. NELKIN:

18   Q    If you could turn to Exhibit 35, which is also Tab 35.

19        Do you recognize that screenshot?

20   A    No.

21   Q    If you look at the top of the -- by where the holes are

22   punched, you will see some tabs:  Purchase and expense,

23   payroll, loans, management report tab.

24        Did the Launch Coffee, did the Launch System have

25   tabs like that?

Friedman - direct - Nelkin                          425

1    A    It's the first time I've seen it.  I don't know.

2    Q    You've never seen this user --

3    A    I have never seen it.  I do not know.

4    Q    Okay.  Do you know who the users of the Launch Coffee

5    System were?

6    A    To me I understood it was -- the way I understood it was

7    me, Sonia -- what you talking about Launch Coffee, right?

8    Q    Yes.

9    A    Me, Sonia, Eugene, Mayer.

10              Continue?

11   Q    Were there other people?

12   A    Yes; Zevi, Vincent.

13   Q    If you look at this list, is that list -- just to be

14   clear, when you referring to Zevi, you are referring to my

15   client --

16   A    Steven.

17   Q    -- Steven Schreiber?

18   A    Yes, sorry, Steven.

19   Q    If you look at this list on this screenshot, do those

20   names -- are those names familiar to you as users of Launch?

21   A    Again, I have never seen it.

22   Q    So I'm asking --

23   A    Only first time in court.

24   Q    I'm asking you to use the document.

25   A    Direct meant all the names or some of the names?

                SAM    OCR    RMR    CRR    RPR

1   Q    I am asking you if you recognize that those people were

2   authorized users of Launch?

3   A    I recognize the names, but I don't know -- what

4   authorized I can tell you:  Me, Cindy, Sonia, Silvia, Vincent,

5   Eugene, Zevi, Mayer, Rubin -- I don't know who Rubin is.

6   Q    Did people have different levels of access on the Launch

7   System?

8   A    I don't know.

9   Q    You don't know if some people could see parts of it and

10  others could see larger parts of it?

11  A    As far as I know, everybody had the same access to -- to

12  see everybody.  The same thing.

13  Q    You don't know anything about the different titles under

14  role name, such as administrator or executive director, sales

15  manager?

16  A    No.

17  Q    Did anyone ever complain to you that they were blocked

18  out of part of the Launch System?

19  A    Mayer came to me.  Unfortunately, I never spoke from day

20  one, but he met Zevi -- with Steve, but any time that somebody

21  called me and said there is a problem, I said I will make sure

22  there shouldn't be.  So if there was, I made sure to tell

23  Eugene or tell Yossi to make sure if there were problems, to

24  make sure to give them whatever has to be done.

25  Q    So it was your instruction that everyone should have full

1  access to all parts of the Launch System?

2  A    That's correct.

3  Q    And you are unaware of the situation where people didn't

4  have full access?

5  A    I don't know.  I really don't know.

6  Q    Who would have made the decisions as to who could see

7  which parts of the Launch System?

8  A    Again, I said, as far as I know I made sure all my

9  partners should be able to see everything.

10 Q    All right.  Well, you are listed on this thing as

11 executive director, correct?

12 A    That's what it says, you are correct.

13 Q    Okay.  Are any other partners on this listed as executive

14 directors?

15 A    I have no idea why this is.  I keep on telling you again.

16 Q    I am just asking if any of them --

17 A    Over here?

18 Q    Yes.

19 A    No.  I'm sorry, it says -- I see it says by Jordan.  I

20 see it says by Michele.

21 Q    I am asking for partners.

22 A    Oh, partners, I'm sorry.  One second.  No, I don't see

23 it.

24 Q    All right, what was Jordan's role at the company?

25 A    Jordan originally was -- I wanted him to -- to -- to

1    do -- help to do, not only the payables, the receivables,

2    and -- and many other stuff for the company.  So originally

3    we -- I hired him like to be a helper for Sonia to do, but

4    unfortunately we got into argument and I just took it off from

5    Two Rivers.

6    Q    And how old was she?

7    A    I don't know.

8    Q    Did she have any training?

9         THE COURT:  As we go into these details, consider

10   that we have a schedule to keep.  I anticipate, as I hope you

11   do, that we will be completing the direct by lunchtime.

12        MR. NELKIN:  I am doing my best, Your Honor.

13        THE COURT:  As I say, that is what I anticipate will

14   happen.  I hope you are, too.

15        MR. NELKIN:  Okay.

16   BY MR. NELKIN:

17   Q    Let's turn to Exhibit 1.  And since the first two pages

18   are in Spanish, you can turn to the third page.

19        Have you ever seen this document?

20   A    Exhibit 1, you said?

21   Q    Exhibit 1, tab 1, third page.

22   A    Third page.  Go ahead.

23   Q    Have you ever seen this?

24   A    This one -- okay.

25   Q    Have you seen this before?

Friedman - direct - Nelkin                    429

1    A    I've seen it.

2    Q    Have you read it?

3    A    I think yes.

4    Q    Okay, is there anything in it that you disagree with?

5         MR. SCHAFHAUSER:  Objection.

6         THE COURT:  Overruled.

7    Q    Take your time.

8    A    Can I just have --

9    Q    Yes.

10   A    I'll just doublecheck.

11        (Pause.)

12   A    Yes.

13   Q    What do you disagree with?

14   A    No, I don't disagree.  I'm sorry, it's fine.

15   Q    So when he says that he helped you remove two computers

16   from Two Rivers --

17   A    That's correct.

18   Q    -- and the he is Mr. Espinal?

19   A    I think it's Espinal, yes.

20   Q    Okay, if you could turn to Exhibit 2.

21        Do you recognize yourself in that photo?

22   A    Yes.

23   Q    Can you tell me what you're doing?

24   A    Yes.  Since my son used to drive in every day to

25   Brooklyn, was a good two hours, two-and-a-half hours' drive

SAM     OCR     RMR     CRR     RPR

Friedman - direct - Nelkin                 430

1   every day, so once I had this -- we had this office, I made

2   one room for him and I asked him -- I didn't want him to drive

3   every day, so I said he should come inside two days a week.

4         So he had an office.  I don't remember who brought

5   his computer, whether me or him.  He had his own computer.

6   Whatever he had in there.  I gave him a phone and -- and there

7   was one office for him.  And one of the computers when he went

8   in to fight was, the argument, so I didn't want -- it was

9   uncomfortable for me that he should be there, so I asked him

10  please to go back to Brooklyn instead of being there.

11        So he asked me he needs a computer to work, so I

12  basically picked up his computer and his printer and I took it

13  to him.

14  Q    Where did you take it?

15  A    I took it to Brooklyn.

16  Q    When you say --

17  A    To the office.

18  Q    To the office?

19  A    He has the same computer, yeah.

20  Q    Okay.  And is it one of the computers that Mr. Nussbaum

21  reviewed?

22  A    Definitely, yes.

23  Q    Okay, do you know which one it is?

24  A    Sure, we know which one it is; yeah.

25  Q    Which one?

SAM      OCR      RMR      CRR      RPR

Friedman - direct - Nelkin                    431

1    A    That's his computer in his office right there.  His

2    computer was the only computer what didn't have nothing,

3    nothing with anybody, any of the companies.  It was his

4    personal thing.  He used to study on it, whatever.

5    Q    Now, you originally swore in your affidavit that computer

6    was removed in October.

7              Do you still believe that?

8    A    I -- I -- I rely very --

9              MR. SCHAFHAUSER:  Sorry, objection to form.  That is

10   not what the declaration says.

11             THE COURT:  When did you remove it?

12             THE WITNESS:  I -- I -- it was right -- I don't

13   recall exactly when it was, but it was right after the couple

14   of weeks after -- after the fight started or a couple of weeks

15   after when Sonia left.  I don't recall.  I really don't

16   recall.

17             THE COURT:  Okay.

18             THE WITNESS:  But I said clear that I -- whatever --

19   and I told Paul I cannot even when --

20             THE COURT:  You don't recall when you moved it?

21             THE WITNESS:  That's correct.

22             THE COURT:  Have you ever said otherwise?

23             THE WITNESS:  No.  I relied on this one, on this

24   thing.  I knew it said, I relied on the picture, right here.

25             THE COURT:  Well, in your affidavit you gave two

Friedman - direct - Nelkin                    432

1   different dates.  Your first affidavit --

2            THE WITNESS:  I said it clear even then, I said

3   clear.  I said I relied onto the picture, whatever the picture

4   is that's what I relied.  So if I wrote October, it's because

5   maybe I relied it's October.

6   BY MR. NELKIN:

7   Q    I only have one question.

8   A    Yes.

9   Q    You said that you knew that it was close in time to when

10  Ms. Rivera left, correct?

11  A    I said I'm not sure when it was.  He asked me again, I

12  said I wasn't sure if it was close to the time when Rivera or

13  I'm not sure it's close then, but I remember --

14           THE COURT:  What's the best you remember about what

15  was going on at time?

16           THE WITNESS:  No, I really don't.  I --

17           THE COURT:  So now you don't know --

18           THE WITNESS:  No, I can't remember exactly which one

19  it was exactly.

20           THE COURT:  There are several landmark events that

21  you are mentioning.

22           Which one was closest to when you took this computer

23  out, or do you just not recall anything about it?

24           THE WITNESS:  No, I recall doing it because I did

25  it.  So, of course, I recall.  But you ask me --

1          THE COURT:  I am asking if you recall anything about

2    the timing.

3          THE WITNESS:  I know I did it in the daytime.  It

4    wasn't done at night or something.  I did it like in full

5    light.  It was not like I was hiding anything.  I think it was

6    maybe March.  I don't remember.

7          THE COURT:  Maybe March?

8          THE WITNESS:  Could have been.

9          THE COURT:  Okay.

10         THE WITNESS:  I don't want to say something else.

11   BY MR. NELKIN:

12   Q    And do you remember when Ms. Rivera's computer was taken?

13   A    Yes.  Ms. Rivera I think two weeks -- what happens is

14   after she went back, a week or two she started complaining to

15   me the computer is too slow, she can't work, da-da-da.  So I

16   told her as soon as I get a chance the next time I go over

17   there I will make sure to -- to pick it up.

18   Q    And in your affidavit you said that was April 6th, the

19   second affidavit?

20   A    Again, if I said -- I relied onto the picture, very

21   clear.  I relied on whatever on the picture and that's what I

22   relied.

23   Q    My question is, as Ms. Rivera testified, that she had the

24   computer brought to her several months after she left and that

25   she left in March.

Friedman - direct - Nelkin                    434

1           MR. FINKEL:  Objection, I don't believe that's the

2    testimony at all, Your Honor.

3           THE COURT:  You will all be arguing about what the

4    testimony was.

5    A    I can only tell you, I -- I can tell I'm almost sure and

6    I don't make -- I don't believe -- maybe she made a mistake,

7    but I'm almost sure it was right a little bit after this that

8    she left.

9           THE COURT:  Again, please do not ask one witness to

10   comment on another witness' testimony.  If you have a

11   question, ask it.  If all you have left, Mr. Nelkin, is asking

12   Mr. Friedman to compare other witnesses' testimony, we can

13   finish now.

14          MR. NELKIN:  Okay.

15          THE COURT:  So I will assume the next question you

16   have asking him to comment on somebody else's testimony is a

17   signal that you have no other new questions to ask.

18   BY MR. NELKIN:

19   Q    Did you authorize the removal of any files from Two

20   Rivers?

21   A    No.

22   Q    Okay.  So any file that was previously stored at Two

23   Rivers should have remained at Two Rivers?

24   A    Hundred percent.

25   Q    And who would have had authority to remove files from Two

Friedman - direct - Nelkin                    435

1   Rivers?

2   A    Nobody.

3   Q    Could you have authorized someone to remove them?

4   A    No, it wasn't -- it wasn't to my benefit to remove any

5   files from there.  Why would I?

6   Q    What about files on computers?

7   A    Nothing.  Why would it be my benefit to move it?

8   Q    Well, as you just testified you removed Ms. Rivera's

9   computer?

10  A    Right.

11  Q    Did you have the authority to remove --

12  A    She was continue working on it.  I didn't remove any

13  files.  Files you move papers, you move documents.  I didn't

14  remove anything.  I moved her computer to make it -- to -- to

15  continue to work and never take a thing.

16  Q    But paper files should have been left at the office?

17  A    Yes.

18  Q    And no one had the authority to order otherwise?

19  A    That's correct.

20  Q    Not even a partner?

21  A    No.

22  Q    Who did Mr. Rogosnitzky take his instructions from with

23  regard to distributing passwords?

24  A    We had discussion who I wanted to use the computer, and I

25  told him all the partners and as the girls were hired, I told

SAM     OCR     RMR     CRR     RPR

Friedman - direct - Nelkin                    436

1   that to him.  So that was, basically, the discussion I had

2   with him.

3   Q    Are you aware of any situation where the partners

4   requested passwords from Mr. Rogosnitzky and were told no?

5   A    The only thing that when I was there was on they wanted

6   some personal -- for some of the -- to go inside, not in the

7   computers, some -- in the -- what is it called?

8         What's the main thing that hold everything?  Oh, the

9   survey or something like this, personal, what it belongs to --

10  to the guy who write the program.  The main thing, what is it

11  called?  I told him that they want -- and I know they want to

12  something and he didn't want to give out his personal password

13  that he works on, that's what I understood.

14  Q    Can you turn to Tab 123, Exhibit 123, please?

15        This is a series of e-mail exchanges between various

16  partners at Two Rivers.  I believe you are copied on it or the

17  thing is addressed to you?

18  A    Okay.

19  Q    And have you seen this before?

20  A    I think, yes.

21  Q    Do you remember the events that were going on that are

22  the subject of this e-mail exchange?

23  A    You talking about on October -- was it October,

24  September, October --

25  Q    They are dated.

1    A    Yes.

2    Q    Okay.  What do you remember was happening here?

3    A    I am trying to remember.  Give me a minute.

4         This was, I think, after they came out with the pack

5    from Maysharim is that what you're talking about it?  And then

6    we got into a thing and they asked -- they asked for the

7    password, they wanted to put new guy in there, something like

8    this.  That's what you're talking about?

9    Q    Maysharim is the base in Maysharim?

10   A    I assume that's Maysharim, right.  After when I was away,

11   correct, you talking about then?

12   Q    Let me ask the questions here.

13        Are they requesting passwords for the server here?

14   A    Yes.

15   Q    Was Yossi giving those passwords to them?

16   A    I -- I don't think so.  I don't know.  I don't know, I'm

17   sorry.  I'm going back, I don't know.

18   Q    Well, they keep requesting it, does he give them to them?

19   A    I don't know what happened then, but --

20   Q    If you could turn to the second page.

21        The third group of words from the bottom, it's a

22   sentence that says:  Mr. Friedman, who is an officer of the

23   company, has coordinated my work to date and I have been

24   answering to him?

25   A    Correct.

1    Q    Is that, in fact, true?

2    A    I wouldn't say exactly true, but yes, it's possible.

3    Yes, did I coordinate work for him; yes.

4    Q    And did he, if you could turn the page, turn to the third

5    paragraph, it says:  I cannot understand why you insist I turn

6    over the passwords to you when I've informed you that

7    Mr. Friedman has them on file and you can easily ask

8    Mr. Friedman for them, two exclamation points.  Indeed, this

9    whole e-mail exchange is very strange.  I've dealt with

10   Mr. Friedman throughout your e-mail to me, out of the blue

11   instead of going to Mr. Friedman is really odd.  It seems to

12   me this request is not connected with regular company

13   business.

14         Do you remember --

15   A    I understand this.  I remember the fight what was going

16   on, yes, but I am not sure exactly what the guy did.

17   Q    Okay.

18   A    I can't answer that.

19   Q    My question is was this about the partners requesting

20   passwords from Mr. Rogosnitzky?

21   A    Was this about the -- they asking for a password on the

22   main, right.

23   Q    And was he refusing to give them to them?

24   A    Yes.

25   Q    And was he saying that you had the passwords?

1    A    No, I didn't have it.

2    Q    But does he say that you have it?

3    A    I can't answer for him what he said, what he did, but I

4    didn't have.  I wouldn't even know how to go there.  I don't

5    know my own password, I can't remember somebody else.

6    Q    You earlier testified that you would always tell

7    Mr. Rogosnitzky --

8              THE COURT:  Could you repeat the question?  Hold on,

9    I just want to understand that.

10             THE WITNESS:  I don't remember --

11             THE COURT:  You don't know your own password, but

12   you log into e-mail?

13             THE WITNESS:  I have all of mine, unfortunately, one

14   number, always the same.

15             THE COURT:  Yes.

16             THE WITNESS:  Because I keep on forgetting.

17             THE COURT:  And you remember that one?

18             THE WITNESS:  Yes, but --

19   BY MR. NELKIN:

20   Q    Right after we were or right around the time you

21   delivered that one password, we were told that you had

22   multiple passwords, that you had a different -- that you

23   changed your passwords.

24             MR. SCHAFHAUSER:  Objection to hearsay.

25   A    Just for your information --

SAM      OCR      RMR      CRR      RPR

1              THE COURT:  It's hearsay?

2              MR. SCHAFHAUSER:  We were told.  Who is we?

3              THE COURT:  He's framing the question.

4              MR. SCHAFHAUSER:  Okay.

5              THE COURT:  His question, just like yours, are not

6    evidence --

7              MR. SCHAFHAUSER:  Very well.

8              THE COURT:  -- as you know.

9              MR. SCHAFHAUSER:  Very well.

10   BY MR. NELKIN:

11   Q    Did you --

12   A    Not at all because I remember very clear that I had

13   Michele an argument, this is my password for everything

14   because I have one number I always do the same.  How can I

15   give it to them, I'm going to lose myself?

16   Q    You never changed your password about six months before

17   the TRO was entered?

18   A    I don't -- don't -- I don't know.  Which one, on which

19   password -- on which -- one second.  Are you talking about on

20   which -- on which -- on which -- on my e-mail you talking

21   about?

22   Q    Yes.

23   A    I changed my password afterwards, yes, because I had one

24   password for everything else and I was told I was allowed to

25   change the password.  Once I gave you guys the opening and

Friedman - direct - Nelkin                    441

1    everything, I was allowed to change my password.

2    Q    In court your lawyers represented to us, and I believe

3    that you were in the room, that you had a single password?

4    A    That's correct.

5    Q    And that you would need time to change that?

6    A    Correct.

7    Q    Subsequent to that, we were told that actually you had

8    changed your password months before that?

9    A    Not true.  I had changed -- I had one password for many,

10   many years for everything.  And then I changed like you

11   just -- like you said, the lawyer said I have -- I have to

12   change.  And after I gave it to you guys, I changed it.

13   Q    Now, I believe you testified that your instructions to

14   Mr. Rogosnitzky were to always give the passwords to the other

15   partners, is that correct?

16   A    I -- I -- that's not what I said, to give them the

17   password.

18        I instructed him if they have a problem and they

19   can't get -- you know, I was told make sure to give them

20   access everywhere.  That's what I said.  I didn't say the

21   passwords.  I don't think I said passwords.

22   Q    But if they needed the password for access, then --

23   A    For access to where?

24   Q    Well, I'd like to ask you that question.

25        What did you understand the words getting access to

1    the system to mean?

2    A    Access if they want to go into the -- open up the

3    computer and -- open up their tab and then -- and then

4    whatever they want to check on the system, they should be able

5    to check it.

6    Q    And did you require a password to do that?

7    A    I don't know.  I had -- I had a password for -- from my

8    system, but do they?  Everyone has their own password.  I

9    don't know.  That's what I always understood.

10   Q    You said you got these e-mails and you're familiar with

11   them.  When they're requesting passwords for the server, what

12   would you tell Mr. Rogosnitzky?

13   A    I spoke to Mr. Rogosnitzky on this one to -- if he can

14   give them or to give them access, so he claimed that's his own

15   thing and belongs -- the system belongs to him.  The system is

16   his and he is not going to give it away.  His own system, he

17   is not going to give it to anybody until he doesn't get paid.

18   Q    Do you continue to have to use Mr. Rogosnitzky for

19   services?

20   A    I told you, I've used him for -- I bought from him, not I

21   used, I bought, for two other -- the same program for two

22   other companies.

23   Q    Have you ever had any discussions with Mr. Rogosnitzky

24   about the fact that the Two Rivers doesn't have access to the

25   Launch System?

Friedman - direct - Nelkin                   443

1  A    When I was notified about it through Paul that, I guess,

2  somebody e-mailed them or something, I called him up and he

3  clearly said to me that I don't want to talk about this one,

4  all the other ones, but over here till I don't pay, he doesn't

5  want to do anything.

6  Q    He said is it because you don't pay him?

7  A    'Til -- we did not pay him; we, not me, I meant -- Two

8  Rivers I meant.

9  Q    So he continued to do work for you on all the other

10  systems, but he just stopped doing it for Two Rivers?

11  A    I don't know if he -- if he one who stopped it, but

12  that's what he told me.  He said he's not going to do anything

13  for Two Rivers 'til we don't give him money.

14  Q    Did you inform Two Rivers of that?

15  A    Unfortunately, the rate sheet was ready, but at that time

16  we didn't talk to each other, so I couldn't even inform if I

17  want to, you understand.

18  Q    Did you inform your lawyers that there was a looming

19  problem?

20         MR. SCHAFHAUSER:  Objection to form.

21         THE COURT:  Overruled.

22  A    I am sure I must have told him.

23  Q    So you knew that the Two Rivers servers or the Two Rivers

24  access was going to be curtailed?

25  A    No, I didn't say I knew.  When you -- curtailed, you mean

1  disconnected?

2          No, I never knew it was gonna be disconnected.  I

3  never knew about none of this.  I found out -- the first time

4  I found out I think Paul must have got an e-mail from somebody

5  and he told me, did I do anything with the computer?  I said

6  no.  They asked me did I disconnect; I said no.  I said I'm

7  gonna call Yossi to find out.

8          THE COURT:  Slow down, please, so we can have a nice

9  clean record.

10 A    I said I will call Yossi to find out if he did it.  And

11 never gave me a clear answer yes or no, and that's only what

12 he said to me.

13 Q    And just to be clear, what did he say to you?

14 A    He told me that 'til me don't give him any money, he

15 doesn't want to talk to me about it.

16 Q    But your testimony is you continued to give him money?

17 A    I -- again, it's completely different thing.  He sells

18 the program.  I -- he is a guy who writes programs, he sells

19 programs.

20 Q    And do you have any idea where the programs that he sells

21 reside?

22 A    I don't know.  I learned all this business,

23 unfortunately, the last few months.

24 Q    Would Mr. Nussbaum know?

25 A    Pardon?

Friedman - direct - Nelkin                    445

1   Q     Mr. Nussbaum know?

2   A     You're asking is it about him?

3   Q     Would Mr. Nussbaum know?

4   A     I assume he knows much more than I know.

5   Q     Have you ever had any discussions with Mr. Nussbaum about

6   the fact that there is no longer access to --

7   A     I am almost sure I must have asked him also and he said

8   also he's gonna check with Yossi.

9   Q     And do you know if he did?

10  A     I think yes.

11  Q     And did he tell you?

12  A     I don't -- no, I never followed up with something.

13  Q     I believe you, in your affidavit, said that you had no

14  knowledge of anything that Mr. Salcedo did when he was at the

15  office at the time that the event in the police report is

16  described, is that correct?

17            MR. SCHAFHAUSER:  Objection to form.

18            THE COURT:  Overruled.  Actually, no, start again.

19  Make it clear.

20  Q     Do you know what -- are you aware that there was a police

21  report with regard to Mr. Salcedo?

22  A     Yes.

23  Q     Okay.  And do you know -- well, do you know if that

24  police report said that Mr. Salcedo had gained entrance to the

25  Two Rivers office?

1   A    If I remember clear, I -- I -- the police officer asked

2   me do I know that Mr. Salcedo broke in or something.  So I

3   said to him, no, but I -- I am almost sure I told him that he

4   came back, that as far as I know he came back to help -- to

5   help Sonia to -- because Sonia has a back problem, he came

6   back to help him to take whatever boxes he needed to -- to --

7   to -- to take it back.

8   Q    But I thought you just said that no one had the right to

9   remove boxes?

10  A    Not -- Sonia didn't remove nothing from Two Rivers.  She

11  was working over there also.  At the same time she also had

12  stuff over there for -- whether it was for her personal stuff.

13  She had stuff she was -- she used to like all kinds of

14  chachkis to put on the desk, on the -- on the shelves.  You

15  understand?  She had pictures.  She had stuff --

16  Q    Were you there when Mr. Salcedo and Ms. Rivera removed

17  things from Two Rivers?

18  A    No.

19  Q    How do you know what they removed?

20  A    I trusted Sonia.  I trust -- the girl works for me for

21  twenty years, of course I trust her.  She told me clear and

22  she knows she doesn't --

23  Q    But you have no independent knowledge of what she and

24  Mr. Salcedo took?

25  A    No.

Friedman - direct - Nelkin                447

1   Q    Okay.  And you don't know whether Mr. Salcedo took a

2   computer or not?

3   A    No, I don't know.

4   Q    Did he have authority to take a computer?

5   A    No.

6   Q    Okay.  Did Ms. Rivera have authority to take a computer

7   without you?

8   A    No.

9   Q    Okay.  Mr. Friedman, did you ever receive a spoliation

10  letter?

11  A    What is that?

12  Q    Are you aware of any letters that you or your lawyers

13  received telling you not to destroy documents?

14  A    Yes.

15  Q    Okay.  What are you aware of?

16  A    I was clearly aware that I was not allowed to destroy any

17  papers, any documents, any delete anything from anywhere.

18  Q    And are you aware of any letters that you received or

19  your lawyers received?

20  A    I don't recall.

21            (Continues on the following page.)

22

23

24

25

SAM     OCR     RMR     CRR     RPR

1   EXAMINATION BY

2   MR. NELKIN:

3   Q    Can you turn to tab 116, Exhibit 116, the second page.

4   Did you ever receive this letter?

5   A    I'm sure I received it.

6   Q    You did receive it?

7   A    I received it.

8   Q    Okay.  Do you remember what triggered this letter?

9   A    Do I remember what?

10  Q    Do you remember what event triggered this letter?

11  A    Can you one more time?

12  Q    Do you remember what event triggered this letter?

13  A    No.

14  Q    You just remember receiving the letter?

15  A    Uh-hum.

16  Q    Mr. Friedman, Associated Fuel, does that have any other

17  offices besides the one in the Bronx?

18  A    No.

19  Q    What about in Hawthorne?  You don't know about --

20  A    I don't know nothing about that.

21  Q    Do you know the registered principal place of business

22  for that?

23  A    No.  I'm sorry, no.

24  Q    How many e-mail accounts do you have?

25  A    I have -- I used to have Associated Fuel for the fuel, so

Friedman - direct - Nelkin                         449

1   I shouldn't get mixed up.  I used to have Emil Friedman 193

2   for myself, and I had -- I have Emil Two Rivers Coffee.

3   Q    Did you have any others?

4   A    I may have had one or two when I opened up the phone.

5   You have to have some kind of an e-mail.  So they opened up I

6   think J something, another one, but I have no idea.

7   Q    Do you have -- does E&J Funding have any computers?

8   A    E&J, no.

9   Q    Does E&J have any computers?

10  A    No.

11  Q    Does E&I have computers?

12  A    No.

13  Q    Then what company has a computer in Brooklyn?

14  A    E and . . . I'm sorry, E & Jeryg, J-E-R-Y-G.

15  Q    That's the only company that has --

16  A    That's the only company.

17  Q    E&J Funding has no computers?

18  A    No.

19  Q    E&J Funding is the company that supposedly lent a lot of

20  money to Two Rivers; is that correct?

21  A    Correct.

22  Q    Where does it store the records for those loans?

23  A    It was basically done manual everything or -- I may have

24  had -- I had -- what do you call?  I did -- I did . . . what

25  do you call it?  Spreadsheet?  It's called, right?  Excel,

1   spreadsheet, I did on the computer, and I think it should

2   be --

3   Q    By computer --

4   A    -- it should be on Sonia's computer.

5   Q    You say you did it?

6   A    I myself, I don't know how to do these things.  When I

7   say me, I apologize.  I really don't know how to do it, I

8   physically don't know.

9   Q    So if there was an interest calculation --

10  A    If there was an interest calculation, I know what to do

11  and I'm good at it, but I must have given it to Sonia and I

12  said please, make sure we have it, and that's what we have.

13  Q    Those would be on the Bronx computers?

14  A    Yes.  I'm almost sure.

15  Q    And how many -- does E&J have any loans to any company

16  besides Two Rivers?

17  A    E&J Funding -- right now, no, I don't think so.

18  Q    And E&I, what is its business?

19  A    E&I Investors, if I'm not mistaken, has one or two

20  properties under E&I Investors.

21  Q    But it has no computers?

22  A    No computer, right.

23  Q    Do they use E&J's computers in any way?

24  A    No.

25  Q    Mr. Ahearn, John Ahearn, there are two John Ahearns;

1    aren't there?

2  A    One we call Papa Jack and one is John, the son.

3  Q    Who is your partner?

4  A    The son.

5  Q    Is the son the one who has been sick?

6  A    Yes.

7  Q    How long has he been sick?

8  A    I don't know.  Quite a few years.

9  Q    Okay.

10  A    Bad, I would say.  If you're calling bad sick.

11  Q    What?

12  A    The last two years, or even more, bad sick, bad.

13  Q    Could it be more than three?

14  A    I don't know.

15  Q    You don't really know the exact --

16  A    No, I talking to him once a month, to visit him.  I talk

17  to him here and there.

18  Q    Does Lawrence Ahearn -- is he the active partner?

19  A    He's the active, yes.

20  Q    In all of these other businesses, are there any other

21  partners besides you and Mr. John Ahearn and Lawrence Ahearn?

22  A    When you say all other businesses, you're talking the one

23  that's named over here, you're asking me now?

24  Q    Yes.

25  A    I don't think so.

Friedman - direct - Nelkin                    452

1    Q    Does the 165th Street Realty Company have a computer?

2    A    Anything from 165th Street, Sylvia is the one.  Anything

3    that's there is on her computer.

4    Q    And what about Light Trucking?

5    A    Light Trucking, if anything, those would be Sylvia or

6    Papa Jack.  Papa Jack.

7    Q    Papa Jack?

8    A    Yes.

9    Q    Papa Jack still comes in the office?

10   A    He still comes in once a week.  He cooks for the people.

11   He keeps so busy now with the. . . .

12   Q    Are there hard copy records kept for the transactions

13   between these businesses and Two Rivers?

14   A    What do you mean?

15   Q    Well, did Park Avenue charge Two Rivers for services?

16   A    Correct.  Right.

17   Q    Did other companies charge Two Rivers for services?

18   A    Right.

19   Q    Were there hard copies of those records?

20   A    I'm sure there's something.  I'm sure.

21   Q    Where would those records be maintained?

22   A    I'm sure it would be in the Bronx, if anything.

23   Q    What about E&J, did they charge Two Rivers?

24   A    Yes.

25   Q    Did they maintain hard copies?

Friedman - direct - Nelkin                   453

1   A    Yes, I'm sure.

2   Q    Would those records also be found on those computers?

3   A    I don't know if it would be found on the computer.  If I

4   would recall, I think all of this one would be given to

5   Michelle.  If she came, she took it, you understand.  Whatever

6   was there, they took it.  They don't save anything on

7   computers.  It's not like anything --

8   Q    What does E & Jeryg do?

9   A    E & Jeryg is a management company.  E & Jeryg works for

10  each building.  We have buildings, apartments.  Sometime we go

11  out for something else to do.  Anything that's development,

12  through the management stuff.

13  Q    Let me ask you something:  Does E&I own Bogart?

14  A    I told you owns a couple of properties.  This is one of

15  them.

16  Q    It owns Bogart?

17  A    Right.

18  Q    But the Ahearns -- are the Ahearns members of E&I?

19  A    The Ahearns are members of E&I, no.

20  Q    Do you know who leases the apartments to Ms. Ezell at

21  Bogart?

22  A    Ahearn.

23  Q    Then I'm confused, if E&I owns the building --

24  A    Okay, I have a relationship -- I am going to back up a

25  little bit.  I have a relationship with all of my partners, a

Friedman - direct - Nelkin                    454

1    handshake with a lot of stuff.  But as far as everybody knows,

2    it belongs to him, used to belong to him, to Mr. Ahearn, and

3    he's the one who rents it out to Sonia.  I don't think Sonia

4    knows him as E&I Investors.

5    Q     But whose is it really?

6    A     E&I Investors in the answer.

7    Q     Who gets the --

8    A     He gets all the -- Ahearn gets all the rent, all the

9    bills, and we straightened out at the end of the year.

10   Whatever relationship we have with them, we straighten out at

11   the end of the year.

12   Q     Do you know where the payroll records for Two Rivers are?

13   A     Payroll records for Two Rivers, yes.

14   Q     Where?

15   A     I assume on the -- on the -- on Launch Coffee.

16   Q     Could you turn to tab 61, Exhibit 61.  And I'm looking at

17   page 2 of this.  First off, let's look at page 1.  Who is this

18   addressed to?

19   A     My home.

20   Q     But who is the company that it is addressed to?

21   A     Two Rivers.

22   Q     Is it from the government?

23   A     Yes.

24   Q     If you look in the middle of page 2, it says location

25   where payroll records will be maintained outside of New

Friedman - direct - Nelkin                455

1   Jersey.  It says Michael Devine's office.

2   A    Yes.

3   Q    Do you know if the records were maintained at Michael

4   Devine's office?

5   A    I assume, yes.  Sonia gives them every week, every month.

6   He pays the taxes on the company.  I mean, he was paying, he

7   was there, so I assume yes.

8   Q    Do you know if those were ever returned to Two Rivers?

9   A    I have no idea.

10  Q    What type of electronic records would be kept of banking

11  transactions for Two Rivers?

12  A    I don't know.

13  Q    Could you transfer money between Two Rivers' accounts

14  electronically?

15  A    No, I have no idea how to do it.  Never in my life I did

16  it.

17  Q    Well, how did Two Rivers' money get transferred through

18  Signature Bank?  Did it require your authorization?

19  A    If it's something to do with the business, then I would

20  assume Sonia would do it or I would ask Sylvia to do it for

21  me.  If nobody is there, then I would maybe call the bank and

22  do it.

23  Q    We are trying to find out where the records are that

24  would show payments to and from E&J Funding to Two Rivers.  Do

25  you know where those would be?

Friedman - direct - Nelkin                    456

1   A    I assume it would be on Launch Coffee.  I'm not sure.

2   E&J Funding to Two Rivers, right?

3   Q    Yes.

4   A    I would assume it would be in Two Rivers -- yeah, Launch

5   Coffee.

6   Q    Would it -- if checks were made out to Two Rivers and

7   deposited by Two Rivers --

8   A    Correct.  Should definitely be there, right.

9   Q    What type of record would be kept of that?  Would there

10  be a deposit slip?

11  A    I assume so.  I. . . .

12  Q    Do you know who would keep those deposit slips?

13  A    I assume again.  I would assume Sonia would keep.  She

14  had a file with all of the deposit slips to back it up.

15  Q    Do you know if they were kept in hard copy or electronic

16  form?

17  A    I don't know.

18  Q    Okay.  Do you know who did the deposits for Two Rivers at

19  Signature Bank?

20  A    It could have been anybody who we asked to go to the

21  bank.

22  Q    Okay.  Do you remember who you asked to go to the bank?

23  A    Could have been sometime me.  Anybody -- Signature Bank

24  had a branch in Brooklyn, had a branch in Manhattan, or had,

25  so if we have to make a deposit and they ask me to give it,

1  then I may give it to somebody in the office, do me a favor,

2  go to the bank and make a deposit.

3  Q    But it had no New Jersey branches?

4  A    No.

5  Q    The credit card allocations that were done, did Rosie in

6  your Brooklyn office have anything to do with those?

7  A    The only thing she has to do with it is like the same as

8  -- I think if it's anything allocated to her, she pays that

9  bill.

10 Q    Do you know if any of her bills were allocated to Two

11 Rivers?

12 A    Her bills to Two Rivers?

13 Q    Yes.

14 A    No.

15 Q    Can you turn to Exhibit 84.  I'm sorry.  98.  98.

16        THE COURT:  We are getting close, Mr. Nelkin?

17        MR. NELKIN:  Yes.

18 Q    Do you recognize this document?

19 A    I see this is e-mail.  I think so, if I am not mistaken.

20 Q    If you could turn to page 2.

21 A    Right.

22 Q    Do you recognize that type of --

23 A    This is the same thing that we spoke about before.  This

24 is -- this is a telephone bill.  This is a credit card.  Now

25 that I know about it, the number belongs to Dov, so I assume

Friedman - direct - Nelkin                458

1   it was several months.  He paid the telephone bill.

2   Q    But this form looks different than the other credit card

3   allocations.  Do you recognize which office would have done

4   this?

5   A    Which form?  Say it again.

6   Q    The second page.

7   A    The 1 of 34?

8   Q    Yes.

9   A    This was done, if anything, not even Rosie.  I assume it

10  was done from Dov.

11  Q    Dov?

12  A    Dov.

13  Q    That's Dov Sandberg?

14  A    Yes.

15  Q    Do you know if his computers are identified on Mr.

16  Nussbaum's chart?

17  A    I don't think so.

18  Q    And do you recognize the e-mail on page one, what this

19  document was doing?

20  A    I'm telling you, this was the telephone.

21  Q    No.  I'm saying it is being forwarded from you to Mayer

22  and it looks like it came from Rosie to you.

23  A    I have no idea.

24  Q    Is that Rosie's e-mail address, the rosie1management@yahoo?

25  A    It could be.

1  Q    What is Rosie's full name?

2  A    Rosie's name is Coello.

3  Q    Do you remember having a bunch of credit card backups

4  sent to Mayer?

5  A    Yeah.  One second.  We sent Mayer or Mayer --

6  Q    Well, who did you send the credit card -- it is from you,

7  Emil Friedman to Mayer and then Mayer, it looks like he

8  forwarded it to other partners.

9  A    I don't know why would anybody from the office would send

10  it Mayer.  I don't know.

11  Q    But does it appear to be coming from Brooklyn as opposed

12  to the Bronx?

13  A    If this means coming from the Brooklyn to him, then

14  that's from Brooklyn to him.  I don't know.  I don't know how

15  to read this exactly.  I'm sorry.

16  Q    And Dov only --

17  A    It says from Mayer to Eugene and here it says from Emil

18  to Mayer.  I'm not sure what you're referring to.

19  Q    Did Dov sit in Brooklyn?

20  A    Yes.

21  Q    Did he have any -- did he ever go -- have any offices in

22  the Bronx?

23  A    No.

24  Q    All right.  I'd like to ask you about your computer in

25  Florida.

Friedman - direct - Nelkin                          460

1   A      Right.

2   Q      Your computer in Florida -- well, do you have an office

3   in your --

4   A      I don't have an office.  I have a home, like I said

5   before, and I have a desk with a computer.  When I come

6   there -- my wife comes most of the time, six months out of the

7   year.  She basically is there and she, like every other lady,

8   she checks, she buys stuff, whatever she does on the computer.

9   I don't know.

10  Q      Do you remember ever working with Eugene Schreiber at

11  that location?

12  A      He was by me I think once.  What we did, we printed out a

13  ticket for him for an airline, if I remember clear.

14  Q      Is that area where the computer is set up like an office?

15  A      No.  It happens to be a nice room.  There is a nice desk.

16  There is a nice computer.  That's about it.  My apartment is

17  fixed up nice, but it doesn't mean it's office or something.

18  Q      Okay.  In your house, you identified your wife as having

19  a computer?

20  A      That's correct.

21  Q      What type of computer does she have?

22  A      I have no idea.

23  Q      Is it a laptop or regular?

24  A      A regular computer.  You're talking about Florida.

25  Q      No, now I'm back at your house.

1    A    Yes.

2    Q    What type of computer?

3    A    I have no idea.

4    Q    Is it a laptop?

5    A    No, it's not a laptop.  Nobody has a laptop.  It's not a

6    laptop.

7    Q    I think mentioned that the computer in Florida is your

8    wife's?

9    A    Yes, I bought it for her.

10   Q    And you paid for it, is what you mean?

11   A    Yeah.  Because we are married, I paid.  There is no such

12   thing I paid, you paid.  It's basically for her because she's

13   there by herself during the week.

14   Q    How often do you go down there?

15   A    I go there Friday to Sunday usually.

16   Q    But in your affidavit you mentioned that you might use

17   that for Two Rivers on occasion?

18   A    Only e-mail.  I don't do anything else on Two Rivers.  I

19   -- these guys, no, I didn't know how to do anything.  I never

20   used anything.  I never dealt with the customer.  I never

21   wrote an e-mail -- I may have wrote I'm sorry, I'm going to

22   say it once -- wrote whatever the name is, Stella on

23   something, I wrote an e-mail, but that's about it.  I don't

24   know anything.

25            THE COURT:  I'm sorry, before you go to the next

1   one, forgive the interruption, please.  To the extent that you

2   know what to do with e-mails, for example, if you are in

3   Florida and you are opening an e-mail and there is an

4   attachment, there is a PDF, you wouldn't open it?

5             THE WITNESS:  I don't know how --

6             THE COURT:  You don't know how to --

7             THE WITNESS:  I barely know how to open attachments.

8   Many times I can't even open it.

9             THE COURT:  So if you see an attachment, you don't

10  click on it?

11            THE WITNESS:  If I see an attachment, unless I know

12  who it is, if I can open it, then I would open it, yes.

13            THE COURT:  So if you get an e-mail with an

14  attachment from somebody you know --

15            THE WITNESS:  Then I open it.  Anywhere.  If it

16  opens up, then I will open it, yes.

17            THE COURT:  Okay.

18  Q    Can you turn to tab 114, Exhibit 114.

19            THE WITNESS:  What did he say?

20            THE COURT:  114.

21  A    Yes.

22  Q    Do you recognize this e-mail?

23  A    Yes.

24  Q    What is this e-mail?

25  A    This is, like I mentioned before, I may have done one or

Friedman - direct - Nelkin                    463

1   twice, a guy by the name Leo Albert, he bought by hand

2   filters, him.  I -- I may have answered him.  I may have sent

3   him an e-mail that is correct.  And I did say it before.  I

4   have no idea from where it came.

5   Q     Can you turn to the third page?

6   A     Which one?

7   Q     Turn to the third page.

8   A     Right.

9   Q     Where he starts his message.  He says Hello, Emil, glad

10  to see you are working on --

11  A     Yes.

12  Q     So it's fair to say that you did do business --

13  A     I said very, very rarely, very, yes.  In my three years

14  of business, you may find 20, you may find 25.  I don't think

15  there is a lot.  I really don't believe.

16  Q     Did you look --

17  A     Like I said before, I have a problem with writing,

18  unfortunately.  It's embarrassing.

19  Q     Do you know anything about Two Rivers servers being --

20  having information deleted from them?

21  A     Do I know anything --

22  Q     About Two Rivers servers having information deleted from

23  them.

24  A     Deleted?

25  Q     Where information that used to be on the server is no

Friedman - direct - Nelkin                    464

1   longer there?

2   A    I have no idea.

3   Q    Do you have any knowledge about Two Rivers servers

4   becoming nonfunctional?

5   A    Only from when we just spoke about before.

6   Q    When there were server problems, who would you contact?

7   A    I don't know what server problems.  If I know I have a

8   problem with a computer or somebody else have a problem with a

9   computer, whether he can't get it, can't open, whether he

10  doesn't see anything, then I would call Ben Nussbaum, or if

11  it's his problem or if it's Yossi, he would guide me to whose

12  problem it is.

13          MR. NELKIN:  Your Honor, if we can take a minute and

14  let me review my notes.

15          THE COURT:  Yes.

16  Q    Just one question.  Mr. Friedman, do you know what

17  materials were delivered by your lawyer to Two Rivers, what

18  documents?

19  A    No.

20  Q    Did you look at them or review them?

21  A    I looked at everything.  I looked at most of them.  I'm

22  not sure what, when.  I don't know.

23  Q    Would it be fair to say it was this volume of material?

24  A    I don't know.

25  Q    I'll represent to you -- they are Exhibit 1, which has

1   been told to me is all of the documents that were delivered

2   from -- to Two Rivers by -- to Mr. Papa by -- you don't have

3   any reason to believe that more documents were delivered?

4   A    I don't know.

5           MR. SCHAFHAUSER:  May I --

6           THE COURT:  He doesn't know.

7           MR. SCHAFHAUSER:  Well, the representation, I don't --

8           THE COURT:  He doesn't know how much was delivered.

9   That's not a useful measure.

10  Q    One last question, what is your definition of books and

11  records?

12  A    My definition of books and records?  Books and records is

13  my definition of any type of papers, any type of bills,

14  records basically to -- that's my definition.

15          MR. NELKIN:  Okay.  I pass the witness.

16          THE COURT:  Okay.  Who wants to go first?  Mr.

17  Schafhauser?

18          MR. SCHAFHAUSER:  Yes.

19          THE COURT:  Do you want a minute to organize your

20  notes?

21          MR. SCHAFHAUSER:  I'm happy to dive right in.

22          THE COURT:  Then let's dive right in.  Let's aim for

23  12:45 and then we will take a one-hour lunch break at that

24  time.

25          MR. SCHAFHAUSER:  As Your Honor directs.

Friedman - direct - Nelkin                    466

1          THE COURT:  Do you need a break?

2          THE WITNESS:  No, no.

3          MS. NELKIN:  Excuse me, Your Honor, can we just take

4    a very short break?

5          THE COURT:  Of course.  Let's take five minutes.

6          (Recess taken.)

7          (Continued on following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Friedman - cross - Schafhauser                467

1          THE COURT:  You may proceed.

2          MR. SCHAFHAUSER:  Thank you, your Honor.

3   CROSS-EXAMINATION

4   BY MR. SCHAFHAUSER:

5   Q    Mr. Friedman, I wanted to go through the computers that

6   were in the discussion.  Let's start with the computer located

7   in South Plainfield.

8          What did you use that computer for?

9   A    I used it for e-mail, as I said before, and I used it

10  for -- we had a program on the payroll.  We had a program that

11  everybody just put his finger in and then this gets translate

12  to the Launch program.  And once it gets in the Launch

13  program, then it tells me when they started, when they

14  finished.

15         So, because there were people who used to come early

16  and hang out and punch in and they punch in when they came

17  instead of when they should start or vice versa, late, they

18  used to play and then hang out and then run, and I was able to

19  override the hours from what it should be instead of what the

20  time clock is.

21         So, there used to be a lady there, I don't know if

22  she's still there, Christy something, Christy Yaede or

23  something.  She used to come up every day and basically tell

24  me whether there is overtime or not and I would overwrite it.

25  And once I saved it, Sonia took it over and she printed the

                    LAM     OCR     RPR

Friedman - cross - Schafhauser                    468

1   checks.

2   Q    What you just described about override, that was on the

3   Launch system?

4   A    That was on the Launch system, yes.

5   Q    Two Rivers?

6   A    The Two Rivers Launch system, correct.

7   Q    And you used your computer --

8   A    That was the only computer, yes, I was able to do it and

9   use it for.

10  Q    And when did you last access that computer?

11  A    Once I wasn't allowed to go in there, that was the end of

12  it.

13  Q    I'll try to put a time frame on it.  You were in court on

14  December 14, 2015, correct?

15  A    Yes.

16  Q    And there was a hearing in this court on that date,

17  correct?

18  A    Yes.

19  Q    Subsequent to that hearing, have you accessed that

20  computer?

21  A    No.

22  Q    Where is that computer, to your knowledge, located today?

23  A    Same place.

24  Q    Same place where?

25  A    In South Plainfield, in my office.

Friedman - cross - Schafhauser                    469

1   Q    And you were in court and you -- by the way, you were

2   represented that day by --

3   A    Michelle.

4   Q    -- David King and you mentioned a Michelle earlier?

5   A    Right.

6   Q    Michelle who?

7   A    I don't know the last name, Michelle from --

8   Q    Michelle Sekowski, was that it?

9   A    Yes, that's correct.

10  Q    So, David King and Michelle Sekowski.

11  A    Right.

12  Q    Did you hear them agree that that computer would be

13  subject to imaging?

14  A    Yes.

15  Q    And do you have an understanding as to whether that

16  computer was, in fact, then made available for imaging?

17  A    I assume, yes.  I don't go to them more, I have nothing

18  to do.

19  Q    Now, next computer.  We talked about or counsel talked

20  about a computer located in your home in Lakewood.

21       You live in Lakewood, right?

22  A    Yes.

23  Q    So, what use do you make of your computer in Lakewood?

24  A    I use it, again, only for e-mail and that's about it.

25  Q    Do you download documents -- first of all, when I say

Friedman - cross - Schafhauser                    470

1    "download documents," do you know what I'm referring to, what

2    "downloading documents" means?

3    A    The only thing if you call a download is I print out if I

4    get a paper from you, if I get a paper -- I like to be able to

5    understand when I see.  I can't on the computer.  I print out,

6    like I said a few minutes ago, when someone sends me e-mail

7    and there's attachment, I print this out.  That's all what I

8    do with it.

9    Q    When you print it out, you make a physical hard copy of

10   it?

11   A    That's correct.

12   Q    But putting aside hard copies and printing out, do you

13   download, do you electronically store on your computer at home

14   business-related documents?

15   A    No.

16   Q    Now, you talked with Mr. Nelkin about documents in your

17   home.

18            You also heard on December 14 that books and records

19   relating to Two Rivers were to be compiled and delivered to

20   Two Rivers?

21   A    Correct.

22   Q    You were you in court for that, right?

23   A    Right.

24   Q    And is it correct that my colleagues actually went to

25   your house thereafter?

Friedman - cross - Schafhauser                    471

1   A     Yes.

2   Q     And do you remember Michelle Sekowski --

3   A     There was about four people.  Michelle came, I think

4   there was another attorney --

5   Q     About four people?

6   A     Yes.

7   Q     And you were present?

8   A     Correct.

9   Q     Is it correct that you showed my four colleagues who went

10  to your house in Lakewood the documents that you had in your

11  custody, possession, and control in that house?

12  A     Yes.

13  Q     Did you withhold from my colleagues any documents that

14  they asked for?

15  A     Definitely not.

16        The only place that I have any documents personal,

17  not personal, anything, is only this one office I have.  And I

18  let them go through.  I was very disappointed about it.  A lot

19  of personal stuff, nothing to do with them, they even went

20  through.  I was why they need it?

21        They took a lot of stuff that have nothing to do,

22  but I have no choice.  They took everything.  Whatever they

23  saw, they took it from me.

24  Q     Was there anything that you told them, my colleagues,

25  they couldn't have?

Friedman - cross - Schafhauser                    472

1  A    No, it was --

2  Q    With the house, we'll get to the other facilities --

3  A    Right.

4  Q    How long were they present in your house --

5  A    They came two times 9 o'clock and I think they left at 1

6  o'clock, if I'm not mistaken.

7  Q    You said they came two times.

8  A    Two times.

9  Q    Was that the first time?

10  A    Both times.

11  Q    Both times from about 9 to 1 each day?

12  A    Yes.

13  Q    On two different days?

14  A    On two different days, yes.

15  Q    And you were you present both times?

16  A    I was present, right.

17  Q    Now, you were asked about the Bronx facility -- before we

18  get to the Bronx facility, you were also asked about mailings

19  that you received and I think you testified about a direction.

20  Let's talk about the direction that you received.

21          At the hearing and shortly after the hearing, you

22  met with my -- I was on trial; you remember that?

23  A    Yes, yes.

24  Q    But you met with Mr. King and Ms. Sekowski, correct?

25  A    Yes.

Friedman - cross - Schafhauser                    473

1  Q    You received a direction not to delete, destroy, any

2  documents and, in fact, to maintain documents, correct?

3  A    Correct.

4  Q    If you received, however, documents relating to Two

5  Rivers subsequent to the inception of this case, you forwarded

6  those documents, correct?

7  A    Correct.

8  Q    For instance, you received, did you not, notices relating

9  to the space occupied by Two Rivers; remember that?

10 A    Yeah, yeah, all right.

11 Q    What did you do with those notices?

12 A    I think I notified you about it.  I may have sent it to

13 you and I think I notified them about it, I think.

14 Q    Right, okay.

15       You received statements relating to equipment used

16 by Two Rivers --

17 A    Correct.

18 Q    -- after the TRO was entered, correct?

19 A    Yes.

20 Q    What did you do with those statements?

21 A    I'm almost sure I gave it to you also and I think we send

22 it also to Papa.

23 Q    Just so I'm clear, if you received documents after the

24 restraints were entered that related to Two Rivers in the

25 mail, you did not withhold them, right?

Friedman - cross - Schafhauser                    474

1   A    Correct.

2   Q    You did not receive instruction not to touch those

3   documents, correct?

4   A    That's correct.

5   Q    You received an instruction not to destroy or delete

6   those documents, correct?

7   A    That's what I received, yes.

8   Q    So, let's now go to -- we were about to get to the Bronx.

9   There is a facility there, and is it correct that after the

10  hearing on December 14 my colleagues also went to the Bronx

11  facility?

12  A    Yes.

13  Q    How many people were in the Bronx?

14  A    I don't recall because I don't think I was there.  I

15  don't know if I was there or not, I'm not sure.  I don't think

16  I was there.  I am not there for sure, I don't think so, I

17  don't recall.  But there were at least four people, I think,

18  also.

19  Q    Let's go through it.

20       Do you know who Brian Waller is?

21  A    Yes.  He was there.  I know this.

22  Q    How do you know he was there?

23  A    Because I know.  They call me.  I had to notify

24  everybody.  I didn't want to make think who knows what happens

25  here.  I notify that:  Somebody is going to come.  Just make

Friedman - cross - Schafhauser                    475

1   sure and give them access to whatever they need.

2   Q    And Michelle Sekowski was there?

3   A    Brian was there, Michelle was there.  I don't know the

4   name, there was another attorney.  I don't know for sure.

5   Q    Do you remember a Gabby?

6   A    There was -- I think it was two ladies there and one guy

7   was there.

8   Q    Very well.

9        This is my question:  What documents did you or the

10  businesses that did activities in the Bronx facility make

11  available to counsel?

12  A    The place was open for them.  They were be able to go

13  through every file cabinet, every drawer, every closet that

14  was open, period.  We left them open.  We said:  You can do

15  whatever you want.

16       Matter of fact, if I may, if you remember, you went

17  to file cabinet looking on a ticket that have nothing to do

18  and I said:  Why you looking for it?

19       So, I left it open for them.

20  Q    Did you withhold or direct anyone in your employ to

21  withhold documents relating to Two Rivers from production in

22  this case?

23  A    Definitely not.

24  Q    And how long were -- the people you mentioned, how long

25  were they in the Bronx facility?

Friedman - cross - Schafhauser                476

1   A    Whole day.

2   Q    Now, let's talk about the -- we'll come back to the

3   computers in these facilities, Mr. Friedman, but I want to

4   talk about now the Brooklyn facility.

5           You understood that a search needed to be made in

6   the Brooklyn facility as well for any documents in your

7   custody, possession, and control relating to Two Rivers,

8   right?

9   A    Yes.

10  Q    Okay.  And do you have an understanding as to whether

11  people went to that facility?

12  A    Yes.

13  Q    How long were the people at that facility?

14  A    I think also whole day, I think.

15  Q    When I say "the people," who was there?

16  A    Again, I don't remember -- I wasn't there for sure, I'm

17  sure I wasn't there.  I think Michelle was there because I

18  know she called me, I think there was two girls were there

19  will and I think one more was there, one more attorney from

20  Brian's office, I think.  I don't remember.  They were there

21  definitely, like, four people.

22  Q    Mr. Friedman, in the Brooklyn facility, did you give

23  instructions to make the books and records, if they existed,

24  relating to Two Rivers available for production in this case?

25  A    Definitely, yes.

LAM      OCR      RPR

Friedman - cross - Schafhauser                    477

1   Q    Now, a question was asked by Mr. Nelkin a few moments ago

2   about a cease and desist letter that was shown -- I'm not

3   going to take the time; we're short -- in October 2015.

4        Did you remember the question and answer?

5   A    Remind me.

6        THE COURT:  I don't think anyone referred to it in

7   those terms, so it may be confusing.

8        MR. SCHAFHAUSER:  That's a very fair comment.

9        Let me move on and I'll get back to that after lunch

10  because I want to stick to the clock as best I can.

11  Q    You have an iPhone, right?

12  A    Yes.

13  Q    I asked you about downloading on your home computer.  Now

14  I want to ask about your iPhone.

15       What do you use your iPhone for?

16  A    Strictly for calls and check my e-mails or my text.  I

17  may send back a text but very rarely also because -- I

18  explained my problem.

19  Q    When you say you explained your problem, what's your

20  problem?

21  A    It's embarrassing to say, but I'm not good in spelling

22  and all this stuff.

23  Q    Why are you not good in spelling, if I may ask that

24  impertinent question?

25  A    Too old.

Friedman - cross - Schafhauser                478

1    Q    Is English your native tongue?

2    A    No, no.

3    Q    What is your native tongue?

4    A    My native, I speak German, French, Yiddish.

5    Q    Very well.

6               So, let's go back to the iPhone.  The iPhone, did

7    you download any information?

8    A    I don't know how to do it.  No, I don't download into the

9    phone.

10   Q    You were asked about another computer in your house which

11   I believe your wife has, right?

12   A    Yes.

13   Q    What use do you make of that computer, if any?

14   A    I never touch it.

15   Q    Now, let's go, then, to the computer --

16              THE COURT:  Sorry, which computer were you just

17   talking about?

18              MR. SCHAFHAUSER:  His wife has a computer.  He has a

19   computer in the house --

20              THE COURT:  In New Jersey?

21              MR. SCHAFHAUSER:  In New Jersey, yes.

22              THE COURT:  Go ahead.

23              MR. SCHAFHAUSER:  Thank you.

24   Q    Now I want to move to the computer, Mr. Friedman, in

25   Florida that we heard you talk about.

Friedman - cross - Schafhauser                    479

1            Forgive me, it was Palm Beach?

2   A    West Palm.

3   Q    West Palm.

4            There is one and only one computer in West Palm?

5   A    Yes.

6   Q    What do you use that computer for?

7   A    Again, the same thing.  Just to check the e-mail and

8   that's about all.

9   Q    Have you ever downloaded information on that computer

10  relating to anything?

11  A    Download to save something?

12  Q    To save on the computer.

13  A    I don't know how to do it.

14           THE COURT:  I don't mean this facetiously:  Do you

15  know how to prevent a computer from storing information that

16  you've looked at?

17           In other words, when you print something, it knows

18  how to print it because it has it in its memory.  Do you know

19  how to keep it from keeping that in its memory?

20           THE WITNESS:  No, it stays in the e-mail, yeah.

21  Q    Now, on December 14, Mr. Friedman, you were also directed

22  to provide access to your passwords; do you remember that?

23  A    Yes.

24  Q    And did you do that?

25  A    Yes.

Friedman - cross - Schafhauser                480

1    Q    Could you please take a look in the binder that I just

2    placed in front of you at Exhibit 2.

3         Do you have that exhibit in front of you?

4    A    One second.  I'm going to close this because there's no

5    room.

6         Yes.

7    Q    Actually, I want to start at the very bottom of the page

8    on Exhibit 2.  It says:  From me to Mr. Nelkin on December 15

9    at 9:33 p.m.

10        Do you see that at the very bottom of the first

11   page?

12   A    9:33, I got it.

13   Q    Now flip the page over.  Let's look at that.  There's a

14   statement there in the last part of the second paragraph.  It

15   says:  Mr. Friedman's password, which will unlock both his

16   local computer and the Launch coffee program, is as follows.

17        And then there's a bunch of letters and numbers; do

18   you see that?

19   A    Yes.

20   Q    Is that the password for your --

21   A    Yes.

22   Q    -- local computer and the Launch coffee system?

23   A    Just was one.  I think there was one number that I used

24   everywhere, if I'm not mistaken.

25   Q    And this was it?

LAM      OCR      RPR

Friedman - cross - Schafhauser                481

1   A     Yes.

2   Q     Do you have any other passwords for your local computer

3   and the Launch coffee program?

4   A     I don't think so because I have always one number.  I

5   couldn't...

6              MR. SCHAFHAUSER:  Your Honor, I'm happy to keep

7   going, but I also want to honor what your Honor directed.

8              THE COURT:  If this is a convenient breaking point,

9   we'll take a one-hour break.

10             MR. SCHAFHAUSER:  Thank you.

11             THE COURT:  We're on track to finish up by 3?

12             MR. SCHAFHAUSER:  I'm going to do my very best, your

13  Honor.  He's a key witness.

14             THE COURT:  If we need to stay later, we will.

15             MR. SCHAFHAUSER:  I appreciate it.  Thank you.

16

17             (Luncheon recess taken.)

18

19

20

21

22

23

24

25

1            **AFTERNOON SESSION**

2

3            THE COURT:  Continue.

4    CROSS-EXAMINATION CONTINUES

5    BY MR. SCHAFHAUSER:

6    Q    Mr. Friedman, the defendants -- I'm sorry, the

7    plaintiffs' binder, which is the bigger binder, Exhibit 116.

8    Before the lunch break I inadvertently called it a

9    cease-and-desist letter, but let me show you Exhibit 116.

10            Do you recall being asked about a litigation hold

11    letter by Mr. Nelkin?

12            MR. NELKIN:  Objection.

13            THE COURT:  Overruled.

14            MR. SCHAFHAUSER:  I withdraw it.

15            THE COURT:  You don't want to say the word

16    spoliation, which is in the letter.  It's a letter about

17    spoliation.  Go ahead.

18            MR. SCHAFHAUSER:  Fine, spoliation.  Fine.

19    Q    Mr. Friedman, you received a copy of this letter,

20    correct?

21    A    Yes.

22    Q    Okay.  And before we get to the letter, itself, let's

23    back up a second.

24            There was a litigation in New Jersey in which you

25    were a party, correct?

Friedman - cross - Schafhauser                483

1   A    Yes.

2   Q    And the adverse party to that litigation or an adverse

3   party was Two Rivers Coffee, LLC, right?

4   A    Yes.

5   Q    Did you have an understanding at that time that you were

6   under a duty to preserve documents related to Two Rivers?

7   A    Yes.

8   Q    And you did so, correct?

9   A    Yes.

10  Q    Okay.  Now, I want to now focus -- and you received that

11  instruction from counsel, correct?

12  A    Yes.

13  Q    Okay.  I want to focus on the first paragraph of

14  Exhibit 116.  And we can all read the words, but this is my

15  question:

16          Did you or persons acting on your instruction delete

17  extensive amounts of data and files from Two Rivers' servers

18  and computer systems?

19  A    Definitely not.

20  Q    Do you know what this is referring to, if anything?

21  A    Any -- any documents if I deleted it or to a computer, or

22  if I told anybody else to delete it on behalf of me, Two

23  Rivers stuff on behalf of me or something.

24  Q    And did you do that?

25  A    No, definitely not.

Friedman - cross - Schafhauser                    484

1    Q     Did you direct anyone or know of anyone associated with

2    you who caused documents on Two Rivers' servers and computer

3    systems to be deleted?

4    A     No.

5    Q     Now, before the break we were also talking, I believe we

6    left off with your iPhone and we were talking about

7    downloading.

8               But you did use your iPhone for e-mails, right?

9    A     Yes.

10   Q     And the iPhone that you used, you still possess that

11   iPhone, right?

12   A     Yes.

13   Q     Do you delete e-mails?

14   A     Do I delete e-mails?

15   Q     Yes.

16   A     No, not at all.

17   Q     Why don't you delete e-mails?

18   A     It's just -- today I'm gonna leave it, you don't know

19   what brings tomorrow, so I just leave it there.

20   Q     Did the instructions that you received impact whether you

21   deleted documents relating to Two Rivers?

22   A     I didn't delete -- I don't delete anything and I didn't

23   delete anything -- anything.

24   Q     And so your testimony -- well, is it your testimony that

25   e-mails relating to Two Rivers have not been deleted by you,

Friedman - cross - Schafhauser                485

1   whether they're on your iPhone, your other computer devices;

2   is that your testimony?

3   A    Yes.

4   Q    Now, we were also talking before the break about

5   documents that were addressed to your house -- withdrawn.

6         We were talking about documents that were sent to

7   your house, but addressed to Two Rivers.  Do you remember

8   that?

9   A    Yes.

10  Q    Okay.  Are there any documents that were addressed to Two

11  Rivers and sent to your house since the inception of this

12  lawsuit that you have not forwarded either directly to Two

13  Rivers or to your counsel to produce to Two Rivers?

14  A    I thought about it before and in the begin, and I think I

15  gave it to Sonia and we e-mailed it to -- I think to Vincent

16  Papa, every one of them what I knew what came from them, to

17  me, I think to you also if I'm not mistaken.  And we e-mailed

18  it to Vincent Papa, Sonia e-mailed it.

19  Q    Let me see if I understand.

20  A    Yeah.

21  Q    You say at the begin, what you do mean at the begin?

22  A    That I remember, this has been going on for nine months

23  so I remember I would say -- at the begin I used to get quite

24  a few e-mails and letters.  Now maybe I get one, two.  So I

25  don't recall that, but when I used to get all these letters,

SAM      OCR      RMR      CRR      RPR

Friedman - cross - Schafhauser                    486

1    especially in the begin, I used to take all these letters and

2    give it to -- to Sonia and Sonia's scanned it and she e-mailed

3    it to Vincent Papa.

4    Q    At the begin, you mean at the beginning of this lawsuit

5    or somewhere around the beginning --

6    A    No, when -- after when I found out that I can't do

7    nothing anymore with it.

8    Q    When you say you can't do nothing anymore about it, you

9    mean you can't -- what do you mean by that?

10   A    I understood, I understood, I basically can't do

11   anything.  That I called her, I just can have nothing with Two

12   River all the time.  That's what I understood.  And when it

13   came anything -- well, at the begin I just, basically, gave it

14   to Sonia and I said, Sonia, do me a favor, just send it.  Send

15   it.  And I'm almost sure we e-mailed it I think to Paul to

16   make sure that they have it.

17   Q    You're almost sure you sent it to me?

18   A    I should say I'm almost sure we send it to Paul and to

19   Vincent Papa.

20   Q    Well, Mr. Friedman, are you sure or not sure?

21   A    I am sure we sent it, but I think also to -- to you.

22   Q    Ah, so you are almost sure that you sent it --

23            THE COURT:  I heard the testimony.  Come on.  I have

24   warned before about the are-you-sure kind of thing.  His

25   testimony is his testimony.  Don't try to shape it, please.

Friedman - cross - Schafhauser                    487

1      MR. SCHAFHAUSER:  Very well.

2  BY MR. SCHAFHAUSER:

3  Q    Now, you were asked by Mr. Nelkin on direct about the

4  removal of boxes from the South Plainfield facility.

5      Do you remember that?

6  A    Yes.

7  Q    Okay.  Did you have a discussion with Ms. Rivera about

8  removing materials from South Plainfield?

9  A    I clearly told her when -- when this lawsuit started

10 in -- in New Jersey by Judge McCormick, whatever the name,

11 that I came back and I told her not to remove, not to do

12 anything.  And when she -- when -- when she decided, for

13 whatever reason we decided that day she is going back to the

14 Bronx, we clearly told her also to make sure you leave

15 everything there and we're not gonna touch.  Because she

16 called me and she says, Can I take my stuff?

17     I said:  You can take anything you want, but not --

18 nothing from Two Rivers and that's exactly what -- what they

19 did.

20 Q    Do you recall the name Ann McCormick?

21 A    Ann McCormick, I'm sorry.

22 Q    All right, so I want to drill down on what you just said.

23     You understood that Ms. Rivera was going to take

24 files that did not relate to Two Rivers?

25 A    That's correct.

Friedman - cross - Schafhauser                488

1   Q    And you understood that Ms. Rivera would keep in South

2   Plainfield's files that did relate to Two Rivers?

3   A    That's correct.

4   Q    And that was your direction to her?

5   A    Yes.

6   Q    And you referenced Judge McCormick in your prior answer.

7        You directed her because you understood that you

8   could not be spoliating documents relating to Two Rivers in

9   light of the litigation with Judge McCormick?

10  A    I directed everybody at that time, not only her,

11  everybody I directed.

12  Q    And at that time was when, when the litigation before

13  Judge McCormick began against you?

14  A    When -- the first time is when we came in front of Judge

15  McCormick.  I came back and said the same thing to Silvia,

16  same to Sonia, anybody that was involved I told them the same

17  thing, to please make sure not to lose anything or not to

18  delete something.

19  Q    Now, the books and records, we're looking at my Exhibit 2

20  or Defendants' Exhibit 2, your Exhibit 2.  Could we please

21  look, Mr. Friedman, at Exhibit 3, please?

22       Mr. Friedman, do you recognize this letter from

23  Ms. Sekowski?

24  A    Yes.

25  Q    And you received a copy of this at the time?

Friedman - cross - Schafhauser                    489

1    A    Yes.

2    Q    And did you understand that books and records were

3    delivered to Mr. Papa on December 15th by hand delivery and

4    e-mail?

5    A    Yes.

6    Q    And take a look, please, at Exhibit 4.  Mr. Friedman, do

7    you recognize Exhibit 4?

8    A    Yes.

9    Q    And did you receive a copy of this letter at the time?

10   A    Yes.

11   Q    And did you have an understanding that additional

12   corporate books and records of Two Rivers were delivered to

13   Mr. Papa on or about December 30, 2015?

14   A    Yes.

15   Q    And could you please turn to Exhibit 5, Mr. Friedman?

16          Do you recognize Defendants' Exhibit 5?

17   A    Yes.

18   Q    And did you receive a copy of this letter on or about

19   December -- I'm sorry, January 15th, 2016?

20   A    Yes.

21   Q    And did you have an understanding that additional books

22   and records were sent to Mr. Papa on January 15th, 2016 after

23   a further search?

24   A    Yes.

25   Q    Okay.  Now, Mr. Friedman, you can see it best, I think.

Friedman - cross - Schafhauser                490

1    There are three boxes there which are marked as Exhibit 1 or

2    this is Exhibit 1 (indicating).

3           Mr. Friedman, do you have an understanding as to

4    whether those documents were delivered to Mr. Papa through

5    these correspondences?

6    A    Yes.

7    Q    Okay.

8           THE COURT:  Wait.  You do?

9           THE WITNESS:  Yes.

10          THE COURT:  Because earlier when you were being

11   asked about those boxes you said you had no idea if that's

12   about how much was delivered.

13          THE WITNESS:  No, I don't because --

14          THE COURT:  So what don't I understand about the two

15   statements?

16          THE WITNESS:  I understand it was delivered to him,

17   the boxes, the boxes, I'm not sure.  If he says the boxes, I

18   don't know what was in there exactly, but I remember

19   we sent --

20          THE COURT:  But now that Mr. Schafhauser is asking

21   you about it, you know that that's what was delivered?

22          THE WITNESS:  Yes.

23          THE COURT:  Okay, go ahead.

24   BY MR. SCHAFHAUSER:

25   Q    Now, just so I understand, do you have any -- do you know

SAM      OCR      RMR      CRR      RPR

Friedman - cross - Schafhauser                    491

1    what is specifically in those boxes?

2    A    I think the stuff from my house or from the office

3    company or the real estate company.  I think that's what stuff

4    is in there.

5              MR. SCHAFHAUSER:  I will move on.

6    Q    Would you please take a look at Exhibit 17 in the same,

7    it should be in the same binder?

8              Mr. Friedman, I am not going to ask you about the

9    e-mails, the Court can make its own determination, but what

10   I'd like you to look at, Mr. Friedman, are the information

11   that is annexed to these e-mails in Exhibit 17.

12   A    I'm sorry, Exhibit 7, you said?

13   Q    17, 1-7, Mr. Friedman.

14   A    17.  Okay.

15   Q    Do you recognize what is annexed to this e-mail?

16   A    Yes.

17   Q    Can you please tell the Court what these documents

18   represent?

19   A    Basically, they -- they wanted to have a backup on the

20   checks -- on the credit card expense, so I told them all to

21   give me the check numbers from the company and then we would

22   be able to give you a backup on each check, what -- which --

23   what bills were to it.

24              As you see, our bills of every -- every -- let's

25   assume if check number was 1000 to AMEX, then we will give you

Friedman - cross - Schafhauser                    492

1   all the $1,000 bill.  It could be a gas bill.  It could be an

2   Internet bill, and so further.  If there is -- is a check is

3   150 to Chase, then we will give you every single one to them.

4        And I -- I am for sure we worked very hard on it and

5   we gave every single check number with the backup.  Some of

6   them I turn it over personally to Vincent Papa when I was

7   still there and some of them we gave it to him after.

8   Q    Now, if you would -- by the way, you said we worked on

9   it.  Who is we?

10  A    When I mean me, everybody, I took Sonia, Silvia, asked

11  everybody to help me to be able to put it together because you

12  had to staple each check, each bill to it to make sure that's

13  exactly what it was.

14        MR. NELKIN:  Your Honor, our Exhibit 17 appears to

15  be a different exhibit, and I just was trying to figure out

16  what --

17        THE COURT:  You don't have 17?

18        MR. SCHAFHAUSER:  I think I handed it to you

19  yesterday.

20        MS. NELKIN:  We don't have Tab 17.

21        MR. NELKIN:  We have it now.

22        THE COURT:  You have it.

23        MR. SCHAFHAUSER:  Do you need a moment, Mr. Nelkin?

24        MR. NELKIN:  You can go on.

25        MR. SCHAFHAUSER:  Thank you.

Friedman - cross - Schafhauser                    493

1    BY MR. SCHAFHAUSER:

2    Q    Just to go back to the prior question, Mr. Friedman.

3              With whom did you compile these documents?

4    A    Okay, I had -- I was working on it.  Sonia was working on

5    it.  Silvia was working on it.  A girl by the name Kathy was

6    working on it.  Everybody, I needed help from everybody.

7    Maybe it was two weeks to physically to put it together every

8    single bill and every -- and every single bill to -- to -- to

9    each check number and -- and then we stapled it, and I think

10   it was even -- I think that Sonia maybe even e-mailed it to

11   them also.  Every single one.

12   Q    And why did you do that?

13   A    Because I was being -- they -- they accused me of

14   stealing money, accused me of -- accused me for stealing money

15   and on the credit cards.  I wanted to show them that every one

16   of them, as long as you give me a check number, we have a

17   backup for every single case.

18   Q    The only other question I have on this, and then we'll

19   move on, the first page my question to you is:  Your name is

20   there among the cc's.

21             Did you, in fact, receive a copy of my e-mail to

22   Mr. Papa on that date, if you recall?

23   A    I don't recall, but --

24   Q    I'll move on.

25             You spoke on direct about the Launch System and the

Friedman - cross - Schafhauser                    494

1    issue of access.  I wanted to address that.

2          What was your understanding as to whether there were

3    the same or different levels of access to review documents on

4    Launch?

5    A    My understand, the access they were able to open

6    anything, to look everything, you understand.  They were able

7    to print out everything.

8    Q    Who is "they"?

9    A    I'm sorry, when I mean they, okay, I should have said

10   anybody in -- whoever was allowed to -- to go into that,

11   Eugene, Steve, Mayer, Vincent Papa, there was a guy name

12   William Issac, Sonia.

13   Q    Well, at what point did you understand that everyone had

14   equal access to review documents on the Launch?

15         I mangled the question, let me withdraw that and ask

16   a more precise one.

17         Do you understand that before this litigation began

18   everyone had equal access to review documents on the Launch?

19   A    Correct, yes.

20   Q    And then you gave your password on December 15th, which

21   we talked about, right?

22   A    Yes.

23   Q    And at that point, your password, what ability did your

24   password have in terms of Launch?

25   A    I really don't know because I never really knew anything

Friedman - cross - Schafhauser                495

1   how to do it, so I don't really know.  There was -- I want to

2   correct one thing.  There was one thing now that I'm thinking

3   about it on printing check, I think this one was the only one

4   person, I think it was Sonia was able to print the check.

5   Q    And --

6   A    If I remember.

7   Q    And that was before the litigation?

8   A    That was -- everything was the same before the

9   litigation, exactly correct, yes.

10  Q    Okay.  Now --

11  A    And after it.

12  Q    Now, this is my question:  When your Launch password was

13  given, do you have an understanding as to whether your Launch

14  password had an ability to also print checks?

15  A    Yes.

16  Q    So once your Launch password was given on December 15th,

17  that enabled whoever had access to that password to also print

18  checks from the Launch?

19  A    Correct.

20  Q    All right, let's turn to a different subject,

21  Mr. Friedman.

22       You testified about a laptop and some trip to China.

23  Do you remember that?

24  A    Yes.

25  Q    How many times did you travel to China in the last five

Friedman - cross - Schafhauser                    496

1    years?

2    A    I'm not sure, maybe four times.

3    Q    And --

4    A    I don't know.

5    Q    -- I am not looking for every detail, but what was the

6    general purpose of your trips to China?

7    A    Basically, it was really Eugene wanted me to like someone

8    said support, negotiate with him, everything else.  But once

9    we left from there he was, basically, controlling the whole

10   thing.  He was e-mailing and he was making changes.  He was,

11   basically, doing everything.

12   Q    All right; and do I have it correct during one of your

13   trips to China on the return you lost the battery to your

14   laptop?

15   A    That's correct.

16   Q    Now, my question is which of those trips was it that you

17   lost your battery?  Are you able to state that?

18   A    I think like the last time when I went -- when I went.

19   Q    And how long ago was that?

20   A    I don't remember when was the last time I was there.

21   Q    Let me ask you, if you would, please, to go to

22   Exhibit 109, which is your declaration.

23            Are you there yet, Mr. Friedman?

24   A    Yes.

25   Q    Okay.

SAM      OCR      RMR      CRR      RPR

Friedman - cross - Schafhauser                    497

1          Before we get to your declaration, you were asked on

2    direct about your conversations with Mr. Nussbaum about

3    computers.

4          Do you remember that general line of questioning?

5    A    Yes.

6    Q    What did you ask Mr. Nussbaum to do with respect to the

7    computers and computer devices -- well, stop the sentence --

8    what did you ask him to do with respect to identifying

9    computer devices, question mark?

10   A    Well, like I said before, I asked him to please to make

11   sure each computer to who it belongs to, to what it belongs to

12   and -- and -- and to make sure that -- to mark it down that

13   whatever we gonna -- if we have to give it the image or we

14   have to turn it over, to make sure we have the right one to

15   the right person -- from the right person.

16

17          (Continues on the following page.)

18

19

20

21

22

23

24

25

SAM     OCR     RMR     CRR     RPR

Friedman - cross - Schafhauser                498

1   CROSS-EXAMINATION

2   BY MR. SCHAFHAUSER:

3   Q    Very well.  Why did you ask Mr. Nussbaum to do that?

4   A    Because I think they -- I think I was told at that time

5   that I think we are going to have to give it over -- I don't

6   know myself.  I think we were supposed to give it over for the

7   image or something.

8   Q    My question -- let me ask a different question.  Why was

9   it that you asked Benzion Nussbaum to do that task?

10  A    Because he was familiar with everything with computer.

11  He basically was installing each of them, he wired each of

12  them.  He knew it better, inside out, than me.  He knew which

13  one belongs to which one.

14  Q    And why do you believe that he knows it better than you?

15  A    Because I know nothing about computers and I know that he

16  knows it.  He -- when there's a problem, a connection, he'll

17  be able -- he came to figure it out, what anything was.

18  Q    Now, you were asked about your reference in your

19  declaration to Mr. Nussbaum's observations.  I want to point

20  you to paragraph 19 and ask you some questions on that.  Are

21  you there, Mr. Friedman, at paragraph 19?

22  A    Yes.

23  Q    You say -- rather than reading your affidavit, which we

24  all can do, this is my question:  First phrase, what did you

25  mean by as best I can in light of my limited knowledge of

Friedman - cross - Schafhauser                    499

1   computer-related issues?  What did you mean by that?

2   A    Best of my knowledge means I'm not an expert in it.  As

3   best as I can say it.  If I see a computer, I can say who

4   belongs to, I can say the person works on it, you know, that's

5   all I can -- can say.

6   Q    All right.  Now, you also say you attempted to

7   independently verify the facts set forth in the Nussbaum

8   declaration by independently observing the computer devices

9   located in the Bronx facility and the Brooklyn facility.  Do

10  you see those words?

11  A    Right.

12  Q    How did you go about --

13  A    I --

14  Q    Let me finish the question, Mr. Friedman.  How did you go

15  about independently observing the computer devices located in

16  the Bronx facility and the Brooklyn facility?

17  A    I asked him.  I asked him how many computer it was and I

18  asked him on it -- which room the computers were, and I

19  basically went to all of these places and I looked if those

20  computers were there.

21  Q    Let me see if I understand.  You were not physically

22  present when Mr. Nussbaum did his own analysis; correct?

23  A    That's correct.

24  Q    After he was done, you spoke with him?

25  A    Correct.

Friedman - cross - Schafhauser                    500

1   Q    And then what did you do after you spoke with him?

2   A    Like I said, I went afterwards, couple of days later, or

3   I don't remember exactly when, I wanted to make sure it's

4   correct, everything of what he told, computers are there.  I

5   asked him how many in the servers, how many's over there.  He

6   basically told me each computer.

7   Q    I don't want to belabor the point, but let's get to the

8   Mr. Nussbaum's declaration and move on and focus on what he

9   actually says.  That is Exhibit 110, Mr. Friedman, the very

10  next exhibit.  Specifically, if you would go, Mr. Friedman to

11  -- it is paragraph 5 on the third page, and then it carries

12  over to the fourth page.  You see there is a listing of

13  computers.  Do you see that?

14  A    Yes.

15  Q    Did you review that before you submitted your

16  declaration?

17  A    Yes.

18  Q    And sitting here today, are you aware of any computer

19  devices in the custody, possession or control of any of the

20  entities that do business in the Brooklyn facility or the

21  Bronx facility as described here that are not listed on this

22  document?

23  A    No.

24  Q    Is what is set forth on this document consistent with

25  your understanding as to the computers that are located in

Friedman - cross - Schafhauser                    501

1   those facilities?

2   A    Yes.

3   Q    Now, the nomenclature that was used, do you know what the

4   word -- okay.  Let me try it -- the phrasing, the words that

5   Mr. Nussbaum sets forth in his declaration, did you have a

6   hand in how he described his list of computers?

7   A    I assume the guy does each computer by the make, by the

8   model.  I'm not sure.

9   Q    Let me try again.  It was my question.

10          THE COURT:  He answered your question.

11          MR. FINKEL:  Okay.

12  Q    Oil companies, do you see the phrase oil companies?

13  A    Yes.

14  Q    Was that his phrase or your phrase?

15  A    I assume it was his phrase.

16  Q    And then you adopted what he said in your declaration, in

17  essence, right?

18  A    Yes.  I know physically where the computer is.  He told

19  me, so I had it by the name, so I know.

20  Q    I want to focus on now Two Rivers, since this is a

21  critical issue, obviously.  Take a look at the third computer.

22  It says old corporate computer and there is a reference to Ms.

23  Rivera having used this computer.  Do you see that, where it

24  says office used by Sonia Rivera?

25  A    Right.

Friedman - cross - Schafhauser                502

1   Q     That computer is still sitting in the Bronx facility?

2   A     Everything's in the Bronx, yeah.

3   Q     And then the next entry, it says -- I should say Mr.

4   Nussbaum says there was also a computer removed from active

5   use and preserved for safekeeping after the Court enters its

6   order used for coffee companies and/or Two Rivers.  What do

7   you understand that to refer to?

8   A     Which again?  I'm sorry.

9   Q     I'm on page 3, the fourth computer listed under office

10  use by Sonia Rivera.

11  A     That it was an old computer over there, what it has, and

12  while we were -- while we were -- I think during the -- we

13  brought the computer back from South Plainfield, she was

14  basically logging in from there to -- to log in from there to

15  South Plainfield to be able to do her work, I assume.

16  Q     All right.  And the computer you say you brought back

17  from South Plainfield, is that computer still located in the

18  Bronx facility?

19  A     Yes.

20  Q     And do you have an understanding as to whether that

21  computer was made available for imaging as well?

22  A     I'm -- I'm almost sure, yes.

23  Q     Take a look, please -- well, do you have an understanding

24  as to whether the plaintiff has imaged your computer in South

25  Plainfield or the --

Friedman - cross - Schafhauser                    503

1          THE COURT:  I think you guys have established who

2    has imaged what to date and I think your client is in a hurry.

3          MR. FINKEL:  Thanks.  I will move on.

4    Q    Let's take a look at Exhibit 2, Defendant's Exhibit 2,

5    Mr. Friedman.  I'm sorry, I said defendant's.  I meant

6    plaintiff's.  It is the larger binder.

7          Are you at Exhibit 2?

8    A    Yes.

9    Q    There's a picture, you see it says 10/3/15?

10   A    Yes.

11   Q    And 4:34:49 p.m.  Do you see that?

12   A    Yes.

13   Q    Now, when was the first time that you saw this picture?

14   A    After the lawsuit.  After the whole case started.

15   Q    Did you have any -- well -- withdrawn.

16         Other than what date was set forth on this picture,

17   do you have any documents to independently verify when the

18   incident depicted in this picture occurred?

19   A    Besides this picture?

20   Q    Let me try again.  You're looking at me confused.  At

21   some point did you become aware that there was some kind of

22   European dating function?

23   A    Yes.

24   Q    When did you first become aware of that?

25   A    Oh, the first time when I gave my declaration or

Friedman - cross - Schafhauser                    504

1   something, we put inside the date, I don't know if we wrote it

2   the opposite.  We wrote it the opposite.  So I -- so I was

3   aware that I made the wrong date on it.

4   Q    And where did you get the October 3rd date that's set

5   forth in your declaration when it says photograph dated

6   October 3rd?

7   A    I thought from the picture.

8   Q    Now, putting aside the date, is it correct -- well,

9   withdrawn.

10         Do you recall when during the day this incident

11  occurred?

12  A    The exact date, I don't remember -- I wasn't sure of the

13  exact date, but I think it was something in March.

14  Q    Very well.  Do you recall what time of day the incident

15  depicted here occurred?

16  A    Yeah.  It was -- it was during the hours of -- it was

17  maybe 4 o'clock or 5 o'clock.  It was in the daytime, I know

18  for sure.

19  Q    Can you take a look at the picture where it says 4:34.

20  A    Right.

21  Q    Do you have any reason to doubt that the incident was at

22  or about that time?

23  A    No.  Because 5 o'clock usually -- we usually went home at

24  5 o'clock.

25  Q    This is my question, Mr. Friedman:  Did you try to keep

Friedman - cross - Schafhauser                505

1   this a secret from anyone at Two Rivers?

2   A    No.  Not at all.

3        THE COURT:  While you're looking for your next

4   exhibit, I will take a moment.  Obviously everybody take a

5   minute as well.  Forgive me for the interruption.

6        (Recess taken.)

7   Q    Mr. Friedman, could you please turn in the defendant's

8   binder this time, the binder that I prepared, to Exhibit 8.

9   Specifically, there is an e-mail among this e-mail chain dated

10  -- and hopefully it's in chronological order, dated October 2,

11  2015, at 3:43 a.m.  I'd ask you to turn to that e-mail, Mr.

12  Friedman.

13  A    What page?

14  Q    You'll see the date is October 2, 2015 at 3:43 a.m.

15  A    Yes.

16  Q    Okay.  And there is a bunch of cc's.  Among them is your

17  name.  Do you see that?

18  A    Yes.

19  Q    Do you have any reason to doubt that you received a copy

20  of this e-mail?

21  A    I'm sure I received it.

22  Q    Do you recall this e-mail?

23  A    I recall about it, yes.

24  Q    What do you recall about this -- before we get to the

25  e-mail.  Was there a dispute involving Yossi?

Friedman - cross - Schafhauser                    506

1  A    There was a whole argument about they wanted -- they

2  claimed that they changed the -- another I tech, another

3  computer guy, or another programmer, whatever they call, they

4  needed to get inside into the server, they wanted to get the

5  password for it.  It seems they had some nasty words.  So

6  finally they e-mailed me that I should have to talk to them, I

7  got to get some sort of numbers, some sort like this.  I got

8  involved in between.

9  Q    When you say you got involved in between, let's talk

10 about what your involvement was and what you communicated to

11 the Schreibers about this issue.

12 A    The Schreibers, I didn't speak anymore.  It became we

13 don't talk to each other, but I asked Yossi if we should give

14 it, Yossi said only if there is Benzi's there, then he kept on

15 saying there's money owed.  There was going constant

16 complaints to each other and I told them they should wait

17 until I get back.  I was in Israel, it was during the Jewish

18 holidays.  Basically they needed it right away.  They were --

19              THE COURT:  Slow down, please.

20 A    They needed it right away.  They said it's an emergency,

21 so I tried to have everybody let's fake like I'm back and I

22 will help everybody.  I only spoke to Mayer at that time.

23 Q    Mayer who?

24 A    Mayer Koenig.

25 Q    And what did you say to Mayer Koenig at that time about

MDL RPR

1   this issue?

2   A    That I am going to try my best, that I am going to get

3   Yossi to do it.  There was some words between Mayer and Yossi.

4   Also everybody got heightened.  They became personal.

5   Q    Did you discuss -- you said in a couple of answers ago, I

6   think, something about somebody was owed money.  Who was owed

7   money?

8   A    Two Rivers was owed money.

9   Q    Two Rivers owed --

10  A    Two Rivers was owed money to Yossi Rogosnitzky.

11  Q    And did you discuss that with Mayer?

12  A    Yes.

13  Q    And what was his response, if you recall?

14  A    He said he didn't say it and that this things belongs to

15  him, stuff like this.

16              (Continued on following page.)

17

18

19

20

21

22

23

24

25

*E. Friedman - Cross/Mr. Schafhauser*　　　508

1  EXAMINATION BY

2  MR. SCHAFHAUSER:

3  (Continuing.)

4  Q    All right.

5            Now, you say you received this e-mail October 2nd,

6  3:43 a.m., so this is my question.

7            Mr. Schreiber says in this e-mail, in the third

8  paragraph, "We have not paid you or authorized any payments to

9  you in the last few years and we do not consider you as any

10  part of our iTeam or network team.

11            Do you see that?

12  A    Yes.

13  Q    Okay.  What was your reaction when you read that?

14  A    All this problem happened after when we got into fight,

15  but didn't matter anymore at that time.  What was true what

16  wasn't true, everything was denied.

17            Unfortunately, all my life, it was always a

18  handshake.  Whatever I said never was changed.  By then, I

19  have my same partners for past 30 years.  I have my wife, my

20  employees, and I have carried all of them with me for 30 more

21  years.  I never had a problem.  This was the first time in my

22  40 years of being in business that I had a problem.  Whatever

23  we said, everything was denied.

24  Q    Now, there's been an allegation that access to the

25  Two Rivers Launch Coffee System has been discontinue in some

1   way.

2           You are aware of the allegation; correct?

3   A    Correct.

4   Q    Did you have --

5           MR. SCHAFHAUSER:  Withdrawn.

6   Q    Do you have any knowledge as to, first, whether the

7   discontinuation has occurred other than the being told?

8   A    No.

9   Q    Okay.

10          Next, do you have any knowledge as to who caused the

11  discontinuation if it did occur?

12  A    The only thing that I can see from all that is going on

13  was the money was owed to him and that's why it was

14  discontinued.

15  Q    Well, let me be very specific.

16          Do you have personal knowledge as to whether that

17  was the reason, or is that --

18          Do you have personal knowledge whether that was the

19  reason?

20  A    I called Benzion and said, Do me a favor and talk to

21  Yossi and there was a -- he basically sent back an e-mail to

22  him or told him that he's not going to do anything until we

23  get some money to him.

24  Q    All right.  So let me focus you then on Exhibit 9,

25  Defendant's Exhibit 9.  Mr. Friedman, you mentioned it a bit.

1          Are you at Exhibit 9?

2     A    Yes.

3     Q    It's Defendant's Exhibit 9, Mr. Friedman.

4     A    Yes.

5     Q    Okay.  It's an e-mail from J.R., it says.  And then

6     jragas@verizon.net, do you see that e-mail?

7     A    Yes?

8     Q    Who do you understand that to be?

9     A    This is Yossi and Rivki.

10    Q    Is this the e-mail that you were referring to in your

11    testimony a moment ago?

12    A    Yes.

13    Q    Other than this e-mail, do you have any personal

14    knowledge --

15    A    Yes.

16    Q    -- as to the circumstances as to why -- whether and why

17    access was discontinue?

18    A    Yes.  As I told I think before.  When this thing -- when

19    I was available the first time, I think I said I called Yossi

20    and he also told me that he's not going to do nothing until he

21    doesn't get paid.

22    Q    And that was after you became aware of the allegation

23    that it was discontinued; is that right?

24    A    That's correct, yes.

25    Q    Now, before service was discontinued, did Yossi ever tell

1    you, I'm terminating service?

2    A    No.  He asked me many times on the phone when I'll get

3    paid, but I never was told now I'm litigating now please wait,

4    wait, wait.

5    Q    But you had no warning that this was happening?

6    A    Not at all.  Nothing.

7    Q    You had no --

8             MR. SCHAFHAUSER:  Withdrawn.  I'll try it this way

9    rather than a leading question.

10   Q    Did you have any involvement in the interruption of the

11   Two Rivers Launch Coffee System?

12   A    No.

13   Q    You testified on direct about doing business on a

14   handshake I think was the phrase you used?

15   A    Correct.

16   Q    What did you mean by that?

17   A    Like I said, I have had many partners in my life.  I've

18   done a lot of business in whether there was a dollar, whether

19   it was a million dollars, and it was always whatever you

20   promised we're going to pay on contracts, or we went out on a

21   bid and we agreed to do it or not to do it, there was also a

22   very normal, common thing that I never got into a fight.

23   Nobody ever changed the thing.  Nobody ever disputed somebody

24   else or something, do you understand?  It was always was a

25   common thing to me, do you understand?  You know, when you say

*E. Friedman - Cross/Mr. Schafhauser*          512

1   something that's what it was.

2   Q    Is it your regular practice to --

3        MR. SCHAFHAUSER:  Withdrawn.

4   Q    When you do business on a handshake, do you document

5   things that on which you shook hands?

6   A    Usually not.  Even here, anything I did before was done

7   by our employees.  I was always very close to Eugene.  There

8   isn't a thing that I did not move without it being discussed.

9   There isn't a thing I didn't ask him or we didn't agree to.

10  There wasn't ever such a thing, you understand to do it.

11  Q    All right.  Let me ask you, please, Mr. Friedman to go to

12  Plaintiff's Exhibit 56.  There's been some discussion about

13  this I want to be clear.

14  A    (Complying).

15  Q    You're at Plaintiff's Exhibit 56?

16  A    Yes.

17  Q    Okay.  You see the reference to, "Emil has an iPad," in

18  the middle of the page?

19  A    Yes.  One second.  This is Exhibit 56, right?

20  Q    Yes.

21  A    Yeah.

22  Q    In the middle of the page, at your address it says,

23  "Sonya Rivera to Eugene Schreiber, Emil's iPad."

24        Do you see that?

25  A    Yes.

E. Friedman - Cross/Mr. Schafhauser          513

1   Q    At the time -- let me put a date.

2          You see on the right, it says "Monday, June 8,

3   2015"?

4   A    Yes.

5   Q    Okay.  At the time that this e-mail was written, did you

6   have an iPad?

7   A    No.

8   Q    So this was -- well, regardless of what Ms. Rivera did,

9   this is my question.

10          You testified you told Ms. Rivera, "Tell him it's an

11   iPad."

12          Were you confused between iPad and iPhone?

13   A    Definitely, yes.

14   Q    Is that an uncommon or common thing for you with

15   technology?

16   A    Unfortunately, it was.

17   Q    Unfortunately what?

18   A    Unfortunately it's common.

19   Q    I didn't hear your answer.

20   A    Unfortunately, it's common.

21   Q    Mike Devine.  Who is Mike Devine?

22   A    Mike Devine is like accountant for Two Rivers and

23   accountant for me.

24   Q    You were asked about your status as Tax Matters's

25   partner.

*E. Friedman - Cross/Mr. Schafhauser*        **514**

1          Do you remember that?

2   A    Yes.

3   Q    Did you understand Mr. Devine to be the accountant for

4   Two Rivers?

5   A    Yes.

6   Q    Okay.  Now, you were asked whether you had

7   submitted -- signed and submitted tax returns for Two Rivers.

8          Do you remember that question?

9   A    Yes.

10  Q    Okay.  Here is my question.

11         Who did you understand would submit and sign tax

12  returns on behalf of Two Rivers?

13  A    I wouldn't have signed anything unless Mike Devine went

14  over and met Vincent and he even had an auditor in the company

15  for, I think, about almost two years and they went over and

16  basically checked and said if everything was okay or if it

17  wasn't okay or we did it right or didn't do it right, I'm not

18  sure exactly of the details.  And once Mike told me that

19  everything is okay then, basically, I may have signed it.

20  It's possible, very possible.

21  Q    All right.  So this is my other question on Mr. Devine.

22         There was an order entered on December 14th which we

23  already talked about?

24  A    Right.

25  Q    Mr. Devine was the accountant for Two Rivers; correct?

*E. Friedman - Cross/Mr. Schafhauser*          515

1   A    Correct.

2   Q    Did you reach out to Mr. Devine to ascertain whether he

3   had tax-related documents relating to Two Rivers?

4   A    Yes.

5   Q    Okay.  And do you have an understanding as to whether

6   Mr. Devine forwarded tax-related documents into his custody,

7   possession, control to Two Rivers?

8   A    Yes.

9   Q    And did you ask or instruct him to do so?

10  A    Yes because I remember Vincent Papa told me or something

11  he didn't receive it.  I called Mike, did you give to him

12  everything.  I mailed everything, what are you talking about?

13  Q    All right.

14           Mr. Friedman, you were asked about the Two Rivers

15  Operating Agreement earlier.  If you would please turn to

16  Defendant's Exhibit 6.

17  A    (Complying).

18           THE COURT:  About how much longer do you have,

19  Mr. Schafhauser?

20           MR. SCHAFHAUSER:  May I ask the Court a question and

21  that will help?

22           THE COURT:  Tell me how much more do you have.

23  We'll stay until you're done.

24           MR. SCHAFHAUSER:  I understand.  I could be done

25  quickly.  I wanted to ask a question and that is this:  I'm

*E. Friedman - Cross/Mr. Schafhauser*        516

1   asking Mr. Friedman questions in response to the direct

2   examination on plaintiff's case.

3          Mr. Friedman has, you know --

4          THE COURT:  You're going to call him as a witness in

5   your case later?

6          MR. SCHAFHAUSER:  It's possible.

7          THE COURT:  We can do that.

8          MR. SCHAFHAUSER:  But I'm try not to exceed the

9   scope of his direct.

10         If your Honor prefers me to do it all now, I can do

11  it now.

12         THE COURT:  I'm not going to tell you how to present

13  your case, I'm really not.  I want to know if we're going to

14  finish with this witness when we told him he'd be going home.

15  That's between you guys.  I will give everybody a chance to

16  question him and we'll stay until it's done.

17         MR. SCHAFHAUSER:  In that case, your Honor, I want

18  to review my notes for a moment.

19         (A brief pause in the proceedings was held.)

20  EXAMINATION BY

21  MR. SCHAFHAUSER:

22  (Continuing.)

23  Q    Very briefly, Mr. Friedman, we're going to skip the

24  document I was about to get to and try to short circuit this.

25         Would you turn to Exhibit 7, Defendant's Exhibit 7.

E. Friedman - Cross/Mr. Schafhauser          517

1   Do you have?

2   A    (Complying).

3   Q    Do you have that?

4   A    Yes.

5   Q    In the middle of the page it says, "Vincent Papa to Emil

6   Friedman," and number of other people do you see that?

7   A    Yes.

8   Q    And it says, "Attached is a list of recurring expenses

9   that will and won't be paid."

10            Do you see that?

11  A    Yes.

12  Q    Okay.  And would you please --

13            And did you receive this e-mail on or about

14  January 19th?

15  A    Correct.

16  Q    Okay.  I'm sorry, January 4th, looking at the wrong when

17  it was sent by Mr. Papa.

18  A    It says January 9th here, no?

19  Q    I mangled the question?

20            THE COURT:  Do you know yourself when it was sent or

21  received?

22            THE WITNESS:  No, I can't.

23            THE COURT:  You don't know the dates without looking

24  at it?

25            THE WITNESS:  No.

*E. Friedman - Cross/Mr. Schafhauser*          518

1          THE COURT:  Move on.

2          MR. SCHAFHAUSER:  Let me move on.

3    EXAMINATION BY

4    MR. SCHAFHAUSER:

5    (Continuing.)

6    Q    Take a look at the second page, please.

7          Did you have an understanding as to certain payments

8    being put on hold by Mr. Papa following the entry of

9    restraints in this case?

10   A    Yes.

11   Q    What payments were those?

12   A    To rent, to stop paying the interest check, to stop

13   paying the cars, to stop paying -- there was other

14   stuff -- telephone, anything.  Anything that had to do with me

15   basically was just discontinued.

16   Q    And were you given notice as to why this was being

17   discontinued?

18   A    No.  Just understood that the Schreibers told him not to

19   pay and that's what it is.

20   Q    And did you have an understanding as to whether your

21   rights under the Two Rivers Operating Agreement except as set

22   forth in the orders of this Court were terminated?

23   A    I answered it.  I can't go to the business, I can't get

24   involved with it there.  But there was no reason that I

25   shouldn't be able to get any whether it was statements or

1   whether there or seeing what was receivable, what was payable.

2   Whether the business is making money, not making money.  I

3   always thought I should be able to get this.

4   Q    Have you received information from Mr. Papa or Two Rivers

5   as a member since the restraints were entered?

6   A    Nothing.

7   Q    Before this case was filed, what information did you have

8   access to?

9   A    I don't remember.  I think I recall I might have had a

10  conversation and he told me he can't send nothing to me.  I'm

11  always sure of it we had a conversation because I asked him

12  nicely, Can I please see if I can get it.  The answer was, I

13  will see what I can do.

14  Q    Have you received any payments from Two Rivers, or on

15  behalf of Two Rivers since this case was incepted?

16  A    Nothing.

17  Q    Okay.  Before this case commenced, what payments did you

18  monthly receive?

19  A    I received everything what I was entitled to get.  I

20  asked him where is my K-1 from this year.  Can I have a tax

21  return from this year?  I had personally call him because he

22  never responded to me.  At the end, I just gave up and he

23  never gave me anything.  Before I used to get everything,

24  whatever used to belong to me.  Whether it was an interest

25  check, whether it was a car check.  Whatever it was my right,

*E. Friedman - Cross/Mr. Schafhauser*          **520**

1   basically, I got.

2   Q    Mr. Friedman, you're aware of a number of discovery

3   orders that have been entered in this case; right?

4   A    Right.

5   Q    Your counsel has told you about those, safe to say.

6   You're sighing.

7        Yes?  Is that a yes?

8   A    Yes.

9   Q    Have you ever tried to circumvent, disregard, disobey, or

10  failed to comply with any orders?

11  A    Never.  To my knowledge never, it was not my interest.

12  The opposite.

13  Q    When you say, "The opposite"?

14  A    It was my interest everything should continue going.  It

15  should be working because I'm not sure it was ever was going

16  to happen at the end of the litigation.  It was always my

17  interest it should be the same and maybe a relationship may

18  not back, everything to leave it the way it did.

19  Q    When you say, "Your interest," who, to your knowledge,

20  has funded the operations of Two Rivers?

21  A    I funded it.

22  Q    How did you fund it?

23       THE COURT:  Is this going towards the purpose of the

24  hearing, or is it to the overall litigation.

25       MR. SCHAFHAUSER:  Your Honor, I will --

*E. Friedman - Cross/Mr. Schafhauser*            **521**

1      THE COURT:  If it's connected to the hearing, I'm

2  just not getting to.

3      MR. SCHAFHAUSER:  I guess I'm -- frankly, I'm trying

4  to go to the equities and good faith but we can argue that I

5  don't want to we'll argue that at the end.

6      Mr. Friedman, I have nothing further.

7      Your Honor, I have nothing further.  Again, I may

8  call Mr. Friedman on my case.

9      THE COURT:  Everyone is free to present their case.

10      Anyone on the defense case?

11      Okay.  Mr. Grantz.

12  CROSS-EXAMINATION

13  BY MR. GRANTZ:

14  Q    We heard about this Papa Jack Ahearn.  How old is he?

15  A    He should be maybe 86.

16  Q    You said he comes into the office occasionally.  What

17  does he come to do in the process?

18  A    He is being -- when the company was bigger and

19  everything, he used to come there Fridays just to cook for the

20  people.  He used to come and do work for Jack and Larry

21  personal.  He used to do whatever personal stuff for them, or

22  light trucking I think.

23  Q    Nowadays, does he have any responsibilities and at any of

24  the companies that are in the Bronx?

25  A    No.

1  Q     John Ahern, this is one of his two sons; right?

2  A     Correct, the twins.

3  Q     Larry is his brother?

4  A     Yes.

5  Q     What is your John Ahearn's health condition?

6  A     It's, unfortunately, he is -- the way I understand it his

7  bones are falling apart.  He's a young man, but it's like on

8  his spine, not osteoporosis.  It's worse than that.

9  Q     Have you been to visit him?

10  A     Yes.

11  Q     Is he able to walk?

12  A     He walks all the way down.  He has a huge big holder.

13  Q     When was the last time he came to the Bronx office to do

14  work?

15  A     I'm telling you must have been two, three years, God

16  knows.

17  Q     You heard testimony about this trip to China.

18        When you went on that trip to China, was it before

19  you were in dispute with the Schreibers involved in the

20  original lawsuit that happened in 2014?

21  A     Everything, unfortunately, started -- a changed from one

22  day to the next as soon as we came back from China.  That's

23  when everything started.  I don't know what caused it, what

24  not.  I think the problem was they tried to -- they only sold

25  the companies worth a million dollars millions of dollars and

1   they had a guy named Bob Egan to sell the company.  And I told

2   the companies is nowhere near this value.  I bought many

3   companies, how they got to this number.  They told me it's

4   worth on a future sales.  So the I came back and he said at

5   the end of the day the company, the only value, the debt which

6   is in the company plus he said the name and the sales may not

7   being a salesman.

8   Q    The trip to China, was it in 2014?

9   A    I don't remember what year it was.  It was before, I

10  think it was before.

11  Q    It was before the initial fight that you had with the

12  Schreibers?

13  A    Yes, definitely before.

14  Q    That resulted in the New Jersey litigation?

15  A    Yes.

16  Q    So when you came back on this flight and lost the

17  battery, it was some time in 2014?

18  A    That's correct.

19  Q    Mr. Schafhauser asked you about records you're getting

20  currently are you get any which financial statements from

21  Two Rivers?

22  A    Nothing.

23  Q    Any balance sheets?

24  A    No.

25  Q    Tax information?

*E. Friedman - Cross/Mr. Schafhauser*          **524**

1   A     Nothing.

2          THE COURT:  Is this the same questioning we just

3   had?

4          MR. GRANTZ:  I'm making sure.

5          THE COURT:  I'm pretty clear about what

6   Mr. Schafhauser established.

7          MR. GRANTZ:  Thank you.

8          I have nothing else.

9          (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Friedman - cross - Finkel                                    525

1    (Continuing)

2    CROSS-EXAMINATION

3    BY MR. FINKEL:

4    Q    Mr. Friedman, I direct your attention to Plaintiff's

5    Exhibit Number 35.  Excuse my back.  This is an exhibit that

6    Mr. Nelkin asked you questions about.

7              Do you recall that?

8    A    Yes.

9    Q    And Mr. Nelkin characterized this exhibit as a list of

10   users of the Two Rivers Launch System, is that correct?

11   A    That's correct, yes.

12   Q    In fact, it's listed on the index of exhibits as that's

13   the title of this exhibit?

14   A    Yes.

15   Q    I'd ask you to look at the exhibit, and look to the last

16   person listed on this list, a Michele Rosado.

17   A    Correct.

18   Q    Do you know Michele Rosado?

19   A    She worked there a short time, not for Two River.

20   Q    Did she ever work for Two Rivers?

21   A    Never.

22   Q    So let me ask you a question:  Would there be any reason

23   for a person who never worked for Two Rivers to have access to

24   Two Rivers' Launch System?

25   A    She did not have -- I -- I -- she did not have access to

Friedman - redirect - Nelkin                    526

1    the Two Rivers Launch System, I don't believe.

2              MR. FINKEL:  Nothing further, Your Honor.

3              THE COURT:  Anyone else?  Okay.  Then redirect.

4              I'm sorry, I'll need one moment before you begin to

5    redirect.  Forgive me.

6              (Recess taken.)

7              (In open court.)

8    REDIRECT EXAMINATION

9    BY MR. NELKIN:

10   Q    Mr. Friedman, I believe you testified when you took the

11   computers you had no intention to hide anything and you were

12   doing it during broad daylight --

13   A    That's correct.

14   Q    -- is that correct?

15             Could you turn to Exhibit 3?  I believe you

16   testified that that is April 6th, now that you know about the

17   dating system?

18   A    Yes.

19   Q    Do you happen to know if that was a Jewish holiday?

20   A    April 6th was a Jewish holiday, no.  I -- I was there

21   when we took it out.

22   Q    Could it have been Chol Hamoed Pesach?

23   A    Definitely not because I was there then.

24   Q    Definitely not Pesach?

25   A    I was there.  No, I don't know about Pesach, but I was

Friedman - redirect - Nelkin                    527

1   there when we took the two computer out.

2   Q    Would looking at the Jewish calendar for that period help

3   refresh you?

4   A    I know for sure that I was there and we took these two

5   computer, that's all I can tell you.

6   Q    And do you know if any of the other partners were there

7   or were they away for Passover?

8   A    I don't remember.

9   Q    Okay, thank you.

10  A    But it's definite I was there.

11  Q    Now, you testified I believe that --

12  A    I think on the paper work shows it.

13  Q    I'm asking if it would help refresh your recollection to

14  look at a Jewish calendar?

15  A    If you tell me, but as far as I know --

16       THE COURT:  Do you want to stipulate what the dates

17  were for Passover last year?

18       MR. NELKIN:  We'll deal with that later, Your Honor.

19       THE COURT:  All right.

20  Q    You mentioned that you haven't received any documents

21  from Two Rivers.

22       Have you requested any documents from Two Rivers?

23  A    No.

24  Q    Okay.  Do you have a Brooklyn Beans e-mail account?

25  A    I -- I never -- I don't have -- opened it.

Friedman - redirect - Nelkin                    528

1   Q    Do you remember being instructed by the Court to open a

2   Brooklyn Beans account at December 14th?

3   A    No, not at all.  Not at all.

4   Q    Okay.  Do you have any idea when the last time you

5   checked a Brooklyn Beans account was?

6   A    I don't even know my password.

7   Q    Do you know if -- you mentioned you haven't received a

8   K-1, do you know if the accountant has finished the tax

9   returns or not?

10  A    I don't know.

11  Q    You do know when Two Rivers has to file the tax returns?

12  A    I don't know, but nobody answered me, nobody got back to

13  me, nobody said anything to me.

14  Q    I'd like you to turn to Exhibit 128.

15         THE COURT:  Which one?

16         MR. NELKIN:  128.

17  A    I'm sorry, 128?

18  Q    Yes.  And I am looking at the first page and the first

19  paragraph.  This is an e-mail between Vincent Papa to your

20  lawyer, Paul Schafhauser, copying a number of different people

21  on it, including yourself.

22         Do you remember getting this e-mail?

23  A    Just give me a minute, I am just -- I see it.  I don't

24  really -- I don't really recall it, but --

25  Q    Did you ever try and gather that information, the missing

Friedman - redirect - Nelkin                529

1    information that Mr. Papa indicated was missing?

2    A    Is this referencing the credit card you're talking about?

3    Q    It says that they're missing a lot of material for an

4    audit request, and that there is 1.158 million dollars in

5    backup that's missing and unaccounted for.

6    A    I have no idea about this.

7    Q    Okay.  So you didn't try and look again to see if you

8    could find it from some other location?

9    A    I had no idea.  I didn't have no idea.

10   Q    And it says it's for Trade Mills and Federal Express.

11            Do you know how Federal Express was paid?

12   A    Yes.

13   Q    How was it paid?

14   A    It was paid by credit cards, if I remember clear.

15   Q    One of your credit cards?

16   A    One of my credit cards.

17   Q    So the missing information would have been something in

18   your domain?

19   A    If you want, I'll tell you what happened.  All this --

20   Q    I'm just --

21            THE WITNESS:  No, I should explain because it's

22   important, Your Honor.

23            THE COURT:  Wait, wait.  Start again with the

24   question and answer the question.

25   Q    I am just asking if the missing credit card information

SAM      OCR      RMR      CRR      RPR

1   would have be something in your custody and control or not,

2   just a yes or no answer?

3   A     No.

4   Q     Okay.  Why would it not have been in your custody and

5   control?

6   A     On the Fed Express what happened was we always used to

7   get the last minute that they carried over the Fed Ex.  Sonia

8   used to go crazy.  They never -- they used to kept bills for

9   him piled all over, never turn it over.  So the last minute to

10  be able to open the Fed Ex we shouldn't get it -- I remember

11  we had a whole argument because of this.

12            THE WITNESS:  I apologize, Your Honor.

13            THE COURT:  Slow down, please.

14  A     So Sonia used to call me and said, Listen to me, they are

15  carry all the Fed Ex who used to call us.  So Sonia went fast.

16  I told her first pay it, and he never gave us the backup.

17  Everything used to come Fed Ex everything to him, not to us.

18  What I mean to us, not to my house, nothing.  That's why we

19  change it, and then we paid it and then we had to go after to

20  go retrieve it from the computer between Fed Ex and the way

21  Sonya was doing it.

22            So we never really had a proper backup on Fed Ex.

23  Because that was one of the problem why we changed from to my

24  house, the 33 Nicholas Avenue, because she used to complain to

25  me always I don't get the bills.  I don't have it, and that's

Friedman - redirect - Nelkin                531

1    why we did it, to make sure that all the bills should be paid

2    on time.

3            And I will say one more thing.  I never, ever took a

4    dollar in the company.  I'm just telling you.

5    Q    I'm not asking you.

6    A    The opposite, I only pay and I gave.

7            THE COURT:  Stop, sir.

8            THE WITNESS:  Your Honor.

9            THE COURT:  You're the one who wants to leave.

10           THE WITNESS:  No, but I want to apologize --

11           THE COURT:  Stop.

12           THE WITNESS:  -- to Your Honor.

13           THE COURT:  Stop, please.  You will answer

14   questions.  If your lawyer or one of the other lawyers has

15   another question they think will draw out something they think

16   is relevant -- I understand it's terribly frustrating

17   process --

18           THE WITNESS:  Okay.

19           THE COURT:  -- but this is going to help me get to

20   the decision I need to make.

21           THE WITNESS:  Okay, I'm sorry.

22   BY MR. NELKIN:

23   Q    I'd like to you turn to page 4 in that exhibit.  And I'd

24   like to turn to the bottom e-mail, it's Mr. Papa writing to

25   your lawyer, Mr. Schafhauser, in response to your questions.

Friedman - redirect - Nelkin                    532

1   And in the first sentence he says that he's not represented by

2   any counsel.  He's requested to be represented by counsel,

3   that request was denied by Mr. Friedman and I was notified of

4   that denial by an e-mail by you.

5           Did you ever block or protest Two Rivers or Mr. Papa

6   from having a lawyer?

7   A    Yes.

8           MR. SCHAFHAUSER:  Objection.

9           MR. GRANTZ:  Exceeds the cross.

10          THE COURT:  I agree, I don't see how this is

11  redirect.

12          MR. NELKIN:  It was talking about whether or not

13  they responded to the information, and I just wanted to say

14  that I thought --

15          THE COURT:  Move along.

16          MR. NELKIN:  Okay.

17  BY MR. NELKIN:

18  Q    Look at the next paragraph down.

19  A    Which -- which -- where are you?

20  Q    Page 4.

21  A    On the same?

22  Q    Yes.

23  A    What number was it, I'm sorry?

24  Q    It's Exhibit 128, page 4, the bottom paragraph.

25  A    Page 4.  Yes.

SAM      OCR      RMR      CRR      RPR

Friedman - redirect - Nelkin                    533

1   Q     This appears to be Mr. Papa telling your lawyer about

2   whether what type of missing tax information there are, and

3   telling you that -- telling him that you as the tax matters

4   member ought to be aware of that.

5           Did you ever see this e-mail?

6   A     Yes, I clearly spoke to Mike Devine and asked him and he

7   told me clearly he sent them everything.  I don't know what

8   this guy is talking about.

9   Q     And if you can turn the page to the next paragraph about

10  the missing books and records, they are too numerous to list,

11  please ask your client to provide a listing of what was sent.

12  I received one small box of vendor files, and then he gives a

13  list of things that are missing.

14          Do you know if there was ever a list that was

15  provided?

16  A     I'm not sure.

17  Q     Two paragraphs down he says, Another example of missing

18  books and records is the Launch Coffee System.  And he talks

19  about what passwords they've been granted and how they still

20  don't have access to data.

21          Did you ever provide any new passwords after this

22  point in time?

23  A     No.  I was told clearly, if I remember, that I have to

24  provide him once -- once, and then I can change my password to

25  my e-mail.

SAM      OCR      RMR      CRR      RPR

Friedman - redirect - Nelkin                      534

1   Q    Now, you testified before that you were in Israel when

2   the whole -- in October when --

3   A    Something, yeah.

4   Q    How long were you out of the country at that point in

5   time?

6   A    If you said you have a Jewish calendar, I was out some

7   time just before Rosh Hashanah to Succos.  I'm sorry.

8   Q    So two, three weeks?

9   A    I would say two weeks, two weeks I would assume.

10  Q    Okay.  And how many businesses do you own a controlling

11  interest in?

12  A    I don't know.

13  Q    More than ten?

14  A    Not sure, maybe.

15  Q    And you didn't feel the need for a computer to keep --

16  A    No.

17  Q    -- up-to-date?

18  A    I don't have none of this stuff.  No, not at all.  I

19  have people, like I said before, working for many, many years

20  and there is no problem.  I can rely on them on everything.

21  Q    I'd like you to turn to -- well, is it correct to say

22  that you -- how many days passed from the time you reviewed

23  Mr. Nussbaum's affidavit until you did your independent

24  verification?

25  A    How many -- after?  I don't really recall.  It could be

SAM     OCR     RMR     CRR     RPR

Friedman - redirect - Nelkin                535

1    two days, it could be three days.  Not talking about months or

2    something.

3    Q    And did you review Mr. Nussbaum's signed affidavit?

4    A    I -- I think yes.

5    Q    Okay.

6    A    Yes, I think yes.

7    Q    Okay, if you could turn to Exhibit 110, please.  And I

8    want you to look at the last page of that.  And I'd like to

9    direct your attention to the top, the fax line.  It says

10   5/13/16, at six --

11   A    Page 3?

12   Q    No, page 5, it's the last page of Exhibit 110.

13   A    Right.

14   Q    It says that -- it's a fax line from 5/13/16 at 6:24

15   from -- either it doesn't show or it's been redacted out to a

16   973 number, which I believe is your attorney's fax number.

17   And then at the bottom it says received at 7:46:13 p.m., also

18   on 5/13.  And then this affidavit is actually filed on 5/13,

19   as was yours, which was 109.

20        And I just was wondering, one, how did this

21   affidavit get to you?

22   A    Because it -- I'm sure they sent me -- they send me a

23   copy before to make sure and everything.  So -- I wasn't -- I

24   said again, I think it was signed, I'm not sure.  I said

25   clearly, I think it was signed, but I'm not sure.

Friedman - redirect - Nelkin                    536

1   Q     Okay.

2               THE COURT:  Any other topics to explore?

3               MR. NELKIN:  I am almost done, Your Honor.

4   Q     You testified that you -- that the whole removal of

5   documents and things was tied to the -- that you told people

6   not to remove things after the litigation before Judge

7   McCormick, is that correct?

8   A     Correct.

9   Q     Was that litigation filed in January or February of 2014?

10  A     I don't recall dates, I'm sorry.

11              MR. GRANTZ:  Objection.

12              THE COURT:  Problem with the date?

13              MR. GRANTZ:  Yes.

14              MR. NELKIN:  Sorry, 2015.

15  Q     January or February of 2015?

16  A     I don't recall the date.

17  Q     Okay.  And the documents, I believe you said, were taken

18  in March of 2015?

19  A     The --

20  Q     After the --

21  A     Oh, they actually came to take the thing you're talking

22  about?

23  Q     The documents that moved to the Bronx.

24              MR. NELKIN:  I'll move on, I think it's been

25  testified to.

SAM      OCR      RMR      CRR      RPR

Friedman - redirect - Nelkin                    537

1    Q    Where is Sonia's computer now, the two computers?

2              MR. GRANTZ:  Objection, this is beyond the scope of

3    cross-examination.

4              THE COURT:  Mr. Schafhauser inquired into the

5    location of the computers.

6    A    I think someone picked it up to take it to --

7    Q    No, I'm not asking about today, I'm asking about where

8    were they two days ago?

9    A    In the Bronx.

10   Q    And where in the Bronx?

11   A    It was in my office.

12   Q    Okay.  And was that office locked?

13   A    My office happens to be locked, yeah.

14   Q    And both of Sonia's computers were there?

15   A    Yes.

16   Q    Now, you testified that when new information came in

17   after this litigation -- well, when did they get to your

18   office?

19   A    I don't recall.  I don't recall.

20   Q    You testified that when new information came in after

21   this litigation that you would have sent it to Sonia for

22   scanning or you would have scanned it?

23   A    No, I -- I wouldn't have scanned it.  I must have given

24   it to her to scan it to -- to --

25   Q    So you had given her a hard copy?

SAM     OCR     RMR     CRR     RPR

Friedman - redirect - Nelkin                              538

1   A    Right.

2   Q    And then she would have scanned it?

3   A    Right.

4   Q    So she would have had to scan it on a different computer

5   than one of the two computers that are in your office,

6   correct?

7   A    Possibly, yes, or possibly somebody's scanner.  I'm not

8   sure, but somebody's scanner, yes.

9   Q    Now, you testified -- and did Michele Rosado, did she

10  take Jordan's place?

11  A    No.

12  Q    Can you look at Exhibit 35?  And if you can just look at

13  the second-to-last line above the text, it says Michele

14  Rosado?

15  A    Yeah, I see it.

16  Q    Does it assign her a Brooklyn Beans number -- address?

17  A    What is the last thing you say?

18  Q    Does it look like she has a Brooklyn Beans e-mail

19  address?

20  A    Correct.

21  Q    Okay.  You testified that there was some confusion

22  between iPad and iPhone when you were allocating bills.

23       Do the original bills from the service provider

24  exist today for those?

25  A    I don't know.

SAM      OCR      RMR      CRR      RPR

Friedman - redirect - Nelkin                    539

1    Q    You don't know.

2         Who would know?

3    A    I have no idea.

4    Q    Okay.  You said you wanted -- you did business on

5    handshakes and you wanted to do business with the Schreibers

6    and people on handshakes.

7         Did you have any existing written agreements with

8    the Schreibers?

9    A    We have -- yes.

10   Q    What do you have?

11   A    I don't remember.  We used an attorney both side.

12   Q    I am just asking what agreements you have with them?

13   A    Oh, you talking about in written or you talking about

14   verbal?  What are you asking me?

15   Q    Written, something besides a handshake.

16   A    We had an --

17        THE COURT:  Are you trying to elicit the fact that

18   there is an operating agreement?

19        MR. NELKIN:  No.

20        THE COURT:  Is there something else you are going

21   to?

22        MR. NELKIN:  Yes.

23        THE COURT:  Why don't you ask him about it?

24   BY MR. NELKIN:

25   Q    Do any of your companies have lending agreements with Two

Friedman - redirect - Nelkin                    540

1  Rivers?

2  A    Yes.

3  Q    Okay.  Do any of your companies have any agreement

4  besides a lending agreement with Two Rivers?

5  A    I don't -- I'm not sure.

6          THE COURT:  If you have something in mind, please

7  let him know what it is.

8  Q    Do you have any collateral agreements or

9  power-of-attorney agreements?

10 A    Yes.

11 Q    Or --

12 A    Yes; anything that was done, yes.

13 Q    So you have a number of agreements?

14 A    Correct.

15 Q    So at least when it came to the Schreibers, you didn't

16 intend to do things --

17 A    No, there was a lot of stuff, what you actually -- in

18 reality I am sure you know that there is a lot of stuff

19 reality is not the same as on paper.  So there is a lot of

20 stuff that we agreed between us, that it wasn't paper.  There

21 is no agreement that we agreed on hiring Jorge Salcedo.

22          I think there is a lot of stuff in the operate -- in

23 the function of running the company, but you can't -- you

24 don't think about it.  Understand?  And we both agreed that

25 it's gonna be -- we can do this, we can do this.

1    Q    Who was -- the lawsuit that was filed that you were

2    referring to, the lawsuit that was filed, who were the parties

3    in that lawsuit?

4    A    It was I think 26 Flavor -- you talking about in

5    New Jersey, that's what you talking about?

6    Q    Yes.

7    A    Okay, it was 26 Flavor against Two River.

8    Q    And do you know if any 26 Flavors documents were removed

9    from Two Rivers?

10   A    If 26 Flavor documents --

11   Q    Yes.

12   A    -- were removed from Two Rivers?

13        26 Flavors had -- whenever -- there was completely

14   different documents.  Completely different thing.

15   Q    Were any Office Coffee documents removed?

16   A    That's all -- yes, separate, it's a separate company

17   completely.

18   Q    I am just asking if there were any documents that were at

19   Two Rivers that were -- from either of those two companies

20   that were removed after the lawsuit was filed?

21   A    It was -- it was in Two Rivers facility and when Sonia

22   moved out she took these documents, that's exactly correct.

23   Q    And they were related to those companies?

24   A    Only strictly, only to that company, right.

25   Q    Okay.  You mentioned that when there was a problem with

Friedman - redirect - Nelkin                              542

1    the bill that Yossi contacted you?

2    A    You talking about his bill?

3    Q    Yes.

4    A    Yes.

5    Q    But he didn't contact the other partners about that, did

6    he?

7    A    No, but -- there was a common -- agreement, it was a

8    common thing that most of the stuff they didn't discuss with

9    me anything.  We had a good relationship that everybody

10   trusted each other.  There was nothing there to -- to worry

11   about when we overlooked each other.

12   Q    Is there anything in writing that you are aware of where

13   you notified the other partners that there was a problem with

14   Yossi's bill?

15   A    No.

16   Q    Did you notify them of the bill?

17   A    We had discussions, yes.

18   Q    When?

19   A    I don't recall.

20   Q    And who did you have that discussion with?

21   A    I think with Mayer or Eugene, I don't remember.

22   Q    Did you meet with Yossi while you were in Israel?

23   A    No.

24   Q    And when was the last time you spoke with Yossi?

25   A    He wasn't there in Israel.  I don't know, he was maybe,

SAM      OCR      RMR      CRR      RPR

Friedman - redirect - Nelkin                                543

1    I'm not sure.  I don't recall.

2    Q    When was the last time you spoke to Yossi?

3    A    Maybe a month ago.

4    Q    And when was the last time you communicated with him by

5    e-mail or any other --

6    A    No, I only spoke to him.  I never --

7    Q    Have you ever texted him?

8    A    I don't think so.  You can't text him.

9    Q    Okay.

10            MR. NELKIN:  Your Honor, I think -- I just want to

11   doublecheck something.

12            THE COURT:  Okay.

13            (Pause.)

14   BY MR. NELKIN:

15   Q    Are you aware if there is any backup of the Launch data?

16   A    I have no idea.

17   Q    And has your lawyer shared with you any financial

18   statements that may have been produced to him by Two Rivers

19   recently?

20   A    I -- I would assume if he would have gotten it, he would

21   have told me about it.

22   Q    But as you're sitting here today you are unaware of any?

23   A    No.

24   Q    Okay.  One question.

25            Could you turn to Exhibit 123?

Friedman - redirect - Nelkin                    544

1          THE COURT:  This will be the last exhibit you will

2    be discussing.

3          THE WITNESS:  Okay.

4    BY MR. NELKIN:

5    Q    This e-mail exchange begins on October 1st, and if you

6    turn to the last page it appears that on October 7th a

7    password for the server is turned over by Mr. Nussbaum?

8    A    Go ahead.

9    Q    Okay.  And that's on October 7th?

10   A    Okay.

11   Q    So it appears that they were fighting about passwords

12   from October 1st to October 7th?

13   A    Possible, yes.

14   Q    Okay.  And can you just tell me the date --

15         MR. NELKIN:  And this is my last question, Your

16   Honor.

17   Q    -- of the spoliation letter that was sent, which I

18   believe is Document 116?

19         THE COURT:  I can look it up.

20         MR. NELKIN:  Okay.

21   Q    It's the next day.

22         THE COURT:  Any recross?

23         MR. SCHAFHAUSER:  Very briefly, thank you.

24

25         (Continues on the following page.)

SAM      OCR      RMR      CRR      RPR

1    RECROSS EXAMINATION

2    BY MR. SCHAFHAUSER:

3    Q    Mr. Friedman, before -- you said you didn't request

4    documents of Two Rivers after this litigation.  Do you

5    remember that testimony?

6    A    Yes.

7    Q    Before the litigation began, did you receive information

8    or have access to Two Rivers information without needing to

9    make a request?

10   A    I had information, I didn't know how much to use it, but

11   I used to get it automatically from Vincent Papa.  I used to

12   sit down with him and go over with him certain numbers I

13   wanted to know.

14   Q    Very briefly, because I'm looking at the clock, what

15   types of information did you get from Vincent Papa?

16   A    I used to get accounts receivable, accounts payable, I

17   used to get profits of the company every month to show if --

18   which item of the -- which item from the thing was losing,

19   should we discontinue or not discontinue, stuff like this.

20   Q    And you received that without having to make a request?

21   A    That's correct.

22   Q    The last item here, Exhibit 128 that you were asked about

23   by Mr. Nelkin a couple of moments ago, the missing -- I

24   apologize, I'm rushing, so let me let you get to the document,

25   128, Mr. Friedman.  Let me start over again.

1  A    I see it.

2  Q    I want you to, as quickly as you can but with

3  comprehension, read that, and then my question will be whether

4  you have any books and records as specified in this that you

5  did not give Vincent Papa?

6  A    I'm going to say this very clear.  This isn't a paper --

7  a piece of paper like this that these guys didn't take up from

8  Launch Coffee and put it in the QuickBooks.  For six months,

9  every single thing was turned over.  There wasn't a single

10  thing Vincent Papa would say I'm missing things, I don't have

11  it.  Every single time are you missing?  I'm up to April, I'm

12  up to March, I'm up to January, so there wasn't a single thing

13  that they did not have.

14          MR. SCHAFHAUSER:  Thank you.  Nothing further, Your

15  Honor.

16          THE COURT:  Anyone else?  Any cross?  No?  Okay.

17  You are excused.

18          THE WITNESS:  I appreciate it.

19          THE COURT:  Have a good day.

20          All right, folks.

21          MR. HELLER:  Before we get to scheduling, I have one

22  issue I would like to raise.  There are two computers that are

23  scheduled for imaging or, at least, be made available for

24  imaging on Monday that I learned over the last 24 hours that I

25  have reason to be concerned about from my client's

Friedman - recross - Schafhauser                  547

1   perspective.  The first one has to do with the new computer

2   that Sonia Rivera uses as an employee of 26 Flavors, never had

3   anything to do with Two Rivers.  This is totally separate.

4   She, for the last six months has.

5         THE COURT:  What's the application, sir?

6         MR. HELLER:  The application is that the e-mails --

7   that there are e-mails on that computer and for the period of

8   time following the time that she took over solely as an

9   employee of 26 Flavors, those things should be vetted before

10  they are turned over to the other side.  We'd like to have an

11  opportunity to vet them before they are turned over for

12  relevance and for responsiveness.

13        THE COURT:  My understanding is that -- I have been

14  told that they have been available for imaging for quite some

15  time?  Yes?  Is that correct?

16        MR. HELLER:  I'm not so sure about that.  I'm not

17  clear as to which computers were available for imaging for

18  quite some time.

19        THE COURT:  Have them imaged by Monday, please.

20        MR. HELLER:  There's an additional one.  That's the

21  Sylvia Ezell computer.  There apparently is some proprietary

22  information that belongs to Office Coffee Services on that

23  computer.

24        THE COURT:  And it won't be used for any purpose

25  outside of this litigation.  Have it by Monday, please.

Friedman - recross - Schafhauser                548

1        Scheduling.  I am loathed to interrupt somebody's
2   preset vacation plans.  We will reconvene on August 1st to
3   complete this.  We will go day to day.  If you have other
4   plans, change them.

5        We are going to get through this hearing.  I am
6   hopeful that in the unduly long time between now and then you
7   will all redouble your efforts to make these motions moot.

8        The testimony that I have been hearing is to the
9   effect, and this matches what the lawyers are saying, trying
10  to make everything available, there shouldn't be a problem.  I
11  am thus far, from what I have heard, persuaded that on the
12  defense side there is the ability to make sure that there is
13  complete access.  Maybe I'll hear something later that
14  persuades me otherwise, and my mind is certainly open to that
15  because the hearing is not completed.  But I think to -- that
16  there are ways to make sure that the plaintiffs have the
17  access that they should to Launch Coffee and to image the
18  computers that have two Rivers information on them.

19       And I'm also confident during the time you are going
20  to re-double your efforts to make sure that Mr. Friedman, as a
21  partner of Two Rivers, is not needlessly excluded from having
22  access to information about the business going forward.  You
23  all need to find ways to make sure this business can continue
24  without undue interference from either side.  I don't have
25  specific suggestions in mind to share with you until you have

Friedman - recross - Schafhauser                549

1  given it your own try, but I have every confidence that you

2  can make virtually all of the matters in dispute moot between

3  now and August 1st.

4        MR. FINKEL:  Your Honor, I have one request.

5        THE COURT:  Yes.

6        MR. FINKEL:  The computers that you have ordered to

7  be imaged, some of those computers pursuant to the Court's

8  order, the defendants and their counsel have not been able to

9  have access to, for example, Sonia Rivera's computer.  Once

10 they're imaged, may we then begin to look at those materials

11 as well?

12       THE COURT:  Any objection?

13       MR. NELKIN:  We had requested that Stros be the

14 party to do the imaging.  We are waiting to do the conflict

15 check.  Hopefully, it will be done by today.

16       THE COURT:  I take it once Stros or some other

17 comparable company images a device, you have what you need

18 preserved.

19       MR. NELKIN:  Yes.  So, basically, I -- my only -- I

20 just want to talk to Stros and find out the mechanism -- to

21 the extent Mr. Finkel gave me a list of communications that he

22 had had that he would like segregated, I just want to find out

23 from Stros --

24       THE COURT:  Work together with them to make sure.

25       MR. NELKIN:  Yes.

Friedman - recross - Schafhauser                550

1        THE COURT:  Look, I don't think any of you want to

2   gain unfair access or inappropriate access to either

3   attorney-client communications or otherwise privileged

4   materials.  I'm confidant you are working in good faith

5   towards this.  What I am not confidant is that you are

6   actually working together to get things done as well you can.

7   For example, and this is departing from the imaging, I'm

8   confidant once something is imaged, you can find a way so that

9   everybody has access to the same information and that the

10  imaged computers can be returned to use.

11        But, for example, with Launch, if there is a problem

12  of what passwords work or don't work, for goodness sake, have

13  the principals and the lawyers and the experts sit down

14  together to talk what is keeping this from working and make it

15  work.  If the problem is that Yossi Rogosnitzky bills to other

16  companies of Mr. Friedman's are being paid but the ones to Two

17  Rivers are not, I'm sure something can be worked out so that I

18  don't have to reach the conclusion that one party or another

19  is creating a circumstance that makes access to Two Rivers

20  Launch impossible.  But we will cross that bridge when we get

21  to it.

22        MR. SCHAFHAUSER:  In fact, Your Honor, we take that

23  to heart.  One of the questions -- the lines of questions that

24  I had heard from Mr. Nelkin was that only Mr. Friedman can

25  authorize or could authorize checks or payments in excess of

1    25,000 --

2         THE COURT:  Look, Mr. Friedman has been paying Mr.

3    Rogosnitzky and if he stopped doing that, and that's what's

4    making it impossible to gain access to Two Rivers, I'll take

5    that into consideration.  I'm confidant you will work out a

6    way to make sure that access to Launch Two Rivers is restored.

7    I'm confident it will be done.  If it's not, we will continue

8    the hearing on that issue as well.

9         MR. SCHAFHAUSER:  I understand.  I'm trying to

10   suggest a way, which is that Mr. Friedman, if the issue was

11   that's not -- he authorizes Two Rivers to make that payment

12   and he's a member of --

13        THE COURT:  I'm not going to suggest how it gets

14   done.

15        MR. SCHAFHAUSER:  Very well.

16        THE COURT:  But I have been paying attention to the

17   evidence as it is coming in as to who has control over Mr.

18   Rogosnitzky's payments.

19        MR. SCHAFHAUSER:  Very well.

20        One point of request for me, because and Mr.

21   Friedman is gone, it's better that he's gone.  At the very end

22   Mr. Nelkin asked Mr. Friedman whether I had given him

23   financial information that was recently sent, and the answer

24   is no.  If for this reason, Mr. Parness sent me a single

25   document or a statement and it was marked as confidential or

Friedman - recross - Schafhauser          552

1   -- he had a designation, and because I took that designation

2   seriously and because I am well aware of the injunctive

3   restraints, that's one document that I did not send to Mr.

4   Friedman.  If I may send it, I'm happy to, but I have not.

5           MR. NELKIN:  I don't represent the company.  I

6   suggest that you talk to Mr. Parness.  If he sent it to you.

7           MR. GRANTZ:  Doesn't Mr. Parness represent the

8   company?

9           THE COURT:  Well, this is yet another way in which

10  it would be useful for everybody, for the partners to agree to

11  have the company itself be represented, whether by Mr. Parness

12  or somebody else, so that you don't find yourself in a bind

13  like this.

14          MR. SCHAFHAUSER:  Right.  I understand.

15          THE COURT:  Perhaps you will see fit to reach that

16  agreement; perhaps not.  I don't know.

17          MR. NELKIN:  Just from -- my client has no objection

18  to that being shared with Mr. Friedman as the partner.

19          THE COURT:  Right, but if it needs the signoff of

20  Two Rivers --

21          MR. SCHAFHAUSER:  I will ask Mr. Parness who is the

22  one who made the designation.  If an attorney sends me

23  something with a designation --

24          THE COURT:  Right.  If you are treating it as Mr.

25  Parness speaks for Two Rivers, perhaps you should make that

Friedman - recross - Schafhauser                553

1    official.

2            MR. SCHAFHAUSER:  Again, he sent me a document -- I

3    won't belabor the point.

4            MR. GEFELL:  Is there any problem with commencing on

5    August 8th rather than August 1st?

6            THE COURT:  Yes, there is.  This has gone on way too

7    long.  I'm trying to accommodate the vacations.  Hopefully we

8    won't need to reconvene by then because you are going to work

9    this out.  I will make my time available and I trust you will

10   make yours.

11           MR. FINKEL:  Thank you, Your Honor.  We appreciate

12   it.

13           MR. SCHAFHAUSER:  We appreciate the consideration

14   for vacation.

15           MR. FINKEL:  Very much.

16           (Matter adjourned to August 1, 2016.)

17

18

19

20

21

22

23

24

25

554

1                          I N D E X

2

3    WITNESS                                    PAGE

4

5        EMIL FRIEDMAN

6           DIRECT EXAMINATION

7           BY MR. NELKIN                        356

8           CROSS-EXAMINATION

9           BY MR. SCHAFHAUSER                   467

10          CROSS-EXAMINATION

11          BY MR. GRANTZ                        521

12          CROSS-EXAMINATION

13          BY MR. FINKEL                        525

14          REDIRECT EXAMINATION

15          BY MR. NELKIN                        526

16          RECROSS EXAMINATION

17          BY MR. SCHAFHAUSER                   545

18

19

20

21

22

23

24

25