```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3   ----------------------------------------X
                                            :
 4   STEVEN SCHREIBER,                       :
                                            :
 5                    Plaintiff,             :
                                            :   15-CV-6861 (CBA)
 6              v.                           :
                                            :   October 13, 2016
 7   EMIL FRIEDMAN, et al,                   :   Brooklyn, New York
                                            :
 8                    Defendants.            :
                                            :
 9   ----------------------------------------X

10
             TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
11             BEFORE THE HONORABLE JAMES ORENSTEIN
                    UNITED STATES MAGISTRATE JUDGE
12
     APPEARANCES:
13
     For the Plaintiff:        JAY P. NELKIN, ESQ.
14                             CAROL NELKIN, ESQ.
                               Nelkin & Nelkin
15                             5417 Chaucer
                               Houston, Texas 77005
16
     For the Defendant:        PAUL H. SCHAFHAUSER, ESQ.
17                             Herrick Feinstein LLP
                               One Gateway Center
18                             Newark, New Jersey 07102

19   For E&I, et al.:          DAVID GRANTZ, ESQ.
                               Meyner & Landis
20                             One Gateway Center
                               Newark, New Jersey 07102
21
                               CATHERINE MARIA PASTRIKOS, ESQ.
22                             Meyner & Landis, LLP
                               One Gateway Center, Suite 2500
23                             Newark, New Jersey 07102

24   For Birnbaum, et al.:     MAURICE W. HELLER, ESQ.
                               Garvey, Shubert, Barer
25                             100 Wall Street
                               New York, New York 10005


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

```
 1                                                              2

 2

 3    APPEARANCES CONTINUED:

 4    For Devine, et al:       MICHAEL SMITH, ESQ.
                               Rosenberg Feldman Smith, LLP
 5                             551 Fifth Avenue
                               24th Floor
 6                             New York, New York 10176

 7    For Ezell, et al.:       RICHARD A. FINKEL, ESQ.
                               Richard A. Finkel & Associates
 8                             270 Madison Avenue
                               New York, New York 10016
 9

10    For Friedman/NY Best     MARIE MATTHEWS, ESQ.
         Coffee:
11

12    For Ezell, Rivera,       RICHARD FINKEL, ESQ.
         Salcedo:              Richard A. Finkel, Esq. &
13                                Associates
                               270 Madison Avenue
14                             New York, New York 10016

15
      For Hersko, et al.:      ROBERT BERGSON, ESQ.
16                             Abrams, Garfinkel, Margolis,
                                  Bergson
17                             237 West 35th Street
                               New York, New York 10001
18

19

20    Court Transcriber:       SHARI RIEMER, CET-805
                               TypeWrite Word Processing Service
21                             211 N. Milton Road
                               Saratoga Springs, New York 12866
22

23

24

25
```

3

1   (Proceedings began at 2:05 p.m.)

2          THE CLERK:  Civil Cause for a Status Conference.

3   Schreiber v. Friedman, et al., Docket Number 15-CV-6861.

4          Will the parties please state their appearances for

5   the record, starting with the plaintiffs.

6          MR. NELKIN: Jay Nelkin for plaintiff Steven

7   Schreiber.

8          MS. NELKIN: Carol Nelkin for plaintiff Steven

9   Schreiber.

10          THE COURT:  Good afternoon.  Mr. Schreiber, good

11   afternoon.

12          MR. SCHAFHAUSER:  Paul Schafhauser defendants Emil

13   Friedman and New York Best Coffee, Inc.

14          THE COURT:  Good afternoon.

15          MR. GRANTZ:  Good afternoon, Your Honor.  David

16   Grantz from the law firm of Meyner & Landis on behalf of E&J

17   defendants and auto and trucking defendants.

18          THE COURT: Good afternoon.

19          MS. KELLY:  Catherine Pastrikos Kelly from Meyner &

20   Landis on behalf of the auto and trucking defendants and the

21   E&J defendants.

22          THE COURT: Good afternoon.

23          MR. SMITH:  Good afternoon, Your Honor.  Michael

24   Smith for Michael Devine and Michael Devine, CPA.

25          THE COURT: Mr. Smith, have you joined us before?

4

1          MR. SMITH: I have not.

2          THE COURT: But we have you on the docket?

3          MR. SMITH: I believe you -- yes, I do.

4          THE COURT: If you're not just make sure you have a

5    notice of appearance.

6          MR. SMITH: There's a notice of appearance on the

7    docket.

8          THE COURT: Good afternoon.

9          MR. BERGSON:  Good afternoon, Your Honor.  Robert

10   Bergson, Abrams, Garfinkel, Margolis, Bergson for Geoffrey

11   Hersko.

12         THE COURT: Good afternoon.

13         MR. HELLER:  Good afternoon, Your Honor.  Maurice

14   Heller, Garvey, Schubert, Barer for the coffee company

15   defendants.

16         THE COURT: Good afternoon.

17         MR. MATTHEWS:  Good afternoon, Your Honor.  Marie

18   Matthews for Emil Friedman and New York Best Coffee.

19         THE COURT: Good afternoon.

20         MR. FINKEL:  Good afternoon, Your Honor.  Richard

21   Finkel for Ms. Ezell, Ms. Rivera and Mr. Salcedo.

22         THE COURT: Good afternoon.  All right, folks.  So

23   there are a number of motions piled up.  I think we've got at

24   least 20 at this point.  Not necessarily the way I think makes

25   sense to litigate a case and some of these motions are

5

1    duplicative.

2            Just a word going forward to the extent we're going

3    to have briefing down the road.  I do rely on counsel to use

4    their judgment about what to give me and what not.  I don't

5    like to micromanage if I can avoid it and I recognize there

6    are times when the three page limit on a letter for a letter

7    motion doesn't make a lot of sense.  But even allowing for

8    that there are times when -- well, not just times.  I rely on

9    you not to abuse it.  Even on a motion on notice for summary

10   judgment, for example, a party would be limited to 25 pages

11   double spaced.

12           I was surprised and a little disappointed, Mr.

13   Schafhauser, if you get 33 pages single spaced in a letter and

14   much of it duplicative, non responsive.  I do hope -- I don't

15   want a response.

16           MR. SCHAFHAUSER: Oh, I wanted to apologize to Your

17   Honor.

18           THE COURT: You don't need to.  Just for -- frankly

19   for everybody.  It's an example.  The examples could be

20   multiplied across the parties.  It's the one that's freshest

21   in my mind but come on, give me a break.

22           All right.  So we do have a lot of motions and I'm

23   happy to hear from the parties on all of them as you see fit

24   to address it.   I think it may be useful to give you a sense

25   of where I'm starting from having read the voluminous

6

1   submissions to date and of course sat through I think eight

2   days of testimony over the summer.

3           There's little doubt in my mind based on the reports

4   I've seen and the submissions I've seen that the defendants

5   have impeded the fair litigation of this matter.  There is a

6   real problem in not complying with orders to disclose computer

7   and other materials.  I think must of the testimony that I

8   heard from defendants and people associated with them, such as

9   Mr. Nussbaum, was in any respects false and in some ways it --

10  the best I can assess it was deliberately so.

11          And that the net result is one that has very much

12  frustrated the fair litigation of the claims in this case and

13  has violated the explicit terms of the preliminary injunction.

14  That's where I'm starting from.  It may be that as we go

15  through the arguments today somebody is going to convince me

16  otherwise but I think it's fair for you to note that that's

17  the impression created by the record thus far.

18          So I'll hear from you on that and I'll have some

19  thoughts after I've heard from you about where we go from

20  here.  So with that, I'm happy to hear from you.  You've made

21  motions, you've made motions.  I don't particularly care who

22  goes first.  Anyone prefer?  Mr. Nelkin, go ahead.

23          MR. NELKIN: Your Honor, I think that the primary

24  motion has to do with the violations of the preliminary

25  injunction and the computers and the failure to comply with

1   this Court's orders and I think that we have come to a similar

2   conclusion for the one Your Honor just expressed, that the

3   evidence is overwhelming.  The testimony appears to, from the

4   plaintiff's perspective, to have been perjured.  Just the

5   overwhelming evidence here is one of document destruction,

6   [inaudible] evidence and failure to turn over devices that

7   contain relevant information.

8           I mean we can -- we've submitted our evidence but we

9   think that it's clear -- I think that from our perspective the

10  question is what really is the next step form this point and

11  we defer to Your Honor as to how he wants to approach it from

12  here.  I'm happy to run through our evidence again if that

13  would be helpful for --

14          THE COURT: I don't know it would necessarily be

15  helpful to run through at this stage stuff that's already in

16  the record but I --

17          MR. NELKIN: I'm happy to just quickly summarize a

18  couple of points.  I mean we think that the computers,

19  particularly office time and Sylvia computers were not

20  preserved.  We think the evidence shows that they were in

21  continuous use well beyond the time that they testified that

22  they were shut off and powered down.  We feel that the

23  documents show that each -- that we submitted the evidence

24  submitted shows that there was massive deletions and wiping

25  instances on those computers and that they took place at times

8

1   that are just absolutely mind boggling from the plaintiff's

2   perspective the day before the initial preliminary injunction

3   hearing right after the order is entered right before they

4   agreed to the entry of the preliminary injunction and then

5   during the hearing itself.

6          We also think that it's important to note all the

7   computers that are still missing we listed and [inaudible]

8   listed [inaudible] had specific names.  They're also the ones

9   that the plaintiff -- the defendants admit that they have.

10          Then we got evidence of things like the oil computer

11   where we've introduced documents that were found on them that

12   show that they absolutely contained highly relevant material.

13   We found evidence of laptops that are not there.  We found

14   other computing devices.

15          But then there are other instances that are really

16   troubling to the plaintiff beyond just the failure to turn

17   over documents and the spoilation of evidence.  Things like

18   the use of a credit card to run up charges for things like

19   their legal bills that have -- in the name of Two Rivers that

20   are expressly prohibited by the preliminary injunction.  We

21   found documents that show that they created Two River

22   [inaudible] and then had computing services canceled.  That's

23   one of the things that was in the record but may not have been

24   highlighted.  I think it's Docket 260-12.

25          And we have insurance claims that have been

9

1   submitted in Two Rivers name and perhaps in the plaintiff's

2   name as well.   Then the Launch system is not accessible and

3   [inaudible] talked about how we had no access to the server

4   and the reliability of information.

5          So I think all those types of things are both

6   troubling and they're ongoing issues.   There's also the issue

7   of they're engaged in competitive behavior that's hurtful and

8   in violation of the injunction.   So we don't only have

9   problems with the -- they're impeding the case and destroying

10  evidence that's relevant and preventing us from having a fair

11  hearing but they're also engaged in activity that's

12  detrimental to Two Rivers and its credit and to its business.

13         So we have those issues that we would like to at

14  least have a framework for dealing with as well.

15         THE COURT: Would you like to be heard on the

16  defendant's side?

17         MR. SCHAFHAUSER: Thank you, Your Honor.   Paul

18  Schafhauser.   Thank you.

19         Let me start by saying these are serious allegations

20  and I take them very seriously and I will tell Your Honor that

21  as a lawyer this is not a situation that one relishes having

22  to address these allegations, period, full stop.   But it's --

23         THE COURT: In case it's --

24         MR. SCHAFHAUSER: But it's my job.

25         THE COURT: -- not clear I do not intend in any way

1    to suggest any, not even slight misconduct on the part of

2    counsel.  You're all representing clients and you're doing it

3    professionally.  There's a disturbing record here of what the

4    clients have done.

5         MR. SCHAFHAUSER: Well, I appreciate Your Honor's

6    comments but I -- as it's my duty I must address the record

7    and create the record with -- and I know I say this all the

8    time but with respect to what Your Honor's comments have been.

9         First of all, the -- again, I say this hesitatingly

10   because I have respect but I need to say that we respectfully

11   submit, Your Honor, that the procedure here has not been one

12   most respectfully that should allow a plaintiff who has not

13   presented a threshold showing of his right to proceed in the

14   name of Two Rivers and make assertions about one's coffee in

15   the name of Two Rivers and make assertions about documents in

16   the name of Two Rivers, hasn't made a threshold showing of

17   standing to assert either derivative or direct claims.

18        I won't dwell on that point.  I know Your Honor has

19   read or believe Your Honor has read my submission on that but

20   that's a point that I don't think should be lost at least from

21   our standpoint most respectfully.

22        In addition, I would respectfully submit to Your

23   Honor that the -- many of the matters that Your Honor heard

24   testimony on relate to pre-complaint allegations and

25   allegations of spoliation that are in the verified complaint

1  filed by plaintiff on December 2nd.  Those allegations I

2  respectfully submit are subject to the arbitration provisions,

3  at least as between Mr. Friedman and Mr. Schreiber.  They are

4  subject to arbitration provisions and those -- that argument

5  actually is pending before Judge Amon as to whether the matter

6  should proceed to arbitration.

7          What Judge Amon did direct with respect to the

8  evidentiary hearing that Your Honor conducted was that

9  although arbitration -- and I want to read the word.  Although

10 she held that arb -- the arbit -- the arbitrability of the

11 instant dispute is a threshold matter that must be determined

12 prior to other substantive issues.  She did direct that Your

13 Honor should conduct an evidentiary hearing albeit I

14 respectfully note that hearing was to be limited in scope and

15 was not to relate to pre-complaint matters except to the

16 extent necessary for Your Honor to understand violations of

17 existing orders.

18         With respect to some of the witnesses, one of them

19 pops into my mind.  Mr. Devine for instance.  Mr. Devine was

20 questioned almost exclusively about things that happened five,

21 ten, fifteen, twenty -- I think he was talking about 23 year

22 ago events at one point which I respectfully submit were

23 beyond the scope but the other thing and while we're talking

24 about Mr. Devine and a number of the witnesses, the plaintiff

25 filed a motion, Your Honor, seeking a number of forms of

1  relief which I respectfully submit turned out to have been

2  misplaced or unwarranted.  For instance, with respect to --

3  well, the easy one is Mr. Devine.  Your Honor heard the

4  testimony of Mr. Popper that Mr. Devine complied.  And yet Mr.

5  Devine's counsel was required to be here but I don't represent

6  Mr. Devine.  I only make that point in a broader context.

7        As to a Launch, which does relate to my client, as

8  to a Launch.  Again, most respectfully, I think the evidence,

9  Your Honor, presented in an uncontroverted fashion that Mr.

10  Friedman was unaware that Yassi Rogasnisky [Ph.] would turn

11  off Launch.  There's no evidence otherwise and Mr. Friedman so

12  testified but what happened thereafter is also telling, most

13  respectfully.

14        What happened thereafter --

15        THE COURT: There is much here that's telling, Mr.

16  Schafhauser, including the current argument.  Go ahead.

17        MR. SCHAFHAUSER: What happened -- thank you, Your

18  Honor.  What happened thereafter is that Your Honor directed

19  the parties -- I believe it was on -- at the conclusion of the

20  hearing on July 8th Your Honor called us all forward and

21  directed the parties to confer to try to get Launch up and

22  running again.

23        It was Mr. Friedman who made a payment to Rogasnisky

24  and a Launch is up and running.  So there was an effort I'm

25  suggesting to Your Honor most respectfully, if there was a

1    violation there was an effort to cure the violation.  We don't

2    believe that there was a violation for the reasons I've

3    already articulated.  This was Yassi Rogasnisky, not Mr.

4    Friedman, but if there was a violation Launch is back.

5              By the way, just because I didn't want to be

6    surprised I actually asked K2 this morning to confirm that the

7    same functionality that was described in K2's report on

8    December 14th with respect to Launch still exists and I'm told

9    that that same functionality with Launch is in fact in effect

10   today.

11             To move on.  The other issue, Your Honor, that I

12   would like to present kind of as a threshold issue is that

13   when we are speaking about discovery I respectfully submit

14   that the orders that were entered required both sides to

15   proceed in discovery.  In fact, Your Honor entered an order on

16   February 2nd directing that the parties proceed with

17   discovery.  I vividly recall it.  I was arguing the contrary

18   as we all remember.  But Your Honor ruled as Your Honor did

19   and then that matter was appealed and we all recall what

20   happened.

21             Judge Amon on March 9 modified the order but

22   nonetheless stated that as to document production discovery

23   should proceed as to both sides.  That was on I believe it was

24   March 9.  It's now October 13th and plaintiff has yet to

25   produce a single document in this case.

14

1          At the same time when plaintiff answered the

2  document production requests this is what plaintiff said about

3  electronically stored information.   In other words, ESI of the

4  kind that plaintiff now complains about.   This is general

5  objection 21.   It's in the record.   Plaintiff objects to each

6  and every request, definition and instruction to the extent

7  that it requires a collection, searching, identification or

8  production of electronically stored information without any

9  reasonable limitation on the collection, searching,

10  identification or production of electronically stored

11  information on the grounds that it is overly broad, vague,

12  ambiguous, and also to the extent that it seeks information

13  which is irrelevant or immaterial to the issues in this action

14  and/or which are not reasonably calculated to lead to the

15  discovery of admissible evidence.

16          Then there's another objection that it would be

17  unduly burdensome, would require plaintiff to spend an undue

18  length of time and incur expenses not commensurate with the

19  defendant's discovery needs and is beyond the scope and

20  obligations imposed by th Federal Rules of Civil Procedure. I

21  can go on.   Your Honor gets the point.

22          The point, most respectfully, is that plaintiff

23  on -- months ago objected that it need not produce ESI because

24  it was beyond the scope of the needs of this case that it was

25  irrelevant in large part and that it was not commensurate with

1  the scope and obligations imposed by the Federal Rules of

2  Civil Procedure.

3          Having not produced one document during discovery to

4  date plaintiff now stands before Your Honor and claims that

5  necessary discovery -- I think the claim is that necessary ESI

6  has been -- has been lost.  Has been spoiliated.  I don't know

7  how plaintiff, most respectfully, can possibly argue that

8  relevant information is unavailable, cannot be retrieved and

9  is unavailable when plaintiff himself has not produced any

10 discovery.  We don't know what the documents are that are

11 relevant, irrelevant, whether they're available in duplicate

12 form.  We haven't proceeded with discovery in the case.

13         So most respectfully I believe that plaintiff's

14 allegations are premature until discovery is completed

15 because, again, the discovery order that Judge Amon entered

16 apply to both sides.

17         Your Honor, I have laid out and again I did on

18 reflection submit a very lengthy, admittedly very lengthy 33

19 page brief.  In all candor to Your Honor, I did it because I

20 realize the seriousness of the allegations.  That's not an

21 excuse but I did want to lay out -- I did want to lay out the

22 position so that Your Honor has a full understanding of the

23 position.

24         I can go through what Your Honor has already but I

25 will simply respectfully note that the hearing before Your

1   Honor on the motions, both sides, as I understand it was not

2   concluded.  In fact, as I recall where it was left was that

3   Mr. Nelkin stated that he did not want to rest and that we

4   then had a colloquy on the last day of the hearing on August 5

5   as to whether we should have Steven Schreiber take the stand

6   that day or hold it in abeyance pending what has now occurred

7   but plaintiff has not yet rested, let alone defendants had an

8   opportunity to present their case.

9            Beyond that --

10           THE COURT: Would you enlighten me please about the

11  proffered evidence that you think I need to hear before I can

12  address any of these motions?

13           MR. SCHAFHAUSER: Sure.  Well, first of all,

14  plaintiff I believe was going to call --

15           THE COURT: I didn't ask about what you think the

16  plaintiff will call.  Please give me a proffer of the evidence

17  that you wish to adduce before you think I can properly

18  resolve any of the motions before me.

19           MR. SCHAFHAUSER: Sure.  The proffer is that as I

20  think I said in the couple of submissions, certainly Mr.

21  Friedman would --

22           THE COURT: Who's testified.

23           MR. SCHAFHAUSER: Would testify --

24           THE COURT: He's testified at length.

25           MR. SCHAFHAUSER: Yes, he has.  Yes, he has, Your

17

1  Honor.

2          THE COURT: Who else?

3          MR. SCHAFHAUSER: He would testify as to some of the

4  allegations that Your Honor heard about today.  For instance,

5  the credit card issue that --

6          THE COURT: He's testified at length.  Who else would

7  you --

8          MR. SCHAFHAUSER: Yes, he has, Your Honor.  And K2

9  Intelligence from whom Your Honor has seen a report.  By the

10  way, neither the report of K2 --

11          THE COURT: Who else, please?

12          MR. SCHAFHAUSER:  -- or Stroz is in evidence.

13          THE COURT: It's not in evidence.  It's in the

14  record.

15          MR. SCHAFHAUSER: And the --

16          THE COURT: Who else could you call, please?

17          MR. SCHAFHAUSER: And the other person and the timing

18  is terrific because I see his lawyer just entered the room.

19  The other person I would call in light of these allegations is

20  Mr. Nussbaum.

21          THE COURT: Who's also testified at length.  Okay.

22          MR. SCHAFHAUSER: Yes.  Those are the persons who

23  come immediately to mind, Your Honor, as the proffer.  I think

24  I so stated certainly with respect to Mr. Friedman in the

25  papers.

1            Let me go on.  In addition --

2            THE COURT: I'm sorry to interrupt.

3            MR. SCHAFHAUSER: Sure.

4            THE COURT: Just in terms of the fact that both Mr.

5    Friedman and Mr. Nussbaum have testified, they testified at

6    length as we all know.

7            MR. SCHAFHAUSER: They did.

8            THE COURT: And -- but not only that, I gave a lot of

9    leeway on cross-examination to points that weren't necessarily

10   responsive but in the interest of efficiency allowed you to,

11   and the defendants generally to develop things in support of

12   their positions and I think the record is quite clear that in

13   doing that you got the advantage of leading witnesses who you

14   would otherwise have been constrained to develop the same

15   evidence via non leading questions.

16           MR. SCHAFHAUSER: The answer is a resounding yes to

17   everything Your Honor just said.  Yes, Your Honor.  Your Honor

18   granted leeway and I was and remain appreciative that Your

19   Honor granted leeway.  Let me explain, however, that the

20   reason why I submit that those witnesses have relevant

21   evidence is that since we were last before Your Honor on

22   August 5 -- I get my dates mixed up.  I think it was August 5.

23   There's been a number of submissions and a number of

24   allegations that plaintiff has made which frankly had not been

25   before the Court on that date and it was -- it really was

19

1   directed to that -- those issues.

2   [Feedback on microphone.]

3         THE COURT: I'm sure there are any number of people

4   who haven't testified yet and some who have who could address

5   issues that [inaudible] of the post hearing submission.

6   Unquestionably.  The question presents itself and is whether I

7   can properly take action on a motion without hearing testimony

8   as to matters that are [inaudible] submissions without also

9   hearing testimony.  I don't know that I'm constrained to act

10  only after hearing testimony on this but I understand your

11  point.

12        MR. SCHAFHAUSER: Thank you.  In that case I'll move

13  on.

14        The next point, Your Honor, and it really goes to

15  the standards for spoilation in this circuit and especially

16  with respect to electronically stored discovery which is

17  really what we're talking about in light of the Stroz

18  submissions.  They're all talking about ESI.  That's what

19  Stroz does.  That's what K2 does frankly as well.  They talk

20  about electronic discovery computer records and the like.

21        Your Honor of course is aware that the rules

22  regarding ESI Rule 37(e) were amended last year.  As I set

23  forth they took effect, ironically a day before, a day before

24  the case was filed.  For the reasons that I outlined again

25  admittedly at great length I don't believe that plaintiff most

1    respectfully has made the following showing which plaintiff

2    had the burden, the burden, Your Honor, of doing.  Plaintiff's

3    burden.

4            First of all, that with respect to the items, be it

5    a Launch, be it what is alleged that Mr. Nussbaum did on July

6    8th, be it on a number of these issues plaintiff has not

7    demonstrated that it was Mr. Friedman -- that it was Mr.

8    Friedman who either orchestrated or in fact knew about these

9    actions.  The evidence again, most respectfully in the record

10   is the opposite.  You have a declaration of Mr. Nussbaum who

11   states that he did not consult with anyone before doing

12   whatever he did or didn't do on July 8th.

13           With respect to Launch, we've already addressed

14   that.  The evidence is that Mr. Friedman was unaware that a

15   Launch would be, that Launch access would be interrupted and

16   when he became so aware it actually was restored and remains

17   restored.  So haven't proven that my client took the actions

18   at issue that my client had the sufficiently culpable state of

19   mind that the law in this circuit requires.

20           Further, the plaintiff which bears the burden on

21   this next point as well, has not proven that the materials in

22   question are -- would have been helpful to the plaintiff and

23   therefore legally irrelevant for purposes of a spoilation

24   [inaudible].  Not even Stroz in its various reports, in its

25   various submissions, not even Stroz identifies what it is that

21

1  it believes these files would have contained.  With respect to

2  a Launch --

3          THE COURT: You say with a tone of surprise in your

4  voice.  How would they know what's in a deleted file?  Isn't

5  that the whole point often of spoilation to prevent litigants

6  from knowing information?

7          MR. SCHAFHAUSER:  Yes.  The short answer yes, that

8  is the point.

9          THE COURT: [Inaudible] spoilation defeats any

10 efforts to sanction it because if it's effective enough so

11 that you can't show what's been destroyed.

12         MR. SCHAFHAUSER: Most respectfully, no.

13         THE COURT: You -- I get it.  Mr. Schafhauser, you

14 respect me as I respect you.  If you can go 30 seconds without

15 saying the word we might get through the afternoon sooner.

16         MR. SCHAFHAUSER: When I say no I try to -- I try to

17 qualify it, Your Honor, but the direct answer is no in my view

18 and now let me explain.  I'm trying, by the way, to answer

19 your questions very directly and then let me explain why I say

20 no.

21         I say no, Your Honor, because even in all the cases

22 of spoilation and Mr. Nelkin is a very thorough attorney and

23 he cited cases and I did too.  In all of the cases in the

24 Second Circuit particularly even in the case where documents

25 have been deleted there has to be a showing I believe under

1   the law in the Second Circuit that the deleted information was

2   relevant or would be helpful.

3            THE COURT: I get it.  I know what the standard is.

4   Also, let's not lose sight of the fact that there are sort of

5   two interrelated issues here.  One is spoilation and whether a

6   discovery sanction under Rule 37 is available and the other

7   which doesn't implicate the same standard is the defendant's

8   compliance with the preliminary injunction.

9            MR. SCHAFHAUSER: I understand.  I recognize that and

10  I --

11           THE COURT: And to the extent that there has been the

12  destruction, incapacitation of access to computerized records

13  that would also be in violation of the preliminary injunction.

14  So maybe you're losing sight of that fact.  I know if you plan

15  to get to it later but I'm not losing sight of that.

16           MR. SCHAFHAUSER: And I am not losing sight of it and

17  I am planning on getting to it.  I am focused at the moment on

18  the spoilation allegation.

19           THE COURT: Go ahead.

20           MR. SCHAFHAUSER: And just to continue the thought on

21  spoilation, Your Honor.  When I said Stroz before perhaps I

22  should have said it differently.  Plaintiff, not Stroz, but

23  plaintiff has not made the requisite showing of relevance most

24  respectfully.  Plaintiff has not shown not only that the

25  documents are relevant but that they would be irretrievable or

23

1    that they could not otherwise be accessible.  We haven't --

2    again, we haven't completed discovery and for all intents and

3    purposes document production hasn't even begun.  So plaintiff

4    hasn't made that showing and at this juncture most

5    respectfully cannot make that showing.

6            Now, Your Honor raised a point which I'd like to

7    address, and that is that there is spoilation and there's

8    violation of orders being alleged here.  Most respectfully --

9    there I go again.  I say most respectfully but --

10           THE COURT: It's a verbal tick.  I have my own.

11   Don't worry about it.

12           MR. SCHAFHAUSER: But with respect to Launch, the

13   preliminary injunction, Your Honor, does not anywhere mention

14   Launch Coffee so far as I can tell.  It does not mention the

15   Launch.

16           THE COURT: No, I'm sure the word lunch is not in

17   there.

18           MR. SCHAFHAUSER: And, Your Honor, the preliminary

19   injunction also does not provide that it is the duty of Emil

20   Friedman to fund ongoing vendors of Two Rivers Coffee.  I

21   don't believe that that is provided in the preliminary

22   injunction and that's really what we're talking about with

23   respect to Launch, that plaintiff came to this Court and said

24   Two Rivers needs Launch and access was interrupted.  It turns

25   out according to the evidence that was presented at the

24

1   hearing that there was a payment issue and the preliminary

2   injunction just as it didn't say that Mr. Friedman had to pay

3   for utilities, didn't have to pay for the electric bill going

4   into the future -- I don't think even the plaintiff says that.

5   I respectfully submit that Launch Coffee is no different.

6           There's another point which I must make, Your Honor,

7   with respect to Launch Coffee when we're talking about

8   sanctions as plaintiff here is.  And that is that Mr. Popper

9   essentially testified that except for historical records

10  relating to payroll he didn't even use or rely on the Launch

11  Coffee.  He had two systems that he used.  He used Quickbooks

12  and more recently Two Rivers has obtained the program by the

13  name of Flex.

14          So the Launch Coffee system, Your Honor, is one that

15  Two Rivers essentially didn't use, apparently didn't pay for

16  but in any event has now been restored.  The historical

17  payroll records that Mr. Popper speaks of they're there.

18  They're on the Launch.

19          In the same vein, Your Honor, I respectfully submit

20  with respect to plaintiff's allegation that all manner of

21  computers within the control of every defendant -- I think the

22  position is that nearly by virtue of the fact that the

23  defendants have a computer, those should have been identified

24  and produced.  I respectfully submit that's not what any order

25  entered by this Court says.

1          On December 14th, and the record I think indicates

2    that on December 14th Your Honor presided over an agreement of

3    the parties and that agreement related to Mr. Friedman, Ms.

4    Rivera and Ms. Ezell.  It did not relate to all of the

5    corporate defendants.  It did not relate to anything other

6    than what the transcript of that agreement on December 14th

7    states.  So, most respectfully, I don't believe that plaintiff

8    can make a showing as it's his burden of proving that a clear

9    and unambiguous order of this Court was violated because

10   Michael Devine or Jack Ahearn or Office Coffee Services or any

11   number of persons affiliated with defendants in this case

12   didn't produce their computing devices.  I don't believe that

13   that is clear.

14          THE COURT: I'm struggling to remember the specifics.

15   Perhaps you can refresh my recollection.  But didn't I enter a

16   subsequent order after we had colloquy in this courtroom about

17   the differing understandings of the prior order?

18          MR. SCHAFHAUSER: Your Honor, absolutely -- yes.

19          THE COURT: That's significantly [inaudible].  I

20   don't recall you addressing that in your letter.

21          MR. SCHAFHAUSER: Yes.  Your Honor absolutely did

22   enter an order and --

23          THE COURT: Are you saying that that order did not

24   cover all the devices that Stroz refers to?

25          MR. SCHAFHAUSER: I am not saying that.  I am --

26

1          THE COURT: Have they been turned over?

2          MR. SCHAFHAUSER: I am --

3          THE COURT: Have they been turned over, sir, the ones

4   that Stroz said they're missing that are the subject of my

5   later order?

6          MR. SCHAFHAUSER: Those have -- some have been turned

7   over and some --

8          THE COURT: Have they all been turned over, sir?

9          MR. SCHAFHAUSER: The answer is not but --

10          THE COURT: When will they be turned over?

11          MR. SCHAFHAUSER: May I explain --

12          THE COURT: When will they be turned over?

13          MR. SCHAFHAUSER:  May I explain why?

14          THE COURT: After you tell me when they will be

15   turned over.

16          MR. SCHAFHAUSER: Your Honor, they will be turned

17   over if an order is entered directing that they be turned

18   over.  Your Honor --

19          THE COURT: I had entered such an order.  So why

20   don't you do it tomorrow?

21          MR. SCHAFHAUSER: Your Honor has not entered --

22   that's what I'm trying to --

23          THE COURT: Oh my goodness.

24          MR. SCHAFHAUSER: That's what I'm trying to tell Your

25   Honor.

27

1          THE COURT: And I'm trying to tell you that I did.

2          MR. SCHAFHAUSER: Your Honor, I have -- I have it.

3          THE COURT: All right.  I'm entering the order now.

4    We'll talk about timing at the end of your argument.  Go

5    ahead, please.

6          MR. SCHAFHAUSER: Your Honor, may I at least present

7    the order that was entered?

8          THE COURT: I will take your representation that in

9    your understanding it was not part of my order.  It was an

10   oversight.  Certainly under the circumstances presented after

11   reading the competing reports even if not an oversight

12   additional steps are appropriate.

13         MR. SCHAFHAUSER: May I --

14         THE COURT: So I don't know that reading the order --

15   but go ahead.  Knock yourself out reading the order.

16         MR. SCHAFHAUSER: Thank you.

17         THE COURT: Please.

18         MR. SCHAFHAUSER: This is what Your Honor ordered

19   on -- and I have it here.  These are docket entries and I have

20   the docket.  There were actually two docket entries to be

21   clear.  The first was on April 14 shortly after plaintiff

22   filed his original motion.  Your Honor said "Defendants

23   Friedman, Ezell, Rivera and Salcedo," those are the defendants

24   that Your Honor -- "Defendants Friedman, Ezell, Rivera and

25   Salcedo are respectfully directed to respond to plaintiff's

28

1   motion, Docket Entry so and so by April 19th.  In submitting

2   their responses defendants Friedman, Ezell, Rivera and Salcedo

3   shall each include an affidavit identifying in detail all

4   computer devices in his or her possession, custody or control,

5   the current location of each such device and a statement as to

6   whether each such device has ever been used in any way in

7   relation to the business of Two Rivers Coffee."

8            So that order, Your Honor, that order was directed

9   to four individual persons and that order said that affidavits

10  be submitted to identify computers.

11           Then Your Honor entered an order on May 9 --

12           MR. NELKIN: Your Honor, I think that the order that

13  you're talking about is --

14           MR. SCHAFHAUSER: Well, I --

15           MR. NELKIN:  -- 266 on August 5th.

16           THE COURT: Please don't interrupt.

17           MR. SCHAFHAUSER: Well, then Your Honor entered an

18  order on May 9 in which Your Honor stated that Your Honor

19  would hold an evidentiary hearing and then you say, and I

20  quote "I clarified my earlier order requiring the defendants

21  to provide affidavits concerning computers used in relation to

22  the business of Two Rivers to correct the misimpression that

23  it has excluded iPhones, iPads or other electronic devices

24  capable of sending or receiving communications or storing

25  information.  All affiants shall promptly file supplemental

29

1    affidavits accordingly."

2           So that order, most respectfully, also did not

3    require the turn over of --

4           THE COURT: I don't think in response you've had all

5    of them identified even.  Certainly there are a number that

6    Stroz reports about that haven't been identified and I don't

7    know if you're relying on well, this is a computer that

8    belongs not to one of the individual defendants but to one of

9    the corporate defendants.  Is that the basis of not

10   identifying them?

11          MR. SCHAFHAUSER: No, that's not the basis because

12   what actually occurred is that there were a number of

13   affidavits.  I think Ms. Ezell filed an affidavit and Ms.

14   Rivera filed an affidavit and Mr. Salcedo filed an affidavit.

15   Mr. Friedman filed an affidavit and then Your Honor remembers

16   Mr. Nussbaum filed an affidavit and Mr. Nussbaum's affidavit

17   went through all of the computers in the Bronx and Brooklyn

18   locations even though they're really not Mr. Friedman's

19   personal computer.  So I did not -- we did not make that

20   distinction, Your Honor.  Mr. Nussbaum laid out -- I don't

21   remember how many computers were in the affidavit but there

22   were a number of them.

23          THE COURT: Look, it sounds like there's a fair

24   reading of the orders that would require all of them to be

25   turned over.  We'll correct that at the end of the day.  Go

1   ahead.

2           MR. SCHAFHAUSER: Again, just to -- if I may just

3   address that issue, Your Honor.  The orders that Your Honor

4   entered, most respectfully, talk about turning over -- and

5   actually this was stipulated at the -- during the hearing.

6   Talked about turning over four computers which in fact were

7   turned over.

8           THE COURT: I know those four were turned over.

9   Look, there's clear evidence that Stroz reports -- and I read

10  K2.  At some point you have to be guided by one or another if

11  there's a dispute.  But it does appear that there are quite a

12  number of computers that have not been made available that

13  have Two Rivers information on them that weren't revealed,

14  much less turned over.

15          So in order for there to be a fair resolution of

16  this matter you have to have additional devices turned over

17  [inaudible].

18          MR. SCHAFHAUSER: May I move on although I must -- I

19  do wish -- I must object to that, Your Honor, because again I

20  must object insofar as plaintiff in our view has not made the

21  requisite showing that these devices contain Two Rivers

22  information that's unique or that under the standards that

23  govern imaging, and we cited case law, warrants wholesale

24  imaging of entire computers.

25          THE COURT: Go ahead.

1          MR. SCHAFHAUSER: Thank you.  I will move on having

2    noted so.

3          Your Honor, we then come to the issue that Mr.

4    Nelkin raised which is if Your Honor finds, and I think I

5    heard Your Honor's views clearly at the outset, if Your Honor

6    were to find a violation what would the appropriate remedy be.

7    Again, for the reasons I've already stated at length in the

8    papers and today in all of my submissions I submit that

9    there's been no violation but -- no intentional spoilation, no

10   violation intentionally.

11         But what would the remedy be appropriate under the

12   circumstances?  In a case like this, Your Honor, where there's

13   been no showing -- there's been no production of documents

14   that would even allow a showing that anything material and

15   irretrievable has been lost.  I respectfully submit that

16   sanctions of the kind that plaintiff is talking about in its

17   papers is -- are unwarranted.

18         Plaintiff cites a number of cases, one of which is

19   the Gutman v. Klein case.  In the Gutman v. Klein case though

20   that case had gone over for a very long time.  In that case

21   prior sanctions had been imposed that did not have effect and

22   in that case an employee was alleged to have taken action at

23   the direction, at the specific direction of the principal.  I

24   respectfully submit that Your Honor does not have evidence

25   that these actions were done by Mr. Friedman or an employee of

32

1  Mr. Friedman.

2          What we're hearing about, what we heard about during

3  the hearing was someone in Israel, Yassi Rogasnisky, who did

4  what he did with respect to an application that he believes

5  was propriety to him and he took actions that he took.

6          Then you have Mr. Nussbaum who is not an employee

7  and who was not acting at the direction of my client when he

8  accessed computers on July 8th.  That's what he himself said

9  in his declaration and there's been no showing to the contrary

10  by the plaintiff.

11          So for all of those reasons, Your Honor, I

12  respectfully submit that the motion should be denied.

13  Plaintiff's -- actually there are two motions.  One is a

14  motion to compel and the second is the motion for sanctions.

15  There's been no showing of a need for the evidence that

16  plaintiff claims and plaintiff himself hasn't given any

17  discovery to date.  To the contrary, what I'd respectfully

18  submit should happen is that plaintiff should happen is that

19  plaintiff should be directed to produce the discovery that he

20  has yet to produce and by the way, this failing also happened

21  during the hearing.  I served a subpoena on plaintiff for

22  document production during the hearing.  That subpoena

23  resulted in no documents being produced as well.

24          So even during the eight days of testimony we at

25  this side of the table had no documents from plaintiff except

1   only for the documents that plaintiff through counsel

2   [inaudible] to give us shortly before they were being put in

3   the record or put on PACER.  Other than that, the defendants

4   had no documents, no discovery before this hearing from

5   plaintiff, no deposition from plaintiff, nothing of the kind.

6           So what should happen, Your Honor, most

7   respectfully, is that plaintiff should be required to produce

8   the discovery that has been due and owing since -- frankly,

9   since February 2nd when plaintiff identified more than 15,000

10  documents in his custody, possession and control that have yet

11  been turned over and Your Honor should deny the motions for

12  sanctions and the motion to compel.  Plaintiff has not made

13  his threshold showing of standing or under the law in this

14  circuit with respect to spoilation and the Court most

15  respectfully should hold this proceeding in abeyance pending

16  Judge Amon's determinations regarding the motion for

17  arbitration.  Thank you, Your Honor.

18          THE COURT: Would anyone else like to be heard?  Mr.

19  Grantz?

20          MR. GRANTZ: Thank you, Your Honor.  I'll be brief.

21  My concern is that the defendants have been [inaudible] and

22  while we understand that Mr. Friedman has controlling interest

23  in some companies he doesn't have controlling interest in all

24  the companies that I represent and my firm represents.

25          The issues have been basically argued that all of

34

1  the defendants have spoiliated, all of the defendants have

2  violated the preliminary injunction but the record doesn't

3  support that.  When we last left here on August 5th Your Honor

4  suspended the hearing with the intention of entertaining -- I

5  don't recall if it was motions.  Your Honor asked for the

6  plaintiff to put forth a letter describing what they were

7  looking for with the intention of coming back and conducting

8  the balance of the hearing and then completing post judgment

9  briefing following the balance of the hearing as to the legal

10  issues that were being presented.

11          I don't think that that has been completed at this

12  point and I appreciate that there's motions pending and that

13  Your Honor needs to decide those motions.  There's a lot of

14  them.

15          What I'm arguing is to make a determination about a

16  violation of a preliminary injunction or spoilation as to the

17  oil and trucking defendants or as to the E&J defendants is

18  simply premature at this time.  You need to complete the

19  hearing, hear the balance of the testimony from the plaintiff,

20  hear what Stroz has to say on the record so that their

21  evidence is submitted and we have an opportunity to cross-

22  examine those experts, have K2 present their evidence and have

23  them cross-examine so that you can make a full determination.

24  I'm not suggesting that you prejudge this but you did come out

25  and say that you've already heard a lot of testimony and this

1  s where you're headed.  So my concern is that you're headed in

2  a direction without hearing all the information, without a

3  full record on those issues.

4         THE COURT: Just so it's clear, I don't think you're

5  suggesting otherwise but maybe shading what I said in a way

6  that might create a misimpression, for the convenience of

7  counsel in framing arguments I told you the impression that's

8  been created thus far.  I made it very clear that I had an

9  open mind to what remains to come.  So to the extent that you

10 are concerned about prejudging, not in the slightest.  But I

11 assess what I hear as it comes in and since we are at this

12 point where we have a pause in the hearing I'm sure you all

13 have your own views about what the evidence has shown to date.

14 In fact, I'm getting the benefit of some of those views today

15 and in the letter [inaudible].

16        If you don't want me to tell you these things as we

17 go along I won't.

18        MR. GRANTZ: Your Honor --

19        THE COURT: But I certainly won't do it if it's going

20 to be characterized in a way it might, not that you intend it

21 to be misleading.  I'm sure you don't but that might on a cold

22 reading of the record be misunderstood.

23        MR. GRANTZ: I didn't intend to mischaracterize.  I

24 didn't intend to mischaracterize what you said earlier.

25        THE COURT: Okay.

1          MR. GRANTZ: And I was not suggesting in any way that

2    you did prejudge itl.   I was concerned about as it implicates

3    my clients, not that the prejudging has occurred but that we

4    wouldn't be completing what needed to be completed and I

5    wanted to make it clear that we believe that any decision on

6    what has now been framed as a motion for sanctions as opposed

7    to an evidentiary hearing that was going to determine whether

8    there's been violations of the preliminary injunction, that's

9    premature.   That's my position, that you shouldn't be making

10   that determination on this motion for sanctions.   You should

11   conduct the balance of the hearing, allow us to submit post

12   judgment, post -- excuse me, post hearing briefing as you

13   initially intended and told us we would be doing.   After the

14   hearings were completed you were going to ask us not to

15   conclude by making closing statements but you were asking for

16   post judgment briefing on the law.

17          So I would ask that that opportunity be had

18   specifically because my clients I don't believe in the record

19   have been implicated in any spoilation and I don't believe

20   they've been implicated in any violations of the preliminary

21   injunction.   So I want that opportunity to write the Court,

22   make that record and present to you what's been presented in

23   the testimony.   So that is what I'm raising for Your Honor and

24   I didn't intend to suggest that you prejudged the

25   determination of the outcome of this.

1        THE COURT: I didn't infer that from your use of the

2   word prejudge in your arguments but others might misunderstand

3   you when you say prejudge.  So I just wanted to make a clearer

4   record.

5        Anything else?

6        MR. GRANTZ: I will defer to Your Honor when you

7   address the issue of turning over computers later because Your

8   Honor said you would take that up later in the middle of Mr.

9   Schafhauser's argument and I think that that's an issue that

10  is an issue related to remedies or relief that doesn't --

11  didn't necessarily need to be argued about in the context of

12  his arguments.

13        The motions that are pending I think that some of

14  those motions have been outstanding for quite some time and

15  need to be resolved before we go forward with further hearing

16  if that's what we intend to do and -- so that we have an

17  understanding of what it is that we're dealing with in the

18  going forward hearing.  We started off with a motion.  It was

19  converted into a hearing about preliminary injunction

20  violations and then ultimately it was further converted into

21  that there were actual spoilation attempts [inaudible] the

22  hearing period and I don't think that that has been fully

23  briefed or addressed and I think it needs to be.

24        THE COURT: Thank you.

25        MR. GRANTZ: Thank you, Your Honor.

38

1          THE COURT: Anyone else?  No?

2          MR. BERGSON:  Your Honor, Rob Bergson.  I'm

3    representing Geoffrey Hersko and we haven't heard that much

4    from me during the course of these proceedings and there's

5    good reason for that.  The motion to compel for violation of

6    the preliminary injunction was never directed at my client.

7    In eight days of testimony I think my client's name was

8    mentioned no more than twice.  There has been zero evidence

9    that my client violated the preliminary injunction.  Certainly

10   no basis for sanctions and I understand that in the interest

11   of moving this along many times Your Honor has referred to

12   defendants in the plural.  I would think that that does not

13   apply to my client because certainly there is no evidence to

14   support any claim against my client.

15          I would ask the Court to just clarify that when you

16   say defendants you don't necessarily include every single

17   defendant.

18          THE COURT: There are certainly occasions in which

19   I've used the collective noun without having in mind each

20   specific defendant.  I don't think that goes as far as you

21   were hoping.   I don't mean it to but that's as far as I'll

22   go.

23          MR. BERGSON: Well, certainly, Your Honor, if there

24   has been any evidence that you've seen with respect to Mr.

25   Hertzog I would like to know that.

39

1          THE COURT: I'm sure you will at some point.  Anyone

2   else?

3          MR. HELLER:  Your Honor, I would just, without

4   getting into the specifics, join in what --

5          THE CLERK:  Your name?

6          THE COURT:  Mr. Heller.

7          MR. HELLER:  Maurice Heller.  I'm sorry.  Without

8   getting into the specifics, what Mr. Schafhauser and Mr.

9   Grantz talked about regarding other defendants that should not

10  be within a rubric of defendants in total, my clients fall

11  into that category in the same way that the oil company

12  defendants and the trucking company defendants do.  Mr.

13  Friedman is only a minority member of the coffee company

14  defendants.  Mr. Birnbaum is an individual.  And nothing has

15  been heard during the course of this hearing about Mr.

16  Birnbaum.  So none of this should be applying to my clients.

17         But I just want to add something because Mr. Nelkin

18  mentioned during his opening that there's certain competitive

19  behavior going on that is in violation of the preliminary

20  injunction.  I believe that's addressed to my clients.  My

21  clients have been doing what they have been doing in their

22  business for the last four years and what kind of aggravated

23  the situation and what may have brought us to here is that Two

24  Rivers decided to get into competition with my client.  Now

25  what they're saying is my client should be prohibited from

1  competing with Two Rivers because it's harming Two Rivers.

2  Now, the same logic can be applied to defending this case were

3  asserting a counterclaim.  So that's a ridiculous argument,

4  Your Honor, with all due respect, and it should be dismissed

5  as such.

6              THE COURT:  Thank you.  Anyone else?

7              MR. SMITH:  Your Honor, Michael Smith for Michael

8  Devine.  I'll simply say that the record does not contain any

9  acts of spoliation or obstruction or violation of a court

10  order by Mr. Devine and that none has been identified by Mr.

11  Nelkin.

12             THE COURT:  Mr. Finkel, I think you're the only one

13  I haven't heard from.

14             MR. FINKEL:  Your Honor, I would just join in the

15  remarks that were made by Mr. Schafhauser [inaudible].

16             THE COURT:  All right.  Thank you all.  And do you

17  wish to respond?

18             MR. NELKIN:  Yes, Your Honor.  First, just at the

19  outset, I think that docket entry 266 is relevant to the issue

20  because it says that no later than August 22, 2016 based on

21  the information received from -- I'm sorry, I'm reading the

22  wrong line.  If possible, produce for imaging each computer or

23  storage device identified in the August 5, 2016 Stroz report.

24  So we think that there was a clear instruction on that point

25  that postdates the two orders that Mr. Schafhauser was talking

41

1    about.

2            We also think that they raised a number of points

3    about the procedural posture of this case and also about

4    whether people like Mr. Nussbaum were -- their acts or their

5    state of mind can be imputed to the defendant.  Mr. Nussbaum

6    in the affidavit where he testifies about tampering with the

7    computers on July 8 says that he did it in preparation for his

8    testimony.  He also testified that he was testifying on behalf

9    of all the corporate defendants including Mr. Birnbaum's

10   clients but also the oil and trucking defendants and Mr.

11   Friedman's.  They designated him as their agent.  He testified

12   the reason he went into those computers was to prepare for his

13   testimony.  We think that the case law is clear, and we'd be

14   happy to either cite cases now or submit to you, that an

15   agent's state of mind is imputed to the principal and also we

16   cited a number of cases that have to do with an agent's

17   spoliation is imputed to the principal.

18           With respect to whether or not the plaintiff has

19   standing to bring this case, we think that New Jersey law is

20   clear.  None of the cases that were cited in the briefing

21   predate the new New Jersey statute on derivative actions.  But

22   even the citation to it represents -- I believe the argument

23   boils down to the fact that plaintiff didn't exercise -- had

24   claimed that it would be futile to make a demand on all of the

25   -- on Two Rivers to bring it.  Mr. Friedman has repeatedly

42

1  stated that no one can bring an action -- he's filed things

2  saying plaintiff can't hire us.  We think it's clear that that

3  would have been a futile act, and to the extent that that's

4  the sole reason that he feels that we don't have standing, we

5  think that that is misplaced.

6          To the extent that there's a discussion about

7  whether or not the affidavit that was submitted by Stroz,

8  Kevin Faulkner, is in evidence, we think that the case law is

9  clear that a sworn affidavit is admissible evidence, it is

10  under penalty of perjury.  We would note that to the extent

11  that they're arguing that somehow it's not admissible, then

12  the K2 report would have the same defects that any earlier

13  materials would have.

14          With respect to Mr. Heller's statement about how the

15  argument that somehow it was a ridiculous argument because

16  injuring Two Rivers could be claimed by filing a claim or

17  counterclaim, we think the preliminary injunction that was

18  consented to makes it clear that while they can't harm Two

19  Rivers in any way or take any action that would impact its

20  business and that was agreed to on consent, that it does have

21  a carve out for filing counterclaims.  And so therefore,

22  that's a false distinction based on the injunction that they

23  agreed to.

24          With respect to whether this hearing is to continue,

25  we would just note that we think that while they have a right

43

1   to be heard, that there's not necessarily a right to an

2   evidentiary hearing on the matter.  To the extent that they're

3   arguing that we're talking about pre-complaint filing

4   spoliation, the documents and our evidence talk about

5   extensive post filing spoliation.  The day before the

6   preliminary injunction after the TRO was entered, right after

7   the December 14th order was entered, repeated violations

8   throughout the course of the next couple of months, and then

9   the final ones on July 6th and July 8, 2016 during this very

10  hearing where Stroz has found evidence of things like ABG

11  Shredder taking out 10,000 files on July 6th and other things

12  of that sort.

13          With respect to burden and whether Mr. Friedman had

14  knowledge, we think the record is clear that Mr. Friedman was

15  in control of [indiscernible].  We think that the record is

16  also clear that Mr. Friedman himself engaged in a number of

17  acts of spoliation.  To the extent that the argument that the

18  Goodman case took place over a long period of time, the

19  Goodman case makes it very clear that the only --

20          THE COURT:  Sorry, you said the Goodman case?

21          MR. NELKIN:  Goodman case.  That the only proper

22  remedy in a case of this sort when there's computer spoliation

23  and wiping of hard drives is a default judgment.  It also

24  makes it clear that it's not the plaintiff's burden to have to

25  try to figure out what the documents were wiped and made

44

1    irretrievable, and we submitted evidence noting that file

2    wiping software that they utilized claims that it is designed

3    to make things permanently irretrievable and not able to be

4    recovered.

5           We would also note that they violated the TRO and it

6    wasn't just the preliminary injunction, that there was

7    spoliation that took place in between the entry of the TRO.

8    They want to talk about the launch computer system as if

9    that's the only spoliation.  They ignore the fact that on the

10   computers that Stroz analyzed that there was wiping of

11   programs related to the launch system on those computers and

12   dates like July 6th and 8th, QuickBook files, backup files,

13   there were files related to 26 Flavors, so those companies are

14   implicated.

15          We would also note that there were other -- the

16   testimony with respect to whether or not the individual people

17   who were doing -- involved with these computers or who had

18   control of these computers, the testimony was so vague on that

19   point with respect to the defendants being able to explain who

20   they work for or who they were investors in who they were

21   officers in makes it impossible for the defendants to argue

22   that they're not all one entity.  And Mr. Friedman even

23   testified that there was really just one oil company.  He

24   controls 24 Hour Oil and he controls all of the variations of

25   that.  He controls all of the employees such as Sylvia Ezell

45

1    and Sonia Rivera.  And the testimony also made it clear that

2    those people worked on behalf of each of those companies.  And

3    to the extent that Sylvia or Sonia testified that they're

4    overwriting files on a daily basis, they're doing that on

5    behalf of each of the defendants that they work for and they

6    testified they work for all of them.  So along with them and

7    Nussbaum, you have all of the corporate defendants and people

8    like Friedman and Birnbaum who control them who are all tied

9    together in this spoliation.

10         And we have also alleged a conspiracy.  And while

11   Judge Amon allowed us to go and do investigation into that, we

12   would note that the defendants refused to turn over any of the

13   documents relating to that.  Mr. Schafhauser talks about

14   subpoenas that we failed to respond to but we actually have a

15   motion on file seeking to compel his responses to our subpoena

16   on a number of fronts.

17         We also have a situation where the defendants are

18   not turning over computers that are specifically identified in

19   name, computers that they admit to utilizing, and they've

20   testified that they continue to overwrite those files and

21   spoliate them.  So there's clear evidence with respect to all

22   the defendants and all of the individual and corporate

23   defendants.  Mr. Devine did testify and we were able to show

24   that there were documents that he didn't turn over that he

25   only thought to turn over during the course of the hearing.

1   And we believe that there's evidence that suggests that

2   there's extensive additional documentation that has yet to be

3   turned over.  We believe that Mr. Hersko as well has failed to

4   turn over documents and is part of the overall conspiracy that

5   relates to all of the defendants.

6          We also note that the defendants have filed things

7   with this Court, motions and pleadings seeking to have the

8   discovery that they claim they need held in abeyance pending

9   the outcome of a number of proceedings.  They're now trying to

10  avoid those positions because they're seeking to avoid having

11  this Court impose some sort of appropriate sanction for their

12  misconduct and so they're trying to change their position mid

13  course.

14         We also would note that with respect to the

15  arbitration issue, the arbitration and Judge Amon's motion is

16  decided on a Rule 56 standard which is dependent on the

17  plaintiff's ability to have access to, and clear access, to

18  evidence.  And when you destroy the computers, the

19  bookkeepers, and you destroy the computers related to the key

20  companies and you refuse to turn over the evidence that

21  relates to whether you may have made a payment, an improper

22  payment to [inaudible] or whether you made an improper payment

23  to somewhere else, or whether you did anything to stall the

24  process, all the things that would be useful to Judge Amon

25  deciding those motions, those things implicate the overall

47

1   spoliation issue and also relate to the issue of whether or

2   not the plaintiffs are entitled to sanctions that would --

3   whether plaintiffs are entitled to sanctions that would result

4   in the defendants having those motions decided against them

5   because the implication is very clear that the plaintiffs were

6   entitled to evidence.  Judge Amon authorized evidence and

7   certain discovery in certain categories and also authorized

8   access to electronic information through the preliminary

9   injunction and through other orders that she issued as well as

10  this Court issued its own issues related to that.  Those

11  orders have all been violated and have deprived the plaintiff

12  of a fair opportunity to move forward.

13          We'd just note that this Court ordered the

14  computers, particular the Rivera computers, on July 6th to be

15  turned over by July 8th.  Then the Court issued a subsequent

16  order on July 7th that allowed the Ezell computer but not the

17  two Rivera computers to be delivered by July 11.  I believe

18  the defendants' position is now that the computers, which was

19  supposed to be made available to the plaintiff, Rivera

20  computers, by July 8th actually did not arrive in their offices

21  until sometime after close of business on July 8th which we

22  think would be a violation of the Court's order.  The reason

23  is is the time line allows them to explain Mr. Nussbaum's

24  spoliation of the computers on the late afternoon or middle

25  afternoon on July 8th and still allow for some time to get to

48

1    Mr. Schafhauser's office.

2              MR. SCHAFHAUSER:  Your Honor, may I respond?

3              THE COURT:  Very briefly.

4              MR. SCHAFHAUSER:  With respect to the order cited by

5    Mr. Nelkin at docket 266 which talks about produced for

6    imaging -- I'm sorry.  That says produce all known information

7    about, and if possible, produce for imaging each computer or

8    storage device identified in the August 5, 2006 Stroz report.

9    We in fact, the defendants in fact did address that order in

10   the submission on August 15, 2016.  And incidentally, with

11   respect to the storage devices in the Stroz report, K2

12   actually addressed those storage devices and pointed out that

13   many of those storage devices were in fact the USBs and

14   there's never been a response from Stroz as to that, but it

15   was addressed twice.  It was addressed in the August 15th

16   submission and every single computer identified in the August

17   5 Stroz report was in fact addressed as --

18             THE COURT:  But not turned over.

19             MR. SCHAFHAUSER:  Well, as was pointed out, all of

20   those in the custody, possession, control of the defendants

21   were in fact turned over.  Many of the, in fact, many of the

22   references in the August 5 Stroz report were to the computers

23   in question, and that was addressed.  So with respect to the

24   computers in the possession of my clients --

25             THE COURT:  I'm not sure I understand.  Are you

49

1   saying that every computer, every storage device, every one

2   listed in the Stroz report has already been turned over?

3           MR. SCHAFHAUSER:  What I'm saying is --

4           THE COURT:  You know, you can add so much.  What I'm

5   saying is -- no, no, I asked a question.  I'll understand the

6   answer if it's yes, I'll understand if it's no.  If you say

7   what I'm saying is something else, I'll have to ask the

8   question again.

9           MR. SCHAFHAUSER:  No, but I have to explain why

10  because --

11          THE COURT:  Well no, that's all I want to know.  I

12  thought you said everybody had been.  Now I understand you're

13  not saying that.

14          MR. SCHAFHAUSER:  No, no, but I have to explain why.

15  The answer is no most directly because some of the storage

16  devices listed in the Stroz report, as K2 pointed out a month

17  ago, either don't even exist or are actually false hits.  So I

18  can't turn over something that doesn't exist or that I don't

19  possess.  But --

20          THE COURT:  Very well.  I understand.

21          MR. SCHAFHAUSER:  So the answer is no -- I'm sorry.

22          THE COURT:  I understand.

23          MR. SCHAFHAUSER:  Thank you.

24          THE COURT:  I will be at somewhat of a loss to

25  determine what to do if I'm not persuaded by K2.  You know,

1  Stroz is somewhat persuasive on these things.  I haven't had

2  the chance to hear cross examination of both the experts, so

3  I'm not reaching any final conclusion.  But I'm troubled by

4  the possibility that I've ordered things to be turned over and

5  they're just not being turned over.  I'm troubled by that.

6          MR. SCHAFHAUSER:  Well, I'm going to try to clarify

7  it this way.

8          THE COURT:  It's not inviting --

9          MR. SCHAFHAUSER:  What my clients have --

10          THE COURT:  It's not inviting colloquy.

11          MR. SCHAFHAUSER:  What my clients have --

12          THE COURT:  Is there something else you wanted to

13  argue?

14          MR. SCHAFHAUSER:  -- they've turned -- yes.  What my

15  clients have they've turned over.  Okay.

16          Next, the comment was made about a QuickBook backup

17  file that was referenced in the Stroz report.  That's exactly

18  the kind of item that I was referring to earlier.  If it's a

19  backup file, there's been no showing that it doesn't exist

20  elsewhere.  And it's QuickBooks.  Mr. Popper may have it.  We

21  just don't know --

22          THE COURT:  Does that relieve you of the obligation

23  to comply with an order to turn it over?

24          MR. SCHAFHAUSER:  The answer is no, I don't ever

25  minimize a court order and I won't today, Your Honor.

51

1          THE COURT:  No, but --

2          MR. SCHAFHAUSER:  I don't.

3          THE COURT:  I don't accuse you of minimizing a court

4    order.  I'm just trying to understand.  So what if it exists

5    elsewhere?  If you've been ordered to turn it over and you

6    think it exists elsewhere, does that excuse compliance?

7          MR. SCHAFHAUSER:  It doesn't.  Again, no.  I'm

8    giving you as direct an answer.  No, I'm not seeking to say

9    that an order should be ignored any time but what I'm saying -

10   -

11         THE COURT:  So the fact that the information may

12   exist elsewhere, or it may not, or it may exist in a different

13   form, entirely irrelevant.  So move on, please.

14         MR. SCHAFHAUSER:  It's not -- I believe it's not

15   irrelevant to the question of remedies, Your Honor, which is

16   what Mr. Nelkin was talking about.

17         THE COURT:  Once we get to the point where remedies

18   are properly being considered, I'm with you.

19         MR. SCHAFHAUSER:  Very well.

20         THE COURT:  And if you're prepared to have me get

21   there, it's not what I understood you to be saying, but I'm

22   prepared to do that if that's what you think.

23         MR. SCHAFHAUSER:  I will move on, Your Honor.

24         The imputation of Mr. Nussbaum's acts to Mr.

25   Friedman, it is absolutely correct that Mr. Friedman had a

52

1   relationship with Mr. Nussbaum.  Your Honor heard the

2   testimony, but he was also a consultant, he was an independent

3   contractor for Two Rivers, he was an independent contractor

4   for Twins.  He was an independent contractor for a number of

5   persons about whom Your Honor has heard testimony.  And what

6   is not correct --

7           THE COURT:  Just so I'm clear, is he not a

8   contractor or consultant for any of the defendants?  Is there

9   any corporate defendant for whom he does not have that

10  relationship?

11          MR. SCHAFHAUSER:  I don't know.  I can't speak to

12  every defendant but --

13          THE COURT:  Just go around the table if Mr. Nussbaum

14  has not served as a consultant or contractor for a corporate

15  defendant.  Please just let me know.

16          MR. SCHAFHAUSER:  But I wasn't seeking --

17          THE COURT:  I want to get the answers, please.

18  Anybody saying that?

19          MALE SPEAKER:  I think there's a few of my clients

20  that he was not --

21          THE COURT:  Was not.  Which ones?  Because he was

22  the 30(b)(6) for all of them, right?

23          MR. SCHAFHAUSER:  He was certainly the 30(b)(6) for

24  all of them.

25          THE COURT:  Okay.  Anybody else?

53

1          MR. SMITH:  Your Honor, I'm not aware of him being a

2   consultant for Mr. Devine but --

3          THE COURT:  For Mr. Devine's corporate practice --

4          MR. SMITH:  Well, he's an individual CPA so it would

5   be and the same.  I'm not distinguishing Mr. Devine --

6          THE COURT:  Well, was he a 30(b)(6) for the

7   practice?

8          MR. SMITH:  I don't believe he was.

9          THE COURT:  Okay.  I thought he was but the record

10  will --

11         MR. SMITH:  Mr. Nussbaum was the 30(b)(6)?  I don't

12  believe he was.

13         THE COURT:  Okay.  You know, there are details that

14  I don't keep in my head and I'll certainly go back to the

15  record for that.  Anyone else?

16         MR. BERGSON:  Your Honor, he's not a consultant for

17  Mr. Hersko and he's not testified.

18         THE COURT:  And was he serving as a 30(b)(6)?

19         MR. BERGSON:  No.

20         THE COURT:  Okay.  Go ahead.

21         MR. SCHAFHAUSER:  Thank you.  So yes, he was a

22  30(b)(6).  Yes, of course he was identified as a 30(b)(6).  My

23  point most respect -- there I go again.  My point, Your Honor,

24  is that when on July 8th he took upon himself to do whatever he

25  did without telling a soul, without telling Mr. Friedman or

54

1   anyone associated with Mr. Friedman, and that's what he

2   declared in his declaration.  He was not an agent, he was not

3   directed by any defendant.  And the defendants did not have a

4   culpable state of mind as to matters that they weren't even

5   aware of.

6           Now, with respect to the imputation cases that

7   plaintiff cites, all of those cases are, as I think I said the

8   other day in my submission, they're not from this circuit.

9   It's very telling that none of the -- not a single case from

10  this circuit who has been cited on imputation -- because

11  apparently plaintiff couldn't find such a case.

12          THE COURT:  Is the reasoning wrong in this case?

13          MR. SCHAFHAUSER:  Well, I would say that the

14  reasoning is based on vastly different facts in those cases.

15          THE COURT:  Is the reasoning incorrect?  You know, I

16  do ask a question having an understanding of what I'm trying

17  to find out.  Is the reasoning incorrect?

18          MR. SCHAFHAUSER:  Under the -- no, not under the

19  facts of those cases.

20          THE COURT:  Of course not.  Okay.

21          MR. SCHAFHAUSER:  No.

22          THE COURT:  Go ahead.

23          MR. SCHAFHAUSER:  But I submit that the facts of

24  this case are different, but no, not under the facts of those

25  cases.

55

1          THE COURT:  Fair enough.

2          MR. SCHAFHAUSER:  Futility.  I've --

3          THE COURT:  Because I'm simply not resolving the

4    issue that's before Judge Amon.  Just not before me.

5          MR. SCHAFHAUSER:  Very well.  My only point on

6    futility, Your Honor, not to argue it, is that it should be

7    addressed before plaintiff is accorded relief.  It should be

8    addressed whether by Judge Amon or by -- someone should

9    address that as a threshold issue before plaintiff is accorded

10   relief.

11         THE COURT:  Look, I so wholeheartedly disagree with

12   that.  There is a pending motion.  It'll be resolved.  But

13   unless and until it's resolved, I've got litigants here that

14   deserve to on all sides be treated fairly and to have

15   procedures work as they are intended to work without

16   obstruction, without spoliation.  And if a party that even

17   correctly believes it should not be in this court disregards

18   the rules of the court to engage in self-help, that's

19   sanctionable.  Now, if Judge Amon decides that the case

20   shouldn't be here, it won't be here and all this will become

21   moot.  But unless and until that happens, if I find that

22   there's been spoliation, contempt for a court order, I'll act

23   accordingly.  And the fact that a party thinks it shouldn't be

24   here in the first place is of no moment to that.  So go into

25   your next argument, please.

56

1          MR. SCHAFHAUSER:  Thank you, Your Honor.

2          The next argument, and actually it's not an argument

3 so much as to make a note, a verbal note, that in addition to

4 plaintiff's motions the defendant has motions pending.

5          THE COURT:  You've made that extremely clear.

6          MR. SCHAFHAUSER:  Thank you.

7          THE COURT:  I haven't forgotten it since the first

8 time you said it this afternoon or since the second time.

9          MR. SCHAFHAUSER:  Thank you.  Thank you, Your Honor.

10          THE COURT:  Anything else?

11          MR. SCHAFHAUSER:  I believe that's all we have.

12          THE COURT:  Okay.  Thank you.  All right.

13          MR. SCHAFHAUSER:  May I just confer?

14          THE COURT:  Yes, of course.

15                    [Pause in proceedings.]

16          MR. SCHAFHAUSER:  [Inaudible] cases on that point.

17          THE COURT:  No.

18          MR. SCHAFHAUSER:  Okay.  Thank you, Your Honor.  I

19 appreciate the opportunity.

20          THE COURT:  All right.  Thank you, all.  Look, this

21 will be unfortunately a little disorganized.  I'll do my best.

22 But to address some of the issues, some of them about

23 procedural aspects of where we stand, I will acknowledge that

24 procedurally what's going on here has been somewhat of a

25 moving target, and I understand the challenges that presents

1   for everybody here and for me as well.  And I've been doing my

2   best to keep up with what to my mind has been a metastasizing

3   problem of trying to find out if there's been compliance with

4   the preliminary injunction and then as that inquiry has gone

5   on, being told of what at first blush at least, and certainly

6   subject to litigation, appears to be efforts to undermine a

7   fair inquiry into the original issue of noncompliance with the

8   preliminary injunction.  So as the problem has magnified, or

9   appears to have magnified, the proceeding to address it has

10  also adapted.  And I understand it presents challenges for

11  everybody but I don't know that there is a realistic

12  alternative.  If in litigating one issue evidence is adduced

13  that a party is undermining the fair litigation of that issue

14  then that has to be addressed as well.  Frankly, the first

15  instance.

16          As to standing, and this is of a piece with the

17  issue of arbitrability, it's just not an issue before me.

18  There's a case pending.  If it's going to be dismissed, it

19  will be dismissed, but until it is, if it is, there's a

20  preliminary injunction in place.  Parties must comply with it.

21  There are discovery orders and other orders that are issued,

22  parties must comply with them.  If they don't, then there are

23  sanctions that are appropriate.  And that goes to the idea

24  also, Mr. Schafhauser mentioned, of the proceeding being

25  premature, that the spoliation complaint is premature until

58

1   discovery is complete.  I simply disagree.  I think if it

2   becomes clear at any point that a party is preventing all the

3   parties litigating on a level playing field, that can and

4   should be addressed as soon as it's recognized.

5          The other sort of [indiscernible] that I heard from

6   a number of the defendants today is a fair one that the

7   evidentiary hearing wasn't completed.  And we all know the

8   circumstances in which you suspended it and it was to address

9   the fact that it looked like, or at least there were reports

10  that as we're conducting the hearing the attempts to litigate

11  the issues are being undermined by Mr. Friedman's actions and

12  those of his associates, and that needs to be resolved.

13         So I think the way to approach this is to do the

14  following.  There are a number of devices that are mentioned

15  in the Stroz reports that have not yet been disclosed for

16  imaging that will help all of us understand better whether the

17  plaintiff can prove spoliation.  Therefore, I direct every one

18  of those devices to be turned over to Stroz for imaging.  Once

19  they've completed that, their report, and K2 has had an

20  opportunity to provide its views in response, we will complete

21  the hearing, but the hearing will be hearing from the experts.

22  Somebody wants to call other witnesses, I'll hear them, but

23  frankly, I think before we can consider anything else,

24  including a remedy if there's been spoliation, if there's been

25  a violation of the preliminary injunction, have to have a firm

1   handle on the issues that Stroz has been examining and the

2   lack of access to information has thus far prevented that.  So

3   I'm not going to decide on the resolution of the motion or the

4   remedies if the plaintiff's motions are granted until I've had

5   a chance to hear from the experts at Stroz and Kay Friedman

6   after those entities have fully examined all of the devices at

7   issue.  So all of the devices identified in their report and

8   including, so you don't get bogged down on the distinction

9   between the party and non-party, Mr. Nussbaum's devices,

10  because he freely admits.  Whether he is acting for himself or

11  for the benefit of others with their knowledge, explicit or

12  tacit, remains to be seen.  But that includes Mr. Nussbaum's

13  device that was used to delete files or otherwise interact

14  with the computers as mentioned in the Stroz report.  I'll

15  hear from you about the timing for these various steps.

16          In all other respects, I simply don't have

17  confidence based on what -- I haven't reached a final

18  conclusion about the merits of the motion for sanctions.  But

19  what has become quite clear to me is that the discovery

20  process in this case is unreliable and broken.  And until I

21  can understand and reach a final determination as to whether a

22  party should be sanctioned for interfering with that process,

23  I'm not going to let the problem grow further still by

24  continuing with a discovery process that isn't serving

25  anybody's interest.  I'm going to suspend discovery until the

60

1    motion for sanction is resolved.  On that basis, all of the

2    pending motions to compel documentary discovery are -- I don't

3    care if you want to call it stayed, held in abeyance, or

4    denied without prejudice to renew, although I think the latter

5    is the one that makes the most procedural sense.

6            I think will be in a better position to understand

7    where we're going with discovery once I've heard from the

8    experts and render a decision on the motion for sanctions.

9            There's one last issue that has been out there

10   subject of a number of letters back and forth that I meant to

11   address earlier and haven't, so it's a side issue today, but I

12   do want to address it before I forget.  There's been back and

13   forth about the extent to which Two Rivers Coffee as an entity

14   can retain counsel.  And you know, I'm not going to decide

15   today can or can't.  They're free to do so.  They're free to,

16   as far as I'm concerned, they're free to engage counsel of

17   their choosing.  Mr. Friedman is free to take such steps if

18   they do so as he believes are appropriate.  And if he does and

19   if Two Rivers, or any party, thinks that that's a violation of

20   his obligations under the preliminary injunction I'll

21   certainly take that up at the appropriate time.  But it may be

22   -- that's something I think would be premature.  I think until

23   Two Rivers has counsel and until Mr. Friedman does something,

24   if he ever does, to try and interfere with their ability to

25   run their business in ways that are manifestly necessary,

1    there's no issue for me to decide.

2              All right.  Let's talk about the timing.

3              MR. NELKIN:  Your Honor?

4              THE COURT:  Yes?

5              MR. NELKIN:  Before you do, I'm concerned that there

6    may be a gap in that there are a number of computers that the

7    defendants have identified as being in the possession of.

8    They've even told us, or the court, that they've scanned at

9    least -- or imaged at least one or two of them already.  I

10   would ask that whatever order covers not only computers and

11   computing devices named in the Stroz reports, but also any

12   that the defendants have themselves identified, or Mr.

13   Nussbaum has identified in their own affidavits.

14             THE COURT:  I didn't mean to leave anything else.

15   I'm trying as best I can to cover the waterfront of the

16   devices and storage media that are available to the

17   defendants.  There is -- the record is rife with evidence of

18   the interrelationship among all of the corporate entities and

19   individual defendants who are employed by them.  Individual

20   defendants, yes, who are employed by them.  It's fruitless to

21   try and rely on such distinctions as who is formerly an

22   employee of whom as the defendants seem not to have respected

23   those lines in conducting their businesses.  So the order is

24   intended to cover all of the identified devices, storage

25   media.

1          When, Mr. Schafhauser, would you -- and I'm happy to

2   hear from all of the defendants -- when would you like to have

3   until you need to comply with that?

4          MR. SCHAFHAUSER:  It'll be an enormous undertaking.

5   I wanted to be heard on the issue but Your Honor has ruled.

6          THE COURT:  I have ruled.

7          MR. SCHAFHAUSER:  So my prior statements are -- Your

8   Honor has ruled.  My clients object to the ruling but we'll

9   comply with the ruling as we understand it subject to any

10  right of appeal that my client may --

11         THE COURT:  Of course.

12         MR. SCHAFHAUSER:  -- wish to avail himself of.  Your

13  Honor, but it is an enormous undertaking.  It'll take time.

14  And I know some in this room are observing holidays next week,

15  so I would ask for ten days just --

16         MALE SPEAKER:  I think that's unrealistic.  I think

17  we need more time, but --

18         THE COURT:  Two weeks.

19         MALE SPEAKER:  -- I wanted to clarify, Judge.

20  You're talking about all the -- in addition to the devices and

21  the Stroz report you're talking about all the devices that

22  were identified --

23         THE COURT:  Look, every computer, every device

24  capable of storing electronic information including thumb

25  drives, you know, independent hard drives.  I'm simply not

63

1    technically savvy enough --

2              MALE SPEAKER:  Neither am I.  So I want to make sure

3    that we're clear because --

4              THE COURT:  But look, the --

5              MALE SPEAKER:  You're talking about personal

6    computers too?

7              THE COURT:  Yes, yes, because look, there is a lot

8    of evidence here of computers that have not been turned over

9    that are being used for the businesses of the defendants

10   contrary to assertions made in sworn affidavits.

11             MALE SPEAKER:  Thank you.

12             MR. BERGSON:  Your Honor, I need to clarify.  You're

13   not talking about Geoffrey Hersko's computers?  They have

14   never been in play here.

15             THE COURT:  I think that's fair.  I think Mr. Hersko

16   and Mr. --

17             MALE SPEAKER:  Devine?

18             THE COURT:  Sorry?

19             MALE SPEAKER:  Devine.

20             THE COURT:  Devine.  Well no, Devine -- I'm trying

21   to remember what the evidence was about Devine.

22             MR. SCHAFHAUSER:  You didn't order that to begin

23   with.  I mean when we started this process, Your Honor --

24             THE COURT:  No, fair enough.

25             MR. SCHAFHAUSER:  And I don't mean to stand up for

64

1    counsel but --

2              THE COURT:  You're doing it anyway and look --

3              MR. SCHAFHAUSER:  -- it's not here.

4              THE COURT:  -- it's not terribly surprising to me

5    that one --

6              MR. SCHAFHAUSER:  Sorry.

7              THE COURT:  No, it's not.  It's entirely consistent

8    with the way the case is being litigated.  Feel free to do it

9    because that's what's been going on.

10             MR. NELKIN:  If we could just talk about the Devine

11   computers just for one moment.  We can present evidence.  We

12   thought we had presented evidence.  We can certainly produce

13   more evidence that shows that Mr. Devine is principal in the

14   companies that --

15             THE COURT:  Look, I haven't heard anything about

16   Devine's computers.  Look, I'm talking about the corporate

17   entities, all the corporate entities that are represented

18   around the table.  Mr. Friedman, Ms. Ezell, Mr. Finkel's

19   clients, and I don't think Mr. Devine's computers were subject

20   to anything, nor Mr. Hersko's.

21             MR. NELKIN:  I agree with that, Your Honor.  I'm

22   just saying that we now evidence that Mr. Devine perjured

23   himself on the stand with respect to his relationship to all

24   of the companies.

25             THE COURT:  Be that as it may, phrase that so it

65

1    actually conveys no information, but look, regardless of

2    whether he perjured himself or not, that doesn't get to

3    whether any computer that he has is likely to have information

4    that should have been turned over pursuant to earlier orders.

5            MR. NELKIN:  I guess what I'm saying is with respect

6    to the preliminary injunction which gives us the right to

7    inspect and copy all computers that might have evidence and

8    electronic information we would at least like to avail

9    ourselves of that with respect to the Hersko and Devine

10   computers pursuant to the injunction.  And if we need to --

11           THE COURT:  You know, I'm not inviting the

12   litigation of new issues here.

13           MR. NELKIN:  I'm saying --

14           THE COURT:  I'm not going to require that now.

15           MALE SPEAKER:  Your Honor, just so I'm clear, you

16   want us to identify the corporate entities' computers?

17           THE COURT:  As opposed to what?  Look --

18           MR. HELLER:  Your Honor --

19           THE COURT:  -- what I'm trying not to do is give

20   somebody a reason to say well I didn't know that this computer

21   was covered.  So if you've got something in mind that you

22   think shouldn't be turned over, let's talk about it.

23           MR. HELLER:  Well, Your Honor, my client has 26

24   Flavors and OCS.  There are many computers that have

25   absolutely nothing to do with any issue in this litigation.

66

1          THE COURT:  I can't be confident about it.  I simply

2     can't.  Not after the testimony I've heard thus far.

3          MR. HELLER:  Well, I don't think any of the

4     testimony has implicated those computers.

5          THE COURT:  26 Flavors?

6          MR. HELLER:  Absolutely.

7          THE COURT:  As a Friedman related entity?

8          MR. HELLER:  Well no, maybe a Friedman related

9     entity.  It doesn't mean he participated or used those

10    computers or had anything to do with them or accessed those

11    computers or knew about those computers for that matter.  So

12    it doesn't automatically link Mr. Friedman to those computers

13    simply because he was a member -- and by the way, he's not

14    even a member, he is a member of a member of 26 Flavors.

15         THE COURT:  My order stands.

16         MR. SCHAFHAUSER:  I just wanted to ask about two

17    points.  Privilege, Your Honor, on all of these computer

18    devices that we're turning over and proprietary information

19    that --

20         THE COURT:  It's a difficult issue.

21         MR. SCHAFHAUSER:  -- doesn't relate to Two Rivers at

22    all.

23         THE COURT:  It's a difficult issue that is not going

24    to stand in the way of the fair resolution of the matters now

25    before the Court.  So I'm happy for you guys to work out

67

1   something to your satisfaction.  In the absence of that, the

2   information be attorneys' eyes only and their experts, not

3   clients.

4           MR. HELLER:  Thank you.

5           MR. NELKIN:  Your Honor, can we have some

6   understanding or some order that requires that the computers

7   be preserved as of today so that there's no spoliation within

8   the period?

9           THE COURT:  Look, there should be no deletion of

10  relevant information and spoliation is spoliation.  I don't

11  need to give an order not to spoliate.

12          MR. NELKIN:  I just was trying to make sure the --

13          THE COURT:  But it's not lost on me that I'm

14  ordering very broad relief because frankly, I don't see a

15  realistic alternative that will get at a fair resolution of

16  the issues.  I understand it's broad and it's burdensome.

17  Part of the burden is that these are devices that are being

18  used in conduct of ongoing businesses.  And if I said preserve

19  them, don't use them until they're imaged, I think these

20  businesses shut down and not something I intend to do.

21          MR. NELKIN:  I just wanted to make sure that they

22  didn't do what Ms. Ezell and Ms. Rivera said where they are

23  overriding files and things of that sort.

24          THE COURT:  Look, I'm not coming to a conclusion

25  about whether Ms. Rivera and Ms. Ezell have actually done

68

1  that.  I'm certainly cognizant of the evidence from Stroz that

2  they have or that --

3          MR. NELKIN:  No, they testified that they did.

4          THE COURT:  Okay.  I'm not going to say don't use

5  the computers.  I'm also not going to say don't spoliate

6  because there is no need to do that.  Between those two, I

7  don't know how I can articulate an order that gets what you're

8  talking about that doesn't overburden the defendants.  If

9  you've got a suggestion, I'll hear it.

10         MR. NELKIN:  It seems to me that there are a number

11 of computers that they claim are already out of service that

12 they've testified to those.  It seems like those should be

13 immediately preserved at the very least.

14         THE COURT:  As opposed to being used in some way.

15         MR. NELKIN:  As opposed to being used.

16         THE COURT:  Look, if somebody uses one of these

17 computers between now and then after we've been told that

18 they're out of service, the implication is going to be quite

19 clear.  I won't hesitate to draw the inference of spoliation

20 in those circumstances.  So look, if somebody thinks that

21 there's a use that needs to be made of a computer that's out

22 of service between now and when it's imaged, you let me know

23 so that you don't run into problems of me drawing an inference

24 that you think is unwarranted.

25         MR. SCHAFHAUSER:  Your Honor, I just want to go back

1  to the privilege issue because I understand Your Honor is

2  ordering broad relief and we're going to make sure that that

3  order is complied with.  But as I understand Your Honor's

4  order, for instance, computing devices includes cell phones,

5  includes other devices --

6           THE COURT:  Sorry, excuse me.  Sir, before you

7  leave, just you're Mr. [inaudible]'s lawyer?

8           MR. GOLDFARB:  Yes.

9           THE COURT:  Would you identify yourself for the

10  record?

11           MR. GOLDFARB:  [Inaudible] Goldfarb.

12           THE COURT:  Mr. Goldfarb, would you convey to your

13  client that his computer is also to be preserved, computers

14  are to be preserved and turned over?

15           MR. GOLDFARB:  I will just note [inaudible] has

16  informed me that he got a new computer which [inaudible] end

17  of August and he would sell the old one.

18           THE COURT:  I'd advise him against that until it

19  could be imaged and probably until this entire issue has been

20  resolved.

21           MR. GOLDFARB:  If I can finish?  He has already

22  wiped that computer because he was readying it for sale.  So

23  just instead of having this come up and having them note that

24  it's been wiped I can say that around the middle, beginning of

25  August --

70

1          THE COURT:  It's a fact that I find very troubling.

2    It may prove entirely inconvenient for Mr. Nussbaum

3    eventually.  Can't change the past.

4          MR. GOLDFARB:  I can't.

5          THE COURT:  Do your best to protect your client

6    against sanctions in the future.  Thank you.  Go ahead, Mr.

7    Schafhauser.

8          MR. SCHAFHAUSER:  Thank you.  In terms of the

9    privilege issue, the reason it's a concern, you can

10   understand, I emailed drafts of things to my client.  Whether

11   they go to his cell phone or -- obviously I have to

12   communicate with my client and I have done so since I first

13   made an appearance in this case.

14         THE COURT:  I don't disregard the difficulty.  I'm

15   looking for a solution.

16         MR. GRANTZ:  Your Honor, I think the solution is the

17   same one that you outlined the last time which is we identify

18   the privileged material and if you believe you need to see it,

19   then we submit it to you in camera.  But we're talking about

20   thousands of emails from me to Mr. Friedman --

21         THE COURT:  Yes.  There's over-designation

22   certainly.  Look --

23         MR. GRANTZ:  But there are --

24         THE COURT:  -- image the computers.  Rule 502 has

25   clawback.  We'll do it that way.

71

1          MR. GRANTZ:  I mean we're going to be giving over

2     information as to our strategy in this litigation.

3          THE COURT:  You know, Mr. Grantz, you may be under

4     the misimpression that I'm taking this action lightly or

5     inadvisedly.  I am terribly concerned about actions that would

6     amount to obstruction of justice.  I think I remarked at the

7     hearing at one point that I've never seen anything like this

8     in a civil case, and I haven't.  Maybe you guys have.  Some of

9     you have been practicing longer than I have.  But this is new

10    to me.  The level of what appears to be interference in a

11    civil litigation process is something I haven't seen before.

12    So I'm in uncharted territory for me.  I'm trying to be fair

13    to all parties here but there needs to be a commitment to a

14    level playing field that I haven't seen.

15         MR. GRANTZ:  I understand, Your Honor, but you did

16    request an alternative and I was providing --

17         THE COURT:  I don't think that's a workable

18    alternative under the circumstances.

19         MR. GRANTZ:  Your Honor, I have a couple of other

20    comments.  In fact, I want to say that in February we did go

21    through some internal imaging, the imaging of some computers

22    for our own purposes.  Those computer imagings would be what

23    we would want to turn over, not the images of the computers as

24    they've been used during this case after.  And we imaged them,

25    for instance, the E & Jeryg computers, they were imaged in

72

1  February.

2          THE COURT:  Yes, but I've been given evidence of

3  spoliation this summer.

4          MR. GRANTZ:  Not with respect to the E & Jeryg

5  computers.

6          THE COURT:  But look, here's the problem, Mr.

7  Grantz, there is no discernible line of demarcation among

8  these corporate defendants that I can find.  Maybe I'm missing

9  something.  It's possible.  I do miss things and I make

10 mistakes.  And I'm sure you'll be happy to point them out to

11 Judge Amon.  And I don't begrudge you.

12         MR. GRANTZ:  I understand.

13         THE COURT:  But the record developed thus far makes

14 me lack any confidence that you can draw these lines and get a

15 fair litigation of the issues.  So I'm interested in as of

16 now.

17         All right.  So the imaged computers will be provided

18 in two weeks which is --

19         THE CLERK:  The 27th.

20         THE COURT:  The 27th.  All right.  And we need to get

21 reports generated on both sides, 30 days each?  30 days each.

22 Plaintiff reports 30 days after receiving the imaged files,

23 the imaged devices, and then defendants respond with their

24 report 30 days after that.

25         MALE SPEAKER:  That's fine.  The devices are going

1  to be turned over to imaging by Stroz.

2          THE COURT:  I mean I'm not -- what is it that -- if

3  there's something else you want to propose, I'm certainly

4  happy to hear it.

5          MALE SPEAKER:  I just wanted to -- I think that's

6  what happened the last time.

7          THE COURT:  Yes, I think it makes sense.

8          MR. NELKIN:  [Inaudible].

9          THE COURT:  We've seen the [inaudible] report.

10         MR. NELKIN:  But it basically said we just didn't

11 find anything.

12         THE COURT:  It says what it says.

13         MR. NELKIN:  I was just going to propose that

14 perhaps we both have a report within 30 days and we each can

15 rebut it.

16         THE COURT:  I think -- you're trying to prove

17 something here.  You're trying to get a dispositive sanction.

18 I'm not going to make them anticipate what Stroz is going to

19 find.  And even if I did, they have a right to respond.  I

20 think it's going to be a lot more efficient for you to

21 generate a report, they generate a response.  And if there's a

22 rebuttal, I think that's fair.

23         MR. NELKIN:  That's all I want.

24         MALE SPEAKER:  Your Honor, could we have a little

25 more than two weeks from the first deadline?  We have the

74

1   Jewish holidays.

2           THE COURT:  Yes, that's okay with me.  You want to

3   do three weeks?

4           MALE SPEAKER:  That would be more --

5           THE COURT:  Okay.

6           MALE SPEAKER:  Thank you, Your Honor.

7           THE COURT:  Sure.  So that gets us to November 3rd.

8   Okay.  So November 3rd for imaging, or turning them over for

9   imaging.  Help me with the dates, Alicia.  December 3rd is a

10  weekday?

11          THE CLERK:  [Inaudible].

12          THE COURT:  December 5th for the plaintiff's expert

13  report.  January 5th also?

14          THE CLERK:  Yes.

15          THE COURT:  January 5th for the K2 response.  And

16  then a rebuttal two weeks later, please, on January 19th.

17          MALE SPEAKER:  I'm sorry, [inaudible]?

18          THE COURT:  Rebuttal report.  And as I said I'm

19  going to -- just one moment, Mr. Grantz.  I'm going to deny

20  without prejudice to reinstatement later a pending motion to

21  compel discovery and stay discovery pending the resolution of

22  the motion for sanctions.  Mr. Grantz?

23          MR. GRANTZ:  On the imaging of the privileged

24  material, with respect to the clawback, if we identify the

25  material that is privileged before we turn it over and

1   immediately demand that it be clawed back, what's the process

2   for that to happen?

3           THE COURT:  Well, you know, I don't want to wade

4   into the technical aspect of the process and put constraints

5   on it that frankly I'm not qualified to do.  In theory, I

6   totally agree that if you've identified something that's

7   subject to an assertion of privilege before it's turned over

8   and you can in some meaningful way segregate it and yet

9   preserve the integrity of what's being imaged so that the

10  image has everything but the privileged materials, or identify

11  it so that the privileged materials aren't examined until --

12  because it may be that they're imaged and nobody accesses

13  them.  Right?  That's --

14          MR. GRANTZ:  We already know that's not going to

15  happen.  I mean as soon as they get Mr. Friedman's emails

16  they're going to look at them as a practical matter.  I mean

17  that's where --

18          THE COURT:  I don't know that.  Right?  The first

19  point is for -- and the point of doing this, maybe this is a

20  way to get at the issue here you're rightly concerned about

21  which is what I have in mind is not discovery where the

22  plaintiff gets to look and their lawyers get to look at

23  everything on all of these devices.  Not in the slightest.

24  It's for the expert to do a forensic examination of these

25  devices to determine where there's deletions, wiping, et

76

1   cetera.

2           MR. GRANTZ:  And I have a suggestion.

3           THE COURT:  Okay.

4           MR. GRANTZ:  That we turn over the devices to the

5   experts and that material not be turned over to the plaintiffs

6   until we have an opportunity to tell the experts which images

7   are privileged and then we can deal with those privileged

8   issues.  Because then Stroz can issue its report.  It doesn't

9   care what I was telling Mr. Friedman.

10          THE COURT:  Right.

11          MR. GRANTZ:  It doesn't.  And they don't have any

12   reason to tell the plaintiffs about that.  So if they can

13   reserve on that part and give the report, they're going to be

14   reporting about whether there's been deletions or spoliation,

15   not about our privilege.  So I think that that's a way to deal

16   with it, Your Honor, taking that time --

17          MR. NELKIN:  One of the issues that we've

18   encountered with Stroz is that Stroz doesn't necessarily

19   understand what may or may not be relevant documents, what may

20   be important or not.  And so I think that the procedure that

21   Your Honor had put into place for the other computers was a

22   better procedure in that it allows for us to work with Stroz

23   to identify what files are germane to the Court's

24   investigation.

25          THE COURT:  How does that work in practice?  Stroz

1   images it, and they're trying to do a forensic examination of

2   the extent to which documents have been deleted.  They're not

3   -- to what extent do they need to look at what's there as

4   opposed to what evidence there is of something being taken

5   away or that the computer was used to delete something on

6   another computer?

7           MR. NELKIN:  Well, I think that there's a number of

8   things that Stroz has identified in their previous reports by

9   looking at the documents themselves.  For instance, a lot of

10  the documents had a computer identifier for its creator, and

11  so Stroz was able to identify a number of computers that were

12  labeled Sylvia Ezell and Sonia Rivera by looking at the next

13  layer into the document and seeing who had created it, what

14  computer had created it.  And so there's data that's imbedded

15  in these files.

16          THE COURT:  But what does that mean you need to look

17  at a particular document?

18          MR. NELKIN:  What I'm saying is is that that's an

19  example of how just the file name alone didn't tell you what

20  was useful or not.  It was actually looking at the document

21  and looking at the document properties inside the document

22  that told you that --

23          THE COURT:  Right.  Well, I understand looking at

24  the document properties and I don't see any problem of them

25  doing that.  Or frankly you doing that.  Right?  There's no

78

1   problem of looking at metadata.

2           THE COURT:  So the problem is at what point do you

3   need to read a document to be able to help Stroz do their

4   work?

5           MR. NELKIN:  Well, I guess the issue for us is

6   twofold.  One is compliance with the Court's orders and the

7   other is compliance with just figuring out exactly what might

8   have happened to these computers.  So with respect to what

9   might have happened to these computers, whether certain files

10  were deleted or why, and things of that sort, there may be

11  logs and other things that you don't have to look at the

12  document to find and that's one aspect of it.

13          There's another aspect of it which has to do with

14  what these computers were used for and how they were used, and

15  that goes to the underlying compliance with this Court's

16  orders, it goes to the testimony that was given.  And it also

17  relates to some of the issues that they're arguing prevent

18  sanctions.  For instance, they're saying we haven't proven

19  that the files are material.  Or if we can just stipulate that

20  that's not a burden or something of that sort, then I don't

21  think that --

22          THE COURT:  Well look, I think you can do that

23  consistent with what Mr. Grantz is proposing which is you

24  don't look at a document until after they had a chance to

25  identify the things that they would say are privileged.

1          MR. GRANTZ:  Doesn't sound like he's even saying

2    he's going to look at a document.  It sounds to me like we're

3    saying Stroz is going to look at the documents and then give a

4    report.

5          THE COURT:  But to some extent -- have a seat until

6    I'm finished with this one.  I didn't mean to call it this

7    one.  This issue.  Just give me a moment, Mr. Heller, and

8    don't let me forget to come back to you.

9          What I understood was that in some respects they'll

10   need to consult with Stroz because Stroz won't necessarily

11   understand the significance of the documents in the

12   litigation.  I think that's fair.  But I think that that can

13   be accommodated while still doing what you propose which is

14   Stroz looks at the images and does its forensic work.

15   Meanwhile, you're identifying things that you think are

16   subject to a privilege and you identify those and you don't

17   look at the contents of documents until they've had a chance

18   to do that.  If you think there's a need to do that before

19   they've had a chance to assert privilege, you know, that's

20   going to be a discrete issue.  You can tell me precisely what

21   the problem is and we'll sort it out at that point.

22         MR. NELKIN:  Well, let's just take the practical

23   problem first which is Stroz is going to image the computers.

24   I'm not sure how long it'll take for them and we have a

25   deadline to then -- from the time that --

80

1          THE COURT:  Yes, you have a deadline.  And I'm going

2    to set the deadlines in a way that accommodates the practical

3    needs here.  So if 30 days on each side doesn't make sense,

4    we'll change it.

5          MR. NELKIN:  It seems to me at the very least 30

6    days from when they come back with their privilege

7    designations and there's some procedure for --

8          THE COURT:  Well, I don't know that that makes sense

9    because look, Stroz has work to do.  It sounds like if not all

10   of the work, a great deal of its work can be done without your

11   input just by doing the forensic work.

12         MR. NELKIN:  One hopes.

13         THE COURT:  One hopes.  And if it proves to be

14   false, you'll let me know.  Okay?  But I'm happy to hear from

15   you after consulting with Stroz and I'm not going to change

16   the 30 days now.  But if you talk to Stroz and they say look,

17   we can't even get an image in 30 days, he's skeptical, I can

18   accommodate that.

19         MR. NELKIN:  The other thing is I understand from

20   the last time that we had this that there are costs that are

21   associated with any type of segregation.  It seems to me that

22   since the defendants want to have that cost incurred that that

23   should be borne by the defendants.

24         THE COURT:  Each side is going to bear its own costs

25   until there's reason to shift them.

81

1          MR. NELKIN:  Well I guess do they have to bear the

2     cost of getting the images?  Meaning every hard drive that's

3     imaged has to cost --

4          THE COURT:  They're turning the computers over to

5     you for Stroz to image.  You'll bear that cost.  Look, if

6     you're right about what's going on here, they're going to

7     reimburse you for all of it.

8          MR. NELKIN:  Thank you.  I'm just talking about the

9     cost of the hard drives, each individual's hard drive for all

10    of them means that every computer costs thousands of dollars

11    beyond the imaging itself.  I just thought that to the extent

12    that -- if we give them one for each computer and they have to

13    bear the cost, is that fine?

14         THE COURT:  I'm not resolving cost issues now.  I

15    don't see any reason to shift costs.

16         MR. NELKIN:  Okay.  Well, and the last time we gave

17    them one hard drive and --

18         THE COURT:  I'm not saying to do something

19    different.  I'm just saying I'm not resolving something that

20    you worked out in the past.  Did we finish with your issue?

21         MR. GRANTZ:  I think so.  I mean I'm gathering we're

22    going to turn over the computers by the 3rd and sometime

23    between now and the end of November we're going to identify

24    privilege logs to Stroz, or privileged material that needs to

25    be clawed back or culled out, and then they're going to

1   segregate that.

2          THE COURT:  Well, excuse me, that I would assume

3   because their report is going to be due.

4          MR. GRANTZ:  Right.  So that's why I'm running into

5   a little bit of a concern because gathering those computers

6   and getting them to Stroz is one project.  Another project is

7   getting them back and actually --

8          THE COURT:  These are big projects.  I get it.

9          MR. GRANTZ:  -- looking at them ourselves.

10         THE COURT:  Yes.  They're big projects.

11         MR. GRANTZ:  I think we need more time.

12         THE COURT:  Well, as you work diligently to complete

13  the items that I've ordered, if you find you don't have enough

14  time --

15         MR. GRANTZ:  I'll write you.  Thank you.

16         THE COURT:  I'm sorry, before you go, Mr. Smith, Mr.

17  Heller was waiting patiently.

18         MR. HELLER:  Your Honor, I think my situation is a

19  bit different than Mr. Grantz's might be.  There were

20  computers that my client uses, separate business, had nothing

21  to do with --

22         THE COURT:  We've passed that point.

23         MR. HELLER:  We're passed that point.  But these are

24  competing businesses.  So they have information on them which

25  are extremely sensitive which Two Rivers would love to get his

83

1   hands on.  And it puts my client in a very difficult position,

2   so --

3           THE COURT:  Attorneys' eyes only.

4           MR. HELLER:  Understood.  But is there a way to claw

5   back the competitive sensitive information as well in addition

6   to the --

7           THE COURT:  Is there a rule for that?

8           MR. HELLER:  Well, I'm asking Your Honor for a

9   ruling.

10          THE COURT:  No, no, I'm not creating -- look, we've

11  got 502 for privileged materials.  Congress hasn't seen fit to

12  do the same for proprietary information.  It's attorneys' eyes

13  only.  Mr. Schreiber is not going to use it.  Period, end.

14          MR. HELLER:  Thank you, Your Honor.

15          THE COURT:  Yes.  Mr. Smith?

16          MR. SMITH:  Your Honor, as I heard this, I'm

17  currently involved in a case where although it didn't involve

18  the imaging, it did involve this large production of ESI

19  information where the same concern was raised that there would

20  be material that would eventually be clawed back.  And what we

21  agreed to, which would be similar to this case, would be after

22  the imaging was turned over to the expert, there was a period

23  of time, we in our case agreed to three weeks, but so that the

24  attorneys could have additional time in which to identify that

25  privileged material in order to segregate it.  So it may be

84

1  that you'd want to --

2          THE COURT:  Anyone object to that?

3          MR. NELKIN:  What's the specific request?

4          THE COURT:  Three weeks after they turn over the

5  images, Stroz doing its work to image, can start on its

6  forensic examination, but you don't do any -- you don't look

7  at anything until three weeks after that by which time they

8  identify their privileged items.

9          MR. NELKIN:  That's okay as long as we start the

10  clock from when --

11          THE COURT:  Yes.

12          MR. NELKIN:  The 30 days for us for the --

13          THE COURT:  Right.  30 days after that.  Okay.  Good

14  suggestion.

15          MR. SMITH:  Thank you, Your Honor.

16          THE COURT:  Okay.  Anyone else?  Okay.

17          MALE SPEAKER:  Can we just run down those dates

18  again?

19          THE COURT:  Yes, I'm just going to go through them.

20  So November 3rd to turn them over for imaging.  November 24th

21  for assertions of privilege.  Then we get to 30 days for

22  plaintiff's report.

23          THE CLERK:  December 27th.

24          THE COURT:  December 27th.

25          THE CLERK:  [Inaudible].

85

1              THE COURT:  Yes.  You know, I've been trying to

2   accommodate the Jewish holidays as best I can because I know

3   there are a lot of people involved in this case who observe

4   them and won't be working.  Will Christmas present the same

5   problem?  My guess is in the context of this case, probably

6   not.  If it is, I don't want to make any unwarranted

7   assumptions, if it is, tell me.

8              MR. FINKEL:  I'm going away from December 24th

9   through January I think 4th, Your Honor.

10             THE COURT:  All right.  So well look, there's three

11  week that that's -- I'll add another week onto that, so the

12  27th to the 4th.  Okay.

13             THE CLERK:  January 3rd.

14             THE COURT:  January 3rd.  Okay.  And this is just

15  plaintiff's report.  Plaintiff's report January 3rd.

16             MR. NELKIN:  Could we move that back just a couple

17  of days?  I just don't know what Stroz is going to do around

18  the 1st or the 2nd, if they'll even be available then.

19             THE CLERK:  That would be Friday.

20             THE COURT:  Friday, yes.  Friday the 6th.  Okay.  So

21  the plaintiff's report then I guess to February 5th for --

22             THE CLERK:  The 6th.

23             THE COURT:  The 6th for K2's response, and then

24  February 20th for the rebuttal report.  And once I've got that

25  I'm going to schedule the date.

86

1          MALE SPEAKER:  That's fine, Judge.  Your Honor,

2     could you go through the dates again, please?

3          THE COURT:  Yes.  Just give me one moment.  I want

4     to think past this last submission on the 20th.  We have a date

5     for the experts to be examined.  Give me a date in early, mid-

6     March that I can have --

7          THE CLERK:  [Inaudible].

8          THE COURT:  March 7th?  Yes, let's make that -- let's

9     block off that day.

10         THE CLERK:  Okay.

11         THE COURT:  Okay.  So let me go through the dates

12    one more time.  November 3rd, turn over all the devices for

13    imaging.  November 24th, assertions of privilege.  January 6th,

14    plaintiff's report from Stroz.  February 6th, defendant's

15    report from K2.  February 20th, rebuttal report.  And March 7th

16    we'll convene here.  Just block off the day, folks, but don't

17    plan on taking more than the day.  We're going to get it done

18    in the day.  You'll each have a chance to examine each other's

19    experts.

20         Now, what I would propose -- again, this is

21    something that I'm throwing out there.  I've seen another

22    judge in the district do it and it seems to work.  If somebody

23    has an objection, I'll hear it.  Not have direct testimony by

24    each expert.  The report will essentially be the direct

25    testimony, and to start off with cross examination on the

87

1  basis of the report followed by redirect.  I just think it's

2  going to save everybody some time and not cost us anything in

3  terms of our ability to fairly litigate the matter.  Does

4  anybody disagree with that?

5          MR. NELKIN:  No, Your Honor.

6          THE COURT:  Okay.  Mr. Schafhauser?

7          MR. SCHAFHAUSER:  Just thinking about it, I just

8  want to confirm --

9          THE COURT:  Yes.  You don't need to -- I don't want

10  to put you on the spot about it.  You've got plenty of time

11  between now and then.

12          MR. SCHAFHAUSER:  Thank you.  We'll advise the Court

13  by next week or very soon.

14          THE COURT:  There's really not a rush on that, but -

15  -

16          MR. SCHAFHAUSER:  Thank you, Your Honor.

17          THE COURT:  -- I do think I'd like you to consider

18  it.  That's my plan unless I hear otherwise.

19          MR. SCHAFHAUSER:  I understand.  Thank you.

20          THE COURT:  Okay?  All right.  Thank you, all.  So I

21  don't think we get together again before that.  So hopefully

22  that will take us through to March.  Have a good day,

23  everybody.

24          ALL:  Thank you.

25  (Proceedings concluded at 4:14 p.m.)

88

* * * * *

    I certify that the foregoing is a court transcript from
an electronic sound recording of the proceedings in the above-
entitled matter.

_____

                    Shari Riemer, CET-805

Dated: October 17, 2016