1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
     ------------------------------x
3                                          15-CV-6861(CBA)(JO)
     STEVEN SCHREIBER,
4                                          United States Courthouse
             Plaintiff,                    Brooklyn, New York
5
             – versus –
6                                          August 4, 2016
                                           9:30 a.m.
7    EMIL FRIEDMAN, et al.,

8            Defendants.

9    ------------------------------x

10        TRANSCRIPT OF CIVIL CAUSE FOR EVIDENTIARY HEARING
               BEFORE THE HONORABLE JAMES ORENSTEIN
11                 UNITED STATES MAGISTRATE JUDGE

12

13   APPEARANCES

14   For the Plaintiff:      BY:  JAY PHILIP NELKIN, ESQ.
                                  CAROL NELKIN, ESQ.
15
     For the Defendants:     BY:  PAUL HANS SCHAFHAUSER, ESQ.
16   Emil Friedman and New York
     Best Coffee, Inc.
17
     For the Defendants:     BY:  DAVID B. GRANTZ, ESQ.
18   E&I Investors Group, LLC;
     E&J Funding Co., LLC;
19   E&J Management Inc.; and
     E & Jeryg Management Corp., LLC
20
     Court Reporter:         LINDA D. DANELCZYK, RPR, CSR, OCR
21                           Phone:  718-613-2330
                             Fax:  718-804-2712
22                           Email:  LindaDan226@gmail.com

23

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.

25

```
1    A P P E A R A N C E S:   (Continued)

2    For the Defendants:      BY:  DAVID GRANTZ, ESQ.
     24 Hour Oil Delivery Corp.;
3    MB Fuel Transport, MB Fuel
     Transport I, Associated Fuel
4    Oil Corp.; Light Trucking Corp.;
     165 Street Realty Corp.;
5    Park Avenue Associates

6    For the Defendants:      BY:  RICHARD AVERY FINKEL, ESQ.
     Sylvia Ezell,
7    Sonia Rivera and
     Jorge Salcedo

8
     For the Defendants:      BY:  RICHARD BRUCE FELDMAN, ESQ.
9    Michael Devine and
     Michael Devine, CPA
10
     For the Defendants:      BY:  ROBERT J. BERGSON, ESQ.
11   Geoffrey Hersko and
     Geoffrey S. Hersko, P.C.
12
     For the Defendants:      BY:  MAURICE HELLER, ESQ.
13   Solomon Birnbaum,
     Single Serve Beverages
14   Distribution; Crazy Cups;
     26 Flavors, LLC; Office
15   Coffee Services, LLC

16

     For the Defendants:      BY:  RAPHAEL M. ROSENBLATT, ESQ.
17   Two Rivers Coffee, LLC

18

19

20

21

22

23

24

25
```

Proceedings

1    THE COURT:  Good morning.

2    MR. NELKIN:  I just wanted to give an update to

3    everyone about the Launch system.

4    We had some difficulty getting on last night with --

5    the password was incorrect in some way, and there are multiple

6    attempts.

7    We were able, with working with Stroz and

8    Mr. Nussbaum, to get one system for a very short period of

9    time, then the system crashed on us.  We sent the error

10   messages to Mr. Schafhauser.  We were able to get back on and

11   test it this morning.

12   However, in the very short period that we had access

13   to it, which was around an hour, we were able to uncover

14   evidence that we feel is potentially dispositive on a number

15   of issues here that we think conclusively refutes basically

16   the affidavits.  Basically, we require a short recess after

17   this witness in order to properly present that to the Court.

18   THE COURT:  Okay.

19   MR. SCHAFHAUSER:  Just briefly.  What I understand

20   occurred is at approximately 6:30 last night, we were all on a

21   phone call with Stroz, someone at Stroz and Mr. Nussbaum and

22   Mr. Nussbaum's counsel was also on the call.

23   And at that time, the gentleman's name is Brian.

24   MR. NELKIN:  Kevin.

25   MR. SCHAFHAUSER:  Kevin at Stroz tried --

Proceedings

1       THE COURT:  I don't want to have a chapter and verse

2   of how we got to this point.  He asked about a recess after

3   Mr. Popa's off the stand.  Any objection?

4       MR. SCHAFHAUSER:  It's difficult for me to respond,

5   Your Honor, because we're in the middle of a hearing and he

6   hasn't disclosed what it is that he believes --

7       THE COURT:  I know.  He wants -- look, the hearing

8   is to present, from both side, evidence about the allegations

9   of failure to comply with the preliminary injunction.

10      I've been trying to get you folks for quite

11  sometime, more vigorously over the summer, but going back to

12  the preliminary injunction and going forth, to have access to

13  Launch.

14      The fact that it's taken this long is itself a

15  problem.  Are you saying that you don't want to have a chance

16  now to access it, after it's been so belatedly restored to

17  collect the evidence that I'll need to have to decide this

18  motion?

19      MR. SCHAFHAUSER:  What I'm saying is and I believe

20  access was, in fact, restored, Stroz confirmed that all --

21      THE COURT:  He's asking for a recess.  I'm asking if

22  you object to the recess.

23      That's a simple question.  I know there are other

24  things that you're interested in talking about, I'm just

25  trying to find out a simple answer to a simple question.

Papa - Cross - Schafhauser

1       MR. SCHAFHAUSER:  You've asked me a yes or no

2  question, Your Honor.

3       THE COURT:  It's true.

4       MR. SCHAFHAUSER:  The answer is, no, I don't object

5  to a recess.  There are things that go through my mind about

6  what I've asked him for and have not received before this

7  hearing.

8       THE COURT:  Let's finish the cross and we'll talk

9  about it at the duration of the recess.

10      MR. SCHAFHAUSER:  Thank you.  Which after the

11  recess, I will want to address those as well.  I don't want to

12  take too much time now.

13      THE COURT:  Continue your cross, Mr. Schafhauser.

14      MR. NELKIN:  Thank you.

15      MR. SCHAFHAUSER:  Thank you.

16      (Witness retakes the witness stand.)

17  VINCENT PAPA, called as a witness, by the Plaintiff, having

18  been previously first duly sworn/affirmed, was examined and

19  testified further as follows:

20  CROSS-EXAMINATION

21  BY MR. SCHAFHAUSER:

22  Q    Mr. Papa, did you attempt to access Launch last night?

23  A    No.

24  Q    Yesterday we spoke -- we were speaking, I think, about

25  books and records and you described books and records you had

Papa – Cross – Schafhauser

1  and that Nicole Barge has books and records, correct?

2  A    Yes.

3  Q    And then Sue Herczeg has books and records, correct?

4  A    Yes.

5  Q    And then Letty Manriquez has some books and records,

6  right?

7  A    Yes.

8  Q    But other than those people, are there any other persons

9  at Two Rivers who possess books and records of the company?

10  A    Not to my knowledge.

11  Q    For instance, does Steven Schreiber have books and

12  records?

13  A    Not to my knowledge.

14  Q    Does Mayer Koenig have books and records?

15  A    No.  I don't think he does.

16  Q    Does Eugene Schreiber have books and records?

17  A    No.

18  Q    And as the company's chief financial officer, what is

19  your understanding as to the books and records that are

20  necessary for the company?

21  A    As I define books and records, I am referring to

22  documents supporting transactions, specifically customer

23  invoices -- we send to customers, invoices we receive from

24  vendors, deposit slips that we make, payroll records, checks

25  that we cut.  Those types -- documents supporting

Papa - Cross - Schafhauser

1    transactions.

2    Q     Very well.

3          If a document exists that references Two Rivers in

4    some way but doesn't relate to transactions, is it a book and

5    record?

6    A     That's a -- I don't understand the -- that's a very vague

7    question.  It's hard for me to answer that.

8    Q     Let me try again.

9          If you send an email about Two Rivers, do you

10   consider that you're creating a book and record?

11   A     Well, that would depend on what's in the email.  So I

12   mean again -- I'm an accountant, I'm not a lawyer.

13   Q     I understand, but I'm asking you what you as the

14   company's CFO require for the company's books and records,

15   so --

16         THE COURT:  So I understand you're asking what he

17   requires to do his job in the operations or what qualifies as

18   books and records for purposes of the party's legal

19   obligations?

20         MR. SCHAFHAUSER:  No, I'm not asking the latter

21   question.

22         THE COURT:  He's asking only for you to keep Two

23   Rivers running, what are the documents -- maybe avoid books

24   and records, because it's a term of art -- what documents and

25   other types of materials that you require?

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Papa - Cross - Schafhauser

1    THE WITNESS:  Well, I require orders from customers

2    so we can invoice properly.  I require invoices from vendors

3    so we know what our bills are.  I require checks to be cut

4    that are proper.  I require payroll records that are retained

5    and proper.  I may require approval of disbursements.

6    Those are generally the books and records that I

7    work with.

8    Q    Now, have you ever reviewed the Two Rivers operating

9    agreement?

10   A    Yes, I have.

11   Q    Do you have an understanding as to whether Mr. Friedman

12   as a member is entitled to the books and records of the

13   company?

14   A    I believe he is.

15   Q    And within your understanding as to what

16   Mr. Friedman's -- what categories of documents do you

17   understand Mr. Friedman to be entitled to, books and records

18   of the company?

19   MS. NELKIN:  Your Honor, I'm going to object.  This

20   is really asking for legal conclusions.

21   THE COURT:  I agree.

22   Q    You mentioned yesterday that when you joined Two Rivers,

23   you understood that Mr. Friedman was an investor and the chief

24   negotiator, if I got those words right, right?

25   A    That's what he was loosely described to me as, yes.

Papa – Cross – Schafhauser

1  Q    Okay.  And who loosely described him to you as such?

2  A    I believe Mayer Koenig used those terms.

3  Q    Let's start with the chief negotiator appellation.

4       What was your understanding as to that role?

5  A    To the best of my knowledge, he was referring to -- at

6  that time they were purchasing things in China, and Emil

7  and/or Eugene were negotiating the best prices.

8  Q    And let's go back now to the -- was there anything else

9  that was encompassed by your understanding of his role as --

10  "his role," meaning Mr. Friedman's role as chief negotiator?

11  A    No, I didn't delve into it, it was just a loose -- it was

12  a term loosely used, I just accepted it for what it was.

13  Q    Very well.  Investor.  What was your understanding as to

14  the nature of Mr. Friedman's investment in the company when

15  you joined?

16  A    At that time I was interviewed?  None.

17  Q    Okay.  After you joined, did you acquire an understanding

18  as to the nature of Mr. Friedman's investment?

19  A    Yes.

20  Q    And what was your understanding that you acquired?

21       MS. NELKIN:  Your Honor, again, I'm going to object.

22  It seems like this is really beyond the scope.

23       THE COURT:  Overruled.

24  A    Well, he provided startup funds for the company to

25  operate.

Papa – Cross – Schafhauser

1    Q    And what was the amount of the startup funds that he

2    provided, as you understand it?

3    A    The amount?

4    Q    Yes.

5    A    At what point in time?  It grew over time.

6    Q    So can you just please just tell me what you know?

7         THE COURT:  This does seem -- I don't see the

8    relevance of the amounts.  Subject to this, of course.

9         MR. SCHAFHAUSER:  On direct he was asked and it was

10   elicited that Mr. Friedman began to and I recall was exert

11   control, increasing control --

12        THE COURT:  Yes, and what's the relevance to the

13   amounts?

14        MR. SCHAFHAUSER:  The relevance is there's a reason

15   why Mr. Friedman began to exert more control.

16        THE COURT:  The amounts grew.

17        MR. SCHAFHAUSER:  The amounts grew.

18        THE COURT:  Move on.

19        The objection sustained.  Move on.

20        MR. SCHAFHAUSER:  Your Honor, most respectfully, may

21   I at least set a record as to Mr. Friedman's role and --

22        THE COURT:  You've done that.  I'm not stopping you

23   from talking about his role then.  We're not going to waste

24   time.  It's limited.  Going into the dollar figures that has

25   nothing to do with the issue before me.  Please move on.

Papa – Cross – Schafhauser

1    BY MR. SCHAFHAUSER:

2    Q    You mentioned yesterday -- well, let's -- you mentioned

3    yesterday that you had loan information, correct?

4    A    Yes.

5    Q    What loan information do you have?

6    A    I have information regarding the amount of money that was

7    loaned to the company and is recorded on the books and -- the

8    books of Two Rivers.

9    Q    And what is the amount of the loan that's recorded on the

10   books of records of Two Rivers?

11              MS. NELKIN:  Your Honor, I'm going to object.

12              THE COURT:  I think it's the same exact manner I

13   just ruled on, so please move on.

14              MR. SCHAFHAUSER:  Your Honor.

15              THE COURT:  Look I made a ruling.  We don't have

16   time for each ruling to be argued and reargued.  Please move

17   on.

18   BY MR. SCHAFHAUSER:

19   Q    Mr. Papa, could you please turn to Exhibit 6.  I'm sorry,

20   Defendant's Exhibit 6.

21   A    Yes.

22   Q    I'd like you to turn to the second to the last page of

23   Defendant's Exhibit 6.

24   A    Page 7.

25   Q    Yes, page 7, it's -- do you see that?

Papa – Cross – Schafhauser

1   A     Yes.

2   Q     There's a number of signatures?

3   A     Yes.

4   Q     Do you recognize any of those signatures?

5   A     Yes.

6   Q     Whose signatures do you recognize?

7   A     All of them.

8   Q     Okay.  Would it be fair to state that this document is

9   the Two Rivers operating agreement and the amendments thereto?

10         Let's go on.

11         Do you recognize this document as the Two Rivers

12  operating agreement to which you referred to earlier in your

13  testimony?

14  A     This is an operating agreement, whether it's the exact

15  one that I saw, I can't tell you that.

16  Q     Now, Mr. Papa, I'd ask you now to turn to exhibit --

17  well, before we get to another exhibit.

18         Are you aware as to whether certain mails were sent

19  to Mr. Friedman's residence while you've been at Two Rivers?

20  A     You said mail?

21  Q     Yes.

22  A     Absolutely.

23  Q     Yes.  And when did that begin?

24  A     I don't know when it began.

25  Q     Well, take a look, please, in this operating agreement at

Papa - Cross - Schafhauser

1    paragraph 1.5.

2         Does that refresh your recollection -- withdrawn.

3         Were you aware that the residence of Mr. Friedman at

4    33 Saint Nicholas Avenue in Lakewood was, in fact, the

5    registered office of the company set forth in the original

6    operating agreement?

7    A    Was I aware of this?  I -- I wouldn't remember this, so I

8    would say, no.

9    Q    Okay.  But it doesn't come as a surprise to you that the

10   arrangement was that mail would be sent to Mr. Friedman's

11   house, correct?

12   A    Well, it -- no, I have to disagree with that.  It does

13   come as a surprise to me that mail -- I mean, vendor bills

14   would be sent to Mr. Friedman's house.  So I would have to

15   disagree with that.

16   Q    Does it surprise you that the registered office was

17   Mr. Friedman's house?

18   A    It does -- nothing surprises me at this point.  But I

19   don't know what my surprise matters.

20        THE COURT:  It doesn't, and we're going to try to

21   avoid these rhetorical would-it-surprise-you questions going

22   forward.

23        MR. SCHAFHAUSER:  Very well.

24   Q    Let's move to Exhibit P60.

25        Do you recognize this document, Mr. Papa?

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Papa - Cross - Schafhauser

1   A    I have never seen this.

2   Q    Do you know who, in September of 2015, was responsible

3   for filings with the state regarding the corporate status of

4   Two Rivers?

5   A    Say that again, I'm sorry.

6   Q    Was there someone of whom you are aware that was

7   responsible for corporate filings with the State of New Jersey

8   back in September 2015?

9   A    Well, corporate filings meaning tax returns?  I mean,

10  corporate filings is a board term.

11  Q    I'm sorry.  Corporate filings with the treasurer of the

12  State of New Jersey regarding the corporate status of the

13  company.

14  A    Do I know who was responsible for that?  No.

15  Q    Okay.  Let me move on.

16           Now, let's go back to the operating agreement.

17           Are you aware of the percentage interest that

18  Mr. Friedman rolled into Two Rivers?

19           MS. NELKIN:  Your Honor, again, this type of

20  question --

21           THE COURT:  I will allow it briefly.  I fail to see

22  the relevance, but perhaps you will uncover something.

23           MR. SCHAFHAUSER:  The proffer is this, Your Honor,

24  that the plaintiff made the point to Your Honor that the

25  internal relationships of the parties was essential and we've

Papa - Cross - Schafhauser

1    heard testimony going back 20 years or 22 years and the

2    interim --

3         THE COURT:  That I heard.  What's the relevance of

4    the percentage number?

5         MR. SCHAFHAUSER:  The relevance, again, is how and

6    why we are here.

7         THE COURT:  I'll tell you why we're here.  Because

8    there has been manifests of noncompliance with the preliminary

9    injunction.  And I'm trying to figure out how best to remedy

10   that.  Understanding the extent to which corporate boundaries

11   among the various entities, among these defendants are

12   accepted is useful to me in helping me trying to determine

13   that.

14        Having this witness testify about the percentage of

15   Mr. Friedman's investment, honestly, I don't understand how

16   that helps.  Anything else?

17        MR. SCHAFHAUSER:  Your Honor, I think we're here for

18   two reasons that Your Honor previously identified.

19        THE COURT:  Yes.

20        MR. SCHAFHAUSER:  And this was discussed.

21        THE COURT:  What's the other reason that I missed?

22        MR. SCHAFHAUSER:  Your Honor, accepting we're here

23   to talk about access on both sides.

24        THE COURT:  I don't know that there are factual

25   disputes about your requests.  There's a legal dispute.  To

Papa - Cross - Schafhauser

1  the extent there's a factual dispute, again, I don't

2  understand what the percentage of Mr. Friedman's interest has

3  to do with it.

4         MR. SCHAFHAUSER:  The factual -- well, the factual

5  dispute can be succinctly stated that -- well, Mr. Friedman

6  has not received --

7         THE COURT:  That's not a factual dispute.  It's a

8  legal dispute about whether he should have received something

9  that everybody agrees he hasn't been given.

10        Please go on with your cross-examination.

11 BY MR. SCHAFHAUSER:

12 Q    Mr. Papa, would you please turn to Defendant's Exhibit 7.

13 A    Okay.

14 Q    Do you recognize the email from you to the members of Two

15 Rivers that's set forth in the middle of the first page dated

16 January 4th, 2016?

17 A    I recognize this email, yes.

18 Q    Okay.  And then if you flip the page, do you recognize

19 the schedule that's attached?

20 A    Yes.

21 Q    Is that a schedule that you prepared?

22 A    Yes.

23 Q    And did you receive any assistance in preparing the

24 schedule?

25 A    Well, I received a list from Sonia from what she referred

Papa - Cross - Schafhauser

1   to as recurring payments.  And I also examined the books and

2   records of QuickBooks and I determined what was paid on a

3   monthly basis.

4   Q    Did you speak with anyone, else other than Ms. Rivera,

5   before you issued this list and this correspondence to the

6   members of Two Rivers?

7   A    I did not.  This is a list of monthly checks.

8   Q    Did you speak with anyone before you issued this list

9   about whether payments to Mr. Friedman under the operating

10  agreements would be discontinued?

11         MS. NELKIN:  Your Honor, again, I'm going to object

12  and --

13         THE COURT:  I don't need a speaking objection.  The

14  basis of the objection is?

15         MS. NELKIN:  The basis is that it's -- there's no

16  motion pending with regard to payments to Mr. Friedman.

17         THE COURT:  Look, to the extent his ability to

18  operate under the current circumstances is an issue, I'll

19  allow it.

20  A    So I was given -- at this point in time, January 4th, I

21  was given the TRO.  There's a limitation in the TRO about

22  self-dealing.  I interrupted self-dealing to be these checks.

23         I had no legal counsel to guide me.  I requested

24  legal counsel to guide me.  I determined that these would

25  qualify as self-dealing.

Papa – Cross – Schafhauser

1    Q    Very well.  Did you speak with Mr. Schreiber about this

2    issue?

3    A    Steven Schreiber?

4    Q    Yes.

5    A    No.

6    Q    Did you speak with anyone other than Miss Rivera before

7    you made the determination you just described?

8    A    I alerted everybody as to what I was doing.

9         THE COURT:  Is this an instance in which the absence

10   of counsel for the corporation has impeded your ability to

11   perform this operation?

12        THE WITNESS:  Yes.

13        THE COURT:  Okay.  Go ahead.

14   Q    Mr. Papa, you say that the absence of counsel has impeded

15   you.

16        What is your understanding as to whether

17   Mr. Friedman's consent is necessary for you to retain counsel?

18   A    My understand -- what I've heard.  I mean, I see the

19   operating agreement, and I see the preliminary injunction

20   where he's not to, quote, interfere, so I can't answer that

21   question.  I'm not a lawyer.

22        I mean, I'm interpreting documents, legal documents,

23   without the benefit of counsel.  I'm doing the best I can.

24   Q    All right.  Well, let's take a look, please, briefly --

25   well, before we get to that.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Papa - Cross - Schafhauser

1    You testified yesterday that Mr. Friedman was

2    exerting control over, I think it was expenses, correct?

3    A    Yes.

4    Q    Could you please turn with me to Exhibit 6, Defense

5    Exhibit 6 again, it's the operating agreement.  It's the third

6    amendment, which is near the end of the document, page 3 and

7    it's paragraph 8.

8    A    The third amendment.

9    Q    It says paragraph 8, and then it begins with

10   Section 6.1.2 of the operating agreement is hereby amended to

11   read and it goes on.

12        Do you see that?

13   A    Yes.

14   Q    Now, I won't take the time to read it unless you, of

15   course, wish to.  But did you have an understanding that under

16   the operating agreement as amended, any member is authorized

17   to issue a check to pay expenditures of the company outside of

18   the ordinary course of the business in an amount less than

19   $50,000 upon Mr. Friedman's consent, and that of two other

20   members of company?

21   A    What are you asking about?  Sorry.

22   Q    Let me try to simplify it.

23        Did you have an understanding that for expenditures

24   of $50,000 or more, Mr. Friedman's consent was required under

25   the terms of the operating agreement?

Papa – Cross – Schafhauser

1    MR. ROSENBLATT:  Your Honor, I object.  He's not a

2  lawyer.

3    THE COURT:  He's not a lawyer, but he's being asked

4  basically about he went about making decisions to fulfill his

5  role.  I'll allow that.

6    It's not legally binding on the company or on

7  anyone.

8  A    So you're asking me was I aware of this specific

9  paragraph in operating agreement?

10  Q    Yes.

11  A    I did not oftentimes read the operating agreement so I

12  don't know how to say, no.

13  Q    So let's move away from the specific words of the

14  operating agreement.

15    Generally, were you aware that for expenditures of

16  50,000 or more, Mr. Friedman's consent was required?

17  A    Generally, no, I was not aware of that limitation.

18  Q    Are you aware --

19    THE COURT:  Just so we have a clear understanding.

20  I'm not sure I do.

21    Are you asking about prior to the advent of the

22  preliminary injunction which puts some constraints on,

23  essentially, Mr. Friedman or the operations of Two Rivers?

24    MR. SCHAFHAUSER:  Yes, I'm asking as a general

25  matter under the operating agreement.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Papa - Cross - Schafhauser

1    THE COURT:  So without reference to the preliminary

2    injunction, that would be before December of 2015.

3    MR. SCHAFHAUSER:  We will address -- yes --

4    THE COURT:  Okay.

5    MR. SCHAFHAUSER:  -- something I think that we'll

6    all address.

7    THE COURT:  Yes, but to the extent he's asking about

8    your understanding, I'm not sure I understand.

9    MR. SCHAFHAUSER:  That's correct.

10   THE COURT:  He's asking about before last December

11   when the preliminary injunction was issued.  He's asking about

12   that period.

13   Go ahead.

14   MR. SCHAFHAUSER:  Thank you.

15   BY MR. SCHAFHAUSER:

16   Q    Now, as the Court clarified my question:  Did you have an

17   understanding that before the preliminary injunction was

18   entered, at least the consent of Mr. Friedman was required for

19   expenditures of 50,000 or north of there?

20   A    No, I -- I don't recall having that discussion or

21   understanding or reading the operating agreement to -- no.

22   Q    Okay.  Did you understand that Mr. Friedman's consent was

23   required to retain an accountant for the firm -- for the

24   company?

25   A    Mr. Friedman's consent was required for everything.  So

Papa - Cross - Schafhauser

1   I'm hard pressed to relate all the discussions to the

2   agreement.

3           I did not refer to the agreement on a frequent basis

4   to understand what was allowed and/or required.

5   Q    All right, so let's go back.

6           When you say Mr. -- what is the basis of your

7   understanding that Mr. Friedman's consent was required for

8   everything?

9   A    The day-to-day operations.  There were no checks cut

10  without his consent.  It was very straightforward.

11  Q    And then, I take it, you reviewed the preliminary

12  injunction, correct?

13  A    I read the preliminary injunction, yes.

14  Q    All right.  And when you read the preliminary injunction

15  and, again, I'm not asking you, Mr. Papa, for your legal views

16  of the preliminary injunction, but I'm asking for your

17  understanding after the preliminary injunction was entered,

18  did you have an understanding that Mr. Friedman's concept was

19  no longer required?

20  A    My understanding was that he was not to engage or

21  interfere in the operations of the company.

22  Q    So is that a "yes," his consent was no longer required?

23  A    I did not specifically address the consent issue.  Again,

24  because I -- it didn't occur to me and I had no guidance from

25  any counsel.  So, again, my understanding, the way I read the

Papa - Cross - Schafhauser

1  preliminary injunction was that he was not to engage or

2  interfere in the operations of the company.  And it's limited

3  to that because, again, I had no counsel guiding me.

4          THE COURT:  So my understanding is, so in making

5  decisions about getting in the RP or retaining an accountant

6  or a counsel, if he was saying, no, you can't do that, did you

7  view that as interfering with the ability to do what the

8  company needs to do.

9          THE WITNESS:  Yes, if he would tell me, no, that

10  would be interference, yes.

11  BY MR. SCHAFHAUSER:

12  Q    Okay, now let me ask the question.

13          Did Mr. -- you didn't feel it necessary to get

14  Mr. Friedman's consent to the retain a new accounting firm for

15  the company, correct?

16  A    Correct.

17  Q    You didn't feel it necessary to get Mr. Friedman's

18  consent to retain a new ERP vendor, correct?

19  A    Correct.

20  Q    And yet you felt it necessary to get Mr. Friedman's

21  consent to retain counsel for the company?

22  A    I didn't feel it was necessary to get his consent.  I

23  requested consent.  I requested to be represented by counsel.

24          I didn't say it was necessary to get his approval.

25  I requested to be represented by counsel.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Papa - Cross - Schafhauser

1   Q    Why did you request that with respect to the counsel

2   issue but not with respect to the ERP issue or hiring an

3   accounting firm?

4   A    Hiring an accounting firm to produce mandatory-type

5   returns it would put the company in further jeopardy.  I

6   believed it was in the best interest of the company to

7   continue to operate.

8        Hiring legal counsel on my own is not something I

9   would entertain.  So I requested to you, and I requested it

10  through Eugene Schreiber, and Mayer Koenig, the two other

11  members of the LLC.

12       With respect to the ERP system, not having the

13  accessing to Launch coffee and not having a system also

14  jeopardizes the company greatly.

15  Q    So let me see if I understand.

16       So with respect to the ERP and the accounting you

17  thought those were issues that were putting the company in

18  jeopardy so you didn't deem Mr. Friedman's consent necessary

19  for those, correct?

20  A    Correct.

21  Q    But for hiring an attorney, that was a different analysis

22  for you?

23  A    It wasn't a different analysis for me, because, again, I

24  was not asking for his consent, I was asking to be represented

25  by counsel.

Papa – Cross – Schafhauser

1 Q    And you were asking for you personally to be represented

2 by counsel?

3 A    No, me as the CFO of Two Rivers.

4 Q    Now, regardless of what Mr. Friedman said or didn't say,

5 you didn't feel yourself constrained after the preliminary

6 injunction was entered to not retain counsel if you deemed it

7 in the company's best interest; did you?

8 A    Say that again?

9 Q    Sure.

10 A    I'm sorry.

11 Q    Regardless of whether Mr. Friedman consented, after the

12 preliminary injunction was entered, you did not feel yourself

13 prohibited from hiring counsel if you believed it was in the

14 company's best interest to hire counsel, correct?

15 A    No.  I would not hire counsel on my own.

16 Q    Now, are there any other expenditures of $50,000 or more

17 that the company has undertaken since the lawsuit was

18 commenced?

19        MS. NELKIN:  Your Honor, I'm going to object, as to

20 the relevance.

21        THE COURT:  Overruled.

22 A    Well, certainly there are purchases we made in the normal

23 course of business for materials that could exceed $50,000.

24 Q    All right.  Putting aside materials.

25        Are there any pieces of equipment or machinery that

Papa – Cross – Schafhauser

1    were the purchased north of $50,000?

2    A    Yes.

3    Q    Please describe those.

4    A    We have authorized purchase for machinery and equipment

5    to automate the manufacturing process.

6    Q    And what types of machinery?

7    A    Coffee and filling machines.  It's the machines that put

8    the coffee in the little single-serve cups.

9    Q    And what is the amount of that authorization?

10   A    Each one is around 4 to $500,000.

11   Q    And how many of those machines have been purchased?

12   A    Two.

13   Q    So about 800,000 to a million dollars has been –– of

14   machines of those kind have been purchased, yes?

15   A    Yes.

16   Q    Okay.  Now, I take it you didn't seek Mr. Friedman's

17   consent to make those purchases?  Yes?

18   A    I –– I did not, no.

19   Q    Okay.  Did any of the other members of Two Rivers

20   consent?

21   A    Yes.

22   Q    Who else –– who did consent?

23   A    Mayer Koenig and Eugene Schreiber.

24   Q    Did Steven Schreiber consent?

25   A    No.

Papa - Cross - Schafhauser

1   Q    Did you ask for Steven Schreiber's consent?

2   A    I don't think so because -- no.

3   Q    Did you ask Mr. Steven Schreiber's consent when you

4   ordered the ERP?

5   A    No.

6   Q    Did you ask for Steven Schreiber's consent when you hired

7   the accounting firm?

8   A    I don't think I did, no.

9   Q    And, I take it, since you didn't ask, you didn't obtain

10  Mr. Schreiber's consent in those instances?

11  A    Correct.

12  Q    Now, let me move on, Mr. Papa, to another line of

13  questions.

14          There's some loose documents which I think we went

15  through a couple yesterday.  Defendant's Exhibits -- well,

16  let's start with Exhibit 37 and then we'll go on from there.

17          But do you have Defendant's Exhibit 37?

18  A    Yes.

19  Q    Do you recognize this as a subpoena that was served on

20  you in connection with this evidentiary hearing?

21  A    Yes.

22  Q    Let's take a look then, please, at Defendant's

23  Exhibit 38.  Is it correct that you retained the Parness Law

24  Firm to represent you in response to the subpoena that was

25  served?

Papa - Cross - Schafhauser

1    MR. ROSENBLATT:  Objection.

2    THE COURT:  Overruled.

3  A    The company retained Hillel Parness.

4  Q    Incidentally, was there some kind of a resolution adopted

5  by the company's members to retain Mr. Parness' firm?

6  A    Not that I've ever seen.

7  Q    Did you ask for member consent to retain the Parness

8  firm?

9  A    Did I?

10 Q    Yes.

11 A    No.

12       Wait a minute, let me back up.

13       Did I ask consent?  I didn't ask for consent.  I did

14 not personally retain this law firm, the company retained this

15 firm.

16 Q    All right.  And when did the company retain the firm?

17 A    Recently.  On or about this date.  June.  Again, I'm not

18 going to guess.  I don't know exactly when they were retained.

19 Q    Sometime in June or July, some area in there, correct?

20 A    Well, yesterday you set me up with that "somewhere

21 around," so I don't know exactly when they were retained.

22 Q    Very well.  I withdraw -- I'm not trying to set you up.

23 Let's try this.

24       Whenever it was that you, on behalf of Two Rivers,

25 retained the Parness firm, did you receive the consent of

Papa – Cross – Schafhauser

1   Steve Schreiber to do that?

2   A     Did I receive?

3          THE COURT:  Speed this up.

4          What was the process of how you retained -- on

5   behalf of the company, of how you retained counsel to

6   represent you in response to the subpoena?

7          THE WITNESS:  To the best of my knowledge, Eugene

8   and Mayer retained counsel to represent Two Rivers and myself

9   in this hearing.

10         THE COURT:  Okay.  Move on.

11  Q     And whenever it was that you retained the Parness firm,

12  you didn't --

13         THE COURT:  The company.

14         MR. SCHAFHAUSER:  You and the company.

15  Q     When it was that you, Mr. Papa, on behalf of Two Rivers

16  Coffee, LLC retained the Parness firm, did you --

17         MS. NELKIN:  Your Honor, I'm going to object.

18         THE COURT:  I'm sorry, that's not what he said.  He

19  just said that --

20         MR. SCHAFHAUSER:  Let me try it again.

21  Q     Whenever it was that --

22         THE COURT:  You know -- ask your question.

23         Go ahead.

24         MR. SCHAFHAUSER:  I'm happy to give Your Honor a

25  proffer.

Papa - Cross - Schafhauser

1    THE COURT:  No, no, it was just the form of the

2    question is creating problems with the preface, which is

3    irrelevant to whatever question you want to ask.  So why don't

4    you just move on to the question.

5    MR. SCHAFHAUSER:  Let me try again.

6  Q    Who is it who made the decision to retain the Parness Law

7  Firm?

8  A    I'm not a hundred percent sure.

9  Q    Were you involved in the decision?

10 A    The decision, no.

11 Q    Were you involved in the selection of the firm?

12 A    No.

13 Q    Were you involved in the decision to retain a firm on

14 behalf of Two Rivers, LLC?

15 A    The decision?  No.

16    THE COURT:  Just to be clear, were you part of the

17 conversations about the need for counsel?

18    THE WITNESS:  Yes.

19    THE COURT:  Okay.

20    THE WITNESS:  Yes.

21 Q    Just so I'm clear.  Your understanding, as best you're

22 able to say, is that Eugene Schreiber and Mayer Koenig

23 authorized the retention of the Parness firm on behalf of Two

24 Rivers, correct?

25 A    Yes.

Papa - Cross - Schafhauser

1  Q    Now, at any time before you were served with the subpoena

2  for this evidentiary hearing, did you ask Eugene Schreiber and

3  Mayer Koenig to do what they did in this instance and retain

4  counsel on behalf of Two Rivers Coffee?

5  A    Yes.

6  Q    And when did you previously do that?

7  A    Well, in between the time the TRO was first served and

8  this date, I requested to be -- requested to be represented by

9  counsel.  I don't know the specific dates.

10  Q    Very well.  Let me ask you whether you recognize

11  Defendant's Exhibit 38.  I don't think I asked that question.

12  A    I've never seen this.

13  Q    Do you know whether documents were produced in response

14  to the subpoena that was served?

15  A    The documents that were requested in my subpoena?

16  Q    Yes.

17  A    I saw that they put something together, but it's a rather

18  lengthy list.  So when you say produced, what do you mean by

19  "produced"?

20  Q    So did you -- did you provide --

21          THE COURT:  Did the lawyer for the company provided

22  the documents listed in here to them?

23          THE WITNESS:  No, I did not produce any documents to

24  the attorney.

25          THE COURT:  Okay.

Papa - Cross - Schafhauser

1    BY MR. SCHAFHAUSER:

2    Q    And your understanding is as of this date, no documents

3    set forth in the subpoena have been forwarded to my office,

4    correct?

5    A    Not exactly what I said.  You asked me if I produced any

6    documents.

7         I did not produce any documents.  I don't know what

8    was produced to you or your office.

9    Q    You don't know what your lawyer -- what the company's

10   lawyer did on behalf of the company; is that right?

11   A    I was told that.

12        MR. ROSENBLATT:  I object.  I'm not sure what

13   relevance this had, A; and, B, there's been no objection with

14   anything that happened --

15        THE COURT:  Look, this is a factual dispute about

16   the extent to which production has been made.  I didn't think

17   there was, but if you want to stipulate, everybody, that

18   neither the company nor the plaintiff produced documents to

19   the defendants?

20        MS. NELKIN:  Your Honor, we wouldn't stipulate that

21   the plaintiff did not.

22        THE COURT:  Okay, so let's start with the company.

23        Has the company produced anything?

24        MR. ROSENBLATT:  It's my understanding that some

25   papes were produced; not many, but there were some.

Papa - Cross - Schafhauser

1     THE COURT:  All right.  And given the fact there's a

2  dispute about what was produced, it's fair game for this

3  hearing.

4     But if he doesn't know, he doesn't know, and you

5  move on with that answer.

6     MR. SCHAFHAUSER:  That's right.  And, Your Honor, on

7  the first day of the hearing, we talked about subpoenas, and

8  Your Honor said we would address those as the witnesses showed

9  up.

10     THE COURT:  Okay.  But he doesn't know.  You got

11  that answer.  So let's move on to the next topic.

12     MR. SCHAFHAUSER:  All right, very well.

13  BY MR. SCHAFHAUSER:

14  Q    Could you please take a look at Exhibit 39.

15  A    Yes.

16  Q    Is this a document that you recognize?

17  A    Yes.

18  Q    And who prepared this document?

19  A    I was told that this was run by Mayer Koenig out of the

20  QuickBooks system.

21  Q    Had you seen this document in connection with the

22  company's response to the subpoena?

23  A    Well, I've certainly seen this statement.  And I was told

24  that this was produced.  But I didn't produce this.  I don't

25  know if I mis-communicated before.  I was told this was run

Papa - Cross - Schafhauser

1  and given to you.

2  Q    Were you told that any other documents, other than this

3  two-page document marked as Exhibit 39, was produced?

4  A    I -- no, I don't remember what else may have been

5  produced.

6           THE COURT:  I want to go back just a moment about

7  the subpoena.

8           MR. SCHAFHAUSER:  Yes.

9           THE COURT:  The subpoena that's addressed to you and

10  the request for documents by you, the documents that are

11  requested are any of those your personal documents?

12           THE WITNESS:  My personal documents?

13           THE COURT:  Yes.

14           THE WITNESS:  No.

15           THE COURT:  So anything here that you would have

16  access to, you would only have access to as an officer of the

17  company?

18           THE WITNESS:  Correct.

19           THE COURT:  Okay.  But the subpoena is to you

20  personally.  You don't have any documents personally?

21           THE WITNESS:  No.

22           THE COURT:  Okay.  Go ahead.

23  BY MR. SCHAFHAUSER:

24  Q    Well, let me see if I understand, Mr. Papa.

25           I thought your testimony was that this response was

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Papa - Cross - Schafhauser

1   prepared on behalf of Two Rivers Coffee, yes?

2   A     When you say "this response," you mean?

3   Q     I'm looking at Defendant's Exhibit 38.

4   A     Again, I have never seen, I was told that there was an

5   objection to me producing documents, and I would not be

6   required to produce documents, but I never actually saw this

7   document.

8              THE COURT:  Just so I'm clear.  I'm just trying to

9   make sure that there wasn't an obligation that Mr. Papa had

10   personally that he hasn't sought to discharge.

11              So move on.

12              MR. SCHAFHAUSER:  Your Honor, and the answer is --

13              THE COURT:  It's addressed to Mr. Papa, that's why

14   I'm asking.

15              MR. SCHAFHAUSER:  Well, the representation was made

16   that counsel was retained on behalf of Two Rivers to respond

17   and is appearing in this case on behalf of the company not on

18   behalf of Mr. Papa.

19              THE COURT:  And to the extent that the subpoena

20   creates an obligation for Mr. Papa individually, I want to

21   make sure he hasn't failed to discharge that.  That's all.

22              Why don't you move on.

23              MR. SCHAFHAUSER:  During the break I'd like to

24   address that Your Honor, when we do take the recess that

25   Mr. Nelkin requested.

Papa – Cross – Schafhauser

1    THE COURT:  Why don't you move on.

2  BY MR. SCHAFHAUSER:

3  Q    Putting aside the subpoena, what documents did you begin

4  to compile after you did receive the subpoena?

5    MR. ROSENBLATT:  Objection.

6    THE COURT:  Overruled.

7  A    I happen to have the list in front of me.

8    THE COURT:  No, no.  I'm going to sustain that,

9  because what was produced is what's at issue, not what work he

10  did to start going about compliance.

11    MR. SCHAFHAUSER:  Your Honor, I'm only seeking to

12  address what documents this witness had.

13    THE COURT:  I've addressed this before,

14  Mr. Schafhauser.  Once I make a ruling, I'd like to move on.

15    MR. SCHAFHAUSER:  I'll move on.

16  Q    Now, putting aside the Parness firm and the retention on

17  behalf of the company, has Two Rivers incurred any fees or

18  expenses or agreed to incur any fees and expenses on behalf of

19  plaintiff's Steven Schreiber relating to this lawsuit?

20    MS. NELKIN:  Your Honor, I'm going to object.

21    THE COURT:  Overruled.

22  A    Can you repeat that question.

23  Q    Yes.

24    Has Two Rivers Coffee incurred or agreed to incur

25  fees or expenses on behalf of plaintiff Steven Schreiber

Papa – Cross – Schafhauser

1    relating to this lawsuit?

2    A    Yes.

3    Q    What are the nature of the fees and expenses that you're

4    talking about?

5    A    There was a check cut for Stroz to Steven.

6    Q    Stroz Friedberg?

7    A    The computer IT.

8    Q    Whoever they are, the computer IT.

9         And why was a check cut by the company for a

10   computer consultant retained by Steven Schreiber?

11   A    Why it was done that way?  I don't know.

12   Q    Were you part of the decision-making process?

13   A    No.

14   Q    Who made that decision?

15   A    Eugene and Mayer.

16   Q    Now, with the exception -- by the way, how much was that

17   check?

18   A    $10,000.

19   Q    With respect to any other fees or expenses relating to

20   this lawsuit -- putting aside the Parness firm and the

21   gentleman sitting at the end of the table, I'm not asking

22   about those fees -- has Two Rivers incurred any other legal

23   fees or expenses relating to this lawsuit?

24   A    I don't think so.

25   Q    Yesterday you mentioned an NLRB matter, if I heard you

Papa – Cross – Schafhauser

1  correctly, Mr. Papa.

2            Could you described what happened with that NLRB

3  matter?

4  A     The basis of the -- we were charged with unfair labor

5  practices after the union election.  The union election

6  occurred in December of 2015, around February or March we were

7  charged with unfair labor practice associated with that

8  election.

9  Q     All right.  And is that matter still pending?

10 A     I have been verbally informed that the matter has been

11 resolved.  I do not have that in writing yet.

12 Q     And by whom have you been so verbally informed?

13 A     Legal counsel who represented us.

14 Q     Who represented who?

15 A     Two Rivers.

16 Q     So Two Rivers had legal counsel representing it with

17 respect to the NLRB?

18 A     Yes.

19 Q     And who was that legal counsel?

20 A     Littler, L-I-T-T-L-E-R.  I don't know the full name.

21 Q     And when was that legal counsel retained?

22 A     Around March, I would guess.

23 Q     And in that instance, did you seek either Mr. Steven

24 Schreiber's consent or Mr. Friedman's consent?

25 A     No, I did not.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Papa - Cross - Schafhauser

1  Q    Are there other lawyers that have been retained on behalf

2  of Two Rivers, other than -- again, I'm not referring to

3  Mr. Parness or his colleague, Mr. Rosenblatt -- but are there

4  other lawyers who have been retained since this litigation,

5  this case began in December of 2015?

6  A    There was a legal counsel retained to represent us in the

7  union election.  I'm not exactly sure if that was before or

8  after the TRO.  I don't know the exact date of that, counsel.

9  Q    Very well.  And who was that legal counsel?

10  A    Hill Wallack.

11  Q    You know my question probably before I ask it but:

12        Was the consent of either Steven Schreiber or Emil

13  Friedman obtained with respect to the retention of Hill

14  Wallack?

15  A    No, they were not.

16  Q    Again, just going back to the NLRB matter.  Your

17  understanding, as best you know, is that the matter has been

18  resolved, yes?

19  A    Yes, with one condition.

20  Q    What's the one condition?

21  A    We have to display the ruling in a conspicuous spot for

22  all employees to see that we charged with unfair labor

23  practices and employees have rights, et cetera, et cetera.

24  Q    Was there any monetary assessment or penalty that was

25  imposed in that NLRB matter?

Papa - Cross - Schafhauser

1    A    No, there were not.

2    Q    Now, yesterday I think you said that you needed counsel

3    because Mr. Friedman had been the tax matters partner.

4              Do I have that correct?

5    A    I made a statement that I'm getting a request from the

6    outside accountants to have the tax matters partner authorize

7    the preparation and filing of the return.

8              And I'm not certain right now who was the tax

9    matters partner.

10   Q    All right.  Now, have you made any requests of

11   Mr. Friedman to authorize the filing of those returns?

12   A    I have not.

13   Q    Have you made any request of any other members to

14   authorize the filing of those returns?

15   A    Not to authorize the filing of the return but, again,

16   that filing is authorized for them by the tax matters partner.

17             I made a request who is the tax matters partner

18   currently.

19   Q    And to whom did you make that request?

20   A    Eugene and Mayer.

21   Q    And what was their response?

22   A    We need legal counsel to guide us.

23   Q    And did you seek such legal counsel for that matter?

24   A    Did I?

25   Q    Yes.

Papa – Cross – Schafhauser

1    A    No.

2    Q    Yesterday you testified -- well, withdrawn.

3          As I understand it, you received payroll information

4    and entered that payroll information on the Launch system,

5    yes?

6    A    No.

7    Q    Okay.  Please tell me what payroll information came to be

8    on the Launch system that you need access to?

9    A    Well, I didn't enter information on the payroll on the

10   Launch system.

11         The information that is on Launch that the company

12   needs are the underlying records stating the name of the

13   employee, the hours that were worked, and the hours that were

14   paid.  That's what we needed.

15   Q    Did you ever enter information on Launch of any kind

16   relating to employee pay, salary, or payroll matters?

17   A    Well, yes, I or someone on my staff entered new employees

18   into Launch, and in entering new employees, we would enter

19   withholding information from a form, a W4.

20   Q    And once that information was entered, what did you do

21   with the physical copies of that information?

22   A    Well, it was either scanned into the system or it was

23   retained in a hard copy file.

24   Q    All right.  So when you say "scanned into the system," it

25   was scanned into which system?

Papa – Cross – Schafhauser

1   A    Launch.

2   Q    Okay.  So the new information that you or your team put

3   on was also scanned into the Launch, correct?

4   A    When you say "also," it was only scanned into Launch.

5   Q    Only scanned into Launch.

6          Was it scanned into any other place, other than

7   Launch?

8   A    It may have been scanned and sent to Sonia.  I'm not

9   certain of that.

10  Q    Have you ever checked to see whether you have that

11  information on scans, other than on the Launch system?

12  A    Have I ever reviewed all the emails sent back and forth

13  for W4 information?  No, I have not.

14  Q    Now, let's if we could please go to Exhibit P128,

15  Mr. Papa, in the larger books.

16          You were asked about this on direct yesterday, yes?

17  A    Yes.

18  Q    And let's go back to where we were yesterday, and I think

19  Miss Nelkin had begun on the last emails, it was an email that

20  I originally sent you, right?

21  A    Let me get there.

22  Q    Don't take my word.  Please turn to page 6.  Don't take

23  my word, Mr. Papa.

24  A    Okay, I'm looking at page 6.

25  Q    Okay.  And you see on the top it says, "on Friday,

Papa - Cross - Schafhauser

1    January 8th, 2016 at 10:33 a.m."?

2    A    Yes.

3    Q    You see that?

4    A    Yes.

5    Q    And you received that email, right?

6    A    Yes.

7    Q    And then in response you sent a list to me of the credit

8    card information that were you looking for, correct?

9    A    Yes.

10   Q    And you testified yesterday that you never heard back

11   from me after you sent the list, right?

12   A    I thought I testified that I did not receive all the

13   information that I was requesting.  I don't know whether I

14   heard back from you immediately after this email.

15   Q    All right.  Well, do you recall now -- putting aside what

16   you testified yesterday, do you recall sitting here today

17   whether you, in fact, did hear back from me in response to the

18   list that you sent?

19   A    I believe you did send some information in response to

20   this email, yes.

21   Q    Okay.  And do you recall the kind of information that I

22   sent you?

23   A    It was limited backup for a few of the transactions that

24   I requested.

25   Q    All right.  Would you please turn, Mr. Papa, to

Papa - Cross - Schafhauser

1    Defendant's Exhibit 17.

2              It's a little mangled because my assistant at the

3    time forwarded information, but why don't we turn to the top

4    of the second page.

5              Do you see there's an email from me to you?

6    A    I'm on the second page.  Yes.

7    Q    Where I say:  "Thank you again for your email this

8    afternoon"?

9              Do you see that?

10   A    Yes.

11   Q    Do you remember seeing that email?

12   A    Yes.

13   Q    And in that email I referenced a list that you had

14   forwarded, right?

15   A    Yes.

16   Q    Okay.  Now, could you take a look on the first page of

17   this Defendant's Exhibit 17.

18   A    Yes.

19   Q    See where it says "attachments," and there's a number of

20   checks?

21   A    Yes.

22   Q    You received those attachments, right?

23   A    Yes.

24   Q    Okay.  And those attachments, if you turn after the

25   email, there's a number of attachments.

Papa – Cross – Schafhauser

1   Do you recall having received those attachments from

2   me on or about January 12th, 2016?

3   A   Yes.

4   Q   Okay.  Now, you received, in addition to this,

5   Mr. Friedman came to your office to hand deliver credit card

6   information, yes?

7   A   Yes.

8   Q   And when was that?

9   A   When was that?

10  Q   When was that?

11  A   I don't remember when.

12  Q   How long -- well, it was months ago?

13  A   Yes.

14  Q   Was it at or about the same time?

15  A   No, it was before.

16  Q   It was before that.

17          THE COURT:  I'm getting a little lost in the

18  timeline.

19          There's this email that you're just talking about

20  with the attachments.

21          MR. SCHAFHAUSER:  Yes.

22          THE COURT:  There's the email in 128 that talks

23  about one point -- Exhibit 128, the very first email that

24  refers to 1.158 million unaccounted for.

25          The email on 17 precedes that, correct?

Papa – Cross – Schafhauser

1    THE WITNESS:  The email on 17?

2    THE COURT:  Yes, I'm trying to get a timeline --

3  part of this is about when you say you didn't hear back

4  further.

5    You clearly got what's in 17.

6    THE WITNESS:  Yes.

7    THE COURT:  Did you get a response to 128 requesting

8  backup for 1.158 million?

9    THE WITNESS:  I did not.

10    THE COURT:  From neither Mr. Schafhauser nor

11  Mr. Friedman?

12    THE WITNESS:  Correct.

13    THE COURT:  I'm sorry, I just wanted to make sure I

14  was following the timeline.

15    Go ahead.

16    MR. SCHAFHAUSER:  That's what I wanted to delve

17  into, Mr. Papa.

18  Q    You received the hand delivery from Mr. Friedman

19  regarding credit card information, yes?

20  A    Yes.

21  Q    And what information did you receive from Mr. Friedman?

22  A    It was the backup for maybe four or five credit card

23  payments that were selected by the auditors as part of their

24  process.

25    And it's all clearly identified on my schedule that

Papa - Cross - Schafhauser

1  I provided to you as to which of those items I received backup

2  that were hand delivered to me.

3  Q    Now, did you have a conversation with Mr. Friedman about

4  the credit card information when he hand delivered it to you?

5  A    I would think so, yes.

6  Q    Did he tell you that if you needed anything else, you

7  should ask him to specify?

8  A    Yes.

9  Q    And when he said that, when he was in your office, what

10  did you say in response?

11  A    I said in response -- in terms of the audit, I do not

12  need any other information because the auditors are not

13  selecting further transactions for testing.

14         The purpose of that exchange was to satisfy an audit

15  requirement.

16  Q    So what Mr. Friedman provided you with this hand

17  delivery -- by they way, it was Mr. Friedman, not some

18  messenger, right, he came to your office?

19  A    I think so, yes.

20  Q    Okay.  And you spoke directly with him, right?

21  A    Yes.

22  Q    Okay.  And whatever you needed for the audit, he provided

23  for you, correct?

24  A    Only in terms of these test transactions.

25         Whatever you need for the audit is way too broad a

Papa – Cross – Schafhauser

1    statement.

2    Q    All right.  Did the auditors ever tell you that what

3    Mr. Friedman had provided was insufficient for them to

4    complete their audit?

5    A    In terms of these particular transactions?

6    Q    Yes.

7    A    No.

8    Q    And has the audit been, in fact, completed?

9    A    It was not.

10          THE COURT:  Which audit are we talking about?  By

11   whom?

12          THE WITNESS:  The company was trying to get audited

13   2014 financial statements.  That's the audit we're referring

14   to now.

15          THE COURT:  Okay.  This is an outside auditor?

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.  Go ahead.

18   BY MR. SCHAFHAUSER:

19   Q    Now, you, in fact, did receive another set of documents

20   relating to credit cards on behalf of Mr. Friedman after that,

21   correct?

22   A    Another set of documents?  I don't think so.

23   Q    Okay.  Let me -- there should be --

24          May I approach the witness, Your Honor?

25          THE COURT:  Of course.

Papa - Cross - Schafhauser

1    MR. SCHAFHAUSER:  There's so many boxes, Mr. Papa,

2    here.  I'll do it on the record, I just wanted to hand the

3    witness.

4    A    Oh, you're referring to that box?

5         THE COURT:  Can you just identify the --

6         MR. SCHAFHAUSER:  Yes.  Referring to -- I'm sorry,

7    referring to Exhibit 42A and B, and with the Court's

8    permission, I'm going to hand you documents and then I'll walk

9    back and we'll --

10   A    I remember getting this box.

11   Q    Just a second, I just want to give you...

12        THE COURT:  Are you selecting certain documents out

13   of the box or just the whole two boxes?

14        MR. SCHAFHAUSER:  I'm selecting a subset of the

15   boxes, yes.

16        MR. ROSENBLATT:  Your Honor, can we have a break?

17   We just have them in that room, we'd like to go get them.

18        THE COURT:  Yes, go ahead.  Take moment also.

19        (Recess was taken.)

20        MS. NELKIN:  Your Honor, these are two bankers

21   boxes.

22        THE COURT:  He will tell you which particular

23   documents are Bates-stamped, yes?

24        MR. SCHAFHAUSER:  They are.

25        THE COURT:  Okay.

Papa - Cross - Schafhauser

1    MR. SCHAFHAUSER:  And by the way, on the Bates stamp

2  issue we, have re-Bates stamped --

3    THE COURT:  We'll take care of that at the break.

4  BY MR. SCHAFHAUSER:

5  Q   Mr. Papa, I put before you, there is a series of

6  documents bearing the Bates stamps of EF, and they're -- and

7  those are in Exhibit 42A, the first of the two boxes, and it

8  goes from EF1 through EF1099.

9    Do you have those?

10  A   The whole thing you're referring to?

11  Q   Yes, I'm referring to the whole thing.

12  A   I assume it's the stack.

13  Q   Yes, that's the stack that I put before you.  Okay.

14    Did you receive this information from my office?

15    MS. NELKIN:  Your Honor, could we just have a moment

16  to retrieve the boxes?

17    THE COURT:  Yes.  Though, I question the

18  practicality of asking Mr. Papa on the stand to determine

19  whether the thousand-case stack in from of him is the same set

20  of documents he's received previously.

21    MR. SCHAFHAUSER:  Your Honor, I think the witness

22  testified that we never produced any documents subsequent to

23  this email regarding credit cards, and that's what I'm trying

24  to explore.

25    THE COURT:  Do you know if you've seen this stack of

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Papa – Cross – Schafhauser

1    documents before?

2            THE WITNESS:  This stack came in Friday morning and

3    was immediately sent out for copying.  I have not looked at it

4    at all.

5            THE COURT:  Do you recognize this generally as a set

6    of documents received on Friday morning, this past Friday?

7            THE WITNESS:  Yes.

8            THE COURT:  Okay.

9            THE WITNESS:  Yes.

10   BY MR. SCHAFHAUSER:

11   Q    So just to short circuit this in the light of the Court's

12   question, you don't -- withdrawn.

13           Do you recognize the two boxes, 42A and 42B,

14   generally as the stack of documents that you received last

15   Friday morning?

16   A    Generally, yes.

17   Q    Okay.  And I think I heard you say you haven't reviewed

18   these documents yet, correct?

19   A    Correct.

20   Q    So you don't know really what's within this set of

21   documents, right?

22   A    Correct.

23   Q    Well, could you just take a look at the first --

24           THE COURT:  To the extent that there's an issue

25   about whether what's in these two boxes vindicates the

Papa - Cross - Schafhauser

1  obligation, if any, in response to the plaintiff's request, I

2  think we can take that up among counsel.  But he hasn't

3  reviewed it, I don't know the utility of asking this witness

4  to discuss the documents.  Just get to the point of the

5  question.

6          MR. SCHAFHAUSER:  We can move on, Your Honor.

7          THE COURT:  Okay.

8          MR. SCHAFHAUSER:  I understand.  I really just

9  wanted to establish that these documents have been delivered.

10         THE COURT:  Okay.  I take it we can stipulate folks

11 that you got these documents on Friday?

12         MS. NELKIN:  Your Honor, they were sent to Mr. Papa,

13 they were not sent to us.

14         THE COURT:  All right.  And he's told us that he

15 received it, and I'm sure -- well, you now have the copies.

16         MS. NELKIN:  We now have the copies.

17         THE COURT:  Okay.  Good.  Let's move on.

18 BY MR. SCHAFHAUSER:

19 Q    Now, in addition to 42A and B, and the D17 set of

20 documents that we looked at, did you receive other documents

21 from my office on behalf of my clients?

22 A    Well, yes.

23 Q    Okay.  And can you just describe for the Court what those

24 documents comprise?

25 A    I believe you're referring to the vendor files, those

Papa – Cross – Schafhauser

1  boxes.

2        Again, I don't know who they come from sometimes,

3  they're just boxes that show up in my office.

4  Q    Okay, very well.  Let me try to do it this way to narrow

5  this.

6        Could you please take a look at D3, Defendant's

7  Exhibit 3.

8        Mr. Papa, are you at D3?

9  A    Yes.

10 Q    Do you recall receiving this letter?

11 A    Yes.

12 Q    Okay.  And were there, in fact, documents enclosed with

13 this letter?

14 A    Yes.

15 Q    Okay.  We'll get to the specifics momentarily.  Right now

16 I'd like you to turn to D4.

17       Do you recall receiving a second delivery from my

18 office on or about December 30, 2015?

19 A    Yes.

20 Q    And there were documents enclosed in the second delivery

21 as well, correct?

22 A    Yes.

23 Q    Okay.  And could you please take a look at -- so you

24 recognize this letter, yes?

25 A    Yes.

Papa – Cross – Schafhauser

1   Q    Okay.  Could you turn to D5, please.

2         Do you recognize this letter?

3   A    Yes.

4   Q    Okay.  And you received an additional set of documents

5   from Miss Sekowski of Howard Feinstein on or about

6   January 15th, 2016, correct?

7   A    Can you repeat that?  I'm sorry, I was reading the

8   letter.

9   Q    Take your time.  I'm not looking to rush you.

10  A    I wasn't listen to the question, I'm sorry.

11  Q    Is it correct that you, in fact, received an additional

12  set of documents on or about January 15th, 2016 from my

13  office?

14  A    I'm not certain which documents I received from this --

15  with this letter.

16  Q    All right.  Well, let's at least look, then, at the last

17  sentence of this letter where she refers to:

18         "Also enclosing a letter from Two Rivers Coffee from

19  the State of New Jersey Department of Labor and Workforce

20  Development which was delivered to 33 Saint Nicholas Avenue,

21  Lakewood, New Jersey."

22         Do you see that?

23  A    Yes.

24  Q    Do you recall receiving that document?

25  A    Yes.

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Papa – Cross – Schafhauser

1  Q    Now, you testified -- well, how voluminous were the

2  documents that you received back in December and January from

3  my office?

4  A    They were maybe five or six boxes like the size of these.

5  Maybe a little bigger.

6  Q    All right.  And you reviewed those boxes?

7  A    Briefly.

8  Q    Briefly.  How long did you take to review the boxes, the

9  five or six boxes?

10 A    I had gone through them less than an hour.

11 Q    And did you do anything with the information that you

12 received in December, January from my office?

13 A    No.

14 Q    Did you input it on any systems?

15 A    No.

16        THE COURT:  Did you elicit what it was that was

17 sent?  I'm sorry.

18 Q    What was it that was received in those boxes?

19 A    Well, generally, they were vendor invoices that had

20 already been paid and/or recorded.

21        They were more historical records than current

22 records.  They didn't require to be entered.

23 Q    So, therefore, nothing needed to be done with respect to

24 those particular records, right?

25 A    Correct.

Papa - Cross - Schafhauser

1    MR. SCHAFHAUSER:  Your Honor, I don't recall whether

2   there was a stipulation already placed as to whether Exhibit 1

3   was, in fact, received.

4           I can go through that if the stipulation isn't.

5           THE COURT:  Is there any dispute that the boxes

6   marked as Exhibit 1 allegedly were received?

7           MS. NELKIN:  If I could just have a moment to look

8   at Exhibit 1.

9           THE COURT:  Sure.

10          MR. NELKIN:  What's the Bates range?

11          MR. SCHAFHAUSER:  Again, the Bates range we've been

12  talking about, but Exhibit 1 is -- it starts with -- it's the

13  EX series of documents, which you pointed out, I think, is

14  redundant with the Bates range of another set and that's

15  why --

16          MR. NELKIN:  Weren't there some unopened letters in

17  the box that you produced?

18          MR. SCHAFHAUSER:  No, no, that was -- that was in

19  Exhibit 42.

20          Exhibit 1 is what was back in December.

21          MS. NELKIN:  Your Honor, we did receive these

22  documents.  In fact, "we," I mean my law firm.  We received

23  some of them on the first day of the hearing and some of them

24  periodically.  I really don't know what Mr. Papa has received.

25          THE COURT:  Okay.  Ask Mr. Papa.

Papa – Cross – Schafhauser

1    MR. SCHAFHAUSER:  Okay.  Very well.

2    MR. NELKIN:  Is it your representation that the

3  unopened letters are in box 42?

4    THE COURT:  That's something you can up take at the

5  break.

6    Ask a question for Mr. Papa about Exhibit 1.

7  BY MR. SCHAFHAUSER:

8  Q   All right.  I want to show you -- get to the questioning

9  momentarily.

10    MR. NELKIN:  Ten seconds.

11    MR. SCHAFHAUSER:  Sure.

12    THE COURT:  Just so the record reflects, you're

13  showing a collection of three boxes, is it, marked as

14  Exhibit 1?

15    MR. SCHAFHAUSER:  Yes.

16    THE COURT:  I'll note I don't have them here with

17  me, I don't necessarily want you to take the time to bring

18  them to me, unless there's a reason I need to look at it.

19    MR. SCHAFHAUSER:  Thank you.  I do have another set,

20  but thanks.

21    THE COURT:  I'm in danger of breaking an ankle with

22  the number of boxes.

23    MR. SCHAFHAUSER:  Let's go back on.

24    THE COURT:  We are.

25

Papa – Cross – Schafhauser

1   BY MR. SCHAFHAUSER:

2   Q    What I've just taken out of the smaller of the three

3   boxes is a set of documents with a Bates range of EF001114

4   through EF0011506.

5        So I want to show these to you, Mr. Papa, and ask

6   you whether you recall receiving these documents back in

7   December, January of this year.

8        MR. NELKIN:  Can I ask you to repeat the range?

9        MR. SCHAFHAUSER:  It's EF0011140 through EF0011506.

10  BY MR. SCHAFHAUSER:

11  Q    And the question, Mr. Papa, is:  Whether you recall

12  seeing these and receiving these?

13  A    I don't recall seeing these.

14  Q    All right.  Well, take a look at the first document, it

15  lists additional insureds on a policy, you see relating to

16  Selective Insurance Company of New England, and the Bates

17  number on that is EF00111403.

18        Do you see that?

19  A    Yes.

20  Q    Okay.  Do you recall receiving insurance documents from

21  my office back in December or January?

22  A    Do I recall?  No.

23  Q    Did you do an inventory of the documents that you

24  received from my office?

25  A    No.

Papa – Cross – Schafhauser

1   Q    Did anyone else prepare an inventory of the documents

2   that you received from my office?

3   A    I did not receive an inventory certainly with the

4   documents, nor did I prepare one.

5   Q    Now, I think you said earlier that you -- sorry.  You

6   received mainly vendor invoices, right?

7   A    To the best of my recollection, yes.

8   Q    Okay.  Other than vendor invoices, what other types of

9   documents do you actually recall having received?

10  A    From your office?

11  Q    Yes.

12  A    There might have been some customer folders in there.  I

13  don't know what else was in there.  I can't recall the

14  contents of a box, I'm sorry.

15  Q    Do you have any reason to doubt that the boxes

16  collectively marked as Exhibit 1 were, in fact, received by

17  you?

18  A    No, I have no basis to doubt it.  I mean...

19  Q    You testified yesterday about Mr. Friedman's office.  I

20  think you said that the office was locked?

21  A    Yes.

22  Q    And you had received a key to the office from someone

23  associated with Mr. Friedman, right?

24  A    I received a key from an employee of the Two Rivers

25  company who worked with Mr. Friedman, yes.

Papa – Cross – Schafhauser

1   Q    Okay.  And who was that employee?

2   A    Criseidy.  C-R-I-S-E-I-D-Y.  Molina, M-O-L-I-N-A.

3   Q    Now, did anyone have a master key to Mr. Friedman's

4   office?

5   A    I have no idea.

6   Q    Do you know whether either Steven Schreiber or Eugene

7   Schreiber had a key to access Mr. Friedman's office?

8   A    I have no idea who had keys.

9   Q    Did you ever see Mr. Friedman enter the Two Rivers

10  facility after the preliminary injunction was entered?

11  A    No.

12  Q    Do you have any reason to believe that Mr. Friedman ever

13  went to the Two Rivers facility after the preliminary

14  injunction was entered?

15  A    I never thought about it.

16  Q    But sitting here today, you don't have any reason to

17  believe that he did; do you?

18  A    Not on my radar what he does.

19  Q    Okay.  You mentioned -- you were asked about a laptop

20  yesterday.  And if I heard you correctly, you said you saw a

21  bag that looked like a laptop?

22  A    I said I saw him carrying a bag and what looked like a

23  laptop in the bag.

24  Q    Now --

25           THE COURT:  But you saw the device itself?

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Papa – Cross – Schafhauser

1    THE WITNESS:  Yeah, I saw the top edge of it.  It

2  was in a bag and I saw the top edge and it looked like a

3  laptop.

4    THE COURT:  You're not just inferring it from the

5  shape of the bag?

6    THE WITNESS:  No.

7    THE COURT:  Okay.

8  Q    Well, how much of the device did you see?

9  A    I saw the top edge.  It was in a bag and I would see the

10  top edge and it looked like a laptop.

11  Q    What did the bag look like?

12  A    It was any bag he grabbed for the day when he brought the

13  mail in.  So he typically would have just a bag, not a

14  courtroom professional bag, it was just a bag.  He brought

15  mail in, and it looked like a laptop in the bag.  It wasn't a

16  briefcase, it wasn't covered, it was just a bag.

17  Q    Very well.  Could you please describe to me that portion

18  of the device that you believe was a laptop -- what did you

19  see that made you think it was a laptop?

20  A    I saw the top edge.  It was a relatively thin piece of

21  what looked like a laptop.  I mean, we've all seen the top

22  edge of a laptop.  That's what I saw.

23  Q    Did you ever see him utilize the laptop?

24  A    I don't think so.

25  Q    Did you ever see the full laptop outside of what you saw

Papa – Cross – Schafhauser

1   on the top of the bag?

2   A    I don't think so.

3   Q    Do you know what, if anything, Mr. Friedman used what was

4   in that bag that you saw for?

5   A    What he used the laptop?  No, no, I don't know what he

6   used laptop for.

7   Q    And how long ago was it that you saw this bag?  Was it --

8   withdrawn.

9        Did you see this bag on one occasion or more than

10  one occasion?

11       THE COURT:  The bag or the device inside it?

12       MR. SCHAFHAUSER:  The bag with the device -- oh,

13  withdrawn.  Let me clarify.

14  Q    As I understand it, you saw a bag and protruding from the

15  top of the bag was something that you believed looked like a

16  laptop, correct?

17  A    Yes.

18  Q    Okay.  How many times did you see that combination of

19  items?

20  A    I have no idea.

21  Q    Was it one time or more than one time?

22  A    You're asking me to guess.  I mean, you know, I saw -- I

23  don't know how many times I saw it.  I'm not guessing.

24  Q    And how long was it that you last saw that?

25  A    Again, I don't recall the dates that I saw these.  He was

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

Papa - Cross - Schafhauser

1   coming and going on a regular basis.  I don't know when I saw

2   it.

3   Q    It could have been two years ago, three years ago or four

4   years ago, correct?

5   A    No, not that far.

6   Q    Okay, how far would you go back?

7   A    Well, my more -- I saw him more frequently in South

8   Plainfield, so I would certainly say since the middle of the

9   2014 when we moved.  April of 2014 when we moved into that

10  building.

11        Prior to that, I didn't see him all that often.

12  Q    All right, but other than April of 2014, are you able to

13  place the date with any more specificity than that?

14  A    No.

15  Q    So it could have been that month or somewhere subsequent

16  to that; is your testimony?

17  A    Yes.  Yes.

18  Q    You testified that Launch became inactive sometime in

19  February.  We went over this, I'm just trying to place the

20  date for you.

21        Whenever it was that Launch became inactive, did you

22  ever reach out to Mr. Rogosnitzky to request that Launch be

23  reactivated?

24  A    Prior to the TRO?

25  Q    At any point in time.

Papa - Cross - Schafhauser

1  A    Frequently I would reach out to him to tell him I had

2  problems accessing Launch.

3  Q    Okay.  And this is prior to the TRO?

4  A    Yes.

5  Q    And you knew that he was the one who was operating

6  Launch, correct?

7  A    He was the one developing Launch.

8  Q    And so when you had a problem with Launch, you reached

9  out to Yossi, right?

10 A    Yossi or Ben.

11        THE COURT:  I don't want to cut off in the middle,

12 but I want to be sure we get our midmorning break.

13        Is this a good time?

14        MR. SCHAFHAUSER:  Yes, this is fine.

15        THE COURT:  Let's take our midmorning break.

16        MR. SCHAFHAUSER:  That's fine.

17        (Recess was taken.)

18        THE COURT:  Okay.

19        MR. SCHAFHAUSER:  Thank you, Your Honor.

20 BY MR. SCHAFHAUSER:

21 Q    Just before the break, I think we were talking about

22 Yossi Rogosnitzky and you interacted with him before the

23 preliminary injunction, correct?

24 A    Yes.

25 Q    How many times did you talk about Mr. Rogosnitzky?  Can I

Papa – Cross – Schafhauser

1    call him Yossi?

2    A     Fine with me.

3    Q     I have difficulty with his last name, Mr. Papa.

4          So, Yossi, how many times did you interact with

5    Yossi over the years?

6    A     More than 50.

7    Q     And on each occasion you were interacting with him

8    regarding the Launch coffee system, correct?

9    A     Yes.

10   Q     Okay.

11         I want to show you another document that you should

12   have with you, it's Exhibit 45.  It's among the --

13         May I approach the witness?

14         THE COURT:  Yes.

15   A     I got it.

16   Q     You got it?

17   A     Yes.

18   Q     Do you recognize Exhibit 45?

19   A     Yes.

20   Q     And could you describe for the Court, generally, what

21   this relates to?

22   A     This is the result of an ongoing dispute I was having

23   with Yossi and the way Launch coffee works, specifically

24   addressing a bank reconciliation process.

25   Q     All right.  And take a look, please, on the second page.

Papa - Cross - Schafhauser

1       Do you recognize that document?

2   A    Yes.

3   Q    What is that document?  What is that page, rather?

4   A    It's a comparison of -- it's bank reconciliations for

5   each month, Launch coffee is the top set, LC; and QuickBooks,

6   QB, is the bottom set, and I'm comparing bank and book

7   balances and outstanding checks in both systems.

8   Q    All right.  So when you saw you're comparing, do I have

9   it correct that you prepared this document?

10  A    I or somebody on my staff.

11  Q    So just so I understand, there's a June 2015 difference

12  that I see of $100.

13       Do you see that?

14  A    Yes.

15  Q    And then there's a July 2015 difference of a much bigger

16  number, $215,000, correct?

17  A    Well, yes, but...

18  Q    But the July 2015 number really wasn't completed, right?

19  A    Correct.

20  Q    So we can throw out the July 2015 number, yes?

21  A    Yes.

22  Q    Okay.  So the most recent reconciliation for Launch, at

23  least on this piece of paper, indicated to you that within

24  $100, the information on Launch matched the information on

25  QuickBooks, yes?

Papa - Cross - Schafhauser

1   A    Yes.

2   Q    And then for the month prior, for May 2015, it matched

3   exactly, correct?

4   A    Just to be specific, this is just the information in one

5   account on Launch coffee, the cash account.

6   Q    Okay.  So just talking about the cash account.

7         The cash account information from May 2015 that you

8   tested matched exactly on the Launch and QuickBooks, right?

9   A    Correct.

10  Q    Did you do any -- and we won't go through this whole set

11  of numbers, but did you do any reconciliation of the Launch

12  and QuickBooks system for any period after July 2015?

13  A    I don't recall when I stopped exactly reconciling the

14  Launch.

15  Q    But I take it from your answer that at some point you did

16  stop?

17  A    Yes.

18  Q    Okay.  And why did you stop doing those reconciliations?

19  A    Well, after December 4th, there were no disbursements

20  made on Launch coffee.

21  Q    December 4th being -- what was the significance of that

22  date?

23  A    That was the date of the TRO.  Well, the date.

24  Q    And is the reason that there were no disbursements made

25  on Launch after December 4th, that the only persons who had

Papa – Cross – Schafhauser

1   made disbursements on Launch before the TRO were affiliated

2   with the defendants?

3   A    Yes.

4   Q    And after December 4th, you did not attempt to make any

5   disbursement using Launch, correct?

6   A    Correct.

7   Q    After December 4th, you utilized solely the QuickBooks

8   system for financial management, correct?

9   A    Yes.

10  Q    Now, sometime this year, Launch became inactive, right?

11  A    Yes.

12  Q    And how did you find out about that?

13  A    I attempted to access it and my access was denied.

14  Q    I know you said you had spoken with Yossi about 50 times

15  previously.

16       Did you attempt to contact him when your access was

17  denied?

18  A    No.

19  Q    Why not?

20  A    Because I thought he was out of the picture and I didn't.

21  Q    So from the date that access was denied on Launch to you

22  until today, have you ever tried to communicate with Yossi to

23  reinstitute Launch?

24  A    No.

25  Q    Do you know whether anyone on behalf of Two Rivers Coffee

Papa - Cross - Schafhauser

1  has attempted to reinstitute Launch through Yossi between the

2  dates that I just described?

3  A     Not to my knowledge.

4  Q     Did you ever learn that Yossi asserted that an amount was

5  due and owing for Launch?

6  A     No.

7  Q     Did you ever attempt to determine the reasons why Launch

8  became inactive?

9  A     No.

10 Q     Why not?

11 A     I don't know -- I don't know why.  I mean, it's -- it was

12 inactive.  I don't know why I would even ask him a question at

13 that point.

14 Q     Well, on the 50 prior occasions or so that you

15 communicated with him, was there ever a time when he refused

16 to answer your call?

17 A     Absolutely.

18 Q     Well, and how many -- when was the last time that he

19 refused to speak with you?

20 A     He would only speak to me when he was quote/unquote

21 authorized to do so.

22 Q     Okay.  And did you attempt to contact him to ask him to

23 get authorization to speak with you?

24 A     Prior to the TRO?

25 Q     No, after the TRO.

Papa - Cross - Schafhauser

1   A    I didn't contact him after the TRO.

2            THE COURT:  You seem to have something in mind that

3   you haven't said yet.  What was going on when Launch -- back

4   to Launch, do you have an understanding of what was going on?

5            THE WITNESS:  After the TRO?

6            THE COURT:  Yes.

7            THE WITNESS:  It was disconnected because of the

8   issue before the Court.  That was my impression.

9            No one ever told me why it was disconnected, I just

10  assumed it was because the issues before the Court.

11           THE COURT:  Go ahead.

12  BY MR. SCHAFHAUSER:

13  Q    So just so I understand.  No one told you the reason why

14  the Launch was disconnected, correct?

15  A    Correct.

16  Q    You simply made an assumption on your own as to the

17  reason why Launch was disconnected, yes?

18  A    Okay.

19  Q    No, I'm asking.

20           Is that correct?

21  A    I honestly didn't think about it.  It's an on or off.  I

22  either have access or I don't.  I didn't get into why I don't

23  have access.  I have way too much to do to debate why or -- I

24  do or I do not have access.  I did not have access.  I

25  notified Mayer and Eugene, and I moved on.

Papa – Cross – Schafhauser

1   Q     Okay.  You as the company CFO believed that access to

2   Launch was necessary or not necessary?

3   A     Necessary.

4   Q     Okay.  Other than notifying Mayer and Eugene, did you

5   contact anyone else about access to Launch after it was

6   discontinued?

7   A     No.

8   Q     Now, between the time that -- I think you said

9   December 4th was the TRO date, yes?

10  A     It's on or around that date.

11  Q     I'm not going to quibble, sometime in early December.

12  A     Yes.

13  Q     In early December, did you or anyone on Two Rivers'

14  behalf take any steps to image the Launch system?

15  A     I did not.

16  Q     Did anyone take any steps to save electronically?

17        THE COURT:  I understand what he did with the

18  device, but what are you asking about with the different

19  systems?

20        MR. SCHAFHAUSER:  Fair point.  Let me try to be more

21  clear here.

22  Q     Did you or anyone at Two Rivers attempt to image the data

23  or preserve the data that was accessible on Launch?

24  A     Not to my knowledge.

25  Q     Were there any backup tapes that Two Rivers Coffee

Papa – Cross – Schafhauser

1  implemented or backup servers with respect to the Launch

2  system?

3  A    There was a backup routine for our server.  I don't know

4  if it was backing up Launch because, honestly, I never knew

5  where Launch actually resides, which server it was on.

6         So I did not handle the backups, Ben or Yossi were

7  responsible for quote/unquote back-ups.

8  Q    Okay.  And when Launch was discontinued, whenever that

9  date was, did you attempt to contact Mr. Nussbaum about Launch

10  or the backups?

11  A    No.

12  Q    Did you attempt to access the backups?

13  A    Who?

14  Q    You.

15  A    I'm not even aware of backups existing so I would say,

16  no.

17  Q    Did you inquire of anyone as to whether backups existed?

18  A    No.

19  Q    Earlier you testified about pieces of equipment, I think

20  you said it was 800,000 to a million dollars in the aggregate

21  for the two pieces.

22         Do I have that right?

23  A    Yes.

24  Q    Has that money already been paid?

25  A    Some has.

Papa – Cross – Schafhauser

1    Q    How much of it has been paid?

2    A    Roughly 2, maybe 300,000; 2 to 300,000.

3    Q    And when does the balance become payable, as to your

4    understanding?

5    A    For one equipment –– for both it's progress payments

6    within a year.

7    Q    In other words, the remaining balance is due within the

8    year?

9    A    Yes.

10   Q    Now, have any of the company's members or offices

11   received increases in salary or distributions since the TRO

12   was entered?

13            MR. ROSENBLATT:  Objection.

14            THE COURT:  Sustained.

15   Q    Has the company made distributions to any members since

16   the TRO was entered?

17            MR. ROSENBLATT:  Objection.

18            THE COURT:  Sustained.

19            MR. SCHAFHAUSER:  Let me move on to another area.

20            You gave testimony yesterday about credit cards and

21   receipts that were being sought.

22            Do you remember that generally the testimony?

23   A    Yes.

24   Q    Now, whose line of credit was backing those credit cards?

25   A    I don't really know because I don't know exactly whose

Papa – Cross – Schafhauser

1    name the credit cards were in.

2    Q    Can you please take a look at Plaintiff's Exhibit 92.  I

3    think you testified earlier that Ms. Ezell was looking for

4    credit card information and backups?

5    A    Yes.

6    Q    You understood that would be part of her responsibility?

7    A    Yes.

8    Q    Okay.  Would you flip the page, please, from the first to

9    the second page of Exhibit 92.

10            Have you ever seen this statement or similar

11   statements to it prior to today?

12   A    No, I have never seen this before.

13   Q    Okay.  Now, as the company's chief financial officer, do

14   you know what bank issues the credit cards for the company's

15   officers and members?

16   A    Are you talking prior to the TRO?

17            There were no company-issued credit card that I'm

18   aware of.

19   Q    Do you know whether Mr. Steven Schreiber had a card that

20   he utilized for company expenses?

21   A    Do I know?  Yes.  Well, yes.

22   Q    What cards did he -- please describe what card was used?

23   A    He used an American Express card.

24   Q    Okay.  And Mr. Eugene Schreiber also had an American

25   Express card for company use?

Papa - Cross - Schafhauser

1    A    I don't recall specifically.  There were no -- you said

2    company?  I'm sorry.

3    Q    Yes.

4    A    There were no company-issued credit cards.

5         THE COURT:  I think he's talking about -- you're

6    talking about regardless of whose name was on the card used by

7    officers or members to incur expenses for the company?

8         MR. SCHAFHAUSER:  Yes.

9         THE COURT:  Okay.  Any cards like that?

10        THE WITNESS:  That they -- their individual cards?

11        THE COURT:  Regardless of whose cards, cards used

12   for company purposes.

13        THE WITNESS:  Yes.

14   BY MR. SCHAFHAUSER:

15   Q    Regardless of who issued the -- and the Court accurately

16   saw where I was falling short.  Regardless of who was issuing

17   the card, were there credit cards available for use by the

18   company's members?  Pre-TRO we're talking about.

19   A    Well, again, what I saw was Chase 4390.  That's the

20   extent of what I saw, that credit card.  I did not enter the

21   card, I did not disperse the payment for the card, so I can't

22   really say whose cards these are.

23   Q    All right.  Now putting aside whose card it is, do you

24   know who arranged for the cards to be issued?

25   A    Do I know?  No.

Papa - Cross - Schafhauser

1    Q    Do you know who had the Chase 4391 account that you just
2    mentioned?
3    A    No.
4    Q    Take a look, please, at Exhibit 14, D14.  Same book.
5         Have you seen this email previously?
6    A    Have I seen this email?  I don't remember.
7    Q    All right, so let's put aside this email.
8         Do you recall being aware that Ms. Ezell frequently
9    asked Mr. Koenig and Steven Schreiber and Eugene Schreiber for
10   receipts for credit cards?
11   A    Yes.
12   Q    And do you know whether she also asked Mr. Friedman for
13   receipts for credit cards?
14   A    I don't know if she asked him or not.
15   Q    That part you don't know, but you know about the request
16   for Mr. -- the Schreibers and Mr. Koenig, yes?
17   A    Only because on occasion she would ask me for assistance
18   about obtaining those receipts.
19   Q    All right.  And did she tell you that there was an issue
20   in getting the receipts that she was looking for?  Is that why
21   she contacted you?
22   A    Yes, she needed help.
23   Q    Okay.  And you attempted to help her and give her the
24   receipts that she was looking for, yes?
25   A    That's kind.

Papa - Cross - Schafhauser

1  Q    Well, I don't want to put words in your mouth.

2  A    I didn't verify that request.

3  Q    Let me go back, then, on my question.  Let me ask it a

4  different way.

5            What, if anything, did you do when Ms. Ezell asked

6  for your assistance in obtaining the receipts from Steven

7  Schreiber, Eugene Schreiber and their cards?

8  A    The most I would do is I would contact one of the three

9  and say, please, give Sonia the receipts she requires.

10

11            (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PAPA - CROSS - SCHAFHAUSER

1   CROSS EXAMINATION

2   BY MR. SCHAFHAUSER:

3   Q    And what, if anything, else did you do other than that

4   with respect to that issue?

5   A    To that request?  That's all I did.

6   Q    And do you know whether they did provide the receipts, or

7   you weren't part of it at that point?

8   A    No.  I didn't stay on top of it.

9   Q    Very well.

10       Now I think you testified that Eugene Schreiber said

11  that you were asking too many questions about expenses,

12  correct?

13  A    Yes.

14  Q    When he said that, he was saying that you were asking too

15  many questions about expenses of Eugene, Steven and Mayer,

16  correct?

17  A    Say that again.

18  Q    When he said you were asking too many questions about

19  expenses, did he describe why he believed you were asking too

20  many questions about expenses?

21  A    Yes, he was concerned that a Emil was getting upset with

22  the level and depth of my questions and that if I didn't,

23  quote/unquote, stop asking questions I may be terminated.

24       THE COURT:  But I think he's asking about questions

25  about what?  In other words, what was Mr. Friedman -- what

PAPA - CROSS - SCHAFHAUSER

1    kind of questions was Mr. Friedman concerned about that you

2    were asking?

3            THE WITNESS:  Well I was asking questions about

4    expenses.  I don't know exactly what Mr. Friedman was

5    concerned about other than the questions I was asking.

6            THE COURT:  You were asking questions about whose

7    expenses or what kinds of expenses?

8            THE WITNESS:  Leasehold improvements, interest

9    expense were the two that come to mind and lack of credit card

10   receipts at some point.

11           THE COURT:  Go ahead.

12   BY MR. SCHAFHAUSER:

13   Q    Now did Mr. Friedman tell you that you might be

14   terminated?

15   A    He never used those words directly.

16           THE COURT:  What did he say?

17   Q    So what you testified to --

18           THE COURT:  I just asked him to expand on that.

19           What did he say?

20           THE WITNESS:  He would tell me it's either none of

21   my business, or don't ask, or leave it alone, or something

22   like that.

23           THE COURT:  Go ahead.  Sorry.

24   BY MR. SCHAFHAUSER:

25   Q    So if I have it correct, your understanding that

PAPA - CROSS - SCHAFHAUSER

1   Mr. Friedman might have been inclined to terminate you, that

2   was based on an oral communication you had with Eugene

3   Schreiber only, right?

4   A      Yes.

5   Q      You don't have any firsthand knowledge about whether that

6   was true, correct?

7   A      Correct.

8   Q      And you don't have any firsthand knowledge as to whether

9   Mr. Friedman was actually complaining to Mr. Eugene Schreiber

10  about requests for credit card receipts do you?

11  A      Say that one again, I'm sorry.

12         THE COURT:  I think he asked if you heard

13  Mr. Friedman complain to Mr. Schreiber.

14         THE WITNESS:  Did I hear Mr. Friedman complain to

15  Mr. Schreiber, no, I did not.

16         THE COURT:  Go ahead.

17  BY MR. SCHAFHAUSER:

18  Q      Mr. Papa, a computer with the host name of Sonia's PC, do

19  you know whether that computer was located in the South

20  Plainfield facility?

21  A      I don't specifically know which computer that's referring

22  to.

23  Q      Do you know whether there was a computer located in South

24  Plainfield other than the computer that had been utilized by

25  Mr. Friedman that was sent for imaging?

PAPA – CROSS – SCHAFHAUSER

1    A    Yes.

2    Q    And what computer was that?

3    A    It was a computer that was in Sonia's office.

4    Q    When was Ms. Rivera last in her office in South

5    Plainfield to your knowledge?

6    A    I don't remember the date that she relocated.

7    Q    Let me ask it this way:  Did Ms. Rivera, to your

8    knowledge, ever access the Two Rivers facility in South

9    Plainfield after the TRO was entered?

10   A    After the TRO, I do not believe she did.

11   Q    And where was Ms. Rivera's computer maintained after the

12   TRO was entered, the one that you're referring to now?

13   A    In the server room.

14   Q    And that server room, was that in an enclosed area?

15   A    It's enclosed but it's not locked.

16   Q    It's not locked.  So people can access it if they wished

17   to go in, yes?

18   A    They cannot access the computer.

19   Q    And why can't they access the computer?

20   A    Because there was password on it that nobody had.

21   Q    Who had possession of the password?

22   A    I have no idea.

23   Q    Was there anything physically preventing them from

24   accessing the computer hardware?

25   A    Who is "they?"  You said prevent them.

PAPA - CROSS - SCHAFHAUSER

1    Q    Anyone?

2    A    Well, the floor is certainly controlled, you can't have

3    access to the floor, you know, the upstairs offices have

4    controls on them.  So not anyone could come in and access that

5    location or computer.

6    Q    Now just so I'm clear, after December 4th, whenever the

7    TRO was entered, you're not aware of any of the defendants

8    being present in the South Plainfield facility, correct?

9    A    Correct.

10   Q    Now if a Stroz report were to indicate that a USB device

11   was in Ms. Rivera's computer in South Plainfield after

12   December 4th, what is your explanation for that if you have

13   one?

14   A    A USB device was in Sonia's computer after the TRO?

15   Q    Yes.

16   A    I can only guess if you want me -- do you want me to

17   guess?

18   Q    I don't want you to guess.

19   A    It is a guess.

20        THE COURT:  I don't want you to guess because it

21   won't help me with anything.

22   Q    I don't think the Court wants you to guess either.

23   A    I don't have an explanation.

24   Q    Let me rephrase the question.  You don't have an

25   explanation for that if that were the case, correct?

PAPA - CROSS - SCHAFHAUSER

1    A    Correct.

2    Q    Now in that same room a server is located I think you

3    testified, right?

4    A    Yes.

5    Q    Please describe the server that is located in that room,

6    what does it look like?

7    A    Describe the server?

8    Q    Yes.

9    A    It's a flat electronic device that looks like a server.

10   Q    Okay.  And that server is also accessible, correct,

11   without a lock on the door, right?

12   A    Correct.

13   Q    If the Stroz report were to indicate that the server in

14   that room had USB devices connected to it after the TRO was

15   entered in early December, do you have an explanation for

16   that?

17   A    Yes.

18   Q    What is the explanation for that?

19   A    We hired remote IT support and they were attempting to

20   backup our systems.  So they may have accessed the server to

21   determine what was on the server and how to back it up.

22   Q    So if USB devices were listed in the report relating to

23   that server, it's possible that it was due to whoever you

24   hired, correct?

25   A    Could be, I don't know exactly what they did but they may

PAPA - CROSS - FELDMAN

1  have used a USB device.

2  Q    And who did you hire?

3  A    AppSolute, A-P-P solute, one word.

4  Q    What did AppSolute do with respect to the server?

5  A    They attempted to access it.  At first we had no password

6  to it, and then they attempted to update and install antivirus

7  software and a backup routine.

8  Q    And were they able to do that?

9  A    Eventually, yes.

10  Q    And so to the best of your knowledge, it's possible that

11  they attached a USB device or devices to that server?

12  A    Possible.

13            MR. SCHAFHAUSER:  Your Honor, give us 30 seconds, I

14  think I'm near the finish line.

15            THE COURT:  Sure.

16            MR. SCHAFHAUSER:  I have nothing further.

17            Thank you very much.

18            THE COURT:  Anything else?

19            MR. FELDMAN:  Just a couple of things, Your Honor.

20  CROSS-EXAMINATION

21  BY MR. FELDMAN:

22  Q    Good afternoon.

23  A    Hello.

24  Q    So as I understand it, you were hired in June of 2013?

25  A    Yes.

PAPA - CROSS - FELDMAN

1  Q    And you moved -- the company moved into the South

2  Plainfield facility April 2014?

3  A    Yes.

4  Q    So was it under construction throughout the period of

5  your tenure, from June 2013 until you moved in June -- I mean

6  in April of 2014?

7  A    I don't believe South Plainfield construction started as

8  early as June of 2013.  I don't remember exactly when it

9  started, but I don't think it was that early.

10  Q    So it happened after you were hired?

11  A    Yes.

12  Q    And was there a construction company who was hired?

13  A    Yes, there was one -- there was many.

14  Q    Were some of the people who worked on it, did they become

15  temporary employees of Two Rivers?

16  A    There were temporary employees on Two Rivers payroll, I

17  don't know exactly what they did 'cause I had no access to the

18  payroll nor any understanding of who these employees were.  So

19  I can't definitively answer that.

20  Q    Well, you knew there were 122 regular employees of Two

21  Rivers, right?

22  A    Well, 122 was an average.  The number of employees

23  fluctuates rather dramatically.

24  Q    Did you have occasion to go visit the construction site

25  as it was ongoing?

PAPA - CROSS - FELDMAN

1    A    Yes.

2    Q    You went to look at your office and look at your

3    furniture in your office -- or where furniture would be

4    placed, things like that?

5    A    I -- yes.

6    Q    And did you observe people who were not full-time

7    employees of Two Rivers but were these temporary workers?

8              MS. NELKIN:  Your Honor, I'm going to object as to

9    this line of questioning.  It seems like it's completely

10   outside the scope.

11             THE COURT:  I'll allow a little leeway to connect it

12   up to anything that's relevant here, so far I don't see it.

13             MR. FELDMAN:  I will tie it up in a second.

14             THE COURT:  Just so I understand, with respect to

15   temporary workers, do you know the people who were doing the

16   construction work were or weren't listed as temporary workers?

17             THE WITNESS:  I believe there were construction

18   temps or people who were doing construction work on the Two

19   Rivers payroll, but I don't know for a fact.

20             THE COURT:  You don't know, okay.

21   BY MR. FELDMAN:

22   Q    Were you asked to supply any information to Mr. Schreiber

23   in connection with his promulgation of the complaint in which

24   these temporary employees were listed?  Did you run a report?

25   A    Did I run which report?

PAPA - CROSS - FELDMAN

1  Q    Any report about these temporary employees.

2           THE COURT:  The predicate is in connection with

3  preparing the complaint.

4           MR. FELDMAN:  Well, if he has the payroll --

5           THE COURT:  But that was the predicate.

6           MR. FELDMAN:  Yes.

7           MS. NELKIN:  Objection as to relevance to this

8  hearing.

9           THE COURT:  Well, relevant and work product, I would

10  think.  It's a communication in anticipation of litigation.

11           MR. FELDMAN:  If he was asked by Mr. Schreiber it's

12  not -- if he's was not asked by counsel, he's asked by

13  Schreiber --

14           THE COURT:  All right.  In any event, what was

15  requested in connection with complaint is totally irrelevant

16  to this proceeding.

17           MR. FELDMAN:  Right.  Okay.

18  Q    Do you know whether or not these temporary employees --

19  withdrawn.  I don't want to ask that question.

20           So you stated that you had restated the 2012 tax

21  returns, right?

22  A    I restated the financial statements.

23  Q    The financial statements 2012.  And in that you basically

24  recognized revenue by -- which would have an effect on the net

25  income, right?

PAPA - CROSS - FELDMAN

1    A    No.  The 2012 restatement of financials had nothing to do

2    with the recognition of revenue.

3    Q    So you stated the 2012, and then there was a review of

4    2013?

5    A    Yes.

6    Q    And that was performed by whom?

7    A    Independent accountants that I forget their name at the

8    moment.

9    Q    Robert Kirchenblatt?

10   A    Thank you.

11   Q    And there was a review done of 2014 financial statements?

12   A    Yes, but not by Kirchenblatt.

13   Q    By a different firm?

14   A    Because Kirchenblatt resigned.

15   Q    And then there was a different firm that performed the

16   review?

17   A    Correct.

18   Q    And that you signed off on?

19   A    The 2014 review?

20   Q    Correct?

21   A    Yes, yes.

22   Q    And you signed off on the 2013?

23   A    Yes.

24   Q    And the 2015 I think you testified is on your desk --

25   A    Yes.

PAPA - CROSS - FELDMAN

1    Q    -- awaiting your sign-off?

2    A    Yes.

3    Q    What do you do to sign-off on a financial statement?

4    A    Well, quote/unquote, the sign-off is a representation

5    letter to the independent accountants that I represent to them

6    that the books are prepared in accordance with generally

7    accepted accounting principles.

8    Q    Right.  An in order to sign-off, you do something, right,

9    you look at things?

10   A    Yes.

11   Q    You verify things to your satisfaction?

12   A    You gotta be careful with the word "verify," I certainly

13   don't verify all transactions.

14   Q    Okay.

15   A    So I review and approve for reasonableness.

16   Q    And in fact, the difference between a review and an audit

17   is simply quantitatively how many things are tested or whether

18   there is third-party verification, things of that nature?

19   A    No, a review and an audit is a substantial differences,

20   it's way more than that.

21   Q    All right.  But these were reviews of 2013, 2014 and

22   we're waiting -- there's a draft of 2015?

23   A    Yes.

24   Q    And the financial statements include the balance sheet,

25   right?

PAPA - CROSS - FELDMAN

1    A    Yes.

2    Q    And the balance sheet there's shareholder's equity, is

3    that one of the line items?

4    A    No shareholder per se 'cause --

5    Q    Member equity?

6    A    Equity, right.

7    Q    Right.  And in terms of ascribing value -- withdrawn.  Is

8    there also a line item for loans to shareholders or from

9    shareholders?

10   A    Not on the financials.

11   Q    It's on the books and records?

12   A    Not on the financials, no.

13   Q    Where would you find that?

14   A    If one existed, it would be on books and records.

15   Q    Loans from shareholders or members?

16   A    Well, are you talking about the loan to Mr. Friedman --

17   or from Mr. Friedman?

18   Q    Yes, where would that appear?

19   A    Well, that appears as loan on the books but not in the

20   equity section, that appears as debt.

21   Q    Okay.  And was that reviewed by you?

22   A    Yes.

23   Q    And in terms -- you mentioned earlier you did a

24   reconciliation, a bank rec.  That meant you had the actual

25   bank statements and you checked off check by check, right, is

PAPA - CROSS - FELDMAN

1    that what a bank rec is?

2    A    Yes.

3    Q    Did you see deposits into the Two Rivers account of these

4    loans that you checked off as you went along?

5    A    Did I -- I'm sorry, I was thinking about your prior

6    question, I'm sorry.

7    Q    That's okay.  With reference to the loans from

8    Mr. Friedman, did you review the bank statements of Two Rivers

9    and check off that these loans were actually received by Two

10   Rivers?

11   A    Yes.

12   Q    And the fact that the company was having review quality

13   financial statements, had moved from unaudited or non-reviewed

14   financial statements to reviewed, was that for a purpose?

15   A    Yes.

16   Q    What was that purpose?

17   A    The company was trying to raise capital and/or sell

18   itself.

19   Q    So you knew --

20        THE COURT:  I'm sorry, sorry.

21   A    Raise capital and/or sell.  If they got an offer they

22   were off there.

23   Q    So you knew that potential lenders or potential

24   purchasers might require review quality or better financial

25   statements?

PAPA - CROSS - FELDMAN

1    A    Yes.

2    Q    And that they would rely upon those bank statements?

3    A    Yes.

4    Q    I'm sorry, those financial statements?

5    A    Yes.

6    Q    So you endeavored to make them as accurate as possible?

7    A    Yes.

8              THE COURT:  I'm trying to understand for purposes of

9    the hearing, where are we going with this?  What issue does it

10   relate to?

11             MR. FELDMAN:  It had to do with what records he had

12   to verify those --

13             THE COURT:  At what point?

14             MR. FELDMAN:  Well, throughout the period prior to

15   the --

16             THE COURT:  Prior to the TRO?

17             MR. FELDMAN:  Prior to the preliminary injunction,

18   Your Honor.

19             THE COURT:  I'm trying to get in compliance with the

20   TRO and the preliminary injunction --

21             MR. FELDMAN:  I understand.

22             THE COURT:  -- so focus on that if you would.

23             MR. FELDMAN:  Okay.  I don't have anything further,

24   Your Honor.

25             THE COURT:  Anyone else?

PAPA − CROSS − GRANTZ

1          MR. GRANTZ:  A couple of quick questions.

2          THE COURT:  Yes, sir.

3    CROSS-EXAMINATION

4    BY MR. GRANTZ:

5    Q    If the Launch Coffee system is restored, I think you

6    earlier testified if you don't have any use for it other than

7    the records that are maintained on it; is that right?

8    A    Yes.

9    Q    So if the records that are currently maintained on the

10   Launch system are downloaded, or imaged, or copied and you

11   have them, do you have any use for the Launch system after

12   that?

13   A    You would need to better define when you say download of

14   records.

15   Q    If you get copies of all the records that are on Launch

16   and you take them off of Launch and you have control of them

17   on another computer system, do you have any need for Launch

18   going forward?

19   A    If I got them electronically and they were sortable and

20   analyzable, yes, I don't need Launch Coffee itself, I need the

21   information contained in Launch Coffee.  And I need that

22   information in the exact same manner it was prepared so that I

23   can answer and satisfy legal requirements to maintain,

24   quote/unquote, books and records.  I can't just have a data

25   dump that requires me to hunt and fish.

PAPA - CROSS - HELLER

1        MR. GRANTZ:  That's all I have, Your Honor.

2        THE COURT:  Anyone else?

3        MR. HELLER:  Yes.

4        THE COURT:  I don't care who goes first.

5   CROSS-EXAMINATION

6   BY MR. HELLER:

7   Q     Good afternoon, Mr. Papa.  At the time back in December,

8   November 2015 or approximately before that, were you aware

9   that a lawsuit was being prepared, this very lawsuit?

10  A     Not specifically.

11  Q     What do you mean not specifically?

12  A     I would overhear or -- you know, I knew that there was a

13  dispute going on, I knew that there were issues being raised.

14  I did not know exactly what form that dispute was taking place

15  nor when it would take place.

16  Q     Were you asked by anyone to provide data or financial

17  information or anything of the sort that would aid in the

18  preparation of this lawsuit by anyone?

19        MS. NELKIN:  Your Honor, I'm going to object --

20        MR. ROSENBLATT:  Objection.

21        MS. NELKIN:  -- it's outside --

22        THE COURT:  Sustained.

23        MR. HELLER:  What's the objection?  I have to

24  understand the objection, Your Honor.

25        THE COURT:  I sustained the objection.  It's

PAPA - CROSS - HELLER

1    irrelevant.  Go ahead.

2                 MR. HELLER:  Can I make an offer, Your Honor?

3                 THE COURT:  Yes.

4                 MR. HELLER:  There have been very serious

5    allegations made that the Launch system has been used to

6    conceal money laundering and theft and --

7                 THE COURT:  That's not the purpose of this hearing.

8                 MR. HELLER:  Well, I think the purpose of this

9    hearing is to determine whether or not the Launch system and

10   value of the Launch system, at least in part, to Two Rivers --

11                THE COURT:  No, sir.

12                MR. HELLER:  -- I think Two Rivers alleged.

13                THE COURT:  Incorrect, sir.

14                MR. HELLER:  I'm sorry?

15                THE COURT:  That's incorrect.  The defendants have

16   an obligation to provide access to the Launch system and have

17   had that obligation since the preliminary injunction.  That

18   hasn't happened yet.  I'm trying to understand the nature of

19   the problem, how to fix it, what real efforts or measures are

20   necessary.

21                What communications he had with respect to the

22   initiation of the lawsuit don't help me resolve any of those

23   things.

24                MR. HELLER:  Let me move on.

25                THE COURT:  Please.

PAPA - CROSS - HELLER

1   BY MR. HELLER:

2   Q    Mr. Papa, after the preliminary injunction was entered --

3   I'm sorry.  After the lawsuit was commenced there was a period

4   of time where you did have access to the Launch system,

5   correct?

6   A    I don't know when the lawsuit was actually commenced so I

7   can't really answer that question, I don't know.

8   Q    Well there was a period of time where you had full access

9   to the Launch system, whether it be a month, a month and a

10  half whatever it was?

11  A    There was a period of time that I had access to the

12  Launch, I don't know if it was full or not.

13  Q    You had the same access that Sonia had?

14  A    That's what I'm told.

15  Q    Do you have any reason to think that you did not have the

16  same access that Sonia had?

17  A    Do I have any reason to doubt that some of the things

18  being told me may not be true?

19  Q    No, that's not my question.  Please listen to my

20  question?

21  A    I'm trying.

22  Q    Okay.  Do you have any reason to think that you did not

23  have the same access to the Launch system, at the time that

24  you had full access, that Sonia had?

25  A    Not specifically, no.

PAPA - CROSS - FINKEL

1    Q    So the answer is no?

2    A    No.

3    Q    At the time you had full access to the Launch system,

4    were you aware of allegations made here that the Launch system

5    was used to conceal a money laundering operation?

6            THE COURT:  I already sustained that objection.  Go

7    on, please, to the next issue.

8    Q    At the time you had full access to the Launch system, did

9    you make any efforts to commence a forensic investigation of

10   the Launch system?

11           MS. NELKIN:  Objection.

12           THE COURT:  Move on.

13           MR. HELLER:  I have no further questions.

14           THE COURT:  Thank you.  Mr. Finkel.

15   CROSS-EXAMINATION

16   BY MR. FINKEL:

17   Q    Good afternoon, Mr. Papa.  Since the TRO being sometime

18   in December of 2015, did you have occasion to communicate with

19   Sonia Rivera, the bookkeeper, with regard to any financial

20   questions or information?

21   A    I think she sent me some information that she received.

22   I don't recall asking her for information.

23   Q    So is it fair to say that Sonia Rivera, since the TRO,

24   never refused to provide information to you; is that a fair

25   statement?

PAPA - REDIRECT - C. NELKIN

1   A    Well, since I didn't ask for anything I would say, yes,

2   she never refused.

3   Q    Next question.  Prior to the TRO, you had many occasions,

4   I would assume, to communicate with Sonia Rivera about

5   financial information concerning Two Rivers; is that correct?

6   A    Yes.

7   Q    And did she always cooperate and provide what you

8   requested?

9   A    Generally speaking, yes.

10  Q    Now with regard to Sylvia Ezell, since the filing of the

11  TRO, did you have any occasion to communicate with Sylvia

12  Ezell and request financial information?

13  A    No.

14          MR. FINKEL:  No further questions, Your Honor.

15          THE COURT:  All right.  Any redirect?

16          MS. NELKIN:  Yes.

17  REDIRECT EXAMINATION

18  BY MS. NELKIN:

19  Q    Mr. Papa, you had testified about the fact that Two

20  Rivers had also used a Corporate system?

21  A    Yes.

22  Q    What exactly is the Corporate system?

23  A    To the best of my knowledge, it was a system utilized

24  by -- under Emil's umbrella of companies to record or make

25  disbursements, cut checks and/or record purchases.

PAPA - REDIRECT - C. NELKIN

1  Q    And there was some question as to whether or not that

2  information had been transferred either into Launch or into

3  QuickBooks or downloaded in some form usable to Two Rivers.

4  And I believe you testified that you didn't think it had been

5  transferred into Launch, why do you say that?

6  A    Well, two reasons:  One is that I had a specific

7  discussion and/or argument with Yossi about his plan to when

8  he was cutting off Corporate and transferring to Launch and,

9  secondly, is that on occasion I would look for information in

10 Launch that predated this cutover and oftentimes it wasn't

11 there.  And it was explained to me by either Yossi or Sonia

12 that it wasn't transferred from the old system.

13 Q    And can I assume that because you were looking for it

14 that it was something that you needed to do your job?

15 A    Yes.

16 Q    Now I'd like to just make sure that we understand what

17 went into both of these systems and why there were two

18 systems.  You were in charge of QuickBooks; is that correct?

19 A    Yes.

20 Q    Did Ms. Rivera enter anything into QuickBooks?

21 A    No.

22 Q    Who was entering information into QuickBooks?

23 A    It was either myself or people on my staff.

24 Q    And other than initially entering new employee data into

25 Launch, did you or anyone in your staff -- on your staff enter

PAPA - REDIRECT - C. NELKIN

1  anything into Launch?

2  A    No, we did not.

3  Q    And what was this new employee information that you

4  entered?

5  A    It would be name, address, date of hire, pay rate and tax

6  information, like withholding information.  W-4 is the form we

7  would refer to it as.

8  Q    So that would be like the initial information that you

9  obtained?

10 A    Yes.

11 Q    And once that was put into the system, did you have any

12 other inputting into Launch with regard to those employees?

13 A    No.

14 Q    And --

15 A    I'm sorry, back up one second.  If there was a raise to

16 an employee we may have -- we may have entered the new rate.

17 But Sonia would know that.

18 Q    But from that point on -- you only put in the information

19 that you knew and then it was Ms. Rivera's responsibility to

20 input into Launch?

21 A    Well, got to be careful there.  Ms. Rivera didn't really

22 input into Launch 'cause there would have been hours -- there

23 was nothing more for Sonia to input, to make a long story

24 short.  But she or Emil would work on the payroll calculation

25 after the new employee started to work.

PAPA - REDIRECT - C. NELKIN

1    Q    What, if anything, would you or your staff do with regard

2    to Launch other than what you've told me which was the new

3    input and raises?

4    A    For payroll?

5    Q    Yes.

6    A    I would run a report or I would get a report from Sonia

7    that summarized the payroll for the time period and I would

8    take that information and enter it into QuickBooks to record

9    the payroll for the week.

10   Q    So the information that's coming from payroll -- from

11   Launch is -- I'm sorry.  What you're putting into QuickBooks

12   is based upon what they're telling you is in Launch?

13   A    Well, either telling me or giving me a report.  They're

14   not telling me verbally, I'm getting a report or she's giving

15   me a report.

16   Q    If, for purposes of this lawsuit we wanted to know what

17   the defendants were inputting so far as financial information

18   is concerned, would we look -- would we need to look at Launch

19   to determine that?

20           MR. FELDMAN:  Objection, Your Honor.  This, I think,

21   exceeds the scope of cross.  I think she's going into a new

22   area now.

23           THE COURT:  Into what Launch does or doesn't do?

24           MR. FELDMAN:  I don't think anyone asked what Launch

25   did or didn't do on cross.

PAPA - REDIRECT - C. NELKIN

1    THE COURT:  I think that's right.

2    MS. NELKIN:  Okay, Your Honor, we'll move on.

3  Q    If we wanted to know what the defendants had been doing

4  with regard to financial records of Two Rivers, prior to the

5  Temporary Restraining Order, where would be the best place to

6  look for that information?

7    MR. FELDMAN:  Objection.

8    MR. SCHAFHAUSER:  Objection.

9    THE COURT:  Overruled.

10    THE WITNESS:  I should answer?

11    THE COURT:  Yes.

12  A    You have to look in Launch, that's the only place where

13  the defendants entered information.

14  Q    Mr. Papa, you had indicated that you had obtained

15  everything from Mr. Devine that you thought -- that you would

16  expect to obtain from an outside accountant?

17    MR. FELDMAN:  Objection, Your Honor.  None of these

18  questions were asked on cross.

19    THE COURT:  Repeat the question, please.

20  BY MS. NELKIN:

21  Q    You had testified that you had obtained everything that

22  you -- that you had obtained from Mr. Devine everything that

23  you thought you would receive from an outside accountant.

24    THE COURT:  There's plenty of questioning on cross

25  about this general subject.  Go ahead.

PAPA – REDIRECT – C. NELKIN

1   A    Yes.

2           THE COURT:  The objection is overruled.

3   A    Yes.

4   Q    And you did not receive from Mr. Devine any payroll

5   records, did you?

6   A    Just to be clear, payroll records, I did receive W-2s.

7   If you consider that a payroll record, I did receive W-2s.

8   Q    I'm really speaking more about the kind of payroll

9   records that might have been on Launch, the kinds of payroll

10  records that you were just speaking about.

11  A    Yes, I did not receive any of those from Mr. Devine.

12  Q    Were you aware that Mr. Devine had requested to maintain

13  those records at his office?

14          MR. FELDMAN:  Objection.

15          THE COURT:  Sustained.

16  Q    Did you know if Mr. -- I'm sorry, let me direct your

17  attention to Exhibit 61, Plaintiff's Exhibit 61.

18          Have you ever seen this document before?

19  A    I don't remember if I've seen this specific document from

20  New Jersey -- is this from New Jersey?

21  Q    Well, were you aware that permission to maintain

22  documents outside the State of New Jersey had been obtained?

23          MR. FELDMAN:  Objection.

24  A    No.

25          MR. FELDMAN:  This was not part of cross.

PAPA – REDIRECT – C. NELKIN

1    THE COURT:  It was part of Mr. Schafhauser's cross

2    about where documents were allowed to be maintained.

3    Overruled.

4         THE WITNESS:  I was not aware of this.

5    BY MS. NELKIN:

6    Q    If you had been aware, would you have expected that all

7    the documents that had been maintained outside of state were

8    to have been returned to you?

9         MR. FELDMAN:  Objection.

10        THE COURT:  Overruled.

11   A    I guess.

12   Q    Would you consider these payroll records that are

13   required to be maintained by the State of New Jersey to be the

14   books and records of Two Rivers?

15        MR. SCHAFHAUSER:  Objection.

16        THE COURT:  Overruled.

17   A    Yes.

18   Q    You spoke about the NLRB proceeding.  Would it have

19   assisted you to have had available the information on Launch

20   in order to deal with that situation?

21   A    Yes.

22   Q    And not having access to Launch, what, if any, problem

23   did that cause for you?

24   A    It made it either harder or impossible to comply with the

25   requests for information that I received from our labor

PAPA – REDIRECT – C. NELKIN

1   counsel to help refute the allegations.

2   Q    Let me direct your attention to Defendants' 25.

3            THE COURT:  After this exhibit I'll need to break

4   because I have a 12:30 conference I had scheduled for our

5   lunch break.

6            MS. NELKIN:  I just have a quick question, Your

7   Honor.

8   Q    Do you recall being asked about these exhibits and the

9   problem of Launch being off?

10  A    I recall being asked about this password, yes.

11  Q    And --

12           THE COURT:  I'm sorry, which exhibit are you on?

13  Which exhibit are you on?

14           MS. NELKIN:  Defendants' 25.

15           THE COURT:  Defendants' 25.  I'm sorry.  I took the

16  wrong document.  Go ahead.

17  Q    I'd like you to look at the date.  What is the date of

18  this document?

19  A    December 11th, 2014.

20  Q    So do you recall what year the TRO was entered?

21  A    Yes.

22  Q    What year?

23  A    2015.

24  Q    So this was a year prior to when the TRO was entered?

25  A    Yes.

PAPA – REDIRECT – C. NELKIN

1     THE COURT:  Do you have much more?

2     MS. NELKIN:  I do have a few additional questions

3 but --

4     THE COURT:  I have this call, I didn't anticipate

5 would be at a convenient point.  How much more?  I want to

6 figure out if I should ask these folks to stay on the line.

7     MS. NELKIN:  I think probably 15, 20 minutes.

8     THE COURT:  Okay.  We will do it after the lunch

9 break.  All right.  See you all at 2:00 o'clock.

10     (Luncheon recess:  2:00 p.m.)

11     (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

V. Papa – Redirect/Ms. Nelkin

1    A F T E R N O O N   S E S S I O N

2         THE COURT:  Okay, Ms. Nelkin, go ahead.

3    BY MS. NELKIN (cont'd.):

4    Q    Mr. Papa, can I direct your attention to Defendant's

5    Exhibit 7.  This is a letter that Mr. Schafhauser asked you

6    about.

7    A    Yes.

8    Q    Do you have it in front of you?

9    A    Yes.

10   Q    In this letter you indicate that this list of recurring

11   expenses that you are sending is not going to be submitted for

12   24-hour approval.  Can you tell us what the 24-hour approval

13   refers to.

14   A    There was a reference in the initial transcripts or

15   minutes that I was to circulate disbursements that I was

16   intending to make and get approval from the members within 24

17   hours or if the members did not respond within 24 hours, I was

18   free to, quote/unquote, cut the checks.

19   Q    When you say "the transcript," what transcript are you

20   referring to?

21   A    The hearing you had on or around December 4th, those,

22   that transcript.

23   Q    So you read that transcript to determine what your

24   responsibilities were going to be as the point person for the

25   partners?

Joshua B. Edwards, RDR, CRR
Official Court Reporter

V. Papa - Redirect/Ms. Nelkin

1   A    At that time, yes.

2   Q    And did you, in fact, institute this system whereby you

3   were circulating things to the partners that you thought

4   needed their approval?

5   A    For a very brief period of time.

6            MR. SCHAFHAUSER:  Objection; leading.

7            THE COURT:  Don't lead.

8   A    For a very brief period of time.

9   Q    And why did you no longer circulate information that you

10  thought needed the approval of the members?

11  A    Well, one is I was very rarely getting responses to these

12  in writing.  And secondly, the preliminary injunction that I

13  read, it did not require me to continue this practice.

14  Q    During the time that you were sending information, what

15  type of information did you send?

16  A    I would send either a list like this or just an e-mail

17  itself, a brief description, a brief of the vendor to be paid

18  and the doctor amount.

19  Q    All right.  And when you say "like this," you are

20  referring to Exhibit 7, page 2?

21  A    Yes.

22  Q    And when you send that information, did you send it to

23  Mr. Friedman as well as to the other partners?

24  A    Yes.

25  Q    Did you ever get any responses from Mr. Friedman?

V. Papa - Redirect/Ms. Nelkin

1    A    No, I did not.

2    Q    Did you ever have any conversations with Mr. Friedman

3    about the information that you were sending?

4    A    Yes.

5    Q    What did you discuss with him?

6    A    Well, there were two conversations that I recall.  There

7    was a conversation whereby he told me he wasn't going to

8    respond to e-mails.  So basically stop sending them.  And

9    there was a conversation that I should be paying the rent.

10   Q    Okay.  And the rent, what rent was that?

11   A    That would be Two Rivers paying New York Best.

12              THE COURT:  Paying --

13              THE WITNESS:  New York Best Coffee.

14   Q    And what is New York Best Coffee?

15   A    It's an entity that was set up to have the lease where

16   the Two Rivers currently operates.

17   Q    And do you know who is the owner of New York Best?

18   A    I do now.  I did not then.

19   Q    What do you know now?

20   A    That it's Emil Friedman.

21   Q    Do you know if, prior to the entry of the TRO,

22   Mr. Friedman consulted with his other partners before he

23   expended any money of TRC, of Two Rivers?

24   A    Well, certainly there was some discussions about some

25   disbursements, but I can't say there was a discussion about

V. Papa - Redirect/Ms. Nelkin

1  all disbursements.

2  Q    When you discussed the fact that you wanted to hire

3  counsel.  How many times have you requested that counsel be

4  hired for you?

5  A    Probably three or four.

6  Q    When would the first time have been that you requested

7  that?

8  A    Probably right after I first read the TRO.

9  Q    And did you -- with whom did you discuss it?

10  A    Probably Eugene and Mayer would have been my first two.

11  Q    And do you know whether or not they were in favor of your

12  hiring counsel?

13  A    They were.

14  Q    Did you also request of Mr. Schafhauser that you be

15  permitted to hire counsel?

16  A    I believe I did, yes.

17  Q    And what response did you get to that?

18  A    I believe I was told no.

19  Q    Were you part of the discussions regarding the purchase

20  of Plex, the ERP system?

21  A    Yes.

22  Q    In your view, was that a system that should be purchased?

23  A    Yes.

24  Q    And did you view that as a luxury or a necessity from the

25  company?

V. Papa – Redirect/Ms. Nelkin

1   A     A necessity.

2   Q     And why is that?

3   A     Because a company as large as we are without a system to

4   process information, we -- we missed sales.  We incur

5   penalties.  We have inventory at that we don't need.  We have

6   inventory that we do need.  It's impossible to run a

7   manufacturing operation without a system like this,

8   efficiently.

9   Q     Were you involved in the discussions regarding the

10  purchasing of the coffee filling machines?

11  A     Yes.

12  Q     And were you in favor or against purchasing those

13  machines?

14  A     In favor.

15  Q     And why is that?

16  A     Because we could reduce our operating costs extensively

17  by reducing labor and automating and the payback is probably a

18  year or less.  It's really a very simple calculation to go

19  through.

20  Q     Did you view that purchase as a luxury or a necessity?

21  A     A necessity.

22  Q     I would like to direct your attention to Exhibit 128.

23  That's Plaintiff's Exhibit and let's look at page 6 of that

24  exhibit again.  Did you in response to Mr. Schafhauser's

25  letter with regard to books and records submit a list to him

V. Papa – Redirect/Ms. Nelkin

1  as to what you were missing?

2  A    Yes.

3  Q    Was that a complete list of all the books and records

4  that you were missing or was that some particular list?

5  A    That was just regarding the credit cards.

6  Q    And until you submitted the list to Mr. Schafhauser, had

7  any defendants sent you those credit card -- that credit card

8  information?

9  A    Well, I did receive from Emil a small subset of them as a

10 result of an audit request.

11 Q    Now, I believe the testimony was that Mr. Friedman

12 actually came and handed you those -- that small number of

13 receipts?

14 A    Yes.

15 Q    And was that before or after entry of the TRO?

16 A    That was before.

17 Q    So if it was before, then it was not in response to any

18 order that had been entered by this Court?

19 A    Correct.

20 Q    So after entry of the TRO, did you receive any credit

21 card information from any defendant until you submitted a list

22 to them?

23 A    I don't think so, but again, I did not examine every

24 document in the boxes that I received.  But generally

25 speaking, there were no credit card receipts supplied to me

V. Papa - Redirect/Ms. Nelkin

1    until I specifically requested them and provided this list.

2    Q    With regard to the documents that were sent in the boxes,

3    you did -- I believe you testified you thumbed through them?

4    A    Yes.

5    Q    Did you see -- do you recall having seen any credit card

6    information?

7    A    No, I do not.

8    Q    And when you thumbed through it, was the contents of the

9    box anything that you felt was necessary for you to utilize in

10   running the company?

11   A    Well, not running the company per se, because it was

12   historical documents.  It's documents we are required to

13   retain.  So I don't know what you mean by "running the

14   company."

15   Q    Did you -- did you believe that the contents of that --

16   of those documents were all the books and records of Two

17   Rivers that were in the possession of any of the defendants?

18           MR. SCHAFHAUSER:  Objection.  She's leading the

19   witness, Your Honor.

20           THE COURT:  Yes.  Rephrase the question, please.

21           MS. NELKIN:  I'm sorry.

22   Q    Once you looked through the documents, can you tell us

23   whether or not you felt like you had obtained all the books

24   and records of Two Rivers that were in the possession of the

25   defendants?

V. Papa – Redirect/Ms. Nelkin

1    MR. SCHAFHAUSER:  Objection; calls for speculation.

2    THE COURT:  Yes.  Look, let me try it so we don't

3    spend all afternoon on it.  You looked through the documents.

4    You are in a position of responsibility for doing what's

5    needed for Two Rivers both going forward and maintaining

6    historical documents.  Did those documents provide you that

7    you needed?

8    THE WITNESS:  No.

9    THE COURT:  Okay, move on.

10   BY MS. NELKIN:

11   Q    We were talking about the list that you had submitted

12   specifically requesting certain information with regard to the

13   credit cards.  Did you get all the information that you

14   requested in the credit cards?

15   A    No.

16   Q    And did you subsequently get more documents in response

17   to your request?

18   A    I -- the initial request, yes.  I think this was

19   January 8th.  And then on January 12th, I did receive, again,

20   a small subset of credit card documents which also really is

21   incomplete.

22   Q    As of this date, do you have a complete set of the

23   documents that you requested?

24   A    No.

25   Q    Now, of the documents that have been returned to you, of

V. Papa - Redirect/Ms. Nelkin

1    the information that has been returned to you, has all of

2    it -- what form has it been in?

3    A    Paper.

4    Q    And have you received any electronic books and records of

5    the company?

6    A    Well, I believe I got electronic copies of either tax

7    returns or payroll tax returns from Mike Devine.

8    Q    And was that -- when did you receive that from

9    Mr. Devine?

10   A    I don't know offhand.

11   Q    Would it have been recently?

12   A    I don't remember when, to be honest.

13   Q    Other than Mr. Devine, did you receive any electronic

14   books and records of Two Rivers?

15   A    Well, in this box that these two boxes that showed up on

16   Friday, there was a disc or some electronic format reference.

17   I don't know what's on it.  I never opened it up.  But in

18   those two boxes, there was something.

19            MS. NELKIN:  Your Honor, I will have to retract

20   something that I told you earlier, because I represented to

21   the Court that we had received during this week and the prior

22   hearing the contents of the box that Mr. Papa had been given,

23   but we did not receive the electronic --

24            THE COURT:  We have had a few boxes discussed here.

25   Was it 1, 36, 42?

V. Papa – Redirect/Ms. Nelkin

1        MS. NELKIN:  I believe it's 42A and B.

2        THE COURT:  You are saying you didn't get that?

3        MS. NELKIN:  We have not received an electronic disc

4   of anything from the defendants.

5        THE COURT:  All right.  I am not going to resolve

6   this now.  I want to finish the testimony which based on what

7   you told me before the break, I anticipate we are within a

8   minute or two of, correct?

9        MS. NELKIN:  I'm sorry, Your Honor?

10       THE COURT:  You told me before the break you had

11  about 15 minutes, so we are passed that.  I assume you are

12  just about done?

13       MS. NELKIN:  Yes, Your Honor.

14  BY MS. NELKIN:

15  Q    Mr. Papa, were significant amounts of the books and

16  records of Two Rivers maintained electronically?

17  A    Yes.

18  Q    And have you received that electronic body of books and

19  records?

20  A    I have not.

21  Q    Mr. Papa, do you know if Mr. Salcedo had a master key to

22  Two Rivers?

23       MR. FINKEL:  Objection, Your Honor.

24       THE COURT:  Sustained.

25  Q    You discussed the fact that Mr. Friedman would come in

V. Papa - Redirect/Ms. Nelkin

1  carrying a bag, and I believe that you said it was, he would

2  bring in the mail; is that correct?

3  A    Yes.

4  Q    Was he bringing a bag full of mail?

5  A    Yes.

6  Q    And do you know from where that mail came?

7  A    I believe it came from his house.

8  Q    And would that be mail that belonged to Two Rivers or was

9  addressed to Two Rivers?

10 A    Yes.

11 Q    And it was sufficient quantities that it was being

12 carried in a bag?

13         THE COURT:  Please don't lead.  Ask your question

14 again without leading, please.

15 Q    How frequently would Mr. Friedman come into Two Rivers

16 carrying a bag of mail?

17 A    Two or three times a week.

18 Q    After entry of the TRO, did Two Rivers receive mail from

19 Mr. Friedman that was addressed to his house?

20 A    Again, I believe in these boxes that showed up on Friday,

21 there was mail.

22         THE COURT:  Between the time of the TRO and -- the

23 preliminary injunction and when you got that box, did you get

24 mail that had been addressed to Mr. Friedman's home?

25         THE WITNESS:  I believe I did, yes.

V. Papa – Redirect/Ms. Nelkin

1       THE COURT:  Okay.  Can you describe how much, how

2   often.  What do you know?

3       THE WITNESS:  It was sporadic at that point.  And it

4   came, I think mostly from Sonia.  She would have most likely

5   scanned it and sent it, or once in a while, I think he put it

6   in the mail to me and I got it in the mail.

7       THE COURT:  All right, go ahead.

8       MS. NELKIN:  Your Honor, if I could approach the

9   witness, I have an exhibit that is the mail that was in the

10  boxes.  We have looked through and I don't believe that this

11  was included in the box that has been here, but it is the mail

12  that was sent.

13      THE COURT:  Is there a question you would like to

14  ask about this exhibit?

15      MS. NELKIN:  Yes.

16      THE COURT:  Have you provided it to the defendants?

17  I'm interested in Mr. Papa's testimony, not yours.

18  Q    Mr. Papa, I want to hand you what has been marked as

19  Exhibit 133A (handing).

20      THE COURT:   If there is an extra floating around,

21  may I have a copy.

22      MS. NELKIN:  Oh, I'm sorry, Your Honor.

23      MR. SCHAFHAUSER:  I think this may be beyond the

24  scope.  We are going to go into the mailings on cross.

25      THE COURT:  I know I heard a question about mail

V. Papa – Redirect/Ms. Nelkin

1   being delivered to -- I forget who it was who said would it

2   surprise you if mail was delivered to his house.  I think it

3   was you, but anyway, it's overruled.

4            MR. NELKIN:  (Handing to the Court.)

5            THE COURT:  This is 193A or 133A?

6            MS. NELKIN:  It's 133A.

7            THE COURT:  Okay, go ahead.

8   BY MS. NELKIN:

9   Q    Mr. Papa, prior to the mail being sent to you on Friday,

10  had you ever seen any of these particular envelopes that were

11  sent?

12  A    Any of -- (perusing) "official state business."  I can't

13  really determine what these are.  Yeah, U.S. Department of

14  Commerce.  I have seen this before.

15  Q    Have you seen this particular one?  Which page are you

16  looking at, by the way?

17  A    The first one that's not so black.  It's, I'm sorry,

18  page 7 of 29, ID number 9368.

19  Q    Okay.  And have you seen one that was dated March 2016?

20  A    Can you refer me to which page.

21           THE COURT:  Over the barcode, there's a date.

22           THE WITNESS:  I don't know which page you are

23  referring to.

24           THE COURT:  I thought you were saying seven of 29.

25           THE WITNESS:  Well, yes, I did.

V. Papa – Redirect/Ms. Nelkin

1    THE COURT:  Okay.  And I think she was asking you

2  about the date on that.

3    THE WITNESS:  Oh.

4  A    It was dated March 1, 2016, yes, I'm sorry.

5  Q    Let me just ask you, what is your understanding, if you

6  look at Defendant's Exhibit 31, what is your understanding of

7  what was being sent to you in Number 1 that's referenced

8  there?

9    MR. NELKIN:  It's in the small book.

10    MR. SCHAFHAUSER:   Ms. Nelkin, which.

11    MS. NELKIN:  Defendant 7 –– I'm sorry,

12  Defendant's 31.

13    MR. SCHAFHAUSER:  31, thank you.

14  A    I'm sorry; can you repeat the question?

15  Q    If you look at Defendant's 31, what is your understanding

16  of what was sent to you in number one that's referenced in

17  that letter, mail addressed to Two Rivers Coffee which was

18  delivered to 33 Saint Nicholas?

19  A    My understanding of what that includes?  Mail.

20  Q    And was it your understanding, was this mail that you had

21  previously received or had not received?

22  A    I didn't look through the mail.  I would assume it's mail

23  I didn't already receive.

24  Q    And if we look at Exhibit 133A and, for example, page 7

25  that you referenced, does it, in fact, say on the envelope

Papa – Recross – Schafhauser

1  that your response is required by law?

2  A    Yes.

3  Q    Do you know if whatever was required by law was responded

4  to?

5  A    It was not.

6  Q    If you look at page 1 of Exhibit 133A, does it in fact

7  say "official state business, your immediate attention

8  required"?

9         THE COURT:  I think I will be able to read things

10  that are written down on a page.  You don't need to have him

11  confirm something that I can read.

12  Q    Mr. Papa, I will just ask you, do you know if a response

13  was given to the New Jersey Department?  And I'm sorry, it's

14  very hard to read.  I believe it's the Department of

15  Unemployment Insurance.  Do you know if a response would have

16  been given to any of these letters in this 133A?

17  A    I believe there were no responses generated.

18         MS. NELKIN:  No further questions, Your Honor.

19         THE COURT:  All right.  Any recross?

20         MR. SCHAFHAUSER:  Yes, please, Your Honor.

21         THE COURT:  Very briefly, please.

22         MR. SCHAFHAUSER:  Thank you.

23  RECROSS-EXAMINATION

24  BY MR. SCHAFHAUSER:

25  Q    Mr. Papa, this exhibit that we are looking at, 133A, did

Papa - Recross - Schafhauser

1  you open the mail that you received?

2  A     Did I?  No.

3  Q     So you don't know what is contained in the mail sitting

4  here today, correct?

5  A     Specifically, no.

6  Q     And you also don't know when a response might be required

7  to any particular items in the mail, right?

8  A     Correct.

9              THE COURT:  What did you do with the mail that you

10  got?

11             THE WITNESS:  I didn't do anything.  It was -- it

12  was taken away to be photocopied.  That whole box, those two

13  boxes that came in on Friday.

14             THE COURT:  No, no, no.  Oh, this is from last

15  Friday?  Okay.

16             MR. SCHAFHAUSER:  Yes.

17             THE WITNESS:  The whole box was sent out for

18  photocopying.

19             THE COURT:  I'm sorry; I thought you were talking

20  about something longer ago.

21             MR. SCHAFHAUSER:  Thank you.

22  BY MR. SCHAFHAUSER:

23  Q     So this is my question.  Why were the -- by the way, you

24  received the original envelopes with the mail in them, right?

25  A     Yes.

Papa - Recross - Schafhauser

1  Q    Okay.  Why did you send it out for photocopying rather

2  than opening -- opening up the mail up [sic]?

3  A    Because we wanted to get the copies copied as soon as

4  possible so that all could see what I received.

5  Q    So as of today, you don't know whether anyone has yet

6  opened up the mail, correct?

7  A    I don't know the status of that mail today.

8  Q    Okay.  You testified about electronic books and records

9  earlier, right?

10  A    Yes.

11  Q    You were referring to the information that's

12  electronically on Launch, correct?

13  A    As one form of electronic storage, yes.

14  Q    Okay.  Is that what you were referring to?

15  A    Well, yeah.  The question was our books and records

16  stored electronically and I said yes.

17  Q    And your testimony is that the electronic information is

18  stored on Launch including payroll and other information on

19  Launch, correct?

20  A    Yes.

21  Q    Okay.  And if Launch were restored, that electronic

22  information and those electronic books and records would be

23  available to you, correct?

24  A    If it was restored and if the information was the same,

25  yes.

Papa - Recross - Feldman

1   Q    Okay.

2              THE COURT:  I think we had the exact same exchange

3   the first time you crossed him, so if we could try and

4   restrict it to new information, I would appreciate it.

5              MR. SCHAFHAUSER:  Very well.

6   Q    You testified that Mr. Friedman at some point said to

7   stop sending you e-mails or he wouldn't respond to e-mails.

8   The question is, when did that conversation first occur?

9   A    I don't know specifically.

10  Q    Was it -- well, was it before the TRO was entered or

11  after the TRO was entered?

12  A    That specific conversation I'm referring to was after the

13  TRO.

14             MR. SCHAFHAUSER:  Thank you, very much, Mr. Papa.  I

15  have nothing further, Your Honor.

16             THE COURT:  Anyone else?

17             MR. FELDMAN:  Very briefly, Your Honor.

18  RECROSS-EXAMINATION

19  BY MR. FELDMAN:

20  Q    Turning to Exhibit 61, Plaintiff's Exhibit 61, Ms. Nelkin

21  asked you about the permit, second page.

22  A    Yes.

23  Q    So the payroll records of hours worked and wages paid

24  to employees, that was maintained by Two Rivers in the Launch

25  system in New Jersey; is that right, hours worked and wages

Papa - Recross - Heller

1    paid?

2    A    That was maintained in the Launch Coffee system, yes.

3    Q    And that was in New Jersey?

4    A    Well, again, you're asking me to --

5    Q    Withdrawn.  Withdrawn.  I don't need you to speculate.

6           But you can access it from your computer in

7    New Jersey?

8    A    I have limited access to payroll records.

9    Q    Right.  But individuals in New Jersey could access that

10   information from Launch; is that right?

11   A    Limited.

12   Q    To get the hours worked and the amounts paid?

13   A    I couldn't get the hourly rates easily.  I could get

14   hours, but I could not get the rates.

15   Q    Okay.  And Mr. Devine, Mr. Devine did the 940s and 941s?

16   A    Yes.

17   Q    He maintained those in his office in New York?

18   A    Yes.

19   Q    And those he delivered to you back in December of 2015?

20   A    Yes.

21   Q    Thank you.

22           MR. FELDMAN:  Nothing further, Your Honor.

23   RECROSS-EXAMINATION

24   BY MR. HELLER:

25   Q    Mr. Papa, is the hiring of counsel to represent Two

Papa - Recross - Grantz

1  Rivers in a legal proceeding a luxury or a necessity?

2          MR. ROSENBLATT:  Objection.

3  A    It's a necessity.

4          MR. HELLER:  Thank you.

5  RECROSS-EXAMINATION

6  BY MR. GRANTZ:

7  Q    The information that Mr. Feldman was just asking you

8  about, about the rates, weren't those the same rates that you

9  put in when the employee starts working for the company?

10  A    They were.

11  Q    Okay.  So you had those records someplace?

12  A    Not necessarily.

13  Q    How did you put them into the Launch system if you didn't

14  have the records?

15  A    Because we may have been told verbally what to pay a

16  person.  Not everything is written down.  And then the

17  employee may have received a raise since the first time it was

18  entered.

19  Q    You would have put that in as well?

20  A    Some of it, I did.  Some of it I may not have.

21          THE COURT:  So the only way to find out definitively

22  is to get into Launch?

23          THE WITNESS:  Yes, yes, yes.

24  Q    Did you also have that information in QuickBooks?

25  A    No.

Papa - Recross - Grantz

1  Q    Did you maintain no written -- no -- no physical copy of

2  that information in your office?

3  A    Of what information?  I'm sorry.

4  Q    The wages.

5  A    There's a difference between the opening wage which was

6  entered and the wage that was paid, because the wage that was

7  paid would include overtime.  I don't know the wages that are

8  paid unless I see those calculations.

9  Q    When you were testifying with respect to Mr. Feldman's

10  questions, you said that you had limited access to Launch.

11  But is that before the TRO or after the TRO?

12  A    Well, certainly before the TRO.

13  Q    So after the TRO, did you have full access based upon

14  getting the passwords from the defendants to Launch?

15  A    I had more access.  Again, I don't know if it was full

16  because I never examined all of Launch coffee.  So I can't

17  answer whether it was full.

18  Q    Why didn't you examine Launch coffee when you got the

19  full access?

20  A    Because I have many other pressing responsibilities to

21  support the company rather than go on a fishing expedition

22  through Launch Coffee to determine what I can and cannot see.

23          THE COURT:  You guys are talking past each other.

24  You said you didn't do a full review of Launch.

25          You are asking if he looked for payroll records?

                          Papa - Recross - Grantz

1              MR. GRANTZ:  Yes.

2              THE COURT:  Did you look for payroll reports?

3              THE WITNESS:  I did not.  Actually, I'm sorry; I did

4     look to see if I could see the rates I. did I do that.

5              THE COURT:  And were you able to?

6              THE WITNESS:  Yes, yes.

7              THE COURT:  Okay.

8              MR. GRANTZ:  Thank you.

9              THE COURT:  All right.  You are excused, thank you.

10             THE WITNESS:  Thank you.

11             THE COURT:  All right, at the start of the morning,

12    you were talking about a recess.  Let me ask you, look, we

13    still have to finish the hearing.  We have got limited time

14    available to do it.  If you are able to present the rest of

15    your evidence and allow the defendants to present their

16    evidence with any so that we can complete the hearing and then

17    you put in a letter with your concerns about what you've

18    learned since opening up Launch, is there some reason we can't

19    do it that way?

20             MR. NELKIN:  I think the bulk of the remainder of

21    our testimony focuses on the Launch system.  And we require

22    some further evaluation, the information that we just receive.

23    In addition, we, during the break we were told that there are

24    some issues with our access to Launch because of some

25    antivirus software that's on their side.

Proceedings

1        THE COURT:  On the Stroz side?

2        MR. NELKIN:  No, not on the Stroz, on the --

3   wherever it's coming from side.  And they are trying to

4   resolve that.  And that's interfering with our ability to --

5        THE COURT:  What are you proposing?  Because I got

6   to tell you, we are not going into next week with this.  We

7   are going to finish it.

8        MR. NELKIN:  We were trying to propose that we went

9   to had a recess until Monday.

10       THE COURT:  No.

11       MS. NELKIN:  Your Honor, can I just briefly explain

12   what we found?  And again, this was just in one hour.  As you

13   know, there were four computers that were identified as

14   being -- there was testimony here, extensive testimony as to

15   what the computers are.  In an hour's time on Launch, we have,

16   and we have copies here if you want to see it, we have

17   information that there were many more computers that were used

18   by Ms. Rivera, that were used by Mr. Friedman.

19       And if you match up the names of some of those, for

20   example, with Sonia 1, you can see that Sonia 1 which they

21   have said, you know, implied that we did something that was a

22   computer that was in use for quite sometime by Ms. Rivera.

23   So, there's a lot of discrepancy between what we have been

24   told, what the testimony was, what the Stroz report shows and

25   now what Launch shows in addition to what the Stroz report

Proceedings

1    was.

2            THE COURT:  Look, I'm not going to speculate about

3    what you did or didn't find in Launch and how much of a

4    concern it may represent.  Just as a practical matter, if this

5    issue with Launch hadn't been resolved to the extent it's been

6    resolved, if you hadn't made the progress that you have made

7    this week until later, I take it you are prepared to present

8    evidence supporting the relief that you are seeking.

9            MS. NELKIN:  Yes, Your Honor, but I think --

10           THE COURT:  Wait.

11           MS. NELKIN:  I'm sorry.

12           THE COURT:  I wasn't finished; forgive me.  So I'm

13   wondering if you can't present the testimony you have prepared

14   to present, we finish the hearing and to the extent that

15   there's something based on, you know, last night's and today's

16   discoveries, you put that in a follow-up letter.  Because I

17   assume on both sides, I am going to have, I will they will you

18   right now, I am going to have some thoughts about what should

19   happen, you know, on the first instance once the presentation

20   is done, but in terms of final resolution of these motions, I

21   am going to give you all a chance to weigh in on what you

22   think the evidence has shown and what the resolution should

23   be.  Is there some reason why in the course of doing that, you

24   can't give me what you have discovered last night and today?

25           MS. NELKIN:  Judge Orenstein, I hesitate to say this

Proceedings

1    because I think it will make us all very upset.  But based

2    upon what I saw in that one hour's time, I believe that we

3    have really wasted a lot of your time because I think --

4              THE COURT:  Look, there's no question on both sides

5    we have wasted each other's times in any number of ways this

6    week.  It's the nature of an evidentiary hearing.  You do

7    things that you think are important that nobody else does.

8              MS. NELKIN:  But I guess what I'm trying to say is

9    that I believe that the reality and the testimony is so

10   different that we would almost need to start over if you were

11   really going to have an evidentiary hearing on what really

12   happened with these computers.

13             THE COURT:  Right.  Let's say that's true.  I have

14   no idea.  I haven't seen it.  If you were to submit what you

15   found to me in paper form, because I assume what you found you

16   can describe in an affidavit or with the exhibits, and I were

17   persuaded after hearing the response that so, you know,

18   obviously it would be, you know, fairly extreme sanctions that

19   would be warranted.

20             That might not necessitate a further evidentiary

21   hearing so much as going right to, oh, look, after seeing the

22   exhibits and hearing the responses, I'm satisfied that, you

23   know, I was presented with false testimony.  Okay, there are

24   ways to deal with that, but I don't know we need to start over

25   with yet another hearing.  And it may not surprise you, but

Proceedings

1   there are other cases that I have to attend to.

2            MS. NELKIN:  I certainly understand.

3            THE COURT:  As I am sure you all do.

4            MS. NELKIN:  I certainly understand.

5            THE COURT:  If you present evidence that the

6   defendants's witnesses and the defendants are presenting false

7   evidence to me, and I'm satisfied after hearing from both

8   sides that that's so, I'm not sure that there's a need for

9   further hearing so much as, you know, input from both sides on

10  the appropriate sanction.

11           MS. NELKIN:  Judge Orenstein, I'm also really

12  concerned by what I heard, I just heard from the first time

13  there's some problem with our access to Launch.

14           THE COURT:  Look, that concerns me as well because I

15  know that under the injunction that has been in place for some

16  eight months, full access has been provided.  If it's not

17  being provided, I think there are sanctions that are

18  appropriate.

19           MS. NELKIN:  It's not, it's more than a question of

20  access.  It's a question of, I believe that we have evidence

21  of computers being wiped.

22           THE COURT:  Yes, I know.  You have told me that

23  already.

24           MS. NELKIN:  And now we were on Launch.  We went to

25  a place really by accident, I mean, you know, just by

Proceedings

1    serendipity that that's where we started immediately.  And it

2    lists names of computers.  And the user, the user and the name

3    of the computer.  So as I said, it shows all these additional

4    computers that are used by -- by Ms. Rivera, by Mr. Friedman,

5    and while we were looking at that, we lost access.  And now

6    apparently we are being told that there's a problem with our

7    getting on it again, so.

8             MR. NELKIN:  If I can just, it went into a failure.

9    We could not -- we tried repeatedly to get back on.  We

10   e-mailed opposing counsel, sent them the error messages.  We

11   checked it this morning before we came into court -- into

12   court.  It was working again.  We were told at the break that

13   the problem was attribute being to antivirus software, but

14   would likely occur again.  But that's --

15            THE COURT:  Whose antivirus, that's on Launch?

16            MR. NELKIN:  Yes.

17            THE COURT:  And that should be removed.

18            MR. NELKIN:  They were telling us they were going to

19   try on their end.

20            THE COURT:  Okay.  Well, they have a continuing

21   obligation to do -- take all steps necessary to restore full

22   access.

23            Mr. Schafhauser, any reason that's not the case that

24   you don't have and your clients have an obligation to restore

25   full access?

Proceedings

1          MR. SCHAFHAUSER:  Well --

2          THE COURT:  Because it seems to me that has been

3     clear for eight months and every time I try and address the

4     problem and I'm told it will be solved, it isn't.

5          MR. SCHAFHAUSER:  Your Honor, may I -- may I address

6     these comments and Your Honor's question?  The answer, Your

7     Honor, is that last night at 6:30 p.m., Stroz Friedberg said

8     that access was restored.  At 12:30 p.m. I received an e-mail

9     from Mr. Nelkin saying that for remote access, there was an

10    issue.  I immediately endeavored to get to the issue.

11         This morning, Your Honor heard that access was

12    restored.  That was in response to the efforts that were made.

13    I'm now hearing something different again now for the first

14    time, so I'm at a loss to respond.  But let me, let me most

15    respectfully say that Mr. Rogosnitzky is not my client.  I

16    don't represent him.

17         THE COURT:  I think there's a factual determination

18    I need to make about the extent to which your client has

19    control about Mr. Rogosnitzky.  I think we have got a fairly

20    good record about that.

21         MR. SCHAFHAUSER:  But Your Honor will make the

22    determination.  I'm simply saying most respectfully that to

23    the extent that we can deal with Mr. Rogosnitzky, I'm trying

24    very hard to do so which is why an agreement was reached on

25    Friday when it was and which is why when I got an e-mail from

Proceedings

1   Mr. Nelkin last night, access Your Honor heard this morning

2   was restored.

3           THE COURT:  I want to be very clear.  I am not in

4   the slightest questioning your good faith personally --

5           MR. SCHAFHAUSER:  Thank you, Your Honor.

6           THE COURT:  -- or the efforts that you are making to

7   have your client discharge his obligations.  What I am

8   questioning, and I will be explicit about this, is your

9   client's commitment to discharging his obligations under the

10  preliminary injunction.  The fact that after all we have been

11  through, full access to Launch is not restored is one reason I

12  question it.

13          MR. SCHAFHAUSER:  Your Honor, whenever, whether we

14  take a recess now or at 5:00, I'm looking the Court in the

15  eyes.  Whenever that recess takes place, I will and

16  Mr. Friedman will redouble efforts to work out the issues.

17  Last night Mr. Friedman was on the phone.  Mr. Nussbaum was on

18  the phone.  Counsel was on the phone.  Mr. Glick [sic],

19  Mr. Nussbaum's attorney was on the phone.  So I understand

20  what Your Honor has very eloquently sought to impart to me.

21  And we take that seriously.

22          MR. NELKIN:  Your Honor, there's one other thing

23  about restoring Launch.  As I told to Mr. Goldfarb who is

24  counsel for Benzion Nussbaum who came in at the break, the way

25  that Launch has been restored, according to Stroz, they are

Proceedings

1  having difficulty with certain functionality.  There not ways

2  to save they can find.  There are not ways to fax or e-mail.

3  They have built-in functions.  As a result, the only way they

4  could figure to have any attempt to actually obtain a copy of

5  the information on a screen or a file with the exception of

6  certain Excel spreadsheets which could be done some particular

7  way was to take a screenshot --

8            THE COURT:  Yes.

9            MR. NELKIN:  -- close the program or minimize it, go

10  to a Paint program.

11            THE COURT:   I get it.

12            MR. NELKIN:  Okay.  And so, for instance, for the

13  records and for everything else and just for us to, our

14  ability to present things, it's an extremely tedious and

15  time-consuming process.  And we are not even sure we can

16  present it.  We know Stroz has told us we can't present a full

17  file because you are only going to get what's on the screen,

18  like if you were trying to save a two-page file, for instance.

19            THE COURT:   Folks, look, I'm sure you are all

20  frustrated with the way this is going, and you have reason to

21  be.  And you have better things to be doing than spend an

22  indefinite amount of time here.  None of us, I am confident,

23  can make this the only thing we do.  So I'm looking for

24  practical suggestions.  There is the need to resolve the issue

25  about identifying all the computers and restoring access to

Proceedings

1    Launch so that the parties's respective rights are vindicated.

2    The longer this goes on, the greater the problem become.

3          And one things that's clear is that Two Rivers as a

4    company, as an entity in which all the parties or many of the

5    parties have direct interest is endangered by the lack of

6    access.  It's not discharging its legal obligations.  So I'm

7    looking for practical solutions about how to get to the bottom

8    of what's going on, put in place any remedial measures that

9    are appropriate.

10         MS. NELKIN:  Judge Orenstein, I might just suggest,

11   I'm looking and seeing that it's almost 3:00.  Assuming that

12   we have access to Launch, which I'm not sure about, but if we

13   could have even until the morning, we could get this evidence

14   in some form to present to you tomorrow.

15         THE COURT:  All right.  And Mr. Schafhauser, I don't

16   want to cut you off.  You were going to say something.

17         MR. SCHAFHAUSER:  I think I gave Your Honor my word

18   this morning I wouldn't object, so I will not now object.

19         THE COURT:   No, but do you have a different

20   suggestion?

21         MR. SCHAFHAUSER:   Well, I would like to -- my focus

22   is putting Launch back on.  That's frankly a focus of mine,

23   and so I would, if -- if -- if we are going to take a recess,

24   I would like to work with counsel to address that issue.

25         THE COURT:  Yes, sir?

Proceedings

1          MR. GRANTZ:  I just have a comment.  I know that

2     they are getting access to Launch and then they are finding

3     things on Launch, but we don't have any access to it.  So we

4     don't know what we are going to find.

5          THE COURT:  Look, one thing I thought I was very

6     clear about last night was everybody get in the same room,

7     restore access, look at the same things.  I have no idea why a

8     system would be created so that you can't download information

9     from it, but if that's where we are, you all need to be in the

10    room looking at it.

11         MR. GRANTZ:  As I said, we certainly at this end of

12    the table haven't seen anything.

13         THE COURT:  Then go look.

14         MR. GRANTZ:  We weren't under the impression that we

15    were entitled to look at the Launch system.

16         THE COURT:  Look, we have to get through this.  All

17    of you look at it together.

18         MR. NELKIN:  Well --

19         MR. SCHAFHAUSER:  Very well.

20         MR. NELKIN:  We don't have an objection.  The way

21    they set it up is there's only a single password to get into

22    it.

23         THE COURT:  No, no, be in the room together.  Look

24    at things together.

25         MR. NELKIN:  Well, as a practical matter, that's not

Proceedings

1    possible, I don't think, I mean.

2            THE COURT:  Why?

3            MR. NELKIN:  We are not set up to do that right now.

4            THE COURT:  Why?  In what way?  There's a room in

5    which you are looking at Launch, right?

6            MR. NELKIN:  No.

7            THE COURT:  No?

8            MR. NELKIN:  It's a remote access.  You do it from

9    any computer.  They can go on their computers and look.

10           THE COURT:  One at a time.  So go into a room where

11   there's a computer.

12           MR. NELKIN:  No, there's four different passwords

13   they can get in.

14           THE COURT:   But at some point in some way somebody

15   is in a room with a computer and seeing what's there, right?

16   Otherwise I don't understand how you are getting this

17   information.

18           MR. NELKIN:  The way that they have set it up is

19   they set up a passwords for my client to get in.  They set up

20   a password for Eugene to get in.

21           THE COURT:   But look, whoever is getting in --

22           MR. NELKIN:  They can set one up for Mr. Friedman to

23   get in.

24           MR. GRANTZ:   But they haven't.  We haven't gone on.

25           THE COURT:  Whoever has access to get in, at some

Proceedings

1   point you are gathering this evidence because somebody is in a

2   room with a computer and seeing what's on the screen, right?

3              MS. NELKIN:  It's on our computer.  They can get it

4   on their computer as well.

5              MR. NELKIN:  Simultaneously.  We can go in as

6   Steven.  They can go in as Eugene.

7              THE COURT:  I don't care how you do it.  If there is

8   a problem of one person seeing it, you all have the same right

9   to see it.

10             MS. NELKIN:  We are not restricted.

11             THE COURT:  Everybody can see it.

12             MR. SCHAFHAUSER:  Very well.

13             THE COURT:  Look, we will break until tomorrow.  We

14  are going to finish this hearing.  The absolute most can I do

15  for you if I move things around is continue into Monday, not

16  even a full day.  That's when the hearing is going to end.  I

17  will see you in the morning.

18             MR. NELKIN:  Your Honor --

19             MR. GRANTZ:  Your Honor, it's a personal issue.  I

20  didn't raise it when we were --

21             THE COURT:  Okay, go ahead.

22             MR. GRANTZ:  I have a scheduled vacation that starts

23  tomorrow.  I am going to go on it and Ms. Pastrikos to step in

24  if that's all right with you.

25             THE COURT:  Look, it's up to your client.  I won't

Proceedings

1    tell you not to take your vacation.  I did tell you when we

2    were together in July I said to everybody clear your

3    schedules.

4                MR. GRANTZ:  This was scheduled in January.

5                THE COURT:  I get it.  And this is one of the

6    reasons I'm determined to finish this hearing.

7                MR. GRANTZ:  I appreciate that.

8                THE COURT:  There are too many people here with too

9    many commitments to keep it going day to day and there are

10   pressing issues that need to be resolved.  Anything else

11   before we break?

12               MR. NELKIN:  Stroz was able to track the down the

13   server where it is located.  It happens to be in New Jersey.

14   They have told you see that you had asked or someone had

15   asked, I think actually Mr. Grantz, if it was all downloaded.

16   Stroz would like to find a way to download it, but they need

17   to get access to the server.

18               THE COURT:  Where is it?  It's in New Jersey?  Who

19   knows where it is?

20               MR. SCHAFHAUSER:  I don't know.

21               MR. NELKIN:  We were told by Stroz in a place

22   called, I think have Vultr, V-U-L-T-R, in Piscataway.  I can

23   ask Stroz for more information.  But if we can get some sort

24   of assistance from the Court.

25               THE COURT:  Look, I can't and won't try to order

Joshua B. Edwards, RDR, CRR
Official Court Reporter

Proceedings

1   somebody who's not before the Court to give access to physical

2   property.  If it is within the control of any of the parties,

3   yes, please do it.

4            MR. NELKIN:  I think under the preliminary

5   injunction there's a thing that says that any repository of

6   information, Judge Amon quoted, has to make it available for

7   access if they have notice.

8            THE COURT:  If you got an order from Judge Amon, I

9   am not going back on it.  If you are saying you need an order

10  from me over a nonparty, I'm not sure I can do that.

11           MR. NELKIN:  Okay, thank you, Your Honor.

12           THE COURT:  Am okay.  See you in the morning.

13           (Time noted:  2:55 p.m.)

14           (Proceedings adjourned as set forth above.)

15

16

17                    I N D E X

18  WITNESS                          PAGE

19  VINCENT PAPA

20  CROSS-EXAMINATION     BY MR. SCHAFHAUSER 1288
    CROSS-EXAMINATION     BY MR. FELDMAN     1367
21  CROSS-EXAMINATION     BY MR. GRANTZ      1376
    CROSS-EXAMINATION     BY MR. HELLER      1377
22  CROSS-EXAMINATION     BY MR. FINKEL      1380
    REDIRECT EXAMINATION  BY MS. NELKIN      1381
23  RECROSS-EXAMINATION   BY MR. SCHAFHAUSER 1404
    RECROSS-EXAMINATION   BY MR. FELDMAN     1407
24  RECROSS-EXAMINATION   BY MR. HELLER      1408
    RECROSS-EXAMINATION   BY MR. GRANTZ      1409

25

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

(Time noted: [1] 1425/12
MR. FELDMAN: [21] 1367/18 1369/12
1370/3 1370/5 1370/10 1370/16
1375/10 1375/13 1375/16 1375/20
1375/22 1384/19 1384/23 1385/6
1385/16 1386/13 1386/22 1386/24
1387/8 1407/16 1408/21
MR. FINKEL: [2] 1381/13 1399/22
MR. GRANTZ: [12] 1420/25 1376/25
1410/25 1411/7 1420/25 1421/10
1421/13 1422/23 1423/18 1423/21
1424/3 1424/6
MR. HELLER: [10] 1377/2 1377/22
1378/1 1378/3 1378/7 1378/11 1378/13
1378/23 1380/12 1409/3
MR. NELKIN: [34] 1286/1 1286/23
1288/13 1339/9 1339/15 1340/1 1340/9
1341/7 1402/3 1403/8 1411/19 1412/1
1412/7 1416/7 1416/15 1416/17
1418/21 1419/8 1419/11 1421/17
1421/19 1421/24 1422/2 1422/5 1422/7
1422/11 1422/17 1422/21 1423/4
1423/17 1424/11 1424/20 1425/3
1425/10
MR. ROSENBLATT: [10] 1302/25
1310/25 1315/11 1315/23 1319/4
1332/15 1356/12 1356/16 1377/19
1409/1
MR. SCHAFHAUSER: [90]
MS. NELKIN: [52] 1291/18 1292/20
1294/10 1297/18 1300/10 1300/14
1308/18 1312/16 1315/19 1319/19
1332/19 1333/14 1335/11 1335/15
1339/6 1339/20 1369/7 1370/6 1377/18
1377/20 1380/10 1381/15 1385/1
1388/5 1388/13 1389/1 1389/6 1396/20
1398/18 1398/25 1399/2 1399/8
1399/12 1401/7 1401/14 1401/21
1402/5 1403/10 1404/17 1412/10
1413/8 1413/10 1413/24 1414/7 1415/1
1415/3 1415/10 1415/18 1415/23
1420/9 1423/2 1423/9
THE COURT: [262]
THE WITNESS: [46] 1290/25 1301/11
1306/8 1312/6 1313/17 1313/19
1314/22 1317/11 1317/13 1317/17
1317/20 1328/25 1329/5 1329/8
1329/11 1331/11 1331/15 1334/1
1334/6 1334/8 1343/25 1344/5 1353/4
1353/6 1358/9 1358/12 1362/2 1362/7
1362/19 1363/13 1369/16 1385/9
1387/3 1392/12 1397/7 1400/24 1401/2
1402/21 1402/24 1403/2 1405/10
1405/16 1409/22 1411/2 1411/5 1411/9

**$**

$10,000 [1] 1320/18
$100 [2] 1349/12 1349/24
$215,000 [1] 1349/16
$50,000 [5] 1302/19 1302/24 1308/16
1308/23 1309/1
$500,000 [1] 1309/10

**-**

-- close [1] 1419/9
-- or [1] 1418/6
----------------------------x [2] 1284/2
1284/9

1.158 million [2] 1328/24 1329/8
1.5 [1] 1296/1
10:33 a.m [1] 1326/1
11th [1] 1388/19
122 [2] 1368/20 1368/22
128 [4] 1328/22 1328/23 1329/7
1394/22
12:30 [1] 1388/4
12:30 p.m [1] 1417/8
12th [1] 1328/2 1397/19
133A [7] 1401/19 1402/5 1402/6
1403/24 1404/6 1404/16 1404/25
14 [1] 1359/4
15 [1] 1389/7
15 minutes [1] 1399/11
15-CV-6861 [1] 1284/3
15th [2] 1337/6 1337/12
165 [1] 1385/1
17 [5] 1327/1 1327/17 1328/25 1329/1
1329/5
193A [1] 1402/5

**2**

20 [2] 1298/1 1389/7
2012 [4] 1370/20 1370/23 1371/1
1371/3
2013 [6] 1367/24 1368/5 1368/8 1371/4
1371/22 1372/21
2014 [10] 1331/13 1346/9 1346/9
1346/12 1368/2 1368/6 1371/11
1371/19 1372/21 1388/19
2015 [19] 1297/2 1297/8 1304/2 1321/6
1322/5 1336/18 1349/11 1349/15
1349/18 1349/20 1350/2 1350/7
1350/12 1371/24 1372/22 1377/8
1380/18 1388/23 1408/19
2016 [8] 1284/6 1299/16 1326/1 1328/2
1337/6 1337/12 1402/19 1403/4
22 [1] 1298/1
2330 [1] 1284/1
24 [3] 1285/2 1390/16 1390/17
24-hour [2] 1390/12 1390/12
25 [3] 1388/2 1388/14 1388/15
26 [1] 1285/14
2712 [1] 1284/21
29 [2] 1402/18 1402/24
2:00 [1] 1389/10
2:00 o'clock [1] 1389/9
2:55 [1] 1425/13
2s [2] 1386/6 1386/7

**3**

30 [2] 1336/18 1367/13
300,000 [2] 1356/2 1356/2
31 [4] 1403/6 1403/12 1403/13 1403/15
33 [3] 1296/4 1337/20 1403/18
36 [1] 1398/25
37 [2] 1310/16 1310/17
38 [3] 1310/23 1314/11 1318/3
39 [2] 1316/14 1317/3
3:00 [1] 1420/11

**4**

42 [3] 1339/19 1340/3 1398/25
42A [5] 1332/7 1333/7 1334/13 1335/19
1399/1
42B [1] 1334/13
4390 [1] 1358/19
4391 [1] 1359/1

45 [2] 1348/12 1348/18
4th [1] 1299/16 1300/20 1350/19
1350/21 1350/25 1351/4 1351/7 1354/9
1365/6 1365/12 1390/21

**5**

50 [3] 1348/6 1351/14 1352/14
50,000 [2] 1303/16 1304/19
5:00 [1] 1418/14

**6**

6.1.2 [1] 1302/10
61 [4] 1386/17 1386/17 1407/20
1407/20
6861 [1] 1284/3
6:30 last [1] 1286/20
6:30 p.m [1] 1417/7

**7**

718-613-2330 [1] 1284/21
718-804-2712 [1] 1284/21

**8**

800,000 [2] 1309/13 1355/20
8th [2] 1326/1 1397/19

**9**

92 [2] 1357/2 1357/9
9368 [1] 1402/18
940s [1] 1408/15
941s [1] 1408/15
9:30 [1] 1284/6

**A**

A-P-P [1] 1367/3
a.m [2] 1284/6 1326/1
ability [5] 1300/17 1301/10 1306/7
1412/4 1419/14
able [10] 1286/7 1286/10 1286/13
1313/22 1346/12 1367/8 1404/9 1411/5
1411/14 1424/12
absence [2] 1301/9 1301/14
absolute [1] 1423/14
Absolutely [2] 1295/22 1352/17
accepted [3] 1292/12 1298/12 1372/7
accepting [1] 1298/22
access [70] 1286/12 1287/12 1287/16
1287/20 1288/22 1298/23 1317/16
1317/16 1324/8 1343/7 1351/13
1351/13 1351/16 1351/21 1353/22
1353/23 1353/24 1353/24 1354/1
1354/5 1355/12 1364/8 1364/16
1364/18 1364/19 1365/3 1365/4 1367/5
1368/17 1378/16 1379/4 1379/8
1379/11 1379/13 1379/16 1379/23
1379/24 1380/3 1380/8 1387/22 1408/6
1408/8 1408/9 1410/10 1410/13
1410/15 1410/19 1411/24 1415/13
1415/15 1415/20 1416/5 1416/22
1416/25 1417/8 1417/9 1417/11 1418/1
1418/11 1419/25 1420/6 1420/12
1421/2 1421/3 1421/7 1422/8 1422/25
1424/17 1425/1 1425/7
accessed [1] 1366/20
accessible [2] 1354/23 1366/10
accessing [3] 1307/13 1347/2 1364/24
accident [1] 1415/25
accordance [1] 1372/6
according [1] 1418/25
account [6] 1350/5 1350/5 1350/6

account... [3] 1350/7 1359/1 1374/3
accountant [5] 1290/12 1304/23 1306/5 1385/16 1385/23
accountants [3] 1323/6 1371/7 1372/5
accounting [6] 1306/14 1307/3 1307/4 1307/16 1310/7 1372/7
accurate [1] 1375/6
accurately [1] 1358/15
acquire [1] 1292/17
acquired [1] 1292/20
actual [1] 1373/24
addition [4] 1328/4 1335/19 1411/23 1412/25
additional [5] 1337/4 1337/11 1341/15 1389/2 1416/3
address [11] 1288/11 1304/3 1304/6 1305/23 1316/8 1318/24 1319/12 1383/5 1417/3 1417/5 1420/24
addressed [7] 1317/9 1318/13 1319/11 1400/9 1400/19 1400/24 1403/17
addressing [1] 1348/24
adjourned [1] 1425/14
adopted [1] 1311/4
advent [1] 1303/21
affidavit [1] 1414/16
affidavits [1] 1286/16
affiliated [1] 1351/1
affirmed [1] 1288/18
afternoon [5] 1327/8 1367/22 1377/7 1380/17 1397/3
aggregate [1] 1355/20
ago [6] 1328/12 1345/7 1346/3 1346/3 1346/4 1405/20
agree [1] 1291/21
agreed [2] 1319/18 1319/24
agreement [20] 1291/9 1295/9 1295/12 1295/14 1295/25 1296/6 1297/16 1301/19 1302/5 1302/10 1302/16 1302/25 1303/9 1303/11 1303/14 1303/25 1304/21 1305/2 1305/3 1417/24
agreements [1] 1300/10
agrees [1] 1299/9
ahead [18] 1301/13 1304/13 1312/23 1317/22 1329/15 1331/17 1332/18 1353/11 1362/11 1362/23 1363/16 1378/1 1385/25 1388/16 1390/2 1401/7 1402/7 1423/21
aid [1] 1377/17
aided [1] 1284/24
al [1] 1284/7
alerted [1] 1301/8
allegations [4] 1287/8 1378/5 1380/4 1388/1
alleged [1] 1378/12
allegedly [1] 1339/6
allow [5] 1297/21 1300/19 1303/5 1369/11 1411/15
allowed [2] 1305/4 1387/2
almost [2] 1414/10 1420/11
alone [1] 1362/21
amended [1] 1302/10 1302/16
amendment [2] 1302/6 1302/8
amendments [1] 1295/9
American [2] 1357/23 1357/24
Amon [2] 1425/6 1425/8
amount [9] 1293/1 1293/3 1294/6 1294/9 1302/18 1309/9 1352/4 1391/18

amounts [6] 1293/8 1293/13 1293/16 1293/17 1399/18 1408/12
analysis [2] 1307/21 1307/23
analyzable [1] 1376/20
ankle [1] 1340/21
answer [16] 1287/25 1288/4 1290/7 1301/20 1316/5 1316/11 1318/12 1350/15 1352/16 1368/19 1376/23 1379/7 1380/1 1385/10 1410/17 1417/6
anticipate [2] 1389/4 1399/7
anticipation [1] 1370/10
antivirus [4] 1367/6 1411/25 1416/13 1416/15
anyway [1] 1402/3
appear [1] 1373/18
APPEARANCES [1] 1284/13
appearing [1] 1318/17
appellation [1] 1292/3
appreciate [2] 1407/4 1424/7
approach [3] 1331/24 1348/13 1401/8
appropriate [3] 1415/10 1415/18 1420/9
approval [7] 1291/5 1306/24 1390/12 1390/12 1390/16 1391/4 1391/10
approve [1] 1372/15
AppSolute [2] 1367/3 1367/4
April [4] 1346/9 1346/12 1368/2 1368/6
April 2014 [1] 1368/2
area [4] 1311/19 1356/19 1364/14 1384/22
argued [1] 1294/16
argument [1] 1382/7
arranged [1] 1358/24
arrangement [1] 1296/10
art [1] 1290/24
ascribing [1] 1373/7
aside [7] 1308/24 1319/3 1319/16 1320/20 1326/15 1358/23 1359/7
asserted [1] 1352/4
assessment [1] 1322/24
assistance [4] 1299/23 1359/17 1360/6 1424/24
assistant [1] 1327/2
assisted [1] 1387/19
associated [3] 1285/3 1321/7 1342/23
Associates [1] 1285/5
assume [7] 1333/12 1381/4 1382/13 1399/11 1403/22 1413/17 1414/15
assumed [1] 1353/10
Assuming [1] 1420/11
assumption [1] 1353/16
attached [2] 1299/19 1367/11
attachments [6] 1327/19 1327/22 1327/24 1327/25 1328/1 1328/20
attempt [9] 1288/22 1351/4 1351/16 1352/7 1352/22 1354/22 1355/9 1355/12 1419/4
attempted [5] 1351/13 1352/1 1359/23 1367/5 1367/6
attempting [1] 1366/19
attempts [1] 1286/6
attend [1] 1415/1
attention [5] 1386/17 1388/2 1390/4 1394/22 1404/7
attribute [1] 1416/13
audit [11] 1330/11 1330/14 1330/22 1330/25 1331/4 1331/8 1331/10 1331/13 1372/16 1372/19 1395/10
audited [1] 1331/12
auditor [1] 1331/15

authorization [1] 1309/9 1352/23
authorize [4] 1323/6 1323/11 1323/14 1323/15
authorized [5] 1302/16 1309/4 1313/23 1323/16 1352/21
automate [1] 1309/5
automating [1] 1394/17
available [5] 1358/17 1387/19 1406/23 1411/14 1425/6
Avenue [3] 1285/5 1296/4 1337/20
average [1] 1368/22
AVERY [1] 1285/6
avoid [2] 1290/23 1296/21
awaiting [1] 1372/1
aware [19] 1295/18 1296/3 1296/7 1297/6 1297/17 1303/8 1303/15 1303/17 1303/18 1355/15 1357/18 1359/8 1365/7 1377/8 1380/4 1386/12 1386/21 1387/4 1387/6

B

back-ups [1] 1355/7
backing [2] 1355/4 1356/24
backup [9] 1326/23 1329/8 1329/22 1330/1 1354/25 1355/1 1355/3 1366/20 1367/7
backups [6] 1355/6 1355/10 1355/12 1355/15 1355/17 1357/4
bag [25] 1343/21 1343/22 1343/23 1344/2 1344/5 1344/9 1344/11 1344/12 1344/13 1344/14 1344/14 1344/15 1344/16 1345/1 1345/4 1345/7 1345/9 1345/11 1345/12 1345/14 1345/15 1400/1 1400/4 1400/12 1400/16
balance [4] 1356/3 1356/7 1372/24 1373/2
balances [1] 1349/7
bank [9] 1348/24 1349/4 1349/6 1357/14 1373/24 1373/25 1374/1 1374/8 1375/2
bankers [1] 1332/20
barcode [1] 1402/21
Barge [1] 1289/1
based [6] 1363/2 1384/12 1399/6 1410/13 1413/15 1414/1
basis [8] 1300/3 1300/14 1300/15 1305/3 1305/6 1321/4 1342/18 1346/1
Bates [9] 1332/23 1333/1 1333/2 1333/6 1339/10 1339/11 1339/14 1341/3 1341/16
Bates-stamped [1] 1332/23
bearing [1] 1333/6
became [4] 1346/18 1346/21 1351/10 1352/8
began [4] 1293/10 1293/15 1295/24 1322/5
begin [2] 1295/23 1319/3
begins [1] 1302/9
begun [1] 1325/19
behalf [19] 1311/24 1312/5 1312/15 1313/14 1313/23 1314/4 1315/10 1318/1 1318/16 1318/17 1318/18 1319/17 1319/18 1319/25 1322/1 1331/20 1335/21 1351/25 1354/14
belatedly [1] 1287/16
belonged [1] 1400/8
Ben [2] 1347/10 1355/6
benefit [1] 1301/23

**B**

Benzion [1] 1418/24
BERGSON [1] 1285/10
best [19] 1284/16 1292/5 1292/7 1298/9
1301/23 1307/6 1308/7 1308/14 1312/7
1313/21 1322/17 1342/7 1367/10
1381/23 1385/5 1392/11 1392/13
1392/14 1392/17
Beverages [1] 1285/13
beyond [2] 1292/22 1401/23
bigger [2] 1338/5 1349/15
bills [2] 1291/3 1296/22
binding [1] 1303/6
Birnbaum [1] 1285/13
black [1] 1402/17
board [1] 1297/10
body [1] 1399/18
book [5] 1290/4 1290/10 1349/6 1359/4
1403/9
bookkeeper [1] 1380/19
books [39] 1288/25 1288/25 1289/1
1289/3 1289/5 1289/9 1289/11 1289/14
1289/16 1289/19 1289/21 1290/14
1290/18 1290/23 1291/6 1291/12
1291/17 1294/7 1294/8 1294/10 1300/1
1325/15 1372/6 1373/11 1373/14
1373/19 1376/24 1387/14 1394/25
1395/3 1396/16 1396/23 1398/4
1398/14 1399/15 1399/18 1406/8
1406/15 1406/22
bottom [2] 1349/6 1420/7
boundaries [1] 1298/10
box [13] 1332/4 1332/10 1332/13
1339/17 1340/3 1342/14 1396/9
1398/15 1398/22 1400/23 1401/11
1405/12 1405/17
boxes [28] 1332/1 1332/13 1332/15
1332/21 1333/7 1333/16 1334/13
1334/25 1336/1 1336/3 1338/4 1338/6
1338/8 1338/9 1338/18 1339/5 1340/13
1340/22 1341/3 1342/15 1395/24
1396/2 1398/15 1398/18 1398/24
1400/20 1401/10 1405/13
break [17] 1318/23 1332/16 1333/3
1340/5 1347/12 1347/15 1347/21
1388/3 1388/5 1389/9 1399/7 1399/10
1411/23 1416/12 1418/24 1423/13
1424/11
breaking [1] 1340/21
Brian [1] 1286/23
brief [4] 1391/5 1391/8 1391/17 1391/17
briefcase [1] 1344/16
briefly [8] 1286/19 1297/21 1301/24
1338/7 1338/8 1404/21 1407/17
1412/11
bring [2] 1340/17 1400/2
bringing [1] 1400/4
broad [1] 1330/25
Brooklyn [1] 1284/4
brought [2] 1344/12 1344/14
BRUCE [1] 1285/8
building [1] 1346/10
built [1] 1419/3
built-in [1] 1419/3
bulk [1] 1411/20
business [5] 1302/18 1308/23 1362/21
1402/12 1404/7

**C**

C-R-I-S-E-I-D-Y [1] 1343/2

calculation [2] 1383/24 1394/18
calculations [1] 1410/7
cannot [2] 1364/9 1410/22
capital [2] 1374/17 1374/21
card [25] 1326/8 1328/5 1329/19
1329/22 1330/4 1357/4 1357/17
1357/19 1357/22 1357/23 1357/25
1358/6 1358/17 1358/20 1358/21
1358/21 1358/23 1362/9 1363/10
1395/7 1395/7 1395/21 1395/25 1396/5
1397/20
cards [21] 1331/20 1333/23 1356/20
1356/24 1357/1 1357/14 1357/22
1358/4 1358/9 1358/10 1358/11
1358/11 1358/17 1358/22 1358/24
1359/10 1359/13 1360/7 1395/5
1397/13 1397/14
careful [2] 1372/12 1383/21
CAROL [1] 1284/14
carried [1] 1400/12
carrying [3] 1343/22 1400/1 1400/16
case [5] 1318/17 1322/5 1333/19
1365/25 1416/23
cases [1] 1415/1
cash [3] 1350/5 1350/6 1350/7
categories [1] 1291/16
CBA [1] 1284/3
certain [8] 1295/18 1323/8 1325/9
1332/12 1337/14 1397/12 1419/1
1419/6
certainly [11] 1308/22 1316/23 1342/3
1346/8 1365/2 1372/12 1392/24
1410/12 1415/2 1415/4 1421/11
cetera [2] 1322/23 1322/23
CFO [3] 1290/14 1308/3 1354/1
chance [2] 1287/15 1413/21
chapter [1] 1287/1
charge [1] 1382/18
charged [3] 1321/4 1321/7 1322/22
Chase [2] 1358/19 1359/1
check [7] 1302/17 1320/5 1320/9
1320/17 1373/25 1373/25 1374/9
checked [5] 1325/10 1373/25 1374/4
1416/11
checks [9] 1289/24 1291/3 1300/7
1300/22 1305/9 1327/20 1349/7
1381/25 1390/18
chief [5] 1289/18 1291/23 1292/3
1292/10 1357/13
China [1] 1292/6
circuit [1] 1334/11
circulate [2] 1390/15 1391/9
circulating [1] 1391/3
circumstances [1] 1300/18
CIVIL [1] 1284/10
clarified [1] 1304/16
clarify [1] 1345/13
clear [12] 1303/19 1313/16 1313/21
1318/8 1354/21 1365/6 1386/6 1417/3
1418/3 1420/3 1421/6 1424/2
clearly [2] 1329/5 1329/25
client [5] 1417/15 1417/18 1418/7
1422/19 1423/25
client's [1] 1418/9
clients [1] 1335/21 1416/24
close [1] 1419/9
Co [1] 1284/18
coffee [29] 1284/16 1285/15 1285/17
1307/13 1309/7 1309/8 1312/16 1314/4
1318/1 1319/24 1337/18 1348/8

1348/23 1349/5 1350/5 1350/20
1397/25 1354/25 1376/9 1376/20
1376/21 1392/13 1392/14 1394/10
1403/17 1408/2 1410/16 1410/18
1410/22
colleague [1] 1322/3
collect [1] 1287/17
collection [1] 1340/13
collectively [1] 1342/16
combination [1] 1345/18
coming [3] 1346/1 1384/10 1412/3
commence [1] 1380/9
commenced [3] 1308/18 1379/3 1379/6
comment [1] 1421/1
comments [1] 1417/6
Commerce [1] 1402/14
commitment [1] 1418/9
commitments [1] 1424/9
communicate [4] 1351/22 1380/18
1381/4 1381/11
communicated [2] 1316/25 1352/15
communication [2] 1363/2 1370/10
communications [1] 1378/21
companies [1] 1381/24
company [64] 1289/9 1289/20 1291/13
1291/18 1292/14 1292/24 1294/7
1296/5 1297/13 1302/17 1302/20
1303/6 1304/24 1305/21 1306/2 1306/8
1306/15 1306/21 1307/5 1307/6
1307/14 1307/17 1308/17 1311/3
1311/14 1311/16 1312/5 1312/13
1312/14 1314/21 1315/10 1315/18
1315/22 1315/23 1317/17 1318/17
1319/17 1320/9 1324/11 1331/12
1341/16 1342/25 1354/1 1356/15
1357/17 1357/20 1357/25 1358/2
1358/4 1358/7 1358/12 1368/1 1368/12
1374/12 1374/17 1393/25 1394/3
1396/10 1396/11 1396/14 1398/5
1409/9 1410/21 1420/4
company's [12] 1289/18 1290/14
1290/14 1308/7 1308/14 1311/5 1315/9
1316/22 1356/10 1357/13 1357/14
1358/18
company-issued [1] 1357/17 1358/4
comparing [1] 1349/6 1349/8
comparison [1] 1349/4
compile [1] 1319/4
complain [2] 1363/13 1363/14
complaining [1] 1363/9
complaint [3] 1369/23 1370/3 1370/15
complete [4] 1331/4 1395/3 1397/22
1411/16
completed [2] 1331/8 1349/18
completely [1] 1369/9
compliance [2] 1319/10 1375/19
comply [2] 1287/9 1387/24
comprise [1] 1335/24
computer [28] 1284/24 1320/7 1320/8
1320/10 1363/18 1363/19 1363/21
1363/23 1363/24 1364/2 1364/3
1364/11 1364/18 1364/19 1364/24
1365/5 1365/11 1365/14 1376/17
1408/6 1412/22 1416/3 1422/9 1422/11
1422/15 1423/2 1423/3 1423/4
computer-aided [1] 1284/24
computers [9] 1412/13 1412/15 1412/17
1414/12 1415/21 1416/2 1416/4
1419/25 1422/9
conceal [2] 1378/6 1380/5

concept [1]  1305/18
concern [1]  1413/4
concerned [5]  1361/1 1362/1 1362/5
1384/18 1415/12
concerning [1]  1381/5
concerns [2]  1411/17 1415/14
conclusions [1]  1291/20
conclusively [1]  1286/15
condition [2]  1322/19 1322/20
conference [1]  1388/4
confident [1]  1419/22
confirm [1]  1404/11
confirmed [1]  1287/20
connect [1]  1369/11
connected [1]  1366/14
connection [5]  1310/20 1316/21 1369/23
1370/2 1370/15
consent [33]  1301/17 1302/19 1302/24
1303/16 1304/18 1304/22 1304/25
1305/7 1305/10 1305/22 1305/23
1306/14 1306/18 1306/21 1306/22
1306/23 1307/18 1307/24 1309/17
1309/20 1309/22 1309/24 1310/1
1310/3 1310/6 1310/10 1311/7 1311/13
1311/13 1311/25 1321/24 1321/24
1322/12
consented [1]  1308/11
consider [3]  1290/10 1386/7 1387/12
conspicuous [1]  1322/21
constrained [1]  1308/5
constraints [1]  1303/22
construction [7]  1368/4 1368/7 1368/12
1368/24 1369/16 1369/17 1369/18
consultant [1]  1320/10
consulted [1]  1392/22
consuming [1]  1419/15
cont'd [1]  1390/3
contact [6]  1351/16 1352/22 1353/1
1354/5 1355/9 1360/8
contacted [1]  1359/21
contained [2]  1376/21 1405/3
contents [1]  1342/14 1396/8 1396/15
1398/22
continue [4]  1288/13 1307/7 1391/13
1423/15
Continued [3]  1285/1 1360/11 1389/11
continuing [1]  1416/20
control [7]  1293/11 1293/11 1293/15
1302/2 1376/16 1417/19 1425/2
controlled [1]  1365/2
controls [1]  1365/4
convenient [1]  1389/5
conversation [5]  1330/3 1392/7 1392/9
1407/8 1407/12
conversations [3]  1313/17 1392/2
1392/6
cooperate [1]  1381/7
copied [2]  1376/10 1406/3
copies [7]  1324/21 1335/15 1335/16
1376/15 1398/6 1406/3 1412/16
copy [4]  1324/23 1401/21 1410/1 1419/4
copying [1]  1334/3
Corp [5]  1284/19 1285/2 1285/4 1285/4
1285/4
corporate [10]  1297/3 1297/7 1297/9
1297/10 1297/11 1297/12 1298/10
1381/20 1381/22 1382/8
corporation [1]  1301/10

correct [76]
correctly [2]  1321/1 1343/20
correspondence [1]  1300/5
costs [1]  1394/16
counsel [49]  1286/22 1300/23 1300/24
1301/10 1301/14 1301/17 1301/23
1305/25 1306/3 1306/6 1306/21
1306/23 1306/25 1307/1 1307/8
1307/25 1308/2 1308/6 1308/13
1308/14 1308/15 1312/5 1312/8
1313/17 1314/4 1314/9 1318/16
1321/13 1321/16 1321/19 1321/21
1322/6 1322/8 1322/9 1323/2 1323/22
1323/23 1335/2 1370/12 1388/1 1393/3
1393/3 1393/12 1393/15 1408/25
1416/10 1418/18 1418/24 1420/24
couple [3]  1310/15 1367/19 1376/1
course [6]  1293/8 1302/15 1302/18
1308/23 1331/25 1413/23
Court's [2]  1332/7 1334/11
Courthouse [1]  1284/4
courtroom [1]  1344/14
covered [1]  1344/16
CPA [1]  1285/9
crashed [1]  1286/9
Crazy [1]  1285/14
created [1]  1421/8
creates [1]  1318/20
creating [2]  1290/10 1313/2
credit [30]  1326/7 1328/5 1329/19
1329/22 1330/4 1331/20 1333/23
1356/20 1356/24 1356/24 1357/1
1357/4 1357/14 1357/17 1358/4
1358/17 1358/20 1359/10 1359/13
1362/9 1363/10 1395/5 1395/7 1395/7
1395/20 1395/25 1396/5 1397/13
1397/14 1397/20
Criseidy [1]  1343/2
cross [16]  1288/8 1288/13 1288/20
1299/10 1361/1 1367/20 1376/3 1377/5
1380/15 1384/21 1384/25 1385/18
1385/24 1386/25 1387/1 1401/24
cross-examination [6]  1288/20 1299/10
1367/20 1376/3 1377/5 1380/15
crossed [1]  1407/3
CSR [1]  1284/20
cups [2]  1285/14 1309/8
current [1]  1300/18 1338/21
customer [2]  1289/22 1342/12
customers [2]  1289/23 1291/1
cut [9]  1289/25 1291/3 1305/9 1320/5
1320/9 1347/11 1381/25 1390/18
1420/16
cutover [1]  1382/10
cutting [1]  1382/8
CV [1]  1284/3

D

D14 [1]  1359/4
D17 [1]  1335/19
D3 [2]  1336/6 1336/8
D4 [1]  1336/16
D5 [1]  1337/1
DANELCZYK [1]  1284/20
danger [1]  1340/21
data [5]  1354/22 1354/23 1376/24
1377/16 1382/24
date [20]  1311/17 1314/8 1315/2 1322/8
1346/13 1346/20 1350/22 1350/23
1350/23 1351/21 1354/9 1354/10

1355/9 1364/6 1383/5 1388/17 1388/17
1397/22 1402/21 1403/2
dated [3]  1299/15 1402/19 1403/4
dates [3]  1314/9 1345/25 1352/2
DAVID [2]  1284/17 1285/2
day-to-day [1]  1305/9
deal [3]  1387/20 1414/24 1417/23
dealing [3]  1300/22 1300/22 1300/25
debate [1]  1353/23
debt [1]  1373/20
December [26]  1304/2 1304/10 1321/6
1322/5 1336/18 1338/2 1338/12
1339/20 1341/7 1341/21 1350/19
1350/21 1350/25 1351/4 1351/7 1354/9
1354/11 1354/13 1365/6 1365/12
1366/15 1377/7 1380/18 1388/19
1390/21 1408/19
December 11th [1]  1388/19
December 30 [1]  1336/18
December 4th [9]  1350/19 1350/21
1350/25 1351/4 1351/7 1354/9 1365/6
1365/12 1390/21
decide [1]  1287/17
decision [7]  1313/6 1313/9 1313/10
1313/13 1313/15 1320/12 1320/14
decision-making [1]  1320/12
decisions [1]  1303/4 1306/5
deem [1]  1307/18
deemed [1]  1308/6
defendant [2]  1395/21 1403/11
Defendant's [15]  1294/20 1294/23
1299/12 1310/15 1310/17 1310/22
1314/11 1318/3 1327/1 1327/17 1336/6
1390/4 1403/6 1403/12 1403/15
Defendant's 31 [1]  1403/12
defendants [25]  1284/8 1284/15 1284/17
1285/2 1285/6 1285/8 1285/10 1285/12
1285/16 1298/11 1315/19 1351/2
1365/7 1378/15 1384/17 1385/3
1385/13 1395/7 1396/17 1396/25
1399/4 1401/16 1410/14 1411/15
1415/6
Defendants' [3]  1388/2 1388/14 1388/15
defendants's [1]  1415/6
Defense [1]  1302/4
define [2]  1289/21 1376/13
definitively [2]  1368/19 1409/21
deliver [1]  1328/5
delivered [8]  1330/2 1330/4 1335/9
1337/20 1402/1 1402/2 1403/18
1408/19
delivery [5]  1285/2 1329/18 1330/17
1336/17 1336/20
delve [2]  1292/11 1329/16
denied [3]  1351/13 1351/17 1351/21
Department [4]  1337/19 1402/13
1404/13 1404/14
deposit [1]  1289/24
deposits [1]  1374/3
depth [1]  1361/22
describe [10]  1309/3 1335/23 1344/17
1348/20 1357/22 1361/19 1366/5
1366/7 1401/1 1414/16
described [6]  1288/25 1291/25 1292/1
1301/7 1321/2 1352/2
description [1]  1391/17
desk [1]  1371/24
determination [3]  1301/7 1417/17
1417/22
determine [9]  1298/12 1333/18 1352/7

**D**

determine... [6] 1366/21 1378/9 1384/19 1390/23 1402/13 1410/22
determined [3] 1300/2 1300/24 1424/6
developing [1] 1347/7
Development [1] 1337/20
device [11] 1343/25 1344/8 1344/18 1345/11 1345/12 1354/18 1365/10 1365/14 1366/9 1367/1 1367/11
devices [3] 1366/14 1366/22 1367/11
Devine [12] 1285/9 1285/9 1385/15 1385/22 1386/4 1386/11 1386/12 1398/7 1398/9 1398/13 1408/15 1408/15
difference [4] 1349/11 1349/15 1372/16 1410/5
differences [1] 1372/19
different [10] 1307/21 1307/23 1354/18 1360/4 1371/13 1371/15 1414/10 1417/13 1420/19 1422/12
difficult [1] 1287/4
difficulty [3] 1286/4 1348/3 1419/1
direct [7] 1293/9 1325/16 1386/16 1388/2 1390/4 1394/22 1420/5
directly [1] 1330/20 1362/15
disagree [2] 1296/12 1296/15
disbursement [1] 1351/5
disbursements [8] 1291/5 1350/19 1350/24 1351/1 1381/25 1390/15 1392/25 1393/1
disc [2] 1398/16 1399/3
discharge [3] 1318/10 1318/21 1418/7
discharging [2] 1418/9 1420/6
disclosed [1] 1287/6
disconnected [4] 1353/7 1353/9 1353/14 1353/17
discontinued [3] 1300/10 1354/6 1355/8
discovered [1] 1413/24
discoveries [1] 1413/16
discrepancy [1] 1412/23
discuss [3] 1335/4 1392/5 1393/9
discussed [4] 1298/20 1393/2 1398/24 1399/25
discussion [3] 1304/20 1382/7 1392/25
discussions [4] 1305/1 1392/24 1393/19 1394/9
disperse [1] 1358/21
display [1] 1322/21
dispositive [1] 1286/14
dispute [11] 1298/25 1299/1 1299/5 1299/7 1299/8 1315/15 1316/2 1339/5 1348/22 1377/13 1377/14
disputes [1] 1298/25
Distribution [1] 1285/14
distributions [2] 1356/11 1356/15
DISTRICT [2] 1284/1 1284/1
doctor [1] 1391/18
document [21] 1290/3 1295/8 1295/11 1296/25 1302/6 1316/16 1316/18 1316/21 1317/3 1318/7 1337/24 1341/14 1348/11 1349/1 1349/3 1349/9 1386/18 1386/19 1388/16 1388/18 1395/24
documents [75]
dollar [1] 1293/24
dollars [2] 1309/13 1355/20
done [7] 1293/22 1320/11 1338/23 1371/11 1399/12 1413/20 1419/6
door [1] 1366/11

doubt [3] 1342/15 1342/18 1378/17
**down [3] 1404/16 1409/8 1424/16**
down [3] 1404/16 1409/8 1424/16
download [3] 1376/13 1421/8 1424/16
downloaded [3] 1376/10 1382/3 1424/15
draft [1] 1372/22
dramatically [1] 1368/23
due [3] 1352/5 1356/7 1366/23
duly [1] 1288/18
dump [1] 1376/25
duration [1] 1288/9

**E**

e-mail [4] 1391/16 1417/8 1417/25 1419/2
e-mailed [1] 1416/10
e-mails [3] 1392/8 1407/7 1407/7
early [5] 1354/11 1354/13 1366/15 1368/8 1368/9
easily [1] 1408/13
EASTERN [1] 1284/1
edge [6] 1344/1 1344/2 1344/9 1344/10 1344/20 1344/22
EF [1] 1333/6
EF001114 [1] 1341/3
EF0011140 [1] 1341/9
EF0011403 [1] 1341/17
EF0011506 [2] 1341/4 1341/9
EF1 [1] 1333/8
EF1099 [1] 1333/8
effect [1] 1370/24
efficiently [1] 1394/8
efforts [5] 1378/19 1380/9 1417/12 1418/6 1418/16
eight [2] 1415/16 1417/3
either [14] 1321/23 1322/12 1324/22 1343/6 1353/22 1362/20 1365/22 1382/2 1382/11 1382/23 1384/13 1387/24 1391/16 1398/6
election [4] 1321/5 1321/5 1321/8 1322/7
electronic [13] 1366/9 1398/4 1398/6 1398/13 1398/16 1398/23 1399/3 1399/18 1406/8 1406/13 1406/17 1406/21 1406/22
electronically [5] 1354/16 1376/19 1399/16 1406/12 1406/16
elicit [1] 1338/16
elicited [1] 1293/10
eloquently [1] 1418/20
email [23] 1284/22 1290/9 1290/11 1299/14 1299/17 1325/19 1326/5 1326/14 1326/24 1327/5 1327/7 1327/11 1327/13 1327/25 1328/19 1328/22 1328/23 1328/25 1329/1 1333/23 1359/5 1359/6 1359/7
emails [2] 1325/12 1325/19
EMIL [8] 1284/7 1284/16 1292/6 1322/12 1361/21 1383/24 1392/20 1395/9
Emil's [1] 1381/24
employee [10] 1324/13 1324/16 1342/24 1343/1 1382/24 1383/3 1383/16 1383/25 1409/9 1409/17
employees [15] 1322/22 1322/23 1324/17 1324/18 1368/15 1368/16 1368/18 1368/20 1368/22 1369/7 1369/24 1370/1 1370/18 1383/12 1407/24
enclosed [4] 1336/12 1336/20 1364/14 1364/18

enclosing [1] 1337/18
endangered [1] 1420/5
endeavored [2] 1375/6 1417/10
engage [2] 1305/20 1306/1
England [1] 1341/16
enter [8] 1324/9 1324/15 1324/18 1343/9 1358/20 1382/20 1382/25 1384/8
entered [27] 1304/18 1305/17 1308/6 1308/12 1324/4 1324/17 1324/20 1338/22 1343/10 1343/14 1356/12 1356/16 1364/9 1364/12 1365/7 1366/15 1379/2 1383/4 1383/16 1385/13 1388/20 1388/24 1395/18 1407/10 1407/11 1409/18 1410/6
entering [3] 1324/18 1382/22 1382/24
entertain [1] 1307/9
entities [1] 1298/11
entitled [3] 1291/12 1291/17 1421/15
entity [2] 1392/15 1420/4
entry [4] 1392/21 1395/15 1395/20 1400/18
envelope [1] 1403/25
envelopes [2] 1402/10 1405/24
equipment [4] 1308/25 1309/4 1355/19 1356/5
equity [4] 1373/2 1373/5 1373/6 1373/20
ERP [6] 1306/18 1307/2 1307/12 1307/16 1310/4 1393/20
error [2] 1286/9 1416/10
ESQ [10] 1284/14 1284/14 1284/15 1284/17 1285/2 1285/6 1285/8 1285/11 1285/12 1285/16
essential [1] 1297/25
essentially [1] 1303/23
establish [1] 1335/9
et [3] 1284/7 1322/23 1322/23
Eugene [22] 1289/16 1292/7 1307/10 1309/23 1312/7 1313/22 1314/2 1320/15 1323/20 1343/6 1353/25 1354/4 1357/24 1359/9 1360/7 1361/10 1361/15 1363/2 1363/9 1393/10 1422/20 1423/6
evaluation [1] 1411/22
event [1] 1370/14
Eventually [1] 1367/9
evidence [12] 1286/14 1287/8 1287/17 1411/15 1411/16 1413/8 1413/22 1415/5 1415/7 1415/20 1420/13 1423/1
evidentiary [6] 1284/10 1310/20 1314/2 1414/6 1414/11 1414/20
EX [1] 1339/13
exact [5] 1294/12 1295/14 1322/8 1376/22 1407/2
exactly [14] 1311/18 1311/21 1315/5 1322/7 1350/3 1350/8 1350/13 1356/25 1362/4 1366/25 1368/8 1368/17 1377/14 1381/22
examination [12] 1288/20 1299/10 1361/1 1367/20 1376/3 1377/5 1380/15 1381/17 1404/23 1407/18 1408/23 1409/5
examine [2] 1395/23 1410/18
examined [3] 1288/18 1300/1 1410/16
example [2] 1403/24 1412/20
exceed [1] 1308/23
exceeds [1] 1384/21
Excel [1] 1419/6
exception [2] 1320/16 1419/5

**E**

exchange [2]  1330/14 1407/2
excused [1]  1411/9
exert [2]  1293/10 1293/15
exerting [1]  1302/2
exhibit [56]  1294/19 1294/20 1294/23
1295/16 1295/17 1296/24 1299/12
1302/4 1302/5 1310/16 1310/17
1310/23 1314/11 1316/14 1317/3
1318/3 1325/14 1327/1 1327/17
1328/23 1332/7 1333/7 1336/7 1339/2
1339/6 1339/8 1339/12 1339/19
1339/20 1340/6 1340/14 1342/16
1348/12 1348/18 1357/2 1357/9 1359/4
1386/17 1386/17 1388/3 1388/12
1388/13 1390/5 1391/20 1394/22
1394/23 1394/24 1401/9 1401/14
1401/19 1403/6 1403/24 1404/6
1404/25 1407/20 1407/20
Exhibit 1 [8]  1339/2 1339/6 1339/8
1339/12 1339/20 1340/6 1340/14
1342/16
Exhibit 128 [1]  1394/22
Exhibit 133A [3]  1401/19 1403/24
1404/6
Exhibit 14 [1]  1359/4
Exhibit 17 [2]  1327/1 1327/17
Exhibit 3 [1]  1336/7
Exhibit 31 [1]  1403/6
Exhibit 37 [2]  1310/16 1310/17
Exhibit 38 [2]  1310/23 1318/3
Exhibit 39 [2]  1316/14 1317/3
Exhibit 42 [1]  1339/19
Exhibit 42A [2]  1332/7 1333/7
Exhibit 45 [2]  1348/12 1348/18
Exhibit 6 [5]  1294/19 1294/20 1294/23
1302/4 1302/5
Exhibit 61 [3]  1386/17 1386/17 1407/20
Exhibit 7 [3]  1299/12 1390/5 1391/20
Exhibit 92 [2]  1357/2 1357/9
Exhibit P128 [1]  1325/14
Exhibit P60 [1]  1296/24
exhibits [4]  1310/15 1388/8 1414/16
1414/22
existed [2]  1355/17 1373/14
existing [1]  1355/15
exists [1]  1290/3
expand [1]  1362/18
expect [1]  1385/16
expected [1]  1387/6
expedition [1]  1410/21
expended [1]  1392/23
expenditures [5]  1302/17 1302/23
1303/15 1304/19 1308/16
expense [1]  1362/9
expenses [17]  1302/2 1319/18 1319/18
1319/25 1320/3 1320/19 1320/23
1357/20 1358/7 1361/11 1361/15
1361/19 1361/20 1362/4 1362/7 1362/7
1390/11
explain [1]  1412/11
explained [1]  1382/14
explanation [5]  1365/12 1365/23
1365/25 1366/15 1366/18
explicit [1]  1418/8
explore [1]  1333/24
Express [2]  1357/2 1357/25
extensive [1]  1412/14
extensively [1]  1394/16

**F**

extent [12]  1298/10 1299/1 1300/17
1304/7 1315/16 1315/19 1354/24
1358/20 1413/4 1413/14 1417/18
1417/23
extra [1]  1401/20
extreme [1]  1414/18
extremely [1]  1419/14
eyes [1]  1418/15
Ezell [6]  1285/6 1357/3 1359/8 1360/5
1381/10 1381/12

facility [6]  1343/10 1343/13 1363/20
1364/8 1365/8 1368/2
fact [22]  1287/14 1287/20 1296/4
1316/1 1326/17 1331/8 1331/19
1336/12 1337/11 1339/3 1339/22
1342/16 1369/19 1372/16 1374/12
1381/19 1391/2 1393/2 1399/25
1403/25 1404/6 1418/10
factual [7]  1298/24 1299/1 1299/4
1299/4 1299/7 1315/15 1417/17
fail [1]  1297/21
failed [1]  1318/21
failure [2]  1287/9 1416/8
fair [5]  1295/8 1316/2 1354/20 1380/23
1380/24
fairly [2]  1414/18 1417/19
faith [1]  1418/4
falling [1]  1358/16
false [2]  1414/23 1415/6
far [4]  1346/5 1346/6 1369/12 1384/17
favor [3]  1393/11 1394/12 1394/14
fax [2]  1284/21 1419/2
February [2]  1321/6 1346/19
fees [7]  1319/17 1319/18 1319/25
1320/3 1320/19 1320/22 1320/23
Feinstein [1]  1337/5
FELDMAN [5]  1285/8 1407/19 1409/7
1425/20 1425/23
Feldman's [1]  1410/9
felt [3]  1306/20 1396/9 1396/23
few [3]  1326/23 1389/2 1398/24
figure [3]  1298/9 1389/6 1419/4
figures [1]  1293/24
file [4]  1324/23 1419/5 1419/17 1419/18
files [1]  1335/25
filing [6]  1323/7 1323/11 1323/14
1323/15 1323/16 1381/10
filings [5]  1297/3 1297/7 1297/9 1297/10
1297/11
filling [2]  1397/9 1394/10
final [1]  1413/20
financial [19]  1289/18 1331/13 1351/8
1357/13 1370/22 1370/23 1371/11
1372/3 1372/24 1374/13 1374/14
1374/24 1375/4 1377/16 1380/19
1381/5 1381/12 1384/17 1385/4
financials [3]  1371/1 1373/10 1373/12
fine [3]  1347/14 1347/16 1348/2
finish [8]  1288/8 1367/14 1399/6
1411/13 1412/7 1413/14 1423/14
1424/6
finished [1]  1413/12
FINKEL [3]  1285/6 1380/14 1425/22
firm [23]  1304/23 1306/14 1307/3
1307/4 1310/7 1310/24 1311/5 1311/8
1311/14 1311/15 1311/16 1311/25
1312/11 1312/16 1313/7 1313/11
1313/13 1313/13 1316/19 1320/20

1339/22 1371/13 1371/15
first [23]  1288/18 1299/15 1314/7
1316/7 1327/16 1328/23 1333/7
1334/23 1339/23 1341/14 1357/8
1367/5 1377/4 1393/6 1393/8 1393/10
1402/17 1407/3 1407/8 1409/17
1413/19 1415/12 1417/13
firsthand [2]  1363/5 1363/8
fish [1]  1376/25
fishing [1]  1410/21
five [3]  1329/22 1338/4 1338/9
fix [1]  1378/19
flat [1]  1366/9
Flavors [1]  1285/14
flip [2]  1299/18 1357/8
floating [1]  1401/20
floor [2]  1365/2 1365/3
fluctuates [1]  1368/23
focus [3]  1375/22 1420/21 1420/22
focuses [1]  1411/21
folders [1]  1342/12
folks [4]  1287/10 1335/10 1389/6
1419/19
follow [1]  1413/16
follow-up [1]  1413/16
following [1]  1329/14
follows [1]  1288/19
forensic [1]  1380/9
forget [2]  1371/7 1402/1
forgive [1]  1413/12
form [9]  1313/1 1324/19 1377/14 1382/3
1383/6 1398/2 1406/13 1414/15
1420/14
format [1]  1398/16
forth [6]  1287/12 1296/5 1299/15 1315/3
1325/12 1425/14
forward [3]  1296/22 1376/18 1397/5
forwarded [3]  1315/3 1327/3 1327/14
four [5]  1329/22 1346/3 1393/5 1412/13
1422/12
frankly [1]  1420/22
free [1]  1390/18
frequent [1]  1305/3
frequently [4]  1346/7 1347/1 1359/8
1400/15
Friday [12]  1325/25 1334/2 1334/6
1334/6 1334/15 1335/11 1398/16
1400/20 1402/9 1405/13 1405/15
1417/25
Friedberg [2]  1320/6 1417/7
FRIEDMAN [62]  1284/7 1284/16
1291/1 1291/17 1291/23 1293/10
1293/15 1296/3 1297/18 1299/5 1300/9
1300/16 1302/1 1303/23 1304/18
1308/4 1308/11 1322/13 1323/3
1323/11 1328/5 1329/11 1329/18
1329/21 1330/3 1330/16 1330/17
1331/3 1331/20 1342/23 1342/25
1343/9 1343/12 1345/3 1359/12
1361/25 1362/1 1362/4 1362/13 1363/1
1363/9 1363/13 1363/13 1414/3 1363/25
1373/16 1373/17 1374/8 1391/23
1391/25 1392/2 1392/20 1392/22
1395/11 1399/25 1400/15 1400/19
1407/6 1412/18 1416/4 1418/16
1418/17 1422/22
Friedman's [29]  1291/16 1292/10
1292/14 1292/18 1293/21 1295/19
1296/10 1296/14 1296/17 1298/15
1299/2 1301/17 1302/19 1302/24

**F**

Friedman's... [15]  1303/16  1304/22
1304/25  1305/7  1305/18  1306/14
1306/17  1306/20  1307/18  1309/16
1321/24  1342/19  1343/3  1343/7
1400/24
front [2]  1319/7  1390/8
frustrated [1]  1419/20
Fuel [3]  1285/3  1285/3  1285/3
fulfill [1]  1303/4
full [20]  1321/20  1344/25  1369/6  1379/8
1379/12  1379/24  1380/3  1380/8  1400/4
1410/13  1410/15  1410/17  1410/19
1410/24  1415/16  1416/21  1416/25
1418/11  1419/16  1423/16
full-time [1]  1369/6
functionality [1]  1419/1
functions [1]  1419/3
Funding [1]  1284/18
funds [2]  1292/24  1293/1
furniture [2]  1369/3  1369/3

**G**

game [1]  1316/2
gathering [1]  1423/1
general [2]  1303/24  1385/25
generally [12]  1291/6  1303/15  1303/17
1334/5  1334/14  1334/16  1338/19
1348/20  1356/22  1372/6  1381/9
1395/24
generated [1]  1404/17
gentleman [1]  1320/21
gentleman's [1]  1286/23
Geoffrey [2]  1285/11  1285/11
given [8]  1299/9  1300/20  1300/21
1316/1  1317/1  1398/22  1404/13
1404/16
Glick [1]  1418/18
gmail.com [1]  1284/22
Goldfarb [1]  1418/23
gotta [1]  1372/12
grabbed [1]  1344/12
GRANTZ [6]  1284/17  1285/2  1409/6
1424/15  1425/21  1425/24
greater [1]  1420/2
greatly [1]  1307/14
grew [3]  1293/5  1293/16  1293/17
Group [1]  1284/18
guess [11]  1311/18  1321/22  1345/22
1365/16  1365/17  1365/18  1365/19
1365/20  1365/22  1387/11  1414/8
guessing [1]  1345/23
guidance [1]  1305/24
guide [3]  1300/23  1300/24  1323/22
guiding [1]  1306/3
guys [1]  1410/23

**H**

half [1]  1379/10
hand [8]  1328/5  1329/18  1330/2  1330/4
1330/16  1332/2  1332/8  1401/18
handed [1]  1395/12
handing [2]  1401/19  1402/4
handle [1]  1355/6
HANS [1]  1284/15
happy [1]  1312/24
hard [5]  1290/7  1305/1  1324/23  1404/14
1417/24
harder [1]  1387/24
hardware [1]  1364/24

heard [14]  1298/1  1298/3  1301/18
1320/23  1326/10  1326/14  1334/17
1343/20  1363/7  1401/25  1415/12
1415/12  1417/11  1418/1
HELLER [4]  1285/12  1408/24  1425/21
1425/24
Hello [1]  1367/23
Herczeg [1]  1289/3
hereby [1]  1302/10
Hersko [2]  1285/11  1285/11
hesitate [1]  1413/25
Hill [2]  1322/10  1322/13
Hillel [1]  1311/3
hire [6]  1308/14  1308/15  1367/2  1383/5
1393/2  1393/15
hired [1]  1310/6  1366/19  1366/24
1367/24  1368/10  1368/12  1393/4
hiring [7]  1307/2  1307/4  1307/8  1307/21
1308/13  1393/12  1408/25
historical [3]  1338/21  1396/12  1397/6
home [1]  1400/24
honest [1]  1398/12
honestly [3]  1298/15  1353/21  1355/4
Honor [76]
Honor's [1]  1417/6
HONORABLE [1]  1284/10
host [1]  1363/18
hour [6]  1285/2  1286/13  1338/10
1390/12  1390/12  1412/12
hour's [2]  1412/15  1414/2
hourly [1]  1408/13
hours [9]  1324/13  1324/13  1383/22
1390/17  1390/17  1407/23  1407/25
1408/12  1408/14
house [6]  1296/11  1296/14  1296/17
1400/7  1400/19  1402/2
Howard [1]  1337/5
hundred [1]  1313/8
hundred percent [1]  1313/8
hunt [1]  1376/25

**I**

ID [1]  1402/18
idea [6]  1343/5  1343/8  1345/20  1364/22
1414/14  1421/7
identified [3]  1298/18  1329/25  1412/13
identify [1]  1332/5
identifying [1]  1419/25
image [2]  1354/14  1354/22
imaged [1]  1376/10
imaging [1]  1363/25
immediate [1]  1404/7
immediately [4]  1326/14  1334/3  1416/1
1417/10
impart [1]  1418/20
impeded [2]  1301/10  1301/14
implemented [1]  1355/1
implied [1]  1412/21
important [1]  1414/7
imposed [1]  1322/25
impossible [2]  1387/24  1394/6
impression [2]  1353/8  1421/14
improvements [1]  1362/8
inactive [5]  1346/18  1346/21  1351/10
1352/8  1352/12
Inc [2]  1284/16  1284/19
Incidentally [1]  1311/4
inclined [1]  1363/1
include [2]  1372/24  1410/7
including [1]  1401/11

includes [1]  1403/19
including [1]  1406/18
income [1]  1370/25
incomplete [1]  1397/21
incorrect [3]  1286/5  1378/13  1378/15
increases [1]  1356/11
increasing [1]  1293/11
incur [4]  1319/18  1319/24  1358/7
1394/4
incurred [3]  1319/17  1319/24  1320/22
indefinite [1]  1419/22
independent [2]  1371/7  1372/5
indicate [3]  1365/10  1366/13  1390/10
indicated [2]  1349/23  1385/14
individual [1]  1358/10
individually [1]  1418/20
individuals [1]  1408/9
inferring [1]  1344/4
information [87]
informed [2]  1321/10  1321/12
initial [3]  1383/8  1390/14  1397/18
initiation [1]  1378/22
injunction [28]  1287/9  1287/12  1298/9
1301/19  1303/22  1304/2  1304/11
1304/17  1305/12  1305/13  1305/14
1305/16  1305/17  1306/1  1306/8
1308/12  1343/10  1343/14  1347/23
1375/17  1375/20  1378/17  1379/2
1391/12  1400/23  1415/15  1418/10
1425/5
input [6]  1338/14  1383/20  1383/22
1383/23  1384/3  1415/9
inputting [2]  1383/12  1384/17
inquire [1]  1355/17
inside [1]  1345/11
install [1]  1367/6
instance [7]  1289/11  1301/9  1314/3
1321/23  1413/19  1419/12  1419/18
instances [1]  1310/10
institute [1]  1391/2
insufficient [1]  1331/3
insurance [3]  1341/16  1341/20  1404/15
insureds [1]  1341/15
intending [1]  1390/16
interact [1]  1348/4
interacted [1]  1347/22
interacting [1]  1348/7
interest [7]  1297/17  1299/2  1307/6
1308/7  1308/14  1362/8  1420/5
interested [2]  1287/24  1401/17
interfere [3]  1301/20  1305/21  1306/2
interference [1]  1306/10
interfering [2]  1306/7  1412/4
interim [1]  1298/2
internal [1]  1297/25
interpreting [1]  1301/22
interrupted [1]  1300/22
interviewed [1]  1292/16
inventory [5]  1341/23  1342/1  1342/3
1394/5  1394/6
investigation [1]  1380/9
investment [3]  1292/14  1292/18  1298/15
investor [2]  1291/23  1292/13
Investors [1]  1284/18
invoice [1]  1291/2
invoices [6]  1289/23  1289/23  1291/2
1338/19  1342/6  1342/8
involved [4]  1313/9  1313/11  1313/13
1394/9
irrelevant [3]  1313/3  1370/15  1378/1

**I**

issue [21]  1293/25 1300/18 1301/2
1302/17 1305/23 1307/2 1307/2 1319/9
1333/2 1334/24 1353/8 1359/19 1361/4
1375/9 1380/7 1413/5 1417/10 1417/10
1419/24 1420/24 1423/19
issued [7]  1300/5 1300/8 1304/11
1357/17 1358/4 1358/15 1358/24
issues [8]  1286/15 1307/17 1353/10
1357/14 1377/13 1411/24 1418/16
1424/10
issuing [1]  1358/16
item [1]  1373/8
items [4]  1330/1 1345/19 1373/3 1405/7
itself [5]  1287/14 1343/25 1374/18
1376/20 1391/17

**J**

JAMES [1]  1284/10
January [13]  1299/16 1300/20 1326/1
1328/2 1337/6 1337/12 1338/2 1338/12
1341/7 1341/21 1397/19 1397/19
1424/4
January 12th [2]  1328/2 1397/19
January 15th [2]  1337/6 1337/12
January 4th [2]  1299/16 1300/20
January 8th [2]  1326/1 1397/19
JAY [1]  1284/14
jeopardizes [1]  1307/14
jeopardy [2]  1307/5 1307/18
Jersey [15]  1297/7 1297/12 1337/19
1337/21 1386/20 1386/20 1386/22
1387/13 1404/13 1407/25 1408/3
1408/7 1408/9 1424/13 1424/18
Jeryg [1]  1284/19
JO [1]  1284/3
job [2]  1290/17 1382/14
joined [3]  1291/22 1292/15 1292/17
Jorge [1]  1285/7
JUDGE [6]  1284/11 1413/25 1415/11
1420/10 1425/6 1425/8
Judge Amon [2]  1425/6 1425/8
Judge Orenstein [2]  1413/25 1415/11
July [6]  1311/19 1349/15 1349/18
1349/20 1350/12 1424/2
July 2015 [4]  1349/15 1349/18 1349/20
1350/12
June [7]  1311/17 1311/19 1349/11
1367/24 1368/5 1368/5 1368/8
June 2015 [1]  1349/11

**K**

keep [2]  1290/22 1424/9
Kevin [2]  1286/24 1286/25
key [6]  1342/22 1342/24 1343/3 1343/7
1399/21
keys [1]  1343/6
kinds [2]  1362/7 1386/9
Kirchenblatt [3]  1371/9 1371/12 1371/14
knowledge [12]  1289/10 1289/13 1292/5
1312/7 1352/3 1354/24 1363/5 1363/8
1364/5 1364/8 1367/10 1381/23
knows [1]  1424/19
Koenig [9]  1289/14 1292/2 1307/10
1309/23 1313/22 1314/3 1316/19
1359/9 1359/16

**L**

L-I-T-T-L-E-R [1]  1321/20
labor [6]  1321/4 1321/7 1322/22

1337/19 1387/25 1394/17
lack [2]  1362/3 1420/24
Lakewood [2]  1337/21
laptop [15]  1343/19 1343/21 1343/23
1344/3 1344/10 1344/15 1344/18
1344/19 1344/21 1344/22 1344/23
1344/25 1345/5 1345/6 1345/16
large [1]  1394/3
larger [1]  1325/15
latter [1]  1290/20
Launch [130]
laundering [2]  1378/6 1380/5
law [6]  1310/23 1311/14 1313/6 1339/22
1404/1 1404/3
lawsuit [12]  1308/17 1319/19 1320/1
1320/20 1320/23 1377/9 1377/9
1377/18 1378/22 1379/3 1379/6
1384/16
lawyer [7]  1290/12 1301/21 1303/2
1303/3 1314/21 1315/9 1315/10
lawyers [2]  1322/1 1322/4
LC [1]  1349/5
lead [2]  1391/7 1400/13
leading [3]  1391/6 1396/18 1400/14
learn [1]  1352/4
learned [1]  1411/18
lease [1]  1392/15
Leasehold [1]  1362/8
least [5]  1293/21 1304/18 1337/16
1349/23 1378/10
leave [1]  1362/21
leeway [1]  1369/11
legal [21]  1290/18 1291/20 1298/25
1299/8 1300/23 1300/24 1301/22
1305/15 1307/8 1320/22 1321/13
1321/16 1321/19 1321/21 1322/6
1322/9 1323/22 1323/23 1376/23
1409/1 1420/6
legally [1]  1303/6
lenders [1]  1374/23
lengthy [1]  1314/18
less [3]  1302/18 1338/10 1394/18
letter [15]  1336/10 1336/13 1336/24
1337/2 1337/8 1337/15 1337/17
1337/18 1372/5 1390/5 1390/10
1394/25 1403/17 1411/17 1413/16
letters [3]  1339/16 1340/3 1404/16
Letty [1]  1289/5
level [1]  1361/22
light [2]  1285/4 1334/11
likely [2]  1401/4 1416/14
limitation [2]  1300/21 1303/17
limited [7]  1293/24 1306/2 1326/23
1408/8 1408/11 1410/10 1411/13
LINDA [1]  1284/20
LindaDan226 [1]  1284/22
line [7]  1310/12 1356/24 1367/14 1369/9
1373/3 1373/8 1389/6
list [19]  1299/25 1300/5 1300/7 1300/8
1314/18 1319/7 1326/7 1326/11
1326/18 1327/13 1390/10 1391/16
1394/25 1395/3 1395/4 1395/6 1395/21
1396/1 1397/11
listed [4]  1314/22 1366/22 1369/16
1369/24
listen [2]  1337/10 1379/19
lists [2]  1341/15 1416/2
litigation [1]  1322/4 1370/10
Littler [1]  1321/20
LLC [2]  1284/18 1284/18 1284/19

1285/14 1285/15 1285/17 1307/11
1342/16 1391/4
loan [5]  1294/3 1294/5 1294/9 1373/16
1373/19
loaned [1]  1294/7
loans [5]  1373/8 1373/15 1374/4 1374/7
1374/9
located [5]  1363/19 1363/23 1366/2
1366/5 1424/13
location [1]  1365/5
lock [1]  1366/11
locked [3]  1342/20 1364/15 1364/16
1343/22 1344/2 1344/10 1344/15
1344/21 1345/15 1396/22 1397/3
1401/10 1410/25
looks [1]  1366/9
loose [2]  1292/11 1310/14
loosely [3]  1291/25 1292/1 1292/12
loss [1]  1417/14
lost [3]  1328/17 1416/5
lunch [1]  1388/5 1389/8
Luncheon [1]  1389/10
luxury [3]  1393/24 1394/20 1409/1

**M**

M-O-L-I-N-A [1]  1343/2
machinery [3]  1308/25 1309/4 1309/6
machines [6]  1309/7 1309/7 1309/11
1309/14 1394/10 1394/13
MAGISTRATE [1]  1284/11
mail [37]  1295/20 1296/10 1296/13
1344/13 1344/15 1391/16 1400/2
1400/4 1400/6 1400/8 1400/16 1400/18
1400/21 1400/24 1401/6 1401/6 1401/9
1401/11 1401/25 1402/2 1402/9
1403/17 1403/19 1403/20 1403/22
1403/22 1405/1 1405/3 1405/7 1405/9
1405/24 1406/2 1406/6 1406/7 1417/8
1417/25 1419/2
mailed [1]  1416/10
mailings [1]  1401/24
mails [4]  1295/18 1392/8 1407/7 1407/7
maintain [3]  1376/23 1386/12 1386/21
1410/1
maintained [10]  1364/11 1376/7 1376/9
1387/2 1387/7 1387/13 1399/16
1407/24 1408/2 1408/17
maintaining [1]  1397/5
management [3]  1284/19 1284/19
1351/8
mandatory [1]  1307/4
mandatory-type [1]  1307/4
mangled [1]  1327/2
manifests [1]  1298/8
manner [2]  1294/12 1376/22
Manriquez [1]  1289/5
manufacturing [2]  1309/5 1394/7
March [4]  1321/6 1321/22 1402/19
1403/4
March 1 [1]  1403/4
March 2016 [1]  1402/19
marked [5]  1317/3 1339/6 1340/13
1342/16 1401/18
master [2]  1343/3 1399/21
match [1]  1412/19
matched [3]  1349/24 1350/2 1350/8
materials [3]  1290/25 1308/23 1308/24
matter [11]  1303/25 1320/25 1321/3
1321/22 1321/22 1322/16 1322/17

Case 1:15-cv-06861-CBA-JO   Document 130 Filed 10/12/16   Page 151 of 157 PageID #: 12686

**M**

matter... [4]  1322/25 1323/23 1413/4 1421/25
matters [7]  1296/19 1323/3 1323/6 1323/9 1323/16 1323/17 1324/16
MAURICE [1]  1285/12
May 2015 [2]  1350/2 1350/7
Mayer [14]  1289/14 1292/2 1307/10 1309/23 1312/8 1313/22 1314/3 1316/19 1320/15 1323/20 1353/25 1354/4 1361/15 1393/10
Mayer Koenig [5]  1289/14 1292/2 1309/23 1313/22 1316/19
MB [2]  1285/3 1285/3
mean [17]  1290/12 1296/13 1297/9 1301/18 1301/22 1314/18 1318/2 1339/22 1342/18 1344/21 1345/22 1352/11 1368/5 1377/11 1396/13 1415/25 1422/1
meaning [2]  1292/10 1297/9
meant [1]  1373/24
measures [2]  1378/19 1420/8
mechanical [1]  1284/24
member [1]  1291/12 1302/16 1311/7 1373/5
members [16]  1299/14 1300/6 1302/20 1307/11 1309/19 1311/5 1323/13 1356/10 1356/15 1357/15 1358/7 1358/18 1373/15 1390/16 1390/17 1391/10
mentioned [7]  1291/22 1294/2 1294/2 1320/25 1343/19 1359/2 1373/23
messages [2]  1286/10 1416/10
messenger [1]  1330/18
Michael [2]  1285/9 1285/9
middle [4]  1287/5 1299/15 1346/8 1347/11
midmorning [1]  1347/12 1347/15
might [8]  1342/12 1362/13 1363/1 1374/24 1386/9 1405/6 1414/20 1420/10
Mike [1]  1398/7
million [4]  1309/13 1328/24 1329/8 1355/20
mind [3]  1288/5 1353/2 1362/9
mine [1]  1420/22
minimize [1]  1419/9
minute [2]  1311/12 1399/8
minutes [3]  1389/7 1390/15 1399/11
mis [1]  1316/25
mis-communicated [1]  1316/25
Miss Nelkin [1]  1325/19
Miss Rivera [1]  1301/6
Miss Sekowski [1]  1337/5
missed [2]  1298/21 1394/4
missing [2]  1395/1 1395/4
Molina [1]  1343/2
moment [5]  1317/16 1332/18 1333/15 1339/7 1371/8
momentarily [2]  1336/15 1340/9
Monday [2]  1412/9 1423/15
monetary [1]  1322/24
money [5]  1294/6 1355/24 1378/6 1380/5 1392/23
month [5]  1346/15 1349/5 1350/2 1379/9 1379/9
monthly [2]  1300/3 1300/7
months [3]  1328/12 1415/16 1417/3
morning [13]  1286/1 1286/11 1334/2

**M** continued

1334/6 1334/15 1411/11 1416/11 1420/16 1420/19 1420/18 1420/24 1423/17 1425/15
most [7]  1293/20 1349/22 1360/8 1401/4 1417/14 1417/22 1423/14
mostly [1]  1401/4
motion [2]  1287/18 1300/16
motions [1]  1413/20
mouth [1]  1360/1
move [26]  1293/18 1293/19 1293/25 1294/13 1294/16 1296/24 1297/15 1303/13 1310/12 1312/10 1313/4 1316/5 1316/11 1318/11 1318/22 1319/1 1319/14 1319/15 1335/6 1335/17 1356/19 1378/24 1380/12 1385/2 1397/9 1423/15
moved [7]  1346/9 1346/9 1353/25 1368/1 1368/1 1368/5 1374/13
Mr. Devine [9]  1385/15 1385/22 1386/4 1386/11 1386/12 1398/9 1398/13 1408/15 1408/15
Mr. Eugene [2]  1357/24 1363/9
Mr. Feldman [1]  1409/7
Mr. Feldman's [1]  1410/9
Mr. Finkel [1]  1380/14
Mr. Friedman [58]  1291/11 1291/17 1291/23 1293/10 1293/15 1296/3 1297/18 1299/5 1300/9 1300/16 1302/1 1303/23 1304/18 1308/4 1308/11 1323/3 1323/11 1328/5 1329/11 1329/18 1329/21 1330/3 1330/16 1330/17 1331/3 1331/20 1342/23 1342/25 1343/9 1343/12 1345/3 1359/12 1361/25 1362/1 1362/4 1362/13 1363/1 1363/9 1363/13 1363/14 1363/25 1373/16 1373/17 1374/8 1391/23 1391/25 1392/2 1392/22 1395/11 1399/25 1400/15 1400/19 1407/6 1412/18 1416/4 1418/16 1418/17 1422/22
Mr. Friedman's [29]  1291/16 1292/10 1292/14 1292/18 1293/21 1295/19 1296/10 1296/14 1296/17 1298/15 1299/2 1301/17 1302/19 1302/24 1303/16 1304/22 1304/25 1305/7 1305/18 1306/14 1306/17 1306/20 1307/18 1309/16 1321/24 1342/19 1343/3 1343/7 1400/24
Mr. Glick [1]  1418/18
Mr. Goldfarb [1]  1418/23
Mr. Grantz [1]  1424/15
Mr. Koenig [2]  1359/9 1359/16
Mr. Nelkin [3]  1318/25 1417/9 1418/1
Mr. Nussbaum [4]  1286/8 1286/21 1355/9 1418/17
Mr. Nussbaum's [2]  1286/22 1418/19
Mr. Papa [46]  1288/22 1294/19 1295/16 1296/25 1299/12 1301/14 1305/15 1310/12 1312/15 1317/24 1318/9 1318/13 1318/18 1318/20 1321/1 1325/15 1325/23 1326/25 1329/17 1332/1 1333/5 1333/18 1335/12 1336/8 1339/24 1339/25 1340/6 1341/5 1341/11 1348/3 1363/18 1377/7 1379/2 1380/17 1381/19 1385/14 1390/4 1398/22 1399/15 1399/21 1401/18 1402/9 1404/12 1404/25 1407/14 1408/25
Mr. Papa's [1]  1401/17
Mr. Parness [1]  1322/3

**M** continued

Mr. Parness' [1]  1311/5
Mr. Popa's [1]  1287/3
Mr. Rogosnitzky [5]  1346/22 1347/25 1417/15 1417/19 1417/23
Mr. Rosenblatt [1]  1322/3
Mr. Salcedo [1]  1399/21
Mr. Schafhauser [9]  1286/10 1288/13 1319/14 1329/10 1390/5 1393/14 1395/6 1416/23 1420/15
Mr. Schafhauser's [2]  1387/1 1394/24
Mr. Schreiber [5]  1301/1 1363/13 1363/15 1369/22 1370/11
Mr. Schreiber's [1]  1310/10
Mr. Steven [3]  1310/3 1321/23 1357/19
Ms. Ezell [3]  1357/3 1359/8 1360/5
Ms. Nelkin [3]  1390/2 1403/10 1407/20
Ms. Pastrikos [1]  1423/23
Ms. Rivera [8]  1300/4 1364/4 1364/7 1382/20 1383/21 1412/18 1412/22 1416/4
Ms. Rivera's [3]  1364/11 1365/11 1383/19
multiple [1]  1286/5

**N**

name [10]  1286/23 1321/20 1324/12 1348/3 1357/1 1358/6 1363/18 1371/7 1383/5 1416/2
names [2]  1412/19 1416/2
narrow [1]  1336/4
nature [6]  1292/14 1292/18 1320/3 1372/18 1378/18 1414/6
near [2]  1302/6 1367/14
necessarily [2]  1340/17 1409/14
necessary [14]  1289/20 1301/17 1306/13 1306/17 1306/20 1306/22 1306/24 1307/18 1354/2 1354/2 1354/3 1378/20 1396/9 1416/21
necessitate [1]  1414/20
necessity [6]  1393/24 1394/1 1394/20 1394/21 1409/1 1409/3
need [28]  1287/17 1300/13 1313/17 1323/22 1324/8 1330/12 1330/25 1340/18 1376/13 1376/17 1376/20 1376/20 1376/21 1384/18 1388/3 1394/5 1394/6 1404/10 1408/5 1414/10 1414/24 1415/8 1417/18 1419/24 1421/9 1424/10 1424/16 1425/9
needed [11]  1323/2 1324/14 1330/6 1330/22 1338/23 1359/22 1382/14 1391/4 1391/10 1397/5 1397/7
needs [2]  1306/8 1324/12
negotiating [1]  1292/7
negotiator [3]  1291/24 1292/3 1292/10
NELKIN [14]  1284/14 1284/14 1318/25 1325/19 1390/2 1390/3 1397/10 1399/14 1402/8 1403/10 1407/20 1417/9 1418/1 1425/22
net [1]  1370/24
never [14]  1297/1 1314/12 1318/4 1318/6 1326/10 1333/22 1343/15 1355/4 1357/12 1362/15 1380/24 1381/2 1398/17 1410/16
New Jersey [7]  1404/13 1407/25 1408/3 1408/7 1408/9 1424/13 1424/18
New York [5]  1392/11 1392/13 1392/14 1392/17 1408/17
next [6]  1316/11 1360/11 1380/7 1381/3 1389/11 1412/6
Nicholas [3]  1296/4 1337/20 1403/18

**N**

Nicole [1] 1289/1
night [8] 1286/4 1286/20 1288/22
1413/24 1417/7 1418/1 1418/17 1421/6
night's [1] 1413/15
NLRB [6] 1320/25 1321/2 1321/17
1322/16 1322/25 1387/18
nobody [2] 1364/20 1414/7
non [1] 1374/13
non-reviewed [1] 1374/13
noncompliance [1] 1298/8
none [4] 1292/16 1362/20 1385/17
1419/22
nonparty [1] 1425/10
normal [1] 1308/22
north [2] 1304/19 1309/1
note [1] 1340/16
nothing [8] 1293/25 1296/18 1338/23
1367/16 1371/1 1383/23 1407/15
1408/22
notice [1] 1425/7
notified [1] 1353/25
notifying [1] 1354/4
November [1] 1377/8
number [16] 1286/14 1295/2 1298/4
1327/19 1327/25 1340/22 1341/17
1349/16 1349/18 1349/20 1368/22
1395/12 1402/18 1403/7 1403/16
1414/5
Number 1 [1] 1403/7
numbers [1] 1350/11
Nussbaum [5] 1286/8 1286/21 1355/9
1418/17 1418/24
Nussbaum's [2] 1286/22 1418/19

**O**

o'clock [1] 1389/9
object [15] 1287/22 1288/4 1291/19
1292/21 1294/11 1300/11 1303/1
1308/19 1312/17 1315/12 1319/20
1369/8 1377/19 1420/18 1420/18
objection [32] 1287/3 1293/19 1300/13
1300/14 1311/1 1315/13 1318/5 1319/5
1356/13 1356/17 1370/7 1377/20
1377/23 1377/24 1377/25 1380/6
1380/11 1384/20 1385/7 1385/8
1385/17 1386/2 1386/14 1386/23
1387/9 1387/15 1391/6 1396/18 1397/1
1399/23 1409/2 1421/20
obligation [7] 1318/9 1318/20 1335/1
1378/16 1378/17 1416/21 1416/24
obligations [4] 1290/19 1418/7 1418/9
1420/6
observe [1] 1369/6
obtain [3] 1310/9 1385/16 1419/4
obtained [7] 1322/13 1383/9 1385/14
1385/21 1385/22 1386/22 1396/23
obtaining [1] 1359/18 1360/6
obviously [1] 1414/18
occasion [8] 1345/9 1345/10 1348/7
1359/17 1368/24 1380/18 1381/11
1382/9
occasions [2] 1352/14 1381/3
occur [3] 1305/24 1407/8 1416/14
occurred [2] 1286/20 1321/6
OCR [1] 1284/20
offer [2] 1374/21 1378/2
offhand [1] 1398/10
office [31] 1285/14 1296/5 1296/16
1315/3 1315/8 1328/5 1330/9 1330/18

**N**

1333/14 1335/21 1336/3 1336/18
1337/13 1338/3 1338/19 1341/21
1341/24 1342/6 1342/10 1342/19
1342/20 1342/22 1343/4 1343/7 1343/23
1364/4 1369/2 1369/3 1386/13 1408/17
1410/2
officer [3] 1289/18 1317/16 1357/13
officers [2] 1357/15 1358/7
offices [2] 1356/10 1365/3
official [2] 1402/12 1404/7
often [2] 1346/11 1401/2
oftentimes [2] 1303/11 1382/10
Oil [2] 1285/2 1285/4
old [1] 1382/12
ongoing [2] 1348/22 1368/25
open [1] 1405/1
opened [2] 1398/17 1406/6
opening [4] 1406/2 1406/2 1410/5
1411/18
operate [3] 1292/25 1300/18 1307/7
operates [1] 1392/16
operating [20] 1291/8 1295/9 1295/12
1295/14 1295/25 1296/6 1297/16
1300/9 1301/19 1302/5 1302/10
1302/16 1302/25 1303/9 1303/11
1303/14 1303/25 1304/21 1347/5
1394/16
operation [2] 1301/11 1380/5 1394/7
operations [5] 1290/17 1303/23 1305/9
1305/21 1306/2
opposing [1] 1416/10
oral [1] 1363/2
order [8] 1286/17 1372/8 1385/5
1387/20 1395/18 1424/25 1425/8
1425/9
ordered [1] 1310/4
orders [1] 1291/1
ordinary [1] 1302/18
ORENSTEIN [4] 1284/10 1413/25
1415/11 1420/10
original [1] 1296/5 1405/24
originally [1] 1325/20
Otherwise [1] 1422/16
outside [10] 1302/17 1323/6 1331/15
1344/25 1369/10 1377/21 1385/16
1385/23 1386/22 1387/7
outstanding [1] 1349/7
overhear [1] 1377/12
overruled [11] 1292/23 1308/21 1311/2
1319/6 1319/21 1385/9 1386/2 1387/3
1387/10 1387/16 1402/3
overtime [1] 1410/7
owing [1] 1352/5
own [3] 1307/8 1308/15 1353/16
owner [1] 1392/17

**P**

P.C [1] 1285/11
p.m [4] 1389/10 1417/7 1417/8 1425/13
P128 [1] 1325/14
P60 [1] 1296/24
page 1 [1] 1404/6
page 2 [1] 1391/20
page 3 [1] 1302/6
page 6 [3] 1325/22 1325/24 1394/23
page 7 [5] 1294/24 1294/25 1402/18
paid [2] 1300/2 1324/14 1338/20
1355/24 1356/1 1391/17 1407/23
1408/1 1408/12 1410/6 1410/7 1410/8
Paint [1] 1419/10

**P**

PAPA [47] 1288/17 1288/22 1294/19
1295/16 1296/25 1299/12 1301/14
1305/15 1310/12 1312/15 1317/24
1318/9 1318/13 1318/18 1318/20
1321/1 1325/15 1325/23 1326/25
1329/17 1332/1 1333/5 1333/18
1335/12 1336/8 1339/24 1339/25
1340/6 1341/5 1341/11 1348/3 1363/18
1377/7 1379/2 1380/17 1381/19
1385/14 1390/4 1398/22 1399/15
1399/21 1401/18 1402/9 1404/12
1404/25 1407/14 1408/25
Papa's [1] 1401/17
paper [3] 1349/23 1398/3 1414/15
papes [1] 1315/25
paragraph [4] 1296/1 1302/7 1302/9
1303/9
paragraph 1.5 [1] 1296/1
paragraph 8 [2] 1302/7 1302/9
Park [1] 1285/5
Parness [11] 1310/23 1311/3 1311/7
1311/25 1312/11 1312/16 1313/6
1313/23 1319/16 1320/20 1322/3
Parness' [1] 1311/5
part [11] 1313/16 1320/12 1329/3
1329/23 1357/6 1359/15 1361/7
1378/10 1386/25 1387/1 1393/19
particular [8] 1331/5 1332/22 1338/24
1395/4 1402/10 1402/15 1405/7 1419/6
parties [4] 1297/25 1420/4 1420/5
1425/2
parties's [1] 1420/1
partner [5] 1323/3 1323/6 1323/9
1323/16 1323/17
partners [4] 1390/25 1391/3 1391/23
1392/22
party [1] 1372/18
party's [1] 1290/18
passed [1] 1399/11
password [7] 1286/5 1364/20 1364/21
1367/5 1388/10 1421/21 1422/20
passwords [3] 1410/14 1422/12 1422/19
past [2] 1334/6 1410/23
Pastrikos [1] 1423/23
PAUL [1] 1284/15
pay [4] 1302/17 1324/16 1383/5 1409/15
payable [1] 1356/3
payback [1] 1394/17
paying [3] 1392/9 1392/11 1392/12
payment [1] 1358/21
payments [5] 1300/1 1300/9 1300/16
1329/23 1356/5
payroll [28] 1289/24 1291/4 1324/3
1324/4 1324/7 1324/9 1324/16 1368/16
1368/18 1369/19 1370/4 1383/24
1384/4 1384/7 1384/9 1384/10 1386/4
1386/6 1386/7 1386/8 1386/9 1387/12
1398/7 1406/18 1407/23 1408/8
1410/25 1411/2
PC [1] 1363/18
penalties [1] 1394/5
penalty [1] 1322/24
pending [2] 1300/16 1321/9
per [2] 1373/4 1396/11
percent [1] 1313/8
percentage [4] 1297/17 1298/4 1298/14
1299/2
perform [1] 1301/11
performed [2] 1371/6 1371/15
perhaps [1] 1297/22

## P

period [12] 1286/8 1286/12 1304/12 1350/12 1368/4 1375/14 1379/3 1379/8 1379/11 1384/7 1391/5 1391/8
periodically [1] 1339/24
permission [2] 1332/8 1386/21
permit [1] 1407/21
permitted [1] 1393/15
person [3] 1390/24 1409/16 1423/8
personal [3] 1317/11 1317/12 1423/19
personally [6] 1308/1 1311/14 1317/20 1317/20 1318/10 1418/4
persons [1] 1289/8 1350/25
persuaded [1] 1414/17
perusing [1] 1402/12
PHILIP [1] 1284/14
phone [6] 1284/21 1286/21 1418/17 1418/18 1418/18 1418/19
photocopied [1] 1405/12
photocopying [2] 1405/18 1406/1
physical [3] 1324/21 1410/1 1425/1
physically [1] 1364/23
picture [1] 1351/20
piece [2] 1344/20 1349/23
pieces [3] 1308/25 1355/19 1355/21
Piscataway [1] 1424/22
place [12] 1325/6 1346/13 1346/19 1377/14 1377/15 1385/5 1385/12 1415/15 1415/25 1418/15 1420/8 1424/21
placed [2] 1339/2 1369/4
Plainfield [5] 1346/8 1363/20 1363/24 1364/5 1364/9 1365/8 1365/11 1368/2 1368/7
plaintiff [7] 1284/4 1284/14 1288/17 1297/24 1315/18 1315/21 1319/25
plaintiff's [6] 1319/19 1335/1 1357/2 1386/17 1394/23 1407/20
plan [1] 1382/7
plenty [1] 1385/24
Plex [1] 1393/20
point [21] 1287/2 1293/5 1296/18 1297/24 1300/20 1328/23 1335/4 1346/25 1350/15 1352/19 1354/20 1361/7 1362/10 1375/13 1383/18 1389/5 1390/24 1401/3 1407/6 1422/14 1423/1
pointed [1] 1339/13
policy [1] 1341/15
Popa's [1] 1287/3
portion [1] 1344/17
position [1] 1397/4
possess [1] 1289/9
possession [3] 1364/21 1396/17 1396/24
possible [6] 1366/23 1367/10 1367/12 1375/6 1406/4 1422/1
potential [2] 1374/23 1374/23
potentially [1] 1286/14
practical [4] 1413/4 1419/24 1420/7 1421/25
practicality [1] 1333/18
practice [2] 1321/7 1391/13
practices [2] 1321/5 1322/23
Pre [1] 1358/18
Pre-TRO [1] 1358/18
precedes [1] 1287/3
precedes [1] 1328/25
predated [1] 1382/10
predicate [2] 1370/2 1370/5

preface [1] 1313/2
preliminary [27] 1287/9 1287/12 1298/8 1301/19 1303/25 1304/1 1304/11 1304/17 1305/11 1305/13 1305/14 1305/16 1305/17 1306/1 1308/5 1308/12 1343/10 1343/13 1347/21 1375/17 1375/20 1378/17 1379/2 1391/12 1400/23 1418/10 1425/4
preparation [2] 1323/7 1377/18
prepare [2] 1342/1 1342/4
prepared [9] 1299/21 1316/18 1318/1 1349/9 1372/6 1376/22 1377/9 1413/7 1413/13
preparing [2] 1299/23 1370/3
present [13] 1286/17 1287/8 1365/8 1411/14 1411/15 1413/7 1413/13 1413/14 1415/5 1419/14 1419/16 1419/16 1420/14
presentation [1] 1413/19
presented [1] 1414/23
presenting [1] 1415/6
preserve [1] 1354/23
pressed [1] 1305/1
pressing [2] 1410/20 1424/10
prevent [1] 1364/25
preventing [1] 1364/23
previously [7] 1288/18 1298/18 1314/6 1333/20 1351/15 1359/5 1403/21
prices [1] 1292/7
principles [1] 1372/7
problem [1] 1287/15 1347/8 1378/19 1387/22 1388/9 1415/13 1416/6 1416/13 1417/4 1420/2 1423/8
problems [2] 1313/2 1347/2
proceeding [3] 1370/16 1387/18 1409/1
Proceedings [2] 1284/24 1425/14
process [7] 1309/5 1312/4 1320/12 1329/24 1348/24 1394/4 1419/15
produce [5] 1307/4 1314/23 1315/7 1316/24 1318/6
produced [16] 1284/24 1314/13 1314/18 1314/19 1315/5 1315/8 1315/18 1315/23 1315/25 1316/2 1316/24 1317/3 1317/5 1319/9 1333/22 1339/17
producing [1] 1318/5
product [1] 1370/9
production [1] 1315/16
professional [1] 1344/14
proffer [2] 1297/23 1312/25
program [2] 1419/9 1419/10
progress [2] 1356/5 1413/6
prohibited [1] 1308/13
promulgation [1] 1369/23
proper [2] 1291/4 1291/5
properly [2] 1286/17 1291/2
property [1] 1425/2
propose [1] 1412/8
proposing [1] 1412/5
protruding [1] 1348/3
provide [7] 1314/20 1361/6 1377/16 1378/16 1380/24 1381/7 1397/6
provided [11] 1292/24 1293/2 1314/21 1330/1 1330/16 1330/22 1331/3 1396/1 1401/16 1415/16 1415/17
purchase [3] 1309/4 1393/19 1394/20
purchased [4] 1309/1 1309/11 1309/14 1393/22
purchasers [1] 1374/24
purchases [3] 1308/22 1309/17 1381/25
purchasing [1] 1292/6 1394/10 1394/12

purpose [5] 1330/14 1374/14 1374/16 1396/7 1378/8
purposes [4] 1290/18 1358/12 1375/8 1384/16
put [17] 1307/5 1309/7 1314/17 1325/2 1333/5 1333/13 1359/7 1360/1 1383/11 1383/18 1401/5 1409/9 1409/13 1409/19 1411/17 1413/16 1420/8
puts [1] 1303/22
putting [9] 1307/17 1308/24 1319/3 1319/16 1320/20 1326/15 1358/23 1384/11 1420/22

## Q

QB [1] 1349/6
qualifies [1] 1290/17
qualify [1] 1300/25
quality [2] 1374/12 1374/24
quantitatively [1] 1372/17
quantities [1] 1400/11
questioning [5] 1340/8 1369/9 1385/24 1418/4 1418/8
questions [21] 1296/21 1310/13 1361/11 1361/15 1361/18 1361/20 1361/22 1361/23 1361/24 1362/1 1362/3 1362/5 1362/6 1376/1 1380/13 1380/20 1381/14 1385/18 1389/2 1404/18 1410/10
quibble [1] 1354/11
quick [2] 1376/1 1388/6
QuickBooks [14] 1300/2 1316/20 1349/5 1349/25 1350/8 1350/12 1351/7 1382/3 1382/18 1382/20 1382/22 1384/8 1384/11 1409/24
quite [1] 1287/10 1412/22
quote [7] 1301/20 1352/20 1355/7 1361/23 1372/4 1376/24 1390/18
quote/unquote [6] 1352/20 1355/7 1361/23 1372/4 1376/24 1390/18
quoted [1] 1425/6

## R

radar [1] 1343/18
raise [5] 1374/17 1374/21 1383/15 1409/17 1423/20
raised [1] 1377/13
raises [1] 1384/3
range [5] 1339/10 1339/11 1339/14 1341/3 1341/8
RAPHAEL [1] 1285/16
rarely [1] 1391/11
rate [2] 1383/5 1383/16
rates [5] 1408/13 1408/14 1409/8 1409/8 1411/4
rather [5] 1314/17 1349/3 1368/23 1406/1 1410/21
re [1] 1333/2
re-Bates [1] 1333/2
reach [2] 1346/22 1347/1
reached [2] 1347/8 1417/24
reactivated [1] 1346/23
read [12] 1302/11 1302/14 1303/11 1305/13 1305/14 1305/25 1390/23 1391/13 1393/8 1404/9 1404/11 1404/14
reading [2] 1304/21 1337/7
real [1] 1378/19
reality [1] 1414/9
really [19] 1291/20 1292/22 1334/20 1335/8 1335/24 1349/18 1356/25

really... [12]  1358/22 1379/7 1383/21
1386/8 1394/18 1397/20 1402/13
1414/3 1414/11 1414/11 1415/11
1415/25
Realty [1]  1285/4
reargued [1]  1294/16
reason [17]  1293/14 1298/21 1340/18
1342/15 1343/12 1343/16 1350/24
1353/13 1353/17 1379/15 1379/17
1379/22 1411/18 1413/23 1416/23
1418/11 1419/20
reasonableness [1]  1372/5
reasons [4]  1298/18 1352/7 1382/6
1424/6
rec [2]  1373/24 1374/1
receipts [13]  1356/21 1359/10 1359/13
1359/18 1359/20 1359/24 1360/6
1360/9 1361/6 1362/10 1363/10
1395/13 1395/25
receive [26]  1289/23 1299/23 1311/25
1312/2 1319/4 1326/12 1329/21
1331/19 1333/14 1335/20 1339/21
1342/3 1385/23 1386/4 1386/6 1386/7
1386/11 1395/9 1395/20 1397/19
1398/8 1398/13 1398/23 1400/18
1403/23 1411/22
received [48]  1288/6 1299/6 1299/8
1299/25 1324/3 1326/5 1327/22 1328/1
1328/4 1329/18 1330/1 1333/20 1334/6
1334/14 1335/15 1337/4 1337/11
1337/14 1338/2 1338/12 1338/18
1339/3 1339/6 1339/22 1339/24
1341/24 1342/2 1342/6 1342/9 1342/16
1342/22 1342/24 1356/11 1374/9
1380/21 1387/25 1395/24 1398/4
1398/21 1399/3 1399/18 1403/21
1403/21 1405/1 1405/24 1406/4
1409/17 1417/8
receiving [6]  1336/10 1336/17 1337/24
1341/6 1341/12 1341/20
recent [1]  1349/22
recently [2]  1311/17 1398/11
recess [16]  1286/16 1287/2 1287/21
1287/22 1288/5 1288/9 1288/11
1318/24 1332/19 1347/17 1389/10
1411/12 1412/9 1418/14 1418/15
1420/23
recognition [1]  1371/2
recognize [16]  1295/4 1295/6 1295/11
1296/25 1299/14 1299/17 1299/18
1310/19 1314/10 1316/16 1334/5
1334/13 1336/24 1337/2 1348/18
1349/1
recognized [1]  1370/24
recollection [2]  1296/2 1342/7
reconciliation [4]  1348/24 1349/22
1350/11 1373/24
reconciliations [2]  1349/4 1350/18
reconciling [1]  1350/13
record [10]  1290/5 1290/10 1293/21
1332/2 1340/12 1381/24 1381/25
1384/8 1386/7 1417/20
recorded [4]  1284/24 1294/7 1294/9
1338/20
records [58]  1288/25 1288/25 1289/1
1289/3 1289/5 1289/9 1289/12 1289/14
1289/16 1289/19 1289/21 1289/24
1290/14 1290/18 1290/24 1291/4

1291/6 1291/13 1291/17 1294/10
1300/2 1324/13 1326/21 1328/22
1338/24 1373/1 1373/14 1375/11
1376/7 1376/9 1376/14 1376/15
1376/24 1385/4 1386/5 1386/6 1386/9
1386/10 1386/13 1387/12 1387/14
1394/25 1395/3 1396/16 1396/24
1398/4 1398/14 1399/16 1399/19
1406/8 1406/15 1406/22 1407/23
1408/8 1409/11 1409/14 1410/25
1419/13
recross [5]  1404/19 1404/23 1407/18
1408/23 1409/5
RECROSS-EXAMINATION [4]  1404/23
1407/18 1408/23 1409/5
recurring [2]  1300/1 1390/10
redirect [2]  1381/15 1381/17
redouble [1]  1418/16
reduce [1]  1394/16
reducing [1]  1394/17
redundant [1]  1339/14
refer [3]  1305/3 1383/7 1402/20
reference [4]  1304/1 1374/7 1390/14
1398/16
referenced [4]  1327/13 1403/7 1403/16
1403/25
references [1]  1290/3
referred [2]  1295/12 1299/25
referring [18]  1289/21 1292/5 1322/2
1331/13 1332/4 1332/6 1332/7 1333/10
1333/11 1335/25 1363/21 1364/12
1390/20 1391/20 1402/23 1406/11
1406/14 1407/12
refers [3]  1328/24 1337/17 1390/13
reflects [1]  1340/12
refresh [1]  1296/2
refused [4]  1352/15 1352/19 1380/24
1381/2
refute [1]  1388/1
refutes [1]  1286/15
regard [9]  1300/16 1380/19 1381/10
1383/12 1384/1 1385/4 1394/25 1396/2
1397/12
regarding [9]  1294/6 1297/3 1297/12
1329/19 1333/23 1348/8 1393/19
1394/9 1395/5
regardless [6]  1308/4 1308/11 1358/6
1358/11 1358/15 1358/16
registered [2]  1296/5 1296/16
regular [2]  1346/1 1368/20
reinstitute [2]  1351/23 1352/1
relate [3]  1290/4 1305/1 1375/10
relates [1]  1348/21
relating [8]  1319/19 1320/1 1320/19
1320/23 1324/16 1331/20 1341/15
1366/22
relationships [1]  1297/25
relatively [1]  1344/20
relevance [9]  1293/8 1293/12 1293/14
1297/22 1298/3 1298/5 1308/20
1315/13 1370/7
relevant [2]  1369/12 1370/9
relief [1]  1413/8
relocated [1]  1364/6
rely [1]  1375/2
remainder [1]  1411/20
remaining [1]  1356/7
remedial [1]  1420/8
remedy [1]  1298/9
remember [11]  1296/7 1317/4 1327/11

1328/11 1332/10 1356/22 1359/6
1367/6 1368/8 1386/19 1398/12
remote [3]  1366/19 1417/9 1422/8
removed [1]  1416/17
rent [3]  1392/9 1392/10 1392/10
repeat [5]  1319/22 1337/7 1341/8
1385/19 1403/14
repeatedly [1]  1416/9
rephrase [2]  1365/24 1396/20
report [13]  1365/10 1366/13 1366/22
1369/24 1369/25 1370/1 1384/6 1384/6
1384/13 1384/14 1384/15 1412/24
1412/25
Reporter [1]  1284/20
reports [1]  1411/2
repository [1]  1425/5
represent [8]  1310/24 1312/6 1312/8
1322/6 1372/5 1408/25 1413/4 1417/16
representation [3]  1318/15 1340/2
1372/4
represented [8]  1306/23 1306/25
1307/24 1308/1 1314/8 1321/13
1321/14 1398/20
representing [1]  1321/16
request [16]  1307/1 1317/10 1323/5
1323/13 1323/17 1323/19 1335/1
1346/22 1359/15 1360/2 1361/5
1381/12 1393/14 1395/10 1397/17
1397/18
requested [20]  1300/23 1306/23
1306/23 1306/25 1307/9 1307/9 1314/8
1314/8 1314/15 1317/11 1318/25
1326/24 1370/15 1381/8 1386/12
1393/3 1393/6 1396/1 1397/14 1397/23
requesting [3]  1326/13 1329/7 1397/12
requests [4]  1298/25 1323/10 1363/10
1387/25
require [12]  1286/16 1290/24 1290/25
1291/1 1291/2 1291/3 1291/4 1291/5
1338/22 1374/24 1391/13 1411/21
required [16]  1302/24 1303/16 1304/18
1304/23 1304/25 1305/4 1305/7
1305/19 1305/22 1318/6 1387/13
1396/12 1404/1 1404/3 1404/8 1405/6
requirement [1]  1330/15
requirements [1]  1376/23
requires [3]  1290/17 1360/9 1376/25
residence [2]  1295/19 1296/3
resides [1]  1355/5
resigned [1]  1371/14
resolution [3]  1311/4 1413/20 1413/22
resolve [4]  1378/22 1399/5 1412/4
1419/24
resolved [5]  1321/11 1322/18 1413/5
1413/6 1424/10
respect [14]  1307/1 1307/2 1307/12
1307/16 1320/19 1321/17 1322/13
1338/23 1355/1 1361/4 1367/4 1369/14
1378/21 1410/9
respectfully [3]  1293/20 1417/15
1417/22
respective [1]  1420/1
respond [6]  1287/4 1318/16 1390/17
1392/8 1407/7 1417/14
responded [1]  1404/3
response [24]  1310/24 1312/6 1314/13
1316/22 1317/25 1318/2 1323/21
1326/7 1326/17 1326/19 1329/7
1330/10 1330/11 1335/1 1393/17
1394/24 1395/17 1397/16 1404/1

**R**

response... [5]  1404/12 1404/15 1405/6 1414/17 1417/12
responses [4]  1391/11 1391/25 1404/17 1414/22
responsibilities [2]  1390/24 1410/20
responsibility [3]  1357/6 1383/19 1397/4
responsible [4]  1297/2 1297/7 1297/14 1355/7
rest [1]  1411/14
restated [2]  1370/20 1370/22
restatement [1]  1371/1
restore [3]  1416/21 1416/24 1421/7
restored [10]  1287/16 1287/20 1376/5 1406/21 1406/24 1417/8 1417/12 1418/2 1418/11 1418/25
restoring [2]  1418/23 1419/25
Restraining [1]  1385/5
restrict [1]  1407/4
restricted [1]  1423/10
result [3]  1348/22 1395/10 1419/3
retain [14]  1301/17 1304/23 1306/14 1306/18 1306/21 1308/6 1311/5 1311/7 1311/14 1311/16 1313/6 1313/13 1314/3 1396/13
retained [19]  1291/4 1310/23 1311/3 1311/14 1311/18 1311/21 1311/25 1312/4 1312/5 1312/8 1312/11 1312/16 1318/16 1320/10 1321/21 1322/1 1322/4 1322/6 1324/23
retaining [1]  1306/5
retakes [1]  1288/16
retention [3]  1313/23 1319/16 1322/13
retract [1]  1398/19
retrieve [1]  1333/16
return [2]  1323/7 1323/15
returned [3]  1387/8 1397/25 1398/1
returns [7]  1297/9 1307/5 1323/11 1323/14 1370/21 1398/7 1398/7
revenue [2]  1370/24 1371/2
review [12]  1338/8 1371/3 1371/11 1371/16 1371/19 1372/15 1372/16 1372/19 1374/8 1374/12 1374/24 1410/24
reviewed [9]  1291/8 1305/11 1325/12 1334/17 1335/3 1338/6 1373/21 1374/13 1374/14
reviews [1]  1372/21
rhetorical [1]  1296/21
RICHARD [2]  1285/6 1285/8
rights [2]  1322/23 1420/1
Rivera [13]  1285/7 1300/4 1301/6 1364/4 1364/7 1380/19 1380/23 1381/4 1382/20 1383/21 1412/18 1412/22 1416/4
Rivera's [3]  1364/11 1365/11 1383/19
Rivers [73]
Rivers' [1]  1354/13
ROBERT [2]  1285/10 1371/9
Rogosnitzky [6]  1346/22 1347/22 1347/25 1417/15 1417/19 1417/23
role [7]  1292/4 1292/9 1292/10 1292/10 1293/21 1293/23 1303/5
rolled [1]  1297/18
room [13]  1332/17 1364/13 1364/14 1366/2 1366/5 1366/14 1421/6 1421/10 1421/23 1422/4 1422/10 1422/15 1423/2
ROSENBLATT [2]  1285/16 1322/3

Roughly [1]  1356/2
routine [2]  1355/3 1367/7
RP [1]  1306/5
RPR [1]  1284/20
ruled [1]  1294/13
ruling [4]  1294/15 1294/16 1319/14 1322/21
run [6]  1316/19 1316/25 1369/24 1369/25 1384/6 1394/6
running [4]  1290/23 1396/10 1396/11 1396/13
rush [1]  1337/9

**S**

Saint [3]  1296/4 1337/20 1403/18
salary [2]  1324/16 1356/11
Salcedo [1]  1285/7 1399/21
sales [1]  1394/4
sanction [1]  1415/10
sanctions [2]  1414/18 1415/17
satisfaction [1]  1372/11
satisfied [2]  1414/22 1415/7
satisfy [2]  1354/16 1376/23
save [3]  1354/16 1419/2 1419/18
saw [26]  1295/15 1314/17 1318/6 1343/20 1343/22 1343/25 1344/1 1344/2 1344/9 1344/20 1344/22 1344/25 1345/4 1345/7 1345/14 1345/22 1345/23 1345/24 1345/25 1346/1 1346/7 1349/8 1358/16 1358/19 1358/20 1414/2
scanned [9]  1324/22 1324/24 1324/25 1325/3 1325/4 1325/5 1325/6 1325/8 1401/5
scans [1]  1325/11
SCHAFHAUSER [14]  1284/15 1286/10 1288/13 1319/14 1329/10 1390/5 1393/14 1395/6 1404/24 1405/22 1416/23 1420/15 1425/20 1425/23
Schafhauser's [2]  1387/1 1394/24
schedule [4]  1299/19 1299/21 1299/24 1329/25
scheduled [3]  1388/4 1423/22 1424/4
schedules [1]  1424/3
SCHREIBER [31]  1284/3 1289/11 1289/16 1301/1 1301/3 1307/10 1309/23 1309/24 1312/1 1313/22 1314/2 1319/19 1319/25 1320/10 1322/12 1343/6 1343/7 1357/19 1357/24 1359/9 1359/9 1360/7 1361/10 1363/3 1363/9 1363/13 1363/15 1369/22 1370/11 1370/13
Schreiber's [5]  1310/1 1310/3 1310/6 1310/10 1321/24
Schreibers [1]  1359/16
scope [4]  1292/22 1369/10 1384/21 1401/24
screen [3]  1419/5 1419/17 1423/2
screenshot [1]  1419/7
se [2]  1373/4 1396/11
second [11]  1294/22 1327/4 1327/6 1332/11 1336/17 1336/20 1348/25 1357/9 1369/13 1383/15 1407/21
secondly [2]  1382/9 1391/12
seconds [2]  1340/10 1367/13
section [2]  1302/10 1373/20
Section 6.1.2 [1]  1302/10
seek [3]  1309/16 1321/23 1323/23
seeking [2]  1319/11 1413/8
seem [2]  1293/7 1353/2

Sekowski [1]  1337/5
selected [1]  1325/23
selecting [3]  1330/13 1332/12 1332/14
selection [1]  1313/11
Selective [1]  1341/16
self [3]  1300/22 1300/22 1300/25
self-dealing [3]  1300/22 1300/22 1300/25
sell [2]  1374/17 1374/21
send [8]  1289/23 1290/9 1326/19 1391/15 1391/16 1391/22 1391/22 1406/1
sending [5]  1390/11 1391/14 1392/3 1392/8 1407/7
sent [27]  1286/9 1295/18 1296/10 1296/14 1325/8 1325/12 1325/20 1326/7 1326/11 1326/18 1326/22 1334/3 1335/12 1335/13 1338/17 1363/25 1380/21 1395/7 1396/2 1401/5 1401/12 1402/9 1402/11 1403/7 1403/16 1405/17 1416/10
sentence [1]  1337/10
September [2]  1297/2 1297/8
September 2015 [1]  1297/8
serendipity [1]  1416/1
series [2]  1333/5 1339/13
serious [1]  1378/4
seriously [1]  1418/21
serve [2]  1285/13 1309/8
served [5]  1310/19 1310/25 1314/1 1314/7 1314/14
server [17]  1355/3 1355/5 1364/13 1364/14 1366/2 1366/5 1366/7 1366/9 1366/10 1366/13 1366/20 1366/21 1366/23 1367/4 1367/11 1424/13 1424/17
servers [1]  1355/1
Services [1]  1285/15
set [29]  1293/21 1296/5 1299/15 1311/20 1311/22 1315/3 1331/19 1331/22 1333/19 1334/5 1334/20 1335/19 1337/4 1337/12 1339/14 1340/19 1341/3 1349/5 1349/6 1350/10 1392/15 1397/22 1421/21 1422/3 1422/18 1422/19 1422/19 1422/22 1425/14
seven [1]  1402/24
shape [1]  1344/5
shareholder [1]  1373/4
shareholder's [1]  1373/2
shareholders [3]  1373/8 1373/9 1373/15
sheet [2]  1372/24 1373/2
short [6]  1286/8 1286/12 1286/16 1334/11 1358/16 1383/24
shown [1]  1413/22
sic [2]  1406/2 1418/18
side [4]  1287/8 1411/25 1412/1 1412/3
sides [5]  1298/23 1413/17 1414/4 1415/8 1415/9
sign [4]  1372/1 1372/3 1372/4 1372/8
sign-off [4]  1372/1 1372/3 1372/4 1372/8
signatures [3]  1295/2 1295/4 1295/6
signed [2]  1371/18 1371/22
significance [1]  1350/21
significant [1]  1399/15
similar [1]  1357/10
simple [4]  1287/23 1287/25 1287/25 1394/18
simplify [1]  1302/22

**S**

simply [3] 1353/16 1372/17 1417/22
Simultaneously [1] 1423/5
single [3] 1285/13 1309/8 1421/21
single-serve [1] 1309/8
site [1] 1368/24
sitting [4] 1320/21 1326/16 1343/16
1405/3
situation [1] 1387/20
six [2] 1338/4 1338/9
size [1] 1338/4
slightest [1] 1418/4
slips [1] 1289/24
small [4] 1395/9 1395/12 1397/20
1403/9
smaller [1] 1341/2
software [3] 1367/7 1411/25 1416/13
solely [1] 1351/7
Solomon [1] 1285/13
solute [1] 1367/3
solutions [1] 1420/7
solved [1] 1417/4
someone [5] 1286/21 1297/6 1324/17
1342/22 1424/14
someplace [1] 1409/11
somewhere [2] 1311/20 1346/15
Sonia [1] 1285/7 1299/25 1325/8
1360/9 1379/13 1379/16 1379/24
1380/19 1380/23 1381/4 1382/11
1383/17 1383/23 1384/6 1401/4
1412/20 1412/20
Sonia's [3] 1363/18 1364/3 1365/14
soon [1] 1406/3
sorry [40] 1294/19 1297/5 1297/11
1302/21 1308/10 1312/18 1329/13
1332/6 1337/7 1337/10 1338/17 1342/5
1342/14 1358/2 1362/23 1363/11
1374/5 1374/6 1374/20 1374/20 1375/4
1378/14 1379/3 1383/15 1384/11
1386/16 1388/12 1388/15 1396/21
1399/9 1401/22 1402/17 1403/4
1403/11 1403/14 1404/13 1405/19
1410/3 1411/3 1413/11
sort [2] 1377/17 1424/23
sortable [1] 1376/19
sought [3] 1318/10 1356/21 1418/20
South [9] 1346/7 1363/19 1363/23
1364/4 1364/8 1365/8 1365/11 1368/1
1368/7
speaking [6] 1288/24 1300/13 1381/9
1386/8 1386/10 1395/25
specific [7] 1303/8 1303/13 1314/9
1350/4 1382/6 1386/19 1407/12
specifically [12] 1289/22 1305/23
1348/23 1358/1 1363/21 1377/10
1377/11 1379/25 1396/1 1397/12
1405/5 1407/9
specificity [1] 1346/13
specifics [1] 1336/15
specify [1] 1330/7
speculate [2] 1408/5 1413/2
speculation [1] 1397/1
Speed [1] 1312/3
spend [2] 1397/3 1419/21
spoken [1] 1351/14
sporadic [1] 1401/3
spot [1] 1322/21
spreadsheets [1] 1419/6
stack [3] 1333/12 1333/13 1333/19

1333/25 1334/3 1334/14
stack... [3] 1324/19 1349/10 1362/23
1382/25 1382/25 1384/1
stamp [1] 1333/1
stamped [2] 1332/23 1333/2
stamps [1] 1333/6
stand [3] 1287/3 1288/16 1333/18
start [7] 1292/3 1310/16 1315/22
1319/10 1411/11 1414/10 1414/24
started [4] 1368/7 1368/9 1383/25
1416/1
starts [3] 1339/12 1409/9 1423/22
startup [2] 1292/24 1293/1
state [10] 1295/8 1297/3 1297/7
1297/12 1337/19 1386/22 1387/7
1387/13 1402/12 1404/7
statement [6] 1316/23 1323/5 1331/1
1357/10 1372/3 1380/25
statements [13] 1331/13 1357/11
1370/22 1370/23 1371/11 1372/24
1373/25 1374/8 1374/13 1374/14
1374/25 1375/2 1375/4
STATES [3] 1284/1 1284/4 1284/11
stating [1] 1324/12
status [3] 1297/3 1297/12 1406/7
stay [2] 1361/8 1389/6
stenography [1] 1284/24
step [1] 1423/23
steps [3] 1354/14 1354/16 1416/21
Steve [1] 1312/1
STEVEN [19] 1284/3 1289/11 1301/3
1309/24 1310/1 1310/3 1310/6 1319/19
1319/25 1320/5 1320/10 1321/23
1322/12 1343/6 1357/19 1359/9 1360/6
1361/15 1423/6
stipulate [3] 1315/17 1315/20 1335/10
stipulation [2] 1339/2 1339/4
stop [5] 1350/16 1350/18 1361/23
1392/8 1407/7
stopped [1] 1350/13
stopping [1] 1293/22
storage [1] 1406/13
stored [2] 1406/16 1406/18
story [1] 1383/23
straightforward [1] 1305/10
Street [1] 1285/4
Stroz [20] 1286/7 1286/21 1286/21
1286/25 1287/20 1320/5 1320/6
1365/10 1366/13 1412/1 1412/2
1412/24 1412/25 1417/7 1418/25
1419/16 1424/12 1424/16 1424/21
1424/23
subject [2] 1293/8 1385/25
submit [2] 1394/25 1414/14
submitted [4] 1390/11 1395/6 1395/21
1397/11
subpoena [14] 1310/19 1310/24 1312/6
1314/1 1314/14 1314/15 1315/3
1316/22 1317/7 1317/9 1317/19
1318/19 1319/3 1319/4
subpoenas [1] 1316/7
subsequent [2] 1333/22 1346/15
subsequently [1] 1397/16
subset [3] 1332/14 1395/9 1397/20
substantial [1] 1372/19
succinctly [1] 1299/5
Sue [1] 1289/3
sufficient [1] 1400/11
suggest [1] 1420/10
suggestion [1] 1420/20

suggestions [1] 1419/24
summarized [1] 1384/7
summer [1] 1287/11
supplied [1] 1395/25
supply [1] 1369/22
support [2] 1366/19 1410/21
supporting [3] 1289/22 1289/25 1413/8
surprise [7] 1296/9 1296/13 1296/16
1296/19 1296/21 1402/2 1414/25
surprises [1] 1296/18
sustain [1] 1319/8
sustained [8] 1293/19 1356/14 1356/18
1377/22 1377/25 1380/6 1386/15
1399/24
sworn [1] 1288/18
sworn/affirmed [1] 1288/18
Sylvia [1] 1285/6 1381/10 1381/11
system [49] 1286/3 1286/8 1286/9
1307/12 1307/13 1316/20 1324/4
1324/8 1324/10 1324/22 1324/24
1324/25 1325/11 1348/8 1350/12
1351/8 1354/14 1355/2 1376/5 1376/10
1376/11 1376/17 1378/5 1378/9
1378/10 1378/16 1379/4 1379/9
1379/23 1380/3 1380/4 1380/8 1380/10
1381/20 1381/22 1381/23 1382/12
1383/11 1391/2 1393/20 1393/22
1394/3 1394/7 1407/25 1408/2 1409/13
1411/21 1421/8 1421/15
systems [6] 1338/14 1349/7 1354/19
1366/20 1382/17 1382/18

**T**

table [2] 1320/21 1421/12
talks [1] 1328/22
tapes [1] 1354/25
tax [10] 1297/9 1323/3 1323/6 1323/8
1323/16 1323/17 1370/20 1383/5
1398/6 1398/7
team [1] 1290/3
tedious [1] 1419/14
temporary [9] 1368/15 1368/16 1369/7
1369/15 1369/16 1369/24 1370/1
1370/18 1385/5
temps [1] 1369/18
Ten [1] 1340/10
tenure [1] 1368/5
term [3] 1290/24 1292/12 1297/10
terminate [1] 1363/1
terminated [2] 1361/23 1362/14
terms [8] 1292/2 1302/25 1330/11
1330/24 1331/5 1373/7 1373/23
1413/20
test [2] 1286/11 1330/24
tested [2] 1350/8 1372/17
testified [23] 1288/19 1302/1 1324/2
1326/10 1326/12 1326/16 1333/22
1338/1 1342/19 1346/18 1355/19
1357/3 1361/10 1362/17 1366/3
1371/24 1376/6 1381/19 1382/4
1385/21 1396/3 1406/8 1407/6
testify [1] 1298/14
testifying [1] 1410/9
testimony [17] 1295/13 1298/1 1317/25
1346/16 1356/20 1356/22 1395/11
1399/6 1401/17 1406/17 1411/21
1412/14 1412/14 1412/24 1413/13
1414/9 1414/23
testing [1] 1330/13
theft [1] 1378/6

## T

therefore [1] 1338/23
thereto [1] 1295/9
thin [1] 1344/20
thinking [1] 1374/5
third [3] 1302/5 1302/8 1372/18
third-party [1] 1372/18
thoughts [1] 1413/18
thousand [1] 1333/19
thousand-case [1] 1333/19
three [6] 1340/13 1341/2 1346/3 1360/8 1393/5 1400/17
throughout [1] 1368/4 1375/14
throw [1] 1349/20
thumbed [1] 1396/3 1396/8
tie [1] 1369/13
time-consuming [1] 1419/15
timeline [3] 1328/18 1329/2 1329/14
today [8] 1326/16 1343/16 1351/22 1357/11 1405/4 1406/5 1406/7 1413/24
today's [1] 1413/15
together [5] 1314/17 1421/17 1421/23 1421/24 1424/2
tomorrow [3] 1420/14 1423/13 1423/23
top [12] 1325/25 1327/3 1344/1 1344/2 1344/9 1344/10 1344/20 1344/21 1345/1 1345/15 1349/5 1361/8
topic [1] 1316/11
totally [1] 1370/15
track [1] 1424/12
transactions [8] 1289/22 1290/1 1290/4 1326/23 1330/13 1330/24 1331/5 1372/13
transcripts [1] 1390/14
transferred [3] 1382/2 1382/5 1382/12
transferring [1] 1382/8
Transport [2] 1285/3 1285/3
TRC [1] 1392/23
treasurer [1] 1297/11
TRO [44] 1300/21 1300/21 1314/7 1322/8 1346/24 1347/3 1350/23 1351/1 1352/24 1352/25 1353/1 1353/5 1354/9 1356/11 1356/16 1357/16 1358/18 1364/9 1364/10 1364/12 1365/7 1365/14 1366/14 1375/16 1375/20 1380/17 1380/23 1381/3 1381/11 1388/20 1388/24 1392/21 1393/8 1395/15 1395/20 1400/18 1400/22 1407/10 1407/11 1407/13 1410/11 1410/11 1410/12 1410/13
Trucking [1] 1285/4
true [4] 1288/3 1363/6 1379/18 1414/13
turn [11] 1294/19 1294/22 1295/16 1299/12 1302/4 1325/22 1326/25 1327/3 1327/24 1336/16 1337/1
Turning [1] 1407/20
two [97]
two-page [2] 1317/3 1419/18
type [3] 1297/19 1307/4 1391/15
types [4] 1289/25 1290/25 1309/6 1342/8
typically [1] 1344/13

## U

U.S [1] 1402/13
umbrella [1] 1381/24
unaccounted [1] 1328/24
unaudited [1] 1374/13
uncover [2] 1286/13 1297/22
underlying [1] 1324/12

understood [3] 1291/23 1357/6
undertaken [1] 1308/17
Unemployment [1] 1404/15
unfair [3] 1321/4 1321/7 1322/22
union [3] 1321/5 1321/5 1322/7
UNITED [3] 1284/1 1284/4 1284/11
unless [3] 1302/14 1340/18 1410/8
unopened [2] 1339/16 1340/3
unquote [5] 1352/20 1355/7 1361/23 1372/4 1376/24 1390/18
update [2] 1286/2 1367/6
ups [1] 1355/7
upset [2] 1361/21 1414/1
upstairs [1] 1365/3
usable [1] 1382/3
USB [6] 1365/10 1365/14 1366/14 1366/22 1367/1 1367/11
useful [1] 1298/12
user [2] 1416/2 1416/2
utility [1] 1335/3
utilize [2] 1344/23 1396/9
utilized [4] 1351/7 1357/20 1363/24 1381/23

## V

V-U-L-T-R [1] 1424/22
vacation [1] 1423/22 1424/1
vague [1] 1290/6
value [2] 1373/7 1378/10
various [1] 1298/11
vendor [7] 1296/13 1306/18 1335/25 1338/19 1342/6 1342/8 1391/17
vendors [2] 1289/24 1291/2
verbally [4] 1321/10 1321/12 1384/14 1409/15
verification [1] 1372/18
verify [5] 1360/2 1372/11 1372/12 1372/13 1375/12
verse [1] 1287/1
versus [1] 1284/5
view [4] 1306/7 1393/22 1393/24 1394/20
views [1] 1305/15
vigorously [1] 1287/11
VINCENT [1] 1288/17
vindicated [1] 1420/1
vindicates [1] 1334/25
visit [1] 1368/24
voluminous [1] 1338/1
Vultr [1] 1424/22

## W

W-2s [2] 1386/6 1386/7
W-4 [1] 1383/6
W4 [2] 1324/19 1325/13
wage [3] 1410/5 1410/6 1410/6
wages [4] 1407/23 1407/25 1410/4 1410/7
Wait [2] 1311/12 1413/10
waiting [1] 1372/22
walk [1] 1332/8
Wallack [2] 1322/10 1322/14
wants [2] 1287/7 1365/22
warranted [1] 1414/19
waste [1] 1293/23
wasted [2] 1414/3 1414/5
ways [4] 1414/5 1414/24 1419/1 1419/2
week [6] 1384/9 1398/21 1400/17 1412/6 1413/7 1414/6
weigh [1] 1413/21

whereby [2] 1391/2 1392/7
whole [6] 1392/13 1333/16 1333/11 1350/10 1405/12 1405/17
wiped [1] 1415/21
wish [1] 1302/15
wished [1] 1364/16
withdraw [1] 1311/22
withdrawn [9] 1296/2 1324/2 1334/12 1345/8 1345/13 1370/19 1373/7 1408/5 1408/5
withholding [2] 1324/19 1383/6
witness [5] 1286/17 1288/16 1288/16 1288/17 1298/14 1319/12 1331/24 1332/3 1333/21 1335/3 1348/13 1396/19 1401/9 1425/18
witnesses [2] 1316/8 1415/6
wondering [1] 1413/13
word [5] 1325/22 1325/23 1367/3 1372/12 1420/17
words [6] 1291/24 1303/13 1356/7 1360/1 1361/25 1362/15
workers [3] 1369/7 1369/15 1369/16
Workforce [1] 1337/19
works [1] 1348/23
would-it-surprise-you [1] 1296/21
writing [2] 1321/11 1391/12
written [3] 1404/10 1409/16 1410/1

## Y

year [8] 1341/7 1351/10 1356/6 1356/8 1388/20 1388/22 1388/24 1394/18
years [6] 1298/1 1298/1 1346/3 1346/3 1346/4 1348/5
yesterday [17] 1288/24 1291/22 1294/2 1294/3 1302/1 1310/15 1311/20 1320/25 1323/2 1324/2 1325/16 1325/18 1326/10 1326/16 1342/19 1343/20 1356/20
YORK [8] 1284/1 1284/4 1284/16 1392/11 1392/13 1392/14 1392/17 1408/17
Yossi [14] 1347/9 1347/10 1347/22 1348/1 1348/4 1348/5 1348/23 1351/14 1351/22 1352/1 1352/4 1355/6 1382/7 1382/11
yourself [2] 1308/5 1308/12