```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2
      ------------------------------x
 3                                        15-CV-6861(CBA)(JO)
      STEVEN SCHREIBER,
 4                                        United States Courthouse
                  Plaintiff,              Brooklyn, New York
 5
                  – versus –
 6                                        August 5, 2016
                                          9:30 a.m.
 7    EMIL FRIEDMAN, et al.,

 8                Defendants.

 9    ------------------------------x

10        TRANSCRIPT OF CIVIL CAUSE FOR EVIDENTIARY HEARING
              BEFORE THE HONORABLE JAMES ORENSTEIN
11               UNITED STATES MAGISTRATE JUDGE

12

13    APPEARANCES

14    For the Plaintiff:      BY:  JAY PHILIP NELKIN, ESQ.
                                   CAROL NELKIN, ESQ.
15
      For the Defendants:     BY:  PAUL HANS SCHAFHAUSER, ESQ.
16    Emil Friedman and New York
      Best Coffee, Inc.
17
      For the Defendants:     BY:  DAVID B. GRANTZ, ESQ.
18    E&I Investors Group, LLC;      CATHERINE PASTRIKOS, ESQ.
      E&J Funding Co., LLC;
19    E&J Management Inc.; and
      E & Jeryg Management Corp., LLC
20
      Court Reporter:         LINDA D. DANELCZYK, RPR, CSR, OCR
21                            Phone:  718-613-2330
                              Fax:  718-804-2712
22                            Email:  LindaDan226@gmail.com

23

24    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
25
```

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

```
 1   A P P E A R A N C E S:   (Continued)

 2   For the Defendants:      BY:  DAVID GRANTZ, ESQ.
     24 Hour Oil Delivery Corp.;
 3   MB Fuel Transport, MB Fuel
     Transport I, Associated Fuel
 4   Oil Corp.; Light Trucking Corp.;
     165 Street Realty Corp.;
 5   Park Avenue Associates

 6   For the Defendants:      BY:  RICHARD AVERY FINKEL, ESQ.
     Sylvia Ezell,
 7   Sonia Rivera and
     Jorge Salcedo
 8
     For the Defendants:      BY:  RICHARD BRUCE FELDMAN, ESQ.
 9   Michael Devine and
     Michael Devine, CPA
10
     For the Defendants:      BY:  ROBERT J. BERGSON, ESQ.
11   Geoffrey Hersko and
     Geoffrey S. Hersko, P.C.
12
     For the Defendants:      BY:  MAURICE HELLER, ESQ.
13   Solomon Birnbaum,
     Single Serve Beverages
14   Distribution; Crazy Cups;
     26 Flavors, LLC; Office
15   Coffee Services, LLC

16
     For the Defendants:      BY:  RAPHAEL M. ROSENBLATT, ESQ.
17   Two Rivers Coffee, LLC

18

19

20

21

22

23

24

25
```

```
 1              (In open court.)

 2              THE COURT:  Be seated.

 3              Okay, just to make sure everybody's on the same

 4    page.

 5              I have a letter filed this morning by Mr. Nelkin,

 6    document number 265.

 7              Have you had a chance to see that?

 8              MR. SCHAFHAUSER:  I have had a chance briefly to

 9    read it this morning, yes, Your Honor.

10              THE COURT:  You've all got it.  Okay.

11              And before I ask anyone further on that, what's the

12    latest on access to Launch?

13              MR. SCHAFHAUSER:  Your Honor, I wanted to provide an

14    update and, frankly, to advise the Court and plaintiff of a

15    discussion I had this morning with Mr. Rogosnitzky, with

16    Yossi.

17              And I need to say this in the light of what I had

18    previously understood and what Yossi told me this morning as I

19    was driving to the courthouse.  Your Honor can see the

20    frustration on my face before I start.

21              Before we came back to this Court on Monday, Your

22    Honor, it was my understanding that Yossi would be restoring

23    access to Launch, and we had been working during the

24    intervening three-week period that Your Honor had allowed to

25    accomplish that.
```

```
 1              On Friday, July 29th, which is, I believe, one week
 2   ago, I was unable to obtain confirmation that access had been
 3   restored.  As I understood it, and as I understood until last
 4   night, I believe that I and my client, Mr. Friedman, were
 5   prevented from ourselves going on to Launch because it is a
 6   Two Rivers property, insofar it has Two Rivers' information.
 7   So I did not personally go on Launch and I directed, of
 8   course, my client not to the access Launch either.
 9              So the only thing that I was able to do to verify
10   that Launch was reactivated was to communicate with Yossi and
11   those working with him.
12              On Friday, July 29th, when I discovered, I was
13   advised by my client that he was unable to confirm from Yossi
14   that Launch had been reactivated, I hit the roof and I
15   demanded that I be given a phone number to speak with Yossi,
16   myself and my client.
17              During what I can only characterize as a very
18   unhappy conversation, which lasted a while, I demanded on
19   behalf of my client that access to Launch be immediately and
20   unqualifiedly and fully restored.
21              And Yossi who was on the phone with me and with my
22   client stated that access would be immediately and
23   unqualifiedly and fully restored.
24              THE COURT:  That was when?
25              MR. SCHAFHAUSER:  This was on Friday and -- this was
```

1    a week ago Friday.  And I'm placing this in context for what

2    I'm about to say.

3         So I advised Mr. Nelkin of this and it's in the

4    record.  I don't need to further belabor this point.

5         What Yossi told me was that access would be restored

6    to the fullest same extent as it was when access was

7    interrupted.  That's what I understood, that's what I told

8    Ms. Nelkin and Mr. Nelkin.

9         Last night I was in that room trying to get on to

10   Launch with a number other people; defendants counsel,

11   Mr. Friedman was there, we were trying to get on.  I

12   communicated with Mr. Nelkin, Ms. Nelkin at several points

13   along the way.

14        THE COURT:  You're referring to the witness

15   conference room?

16        MR. SCHAFHAUSER:  Yes.  Correct, Your Honor.

17        I believe that at one point in time -- Catherine, we

18   were able to get on there once?

19        MS. PASTRIKOS:  Yes.

20        MR. SCHAFHAUSER:  We were able to get on, in the

21   witness room.  We able to get on and then we stayed for a few

22   hours in that witness room and we thought and believed that

23   there -- I'm looking at Ms. Pastrikos because we were on her

24   laptop, Your Honor.  We thought that the issue was an internet

25   connectivity issue with the Court's internet.

```
 1              THE COURT:  I know our WiFi for attorneys can be

 2    spotty.

 3              MR. SCHAFHAUSER:  Yes.  So we were on and off and

 4    about, what it was 6:30, 6:00, at some point in time it was at

 5    5:30, 6:00 we left.  I was in traffic, I communicated by phone

 6    with Ms. Nelkin.  Anyhow, let me fast forward.  We attempted

 7    repeatedly to get access restored.

 8              This morning, once again, because I was exceedingly

 9    frustrated that I was not able to confirm directly, I once

10    again contacted Mr. Rogosnitzky, Yossi, with my client on the

11    phone as I was driving to court, I was on the Garden State

12    Parkway.

13              During the call, I again complained as to what was

14    going on, why access had not been available yesterday during

15    points of the evening, and during the course of that

16    conversation -- this is really the disclosure that I'm leading

17    up to -- in the course of that conversation, he advised me

18    that -- and I pulled over on the side of the road to scribble

19    these notes -- he advised me -- and again, I don't represent

20    him so there's no privilege, this is simply a disclosure.

21              He advised me that there was -- he had done a major

22    upgrade to the Launch system in or about February 2016.  He

23    asserted that the original system remained available to Two

24    Rivers through approximately April 2016.

25              I asked him immediately what system is now
```

1   available?  What system did you in fact upload?  What version

2   did you upload?

3            THE COURT:  Upload or upgrade?

4            MR. SCHAFHAUSER:  Well, he upgraded the system.  He

5   said he upgraded the system.

6            THE COURT:  This is during the period when he wasn't

7   providing access because of the fee dispute?

8            MR. SCHAFHAUSER:  No, let me go back.  Again, I'm

9   not being as clear as I really should be.

10            Your Honor, has heard, I think, testimony that

11   Launch was -- went down in about February of 2016.  Again, I

12   don't have personal knowledge.

13            THE COURT:  You're the lawyer, you don't have to

14   have knowledge, as I understand it.

15            MR. SCHAFHAUSER:  He has asserted --

16            THE COURT:  What I have been hearing in Court the

17   seven days out of this eight days of hearing, I've heard that

18   on your side it's been attributed to a fee dispute.

19            MR. SCHAFHAUSER:  That's correct.

20            THE COURT:  Okay.  And during this fee dispute he

21   did an upgrade.

22            MR. SCHAFHAUSER:  Apparently during this dispute, he

23   did an upgrade and, again, I'm telling you what I heard an

24   hour ago.

25            THE COURT:  I don't assume that you ascribe any

1    weight or credibility to that than I would.

2              MR. SCHAFHAUSER:  I can only -- I can only report to

3    the Court what I know.

4              THE COURT:  Yes, please.

5              MR. SCHAFHAUSER:  Okay.  He asserts that he did, and

6    what my notes indicate, is a major upgrade to the system

7    because he apparently is marketing or selling or distributing

8    or disseminating this system to other persons.

9              So he did an upgrade to the system.  That upgrade

10   apparently was done by him by, again, there's a two-month

11   period that we're talking about.  He did the upgrade, as I

12   understand my notes on -- and that was on February 2nd, 2016.

13   Again, I see people writing notes, I'm only telling you what I

14   learned in conversation with Ms. Nelkin.

15             THE COURT:  I think your disclaimer suffices.  I

16   don't need to hear it several more times.

17             MR. SCHAFHAUSER:  He apparently kept access to the

18   existing version of Launch available to Two Rivers, he

19   asserts, through sometime in April, I don't have an exact

20   date.

21             Now, why am I saying all this?  I'm saying all this

22   because when I learned this morning that what was uploaded by

23   Yossi recently, and what is apparently on the system today,

24   and by the way, he asserts that access is fully restored now,

25   but what was apparently uploaded is not the version that was

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

1    available to Two Rivers and that was used by Two Rivers back

2    in, let's say, February, but is the, quote, major updated

3    version, to which I then asked:  Well, what happened to the

4    version that you told me a week ago you would be uploading to

5    the system to have the identical information available to Two

6    Rivers that was available before?

7            And he had represented that that version is also

8    available and that -- and, again, I have no influence on this

9    gentleman, Your Honor, but on behalf of my client and

10   certainly as an officer of this Court, I, in the most blunt

11   terms, asked him to make not just this new version available

12   but the original version available so that everyone and

13   plaintiff and Two Rivers and we have access to every piece of

14   information and every data point.

15           Because I cannot now, as an officer of this Court,

16   make heads or tails as to which version Yossi Rogosnitzky put

17   on, and so I've now demanded that he do that.  He purportedly

18   agreed this morning at 8:30 that he would be doing that and is

19   apparently in the process of doing that, but you can see my

20   frustration.

21           THE COURT:  I hear what you're saying.  One area of

22   confusion for me --

23           MR. SCHAFHAUSER:  Yes.

24           THE COURT:  -- and I may be showing my ignorance of

25   technological matters, but if he's upgrading the system or

1    changing the system, that wouldn't have any affect, I would

2    assume, on the data stored on the system, correct?

3              MR. SCHAFHAUSER:  I hope not.

4              THE COURT:  So the matters discussed in this

5    morning's submission from the plaintiff regarding evidence of

6    previously undisclosed computers and evidence of data being

7    wiped out wouldn't entirely, if at all, be explained by an

8    upgrade to the software, correct?

9              MR. SCHAFHAUSER:  And I'm not asserting that it

10   would be, Your Honor.

11             THE COURT:  I see.

12             MR. SCHAFHAUSER:  I'm actually -- I hope to get to

13   plaintiff's submission this morning momentarily.

14             My disclosure, what I'm telling Your Honor is

15   independent of a response, I'm simply trying to --

16             THE COURT:  Got you.

17             MR. SCHAFHAUSER:  -- disclose what I know, because

18   what I had understood to be on the line, I've now learned may

19   not -- it may be, but I'm not a tech person either -- it may

20   be the same thing, it maybe the same information, it maybe the

21   same data points.

22             But in light of my interactions with Yossi, I cannot

23   vouch for it, and I, as an officer of the Court, as a

24   representative of Mr. Friedman, I cannot vouch for what Yossi

25   did and what version, which is why I believe we all need --

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

1    all, both sides -- need both versions so that Stroz and any

2    forensic analyst that we may retain can compare what he did

3    and what's available.

4           That's all I wanted to say.  I wanted to disclose

5    that.

6           THE COURT:  There is no easy way to -- what do we

7    know about the server on which Launch is resident?

8    Physically, where is it and who has custody or control of it;

9    do you know?

10          MR. SCHAFHAUSER:  Well, I -- what I was able to

11   understand last night, and I'm going to be looking around the

12   table because I mangle these tech terms.  But my understanding

13   is that that is a third-party vendor.

14          Mr. Grantz, who was it Vultan or?  Okay.  It was a

15   third-party vendor -- the answer is I think it's a third-party

16   vendor that rents this access.  It's not something that --

17   again, I -- well, Mr. Finkel is making the very good point

18   that I'm really speaking beyond the account of my knowledge

19   and I'm speculating.

20          THE COURT:  Do you want to step in?

21          MR. FINKEL:  We just made some inquiries yesterday

22   based upon what Ms. Nelkin -- or Mr. Nelkin, I forget which --

23   made a representation about a particular vendor in Piscataway,

24   New Jersey.  So we understand that that's a generally

25   available vendor that makes large storage space available.  We

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

1    do not know --

2              THE COURT:  I just want to know --

3              MR. FINKEL:  We don't know, bottom line is -- at

4    least I don't know -- where Yossi stores the data.

5              THE COURT:  Okay.  There's a server somewhere that

6    needs to be examined.  Somebody has physical custody of it, we

7    need to identify the person or entity that does so an

8    appropriate court order or subpoena could be issued.

9              Does anybody have that information?

10             MR. NELKIN:  The only thing that I have heard, and I

11   can't vouch for it, is that Stroz told me that they had looked

12   up somehow --

13             THE COURT:  The IP address?

14             MR. NELKIN:  The IP address, and it says it was this

15   place, I think that they mentioned V-U-L-T-R in Piscataway.

16             THE COURT:  Okay.

17             MR. NELKIN:  But they didn't have any more

18   information, it was based on an IP address.

19             THE COURT:  Got you.  Okay.

20             MR. FINKEL:  That's all we know, Your Honor.  We

21   don't know, as far as I understand, at least I don't know

22   where Yossi stores his data.

23             THE COURT:  Has anyone asked him?

24             MR. SCHAFHAUSER:  I'm leaning over.  Mr. Friedman

25   tells me that he asked him many times.

1     MR. FRIEDMAN:  May I speak?

2     THE COURT:  You may, but it's up to your lawyer.

3  It's between you and your lawyer if you decide if you want to

4  speak.

5     MR. SCHAFHAUSER:  Mr. Friedman apparently asked him

6  a number of times, and Yossi asserted that it's his custody,

7  his property.  There's been --

8     THE COURT:  Yeah, but if it's in the United States,

9  I assume it's subject to subpoena, I just want to know to who

10  the subpoena or a Court order or a warrant should be issued?

11     MR. SCHAFHAUSER:  I'm in agreement with Your Honor.

12     THE COURT:  Yes.

13     MR. SCHAFHAUSER:  I'm in agreement.

14     THE COURT:  But I use the word "warrant" for a

15  reason.

16     MR. SCHAFHAUSER:  I understand you, Your Honor.

17     THE COURT:  That the stakes are rising.

18     MR. SCHAFHAUSER:  I understand, and we actually

19  agree, and I'm not here to defend Yossi and his conduct.

20     THE COURT:  Okay.  But I haven't gotten the answer

21  yet.

22     Has anyone asked him where this server is?

23     MR. SCHAFHAUSER:  Apparently Yossi has refused to

24  disclose where it is to Mr. Friedman.  Which, unfortunately,

25  is not is not inconsistent with Yossi's conduct during his

 1   conversation with me.

 2              THE COURT:  Miss Nelkin.

 3              MR. SCHAFHAUSER:  Your Honor, let me say one last

 4   thing.

 5              I would support and join in any subpoena or order

 6   with respect to the server.  On behalf of Mr. Friedman, we

 7   would join and support that at this juncture, and if it's this

 8   Vultr entity somewhere in New Jersey -- Piscataway, we would

 9   join in that.

10              THE COURT:  Ms. Nelkin.

11              MS. NELKIN:  Your Honor, I'm going to let Jay Nelkin

12   address the technical issues.  But I must tell you that I'm

13   simply astounded by what has happened here.

14              I practice law a long time and I have never seen

15   anything like what is going on.

16              Just Mr. --

17              THE COURT:  I have, but not in a civil case.

18              MS. NELKIN:  That may be true, Your Honor.

19              Mr. Schafhauser said he was going to address the

20   actual report that we filed, and you're absolutely right, this

21   has nothing to do with the fact that you ordered December 14th

22   for the computers to be preserved and imaged by December 15th.

23              And here we are, there's no way -- I mean, maybe

24   Stroz can tell us more about what happened when with all of

25   this data.  But it's really just extraordinary.  And it

1    assumes that everyone is stupid, because the computer went

2    down, Stroz was on it, Jay was on it -- I'll let him tell you

3    more about it -- and it goes down shortly after.  I told you

4    in Court yesterday what we have found and what we want to do

5    to bring you more information, and it miraculously goes back

6    on at 7:00, approximately the time that we need to leave New

7    Jersey to make it to the courthouse on time.  You know --

8              THE COURT:  Well, I'm missing the point here, the

9    inference you're drawing.

10             MS. NELKIN:  The inference I'm drawing is that I

11   don't believe it's a coincidence that we were not able to get

12   on.

13             THE COURT:  I get that.

14             What's the agenda behind having the timing revolve

15   around when you leave New Jersey to come here?  Stroz remains

16   active while you're here, correct?

17             MS. NELKIN:  Stroz checked every 30 minutes last

18   night, and it only goes on because we would have no time to do

19   the analysis that we wanted to do to look more into the

20   computer and give you more information, which is why we asked

21   for the recess, it was, I mean --

22             THE COURT:  I guess what I'm trying to -- what are

23   you referring about the fact that it's only when you leave,

24   even though Stroz is still there to gather information that's

25   available.  What's the inference behind that?

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

1        MS. NELKIN:  Your Honor, we asked for a recess

2   yesterday in order to be able to obtain the material and bring

3   you more information.

4        But the information that we gave you is only with

5   regard to payroll records.  There are records on that

6   computer -- at least there were at one time -- with regard to

7   the loans, with regard to the bank accounts, they're duplicate

8   checks on that.  There's a lot of information on Launch that

9   goes to our proving our claims.  And because the defendants

10  always had possession of it, they -- I feel like they can

11  manipulate it, and I think that's going to continue.

12        I think there are extraordinary issues of

13  spoliation, and we have been given, over the last few days,

14  multiple explanations as to why this system goes down, none of

15  which are really very credible.

16        And I'm just saying that I believe that the system

17  was intentionally taken down last night.  I believe that

18  despite -- and I don't doubt that Mr. Schafhauser was told

19  what he was told, but I don't think it was an innocent thing.

20        THE COURT:  I have a question.  It probably is in

21  some of the submission of the documents, so I missed it.

22        Has Stroz determined, with any level of confidence,

23  the timing of when it has seen evidence of wiping technology,

24  Mr. Nelkin?

25        MR. NELKIN:  So they have seen -- at different

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

1    points, they've seen evidence of it.  But certainly the

2    following timeline is relevant.

3         The initial beth din came back on September 25th and

4    ordered him to go to a beth din.

5         On October 1st, they were trying to install

6    antivirus software on their computer.

7         MR. SCHAFHAUSER:  Beth din.

8         MR. NELKIN:  Two Rivers.  The QuickBooks plug-in or

9    some upgrade or something that needed to be done, and they

10   needed to have the IP person access the server.  They were

11   locked out of the server.  They asked for permission to get

12   this software put in.  Mr. Friedman refused to give them the

13   password.  Yossi he refused to give them the passwords.

14        On October 2nd -- he said that they needed to take

15   material off the --

16        THE COURT:  Forgive me for interrupting, I know

17   there's a much longer history that we're going to be debating.

18   I'm just talking about recently -- just if you focus in on the

19   last like during -- since the start of the hearing when access

20   has been restored temporarily to some extent.

21        MR. NELKIN:  I'm sorry, I thought you wanted me

22   to --

23        THE COURT:  No, no, that's why I interrupted you.

24        Is there any evidence of wiping during this most

25   recent period since the hearing began?

1        MR. NELKIN:  Well, yes.

2        THE COURT:  Okay, that's what I'm asking for.

3        MR. NELKIN:  So basically what the evidence shows is

4   that several things.

5        One is, it shows the computers that were returned do

6   not appear to be the correct computers.

7        It appears that the computers themselves don't match

8   up with the time periods that they should match up with, based

9   on their starting dates and who the users were.

10        THE COURT:  I'm talking about -- look, and we're

11   sort of going down this somewhat path because of what

12   Ms. Nelkin was saying about the timing of when access was

13   available and not available.

14        MR. NELKIN:  So let me address the access points and

15   maybe that will help.

16        THE COURT:  Just to focus the question I'm asking.

17   I'm trying to understand if the implication you're asking me

18   to draw is that -- you are making is that wiping has -- the

19   access has been withdrawn to allow wiping during this period.

20        MR. NELKIN:  Well, if nothing else, Mr. Schafhauser

21   just told us that the system that is on right now is not the

22   system that used to be on there, so --

23        THE COURT:  Yes.

24        MR. NELKIN:  -- we know that there's a different

25   system, which does not explain exactly, but Stroz hasn't been

1    able to investigate that.

2                THE COURT:  Look I am extremely troubled by what's

3    in this letter.  I don't intend to reach any conclusion until

4    I have had a chance to hear from your adversaries.  I'm trying

5    to understand your model of what happened and I want to frame

6    it this way:

7                Is this submission and the one I guess yesterday or

8    Monday, I forget, we've had a couple of submissions from Stroz

9    where based on access that you have since the start of these

10   proceedings to Launch you've been able to detect what I appear

11   to characterize as exfoliation or wiping and so on.  And so

12   the question arises:  If they are intentionally frustrating

13   your access to information, why are they letting you get at

14   some of the information that will allow you to discover

15   wiping?

16               MR. NELKIN:  One of the things that we were

17   interested in investigating and getting access to Launch,

18   which we have not had during the course of the proceedings, we

19   only had access for a very short period of time, like an hour

20   or two.

21               THE COURT:  Right.  Why would you get that hour or

22   two, you get damming evidence?

23               MR. NELKIN:  Well, one of our theories was is that

24   we wanted to go on the site and compare it against things that

25   we might have observed before the case was filed on the Launch

1   system to see if there had been wiping.

2          But we simply have not had access to the Launch

3   system for months, and we don't have any ability right now to

4   tell you that it's the same data or that it hasn't been

5   adjusted, and Stroz doesn't have any ability to do it unless

6   they can get access to the underlying material.  And even then

7   I'm not sure if it's simply then something that has been

8   crafted and created and plugged into a new system.  Meaning if

9   they altered the data beforehand and then loaded it on to a

10  new server, then what --

11         THE COURT:  So in other words, in an effort to --

12  and I'm not assuming any of this is true, I'm trying to

13  articulate the theory I think you're identifying not

14  validating.

15         But in an effort to stay in compliance, they're

16  putting something up online and making it available but in a

17  way that does not successfully mask the prior spoliation.

18         Is that basically it?

19         MR. NELKIN:  Basically.

20         MS. NELKIN:  And, Your Honor, I don't mean to

21  interrupt -- and Jay can address this better than I can -- but

22  I believe that the historical evidence will show that these

23  computers -- for example, we had a hearing, and I don't

24  remember the exact date, July 5th or the 6th -- the computers

25  were accessed and they were not supposed to have been accessed

1       the day before a hearing before this Court.  That's happened I

2       believe more than once.  So our suspicious are not just, you

3       know, paranoia, they're based on --

4               THE COURT:  Look, I'm not suggesting you're

5       paranoid, I'm not suggesting you're right or wrong, I'm trying

6       to identify -- it's a complicated area, I'm trying to identify

7       the theories you're advancing and clearing up my own

8       confusion.  That's all.

9               MR. NELKIN:  But to respond.  What Stroz has been

10      following here was what they were able to accomplish simply

11      before they were cut off from the system that apparently is

12      not the same as the original system based on Mr. Schafhauser's

13      representation.

14              However, we have no confidence that the data had not

15      been manipulated or that it wasn't taken down for other

16      purposes and then being restored.

17              But I think it's also important to note that the way

18      that we've been denied access to it keeps changing.  We

19      first -- Stroz and us were first denied access -- the way that

20      you have to get in is you have to go through a remote login,

21      and then you have to -- then once you're there, go into the

22      login for the Launch system.

23              Initially we were given passwords, I think there's a

24      submission, Your Honor, neither Stroz nor I could get on; they

25      tried all different things.  We took that up with the

1    defendants.  After some period of time they changed some

2    password setting.  We were able to get through to the VPN.  We

3    were able to get on Launch, but it crashed when you went to

4    data.

5            We took that up with them.  Again they told us there

6    was a problem on their side, something to do with some sort of

7    antivirus software that they had was the claim.

8            THE COURT:  All of this that you're telling me, this

9    is after the fee issue was resolved, yes?

10           MR. NELKIN:  This is while we've been in court.

11           THE COURT:  Okay.

12           MR. NELKIN:  The second time.

13           THE COURT:  Okay.

14           MR. NELKIN:  They told us --

15           THE COURT:  I want -- sorry, this has got me with so

16   many questions.

17           The antivirus, I remember hearing about that

18   yesterday, and apparently that's not what the problem is.

19           Who first said anything about the problem being

20   antivirus software?

21           MR. NELKIN:  Akiva Goldfarb told me that.

22           THE COURT:  That's Mr. Nussbaum's lawyer.

23           MR. NELKIN:  Mr. Nussbaum's lawyer.

24           The history was when we had trouble getting on the

25   first time with the passwords, we sat here for half an hour,

1  Mr. Nussbaum tried to get access on his end, kept being

2  delayed and kept having delayed conference calls and,

3  ultimately, they would get on until the system crashed when we

4  got on.

5          Then we came back, told him about that.  They told

6  us that it was antivirus and it would take a day or two to

7  resolve.  We do that.  We get on for maybe an hour or so

8  through the VPN.  We come to the Court and we tell the Court

9  that we have found evidence that we'd like to take a recess

10  for.

11         We go home.  I was able to log on the system for

12  maybe five minutes, and then I got kicked off.  And when I

13  tried to go back on, I no longer had access through the

14  password or the VPN.

15         Stroz had the exact same thing.  They were on, they

16  were looking at stuff, it kicked them off, and then when they

17  tried to log back in, the VPN wouldn't let them in at all.

18         So it sounds to Stroz and to us as if someone had

19  gone in and intentionally kicked you off and then blocked the

20  password.

21         THE COURT:  Right, and the inference most readily

22  drawn is the attempts to log in provides an alert to someone

23  or something monitoring it, and the response is that --

24         MR. NELKIN:  Stroz has told us that whoever is doing

25  it, it's on their computer, they can see everything that we

1   do, they can see every record, and apparently there is an

2   ability to --

3            THE COURT:  Okay.

4            MR. NELKIN:  -- to alter data, if you were so

5   interested.

6            MS. NELKIN:  Or to see who's on and what they're

7   doing and if you're in the place where they don't want you to

8   be...

9            MR. NELKIN:  And there is one more aspect to the

10  system that you should be aware of is:  From the very earliest

11  days there has been an administrator password to the system

12  that's never been provided to us.  It appears to provide even

13  greater access than Sonia's password, which is the highest

14  level that we've ever been given.  Sonia's password gives you

15  more access than Mr. Schreiber.

16           What they've told us is if you log in as

17  Mr. Schreiber, you will only have restricted access; if you

18  log in as Sonia, you will have more.  But there appears to be

19  administrator, and administrator provides you with far broader

20  access than Sonia's.

21           MR. SCHAFHAUSER:  Your Honor, to the extent that

22  Mr. Nelkin and Ms. Nelkin are saying that they were prejudiced

23  last night, and I don't know whether that's the assertions

24  and, obviously, the Court will tell us how it wishes to

25  proceed.

1       But if the argument is that they were prejudiced, I

2  wanted to see the same information that I've heard about in

3  court.  I have -- and I told counsel before Your Honor came

4  out on the bench this morning, depending on what plaintiff

5  wishes to do, I have no issue with -- if they believe they

6  need more time to review the data that I hope is now fully

7  available, and that both versions are now fully available, and

8  that I expect and understand will be fully available, I have

9  no issues proceeding as the Court wishes.  That's number one.

10      Number two, with respect, very briefly, to what I

11  received, as the Court did a couple of hours ago, there's a

12  lot in here.  We will need to respond, and it's my expectation

13  that we will need to hear from Stroz, who has I think now has

14  submitted three reports, the Court hasn't heard from Stroz.

15  We will, very likely, have to submit the defendant's

16  testimony -- and I spoke with Mr. Finkel, whose client was

17  prominently mentioned in this document as well -- we will need

18  to submit testimonial evidence in response to these assertions

19  as well as potentially to conduct our own forensic analysis in

20  response to what's --

21      THE COURT:  What you want to do, some of it sounds

22  time consuming, and every moment that passes, things that

23  should have happened in December remain undone.  That's one of

24  my concerns.

25      I want to make sure there is appropriate process for

1   all of this, but I weigh that against the concern that from

2   what I've seen so far -- obviously, I haven't seen

3   everything -- there seems to be significant and continuing

4   noncompliance with Court orders.  And I'm troubled, and not

5   just about that appearance, but also about how best to

6   vindicate everybody's legitimate interests under these

7   circumstances.  So let's take it step by step.

8           Today, is there anybody who thinks that we all

9   benefit from continuing with the development of witness

10  testimony on the hearing which we have gathered.

11          My sense is that there are other things on each side

12  that you need to be doing and that what we've been doing here

13  has been, in some sense, overtaken by events.

14          So, again, I'm open to suggestions, but I want to

15  know if anybody thinks that anybody's purpose is best served

16  by continuing with developing testimony today?

17          MS. NELKIN:  Your Honor, our next witness that we

18  were going to call was Steven Schreiber.  He has a little bit

19  to add but nothing that I think comes close to the issues that

20  are being addressed now, and I think it would be

21  counterproductive.

22          I'm much more concerned about where are these

23  computers that have been identified and how to best preserve

24  those and to even know where they are.  Certainly a much more

25  serious issue than most of the testimony we've already heard,

1    Your Honor.

2              THE COURT:  Well, I've heard most of the plaintiff's

3    testimony, the defendant's in a moment.

4              But the other thing is, to the extent that there is

5    testimony that hasn't yet been presented, and Mr. Schafhauser

6    alluded to this a moment ago, it won't affect the testimony

7    I've already heard, it maybe that before I can resolve the

8    issues that are coming up, some witnesses are going to have to

9    come back on the stand.  So I think that any testimony you

10   would develop today, we have to revisit in any event after

11   you've done what you're going to do.

12             So my suggestion, and I want to hear from you as

13   well, from all of you, anybody think that we should be

14   continuing with the development of evidence today?

15             MR. SCHAFHAUSER:  Your Honor, I -- and I said this

16   to Ms. Nelkin before, I'm happy either way.  As truth be told,

17   I was prepared to examine Mr. Schreiber days ago.  But in the

18   light of what happened with respect to access to Launch, and

19   in light of what I understood and appreciated was an assertion

20   that there was a prejudice to the plaintiff in getting on last

21   night, I don't know oppose whatever applications she's making

22   for more time, and all I'm saying is that whenever we

23   reconvene, it would be my goal, after plaintiff rests, to

24   present evidence in response to what Your Honor has seen.

25             THE COURT:  Yes.  Okay.  There's that, and, again,

1    I'm looking at all the defendants, if you want to be the

2    spokesperson --

3              MR. SCHAFHAUSER:  I really shouldn't be the

4    spokesperson, I'll sit.

5              THE COURT:  No, no, anybody weigh in, but in

6    addition to, obviously, cross-examining Mr. Schreiber when he

7    testifies and putting on the evidence that you may want to

8    develop in response to this morning's submission, was anybody

9    planning to present evidence the remainder of this hearing

10   today, you know, affirmative evidence on defendant's side?

11             MR. SCHAFHAUSER:  What I -- yes, except what I

12   had -- Your Honor had asked me a few days ago who I was

13   intending to call.

14             THE COURT:  Yes.

15             MR. SCHAFHAUSER:  And I think I mentioned Mr. Papa,

16   Mr. Schreiber, and Mr. Koenig, who I believe I see in the back

17   of the courtroom.

18             We've heard from Mr. Papa.  I don't believe that

19   we're going to need to recall him.  Your Honor has heard

20   extensively from him.  Mr. Schreiber is being called by

21   plaintiff, whenever that occurs, and depending on what is

22   elicited through Mr. Schreiber's testimony, there may or may

23   not be a need to call Mr. Koenig.  You know, they're all

24   members of the same entity, so I don't need to ask the same

25   questions many times.

1           THE COURT:  To the extent you want to put on

2   affirmative evidence on your side, is it about the issue of

3   plaintiff's compliance with their obligations under the

4   preliminary injunction?

5           MR. SCHAFHAUSER:  Yes, I will also want to do that

6   as well, particularly in light of -- particularly in light of

7   these allegations that have been made through these

8   submissions, I will want to put in evidence as well about,

9   frankly, what I read this morning about some of these

10  computers and where they are and who they belong to and so on.

11          THE COURT:  Anyone else?

12          MR. SCHAFHAUSER:  And if they -- go ahead.

13  Mr. Finkel --

14          MR. FINKEL:  And even if Stroz is right, Stroz may

15  be wrong and these other phantom computers, if you will, may

16  not really exist.

17          And the testimony that you heard, for example, from

18  my client may well prove to be, and I think will prove to be,

19  truthful.  There were two computers, not more.  And that has

20  to be explained.

21          And so from my perspective, I think I would adopt

22  Your Honor's suggestion, I think proceeding with additional

23  testimony right now is not the core step we should take.

24          THE COURT:  The one caveat that I'm trying to clear

25  up, I call it the defense side:  Are there issues separate

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

1    from the computer issues, or broadly stated, access to Launch,

2    who had what computer; are there other issues on your side

3    which you're seeking relief that you were going to present

4    evidence?

5            MR. SCHAFHAUSER:  I was and, again, in part, I think

6    I've already done that.  The issues that we were going to

7    present, and Your Honor has heard about, was the information.

8    We take the position that under the operating agreement

9    Mr. Friedman is entitled to certain things.

10           THE COURT:  Yes.

11           MR. SCHAFHAUSER:  And I think Your Honor has heard

12   that, and to some degree -- and I said this before, to some

13   degree I'm prepared to address that in writing.  Your Honor,

14   can read the operating agreement and read the orders and make

15   your determination.

16           THE COURT:  Right.  That's fair.

17           I know that you've got some submissions on your

18   side, and I think they can be addressed without need for a

19   factual determination -- you have a factual resolution

20   disputed issue.

21           MR. SCHAFHAUSER:  I don't think there's many issues

22   in dispute.  The facts are certain pieces of paper were

23   presented and certain pieces of paper were not presented, I

24   don't think there's really much dispute about that.  Your

25   Honor has heard the testimony on those points.  And the same

1     with the payments.

2               THE COURT:  Anyone else on the defense side before I

3     come back to plaintiffs?

4               Okay, Ms. Nelkin.

5               MS. NELKIN:  Your Honor, I didn't know if

6     Mr. Schafhauser was going to go into his clients, because it's

7     our position that there's no motion.

8               THE COURT:  Well, I think there's a motion pending,

9     it may not be exactly congruent with the issues that he's

10    talking about, but there's no motion on defense side,

11    certainly.

12              MR. SCHAFHAUSER:  I'm sorry, the one other thing, as

13    they were talking, I -- the other issue, Your Honor, that has

14    been overlaid on this, is there has been a number of

15    discussions, I don't know whether this is part of the

16    motion -- I think there actually is a motion on the docket

17    that I filed, and I think there is another motion that

18    Mr. Nelkin and Ms. Nelkin filed that relates to the issue of

19    electronic discovery.  I don't know whether this is part of

20    the hearing, but I'm just raising it since we're, in essence,

21    talking about open issues; electronic discovery, and ESI

22    protocol, search terms, and exchange of documents during

23    discovery.  I don't know whether plaintiff's position is that

24    that's part of this motion or should be separately addressed.

25    But that has been out there, is out there, there are motions

1  pending, it's not clear to me whether they are technically

2  part of this evidentiary hearing.

3          THE COURT:  Well, I don't think so, only because

4  there's not facts in dispute, I think.

5          MR. SCHAFHAUSER:  What I'm suggesting to Your Honor

6  is that Judge Amon on May -- I'm sorry, March 9th entered an

7  order directing, among other things, that document production

8  proceed with between both sides and that Mr. Friedman should

9  sit for a deposition.

10          The document production, there's been disputes

11  between the parties about a number of things; one of which had

12  been a protective order.  Your Honor has entered a protective

13  order, and at least as to the images.

14          THE COURT:  Yes.

15          MR. SCHAFHAUSER:  That's the imaged computers.  So

16  the protective order remains an issue as well as ESI.

17          That issue, the resolution of those two issues will

18  allow both sides to exchange in document production, as Judge

19  Amon directed.

20          MR. BERGSON:  I just want to make sure that it's

21  clear that it's not been documents, it's internal devices.

22          THE COURT:  No, you've all been quite voluble in

23  making that point repeatedly.  No, it's not lost on me.  In

24  fact, I was going to get to it.

25          MS. NELKIN:  Judge Orenstein, in addition to what

1    Mr. Schafhauser just said, we count as part of our motion the

2    fact that we asked for certain documents in a subpoena dues

3    Tecum to Mr. Friedman's notice of deposition, which he did not

4    produce.  We think that the issue of the computers and what

5    we're dealing with in this hearing is a primary concern.

6    We've been prepared to turn over documents, and

7    Mr. Schafhauser is correct, we've never been able to agree,

8    because every time we try and reconfirm, there's some other

9    issue that's brought up.

10            My position would be, yes, we need to address all of

11   those document productions, but I don't want these computers

12   to get weathered.

13            THE COURT:  Okay, look, we're going to talk about a

14   schedule for next time, but I want to talk about some

15   substantive things that I think we need to have an

16   understanding going forward.  This may be a little scattered,

17   so please forgive me.

18            But we need to develop the information about the

19   computers, we need to continue to work on restoring full

20   access to every version of Launch, and making sure that the

21   data is there, and that's the priority.  And we'll talk about

22   the schedule for the next steps, you know, what next step

23   happens when.

24            But there's some other things that I think as a

25   result of this hearing have become clear, issues that need to

1    be resolved.

2         One is -- and a lot of this actually became apparent

3    in Mr. Papa's testimony.  There was questions about documents

4    that were sent to Mr. Papa but counsel hadn't seen or vice

5    versa.  And, look, it's a fraught situation where the partners

6    are locked in a dispute and they have a business that needs to

7    continuing running and Mr. Papa is responsible for making sure

8    that happens.

9         I think it would make sense, please tell me if

10   anybody disagrees, that direct communications between any of

11   the principals in terms of just providing documents, I'm not

12   purporting to say there shouldn't be any direct communications

13   in terms of phone calls, you know, for day-to-day matters.

14   But in terms of documents that Mr. Papa needs, I think they

15   should be coming from counsel rather than from one of the

16   defendants directly to Mr. Papa so that we don't have any

17   disconnect between what Mr. Papa understands he has and what

18   counsel is getting.

19        Anybody disagree with that?

20        MR. SCHAFHAUSER:  No disagreement, Your Honor.

21        MS. NELKIN:  No, Your Honor.

22        THE COURT:  All right, so please going forward let's

23   do it that way.

24        The other is -- and this may be more controversial,

25   but actually this gets at two related areas:  The issue of

1    counsel for Two Rivers, and Mr. Papa's ability to do

2    transactions and take certain actions on behalf of the company

3    as a person that everybody agrees to one person for the

4    company.

5           The operating agreement unambiguously gives certain

6    rights to the partners, including the right to consent to

7    certain actions.  The preliminary injunction entered later, in

8    consent of all the parties, prohibits any defendants from

9    interfering with the operations of Two Rivers.  And I think

10   those two provisions can be intentioned in certain respects.

11          With respect to counsel, Mr. Papa made it quite

12   clear in a couple of different ways in his testimony that the

13   company needs to have counsel.  It's a necessity not a luxury.

14   I think actually one of the defendant's counsel elicited that.

15          So as I understand the preliminary injunction, as

16   far as what he needs to do to run it, and the defendants can't

17   impede that.  That said, the operating agreement requires

18   consent.

19          So I think the way I've written that is if Mr. Papa

20   wants to retain counsel on behalf of the company going

21   forward, not just for purposes of his testimony today, he

22   solicits consent.  If the consent is withheld and he comes to

23   me and says the lack of consent is impeding the company, it's

24   a violation of the preliminary injunction, and I or Judge Amon

25   will hear from counsel on that issue.  But it's hard for me to

1    see how withholding consent for Two Rivers to have counsel is

2    impeding the operations.

3            The flip side of that, Two Rivers is doing other

4    transactions, we heard about those two machines for 400,

5    $500,000 each, a couple other things that came up, that appear

6    to, under the operating agreement, be a source of things for

7    which Mr. Friedman's consent be required, Mr. Papa wasn't

8    seeking it.  And, again, this is of part why the company needs

9    counsel, because he was making some assumptions of how the

10   preliminary injunction works and not seeking that consent.

11           I don't see anything under the preliminary

12   injunction that frees Mr. Papa, acting on behalf of the

13   company, from letting Mr. Friedman know, giving him a chance

14   to be heard, and I understood his testimony to be that

15   Mr. Friedman wasn't interested in weighing in on some of these

16   things, I'm not going to resolve that issue.

17           But it does seem to me that the safest course of

18   conduct going forward for things that Mr. Papa thinks need to

19   be done on behalf of the company, that under the operating

20   agreement would require the consent of the partners is to

21   solicit consent and it's denied, come back to court and say

22   they're impeding the operations.

23           Sort of two layered-issues I wanted to run by you.

24   Anybody have thoughts on that?

25           MS. NELKIN:  Your Honor, I think the framework in

Linda D. Danelczyk, RPR, CSR
Official Court Reporter

1  general that you're talking about is fine.  I think that there

2  are a couple of things that need to be said, and I'm not the

3  counsel for the company, Mr. Rosenblatt is here, but who's

4  substituting for Mr. Parness who is, I think, on a speaking

5  engagement in Europe, so I may be more familiar with the

6  situation.

7        It would be my opinion that the third amendment to

8  the operating agreement only requires consent of all the

9  parties for very specific enumerated things, and I think what

10  you're talking about is perfectly reasonable, that there's no

11  reason why Mr. Friedman's consent can't be solicited on those

12  things.

13        I'm not certain -- it would be our position that the

14  hiring of counsel is not an enumerated thing in that paragraph

15  that requires unanimous consent.

16        THE COURT:  I'm not saying it is, I know that's an

17  issue in dispute.

18        MS. NELKIN:  Yes, I understand.  And I honestly, I

19  don't know if purchasing the machinery falls in that category

20  or not.  I think for those things that are enumerated there's

21  no problem with what you're suggesting.

22        There is the additional problem, however, that in

23  violation of the operating agreement, Mr. Friedman is running

24  a competing company, and Mr. Heller is frequently talking

25  about the proprietary interest of 26 Flavors and Office Coffee

1    Service.  Well, Two Rivers has those shows same proprietary

2    interests and Mr. Friedman, in violation of that operating

3    agreement, is, you know, he has a foot in both camps.  So

4    communicating with him on major decisions is somewhat of a

5    problem that is caused by Mr. Friedman's action.

6            So depending on what it is, I mean Two Rivers can't

7    really give a competitor the authority to block them, for

8    example, from purchasing machinery that Mr. Papa says is a

9    necessity.

10           THE COURT:  No, I get that and so here's what I have

11   in mind that I think would -- just let me finish this thought,

12   sorry, that I'm struggling with it -- that I think would help

13   resolve the tension.

14           If it's something that the company needs to do,

15   generally, tell Mr. Friedman if he withholds consent or says

16   that he has to apply consent and he's withholding it from the

17   company, the company comes to Court and says he violated the

18   preliminary injunction, we resolve that.

19           If there's a reason that even giving him notice of

20   the intended action would put Two Rivers at a competitive

21   risk, you can always ask for leave to make -- the company ask

22   for leave to make an ex parte application, and we take it from

23   there.

24           MR. NELKIN:  Your Honor.

25           THE COURT:  I'm sorry, just one last thing.

1      I'm not sure, for example, buying machines would

2  fall into that.  If Mr. Friedman said, no, you have a good

3  argument to say, you know, he doesn't get to say, no, or say,

4  no, he violated the PI, but I don't understand you to be

5  saying that soliciting the consent would be problematic; are

6  you?

7           MR. NELKIN:  My client --

8           MS. NELKIN:  It depends.

9           MR. NELKIN:  -- is actually on certain matters, but

10  I just want to draw your attention to Section 6.12 it's on

11  page 10 of the third operating addiction --

12           THE COURT:  Give me a moment, please.  I have it,

13  let me get to it.  I was looking at the preliminary

14  injunction, I'm sorry.  It's Defendant's?

15           MR. NELKIN:  Exhibit 6.

16           (Continued on next page.)

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1    THE COURT:  Okay.

2    MR. NELKIN:   And there is a 6.12, and there's a

3    second one that I'm looking for, if you'd give me a second

4    while you all are reading that one that I think is also

5    relevant.

6    THE COURT:  6.12 is majority of members can

7    authorize day-to-day management and operations.

8    MR. NELKIN:   Yes, correct.

9    THE COURT:  Neither of which describes retaining

10   counsel or buying major machinery.

11   MR. NELKIN:   There's a separate one for the

12   retaining of counsel.  I'm just looking for it right here.  It

13   says that they are allowed to contract -- it's the one that

14   they cite that they tried to get us disqualified for.  As long

15   as you're not a relative.

16   I'm looking for it.  It has to do with hiring

17   outside contractors.  It's cited in our -- I'm just trying to

18   find it now.

19   MR. SCHAFHAUSER:   If it will help you, it is on

20   page 4 of the third amendment as I read it, section -- it's in

21   the middle of the third page, paragraph 8, which is an

22   amendment to Section 6.1.2.  It's Subsection B.

23   MR. NELKIN:   That's the problem.  I was on the

24   wrong amendment.

25   THE COURT:  It's amendment 3, page 4.

PROCEEDINGS

1      MR. SCHAFHAUSER:   Page 4, your Honor, and it's

2  Subsection B.

3      THE COURT:  Got it.  All decisions relating to

4  staffing, employment and independent contract work for the

5  company shall be made only upon the consent of the majority of

6  the members per capita except hiring of family members and any

7  member shall require the unanimous consent of the members.

8      MR. NELKIN:   Judge McCormick in Middlesex actually

9  said that that authorized the other members to hire counsel

10  without Mr. Friedman.

11      THE COURT:  Yeah.

12      MR. SCHAFHAUSER:   Your Honor, that is an issue that

13  has been in dispute, but you heard what I was asking Mr. Papa

14  as well.  Frankly, we're being asked, on the one hand, to

15  consent on an issue in dispute in which my client takes the

16  position is an arbitrable issue.

17      But number two, on the other hand, Mr. Papa, I

18  gather, has -- not Mr. Papa, Two Rivers has retained counsel

19  for other matters without consent not only by Mr. Friedman,

20  but without consent by plaintiff.  So under this provision

21  that counsel just pointed to, even under the per capita, it's

22  two out of four members, it wouldn't even apply what your

23  Honor has just been saying.

24      THE COURT:  Look, if you want to take action against

25  Mr. Papa, the person you've entrusted to run this company,

PROCEEDINGS

1    you're going to do it.  I'm not saying you can or can't.

2         What I'm saying is, going forward, the company needs

3    counsel.  And to the extent that Mr. Friedman thinks that he

4    can block that from happening by withholding consent

5    consistent with this agreement for the moment, I'm not

6    interpreting the agreement to resolve that issue.  I do

7    question whether withholding consent would violate the

8    preliminary injunction.

9         MR. SCHAFHAUSER:   I understand.  And I've

10   heard -- and I understand it.

11        THE COURT:  And so I think going forward -- you

12   know, look, my -- one of my goals generally is to avoid

13   prematurely deciding an issue without -- and the issue of

14   whether the company needs counsel or can't have counsel may

15   not be premature at this point, but it seems to me that

16   there's no doubt anymore that it's a necessity.  To the extent

17   that he's got rights to withhold consent, that implicates

18   paragraph 4 of the preliminary injunction.

19        So I'm asking all of you going forward, consult on

20   these major matters to see if there's a dispute.  Now, if

21   there's a reason for competitive reasons -- and I get it,

22   right.  Two Rivers is in business.  It's competing with

23   another company that Mr. Friedman has an interest in.

24        MR. HELLER:   Your Honor, can I just address --

25        THE COURT:  You may not interrupt me.

PROCEEDINGS

1       MR. HELLER:   I'm sorry.

2       THE COURT:   To the extent that Two Rivers needs to

3  take action in its competitive interest that would be

4  prejudiced by disclosing it to somebody who has an interest in

5  a competitor, I think the solution is to come to court for

6  permission to act ex parte consistent with the preliminarily

7  injunction.  But absent the need to do so ex parte to avoid

8  prejudice, I think it should be on notice and if consent is

9  withheld, we litigate that here.

10      MS. NELKIN:   Judge Orenstein, the only thing that I

11 have some concern about with what you're suggesting -- and

12 maybe to Two Rivers it won't be this way, but to me it's

13 rather vague in my mind as to what matters fall under this

14 framework that you're talking about.  This is a large company

15 that is selling a lot of coffee to grocers and whatever --

16      THE COURT:  All the more reason.  Sorry to

17 interrupt.  I'm not going to resolve that now.  I can't.

18      MS. NELKIN:   I'm sorry.

19      THE COURT:  Wait.  All the more reason for counsel

20 acting on behalf of Two Rivers to say to both sides here,

21 here's what we need to do without having to go through a fight

22 among the litigating parties, just to keep the doors open and

23 the business running.  If anybody thinks that that shouldn't

24 happen, come to court and we'll resolve it.

25      MS. NELKIN:   The thing that I'm concerned about

PROCEEDINGS

1   from Two Rivers' standpoint is, you know, they are not going

2   to want to be bothering you every minute and they are not

3   going to want to be for every decision that they make having

4   to wonder if it's one that they have to deal with this way.

5          THE COURT:  Right.  That's why I'm saying counsel

6   for Two Rivers -- you're speaking on behalf of somebody you

7   don't represent.

8          MS. NELKIN:   That's true.

9          THE COURT:  Counsel for Two Rivers should

10  be -- look, I think most of this is covered by the operating

11  agreement anyway.  The day-to-day operations just don't need

12  to have this kind of consent.  To the extent that there are

13  things that don't happen every day and there's a gray area

14  between day-to-day operations and major decisions, which is

15  also spelled out in the operating agreement, I think in the

16  first instance counsel for Two Rivers should try and sketch

17  out, you know, what kinds of things those are and get some

18  clarity in the preliminary injunction, if not an agreement

19  between counsel as to what kind of input and/or consent is

20  necessary.

21         MR. NELKIN:   Would it be helpful, perhaps, if we

22  could reach an agreement as to a dollar amount threshold or

23  something?

24         THE COURT:  It might.  But look, once again,

25  Mr. Nelkin, neither you nor Ms. Nelkin, you don't represent

PROCEEDINGS

1 Two Rivers.

2         MR. NELKIN:   No, no, I was just speaking on behalf

3 of my client.

4         THE COURT:   Right.  We need to get Two Rivers to be

5 able to operate and that is the point, much of the point, of

6 the preliminary injunction, to maintain the viability of Two

7 Rivers which you all have an interest.  You need to keep it

8 running, keep it as a healthy company.  It needs to have

9 counsel to negotiate with all of you what does and doesn't

10 require consent from some or all of the partners or court

11 intervention.

12         MR. SCHAFHAUSER:   Your Honor, at an appropriate

13 interval, could we take a five-minute break?

14         THE COURT:  Let's do that now.

15         MR. SCHAFHAUSER:   Thank you.

16         (Recess taken at 10:45a.m.)

17         MR. SCHAFHAUSER:  Your Honor --

18         MR. ROSENBLATT:   On behalf of Two Rivers, if I may,

19 your Honor, I appreciate the recognition that the company does

20 in fact need counsel.  The concern is that -- and just I come

21 to this case as new as anybody.

22         THE COURT:  Yes.

23         MR. ROSENBLATT:  But it's already very clear that

24 any major decision will be contentious and will result in

25 being hailed into court.

PROCEEDINGS

1        The concern is that Two Rivers is going to be hailed

2    into court all the time, and it needs to make important

3    decisions and that's going to impede their business.  We will

4    endeavor to identify those type of things by speaking to

5    Mr. Papa and the members of the LLC about the types of things

6    that the company does, and we will try to anticipate what

7    needs to be done and what decisions may need consent.  We'll

8    try to work it out with counsel.

9        I wanted to make your Honor aware of that, but that

10   is a concern.

11       THE COURT:  Of course it's a concern but, look, I

12   think if you sit down around the table, you know, counsel for

13   the plaintiff, counsel for Mr. Friedman, and you or

14   Mr. Parness, there are some things that are quite clearly

15   day-to-day operations and under the operating agreement nobody

16   can really say that the partners have to -- the members have

17   to weigh in, some things that are clearly, you know,

18   dissolving the business, clearly major decisions, explicitly

19   so under the agreement yet -- that are gray area.  And

20   Mr. Papa in particular seems to have, you know, the experience

21   of at least the last, you know, eight months or so, if not

22   longer, to -- and you guys have the experience of, you know,

23   testimony and the experience of your clients in the business,

24   to put on the table things that you think fall into the gray

25   area.  If you can agree on what does and doesn't require

PROCEEDINGS

1  consent, great.  If there's, for instance, specific types of

2  things that in a planning meeting you identify as being in

3  dispute, you can come back for some clarification, right.

4          So hopefully we can get past a lot of the potential

5  disputes early on.

6          MR. ROSENBLATT:  And we will endeavor to do that.  I

7  just want to make it clear.

8          THE COURT:  I think far better for all concerned,

9  particularly the company, if such areas that are in dispute

10  are addressed in advance rather than post hoc.

11          MR. ROSENBLATT:  Understood.  Thank you.

12          MR. SCHAFHAUSER:   Your Honor, if I may?

13          THE COURT:  Yes.

14          MR. SCHAFHAUSER:   During the recess I consulted,

15  and my client -- I'm speaking carefully because I need to

16  assert a position clearly and carefully.

17          THE COURT:  Yes.

18          MR. SCHAFHAUSER:   My client does not object to the

19  appointment of counsel for Two Rivers for the litigation with

20  two qualifiers and caveats.

21          The first is that -- and it's the same caveat that I

22  put on the record the other day -- he has a position under the

23  operating agreement.  He has a position with respect to the

24  pending motion for Judge Amon.  My client would be agreeing

25  without waiver of any rights, without prejudice to his

PROCEEDINGS

1  positions of his rights under the operating agreement and

2  otherwise.  That would be the first --

3        THE COURT:  Can I respond to that?

4        MR. SCHAFHAUSER:   Of course.

5        THE COURT:  It essentially has nothing to do with

6  this litigation and therefore doesn't even implicate waiver.

7  It's, as among the partners, it makes it clear that he's

8  providing consent for Two Rivers to have counsel.

9        MR. SCHAFHAUSER:   Okay.  The second -- well,

10  really, his position is that it would be not really a

11  settlement, but it would be a way of resolving an issue that

12  has caused friction in this case.  That's what -- he would be

13  consenting to the appointment of counsel essentially to

14  resolve an issue of dispute.  And that's why I make the

15  anti-waiver comment for whatever significance that has.

16        The second point is that your Honor had directed us

17  to -- when I say "us," me and counsel for the plaintiff, a

18  couple of months ago to meet and confer.  We did meet and

19  confer.  We exchanged lists of names.  I gave, I think, three

20  names.  Ms. Nelkin gave me three names.  We went back and

21  forth.  We didn't -- unfortunately, we didn't reach an

22  agreement.

23        Mr. Parness was on the list that plaintiff had

24  provided.  And actually I think both of these lists were

25  submitted to your Honor in the letters.  I think the parties,

PROCEEDINGS

1    most respectfully, are at an impasse as to who that

2    independent counsel should be.

3              THE COURT:   I'm going to defer to Mr. Papa on that.

4              MR. SCHAFHAUSER:   I would respectfully submit that

5    your Honor can appoint counsel that the Court sees fit to

6    represent -- defend the interests of Two Rivers.

7              THE COURT:   Look, you know, I think there are a lot

8    of people in this room.  I think I'm the least qualified to

9    tell Two Rivers how to run its business and who it should hire

10   and that sort of thing.  If Mr. Papa is the point person that

11   you've all agreed should be running this business while you

12   try and resolve your disputes, if he's comfortable with

13   Mr. Parness and Mr. Greenblatt, it's fine with me.  I don't

14   have an objection.  I'm not going to try and override it.

15             If he wants to find somebody else, I'm not going to

16   challenge that.  It's ultimately the company's decision and I

17   think since Mr. Papa is essentially handling the day-to-day

18   operations, he's the one who needs to figure out who best to

19   represent the company.

20             MR. SCHAFHAUSER:   Except under the operating

21   agreement, your Honor, it's not Mr. Papa's right to appoint

22   counsel; it's the members' right to appoint counsel, as we

23   just looked through the agreement.  And in the absence of an

24   agreement, there needs to be a way to resolve an impasse.

25             THE COURT:   I'm proposing one.  You said you want to

PROCEEDINGS

1    defer to me.  Here's what I would do.  I would say rather than

2    me pick out a lawyer that I don't know or choose between

3    somebody proposed by either litigant, I would trust Mr. Papa

4    whose testimony was refreshingly in this hearing in my mind

5    candid and straight forward.  He seems to know what he's doing

6    and be acting in the interest of the company as an entity.

7    He's given me no reason to question his competence or his good

8    faith in this area.

9              So if you're deferring to me, I'm deferring to him.

10             MR. SCHAFHAUSER:   Well, actually, the request was

11   that the Court independently appoint someone.

12             And the other issue --

13             THE COURT:  I'm doing that, I'm doing that, but I'm

14   telling you my methodology.

15             MR. SCHAFHAUSER:   The other issue is that Mr. -- I

16   think I raised this when Mr. Parness was actually hear back in

17   early July.  It's my understanding that Mr. Parness

18   represented either the company --

19             (Brief pause.)

20             MR. SCHAFHAUSER:   He represented Two Rivers before

21   he dealt with Mr. Friedman, among others.

22             THE COURT:  If he's represented the company before,

23   all the more reason to think that he's got a duty of loyalty

24   to the company as an entity, not to anyone who is a litigant

25   in this case.

PROCEEDINGS

1          MR. SCHAFHAUSER:   Well, he, I believe, may have

2     obtained information and have had communications with a

3     litigant in this case who happens to be a 60 percent majority

4     member of the company but now seems to be in an potentially

5     adverse position.

6          THE COURT:   But he didn't represent Mr. Friedman

7     personally.

8          Look, to the extent he's had communications with

9     Mr. Friedman as counsel for the company, he would have

10    obtained information that is privileged under a privilege held

11    by the company.

12         MR. SCHAFHAUSER:   It's not my understanding that he

13    represented Mr. Friedman personally.   I'm not so asserting.

14    What I'm asserting -- and you see I'm whispering to my client,

15    I'm trying to get the facts, but what I understand is that in

16    the course of representing the company, there were certain

17    matters that were disclosed to Mr. Parness.

18         The bottom line is we don't believe that

19    Mr. Parness -- and this is not a commentary on his ability or

20    his integrity, it's only a commentary on the unfortunate

21    impasse that we find ourselves -- we don't believe that he is

22    the appropriate person to represent --

23         THE COURT:   Okay.   The fact that he's had

24    communications with Mr. Friedman or, as I assume -- I'm happy

25    to hear or not, you know, further on this -- I assume he's had

Lisa S. Schwam, CRR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1    communications similarly with each of the members.  And it

2    might be an issue if Two Rivers becomes a party to the

3    litigation adverse to Mr. Friedman or Mr. Schreiber or anyone

4    else.  I'm talking about to the extent that Two Rivers has to

5    take actions vis-a-vis the rest of the world so that it can

6    operate its business and it needs counsel to be able to

7    undertake that mission, I don't see any reason why Mr. Papa

8    can't have Mr. Parness do that.

9              MR. SCHAFHAUSER:   Again, the request that I was

10   asked to make was that your Honor appoint someone

11   independently.  That was a request.

12             THE COURT:  Okay.

13             MR. SCHAFHAUSER:   You're declining that request.

14             THE COURT:  I'm declining to do so, that's correct.

15             MR. SCHAFHAUSER:   The other item I wish to

16   address -- actually a couple items.  The first is the

17   interplay between the operating agreement and the preliminary

18   injunction.  And I understand and appreciate that your Honor

19   has said you're not making a determination today as to certain

20   issues.

21             THE COURT:  I can't --

22             MR. SCHAFHAUSER:   Those are being held in abeyance.

23   I just need to put on the record that the operating agreement,

24   as your Honor has pointed out, provides certain rights.  The

25   preliminary injunction, we've all read it, I multiple times,

PROCEEDINGS

1  and it says certain things.  If there is a dispute as to an

2  issue as to consent, what we would propose to do is if that

3  cannot be agreed upon, to bring it to your Honor's attention.

4          THE COURT:  That's fine.

5          MR. SCHAFHAUSER:  Because I certainly don't want to

6  be -- I didn't mean to interrupt.

7          THE COURT:  I interrupted you.  Go ahead.

8          MR. SCHAFHAUSER:  I'm sorry.

9          I certainly don't want to be in a position, nor do I

10 want my client to be in a position, where -- and this is a

11 purely hypothetical, that someone says let's buy the Taj

12 Mahal, we think it's necessary.  And he says, Mr. Friedman

13 says, no, it's not necessary.  And if he says no, then he's in

14 violation of a preliminary injunction.  What I would propose

15 to do in that instance is to immediately present the issue or

16 Two Rivers present the issue to your Honor.

17         THE COURT:  If that wasn't clear in what I was

18 saying, I meant it to be.

19         MR. SCHAFHAUSER:  Thank you.

20         THE COURT:  Yes.  But with one, I think, very

21 important caveat.

22         You know, in my position as a magistrate judge, I

23 can decide non-dispositive pretrial matters, but I can't order

24 injunctive relief.  So to the extent that any dispute that

25 arises on the preliminary injunction could be resolved only by

PROCEEDINGS

1    the Court clarifying or entering some new provision into the

2    injunction, it would have to come from Judge Amon.  I am more

3    than happy to have all of you come to me in the first instance

4    if you think that's efficient so that I can either recommend a

5    result that you can then take up to Judge Amon or agree that

6    that's enough of a resolution, you know, for purposes of going

7    forward.  As long as we're all clear that anything that

8    changes the injunction can only be recommended by me, can't be

9    decided.

10          MR. SCHAFHAUSER:   Understood.  I appreciate that.

11          Your Honor, so I just need -- and I appreciate that.

12   The next item that I wanted to address very briefly is your

13   Honor's comments about information.  The information -- if the

14   members are getting information, I believe Mr. Friedman should

15   be getting that same information under the operating

16   agreement.

17          And very briefly, the comment was made that

18   Mr. Friedman owns an interest in another company.  Your

19   Honor's heard the testimony; he owns interest in a number of

20   entities.  But I think we're talking here in this instance

21   about 26 Flavors that counsel mentioned.

22          Well, 26 Flavors, again, as I think Mr. Heller was

23   about to jump up and contest whether or not it's a truly

24   competing business, and we need not address that; your Honor

25   has enough on the Court's plate to address whether it's a

PROCEEDINGS

1  competing business or not.  I'm just making the point that

2  whether or not it's a competing business, the plaintiff sought

3  and obtained information through these images, for instance,

4  without -- when the issue was raised as to whether any other

5  parties had proprietary interest -- and it was Mr. Heller who

6  was pushing this point -- plaintiff took the position that no

7  segregation was needed for proprietary information so it's

8  surprising to hear that all of a sudden proprietary

9  information becomes necessary.

10          THE COURT:  I'm truly surprised that you're going to

11  make that argument and invite the very obvious response, but

12  if that's what you want to go to bat on, by all means.

13          MR. SCHAFHAUSER:   I'm not going to bat.

14          THE COURT:  Because, look --

15          MR. SCHAFHAUSER:   It was a prelude to a different

16  point.

17          THE COURT:  I'm going to deem that withdrawn unless

18  you really want a full response.

19          MR. SCHAFHAUSER:   I anticipate that Mr. Heller is

20  going to make his own application on that point.  But the

21  prelude was really to this point:  To the extent that before

22  the TRO was entered whatever information was made available to

23  Mr. Friedman then under the operating agreement, whether it

24  was involving 26 flavors or whatever it was, it was good

25  enough for years before the TRO was entered.  And most

PROCEEDINGS

1    respectfully, I don't believe that TRO vitiated my client's

2    right to information and to the payments set forth in the

3    operating agreement.

4              THE COURT:  It doesn't change the operating

5    agreement, but it does change the status quo.  It was entered

6    into on consent, but these seven days of testimony have made

7    it quite clear to me that there is a need to restrain

8    Mr. Friedman from interfering with the operations of Two

9    Rivers.

10             So to the extent that there is information about the

11   operation of Two Rivers on the going-forward basis that if

12   shared with Mr. Friedman could lead to action that's would

13   prejudice Two Rivers, I don't see any reason why the Court

14   can't exercise its injunctive powers to prevent it,

15   notwithstanding the operating agreement.

16             And so I can't and wouldn't try to prejudge any such

17   issue as it arises.  What I'm saying is there needs to be a

18   way going forward for the business to operate with as little

19   prejudice to Mr. Friedman's right to information as possible.

20   That doesn't preclude their right to come to the Court and say

21   for this reason this information should not be shared, even

22   though the operating agreement would normally make it

23   available.

24             MR. SCHAFHAUSER:  Your Honor, I don't disagree.

25   All I was suggesting was that before your Honor has an

PROCEEDINGS

1    application before your Honor on a specific issue, the

2    presumption should be that Mr. Friedman is entitled to the

3    same information that the other members receive unless a

4    showing is made to your Honor as to why a particular item of

5    information should be -- I think your Honor said the word "in

6    camera" or "ex parte," whatever the phrase was -- unless there

7    is a showing that's made.

8              I think what your Honor just articulated is what I

9    was trying to say in my own inarticulate way, which is that

10   Mr. Friedman should be given the information to which he is

11   presumptively entitled as a member under the operating

12   agreement unless a showing is made to your Honor otherwise.

13   That's what I respectfully submit.

14             THE COURT:  I don't think we're saying different

15   things.

16             Mr. Rosenblatt.

17             MR. ROSENBLATT:  Your Honor, just I think a couple

18   things.  I mean, the first is with regard to the counsel

19   issue, I don't know if you even want to hear me on that.

20             THE COURT:  Look, what I've said is I'm deferring to

21   Mr. Papa.  There is an agreement, as I understand it, that the

22   company can retain counsel.  To the extent that anybody was

23   saying I should decide, I am making no decision other than the

24   company can hire counsel.

25             MR. ROSENBLATT:  Thank you.  I just find it ironic

PROCEEDINGS

1    that they asked your Honor to make a decision.  Your Honor

2    made a decision and then --

3              THE COURT:   Okay.  Look, we're past that issue.

4              MR. ROSENBLATT:  But as to the information issue, I

5    mean, as your Honor recognized, clearly Mr. Friedman has

6    significantly competing interests here.  We've heard

7    testimony, at least I've heard, just from this week alone that

8    gives rise to significant questions about information about

9    Two Rivers' operations that Mr. Friedman should have access to

10   considering he's working for a competitor.  So obviously we

11   would object to disclosure of information.

12             THE COURT:   Well, look, I think this should be part

13   of your conversations with the parties' counsels about, you

14   know, same way as trying to map out going forward what

15   requires consent and what doesn't.  You know, there are going

16   to be some areas of dispute.  I think there can be -- it's not

17   that difficult to map out types of information that can and

18   should properly be shared and types of information about which

19   you have a concern.

20             And, yes, if there is a dispute, come to court and

21   it gets resolved.

22             MR. ROSENBLATT:  We'll work on it, Judge.

23             THE COURT:   Okay.  But I don't think we can

24   speculate about where the disputes are going to be.  It's much

25   better to put some flesh on the bone and have specific

PROCEEDINGS

1   disputes to resolve.

2            MR. ROSENBLATT:  Thank you.

3            THE COURT:  Mr. Heller.

4            MR. HELLER:  Your Honor, a little context needs to

5   be put in order.  The only reason why Two Rivers is a

6   competitor of 26 Flavors is because Two Rivers is acting in

7   flagrant violation of a noncompete agreement that it had with

8   26 Flavors going back to 2012.  These companies were not

9   supposed to be in competition.  My clients, 26 Flavors and

10  Office Coffee Services, were distributors of these K-Cups or

11  whatever they resemble.  Two Rivers was supposed to be a

12  manufacturer.  Two Rivers began to compete against my client.

13           So that's some of the context that you need to

14  understand.  And that's part of the reason why we're here is

15  because 26 Flavors took action against Two Rivers by bringing

16  them to arbitration and also attempting to get a preliminary

17  injunction in New Jersey which was denied but that

18  arbitration, the only reason why it's not proceeding at this

19  point is, A, because of this litigation and, B, because Two

20  Rivers showed up and claimed it didn't have counsel and

21  couldn't proceed.

22           Those things are subject to judicial --

23           THE COURT:  That was the New Jersey proceeding where

24  Mr. Friedman wouldn't consent to have them have counsel,

25  correct?

PROCEEDINGS

1      MR. HELLER:  That's part of the issue.

2      THE COURT:  Yes, okay.  I got it.

3      MR. HELLER:  That's something that's outside of my

4  control unfortunately.

5      THE COURT:  Well, your control, meaning your

6  client.

7      MR. HELLER:  My client.

8      THE COURT:  In which Mr. Friedman is a member?

9      MR. HELLER:  Mr. Friedman is a minority member in 26

10  Flavors.

11      THE COURT:  Right.  Okay.  Got it.

12      MR. HELLER:  Okay.  That's the context of this

13  competition issue.  Now, right now --

14      THE COURT:  Do you understand how I'm having trouble

15  understanding how that isn't a problem essentially of the

16  making of 26 Flavors in conjunction with Mr. Friedman?  Do you

17  understand why that would be difficult for me to understand?

18      MR. HELLER:  Well, only because your Honor has a

19  particular opinion of Mr. Friedman which I can understand has

20  been generated throughout the last week, and I can understand

21  that.  So, you know, that's unfortunate.  But I gotta say that

22  the fact that these companies are in competition is not a

23  fault of my client.  And the fact that --

24      THE COURT:  I'm sorry.  It's not a matter of fault.

25  I'm nowhere near a point where I could assign fault for

PROCEEDINGS

1    something.  But I think it is a fact -- tell me if that's

2    wrong -- that they are competing.

3             MR. HELLER:  It is a fact.

4             THE COURT:  Yes.

5             MR. HELLER:  So that your Honor would understand,

6    they are not competing in every facet of the business.  They

7    are only competing on the distribution side of this business.

8             THE COURT:   Whatever they are competing on, you

9    guys knows this better.  But to the extent that Mr. Friedman

10   has an interest in two competing businesses and is saying to

11   one of them give me information about how you run your

12   business, there's the obvious potential for a conflict of

13   interest that would give the business competing with your

14   client a reason to want to withhold some information.  And all

15   I'm doing is saying if that's a concern, we're going to have a

16   process for resolving that.

17             Is there a problem with that?

18             MR. HELLER:  I don't have a problem with that

19   concept, your Honor.

20             THE COURT:  Okay.

21             MR. HELLER:  But I just wanted to put everything

22   into context.  Unfortunately, context has not been something

23   we've been able to do throughout this process.

24             THE COURT:  That's a matter of opinion.  I

25   appreciate you adding your context to the record.  Thank you.

PROCEEDINGS

1    MR. SCHAFHAUSER:   Just quickly on what I heard from

2  Mr. Rosenblatt.

3    THE COURT:  You both stood up at the same time.  I

4  assume you'll want to respond to both.

5    MS. NELKIN:   Yes.

6    MR. SCHAFHAUSER:   I apologize.

7    What I was proposing on my client's behalf was that

8  the Court appoint someone independent.  If the Court is not

9  prepared to appoint someone independent, my client doesn't

10  wish to proceed with that proposal.

11    THE COURT:  That's something I think we need to tee

12  up quickly.  Because it's my view that withholding consent on

13  this record for Two Rivers to have counsel is in violation of

14  paragraph 4 of the preliminary injunction.

15    MR. SCHAFHAUSER:  Very well.

16    THE COURT:  To my mind, a willful violation.

17    So I'll be happy to write that up quickly as a

18  recommendation to Judge Amon that leaving all the other issues

19  unresolved, an appropriate sanction in addition to the remedy

20  of appointing counsel should be decided upon.

21    MR. SCHAFHAUSER:   Again, Mr. Friedman's not

22  withholding consent to a counsel.  It is the identity of the

23  counsel to which he respectfully objects, your Honor.  He

24  wishes the appointment of an independent counsel.

25    THE COURT:  The Court is not appointing counsel.

PROCEEDINGS

1   Two Rivers is hiring counsel.  He can consent to that or he

2   can object to it.

3            MR. SCHAFHAUSER:   Thank you, your Honor.

4            THE COURT:  Which is it?

5            MR. SCHAFHAUSER:   I will need to confer with him

6   the point your Honor has articulated.  I appreciate your

7   Honor's comments.

8            THE COURT:  Yes.

9            MS. NELKIN:   Your Honor, I think you have some

10  understanding just by the attempt to reach a conclusion on

11  this matter what my client has been dealing with.  I just want

12  to ask the Court to have some clarification as to what

13  Mr. Friedman's consent to having the attorney means when he

14  says I'm not waiving any of my rights.  Because the whole

15  problem that arose was that Mr. Friedman was arguing that the

16  individual plaintiffs -- I'm sorry, they were not plaintiffs,

17  they were actually defendants, that they should have to

18  independently pay the attorneys' fees for Two Rivers because,

19  as a partner, he was not willing to authorize counsel --

20           THE COURT:  Look, you guys are fighting over money,

21  I get that, among other things.  Two Rivers is running a

22  business, a business in which I assumed both of the individual

23  parties on opposite sides, Mr. Schreiber and Mr. Friedman,

24  have a shared interest in seeing it succeed.  That's not

25  happening if it doesn't have counsel.

PROCEEDINGS

1    When it hires counsel, as it does when it buys a

2    machine, when it pays a vendor bill, it spends money.  It

3    spends the money of Two Rivers.  At some point you guys are

4    going to be going through to the resolution of a fight over

5    who is entitled to that money or responsible for paying into

6    that budget.  But the money comes from Two Rivers, I would

7    assume, in the first instance, not from Mr. Friedman, not from

8    Mr. Schreiber.

9    MR. SCHAFHAUSER:   Agreed, your Honor.

10    THE COURT:  So Mr. Friedman is either going to

11    exercise what he believes to be his right to withhold consent

12    from Two Rivers hiring counsel.  If Two Rivers says, wait,

13    there's a gray area of whether we can hire counsel in the

14    absence of consent, you'll come to court.  If the Court

15    concludes that, yeah, under the operating agreement consent is

16    required and withholding that consent is in violation, then an

17    appropriate remedy will be fashioned.

18    MR. SCHAFHAUSER:   Yes, your Honor.

19    THE COURT:  All of this falls by the wayside if, as

20    I thought we had an agreement a few minutes ago, Two Rivers,

21    like virtually any other operating company, is in a position

22    to hire an attorney to represent it in settings where counsel

23    is needed.

24    An example of which would be you issued a subpoena,

25    Mr. Schafhauser, to Two Rivers -- to Mr. Papa, intending it to

PROCEEDINGS

1  be for Two Rivers because that's what the documents are for.

2  That's why I was clarifying earlier about Mr. Papa

3  individually. I didn't think it was directed to him despite

4  the way it was written, but I wanted to make sure that that

5  wasn't a problem.

6      Had Two Rivers failed to discharge its obligations,

7  maybe you think it did, it would have to face a show cause

8  hearing to show why it shouldn't be held in contempt. It

9  would be the lawyer to appear there. It couldn't appear at

10  that hearing without counsel. A company needs counsel.

11      So I would assume that members of a company want the

12  company to have counsel just like it wants the company to have

13  an accountant. If there's not consent for that and you think

14  consent is required, we will take that up.

15      MR. SCHAFHAUSER: Your Honor, I understand and I

16  appreciate it. My client's position -- I just want to say it

17  one more time because there's been back and forth on this. My

18  client's position is not that he's refusing consent to an

19  attorney. It's that, most respectfully, that that attorney

20  should be independent and not be someone who is participating

21  on, most respectfully, one side of the table in a proceeding

22  against him.

23      An example, a hand delivery is made of, among other

24  things, mails to Mr. Papa. Instead of opening the mails, I

25  thought I heard the testimony to be that the first priority

PROCEEDINGS

1  was to copy everything and disseminate it to others so that we

2  could have an exhibit in this case, rather than attend to what

3  was in the unopened mails.

4          THE COURT:  I heard the same testimony that you did,

5  and I think you're putting more of a gloss on it than it will

6  support.  He clearly, without the benefit of counsel, thought

7  he needed to give it to counsel to preserve it for use in the

8  litigation.  Whether to favor one side or not, I did not get

9  that in the slightest.

10         MR. SCHAFHAUSER:   Okay.  I don't mean to --

11         THE COURT:  I gotta tell you, everyone who sat in

12  that witness chair had a stake in this except Mr. Papa.  I've

13  gotta tell you, unlike every other witness, he was answering

14  your questions and their questions with the same demeanor, the

15  same level of cooperativeness.

16         One thing I'm without a doubt about is that Mr. Papa

17  is an honest broker trying to keep the company running while

18  you folks fight out who owns it.

19         MR. SCHAFHAUSER:   Very well.

20         THE COURT:  You've got a very uphill climb to

21  persuade me that he's taking actions, Mr. Papa, to favor one

22  side or another.  But even if you're right, that example of

23  him handling the mail that you delivered to him has nothing to

24  do with how Mr. Parness and Mr. Greenblatt is acting or about

25  their independence.

PROCEEDINGS

1          Look, Mr. Friedman is going to either consent to Two

2     Rivers hiring counsel or not.  I understand.  You're trying to

3     draw a distinction between Mr. Parness and Mr. Greenblatt, on

4     the one hand, and some other lawyer on the other.  I'm telling

5     you my view is that's Two Rivers' decision to make.  If you

6     want to challenge it and disqualify someone, go, make the

7     application.

8          MR. SCHAFHAUSER:   Thank you, your Honor.

9          THE COURT:  Please let me know if there's something

10    that I need to take up with Judge Amon in terms of making a

11    recommendation.

12         MR. SCHAFHAUSER:   And I will.  Needless to say, I

13    need to consult with my client.  I will.

14         THE COURT:  Okay.  You'll consult.  Let's try and

15    wrap up as much as we can here.

16         One last issue, and I trust this will be a lot less

17    contentious than the one we've been dealing with the last

18    several minutes, one of the just operational difficulties that

19    I was hearing from Mr. Papa's testimony and some of the others

20    arises from the fact that the corporate address and the

21    address to which a lot of mail was being sent is

22    Mr. Friedman's residence and yet the preliminary injunction

23    imposes some real restrictions on what he can do.  He can't

24    even go within a thousand feet of it certain any

25    circumstances.

PROCEEDINGS

1           Is there any reason why the mailing address and the

2    corporate address can't be switched officially to the Two

3    Rivers office?  Just so that Mr. Papa isn't waiting, you know,

4    for mail that's going to Mr. Friedman.

5           MR. SCHAFHAUSER:   The answer is we don't have an

6    objection.  I'm trying to understand what the facts are.

7           (Brief pause.)

8           MR. SCHAFHAUSER:   Again, I'm relaying information.

9           THE COURT:  Do you want to take a break?  That was

10   the last thing on my agenda.

11          MR. SCHAFHAUSER:   My understanding from what I've

12   just been told is that the mails have been switched.  But

13   insofar as they haven't and, listen, I delivered the mail

14   because I learned about mail, right.  Needless to say, when I

15   learned about it, I delivered it.  Insofar as those mailings,

16   which we did not open, by the way, for obvious reasons,

17   insofar as those mailings indicate that certain people still

18   have his home address, I don't believe -- we don't object.

19          THE COURT:  So again, that's something --

20          MR. SCHAFHAUSER:   We can cooperate on that.  We

21   have no need to receive mail at home.  It's only a complicated

22   factor for all of us.

23          THE COURT:   Right.  So there's the mail issue.  And

24   I guess one just came to mind, belated, is the New Jersey

25   Department of Labor has records being kept at Mr. Devine's

PROCEEDINGS

1    office, I think, which --

2              To the extent that the company is on record with New

3    Jersey as saying we're keeping our records with Mr. Devine and

4    that's not the case, I think that needs to be changed as well,

5    right?

6              MR. FELDMAN:  That's fine.  That was just a permit

7    allowing him.

8              THE COURT:   Right.  All I'm saying is to the extent

9    that one of the issues that's arising is people outside the

10   company thinking that the place to look for records or to send

11   things for the company is Mr. Devine or Mr. Friedman's

12   residence, that's guaranteed to cause problems down the road

13   so let's try and resolve those things.

14             MR. FELDMAN:  Agreed.

15             THE COURT:  Mr. Nelkin.

16             MR. NELKIN:   Yeah.  Your Honor, I believe, and

17   Mr. Schafhauser or Mr. Friedman can correct me if I'm wrong,

18   but I believe that there still is some bank accounts for

19   things like Signature Bank that may remain open.  And I

20   believe those account statements may still be going to

21   Mr. Friedman.  Not to his house but to some other address.

22             THE COURT:   Okay.  But make sure -- look, anything

23   that's a Two Rivers account, mailing address, anything, it

24   should be going to Two Rivers' office so that Mr. Papa can

25   deal with it rather than any of the litigants.

PROCEEDINGS

1      MR. NELKIN:   There's an official registration and
2   they need his consent to get that.
3      THE COURT:   Guys, we're not going to track down
4   every instance of this.  I'm trying to give you the general
5   principle and ask you to pay attention to it so you can avoid
6   problems in the future.
7      Last thing before we take a break so you can consult
8   with your client, Mr. Schafhauser, we just need to have some
9   next steps in mind for pursuing the issues regarding the
10  computers and access to Launch.
11     To some extent on the defense side you have a moving
12  target because it's an evolving set of facts coming from
13  Stroz.  So I'd like to have a schedule in which the first step
14  is the plaintiff presents whatever it's going to present from
15  Stroz, but to get to that, we need to just resolve access to
16  Launch.
17     MR. NELKIN:   And to the computers.
18     THE COURT:   Yes, yes.
19     I'm open to suggestions how we proceed from here.
20     MR. NELKIN:   I mean, your Honor, it's my
21  understanding that quite a bit depends on, one, access to
22  Launch, but it also depends on the place where Launch is being
23  accessed, meaning, if they are just accessing it through a
24  remote thing, that's not going to be able to determine
25  anything.

PROCEEDINGS

1          THE COURT:  You need the server.

2          MR. NELKIN:   We need the server.

3          The other thing is right now the way that it's set

4    up is not the way it used to be set up, meaning, the only way

5    for -- well, I think we covered this about to copy documents

6    or save a document.

7          THE COURT:  Yeah.  I don't know that there's going

8    to be a solution to that.  You know, part of I think what we

9    need to plan for is to try and resolve these issues quickly,

10   but also figure out a point at which we say it ain't getting

11   resolved.  And what we have to do is figure out the

12   implications of the fact that the parties are not going to be

13   able to reestablish in any meaningful way access to the Launch

14   system and the records kept as they were originally kept.

15          I don't know if we're going to get to that point,

16   but we need to recognize when we're there so we can take

17   whatever action is appropriate thereafter.  I don't think we

18   should just indefinitely pursue more and different ways of

19   trying to get access.

20          MR. NELKIN:   I agree completely, your Honor.  I

21   also believe that there's a very significant issue with the

22   same with regard to computers.  I mean, computers clearly

23   weren't preserved.  There's some that we don't even know where

24   they are.  And so I think it's not just Launch that we may not

25   be able to get back, I think it's the computers.

PROCEEDINGS

1    THE COURT:  As to that, I want to be careful about

2    how I phrase things because I don't know if what Stroz has

3    suggested is correct, if there are, in fact, computers that

4    haven't been disclosed and turned over, or if there's some

5    explanation.  We're going to have to resolve that.

6         The short-term goal for me is to -- for all of us is

7    to get to a point where we recognize that we have the

8    information we're going to have and we're not continuing to

9    try and gather information on which decisions will be made.

10   So let's focus on that for the moment.

11        Any suggestions about getting to that point?

12        MR. NELKIN:  Well, my other concern is, and I just

13   don't know how to do this, is that I'm concerned that the

14   information that is on Launch may not be the same today that

15   it will be tomorrow.

16        THE COURT:  Yes, I get it.

17        MR. NELKIN:  So I don't even know how reliable any

18   new --

19        THE COURT:  Look, I understand.  You're going to be

20   able to litigate that.  Right now we're in an

21   information-gathering mode and we can't do that indefinitely.

22   At some point we have to say even if conceivably there is some

23   other step that could be taken to try and get more

24   information, the litigation has to move forward so we're going

25   to say this is the record on which decisions will be made

PROCEEDINGS

1  about such remedies as are appropriate.  I'm trying to figure

2  out how we get there, what steps, if any, any of you think

3  need to be undertaken before we can say, okay, we've got the

4  full record.

5          MR. SCHAFHAUSER:  Your Honor, and on that point and

6  to Mr. Nelkin's point just now about information on Launch

7  that may or may not be available today or tomorrow.  Again,

8  we've all been before you so I don't know what is happening on

9  the ground right now with Launch subsequent to the call this

10  morning that I had with Yossi Rogosnitzky.

11          At some point, fingers crossed, prayers raised to

12  heaven, I'm hopeful that we both, meaning plaintiff and

13  defendants, will have access to two versions of Launch.  I'm

14  hopeful that that's today based on what I said earlier.  If

15  and when that occurs, I would assume that Stroz, who is a very

16  fine firm that I think we all have heard about in other

17  contexts, that I would assume that Stroz has the ability to --

18  and this is where I trip myself up -- either download or image

19  or store or maintain or freeze or capture a picture of what is

20  on Launch at that moment, both versions.

21          MR. NELKIN:  Stroz has told me that they cannot do

22  that.

23          THE COURT:  Look, again, I may be showing my

24  ignorance, but my understanding is that they can get an image

25  of something, but I don't know that even Stroz, as competent

PROCEEDINGS

1    as they are, can make data transferable in a certain form if

2    it doesn't exist in that transferable form in the original.

3            MR. SCHAFHAUSER:   Okay.

4            THE COURT:  I don't know.  But here's what I'm going

5    to suggest -- I'm sorry, you had wanted to speak and then I'll

6    say what I was going to say.

7            MS. NELKIN:   Well, I was just going to say that one

8    thing that needs to be done in my opinion right away is that

9    the defendants need to ascertain where these new computers

10   are.  And another thing that I think needs to be addressed,

11   and I don't know what would be appropriate with regard to

12   this, but the plaintiff has been put to great expense imaging

13   computers that apparently were not the right computers.

14           So to the extent that we're now going to have to

15   image other things, I think that the defendant should have to

16   participate in the cost.

17           THE COURT:  Look, issues of cost are going to be

18   taken up later partly because, you know, you say it's the

19   wrong computers.  I don't know and I don't think I will know

20   until we sort it out what information is and isn't available.

21   If you've been given the wrong computers in bad faith, as

22   result of an innocent mistake, or you've been given the only

23   computers there are, I just can't make that decision at this

24   point without the information we're trying to gather.  You're

25   not waiving any right to seek reimbursement, but I just don't

Lisa S. Schwam, CRR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1   think I can address it now.

2          Here's what I'm going to suggest.  Please weigh in

3   on it if you disagree.  I think the incentive is very much on

4   the defendants and your remarks earlier, Mr. Schafhauser, are

5   in accord with this.  Defendants have every incentive in the

6   world to show that they're cooperating in this process by

7   finding a way to track down the server on which Launch exists

8   and in the state it resides, to provide full access to Launch

9   and to provide any explanation that's available and any

10  information that's available with respect to these other

11  computers that Stroz has identified.

12         So I'm going to put a deadline.  By next Friday I

13  want plaintiff and Stroz to have that information to the

14  extent you can get it.  Later it's going to be too late absent

15  some extraordinary showing.  A week after that, Stroz gives

16  me -- again, I'm more than happy to talk about particular

17  deadlines, but my proposal is a week for the defendants to get

18  me and get the plaintiff what they can on those issues.  And a

19  week after that, Stroz digests the information and prepares

20  its report to say here's what we think is going on.

21         MR. NELKIN:  We don't have a problem with the

22  timeline except for the fact that I don't know what Stroz

23  can --

24         THE COURT:  Yeah, that's what I'm saying.  I'm open

25  to changing the particular days because I don't know what they

Lisa S. Schwam, CRR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1    can do either.

2              MR. NELKIN:   I think it also depends on what they

3    are given access to.

4              THE COURT:  Yes, I understand.  Look, any deadline

5    that we set is obviously subject to somebody saying it's

6    unrealistic and, you know, reset.

7              Step one, defendants provide the information that

8    I've described.  Step two, Stroz provides a report and the

9    plaintiffs, based on that report, say here's the relief that

10   we seek.  Step three, defendants say we disagree and here's

11   why, here's what we propose.  All right.

12             MR. SCHAFHAUSER:   I agree with that.  The only

13   thing I would respectfully add is that to respond whenever it

14   is to Stroz's report, we'll need access to the same imaged

15   information as Stroz has.

16             THE COURT:  I don't know that there would be any

17   reason to disagree.  Do you?

18             MR. NELKIN:   No.  I'm not sure what he's referring

19   to.

20             THE COURT:  Look, you're getting ideally access to

21   Launch, the server on which its data is resident and any other

22   computers that are turned up by the information that you have

23   already brought forward, if there are.  I think what

24   Mr. Schafhauser is saying you don't get exclusive access to

25   any of that; they get it, too.

Lisa S. Schwam, CRR, RPR, RMR
Official Court Reporter

PROCEEDINGS

1          MR. NELKIN:  Basically -- I just don't -- I think

2     we're good.  We don't have a problem with them having access

3     to Launch as long as there's a commitment that they won't

4     change it.  And as far as the computers that were provided to

5     Mr. Rosenblatt, those have been returned, three of the four --

6     actually, all four were returned to you, I think.

7               (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1503

PROCEEDINGS

1    MR. NELKIN:  We already arranged with Stroz to

2 prepare a hard drive with all the images and to give to them.

3    THE COURT:  With respect to a computer, obviously --

4 not obviously, but my understanding is when Stroz does work or

5 any other computer forensic expert, they will image it and

6 work with the image.  I think we're all on the same page that

7 whether it's the image or the original computer, I guess

8 preferably the image, you all have access to the same corpus

9 of information.

10    MR. SCHAFHAUSER:  Yes, Your Honor.

11    MR. NELKIN:  Yes, we're basically giving them the

12 same image that we got and by return of the computers.

13    THE COURT:  Yes.

14    MR. SCHAFHAUSER:  Okay.  Thank you, Your Honor.

15    THE COURT:  Let's talk about the timing.

16    MR. SCHAFHAUSER:  Yes, Your Honor.

17    THE COURT:  I was going to say a week for each of

18 these steps.  I'm more than happy to have you weigh in as you

19 are going along and say it's proven to be unrealistic, but as

20 an initial schedule, does anybody see a problem with that?

21    MR. SCHAFHAUSER:  I'm just turning on my cell phone

22 to look at my calendar --

23    THE COURT:  Look at your schedules.

24    MR. SCHAFHAUSER:  -- your Honor.

25    MR. NELKIN:  Your Honor.

1504

PROCEEDINGS

1    THE COURT:  Yes.

2    MR. NELKIN:  Just one question as far as what you

3    are anticipating once the reports are prepared, the next step

4    will be with the Court.  The only reason I ask is that my

5    client has long-scheduled plans from --

6    THE COURT:  I'm not anticipating, in the first

7    instance, reconvening an evidentiary hearing.  We all need to

8    get our hands around what information is available.  Once you

9    have that, Stroz is going to give you a report and I am

10   anticipating that you folks will send me the report, along

11   with a letter that says, based on this, essentially, you know,

12   here's what we think the facts are that you should find and

13   here's the relief we think we're entitled to because of it.  I

14   don't want a long brief.  This is either they have hid the

15   ball and here's what's the appropriate response or it's not,

16   right.  They'll get a chance to write back and say here's why

17   it doesn't happen.  And if anybody says that we can't figure

18   out what's appropriate without having somebody take the stand,

19   we will talk about that, we'll make a schedule for that, but

20   I'm not scheduling further testimony at this point.

21   MR. NELKIN:  And the issue is limited to the

22   computers and the Launch system as opposed to some other

23   aspects we've been hearing about such as books and records

24   compliance and things of that sort.

25   THE COURT:  That's the issue I'm trying to deal with

Georgette K. Betts, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    now.

2              MR. NELKIN:  Okay.  I just want to make sure I

3    know --

4              THE COURT:  Yes, I think the books and records part

5    of it can be done on a separate track and doesn't require as

6    much lead time.

7              MR. NELKIN:  Thank you, Your Honor.

8              MR. SCHAFHAUSER:  I've canvassed, and I hate to be

9    the spokesman all the time, but I've canvassed everyone and I

10   think a week, a week, a week I think it works for us.

11             THE COURT:  All right.

12             So August 12th is the deadline for defendants

13   providing whatever information or access they are going to

14   provide on this matter regarding Launch and the computers.

15   After that it will be outside the record absent some

16   extraordinary showing.

17             MR. SCHAFHAUSER:  Could I have is at least until the

18   following Monday, August 15th?

19             THE COURT:  Any objection?

20             MR. NELKIN:  No, Your Honor.

21             THE COURT:  August 15th.  Let me make my notes here.

22             MR. NELKIN:  Your Honor, are there any provisions in

23   case the Launch system goes down after it's restored?

24             THE COURT:  Not, I can't --

25             MR. NELKIN:  Okay.

PROCEEDINGS

1    THE COURT:  Right.  But if -- I think that's part of

2  the record, right?  If by August 15th they haven't provided

3  access to Launch that is up and stays up, I'm going to draw

4  certain inferences.

5    MR. NELKIN:  Thank you, Your Honor.

6    THE COURT:  All right.  So August 15th for the

7  defendants to provide information and access.  And I should

8  say in that regard in terms of providing access to Launch,

9  that's the deadline for essentially completing the record on

10  which further submissions are going to be predicated.  It does

11  not serve as an extension of the deadline that has been in

12  existence since last December for the defendants to provide

13  access to Launch, that remains in effect, and to the extent

14  that any remedy is appropriate for failing to do it by then,

15  I'm not taking away anybody's right to seek such a remedy.

16    MR. NELKIN:  Your Honor, can we also require -- I

17  think it's clear but I just want to make sure, we've never,

18  and I don't believe anyone here has represented they've ever

19  had full access to Launch, we've always had a portion of it.

20  There's an administration level that's above --

21    THE COURT:  I'm talking about full access to all

22  data on Launch and the ability to engage in all transactions

23  on Launch.  Just so it's clear, because the lines have been

24  blurred a couple of times during the hearing, there are two

25  distinct issues with respect to access to Launch.  One is, to

PROCEEDINGS

1   the limited extent clearly, that access to Launch is needed

2   for the operation of Two Rivers.  That's Mr. Papa's concern.

3   A greater concern is to allow the parties to litigate the

4   facts in dispute in this case.

5           MR. SCHAFHAUSER:  Your Honor, as to that, when

6   Mr. Nelkin says full access, what we've provided there are the

7   passwords for the people that I control with the fullest

8   possible access and, you know, I think that's what he was

9   using.  What I'm undertaking to do is to get both versions of

10   the Launch to that level of access.

11           THE COURT:  Okay, but Launch quite obviously has

12   different levels of access.  Whatever the highest level of

13   access, the one that has no restrictions upon it is what is to

14   be provided.  I'm not saying you disagree --

15           MR. SCHAFHAUSER:  No disagreeing.  All I'm saying is

16   the only thing that Mr. Nelkin keeps saying is the

17   administrator --

18           THE COURT:  It's a label.

19           MR. SCHAFHAUSER:  The one thing I am not is in

20   control of Yossi Rogosnitzky.  I am certainly a represent --

21   counsel, and to the extent that Mr. Friedman has access to

22   Launch, they're going to get the identical access that

23   Mr. Friedman has and to extent Ms. Rivera --

24           THE COURT:  Look, one of the factual issues raised

25   in this hearing is whose interests, if anyone besides his own,

Georgette K. Betts, RPR, CSR
Official Court Reporter

PROCEEDINGS

1  Mr. Rogosnitzky is serving.

2          MR. SCHAFHAUSER:  Understood.  I'm just raising that

3  as an issue.

4          THE COURT:  Yes.  All right.  So August 15th, using

5  a shorthand, close the record on the information and access

6  that's being provided.  August 22nd for Stroz to provide a

7  report and the plaintiffs to make their submissions seeking

8  whatever relief they think is appropriate based on the facts

9  that have been disclosed, and August 29th for the defendants

10  to respond.

11          MR. NELKIN:  Your Honor, could you make clear in the

12  order that extends to the server and --

13          THE COURT:  Yes.

14          MR. NELKIN:  Thank you.

15          MR. SCHAFHAUSER:  I cautioned.  I apologize.

16          THE COURT:  We're never going to leave here.

17          MR. SCHAFHAUSER:  I apologize.  Go ahead.

18          THE COURT:  Let's find a date to get back together

19  after I've had time to digest.  I'm going to suggest -- let me

20  see my schedule -- September 9th at 11:00 a.m.

21          MR. GRANTZ:  What was the date, Judge?

22          THE COURT:  September 9th at 11.

23          MR. GRANTZ:  Judge, I'm on trial in Suffolk County

24  starting on September 7th, I don't think it will finish by

25  September 9th.  The following week would be better for me.  I

Georgette K. Betts, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    apologize for the inconvenience.

2              THE COURT:  September 12th at 2.

3              MR. FINK:  At two, Your Honor?

4              THE COURT:  Yes.  Again, I'm not anticipating that

5    being an evidentiary hearing.  If there is a need for such a

6    hearing, we will figure out amongst ourselves whether to make

7    it that afternoon or some other time.

8              MR. GRANTZ:  Judge --

9              MR. SCHAFHAUSER:  Just a couple of points of

10   clarification, Your Honor.  The images that are available and

11   existing with Stroz now, could we also have those by the same

12   August 15th exchange date?

13             MR. NELKIN:  I believe if you just provide me with

14   an address for Stroz, I'll send it out tomorrow --

15             MR. SCHAFHAUSER:  Very well.

16             MR. NELKIN:  -- or Monday.

17             MR. SCHAFHAUSER:  Thank you, I appreciate it.

18             The second point is with respect to the comment

19   about the server, again the Court may end up making a

20   determination hearing testimony, but I am just telling, Your

21   Honor, that I cannot at this moment commit to producing a

22   server that is not within, what I understand to be, in my

23   client's custody, possession and control.

24             THE COURT:  You guys are going to do what you can

25   and will do.

PROCEEDINGS

1          MR. SCHAFHAUSER:  We are going to do what we can.

2          THE COURT:  Okay.

3          MR. SCHAFHAUSER:  As I said earlier, we may be

4    making a joint application about a subpoena.

5          THE COURT:  Right.

6          MR. SCHAFHAUSER:  But I just --

7          MR. GRANTZ:  I don't think that there's going to be

8    sufficient time after the Stroz report is provided on

9    August 22 for us to have our forensic person look at it and

10   provide a report within a week, so I think we should have a

11   little bit more time.

12         THE COURT:  Have you gotten a forensic expert?

13         MR. GRANTZ:  I think we've consulted with someone.

14         THE COURT:  If and when that becomes an issue,

15   right, you have some information -- I'm not saying the answer

16   is no by any means, but I want to know what they can and can't

17   do.

18         MR. GRANTZ:  Okay.

19         THE COURT:  Okay.

20         MR. SCHAFHAUSER:  Fair enough, Your Honor.

21         THE COURT:  Okay.

22         MR. SCHAFHAUSER:  Thank you.

23         THE COURT:  We need to take a short break so you can

24   consult about the counsel issue, yes?

25         MR. SCHAFHAUSER:  Yes.  And, frankly, what I was

PROCEEDINGS

1  probably going to end up doing is having a meet and confer

2  with plaintiff.  I don't know -- in other words, I don't know

3  whether the issue can be resolved in 15 minutes or not, but

4  I'm happy to meet and confer with plaintiff's counsel.

5          THE COURT:  Let's leave this because I don't want us

6  all sitting around waiting for something we're rushing the

7  conversation, but give me a letter at the end of day not

8  arguing, please.

9          MR. SCHAFHAUSER:  Yes.  I understand.

10          THE COURT:  Just there's an agreement on this or

11  there is not.

12          MR. SCHAFHAUSER:  Yes, Your Honor.

13          THE COURT:  Okay.  There was one other issue though

14  you were going to drawn counsel -- I didn't take a note.  Was

15  there a second issue you were going to consult with

16  Mr. Friedman about, or was it all about the counsel issue?

17          MR. SCHAFHAUSER:  I'll check my notes as well, Your

18  Honor.  There's been so many issues raised.

19          THE COURT:  Yes.  Anybody recall?

20          MR. SCHAFHAUSER:  I honestly don't remember.  If

21  there is I'll write a letter to the Court, with the Court's

22  permission.

23          THE COURT:  You know what, I think it was the

24  related issue about information.

25          MR. SCHAFHAUSER:  Yes.

Georgette K. Betts, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    THE COURT:  The information sharing.

2    MR. SCHAFHAUSER:  Yes.

3    THE COURT:  Again, all of that springs -- not

4  springs, but a lot of it can more readily be resolved once Two

5  Rivers, as an entity, has a seat at the table and can talk to

6  both sides about ways to go forward.  But I think it has to be

7  represented just to have that conversation.

8    MR. SCHAFHAUSER:  Yes, Your Honor.

9    THE COURT:  All right.  Anything else before we

10 break?

11   MR. SCHAFHAUSER:  No, Your Honor, thank you.

12   THE COURT:  It's been a pleasure spending the week

13 with all of you.

14   MR. SCHAFHAUSER:  Thank you, Your Honor.

15   MR. FINK:  Have a nice weekend, Your Honor.

16   THE COURT:  I'm not going to suggest we do it again

17 soon.  Folks, let me ask you, you have lots of boxes here, it

18 doesn't have to be out today, but take them home including the

19 boxes you've left for me unless you think I need to keep them

20 here.

21   MR. SCHAFHAUSER:  I will probably have a messenger

22 take home this later today, Your Honor.

23   MR. NELKIN:  Is there a mechanism -- they told us

24 that there might be -- for some way for us to get closer to

25 the courthouse to pick up the boxes.

PROCEEDINGS

1    THE COURT:  That you have to talk to the CSOs

2  downstairs.

3    MR. NELKIN:  I thought they said talk to the clerk.

4    MR. SCHREIBER:  The deputy.

5    THE COURT:  Ms. Guy?

6    THE COURTROOM DEPUTY:  The loading dock.

7    THE COURT:  Or the loading dock.

8    Excuse me.  We're adjourning the proceeding.  There

9  are informal conversations I know you are going to have.

10  Thank you all, have a good day.

11    (Whereupon, the hearing was adjourned at 12 noon.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MR. BERGSON: [1] 1457/19
MR. FELDMAN: [2] 1494/5 1494/13
MR. FINK: [2] 1509/2 1512/14
MR. FINKEL: [4] 1436/20 1437/2
1437/19 1454/13
MR. FRIEDMAN: [1] 1437/25
MR. GRANTZ: [6] 1508/20 1508/22
1509/7 1510/6 1510/12 1510/17
MR. HELLER: [13] 1467/23 1467/25
1484/3 1484/25 1485/2 1485/6 1485/8
1485/11 1485/17 1486/2 1486/4
1486/17 1486/20
MR. NELKIN: [65]
MR. ROSENBLATT: [9] 1470/17
1470/22 1472/5 1472/10 1482/16
1482/24 1483/3 1483/21 1484/1
MR. SCHAFHAUSER: [125]
MR. SCHREIBER: [1] 1513/3
MS. NELKIN: [21] 1439/10 1439/17
1440/9 1440/16 1440/25 1445/19
1449/5 1451/16 1456/4 1457/24
1459/20 1461/24 1462/17 1464/7
1468/9 1468/17 1468/24 1469/7 1487/4
1488/8 1499/6
MS. PASTRIKOS: [1] 1430/18
THE COURT: [217]
THE COURTROOM DEPUTY: [1]
1513/5

$
$500,000 [1] 1461/5

-
----------------------------x [2] 1426/2
1426/9

1
10 [1] 1464/11
10:45a.m [1] 1470/16
11 [1] 1508/22
11:00 a.m [1] 1508/20
12 [1] 1513/11
12th [1] 1505/12 1509/2
14th [1] 1439/21
15 [1] 1511/3
15-CV-6861 [1] 1426/3
15th [7] 1439/22 1505/18 1505/21
1506/2 1506/6 1508/4 1509/12
165 [1] 1427/4
1st [1] 1442/5

2
2012 [1] 1484/8
2016 [5] 1426/6 1431/22 1431/24
1432/11 1433/12
22 [1] 1510/9
22nd [1] 1508/6
2330 [1] 1426/21
24 [1] 1427/2
25th [1] 1442/3
26 [11] 1427/14 1462/25 1479/21
1479/22 1480/24 1484/6 1484/8 1484/9
1484/15 1485/9 1485/16
265 [1] 1428/6
2712 [1] 1426/21
29th [3] 1429/1 1429/12 1508/9
2nd [2] 1433/12 1442/14

30 [1] 1440/17

4
400 [1] 1461/4

5
5:30 [1] 1431/5
5th [1] 1445/24

6
6.1.2 [1] 1465/22
6.12 [3] 1464/10 1465/2 1465/6
60 [1] 1476/3
6861 [1] 1426/3
6:00 [2] 1431/4 1431/5
6:30 [1] 1431/4
6th [1] 1445/24

7
718-613-2330 [1] 1426/21
718-804-2712 [1] 1426/21
7:00 [1] 1440/6
7th [1] 1508/24

8
8:30 that [1] 1434/18

9
9:30 [1] 1426/6
9th [4] 1457/6 1508/20 1508/22 1508/25

A
a.m [2] 1426/6 1508/20
abeyance [1] 1477/22
ability [7] 1445/3 1445/5 1449/2 1460/1
1476/19 1498/17 1506/22
able [22] 1429/9 1430/18 1430/20
1430/21 1431/9 1436/10 1440/11
1441/2 1444/1 1444/6 1446/10 1447/2
1447/3 1448/11 1458/7 1470/5 1477/6
1486/23 1495/24 1496/13 1496/25
1497/20
absence [2] 1474/23 1489/14
absent [3] 1468/7 1500/14 1505/15
absolutely [1] 1439/20
access [68]
accessed [3] 1445/25 1445/25 1495/23
accessing [1] 1495/23
accomplish [2] 1428/25 1446/10
accord [1] 1500/5
account [3] 1436/18 1494/20 1494/23
accountant [1] 1490/13
accounts [2] 1441/7 1494/18
act [1] 1468/6
acting [5] 1461/12 1468/20 1475/6
1484/6 1491/24
action [7] 1463/5 1463/20 1466/24
1468/3 1481/12 1484/15 1496/17
actions [4] 1460/2 1460/7 1477/5
1491/21
active [1] 1440/16
actual [1] 1439/20
add [2] 1451/19 1501/13
addiction [1] 1464/11
adding [1] 1486/25
addition [3] 1453/6 1457/25 1487/19
additional [2] 1454/22 1462/22
address [23] 1437/13 1437/14 1437/18
1439/12 1439/19 1443/14 1445/21

1455/13 1458/10 1467/24 1477/16
1478/9 1479/24 1479/25 1492/20
1492/21 1493/1 1493/2 1493/19
1494/21 1499/23 1500/1 1509/14
addressed [5] 1451/20 1455/18 1456/24
1472/10 1499/10
adjourned [1] 1513/11
adjourning [1] 1513/8
adjusted [1] 1445/5
administration [1] 1506/20
administrator [4] 1449/11 1449/19
1449/19 1507/17
adopt [1] 1454/21
advance [1] 1472/10
advancing [1] 1446/7
adversaries [1] 1444/4
adverse [2] 1476/5 1477/3
advise [1] 1428/14
advised [5] 1429/13 1430/3 1431/17
1431/19 1431/21
affect [2] 1435/1 1452/6
afternoon [1] 1509/7
agenda [2] 1440/14 1493/10
ago [10] 1429/2 1430/1 1432/24 1434/4
1450/11 1452/6 1452/17 1453/12
1473/18 1489/20
agree [6] 1438/19 1458/7 1471/25
1479/5 1496/20 1501/12
agreed [5] 1434/18 1474/11 1478/3
1489/9 1494/14
agreeing [1] 1472/24
agreement [39] 1438/11 1438/13 1455/8
1455/14 1460/5 1460/17 1461/6
1461/20 1462/8 1462/23 1463/3 1467/5
1467/6 1469/11 1469/15 1469/18
1469/22 1471/15 1471/19 1472/23
1473/1 1473/22 1474/21 1474/23
1474/24 1477/17 1477/23 1479/16
1480/23 1481/3 1481/5 1481/15
1481/22 1482/12 1482/21 1484/7
1489/15 1489/20 1511/10
agrees [1] 1460/3
ahead [3] 1454/12 1478/7 1508/14
aided [1] 1426/24
ain't [1] 1496/10
Akiva [1] 1447/21
al [1] 1426/7
alert [1] 1448/22
allegations [1] 1454/7
allow [4] 1443/19 1444/14 1457/18
1507/3
allowed [2] 1428/24 1465/13
allowing [1] 1494/7
alluded [1] 1452/6
alone [1] 1483/7
alter [1] 1449/4
altered [1] 1445/9
amendment [5] 1462/7 1465/20 1465/22
1465/24 1465/25
Amon [8] 1457/6 1457/19 1460/24
1472/24 1479/2 1479/5 1487/18
1492/10
amount [1] 1469/22
analysis [2] 1440/19 1450/19
analyst [1] 1436/2
answer [4] 1436/15 1438/20 1493/5
1510/15
answering [1] 1491/13
anti [1] 1473/15
anti-waiver [1] 1473/15

## A

anticipate [2]  1471/6 1480/19
anticipating [4]  1504/3 1504/6 1504/10
 1509/4
antivirus [5]  1442/6 1447/7 1447/17
 1447/20 1448/6
Anyhow [1]  1431/6
anyway [1]  1469/11
apologize [4]  1487/6 1508/15 1508/17
 1509/1
apparent [1]  1459/2
appear [5]  1443/6 1444/10 1461/5
 1490/9 1490/9
appearance [1]  1451/5
APPEARANCES [1]  1426/13
application [5]  1463/22 1480/20 1482/1
 1492/7 1510/4
applications [1]  1452/21
apply [2]  1463/16 1466/22
appoint [7]  1474/5 1474/21 1474/22
 1475/11 1477/10 1487/8 1487/9
appointing [2]  1487/20 1487/25
appointment [3]  1472/19 1473/13
 1487/24
appreciate [8]  1470/19 1477/18 1479/10
 1479/11 1486/25 1488/6 1490/16
 1509/17
appreciated [1]  1452/19
appropriate [13]  1437/8 1450/25
 1470/12 1476/22 1487/19 1489/17
 1496/17 1498/1 1499/11 1504/15
 1504/18 1506/14 1508/8
April [2]  1431/24 1433/19
April 2016 [1]  1431/24
arbitrable [1]  1466/16
arbitration [2]  1484/16 1484/18
area [7]  1434/21 1446/6 1469/13
 1471/19 1471/25 1475/8 1489/13
areas [3]  1459/25 1472/9 1483/16
arguing [2]  1488/15 1511/8
argument [3]  1450/1 1464/3 1480/11
arises [4]  1444/12 1478/25 1481/17
 1492/20
arising [1]  1494/9
arose [1]  1488/15
arranged [1]  1503/1
articulate [1]  1445/13
articulated [2]  1482/8 1488/6
ascertain [1]  1499/9
ascribe [1]  1432/25
aspect [1]  1449/9
aspects [1]  1504/23
assert [1]  1472/16
asserted [3]  1431/23 1432/15 1438/6
asserting [3]  1435/9 1476/13 1476/14
assertion [1]  1452/19
assertions [2]  1449/23 1450/18
asserts [3]  1433/5 1433/19 1433/24
assign [1]  1485/25
Associated [1]  1427/3
Associates [1]  1427/5
assume [10]  1432/25 1435/2 1438/9
 1476/24 1476/25 1487/4 1489/7
 1490/11 1498/15 1498/17
assumed [1]  1488/22
assumes [1]  1440/1
assuming [1]  1445/12
assumptions [1]  1461/9
astounded [1]  1439/13

attempt [1]  1488/10
attempted [1]  1451/8
attempting [1]  1484/16
attempts [1]  1448/22
attend [1]  1491/2
attention [3]  1464/10 1478/3 1495/5
attributed [1]  1432/18
August [11]  1426/6 1505/12 1505/18
 1505/21 1506/2 1506/6 1508/4 1508/6
 1508/9 1509/12 1510/9
August 12th [1]  1505/12
August 15th [6]  1505/18 1505/21 1506/2
 1506/6 1508/4 1509/12
August 22 [1]  1510/9
August 22nd [1]  1508/6
August 29th [1]  1508/9
authority [1]  1463/7
authorize [2]  1465/7 1488/19
authorized [1]  1466/9
available [28]  1431/14 1431/23 1432/1
 1433/18 1434/1 1434/5 1434/6 1434/8
 1434/11 1434/12 1436/3 1436/25
 1436/25 1440/25 1443/13 1443/13
 1445/16 1450/7 1450/7 1450/8 1480/22
 1481/23 1498/7 1499/20 1500/9
 1500/10 1504/8 1509/10
Avenue [1]  1427/5
AVERY [1]  1427/6
avoid [3]  1467/12 1468/7 1495/5
aware [2]  1449/10 1471/9

## B

bad [1]  1499/21
ball [1]  1504/15
bank [3]  1441/7 1494/18 1494/19
based [10]  1436/22 1437/18 1443/8
 1444/9 1446/3 1446/12 1498/14 1501/9
 1504/11 1508/8
basis [1]  1481/11
bat [2]  1480/12 1480/13
be -- I [2]  1478/6 1482/5
be -- it's [1]  1483/16
be -- look [1]  1469/10
became [1]  1459/2
becomes [3]  1477/2 1480/9 1510/14
beforehand [1]  1445/9
began [2]  1442/25 1484/12
behalf [12]  1429/19 1434/9 1439/6
 1460/2 1460/20 1461/12 1461/19
 1468/20 1469/6 1470/2 1470/18 1487/7
belabor [1]  1430/4
belated [1]  1493/24
believe -- we [1]  1493/18
belong [1]  1454/10
bench [1]  1450/4
benefit [2]  1451/9 1491/6
BERGSON [1]  1427/10
best [5]  1426/16 1451/5 1451/15
 1451/23 1474/18
beth [3]  1442/3 1442/4 1442/7
Beverages [1]  1427/13
beyond [1]  1436/18
bill [1]  1489/2
Birnbaum [1]  1427/13
bit [3]  1451/18 1495/21 1510/11
block [2]  1463/7 1467/4
blocked [1]  1448/19
blunt [1]  1434/10
blurred [1]  1506/24
bone [1]  1483/25

books [2]  1504/23 1505/4
bottom [2]  1437/3 1476/18
boxes [3]  1512/17 1512/19 1512/25
break [5]  1470/13 1493/9 1495/7
 1510/23 1512/10
brief [3]  1475/19 1493/7 1504/14
briefly [4]  1428/8 1450/10 1479/12
 1479/17
bring [3]  1440/5 1441/2 1478/3
bringing [1]  1484/15
broader [1]  1449/19
broadly [1]  1455/1
broker [1]  1491/17
Brooklyn [1]  1426/4
brought [2]  1458/9 1501/23
BRUCE [1]  1427/8
budget [1]  1489/6
business [19]  1459/6 1467/22 1468/23
 1471/3 1471/18 1471/23 1474/9
 1474/11 1477/6 1479/24 1480/1 1480/2
 1481/18 1486/6 1486/7 1486/12
 1486/13 1488/22 1488/22
businesses [1]  1486/10
buy [1]  1478/11
buying [2]  1464/1 1465/10
buys [1]  1489/1

## C

calendar [1]  1503/22
camera [1]  1482/6
camps [1]  1463/3
candid [1]  1475/5
cannot [6]  1434/15 1435/22 1435/24
 1478/3 1498/21 1509/21
canvassed [2]  1505/8 1505/9
capita [2]  1466/6 1466/21
capture [1]  1498/19
careful [1]  1497/1
carefully [2]  1472/15 1472/16
CAROL [1]  1426/14
case [10]  1439/17 1444/25 1470/21
 1473/12 1475/25 1476/3 1491/2 1494/4
 1505/23 1507/4
category [1]  1462/19
CATHERINE [2]  1426/18 1430/17
caused [2]  1463/5 1473/12
cautioned [1]  1508/15
caveat [3]  1454/24 1472/21 1478/21
caveats [1]  1472/20
CBA [1]  1426/3
cell [1]  1503/21
certain [18]  1455/9 1455/22 1455/23
 1458/2 1460/2 1460/5 1460/7 1460/10
 1462/13 1464/9 1476/16 1477/19
 1477/24 1478/1 1492/24 1493/17
 1499/1 1506/4
certainly [7]  1434/10 1442/1 1451/24
 1456/11 1478/5 1478/9 1507/20
chair [1]  1491/12
challenge [2]  1474/16 1492/6
chance [5]  1428/7 1428/8 1444/4
 1461/13 1504/16
change [3]  1481/4 1481/5 1502/4
changed [1]  1447/1 1494/4
changes [1]  1479/8
changing [3]  1435/1 1446/18 1500/25
characterize [2]  1429/17 1444/11
check [1]  1511/17
checked [1]  1440/17

**C**

checks [1] 1441/8
choose [1] 1475/2
circumstances [2] 1451/7 1492/25
cite [1] 1465/14
cited [1] 1465/17
civil [2] 1426/24 1439/17
claim [1] 1447/7
claimed [1] 1484/20
claims [1] 1441/9
clarification [3] 1472/3 1488/12 1509/10
clarifying [2] 1479/1 1490/2
clarity [1] 1469/18
clear [15] 1432/9 1454/24 1457/1
 1457/21 1458/25 1460/12 1470/23
 1472/7 1473/7 1478/17 1479/7 1481/7
 1506/17 1506/23 1508/11
clearing [1] 1446/7
clearly [8] 1471/14 1471/17 1471/18
 1472/16 1483/5 1491/6 1496/22 1507/1
clerk [1] 1513/3
client [28] 1429/4 1429/8 1429/13
 1429/16 1429/19 1429/22 1431/10
 1434/9 1450/16 1464/18 1464/7
 1466/15 1470/3 1472/15 1472/18
 1472/24 1476/14 1478/10 1484/12
 1485/6 1485/7 1485/23 1486/14 1487/9
 1488/11 1492/13 1495/8 1504/5
client's [5] 1481/1 1487/7 1490/16
 1490/18 1509/23
clients [1] 1456/6 1471/23 1484/9
climb [1] 1491/20
close [2] 1451/19 1508/5
closer [1] 1512/24
Co [1] 1426/18
coffee [6] 1426/16 1427/15 1427/17
 1462/25 1468/15 1484/10
coincidence [1] 1440/11
comfortable [1] 1474/12
coming [3] 1452/8 1459/15 1495/12
comment [3] 1473/15 1479/17 1509/18
commentary [2] 1476/19 1476/20
comments [2] 1479/13 1488/7
commit [1] 1509/21
commitment [1] 1502/3
communicate [1] 1429/10
communicated [2] 1430/12 1431/5
communicating [1] 1463/4
communications [6] 1459/10 1459/12
 1476/2 1476/8 1476/24 1477/1
companies [2] 1484/8 1485/22
company [45]
company's [1] 1474/16
compare [2] 1436/2 1444/24
compete [1] 1484/12
competence [1] 1475/7
competent [1] 1498/25
competing [12] 1462/24 1467/22
 1479/24 1480/1 1480/2 1483/6 1486/2
 1486/6 1486/7 1486/8 1486/10 1486/13
competition [3] 1484/9 1485/13 1485/22
competitive [3] 1463/20 1467/21 1468/3
competitor [4] 1463/7 1468/5 1483/10
 1484/6
complained [1] 1431/13
completely [1] 1496/20
completing [1] 1506/9
compliance [3] 1445/15 1454/3 1504/24
complicated [2] 1446/6 1493/21

computer [11] 1426/24 1440/1 1440/20
 1441/4 1442/6 1448/25 1455/1 1455/2
 1503/3 1503/5 1503/7
computer-aided [1] 1426/24
computers [33] 1435/6 1439/22 1443/5
 1443/6 1443/7 1445/23 1445/24
 1451/23 1454/10 1454/15 1454/19
 1457/15 1458/4 1458/11 1458/19
 1495/10 1495/17 1496/22 1496/22
 1496/25 1497/3 1499/9 1499/13
 1499/13 1499/19 1499/21 1499/23
 1500/11 1501/22 1502/4 1503/12
 1504/22 1505/14
conceivably [1] 1497/22
concept [1] 1486/19
concern [12] 1451/1 1458/5 1468/11
 1470/20 1471/1 1471/10 1471/11
 1483/19 1486/15 1497/12 1507/2
 1507/3
concerned [4] 1451/22 1468/25 1472/8
 1497/13
concerns [1] 1450/24
concludes [1] 1489/15
conclusion [2] 1444/3 1488/10
conduct [4] 1438/19 1438/25 1450/19
 1461/18
confer [5] 1473/18 1473/19 1488/5
 1511/1 1511/4
conference [1] 1430/15 1448/2
confidence [2] 1441/22 1446/14
confirm [2] 1429/13 1431/9
confirmation [1] 1429/2
conflict [1] 1486/12
confusion [2] 1434/22 1446/8
congruent [1] 1456/9
conjunction [1] 1485/16
connectivity [1] 1430/25
consent [49]
consenting [1] 1473/13
considering [1] 1483/10
consistent [2] 1467/5 1468/6
consult [6] 1467/19 1492/13 1492/14
 1495/7 1510/24 1511/15
consulted [2] 1472/14 1510/13
consuming [1] 1450/22
contacted [1] 1431/10
contempt [1] 1490/8
contentious [3] 1470/24 1492/17
contest [1] 1479/23
context [7] 1430/1 1484/4 1484/13
 1485/12 1486/22 1486/22 1486/25
contexts [1] 1498/17
continue [2] 1441/11 1458/19
Continued [3] 1427/1 1464/16 1502/7
continuing [6] 1451/3 1451/9 1451/16
 1452/14 1459/7 1497/8
contract [2] 1465/13 1466/4
contract -- it's [1] 1465/13
contractors [1] 1465/17
control [6] 1436/8 1485/4 1485/5 1507/7
 1507/20 1509/23
controversial [1] 1459/24
conversation [7] 1429/18 1431/16
 1431/17 1433/14 1439/1 1511/7 1512/7
conversations [2] 1483/13 1513/9
cooperate [1] 1493/20
cooperating [1] 1500/6
cooperativeness [1] 1491/15
copy [2] 1491/1 1496/5
core [1] 1454/23

**Corp [5]** 1426/19 1427/2 1427/4 1427/4
 1427/4
corporate [2] 1492/20 1493/2
corpus [1] 1503/8
correct [12] 1430/16 1432/19 1435/2
 1435/8 1440/16 1443/6 1458/7 1465/8
 1477/14 1484/25 1494/17 1497/3
cost [2] 1499/16 1499/17
counsel [73]
counsels [1] 1483/13
count [1] 1458/1
counterproductive [1] 1451/21
County [1] 1508/23
couple [10] 1444/8 1450/11 1460/12
 1461/5 1462/2 1473/18 1477/16
 1482/17 1506/24 1509/9
course [8] 1429/8 1431/15 1431/17
 1444/18 1461/17 1471/11 1473/4
 1476/16
Court's [3] 1430/25 1479/25 1511/21
courthouse [4] 1426/4 1428/19 1440/7
 1512/25
courtroom [1] 1463/17
covered [2] 1469/10 1496/5
CPA [1] 1427/9
crafted [1] 1445/8
crashed [2] 1447/3 1448/3
Crazy [1] 1427/14
created [1] 1445/8
credibility [1] 1433/1
credible [1] 1441/15
cross [1] 1453/6
cross-examining [1] 1453/6
crossed [1] 1498/11
CSOs [1] 1513/1
CSR [1] 1426/20
Cups [2] 1427/14 1484/10
custody [4] 1436/8 1437/6 1438/6
 1509/23
cut [1] 1446/11
CV [1] 1426/3

**D**

damming [1] 1444/22
DANELCZYK [1] 1426/20
data [17] 1434/14 1435/2 1435/6
 1435/21 1437/4 1437/22 1439/25
 1445/21 1445/9 1446/14 1447/4 1449/4
 1450/6 1458/21 1499/1 1501/21
 1506/22
date [5] 1433/20 1445/24 1508/18
 1508/21 1509/12
dates [1] 1443/9
DAVID [2] 1426/17 1427/2
day -- he [1] 1472/22
day-to-day [6] 1459/13 1465/7 1469/11
 1469/14 1471/15 1474/17
deadline [5] 1500/12 1501/4 1505/12
 1506/9 1506/11
deadlines [1] 1500/17
deal [3] 1469/4 1494/25 1504/25
dealing [3] 1458/5 1488/11 1492/17
dealt [1] 1475/21
debating [1] 1442/17
December [4] 1439/21 1439/22 1450/23
 1506/12
December 14th [1] 1439/21
December 15th [1] 1439/22
decide [3] 1438/3 1478/23 1482/23
decided [2] 1479/9 1487/20

**D**

deciding [1]  1467/13
decision [8]  1469/3 1470/24 1474/16
1482/23 1483/1 1483/2 1492/5 1499/23
decision and [1]  1483/2
decisions [8]  1463/4 1466/3 1469/14
1471/3 1471/7 1471/18 1497/9 1497/25
declining [2]  1477/13 1477/14
deem [1]  1480/17
defend [2]  1438/19 1474/6
defendant [1]  1499/15
defendant's [5]  1450/15 1452/3 1453/10
1460/14 1464/14
defendants [28]  1426/8 1426/15 1426/17
1427/2 1427/6 1427/8 1427/10 1427/12
1427/16 1430/10 1441/9 1447/1 1453/1
1459/16 1460/8 1460/16 1488/17
1498/13 1499/9 1500/4 1500/5 1500/17
1501/7 1501/10 1505/12 1506/7
1506/12 1508/9
defense [4]  1454/25 1456/2 1456/10
1495/11
defer [2]  1474/3 1475/1
deferring [3]  1475/9 1475/9 1482/20
degree [2]  1455/12 1455/13
delayed [2]  1448/2 1448/2
delivered [3]  1491/23 1493/13 1493/15
delivery [2]  1427/2 1490/23
demanded [3]  1429/15 1429/18 1434/17
demeanor [1]  1491/14
denied [4]  1446/18 1446/19 1461/21
1484/17
Department [1]  1493/25
deposition [2]  1457/9 1458/3
deputy [1]  1513/4
described [1]  1501/8
describes [1]  1465/9
despite [2]  1441/18 1490/3
detect [1]  1444/10
determination [2]  1455/15 1455/19
1477/19 1509/20
determine [1]  1495/24
determined [1]  1441/22
develop [3]  1452/10 1453/8 1458/18
developing [1]  1451/16
development [2]  1451/9 1452/14
devices [1]  1457/21
Devine [4]  1427/9 1427/9 1494/3
1494/11
Devine's [1]  1493/25
didn't -- unfortunately [1]  1473/21
different [8]  1441/25 1443/24 1446/25
1460/12 1480/15 1482/14 1496/18
1507/12
difficult [2]  1483/17 1485/17
difficulties [1]  1492/18
digest [1]  1508/19
digests [1]  1500/19
din [3]  1442/3 1442/4 1442/7
direct [2]  1459/10 1459/12
directed [4]  1429/7 1457/19 1473/16
1490/3
directing [1]  1457/7
directly [2]  1431/9 1459/16
disagree [6]  1459/19 1481/24 1500/3
1501/10 1501/17 1507/14
disagreeing [1]  1507/15
disagreement [1]  1459/20
disagrees [1]  1459/10

discharge [1]  1490/6
disclaimer [1]  1453/15
disclose [3]  1435/17 1436/4 1438/24
disclosed [3]  1476/17 1497/4 1508/9
disclosing [1]  1468/4
disclosure [4]  1431/16 1431/20 1435/14
1483/11
disconnect [1]  1459/17
discover [1]  1444/14
discovered [1]  1429/12
discovery [3]  1456/19 1456/21 1456/23
discussed [1]  1435/4
discussion [1]  1428/15
discussions [1]  1456/15
dispositive [1]  1478/23
dispute [20]  1432/7 1432/18 1432/20
1432/22 1455/22 1455/24 1457/4
1459/6 1462/17 1466/13 1466/15
1467/20 1472/3 1472/9 1473/14 1478/1
1478/24 1483/16 1483/20 1507/4
disputed [1]  1455/20
disputes [5]  1457/10 1472/5 1474/12
1483/24 1484/1
disqualified [1]  1465/14
disqualify [1]  1492/6
disseminate [1]  1491/1
disseminating [1]  1433/8
dissolving [1]  1471/18
distinct [1]  1506/25
distinction [1]  1492/3
distributing [1]  1433/7
distribution [2]  1427/14 1486/7
distributors [1]  1484/10
DISTRICT [2]  1426/1 1426/1
dock [2]  1513/6 1513/7
docket [1]  1513/2
document [7]  1428/6 1450/17 1457/7
1457/10 1457/18 1458/11 1496/6
documents [10]  1441/21 1456/22
1457/21 1458/2 1458/6 1459/3 1459/11
1459/14 1490/1 1496/5
dollar [1]  1469/22
done [9]  1431/21 1433/10 1442/9
1452/11 1455/6 1461/19 1471/7 1499/8
1505/5
doors [1]  1468/22
doubt [3]  1441/18 1467/16 1491/16
down [12]  1432/11 1440/2 1440/3
1441/14 1441/17 1443/11 1446/15
1471/12 1494/12 1495/3 1500/7
1505/23
download [1]  1498/18
downstairs [1]  1513/2
draw [4]  1443/18 1464/10 1492/3
1506/3
drawing [2]  1440/9 1440/10
drawn [2]  1448/22 1511/14
drive [1]  1503/2
driving [2]  1428/19 1431/11
dues [1]  1458/2
duplicate [1]  1441/7
duty [1]  1475/23

**E**

earliest [1]  1449/10
early [2]  1472/5 1475/17
EASTERN [1]  1426/1
easy [1]  1436/6
effect [1]  1506/13
efficient [1]  1479/4

effort [2]  1445/11 1445/15
eight [2]  1432/17 1491/21
either [11]  1429/8 1435/19 1452/16
1475/3 1475/18 1479/4 1489/10 1492/1
1498/18 1501/1 1504/14
electronic [2]  1456/19 1456/21
elicited [2]  1453/22 1460/14
Email [1]  1426/22
EMIL [2]  1426/7 1426/16
employment [1]  1466/4
endeavor [2]  1471/4 1472/6
engage [1]  1506/22
engagement [1]  1462/5
entered [6]  1457/6 1457/12 1460/7
1480/22 1480/25 1481/5
entering [1]  1479/1
entirely [1]  1435/7
entities [1]  1479/20
entitled [5]  1455/9 1482/2 1482/11
1489/5 1504/13
entity [6]  1437/7 1439/8 1453/24 1475/6
1475/24 1512/5
entrusted [1]  1466/25
enumerated [3]  1462/9 1462/14 1462/20
ESI [2]  1456/21 1457/16
ESQ [11]  1426/14 1426/14 1426/15
1426/17 1426/18 1427/2 1427/6 1427/8
1427/10 1427/12 1427/16
essence [1]  1456/20
essentially [6]  1473/5 1473/13 1474/17
1485/15 1504/11 1506/9
et [1]  1426/7
Europe [1]  1462/5
evening [1]  1431/15
event [1]  1452/10
events [1]  1451/13
evidence [18]  1435/5 1435/6 1441/23
1442/1 1442/24 1443/3 1444/22
1445/22 1448/9 1450/18 1452/14
1452/24 1453/7 1453/9 1453/10 1454/2
1454/8 1455/4
evidentiary [4]  1426/10 1457/2 1504/7
1509/5
evolving [1]  1495/12
ex [4]  1463/22 1468/6 1468/7 1482/6
exact [3]  1433/19 1445/24 1448/15
exactly [2]  1443/25 1456/9
examine [1]  1452/17
examined [1]  1437/6
examining [1]  1453/6
example [7]  1445/23 1454/17 1463/8
1464/1 1489/24 1490/23 1491/22
exceedingly [1]  1431/8
except [5]  1453/11 1466/6 1474/20
1491/12 1500/22
exchange [3]  1456/22 1457/18 1509/12
exchanged [1]  1473/19
exclusive [1]  1501/24
Excuse [1]  1513/8
exercise [2]  1481/14 1489/11
exfoliation [1]  1444/11
exhibit [2]  1464/15 1491/2
Exhibit 6 [1]  1464/15
exist [2]  1454/16 1499/2
existence [1]  1506/12
existing [2]  1433/18 1509/11
exists [1]  1500/7
expect [1]  1450/8
expectation [1]  1450/12
expense [1]  1499/12

**E**

experience [3]  1471/20 1471/22 1471/23
expert [2]  1503/5 1510/12
explain [1]  1443/25
explained [2]  1435/7 1454/20
explanation [2]  1497/5 1500/9
explanations [1]  1441/14
explicitly [1]  1471/18
extends [1]  1508/12
extension [1]  1506/11
extensively [1]  1453/20
extent [25]  1430/6 1442/20 1449/21
 1452/4 1454/1 1467/3 1467/16 1468/2
 1469/12 1476/8 1477/4 1478/24
 1480/21 1481/10 1482/22 1486/9
 1494/2 1494/8 1495/11 1499/14
 1500/14 1506/13 1507/1 1507/21
 1507/23
extraordinary [4]  1439/25 1441/12
 1500/15 1505/16
extremely [1]  1444/2
Ezell [1]  1427/6

**F**

face [2]  1428/20 1490/7
facet [1]  1486/6
fact [15]  1432/1 1439/21 1440/23
 1457/24 1458/2 1470/20 1476/23
 1485/22 1485/23 1486/1 1486/3
 1492/20 1496/12 1497/3 1500/22
factor [1]  1493/22
facts [8]  1455/22 1457/4 1476/15 1493/6
 1495/12 1504/12 1507/4 1508/8
factual [3]  1455/19 1455/19 1507/24
failed [1]  1490/6
failing [1]  1506/14
fair [2]  1455/16 1510/20
faith [2]  1475/8 1499/21
fall [3]  1464/2 1468/13 1471/24
falls [2]  1462/19 1489/19
familiar [1]  1462/5
family [1]  1466/6
far [7]  1437/21 1449/19 1451/2 1460/16
 1472/8 1502/4 1504/2
fashioned [1]  1489/17
fast [1]  1431/6
fault [3]  1485/23 1485/24 1485/25
favor [2]  1491/8 1491/21
Fax [1]  1426/21
February [4]  1431/22 1432/11 1433/12
 1434/2
February 2016 [1]  1431/22
February 2nd [1]  1433/12
fee [4]  1432/7 1432/18 1432/20 1447/9
fees [1]  1488/18
feet [1]  1492/24
FELDMAN [1]  1427/8
few [4]  1437/21 1441/13 1453/12
 1489/20
fight [3]  1468/21 1489/4 1491/18
fighting [1]  1488/20
figure [6]  1474/18 1496/10 1496/11
 1498/1 1504/17 1509/6
filed [5]  1428/5 1439/20 1444/25
 1456/17 1456/18
fine [5]  1462/1 1474/13 1478/4 1494/6
 1498/16
fingers [1]  1498/11
finish [2]  1463/11 1508/24
FINKEL [4]  1427/6 1436/17 1450/16

1454/13
film [1]  1498/16
first [14]  1446/19 1446/19 1447/19
 1447/25 1469/16 1472/21 1473/2
 1477/16 1479/3 1482/18 1489/7
 1490/25 1495/13 1504/6
fit [1]  1474/5
five [2]  1448/12 1470/13
five-minute [1]  1470/13
flagrant [1]  1484/7
flavors [11]  1427/14 1462/25 1479/21
 1479/22 1480/24 1484/6 1484/8 1484/9
 1484/15 1485/10 1485/16
flesh [1]  1483/25
flip [1]  1461/3
focus [3]  1442/18 1443/16 1497/10
folks [3]  1491/18 1504/10 1512/17
following [4]  1442/2 1446/10 1505/18
 1508/25
foot [1]  1463/3
for -- well [1]  1496/5
forensic [5]  1436/2 1450/19 1503/5
 1510/9 1510/12
forget [2]  1436/22 1444/8
forgive [2]  1442/16 1458/17
form [2]  1499/1 1499/2
forth [3]  1473/21 1481/2 1490/17
forward [16]  1431/6 1458/16 1459/22
 1460/21 1461/18 1467/2 1467/11
 1467/19 1475/5 1479/7 1481/11
 1481/18 1483/14 1497/24 1501/23
 1512/6
forward -- you [1]  1467/11
four [3]  1466/22 1502/5 1502/6
frame [1]  1444/5
framework [2]  1461/25 1468/14
frankly [4]  1428/14 1454/9 1466/14
 1510/25
fraught [1]  1459/5
frees [1]  1461/12
freeze [1]  1498/19
frequently [1]  1462/24
friction [1]  1473/12
Friday [5]  1429/1 1429/12 1429/25
 1430/1 1500/12
FRIEDMAN [56]
Friedman's [9]  1458/3 1461/7 1462/11
 1463/5 1481/19 1487/21 1488/13
 1492/22 1494/11
frustrated [1]  1431/9
frustrating [1]  1444/12
frustration [2]  1428/20 1434/20
Fuel [3]  1427/3 1427/3 1427/3
full [7]  1458/19 1480/18 1498/4 1500/8
 1506/19 1506/21 1507/6
fullest [2]  1430/6 1507/7
fully [6]  1429/20 1429/23 1433/24
 1450/6 1450/7 1450/8
Funding [1]  1426/18
future [1]  1495/6

**G**

Garden [1]  1431/11
gather [4]  1440/24 1466/18 1497/9
 1499/24
gathered [1]  1451/10
gathering [1]  1497/21
general [2]  1462/1 1495/4
generally [3]  1436/24 1463/15 1467/12
generated [1]  1485/20

gentleman [1]  1434/9
Geoffrey [2]  1427/10 1427/11
given [9]  1429/15 1441/13 1446/23
 1449/14 1457/7 1482/10 1499/21
 1499/22 1501/3
gloss [1]  1491/5
gmail.com [1]  1426/22
goal [2]  1452/23 1497/6
goals [1]  1467/12
going-forward [1]  1481/11
Goldfarb [1]  1447/21
gotta [3]  1485/21 1491/11 1491/13
GRANTZ [3]  1426/17 1427/2 1436/14
gray [4]  1469/13 1471/19 1471/24
 1489/13
great [2]  1472/1 1499/12
greater [2]  1449/13 1507/3
Greenblatt [3]  1474/13 1491/24 1492/3
grocers [1]  1468/15
ground [1]  1498/9
Group [1]  1426/18
guaranteed [1]  1494/12
guess [4]  1440/22 1444/7 1493/24
 1503/7
Guy [1]  1513/5
guys [6]  1471/22 1486/9 1488/20 1489/3
 1495/3 1509/24

**H**

hailed [2]  1470/25 1471/1
half [1]  1447/25
hand [4]  1466/14 1466/17 1490/23
 1492/4
handling [2]  1474/17 1491/23
hands [1]  1504/8
HANS [1]  1426/15
happy [7]  1452/16 1476/24 1479/3
 1487/17 1500/16 1503/18 1511/4
hard [2]  1460/25 1503/2
has -- not [1]  1466/18
hate [1]  1505/8
heads [1]  1434/16
healthy [1]  1470/8
heard [26]  1432/10 1432/17 1432/23
 1437/10 1450/2 1450/14 1451/25
 1452/2 1452/7 1453/18 1453/19
 1454/17 1455/7 1455/11 1455/25
 1461/4 1461/14 1466/13 1467/10
 1479/19 1483/6 1483/7 1487/1 1490/25
 1491/4 1498/16
heard -- and [1]  1467/10
heaven [1]  1498/12
held [3]  1476/10 1477/22 1490/8
HELLER [6]  1427/12 1462/24 1479/22
 1480/5 1480/19 1484/3
helpful [1]  1469/21
Hersko [2]  1427/11 1427/11
hid [1]  1504/14
highest [2]  1449/13 1507/12
hire [5]  1466/9 1474/9 1482/24 1489/13
 1489/22
hires [1]  1489/1
hiring [6]  1462/14 1465/16 1466/6
 1488/1 1489/12 1492/2
historical [1]  1445/22
history [2]  1442/17 1447/24
hit [1]  1429/14
hoc [1]  1472/10
home [5]  1448/11 1493/18 1493/21
 1512/18 1512/19

# H

honest [1] 1491/17
honestly [2] 1462/18 1511/20
Honor [109]
Honor's [5] 1454/22 1478/3 1479/13
1479/19 1488/7
HONORABLE [1] 1426/10
hope [3] 1435/3 1435/12 1450/6
hopeful [2] 1498/12 1498/14
hopefully [1] 1472/4
hour [6] 1427/2 1432/24 1444/19
1444/21 1447/25 1448/7
hours [2] 1430/22 1450/11
house [1] 1494/21
hypothetical [1] 1478/11

# I

ideally [1] 1501/20
identical [2] 1434/5 1507/22
identified [2] 1451/23 1500/11
identify [5] 1437/7 1446/6 1446/6 1471/4
1472/2
identifying [1] 1445/13
identity [1] 1487/22
ignorance [2] 1434/24 1498/24
image [8] 1498/18 1498/24 1499/15
1503/5 1503/6 1503/7 1503/8 1503/12
imaged [3] 1439/22 1457/15 1501/14
images [4] 1457/13 1480/3 1503/2
1509/10
imaging [1] 1499/12
immediately [4] 1429/19 1429/22
1431/25 1478/15
impasse [3] 1474/1 1474/24 1476/21
impede [2] 1460/17 1471/3
impeding [3] 1460/23 1461/2 1461/22
implicate [1] 1473/6
implicates [1] 1467/17
implication [1] 1443/17
implications [1] 1496/12
important [3] 1446/17 1471/2 1478/21
imposes [1] 1492/23
inarticulate [1] 1482/9
Inc [2] 1426/16 1426/19
incentive [2] 1500/3 1500/5
including [2] 1460/6 1512/18
inconsistent [1] 1438/25
inconvenience [1] 1509/1
indefinitely [2] 1496/18 1497/21
independence [1] 1491/25
independent [7] 1435/15 1466/4 1474/2
1487/8 1487/9 1487/24 1490/20
independently [3] 1475/11 1477/11
1488/18
indicate [2] 1433/6 1493/17
individual [2] 1488/16 1488/22
individually [1] 1490/3
inference [4] 1440/9 1440/10 1440/25
1448/21
inferences [1] 1506/4
influence [1] 1434/8
informal [1] 1513/9
information [64]
information -- if [1] 1479/13
information-gathering [1] 1497/21
initial [2] 1442/3 1503/20
injunction [22] 1454/4 1460/7 1460/15
1460/24 1461/10 1461/12 1463/18
1464/14 1467/8 1467/18 1468/7
1469/18 1470/6 1477/18 1477/25

1478/14 1478/25 1479/2 1479/8
1480/17 1481/14 1482/22
injunctive [2] 1478/24 1481/14
innocent [1] 1441/19 1499/22
input [1] 1469/19
inquiries [1] 1436/21
insofar [4] 1429/6 1493/13 1493/15
1493/17
install [1] 1442/5
instance [9] 1469/16 1472/1 1478/15
1479/3 1479/20 1480/3 1489/7 1495/4
1504/7
Instead [1] 1490/24
integrity [1] 1476/20
intend [1] 1444/3
intended [1] 1463/20
intending [2] 1453/13 1489/25
intentionally [3] 1441/17 1444/12
1448/19
intentioned [1] 1460/10
interactions [1] 1435/22
interest [12] 1462/25 1467/23 1468/3
1468/4 1470/7 1475/6 1479/18 1479/19
1480/5 1486/10 1486/13 1488/24
interested [3] 1444/7 1449/5 1461/15
interests [5] 1451/6 1463/2 1474/6
1483/6 1507/25
interfering [2] 1460/9 1481/8
internal [1] 1457/21
internet [2] 1430/24 1430/25
interplay [1] 1477/17
interpreting [1] 1467/6
interrupt [4] 1445/21 1467/25 1468/17
1478/6
interrupted [3] 1430/7 1442/23 1478/7
interrupting [1] 1442/16
interval [1] 1470/13
intervening [1] 1428/24
intervention [1] 1470/11
investigate [1] 1444/1
investigating [1] 1444/17
Investors [1] 1426/18
invite [1] 1480/11
involving [1] 1480/24
IP [4] 1437/13 1437/14 1437/15 1442/10
ironic [1] 1482/25
issue [52]
issued [3] 1437/8 1438/10 1489/24
issues [25] 1439/12 1441/12 1450/9
1451/19 1452/8 1454/25 1455/1 1455/2
1455/6 1455/21 1456/9 1456/21
1457/17 1458/25 1461/23 1477/20
1487/18 1494/9 1495/9 1496/9 1499/17
1500/18 1506/25 1507/24 1511/18
item [1] 1477/15 1479/12 1482/4
items [1] 1477/16

# J

JAMES [1] 1426/10
JAY [4] 1426/14 1439/11 1440/2
1445/21
Jersey [8] 1436/24 1439/8 1440/7
1440/15 1484/17 1484/23 1493/24
1494/3
Jeryg [1] 1426/19
JO [1] 1426/3
join [3] 1439/5 1439/7 1439/9
joint [1] 1510/4
Jorge [1] 1427/7
judge [17] 1426/11 1457/6 1457/18

1457/25 1460/24 1466/8 1468/10
1472/24 1478/22 1479/2 1479/5
1483/22 1487/18 1492/10 1508/21
1508/23 1509/8
judicial [1] 1484/22
July [4] 1429/1 1429/12 1445/24
1475/17
July 29th [2] 1429/1 1429/12
July 5th [1] 1445/24
jump [1] 1479/23
juncture [1] 1439/7

# K

K-Cups [1] 1484/10
keep [5] 1468/22 1470/7 1470/8
1491/17 1512/19
keeping [1] 1494/3
keeps [2] 1446/18 1507/16
kept [6] 1433/17 1448/1 1448/2 1493/25
1496/14 1496/14
kicked [3] 1448/12 1448/16 1448/19
kinds [1] 1469/17
knowledge [3] 1432/12 1432/14 1436/18
knows [1] 1486/9
Koenig [2] 1453/16 1453/23

# L

label [1] 1507/18
Labor [1] 1493/25
lack [1] 1460/23
laptop [1] 1430/24
large [2] 1436/25 1468/14
lasted [1] 1429/18
late [1] 1500/14
latest [1] 1428/12
Launch [52]
law [1] 1439/14
lawyer [8] 1432/13 1438/2 1438/3
1447/22 1447/23 1475/2 1490/9 1492/4
layered [1] 1461/23
layered-issues [1] 1461/23
lead [2] 1481/12 1505/6
leading [1] 1431/16
leaning [1] 1437/24
learned [5] 1433/14 1433/22 1435/18
1493/14 1493/15
least [8] 1437/4 1437/21 1441/6 1457/13
1471/21 1474/8 1483/7 1505/17
leave [7] 1440/6 1440/15 1440/23
1463/21 1463/22 1508/16 1511/5
leaving [1] 1487/18
left [2] 1431/5 1512/19
legitimate [1] 1451/6
less [1] 1492/16
letter [8] 1428/5 1444/3 1504/11 1511/7
1511/21
letters [1] 1473/25
letting [2] 1444/13 1461/13
level [6] 1441/22 1449/14 1491/15
1506/20 1507/10 1507/12
levels [1] 1507/12
light [7] 1427/4 1428/17 1435/22
1452/18 1452/19 1454/6 1454/6
likely [1] 1450/15
limited [2] 1504/21 1507/1
LINDA [1] 1426/20
LindaDan226 [1] 1426/22
line [3] 1435/18 1437/3 1476/18
lines [2] 1506/23
list [1] 1473/23

listen [1]  1493/13
lists [2]  1473/19 1473/24
litigant [3]  1475/3 1475/24 1476/3
litigants [1]  1494/25
litigate [3]  1468/9 1497/20 1507/3
litigating [1]  1468/22
litigation [6]  1472/19 1473/6 1477/3 1484/19 1491/8 1497/24
LLC [7]  1426/18 1426/18 1426/19 1427/14 1427/15 1427/17 1471/5
loaded [1]  1445/9
loading [2]  1513/6 1513/7
loans [1]  1441/7
locked [2]  1442/11 1459/6
log [5]  1448/11 1448/17 1448/22 1449/16 1449/18
login [2]  1446/20 1446/22
long-scheduled [1]  1504/5
looked [1]  1437/11 1474/23
lost [1]  1457/23
loyalty [1]  1475/23
luxury [1]  1460/13

## M

machine [1]  1489/2
machinery [3]  1462/19 1463/8 1465/10
machines [2]  1461/4 1464/1
magistrate [2]  1426/11 1478/22
Mahal [1]  1478/12
mail [7]  1491/23 1492/21 1493/4 1493/13 1493/14 1493/21 1493/23
mailing [2]  1493/1 1494/23
mailings [2]  1493/15 1493/17
mails [4]  1490/24 1490/24 1491/3 1493/12
maintain [2]  1470/6 1498/19
major [9]  1431/21 1433/6 1434/2 1463/4 1465/10 1467/20 1469/14 1470/24 1471/18
majority [3]  1465/6 1466/5 1476/3
management [3]  1426/19 1426/19 1465/7
mangle [1]  1436/12
manipulate [1]  1441/11
manipulated [1]  1446/15
manufacturer [1]  1484/12
map [2]  1483/14 1483/17
March [1]  1457/6
March 9th [1]  1457/6
marketing [1]  1433/7
mask [1]  1445/17
match [2]  1443/7 1443/8
material [3]  1441/2 1442/15 1445/6
matter [4]  1485/24 1486/24 1488/11 1505/14
matters [9]  1434/25 1435/4 1459/13 1464/9 1466/19 1467/20 1468/13 1476/17 1478/23
MAURICE [1]  1427/12
MB [2]  1427/3 1427/3
McCormick [1]  1466/8
me -- again [1]  1500/16
mean [10]  1439/23 1440/21 1445/20 1463/6 1478/6 1482/18 1483/5 1491/10 1495/20 1496/22
meaning [5]  1445/8 1485/5 1495/23 1496/4 1498/12
meaningful [1]  1496/13
means [3]  1480/12 1488/13 1510/16

meant [1]  1478/18
mechanical [1]  1426/24
mechanism [1]  1512/23
meet [4]  1473/18 1473/18 1511/1 1511/4
meeting [1]  1472/2
member [5]  1466/7 1476/4 1482/11 1485/8 1485/9
members [13]  1453/24 1465/6 1466/6 1466/6 1466/7 1466/9 1466/22 1471/5 1471/16 1477/1 1479/14 1482/3 1490/11
members' [1]  1474/22
mentioned [4]  1437/15 1450/17 1453/15 1479/21
messenger [1]  1512/21
methodology [1]  1475/14
Michael [2]  1427/9 1427/9
middle [1]  1465/21
Middlesex [1]  1466/8
might [4]  1444/25 1469/24 1477/2 1512/24
mind [6]  1463/11 1468/13 1475/4 1487/16 1493/24 1495/9
minority [1]  1485/9
minute [2]  1469/2 1470/13
minutes [5]  1440/17 1448/12 1489/20 1492/18 1511/3
miraculously [1]  1440/5
Miss Nelkin [1]  1439/2
missed [1]  1441/21
missing [1]  1440/8
mission [1]  1477/7
mistake [1]  1499/22
mode [1]  1497/21
model [1]  1444/5
moment [8]  1450/22 1452/3 1452/6 1464/12 1467/5 1497/10 1498/20 1509/21
momentarily [1]  1435/13
Monday [4]  1428/21 1444/8 1505/18 1509/16
money [5]  1488/20 1489/2 1489/3 1489/5 1489/6
monitoring [1]  1448/23
month [1]  1433/10
months [3]  1445/3 1471/21 1473/18
morning [11]  1428/5 1428/9 1428/15 1428/18 1431/8 1433/22 1434/18 1435/13 1450/4 1454/9 1498/10
morning's [2]  1435/5 1453/8
most [10]  1434/10 1442/24 1448/21 1451/25 1452/2 1469/10 1474/1 1480/25 1490/19 1490/21
motion [9]  1456/7 1456/8 1456/10 1456/16 1456/16 1456/17 1456/24 1458/1 1472/24
motions [1]  1456/25
move [1]  1497/24
moving [1]  1495/11
Mr. Devine [2]  1494/3 1494/11
Mr. Devine's [1]  1493/25
Mr. Finkel [3]  1436/17 1450/16 1454/13
Mr. Friedman [53]
Mr. Friedman's [9]  1458/3 1461/7 1462/11 1463/5 1481/19 1487/21 1488/13 1492/22 1494/11
Mr. Grantz [1]  1436/14
Mr. Greenblatt [3]  1474/13 1491/24 1492/3

Mr. Heller [5]  1462/24 1479/22 1480/5 1480/7 1483/3
Mr. Koenig [2]  1453/19 1453/23
Mr. Nelkin [12]  1428/5 1430/3 1430/8 1430/12 1436/22 1441/24 1449/22 1456/18 1469/25 1494/15 1507/6 1507/16
Mr. Nelkin's [1]  1498/6
Mr. Nussbaum [1]  1448/1
Mr. Nussbaum's [1]  1447/22 1447/23
Mr. Papa [33]  1453/15 1453/18 1459/4 1459/7 1459/14 1459/16 1459/17 1460/11 1460/19 1461/7 1461/12 1461/18 1463/8 1466/13 1466/17 1466/18 1466/25 1471/5 1471/20 1474/3 1474/10 1474/17 1475/3 1477/7 1482/21 1489/25 1490/2 1490/24 1491/12 1491/16 1491/21 1493/3 1494/24
Mr. Papa's [5]  1459/3 1460/1 1474/21 1492/19 1507/2
Mr. Parness [11]  1462/4 1471/14 1473/23 1474/13 1475/16 1475/17 1476/17 1476/19 1477/8 1491/24 1492/3
Mr. Rogosnitzky [3]  1428/15 1431/10 1508/1
Mr. Rosenblatt [4]  1462/3 1482/16 1487/2 1502/5
Mr. Schafhauser [12]  1439/19 1441/18 1443/20 1452/5 1456/6 1458/1 1458/7 1489/25 1494/17 1495/8 1500/4 1501/24
Mr. Schafhauser's [1]  1446/12
Mr. Schreiber [9]  1449/15 1449/17 1452/17 1453/6 1453/16 1453/20 1477/3 1488/23 1489/8
Mr. Schreiber's [1]  1453/22
Ms. Guy [1]  1513/5
Ms. Nelkin [13]  1430/8 1430/12 1431/6 1433/14 1436/22 1439/10 1443/12 1449/22 1452/16 1456/4 1456/18 1469/25 1473/20
Ms. Pastrikos [1]  1430/23
Ms. Rivera [1]  1507/23
multiple [2]  1441/14 1477/25
must [1]  1439/12
my -- one [1]  1467/12

## N

names [3]  1473/19 1473/20 1473/20
near [1]  1485/25
necessary [4]  1469/20 1478/12 1478/13 1480/9
necessity [3]  1460/13 1463/9 1467/16
need [55]
need -- and [1]  1479/11
needed [7]  1442/9 1442/10 1442/14 1480/7 1489/23 1491/7 1507/1
Needless [2]  1492/12 1493/14
needs [22]  1437/6 1459/6 1459/14 1460/13 1460/16 1461/8 1463/14 1467/2 1467/14 1468/2 1470/8 1471/2 1471/7 1474/18 1474/24 1477/6 1481/17 1484/4 1490/10 1494/4 1499/8 1499/10
negotiate [1]  1470/9
NELKIN [29]  1426/14 1426/14 1428/5 1430/3 1430/8 1430/8 1430/12 1430/12 1431/6 1431/8 1431/22 1436/22

## N

NELKIN... [17]  1439/2 1439/10 1439/11
1441/24 1443/12 1449/22 1449/22
1452/16 1456/4 1456/18 1456/18
1469/25 1469/25 1473/20 1494/15
1507/6 1507/16
Nelkin's [1]  1498/6
never [5]  1439/14 1449/12 1458/7
1506/17 1508/16
next [10]  1451/17 1458/14 1458/22
1458/22 1464/16 1479/12 1495/9
1500/12 1502/7 1504/3
nice [1]  1512/15
night [7]  1429/4 1430/9 1436/11
1440/18 1441/17 1449/23 1452/21
nobody [1]  1471/15
non [1]  1478/23
non-dispositive [1]  1478/23
noncompete [1]  1484/7
noncompliance [1]  1451/4
none [1]  1441/14
noon [1]  1513/11
normally [1]  1481/22
note [2]  1446/17 1511/14
notes [6]  1431/19 1433/6 1433/12
1433/13 1505/21 1511/17
nothing [5]  1439/21 1443/20 1451/19
1473/5 1491/23
notice [3]  1458/3 1463/19 1468/8
notwithstanding [1]  1481/15
nowhere [1]  1485/25
number [10]  1428/6 1429/15 1430/10
1438/6 1450/9 1450/10 1456/14
1457/11 1466/17 1479/19
Nussbaum [1]  1448/1
Nussbaum's [2]  1447/22 1447/23

## O

object [4]  1472/18 1483/11 1488/2
1493/18
objection [3]  1474/14 1493/6 1505/19
objects [1]  1487/23
obligations [2]  1454/3 1490/6
observed [1]  1444/25
obtain [2]  1429/2 1441/2
obtained [3]  1476/2 1476/10 1480/3
obvious [3]  1480/11 1486/12 1493/16
obviously [8]  1449/24 1451/2 1453/6
1483/10 1501/5 1503/3 1503/4 1507/11
occurs [3]  1452/21 1498/15
OCR [1]  1426/20
October [2]  1442/5 1442/14
October 1st [1]  1442/5
October 2nd [1]  1442/14
office [6]  1427/14 1462/25 1484/10
1493/3 1494/1 1494/24
officer [3]  1434/10 1434/15 1435/23
official [1]  1495/1
officially [1]  1493/2
Oil [2]  1427/2 1427/4
online [1]  1445/16
open [8]  1428/1 1451/14 1456/21
1468/22 1493/16 1494/19 1495/9
1500/24
opening [1]  1490/24
operate [3]  1470/5 1477/6 1481/18
operating [27]  1455/8 1455/14 1460/5
1460/17 1461/6 1461/19 1462/8
1462/23 1463/2 1464/11 1469/10
1469/15 1471/15 1472/23 1473/1

1474/20 1477/17 1477/23 1479/15
1480/23 1481/3 1481/4 1481/15
1481/22 1482/11 1489/15 1489/21
operation [2]  1481/11 1507/2
operational [1]  1492/18
operations [10]  1460/9 1461/2 1461/22
1465/7 1469/11 1469/14 1471/15
1474/18 1481/8 1483/9
opinion [4]  1462/7 1485/19 1486/24
1499/8
oppose [1]  1452/21
opposed [1]  1504/22
opposite [1]  1488/23
order [11]  1437/8 1438/10 1439/5
1441/2 1457/7 1457/12 1457/13
1457/16 1478/23 1484/5 1508/12
ordered [2]  1439/21 1442/4
orders [2]  1451/4 1455/14
ORENSTEIN [3]  1426/10 1457/25
1468/10
original [5]  1431/23 1434/12 1446/12
1499/2 1503/7
originally [1]  1496/14
otherwise [2]  1473/2 1482/12
our -- I'm [1]  1465/17
ourselves [3]  1429/5 1476/21 1509/6
outside [4]  1465/17 1485/3 1494/9
1505/15
overlaid [1]  1456/14
override [1]  1474/14
overtaken [1]  1451/13
own [5]  1446/7 1450/19 1480/20 1482/9
1507/25
owns [3]  1479/18 1479/19 1491/18

## P

P.C [1]  1427/11
page 10 [1]  1464/11
Papa [33]  1453/15 1453/18 1459/4
1459/7 1459/14 1459/16 1459/17
1460/11 1460/19 1461/7 1461/12
1461/18 1463/8 1466/13 1466/17
1466/18 1466/25 1471/5 1471/20
1474/3 1474/10 1474/17 1475/3 1477/7
1482/21 1489/25 1490/2 1490/24
1491/12 1491/16 1491/21 1493/3
1494/24
Papa's [5]  1459/3 1460/1 1474/21
1492/19 1507/2
paper [2]  1455/22 1455/23
paragraph [4]  1462/14 1465/21 1467/18
1487/14
paranoia [1]  1446/3
paranoid [1]  1446/5
Park [1]  1427/5
Parkway [1]  1431/12
Parness [11]  1462/4 1471/14 1473/23
1474/13 1475/16 1475/17 1476/17
1476/19 1477/8 1491/24 1492/3
part [13]  1455/5 1456/15 1456/19
1456/24 1457/2 1458/1 1461/8 1483/12
1484/14 1485/1 1496/8 1505/4 1506/1
parte [4]  1463/22 1468/6 1468/7 1482/6
participate [1]  1499/16
participating [1]  1490/20
particular [6]  1436/23 1471/20 1482/4
1485/19 1500/16 1500/25
particularly [3]  1454/6 1454/6 1472/9
parties [9]  1457/11 1460/8 1462/9
1462/20 1473/25 1480/5 1488/23

1496/12 1507/3
parties [1]  1483/13
partly [1]  1499/18
partner [1]  1488/19
partners [6]  1459/5 1460/6 1461/20
1470/10 1471/16 1473/7
party [4]  1436/13 1436/15 1436/15
1477/2
passes [1]  1450/22
password [7]  1442/13 1447/2 1448/14
1448/20 1449/11 1449/13 1449/14
passwords [4]  1442/13 1446/23 1447/25
1507/7
past [2]  1472/4 1483/3
PASTRIKOS [2]  1426/18 1430/23
path [1]  1443/11
PAUL [1]  1426/15
pause [2]  1475/19 1493/7
pay [2]  1488/18 1495/5
paying [1]  1489/5
payments [2]  1456/1 1481/2
payroll [1]  1441/5
pays [1]  1489/2
pending [3]  1456/8 1457/1 1472/24
per [2]  1466/6 1466/21
percent [1]  1476/3
perfectly [1]  1462/10
perhaps [1]  1469/21
period [7]  1428/24 1432/6 1433/11
1442/25 1443/19 1444/19 1447/1
periods [1]  1443/8
permission [3]  1442/11 1468/6 1511/22
permit [1]  1494/6
person [9]  1435/19 1437/7 1442/10
1460/3 1460/3 1466/25 1474/10
1476/22 1510/9
personal [1]  1432/12
personally [3]  1429/7 1476/7 1476/13
persons [1]  1433/8
perspective [1]  1454/21
persuade [1]  1491/21
phantom [1]  1454/15
PHILIP [1]  1426/14
phone [7]  1426/21 1429/15 1429/21
1431/5 1431/11 1459/13 1503/21
phrase [2]  1482/6 1497/2
physical [1]  1437/6
Physically [1]  1436/8
PI [1]  1464/4
pick [2]  1475/2 1512/25
picture [1]  1498/19
piece [1]  1434/13
pieces [2]  1455/22 1455/23
Piscataway [3]  1436/23 1437/15 1439/8
place [4]  1437/15 1449/7 1494/10
1495/22
placing [1]  1430/1
plaintiff [21]  1426/4 1426/14 1428/24
1434/13 1435/5 1450/4 1452/20
1452/23 1453/21 1466/20 1471/13
1473/17 1473/23 1480/2 1480/6
1495/14 1498/12 1499/12 1500/13
1500/18 1511/2
plaintiff's [5]  1435/13 1452/2 1454/3
1456/23 1511/4
plaintiffs [5]  1456/3 1488/16 1488/16
1501/9 1508/7
plaintiffs -- I'm [1]  1488/16
plan [1]  1496/9
planning [2]  1453/9 1472/2

**P**

plans [1]  1504/5
plate [1]  1479/25
pleasure [1]  1512/12
plug [1]  1442/8
plug-in [1]  1442/8
plugged [1]  1445/8
point [32]  1430/4 1430/17 1431/4
 1434/14 1436/17 1440/8 1457/23
 1467/15 1470/5 1470/5 1473/16
 1474/10 1480/1 1480/6 1480/16
 1480/20 1480/21 1484/19 1485/25
 1488/6 1489/3 1496/10 1496/15 1497/7
 1497/11 1497/22 1498/5 1498/6
 1498/11 1499/24 1504/20 1509/18
pointed [2]  1466/21 1477/24
points [7]  1430/12 1431/15 1435/21
 1442/1 1443/14 1455/25 1509/9
portion [1]  1506/19
position [18]  1455/8 1456/7 1456/23
 1458/10 1462/13 1466/16 1472/16
 1472/22 1472/23 1473/10 1474/6/5
 1478/9 1478/10 1478/22 1480/6
 1489/21 1490/16 1490/18
positions [1]  1473/1
possession [2]  1441/10 1509/23
possible [2]  1481/19 1507/8
post [1]  1472/10
potential [2]  1472/4 1486/12
potentially [2]  1450/19 1476/4
powers [1]  1481/14
practice [1]  1439/14
prayers [1]  1498/11
preclude [1]  1481/20
predicated [1]  1506/10
preferably [1]  1503/8
prejudge [1]  1481/16
prejudice [5]  1452/20 1468/8 1472/25
 1481/13 1481/19
prejudiced [3]  1449/22 1450/1 1468/4
preliminarily [1]  1468/6
preliminary [19]  1454/4 1460/7 1460/15
 1460/24 1461/10 1461/11 1463/18
 1464/13 1467/8 1467/18 1469/18
 1470/6 1477/17 1477/25 1478/14
 1478/25 1484/16 1487/14 1492/22
prelude [2]  1480/15 1480/21
premature [1]  1467/15
prematurely [1]  1467/13
prepare [1]  1503/2
prepared [5]  1452/17 1455/13 1458/6
 1487/9 1504/3
prepares [1]  1500/19
present [7]  1452/24 1453/9 1455/3
 1455/7 1478/15 1478/16 1495/14
presented [3]  1452/5 1455/23 1455/23
presents [1]  1495/14
preserve [2]  1451/23 1491/7
preserved [1]  1439/22 1496/23
presumption [1]  1482/2
presumptively [1]  1482/11
pretrial [1]  1478/23
prevent [1]  1481/14
prevented [1]  1429/5
previously [1]  1428/18 1435/6
primary [1]  1458/5
principals [1]  1459/11
principle [1]  1495/5
priority [2]  1458/21 1490/25

privilege [2]  1431/20 1476/10
privileged [1]  1476/10
problem [15]  1447/6 1447/18 1447/19
 1462/21 1462/22 1463/5 1465/23
 1485/15 1486/17 1486/18 1488/15
 1490/5 1500/21 1502/2 1503/20
problematic [1]  1464/5
problems [2]  1494/12 1495/6
proceed [5]  1449/25 1457/8 1484/21
 1487/10 1495/19
proceeding [6]  1450/9 1454/22 1484/18
 1484/23 1490/21 1513/8
proceedings [3]  1426/24 1444/10
 1444/18
process [5]  1434/19 1450/25 1486/16
 1486/23 1500/6
produce [1]  1458/4
produced [1]  1426/24
producing [1]  1509/21
production [3]  1457/7 1457/10 1457/18
productions [1]  1458/11
prohibits [1]  1460/8
prominently [1]  1450/17
properly [1]  1483/18
property [2]  1429/6 1438/7
proposal [2]  1487/10 1500/17
propose [3]  1478/2 1478/14 1501/11
proposed [1]  1475/3
proposing [2]  1474/25 1487/7
proprietary [5]  1462/25 1463/1 1480/5
 1480/7 1480/9
protective [3]  1457/12 1457/12 1457/16
protocol [1]  1456/22
prove [2]  1454/18 1454/18
proven [1]  1503/19
provide [11]  1428/13 1449/12 1500/8
 1500/9 1501/7 1505/14 1506/7 1506/12
 1508/6 1509/13 1510/10
provided [8]  1449/12 1473/24 1502/4
 1506/2 1507/6 1507/14 1508/6 1510/8
provides [1]  1448/22 1449/19 1477/24
 1501/8
providing [5]  1432/7 1459/11 1473/8
 1505/13 1506/8
proving [1]  1441/9
provision [1]  1466/20 1479/1
provisions [2]  1460/10 1505/22
pulled [1]  1431/18
purchasing [2]  1462/19 1463/8
purely [1]  1478/11
purportedly [1]  1434/17
purporting [1]  1459/12
purpose [1]  1451/15
purposes [3]  1446/16 1460/21 1479/6
pursue [1]  1496/18
pursuing [1]  1495/9
pushing [1]  1480/6
put [13]  1434/16 1442/12 1454/1 1454/8
 1463/20 1471/24 1472/22 1477/23
 1483/25 1484/5 1486/21 1499/12
 1500/12
putting [3]  1445/16 1453/7 1491/5

**Q**

qualified [1]  1474/8
qualifiers [1]  1472/20
questions [6]  1447/16 1453/25 1459/3
 1483/8 1491/14 1491/14
QuickBooks [1]  1442/8
quickly [4]  1487/1 1487/12 1487/17

1496/9
quite [6]  1457/22 1460/11 1471/14
 1481/7 1495/21 1507/11
quo [1]  1481/5
quote [1]  1434/2

**R**

raised [5]  1475/16 1480/4 1498/11
 1507/24 1511/18
raising [1]  1456/20 1508/2
RAPHAEL [1]  1427/16
rather [6]  1459/15 1468/13 1472/10
 1475/1 1491/2 1494/25
reach [1]  1444/3 1469/22 1473/21
 1488/10
reactivated [2]  1429/10 1429/14
read [6]  1428/9 1454/9 1455/14 1455/14
 1465/20 1477/25
readily [2]  1448/21 1512/4
reading [1]  1465/4
real [1]  1492/23
really [14]  1431/16 1432/9 1436/18
 1439/25 1441/15 1453/3 1454/16
 1455/24 1463/7 1471/16 1473/10
 1473/10 1480/18 1480/21
Realty [1]  1427/4
reason [18]  1438/15 1462/11 1463/19
 1467/21 1468/16 1468/19 1475/7
 1475/23 1477/7 1481/13 1481/21
 1484/5 1484/14 1484/18 1486/14
 1493/1 1501/17 1504/4
reasonable [1]  1462/10
reasons [2]  1467/21 1493/16
reasons -- and [1]  1467/21
receive [2]  1482/3 1493/21
received [1]  1450/11
recent [1]  1442/25
recently [2]  1433/23 1442/18
recess [5]  1440/21 1441/1 1448/9
 1470/16 1472/14
recognition [1]  1470/19
recognize [2]  1496/16 1497/7
recognized [1]  1483/5
recommend [1]  1479/4
recommendation [2]  1487/18 1492/11
recommended [1]  1479/8
reconfirm [1]  1458/8
reconvene [1]  1452/23
reconvening [1]  1504/7
record [11]  1430/4 1449/1 1472/22
 1477/23 1486/25 1487/13 1494/2
 1497/25 1498/4 1505/15 1506/2 1506/9
 1508/5
recorded [1]  1426/24
records [8]  1441/5 1441/5 1493/25
 1494/3 1494/10 1496/14 1504/23
 1505/4
reestablish [1]  1496/13
referring [3]  1430/14 1440/23 1501/18
refreshingly [1]  1475/4
refused [3]  1438/23 1442/12 1442/13
refusing [1]  1490/18
regard [7]  1441/5 1441/6 1441/7
 1482/18 1496/22 1499/11 1506/8
regarding [3]  1435/5 1495/9 1505/14
registration [1]  1495/1
reimbursement [1]  1499/25
related [1]  1459/25 1511/24
relates [1]  1456/18
relating [1]  1466/3

**R**

relative [1]  1465/15
relaying [1]  1493/8
relevant [2]  1442/2 1465/5
reliable [1]  1497/17
relief [5]  1455/3 1478/24 1501/9
 1504/13 1508/8
remain [3]  1450/23 1494/19
remainder [1]  1453/9
remained [1]  1431/23
remains [3]  1440/15 1457/16 1506/13
remarks [1]  1500/4
remedies [1]  1498/1
remedy [4]  1487/19 1489/17 1506/14
 1506/15
remember [3]  1445/24 1447/17 1511/20
remote [2]  1446/20 1495/24
rents [1]  1436/16
repeatedly [2]  1431/7 1457/23
report [11]  1433/2 1439/20 1500/20
 1501/8 1501/9 1501/14 1504/9 1504/10
 1508/7 1510/8 1510/10
Reporter [1]  1426/20
reports [2]  1450/14 1504/3
represent [9]  1431/19 1469/7 1469/25
 1474/6 1474/19 1476/6 1476/22
 1489/22 1507/20
represent -- defend [1]  1474/6
representation [2]  1436/23 1446/13
representative [1]  1435/24
represented [7]  1434/7 1475/18 1475/20
 1475/22 1476/13 1506/18 1512/7
representing [1]  1476/16
request [4]  1475/10 1477/9 1477/11
 1477/13
require [6]  1461/20 1466/7 1470/10
 1471/25 1505/5 1506/16
required [3]  1461/7 1489/16 1490/14
requires [4]  1460/17 1462/8 1462/15
 1483/15
resemble [1]  1484/11
reset [1]  1501/6
residence [2]  1492/22 1494/12
resident [2]  1436/7 1501/21
resides [1]  1500/8
resolution [4]  1455/19 1457/17 1479/6
 1489/4
resolve [16]  1448/7 1452/7 1461/16
 1463/13 1463/18 1467/6 1468/17
 1468/24 1473/14 1474/12 1474/24
 1484/1 1494/13 1495/15 1496/9 1497/5
resolved [7]  1447/9 1459/1 1478/25
 1483/21 1496/11 1511/3 1512/4
resolving [2]  1473/11 1486/16
respect [9]  1439/6 1450/10 1452/18
 1460/11 1472/23 1500/10 1503/3
 1506/25 1509/18
respectfully [8]  1474/1 1474/4 1481/1
 1482/13 1487/23 1490/19 1490/21
 1501/13
respects [1]  1460/10
respond [4]  1446/9 1450/12 1473/3
 1487/4 1501/13 1508/10
response [9]  1435/15 1448/23 1450/18
 1450/20 1452/24 1453/8 1480/11
 1480/18 1504/15
responsible [2]  1459/7 1489/5
rest [1]  1477/5
restored [9]  1429/3 1429/20 1429/23

restoring [1]  1428/22 1458/19
restrain [1]  1481/7
restricted [1]  1449/17
restrictions [2]  1492/23 1507/13
rests [1]  1452/23
result [4]  1458/25 1470/24 1479/5
 1499/22
retain [3]  1436/2 1460/20 1482/22
retained [1]  1466/18
retaining [2]  1465/9 1465/12
return [1]  1503/12
returned [3]  1443/5 1502/5 1502/6
review [1]  1450/6
revisit [1]  1452/10
revolve [1]  1440/14
RICHARD [2]  1427/6 1427/8
rights [6]  1460/6 1467/17 1472/25
 1473/1 1477/24 1488/14
rise [1]  1483/8
rising [1]  1438/17
risk [1]  1463/21
Rivera [2]  1427/7 1507/23
Rivers [63]
Rivers -- you're [1]  1469/6
Rivers' [5]  1429/6 1469/1 1483/9 1492/5
 1494/24
road [1]  1431/18 1494/12
ROBERT [1]  1427/10
Rogosnitzky [6]  1428/15 1431/10
 1434/16 1498/10 1507/20 1508/1
roof [1]  1429/14
room [5]  1430/9 1430/15 1430/21
 1430/22 1474/8
ROSENBLATT [5]  1427/16 1462/3
 1482/16 1487/2 1502/5
RPR [1]  1426/20
run [5]  1460/16 1461/23 1466/25 1474/9
 1486/11
running [7]  1459/7 1462/23 1468/23
 1470/8 1474/11 1488/21 1491/17
rushing [1]  1511/6

**S**

safest [1]  1461/17
Salcedo [1]  1427/7
sanction [1]  1487/19
sat [2]  1447/25 1491/11
save [1]  1496/6
scattered [1]  1458/16
SCHAFHAUSER [14]  1426/15 1439/19
 1441/18 1443/20 1452/5 1456/6 1458/1
 1458/7 1470/17 1489/25 1494/17
 1495/8 1500/4 1501/24
Schafhauser's [1]  1446/12
schedule [6]  1458/14 1458/22 1495/13
 1503/20 1504/19 1508/20
scheduled [1]  1504/5
schedules [1]  1503/23
scheduling [1]  1504/20
SCHREIBER [11]  1426/3 1449/15
 1449/17 1451/18 1452/17 1453/6
 1453/16 1453/20 1477/3 1488/23
 1489/8
Schreiber's [1]  1453/22
scribble [1]  1431/18
search [1]  1456/22
seat [1]  1512/5
seated [1]  1428/2

second [7]  1447/12 1465/3 1465/3
 1473/9 1473/16 1508/16 1511/15
second -- well [1]  1473/9
section [3]  1464/10 1465/20 1465/22
section -- it's [1]  1465/20
seek [3]  1499/25 1501/10 1506/15
seeking [4]  1455/3 1461/8 1461/10
 1508/7
seem [1]  1461/17
segregation [1]  1480/7
selling [2]  1433/7 1468/15
send [3]  1494/10 1504/10 1509/14
sense [3]  1451/11 1451/13 1459/9
sent [2]  1459/4 1492/21
separate [3]  1454/25 1465/11 1505/5
separately [1]  1456/24
September [6]  1442/3 1508/20 1508/22
 1508/24 1508/25 1509/2
September 12th [1]  1509/2
September 25th [1]  1442/3
September 7th [1]  1508/24
September 9th [3]  1508/20 1508/22
 1508/25
serious [1]  1451/25
serve [2]  1427/13 1506/11
served [1]  1451/15
server [14]  1436/7 1437/5 1438/22
 1439/6 1442/10 1442/11 1445/10
 1496/1 1496/2 1500/7 1501/21 1508/12
 1509/19 1509/22
Service [1]  1463/1
Services [2]  1427/15 1484/10
serving [1]  1508/1
set [5]  1481/2 1495/12 1496/3 1496/4
 1501/5
setting [1]  1447/2
settings [1]  1489/22
settlement [1]  1473/11
seven [1]  1432/17 1481/6
several [4]  1430/12 1433/16 1443/4
 1492/18
shall [2]  1466/5 1466/7
shared [4]  1481/12 1481/21 1483/18
 1488/24
sharing [1]  1512/1
short [3]  1444/19 1497/6 1510/23
short-term [1]  1497/6
shorthand [1]  1508/5
shortly [1]  1440/3
side [17]  1431/18 1432/18 1447/16
 1451/11 1453/10 1454/2 1454/25
 1455/2 1455/18 1456/2 1456/10 1461/3
 1486/7 1490/21 1491/8 1491/22
 1495/11
sides [6]  1436/1 1457/8 1457/18
 1468/20 1488/23 1512/6
Signature [1]  1494/19
significance [1]  1473/15
significant [3]  1451/3 1483/8 1496/21
significantly [1]  1483/6
similarly [1]  1477/1
simply [6]  1431/20 1435/15 1439/13
 1445/2 1445/7 1446/10
Single [1]  1427/13
sit [3]  1453/4 1457/9 1471/12
site [1]  1444/24
sitting [1]  1511/6
situation [2]  1459/5 1462/6
sketch [1]  1469/16
slightest [1]  1491/9

**S**

software [5]  1435/8 1442/6 1442/12
 1447/7 1447/20
solicit [1]  1461/21
solicited [1]  1462/11
soliciting [1]  1464/5
solicits [1]  1460/22
Solomon [1]  1427/13
solution [2]  1468/5 1496/8
someone [10]  1448/18 1448/22 1475/11
 1477/10 1478/11 1487/8 1487/9
 1490/20 1492/6 1510/13
somewhat [2]  1443/11 1463/4
somewhere [2]  1437/5 1439/8
Sonia [2]  1427/7 1449/18
Sonia's [3]  1449/13 1449/14 1449/20
soon [1]  1512/17
sorry [14]  1442/21 1447/15 1456/12
 1457/6 1463/12 1463/25 1464/14
 1468/1 1468/16 1468/18 1478/8
 1485/24 1488/16 1499/5
sort [5]  1443/11 1447/6 1461/23
 1474/10 1499/20 1504/24
sought [1]  1480/2
sounds [2]  1448/18 1450/21
source [1]  1461/6
space [1]  1436/25
speaking [6]  1436/18 1462/4 1469/6
 1470/2 1471/4 1472/15
specific [4]  1462/9 1472/1 1482/1
 1483/25
speculate [1]  1483/24
speculating [1]  1436/19
spelled [1]  1469/15
spending [1]  1512/12
spends [2]  1489/2 1489/3
spokesman [1]  1505/9
spokesperson [2]  1453/2 1453/4
spoliation [2]  1441/13 1445/17
spotty [1]  1431/2
springs [2]  1512/3 1512/4
staffing [1]  1466/4
stake [1]  1491/12
stakes [1]  1438/17
stand [2]  1452/9 1504/18
standpoint [1]  1469/1
start [3]  1428/20 1442/19 1444/9
starting [2]  1443/9 1508/24
state [2]  1431/11 1500/8
statements [1]  1494/20
STATES [4]  1426/1 1426/4 1426/11
 1438/8
status [1]  1481/5
stay [1]  1445/15
stayed [1]  1430/21
stays [1]  1506/3
stenography [1]  1426/24
step [11]  1436/20 1451/7 1451/7
 1454/23 1458/22 1495/13 1497/23
 1501/7 1501/8 1501/10 1504/3
steps [4]  1458/22 1495/9 1498/2
 1503/18
STEVEN [2]  1426/3 1451/18
stood [1]  1487/3
storage [1]  1436/25
store [1]  1498/19
stored [1]  1435/2
stores [2]  1437/4 1437/22
straight [1]  1475/5

Street [1]  1427/4
Stroz [42]  1436/7 1437/11 1439/24
 1440/2 1440/15 1440/17 1440/24
 1441/22 1443/25 1444/8 1445/5 1446/9
 1446/19 1446/24 1448/15 1448/18
 1448/24 1450/13 1450/14 1454/14
 1454/14 1495/13 1495/15 1497/2
 1498/15 1498/17 1498/21 1498/25
 1500/11 1500/13 1500/15 1500/19
 1500/22 1501/8 1501/15 1503/1 1503/4
 1504/9 1508/6 1509/11 1509/14 1510/8
Stroz's [1]  1501/14
struggling [1]  1463/12
stuff [1]  1448/16
stupid [1]  1440/1
subject [3]  1438/9 1484/22 1501/5
submission [6]  1435/5 1435/13 1441/21
 1444/7 1446/24 1453/8
submissions [5]  1444/8 1454/8 1455/17
 1506/10 1508/7
submit [4]  1450/15 1450/18 1474/4
 1482/13
submitted [1]  1450/14 1473/25
subpoena [7]  1437/8 1438/9 1438/10
 1439/5 1458/22 1489/24 1510/4
Subsection [2]  1465/22 1466/2
subsequent [1]  1498/9
substantive [1]  1458/15
substituting [1]  1462/4
succeed [1]  1488/24
successfully [1]  1445/17
sudden [1]  1480/8
suffices [1]  1433/15
sufficient [1]  1510/8
Suffolk [1]  1508/23
suggest [4]  1499/5 1500/2 1508/19
 1512/16
suggested [1]  1497/3
suggesting [6]  1446/4 1446/5 1457/5
 1462/21 1468/11 1481/25
suggestion [1]  1452/12 1454/22
suggestions [3]  1451/14 1495/19
 1497/11
support [3]  1439/5 1439/7 1491/6
supposed [3]  1445/25 1484/9 1484/11
surprised [1]  1480/10
surprising [1]  1480/8
suspicious [1]  1446/2
switched [2]  1493/2 1493/12
Sylvia [1]  1427/6
system [32]  1431/22 1431/23 1431/25
 1432/1 1432/4 1432/5 1433/6 1433/8
 1433/9 1433/23 1434/5 1434/25 1435/1
 1435/2 1441/14 1441/16 1443/21
 1443/22 1443/25 1445/1 1445/3 1445/8
 1446/11 1446/12 1446/22 1448/3
 1448/11 1449/10 1449/11 1496/14
 1504/22 1505/23

**T**

table [5]  1436/12 1471/12 1471/24
 1490/21 1512/5
tails [1]  1434/16
Taj [1]  1478/11
target [1]  1495/12
tech [2]  1435/19 1436/12
technical [1]  1439/12
technically [1]  1457/1
technological [1]  1434/25
technology [1]  1441/23

Tecum [1]  1458/3
tee [1]  1487/10
temporarily [1]  1442/20
tension [1]  1463/13
term [1]  1497/6
terms [8]  1434/11 1436/12 1456/22
 1459/11 1459/13 1459/14 1492/10
 1506/8
testifies [1]  1453/7
testimonial [1]  1450/18
testimony [27]  1432/10 1450/16 1451/10
 1451/16 1451/25 1452/3 1452/5 1452/6
 1452/9 1453/22 1454/17 1454/23
 1455/25 1459/3 1460/12 1460/21
 1461/14 1471/23 1475/4 1479/19
 1481/6 1483/7 1490/25 1491/4 1492/19
 1504/20 1509/20
that -- and [1]  1472/21
themselves [1]  1443/7
theories [1]  1444/23 1446/7
theory [1]  1445/13
thereafter [1]  1496/17
therefore [1]  1473/6
they've [3]  1442/1 1449/16 1506/18
thinking [1]  1494/10
thinks [5]  1451/8 1451/15 1461/18
 1467/3 1468/23
third [7]  1436/13 1436/16 1436/15
 1462/7 1464/11 1465/20 1465/21
third-party [3]  1436/13 1436/15 1436/15
thoughts [1]  1461/24
thousand [1]  1492/24
three [6]  1428/24 1450/14 1473/19
 1473/20 1501/10 1502/5
three-week [1]  1428/24
threshold [1]  1469/22
throughout [2]  1485/20 1486/23
timeline [2]  1442/2 1500/22
timing [4]  1440/14 1441/23 1443/12
 1503/15
to -- and [1]  1471/22
to -- for [1]  1497/6
to -- the [1]  1471/16
to -- when [1]  1473/17
today [13]  1433/23 1451/8 1451/16
 1452/10 1452/14 1453/10 1460/21
 1477/19 1497/14 1498/7 1498/14
 1512/18 1512/22
together [1]  1508/18
tomorrow [3]  1497/15 1498/7 1509/14
track [3]  1495/3 1500/7 1505/5
traffic [1]  1431/5
transactions [1]  1460/2 1461/4 1506/22
transferable [2]  1499/1 1499/2
Transport [2]  1427/3 1427/3
trial [1]  1508/23
trip [1]  1498/18
TRO [3]  1480/22 1480/25 1481/1
trouble [2]  1447/24 1485/14
troubled [1]  1444/2 1451/4
Trucking [1]  1427/4
true [3]  1439/18 1445/12 1469/8
truly [2]  1479/23 1480/10
trust [2]  1475/3 1492/16
truth [1]  1452/16
truthful [1]  1454/19
turn [1]  1458/6
turned [2]  1497/4 1501/22
turning [1]  1503/21
two [87]

**T**

two-month [1]  1433/10
type [1]  1471/4
types [4]  1471/5 1472/1 1483/17
 1483/18

**U**

ultimately [2]  1448/3 1474/16
unable [2]  1429/2 1429/13
unambiguously [1]  1460/5
unanimous [2]  1462/15 1466/7
underlying [1]  1445/6
understood [10]  1428/18 1429/3 1429/3
 1430/7 1435/18 1452/19 1461/14
 1472/11 1479/10 1508/2
undertake [1]  1477/7
undertaken [1]  1498/3
undertaking [1]  1507/9
undisclosed [1]  1435/6
undone [1]  1450/23
unfortunate [2]  1476/20 1485/21
unfortunately [4]  1438/24 1473/21
 1485/4 1486/22
unhappy [1]  1429/18
UNITED [4]  1426/1 1426/4 1426/11
 1438/8
unless [6]  1445/5 1480/17 1482/3
 1482/6 1482/12 1512/19
unlike [1]  1491/13
unopened [1]  1491/3
unqualified [2]  1429/20 1429/23
unrealistic [2]  1501/6 1503/19
unresolved [1]  1487/19
update [1]  1428/14
updated [1]  1434/2
upgrade [10]  1431/22 1432/3 1432/21
 1432/23 1433/6 1433/9 1433/9 1433/11
 1435/8 1442/9
upgraded [2]  1432/4 1432/5
upgrading [1]  1434/25
uphill [1]  1491/20
upload [3]  1432/1 1432/2 1432/3
uploaded [2]  1433/22 1433/25
uploading [1]  1434/4
users [1]  1443/9

**V**

V-U-L-T-R [1]  1437/15
vague [1]  1468/13
validating [1]  1445/14
vendor [6]  1436/13 1436/15 1436/16
 1436/23 1436/25 1489/2
verify [1]  1429/9
versa [1]  1459/5
version [11]  1432/1 1433/18 1433/25
 1434/3 1434/4 1434/7 1434/11 1434/12
 1434/16 1435/25 1458/20
versions [5]  1436/1 1450/7 1498/13
 1498/20 1507/9
versus [1]  1426/5
viability [1]  1470/6
vice [1]  1459/4
view [2]  1487/12 1492/5
vindicate [1]  1451/6
violate [1]  1467/7
violated [2]  1463/17 1464/4
violation [8]  1460/24 1462/23 1463/2
 1478/14 1484/7 1487/13 1487/16
 1489/16
virtually [1]  1489/21

vis [2]  1477/5 1477/5
vis-a-vis [1]  1477/5
vitiated [1]  1487/22
voluble [1]  1457/22
vouch [3]  1435/23 1435/24 1437/11
VPN [4]  1447/2 1448/8 1448/14 1448/17
Vultan [1]  1436/14
Vultr [1]  1439/8

**W**

wait [2]  1468/19 1489/12
waiting [1]  1493/3 1511/6
waiver [3]  1472/25 1473/6 1473/15
waiving [2]  1488/14 1499/25
wants [3]  1460/20 1474/15 1490/12
warrant [2]  1438/10 1438/14
was -- unless [1]  1482/6
ways [3]  1460/12 1496/18 1512/6
wayside [1]  1489/19
weathered [1]  1458/12
week [16]  1428/24 1429/1 1430/1
 1434/4 1483/7 1485/20 1500/15
 1500/17 1500/19 1503/17 1505/10
 1505/10 1505/10 1508/25 1510/10
 1512/12
weekend [1]  1512/15
weigh [5]  1451/1 1453/5 1471/17 1500/2
 1503/18
weighing [1]  1461/15
weight [1]  1433/1
what -- he [1]  1473/12
where -- and [1]  1478/10
whispering [1]  1476/14
whole [1]  1488/14
WiFi [1]  1431/1
willful [1]  1487/16
willing [1]  1488/19
wiped [1]  1435/7
wiping [7]  1441/23 1442/24 1443/18
 1443/19 1444/11 1444/15 1445/1
wish [2]  1477/15 1487/10
wishes [4]  1449/24 1450/5 1450/9
 1487/24
withdrawn [2]  1443/19 1480/17
withheld [2]  1460/22 1468/9
withhold [3]  1467/17 1486/14 1489/11
withholding [7]  1461/1 1463/16 1467/4
 1467/7 1487/12 1487/22 1489/16
withholds [1]  1463/15
without -- and [1]  1467/13
without -- when [1]  1480/4
witness [7]  1430/14 1430/21 1430/22
 1451/9 1451/17 1491/12 1491/13
witnesses [1]  1452/8
wonder [1]  1469/4
word [2]  1438/14 1482/5
words [2]  1445/11 1511/2
works [2]  1461/10 1505/10
world [2]  1477/5 1500/6
wrap [1]  1492/15
write [3]  1487/17 1504/16 1511/21
writing [2]  1433/13 1455/13
written [2]  1460/19 1490/4

**Y**

years [1]  1480/25
yesterday [6]  1431/14 1436/21 1440/4
 1441/2 1444/7 1447/18
yet -- that [1]  1471/19
YORK [3]  1426/1 1426/4 1426/16

Yossi [21]  1428/16 1438/18 1428/22
 1429/10 1429/13 1429/19 1429/21
 1430/5 1431/10 1433/23 1434/16
 1435/22 1435/24 1437/4 1437/22
 1438/6 1438/19 1438/23 1442/13
 1498/10 1507/20
Yossi's [1]  1438/25