```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    -------------------------------------x
      STEVEN SCHREIBER, individually and
 3    derivatively on behalf of TWO RIVERS
      COFFEE, LLC,
 4
                          Plaintiff,
 5
                versus                        15 CV 6861 (CBA)
 6
      EMIL FRIEDMAN; E&I INVESTORS GROUP LLC;
 7    E&J FUNDING CO. LLC; E&J MANAGEMENT,
      INC.; E & JERYG MANAGEMENT CORP, LLC;
 8    24 HOUR OIL DELIVERY CORP.; MB FUEL
      TRANSPORT, INC.; MB FUEL TRANSPORT I,
 9    INC.; ASSOCIATED FUEL OIL CORP.; LIGHT
      TRUCKING CORP.; 165 STREET REALTY
10    CORP.; PARK AVENUE ASSOCIATES, L.L.C.;
      NEW YORK BEST COFFEE, INC.; JOHN
11    AHEARN; SYLVIA EZELL; SONIA RIVERA;
      JORGE SALCEDO; MICHAEL DEVINE; MICHAEL
12    DEVINE, CPA; GEOFFREY HERSKO; GEOFFREY
      S. HERSKO, P.C.; SOLOMON BIRNBAUM;
13    SINGLE SERVE BEVERAGES DISTRIBUTION;
      CRAZY CUPS; 26 FLAVORS LLC; AND OFFICE
14    COFFEE SERVICES LLC,
                                              U.S. Courthouse
15                    Defendants, and         Brooklyn, New York

16    TWO RIVERS COFFEE, LLC,                 June 10, 2016
                                              2:00 p.m.
17                    Nominal Defendant.
      -------------------------------------x
18
              Transcript of Civil Cause for Oral Argument
19
      Before:      HONORABLE CAROL B. AMON,
20                            District Court Judge

21                            APPEARANCES

22    Attorney for Plaintiff:
      NELKIN & NELKIN, ESQS.
23    5417 Chaucer Drive
      Houston, Texas 77005
24    BY:  JAY P. NELKIN, ESQ.
           CAROL NELKIN, ESQ.
25
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

```
 1   Appearances (continuing):

 2   Attorneys for Defendants:
     CHIESA SHAHINIAN & GIANTOMASI P.C.
 3   One Boland Drive
     West Orange, New Jersey 07052
 4   BY:  PAUL H. SCHAFHAUSER, ESQ.
          MELISSA WERNICK, ESQ.
 5
     MEYNER AND LANDIS LLP
 6   Gateway Center, Suite 2500
     Newark, New Jersey 07102-5311
 7   BY:  DAVID B. GRANTZ, ESQ.
          CATHERINE PASTRIKOS, ESQ.
 8
     THOMPSON HINE LLP
 9   335 Madison Avenue, 12th Floor
     New York, New York 10017-4611
10   BY:  BRIAN D. WALLER, ESQ.

11   RICHARD A. FINKEL, ESQ. & ASSOCIATES, PLLC
     270 Madison Avenue, Suite 1203
12   New York, New York 10116
     BY:  RICHARD A. FINKEL, ESQ.
13
     ROSENBERG FELDMAN SMITH, LLP
14   551 Fifth Avenue, 24th Floor
     New York, New York 10176
15   BY:  MICHAEL H. SMITH, ESQ.

16   ABRAMS GARFINKEL MARGOLIS BERGSON, LLP
     1430 Broadway, 17th Floor
17   New York, New York 10018
     BY:  ANDREW W. GEFELL, ESQ.
18
     GARVEY SCHUBERT BARER, ESQS.
19   100 Wall Street
     New York, New York 10005
20   BY:  MAURICE W. HELLER, ESQ. (via telephone)

21
     Official Court Reporter:
22   MICHELE NARDONE, CSR, RPR, CRR
     Phone:  718-613-2601
23   Fax:  718-613-2631
     Email:  Mishrpr@aol.com

24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1          (In open court.)

2          THE CLERK:  Schreiber v. Friedman, et al., docket

3   number 15 CV 6861, on for oral argument.

4          THE COURT:  Would the parties state their appearances,

5   please.  First, for the plaintiff?

6          MR. NELKIN:  Good afternoon, your Honor.  Jay Nelkin,

7   Nelkin & Nelkin, for the plaintiff.

8          THE COURT:  And for the Defendant Friedman?

9          MR. SCHAFHAUSER:  Good afternoon.  Paul Schafhauser of

10  Chiesa Shahinian & Giantomasi; and with me, Melissa Wernick,

11  for the Friedman Defendants.

12         THE COURT:  All right.  Do the other counsel just want

13  to state their appearances.

14         MR. GRANTZ:  Good afternoon, your Honor.  David

15  Grantz, G-R-A-N-T-Z, from the law firm of Meyner and Landis, on

16  behalf of E&J Defendants.  I have with my Catherine Pastikos

17  from our firm.

18         MR. GEFELL:  Andrew Gefell from the firm Abrams

19  Garfinkel Margolis Bergson, for the Hersko Defendants.

20         MR. SMITH:  Michael H. Smith, Rosenberg Feldman Smith,

21  for Michael Devine and Michael Devine, CPA.

22         MR. WALLER:  Brian Waller, Thompson Hine LLP, for the

23  oil trucking defendants and John Ahearn.

24         MR. FINKEL:  Good afternoon, your Honor.  Richard A.

25  Finkel, for Sylvia Ezell, Sonia Rivera, and Jorge Salcedo.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1          THE COURT:  All right.

2          MR. HELLER:  Yes, your Honor.  On the telephone,

3   Maurice Heller, Garvey Schubert Barer, for the Defendants 26

4   Flavors, Office Coffee Services, Solomon Birnbaum, Crazy Cups,

5   and Single Serve Beverages Distribution.

6          THE COURT:  Okay.  Can you hear us, Mr. Heller?

7          MR. HELLER:  I can.  Thank you.

8          THE COURT:  All right.  Everyone want to be seated,

9   please.  The papers that have been filed here are, to put it

10  mildly, extensive, including a reply brief that was filed that,

11  I guess, was about 90-something pages.  Of course, the

12  opposition to the original motion was of similar length.  There

13  is a lot of, I guess, to put it mildly, he said/she said in

14  most of these papers.

15         Let me hear from counsel for Friedman as to why you

16  think on the current record that the court should order that

17  the complaint be stayed or dismissed and proceed with

18  arbitration, and does it involve resolving factual disputes.

19         MR. SCHAFHAUSER:  Thank you, your Honor.

20         I believe that, to answer your Honor's question

21  directly, I believe that the court can, on the current record,

22  find that there are no issues of fact as to the agreement to

23  arbitrate, and I wanted to explain what I mean by that.

24         THE COURT:  I don't think it's contested that the

25  operating agreement has agreement to arbitrate.  I don't think

MICHELE NARDONE, CSR, RPR, CRR –– Official Court Reporter

Schreiber v. Friedman

1    anybody is really contesting that.

2           I think the principal position of the plaintiffs here,

3    if I understand it correctly, is that an attempt was made to

4    arbitrate this by the plaintiffs and that defendants' conduct

5    waived any further need to arbitrate.  Is that essentially it?

6           MR. NELKIN:  That is correct, your Honor.

7           THE COURT:  Aren't all the claims in the complaint --

8    wouldn't you agree that all the claims in the complaint would

9    be subject to the arbitration agreement, assuming it was going

10   to be enforced?

11          MR. NELKIN:  No, I would not agree with that

12   statement, your Honor.

13          THE COURT:  What claims are outside of the arbitration

14   agreement?

15          MR. NELKIN:  There are a number of claims involving

16   the what I will call the coffee defendants, that they

17   themselves claim have to do with an entirely different

18   agreement that we contest is even in effect.  So a number of

19   those claims.

20          There are a number of claims that the defendants

21   agreed are not subject to arbitration, the claims against

22   Defendants Hersko, or the Hersko Defendants are two, and

23   against the Devine Defendants, they agreed are not subject to

24   arbitration.

25          We would also argue that there are a number of other

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    claims.

2           THE COURT:  I understand that because they are not

3    parties to any arbitration agreement.  The argument there is

4    that they are so intertwined they ought to be considered in an

5    arbitration.

6           What claims against the Friedman would you say would

7    not be subject to the arbitration agreement?

8           MR. NELKIN:  Well, when you say Mr. Friedman, are you

9    talking about just Mr. Friedman, or are you talking about --

10          THE COURT:  Well, the Two Rivers.  What claims?

11          MR. NELKIN:  There are a number of companies that

12   Mr. Friedman may or may not have interest in, like E&J Funding,

13   that had purported loans to Two Rivers that are subject to

14   separate contracts, loan agreements, specify that they are

15   supposed to take place in -- they have clauses that specify

16   courts in New York.  Those are subject to different agreements

17   that are not part of this.

18          THE COURT:  So what causes of action would they be?

19          MR. NELKIN:  They are ones for usury, they are ones

20   that have to do --

21          THE COURT:  Against these E&J?

22          MR. NELKIN:  Yes.

23          THE COURT:  Is it your contention that all of the

24   allegations against E&J all fall outside the scope of any

25   arbitration agreement?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1          MR. NELKIN:  Yes.  We would contend that all claims

2     against all of the other defendants fall outside of the

3     Friedman arbitration agreement, and we would say that the

4     Hersko Defendants and the Devine Defendants agree that while

5     they are seeking to stay those, that those are not arbitrable.

6     So they concede that point, at least for those.

7          They concede, and we agree with them, that certain

8     claims that we have asserted against them, like RICO claims,

9     are not arbitrable because they are not parties and so they say

10    these are not arbitrable.

11         THE COURT:  Who agrees that those are not arbitrable?

12         MR. NELKIN:  The Hersko Defendants and the Devine

13    Defendants, in their papers they said that.

14         THE COURT:  What about claims with regard to Friedman?

15         MR. NELKIN:  With regard to Mr. Friedman, Mr. Friedman

16    wears a number of hats.  He is a principal in the loan company,

17    he is a principal in some of these other companies that we have

18    claims against for doing things such as false invoicing the

19    company and doing things to hurt the company, either taking

20    money out of the company or stealing money through different

21    schemes, diverting checks and things.  We believe that to the

22    extent that those were done on behalf of those other companies

23    by either someone at that company or by Mr. Friedman as a

24    principal of those companies, that those are not arising out of

25    the operating agreement and that they are separate and

Schreiber v. Friedman

1    independent claims that are not arbitrable.

2           We do have some claims against Mr. Friedman for breach

3    of, let's say, a noncompetition agreement in the operating

4    agreement.  That we would agree would be arbitrable, if he

5    hadn't already forfeited the right to arbitrate, but we believe

6    that a number --

7           THE COURT:  What claims do you concede would be

8    arbitrable but for the breach of these?

9           MR. NELKIN:  The ones where we allege that he engaged

10   in an -- well, the ones that he -- we have a claim for him for

11   breaching the agreement to do -- not compete in the coffee

12   business.  We have breaches of fiduciary duty against him

13   within the company for doing different types of things that we

14   feel were inconsistent with his role as a partner.  Those types

15   of partnership disputes or breach of a duty as a partner are

16   the ones that we would say arise out of the agreement, to the

17   extent that any of them do.

18          But we believe that most of the claims against

19   Mr. Friedman relate to his role at the other company.

20          THE COURT:  All right.

21          (Pause.)

22          THE COURT:  All right.  I'm sorry.  Counsel, do you

23   want to -- you can be seated.  Do you want to continue?

24          MR. SCHAFHAUSER:  Yes.  Thank you, your Honor.

25          Just to address both of your Honor's questions, in

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    terms of the scope of the agreement, I think your Honor just

2    heard from plaintiff's counsel, most respectfully, that in

3    terms of Mr. Friedman the claims or most of the claims he

4    concedes are within the scope of that agreement.  I would

5    actually go one step further and respectfully submit that under

6    the law that we have cited in the brief -- none of which I will

7    repeat because I appreciate that the court has already read

8    it -- but under the law, the scope of the agreement should be

9    broadly construed and the agreement itself is very broadly

10   written and therefore encompasses the claims.

11          By the way, the claims that I heard Mr. -- the

12   plaintiff's counsel talk about were partnership dispute claims,

13   which I believe are the quintessential claims that would arise

14   under the partnership agreement, i.e., the operating agreement.

15          But let me go back, most respectfully, to your Honor's

16   question to me, which, as I remember it, was on this record do

17   I believe that the court has an ability to rule in favor of my

18   clients, I believe, was essentially the thrust of the question.

19   So let me respectfully address that.

20          I was beginning to say that as to the agreement to

21   arbitrate, we believe that's clear.  It's a written document.

22   That brings us to -- that brings us to the defense raised by

23   plaintiff, and the defense, of course, as your Honor has

24   articulated it very well, is the defense is waiver.  He

25   forfeited it, he waived it, however one wants to couch it,

Schreiber v. Friedman

1    that, I believe, is the defense.  I believe, respectfully, that

2    in and of itself is an arbitrable issue.

3         THE COURT:  That's not an argument that you made,

4    however, in your original papers, correct?  I don't remember

5    seeing that you argued that the question of waiver itself was

6    arbitrable.

7         MR. SCHAFHAUSER:  I did not, you are correct; and

8    there is a good reason why I didn't.  But your Honor is

9    correct, I did not argue that in my original papers.  The

10   reason I didn't is that the defense of waiver hadn't been

11   raised.  The defense of waiver --

12        THE COURT:  Your original papers discuss waiver and

13   seek to answer the waiver issue.  If it hadn't been raised, why

14   are you talking about it?

15        MR. SCHAFHAUSER:  Well, I was anticipating, as best I

16   could, what was forthcoming, but --

17        THE COURT:  You have a whole discussion of waiver.  In

18   that you could have argued as well that the issue of waiver

19   itself has to be decided by the arbitrator.

20        MR. SCHAFHAUSER:  Your Honor, I'm giving you a

21   straight answer.  It wasn't in the original brief.  But I

22   raised it in response to what I believe was plaintiff's defense

23   of waiver in his opposition.

24        That being said -- that being said, your Honor, the

25   record -- and going back to your Honor's question, what is the

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    record?  Your Honor now has a very ample record, and I

2    respectfully submit that plaintiff, A, bears the burden of

3    proving a defense of waiver; B, under the law of this circuit

4    doubts are to be resolved in favor of arbitrability; and, C,

5    and most importantly, plaintiff has not borne its burden of

6    demonstrating a waiver by my clients.

7         And I can -- I will be brief on the issue.  I'm happy

8    to discuss it at as much length as the court wishes, but I

9    appreciate that we have, both sides, have amply submitted our

10   positions in writing already.  So, briefly, as to the third

11   point, why my clients under the record have not waived their

12   right to arbitration.

13        Well, even in plaintiff's submission, your Honor, in

14   plaintiff's submission he refers to a Beis Din Beis Yoseph

15   proceeding that was commenced before this case was filed, and

16   that was done in October.  Plaintiff also refers to

17   Mr. Friedman's application to a Maysharim in June, which is a

18   second proceeding initiated by Mr. Friedman.  Plaintiff also

19   refers to Mr. Friedman --

20        THE COURT:  I'm sorry.  What application are you

21   speaking of?

22        MR. SCHAFHAUSER:  Sure, the application in June by

23   Mr. Friedman was to Maysharim to withdraw the Heter, our --

24        THE COURT:  Was that before or after this lawsuit?

25        MR. SCHAFHAUSER:  That was six months, approximately,

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1   before the lawsuit.  The application was in June.  The lawsuit

2   was in, I believe, December 3rd or December 2nd of last year.

3        So there were, just to recap, we have Beis Din Beis

4   Yoseph before this lawsuit.  We have --

5        THE COURT:  What is that one?

6        MR. SCHAFHAUSER:  The Beis Din Beis Yoseph was a

7   rabbinical court that -- whose jurisdiction Mr. Friedman

8   invoked in October.  I'm actually going in reverse

9   chronological order, and I probably should have done it the

10  other way, but in October Bais Din --

11       THE COURT:  October of?

12       MR. SCHAFHAUSER:  Of 2015, in other words, two months

13  before the lawsuit, Mr. Friedman attempted to commence a

14  rabbinical court proceeding.

15       THE COURT:  For what?

16       MR. SCHAFHAUSER:  For a directive regarding the status

17  of the parties' dispute.

18       THE COURT:  The dispute about what?

19       MR. SCHAFHAUSER:  A dispute about whether the Heter --

20  whether plaintiff was authorized to proceed in secular court.

21       THE COURT:  Why is he going to a different Beth Din to

22  raise that issue?  Wouldn't he go back to the one that issued

23  the Heter?

24       MR. SCHAFHAUSER:  He in fact did.  He in fact did.

25  There is actually -- I'm about to go through four different

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    tribunals.

2           THE COURT:  But there is -- all right.  So this one,

3    you are saying, is before the lawsuit.  So basically your point

4    is what, he really likes Beth Dins and he will go to them any

5    time he gets a chance, is that it?

6           MR. SCHAFHAUSER:  No.  My point is not that.

7           My point is that throughout the proceedings in New

8    Jersey it was Mr. Friedman who was arguing in favor of

9    arbitration and plaintiff and his co-minority members who were

10   arguing against arbitration.

11          THE COURT:  And the judge basically -- they were

12   arguing against arbitration with respect to the fees and

13   getting a lawyer, and the judge agreed with them that that

14   shouldn't be arbitrated; and so the whole point of what they

15   were raising in New Jersey, the judge in New Jersey agreed with

16   them.

17          MR. SCHAFHAUSER:  Well, the judge agreed in part and

18   disagreed, most respectfully, in part, your Honor.  The judge

19   agreed that as to the provisional remedy of a $20,000 payment

20   for the fees, yes, the judge agreed with them; but the judge

21   then said that the remaining claim sought to be asserted

22   against Mr. Friedman would be dismissed and close the case on

23   the same day.  So the judge granted the application in part and

24   denied it in part.

25          And the judge would not, most respectfully, your

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1  Honor, have denied any claim or closed the case if the judge

2  had not found that arbitration were warranted.  We quote it.  I

3  mean, we need not wonder.

4          THE COURT:  I have read the entire record before the

5  judge in the New Jersey court, and I'm not sure that I have the

6  exact same reaction that you have been advocating upon the

7  court.

8          MR. SCHAFHAUSER:  Very well, your Honor.  What I'm

9  simply saying -- and the record is the record.  My point is not

10  even to characterize what the judge did.  My point, most

11  respectfully, is to characterize what Mr. Friedman did, which

12  goes to the waiver issue, and what Mr. Friedman did is --

13  whether he won or lost in New Jersey, the record will say; but

14  Mr. Friedman was arguing consistently in favor of arbitration,

15  which rebuts the argument that he refused to arbitrate.

16          THE COURT:  Well, the argument is not that he refused

17  to arbitrate in the 26 Flavor issue.  The argument is that he

18  refused to arbitrate the issues that are now the subject matter

19  of this case when plaintiffs brought that to a Beth Din in --

20  whatever date it was; I don't have the date in front of me

21  right now.  That's what he is -- it's not that he has never

22  sought the jurisdiction of Beth Dins, but when they sought to

23  raise these claims that are now the subject matter of this case

24  they didn't -- they didn't agree to a Beth Din on those issues.

25          The fact that they may have agreed to the jurisdiction

Schreiber v. Friedman

1   of a Beth Din on other issues, what's the relevance of that?

2          MR. SCHAFHAUSER:  Well, first of all, your Honor, what

3   plaintiff sought to bring to Maysharim in December 2014 also

4   was not the subject matter of this case, most respectfully.

5   What plaintiff sought, and we point that out in our papers,

6   what plaintiff sought to address at that time was the argument

7   that Mr. Friedman should cause E&J Funding to extend another

8   million dollars, and plaintiff was upset that he didn't agree

9   to extend another million dollars and plaintiff and his

10  co-minority members --

11         THE COURT:  Was that specifically stated, because I

12  thought the claim more broadly was partnership improprieties?

13         MR. SCHAFHAUSER:  Yes, your Honor.  The claim was in

14  fact partnership improprieties.  Those were the two words,

15  absolutely.  There was no specificity as to what that meant --

16         THE COURT:  Okay.

17         MR. SCHAFHAUSER:  -- by plaintiff.

18         THE COURT:  Now you are telling me that it only could

19  have meant the fact that he didn't spring up for the other

20  million bucks that they wanted from him.

21         MR. SCHAFHAUSER:  That's my position, your Honor.

22         THE COURT:  Well, that's your interpretation; but the

23  claim itself says partnership improprieties, correct?

24         MR. SCHAFHAUSER:  There is no doubt.

25         THE COURT:  Which could have covered -- arguably; I

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    don't know what the phrase covered -- it could have covered a

2    broad array of the issues that plaintiff has raised in this

3    lawsuit.

4            MR. SCHAFHAUSER:  The answer is yes, your Honor, the

5    claim was partnership improprieties.  I'm not going to deny the

6    obvious.  That's what it said.  All I'm saying, your Honor, I'm

7    sorry, I didn't mean --

8            THE COURT:  No, go ahead.

9            MR. SCHAFHAUSER:  I apologize.  I have had too much

10   coffee, and I'm excited about today, your Honor.  I didn't mean

11   to interrupt your Honor.

12           THE COURT:  No.  Go ahead.  You are not interrupting

13   me.

14           MR. SCHAFHAUSER:  Yes, the claim said partnership

15   improprieties, your Honor.

16           I most respectfully submit that the record indicates

17   that it did not relate to these claims; but, whether or not it

18   did or didn't, whether or not it did or didn't, your Honor,

19   Mr. Friedman on the record -- I'm going back to your original

20   question of me -- on this record, I respectfully submit that

21   plaintiff has not borne his burdens of demonstrating that

22   Mr. Friedman intended to relinquish his right to arbitration

23   because what -- when Mr. Friedman learned about this Heter, the

24   Heter dated January 5, 2000, he was not notified about it, and

25   there is no dispute about that.  He was not notified until

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1   April.

2          When he learned about it, Mr. Friedman responded --

3   and I'm not going to go back and talk about the New Jersey

4   litigation, which we talked about -- but he then commenced or

5   attempted to commence another proceeding, a Zabla proceeding,

6   which we addressed in the papers.  A Zabla proceeding, under

7   orthodox --

8          THE COURT:  That's starting a new proceeding before a

9   different Beth Din?

10          MR. SCHAFHAUSER:  That is one of the procedures that's

11   recognized under rabbinical law.

12          THE COURT:  For what?

13          MR. SCHAFHAUSER:  To start a Beth Din proceeding.

14          THE COURT:  Right.

15          MR. SCHAFHAUSER:  Just so, the Zabla is that one side

16   picks one arbitrator, the other side picks another arbitrator,

17   and the two arbitrators pick the third arbitrator.  That's what

18   a Zabla proceeding is.

19          THE COURT:  Right.

20          MR. SCHAFHAUSER:  He commenced that or attempted to

21   commence that in May of 2015 -- again, many months before this

22   lawsuit was filed -- and notified plaintiff and the other

23   minority members.  They refused to participate in the Zabla.

24   So to recap, they refused to participate in the Zabla.  They

25   were served with -- plaintiff admits having been served with

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

 1   three, if not four, summonses by Beis Din Beis Yoseph and

 2   refused to participate in that.

 3          THE COURT:  Well, if you have got one going, what

 4   happens here with these types of proceedings?  One person has

 5   already instituted a proceeding and has gotten from that

 6   proceeding this Heter.  What permits the person to ignore that

 7   and go start another Beth Dins and say, look, I'm trying to

 8   arbitrate.  Once a Beth Din has been established, can someone

 9   go to another one and start issuing summonses?

10          It would be the equivalent if you had a case going

11   here in the Eastern District and you weren't happy with how it

12   was going, then you initiate the identical case in the Southern

13   District and say you didn't show up to the Southern District

14   case.

15          MR. SCHAFHAUSER:  Well, the proceeding before -- and

16   this is why it is, of course, a little convoluted -- the

17   proceeding before Maysharim that was commenced in June was a

18   limited proceeding; and that's the answer to your Honor's

19   question.  The proceeding before Maysharim was to rescind the

20   Heter.  Yes or no, rescind the Heter.  That was the issue

21   presented to Maysharim.  So that's what Maysharim was asked to

22   do in June.

23          And then there was a hearing that your Honor has seen

24   referenced in the papers, and Maysharim in September of 2015

25   issued a directive regarding that issue that your Honor has

Schreiber v. Friedman

1    seen.  But the proceeding before Maysharim was a limited

2    proceeding, not, I respectfully submit, intended to address the

3    full panoply of disputes between the parties.  That's why

4    Mr. Friedman was trying to commence the Zabla.  But plaintiff

5    did not participate in the Zabla.

6         So now let me go to the Maysharim proceeding, your

7    Honor.

8         THE COURT:  But plaintiff now has this Heter, which

9    allows him to go to a secular court on all of the issues that

10   he wants to raise, because I guess that entity determined that

11   Mr. Friedman hadn't complied with the procedures and then

12   allowed plaintiff to come to court.  So plaintiff now has this

13   ability to come to court.

14        What means would that circumstance, what requires him

15   to then submit to another arbitration proceeding that

16   Mr. Friedman initiates on the same matter?  That doesn't sound

17   right.

18        MR. SCHAFHAUSER:  Again, I don't believe it's the same

19   matter.

20        But to go to the Heter your Honor, the Heter was

21   issued on January 5, 2015, almost a year before this case was

22   commenced.  Now, plaintiff claims reliance on the Heter.

23   Plaintiff claims that the Heter authorized, as your Honor just

24   put it, authorized him to go to secular court.

25        If plaintiff relied on the Heter, then why didn't he

Schreiber v. Friedman

1   ever confirm the Heter as an award for 11 months before he

2   filed this lawsuit?  I would respectfully ask plaintiff that

3   question.

4            Secondly, your Honor --

5            THE COURT:  Is there some requirement that he confirm

6   it before he come to court?

7            MR. SCHAFHAUSER:  Well, I believe there is a -- well,

8   I believe it's an indicia of whether he actually relied on the

9   Heter before.

10           THE COURT:  The day he got it could he have come to

11  court, without confirming it?

12           MR. SCHAFHAUSER:  According to plaintiff, according to

13  plaintiff, the answer is yes; and plaintiff says that in his

14  papers.  And that's my point, most respectfully, your Honor.

15           Most respectfully, a plaintiff says he could have gone

16  to court on January 6 of 2015 if the Heter was issued on

17  January 5 of 2015.

18           THE COURT:  Do you disagree with that proposition?

19           MR. SCHAFHAUSER:  I disagree because I believe that

20  the Heter was improperly issued.

21           THE COURT:  But not that it had to be -- something

22  else had to happen?

23           MR. SCHAFHAUSER:  Well, I believe, your Honor, that

24  plaintiff, if he was truly relying on the Heter, under the

25  federal arbitration act he could have moved to confirm that

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    Heter for the entire year following that.  He never did.

2              THE COURT:  Did he have to?

3              MR. SCHAFHAUSER:  He -- there is no --

4              THE COURT:  He's got an order from a rabbinical court

5    that says you can go to court.  Your position is -- or one of

6    the things you argue about, well, he didn't go to court for a

7    long time and he says he could have gone the next day.  My

8    question to you is:  Could he have gone the next day, or are

9    you challenging that because you are talking about he could

10   have confirmed something.  Did he have to confirm something to

11   do that?

12             MR. SCHAFHAUSER:  Well, the direct answer to your

13   question, your Honor, is if he is saying he relied on it as a

14   final award, then yes.  Then it should have been an enforceable

15   final award.

16             THE COURT:  Why wasn't it --

17             MR. SCHAFHAUSER:  Plaintiff -- I'm sorry.  Go ahead.

18             THE COURT:  Why was it not a final, enforceable award?

19             MR. SCHAFHAUSER:  It wasn't a final, enforceable award

20   for -- well, the facts bear out that it wasn't a final

21   enforceable award.  Why wasn't it a final enforceable award?

22   Because when Mr. Friedman made an application to Maysharim,

23   Maysharim itself held, on September 25, i.e., nine months after

24   the Heter was issued, Maysharim itself held we will withdraw

25   the Heter if Mr. Friedman does items one and two and we will

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    get to what those are, but Maysharim itself recognized that it

2    was not a final award and was going to withdraw the Heter and

3    in fact then issued a subsequent ruling indeed withdrawing the

4    Heter; and, by the way, nowhere does plaintiff argue, your

5    Honor, that Maysharim on December -- I'm sorry -- on

6    September 25, 2015 didn't have the authority to do what it did.

7    Nowhere does plaintiff take issue with that award.  In fact,

8    plaintiff is seeking to confirm that award, thereby

9    demonstrating that the Heter itself was not final.

10          But I have another reason, your Honor, why I

11   respectfully submit that the Heter was not final.  That is that

12   plaintiff himself conceded that the Heter was not -- and I will

13   use the exact word -- permanent.  In October 2015 -- by the

14   way, a date that plaintiff now argues Maysharim had no

15   jurisdiction -- but back then, in October 2015, plaintiff wrote

16   the court on October 15 of last year, wrote Maysharim and asked

17   Maysharim to make the Heter permanent.  That's the word, make

18   it permanent.  And plaintiff asked for other forms of relief.

19          But to your question as to why was the Heter not

20   final, well, plaintiff recognized that it was not, quote,

21   permanent because it asked Maysharim to make it permanent; and

22   Maysharim tellingly did not make it permanent, your Honor,

23   never made the Heter permanent.

24          THE COURT:  What authority does the court have, having

25   said that you can go to court earlier and assuming he could go

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    to court, how can a rabbinical court, after someone has come to

2    court, then issue an order saying that you can no longer go to

3    court, and what effect does that have?  In other words, a court

4    proceeding has been initiated assuming -- assume that it's

5    legitimately initiated pursuant to the first Heter.  Is it your

6    argument that even if all of that had been -- pardon the

7    phrase -- kosher, that nonetheless the rabbinical court can rip

8    the jurisdiction away from the district court and by coming up

9    with a subsequent ruling?

10        MR. SCHAFHAUSER:  My argument, your Honor, is -- there

11   is a number of pieces to your question.  So I'm struggling to

12   give a yes-or-no question -- yes-or-no answer to your question,

13   your Honor.

14        But my argument is that the Heter itself, as I said a

15   moment ago, was not final; and the Heter itself says, on the

16   face of the document, back in January of 2015, that the

17   Defendant Friedman -- I'm sorry -- that the plaintiff could go

18   to court against Defendant Friedman so long as Mr. Friedman did

19   not submit to this jurisdiction of a rabbinical court, not

20   necessarily Maysharim but a rabbinical court.  That's what the

21   Heter itself said.

22        So on its face, your Honor, it was only valid and

23   enforceable so long as Mr. Friedman did not submit to the

24   jurisdiction of a rabbinical court.  As I have mentioned to

25   your Honor, I respectfully submit that he submitted to the

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1  jurisdiction of at least three rabbinical courts or attempted

2  to do so, but plaintiff didn't cooperate, at least three times

3  before the lawsuit was filed.

4          So the Heter on its face was no longer enforceable,

5  but, again, we have plaintiff's admission in writing to

6  Maysharim asking Maysharim to make the Heter permanent, and the

7  Heter was never made permanent.  So to answer your Honor's

8  question in this way, I do not believe that a plaintiff can

9  ignore the conditional nature of a Heter, admit that Maysharim

10 retains jurisdiction, be told by Mr. Friedman, by the way --

11 this is also in the papers -- Mr. Friedman told plaintiff and

12 his father that he would comply with Maysharim's directives.

13         THE COURT:  But he didn't.

14         MR. SCHAFHAUSER:  And then run to court.

15         THE COURT:  But he didn't comply with their

16 directives.  When did he -- so he says, okay, I'm going to

17 comply with your directives, but he doesn't do it.

18         MR. SCHAFHAUSER:  Well, he did before.  I mean the

19 Maysharim ultimately found that Mr. Friedman did comply, most

20 respectfully, with its directives.

21         Again, the question, your Honor, is, A, did

22 Mr. Friedman refuse to arbitrate; B, was plaintiff prejudiced

23 and can plaintiff show prejudice; C, did plaintiff reasonably

24 rely on an alleged refusal to arbitrate; and I respectfully

25 submit that the answer to all three of those questions is no,

Schreiber v. Friedman

1   based on the record before your Honor, based on the record that

2   is really not even in dispute by plaintiff at this point.

3        I mean plaintiff's submissions to Maysharim are in

4   plaintiff's own exhibits.  So those can't be disputed, that

5   plaintiff said, please make the Heter permanent, and the Heter

6   was never made permanent.  Plaintiff also can't dispute that it

7   was never enforced as final.

8        Your Honor understands, I believe, my position; and,

9   again, my position, to answer -- circle back to the original

10  question is on this record plaintiff has not borne its very

11  heavy burden, most respectfully, to demonstrate a waiver, and a

12  waiver, as your Honor is well aware, is not likely to be

13  inferred under the Federal Arbitration Act and Mr. Friedman,

14  contrary to refusing to arbitrate, in fact, repeatedly

15  attempted to do just that before the case was filed.

16       THE COURT:  Well, I mean the argument can be made that

17  he attempted to do it on his own terms.

18       MR. SCHAFHAUSER:  In fairness, I believe that is

19  plaintiff's argument.  There is no doubt that is plaintiff's

20  argument.

21       But, to rebut that argument, your Honor, I would note

22  the following.  Number one, Mr. Friedman went back to

23  Maysharim, which is the rabbinical court that plaintiff himself

24  chose; and that rabbinical court ultimately found that

25  Mr. Friedman had complied with its requirements and withdrew

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    the Heter.

2          THE COURT:  How did that -- what were the

3    circumstances leading to the January 28, 2016 decision?  Was

4    there new information provided to the Maysharim?  How did they

5    come to say that you really didn't meet the requirements that

6    we had earlier imposed in September?  How did that happen?  How

7    did they know anything about it?  I mean what happened?

8          MR. SCHAFHAUSER:  Mr. Friedman testified to this in

9    his deposition, but essentially what Mr. Friedman testified to,

10   your Honor, is that he posted a 250,000 -- the sum of 250,000

11   was posted, and Mr. Friedman executed an arbitration agreement

12   with a rabbinical court and that was submitted to Maysharim and

13   that ruling was thus rendered on that basis.  That's what

14   happened.

15         THE COURT:  You mean he came up with the $250,000 to

16   that Maysharim, or he gave it to another one?

17         MR. SCHAFHAUSER:  The sum of $250,000 was posted.  It

18   was placed in a, I believe, in another rabbinical court, which

19   Maysharim recognized as sufficient for purposes of its

20   directive.

21         THE COURT:  But it wasn't put with Maysharim, which is

22   where it was supposed to be put, right, originally?

23         MR. SCHAFHAUSER:  I don't believe that Maysharim

24   required it to be put with Maysharim.  I believe -- I have to

25   go back to the directive itself, but I believe it was that he

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    simply posted --

2              THE COURT:  No.  I think it was that there were three

3    Beth Dins that he could choose from, and then it says the sum

4    of $250,000 by the Beth Din Chosin.

5              MR. SCHAFHAUSER:  Right.  So it's not the Maysharim.

6              THE COURT:  So he never chose any of those three to

7    resolve the dispute, correct?

8              MR. SCHAFHAUSER:  He chose another Beth Din, correct.

9              THE COURT:  Which wasn't any one of the three named in

10   the September 25 order.

11             MR. SCHAFHAUSER:  Well, I believe it's a different

12   Beth Din.

13             THE COURT:  Where is the $250,000 escrowed now?  Where

14   is it?

15             MR. SCHAFHAUSER:  The $250,000 is still with that, as

16   Mr. Friedman testified, still there.

17             THE COURT:  Still where?

18             MR. SCHAFHAUSER:  It's with the -- I don't have the

19   document and his deposition transcript in front of me, but it's

20   with the same rabbinical court.

21             THE COURT:  Is it with the BDBY, Beis Din Beis Yoseph?

22   Is it the one that excommunicated the plaintiff?

23             MR. SCHAFHAUSER:  It's either the Beth Din or an

24   affiliated rabbinical court.

25             THE COURT:  I think there was one that determined that

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    the plaintiff had been excommunicated.  Isn't that the Yoseph

2    one?

3            MR. NELKIN:  Your Honor, I can answer that, if you

4    would like.

5            MR. SCHAFHAUSER:  Go ahead.

6            THE COURT:  Isn't that the Beis Din Yoseph?

7            MR. NELKIN:  No.

8            MR. SCHAFHAUSER:  I'm actually referring to the

9    transcript, your Honor, to give your Honor a very specific

10   answer.  In the transcript, at page 196 of Mr. Friedman's

11   deposition, refers to the Bais Din Tzedek Umishpot, which is in

12   Brooklyn.

13           MR. NELKIN:  That is incorrect, your Honor.  It's with

14   the Mechon L'Hoyroa.  That's what he testified to.  Mechon

15   L'Hoyroa is the one that his partner Joseph Friedman

16   contributed at least $695,000 to; and Mr. Friedman testified

17   that he himself did not give the money to Mechon L'Hoyroa, this

18   Joseph Friedman did.  He wasn't sure exactly.  He couldn't

19   remember how.  He thought Joseph had done it on his behalf.

20           THE COURT:  That's where the money is?

21           MR. NELKIN:  Yes.

22           THE COURT:  But that's not this --

23           MR. NELKIN:  It's not any of the ones that were

24   specified.

25           THE COURT:  I know it's not any of the ones that were

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1   specified, but I thought there was one called Beis Din Beis

2   Yoseph.  Is it the one that excommunicated your clients?  Which

3   one did that?

4          MR. NELKIN:  That's Beis Din Beis Yoseph, but there is

5   overlap between some of the Beth Dins.

6          THE COURT:  But the money was put in yet a third or

7   fourth Beth Din?

8          MR. NELKIN:  It was put in one that was specifically

9   excluded by Maysharim, after hearing the proof and evidentiary

10  submissions.

11         THE COURT:  Excluded when, September 25, 2015?

12         MR. NELKIN:  Yes.  Mr. Friedman had requested that

13  that one be one of the Beth Dins that was allowed.

14         THE COURT:  On January 28 at 2016, apparently all is

15  forgiven?

16         MR. NELKIN:  They said that he had essentially

17  fulfilled it by giving it to a different Beth Din, and what

18  they said is he gave it to him but, in fact, his testimony is

19  that he did not.  So they were under the misimpression that he

20  had actually contributed it when he did not.

21         THE COURT:  Who contributed it.

22         MR. NELKIN:  Someone named Joseph Friedman.

23         THE COURT:  Put the $250,000 in?  Is there money

24  escrowed somewhere now?

25         MR. NELKIN:  We don't know that because they never

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    submitted any proof.  They refused to produce any records on

2    that point.  We believe that that was a very suspicious

3    transaction, to the extent that it took place; but we have seen

4    no evidence of an escrow, we have seen no evidence of a

5    contribution by Mr. Friedman, we have seen none of the

6    documents related to anything.

7         The only thing that we know is that Mr. Friedman

8    testified that he himself did not give the money to Mechon

9    L'Hoyroa, and he couldn't remember the circumstance as to how

10   it occurred or what transpired.

11        THE COURT:  You all have had discovery.  There has

12   been some discovery.

13        What is the information, what was presented to the

14   Maysharim that led to this January 28, 2016 award?  Counsel for

15   Mr. Friedman, do you know the answer to that?

16        MR. SCHAFHAUSER:  I know what Mr. Friedman testified

17   to.

18        THE COURT:  I'm sorry.  Just refresh my recollection.

19   He testified to what about that?

20        MR. SCHAFHAUSER:  He testified that the sum of

21   $250,000 was deposited on his behalf with this rabbinical court

22   and that he signed -- it's actually an exhibit to what

23   Maysharim ultimately entered on January 28.  The second page, I

24   believe, is what Mr. Friedman executed.

25        THE COURT:  What exhibit is that?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1           MR. SCHAFHAUSER:  The exhibit --

2           THE COURT:  Is this something that the Maysharim

3     provided?

4           MR. SCHAFHAUSER:  No, no.  It's an agreement to

5     arbitrate that Mr. Friedman executed and that was submitted to

6     Maysharim and on the basis of the fact that the sum of $250,000

7     was deposited.

8           THE COURT:  Does he say and -- is there some evidence

9     that backs up that he put this money in escrow some where that

10    was given to the Maysharim?

11          MR. SCHAFHAUSER:  He testified to it, your Honor.  He

12    testified that it was.

13          THE COURT:  So he testified that I gave this -- that I

14    showed them that I had commenced a Beth Din with this other

15    group and I also gave him evidence that I had escrowed this

16    money?  Is that what he said?

17          MR. SCHAFHAUSER:  That's correct, and Maysharim found

18    that evidence satisfactory and rendered the ruling that it did.

19    That's correct.

20          THE COURT:  Do we have any -- is there in the record a

21    document that he says this is what I gave them to show the

22    money was there?

23          MR. SCHAFHAUSER:  I don't believe that was submitted

24    as part of this.  What was submitted was Mr. Friedman's

25    deposition testimony surrounding those events as well as

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    Maysharim's ruling.

2              THE COURT:  Okay.

3              MR. SCHAFHAUSER:  Again, Maysharim was the one, was

4    the rabbinical court that plaintiff chose originally and

5    Maysharim, i.e., plaintiff's original rabbinical court, the

6    forum of its choosing, found that Mr. Friedman had complied

7    with its conditions.

8              But I'm moving afield.  So let me go back to your

9    Honor's original question, because we are now talking about

10   January of this year.  But I wanted to focus again to the

11   prelitigation events.

12             Your Honor was asking me about the prelitigation

13   events, and the prelitigation events are, based on the record,

14   that plaintiff went to Maysharim, plaintiff was aware that

15   Maysharim issued a Heter that said if Mr. Friedman submits to a

16   rabbinical court's jurisdiction the Heter is no longer in

17   effect, plaintiff doesn't confirm the Heter, plaintiff doesn't

18   act in accordance with the Heter, plaintiff sits and waits,

19   plaintiff watches Mr. Friedman commence a proceeding to

20   withdraw the Heter, plaintiff represents to Maysharim --

21             THE COURT:  When was the proceeding to withdraw the

22   Heter?

23             MR. SCHAFHAUSER:  The proceeding to withdraw the Heter

24   was commenced in June of 2015, again, five to six months before

25   the lawsuit.

Schreiber v. Friedman

1          THE COURT:  Okay, but he doesn't go to court then.

2          MR. SCHAFHAUSER:  He does not go to court then either.

3          THE COURT:  The September order comes out.  So he

4    waits for the September order, and then one of the conditions

5    of the September order is that $250,000 goes to one of these

6    Beth Dins.  By December 19 that hasn't happened, so he goes to

7    court.

8          MR. SCHAFHAUSER:  That is plaintiff's position.

9          THE COURT:  I'm sorry, September 2nd –– December 2nd.

10         MR. SCHAFHAUSER:  I understood what your Honor was

11   saying, December 2nd.  That is plaintiff's position.

12         But this is an interesting fact.  Plaintiff himself

13   was troubled by the fact that there was no deadline in

14   Maysharim's September 25 directive, and so plaintiff, a month

15   after that directive was issued, went back to Maysharim another

16   time.

17         THE COURT:  Okay.

18         MR. SCHAFHAUSER:  Another time and said, Maysharim,

19   would you please issue a date certain by which Mr. Friedman

20   needs to comply with the directives because it's unclear as to

21   when those directives have to be satisfied.  Maysharim never

22   issued a date certain.

23         So on December 2nd, when plaintiff chose to come to

24   this court, at that moment, under Maysharim's own directives,

25   there was no date certain; and plaintiff knew it, and plaintiff

Schreiber v. Friedman

1    had applied to get a date certain and was denied that.  So I

2    respectfully submit that's yet another fact, which, by the way,

3    cannot be disputed because it's in plaintiff's own submission.

4         There cannot be a reasonable reliance on an award

5    which is an interlocutory award.  The award on its face says,

6    your Honor, that if Mr. Friedman satisfies certain conditions,

7    the Heter will be removed.  Well, the moment that directive was

8    issued, plaintiff, most respectfully, your Honor, was on notice

9    that the Heter could be removed if Mr. Friedman satisfied the

10   conditions.  So as of that moment, plaintiff couldn't rely on

11   that directive.

12        Secondly, because it was an interim award, is wasn't a

13   final award; and, thus, it cannot be confirmed under the

14   Federal Arbitration Act either.  As plaintiff himself admitted

15   when he asked for the award to be -- for the Heter to be deemed

16   permanent and it was not.

17        So plaintiff came to court, in short, based on a Heter

18   that was procedurally flawed, a Heter on which he did not rely,

19   a Heter on which he did not confirm, a directive of Maysharim

20   which plaintiff admits was not permanent, a directive that was

21   subject to change; and plaintiff asked Maysharim to change the

22   directive, and, as well, Mr. Friedman's efforts to commence

23   other arbitration proceedings.  Plaintiff can quibble as to

24   whether the arbitration proceedings were the correct Beth Din

25   or incorrect Beth Din, whether the rabbinical court, your

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1   Honor, was the right one or the wrong one.

2          But the fact is that Mr. Friedman attempted to

3   commence arbitration proceedings before this lawsuit was filed.

4   He was not refusing to participate in arbitration, as plaintiff

5   alleges; and, therefore, on this record, based on the

6   documentary evidence, your Honor, I respectfully submit that

7   plaintiff cannot possibly demonstrate his burden of proving

8   waiver under the law in this circuit, your Honor.

9          THE COURT:  Is that true, even if the court were to

10  find that his efforts to his -- purported other efforts to

11  arbitrate were not genuine, is it still true that -- your

12  argument that because he had a Heter that was not final or an

13  interim award that he still couldn't legitimately come to

14  court?

15         MR. SCHAFHAUSER:  Yes.  The answer is if the court

16  were to discard the Beis Din Beis Yoseph proceeding and if the

17  court were to disregard the Zabla proceeding -- although I

18  respectfully submit we shouldn't -- but if the court were to

19  disregard those proceedings and to focus solely on the Heter by

20  Maysharim and the September 25 directive by Maysharim, on the

21  record of those two items, there cannot possibly have been a

22  waiver because Mr. Friedman, putting aside what he did with the

23  Zabla and what he did with Beis Din Beis Yoseph, was in

24  Maysharim asking for the Heter to be removed but the Heter

25  itself said that if he submitted to a rabbinical court

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1   plaintiff could not go to court any longer.

2           Last point on the Heter, your Honor -- and I want to,

3   by the way, thank your Honor for your patience in hearing these

4   arguments; they are obviously very significant to my client --

5   but the last point on the Heter, while we are talking about

6   rabbinical court proceedings, it must be noted that Maysharim

7   issued a single summons, contrary to its own procedure, in

8   December of 2014, and that summons said that if the defendant

9   failed to comply then the rabbinical court Maysharim would

10  entertain an application for the issuance of sanctions,

11  including a Heter.

12          Nowhere in the papers submitted by your Honor --

13  submitted by plaintiff to your Honor has plaintiff explained

14  how it came to be that between the issuance of a summons and

15  the issuance of a Heter, how Maysharim did that without a

16  communication by the plaintiff, without notice to Mr. Friedman,

17  without notice of an application for a sanction being

18  submitted.  Nowhere in the papers is there any explanation on

19  that significant point.  So the initial proceeding, your Honor,

20  most respectfully --

21          THE COURT:  Well, I think it's like default and

22  default judgment.  I mean he doesn't respond.  What has to

23  be -- there is certain relief that's being requested.  If he

24  doesn't respond, what is it that -- what have you shown as to

25  what is required to be done here?

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    MR. SCHAFHAUSER:  Well, what I have shown is

2  Maysharim's own document, your Honor, most respectfully.  That

3  document talks about an application; but, even under your

4  Honor's analogy of a default and a default judgment, one

5  actually has to apply for the entry of a final judgment by

6  default.  And there is no record here of how, when, where, and

7  on what notice plaintiff applied for the entry of a Heter.  And

8  the Heter was curiously issued approximately two and a half

9  weeks after the proceeding was commenced.

10    So within a two-week period we went from the first

11  summons and the only summons to the entry of, as your Honor

12  puts it, a final judgment by default.  It's on the basis of

13  that so-called final judgment of default that plaintiff

14  purports to have relied for the ensuing 11 months, although it

15  took no action to enforce that judgment.

16    THE COURT:  Wasn't there a hearing that he failed to

17  appear before, at a hearing?

18    MR. SCHAFHAUSER:  Well, there is no record of whether

19  there was a hearing or not.  There is no record before this

20  court of any hearing or any notice to Mr. Friedman of a

21  hearing.  The only thing that we have, your Honor --

22    THE COURT:  Well, the summons was --

23    MR. SCHAFHAUSER:  -- is the original summons.

24    THE COURT:  The summons is to show up though, right?

25    MR. SCHAFHAUSER:  Yes, the summons, yes, we have the

38

Schreiber v. Friedman

1   summons.  We have one summons.

2         THE COURT:  He, first of all, claimed that he didn't

3   learn about that, but then he admitted he did know about it.

4         MR. SCHAFHAUSER:  No.  What he claims, your Honor --

5         THE COURT:  Was that he didn't receive it or something

6   at first.

7         MR. SCHAFHAUSER:  -- is that he learned about one and

8   only one summons, but he understood that an additional two

9   summonses would be issued.  By the way --

10        THE COURT:  Didn't he first claim he didn't get any

11  notice of it until much later, and then at his deposition he

12  admitted he got it earlier?  I thought there was an

13  inconsistency there.

14        MR. SCHAFHAUSER:  Well, I think he testified -- he

15  testified in his deposition, your Honor, that, very

16  consistently, that he knew of one summons.

17        THE COURT:  Well, the timing of when he knew of the

18  summons was what was inconsistent.

19        MR. SCHAFHAUSER:  Well, he wasn't aware of two other

20  summonses, and what he also testified was that he did not learn

21  about the Heter until -- the Heter that was issued until a Beth

22  Din proceeding in April of 2015.  There was no rebuttal to

23  that.  So even when the Heter was issued, plaintiff never told

24  Mr. Friedman about the issuance of the Heter.  There is no

25  declaration by Mr. Schreiber to the contrary.

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1    So, on those facts, your Honor, I respectfully submit

2    that the scope of the agreement is clear, it's broad, under the

3    law it must be construed broadly; and on this record plaintiff,

4    who bears a very heavy burden under the law, has failed to

5    demonstrate a waiver.  The court then should, most

6    respectfully, grant my client's application, dismiss the

7    complaint, and refer the matter to a Beth Din arbitration.

8        (Continued on the next page.)

9                o O o

10   Certified to be a true and accurate transcript.
     /s/ Michele Nardone
11   MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

Schreiber v. Friedman

1          (In open court.)

2          THE COURT:  Where would it go?  Assuming that I grant

3    you the relief that you want that it goes to a Beth Din where

4    does it go?

5          MR. SCHAFHAUSER:  It would go to one of the Beth Dins

6    properly designated under the Two Rivers operating agreement.

7    And the Two Rivers operating agreement says a, "Beth Din," I

8    believe, "within New York or New Jersey."

9          THE COURT:  So that could be anyone.

10         Are you saying to goes back to the one that

11   excommunicated Mr. Schreiber?

12         I mean, would all of this would all of this litigation

13   go away if the plaintiff and Mr. Friedman now could agree on a

14   Beth Din to resolve all of this?

15         MR. SCHAFHAUSER:  Yes.  I submit that it would go

16   away.

17         And, your Honor?

18         THE COURT:  Let me ask plaintiff's counsel.

19         Assuming that you could come up with a Beth Din, I

20   don't know, we have gone to a Beth Din of America or someone,

21   where everybody agreed to who the arbitrators should be would

22   that solve this lawsuit?

23         MR. NELKIN:  Well, we don't believe so, your Honor,

24   for a couple of the reasons, not the least which a number of

25   defendants were not prepared to go to a Beth Din.

Schreiber v. Friedman

1        THE COURT:  Would it deal with the majority of the

2    case against Mr. Friedman?

3        MR. NELKIN:  Well, your Honor, I think that he parties

4    could always agree to go and have an arbitrator take care of a

5    claim or mediation.  That's part of just any litigation.  I

6    think that in -- we certainly would like to respond to a lot of

7    the things.

8        THE COURT:  I'm going to give you the chance.

9        MR. NELKIN:  But, basically, we believe that the law

10   is clear on this one that, for a variety of reasons, that we'd

11   like to respond to, that Beth Din proceeding is no longer

12   appropriate in this matter.

13        Now, that being said, assuming that the parties

14   could reach an agreement then that, you know, that any

15   lawsuit --

16        THE COURT:  Well, is that just not possible in your

17   view?

18        MR. NELKIN:  We think that it's very unlikely in light

19   of a number of reasons, not the least of which is

20   Mr. Friedman's efforts, we believe, to corrupt the Beth Din

21   process and the lack of transparency in the Beth Din process.

22        THE COURT:  In all Beth Din processes?

23        MR. NELKIN:  Unfortunately, from what we've seen, it's

24   very troubling, your Honor.

25        THE COURT:  So, this Beth Din of America, is that

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1    something that's --

2             MR. NELKIN:  The Beth Din America --

3             THE COURT:  -- reputable.

4             MR. NELKIN:  The Beth Din of America has refused to go

5    forward with the proceedings in the 26 Flavors case because of

6    Mr. Friedman's actions before them.

7             So they, themselves, said they wouldn't go forward

8    because of Mr. Friedman's actions in that case.  And that's in

9    our papers but I can explain that.  But, basically,

10   Mr. Friedman took the position that Two Rivers could not have

11   counsel and could not be represented in that matter, and they

12   felt that it was in denial of due process, and as long as he

13   continued to insist on that position.

14            He also took the position that they couldn't have

15   jurisdiction and he refused to agree to jurisdiction before the

16   Beth Din of America for all of these issues.

17            And so, between the fact that Mr. Friedman refused to

18   submit those issues to the Beth Din of America, and the fact

19   that he refused to allow Two Rivers to have counsel just for

20   the little matter that they were trying to deal with, the

21   Beth Din of America has notified the parties that they will not

22   proceed.

23            THE COURT:  Well, okay.  You want to be heard in

24   response to counsel then?

25            MR. NELKIN:  I would, your Honor.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

43

Schreiber v. Friedman

1        THE COURT:  Okay.  You can be seated, Counsel.

2        MR. SCHAFHAUSER:  I was going to finish up.

3        THE COURT:  I thought you had.

4        MR. SCHAFHAUSER:  Very well.

5        THE COURT:  It's hour an 20 minutes.

6        MR. SCHAFHAUSER:  Thank you, your Honor.  I will

7   respond.

8        THE COURT:  It's been at least an hour.  Maybe I was a

9   little late coming onto the bench.

10        Counsel.

11        MR. NELKIN:  Your Honor, I think at the very outset, I

12   need to correct the timeline on a number of fronts.  And I also

13   need to correct certain terms that I think Mr. Schafhauser was

14   using either incorrectly or interchangeably.

15        There is something called an hazmana or a summons,

16   that is, a request to arbitrate.  There is also something

17   called a heter, that is when someone refuses to respond to a

18   summons.

19        I think those two types of documents are very

20   important to distinguish.  And I think it's very important to

21   understand the timeline in this case.  I would also note before

22   I get to the timeline that at the hearing before in March 8th,

23   I believe, in response to the premotion conference submissions

24   where we raised things like the Lane case and the issues of

25   waiver, your Honor instructed the defendants to make sure that

Schreiber v. Friedman

1    their papers addressed their failure to go forward.

2           So I find it somewhat difficult to understand why they

3    wouldn't address that in their opening papers and would only

4    raise that in their reply papers.

5           THE COURT:  Only raise what in their reply papers?

6           MR. NELKIN:  The issues of waiver.

7           THE COURT:  They raised the issue of waiver in

8    their initial papers.  What they didn't raise was an argument

9    that waiver itself is arbitrable, that wasn't in the initial

10   papers.  They addressed the issue of waiver in their original

11   papers.

12          MR. NELKIN:  Be that as it may, we have issues with

13   what they put into their reply on that point.  The timeline is

14   as follows.

15          The timeline is in December, I believe, 16, 2014, the

16   plaintiffs had a summons sent from Maysharim to Mr. Friedman.

17   Mr. Friedman, although he told this court in his opening papers

18   that he never received it.  And he told the Middlesex court

19   that he never received it.  Admitted in his deposition that he

20   had received it.

21          He also admitted before Beth Din Maysharim, when they

22   quizzed him on it at length, and he told them that he ignored

23   it.  He testified in his deposition that he ignored to; that he

24   sent it to his lawyer, Herstow, and that he sent it to someone

25   else an Rabbi Gruber but he ignored it.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1      A heter was issued as a result of that.  Your Honor is

2  correct, it is like a default judgment.  If you don't show up,

3  they issue --

4      THE COURT:  Is there some requirement that they issue

5  three summonses?

6      MR. NELKIN:  Absolutely not.  I mean, you can go back

7  to the Talmud, and the Talmud says you have to respond to the

8  first one.  But you can also look at any of their documents

9  that they submitted.  The Laymen's Guide where they have these

10  procedures to Beth Din of America.  The summonses that had been

11  submitted from the different Beth Dins.  There is no place on

12  any of those where they say you have to -- you can ignore the

13  first two.  In fact, in Beth Din Maysharim they actually talk

14  to Mr. Friedman about that.

15      THE COURT:  What record is that of their talking to

16  him?  I mean, is there some record of some proceeding?

17      MR. NELKIN:  There is, in fact, a transcript of that

18  that exists.

19      THE COURT:  But it's not in the record here.

20      MR. NELKIN:  Well, it is, there's an affidavit where

21  people have testified about what was said by Mr. Friedman at

22  that.

23      THE COURT:  When was this that they were talking to

24  Mr. Friedman?

25      MR. NELKIN:  I will get to that in the timeline.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1          THE COURT:  Okay.

2          MR. NELKIN:  So, Mr. Friedman, notwithstanding the

3    fact they told this court that he didn't get the heter, the

4    summons, and notwithstanding the fact they told the Middlesex

5    court that he didn't get the summons, got the summons in

6    December and he ignored it.  He ignored it for a very long

7    time, whether or not he knew about the heter or not.  We

8    believe he did know about the heter since the heter was sent to

9    him.  But we also believe he knew it about since the day after

10   the heter was issued.

11         THE COURT:  Who sent it to him?

12         MR. NELKIN:  The Beth Din Maysharim.

13         THE COURT:  Now, how do we know that?

14         MR. NELKIN:  I believe that there is evidence of that

15   that's in the record, your Honor.

16         But regardless of that point, he knew about the

17   summons and the request to arbitrate, and he simply he chose to

18   ignore it.  There's testimony in the record about he told

19   people about how he dealt with Beth Dins.  He would often

20   ignore them despite admitting that he got it.

21         At some point, he learned about the heter.  Again,

22   he's told different stories about when he learned about it.  I

23   think he told in the record the different points where he said

24   he first learned about it in the Middlesex case.  He's now

25   admitted that he learned about it at least in April at the

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1    hearing before the Beth Din of America and that's certainly

2    true because --

3                THE COURT:  April of what year?

4                MR. NELKIN:  April of 2015.

5                Because I circulated that, I was at that hearing, and

6    circulated it in the room.

7                THE COURT:  He knew about it then.  That's when the

8    Middlesex, New Jersey case was going on.

9                MR. NELKIN:  That's the Beth Din of America there's a

10   hearing of that and he submitted a transcript and he refers to

11   the record in his reply and admits that he now got it at least

12   at that date in April.  He then ignored that.  He didn't do

13   anything about it.

14               THE COURT:  At the heter in April?

15               MR. NELKIN:  Yes.  He certainly got a copy of it in

16   April and knew about it in April when he attended the Beth Din

17   of America proceeding in the 26 Flavors matter.  He ignored to.

18   He ignored it until it started going bad for him in the

19   Middlesex case at which point he went to Beth Din Maysharim and

20   said he wanted to have them hold a hearing to rescind the

21   heter.

22               THE COURT:  When did he do that?

23               MR. NELKIN:  Certainly, by in June of '14 I think is

24   in the record.

25               So a couple of months after he admittedly knew about

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1    the heter, and about six months after he knew about the summons

2    that he ignored.  There is then a proceeding before the

3    Beth Din Maysharim that he submits to that he accepts their

4    jurisdiction of and where they hold a full hearing where he's

5    represented by a representative at, and they quizzed him about

6    all sorts of thing like why he ignored the summons.

7            THE COURT:  Is there a transcript of that in the

8    record?

9            MR. NELKIN:  What there is in the record is an

10   affidavit from one of the partners that says that he testified

11   about that.

12           THE COURT:  Okay.

13           MR. NELKIN:  At that point, he -- that results in a

14   September 25th ruling from Maysharim which they call "Psak or

15   "Psak Din."  Another term to be aware of, Psak Din is defined

16   in some of the submissions such as the laymen's submissions.

17   It is a final award.  There is also a case that we cited from

18   New York, I think it's the Kamar case that recognizes that a

19   "Psak" or "Psak Din" is a final arbitration award, and they

20   issued one in September 25th.

21           He then does not comply with that, he ignores it.  And

22   worse than ignores it, he goes and runs to another Beth Din,

23   one that had been specifically rejected by Maysharim.

24           THE COURT:  How do we know?  What evidence does that

25   that it was?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1          MR. SCHAFHAUSER:  That's in the record.  They had

2     asked each of the parties to submit potential Beth Dins and to

3     comment on the other parties' Beth Din.

4          THE COURT:  We have records in this record here?

5          MR. NELKIN:  Yes.  You'll see partial -- I think

6     Mr. Schafhauser has attached at least one of those where

7     there is a letter from either me or Carol to the Beth Din

8     Maysharim responding to those commenting on those potential

9     Beth Dins.

10         So he submits a couple of Beth Dins.  He knows

11    Machon L'hora and he submits a -- where his partner gave

12    hundreds of thousands of dollars in donations.  He submits to

13    Bais Joseph where we raised a whole bunch of issues relating to

14    their intertangling in lawsuits that relate to our case.  Some

15    donations that were made to them and other matters that we

16    thought rendered them inappropriate.

17         And Maysharim issued an order that says that he has to

18    escrow $250,000 with one of three Beth Dins and he has to sign

19    an arbitration agreement with one of them things.  He doesn't

20    do that; in fact, he runs to this other Beth Din, Beth Din

21    Bais Joseph, and he proceeds to have them go and send summons

22    to the plaintiff and the other members of Two Rivers saying

23    that they inappropriately went to Maysharim and that they have

24    Maysharim's ruling was invalid and ultimately resulting in him

25    being excommunicated for trying --

50

Schreiber v. Friedman

1          THE COURT:  Which group excommunicated him?

2          MR. NELKIN:  Beth Din Bais Joseph.

3          THE COURT:  Okay.

4          MR. NELKIN:  For relying on that heter.  And they do

5     all of that before the new Maysharim action.

6          The final excommunication order comes out.  It's dated

7     Sunday, which was before Hanukah, December 13th, but it's not

8     mailed until December 17th.  December 13th, as we note in our

9     papers, is an unusual day.  It was the day before a hearing

10    where the parties agreed to have no further a standstill

11    agreement with regard to all Beth Din activities.

12         The plaintiffs believe that that document was actually

13    backdated to obscure the fact it was issued after the hearing,

14    particularly, since the hearing -- it took a very long time to

15    reach an agreement with respect to standing still on those

16    Beth Din issues.

17         The plaintiff repeatedly sought to arbitrate this with

18    Mr. Friedman, sent him a summons, and there is one other point

19    that I left out, I apologize.

20         Mr. Friedman, when he contacted the Beth Din Maysharim

21    in June, suggested to Beth Din Maysharim that he wanted to

22    pursue a Zabla proceeding.  There was a number of objections to

23    do that, one of out of time based on their initial summons;

24    two, it was inappropriate for a number of reasons, the number

25    of parties and other things.  And also the fact that there is

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

51

Schreiber v. Friedman

1   Zabla proceeding is a known way to delay and stretch out, or

2   thwart, Beth Din proceedings.  Because, basically, you have to

3   get two rabbis, one from each party, to agree on a third and

4   they have to agree on procedures.  And, basically, you have to

5   set up and constitute an ad hoc Beth Din and agree to all the

6   procedures.  When you have multiple parties and you don't have

7   just two, and when you have people like Mr. Friedman.

8          THE COURT:  Was there ultimately an agreement in

9   July 2015 for the parties to submit to the jurisdiction of the

10  Maysharim.

11         MR. NELKIN:  Yes.  That's what resulted in the

12  hearing.  And, at that hearing, he raised the issue of the

13  Zabla and they disregarded it and they said they thought that

14  was inappropriate.

15         THE COURT:  So he submits to the jurisdiction of

16  Maysharim, and in that same time is when he talks about let's

17  do a Zabla, they say no, and then they issue this award saying

18  the heter will be withdrawn if?

19         MR. NELKIN:  Correct.

20         Now, he again ignores that award runs and acts

21  completely inconsistent with it by obtaining multiple, well,

22  with Beth Din Bais Joseph repeatedly arguing that that award

23  was inappropriate and that it was contrary to Jewish law; that

24  it was invalid and so outrageous that it resulted in the

25  excommunication of my client and the others.

Schreiber v. Friedman

1        Mr. Schafhauser argues that that's not inconsistent

2   with Maysharim's verdict, but it's certainly inconsistent with

3   the September award at the Psak Din.

4        THE COURT:  He makes a point that you go there and try

5   to confirm this and try to get the Maysharim and give a

6   deadline and they don't give a deadline.  So what does that

7   mean to the enforceability of this heter?

8        MR. NELKIN:  On that, I would say it's important to

9   understand the deadlines for acting with regard to arbitration

10  awards both under the FAA and New Jersey law.  Under the FAA,

11  you have 90 days to seek to vacate an award.

12        THE COURT:  And you say the first issuance of the

13  heter was, in fact, an award?

14        MR. NELKIN:  Yes.  They use the term Psak, Psak Din.

15        THE COURT:  When they issued the initial heter or

16  later?

17        MR. NELKIN:  They referred to it as a Psak, and

18  Mr. Friedman testified it was a Psak.  And he testified what a

19  Psak was.

20        THE COURT:  But which award are we talking about?

21        MR. NELKIN:  September.

22        THE COURT:  We're talking about September.

23        MR. NELKIN:  September.

24        THE COURT:  Okay.

25        MR. NELKIN:  And so, they issue that.  He had two

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1   choices.  He had 90 days to seek to vacate it, he didn't.  I

2   should clarify it's 90 days from the receipt.  In their papers,

3   you'll see some arguments that our filings to vacate some of

4   these other awards were untimely because they came a day or two

5   after the timeline they come after a receipt.

6          So the Beth Din Bais Joseph, which was postmarked --

7   and it's in the record, the postmark is the 17th, it wasn't

8   received until the 18th, so that's when that three-month

9   deadline would run from.

10         The same thing from the others in terms of receipt.

11  Others are from issuance, it depends on which law you're

12  looking at.

13         But the other alternative is 20 days for the

14  arbitrator to revise it upon a motion or request.  While we

15  asked them to clarify certain things, we did that within the

16  20-day window, they chose not to.  Mr. Friedman admits that

17  they chose not to.

18         But we believe that that was simply one within the

19  window that was able to be done, and when they chose not to do

20  it, it remained in place and final, at least from them, no

21  longer being able to alter its terms.  But also once the

22  90 days changed, Mr. Friedman can't seek to reverse it or

23  vacate it.

24         THE COURT:  But what's the affect of it not having a

25  deadline for him to comply with it?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1    MR. NELKIN:  The way that we understood that is that

2    we were entitled to go and file.  We did not race to the

3    courthouse to do it.  We tried to resolve it with him in a

4    number of options.  First with the summons, then with the

5    heter, which he knew about.  And after Maysharim ruled, for

6    four months, he just chose not to do anything and ultimately we

7    went to court.

8          And so, we feel that once we went to court that that

9    was -- we're in court and it cannot be withdrawn.  It certainly

10   can't be withdrawn by the panel.  They can't alter the terms,

11   and we feel that the record is clear that Mr. Friedman hasn't

12   complied with the terms anyway because he didn't deposit the

13   money with one of the three specified Beth Dins.  He didn't

14   even deposit the money, someone else did.

15         And so, we also feel that there are a number of things

16   that we were unaware of that we're now aware of.  For instance,

17   the fact that the overlap between judges with the Beth Din that

18   he seeks to go to, or I guess he says he doesn't have to go to

19   that one now anyway.  And Machon L'hora where all the money is

20   involved.  And so, we feel that to -- that failure disclose

21   those facts and --

22         THE COURT:  Failure to disclose which facts?

23         MR. NELKIN:  The fact that all the judges at the other

24   Beth Dins --

25         THE COURT:  Which other Beth Din are we referring to?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1          MR. NELKIN:  The U'Mishapt.  It terms out all the

2    judges --

3          THE COURT:  I thought the U'Mishapt was one that they

4    allowed him to go to if they wanted to.

5          MR. NELKIN:  They did, but he didn't until after we

6    filed a case.  He didn't go to them or seek to go to them until

7    several months after we filed the case.

8          THE COURT:  So after you filed the case, he goes to

9    one of the selected Beth Dins.

10         MR. NELKIN:  Not exactly.  What he did was, and we

11   don't understand it, certainly, seems suspicious to us, he goes

12   it Machon L'hora.  He lives in Lakewood, the U'Mishapt is in

13   Brooklyn.  He goes to Machon L'hora up in Monsey.

14         THE COURT:  Which is where he lives?

15         MR. NELKIN:  No he goes to Lakewood, all the way south

16   towards the Jersey Shore.

17         So he doesn't go to the one in U'Mishapt, he goes to

18   Machon L'hora.  Someone else gives them money.  Someone who has

19   a long history of making, I put air quotes around it,

20   "charitable contributions," to that institution.  We know just

21   from the documents we submitted to the Court, tax filings,

22   $695,000 worth of them, submits another 250,000, and

23   Mr. Friedman admits that that was not him that submitted it,

24   and --

25         THE COURT:  Okay.  But we're not at this -- when does

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1    get to the U'Mishapt?

2              MR. NELKIN:  January 27th is when the document that

3    they submitted is signed.  January 27, 2016.

4              THE COURT:  So where is the money now, the 250,000?

5    That's not at --

6              MR. NELKIN:  U'Mishapt.  It's at Machon L'hora.

7              THE COURT:  So does that fulfill that September 25th

8    order?

9              MR. NELKIN:  Not in my mind.  If it says you have to

10   deposit $250,000 with one of these three, and you deposit it

11   with a fourth one that is not specified --

12             THE COURT:  That's what I was asking you.  Beth Din

13   U'Mishapt is one of the ones that's listed.

14             MR. NELKIN:  One of the difficulties is that some of

15   the words overlap but they're different.

16             THE COURT:  So it's not the same one.

17             MR. NELKIN:  Machon L'hora, which may fit the term,

18   "Beth Tzedec" or not, Machon L'hora is an institution in

19   Monsey.  It is a Beth Din in Monsey.

20             THE COURT:  It is not one of the three?

21             MR. NELKIN:  It is not one of the three that is

22   specified.

23             THE COURT:  Okay.  So he starts a proceeding there and

24   puts the money there?

25             The money is in Monsey?

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1        MR. NELKIN:  The money in Monsey officially.  We have

2   not seen any record of that, there has been no proof of it.

3   He, himself, testified that Joseph Friedman he thought gave it

4   to a building, he wasn't sure.  He thought there might have

5   been a check back and forth.  Maysharim appeared to believe it

6   was a result of a wire from Mr. Friedman; in fact, it was not,

7   we know that based on his testimony.

8        So Mr. Friedman did not deposit any money and he

9   didn't deposit -- no one deposited the 250,000 with any of the

10  three specified Beth Dins, and I believe that's undisputed.

11       My colleague can stand up if he disputes that but it's

12  undisputed.

13       The fact is as the case law makes it very clear.  Your

14  Honor asked, well, how can you run it from one Beth Din to

15  another?  The answer is you can't.  There is a case we cite,

16  the Arrowood case, in our papers.  It's very clear that once

17  you submit to one arbitration panel, you can't run to an

18  entirely different one and seek to overturn it.  Your options

19  are to go back to the same panel within the 20 days, or to go

20  to Court within 90 days.  We cited a bunch of law.

21       THE COURT:  So your position is he'd already submitted

22  to the Maysharim when they came up with these conditions.  So

23  he's already submitted to that one.

24       MR. NELKIN:  Right.  And one of the things that's at

25  issue here is that Mr. Friedman, notwithstanding his counsel's

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1    able argument, he's played games.  If you look, it's in the

2    record.  We quoted it at length in our briefs, but it's also, I

3    think, Exhibit 62 or 61 in our opposition.

4         Mr. Schafhauser, on the same day, that he that the

5    Beth Din Bais Joseph is issuing their first summons writes to

6    Maysharim and says, "You had no jurisdiction, there was never

7    an agreement to do anything.  You have to write right to do

8    it."

9         We quoted at length because it's no counter to

10   somewhat he's trying to argue now, and that's a problem and I

11   think that's somewhat all the cases that we cite like Lane in

12   the Second Circuit, the other cases, they don't like people

13   playing games and ping-ponging back and forth and refusing to

14   arbitrate or thwarting arbitration processes, or claiming that

15   they'll arbitrate and then imposing conditions like you can't

16   have counsel representing you.  Those are all things the courts

17   have said are inconsistent with a desire to arbitrate and they

18   result in a forfeiture of the right to arbitrate.

19        But one also has to question.  Mr. Friedman claims

20   that he wants to arbitrate, but at each instance when he's

21   given a chance to arbitrate he chooses not to he ignores it.

22        In papers, he says, Well, earlier on, they asked me to

23   arbitrate before a secular panel and I want to go to a rabbinic

24   panel.  Then, when he gets notice from the rabbinic panel, he

25   ignores it.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1    When he gets the -- he learns of the heter, he sits on

2    it, doesn't go back to Maysharim for awhile.  When he goes back

3    to Maysharim, and they issue the same, we'll give you a second

4    chance, just do these two or three things he refuses to do them

5    and doesn't do them.

6         And the case law is clear that when you -- the case

7    law is a lot clear -- that you don't have windows, like, a year

8    they took.  One month, two months, three months.  These type of

9    windows that are in the case law where that seemed --

10        THE COURT:  What's import of your request for a

11   deadline and their failure to give it to you?

12        MR. NELKIN:  We, again, don't believe that that had

13   any import once we filed the case.  I think --

14        THE COURT:  But you asked for that before you filed

15   the case.

16        MR. NELKIN:  Our concern was, as your Honor has seen,

17   the pleadings in this case are a very extensive pleading, and I

18   think that there was some concern that we would be working in

19   reliance on the heter and then someone might try and rescind

20   and then we'd have an extra argument that there was -- that

21   that happened before we filed.  But, in fact, that didn't

22   happen because he never was willing to arbitrate, and so, we

23   ultimately were able to complete the work and we filed.  And

24   once you file --

25        THE COURT:  And why didn't you answer the summons or

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1    your client answer the summons from the --

2         MR. NELKIN:  We did.  We answered them four times.

3    That's in the record.

4         THE COURT:  What did you say?

5         MR. NELKIN:  We said, you have no jurisdiction,

6    there's been a previous panel.  We attached the heter.  We ran

7    through all of the stuff.  We said, Mr. Friedman lacked the

8    authority to go to it.  We said, Here are the facts, and we did

9    it four times.

10        So that's four opportunities that Mr. Friedman had to

11   go and arbitrate before one of the three panels that they had

12   specified he was able to go to.  He just didn't want to, and

13   so, he each time we respond and say, and all four of them are

14   in the record, we say, You should be aware that this happened;

15   you should be aware that there's no jurisdiction; you should be

16   aware that Mr. Friedman doesn't have the authority or the right

17   that I think we cited some of the case law like Arrowood and we

18   laid out facts there, and what we'd get in the response, and

19   the translations are there, and we spoke with all the junction

20   at Maysharim.  So there is an ex parte communication admitted

21   to and we discussed this case.  And after discussing it with

22   Maysharim, we, Beth Din Bais Joseph, believed that the

23   Maysharim had no authority to issue the heter and it's improper

24   and you can't rely on it and ultimately excommunicate my client

25   for relying on it.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1          THE COURT:  That happened in January.

2          MR. NELKIN:  No, the excommunication happened,

3     according to the dated document, December 13th.  It was not

4     sent out until December 17th and not received until afterwards.

5

6          THE COURT:  So how did it come about that Maysharim

7     issued the reversal?  We don't know?

8          MR. NELKIN:  We don't know.  You will see in our

9     papers at the end of our opposition, we've made it clear, that

10    we received no discovery from the defendants.  They have not

11    produced a single document.

12         THE COURT:  Have you raised this with the magistrate

13    judge?

14         MR. NELKIN:  We raised a number these issues with the

15    magistrate.  We attached one of the things, a portion of the

16    transcript, where he says that future hearing they're seeking

17    to postpone or eliminate, he says that's one of the things that

18    we'll be discussing at the hearing -- the fact that they would

19    not allow to us inspect or take a look at documents we've

20    requested.

21         We've mentioned to the magistrate the fact that they

22    never responded to our subpoena related specifically to

23    Beth Din issues -- payments to Beth Dins, communications with

24    Beth Dins, questions like that we attached that in the record.

25    And we attached their opposition where they say these are

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1    irrelevant, these are not likely to lead to useful information.

2    That's all part of the record.

3            THE COURT:  But it hasn't been resolved by the

4    magistrate these complaints?

5            MR. NELKIN:  Not yet.  There are also issues related

6    to the fact that other things have disappeared that are also

7    subject to letters to your Honor both from both parties related

8    to this hearing but where we mentioned it.

9            THE COURT:  That's a hearing where you claim that

10   that, I mean, the claim is articles that you have requested in

11   discovery have been --

12           MR. NELKIN:  The magistrate, I believe, has ordered to

13   go through different discovery issues at that hearing.  But

14   there are other matters that are at that hearing, it's an

15   evidentiary hearing.

16           THE COURT:  What do you understand the evidentiary

17   hearing to be about?

18           MR. NELKIN:   At the very least, the evidentiary

19   hearing appears to be about two things in our understanding.

20           One is there was an order that certain computers were

21   to be turned over for imaging.  We discovered -- we asked

22   counsel how many there were, he told us we felt that that was

23   insufficient based on our review of photographic evidence of

24   people walking out the door like Mr. Friedman with computers

25   under his arms in sworn afterwards that we entered into the

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1    record with Judge Orenstein.

2            Judge Orenstein ordered them to produce affidavits.

3    We had a hearing and he felt their affidavits were insufficient

4    and ordered them to produce new affidavits related to their

5    computers and where they possessed them and where they are now

6    and that sort of stuff.  That's one issue.

7            The other issue is, pursuant to the preliminary

8    injunction, there is not supposed to be any concealment of

9    computers or any destruction of computer or electronically

10   stored information.  Right after we got their objections to

11   our discovery request where they said we should refer to

12   Two Rivers's computer systems for those, or to Two Rivers

13   for those, Two Rivers launched computer system, which was

14   one of that primary system and has payroll whole bunch of key

15   records on it simply disappeared.  Went offline, can't be

16   accessed.

17           The other defendants utilize that system, and so,

18   basically, we raised that issue with Judge Orenstein and I

19   believe that's an issue as well.

20           In addition, we raised the issue with the fact that

21   your Honor had gone through what type of discovery we're

22   entitled to.  We had a discussion on the record which I think

23   we've attached a portion into the different submissions here as

24   an exhibit as to certain types of categories of information

25   that we were entitled to.  We believe, your Honor, since we

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

64
Schreiber v. Friedman

1   hadn't received those, we raised those with Judge Orenstein and

2   we attached a transcript where he says, That's for the hearing

3   that's coming up in a week or two.

4          So there are multiple matters of that, but some relate

5   to discovery issues and some relate to, for lack of a better

6   word, spoliation issues.

7          THE COURT:  Spoliation of documents that you had

8   requested in discovery; correct?

9          MR. NELKIN:  Correct.  Spoliation issues taking place

10  subsequent to the filing of the case as opposed to prior to the

11  case.

12         THE COURT:  Okay.  All right.  Thank you.

13         MR. SCHAFHAUSER:  Your Honor, may I just briefly

14  respond to a couple of items that counsel addressed.

15         THE COURT:  As long as it's not repeating what you

16  said the first hour you stood up.

17         MR. SCHAFHAUSER:  And I will try my best.

18         Your Honor, asked counsel a question about an

19  agreement in July, and it's an important question that your

20  Honor asked.

21         Your Honor elicited the answer that the parties did,

22  in fact, agree to submit to Maysharim's jurisdiction in July.

23  Well, under the heter, which is Exhibit 7 to plaintiff's

24  papers, the heter says and I quote, "plaintiffs are allowed to

25  submit their claim against him in secular court so long as the

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1   defendant fails to accept upon him the authority of a

2   rabbinical court and the burden of Jewish law to signing an

3   arbitration agreement."

4        Your Honor just heard plaintiff admit through counsel

5   that Mr. Friedman did not fail to submit to the jurisdiction of

6   a rabbinical court.  He indeed submitted to the jurisdiction of

7   a rabbinical court in July.  So, therefore, as of that moment,

8   the terms of the heter were unenforceable.

9        Second point.

10       THE COURT:  Well, the Maysharim must not have thought

11  so because in September they issued an order which said the

12  heter would be withdrawn but only on certain specific

13  circumstances.  So they, obviously, didn't view it as withdrawn

14  in July.

15       MR. SCHAFHAUSER:  The Maysharim ruled as it did.

16       THE COURT:  Right.

17       MR. SCHAFHAUSER:  There's no doubt about it.  And

18  Maysharim --

19       THE COURT:  So the way they interpreted their own word

20  wouldn't have been that, look, your showing up is all we need.

21       MR. SCHAFHAUSER:  I suppose that is correct here, your

22  Honor, but if we're going to also adopt Maysharim's

23  interpretation of their own words.  Maysharim also ruled in a

24  ruling that Mr. Friedman had complied with the directives that

25  your Honor is referring to and, in fact, did rescind the heter.

66

Schreiber v. Friedman

1    And I respectfully submit that under the Federal Arbitration

2    Act that final ruling should be enforced.

3            But let me go back.

4            THE COURT:  We've talked about all of that, is there

5    something that pertains to something new that --

6            MR. SCHAFHAUSER:  Yes.

7            THE COURT:  -- that counsel said?

8            MR. SCHAFHAUSER:  Yes.

9            Counsel talked about a number of things such as your

10   Honor asked a question about where in the record is there

11   evidence that the heter was sent and served to plaintiff.  And

12   counsel said, "Oh, it's in the record."

13           There's nothing to that I've seen in this record.

14   Counsel was also asked by your Honor and, again, burden is on

15   plaintiff on waiver.  Counsel was also asked about what

16   happened.

17           THE COURT:  Are you disputing the fact that the

18   Maysharim would send the heter to your client?

19           MR. SCHAFHAUSER:  I am disputing that the heter was

20   sent to Mr. Friedman because I am, and as Mr. Friedman himself

21   testified to repeatedly, he was not aware of the heter until

22   April of 2015.  And by the way, not even plaintiff says that he

23   told Mr. Friedman about the heter.  Remember plaintiff has the

24   burden.

25           THE COURT:  I know.

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1          MR. SCHAFHAUSER:  There's no affidavit from plaintiff.

2          THE COURT:  Okay.

3          MR. SCHAFHAUSER:  Another issue.

4          As Mr. Schreiber's counsel asserts that he relied on

5    the directives of Maysharim dated September 25, 2015, but six

6    weeks before that directive was issued, counsel submitted time

7    sheets to Maysharim saying that in a matter entitled Schreiber

8    v. Friedman counsel, same counsel that's appearing today, had

9    billed 619 hours for a total of $314,000 in August of last year

10   before, not after, but before the September 25th directive was

11   issued on researching and working on a matter that didn't even

12   yet exist entitled, Schreiber v. Friedman.

13         THE COURT:  So that's relevant to what?

14         MR. SCHAFHAUSER:  That's relevant to the lack of

15   reliance on the September 25th ruling and what --

16         THE COURT:  You mean, why are we doing research if

17   we -- but that's research that occurred before the September

18   ruling.

19         MR. SCHAFHAUSER:  It occurred before, not after.  And

20   the reason it occurred before, your Honor.

21         THE COURT:  What does that establish?  I don't

22   understand your point.

23         MR. SCHAFHAUSER:  My point, and I guess I didn't say

24   it well, so let me try again.

25         The reliance couldn't possibly have begun on

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1    September 25th when Maysharim issued its directive because

2    plaintiff was angling to file suit against Mr. Friedman well

3    before, months before.  And the reason, your Honor, that this

4    suit was timed when it was most respectfully had nothing to do

5    with the heter or the rabbinical courts.  It had to do with the

6    fact that --

7              THE COURT:  I don't know why that's relevant.

8              Is there anything else, counsel, that you really feel

9    that you have to address because it's getting late.

10             MR. SCHAFHAUSER:  Yes.

11             The other thing he talks about discovery.  Plaintiff

12   has yet to produce a single document.  He hasn't mentioned

13   that.  Plaintiff has not produced.

14             THE COURT:  Well, all of you can raise your discovery

15   issues with the magistrate judge.

16             To the extent that there's some request for staying

17   some proceeding before the magistrate judge, I'm not inclined

18   to stay any hearings that the magistrate judge has set.  I

19   think they seem to deal with the issue of discovery and what

20   has taken place in the discovery that's been ordered so far.

21   If you have concerns, counsel, about the discovery that you

22   think that you've asked plaintiff's counsel for and haven't

23   gotten I think that you need to raise that with Judge Orenstein

24   at least in the initial.

25             MR. SCHAFHAUSER:  Your Honor, may I just be heard on

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1    that because somewhat your Honor heard from plaintiff's counsel

2    today is not somewhat plaintiff's counsel.

3              THE COURT:  Be heard on what?  What part.

4              MR. SCHAFHAUSER:  Heard on the scope of the hearing.

5    The scope of the hearing before Judge Orenstein.  Your Honor

6    heard --

7              THE COURT:  As to that, as to the scope of the hearing

8    before Judge Orenstein, I'll review your papers on that.  I

9    know you've complained that the scope is too large and I'll

10   advise the parties at some point next week of my views on the

11   scope of it.

12             MR. SCHAFHAUSER:  Very well.  One last point I just

13   don't want to be in a position where plaintiff argues waiver so

14   I want to clearly say this, your Honor.

15             THE COURT:  It's not in the 90 pages that you put in

16   your reply?

17             MR. SCHAFHAUSER:  In response to what plaintiff said

18   this afternoon.

19             THE COURT:  Okay.

20             MR. SCHAFHAUSER:  My position, your Honor, so it's

21   clear, is that the Court can find that plaintiff did not bear

22   itself.  If, however.  If, however, the Court finds there's an

23   issue of fact as to waiver, yes, we would then submit that we

24   are entitled to discovery including a deposition, including the

25   other things that I outlined in the papers, and I'm certainly

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

Schreiber v. Friedman

1    not waiving that request, nor the right of my client to a

2    hearing and discovery if your Honor does find that there are

3    issues of fact.  I believe there aren't, but I just wanted to

4    put that on the record for that.

5              THE COURT:  Okay.  Fine.  Thank you.

6              MR. SCHAFHAUSER:  Thank you.

7              (End of proceedings.)

8                              o O o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter