1059

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - - - X
 3
      STEVEN SCHREIBER,              :   15-CV-6861(CBA)
 4    individually and              :
      derivatively on behalf of     :
 5    TWO RIVERS COFFEE, LLC,        :
                                     :   United States Courthouse
 6              Plaintiff,           :   Brooklyn, New York
                                     :
 7                                   :
                                     :
 8         -against-                 :
                                     :   Wednesday, August 3, 2016
                                     :   9:30 a.m.
 9    EMIL FRIEDMAN, ET AL.,         :
                                     :
10              Defendants.          :
11    - - - - - - - - - - - - - - X
12         TRANSCRIPT OF CIVIL CAUSE FOR EVIDENTIARY HEARING
               BEFORE THE HONORABLE JAMES ORENSTEIN
13              UNITED STATES MAGISTRATE JUDGE
14                     A P P E A R A N C E S
15    For the Plaintiffs:           JAY PHILIP NELKIN, ESQ.
                                    CAROL NELKIN, ESQ.
16
17    For the Defendants           PAUL HANS SCHAFHAUSER, ESQ.
      EMIL FRIEDMAN AND NEW YORK BEST
18    COFFEE, INC.:
19
      For the Defendants           DAVID B. GRANTZ, ESQ.
20    E&I INVESTORS GROUP, LLC, E&J
      FUNDING CO., LLC,   E&J
21    MANAGEMENT INC., E & JERYG
      MANAGEMENT CORP., LLC, 24 HOUR
22    OIL DELIVERY CORP., MB FUEL
      TRANSPORT, MB FUEL TRANSPORT I,
23    ASSOCIATED FUEL OIL CORP.,
      LIGHT TRUCKING CORP.; 165
24    STREET REALTY CORP. AND PARK
      AVENUE ASSOCIATES:
25
```

1060

1           A P P E A R A N C E S (cont'd.):

2

For the Defendants              RICHARD AVERY FINKEL, ESQ.
3   SYLVIA EZELL, SONIA RIVERA,
AND JORGE SALCEDO:

4

5   For the Defendants              RICHARD BRUCE FELDMAN, ESQ.
MICHAEL DEVINE AND MICHAEL
6   DEVINE, CPA:

7

For the Defendants              ANDREW W. GEFELL, ESQ.
8   GEOFFREY HERSKO AND GEOFFREY
S. HERSKO, P.C.:

9

10  For the Defendants              MAURICE HELLER, ESQ.
SOLOMON BIRNBAUM, SINGLE
11  SERVE BEVERAGES DISTRIBUTION,
CRAZY CUPS, 26 FLAVORS, LLC,
12  OFFICE COFFEE SERVICES, LLC,
AND TWO RIVERS COFFEE, LLC:

13

14  Court Reporter:                 JOSHUA B. EDWARDS, RDR, CRR
225 Cadman Plaza East
15                                  Brooklyn, New York 11201
joshuabedwards1980@gmail.com

16

Proceedings recorded by mechanical stenography; transcript
17  produced by Computer-Assisted Transcription.
                    *        *        *
18              MR. SCHAFHAUSER:  Your Honor, I wish to apologize

19  for being late.

20              THE COURT:  All right.

21              MR. SCHAFHAUSER:  I'm really sorry.

22              THE COURT:  I understand.  It happens.  Leave

23  earlier next time.  We will start on time in the future and

24  anyone who is late will read the transcript.

25              MR. SCHAFHAUSER:  Yes.  Thank you, Your Honor.

 1          THE COURT:  And the witness?

 2          MR. NELKIN:  Mr. Salcedo.

 3          THE COURT:  Mr. Salcedo, are you here?  Come on up,

 4   please.

 5          (The witness assumes the stand.)

 6          THE COURT:  Raise your right hand.

 7   **JORGE SALCEDO**, called as a witness, having been first duly

 8   sworn, was examined and testified as follows:

 9          THE COURT:  Have a seat, please.

10          Go ahead, sir.

11   DIRECT EXAMINATION

12   BY MR. NELKIN:

13   Q    Please state your full name.

14   A    I didn't hear.

15   Q    I'm sorry.  Please state your full name.

16   A    Jorge with a "J" Salcedo.

17   Q    Are you also known by "hor-hey" (ph)?

18   A    Yeah, that is in Spanish.

19   Q    Okay.  And which one do you tend to --

20   A    Makes no difference.

21   Q    Where do you reside?

22   A    In the Bronx.

23   Q    What address?

24   A    1567 Paulding Avenue.

25   Q    And do you own or rent that?

1   A    I own that.

2   Q    Okay.  And who did you buy it from?

3   A    The Ahearns.

4   Q    Okay.  And do you know when you bought it?

5   A    Twenty-five years ago, 30 years ago.

6   Q    And how long have you known the Ahearns?

7   A    Twenty-five years, 30 years.

8   Q    Have you known them through a business relationship or

9   have you known them as friends?

10  A    Both.

11  Q    Okay.  When did you first start working for the Ahearns?

12  A    About 25 years ago.

13  Q    And do you remember what company you started working for

14  them for?

15  A    Could have been Associated Fuel.  It's such a long time.

16  Q    And do you know where that company was located?

17  A    Well, I think it's in the Bronx, 141 East.

18  Q    165th Street?

19  A    Yeah.

20  Q    Are you employed now?

21  A    Yes.

22  Q    And who is your employer?

23  A    N&S, N&S Fuel.

24  Q    N and S?

25  A    Yeah.

1    Q    Okay.  And who owns that company?

2    A    According to my understanding is, his name is Max, and

3    then Nick.

4    Q    What are their last names?

5    A    I don't know their last name.  Nick I know is Ahearn.

6    Q    Nick is an Ahearn?

7    A    Yes, last name is Ahearn.

8    Q    Okay.  But you don't know Max's last name?

9    A    No.

10   Q    And where is that business located?

11   A    Hawthorne.

12   Q    Hawthorne?

13   A    Yeah.

14   Q    And do you work in Hawthorne?

15   A    No.  They call me, give me work through my phone.

16   Q    Through your phone?

17   A    Right.

18   Q    Okay.  What type of phone is that?

19   A    Samsung phone.

20   Q    And where do you actually go?  Do you go to a particular

21   job site?

22   A    Yes.

23   Q    And where is that?

24   A    Anywhere they send me, all over the place.

25   Q    And if there's no place that they are sending you, do you

1   have an office?

2   A    I stay home.

3   Q    You stay home?  So you are either at home or you are

4   going to some site?

5   A    Right.

6   Q    Can you tell me what your job description is.

7   A    Plumbing and heating.

8   Q    But what, in particular, do you do?

9   A    I do a little of everything.  I do electric work.  I do

10   any repairs.

11   Q    Are you a mechanic?

12   A    No.  I'm an all-around guy.

13   Q    Well, are you working on machinery?

14   A    Working on boilers, water leaks, water pumps.

15   Q    And repairing them?

16   A    Right.

17   Q    And do you order parts?

18   A    When I need them.

19   Q    Okay.  And are you licensed?

20   A    No.

21   Q    If you have to do work on a boiler, does that require a

22   license?

23   A    It depends the work you are doing.

24   Q    What type of work would require a license and what type

25   wouldn't require a license?

1   A    Well, an inspection from the City, an environmental

2   inspection, DP inspection, you need a license.

3   Q    What about installing a boiler?

4           MR. FINKEL:  Objection, Your Honor.

5           THE COURT:  Overruled.  If I say "overruled," that

6   means you can answer.

7           THE WITNESS:  Oh.

8   A    Yeah, you need a license to install a boiler, definitely.

9   Q    Okay.  Did you ever install a boiler for Two Rivers?

10  A    No.

11  Q    Now, how long have you worked for N&S?

12  A    Maybe four months I have working with them.

13  Q    Who did you work for before that?

14  A    Two Rivers.

15  Q    You worked for Two Rivers up until four months ago?

16  A    No.  I was out of work about for two months, three

17  months, then I worked for Two Rivers -- for N&S.

18  Q    Well, this is now --

19  A    I'm bad with timing, dates and time.  Hang me if you want

20  me to, but I'm very bad with it.

21  Q    Okay.  What's the last event that you remember doing at

22  Two Rivers?

23  A    The last event?  About 7:00 in the morning I was working

24  on a machine getting it ready for the day.  And that was my

25  last event that I did.

1    Q    Did you ever help Ms. Rivera remove anything from Two

2    Rivers?

3    A    Yes.

4    Q    Okay.  Did you do that before or after the last event you

5    just described?

6    A    After.

7    Q    After?

8    A    Yes.

9    Q    Okay.  Well, I'm confused because the last event would

10   then be removing the boxes or removing something from Two

11   Rivers, correct?

12   A    Well, I helped remove from her office, from Two Rivers

13   back to the Bronx which Mr. Friedman instructed me to help her

14   do that.

15   Q    Okay.  Is that the last thing that you did at Two Rivers?

16   A    No.

17   Q    What did you do besides that?

18   A    I went back to two reviewer about, I don't know, maybe

19   three weeks after that, four weeks after that and I, by

20   Mr. Friedman's instructions because we had that an oxygen tank

21   there.

22           THE COURT:  You had a what?

23           THE WITNESS:  An oxygen tank.

24           THE COURT:  Yes.

25   A    With a torch, torch set, which those were rented.  So he

1   asked me to go back, get the tanks and return them back from

2   where we got them from.

3   Q    And did you do that?

4   A    Yes, I did.

5   Q    Do you know what company you returned them to?

6   A    It's in South Plainfield.  I don't remember the name,

7   Argo something.

8   Q    And what time of day did you take those tanks?

9   A    It was during the day, of course, but the date, I don't

10  remember the date exactly, but --

11  Q    And how did you get into the --

12  A    I called Javier Espinal to open the door and let me in

13  and he helped me with the tank, brought the tank out and

14  helped me load up the tank.  It's a very heavy tank and that's

15  how I did that.

16  Q    And were you working for Two Rivers at that time?

17  A    No, sir.

18  Q    What caused you to stop working for Two Rivers?

19  A    Well, like I said, I was working on that machine.  And

20  normally I opened up the place in the morning and get all the

21  lights on and everything on, the compressors on and so the

22  employees can come to work.  I was working on the machinery in

23  the morning.  I was working in the hallways.  Mr. Schreiber,

24  Eugene, started screaming to me that my desk was numbers here.

25  I don't know what happened to him, why he was screaming at me.

*J. Salcedo - Direct/Mr. Nelkin*                               1068

1   And I called Mr. Friedman.  He told me pick up my stuff and go

2   back to the Bronx and I picked up my staff, my tools and

3   whatever I had there and load up my truck and I left back to

4   the Bronx.  That was the end of that.

5   Q    And at that point, did you consider yourself to no longer

6   be working for Two Rivers?

7   A    You could say that.

8   Q    Okay.  Could that have been around March of 2015?

9   A    That's what you are telling me, it might be; I don't

10  know.  Like I said, with dates, forget about it.  You know, I

11  don't know what to tell you.

12  Q    All right.  And from the time you went back to the Bronx,

13  who were you -- well, who were you working for in the Bronx?

14  A    Nobody.  I didn't work for about two months.

15  Q    So, well, honestly, it appears to be more like a year

16  something.

17  A    Well, like I told you, dates and time, I'm the worst guy

18  in the world, man.  Forgive me, but that's what it is.

19  Q    Who do you live with?

20  A    My wife and kids.

21  Q    Okay.  Does your wife work?

22  A    Yes.

23  Q    What does she do?

24  A    She lives with me.

25  Q    What?

1    A    What was your question again?

2    Q    Does your wife work?

3    A    Yes.

4    Q    What does she do?

5    A    She's a teacher assistant.

6    Q    And do you remember how much money you were earning at

7    Two Rivers?

8    A    Yeah, I was making, I think it was about $900, in at that

9    area.

10   Q    Nine hundred?

11   A    A week.

12   Q    Could it have been more like $1,500 a week?

13   A    I would have to look at the checks; I don't know.

14   Q    We will get to the checks in a little bit.

15        THE COURT:  I'm sorry; so you don't know what you

16   were making?

17        THE WITNESS:  Well, I don't remember exactly.  It's

18   about, you know, could be a thousand dollars.  You know, I

19   don't --

20        THE COURT:  But I just want to make sure, you can't

21   tell me with any kind of precision how much money you were

22   making?

23        THE WITNESS:  I don't remember.  This is why.

24        THE COURT:  Got it.

25        Go ahead.

1    BY MR. NELKIN:

2    Q    How were you paid?

3    A    By check.

4    Q    And what did you do with those checks?

5    A    Deposit them in my checking account.

6    Q    How many checking accounts do you have?

7    A    I have two.

8    Q    Two?

9    A    Right.

10   Q    Customer give any of your checks to Mr. Friedman?

11   A    I don't recall; I don't remember if I did or not.

12   Q    You don't remember if it you ever gave a check to him and

13   he gave you cash back?

14   A    No, I don't think so.

15   Q    Do you ever remember if he gave you cash?

16   A    No.  I always got a check from Two Rivers.

17   Q    What are your bank account numbers?

18   A    I don't know my bank account numbers.

19   Q    Would you be able to determine what your -- well, what's

20   your bank?

21   A    I got Chase Bank and I have Citibank.

22   Q    You have two separate banks?

23   A    Yes.

24   Q    Okay.  And do you know if their account numbers start

25   with the same account number, the same numbers?

```
 1   A     My wife takes care of that.  I don't know.

 2   Q     Okay.  Does your wife have any bank accounts?

 3   A     Probably, yeah.

 4   Q     Separate than yours?

 5   A     I think so, yeah.

 6   Q     Do you know what bank she would have them at?

 7   A     Chase.

 8   Q     So they are either at Chase or Citibank?

 9   A     I got Citibank and I have Chase.  That's it.

10   Q     And they are both checking accounts?

11   A     Checking and savings.

12   Q     Okay.  And when did you open those accounts?

13   A     A long time ago, a long, long time ago.

14   Q     What branch?

15   A     Citibank.  What do you mean "what branch"?

16   Q     Where is the bank located in?

17   A     The Bronx.

18   Q     What is the address?

19   A     I don't know the address.  One is in Istremia (ph), one

20   is in Willett Point Road.

21   Q     And do you have an ATM card for them?

22   A     Yeah.

23   Q     And do you have it for both?

24   A     Excuse me?

25   Q     Do you have an ATM card for both bank accounts?
```

1   A     Yes.

2   Q     Okay.  And do they send you statements?

3   A     Yes.

4   Q     Okay.  Do you have those statements?

5   A     Not with me.  My wife takes care of that.

6   Q     But you haven't thrown them away?

7   A     No.  My wife takes care of that.  I'm not -- I don't do

8   numbers well.

9   Q     Okay.  And those would be stored at your house?

10  A     Probably, yeah.

11  Q     Okay.  Do you have any brokerage accounts?

12  A     What's a brokerage account?

13  Q     With, like, an investment account?

14  A     Yes, I do.

15  Q     Where is that?

16  A     Chase.

17  Q     Also at Chase?

18  A     Mm-hmm.

19  Q     Any other financial accounts?

20          MR. FINKEL:  Objection, Your Honor.

21          THE COURT:  Overruled.

22  A     My mortgage with Citibank.

23  Q     Did your salary ever change at Two Rivers?

24  A     No.

25  Q     So you always earned roughly 900 or --

1   A    A thousand dollars; I don't remember.  You have the

2   numbers.

3   Q    Well, I'm trying to find out what information you have.

4   A    You are in trouble if it you want to find out.  I'm

5   terrible.

6   Q    Okay.

7   A    I try my best, you know, so that's all I can do for you.

8   Q    How do you receive information from N&S?

9   A    They call me.  They fax it sometimes to us or they text

10  me.

11  Q    Text you?  And the text would be to your phone?

12  A    Right.

13  Q    Okay.  And the fax is at your house?

14  A    Yes, it's a printer, all-in-one printer.

15  Q    And what is it connected to?

16  A    The phone line.

17  Q    Okay.  Did Mr. Friedman keep part of your salary?

18  A    No.

19  Q    Okay.  Did you get a W-2 or 1099?

20  A    I got a tax paper, sure.

21  Q    Okay.  And do you remember who gave that to you?

22  A    Two Rivers.

23  Q    Two Rivers?  Do you remember who at Two Rivers gave it to

24  you?

25  A    Excuse me?

J. Salcedo - Direct/Mr. Nelkin                                1074

1    Q    Who at Two Rivers gave it to you?

2    A    Maybe Eugene; I don't know.

3    Q    Do you remember when you started working for Two Rivers?

4    A    I worked there about year and a half.  That's all I know.

5    Q    About --

6    A    One year and a half, in that area.

7    Q    Did you work for them in 2012, do you know?

8    A    (No verbal response.)

9    Q    Who did you work for before you came to Two Rivers?

10   A    MB Fuel, MB.

11   Q    And do you know the full name of that company?

12   A    No, MB Fuel, that's all I know.

13   Q    Okay.  Is there more than one MB Fuel?

14   A    I always know MB Fuel.  That's it.

15   Q    And what did you do at MB Fuel?

16   A    Heating and plumbing, I'm all-around guy, you know.

17   Q    And how long were you at MB Fuel?

18   A    Since the company started, since the company -- since I

19   went back to Two Rivers, I think.

20   Q    When you were at MB Fuel, did you ever do any work for

21   Two Rivers?

22   A    Yes, I did.

23   Q    Okay.  What did you do?

24   A    We helped construct Two Rivers, mechanically-wise.

25   Q    Okay.  And how were you paid for that work?

*J. Salcedo - Direct/Mr. Nelkin*                                    1075

1    A    I was paid from MB Fuel by check.

2    Q    Okay.  And who do you understand MB Fuel was owned by?

3    A    The Ahearns.

4    Q    What about Mr. Friedman?

5    A    (No verbal response.)

6    Q    Who else worked at MB Fuel?

7    A    Worked where, office, floor?

8    Q    Just tell me everyone you know who worked at MB Fuel.

9    A    Me, couple other mechanics.  We had three or four

10   mechanics.

11   Q    What were their names?

12   A    Can't remember the name right now.

13   Q    But there were three of them?

14   A    Yeah, about three.

15        THE COURT:  You don't remember the names of anybody

16   you worked with?

17        THE WITNESS:  Not right now because I'm kind of

18   nervous, you see.

19        THE COURT:  Why don't you take a moment.  If you

20   need a break, calm down, that's fine.  We can take a break.  I

21   want you to be calm and relaxed enough so that if it somebody

22   asks you, you know, a question like tell me some of the people

23   you worked with, you are calm enough to be able to do that.

24   Would you like a break?

25        THE WITNESS:  I don't know.

1          THE COURT:  Okay, but you can't remember the names?

2          THE WITNESS:  Not right now.

3          THE COURT:  Okay, go on, sir.

4    BY MR. NELKIN:

5    Q    How long did you work there?

6    A    Where?

7    Q    At MB Fuel.

8    A    A long time.  I don't have dates exact.

9    Q    More than five years?

10   A    Probably.

11   Q    More than ten years?

12   A    (No verbal response.)

13   Q    Okay.  And how long did you work with those other

14   mechanics?

15   A    A long time.

16   Q    Were they there the whole time you were there?

17   A    Most of them.

18   Q    Okay.  And who else do you work working at MB Fuel?

19   A    Well, I don't know if they worked for MB Fuel, but they

20   are there in the building, you know, because there was Sonia,

21   Sylvia.

22   Q    Okay.  You say you don't know if they worked for them,

23   but they were there in the building?

24   A    Yeah, in this the office, they were office people.

25   Q    Tell me what you mean by "the office."

1    A    Work upstairs in the office.

2    Q    Okay.  Is there one office?

3    A    No, there were several office, still more.

4    Q    Was it one company's office?

5    A    I don't know how the company worked.  You know, I was

6    just an employee; I don't know.

7    Q    Did you ever go up to that office?

8    A    Yes.

9    Q    Okay.  And when you went up to the office, what were you

10   doing up there?

11   A    Maybe changing a light fixture or changing the filter

12   from the air condition, that type of stuff.

13   Q    Okay.  And Ms. Rivera was up there?

14   A    Yeah, yes.

15   Q    You observed Ms. Rivera in that office?

16   A    Right, yeah.

17   Q    But you don't know who she worked for?

18   A    Right, because there's several companies; I don't know.

19   I'm not -- I'm on the floor.  I'm on the street.

20   Q    What are the other companies?

21   A    Well, right now there's H& A Pump there which is, you

22   know, work out of there.  And there's Pronto Heating Supply

23   there.

24   Q    When you say they "work out of there," do they have

25   separate units or storefronts?

*J. Salcedo - Direct/Mr. Nelkin*                              1078

1   A     I guess storefront, you could say.

2   Q     Well, if I'm walking by the street, would I walk into an

3   H& A Pump store?

4   A     Go to the door and they are in there.

5   Q     And if, then if I was in their office, could I get up to

6   Sonia's office or would I have to go out from the street?

7   A     No, you could walk from the building, different area to

8   go upstairs.

9   Q     And is it locked or is H&A's space connected and open to

10  the main building?

11  A     It's a separate space, you know, that's in the building.

12  Q     Okay.  It's a separate space?

13  A     Mm-hmm.

14  Q     What -- just describe their space.  Tell me all the doors

15  to their space, to the H&A space.

16  A     H&A, it's like, half of this place here with a door like

17  that in the front, a sliding door (indicating) and you go in.

18  Q     Okay.  I'm in their space --

19        THE COURT:  Can you move on from H&A.  Seems to be a

20  completely separate issue here.

21        MR. NELKIN:  Well, I'm just trying to figure out if

22  it's a connected company or not.

23  Q     What other units, companies are there?

24  A     Pronto Heating.

25  Q     Okay.  And can you get through the Pronto office up to

1    the other office?

2    A     No.

3    Q     But you can from H&A?

4    A     Well, you see, there's one big building dividing

5    different things.

6    Q     The MB space --

7    A     Right.

8    Q     -- is that a separate space?

9    A     It's divided separate from the rest of the stuff,

10   different building.

11   Q     So it's not connected to the others?

12   A     Well, physically, it's one structure, but, you know.

13   Q     Does -- do you know who owns H&A?

14   A     Yeah.

15   Q     Who?

16   A     His name is Hector.

17   Q     Does he have anything to do with the Ahearns?

18   A     No.

19   Q     Does he have anything to do with Mr. Friedman?

20   A     No, that I know of.

21   Q     What about Pronto?

22   A     (No verbal response.)

23   Q     Who else have you seen in the office at MB?

24   A     Sylvia, Sonia.  There's Cathy and there's another girl.

25   I can't remember her name.

1    Q    What about Jack Ahearn?

2    A    I haven't seen Jack for a long time.

3    Q    Any idea how long?

4    A    I don't know.

5    Q    Five years?

6    A    It's possible.  I know he's sick.

7    Q    What about Laurence Ahearn?

8    A    Yes.

9    Q    Okay.  Is he in that office?

10   A    He's all over the building.  That's Larry.  You are

11   talking about Larry?

12   Q    Well, Laurence Ahearn, do you know if Laurence Ahearn is

13   known as Larry?

14   A    I know him by Larry, not by Laurence.

15   Q    Okay.  Is there -- is he in that space?

16   A    Yes.

17   Q    Does he have an office there?

18   A    Yes.

19   Q    What about Mr. Friedman?

20   A    What about him?

21   Q    Does he have an office there?

22   A    Yes.

23   Q    And you see him there?  Is there anyone else who has

24   offices there?

25   A    Yeah.

1   Q    Who?

2   A    I think there's Bright Fuel, I think is the name of the

3   company, rents there, Bright Fuel, or no, hunts Point Fuel.

4   Q    And does that have any connection with the Ahearns?

5   A    No.

6   Q    What about with Mr. Friedman?

7   A    Not that I know of.

8   Q    Do you know a Robert Janz?

9   A    Yes.

10  Q    Who is he?

11  A    He used to be, according to my understanding -- don't

12  hold me on it -- he used to be a dispatcher there.  That's

13  what I used to know.

14  Q    Okay.  And where is he now?

15  A    I have no idea.  I haven't been there for a while.

16  Q    Okay.  Do you know if he ever owned MB?

17  A    I don't know anything about him.

18  Q    Okay.  How long was he a dispatcher that you --

19  A    A long time, at least that's what I think that's what his

20  role was.

21  Q    And that was for MB?

22  A    I think so.

23  Q    Okay.  And so he worked for the Ahearns?

24  A    I imagine.

25  Q    You worked for the Ahearns when you were at MB?

1    A    Yes.

2    Q    And did you get a check from MB?

3    A    Yes.

4    Q    And did you get checks from N&S?

5    A    When I worked for MB, I used to get a check from MB.  Now

6    I don't work for MB, so I don't get no checks.  Now I work for

7    N&S, I get a check from N&S.  I used to.

8    Q    Besides Two Rivers, M&S and MB, are there any other

9    companies that you worked for?

10   A    Associated Fuel.

11   Q    Did you get a check for them?

12   A    I used to when I used to work for them.

13   Q    How long ago was it that you worked for them?

14   A    A long time ago.

15   Q    Are there any other companies besides those companies

16   that you worked for?

17   A    Associated Fuel, MB Fuel, that I can remember.

18   Q    And did you have roughly the same job responsibilities at

19   all of those companies?

20   A    Yes.

21   Q    Okay.  Did you ever do any work for Mr. Friedman besides

22   through MB Fuel?

23   A    No, I always worked through MB Fuel.

24   Q    Did you ever work -- do any repairs on any buildings that

25   Mr. Friedman might have owned?

1    A    Yes, through MB Fuel.

2    Q    Through MB Fuel?  Okay, so MB Fuel -- well, what is MB

3    Fuel's business?

4    A    I used to do service for them.  They delivered oil and,

5    you know, heating oil and to service for the equipment.

6    Q    So anything connected with an oil thing?  All right.  And

7    you did that for Mr. Friedman's companies?

8    A    Mr. Friedman had a problem, he called MB Fuel.  They used

9    to send me to service the equipment.

10   Q    Okay.  Were you paid directly or did that go through MB

11   Fuel?

12   A    Goes through MB Fuel.

13   Q    All right.  Tell me when you were at you were at Two

14   Rivers, did you have a computer?

15   A    No.  Two Rivers had a computer in the office, not

16   personally.

17   Q    Okay.  But in your -- did you use a computer at Two

18   Rivers?

19   A    Their computer.

20   Q    Okay.  Just tell me what you used that computer for.

21   A    Look up parts for Two Rivers.

22   Q    Okay.  And did you use a computer anywhere else to look

23   for parts?

24   A    No, only Two Rivers' computer.

25   Q    So you never used a computer at any other company to look

1   for parts?

2   A    Well, once in a while, you know, for Associated Fuel or

3   MB Fuel if I need something, you know.

4   Q    And where were the computers that you would have used to

5   do that work?

6   A    On their place, on their premise.

7   Q    So let's just say when you were at MB Fuel and you needed

8   to use a computer, what computer would you use?

9   A    I would use anyone.  I barely used the computer at MB

10  Fuel.  I would go to the supply house because Pronto Heating

11  is right there go on the floor and talked to him what I

12  wanted.

13  Q    But if you needed to use one at MB Fuel, you could use

14  anyone up there?

15  A    No.  I will probably ask the dispatcher to, you know, to

16  use his, you know, but very rare.

17  Q    All right.  Now, you said that you helped Ms. Rivera

18  remove certain things from Two Rivers?

19  A    Yes, I did.

20  Q    What did you help her remove?

21  A    A couple of boxes, a few boxes.  I don't remember exactly

22  what I did.

23  Q    Okay.  And what did you do with those boxes?

24  A    I load them up in my truck, I took them to the Bronx,

25  delivered to her office.

1   Q     Okay.  Did she already have an office there?

2   A     They made an office for her when they moved her -- she

3   had one from before and then she, you know.

4   Q     Okay.  And did you help her put things in the boxes?

5   A     No.

6   Q     The boxes were already done?

7   A     Yes.

8   Q     Okay.  Did you help her unload the boxes?

9   A     No.  I unloaded them out of my truck and took them

10  upstairs to her place and that was it.

11  Q     Okay.  And you said that Mr. Friedman told you to do

12  that?

13  A     To help her move from Two Rivers back to the Bronx.

14  Q     Okay.  When you -- did you do anything else during that

15  visit?

16  A     No.

17  Q     Did you change any locks?

18  A     No.

19  Q     You didn't change any locks on any doors?

20  A     No.  I'm not a locksmith.

21  Q     Okay.  And how did you get into the building?

22  A     With a key.

23  Q     With a key?

24  A     Sonia was there present with me.

25        THE COURT:  I'm sorry; I didn't hear the last

*J. Salcedo - Direct/Mr. Nelkin*                                    1086

1    answer.

2              THE WITNESS:  Sonia was there present.  I wasn't by

3    myself.

4    Q    Did you try and use the card to get in?

5    A    I don't have a card key.  I gave them up before I left to

6    Sandra.

7    Q    So you are saying on the day that you came to the

8    building, you didn't have a card key?

9    A    No.

10   Q    Okay.  Do you know if Sonia had a card key?

11   A    Who?

12   Q    Sonia.

13   A    Probably.

14   Q    Where is the door with the key?

15   A    Where is the door with the key?  Next to the big gate in

16   front of the building.

17   Q    Is the card key reader there?

18   A    There's a card key reader, sure.

19   Q    Is can use either a key --

20   A    Or the card, sure.

21   Q    Do you know why Sonia wouldn't have used her card to get

22   in?

23              MR. FINKEL:  Objection.

24              THE COURT:  Overruled.

25              MR. FINKEL:  Assuming facts not --

1        THE COURT:  I said overruled.

2   Q    Where did you get the keys?

3   A    Which key?

4   Q    The one you used to get into the building?

5   A    I used to open up the building every morning, 7:00 in the

6   morning to have the building ready for the employees to come

7   in at 8:00 to start working.  That used to be part of my job,

8   open up the place, make sure everything is ready to go.

9   Q    When Mr. Friedman told you to no longer come to the

10  facility, did he ask for the keys back?

11  A    About a week later I gave him the key back.

12  Q    Were there any other Two Rivers keys on there besides the

13  front door?

14  A    The elevators key I had.

15  Q    Elevator key?  Okay.  Did you have to put a code in to

16  get up to the office?

17  A    Yeah.

18  Q    Okay.  And did you have that code?

19  A    Yes, I did.

20  Q    Okay.  What were you -- what reason did you have the code

21  to get into the office?

22  A    Well, the same code was for the service room office where

23  I used to sit, it was the same code for every door.

24  Q    So the code for the office --

25  A    The closet had a code.  That was the same code for

1    everything.

2    Q    Okay.  Did you go to the Two Rivers office on any other

3    occasion besides that one?

4    A    Not to the office.  I went to the facility to pick up the

5    oxygen tank to return it back to the place where we had the

6    tank rented from.

7              THE COURT:  I'm sorry, it's been bothering me from

8    the first time.  This is the same assembly tank?

9              THE WITNESS:  Yes.

10             THE COURT:  It's a coffee company.  What do they

11   need that tank for?

12             THE WITNESS:  There's a lot of machines from metal

13   to metal, to heat up metal, bend metal.

14             THE COURT:  I see, just curious.

15             THE WITNESS:  We had a welding machine there.

16             THE COURT:  Got it.

17             Go ahead.  Sorry to interrupt.

18   BY MR. NELKIN:

19   Q    What I'm asking is, during your normal duties at Two

20   Rivers, did you ever have a reason to be in their office area?

21   A    Repeat that again, please.

22   Q    When you were working at Two Rivers --

23   A    Yes.

24   Q    -- you were not in the office; is that correct?

25   A    Right, I was not in the office.

1    Q    Okay.  Did you ever go upstairs while you were --

2    A    Yes.

3    Q    What -- what were the reasons you would go upstairs?

4    A    Every time I needed a part, I looked it up in the

5    computer, I copied the number.  I go to Eugene Schreiber, can

6    you order this for me, please.  And he used to order the parts

7    that I needed because I was not -- I had no authority of

8    ordering anything.

9    Q    Did you used to buy parts for Two Rivers?

10   A    Eugene buy the parts.

11   Q    You never bought any parts for Two Rivers?

12   A    Not personally, no.

13   Q    You interview used any, like, Mr. Friedman's credit card

14   to buy any parts for Two Rivers?

15   A    When we were building, building the building, the Two

16   Rivers, I had a -- you know, when I needed something, he wants

17   to know, he lent me his credit card.  I used to go to Home

18   Depot, whatever to pick up a bulb, a screw or whatever.

19   Q    Did you have a credit card you could use for Two Rivers's

20   expenses?

21   A    No.

22   Q    Did you ever travel on behalf of Two Rivers?

23   A    Yes.

24   Q    Where did you travel?

25   A    I went to Florida.

1   Q    Okay.  And what did you do in Florida?

2   A    When they were building a machine there, I went, Eugene,

3   I went with Eugene Schreiber to Florida to the factory where

4   they were building the machine.

5   Q    And were you trained there or --

6   A    Yeah.

7   Q    Okay.  Were there any problems when you were down there?

8   A    I wasn't too happy the way the machine was working.

9   Q    So what happened?

10  A    I took the plane back to New York from Florida back to

11  New York.

12  Q    And do you know if there were any complaints about you?

13  A    No.

14  Q    Did you incur any expenses on that trip?

15  A    Sure, hotel and lunch, food.

16  Q    And how did you pay for them?

17  A    Schreiber paid for them with a credit card.

18  Q    So all the expenses were paid for by Mr. Schreiber?

19  A    Yes.

20  Q    Okay.  Besides the occasional Home Depot purchase, did

21  you ever purchase any equipment or any other things for Two

22  Rivers?

23  A    We used to go to, I think it's called Global store with

24  Schreiber and we used to pick up stuff together.  Whatever

25  what I need, he go with me or he invited me, we bought

1    equipment together.  But by myself, I never did.

2    Q    So you weren't issued a card or allowed to use someone

3    else's card?

4    A    No.

5    Q    Did you ever turn in receipts to Ms. Rivera?

6    A    Yes.  Did I?  I might; I don't know.

7    Q    Did you ever turn in receipts to Ms. Ezell?

8    A    Ms. Ezell?  Well, depends on what I'm buying for.  You

9    see what I'm saying?

10   Q    Well --

11   A    Which company are we talking about, Two Rivers or MB

12   Fuel?

13   Q    Which companies did you buy --

14   A    MB Fuel I used to buy parts, go to Pronto pick up the

15   parts, sign for it and give the receipt to Sylvia or drop them

16   off in the box in the office, you know.

17   Q    Okay.  And did you have a card that you could use to do

18   that?

19   A    No.  We have opened accounts.

20   Q    What do you mean by "open accounts"?

21   A    That I go pick up the parts and I tell them and that was

22   it.

23   Q    And them who would you get a bill?

24   A    The company will get a bill.

25   Q    Then why did you have to turn in receipts?

*J. Salcedo - Direct/Mr. Nelkin*                              1092

1   A    To match the receipt for what the bill is, you know.  You

2   know when you go, you sign for it.  Then you sign the receipt,

3   you take the receipt, you drop it off and eventually they will

4   get a monthly bill.

5   Q    But ten what's the purpose of the receipt?

6              MR. FINKEL:  Objection.

7              THE COURT:  Sustained.

8   Q    Mr. Salcedo, were you aware that there was a police

9   report that --

10  A    I am now.

11  Q    Have you had a chance to report that police report?

12  A    Yes.

13  Q    Okay.  Would you turn to Exhibit 6.

14             THE COURT:  Whose 6?

15             MR. NELKIN:  Plaintiff's.

16  Q    I'm looking at page 2.

17  A    Which number exhibit?

18  Q    Exhibit 6.

19  A    Six?  (Perusing.)  Okay.

20  Q    And I believe this police report, if you look at the

21  first page of it, it says "date and time of report" about an

22  inch or two off the bottom is March 3, 2015.

23  A    Mm-hmm.

24  Q    And I believe it's reporting something that happened the

25  day before.  Does that help you fix the time that you went to

*J. Salcedo - Direct/Mr. Nelkin*                    1093

1   Two Rivers?

2   A     It's possible, sure.

3   Q     If you could turn to page 2, well, did you see anyone

4   when you went to Two Rivers?

5   A     Yes.  There was two, two workers there.

6   Q     Who were they?

7   A     I don't know the name?

8   Q     You don't know the name?

9   A     No.

10  Q     Okay.  And if the report says that they observed you

11  trying to swipe into the building, would you disagree with

12  that?

13  A     Yes, I do.

14  Q     Okay.  But you don't dispute that you were there?

15  A     I was there, twice before -- after I left, definitely.

16  Q     Okay.  When you were there, did you do anything to any of

17  the machines?

18            MR. FINKEL:  Objection, Your Honor.  What date?

19  When are we talking about?

20            THE COURT:  The date referenced in the police

21  report?

22            MR. NELKIN:  Yes.

23            THE COURT:  Okay.  Since everybody else knows what

24  we are talking about, I will allow it.

25  Q     On that date, did you --

*J. Salcedo - Direct/Mr. Nelkin*                                1094

1   A    For what reason?

2   Q    I'm not asking for what reason.  I'm just asking --

3   A    No.

4   Q    -- you didn't --

5   A    They saw me going to one of the machines because we had a

6   set of Allen key in the machine which we used to adjust

7   machine, which is my tool.  So when I grabbed my tool and I

8   left.  I think that's the date that I helped Sonia move out of

9   there.

10  Q    Yes.

11  A    You know.

12  Q    So you did go near the machine?

13  A    Yes, I did, definitely.

14  Q    And just explain to me what you did there.

15  A    I grabbed a set of Allen keys.

16  Q    Allen keys?

17  A    Yes, a key like an L-shape like a stop sign.

18  Q    Yes, I understand.  But where were they?

19  A    Inside the machine to -- we used that key to adjust the

20  boxes goes this way (indicating).  They dropped a little thing

21  that flips the box around.  That things always needed to be

22  adjusted.  So I kept a set in there for that.

23  Q    So if you --

24          THE COURT:  Wait.  You went back in there.  That was

25  the purpose, to get the set of Allen keys?

*J. Salcedo - Direct/Mr. Nelkin*                                    1095

1          THE WITNESS:  Yeah, that's it.  That was what I did,

2    I helped Sonia move Sonia out.  So at the same time I went to

3    the machine, I grabbed my tool.  It's a tool.

4          THE COURT:  Got it.  Go ahead.

5    BY MR. NELKIN:

6    Q    Okay.  Now, you said that you needed that those Allen

7    tools --

8    A    It's a tool.

9    Q    -- to adjust the machine?

10   A    Right.

11   Q    So wouldn't Two Rivers have needed that same set of Allen

12   keys?

13   A    It's my personal tools.

14   Q    You bought them?

15   A    Yeah, my tools that I bought when I went to work for Two

16   Rivers to have my own tools at Two Rivers.

17   Q    Did you -- did you tell anyone that you were going to

18   take the --

19   A    No.

20   Q    -- tools?

21   A    No.

22   Q    Okay.

23   A    Not that -- not that my tools, yes, but not that, you

24   know, I mean, it was mine, so.

25   Q    Okay.  Now, did you -- well, if someone said that the

1   wires were tampered with, would you --

2   A     Sure they were tampered with.  It was me.

3   Q     It was you?

4   A     Yeah, but I didn't tamper.  I was working on the machine.

5   Q     At the same time that you were picking up the boxes?

6   A     No, that never happened, no.  You are confused.

7   Q     Do you know what the word "tampered" means?

8   A     When you try to mess something up, I guess.

9   Q     Okay.  So when you said -- when I asked you if you

10  tampered with the machine -- someone tampered with the machine

11  and you said "it was me" --

12  A     I don't mean -- I was the one, the day that I had, that

13  Eugene came in, had the discussion with me, I was working on

14  that machine.

15  Q     And then you came back --

16  A     To get my Allen key set, not out of the same machine,

17  different machine.  You got about ten machines in there.

18  Q     Which one do you think the workers observed you going to?

19  A     To the machine that we bought in Florida, the packing

20  machine.

21  Q     Okay.  And how do you know which one was thought to be

22  tampered with?

23  A     I figured it's the tampered machine because I was the one

24  working on that machine.  When I left, I was working on it, I

25  picked up my tools and --

1  Q    Okay.  But the police report doesn't say which machine

2  is --

3  A    But I know that's the machine you guys are talking about.

4  You know, that's the only machine I touch because I was

5  working on that machine earlier in the morning to get it ready

6  for the day work.

7  Q    Okay.  But no one -- did anyone tell you which machine

8  people thought had been tampered with?

9  A    No.  I read this in the book, the thing here.

10 Q    So you just read that a machine was tampered with and you

11 assumed it was the one you had worked on?

12 A    Sure.  Which other machine?  I haven't touched other

13 machines.

14 Q    Yeah.  If they were your personal tools, why didn't you

15 just ask someone to tell someone that you were going to go

16 pick them up?

17 A    I didn't.

18 Q    Why not did didn't you ask Mr. Friedman?

19 A    I don't think he was there.

20 Q    But you talked to him about going to the building.  You

21 said he told you --

22 A    Yeah, but he called me on the phone to go help Sonia

23 move.

24 Q    Okay.  Did you take anything else besides the boxes and

25 the tools when you left?

1   A    No, only my personal things.

2   Q    Tell me what your personal things were.

3   A    Tools, screwdrivers, wrenches ratchets, a die set to make

4   threads, a drill.

5   Q    And what proof would you have that you owned those?

6   A    Still have them.  You know, they are old tools and I have

7   them.

8   Q    What proof would you have that you bought?

9        MR. GRANTZ:  Objection to relevance.

10       THE COURT:  Why is it relevant if he has proof or

11  not that he bought them?

12       MR. NELKIN:  Well, in this case we are alleging that

13  he came in and took certain things and sold certain things.

14  And I would like to --

15       THE COURT:  You are not disputing what he took.

16  It's a question of whether he owns them.  What's the

17  relevance?

18       MR. NELKIN:  I'm just trying to figure out what

19  records --

20       THE COURT:  I know what you are trying to figure

21  out.  Why is it relevant?

22       MR. NELKIN:  I just thought it was relevant to the

23  veracity of the within.

24       THE COURT:  Move on.

25       I think you don't have receipts for those, right?

1    They are old tools?

2              THE WITNESS:  They are tools.  They are my tools.

3              THE COURT:  Okay.

4              THE WITNESS:  I do heating and plumbing.  I carry a

5    lot of tools.  I carry pipe wrenches.  I carry threaders in my

6    truck.  I carry screwdrivers.  I carry wires, different gauges

7    of wires.

8              THE COURT:  Stop.

9              Move on.

10   BY MR. NELKIN:

11   Q    What happened to your card key?

12   A    I turned them in to Sandra when she was working there

13   before I left.

14   Q    What day did you turn them in?

15   A    The day before the day of the police report, yes.

16   Q    Okay.  Could you turn to Exhibit 32.  Well, actually,

17   before we turn to Exhibit 32, what time did you go to Two

18   Rivers to pick up the equipment?

19             THE COURT:  This is still on that same date of the

20   police report?

21             MR. NELKIN:  Yes.

22   A    The day before, I think.  That's the day I left.

23   Q    I'm asking what time of day you went?

24   A    No, I picked up my tools the day that Eugene had the

25   argument with me.  That's the day I left.  I picked up all my

1   stuff on the same day.

2   Q    Okay.  That was the day before you came back with

3   Ms. Rivera?

4   A    Yeah.

5   Q    Okay.  So if it you came back with Ms. Rivera on the 2nd,

6   then you picked up all your tools on the 1st?

7   A    Right.

8   Q    And you turned in your card key on the 1st?

9   A    Right, with Sandra.

10  Q    Okay.  What time did you come back to Two Rivers with

11  Ms. Rivera?

12  A    It was late afternoon.

13  Q    Around 5:00?

14  A    It's possible.

15  Q    Okay.  Can you turn to Exhibit 32, please.  And I will

16  tell you these are screen shots of Two Rivers's log for the

17  card keys.  And if you look at the first page, you will see

18  that there are five things in a row.  They start on line, I

19  think, 6, and they go up to line 10 where it says, "Access to

20  area denied."  And they appear to all take place on March 2nd

21  at 5:07, roughly a couple of seconds apart.

22  A    Sonia had a key to go into the building.  She had a card

23  so we went that way.  I don't know what you are talking about.

24  Q    But I thought you said you used your key to get in, not

25  Sonia's?

1    A    You know, could have been mine's or hers.

2    Q    Okay.  I would like you to turn to the next page and it

3    says, "User Jorge Salcedo card" and it has a number for those

4    five entries where it says "access was denied."  Can you tell

5    me why your card which you supposedly turned in was being

6    used?

7    A    I don't know if that's my card or not.  I left my card

8    with Sandra.  They could have used my card to go in a few

9    times.  I have no idea.  My card was in the premise.  Anybody,

10   you know, Schreiber could have grabbed it and go, go back and

11   forth to fabricate this; I don't know.

12   Q    Okay.  But your testimony is you can't explain why your

13   card shows up as trying to come in at exactly the time --

14   A    My testimony is that I went twice back to that place

15   after I left.  That's my testimony.

16   Q    Okay.  And it was around this time?

17            THE COURT:  The question is, you returned with

18   Ms. Rivera?

19            THE WITNESS:  Yes.

20            THE COURT:  And she used her card -- wait, wait.

21   Regardless of what who used whose card, was there anybody else

22   with you or was it just the two of you?

23            THE WITNESS:  It was probably just the two of us; I

24   don't remember.  But there should have been more people there.

25            THE COURT:  No, no, but to get in?

1           THE WITNESS:  Oh, it's a possibility.

2           THE COURT:  Who else was with you when you tried to

3    get in?

4           THE WITNESS:  No, I went in with Sonia and me.

5           THE COURT:  Just the two of you?

6           THE WITNESS:  Yeah.

7           THE COURT:  So there was nobody else?  When you two

8    entered, there was nobody else using the card trying to enter?

9           THE WITNESS:  Right; I don't remember.

10          THE COURT:  Okay.  And I only ask just you had said

11   somebody else might have used your card.

12          THE WITNESS:  Well, I'm saying they showed me the

13   stuff; I don't know.

14          THE COURT:  Okay, got it.

15          THE WITNESS:  I have no idea.

16   BY MR. NELKIN:

17   Q    And were any of the partners of Two Rivers there?

18   A    I don't remember, honestly don't remember.

19   Q    Okay.  Could you turn to Exhibit 112.  This is a document

20   that your lawyer Mr. Finkel filed with the Court.  And I would

21   just like to ask you about a couple of statements in it.  It

22   says that, "Mr. Salcedo was not fired by Two Rivers."

23   A    I wasn't fired by Two Rivers.

24   Q    Okay.  You just were -- but did they stop paying you?

25   A    Yes.  Like I said before, when I called Mr. Friedman to

*J. Salcedo - Direct/Mr. Nelkin*                                    1103

1   go pick up my tools to go back to the Bronx and that's what I

2   did.  I wasn't fired.  I left because he told me to leave.

3   Q    But from that point on, Two Rivers wasn't paying you?

4   A    Right.

5   Q    And no one else was paying you?

6   A    No.

7   Q    And until you started working at N&S a couple of months

8   ago --

9   A    Right.

10  Q    And did you ever file for unemployment?

11  A    Yes, I did.

12  Q    You did?  Okay.  And when did you file for that?

13  A    Maybe two weeks after that.

14  Q    Okay.  And what did you put down as the reason for filing

15  for unemployment?

16  A    Argument between owners.

17  Q    But did you say that you were terminated or fired?

18  A    No, I told them I left because they told me to.  I told

19  them what I'm telling you.

20          THE COURT:  Wait, wait.  Why -- I don't understand

21  the testimony.  Are you saying you quit?

22          THE WITNESS:  Practically, you know.

23          THE COURT:  No, no.  Whose decision was it, yours or

24  theirs?

25          THE WITNESS:  It was Mr. Friedman's decision for me

*J. Salcedo - Direct/Mr. Nelkin*                        1104

1    to go back to the Bronx and --

2              THE COURT:  So he told you you are no longer working

3    for Two Rivers?

4              THE WITNESS:  Not directly.

5              THE COURT:  Look.  Somebody made a decision that you

6    are no longer working at Two Rivers.  It's either you or one

7    of your employers, right?  Was it you?

8              THE WITNESS:  Yeah.

9              THE COURT:  You decided?

10             THE WITNESS:  Right.

11             THE COURT:  You quit?

12             THE WITNESS:  Yeah, I quit.

13             THE COURT:  So what did Mr. Friedman tell you?

14             THE WITNESS:  Pick up your tools, go back to the

15   Bronx.

16             THE COURT:  Had he not told you that --

17             THE WITNESS:  I was probably still being abused by

18   Eugene there.

19             THE COURT:  So in what sense did you quit?  I'm just

20   trying to understand, sir.  You are telling me two things that

21   don't add up.

22             THE WITNESS:  I don't feel that I was fired.

23             THE COURT:  You don't feel that you were fired?

24             THE WITNESS:  Right, because, you know, because of

25   Mr. Friedman never told me to pick up my tools.

1        THE COURT:  So Mr. Friedman told you to pick up your
2   tools and go somewhere else?
3        THE WITNESS:  Right.
4        THE COURT:  Not to work for Two Rivers anymore, and
5   your feeling about that is that's not firing?
6        THE WITNESS:  Right.
7        THE COURT:  I understand what you are saying.
8        Go ahead.
9   BY MR. NELKIN:
10  Q    Now, the next page, you say that he told you to remove
11  your tools and to report to Mr. Friedman's Bronx office?
12  A    Right.
13  Q    What were you to do at the Bronx office?
14  A    What did I do at the Bronx office?
15  Q    Yes.
16  A    Nothing, you know.
17  Q    So you weren't being paid?  You just were to go to the
18  office?
19  A    I went to the office, you know, a couple of times.  That
20  was it, you know, never been back.
21  Q    What was the reason for you to go to the Bronx office?
22  A    That's the work we used; I don't know.  I just went
23  there.
24  Q    And what did you do there?
25  A    Why would I do that?

1   Q    No, what would you do there?

2   A    I won't do anything in the office.  I'm not an office

3   guy.

4   Q    Well, then, what did you do?  And where did you do it?

5   You are at 431, I'm assuming.

6   A    Right, okay.

7   Q    Okay.  And you are told by Mr. Friedman to go there?

8   A    Okay.  I met Sonia there and --

9   Q    Okay.  Now, what did you do?  Did you just sit there or

10  did you work on the computer?  Did you read a book?

11          MR. GRANTZ:  Objection.

12          THE COURT:  I'm sorry; I'm sorry.  Wait.  There's an

13  objection.  Who objected?

14          MR. GRANTZ:  There's three questions there.

15          THE COURT:  So the objection is there are three

16  questions?  Okay, let's ask each of them individually.

17          MR. GRANTZ:  Yes, that's fine.

18          THE COURT:  What did you do in the Bronx?

19          THE WITNESS:  I didn't do anything in the Bronx.

20          THE COURT:  You didn't do anything?

21          THE WITNESS:  Right.

22          THE COURT:  What was the next question?

23          MR. NELKIN:  I said, did you read a book in the

24  Bronx?

25          THE COURT:  Did you read a book in the Bronx?

1          THE WITNESS:  No.

2          THE COURT:  What was the next question?

3          MR. NELKIN:  Did you work on a computer in the

4    Bronx?

5          THE COURT:  Did you work on a computer in the Bronx?

6          THE WITNESS:  No, sir.

7          THE COURT:  Are you satisfied, Counsel.

8          MR. GRANTZ:  Yes, thank you.

9          THE COURT:  Thank you.

10   BY MR. NELKIN:

11   Q    And how many times did you go to the office there after

12   you left Two Rivers?

13   A    I went back a few times to talk to Mr. Friedman, talk to

14   Sonia.

15   Q    And what did you talk about?

16   A    Friends, you know, what was next, you know.

17   Q    And what was next?

18   A    Next was I was out of a job.  That was next.

19   Q    So Mr. Friedman didn't have any advice for you?

20   A    Yeah.  You know, he advised, you know, he told me to go

21   back to work for as a mechanic for MB.  I didn't want to work

22   as a mechanic, fixing trucks, you know.

23   Q    Isn't that what you do now?

24   A    No, I don't fix trucks.  I am boiler, do boiler and

25   heating.

1   Q    I think I asked you earlier if you did roughly the same

2   thing for each --

3   A    That's what I do.

4   Q    Okay.

5   A    Heating and pluming.

6   Q    And when you were at MB, I thought you said you used to

7   go and fix boilers at Mr. Friedman's buildings?

8   A    Yes, and when I was an MB employee.  But he owns trucks,

9   so they had no opening right now for boilers.  So he asked me

10  if I wanted to stay on the floor to fix trucks.

11  Q    Is it your testimony that some mechanics only fix trucks

12  and some mechanics only fix boilers?

13  A    Yes.

14          MR. FINKEL:  Objection, Your Honor.  It's not

15  anywhere what the testimony --

16          THE COURT:  He's asking if that is his testimony.

17  Did you hear the question, sir?

18          MR. FINKEL:  I guess I didn't, Your Honor.

19          THE COURT:  Okay.  Then to the extent you didn't,

20  what I heard was, as I think the transcript will reflect, is

21  that your testimony?  And I think that's not an objectionable

22  question.  But are you raising on objection to that question?

23          MR. FINKEL:  No, Your Honor.

24          THE COURT:  Go ahead.

25  A    There is different mechanics.  They got mechanics for the

1  trucks.  Truck breaks down, has a flat, et cetera, et cetera.

2  And there's a different mechanic for boiler and plumbing.

3  Q    And you were exclusively a boiler guy?

4  A    Yeah.

5  Q    You never fixed trucks before?

6  A    Sure, I fixed trucks, but I didn't want to go back to

7  that.

8  Q    So sometimes you were a truck guy and sometimes you were

9  a boiler?

10  A    No, I was a boiler --

11        THE COURT:  I think we can move on from trucks

12  versus boilers.

13        MR. NELKIN:  All right.

14  Q    So your testimony is that you had chose to be unemployed

15  rather than go back to work with your former employer?

16  A    Yes, that's my testimony, exactly.  I was waiting for an

17  opening again.

18  Q    Okay.  And how did you get the job at N&S?

19  A    Through Ahearns.

20  Q    Okay.  Who also owned MB Fuel?

21  A    So I think so.  I don't know particularly who owns what.

22  Q    Okay.  And how did that job open, come to you?

23  A    Well, when you asked me that about the mechanic, one of

24  them was Billy that worked with us.  He got a job as a City

25  inspector, boiler City inspector.  So I got his place there.

*J. Salcedo - Direct/Mr. Nelkin*                    1110

1   He left to become a boiler City inspector.

2   Q    All right.  Let's move on to the next paragraph.  Did you

3   turn any cameras around when you were at Two Rivers?

4   A    No.

5   Q    Did you erase any video?

6   A    I have no idea about erasing video.  I don't have no --

7   no.

8   Q    Okay.  Now, was Mr. Friedman there at the time you went

9   back with Ms. Rivera?

10  A    I don't recall he was there.

11  Q    I'm looking at the bottom of your lawyer statement.  It

12  says that -- well, that the police report additionally

13  establishes -- let's just go on.

14        THE COURT:  Why don't you just ask him a question

15  about what he remembers, what he observed, what happened,

16  instead of comparing it to something he didn't write.

17        MR. NELKIN:  Okay.

18  Q    How long were you in the office when that happened?

19  A    When what happened?

20  Q    When you removed the boxes.

21  A    A couple hours, I guess, you know, about an hour, maybe;

22  I don't know.

23  Q    Why did it take so long to move the boxes?

24  A    Well, you got to walk from the hallway to the elevator,

25  take the elevator down, carry the boxes out.

1   Q     And how far a walk is that?

2   A     It's a walk.

3   Q     Is it more than 100 feet?

4   A     I think so.

5   Q     More than 200 feet?

6   A     Maybe, maybe it's 200 feet, 150 feet.

7              MR. GRANTZ:  Objection to the relevance, Judge.

8              THE COURT:  Overruled.

9   Q     So is your testimony that you took several hours or at

10  least an hour --

11  A     Yes, at least an hour.

12  Q     -- to move three boxes?

13  A     Well, you know, I just move the three boxes.  At the same

14  time we talk, we mingle, you know.

15             THE COURT:  I'm sorry, who talked and mingled?

16             THE WITNESS:  Sonia and I and, you know.

17             THE COURT:  With whom did you mingle?

18             THE WITNESS:  With Sonia.

19             THE COURT:  I see.

20             THE WITNESS:  You know.

21             THE COURT:  Okay.

22  BY MR. NELKIN:

23  Q     Okay.  Let's move on.  Did you use your phone -- well,

24  what phone did you have when you were at Two Rivers?

25  A     I had an iPhone.

1  Q     And what happened to that iPhone?

2  A     I traded it for this Samsung phone that I have.

3  Q     I think your affidavit says you either lost it or traded

4  it in?

5  A     Right.

6  Q     So you definitely traded it in?

7  A     I'm not saying -- no, it could have been either one.

8  Q     You don't remember if you lost it or if you traded it in?

9  A     Most likely I traded it in; I don't know.

10 Q     And what's your service provider?

11 A     T-Mobile.

12 Q     Okay.  And do you remember if they gave you a credit when

13 you turned in your phone?

14 A     I lost my phone.  The reason why was I think I went to

15 the pharmacy.  I bought a Cricket phone for $20 so I could get

16 a credit to buy a new phone.  That's what happened.

17 Q     And when did that happen?

18 A     After I left Two Rivers.  I don't remember the dates when

19 it happened.  But I remember I went to the pharmacy, I bought

20 a cricket for about $29, something like that, so I could get a

21 credit for returning a phone to buy a new one.

22 Q     Wait.  Did you lose your phone or you turned it in?

23 A     I think I lost it because like I said, I lost it.

24 Q     So you didn't get a credit for Cricket?

25 A     No, I bought a Cricket phone next door which is a prepaid

*J. Salcedo - Direct/Mr. Nelkin*                                    1113

1   phone and I turned that in to T-Mobile as my phone so they

2   could give me credit for the new phone.

3   Q    Okay.  Did you read e-mails on your old phone?

4   A    Excuse me?

5   Q    On your iPhone, did you read e-mails?

6   A    I read e-mail?

7   Q    Yeah.

8   A    Yeah.

9   Q    Okay.  And did you do that on your new phone?

10  A    Yes.

11  Q    Okay.  And did you send e-mail on your phone?

12  A    Once in a while I do.

13  Q    Okay.  And did you send it on the phone that you lost?

14  A    When I had that phone.

15  Q    Your phone, do you have to -- how do you get your e-mail?

16  A    Through Hotmail.

17  Q    And how do you access it on your phone?

18  A    I open the screen, press the icon and mail it opens up.

19  Q    Okay.  So you don't have to put in any password?

20  A    Oh, I do have a password, security password, definitely.

21  Q    On the phone?

22  A    Yes, on the phone to start it up.

23  Q    I am just asking for your e-mail, you don't have to put

24  in --

25  A    No, it's automatically in there.

1   Q     And was it that way on your old phone?

2   A     Yes.

3   Q     Did you use the other phone for Two Rivers's business?

4   A     I used it once to text, to text to Eugene when he was in

5   China.

6   Q     To text?

7   A     Yeah, because I talked in the phone, what I say

8   translates it into text.

9   Q     Did you ever send any e-mails by phone?

10  A     I did, to China, to Eugene.

11  Q     Well, were they texts or were they e-mails?

12  A     I think it was texts.  What's the difference?  I don't

13  know the difference from text and e-mail.  You are still

14  writing and talking.

15  Q     Well, I guess they are different programs with different

16  ways of using the phone.

17  A     I just press the little microphone on the thing and I

18  speak and it writes down whatever I want.

19  Q     So you basically use both text and e-mail?

20  A     I guess so, yeah.

21  Q     And what about to Mr. Friedman?

22  A     What about him?

23  Q     Did you ever use your phone to communicate with

24  Mr. Friedman?

25  A     All the time.

*J. Salcedo - Direct/Mr. Nelkin*                          1115

1  Q    Okay.  And did Mr. Friedman ever communicate with you by

2  phone?

3  A    Yes.

4  Q    And was that texts?

5  A    Sometimes text, sometimes he calls, yeah.

6  Q    What about e-mail?

7  A    Sometimes, very little e-mail.

8  Q    What is your e-mail account?

9  A    You want to know my e-mail account?

10 Q    Yes.

11        THE WITNESS:  Do I have to tell him my e-mail

12 account?

13        THE COURT:  Yes.

14 A    JS1567@hotmail.com.

15 Q    Have you ever in any other e-mail accounts?

16 A    Yes, I do.  I have a Gmail.

17 Q    What is that?

18 A    Jorge with a "J," 1567@gmail.com.

19 Q    Have you ever any other e-mail accounts?

20 A    No.

21 Q    What about a Brooklyn Beans account?

22 A    Well, he opened one for me.

23 Q    Did you use it?

24 A    I don't recall using it, but according to the papers, I

25 did use it once or twice to talk to Mr. -- his father, Eugene

*J. Salcedo - Direct/Mr. Nelkin*                    1116

1    to China, according to them.  I don't remember doing that,

2    either, so I don't know.

3    Q    But you don't -- you don't challenge the fact that that

4    happened?

5    A    Oh, no, definitely that happened.  I remember that

6    trailer.

7              THE COURT:  You remember that --

8              THE WITNESS:  That trailer, the merchandise that

9    came in --

10             THE COURT:  Got it.

11             THE WITNESS:  -- that he's asking me about.

12   BY MR. NELKIN:

13   Q    And if you could just turn to Exhibit 33.  Is that an

14   example of you using your Brooklyn Beans account?

15   A    I can't hear what you said.

16   Q    Oh, I'm sorry.  Can you turn to Exhibit --

17   A    I am on 33 or 34?

18   Q    Thirty-three.

19   A    Okay, I'm on 33.

20   Q    Is that an example of you using your Brooklyn Beans

21   account?

22   A    That's what it says.

23   Q    Okay.  And you don't -- you don't challenge that this is

24   an authentic document?

25   A    I challenge the word that I used Brooklyn because this

1   came out of my phone.  In my phone, I don't use -- I didn't

2   have this Brooklyn Two Rivers e-mail, whatever you call it.

3   Q    Why do you say it came out of your phone?

4   A    Because that's how I text.  I can't write that well.  So

5   I call, I push the button, the microphone on my phone and I

6   speak to my phone and it writes whatever I want.

7   Q    So you are saying that you don't remember sending a

8   text --

9   A    I remember the text, but I don't remember the Brooklyn

10  stuff.

11                   (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*J. Salcedo - Direct/Mr. Nelkin*          1118

1   EXAMINATION BY

2   MR. NELKIN:

3   (Continuing.)

4   Q    Okay.  Thank you.  And if you could turn to page -- to

5   Exhibit 34.

6           Do you remember this exchange?

7   A    I could say I do.

8   Q    You do?

9   A    I think I do.

10  Q    Okay.  And can you tell me what this was about?

11  A    That container was unloaded today, and in the container

12  we found two wooden crates.

13  Q    So do you remember sending these e-mails?

14  A    Huh?

15  Q    Do you challenge that you sent this e-mail?

16  A    I'm not challenging that I sent it.  I'm challenging that

17  it says "Brooklyn," the Brooklyn e-mail thing.  I don't

18  remember using that.

19          THE COURT:  Leaving aside the address, does the

20  exchange --

21          THE WITNESS:  It's possible.

22          THE COURT:  That seems familiar to you?

23          THE WITNESS:  Yes.

24          THE COURT:  Okay.

25  Q    Did you work full time for Two Rivers?

1    A    Yes.

2    Q    And did you work full time for Two Rivers in 2014?

3    A    That's the year that I worked, sure.

4    Q    Did you work for anyone else then?

5    A    Two Rivers.

6    Q    Can you turn back to Exhibit 33.  Do you know what Gates

7    Place is?

8    A    Yes, it's a building from Mr. Friedman.

9    Q    And what were you doing there?

10   A    Working on the heating system.

11   Q    Was that the Two Rivers job?

12   A    No, but I had an agreement with Mr. Friedman that he was

13   part of Two Rivers, and wherever he sent me I told me to do

14   certain things.  Schrieber told me to do certain things I

15   would do it.

16   Q    Would Mr. Schrieber tell you to do anything besides

17   Two Rivers work?

18   A    Yes, I went to his house and fixed his boiler one day.

19   Q    Okay.

20   A    He had no heat.

21   Q    What?

22   A    He had no heat in his house.  I went to Gene's house to

23   fix his boiler.

24   Q    Was that before or after -- when did you do that?

25   A    I don't remember the date but I was working for

*J. Salcedo - Direct/Mr. Nelkin*          1120

1  Two Rivers when that happened, too.

2  Q    Did you work for Two Rivers full time in 2013?

3  A    Probably.  I told you I was bad on dates.

4  Q    And you said that you always earned the same amount?

5  A    Yes.

6  Q    Okay.  If I have a W-2 for you from 2014 and it shows

7  that your wages and tips were $83,150.  And I have one for you

8  for 2013 and it shows that your wages and tips were only

9  $5,200.  Would you be able to explain why there was such a big

10 difference in number?

11 A    Sure.  I do a lot of side work.

12 Q    You just told me you don't do --

13 A    Not with Two Rivers, I wasn't with Two Rivers.  I didn't

14 live in Two Rivers, you know, I had a life, too, you know.

15 Q    This is what Two Rivers is paying you.  This is a W-2

16 from Two Rivers for $83,150 for 2014, and there is a W-2 for

17 2013 for only 5,000 something dollars?

18 A    $5,000?

19       THE COURT:  Do we know the dates of employment in

20 2013?

21       MR. NELKIN:  I believe that he was -- I'd have to

22 look that up, your Honor.

23 Q    What dates were you working in 2013?

24 A    What dates?

25 Q    Yes, for Two Rivers?

1  A    Well, Two Rivers, I used to five days, six days.

2  Sometimes working on Sundays, sometimes we didn't.  No

3  Saturdays, you know.

4  Q    Is it possible?

5  A    No hours.  Open up at 7:00 sometimes work 'till

6  8:00 o'clock at night.  Still I was there.

7          THE COURT:  At least to the extent that I was asking

8  the question, were you working for Two Rivers all through

9  2013?

10          THE WITNESS:  I think so.

11          THE COURT:  Okay.  So then any idea why your

12  W-2would be less, if it's true, I haven't seen it, why a W-2

13  for 2013 would be so much less than 2014.

14          THE WITNESS:  Well, in 2014 I must have been -- in

15  2013, I was still working for my building and doing the

16  construction on Two Rivers.  I don't know.

17          THE COURT:  You don't know.

18          THE WITNESS:  I don't know.

19          THE COURT:  I don't want you to guess.

20  Q    And do you remember if when you worked for -- did the

21  boiler work for Mr. Schrieber, whether you were working at MB

22  at that time, or whether you were working at Two Rivers at

23  that time.  Is it possible that you were work at MB?

24  A    It's a possibility.  When I had contacted with Schrieber

25  that's when I started working in Two Rivers in the sense of

1    the construction, putting the machines together, doing the

2    wiring, et cetera, et cetera.

3    Q    Do you know why your paycheck, some of your paychecks are

4    for $324.37, and others are for $1,400 in differing amounts?

5    A    I did more hours.

6    Q    So you were an hourly worker?

7    A    Not really, but, you know, it was more work.

8    Q    I guess -- let me ask you.  Were you paid by the hour or

9    paid by salary?

10   A    I was paid by salary in Two Rivers.

11   Q    But you told me your salary --

12   A    For what company are those checks?

13   Q    Two Rivers.

14   A    Both?

15   Q    Yes.

16   A    I don't know.

17   Q    So you have no recollection of your salary amount from

18   Two Rivers changing?

19   A    Not that I know of.

20   Q    And you have no recollection of the exact amount you were

21   paid?

22   A    You just told me them.

23            THE COURT:  No, he's asking what you recall.

24            THE WITNESS:  No.

25   Q    And you do recall that you were a salaried employee and

1  not an hourly employee?

2  A    Can you repeat that again, please.

3  Q    You testified you were a salaried employee, not an hourly

4  employee?

5  A    Right.

6  Q    So you had some salary that was established; correct, it

7  didn't change by how many hours you worked?

8  A    Right.

9  Q    Thank you.

10       Did Mrs. Ezell have anything to do with the

11  distribution of your checks?

12  A    Sylvia?

13  Q    Yes.

14  A    When I was with MB.

15  Q    What about when you were at Two Rivers?

16  A    No.

17  Q    Who gave you your check?

18  A    Sonya used to print them out.

19  Q    And Sonya would hand you the check?

20  A    They gave me a pack of checks and I would give them to

21  the employees.

22  Q    So your job consisted --

23  A    I did that, too, you know.  Whatever they did, I used to

24  try to do the best I can.

25  Q    Were you ever involved in any exchange of checks for

1    cash?

2    A    I don't remember.  I don't think so.

3    Q    You don't remember or you don't think?

4    A    I don't think so.

5    Q    Is it possible?

6    A    I could probably give a check to Sonya or Sylvia to cash

7    to for me or something of that sort.  I don't know.  It's a

8    possibility.

9    Q    What about to Mr. Friedman?

10   A    No, Friedman don't carry cash.

11            THE COURT:  What was that?

12            THE WITNESS:  I don't think Mr. Friedman carries

13   cash.

14            THE COURT:  He doesn't carry cash.

15            THE WITNESS:  I don't think so.

16            THE COURT:  I wasn't sure what you said.

17   Q    If a check of yours got into Mr. Friedman's bank account,

18   could you explain that?

19   A    I must have gave it to him to cash it for me if that's

20   the case.

21   Q    But you have no recollection?

22   A    No recollection.  I don't practice that that often to

23   remember if I ever did or not.

24   Q    When you say you don't practice?

25   A    Once in a while, I gave a check to Sylvia to cash for me.

*J. Salcedo - Direct/Mr. Nelkin*          **1125**

1    That's what I mean by that in general.

2    Q    And if you did get a check cashed, how would they give

3    you the exact amount of check?

4    A    Yes.  It's my money.

5    Q    If it was for 87 cents they would give you 87 cents?

6    A    They would give me a dollar for the 87 or whatever, you

7    know.

8    Q    Would they charge you anything for it?

9    A    No.

10   Q    Let's turn --

11            THE COURT:  Before you move on.  I don't think I

12   understood your testimony.  So sometimes you think maybe --

13            THE WITNESS:  To Sonya or Sylvia.

14            THE COURT:  But not Mr. Friedman.

15            THE WITNESS:  If I ever did it, it could have been

16   maybe in a blue moon.  I don't remember giving him any checks.

17            THE COURT:  Okay.  Go ahead.

18   Q    And when you said you might have given it to Sonya or?

19   A    Probably most likely Sylvia.

20   Q    Okay.  But you just told me that you didn't have --

21   Sylvia didn't have any connection with your checks?

22   A    To cash it.  We live in the Bronx together.

23   Q    When you say you live together?

24   A    She lives four blocks from my house or five blocks, you

25   know?  I go visit the building where she works, you know.

1    Q    Have you been to her house?

2    A    Sure.

3    Q    Does she have a computer there?

4    A    I have no idea.  I go over there sometimes.  She calls me

5    to change the light bulb or fix something, or the faucet is

6    leaking.  She calls me, I go fix it, you know?  I do her a

7    favor, you know.

8    Q    But you don't remember seeing a computer there?

9    A    No.  I go to the kitchen or the bathroom or to the boiler

10   room downstairs in that building, that house.  I don't ask too

11   much questions.  I don't investigate too much.

12   Q    What about Ms. Rivera.  Did you ever go to her house?

13   A    No, the house has gas.

14   Q    Has what?

15   A    Runs on gas.  The boiler is gas.

16   Q    You never do any favors for her?

17   A    Very little.  Gas doesn't give you too much problems.

18   Sonya has oil in her house.  Oil is different.

19   Q    Don't they live in the same building?

20   A    I will give you an example.  It's all one big lot.  Five

21   different houses together A, B, C together.

22   Q    But have you ever been to Ms. Rivera's house?

23   A    I've been there, sure.

24   Q    And you've been there enough to know it runs on either

25   gas?

J. Salcedo - Direct/Mr. Nelkin          1127

1   A    I serviced that equipment when it needs to be serviced.

2   Maybe go there once every two years, your know.

3   Q    So you serviced the equipment there?

4   A    Yes.

5   Q    So you serviced both Ms. Ezell and Ms. Rivera?

6   A    Yes.

7   Q    Did you do that for a company, or did you do that just as

8   a friend?

9   A    MB Fuel.

10  Q    MB Fuel?

11  A    Sylvia, I help her out when she needs help.  She has no

12  husband, has her son home.  So, you know, she doesn't know how

13  to change a bulb she calls me five, four blocks away from her

14  house.

15  Q    What about Sonya?  Who does she live with?

16  A    She lives with her husband, her family, I guess.

17  Q    So just the mechanism.  So you got paid in Two Rivers in

18  New Jersey, and instead of going to your bank in the Bronx you

19  would sometimes have Ms. Ezell?

20  A    Once in a blue, not sometimes, not that often.  Sometimes

21  is very often.  It's not often.  Maybe once a year who knows.

22  Q    Can you just give me a reason why you might have needed

23  to have her cash it?

24  A    Maybe the bank was closed that day and I needed money for

25  something or whatever.

*J. Salcedo - Direct/Mr. Nelkin*          1128

1       THE COURT:  Have you ever use the ATM card?

2       THE WITNESS:  Very, very, very, very rare.  My wife

3  takes care that.  If I need money, I ask her to give me a

4  hundred dollars for the week or $200 for the week she takes

5  care of that.

6       THE COURT:  If you need cash, you don't go to the

7  ATM, you cash the check with Sylvia.

8       THE WITNESS:  No, I told my wife.

9       THE COURT:  I see.

10       THE WITNESS:  To give me $200.

11       THE COURT:  Okay.

12  Q    Does your ATM let you put a check in and deposit a check?

13  A    My wife does that.  I give the envelope to my wife.

14  Q    Okay.  Thank you.

15       THE COURT:  Is this a convenient time for our

16  morning break?

17       MR. NELKIN:  Fine with me, your Honor.

18       THE COURT:  Let's take 15 minutes.

19       (Witness leaves the witness stand.)

20       (A recess in the proceedings was taken.)

21       THE COURT:  Have a seat, please.

22       (Witness takes the witness stand.)

23       THE COURT:  I think we're missing Mr. Finkel.

24       All right.  You may continue.

25

*J. Salcedo - Direct/Mr. Nelkin*                    **1129**

1   EXAMINATION BY

2   MR. NELKIN:

3   (Continuing.)

4   Q    Did you ever use your iPhone to take photos.

5           Did you ever use your iPhone to take photos?

6   A    Sure.

7   Q    Did you ever use your iPhone to fake photos at

8   Two Rivers?

9   A    Sure.

10  Q    What would you take photos of?

11  A    Numbers, adjustments in the machines.  The adjustments in

12  the machine were made with numbers like 09, 020, like the

13  timing on the things.  So when I find a number that the

14  machine works the best, I used to take a picture of it to keep

15  it.  So just in case it gets whacked, I would go to that

16  picture and set the same numbers.

17  Q    It would be useful information to have for those

18  machines?

19  A    At that time.

20  Q    Okay.  Well, wouldn't it remain the same?

21  A    No, because the machine wears out.

22  Q    As long as the same machine is working, that would be a

23  useful piece of information?

24  A    The machine works for five days it might change because

25  it wears.

1    Q    Okay.  And how many photos did you take?

2    A    I had about two or three.  I had them, I don't have them

3    anymore.

4    Q    You don't have them any more?

5    A    I would have to search my phone to see if they were

6    transferred.  They were in the phone, whatever.

7    Q    I thought you said you don't have the iPhone anymore?

8    A    I don't have the iPhone anymore.  I have a Samsung phone.

9    We're talking about when I was with Two Rivers?

10   Q    Right.  Did you transfer the data from your phone?

11   A    I lost the phone.  Remember I bought a Cricket phone I

12   told you.

13   Q    Do you have the photos or not?

14   A    I don't think so.

15   Q    Well, where could you have them?

16   A    If I have them, they would be on a little SD card that I

17   have at home just in case.

18   Q    Now, did you look at Exhibit 108.  Can you look at

19   Paragraph 8.  "The number of photographs at my work at

20   Two Rivers were taken with this iPhone.  I downloaded these

21   photos to a storage device that I maintain in my home.  The

22   storage device contains numerous earlier remember photographs

23   of a personal nature.

24   A    It's possible I might have them.  That's the answer I

25   gave you.

J. Salcedo - Direct/Mr. Nelkin          1131

1    Q    But you swore in an affidavit.

2              THE COURT:  It says what it says.  Do you have it?

3              THE WITNESS:  I have to look to see if I have to.

4              THE COURT:  You already said that you have it so

5    produce it, please.

6    Q    And can you tell me how you downloaded photos what was

7    the mechanism?

8    A    Plug them in.  You plug it into the computer.

9    Q    You plug it into a computer?

10   A    Yes.

11   Q    And you save it on the computer?

12   A    Yes.  And I put it in the little SD card.

13   Q    So it would also be saved on the computer?

14   A    I don't save anything on the computer.

15   Q    Then how does it get to the card?

16   A    Through the computer.

17   Q    So your testimony is that it just transfers without?

18   A    I don't save them on the computer.  The computer goes

19   bad.

20   Q    When did you download those photos?

21   A    A long time ago.  I don't remember.  That's why I have to

22   see if I have them.

23   Q    Okay.  And which computer would you have downloaded them

24   on to?

25   A    Well, I used to have an Apple computer which died.  So I

1  bought a new computer not too long ago.  I bought an Ace

2  computer.  I don't have them in that computer.

3  Q    What happened to the Apple computer?

4  A    It got a heart attack and died on me.  Broke.

5  Q    Where is it?

6  A    Maybe home somewhere.  I don't know.

7  Q    You were asked to prepare an affidavit detailing all the

8  computers that you had?

9  A    Yes.

10 Q    Did you mention that Apple computer on that affidavit?

11 A    I don't recall if I did or not.  What does it say?

12       THE COURT:  You have it in front of you.

13 Q    You can look at it, it's 108?

14 A    No. 8 you're saying?

15 Q    No, just read the whole affidavit?

16       THE COURT:  I know we had a couple of affidavits for

17 some people.  Was this the only one?

18       MR. NELKIN:  There were two.

19       THE COURT:  Is the Apple mentioned in either one?

20       MR. NELKIN:  No.  Do we need to -- sorry.

21       THE COURT:  Come on.

22 Q    So, Mr. Salcedo, are there any other computers besides

23 the Apple computer that are not mentioned in your affidavit?

24 A    I did not mention the Apple computer.  I don't believe it

25 exists, it's garbage.  That's what you're asking me.

*J. Salcedo - Direct/Mr. Nelkin*        1133

1   Q     When did it quit working?

2   A     A long time ago.  I don't remember the dates.

3   Q     After you left Two Rivers?

4   A     Maybe when I was in Two Rivers.  It's a long time.

5   Q     Your affidavit says, well, when your first one died, did

6   you get the new one right away?

7   A     No.

8   Q     How much time elapsed?

9   A     I got a new one maybe five months ago.  I'm not a

10  computer guy.

11  Q     How much time passed between the time that your old

12  computer died.  How long?  You don't know?

13  A     (Nodding).

14  Q     Now, do you use any of the other computers in your house?

15  A     Yes.  Well, I don't use them.  Like, if I wanted

16  something from Amazon, I ask my son to order it for me.

17  Q     Did you ever use the computer?

18  A     To read e-mail once in a while.

19  Q     How do you get your e-mail on that computer?

20  A     Through Hot Mail.  I have a little tablet that I use for

21  that, too, you know.

22  Q     So you get your e-mail on the tablet?

23  A     Any computer.  You just log in to Hot Mail.

24  Q     Tell me how you log in?

25  A     Hotmail.com I sign in and I put in my password.

1   Q    You do it on each the computer?

2   A    My tablet doesn't need any password because it's

3   automatic.  I open the mail and it opens up.

4   Q    So your e-mail is on your tablet?

5   A    Yes.

6   Q    Is that the tablet that you say you use for games?

7   A    Yes.  Yes.  Yes, that one.

8   Q    And how long did you have that tablet?

9   A    Awhile.

10  Q    A year, two years, three years?

11  A    Maybe a year, year and a half.

12  Q    Did you have it while you were working at Two Rivers?

13  A    Yes.

14  Q    And the other computer, the one that you just bought, is

15  your e-mail installed on that?

16  A    Does it automatically.  It's there but I don't use it.

17  Q    And on the one you used to have, was it automatic as

18  well?

19  A    Yes.  Sometimes I forget my password, so I have to ask my

20  sons for it.  This is why I have it automatic because I'm not

21  good with that part of the world.

22  Q    Where are those passwords recorded?  I mean --

23  A    They're in the computer automatically.  They sign-in

24  automatically.

25  Q    Okay.  Thank you.  But what are you asking your son for

J. Salcedo - Direct/Mr. Nelkin          1135

1   in connection --

2   A    Sometimes I screw up, I forget.  Sometimes I can't get

3   in, so I tell him what's the password whatever because it

4   messes up sometimes.

5   Q    Do your sons have different passwords than you?

6   A    They have their own password, their own e-mail.  I don't

7   know.

8   Q    But they know your password?

9   A    Sure they know everything about me.  I got nothing to

10  hide.

11  Q    Now, besides the photos of the machines, were there any

12  other types of photos related to Two Rivers that you took?

13  A    Not that I recall.

14  Q    Did you take any of the work that was being done?

15  A    It's a possibility.

16  Q    Did you take any pictures of the workers who were working

17  on the job?

18  A    Yes.  The thing is where do I have them if I have them

19  anymore.

20  Q    Did you give those pictures to anyone else?

21  A    My lawyer has pictures I think I gave him.

22  Q    Besides your lawyer, did you give them to anyone else?

23  A    I don't use them.  I just use them for my purpose.  My

24  recreation.  I like pictures.

25  Q    When I asked you before if you had the pictures or didn't

1   have the pictures, and you said, no, you'd have to go look?

2   A    I said maybe I have to look.  I don't remember.

3   Q    But now you remember you gave them to your lawyer?

4   A    You just told me if I gave pictures to somebody else it

5   clicked in.

6   Q    Have you done any work for any of the coffee companies in

7   Newark?

8   A    I done work after I left Two Rivers.

9   Q    After Two Rivers?

10  A    Yes.  I didn't know that company existed.

11  Q    What did you do there?

12  A    I helped install a garbage compactor.

13  Q    Do they have any of the same machines that Two Rivers

14  has?

15  A    I don't know.  I just went to do a garbage compactor.  I

16  didn't go to the office or anything like that.

17  Q    Did you ever work on any coffee machines there?

18  A    There is no coffee machines there.  I don't know if there

19  are.  I don't know.

20  Q    And who paid you to?

21  A    Through MB Fuel when I used to go there.

22  Q    But you told me before if I remember that after you left

23  Two Rivers you didn't work for MB Fuel?

24  A    About two months.  I never worked.  After that, I never

25  worked for MB Fuel, I worked for N&S.  I don't know how to

1    explain to you.

2            THE COURT:  Try to explain it because I'm not

3    getting it.

4            THE WITNESS:  Well, the Ahearns, I don't know what

5    relation they have with N&S and MB Fuel.  I know MB Fuel

6    because I used to work for MB Fuel.  It's more common for me

7    because I used to work for MB Fuel.

8            THE COURT:  Do the distinctions matter to you

9    between MB Fuel --

10           THE WITNESS:  As long as I get my check on Friday

11   that's all I care.  I'm not interested in nothing else, man.

12   Q    Do you know the names on the check?

13   A    Mine says N&S right now.

14   Q    Did you get any other names on your check besides MB Fuel

15   or Two Rivers?

16   A    No.

17   Q    Now, it's my understanding of your testimony that you

18   left Two Rivers?

19   A    Right.

20   Q    And you filed for unemployment?

21   A    Right.

22   Q    Did you receive unemployment?

23   A    Yes, I did.

24   Q    Now?

25   A    I had a hearing on this.

1   Q    You had a hearing.  What did you tell them was the reason

2   for --

3   A    Same thing I told you before.  Mr. Friedman told me to

4   pick up my tools, go to the Bronx, and I thought I was fired.

5   Q    You were fired?

6   A    That I didn't feel that I was tired.

7   Q    Do you get unemployment?  Do you know if you get

8   unemployment if you quit?

9   A    I don't know that, I have no idea.  I never done it

10  before.  Anyway, this was the first time I had nothing to do

11  with that.

12  Q    At the hearing, did you tell them that you quit or that

13  you were fired?

14  A    I told them that I quit most likely.  I don't remember.

15  It was awhile from now?

16  Q    Who represented the company at that hearing?

17  A    I think we did that through the phone.

18  Q    Well, was it --

19  A    I spoke to a lady, that was it.  It was a hearing on the

20  phone.  I wasn't in a place like that she called me on the

21  phone.  They called me on the own.

22  Q    Who was on the phone from Two Rivers?

23  A    A lady, I don't know.  I didn't speak to anybody from

24  Two Rivers, I spoke to a lady on the phone in Georgia or

25  wherever.

*J. Salcedo - Direct/Mr. Nelkin*         1139

1       THE COURT:  Ms. Nelkin, I'm trying to listen to the
2   testimony, and while you're whispering it's making it hard for
3   me to hear it.
4       MS. NELKIN:  I'm sorry.
5       THE COURT:  Please pass notes if you must.  The
6   whispering is a little loud, please.
7       Go ahead, sir.
8   A   Did I answer your question.
9   Q   No.
10      THE COURT:  I'm sorry, I didn't hear your answer.
11      THE WITNESS:  He asked me who was in the hearing and
12  I said I don't know.  They called my on the phone, I spoke to
13  a lady, that was the end of it.
14      THE COURT:  Go ahead.
15  Q   Was there someone on the phone besides you and the lady?
16  A   I have no idea.  She hanged up and she got back to me and
17  they give me this number that I used to call once a week to
18  report myself in and that was it.  I did it for about three
19  weeks or four weeks that was the end of that, too.
20  Q   How long did you get unemployment?
21  A   Nor two or three weeks.
22  Q   Then what happened?
23  A   I dropped it.
24  Q   You stopped getting unemployment?
25  A   I stopped calling the number and then the checks stopped

*J. Salcedo - Direct/Mr. Nelkin*          **1140**

1    coming.

2    Q    Was it difficult for you and your wife to suddenly have

3    that $80,000 in income stop?

4    A    No, I was making good money.

5    Q    What did you to do replace the difference?

6    A    When I worked for MB Fuel, MB Fuel, I do a lot of side

7    work.

8    Q    Who did you do the side work for?

9    A    Different customers.

10   Q    Just tell me who?

11   A    If you call a person, like, you call Jorge, can you do

12   this fix this for me, I will go to your house.

13            THE COURT:  He's not asking what the conversation

14   would be like.  He's asking who were these other people that

15   you did work for.

16            THE WITNESS:  Customers of mines.

17            THE COURT:  Who are they?  Names because I assume

18   you know who you're working for.  If you could tell us the

19   people and the companies.

20            THE WITNESS:  No, it's not companies.  It's people

21   from the street.  People that I met.  I tell them I do this,

22   my next-door neighbor.

23            THE COURT:  There you go.  Start going down that

24   list.

25            THE WITNESS:  My next door neighbor house.  I do

1    across the street from my house.

2            THE COURT:  Sir, it's not hard.  I take it you know

3    the names of people that you work for.

4            THE WITNESS:  Names.  Oh, man.  Well, my next door,

5    she's Cuban, her name is Maria, she owns the two houses over.

6    I fix her heating one day when they have a problem they call

7    me so side work for me.

8    Q    And how much does --

9    A    I charge --

10           MR. FINKEL:  Objection, your Honor.

11           THE COURT:  Overruled.

12           THE WITNESS:  I charge her $120, $130 for the

13   service call plus parts.

14   Q    And how many did you have between the time you started

15   stopped working at Two Rivers and started working at N&S?

16   A    How much work that I had?  I always had work, plenty of

17   work.

18   Q    Five service calls, 50 service calls?

19   A    In the winter, you have a lot of them.  In the summer, I

20   don't have too much.  That's why in the summer I take a month

21   off because there's nothing to do in the middle of June, July,

22   I disappear for a month.  I go back home.  It's cheaper to go

23   home than stay in New York City.

24   Q    How are you paid for these service calls?

25   A    I get cash, sometimes check.

1    Q    And do you know the rough amount that you earned?

2               MR. FINKEL:  Objection, your Honor.

3               THE COURT:  Overruled.

4               THE WITNESS:  I don't keep track of that.

5    Q    Did you declare that income?

6               MR. FINKEL:  Objection, your Honor.

7               THE COURT:  Sustained.

8    Q    Would there be any records of this work?

9               MR. FINKEL:  Objection, your Honor.

10              THE COURT:  Overruled.

11              THE WITNESS:  Not really.

12   Q    Would it be reflected on your taxes?

13              MR. FINKEL:  Objection.

14              THE COURT:  Overruled.

15              THE WITNESS:  Do I have to answer that?

16              THE COURT:  Yes.

17   A    Sometimes, it depends.  If I get cash, I don't put it on

18   the tax.  If I get checks, I have to deposit it so I put it on

19   the taxes.

20   Q    Okay.  Let me move on to when you were -- when you went

21   to 26 Flavors?

22   A    I went to 26 Flavors?

23   Q    I think you testified that you went to the coffee

24   companies in Newark to do that?

25   A    I don't know that was 26 Flavors.

1   Q     Who did you think it was?

2   A     I thought it was a coffee company.

3   Q     Who asked you to go?

4   A     Mr. Friedman.

5   Q     And who paid you?

6   A     MB Fuel.

7   Q     So you were working --

8   A     Or N&S.  I don't know, makes no difference to me.

9   Q     But you did that as their employee?

10  A     Yeah.  Maybe not.  Maybe I did it, you know, but I go to

11  them, you know.

12  Q     Besides this one service call to the coffee companies

13  that you went through them for, did you go through them for

14  any other service calls?

15  A     No, I went to the garbage compactor.

16          THE COURT:  Through the --

17          THE WITNESS:  Garbage compactor.  I went to install

18  it.

19  Q     Besides that one Instance, did you have any other work

20  for --

21  A     Yes, I did.  I went there to put in an electric hi-lo so

22  I went to wire up the electric pour supply to charge the

23  hi-lo.

24  Q     Besides that, were you doing other jobs for MB Fuel at

25  this time?

*J. Salcedo - Direct/Mr. Nelkin*          1144

1   A    Like I said before, I do work.  I'm an employee, I do

2   whatever they say.  Whoever cuts me a check on Friday that's

3   what I try to do.

4   Q    Before the five or six months ago that you started

5   working for N&S, did you do any work for them, for MB Fuel, as

6   an employee before that?

7   A    I don't know how to answer that question.

8           THE COURT:  I'm sorry.

9           THE WITNESS:  I don't know how to answer that

10  question.

11          THE COURT:  He asked the question, you give the

12  facts that are responsive.

13          THE WITNESS:  Like, you know, I had a window in

14  between that I wasn't working.  Two months, I think it was,

15  you know.  And even though I had work sometimes, I called,

16  listen, I got to stop and I'm going to this place because I

17  was using their vehicle.  So I had to inform them what I was

18  doing, that he's used to pay me for the call.  Not it's an

19  employee but they pay me.

20  Q    How did this pay you?

21  A    They gave me a check and sometimes they would give me

22  cash the Ahearns give me $200, $300, it depends on what I did

23  because I was using his vehicle to transport myself and the

24  equipment to wherever I go.  I don't have a working truck.  I

25  don't have a van.

1   Q    So the Ahearns sometimes paid you in cash?

2   A    Inside those two months, once in a while sure.

3   Q    Did Mr. Friedman ever pay you in cash for anything?

4   A    I never worked directly to Mr. Friedman.  He calls

5   MB Fuel or I never got nothing.

6   Q    Do you know if he has any role at MB Fuel?

7   A    I see that he has an office there.  I see him there once

8   in a blue moon and that's all I know about Mr. Friedman.

9   Q    Okay.  Have you ever done work for Mr. Birnbaum?

10  A    I don't know who he is.

11  Q    Have you done anything else for any of the coffee

12  companies besides those two visits?

13  A    No, not that I recall.

14  Q    Do you remember when you went to Sonya's office to remove

15  the boxes.  Were the boxes in the office?

16  A    I think so.  I think they were on the floor in the

17  office, yeah.

18  Q    Okay.  Do you remember how many desks were in the office?

19  A    Two desks.

20  Q    Okay.  And do you remember which one was Ms. Rivera's?

21  A    I will make a picture of it.  This is Rivera's desk and

22  this was her assistant's desk and they were in this position.

23  Q    Where would the door be?

24  A    The door would be on this side right there.

25  Q    Okay.  So --

1    A    She would be in the windows and the other table would be

2    like this, like an L shape.

3    Q    Okay.  Do you remember how many computers were on the

4    desks?

5    A    No.

6    Q    Were there any computers on the desks?

7    A    I just picked up the boxes, you know?  Like I said

8    before, I'm not a --

9    Q    And where were you mingling with Ms. Rivera?

10   A    In the hallway as, you know, it's a long hallway.

11   Q    Did Ms. Rivera ever tell you anything about why she

12   needed the boxes removed?

13           MR. FINKEL:  Objection.  Hearsay.

14           THE COURT:  He hasn't asked for the contents, so

15   overruled.  We have the declarant on the stand and is

16   available, so I will overrule the content as well.

17           THE WITNESS:  Answer the question?

18           THE COURT:  Answer, please.

19           THE WITNESS:  What was your question again.

20   Q    Did Ms. Rivera ever tell you anything about why she

21   needed the boxes moved?

22   A    I knew she was leaving Two Rivers Coffee.

23   Q    So she told you she was leaving Two Rivers Coffee?

24   A    Yes.

25   Q    Did she tell you where she was going?

1  A    I knew she was going to the Bronx.

2  Q    Did you wonder why she didn't need her computer?

3           MR. FINKEL:  Objection.

4           THE COURT:  Overruled.

5           THE WITNESS:  We didn't have no conversation about

6  her computer that I could remember.  Nice day, raining, just

7  carry the boxes out, et cetera, et cetera.  That's the type of

8  conversation that we had.  I don't talk about no work.  She

9  doesn't talk to about me no work.  I'm not interested in that

10 stuff, man.

11 Q    Why did Ms. Rivera need your help?

12 A    They were heavy boxes, I guess.  You know?

13 Q    Did you carry them?

14 A    She was a little lady.  She's nice, you know?

15 Q    How did you transport the boxes?

16 A    In the van.

17 Q    Did you use a hand cart, did you carry them one by one?

18 A    I think we carried them one by one or two at a time.  I

19 don't remember.

20 Q    And do you remember how many trips you made?

21 A    No.  A couple of trips.  Three or four.  Maybe two.  I

22 don't know.

23 Q    So you could have had four boxes, eight boxes?

24 A    It's possible, four.

25 Q    I'd like to ask you which of the defendants you know and

1   how long you've known them.

2         How long have you known Mr. Friedman?

3   A    20 years maybe in that neighborhood.

4   Q    When did you first meet him?

5   A    We met at Zerega Avenue in the oil terminal.  A terminal

6   of oil where they sell oil wholesale.

7   Q    In Zerega?

8   A    Zerega Avenue.

9   Q    What was he doing there?

10  A    I guess he was there.  I don't know what he was doing

11  there.

12  Q    Was it his place of business?

13  A    I have no idea if it was his place.  I was there with the

14  Ahearns.

15  Q    And do you remember why you met Mr. Friedman?

16  A    They introduced him to me.

17  Q    What were you doing there?

18  A    Maintaining the place like I did in Two Rivers.  Mechanic

19  work, you know, whatever had to be done.

20  Q    And you have no recollection as to whether he was just

21  walking by or part of the business you were helping to

22  maintain?

23  A    I don't think he was part of the business, but he was

24  there.  Like I said, I don't.

25  Q    When did you first meet Jack Ahern?

J. Salcedo - Direct/Mr. Nelkin                1149

1    A    30 years ago maybe.  Him and his brother I start working

2    for them as truck mechanic.

3    Q    Truck mechanic?

4    A    Yes.  I was very good at that.

5    Q    But yet, you don't like doing that?

6    A    It's too dirty, too greasy.  I wear gloves when I work,

7    you know.

8    Q    When did you meet Ms. Rivera?

9    A    I met Ms. Rivera maybe 15 years ago, 20 years ago.

10   Q    When did you first meet her?

11   A    15, 20 years ago.

12   Q    No, not why.  How did you first meet her, I'm sorry.

13   A    I think they bought an oil company.  She came with the

14   company, like, you know.

15   Q    Who bought the oil company.

16   A    I don't know.  The Ahearns, I guess, you know.

17   Q    And so, she just suddenly showed up at 431?

18   A    She was working at that company.  I think they kept her

19   working, you know.

20   Q    Do you remember --

21   A    To change the help.

22   Q    Do you remember when Mr. Friedman first came to 431?

23   A    Not really.

24   Q    Do you know when -- does 431 have more than one address?

25   A    It has two addresses, it's a one block.  It goes from one

1  block to another.  This is 163rd and this is 164th.  And you

2  can go right through the building to the other side to the

3  other block.

4  Q    And do you know if some companies use one address and

5  others use the other?

6  A    I have no idea of it.

7  Q    When did you first meet Ms. Ezell?

8  A    I working a long time ago, too.  20 years ago.

9  Q    Do you remember Ms. Ezell was arrested?

10              MR. FINKEL:  Objection.

11              THE COURT:  Sustained.

12              Move on.

13  Q    Do you know Richard Spence?

14              MR. FINKEL:  Objection.

15              THE COURT:  Overruled.

16              THE WITNESS:  Answer that?

17              THE COURT:  If I say "overruled," please answer.

18  A    Yes, I met him, sure.

19  Q    How did you meet him?

20  A    Used to be in that building, 160 -- 431.

21  Q    What did he do there?

22  A    I know he was the manager or the boss.  I don't know.  He

23  used to give orders.

24  Q    Give orders?

25  A    You know --

J. Salcedo - Direct/Mr. Nelkin          1151

1    Q     For what?

2    A     Fix things.

3    Q     Did he give you orders?

4    A     Yeah.

5    Q     Did you work for him?

6    A     I worked for the Ahearns.  Just like I worked at

7    Two Rivers.  I worked for Eugene, I worked for his son here

8    and I worked for Friedman.

9    Q     Did the Ahearns work for Mr. Spence?

10   A     I don't know.

11   Q     But Mr. Spence had the ability to tell what you to do?

12   A     Sure.  Anybody tells you what to do in that place,

13   there's no bosses there.  The place runs by itself, actually.

14   Everybody is a boss there.

15   Q     I don't understand that.

16   A     Well, you know, if John tells you, let's pick up the

17   garbage, let's go pick up the garbage.  If I tell you, let's

18   go paint the wall, let's go paint the wall.  It's not much of

19   anything, you know.

20   Q     Could the guy at H&A Pump tell you what to do?

21   A     No, they rent that place.  We're trends.

22   Q     Could the guy at Pronto tell what you to do?

23             THE COURT:  Move along, please.  We're not going to

24   spend the entire week chasing down every permutation of every

25   conceivable question.  You're going to be finished in the next

1   few minutes?

2           MR. NELKIN:  I have one or two questions left.

3   Q    Did Ms. Ezell work for Mr. Spence?

4           MR. FINKEL:  Objection.

5           THE WITNESS:  I have no idea.

6           THE COURT:  Overruled.

7   Q    Did Mr. Spence tell her what to do?

8   A    They were office people, I'm not an office guy.  I don't

9   know.  The office was upstairs on the second floor.  I'm on

10  the first floor.  I don't know.

11  Q    One last question.  Do you know if Mr. Spence had any

12  involvement with MB Fuel?

13  A    I can't say yes or no.  I don't know.  Like I told you,

14  he used to tell me things to do.  Things got done.

15  Q    What about Associated Fuel?

16  A    I have no idea.

17  Q    At your new place, is Mr. Cirillo involved?

18  A    What's the new place.

19  Q    N&S?

20  A    I don't know who is Mr. Cirillo.  Yesterday, I find out

21  that N&S they were saying that Ahearns own N&S.  I don't know

22  anything about that.  Like I said, I'm just employee, man.

23  Q    Who gives you your check there?

24          MR. FINKEL:  Objection.

25          THE COURT:  Overruled.

1       THE WITNESS:  It goes automatically to my checking

2  account.

3  Q    Goes automatically?

4  A    Yes.

5  Q    And is that a new -- did any other checks you ever got go

6  into your checking account?

7  A    This is new for me.

8  Q    New for you?

9  A    It's very convenience.

10 Q    Do you know if Ms. Ezell is involved in any way with N&S?

11 A    I have no idea.

12 Q    Or Ms. Rivera?

13 A    I don't know.

14 Q    Or Mr. Friedman?

15 A    No, because the company is in Hawthorne.  It's about an

16 hour away from where these people are in the Bronx.

17      MR. NELKIN:  I don't think I have any more

18 questions, your Honor.

19      THE COURT:  Mr. Finkel?

20      MR. FINKEL:  Yes.

21      (Continued on the next page.)

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. FINKEL:

3    Q    Good afternoon, Mr. Salcedo.  Would it be fair to say

4    that you are an all-around fix-it type guy?

5    A    Yes, it is.

6    Q    And wherever you worked, you did whatever was necessary

7    to fulfill the requirements of your boss?

8    A    Try my best.

9    Q    Okay.  So you start off fixing cars and trucks and then

10   later machinery; is that correct?

11   A    Yes, make more money, machinery, for sure.

12   Q    I would like to direct your attention to a day that

13   Mr. Nelkin asked you a number of questions about, the day that

14   you had an argument with Mr. Schreiber.  Was that the first

15   time you ever had an argument with Mr. Eugene Schreiber?

16   A    No.

17   Q    Okay.  Do you know whether Sylvia Rivera also had

18   arguments with Mr. Schreiber?

19   A    Sonia?

20   Q    I'm sorry.  Do you know whether Sonia had arguments with

21   Mr. Schreiber?

22   A    No.

23   Q    You are right; I apologize.

24   A    No, I don't.

25   Q    Okay.  Now, the day that you had this argument with

1   Mr. Schreiber, is it fair to say right after that you called

2   Mr. Friedman?

3   A    Yes, I did.

4   Q    And what, if anything, did Mr. Friedman tell you to do?

5   A    Pick up my tools and go to the Bronx office.

6   Q    Okay.  And did you pick up your tools?

7   A    Yes, I did.

8   Q    Okay.  And after you picked up your tools, where did you

9   put them?

10  A    My van.

11  Q    Okay.  And after that, did there come a time that same

12  day that you turned in your key cards?

13  A    Yes, two.

14  Q    How many key cards did you have?

15  A    I had two.

16  Q    Why did you have two?

17  A    One for me and one for the, like, an electrician came or

18  a plumber came or somebody came, I lend them my card and we go

19  back and forth out the building to do construction, whatever

20  you got to do, so I don't have to be chasing them around.

21  Q    And you were issued that second card to give to

22  contractors?

23  A    That was the purpose of that.

24  Q    Okay.  And when approximately, if you can recall, what

25  time that day did you turn in those two key cards?

*J. Salcedo - Cross/Mr. Finkel*                                   1156

1  A    During the course of the day.  You know, I had a lot of

2  stuff there.  Took me a while to, you know, pick up all my

3  stuff.

4  Q    Well, was it before lunch or after lunch?

5  A    Probably after lunch.

6  Q    Was it after sundown or before sundown?

7  A    No, before.

8  Q    And so it was still daylight out?

9  A    Yes, yes.

10 Q    Okay.  And was that the same day that you assisted

11 Ms. Rivera in taking boxes out of the premises?

12 A    It could have been or could have been the next day; I'm

13 not sure.

14 Q    Okay.  And do you know why Ms. Rivera was moving from

15 New Jersey back to the Bronx?

16 A    I heard rumors that she didn't -- Schreiber here

17 (indicating), he keep bugging, you know, and having arguments

18 in her had office, you know.

19 Q    Okay.  And so you put her boxes, the boxes from her

20 office into your van?

21 A    Right.

22 Q    And the boxes were already packed in her office; is that

23 correct?

24 A    Right.

25 Q    And you took the boxes to the Bronx?

1  A    Yes, sir.

2  Q    And you put the boxes in an office in the Bronx where she

3  was going to work?

4  A    Right.

5  Q    Okay.  And subsequent to that day, you returned at

6  Mr. Friedman's request to take out an oxygen tank; is that

7  correct?

8  A    That's correct.

9  Q    Did you -- how did you gain access to the building?

10 A    I called Javier Espinal which he still worked there.  He

11 opened the door and let me in.

12 Q    Did there ever come a time that you forced your way into

13 the premises of Two Rivers in New Jersey?

14 A    No, sir.

15 Q    Okay.  And when you -- on the time that you came back

16 with Sonia Rivera, do you specifically recall how you gained

17 entry into the building?

18 A    It could have been my key or could have been her key.

19 Q    Okay.

20 A    We had a key.

21 Q    Okay.  So in addition to the two key cards, there was

22 another key?

23 A    Sure.  You have to open the first door with a key, and

24 the they could door is the one that opens up with a card or a

25 key.

*J. Salcedo - Cross/Mr. Finkel*                                    1158

1   Q     Okay.  So you would have first opened the first door with

2   a regular old-fashioned metal key?

3   A     Right.

4   Q     And that could have been Sonia's or yours?

5   A     Right.

6   Q     And then you had to get through the electronic door?

7   A     Correct.

8   Q     At that point, with Sonia, you didn't have a passkey

9   anymore because you had turned it in; is that correct?

10  A     Right.

11  Q     So then how did you get past the second door?

12  A     We probably had a key, the key.

13  Q     Sonia's key?

14  A     Her or mine's.

15  Q     Well, you turned in your passkey already?

16  A     Well, we had a metal key.

17  Q     Okay.  There are two doors, correct?

18  A     Right.  Both work with keys, too.

19  Q     Okay, fine, okay.  Now, there was some discussion about

20  the word "tampering," okay.  Did there ever come a time that

21  you intentionally tried to disable or break any equipment at

22  Two Rivers?

23  A     No, I haven't.

24  Q     Did you know that that is what "tampering" means?

25  A     No.  I thought tampering is like messing something up, I

1   guess, yeah, what you say.

2   Q    Well, did you ever intentionally mess up something?

3   A    No.

4   Q    Okay.  And when you -- you came back to take your Allen

5   wrenches, when did that happen?  Was that the same day you

6   took all your other tools?

7   A    No, I returned that key when I went to Sonia, to pick up

8   her files.

9   Q    Okay.  And your Allen wrenches, they were located inside

10  a piece of equipment?

11  A    Inside a machine which is the second box.

12  Q    And when you took your Allen wrenches, did you do

13  anything else to that equipment except take the Allen wrench?

14  A    Just take my Allen keys.

15  Q    You had fixed and repaired and adjusted those machines;

16  is that correct?

17  A    That's correct.

18  Q    How many machines did you fix and repair during the time

19  you were in Two Rivers?

20  A    There are about nine machines.  Every day I was on top of

21  them.

22  Q    And okay.  Now, did there come a time that you provided

23  services for Two Rivers when they were building the interior

24  of the building in South Plainfield?

25  A    Sure.  I build that.

1  Q    I'm sorry?

2  A    I worked on that and I helped to build it.

3  Q    Okay.  And during that time, you were not employed

4  full-time by Two Rivers, were you?

5  A    No, I wasn't.

6  Q    Who were you employed by during that time?

7  A    MB.

8  Q    Okay.  And during that time, would you say that was in

9  2013?

10  A    Probably.

11  Q    Okay.  And so in 2013 once the build-out of the premises

12  was underway and taking shape, did there transfer come a time

13  that same year that you became a full-time employee of Two

14  Rivers?

15  A    Yes.

16  Q    And when you were doing the build-out before you became a

17  full-time employee of Two Rivers, who paid you?

18  A    MB.

19  Q    Okay.  And during that time, did you take any photographs

20  with your -- with your -- well, withdrawn.

21      During that time, did you have an iPhone?

22  A    Yes, I did.

23  Q    And did you take photographs during that build-out with

24  your iPhone?

25  A    I took a few photos.

*J. Salcedo - Cross/Mr. Finkel*                                    1161

1    Q    And do you know where those photographs are now?

2    A    It's such a long time, I don't know.

3    Q    Well, I am going to ask you to think, did you ever turn

4    those photographs into me, your lawyer?

5    A    Yes, I gave you photos.

6    Q    And why did you do that?

7    A    You asked me for them.

8    Q    I see, okay.  I would ask you to direct your attention to

9    Exhibit --

10             THE COURT:  Sorry, Mr. Finkel, I am just trying to

11   keep track of the various things in dispute.  These are

12   photographs he has turned over?

13             MR. FINKEL:  No, we have not turned them over.

14   That's part of discovery, Your Honor.

15             THE COURT:  Okay.

16             MR. FINKEL:  They were --

17             THE COURT:  Okay, go on.

18             MR. FINKEL:  Plaintiff is aware that we have them

19   because we disclosed them.

20             THE COURT:  No, obviously.  I just wondered if there

21   was a dispute before we now.  Go ahead.

22   BY MR. FINKEL:

23   Q    I direct your attention to Exhibit 33.  Have you taken a

24   look at that?

25   A    (Perusing.)  Right.

*J. Salcedo - Cross/Mr. Finkel*                                    1162

1    Q     Okay.  You were asked some questions about that

2    previously; is that correct?

3    A     Yes.

4    Q     Now, look at the words in this communication where it

5    says, "Tell Mr. Friedman tomorrow morning," et cetera, et

6    cetera, et cetera.  Do you see those?

7    A     Yeah.

8    Q     Did you type those words into any device?

9    A     No.

10   Q     How did those words, therefore, appear?

11   A     I speak to the phone and it types it.

12   Q     And when you are speaking into that phone at that time,

13   were you using a Brooklyn Beans account?

14   A     I don't think so.  You know, I'm not happy with that

15   Brooklyn sign there.

16   Q     And would you characterize this as an e-mail or as a text

17   message or something else?

18   A     It might be text; I don't know.  Makes no difference to

19   me as long as I get --

20   Q     So do you know whether this is an e-mail or a text

21   message or not?

22   A     I guess it's an e-mail because the address up there.

23   It's an e-mail address up there.  But like I said, I don't

24   know if, you know --

25   Q     So you don't know?

*J. Salcedo - Cross/Mr. Schafhauser*                    1163

1    A    No, it could be either one.

2    Q    Okay.  I direct your attention to the next exhibit,

3    Exhibit 34.  In the middle of the page, there's additional --

4    further communication.  It says, "The container was unloaded

5    today," et cetera.  Do you see that entry?

6    A    Yes.

7    Q    Did you type that in?

8    A    No.

9    Q    Then how did that communication occur?

10   A    I -- I pressed my mic on the thing and it types it in for

11   me.

12           MR. FINKEL:  I have no further questions, Your

13   Honor.

14           THE COURT:  Okay, anyone else?  Mr. Schafhauser?

15           MR. SCHAFHAUSER:  Yes, thank you, Your Honor.

16   CROSS-EXAMINATION

17   BY MR. SCHAFHAUSER:

18   Q    Mr. Salcedo, when you worked for Two Rivers, did you use

19   a computer that was located in the South Plainfield office?

20   A    Yes.

21   Q    Okay.  Could you please tell me what computer you used in

22   the South Plainfield.

23   A    Well, it's a computer that was in the service room

24   office, in the service room.  We had a desk there with a

25   computer on top of it.

*J. Salcedo - Cross/Mr. Schafhauser*                    1164

1   Q    And what was on that computer?

2   A    Nothing, you know, the Internet.

3   Q    It had access to the Internet?

4   A    Yeah, that's all we had.

5   Q    Did it have any other programs on it that you call?

6   A    No.

7   Q    Was that computer accessible to other people?

8   A    Anybody that walked into that office could use that

9   computer.

10  Q    There was no password?

11  A    No password, nothing.

12  Q    And did you, in fact, use that computer?

13  A    Yes, I did.

14  Q    How often did you use that computer?

15  A    When I had nothing to do, I sat there and I probably

16  looked at the Internet, Google, you know, looked at other

17  machines, you know.

18  Q    Very well.  And when did you last -- withdrawn.  I

19  remember your testimony about dates, so I will withdraw the

20  question.

21       Let me ask it this way.  Whenever it was that you

22  last worked at Two Rivers, did that computer remain in the

23  South Plainfield location?

24  A    It was there when I left.

25  Q    You haven't used that computer since then, right?

1   A    It still there.

2   Q    How long has it been since you have been back to South

3   Plainfield?

4   A    I haven't been back.

5   Q    Now, did you ever take a computer that was located in

6   South Plainfield in the Two Rivers facility and remove it from

7   there to somewhere else?

8   A    No.

9   Q    You never did?

10  A    No.

11  Q    You mentioned, or actually I think Mr. Nelkin had asked

12  you about a different computer, and it was an Apple computer

13  that you were referring to.  And my notes say you said it

14  doesn't work?

15  A    No, it doesn't work.

16  Q    Well, well, how do you know it doesn't work?

17  A    You plug it in, nothing happens.  You know, I took it

18  apart, you know.  Whatever is home is home, you know.

19          THE COURT:  I'm sorry.  You took it apart

20  physically?

21          THE WITNESS:  Yeah.  I was trying to fix it.

22          THE COURT:  You opened it up?  Did you remove the

23  hard drive?

24          THE WITNESS:  I removed everything out of it.

25          THE COURT:  What did you do with the hard drive?

1          THE WITNESS:  Probably threw everything out.  I

2    probably threw everything out; I don't know.  It's probably

3    home somewhere.

4    BY MR. SCHAFHAUSER:

5    Q    Let me see if I get this straight.  When you say you

6    threw it out, you took the computer apart?

7    A    Right.

8    Q    And the computer, are the parts to the computer still

9    with you somewhere in your home?

10   A    Probably.

11   Q    They are probably still there?

12   A    Yeah.

13   Q    So now I'm confused.  You did not dispose of the parts in

14   the garbage, correct?

15   A    No, no, no, no.

16   Q    When you say you took it apart and you threw it out, the

17   parts to the computer even if they are not integrated are

18   still located physically somewhere in your house, right?

19   A    Most likely.

20   Q    And where in the house are they?

21   A    I have to look for them.  I have no idea.

22   Q    Okay.  But let's go back to why you took it apart.  Why

23   did you take the computer apart?

24   A    The thing doesn't work.

25   Q    It doesn't work?  And at some point, did you try to

1   reassemble the computer?

2   A    I lost a couple of screws, odds and ends.

3           THE COURT:  Can I just, it's so hard to understand

4   this testimony.  Were you trying to fix it?

5           THE WITNESS:  Yeah, see if I could have fixed it.

6           THE COURT:  Do you have any reason to think --

7           THE WITNESS:  I'm a very curious person.

8           THE COURT:  You are a curious person so you took

9   apart the computer?

10          THE WITNESS:  Yeah.  I don't know anything about

11  computers, but you know.

12          THE COURT:  Okay.  But you didn't have any training

13  to fix the computer?

14          THE WITNESS:  No, I didn't know knowing.

15          THE COURT:  Go ahead, sir.

16  BY MR. SCHAFHAUSER:

17  Q    Let me see if I understand.  Were you able to fix the

18  computer?

19  A    No.

20  Q    You were unable to fix the computer?

21  A    Correct.

22  Q    To this day, as best as you know, the computer does not

23  work?

24  A    Doesn't work.

25  Q    And when did you last use the computer, how long ago?

*J. Salcedo - Cross/Mr. Schafhauser*                                1168

1    A    What was the question again?

2    Q    Let me try again.  I know dates are an issue, but is it a

3    period of months, years that you used -- how long ago did you

4    use the computer?  I'm sorry.  Let me try again.

5              How long ago was it, to the best of your

6    recollection, that you were actually able to do anything on

7    the computer?

8    A    On that particular computer?

9    Q    Yes.

10   A    I haven't done anything.  It's broken.

11   Q    Okay.  And how long has it been broken?

12   A    A long time.

13   Q    And how long is a long time ago?

14   A    A year, two years; I don't remember.

15   Q    You are not able to say?

16   A    No.  Buy a computer for $200, $100 at microcenter [sic].

17   Q    Now, you talked about -- testified about oxygen tanks.  I

18   think you said Mr. Friedman told you to take oxygen tanks out

19   from Two Rivers?

20   A    One tank.

21   Q    One tank?

22   A    That's what it is.

23   Q    And what was your understanding as to who owned that

24   tank?

25   A    Nobody owns it.  It's a rented tank.

1   Q     It's a rented tank?

2   A     Yes.

3   Q     So when you took that tank, where did that tank go?

4   A     Went back to the place I picked it up, the place that

5   sold, George's welding supply store.

6   Q     The welding supply store?

7   A     Correct.

8   Q     So, so the tank so far as you understood belonged to the

9   welding supply store?

10  A     That's correct.

11  Q     That's where it was rented from?

12  A     Right.

13  Q     And they took the tank back?

14  A     Gave me a receipt.

15  Q     They gave you a receipt for the tank?

16  A     Right.  They received it.

17  Q     Was the tank full or empty?

18  A     I couldn't tell.  I think it had a little bit in it, but

19  normally you have to put gauges to know how much gas is in

20  there.  But, you know, you take -- the gauges don't go with

21  the tank.  You know, you return the tank, you take the gauges

22  out, you put a cap and return it or you store them without

23  gauges.  You know, you never keep the gauges on them since

24  it's dangerous.

25  Q     Very well.  You were asked about the amount of money that

1  you earned at Two Rivers.  Did you ever receive overtime?

2  A    No.

3  Q    You were -- you testified that Mr. Friedman told you to

4  go to the Bronx office whenever it was that you had this issue

5  with Mr. Eugene Schreiber, right, approximately that time?  Do

6  you remember the testimony?

7  A    I remember the what?

8  Q    Let me try again.

9          THE COURT:  Why don't just ask the question.

10          MR. SCHAFHAUSER:  Yes, yes.  Thank you.

11 Q    Did -- when you last worked for Two Rivers, was it

12 Mr. Friedman who told you to take your things and go to the

13 Bronx office?

14 A    Yes.

15 Q    Okay.  And did you do so?

16 A    Yes, I did.

17 Q    And did you go to the scene Bronx office the same day or

18 some other day?

19 A    Could have been the next day.

20 Q    Okay.  And when you got to the Bronx office, what did you

21 do?

22 A    Nothing.  I spoke to Sonia, I guess, whatever was there

23 and, you know, had a conversation, had coffee, you know,

24 whatever.

25 Q    Did you speak with Mr. Friedman?

1  A     I don't remember if he was there that day or the next

2  day.

3  Q     Did you bring anything with you when you returned to the

4  Bronx office?

5  A     When I left?

6  Q     Yes.

7  A     No.

8  Q     No?  Okay.  So I think we also heard about an Allen

9  wrench, if I got it right, right?

10  A     Yeah, Allen key wrench.

11  Q     You didn't bring that Allen wrench to the Bronx, did you?

12  A     No, it was in my truck.

13  Q     That was in your truck?

14  A     Yes, tools.

15  Q     And your testimony is that belonged to you, not to

16  Mr. Friedman?

17  A     But the tools, the tools belonged to me.  The vehicle

18  belongs to MB Fuel or N&S, whoever.

19  Q     Now, other than the Allen wrench, did you remove any

20  other tools from the South Plainfield facility used by Two

21  Rivers?

22  A     My personal tools?

23  Q     Your personal tools.

24  A     Yes.

25  Q     What other tools?

*J. Salcedo - Cross/Mr. Schafhauser*                    1172

1   A    Which other tools?

2   Q    Right.

3   A    Nothing else, my personal stuff.

4   Q    Nothing else?  Okay.  Now, other than your personal

5   tools, did you remove anything, whether a tool, an instrument

6   of some sort, some kind of computer device, did you remove

7   anything else from the South Plainfield facility except for

8   the boxes we heard about you helped Ms. Rivera?  Other than

9   that, did you remove anything?

10  A    No.  Those are mine's.

11           THE COURT:  What was the last thing?

12           THE WITNESS:  It was mine's.

13           THE COURT:  It was yours?

14           THE WITNESS:  Yeah, nothing else.

15  Q    Now, are you aware of any video recording devices at the

16  South Plainfield facility?

17  A    There were cameras everywhere.

18  Q    There were cameras everywhere?

19  A    Everywhere.

20  Q    How do you know that?

21  A    You see them in the walls and I had a monitor in my

22  office or the service room that includes monitor the camera

23  were there (indicating).

24  Q    Did you ever do -- did you ever have access to either the

25  cameras or whatever location it was that recorded the videos?

*J. Salcedo - Cross/Mr. Schafhauser*                                      1173

1    Do you understand?  I see a quizzical look.  Let me try again.

2              Did you ever control the cameras that took the

3    videos?

4    A    No.

5    Q    Let me try another question, then.  Did you ever touch or

6    change or delete any videos that were in that facility?

7    A    No.

8    Q    Did you -- do you know who had the control of those

9    cameras?

10   A    The Schreibers (indicating).

11   Q    And how do you know that?

12   A    Well, because one day I saw one of the employees going

13   out with a silver tray, run upstairs to the office and I told

14   him to go, take the tape and rewind the video so you could the

15   see.  And they told me his father gave him the tray, silver

16   tray to carry stuff, plates, silver tray.

17   Q    You have to be more specific.  "His father," who are you

18   referring to?

19   A    Eugene.

20   Q    And so what happened?  Did you -- was that tape rewound?

21   A    Yeah, they did it.  I don't know how.

22   Q    They who do it?

23   A    The camera guys were there that day.

24   Q    The camera guy?

25   A    Yeah.

*J. Salcedo - Cross/Mr. Schafhauser* 1174

1    Q    Did you rewind it?

2    A    No.

3    Q    Did you know how to rewind it?

4    A    I'm not too good with that.

5    Q    Okay.

6              THE COURT:  Just so I understand, so where are the

7    cameras?

8              THE WITNESS:  Well, all over the building there's

9    cameras, even in the entrance, everywhere.

10             THE COURT:  And where do you go to rewind it?

11             THE WITNESS:  Upstairs in the office.

12             THE COURT:  Which office?

13             THE WITNESS:  Two Rivers office on the second floor.

14             THE COURT:  This is the taping machine?

15             THE WITNESS:  Right, right.

16             THE COURT:  Where is that within the office?

17             THE WITNESS:  Well, you go up the elevator.  The

18   office for the reception is there.  Then you open the door and

19   there's a kitchen here and the things, that room is left-hand

20   side.

21             THE COURT:  Okay.

22   BY MR. SCHAFHAUSER:

23   Q    So just so I'm clear, you never rewound the camera,

24   correct.

25   A    Right.

*J. Salcedo - Cross/Mr. Bergson*                                          1175

1    Q    You never deleted the videos in the cameras, right?

2    A    Right.

3    Q    You never modified what's on the video in the camera,

4    correct?

5    A    Correct.

6    Q    You wouldn't even know how to do that, correct?

7    A    No, I won't.

8             MR. SCHAFHAUSER:  I don't have anything further,

9    Your Honor.

10            THE COURT:  Anyone else?

11            MR. BERGSON:  Your Honor, a couple of questions.

12   CROSS-EXAMINATION

13   BY MR. BERGSON:

14   Q    Good afternoon, Mr. Salcedo.  You had testified in

15   response to a question by Mr. Nelkin that you had gone to an

16   office in Newark to install a trash compactor.  Do you recall

17   that?

18   A    Yes.

19   Q    Do you recall the address of that office?

20   A    I had to put it in my GPS to get there.  I don't know the

21   address physically.

22   Q    Do you recall the street?

23   A    I take Route 21 to 22 together.  Newark, I think it is.

24   Q    You also recall your testimony that you had installed on

25   a separate occasion an electric Hi-Lo?

*J. Salcedo - Cross/Mr. Feldman*                                    1176

1    A     Charger for the Hi-Lo.

2    Q     What's a Hi-Lo?

3    A     A Hi-Lo is a thing like a little cart with a fork in

4    front of it that carries up pallets with boxes, move boxes

5    around.

6    Q     So it's a piece of machinery, correct?

7    A     Yeah.

8    Q     Okay.  And you also testified that those are the only two

9    times you ever visited that facility, correct?

10   A     That I can recall, yes.

11   Q     Okay.  Were you ever an employee of a company called

12   26 Flavors LLC?

13   A     Never.

14   Q     Were you ever an employee of a company called Office

15   Coffee Services, LLC?

16   A     No.

17   Q     You never received checks from either company?

18   A     No.

19   Q     You never received cash from anyone at either company?

20   A     No.

21              MR. BERGSON:  No further questions, Your Honor.

22              MR. FELDMAN:  May I?

23              THE COURT:  Yes.

24   CROSS-EXAMINATION

25   BY MR. FELDMAN:

1  Q     In response to some questions from Mr. Nelkin, you

2  testified to there being a build-out at the South Plainfield

3  facility.  Do you remember?

4  A     What was that again?

5  Q     A build-out.

6  A     A build-out, to build the building?

7  Q     Yes, that there was construction.

8  A     Yeah, yeah, yeah.

9  Q     What did it look like before the build-out?

10 A     Four empty walls, nothing, four empty walls.

11 Q     And this was, how large a facility is this?

12 A     Like the size of a 100 ball, that neighborhood.

13 Q     And were you involved from the build-out from start to

14 finish?

15 A     Yes, I was.

16 Q     How many other people worked with you on this build-out?

17 A     Ten, twenty, you know.

18 Q     Over what period of time, if you recall -- I understand

19 you have problems with dates -- did this build-occur?  Was it

20 days, weeks, months?

21 A     Maybe a year, a long time.

22 Q     And did the members of Two Rivers, Mr. Friedman or the

23 Schreibers, did you observe them visiting the location during

24 the build-out?

25 A     Never saw him.  Never seen his son over there, but

*J. Salcedo - Redirect/Mr. Nelkin*                                    1178

1    Eugene, I saw him a few times there and Mr. Friedman a lot

2    there.

3    Q    Okay.  So you saw Eugene Schreiber there on occasion?

4    A    Right.

5    Q    Was he there while the work was ongoing?

6    A    When it was going.

7    Q    Did you observe him communicating with some of the

8    workers who were doing the work?

9    A    No, he jokes around in Spanish.  He speaks Spanish a

10   little bit.

11   Q    Were the people who were working there, to your

12   knowledge, were they employees of Two Rivers?

13   A    I have no idea.

14   Q    And the materials for the build-out, do you know who

15   bought those?

16   A    We used to order them out of the electric supply store.

17          MR. FELDMAN:  I have nothing further, Your Honor.

18          THE COURT:  Anyone else?  Okay.  How much redirect,

19   if any?

20          MR. NELKIN:  Very short.

21          THE COURT:  Okay.

22   REDIRECT EXAMINATION

23   BY MR. NELKIN:

24   Q    Mr. Salcedo, you mentioned that there was a monitor in

25   your office for the security cameras.  Do you know if your

1  computer had access to those security cameras?

2  A    No, didn't have access.  It was only Internet.

3  Q    And do you know if the cameras could be turned by

4  computer or not?  Can the cameras be redirected

5  electronically?

6  A    Yeah, two of them only.

7  Q    How do you know that?

8  A    Because from the monitor, you see them move.

9  Q    The monitors shows you --

10 A    Yeah, you put a little thing here like a little keypad

11 that you can move those two cameras to the direction, only two

12 of them are moveable.

13 Q    Next to the monitor?

14 A    Right.

15 Q    In your office?

16 A    Right.  Only two, only two of them, one inside, one

17 outside.  The inside didn't work that well, either.

18 Q    So then you could have moved the cameras?

19 A    I could have moved the outside camera, sure, to see, you

20 know, somebody walking or something.

21 Q    So if the cameras were turned in such a way that they

22 didn't --

23 A    No, couldn't turn them in such a way.  They only turned

24 so much.  You only see something.

25 Q    You said you had an argument with Mr. Schreiber, Eugene

1    Schreiber.  What was that argument about?

2    A    I don't know.  Well, he came in arguing with me.  I was

3    working on that particular machine, the top of the machine.

4    Q    You said you had an argument.  You don't know what the

5    argument was?

6                MR. FINKEL:  Objection as to --

7    A    He came --

8                THE COURT:  Stop.  Everybody stop.

9    A    He came to me.  I was walking in the hallway.  He came to

10   me, my face started screaming in my face that my desk here

11   were numbers.  And when he started with that attitude, I

12   called Mr. Friedman and I told him what was going on.  And he

13   told me pick up my tools and come to the Bronx.  That was it.

14   I did not argue with Eugene or anything.  He just came in.  He

15   must have had a bad day or something in the morning it sounds

16   or something, he had to let out steam or something; I don't

17   know.

18   Q    You mentioned that you got a receipt for those cylinders?

19   A    For one cylinder.

20   Q    But you got a receipt?

21   A    Yeah.

22   Q    Do you know where that receipt?

23   A    I handed that over to Mr. Emil Friedman.

24   Q    So if Two Rivers is still being charged for cylinders,

25   they could ask Mr. Friedman for that receipt?

1   A     Sure, we were being charged.  That was --

2   Q     But if --

3   A     It's a receipt that I received the equipment, so that was

4   the end of that, you know.

5   Q     But you gave it to Mr. Friedman?

6   A     Definitely.

7   Q     Okay.  Do you know if Two Rivers had another door that

8   didn't have a card key on it did their facility?

9   A     Sure.  There's a lot of doors.

10  Q     So if someone wanted to get into the building and didn't

11  want to use the card key, could they get in?

12  A     Tell me again?

13  Q     If someone wanted to get into the Two Rivers building --

14  A     Right.

15  Q     -- and they had a key to the door --

16  A     They could get in, sure, but --

17  Q     They wouldn't have to swipe a card?

18  A     Right.

19  Q     But the other door that you mentioned that had the card

20  swipe, you would have to swipe the door?

21  A     No, one key, too, without a card.

22  Q     So you are saying that you didn't have to swipe the card

23  to get into that?

24  A     No, because you have a key.

25  Q     But I think Mr. Finkel asked you and you said you had to

1   do both?

2   A    No, you could do either one, me, in my case, you see what

3   I'm saying?

4   Q    Okay.  So there's a way to get in the building with just

5   a key?

6   A    No, there was a swipe key, but I don't have to use it

7   because I have the key, too, for that door if I needed it.

8   Q    That's my only question on that point.

9           If you could turn to Exhibit 112 and the second page

10  of that.  And paragraph 3 on the second page, the third line.

11  It says that, "Mr. Friedman was present at the same time the

12  night that Mr. Salcedo was alleged to be in the facility."  Is

13  that true?

14  A    It's possible.

15          MR. FINKEL:  Objection, Your Honor.  That statement

16  does not come from the witness.  It comes from the police

17  report.

18          THE COURT:  He is not attributing it to anyone.

19  He's asking if it's true.

20  A    I don't know; I don't remember.

21          THE COURT:  It's not objectionable.  It's permitted.

22  Do you know if Mr. Friedman was there that night?

23          MR. NELKIN:  Just for the record, it comes from --

24          THE COURT:  Not for the record.

25          Look, the question is whether Mr. Friedman was there

1   that night.  Was he there?

2            THE WITNESS:  I don't remember.  It's been such a

3   long time, I'm not sure.  I got a memory when it comes to that

4   type of stuff.

5   Q    Well, if your lawyer wrote to the Court --

6            THE COURT:  Mr. Nelkin, the question -- the question

7   he can answer is whether Mr. Friedman was there.

8            MR. NELKIN:  Okay, fine.

9            THE COURT:  All right.  Everything else you will

10  argue.

11           MR. NELKIN:  All right, thanks.

12  BY MR. NELKIN:

13  Q    If you could turn to Exhibit 132 and to the second page.

14  Do you see that there's a desk in that picture?

15           THE COURT:  Second page.

16           THE WITNESS:  This one?  (Indicating.)

17           THE COURT:  Second page.

18  Q    Second page.

19           THE WITNESS:  This?  (Indicating.)

20           THE COURT:  Is that the second page?  Then that's

21  the one he's asking about.

22  A    Okay.

23  Q    Do you see that there is a desk there in the -- on the

24  top-right corner?

25  A    Yes.

*J. Salcedo - Redirect/Mr. Nelkin*                                    1184

1   Q     And do you see that there appears to be a second desk

2   that's connecting sort of the way that Ms. Rivera's desk

3   connected to the other desk?

4   A     No, I think that's the wall.

5   Q     If you look, it's got --

6         THE COURT:  Just, what is the question, please?

7   Q     My question is, did that L-shape there of these two desks

8   look the same way that --

9   A     That's the wall.  That's not a desk.

10  Q     Okay.  Do you recognize, if you could look at the three

11  pictures on 132, can you tell me if you recognize based on the

12  pictures whose office that might be?

13  A     No.  All those offices looked alike.  They all have the

14  same furniture.

15  Q     Do they all have the same number of desks?

16  A     Excuse me?

17  Q     Do they all have the same number of desks?

18  A     No.  Some of them had one and some of them had two.

19        THE COURT:  Move on.

20        MR. NELKIN:  That's my last question, Your Honor.

21        THE COURT:  Thank you, you are excused.  All right.

22  We will take our lunch break and -- I'm sorry.  I didn't mean

23  to cut you off.

24        MR. SCHAFHAUSER:  I wanted to ask him one question,

25  Your Honor.

*J. Salcedo - Recross-Mr. Schafhauser*                          1185

1                THE COURT:  Recross on what we just heard?

2                MR. SCHAFHAUSER:  One question on what Mr. Nelkin

3     had asked.

4                THE COURT:  Go ahead.

5     RECROSS-EXAMINATION

6     BY MR. SCHAFHAUSER:

7     Q    Mr. Nelkin asked you whether you could have moved the

8     videocameras.  My question is, did you move the videocameras?

9     A    I moved it once in a while to follow or look at cars

10    parked in the parking lot.

11               THE COURT:  Okay.  I take it that's what you wanted

12    to ask.

13               MR. SCHAFHAUSER:  Thank you.

14               THE COURT:  You are excused.  All right, we will

15    reconvene at 2:00.  Who is next?

16               MR. NELKIN:  Mr. Papa.

17               THE COURT:  Okay.

18               (Recess taken.)

19               (Continued on the next page.)

20

21

22

23

24

25

*Proceedings*                                        1186

1            **A F T E R N O O N    S E S S I O N**

2            (In open court.)

3            THE COURT:  Sir, who are you?

4            MR. GOLDFARB:  Akeev Goldfarb, and I represent

5    Mr. Nussbaum.

6            THE COURT:  Is there some reason you need to take up

7    the time now while there is a witness waiting?

8            MR. GOLDFARB:  I just wanted to clarify that I come

9    here to -- I understood there was a colloquy regarding

10   Mr. Nussbaum.

11           THE COURT:  Sir, if you want to add something to a

12   record that's already passed, write a letter.  I have a

13   witness waiting.

14           Do you have a witness, Ms. Nelkin?

15           MS. NELKIN:  Yes, your Honor.  The plaintiff will

16   call Vincent Papa, and with your permission I will examine the

17   witness.

18           THE COURT:  Mr. Papa, come on up, please.

19           MR. ROSENBLATT:  Your Honor, I just wanted to

20   introduce myself.  Raphael Rosenblatt.  I'm here for Hillel

21   Parness, of counsel, on behalf of Two Rivers.  Thank you.

22           MR. GRANTZ:  Your Honor, he said he was here on

23   behalf of Two Rivers.  I understood that he was representing

24   Mr. Papa.

25           THE COURT:  You are here as Mr. Papa's attorney?

*Proceedings*                                                    1187

1          MR. ROSENBLATT:  I'm here as attorney for Two

2    Rivers.  So Mr. Papa is being represented in that capacity.

3          THE COURT:  Okay.

4          MR. SCHAFHAUSER:  Your Honor, I don't know that

5    there has been an appearance in the case yet.

6          THE COURT:  There hasn't because he is a witness.

7          MR. SCHAFHAUSER:  I understand, but he doesn't

8    represent --

9          THE COURT:  We have a witness.  He has counsel.  Is

10   there a problem with that?

11         MR. GRANTZ:  Only to the extent that he is

12   representing Two Rivers without the permission of

13   Mr. Friedman.

14         THE COURT:  We will deal with it later.

15         MR. GRANTZ:  Okay.  Thank you.

16         THE COURT:  There is an objection to having this

17   fellow have counsel provided by Two Rivers?

18         MR. GRANTZ:  No.

19         MR. SCHAFHAUSER:  The objection is, your Honor, that

20   under the Two Rivers operating agreement Mr. Friedman has

21   rights --

22         THE COURT:  Mr. Friedman does not consent to have

23   this witness represented by counsel provided by Two Rivers?

24   That's what I want to understand you are saying.

25         MR. SCHAFHAUSER:  Mr. Friedman --

*Proceedings*                                                    1188

1          THE COURT:  He doesn't consent?

2          MR. SCHAFHAUSER:  This witness is -- the counsel is

3    not representing Mr. Papa.  He is representing Two Rivers.

4          THE COURT:  I understand.  Two Rivers provided

5    counsel to represent Mr. Papa's interests here.  Mr. Friedman

6    does not consent to that?

7          MR. SCHAFHAUSER:  May I have one minute?

8          THE COURT:  Of course, yes.

9          (Pause.)

10         MR. NELKIN:  Your Honor, can I just ask if there are

11   any extra books.

12         THE COURT:  Anything you want to talk with them

13   about, off the record.

14         (Pause.)

15         MR. SCHAFHAUSER:  Your Honor, Mr. Friedman did not

16   receive notice of any -- I'm not authorized to consent.

17         THE COURT:  Well, Mr. Friedman is sitting right next

18   to you.  You just spoke to him.  The authorization is not a

19   problem.  He refuses to consent that's what you are telling

20   me.

21         MR. SCHAFHAUSER:  He respectfully declines to

22   consent.

23         THE COURT:  All right.  Well, I can't ask you

24   because -- are you willing to testify without a lawyer who can

25   represent your interests?

*Proceedings*                                                    1189

1          THE WITNESS:  Yes.

2          THE COURT:  You don't have to.

3          THE WITNESS:  I'm willing to answer questions, your

4    Honor.

5          THE COURT:  Okay.  Ms. Nelkin?

6          MS. NELKIN:  Your Honor, I'm going to say that the

7    plaintiff wants Mr. Papa to testify.  We also believe that

8    Mr. Papa has a right to have an attorney to represent him as

9    well.

10         THE COURT:  Sure, I think so too.  Since we can't

11   resolve this, we will have motion practice.  We will reconvene

12   at the defendants' costs, if I resolve this against them.

13         I'm not going to make this man testify without

14   counsel when he was planning on having it.  So do you have

15   another witness that we can put on and, if so, when?

16         MS. NELKIN:  Your Honor, his testimony was really

17   laying the background for our only other witnesses, the

18   plaintiff, Steven Schreiber.

19         THE COURT:  When is he available?

20         MS. NELKIN:  He is here.

21         THE COURT:  Okay.  You want to go ahead with him, or

22   do you want to take a break to prepare?  Because this should

23   not be happening.  This does not need to be a problem.  It is

24   one made by one person, as far as I'm concerned.

25         MS. NELKIN:  Your Honor, I would just like to point

*Proceedings*                                                    1190

1   out that Mr. Papa is the chief financial officer of Two

2   Rivers.

3            THE COURT:  He is here an as employee of Two Rivers.

4            MS. NELKIN:  Absolutely.

5            THE COURT:  There is no reason he shouldn't have

6   counsel.  I'm open to some other suggestion of how to proceed

7   so that we don't have the inefficiency of having to break down

8   due to Mr. Friedman's unwillingness to let this man have an

9   attorney represent his interests when he testifies.

10           MR. SCHAFHAUSER:  Your Honor, most respectfully --

11           THE COURT:  You can say it disrespectfully, if you

12   like.  I would like a constructive suggestion.

13           MR. SCHAFHAUSER:  Mr. Friedman's position is that

14   the right to consent to counsel -- and this is something --

15           THE COURT:  I'm not interested in an explanation of

16   his position.  I know what it is.  I'm looking for a

17   constructive suggestion of something else we can do.

18           MR. SCHAFHAUSER:  I don't have any suggestion

19   because this issue has been an impasse.  This very issue of

20   Two Rivers representation of counsel was an impasse going back

21   to the litigation in New Jersey.  This issue has been an

22   issue --

23           THE COURT:  If you don't have a suggestion, let's

24   not waste further time telling me why you don't have a

25   suggestion.  I'm looking for a constructive suggestion of how

*Proceedings*                                                      1191

1  we can allow me to hear the testimony that will help me decide

2  the issues that are before me --

3         MR. SCHAFHAUSER:  Your Honor, may I --

4         THE COURT:   -- without having the ability to present

5  testimony obstructed.

6         MR. SCHAFHAUSER:  I will respectfully ask for

7  another break.  I have a recommendation for my client that I

8  need discuss with my client.

9         THE COURT:  Well, I don't know if there is anything

10 else we can do at the moment.  So take a break.

11        MR. SCHAFHAUSER:  Then I will make that proposal to

12 counsel, if I --

13        THE COURT:  Go ahead.

14        We are off the record until they return.

15        (Recess.)

16        THE COURT:  Have a seat, please.  All right.

17 Mr. Schafhauser, you said you were going to have a suggestion.

18        MR. SCHAFHAUSER:  Yes.  I actually was communicating

19 that to plaintiff's counsel.  The suggestion is that

20 Mr. Friedman is prepared to give a limited consent for the

21 purpose of allowing Mr. Papa to be represented by

22 Mr. Rosenblatt for this evidentiary hearing so we don't need

23 to delay things.  I don't know whether they have had a chance

24 to consider it because I was just communicating it, but the

25 proposed stipulation would be that by granting such consent

1   his consent is not going to be construed or cited or deemed a

2   waiver of his rights or arguments under the Two Rivers

3   operating agreement or his rights regarding going to a Beth

4   Din arbitration, nor is it a waiver.

5          THE COURT:  He doesn't waive anything.  It just

6   allows us to move forward today.

7          MR. SCHAFHAUSER:  That's the idea, and he also

8   doesn't waive his arguments as to representation of Two

9   Rivers' counsel.

10         THE COURT:  It just lets us move forward with this

11  hearing; is that right?

12         MR. SCHAFHAUSER:  That's correct.

13         MS. NELKIN:  Except, Judge Orenstein, what

14  Mr. Schafhauser just said at the last moment, which is if his

15  giving his consent then puts my client at risk for his

16  alleging that Mr. Schreiber should have to pay the attorney's

17  fees for Mr. Papa to testify here today, then I don't think

18  that the burden should be shifted to us.

19         THE COURT:  Look, I assume he is representing

20  Two Rivers on behalf of its employee Mr. Papa.  I assume

21  that's coming out of costs for Two Rivers.  Correct?

22         MS. NELKIN:  Except that Mr. Friedman wants to

23  assert that that's an improper expenditure of Two Rivers'

24  funds.

25         THE COURT:  Do you want to assert that?

*Proceedings* 1193

1          MR. SCHAFHAUSER:  We are not asserting that --

2     again, we want the hearing to go forward.

3          THE COURT:  Who gets to pay for the lawyer for

4     purposes of today?

5          MR. SCHAFHAUSER:  For purposes of today, yes.

6          MR. NELKIN:  Can we extend it for purposes of this

7     hearing?

8          THE COURT:  For this hearing.  So that Mr. Papa can

9     appear at this hearing, Two Rivers pays Mr. Rosenblatt to be

10    here, to provide counsel.  No one waives anything.  Two Rivers

11    pays the bill.  Anybody object to that?

12         MR. SCHAFHAUSER:  He has no objection to

13    Mr. Rosenblatt's appearance or payment for today, no.

14         THE COURT:  Look, I assume he is here today --

15         MR. SCHAFHAUSER:  Oh, if he comes tomorrow, yeah,

16    until Mr. Papa's testimony is concluded.

17         THE COURT:  Right, and the preparation involved in

18    getting him here obviously.

19         MR. NELKIN:  Mr. Parness as well, who is working in

20    conjunction with Mr. Rosenblatt.

21         THE COURT:  Mr. Papa, come on up.

22         MR. SCHAFHAUSER:  Well, the consent is for

23    Mr. Rosenblatt to be paid for his representation of Mr. Papa

24    at the hearing.

25         THE COURT:  Mr. Rosenblatt, are you part of the firm

1   with Mr. Parness?

2          MR. ROSENBLATT:  I'm not part of his firm but I'm

3   here in an of counsel capacity.

4          THE COURT:  I'm not resolving anything about

5   Mr. Parness today because we don't need Mr. Parness here to

6   get this man to testify.

7          Raise your right hand, please.

8   **VINCENT PAPA**, called as a witness, having been first duly

9   sworn/affirmed, was examined and proceeded to testify as

10  follows:

11         THE COURT:  Have a seat, please.

12  DIRECT EXAMINATION

13  BY MS. NELKIN:

14  Q    Mr. Papa, would you please state your full name?

15  A    Vincent Papa.

16  Q    Where do you reside, Mr. Papa?

17  A    Long Valley, New Jersey.

18  Q    Can you tell us what your educational background is?

19  A    I'm an accounting major, graduate of Iona College.

20  Q    Are you a CPA?

21  A    No, I am not.

22  Q    How are you currently employed?

23  A    By Two Rivers Coffee.

24  Q    When were you first employed by Two Rivers?

25  A    June of 2013.

*V. Papa - Direct/C. Nelkin*                                    1195

1    Q     What is your job title at Two Rivers?

2    A     Chief financial officer.

3    Q     Can you just briefly tell us what your primary

4    responsibilities are at Two Rivers.

5    A     To prepare and install -- to install systems and prepare

6    financial statements, implement financial controls, things of

7    that nature.

8    Q     Now, you mentioned that you are not a CPA.

9          During the time that you have been employed at Two Rivers

10   has Two Rivers always had an outside accountant?

11   A     Yes.

12   Q     And who was the outside accountant when you became

13   employed?

14   A     Mike Devine.

15   Q     And you are aware that there is -- there was a

16   preliminary injunction entered in this case?

17   A     Yes.

18   Q     Since that preliminary injunction has Two Rivers had

19   another outside accountant?

20   A     Yes.

21   Q     And what is that outside accountant's name?

22   A     Meglio, M-E-G-L-I-O, and Associates.

23   Q     Mr. Papa, do you know the Plaintiff Steven Schreiber?

24   A     Yes.

25   Q     How do you know Mr. Schreiber?

1  A    We work together at Two Rivers.

2  Q    Do you know what Mr. Steven Schreiber's primary duties

3  are at Two Rivers?

4  A    Yes.

5  Q    What are they?

6  A    Logistics, he sets up customers, new customers, he works

7  on refuting customer deductions.

8        THE COURT:  I'm sorry, doing what?

9        THE WITNESS:  Refuting customer deductions that are

10  improper in our opinion.

11  A    (Continuing) He supports IT when needed, he evaluates

12  equipment for us when needed, the ROI.  Operations basically.

13  Q    Do you know Steven Schreiber's father, Eugene Schreiber?

14  A    Yes.

15  Q    How do you know Eugene Schreiber?

16  A    We work together at Two Rivers.

17  Q    Are you aware of what Mr. Eugene Schreiber's primary

18  duties and responsibilities are at Two Rivers?

19  A    Yes.

20  Q    What are they?

21  A    Well, his title is the president.  He is primarily

22  responsible for procuring and designing equipment used in the

23  manufacturing process.  He oversees the plant engineer, the

24  plant manager.  So all of production and QC, I believe,

25  directly reports to him.

1   Q      Do you know Mayer Koenig?

2   A      Yes.

3   Q      Do you also work with Mayer Koenig at Two Rivers?

4   A      Yes.

5   Q      Do you know what Mr. Koenig's responsibilities are?

6   A      Yes.

7   Q      Can you tell us what his primary responsibilities are?

8   A      Sales and marketing.

9   Q      Do you also know Emil Friedman?

10  A      Yes.

11  Q      How do you know Mr. Friedman?

12  A      Work together at Two Rivers.

13  Q      Do you have -- when you first met Mr. Friedman were you

14  told what his primary role in the Two Rivers was?

15  A      He was described to me as an investor, as a chief

16  negotiator, and those were the general terms.

17  Q      When you first came did that appear to be what his role

18  was?

19  A      Well, when I first started I didn't have a whole lot of

20  contact with him.  So I don't know what he did at first.  I

21  wasn't up to speed on what he did really.

22  Q      Well, at some point in time did Mr. Friedman's role

23  appear to you to be something other than an investor?

24  A      Yes.

25  Q      Okay.  Can you tell us what you began to see his role as

1  being?

2  A    He began to exert more and more control, certainly over

3  disbursements, check signing.  All checks were authorized

4  through him.  He had more and more control over payroll, and

5  he had more and more control over IT, in terms of which system

6  we would deploy.

7  Q    When you say which system you would deploy, are you

8  familiar with the Launch system?

9  A    Yes.

10 Q    Can you just tell us what the Launch system is?

11 A    Well, the intent was there was to be a custom-designed

12 enterprise resource planning type system.  It never reached

13 that level.  It was primarily used to write checks, record

14 purchases, and process payroll.

15 Q    Were you involved in the initial discussions about

16 implementing the Launch system?

17 A    I was involved in discussions.  I don't know if they were

18 initial because I don't know when they may have started before

19 me, but I was certainly involved in discussions about what

20 Launch Coffee should do and should not do.

21 Q    Who else was involved in those discussions?

22 A    Well, Emil, Yossi -- I don't know his real name -- Yossi

23 Rosenkowski.  I don't know his last name.  I'm sorry.

24 Q    Are you referring to Yossi Rogosnitzky?

25 A    Yes.  Thank you.

1    Q    I hope I pronounced it right.

2    A    Yes, I'm referring to him.  And at times it was the other

3    members of the LLC.

4    Q    Just for the record, who do you understand the other

5    members of the LLC to be?

6    A    Well, Steven, Mayer, Eugene.  Launch Coffee was discussed

7    endlessly at times.

8    Q    Okay, and you understood that the four partners in Two

9    Rivers were Mr. Friedman, the two Schreibers, and Mr. Koenig?

10   A    Yes.

11   Q    Now, were you in favor of implementing the Launch system?

12   A    No.

13   Q    Why not?

14   A    Because in my opinion or in my judgment it was

15   unnecessary to custom design a system.  I don't think the

16   resources were there to implement it as discussed, i.e. one

17   programmer overseas.  It was not controlled in the proper

18   manner.

19          There was no budget for it that I was aware of.

20   There was no contractual agreement that I was aware of.  There

21   was no definition as to the scope of the project.

22          It was a poorly conceived and poorly implemented

23   project that was completely unnecessary and prevented us from

24   doing things that were necessary.

25   Q    Do you know if Eugene Schreiber was in favor of the

1    Launch system?

2    A     He was not.

3    Q     Do you know if Steven Schreiber was in favor of

4    implementing the Launch system?

5    A     He was not.

6    Q     And do you know if Emil Friedman was?

7    A     Yes, he was.

8    Q     And what about Mayer Koenig?

9    A     He was not.

10   Q     But was the Launch system nonetheless implemented?

11   A     In various degrees, yes.

12   Q     Now, were there other -- are you familiar with the term

13   ERP system?

14   A     Yes.

15   Q     What is an ERP system?

16   A     Enterprise resource planning.

17   Q     And what is an enterprise resource planning system?

18   A     It's a comprehensive solution for a manufacturing

19   company.  It would cover everything from purchasing to

20   scheduling to production to financial statements.  It's the

21   backbone of the company.  All things flow through a properly

22   designed and implemented ERP.

23   Q     At the time Two Rivers was discussing implementing the

24   Launch system, were there off-the-shelf ERP systems that could

25   have been implemented instead?

1    A    Yes.

2    Q    And can you just give us some names of those systems?

3    A    Well, we used QuickBooks Enterprise system, which was

4    inadequate; but Sage puts out a family of products, an ERP

5    suite that would be adequate.  Oracle is a higher-end platform

6    that was probably too much for us.  Net Suite.  There is

7    dozens of ERP companies that would serve a medium-sized

8    manufacturer like ours.

9    Q    And did you and Mr. -- the two Schreibers and Mr. Koenig

10   believe that implementing one of those systems would have been

11   a preferred method to a system that was designed by an Israeli

12   gentleman who was a sole independent contractor?

13   A    Yes.

14           MR. SCHAFHAUSER:  Objection, leading.

15           THE COURT:  Don't lead.  Do you want to ask another

16   question?

17           MS. NELKIN:  Yes.

18   Q    Can you tell us whether or not the -- well, can you tell

19   us approximately when the Launch program was initiated?

20   A    Well, by initiated do you mean used, or do you mean

21   developed?

22   Q    Well, let's do both.

23        When was it in the development stages?

24   A    My understanding it was in development prior to my

25   arrival and then development continued.

1          THE COURT:  I'm sorry.  When did you arrive?

2          THE WITNESS:  June of 2013.

3          THE COURT:  Sorry to interrupt.  Go ahead.

4   A    I believe, to the best of my recollection, it was

5   implemented sometime mid-2014.

6   Q    As the chief financial officer of Two Rivers, did you

7   ever see a contract or a proposal or a scope of work for the

8   Launch program?

9   A    No, I did not.

10  Q    Did you ask for one?

11  A    I discussed the lack thereof, yes.

12  Q    Who did you discuss it with?

13  A    Emil, primarily.

14  Q    What was the nature of the discussion you had with

15  Mr. Friedman?

16  A    It was largely one sided.  I was told -- first I was told

17  it was none of my business.  Then I was told that he knew what

18  he was doing and it was primarily my job to implement what he

19  decided.

20  Q    And was that in fact carried forth?

21  A    That Launch was implemented?

22  Q    Yes.

23  A    Yes.

24  Q    Do you know what Two Rivers paid for Launch?

25  A    We paid a JRIT Consulting, I think, 19,000, maybe 15,000.

1    I'm not a hundred percent sure.

2    Q    Prior to December 14 of 2015 what access did you have to

3    Launch?

4    A    I primarily accessed Launch for disbursements, purchases,

5    and limited payroll information.

6    Q    Do you know whether or not you had full access to the

7    Launch program?

8    A    I did not.

9    Q    Do you know who did have full access to it?

10   A    Not really.

11   Q    What access did you have?

12   A    What access?

13   Q    Yes.  What could you do as the CFO?

14   A    Well, I could see disbursements that were already

15   disbursed under what checks were written.  I could see vendor

16   invoices that were entered, and I could run limited payroll

17   reports to determine what payroll was issued for the prior

18   week.

19   Q    Mr. Papa, do you see in front of you a book that's marked

20   Plaintiff's Exhibits.  It's probably the largest book in front

21   of you.

22   A    I have two large books.  I assume it's one of these.

23   Q    If you look at the front of this, it should say

24   Plaintiff's Exhibits.

25   A    This is Plaintiff's Exhibits.  Okay.

1    Q    I would like to direct your attention to Exhibit 35.

2    A    Okay.

3    Q    Have you seen this exhibit previously?

4    A    I saw this earlier today or last night for the first

5    time.

6    Q    All right.  Do you see your name listed on Exhibit 35?

7    A    Yes, I do.

8    Q    Do you see a column that says role name?

9    A    Yes.

10   Q    What does it say next to your name with regard to role

11   name?

12   A    Financial manager.

13   Q    If we just go back up to the top where it says role name

14   and it says administrator, and if you go across that column

15   you see an e-mail address, it's nspeck@gmail.com?

16   A    Yes.

17   Q    Do you know whose e-mail address that is?

18   A    That's Yossi Rogosnitzky.

19         THE COURT:  I think for ease of reference we are all

20   calling him Yossi.

21         THE WITNESS:  Yossi, thank you.

22   Q    If you look at the second listing under role name, do you

23   see that it says executive director?

24   A    Yes.

25   Q    Do you see, moving across the column, it says executive

1   director is Mr. Friedman's name?

2   A    Yes.

3   Q    And do you recognize that as one of Mr. Friedman's e-mail

4   addresses in the column?

5   A    It's not one that I have used.  So no, I don't.

6   Q    Now, do you know who Cindy Jones is?

7   A    Yes.

8   Q    Who is Cindy Jones?

9   A    She was an administrative assistant that was employed by

10  Two Rivers from 2012 through the time we moved South

11  Plainfield.

12  Q    The next column down again says executive director?

13  A    Yes.

14  Q    Next to that, going across, is Ms. Rivera's name?

15  A    Yes.

16  Q    Who is Ms. Rivera?

17  A    She was a bookkeeper.

18  Q    As CFO of Two Rivers were you a higher-level employee

19  within the company than Ms. Rivera?

20  A    One would think.

21  Q    And if we keep going down the roll name column, does it

22  again say executive director and then, going across, it says

23  Silvia Ezell?

24  A    Yes.

25  Q    Do you know Ms. Ezell?

*V. Papa - Direct/C. Nelkin*                                    1206

1    A    Yes.

2    Q    Was she an employee of Two Rivers?

3    A    No.

4    Q    How do you know Ms. Ezell?

5    A    On various occasions I worked with her while I'm working

6    at Two Rivers.

7    Q    And what would be an occasion that you worked with

8    Ms. Ezell?

9    A    Well, she from time to time would call me to help me

10   track down credit card receipts that she may have been looking

11   for that certain individuals didn't comply with.  She

12   processed, to the best of my knowledge, insurance-type

13   information.  She filled out paperwork for regulatory

14   authorities, like New Jersey taxing authorities.  So she

15   wanted information.

16           She handled -- I think she handled worker's comp

17   claims or any employer liability claims.  So she would want

18   information about that, things of that nature.

19   Q    And these things that you said that she did, was she

20   doing that on behalf of Two Rivers?

21   A    Yes.

22   Q    Do you have any understanding of where -- who she was

23   employed by?

24   A    No.

25           THE COURT:  Can you help me understand that

1  relationship.  The first time you hear from Ms. Ezell she is

2  not an employee, she is asking for this information.  Do you

3  have any discussion about what her role was or why she was

4  doing this?

5         THE WITNESS:  Well, I knew that Emil as an investor

6  owned many businesses, and it was like a share of

7  administrative services type set up.  So it wasn't shocking to

8  me that she was not technically employed by Two Rivers.

9         THE COURT:  But she identified herself as somebody

10  who works for Mr. Friedman?

11         THE WITNESS:  Yes.

12         THE COURT:  I'm just trying to understand how you

13  knew to share information with her.

14         THE WITNESS:  Yes.  I was introduced to her by Sonia

15  or Emil.  I forget which one, but I knew that Sonia and Silvia

16  worked together and I was to give Silvia what she needed to do

17  her job.

18         THE COURT:  Okay.  Thank you.  Go ahead.

19

20  BY MS. NELKIN:

21  Q    Okay.  We discussed that you were listed as financial

22  manager.

23       If we go down one past your name, it says director; and,

24  going across, it says Eugene Schreiber.

25  A    Yes.

1   Q    Now, I believe you testified that Mr. Schreiber was the

2   president of Two Rivers.

3   A    That's his title, yes.

4   Q    Would you think that he would have more or less access to

5   the Launch system than Ms. Rivera or Ms. Ezell?

6   A    Well, he should have full access, yes.

7   Q    And in your experience in the corporate world, is an

8   executive director higher level than a director?

9   A    Yes.

10            MR. FINKEL:  Objection.

11            THE COURT:  Sustained.  Look, let's not ask him to

12  speculate about what happens elsewhere.  We have this

13  evidence.  I can read it.  Let's move on to things he can tell

14  us about from his personal knowledge.

15            MS. NELKIN:  Yes.

16  Q    And if we look at the next column in roll, it says

17  financial manager next to Steven Schreiber's name.

18  A    Yes.

19  Q    Would you think that --

20            THE COURT:  I don't know if you understood what I

21  said.  Perhaps I wasn't too clear.  I would like you to move

22  on from this exhibit.  I get it.

23            MS. NELKIN:  I'm sorry, your Honor.

24            THE COURT:  If there is some information he has

25  about it that hasn't been elicited yet, by all means; but if

1   it's a matter of pointing out who has what title, I'm not sure

2   it's particularly useful to me.

3            MS. NELKIN:  Your Honor, if I may ask one more

4   question about it.

5   Q    There is a name listed, Mr. Papa, as -- if you look, the

6   name is Jordan Napolitano.

7   A    Yes.

8   Q    Do you know who Jordan Napolitano was?

9   A    Yes.

10  Q    Who is she?

11  A    She was a person hired by, I believe, Emil to support

12  Sonia.  She was an administrative aide, inexperienced young

13  person.

14  Q    Approximately how old was she?

15  A    Eighteen, nineteen, twenty tops.

16  Q    And she is listed as an executive director so far as

17  Launch is concerned?

18  A    Yes.

19  Q    Mr. Papa, did you ever complain to anyone at Two Rivers

20  about the fact that your access to the Launch system was

21  limited?

22  A    Yes.

23  Q    Who did you complain to?

24  A    Emil, probably Eugene, Steven, Mayer.  I would have

25  talked to anybody at that point about problems.

1  Q    When you talked to Mr. Friedman about it, what was his

2  response?

3  A    Well, sometimes he was receptive, if he agreed with my

4  need.  If he disagreed with my need, nothing was done.

5  Q    Well, specifically with respect to the Launch system,

6  prior to entry of the preliminary injunction in this matter

7  was your access to the Launch system ever changed?

8  A    Prior to the preliminary injunction, yes.  There would be

9  times when I would demonstrate a need and I would get a little

10  more information available to me.

11  Q    Would that be on a one-time basis, or was that once it

12  was established and you had a different access?

13  A    Well, it was as needed.  So if there were times when I

14  ran into a problem with not having access to information, that

15  either Ben or Yossi would grant me more access, but there were

16  many times that that access was not granted.

17  Q    And it would be Ben and Yossi who would grant you, as the

18  CFO, the access?

19  A    They would grant me the access after consultation with

20  Emil.  They very rarely did anything without his consent.

21         THE COURT:  Can I just ask, because I'm not quite

22  getting it.  You told me the access you did have, but I don't

23  have a clear picture of the thing you didn't have that you

24  sometimes thought you needed.  Can you give me specifics.

25         THE WITNESS:  I had access to the payroll reports,

1  but I did not have access to the actual compensation that

2  employees actually earned, which is kind of odd.

3          THE COURT:  You couldn't find out from the system

4  the salaries of employees?

5          THE WITNESS:  Correct.

6          THE COURT:  Okay.

7          THE WITNESS:  Sometimes I would have to run reports

8  for demographic-type information, where I had to sort the

9  payroll data, new hires, full-time, part-time, et cetera, I

10  couldn't do that.

11          THE COURT:  Uh-huh.

12          THE WITNESS:  I could not enter information into the

13  system, like new vendors.  I certainly couldn't cut checks.

14  So things like that.  I could view checks that were cut, but I

15  could not create information.

16          THE COURT:  Okay.  Go ahead.

17  BY MS. NELKIN:

18  Q    Mr. Papa, Judge Orenstein anticipated some of my

19  questions.

20      My next question was:  Did you encounter any problems as

21  the CFO because you had this limited access?

22  A    Yes.

23  Q    Okay.  And you explained to Judge Orenstein some of the

24  problems that you had, but, for example, if you -- if a new

25  employee came into the company did you have some

1   responsibility for seeing to it that that new employee would

2   get entered into Launch?

3   A    Yes.  There was a person on my staff who entered that

4   person's information into Launch.

5   Q    Then what would happen once that was done?

6   A    Well, eventually they would get paid, but that

7   information was also reviewed by Sonia.  We would scan the

8   documentation, either the employment app or the W-4, and then

9   hours would be accumulated, and then eventually the person got

10  a paycheck.

11  Q    Did you have access to what the rate of pay for the

12  employee would be?

13  A    Only at time of data entry, when we entered it, but after

14  then it was blocked from my view.

15  Q    Did that create any problems for you?

16  A    Yes.  I mean it's -- it's -- to be honest, it's

17  insulting, but, yes, there were times when I needed access to

18  payroll information.  For instance, we were getting insurance

19  quotes.  I needed access to demographic-type information.  Not

20  having complete access to payroll was not the way it should

21  have been.

22  Q    Were there any problems that you encountered with regard

23  to wage and hour issues?

24  A    You are talking before the TRO, in total?

25  Q    Before the TRO.  Did you have concerns about potential

1   problems?

2   A     Yes.

3   Q     About --

4   A     Yes.

5   Q     And this would be with regard to the hours that were

6   being recorded for employees?

7   A     Yes.

8   Q     All right.  Can you tell us what those concerns were?

9   A     There were oftentimes discrepancies between the punched

10  hours or the hours accumulated by the time clock versus the

11  hours that were actually paid.  Those decisions were made by

12  Emil.  I did not agree with the process that he employed.  I

13  think that he placed the company at undue risk, for not making

14  a greater effort to resolve those types of discrepancies and

15  not unduly penalize the employee by not paying them correctly.

16  Q     Okay.  How did it work?  What control did Mr. Friedman

17  have over the time entries?

18  A     Complete.

19  Q     Were you responsible for payroll, as one of your duties?

20  A     Prior to -- no, prior to the TRO, no, I was told to stay

21  out of it.

22          THE COURT:  I'm not quite following.  So an employee

23  would punch in and punch out a certain number of hours and get

24  paid for a different number?  How would that work?

25          THE WITNESS:  Well, the issues were the employee may

1   punch in but they didn't punch out.  So Mr. Friedman took the
2   position if the employee didn't punch out he wasn't going to
3   pay them; he was going to teach them a lesson, if you doesn't
4   punch out you don't get paid.  He ultimately did pay them, but
5   it was two weeks later.
6          My position is that you know the employee is here.
7   You can simply resolve that issue and cut the check right the
8   first time.  I believe it's the burden of the employer to
9   resolve that.
10          THE COURT:  But you didn't have a set number of
11   hours in the system.  You had to determine it.  You had
12   different ways of figuring out what to do about that?
13          THE WITNESS:  Yes.  We had that also.  We had
14   rounding rules.  If an employee worked overtime, if they
15   punched out early or punched out late.  That's all part of
16   payroll processing.  You have to determine how to pay those
17   hours or not.
18          THE COURT:  Okay.
19   BY MS. NELKIN:
20   Q    Did Mr. Friedman utilize a computer on which he dealt
21   with the time?
22   A    Yes.
23   Q    Did you or anyone else at the company have access to that
24   computer so you could see what was going on with regard to how
25   the time was being recorded?

1    A    I didn't have access to his computer, and I don't believe

2    I had access to the underlying hours, hours that were in the

3    system.  I think that's another area that I did not see.

4    Q    You said that you were concerned about this.

5         Was anyone else in the company concerned about it?

6    A    Well, Eugene and Steven were because they would hear from

7    employees that once again their paycheck was wrong, and we

8    would cut or he would cut maybe 20 or 30 adjustment checks per

9    week.  That's an outrageous number of corrections to have on a

10   hundred-person payroll.  So it was constantly brought up that

11   employees weren't being paid properly.

12   Q    When you say adjustment checks would be cut, who was

13   cutting those checks?

14   A    Emil.

15   Q    And was that -- what was the process by which that had to

16   be done?

17   A    Well, the preceding process was that he would review the

18   time with an employee of his choosing, Chris Molina, who was

19   an administrative aide to the plant manager.  They would

20   determine the correct hours to pay.  If the employee

21   complained to somebody, either other members of the LLC or

22   myself or management, and he agreed with that correction, he

23   would process a correcting paycheck.  It maybe took two weeks.

24   Q    In addition to the payroll issues did you have problems

25   because your access was limited with regard to payment for

*V. Papa - Direct/C. Nelkin*                                    1216

1    credit card matters?

2    A    Well, I had -- that depends on the role that I'm being

3    asked to play.  So, if I may, I was told from day one that my

4    role was to record disbursements, not verify, review, and

5    approve.

6              So most of those credit card payments, my job was

7    limited to just recording them.  I got a summary of the

8    charges as to which general ledger account they wanted to be

9    charged to.  If I requested backup to support those charges, I

10   was told it was none of my business.

11   Q    And with whom did you have that discussion where you were

12   told it was none of your business?

13   A    Well, Emil certainly, Sonia, again, Eugene, Steven,

14   Mayer.  There was a period of time when the credit card

15   charges got pretty excessive, and I said there is a lot of

16   disbursements being made here and I can't review them or

17   verify them or approve them.  I can't even determine that they

18   are being charged to the correct accounts because I don't know

19   what they are other than what I'm being told.

20             THE COURT:  You mentioned, I think, three of the

21   four partners, all of them were saying it was none of your

22   business.

23             THE WITNESS:  No, only Emil said so.  Well, Emil

24   said it was none of my business; and, honestly, at one point

25   Eugene told me to stop asking so many questions also because

1    he said Emil was getting upset I was asking too many

2    questions.

3              THE COURT:  All right.

4    Q    And when -- did Mr. Schreiber explain to you what his

5    concern was when he told you not to ask -- not to deal with

6    issues?

7    A    He was concerned that I was going to be terminated

8    because I was too much of a problem because I asked too many

9    questions.

10   Q    And was -- did he indicate to you who he thought might be

11   going to terminate you?

12   A    Well, he indicated that Emil was getting upset, that I

13   was asking too many questions.

14   Q    With regard to the credit cards, at the time prior to

15   entry of the preliminary injunction what was your

16   understanding as to where the -- whose credit cards were these

17   charges being put on?

18   A    For the most part, I did not know whose credit card.  All

19   I saw was the name of the credit card company and the last

20   four digits of the card number.

21   Q    Did you come to understand that this was not a company

22   card but personal cards of Mr. Friedman?

23   A    Well, I knew they were not company cards.  Then again, I

24   did not know exactly whose card it was.

25   Q    Did you subsequently learn whose it was?

1   A    Yes.

2   Q    Who did you learn that it was?

3   A    I'm sorry, who did I learn?

4   Q    Whose card did you learn that these charges were being

5   put on?

6   A    Well, some of them were his, some of them were others.

7   There is a variety of credit card charges that went through

8   the company.  They were not all Emil's.

9   Q    Do you know if the majority of them were?

10  A    I don't know a majority because, again, I don't know -- I

11  never put a schedule together associating each number with

12  each name.  So I can't really say whether it's a majority of

13  or not.

14  Q    And once the preliminary injunction was put in place in

15  December of 20 -- well, there was a temporary retraining order

16  entered in December of 2015 and ultimately a preliminary

17  injunction in January.

18       At that point in time did you get increased access to the

19  Launch program?

20  A    Yes.

21  Q    Can you tell us how that came about?

22  A    Well, it was after some back and forth.  I was finally

23  given Sonia's user name and Sonia's password, and that gave me

24  greater access to Launch Coffee.

25  Q    When you say there was some back and forth, was there any

1    kind of problem with obtaining the password?

2    A     Well, I don't know.  I would assume there was a problem.

3    I didn't get it right away.  So I can only assume that there

4    was a delay.  There was some concern about the TRO.  The

5    preliminary injunction prohibited Ben and Yossi from working

6    on the system.  It just took a while to get to me.  I don't

7    know all the back and forth that goes on with this crowd.

8              THE COURT:  I ask you to pause for a minute.  I

9    apologize, everybody.  Be back in just a moment.

10             (Pause.)

11             THE COURT:  Thanks.

12             (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. NELKIN (cont'd.):

2   Q    Mr. Papa, I believe you had stated that after entry of

3   the temporary restraining order, preliminary injunction in

4   this case, that you were then able to sign in using Sonia

5   Rivera's passwords; is that correct?

6   A    Yes.

7   Q    Okay.  And once you did that, what access were you given

8   to the Launch program?

9   A    I don't know the full extent of it because I only signed

10  in to get what I needed.  So I did not sign in and explore the

11  whole system.  So I can't really answer what greater access

12  that gave me.

13  Q    But did you have more access than you had previously?

14  A    Yes.

15  Q    And was there a point in time after the preliminary

16  injunction had been entered in this case where you no longer

17  had any access to Launch?

18  A    Yes.

19  Q    Can you tell us approximately when that was.

20  A    I would guess February, either side of February, maybe.

21  I don't know for a fact without looking.

22  Q    And that would be of this year, 2016?

23  A    Yes.

24  Q    And were you given any warning that the Launch system was

25  going to be turned off or that you were no longer going to

1    have any access to Launch whatsoever?

2    A     No.

3    Q     Had you received any kind of a demand for payment from?

4    Mr. Rogosnitzky with regard to the Launch system.

5    A     No, I did not.

6    Q     And as CFO, would you have expected to have received any

7    kind of monetary demand if someone was making it?

8    A     If there was a demand for disbursement placed on a

9    company, yes, I would expect to see it.

10   Q     And you did not see anything concerning a demand for

11   payment that the Launch system was going to be shut down

12   unless payment was made?

13   A     Correct.

14        THE COURT:  Can I ask, in the interim between when

15   you first got access to Ms. Rivera's log-in information and

16   when it was shut off, were there any difficulties in using

17   Launch that you experienced?

18        THE WITNESS:  Between what time period?  I'm sorry.

19        THE COURT:  During that period when you were using

20   Ms. Rivera's log-in information, was it working then?

21        THE WITNESS:  It wasn't necessary for me to use

22   Launch then.

23        THE COURT:  Okay.

24        THE WITNESS:  It was just for background

25   information.  I was processing information for another system.

*V. Papa - Direct/Ms. Nelkin*                                    1222

1          THE COURT:  Got it.

2          Go ahead.

3          THE WITNESS:  It was just --

4    BY MS. NELKIN:

5    Q    From the time you say in February up until the last few

6    days, has there been access to Launch?

7    A    Not to my knowledge.

8    Q    Now, was -- in addition to Launch, did the company use

9    some other system?

10   A    Yes.

11   Q    What was that system?

12   A    We used QuickBooks Enterprise and we used a system called

13   Misys, M-I-S-Y-S.

14   Q    And why was it necessary to use these other systems in

15   addition to Launch?

16   A    Well, because Launch was very limited in scope.  It only

17   was in effect a glorified checkbook and a payroll processing

18   operation.  It was not a full-scale accounting system.

19   Q    So you said that Two Rivers used QuickBooks.  How was

20   QuickBooks being used at the time that Launch was also being

21   used?

22   A    Well, QuickBooks was a system we entered our orders on.

23   We did our billing on QuickBooks.  We generated our financial

24   statements on QuickBooks.  We attempted to control inventory

25   on QuickBooks.  Most of those -- none of those were really

1    done on Launch.

2    Q    How would the information -- how would you coordinate the

3    information between Launch and QuickBooks?

4    A    What I did was or my staff, I ran reports on Launch

5    specifically regarding disbursements that were made and/or

6    purchases that were entered or payroll that was processed.  So

7    from those reports I entered information that I deemed

8    appropriate into QuickBooks.

9    Q    And when you say you "deemed appropriate," what

10   criteria --

11   A    Well, there was some transactions in Launch that I --

12   that were not generally accepted accounting principles, so I

13   do not enter those.

14   Q    Can you give us an example.

15   A    If there was a commitment for a purchase of equipment

16   that required progress payments over time, the tendency in

17   Launch was to enter the full amount as an item or an expense

18   or an asset.  And that's improper at that time.  It's really,

19   you can't enter future commitments into your books, you know,

20   currently.  You have to enter them at the time they earned or

21   they are due because I can explain more accounting, but I

22   don't think you want more of that unless you do.

23   Q    But in any event, you had concerns about some of the

24   entries in Launch, so those simply you would not bring those

25   over into QuickBooks?

1    A     Correct.

2              THE COURT:  May I ask a question about the mechanics

3    of this.  You say bring it over, transferring the information

4    electronically in any way or just by hand?

5              THE WITNESS:  Manually entered, total duplicate

6    entries.

7              THE COURT:  Okay, go ahead.

8              THE WITNESS:  Two staffs, two processes.

9              THE COURT:  Go ahead.

10   Q     Did you have any concerns about the situation where there

11   were two, basically two accounting programs going on?

12   A     Well, it wasn't easy for me to work that way, but since

13   the financial statements with respect being produced from

14   Launch, I was able to work around it.  But it certainly was

15   harder for me to determine what I needed and understand what I

16   was looking at working from a report not oftentimes from the

17   original documentation.  So many times I had to get the

18   underlying invoice which oftentimes was scanned into Launch

19   and that's where it still resides today.

20   Q     And when you say it was scanned, do you know who was

21   scanning it into Launch?

22   A     Well, it would either be Sonia or someone under her --

23   could have been Jordan or someone that was working with Sonia.

24   But Launch was designed to electronically keep records.  So

25   vendor invoices that may have been e-mailed to Sonia or even

1    physically mailed to her, Sonia or her delegate would enter

2    that information or electronically get it into Launch.  They

3    were trying to get away from paper files.

4    Q    And so would it be a fair statement to say that important

5    financial information was entered and stored on to the Launch

6    system?

7    A    Absolutely.

8    Q    And would it be fair to say that once the system shut

9    down, you did not have access -- Two Rivers did not have

10   access to that data?

11              MR. SCHAFHAUSER:  Objection; leading.

12              THE COURT:  Yes, please don't lead.

13              MS. NELKIN:  I'm sorry.

14   Q    Mr. Papa, can you tell me whether or not once the system

15   was shut down you were able to access all the historical

16   financial data of the company?

17   A    I could not access without Launch, I could not access all

18   the financial data required for Two Rivers.

19   Q    Mr. Papa, did you become aware after -- after the entry

20   of -- well, how did you become aware of the entry of the

21   preliminary injunction?

22   A    I believe Eugene gave it to me.  It was a printout.  It

23   was given to me and I was told to be aware of it and read it

24   and follow it.

25   Q    And at some point in time, did your responsibilities in

1   the company change as a result of that entry of the

2   preliminary injunction?

3   A     Yes.

4   Q     How did they change?

5   A     Well, I assumed responsibility for payroll.  I assumed

6   more responsibility for human resources.  And I became much

7   more involved in cash management.

8   Q     In -- in addition to your additional responsibilities,

9   were you at some point advised that you were going to be the

10  focal point for receipt of books and records of the company?

11  A     I was also given a copy of the proceeding or the minutes

12  of the meeting you had here at December 4th where it was

13  discussed that I would be the recipient of all that

14  information.  So yes, I was aware of the fact that I was to

15  get all the information that all the parties had.

16  Q     Did you, in fact, receive information after entry of the

17  preliminary injunction?

18  A     Yes.

19  Q     Can you tell us what the first information that you

20  received after entry of the preliminary injunction was.

21  A     I can't tell you what was first, but I did get a box from

22  Mike Devine's office that contained the tax returns, the

23  payroll tax returns, W-2s for years 2012 through 2014.  I got

24  a couple of -- I got 1099s that he had issued.  I think I got,

25  like, some corporate paper, maybe a certificate of formation

Q     What is the basis for your belief?V. Papa - Direct/Ms. Nelkin                          1227

1   that he might have had, generally what I would have expected

2   from an outside tax accountant.

3   Q     What was the volume of the documents?

4   A     I'm sorry?

5   Q     What was the volume of the documentation?

6   A     It was one box from Mike's office (indicating).

7   Q     And you said you got it for 2012.  Do you know from what

8   date in 2012?

9   A     I said tax returns 2012 through 2014 and payroll tax

10  returns through the third quarter of 2015.

11  Q     Okay.  With regard to any payroll records, did you

12  receive any payroll records?

13  A     Limited.  Depends on what you mean by "payroll records."

14  For instance, a W-2 could be considered a payroll record.  So

15  yes, he did give me W-2s that he generated.  I did not receive

16  what I consider critical, the underlying payroll record

17  indicating who was paid, how many hours were paid, whether he

18  paid overtime or not, those are the payroll records that we

19  are required to maintain by law and we don't have.  And I did

20  not get those from Mike and I don't believe he has those.

21  Q     When you say you "don't believe he has those," do you

22  know whether or not he was the person who was keeping those

23  records for Two Rivers?

24  A     I don't know, but I believe he was not.

25  Q     What is the basis for your belief?

1    A    Because the payroll was processed in Launch Coffee.  And

2    my belief is that he would just be -- he just would have

3    received the reports from Sonia telling him which taxes were

4    withheld and what he had to remit.  One of the two remitted

5    the tax withheld and filed the appropriate return.  I think

6    Mike filed the appropriate return based on the information he

7    was given.

8    Q    If -- did you also receive documents that did not come

9    from?  Mr. Papa -- I'm sorry, from Mr. Devine.

10   A    Yes, I received two or three boxes of what I would refer

11   to as vendor files, accounts payable files.  They were folders

12   by vendor with invoices in those folders.

13   Q    And do you know where those came from?

14   A    They came -- either had Mr. Schafhauser's name on it or

15   Sonia.  I don't remember exactly where they came from, no.

16   Q    Let me direct your attention, Mr. Papa, to Plaintiff's

17   Exhibit 128.  Do you have that in front of you?

18   A    Yes, I do.

19   Q    Okay.  And because it's an e-mail chain, we are going to

20   have to start at the back of page 6 of Exhibit 128.  And let

21   me just ask you do you recognize this exhibit?  Have you seen

22   it previously?

23   A    Yes.

24   Q    Okay.  And can you just briefly described what you

25   understand this document be.

*V. Papa - Direct/Ms. Nelkin*                                    1229

1   A    Starting with page 1 or parting with page 6 or just in

2   general?

3   Q    Just in general, what is it?

4   A    Well, this is my attempt to clearly identify information

5   that I did not receive that is critical for Two Rivers to have

6   specifically regarding credit card disbursements with no

7   supporting documents.

8   Q    Now, if we look at page 6 of the Exhibit 128, can you

9   just tell us what that is.

10  A    This is a letter to me.

11  Q    Who is it from?

12  A    Paul Schafhauser.

13  Q    And you say it's a letter, but was it, in fact, an e-mail

14  to you?

15  A    I would assume it's an e-mail yes, yes.  I don't remember

16  ever getting an actual letter, although I may have.  I don't

17  remember, really.

18  Q    And did you -- you received this?

19  A    Yes.

20  Q    You have seen it before?

21  A    Yes.

22  Q    And without reading it word for word, can you tell us

23  what it was that Mr. Schafhauser was asking you in this

24  letter?

25  A    He's asking me?  Well, in the middle paragraph, he's

1    asking me if I am in possession of Two Rivers's signed tax

2    returns, and then specifically any books and records that are

3    missing, in quotes.  And he's asking me if I -- "Please also

4    advise if you are represented by Carol and Jay Nelkin or other

5    counsel, in which case he will direct this question to them."

6    Those are --

7              THE COURT:  Instead of having the witness read

8    documents that I have got in front of me, can you ask

9    questions that aren't on the page.

10             MS. NELKIN:  Yes, Your Honor.

11             THE COURT:  Thank you.

12   Q    Mr. Papa, did you respond to Mr. Schafhauser's letter or

13   e-mail?

14   A    I believe I did.

15   Q    All right.  And at the time you responded to this, could

16   you tell us whether or not you indicated to him that you were

17   missing documents?

18   A    Yes.  I indicated to him that I was missing documents and

19   I -- either in this e-mail or a subsequent e-mail I provided a

20   specific schedule that was not meant to be all-encompassing,

21   but it was a specific schedule for those credit cards

22   disbursements that I had no support documentation for.

23   Q    And once you did that, what happened?

24   A    I don't think I ever heard back from him.

25   Q    Were you ever able to reconcile the credit card matters?

1   A    When you say "reconcile," I'm not sure what you mean by

2   "reconcile."  I never got supporting documentation for credit

3   card disbursements, if that's what you mean by "reconcile."

4   Q    Did you ultimately advise Mr. Schafhauser that there was

5   a significant dollar amount of disbursements that you could

6   not account for?

7   A    Yes.

8   Q    Okay.  Tell us what that was all about, how that worked.

9   A    Well, it's right on page 1, "Please be advised that the

10  original million four, there's a total of a million 158

11  unaccounted for."

12  Q    And were these the credit card disbursements that you

13  were talking about?

14  A    Yes.

15  Q    Did you ever get the documentation that supported what

16  was remaining missing at the time you wrote this e-mail?

17  A    No.

18  Q    What did you respond to Mr. Schafhauser's inquiry about

19  whether or not you were represented by counsel?

20  A    What did I respond?

21  Q    Yes.

22  A    I'm not sure.

23           THE COURT:  Again, I can read it on the page.

24           MS. NELKIN:  Okay.

25           THE COURT:  Go on to something that's not on the

1   page.

2   A    I requested to be represented by counsel several times

3   and I was turned down I believe once by Mr. Schafhauser in a

4   phone conversation that was or an e-mail.  I don't remember

5   exactly which.  But I repeatedly said I should not be doing

6   this on my own.  These are legal documents.  I should be

7   guided.  Someone ought to be representing Two Rivers Coffee.

8   Who represents me and who represents Two Rivers Coffee?  And

9   it was always denied.

10              THE COURT:  Does it interfere in any way with --

11   leaving aside concerns that you may have because you are not a

12   lawyer, is there any way in which the fact that Two Rivers

13   doesn't have counsel impedes your work or the work of Two

14   Rivers?

15              THE WITNESS:  Well, I have a current matter right

16   now that I'm looking for a direction on.

17              THE COURT:  Yes.

18              THE WITNESS:  The tax returns need to be authorized

19   by the tax matters partner.

20              THE COURT:  Yes.

21              THE WITNESS:  The tax matters partner is

22   Mr. Friedman; is he still the tax matters partner or not?

23              THE COURT:  So you need guidance on that as a legal

24   matter?

25              THE WITNESS:  Right.  There's things that surface in

1   the day-to-day.

2   Q    Mr. Papa, did Mr. Friedman have an office at Two Rivers?

3   A    Yes.

4   Q    And did he have computers in that office?

5   A    Well, he had at least a computer.  I don't know for a

6   fact if it was plural.

7   Q    At some point in time, did you become -- did you receive

8   the key to that office?

9   A    I received a key from this employee Criseidy Molina,

10  which is the key to that office, yes.

11  Q    When were you given that key?

12  A    It was shortly after the TROs, I would guess, the week of

13  December 10th, maybe.  It was right around then.

14  Q    And have you taken steps to make sure that that computer

15  has remained as it was at the time of the preliminary

16  injunction?

17  A    Yes.  That office has remained locked and no one goes in

18  that office unless I'm present, to my knowledge.  Again, if

19  there's -- I received a key.  If there are other keys, I don't

20  know that for a fact.

21  Q    You don't have any reason to believe that any -- well, do

22  you have any reason to believe that either of the trial groups

23  have a key to that office?

24  A    No.  I'm fairly certain that they don't.  But again, I

25  did not receive Emil's key.  I received a key that he had

*V. Papa - Direct/Ms. Nelkin*                              1234

1   given to an employee.

2   Q     Do you have any reason to believe that Mr. Koenig has a

3   key to that office?

4   A     I believe he does not.

5   Q     But do I understand from your testimony that

6   Mr. Friedman's key is still unaccounted for?

7   A     Well, I have no knowledge of his key.  I did not receive

8   per se his key.  Again, I received a key that he had given to

9   an employee who he allowed to have access to his office.  No

10  one else had access to his office except this one employee who

11  helped him prepare payroll.

12  Q     Mr. Papa, have you at any time ever seen Mr. Friedman in

13  the possession of a laptop computer?

14  A     Yes.

15  Q     When did you see it?  What would be the occasion?

16  A     I don't remember a specific date, but from time to time

17  when he came into the building to do his work, he would be

18  carrying what looked like to be a laptop and amongst the

19  things he was carrying.

20  Q     And can you give us some approximate date as to when the

21  last time you would have seen him carrying that laptop would

22  be?

23  A     No.

24  Q     Well, would it have been in 2015?

25  A     Yes.

1   Q     Mr. Papa, are there -- are there any items that you would

2   consider the books and records of Two Rivers that you still do

3   not have access to today?

4   A     Well, yes, certainly the payroll records that were in

5   Launch Coffee and all of the vendor billings that were

6   electronically stored in Launch Coffee.

7   Q     Anything else?

8   A     Those are the two biggest items that come to mind.

9   Again, I -- I -- I -- I did not -- I don't profess to, you

10  know, have examined all the documents and say that, you know,

11  of the five thousand checks we cut in the last four years I

12  have ever invoice that I'm required to have.  But I know I

13  don't have access to Launch Coffee and I know that information

14  was in Launch Coffee.

15  Q     Were -- were all the checks that were written on behalf

16  of Two Rivers entered into Launch?

17  A     Yes.

18  Q     So because you don't have access to Launch, you don't

19  have access to those checks?

20  A     Well, yes.  I don't have access to the checks, but with

21  the exception of payroll, those checks were entered into

22  QuickBooks.  So I do have a duplicate copy of the check in

23  QuickBooks except for payroll because that was entered in a

24  summary fashion.

25  Q     Do you know whether or not you are required by law to

*V. Papa - Direct/Ms. Nelkin*                              1236

1  maintain those payroll records?

2  A    We are.  We are required to maintain payroll records

3  indicating name of employee, date paid, hours paid,

4  calculation of wages.  We are required I think for six years

5  in New Jersey to have access to those records.  And we do not

6  have that.

7          MS. NELKIN:  Your Honor, if I could just have a

8  moment?

9          THE COURT:  Yes.

10 Q    Mr. Papa, do you know if information concerning loans to

11 Two Rivers would have been maintained in the Launch system?

12 A    Yes, it was.

13         MS. NELKIN:  Your Honor, we pass the witness.

14         THE COURT:  Okay.  We will take a break in just a

15 moment, our mid-afternoon break and we will start with cross

16 after the break.

17         When you say "loan information," what kind of

18 information about loans is kept in Launch?

19         THE WITNESS:  Well, I believe Carol is referring to

20 loans that Emil had made to the company.  The receipt of the

21 loan is recorded in Launch as it is recorded in QuickBooks.

22         THE COURT:  Do you have the information in

23 QuickBooks?

24         THE WITNESS:  Yes.

25         THE COURT:  So are you lacking access to information

1    about any loans to or from Two Rivers?

2              THE WITNESS:  Not the primary loan.  If there are

3    other loans that is being alluded to, I don't have any

4    information about any other loans.  But the main loan that

5    funded the company --

6              THE COURT:  Yes.

7              THE WITNESS:  -- I don't believe --

8              THE COURT:  But any other loans, would other loans

9    be on Launch?  I'm just trying to understand if there's

10   information that you believe you don't have because it's

11   resident only on Launch.

12             THE WITNESS:  I don't -- well, I don't believe so.

13             THE COURT:  Okay.

14             THE WITNESS:  If there's something I'm missing, I'm

15   missing it.

16             THE COURT:  You don't know what you don't know.

17             Great.  Go ahead.

18             MS. NELKIN:  If I could just ask a follow-up

19   question to what you asked, Your Honor?

20             THE COURT:  Yes.

21   BY MS. NELKIN:

22   Q    Do you know, do you have any way of knowing whether or

23   not the information that you have on QuickBooks matches the

24   loan information that's on Launch?

25             THE COURT:  I think that's basically what he just

1    said.  You don't know what you don't know.

2    A    Well, I don't know for a fact it matches.  I believe it's

3    recorded in Launch -- in Launch and in QuickBooks.  But, you

4    know, if there are other loans recorded in Launch Coffee, I

5    wouldn't know about them per se because I'm not looking for

6    that information in Launch.  I am -- I'm not relying on Launch

7    to determine what is the loan payable to Emil.

8              THE COURT:  I'm not trying to cut you off.

9              MS. NELKIN:  No further questions, Your Honor.

10             THE COURT:  All right.  We will take our break.  We

11   will return in 15 minutes.

12             (Recess taken.)

13             THE COURT:  All right, who would like to question

14   first?

15             MR. SCHAFHAUSER:  I will volunteer, Your Honor.

16   Thank you.

17             THE COURT:  Okay.

18   CROSS-EXAMINATION

19   BY MR. SCHAFHAUSER:

20   Q    Good afternoon, Mr. Papa.  You -- by the way, we have

21   corresponded.  My name is Paul Schafhauser.

22   A    Hi.

23   Q    We have corresponded.  We haven't spoken by phone before,

24   have we?

25   A    I don't recall.

1   Q    Okay.  You began at Two Rivers, I believe I heard you say

2   June 2013, correct?

3   A    Yes.

4   Q    Okay.  What were you doing before you joined Two Rivers?

5   A    The immediate 15 months prior I was not employed.

6   Q    And before that period of time, what were you doing?

7   A    I believe right then, before that I was a CFO at Marquis

8   Who's Who, a publishing company.

9   Q    And how is it that you came to be familiar with Two

10  Rivers Coffee?

11  A    I was contacted by Mayer Koenig to come on an interview

12  for a CFO position.

13  Q    And how did you come to be in contact with Mr. Koenig?

14  A    Well, he found me on Indeed and then he called me.

15  Q    Indeed is --

16  A    Indeed is a job site aggregator.

17  Q    Very well.  And he called you and you were ultimately

18  hired, correct?

19  A    Yes, yes.

20  Q    Okay.  Now at the time that you were hired, who were the

21  members of Two Rivers Coffee?

22  A    Emil Friedman, Eugene Schreiber, Steven Schreiber and

23  Mayer Koenig, to the best of my knowledge.  At the time I was

24  hired, they were introduced to me as such, but I saw no

25  paperwork to prove that.  I was a brand new hire.

*V. Papa - Cross/Mr. Schafhauser*                                        1240

1    Q    Very well.  Before we go forward, did you do any

2    preparation for your testimony here today?

3    A    I met with my counsel.

4    Q    Okay.  Other than your meeting with counsel, did you

5    speak with anyone else about this hearing or this lawsuit

6    prior to today?

7    A    Well, I was carrying --

8              THE COURT:  About this lawsuit?

9              MR. SCHAFHAUSER:  I'm sorry?

10             THE COURT:  About the lawsuit?

11             MR. SCHAFHAUSER:  Withdrawn.

12   Q    Did you speak with anyone about your testimony or this

13   evidentiary hearing other than your counsel?  I'm not asking

14   to you communications with Mr. Rosenblatt.

15   A    Well, I was -- they were preparing last night.  I was

16   waiting all day to testify.  After the hearing they came out

17   and asked me some questions for them to prepare for today.

18   Q    Okay.  Did you review any documents before -- in

19   preparation for your testimony?

20   A    With my counsel or with anybody?  I mean --

21   Q    With anyone, although I'm not asking for any

22   communications with your counsel, just so --

23   A    Okay.

24   Q    Okay.  So could you did you review any documents?

25   A    Ever?

1   Q     No, in preparation -- withdrawn.

2           I assume -- well, withdrawn.  Did you --

3           THE COURT:  Could we get to substantive matters?

4           MR. SCHAFHAUSER:  Very well.

5   Q     When did you first meet Mr. Steven Schreiber?

6   A     When I interviewed.

7   Q     Who was in the interview with -- with Mr. Koenig and

8   Mr. Steven Schreiber?

9   A     The interview I had in per se was the four members of --

10  what I perceived to be the four members of the LLC and Mike

11  Devine.

12  Q     All four of them and Mr. Devine were in the room

13  together?

14  A     Yes, yes.

15  Q     And what did they tell you about your duties and

16  responsibilities would be?

17  A     They wanted me to professionally prepare financial

18  statements and to install systems and controls that would

19  allow such statements to be generated in accordance with

20  generally accepted accounting principles.  And they wanted to

21  make sure I wasn't going to wear a tie and just be a bean

22  counter.

23  Q     Did you have an understanding at the time that you were

24  hired that there was an existing CPA who was handling CPA

25  functions for the company?

*V. Papa - Cross/Mr. Schafhauser*                    1242

1  A     You will have to describe CPA functions, but I'm not

2  aware of that term.

3  Q     Okay.  Let me re-characterize it.  Did you have an

4  understanding when you were hired that someone else would be

5  acting as the company's outside certified public accountant?

6  A     Yes, I understood that Mike Devine would prepare the tax

7  returns.

8  Q     Now, I think you said one of the tasks that you were

9  going to handle was installing systems.  What kind of systems

10 did you understand would be installed?

11 A     Financial systems, accounting systems, management

12 systems.

13 Q     And once you began, were there any systems that you

14 installed other than what you have already testified to in

15 response to Ms. Nelkin's questions?

16 A     Well, when I began, the company was using QuickBooks on

17 Online.  I upgraded that to QuickBooks Enterprise.  I

18 subsequently added an add-on called Misys to better control

19 the manufacturing and inventory.

20 Q     So let me see if I understand.  The company when you

21 began was using QuickBooks Online, yes?

22 A     Yes.

23 Q     And you, when you say you upgraded it, what were the

24 features that were enhanced when the company went to

25 QuickBooks Enterprise?

1  A     If I could back up, they were also using a system called

2  Corporate something which I'm not too familiar with it.  It

3  was another home-grown system.  The difference between

4  QuickBooks Online and QuickBooks Enterprise is primarily

5  inventory control.

6  Q     You mentioned "Corporate" and you said you are not too

7  familiar with it.  Have you ever used the Corporate system?

8  A     I received reports from the Corporate system.  I have

9  never entered data into the Corporate system.

10 Q     And what -- from whom would you receive reports from the

11 Corporate system?

12 A     Sonia.

13 Q     Other than receiving reports from Ms. Rivera, did you

14 utilize the Corporate system in any way since -- during the

15 time that you've been at Two Rivers?

16 A     Well, I utilized the reports from that system to prepare

17 the financials for -- to restate both 2012 and to prepare

18 2013.

19 Q     When you say "restate," please explain what you mean by

20 restating the financials.

21 A     I was given a financial statement that was prepared by

22 Mike Devine which purported to be the financial statements for

23 the year 2012.  Upon examination and review, I determined that

24 those statements were inaccurate and I had to correct them

25 which is commonly referred to as restating the net income for

1   the year for the company.

2   Q    And you did that for 2012 and 2013, correct?

3   A    I did not restate 2013 financial statements.  I restated

4   2012.

5   Q    Oh, okay, 2012.  Other than restating the 2012 financial

6   statements, did you use the corporate system for any other

7   purpose while you've been at Two Rivers?

8   A    No, not that I can think of right now.

9   Q    All right.  Do you have an understanding as to whether

10  the information that was on the corporate system was

11  transferred at some point to the Launch Coffee system?

12  A    I have had some discussion and some understanding of

13  that, and I do not believe it was transferred.

14  Q    Okay.  With whom did you have those discussions?

15  A    Primarily Yossi.

16  Q    Could you tell me what the discussions were about that

17  item.

18  A    That the way he was describing the transfer to me was,

19  once again, inadequate in that he was not transferring

20  historical information.  He was only transferring open

21  balances, meaning unpaid vendor bills, that's it, and checks

22  that were not cleared or outstanding checks.  So once again,

23  we would not have a complete history in any one system.  And I

24  said that's not good.  We need to have complete historical

25  information in one system.  You need to transfer this data.

1   Q     And when did you have this conversation with Yossi?

2   A     When he was shutting down corporate and they were

3   migrated to Launch.  I don't remember the exact dates.

4   Q     Could you give me an approximate time period?

5   A     Probably mid-2014, I would guess if I had to.

6               THE COURT:  Sorry to interrupt.  Are you saying that

7   Corporate only had open balances to migrate or that only a

8   subset of the information on corporate was migrated?

9               THE WITNESS:  Only a subset was migrated.

10              THE COURT:  Got it.

11              Go ahead, please.

12  Q     Now, at some point, was an effort made if you know, to

13  transfer the data on the Launch system to the QuickBooks

14  Enterprise system?

15  A     Data was never transferred from Launch Coffee.  If you

16  are referring to an electronic transfer, data was never

17  transferred from Launch into QuickBooks.

18  Q     All right.  Let me -- let me ask, then, a follow-up

19  question.  I mangled the question.  Was information

20  transferred or input on to the QuickBooks Enterprise system

21  that had previously been located on the Launch system?

22  A     Yes.

23  Q     And when was that done?

24  A     It was done throughout 2013 and throughout 2014.  It was

25  done throughout.

1    Q    And who did that?

2    A    Who?  Well, I directed it and I certainly entered some of

3    it myself.  But again, I would run reports from Launch and I

4    would determine what needed to be entered into QuickBooks

5    except for payroll.  Payroll I handled differently.

6    Q    So you made a determination based on what you ran in

7    Launch as to what needed to be put into QuickBooks?

8    A    Yes.

9    Q    Okay.  And if you determined that it was necessary

10   information, you then transferred it into QuickBooks, correct?

11   A    I entered it.

12   Q    I'm sorry; you entered it.  If the information was

13   necessary, you would have entered it into the QuickBooks

14   Enterprise system?

15   A    For disbursements.

16   Q    Very well.  And was there a gentleman by the name of

17   Isaac?  I don't know his last name.

18   A    Yes.

19   Q    What was Isaac's last name?

20   A    Benkowski (ph).

21   Q    And what was his role?

22   A    He was hired by Emil and Yossi to attempt to further have

23   Launch Coffee either duplicate QuickBooks or replace

24   QuickBooks.  So he entered information both into QuickBooks

25   and Launch Coffee, specifically orders and applying cash from

1    customers to invoices.  Prior to him, Launch Coffee had no

2    accounts receivable information and no orders.

3    Q    And when -- when you say "prior," when he began and did

4    his tasks, did Launch then get the information that you just

5    referred to input on its system?

6    A    He was attempting to do that, although as far as I could

7    tell he never was successful.

8    Q    Did -- did you ask him to input information on the

9    QuickBooks Enterprise system?

10   A    Yes.

11   Q    And did he do so?

12   A    Yes.

13   Q    And he did so under your supervision?

14   A    On QuickBooks, yes.

15   Q    And is the information, as best as you know, on

16   QuickBooks accurate?

17   A    Yes.

18   Q    I take it you rely on the information that's available on

19   QuickBooks, correct?

20   A    Yes.

21   Q    And for purposes -- well, let me go back.  We talked

22   about Mr. Devine's role.  Mr. Devine prepared tax returns for

23   several years.  I think you said 2012, '13 and '14, correct?

24   A    Yes.

25   Q    For purposes of delivering information to Mr. Devine to

*V. Papa - Cross/Mr. Schafhauser*                              1248

1    prepare the tax returns, is it correct that the information

2    that you delivered to him was based on what existed on the

3    QuickBooks Enterprise system?

4    A     Yes.

5    Q     For purposes of preparing financial information for the

6    members of the company, did you also deliver to them

7    information from the QuickBooks Enterprise system?

8    A     Yes.

9    Q     You mentioned mice assist earlier and I'm not familiar

10   with that, so forgive me.  What is Misys?  Could you describe

11   its functions.

12   A     Misys is a poor-man's Enterprise resource system.  It

13   attempts to control inventory, schedule jobs, determine what

14   material to order, how to run your production.  It is an

15   extremely low-end product.

16   Q     And when was Misys implemented at Two Rivers?

17   A     October of 2014.

18   Q     Why was it implemented?

19   A     Because it was needed.

20   Q     And at whose direction was it implemented?

21   A     Mine.

22              THE COURT:  May I just --

23              MR. SCHAFHAUSER:  Of course.

24              THE COURT:  -- understand.  I think you talked about

25   three different ERPs that were being used, Launch, Quicken and

1   now Misys.  Can you just walk me through how they overlap in

2   terms of functionality.

3           THE WITNESS:  Well, Launch Coffee was intended to be

4   an ERP, but it never got there.  So let's take that out of the

5   equation.

6           THE COURT:  Okay.

7           THE WITNESS:  QuickBooks is an ERP system, but it's

8   inadequate.  So Misys is a little bit like an add-on module

9   that just handles ERP functions and QuickBooks does accounts

10  payable, accounts receivable.  So Misys feeds into QuickBooks.

11          THE COURT:  Okay.  But they don't have overlapping

12  functions?

13          THE WITNESS:  No.

14          THE COURT:  Okay.

15          THE WITNESS:  Because I disabled the overlapping

16  piece that was in QuickBooks.

17          THE COURT:  Okay.

18          All right, go ahead, I'm sorry to interrupt.

19          MR. SCHAFHAUSER:  No problem, thank you, Judge.

20  BY MR. SCHAFHAUSER:

21  Q     Judge Orenstein asked you questions about ERPs and I was

22  actually going to go there next.  You mentioned a number of

23  ERPs and my notes had you mentioned QuickBooks Enterprise

24  which we talked about.  There was also Sage.  What is Sage?

25  A     Well, Sage is a company that produces many different

1   levels of enterprise resource planning-type systems.  Some are

2   more expensive, less expensive.  They are industry-specific.

3   There's a whole suite of products that are available to a

4   company.

5   Q    Was there a time when you wanted to implement a Sage

6   system at Two Rivers?

7   A    I was a little reluctant in October of 2013 to implement

8   Sage because it was a little too expensive, I thought, for our

9   taste, at least the one being discussed.

10  Q    What was the one that was under discussion at the time?

11  I'm sorry; what was the cost of the one under discussion at

12  the time?

13  A    That one was maybe a hundred thousand that was being

14  thrown around.

15  Q    And who was throwing that number around?

16  A    I believe Mayer had some preference for that system.

17  Q    So Mr. Koenig wanted to go to Sage, but you learned that

18  the cost was a hundred thousand and you were against it?

19  A    In October 2013, yes.

20  Q    Did there come a point in time when you revisited going

21  to a Sage system?

22  A    Yes.

23  Q    When was that?

24  A    Recently.  We did an evaluation -- let me think for a

25  second here -- the end of the 2015 into early 2016 we

1    reevaluated it.  And I had reevaluated -- I had proposed other

2    lower-cost options during the whole debate about whether or

3    not to custom-right Launch.  And that's how Misys surfaced as

4    a low-end alternative suitable for an early-stage company like

5    ours.

6    Q     Now, you say you reevaluated Sage in 2015, early 2016.

7    Who was involved in reevaluating whether to go to the Sage

8    system?

9    A     The members of the LLC and myself.

10   Q     Was this before the lawsuit began or after the lawsuit

11   began?

12   A     When you say "the lawsuit," I don't know which one you

13   are referring to or what you are referring to.

14   Q     That's a fair point.  Let me go back a step.  Do you

15   recall that a temporary restraining order was entered in our

16   about December, mid-December 2015?

17   A     Yes, yes.

18   Q     Okay.  The discussion about Sage, did that occur before

19   or after the TRO was entered?

20   A     The discussion about an alternative to Launch Coffee was

21   ongoing.  It never really stopped because Launch Coffee was

22   never going to happen, I believed.  So we had to be prepared

23   for an alternative.  So I was always evaluating the

24   marketplace for alternatives.  I could not leave the company

25   totally at risk for not having a system to manage its affairs.

*V. Papa - Cross/Mr. Schafhauser*                                    1252

1    Q    What do you mean by "Launch Coffee was never going to

2    happen"?

3    A    It was never going to be a fully implemented ERP system.

4    Q    It was a system on which you didn't rely, right?

5    A    No, that is not true.  I relied on it for information

6    regarding disbursements, purchases and payroll.

7    Q    Now, did -- did you -- you -- did Two Rivers ever make

8    the decision to implement the Sage system?

9    A    No, we did not.

10   Q    Why not?

11   A    Because we found a better alternative.

12   Q    What was the better alternative?

13   A    Plex.

14   Q    Plex?

15   A    Plex, P-L-E-X.

16   Q    And when was Plex implemented?

17   A    It's being implemented right now.

18   Q    When was it -- when was the decision first made to

19   implement Plex?

20   A    I believe February of 2016.

21   Q    And what is Plex?

22   A    Plex is an ERP system that is specifically suited to food

23   and beverage manufacturers.

24   Q    And who was involved in making the decision to implement

25   Plex?

1    A     Well, myself, and Mayer and Eugene, certainly.

2    Q     And was Steven Schreiber also involved in that

3    determination?

4    A     I don't think he participated.

5    Q     And again, I'm asking obtuse questions because I don't

6    know this field, but did someone order a program called Plex

7    at some point?

8    A     You are going to have to do better than that.

9    Q     Okay, I will try again.  At some point, a contract was

10   entered with the owner of the Plex system, yes?

11   A     With the company at Plex, yes.

12   Q     With the company?

13   A     Yes.

14   Q     And when was that contract entered into?

15   A     February of 2016.

16   Q     And what was the amount of that contract?

17   A     It's an annual subscription for the first year, I believe

18   is $58,000 because it was prorated.  And there was an

19   implementation fee, a one-time fee of 125,000.

20   Q     And the $125,000 fee has been paid?

21   A     It is in the process of being paid.  It's installments.

22   It's pay as you go.

23   Q     Okay.  So let me see if I understand.  The annual fee is

24   58,000 and that's a recurring fee each year, correct?

25   A     Correct.

1    Q    And the one-time fee is being paid over time, correct?

2    A    Over the implementation period which is six months.

3    Q    So do I have it correct that the $125,000 sum is being

4    paid in six equal installments totaling $125,000?

5    A    Except for the equal part.  They are not six equal

6    installments.  It's monthly billing.  So it depends on what

7    they do for -- in a given month.

8    Q    Now, under the contract, once the system is actually

9    installed, is there also a monthly maintenance or usage fee?

10   A    No.

11   Q    And who was responsible for implementing the Plex system?

12   A    I am.

13   Q    Okay.  Do you have anyone assisting you in that process?

14   A    Yes.

15   Q    Who do you have assisting you in that process?

16   A    Well, in addition to Plex, I have the staff of the

17   company.  It's all the key players in the company.

18   Q    Who are the key players in the company who are helping

19   you on Plex?

20   A    The core committee consists of the plant manager, Larry

21   Cruz, Vanessa who works for me in order entry, Brian who does

22   IT, Yehuda Bears (ph) who does shipping, Mercedes who does

23   logistics and I think Wardes (ph) who assists Larry.  That's

24   the core committee who is implementing Plex.

25   Q    I think you said Plex is being implemented right now.

*V. Papa - Cross/Mr. Schafhauser*                                    1255

1   What is the process -- what stage of the process is the

2   implementation of at this moment?

3   A    Well, Monday, August 8th is our second readiness

4   assessment.  If we pass that, we will implement it

5   August 22nd.

6   Q    And what information will be available as of August 22nd

7   if the second readiness assessment is successful?

8   A    Can you repeat that, please?  I'm sorry.

9   Q    Sure.  Assuming that the second readiness assessment is

10  successful --

11            THE COURT:  This sounds like a fascinating topic for

12  how best to run things going forward.  I'm missing the point

13  of how it relates to the subject matter of the hearing.

14            MR. SCHAFHAUSER:  Well, a principal question would

15  be what information is available to the company at this point

16  that's being put on to the Plex system.  To the extent that

17  it's available and the company is able to rely on it --

18            THE COURT:  Why don't we talk about what's

19  available.  But the ins and outs of a system that's new

20  doesn't strike me as -- I'm just not getting it.  So if you

21  could move on, I would appreciate it.

22            MR. SCHAFHAUSER:  I just wanted to ask what

23  information is being put on Plex.

24            THE COURT:  This will be the last question about

25  Plex and we will move on.

*V. Papa - Cross/Mr. Schafhauser*                          1256

1        MR. SCHAFHAUSER:  I just wanted to ask what

2   information is being put on place.

3        THE COURT:  This will be the last question about

4   Plex and then move on.

5   BY MR. SCHAFHAUSER (cont'd.):

6   Q    What information is being put on Plex for use by the

7   company?

8   A    It would be our item file.  It would be our inventory.

9   It will be our bills and material.  It would be invoice, open

10  invoices, customer invoice, open vendor invoices.  Open

11  purchase orders.

12  Q    Okay.  Now, we'll move on from Plex.  The Court had asked

13  me and I, of course, will comply.  This is my question.

14       The information that you just described, where is that

15  information now located?

16  A    In QuickBooks.

17  Q    So all of the information that you just described is

18  available on QuickBooks?

19  A    Yes.

20  Q    You mentioned that another of your tasks when you joined

21  Two Rivers was the preparation of financial statements; right?

22  A    Yes.

23  Q    Okay.  What financial statements do you prepare as part

24  of your duties and responsibilities for Two Rivers at the

25  present time?

1  A    Well, on an annual basis, I prepare a statement of income

2  and expense, a balance sheet, and a statement of cash flows.

3  Q    Do you prepare any monthly reports?

4  A    No.

5  Q    Do you prepare any quarterly reports?

6  A    On occasion.

7  Q    What types of reports?

8  A    The same three.  The same big three.

9         THE COURT:  Financials, balances, and cash flow?

10        THE WITNESS:  Income statement, balance sheet, cash

11  flow.  Those are the big three.

12  Q    Did you disseminate to the members of Two Rivers?

13  A    On occasion.

14  Q    When did you last prepare a quarterly report?

15  A    I did one for 2016, for March and June, so I did a

16  six-month statement about two weeks ago.

17  Q    Let me see if I understand.  You did one for March and

18  you did another one for June?

19  A    At the same time.

20  Q    So, in June, you did two statements.  One for the first

21  three months of the year and another for the second three

22  months of the year?

23  A    In July.

24  Q    In July?

25  A    Yes.

1    Q    And to whom did you provide those statements?

2    A    We had a meeting with Eugene, Mayer, and I believe Steven

3    was present for that.

4    Q    And you gave Eugene, Mayer, and Steven of the copy of the

5    quarterly statements?

6    A    Yes.

7    Q    Did he ever provide those statements to Mr. Friedman?

8    A    No.

9    Q    Why not?

10   A    Because in the past, I would e-mail Mr. Friedman and he

11   would either say, don't e-mail me, I don't read them, or call

12   me.  I don't call so I just didn't send them.  There's no real

13   reason.

14           THE COURT:  If he wants them, do you problem any

15   giving them?

16           THE WITNESS:  I have no problem.  Recently, in

17   March, he asked for me for an estimate for his tax returns and

18   I provided information.

19           THE COURT:  So you'll work that out.

20   Q    What other did you provide any weekly information to the

21   members of Two Rivers?

22   A    Well, we certainly run our accounts payable which is

23   unpaid bills, and we run our accounts receivable which is

24   uncollected receipts.  We run those pretty much daily, either

25   the members themselves run them or I run them and we discuss

1   it.

2   Q    And you do that on pretty much a daily basis during the

3   week?

4   A    Well, certainly, with Eugene.  He and I discuss things

5   constantly.  Less so with Mayer and less so with Steven.

6   Q    You probably anticipated the next question.

7        Would you have an objection providing them to

8   Mr. Friedman if he asked for those?

9   A    Well, I would without counsel.

10            THE COURT:  Sorry.

11            MR. ROSENBLATT:  This is not something he should say

12  with something production of documents from the company.  This

13  should be something that counsel should look at.  So if he

14  makes an application --

15            THE COURT:  From the perspective of consistency with

16  past practice or any way it would interfere with your

17  abilities I'll let you answer, but it doesn't commit the

18  company in anything.

19            MR. ROSENBLATT:  Okay.  Thank you.

20            THE WITNESS:  I have no problem providing

21  information to whoever asks for it if I'm allowed to again.

22  Q    All right.  Thank you.  The third responsibility that you

23  mentioned was the implementation of financial controls.  What

24  financing controls have you ever implemented while at

25  Two Rivers?

*V. Papa - Cross/Mr. Schafhauser*                                1260

1  A    Well, the primary one I instituted was recognition of

2  revenue based upon ship date so that we would not improperly

3  recognizing revenue i.e. prior to shipping.

4         THE COURT:  You'll have to explain that one to me.

5  I don't understand it.

6         THE WITNESS:  Prior to my arrival, they would ship

7  something tomorrow but recognize revenue today.  So they were

8  cheating, they didn't earn that revenue.

9         THE COURT:  They'd say they had the money before the

10  product had been shipped for which they would then receive

11  payment?

12         THE WITNESS:  The sale, not so much the money.  They

13  could inflate their sales.  They don't actually earn the right

14  to recognize the revenue on the financial statements until

15  they ship the product.

16         THE COURT:  Okay.

17         THE WITNESS:  It was a very loose cut off between

18  when it was shipped and when it was reported on the financial

19  data.  So companies could play games with their revenues.

20         THE COURT:  And you changed it from recognizing it

21  as revenue before shipment?

22         THE WITNESS:  Only when it ships.

23         THE COURT:  Only when it ships.

24         What is the relationship between either of those

25  periods and when the money that is revenue actually comes in?

1         THE WITNESS:  Well, the money that comes is against

2    our receivables, that's not quite revenue in accounting,

3    that's just cash receipts against a receipt.

4         THE COURT:  I'm showing you my ignorance.

5         Go ahead sorry.

6    EXAMINATION BY

7    MR. SCHAFHAUSER:

8    (Continuing.)

9    Q    Thank you.  You also mentioned payroll earlier.

10        Did you receive pay stubs with respect to the payments

11   that were being made to Two Rivers's employees?

12   A    Paper copies?

13   Q    Yes, you did.

14   A    Yes.

15   Q    What information was on those pay stubs?

16   A    I don't remember exactly.

17   Q    Well, putting aside what you remember today, did you

18   review the pay stubs at the time you received them?

19   A    No.

20   Q    Why not?

21   A    I had no responsibility for payroll, and the pay stub is

22   a rather, I'll say, irrelevant document.  Why would I review

23   122 pay stubs every week?

24   Q    Let me ask you this.  I don't want to argue relevance

25   with you, Mr. Papa.  This is my question.

1      Is it correct that whatever the documents have on them

2   you have the pay stubs in your possession, yes?

3   A    I have copies of pay stubs but those are not the payroll

4   records that we're required to maintain by law.

5            THE COURT:  I'm missing the difference.  What is it

6   you don't have for payroll purposes?

7            THE WITNESS:  I don't have a comparison of the hours

8   that the employee punched in or out versus the hours that were

9   paid either overtime or not, or if they were paid for sick

10  time or paid for holiday time.  I don't have that -- those

11  payroll records.

12           THE COURT:  Well, you talk about comparison between

13  sets of information.  What primary documents don't you have

14  that you need to prepare that information?

15           THE WITNESS:  I'm not preparing it per se.  I'm

16  required to retain it.

17           THE COURT:  Okay.  Are there documents that somebody

18  has that you don't have?

19           THE WITNESS:  Those documents are electronically

20  stored in Launch Coffee.

21           THE COURT:  Okay.  Go ahead.

22  Q    In addition to what's on the Launch, you do have the pay

23  stubs for whatever value they have to you; correct?

24  A    I have pay stubs, yes.

25  Q    Okay.  Now, has the lack of access to the payroll records

1   on the Launch prevented you from submitting any tax or

2   financial statement on behalf of the company?

3   A    Well, most of those -- that information that you're

4   referring to was already submitted by Mike Devine through

5   December 4th.  From January 1st, I went to an outside payroll

6   provider on Paychex.  There were three weeks in that gap that

7   I asked Mike to, as a favor to me, produce the return.  So

8   there are no outstanding issues with remitting payroll taxes

9   properly that I'm aware of.

10  Q    So which outside vendor did you go to?

11  A    Paychex.

12  Q    And Paychex was able to give you the information you

13  needed to make the appropriate filings?

14  A    Paychex generates the information starting in 2016.  They

15  make the filing, I do not.

16  Q    So Paychex made the filings for payroll taxes?

17  A    For 2016, yes.

18  Q    Very well.  And before 2016, Mr. Devine was responsible

19  for the payroll tax filings; correct?

20  A    To the best of my knowledge, yes.

21  Q    So there was no gap period for any payroll taxes were not

22  reported or accounted for; correct?

23  A    Correct.

24            THE COURT:  I'm sorry, now I'm confused again.

25            You said you're missing some payroll information

 1   that's only resident on Launch.

 2              THE WITNESS:  Yes.

 3              THE COURT:  But Paychex is generating payroll tax

 4   records.

 5              THE WITNESS:  Yes.

 6              THE COURT:  How is it able to do that without the

 7   information that you need that's on Launch?

 8              THE WITNESS:  Because the information that Paychex

 9   is using is current hours which I've captured and entered into

10   Paychex.  Paychex is preparing the current payroll and

11   remitting taxes from January 1st forward.

12              THE COURT:  Okay.

13              THE WITNESS:  Launch did it prior.

14              THE COURT:  So the information you don't have from

15   Launch is historical?

16              THE WITNESS:  Yes.

17              THE COURT:  Okay.  You need that for what.

18              THE WITNESS:  Because we're required by law to

19   maintain records of who we paid, hours, et cetera.  So it's

20   not a question of reporting or remitting.

21              THE COURT:  That's where I was --

22              THE WITNESS:  It's retained.

23              THE COURT:  Sorry.

24   EXAMINATION BY

25   MR. SCHAFHAUSER:

1   (Continuing.)

2   Q    So let me see if I understand.

3        If access to Launch were restored in some way, then the

4   issues regarding the payroll records would be moot; correct?

5   A    If access is restored, and if the data is there, then,

6   yes.

7   Q    You mentioned I think it was Meglio or DiMeglio?

8   A    Meglio, M-e-g-l-i-o.

9   Q    Meglio & Associates.  And when were they retained?

10  A    Probably January of 2016.

11  Q    And they are the outside accountants for the company now?

12  A    Yes.

13  Q    Was a contract entered into with Meglio?

14  A    There was an engagement letter signed, yes.

15  Q    Incidentally, are you aware as to whether all of the

16  members of Two Rivers authorized the engagement of Meglio &

17  Associates?

18  A    No.  All of the members did not authorize to.

19  Q    Who authorized the retention of Meglio & Associates?

20  A    I think it was Eugene and Mayer.

21  Q    And did Steven Schrieber authorize the retention of

22  Meglio & Associates?

23  A    No.

24  Q    Going back to the new system that is being implemented.

25       Did Steven Schrieber authorize the contract for the new

1    financial settlement that's being implemented?

2    A    No.

3    Q    Do you know whether Mr. Friedman authorized that

4    contract?

5    A    I don't think he did.

6    Q    What filings has Meglio & Associates prepared to date?

7    A    They did the 4th quarter payroll tax return for 2015 and

8    they did the -- reviewed financials for both 2014 and I have a

9    draft version for 2015 awaiting my sign-off.

10   Q    And, again, on the payroll tax return that Meglio &

11   Associates prepared, where did that information come from?

12   A    It was largely information I obtained from Mike and it

13   was information that was generated for the three pay periods

14   that ended 2015 before Paychex took over.  There were three

15   payrolls that I produced out of QuickBooks in that little stub

16   period.

17   Q    You testified that you received Ms. Rivera's password

18   some time after the TRO was entered; right?

19   A    Yes.

20   Q    Okay.  When you received that password, what did you do

21   on the Launch program, if anything?

22   A    I don't recall specifically.

23   Q    Was there anything on Launch that you needed and you were

24   able to obtain once you had the password that you didn't have

25   previously?

*V. Papa - Cross/Mr. Schafhauser*                                1267

1  A    Well, again, for reporting and remitting, not for

2  retaining, yes.  I did have an issue that I was currently

3  working on in response to the NLRB that we had an unfair labor

4  practice against us.  And they were requiring us to analyze

5  payroll information regarding who worked, what hours, and did

6  your overtime fluctuate and who got laid off, who got fired.

7            That's the kind of information I could readily get

8  out of Launch had I had access to Launch.  That's what I don't

9  have in QuickBooks.

10  Q    So once you received Ms. Rivera's password, you did have

11  access to that information, right?

12  A    Again, I don't remember exactly when I received it and

13  how long it was actually operational before it was turned off.

14  Q    Let me start with a second question.  When was it turned

15  off?

16  A    I don't remember exactly.

17  Q    I think you testified on direct your best estimate is it

18  some time in February 2016; correct?

19  A    Okay.

20            THE COURT:  Just tell me what your best recollection

21  is.  My recollection is what you said before February or

22  either side of it.

23            THE WITNESS:  Yes, exactly.

24            THE COURT:  Any more specificity that you have?

25            THE WITNESS:  Not that I'm aware of, no.

1          THE COURT:  Go ahead.

2    Q    All right.  So I want to now place another date before

3    you, Mr. Papa.

4          Could you please turn to exhibit, Plaintiff's

5    Exhibit 101.  It's in the biggest of the binders.

6    A    Okay.

7    Q    Do you recognize this --

8          MR. SCHAFHAUSER:  Well, withdrawn.

9    Q    Have you seen this e-mail from Mr. Finkel to Mr. Nelkin

10   dated December 15, 2015, prior to today?

11   A    No.

12   Q    Well, take a look to says, "Cafe 9474."  Are you familiar

13   with that password?

14   A    I've seen that password, yes.

15   Q    When did you first see that password?

16   A    I don't remember exactly.

17   Q    Okay.  Do you know what that password is for?

18   A    I believe it's nor Sonya.

19   Q    And did you use that password at whatever point you first

20   saw it?

21   A    I used the password, yes.

22   Q    And is that the password that you are referring to that

23   you received to access her Launch capabilities?

24   A    Yes.

25   Q    Does this refresh your recollection that you received the

*V. Papa - Cross/Mr. Schafhauser*                              1269

1   password in or about December 2015?

2   A     Well, this not saying I received it.

3              THE COURT:  He's asking -- lawyers use this phrase a

4   lot, "Does this refresh your recollection?"

5              You weren't able to pin down a date, and the

6   question that's being asked when he says, "Does it refresh

7   your recollection," you look at this piece of paper now do you

8   remember it?

9              THE WITNESS:  If I received it earlier than

10  February, yes.  But when I did, that's the problem with

11  guessing.  So I will no longer guess.

12  Q     I don't want to you guess, Mr. Papa.  Let me move on.

13        I want to show another password, though, in the same

14  timeframe.  If you look now, there's a smaller binder.  It's

15  the Defendant's Exhibit and it's Exhibit 2.  It's the first

16  exhibit in that binder.

17  A     Okay.

18  Q     Are you at Defendant's Exhibit 2, Mr. Papa?

19  A     Yes.

20  Q     Have you ever seen this e-mail dated December 15, 2015,

21  from me to Mr. Nelkin?

22  A     No.

23  Q     Already.  I just want to ask you about one of the

24  passwords.  It says, "Coffee dollar 12 x."  Do you see that?

25  A     Yes.

*V. Papa - Cross/Mr. Schafhauser*                                    1270

1    Q    Are you familiar with that password?

2    A    No.

3    Q    Have you ever used such a password to your recollection?

4    A    To the best of my recollection, no.

5    Q    The second page of there's another e-mail that refers to

6    "EF18414XY."

7         First of all, before we get to the password, have you

8    ever seen this e-mail from me to Mr. Nelkin dated December 15,

9    2015?

10   A    No.

11   Q    Okay.  Do you recognize the password that I just read out

12   to you?

13   A    No.

14   Q    Have you ever used a password to access Mr. Friedman's

15   computer in Two Rivers?

16   A    Me?

17   Q    Yes?

18   A    No.

19   Q    Do you know whether anyone else has accessed

20   Mr. Friedman's computer since the TRO was entered?

21   A    To the best of my knowledge, no.

22   Q    Mr. Friedman's computer was stored in a locked office is

23   I think what I heard you say.

24   A    Yes.

25   Q    Was the computer on or off?

1    A    I don't know.

2    Q    Did you ever enter the office to see what was going on

3    with the computer?

4    A    Did I ever enter his office to see what was going on with

5    the computer.

6    Q    Yes?

7    A    No.

8    Q    Do you know whether anyone else entered Mr. Friedman's

9    office to access a computer at any time since the TRO was

10   entered?

11   A    Yes.

12   Q    Who?

13   A    Well, the recent forensic company think accessed the

14   office.  And Jay Nelkin accessed the office.

15   Q    When did Mr. Nelkin access the office?

16   A    I don't recall when.

17   Q    Was it before or after the forensic team went to the

18   office?

19   A    It was before.

20   Q    About how long before?

21   A    Maybe a month, I don't remember.  I'm not guessing.  I

22   don't remember.

23   Q    And what do you know -- were you there when Mr. Nelkin

24   accessed the computer?

25   A    He did not access the computer he accessed the office.

*V. Papa - Cross/Mr. Schafhauser*                    1272

1   Q    Okay.

2   A    He was in the office.  I was present with him in the

3   office.

4   Q    You were present at all times when he was in the office?

5   A    Yes.

6   Q    What was he doing in the office of Mr. Friedman?

7   A    Just looking just trying to see what was in there.  Just

8   looking.

9   Q    Did anyone turn on the computer?

10  A    No.

11  Q    Was the computer on?

12  A    I didn't look at the computer so I can't answer that.

13          THE COURT:  Anyone take any action with the computer

14  while you were in there?

15          THE WITNESS:  Not in my presence.  Absolutely not.

16          THE COURT:  Next subject.

17  Q    Did anyone take any materials from Mr. Friedman's office?

18  A    No.

19  Q    Okay.  Could we move then to D-25 which is a smaller

20  binder, Mr. Papa?

21  A    Okay.

22  Q    You've interacted with Benzion Nussbaum.

23       You recognize this e-mail with Mr. Nussbaum dated

24  December 11, 2014?

25  A    Do I recognize it?

V. Papa - Cross/Mr. Schafhauser                    1273

1    Q     Yes.

2    A     It's a text message, so yes.

3    Q     You see where it says, "Coffee dollar 12 x."  Do you see

4    that?

5    A     Yes.

6    Q     Does that refresh your recollection that the password

7    that I showed you a moment ago in the e-mail dated

8    December 15, 2015, you had received on December 11, 2014, from

9    Mr. Nussbaum?

10   A     Yes, it looks like I received this password, yes.

11   Q     Okay.  Now, could you please flip to the next, actually,

12   the third page.  It looks like it's a text from you to him

13   saying did not work.  Do you see that?

14   A     Yes.

15   Q     Okay.  And you flip to the next page and it says now it

16   did.

17         Do you see that?

18   A     Yes.

19   Q     And the next page says he's asking you, "Did they get you

20   up and running?"  Do you see that?

21   A     Yes.

22   Q     Okay.  And your answer on the next page is yes.  Do you

23   see that?

24   A     Yes.

25   Q     Does that refresh your recollection that in December 2014

1    you have the password and got up and running in Launch based

2    on that password?

3    A    It doesn't really reflect -- refresh my recollection as

4    to what I got up and running, or what I was doing with this.

5    It doesn't -- it's not informative enough really to help me

6    understand what's going on here.  I do recognize that I have

7    the password.  What the password is to, I don't really

8    remember.

9    Q    Very well.

10   A    It's two years ago.

11   Q    I understand it's two years ago.  I don't remember what I

12   had for breakfast this morning.  So let me move to a more

13   general question then.

14        Did you receive assistance from Mr. Nussbaum in accessing

15   Launch when you needed access to Launch?

16   A    Yes.

17   Q    You were asked on direct about books and records.

18        What books and records do you have available to you with

19   respect to Two Rivers Coffee?

20   A    I have the invoicing that we did.  I would have the

21   orders from customers perhaps.  I have limited vendor invoices

22   or accounts payable.  And I have the financial statements that

23   I produced from the QuickBooks system.

24   Q    Putting aside the QuickBooks system information where are

25   the physical documents located?

*V. Papa - Cross/Mr. Schafhauser*                              1275

1   A     They're in a file room that doubles as our server room

2   and they're in two other offices.

3   Q     Have you ever asked, putting aside Mr. Friedman, have you

4   asked Mr. Koenig or Mr. Papa -- I'm sorry, Mr. Koenig or

5   Mr. Eugene Schrieber or Mr. Steven Schrieber for books and

6   records that you believed you needed relating to the company?

7   A     Yes.

8   Q     When did you last do that?

9   A     During the course of my employment as the need arose.

10  Q     And do you recall when you last received books and

11  records from the Schriebers or Mr. Koenig?

12  A     Well, I received information from Eugene Schrieber

13  frequently, so constantly, not constantly, but frequently.

14  Q     Let me put before you a document it's Exhibit 11.

15  Defendant's Exhibit 11, Mr. Papa.  And if you would take a

16  look at the -- it's Page 21 of Defendant's Exhibit 11?

17  A     Okay.

18  Q     On Page 21, there is a Paragraph 1 it says, "Plaintiff

19  has documents Bates-stamped SS000001 to SS12192."  And then it

20  goes on, we can all read those words.

21        My question to you is simply:  Have you ever had access

22  to those documents?

23  A     I've never seen this.  I don't know what this is

24  referring to.

25  Q     You don't know what documents are encompassed by this;

*V. Papa - Cross/Mr. Schafhauser*                                 1276

1   correct?

2   A    I have never seen this.

3   Q    Okay.  Do you know whether plaintiff has compiled

4   documents, 12,000-plus pages of documents, for purposes of

5   this case, or is this a first you're learning about this?

6   A    This is a first I'm seeing this document.  I don't know

7   what this is referring to.

8   Q    Putting aside the document, did you know --

9         MR. SCHAFHAUSER:  Well, withdrawn.

10  Q    Putting aside the document, are you aware as to whether

11  plaintiff has, approximately, 12,000-plus documents that he

12  has identified as available.  Were you aware of that before

13  today?

14  A    No.

15  Q    Have you ever seen those documents so far as you know?

16  A    I don't know what they're referring to so I don't know.

17  Q    Very well, I'll move on.

18        Now, are there file cabinets that possess hard copies of

19  Two Rivers documents that are maintained in South Plainfield?

20  A    Yes.

21  Q    Where are those file cabinets located within the

22  facility?

23  A    They're in some in my office, some in you want the names

24  of employees.

25  Q    Yes, please?

*V. Papa - Cross/Mr. Schafhauser*                    1277

1   A     Nicole Barge would have file cabinets and Sue Herzog

2   would have file cabinets.

3   Q     Anyone else?

4   A     There used to be filing cabinets in Sonya's office.  I

5   don't remember offhand if they're 'till there.  I don't think

6   they are.  That's off the top of my head.

7   Q     That's okay.  We can only ask you what you remember

8   Mr. Papa.

9         Generally, can you describe to me what documents are in

10  your file cabinets with respect to Two Rivers's books and

11  records?

12  A     I would have some of the legal contracts, the legal

13  bills.  I try need to keep them generally filed.  I would have

14  some of the tax returns, I'm sorry, there's also records in we

15  have a payroll administrator.  There would be books and

16  records in her office as well.

17  Q     Who is the payroll administrator?

18  A     Lety Manriquez.

19  Q     Thank you.  Going back to your books and records?

20  A     I would have try to have some he certificate of formation

21  that I obtained recently.  I might have the tax authority

22  information with New Jersey.  I would have corporate papers if

23  I can loosely describe them as that.

24  Q     And how voluminous would you say these are?

25  A     Not much.  One file cabinet.

1    Q    One file cabinet?

2    A    I have financial statements that I produced.  I have of

3    those pay stubs I alluded to earlier taking up space.  I have

4    some of the prior copies of the credit card disbursement

5    receipts that I obtained.  I have those.  I might have

6    invoices for the fixed assets that was a big part of the

7    restatement for 2012.  I would have the reviewed financial

8    statements independently prepared.

9    Q    Anything else?

10   A    No.

11   Q    All right.  You mentioned Nicole Barge.  What books and

12   records are in her possession, custody, and control?

13   A    Either accounts receivable related, or some accounts

14   payable.  Customer or vendor.

15   Q    And how voluminous are those documents?

16   A    Two lateral file cabinets.

17   Q    Anything else that you know about with respect to

18   Ms. Barge's books and records or, rather, the books and

19   records in her possession?

20   A    Anything else?  No.

21   Q    All right.  Ms. Herzog, you mentioned Sue Herzog, what

22   books and records are in custody and possession?

23   A    She would have some accounts payable as well and she

24   would have some accounts receivable and invoicing.

25   Q    And how volume up knows are those documents?

1    A     She has four file cabinets, I believe.  Two lateral and

2    two vertical.

3    Q     And then you mentioned Ms. I think it's Lety Marquez?

4    A     Manriquez.

5    Q     I can't read my own writing.  And I think you said was

6    she has payroll records, yes?

7    A     Yes.

8    Q     What kind of payroll records does she have.

9    A     She has payroll reports produced from Paychex starting in

10   2016.

11   Q     Now, when you -- whatever it was that you got the

12   password for Launch which we went through a moment ago.  When

13   you accessed Launch did you take any steps to download the

14   information or record the information in any way?

15   A     Did I download?  Definitely not.  And there was nothing

16   new to record at that time.  And I wasn't using that system

17   going forward.  So, no, there was nothing new to record.

18   Q     So there was no reason to record anything from a Launch

19   at that point when you got access?

20   A     There was a reason to retrain, we seem to be repeating

21   ourselves.  The goal is to retrain historical records.  That's

22   what's missing.  I don't use Launch to generate new

23   information.

24   Q     So if I can ask this question, Mr. Papa.

25         Other than the retention issue, the company hasn't been

1  unable to function in any way because of the loss of Launch;

2  correct?

3  A    Well, again, I had a problem with the NLRB case that I

4  could not easily generate that information.  And we're in

5  violation of state laws requiring us to retain information

6  that's like, "Other than the play, Mrs. Lincoln, how did you

7  like the play?"

8          We're in violation of law, we don't have adequate

9  records to support the financial statements I produced that I

10  reviewed and the basis of the tax returns.

11  Q    Has it come to your attention, by the way, that an effort

12  was made to reinstitute Launch?  Were you aware of that?

13  A    Not really, no.

14  Q    No.  Did anyone provide you with instructions to try to

15  access Launch?

16  A    No.

17  Q    Within the last week?

18  A    No.

19  Q    This is the first you're hearing about this?

20  A    I heard a discussion about providing access or overheard

21  comments.  Nobody spoke to me specifically about accessing

22  Launch.

23  Q    What did you overhear?  What comments did you overhear

24  about the issue?

25  A    That there was some discussion about providing us access

*V. Papa - Cross/Mr. Schafhauser*                              1281

1    to Launch.

2    Q    But no one forwarded to you any instructions that could

3    be used to access Launch?

4    A    Correct.

5    Q    Now, I just want to be clear.  Could you please turn to

6    Exhibit 33.

7    A    In defendant's?

8    Q    Yes, Defendant's Exhibit 33.

9          THE COURT:  I'm sorry, Defendant's 33.

10          MR. SCHAFHAUSER:  Your Honor, I think you got the

11    small book here in front of you.

12    Q    Have you seen this e-mail from me to Mr. Parness dated

13    July 29, 2016, before now?

14    A    No.

15    Q    Let me --

16          MR. SCHAFHAUSER:  Your Honor, I see it's

17    5:00 o'clock.

18          THE COURT:  Why don't we suspend.  There's a matter

19    I'd like to discuss with you before we break for the day.

20          MR. SCHAFHAUSER:  Yes, of course.

21          THE COURT:  So you can stay or go as you like.

22          On this, what's the status?  Maybe Mr. Nelkin or

23    Ms. Nelkin, to what extent have the instructions that were in

24    the July 29th e-mail been attempted?

25          MR. NELKIN:  I forwarded that exact e-mail to Stroz.

*Proceedings*                                                    1282

1          THE COURT:  Stroz has tried this without success.

2          MR. NELKIN:  I asked them to do it just to test it

3    if it worked for Vince.

4          THE COURT:  And earlier in the week, I asked all of

5    you to arrange for Stroz and Mr. Nussbaum, whoever needs to be

6    in the room together, to sit down and do it.

7          MR. NELKIN:  We discussed it today, your Honor.

8          THE COURT:  Tonight, please.  Tonight.  Let me know

9    in the morning.

10         Anything else before we break.

11         MR. GRANTZ:  Mr. Goldbarg came here today to address

12   that issue, that's what he was trying to tell you.  He came up

13   here and said, I'm trying to facilitate that with Ben.  So he

14   left.  But that's what he was trying to express.

15         THE COURT:  Mr. Nussbaum is not a party to this, you

16   folks are getting it done tonight, please.

17         MR. SCHAFHAUSER:  Yes, Your Honor.

18         THE COURT:  Have a good night, everybody.

19         MR. NELKIN:  Thank you.

20         MR. SCHAFHAUSER:  Thank you.

21         (Witness leaves the witness stand.)

22         (WHEREUPON, this matter was adjourned to August 4,

23   2016, at 9:30 a.m.)

24

25                          *   *   *

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

1283

1                    I N D E X

2

3    WITNESS                                          PAGE

4       JORGE SALCEDO

5       DIRECT EXAMINATION                            1061

6       BY MR. NELKIN

7       CROSS-EXAMINATION                             1154

8       BY MR. FINKEL

9       CROSS-EXAMINATION                             1163

10      BY MR. SCHAFHAUSER

11      CROSS-EXAMINATION                             1175

12      BY MR. BERGSON

13      CROSS-EXAMINATION                             1176

14      BY MR. FELDMAN

15      REDIRECT EXAMINATION                          1178

16      BY MR. NELKIN

17      RECROSS-EXAMINATION                           1185

18      BY MR. SCHAFHAUSER

19

20      VINCENT PAPA

21      DIRECT EXAMINATION                            1194

22      BY MS. NELKIN

23      CROSS-EXAMINATION                             1238

24      BY MR. SCHAFHAUSER

25

## $

**$1,400** [1] - 1122:4
**$1,500** [1] - 1069:12
**$100** [1] - 1168:16
**$120** [1] - 1141:12
**$125,000** [3] - 1253:20, 1254:3, 1254:4
**$130** [1] - 1141:12
**$20** [1] - 1112:15
**$200** [4] - 1128:4, 1128:10, 1144:22, 1168:16
**$29** [1] - 1112:20
**$300** [1] - 1144:22
**$324.37** [1] - 1122:4
**$5,000** [1] - 1120:18
**$5,200** [1] - 1120:9
**$58,000** [1] - 1253:18
**$80,000** [1] - 1140:3
**$83,150** [2] - 1120:7, 1120:16
**$900** [1] - 1069:8

## '

**'13** [1] - 1247:23
**'14** [1] - 1247:23
**'till** [2] - 1121:5, 1277:5

## 0

**020** [1] - 1129:12
**09** [1] - 1129:12

## 1

**1** [3] - 1229:1, 1231:9, 1275:18
**10** [1] - 1100:19
**100** [2] - 1111:3, 1177:12
**101** [1] - 1268:5
**108** [2] - 1130:18, 1132:13
**1099** [1] - 1073:19
**1099s** [1] - 1226:24
**10th** [1] - 1233:13
**11** [5] - 1272:24, 1273:8, 1275:14, 1275:15, 1275:16
**112** [2] - 1102:19, 1182:9
**11201** [1] - 1060:15
**12** [2] - 1269:24, 1273:3
**12,000-plus** [2] - 1276:4, 1276:11

**122** [1] - 1261:23
**125,000** [1] - 1253:19
**128** [3] - 1228:17, 1228:20, 1229:8
**132** [2] - 1183:13, 1184:11
**14** [1] - 1203:2
**141** [1] - 1062:17
**15** [9] - 1128:18, 1149:9, 1149:11, 1238:11, 1239:5, 1268:10, 1269:20, 1270:8, 1273:8
**15,000** [1] - 1202:25
**150** [1] - 1111:6
**1567** [1] - 1061:24
**1567@gmail.com** [1] - 1115:18
**158** [1] - 1231:10
**160** [1] - 1150:20
**163rd** [1] - 1150:1
**164th** [1] - 1150:1
**165th** [1] - 1062:18
**19,000** [1] - 1202:25
**1st** [4] - 1100:6, 1100:8, 1263:5, 1264:11

## 2

**2** [4] - 1092:16, 1093:3, 1269:15, 1269:18
**20** [6] - 1148:3, 1149:9, 1149:11, 1150:8, 1215:8, 1218:15
**200** [2] - 1111:5, 1111:6
**2012** [14] - 1074:7, 1205:10, 1226:23, 1227:7, 1227:8, 1227:9, 1243:17, 1243:23, 1244:2, 1244:4, 1244:5, 1247:23, 1278:7
**2013** [19] - 1120:2, 1120:8, 1120:17, 1120:20, 1120:23, 1121:9, 1121:13, 1121:15, 1160:9, 1160:11, 1194:25, 1202:2, 1239:2, 1243:18, 1244:2, 1244:3, 1245:24, 1250:7, 1250:19
**2014** [13] - 1119:2, 1120:6, 1120:16, 1121:13, 1121:14, 1226:23, 1227:9,

1245:24, 1248:17, 1266:8, 1272:24, 1273:8, 1273:25
**2015** [17] - 1068:8, 1092:22, 1203:2, 1218:16, 1227:10, 1234:24, 1250:25, 1251:6, 1251:16, 1266:7, 1266:9, 1266:14, 1268:10, 1269:1, 1269:20, 1270:9, 1273:8
**2016** [13] - 1220:22, 1250:25, 1251:6, 1252:20, 1253:15, 1257:15, 1263:14, 1263:17, 1263:18, 1265:10, 1267:18, 1279:10, 1281:13
**21** [3] - 1175:23, 1275:16, 1275:18
**22** [1] - 1175:23
**225** [1] - 1060:14
**22nd** [2] - 1255:5, 1255:6
**25** [1] - 1062:12
**26** [5] - 1060:11, 1142:21, 1142:22, 1142:25, 1176:12
**29** [1] - 1281:13
**29th** [1] - 1281:24
**2:00** [1] - 1185:15
**2nd** [2] - 1100:5, 1100:20

## 3

**3** [2] - 1092:22, 1182:10
**30** [4] - 1062:5, 1062:7, 1149:1, 1215:8
**32** [3] - 1099:16, 1099:17, 1100:15
**33** [8] - 1116:13, 1116:17, 1116:19, 1119:6, 1161:23, 1281:6, 1281:8, 1281:9
**34** [3] - 1116:17, 1118:5, 1163:3
**35** [2] - 1204:1, 1204:6

## 4

**431** [5] - 1106:5, 1149:17, 1149:24, 1149:24, 1150:20
**4th** [3] - 1226:12, 1263:5, 1266:7

## 5

**5,000** [1] - 1120:17
**50** [1] - 1141:18
**58,000** [1] - 1253:24
**5:00** [2] - 1100:13, 1281:17
**5:07** [1] - 1100:21

## 6

**6** [7] - 1092:13, 1092:14, 1092:18, 1100:19, 1228:20, 1229:1, 1229:8

## 7

**7:00** [3] - 1065:23, 1087:5, 1121:5

## 8

**8** [2] - 1130:19, 1132:14
**87** [3] - 1125:5, 1125:6
**8:00** [2] - 1087:7, 1121:6
**8th** [1] - 1255:3

## 9

**900** [1] - 1072:25
**9474** [1] - 1268:12

## A

**abilities** [1] - 1259:17
**ability** [2] - 1151:11, 1191:4
**able** [15] - 1070:19, 1075:23, 1120:9, 1167:17, 1168:6, 1168:15, 1220:4, 1224:14, 1225:15, 1230:25, 1255:17, 1263:12, 1264:6, 1266:24, 1269:5
**Absolutely** [1] - 1190:4
**absolutely** [2] - 1225:7, 1272:15
**abused** [1] - 1104:17
**accepted** [2] - 1223:12, 1241:20
**Access** [1] - 1100:19
**access** [74] - 1101:4, 1113:17, 1157:9, 1164:3, 1172:24, 1179:1, 1179:2,

1203:2, 1203:6, 1203:9, 1203:11, 1203:12, 1208:4, 1208:6, 1209:20, 1210:7, 1210:12, 1210:14, 1210:15, 1210:16, 1210:18, 1210:19, 1210:22, 1210:25, 1211:1, 1211:21, 1212:11, 1212:17, 1212:19, 1212:20, 1214:23, 1215:1, 1215:2, 1215:25, 1218:18, 1218:24, 1220:7, 1220:11, 1220:13, 1220:17, 1221:1, 1221:15, 1222:6, 1225:9, 1225:10, 1225:15, 1225:17, 1234:9, 1234:10, 1235:3, 1235:13, 1235:18, 1235:19, 1235:20, 1236:5, 1236:25, 1262:25, 1265:3, 1265:5, 1267:8, 1267:11, 1268:23, 1270:14, 1271:9, 1271:15, 1271:25, 1274:15, 1275:21, 1279:19, 1280:15, 1280:20, 1280:25, 1281:3
**accessed** [7] - 1203:4, 1270:19, 1271:13, 1271:14, 1271:24, 1271:25, 1279:13
**accessible** [1] - 1164:7
**accessing** [2] - 1274:14, 1280:21
**accordance** [1] - 1241:19
**according** [4] - 1063:2, 1081:11, 1115:24, 1116:1
**account** [19] - 1070:5, 1070:17, 1070:18, 1070:24, 1070:25, 1072:12, 1072:13, 1115:8, 1115:9, 1115:12, 1115:21, 1116:14, 1116:21, 1124:17, 1153:2, 1153:6, 1162:13, 1216:8, 1231:6
**accountant** [5] - 1195:10, 1195:12, 1195:19, 1227:2, 1242:5

**accountant's** [1] - 1195:21
**accountants** [1] - 1265:11
**accounted** [1] - 1263:22
**accounting** [8] - 1194:19, 1222:18, 1223:12, 1223:21, 1224:11, 1241:20, 1242:11, 1261:2
**accounts** [23] - 1070:6, 1071:2, 1071:10, 1071:12, 1071:25, 1072:11, 1072:19, 1091:19, 1091:20, 1115:15, 1115:19, 1216:18, 1228:11, 1247:2, 1249:9, 1249:10, 1258:22, 1258:23, 1274:22, 1278:13, 1278:23, 1278:24
**accumulated** [2] - 1212:9, 1213:10
**accurate** [1] - 1247:16
**Ace** [1] - 1132:1
**acting** [1] - 1242:5
**action** [1] - 1272:13
**actual** [2] - 1211:1, 1229:16
**add** [4] - 1104:21, 1186:11, 1242:18, 1249:8
**add-on** [2] - 1242:18, 1249:8
**added** [1] - 1242:18
**addition** [7] - 1157:21, 1215:24, 1222:8, 1222:15, 1226:8, 1254:16, 1262:22
**additional** [2] - 1163:3, 1226:8
**additionally** [1] - 1110:12
**address** [12] - 1061:23, 1071:18, 1071:19, 1118:19, 1149:24, 1150:4, 1162:22, 1162:23, 1175:19, 1175:21, 1204:15, 1204:17
**addresses** [2] - 1149:25, 1205:4
**adequate** [2] - 1201:5, 1280:8
**adjust** [3] - 1094:6, 1094:19, 1095:9
**adjusted** [2] - 1094:22, 1159:15

**adjustment** [2] - 1215:8, 1215:12
**adjustments** [2] - 1129:11
**administrative** [4] - 1205:9, 1207:7, 1209:12, 1215:19
**administrator** [3] - 1204:14, 1277:15, 1277:17
**advice** [1] - 1107:19
**advise** [2] - 1230:4, 1231:4
**advised** [3] - 1107:20, 1226:9, 1231:9
**affairs** [1] - 1251:25
**affidavit** [7] - 1112:3, 1131:1, 1132:7, 1132:10, 1132:15, 1132:23, 1133:5
**affidavits** [1] - 1132:16
**afternoon** [5] - 1100:12, 1154:3, 1175:14, 1236:15, 1238:20
**aggregator** [1] - 1239:16
**ago** [29] - 1062:5, 1062:12, 1065:15, 1071:13, 1082:13, 1082:14, 1103:8, 1131:21, 1132:1, 1133:2, 1133:9, 1144:4, 1149:1, 1149:9, 1149:11, 1150:8, 1167:25, 1168:3, 1168:5, 1168:13, 1257:16, 1273:7, 1274:10, 1274:11, 1279:12
**agree** [1] - 1213:12
**agreed** [2] - 1210:3, 1215:22
**agreement** [4] - 1119:12, 1187:20, 1192:3, 1199:20
**ahead** [26] - 1061:10, 1069:25, 1088:17, 1095:4, 1105:8, 1108:24, 1125:17, 1139:7, 1139:14, 1161:21, 1167:15, 1185:4, 1189:21, 1191:13, 1202:3, 1207:18, 1211:16, 1222:2, 1224:7, 1224:9, 1237:17, 1245:11, 1249:18, 1261:5, 1262:21,

1268:1
**Ahearn** [7] - 1063:5, 1063:6, 1063:7, 1080:1, 1080:7, 1080:12
**Ahearns** [17] - 1062:3, 1062:6, 1062:11, 1075:3, 1079:17, 1081:4, 1081:23, 1081:25, 1109:19, 1137:4, 1144:22, 1145:1, 1148:14, 1149:16, 1151:6, 1151:9, 1152:21
**Ahern** [1] - 1148:25
**aide** [2] - 1209:12, 1215:19
**air** [1] - 1077:12
**Akeev** [1] - 1186:4
**alike** [1] - 1184:13
**all-around** [1] - 1064:12, 1074:16, 1154:4
**all-encompassing** [1] - 1230:20
**all-in-one** [1] - 1073:14
**alleged** [1] - 1182:12
**alleging** [2] - 1098:12, 1192:16
**Allen** [13] - 1094:6, 1094:15, 1094:16, 1094:25, 1095:6, 1095:11, 1096:16, 1159:4, 1159:9, 1159:12, 1159:13, 1159:14, 1171:8, 1171:10, 1171:11, 1171:19
**allow** [3] - 1093:24, 1191:1, 1241:19
**allowed** [3] - 1091:2, 1234:9, 1259:21
**allowing** [1] - 1191:21
**allows** [1] - 1192:6
**alluded** [2] - 1237:3, 1278:3
**alternative** [1] - 1251:4, 1251:20, 1251:23, 1252:11, 1252:12
**alternatives** [1] - 1251:24
**Amazon** [1] - 1133:16
**amount** [9] - 1120:4, 1122:17, 1122:20, 1125:3, 1142:1, 1169:25, 1231:5, 1253:16
**amounts** [1] - 1122:4

**analyze** [1] - 1267:4
**AND** [4] - 1060:3, 1060:5, 1060:8, 1060:12
**ANDREW** [1] - 1060:7
**annual** [3] - 1253:17, 1253:23, 1257:1
**answer** [18] - 1065:6, 1086:1, 1130:24, 1139:8, 1139:10, 1142:15, 1144:7, 1144:9, 1146:17, 1146:18, 1150:16, 1150:17, 1183:7, 1189:3, 1220:11, 1259:17, 1272:12, 1273:22
**anticipated** [2] - 1211:18, 1259:6
**anyway** [1] - 1138:10
**apart** [8] - 1100:21, 1165:18, 1165:19, 1166:6, 1166:16, 1166:22, 1166:23, 1167:9
**apologize** [3] - 1060:18, 1154:23, 1219:9
**app** [1] - 1212:8
**appear** [5] - 1100:20, 1162:10, 1193:9, 1197:17, 1197:23
**appearance** [2] - 1187:5, 1193:13
**Apple** [7] - 1131:25, 1132:3, 1132:10, 1132:19, 1132:23, 1132:24, 1165:12
**application** [1] - 1259:14
**applying** [1] - 1246:25
**appreciate** [1] - 1255:21
**appropriate** [5] - 1223:8, 1223:9, 1228:5, 1228:6, 1263:13
**approve** [2] - 1216:5, 1216:17
**approximate** [1] - 1234:20, 1245:4
**arbitration** [1] - 1192:4
**area** [6] - 1069:9, 1074:6, 1078:7, 1088:20, 1100:20, 1215:3
**Argo** [1] - 1067:7
**argue** [3] - 1180:14, 1183:10, 1261:24

**arguing** [1] - 1180:2
**argument** [9] - 1099:25, 1103:16, 1154:14, 1154:15, 1154:25, 1179:25, 1180:1, 1180:4, 1180:5
**arguments** [5] - 1154:18, 1154:20, 1156:17, 1192:2, 1192:8
**arose** [1] - 1275:9
**arrested** [1] - 1150:9
**arrival** [2] - 1201:25, 1260:6
**arrive** [1] - 1202:1
**aside** [7] - 1118:19, 1232:11, 1261:17, 1274:24, 1275:3, 1276:8, 1276:10
**assembly** [1] - 1088:8
**assert** [2] - 1192:23, 1192:25
**asserting** [1] - 1193:1
**assessment** [3] - 1255:4, 1255:7, 1255:9
**asset** [1] - 1223:18
**assets** [1] - 1278:6
**assist** [1] - 1248:9
**assistance** [1] - 1274:14
**assistant** [2] - 1069:5, 1205:9
**assistant's** [1] - 1145:22
**Assisted** [1] - 1060:17
**assisted** [1] - 1156:10
**assisting** [2] - 1254:13, 1254:15
**assists** [1] - 1254:23
**Associated** [2] - 1084:2, 1152:15
**associated** [3] - 1062:15, 1082:10, 1082:17
**Associates** [7] - 1195:22, 1265:9, 1265:17, 1265:19, 1265:22, 1266:6, 1266:11
**associating** [1] - 1218:11
**assume** [9] - 1140:17, 1192:19, 1192:20, 1193:14, 1203:22, 1219:2, 1219:3, 1229:15, 1241:2
**assumed** [3] - 1097:11, 1226:5

**assumes** [1] - 1061:5
**assuming** [3] - 1086:25, 1106:5, 1255:9
**ATM** [5] - 1071:21, 1071:25, 1128:1, 1128:7, 1128:12
**attack** [1] - 1132:4
**attempt** [2] - 1229:4, 1246:22
**attempted** [2] - 1222:24, 1281:24
**attempting** [1] - 1247:6
**attempts** [1] - 1248:13
**attention** [7] - 1154:12, 1161:8, 1161:23, 1163:2, 1204:1, 1228:16, 1280:11
**attitude** [1] - 1180:11
**attorney** [4] - 1186:25, 1187:1, 1189:8, 1190:9
**attorney's** [1] - 1192:16
**attributing** [1] - 1182:18
**August** [3] - 1255:3, 1255:5, 1255:6
**authentic** [1] - 1116:24
**authorities** [2] - 1206:14
**authority** [2] - 1089:7, 1277:21
**authorization** [1] - 1188:18
**authorize** [3] - 1265:18, 1265:21, 1265:25
**authorized** [6] - 1188:16, 1198:3, 1232:18, 1265:16, 1265:19, 1266:3
**automatic** [3] - 1134:3, 1134:17, 1134:20
**automatically** [6] - 1113:25, 1134:16, 1134:23, 1134:24, 1153:1, 1153:3
**available** [12] - 1146:16, 1189:19, 1210:10, 1247:18, 1250:3, 1255:6, 1255:15, 1255:17, 1255:19, 1256:18, 1274:18, 1276:12
**Avenue** [3] - 1061:24,

1148:5, 1148:8
**AVERY** [1] - 1060:2
**awaiting** [1] - 1266:9
**aware** [18] - 1092:8, 1161:18, 1172:15, 1195:15, 1196:17, 1199:19, 1199:20, 1225:19, 1225:20, 1225:23, 1226:14, 1242:2, 1263:9, 1265:15, 1267:25, 1276:10, 1276:12, 1280:12
**awhile** [1] - 1134:9, 1138:15

## B

**backbone** [1] - 1200:21
**background** [3] - 1189:17, 1194:18, 1221:24
**backup** [1] - 1216:9
**bad** [5] - 1065:19, 1065:20, 1120:3, 1131:19, 1180:15
**balance** [2] - 1257:2, 1257:10
**balances** [3] - 1244:21, 1245:7, 1257:9
**ball** [1] - 1177:12
**Bank** [1] - 1070:21
**bank** [10] - 1070:17, 1070:18, 1070:20, 1071:2, 1071:6, 1071:16, 1071:25, 1124:17, 1127:18, 1127:24
**banks** [1] - 1070:22
**barely** [1] - 1084:9
**Barge** [2] - 1277:1, 1278:11
**barge's** [1] - 1278:18
**based** [6] - 1184:11, 1228:6, 1246:6, 1248:2, 1260:2, 1274:1
**basis** [5] - 1210:11, 1227:25, 1257:1, 1259:2, 1280:10
**Bates** [1] - 1275:19
**Bates-stamped** [1] - 1275:19
**bathroom** [1] - 1126:9
**bean** [1] - 1241:21
**Beans** [4] - 1115:21, 1116:14, 1116:20, 1162:13

**Bears** [1] - 1254:22
**became** [4] - 1160:13, 1160:16, 1195:12, 1226:6
**become** [4] - 1110:1, 1225:19, 1225:20, 1233:7
**began** [9] - 1197:25, 1198:2, 1239:1, 1242:13, 1242:16, 1242:21, 1247:3, 1251:10, 1251:11
**behalf** [7] - 1089:22, 1186:21, 1186:23, 1192:20, 1206:20, 1235:15, 1263:2
**belief** [2] - 1227:25, 1228:2
**belonged** [3] - 1169:8, 1171:15, 1171:17
**belongs** [1] - 1171:18
**Ben** [3] - 1210:15, 1210:17, 1219:5
**bend** [1] - 1088:13
**Benkowski** [1] - 1246:20
**Benzion** [1] - 1272:22
**BERGSON** [3] - 1175:11, 1175:13, 1176:21
**best** [16] - 1073:7, 1123:24, 1129:14, 1154:8, 1167:22, 1168:5, 1202:4, 1206:12, 1239:23, 1247:15, 1255:12, 1263:20, 1267:17, 1267:20, 1270:4, 1270:21
**Beth** [1] - 1192:3
**better** [4] - 1242:18, 1252:11, 1252:12, 1253:8
**between** [13] - 1103:16, 1133:11, 1137:9, 1141:14, 1144:14, 1213:9, 1221:14, 1221:18, 1223:3, 1243:3, 1260:17, 1260:24, 1262:12
**beverage** [1] - 1252:23
**BEVERAGES** [1] - 1060:11
**big** [7] - 1079:4, 1086:15, 1120:9, 1126:20, 1257:8, 1257:11, 1278:6
**biggest** [2] - 1235:8,

1268:5
**bill** [5] - 1091:23, 1091:24, 1092:1, 1092:4, 1193:11
**billing** [2] - 1222:23, 1254:6
**billings** [1] - 1235:5
**bills** [4] - 1244:21, 1256:9, 1258:23, 1277:13
**Billy** [1] - 1109:24
**binder** [3] - 1269:14, 1269:16, 1272:20
**binders** [1] - 1268:5
**Birnbaum** [1] - 1145:9
**BIRNBAUM** [1] - 1060:10
**bit** [4] - 1069:14, 1169:18, 1178:10, 1249:8
**block** [3] - 1149:25, 1150:1, 1150:3
**blocked** [1] - 1212:14
**blocks** [3] - 1125:24, 1127:13
**blue** [3] - 1125:16, 1127:20, 1145:8
**boiler** [17] - 1064:21, 1065:3, 1065:8, 1065:9, 1107:24, 1109:2, 1109:3, 1109:9, 1109:10, 1109:25, 1110:1, 1119:18, 1119:23, 1121:21, 1126:9, 1126:15
**boilers** [5] - 1064:14, 1108:7, 1108:9, 1108:12, 1109:12
**book** [7] - 1097:9, 1106:10, 1106:23, 1106:25, 1203:19, 1203:20, 1281:11
**bookkeeper** [1] - 1205:17
**books** [17] - 1188:11, 1203:22, 1223:19, 1226:10, 1230:2, 1235:2, 1274:17, 1274:18, 1275:5, 1275:10, 1277:10, 1277:15, 1277:19, 1278:11, 1278:18, 1278:22
**boss** [3] - 1150:22, 1151:14, 1154:7
**bosses** [1] - 1151:13
**bothering** [1] - 1088:7
**bottom** [2] - 1092:22, 1110:11

**bought** [18] - 1062:4, 1089:11, 1090:25, 1095:14, 1095:15, 1096:19, 1098:8, 1098:11, 1112:15, 1112:19, 1112:25, 1130:11, 1132:1, 1134:14, 1149:13, 1149:15, 1178:15
**box** [5] - 1091:16, 1094:21, 1159:11, 1226:21, 1227:6
**boxes** [35] - 1066:10, 1084:21, 1084:23, 1085:4, 1085:6, 1085:8, 1094:20, 1096:5, 1097:24, 1110:20, 1110:23, 1110:25, 1111:12, 1111:13, 1145:15, 1146:7, 1146:12, 1146:21, 1147:7, 1147:12, 1147:15, 1147:23, 1156:11, 1156:19, 1156:22, 1156:25, 1157:2, 1172:8, 1176:4, 1228:10
**branch** [2] - 1071:14, 1071:15
**brand** [1] - 1239:25
**break** [15] - 1075:20, 1075:24, 1128:16, 1158:21, 1184:22, 1189:22, 1190:7, 1191:7, 1191:10, 1236:14, 1236:15, 1236:16, 1238:10, 1281:19
**breakfast** [1] - 1274:12
**breaks** [1] - 1109:1
**Brian** [1] - 1254:21
**briefly** [2] - 1195:3, 1228:24
**Bright** [2] - 1081:2, 1081:3
**bring** [4] - 1171:3, 1171:11, 1223:24, 1224:3
**broke** [1] - 1132:4
**broken** [2] - 1168:10, 1168:11
**brokerage** [2] - 1072:11, 1072:12
**Bronx** [39] - 1061:22, 1062:17, 1066:13, 1068:2, 1068:4, 1068:12, 1068:13, 1071:17, 1084:24,

1085:13, 1103:1, 1104:1, 1104:15, 1105:11, 1105:13, 1105:14, 1105:21, 1106:18, 1106:19, 1106:24, 1106:25, 1107:4, 1107:5, 1125:22, 1127:18, 1138:4, 1147:1, 1153:16, 1155:5, 1156:15, 1156:25, 1157:2, 1170:4, 1170:13, 1170:17, 1170:20, 1171:4, 1171:11, 1180:13
**Brooklyn** [11] - 1060:15, 1115:21, 1116:14, 1116:20, 1116:25, 1117:2, 1117:9, 1118:17, 1162:13, 1162:15
**brother** [1] - 1149:1
**brought** [2] - 1067:13, 1215:10
**BRUCE** [1] - 1060:5
**budget** [1] - 1199:19
**bugging** [1] - 1156:17
**build** [15] - 1159:25, 1160:2, 1160:11, 1160:16, 1160:23, 1177:2, 1177:5, 1177:6, 1177:9, 1177:13, 1177:16, 1177:19, 1177:24, 1178:14
**build-occur** [1] - 1177:19
**build-out** [11] - 1160:11, 1160:16, 1160:23, 1177:2, 1177:5, 1177:6, 1177:9, 1177:13, 1177:16, 1177:24, 1178:14
**building** [40] - 1076:20, 1076:23, 1078:7, 1078:10, 1078:11, 1079:4, 1079:10, 1080:10, 1085:21, 1086:8, 1086:16, 1087:4, 1087:5, 1087:6, 1089:15, 1090:2, 1090:4, 1093:11, 1097:20, 1100:22, 1119:8, 1121:15, 1125:25, 1126:10, 1126:19, 1150:2, 1150:20, 1155:19, 1157:9, 1157:17,

1159:23, 1159:24, 1174:8, 1177:6, 1181:10, 1181:13, 1182:4, 1234:17
**buildings** [2] - 1082:24, 1108:7
**bulb** [3] - 1089:18, 1126:5, 1127:13
**burden** [2] - 1192:18, 1214:8
**business** [12] - 1062:8, 1063:10, 1083:3, 1114:3, 1148:12, 1148:21, 1148:23, 1202:17, 1216:10, 1216:12, 1216:22, 1216:24
**businesses** [1] - 1207:6
**button** [1] - 1117:5
**buy** [9] - 1062:2, 1089:9, 1089:10, 1089:14, 1091:13, 1091:14, 1112:16, 1112:21, 1168:16
**buying** [1] - 1091:8
**BY** [36] - 1061:12, 1070:1, 1076:4, 1088:18, 1095:5, 1099:10, 1102:16, 1105:9, 1107:10, 1111:22, 1116:12, 1128:4, 1129:1, 1154:2, 1161:22, 1163:17, 1166:4, 1167:16, 1174:22, 1175:13, 1176:25, 1178:23, 1183:12, 1185:6, 1194:13, 1207:20, 1211:17, 1214:19, 1220:1, 1222:4, 1237:21, 1238:19, 1249:20, 1256:5, 1261:6, 1264:24

## C

**cabinet** [2] - 1277:25, 1278:1
**cabinets** [8] - 1276:18, 1276:21, 1277:1, 1277:2, 1277:4, 1277:10, 1278:16, 1279:1
**Cadman** [1] - 1060:14
**Cafe** [1] - 1268:12
**calculation** [1] - 1236:4
**calm** [3] - 1075:20,

1075:21, 1075:23
**camera** [6] - 1172:22, 1173:23, 1173:24, 1174:23, 1175:3, 1179:19
**cameras** [16] - 1110:3, 1172:17, 1172:18, 1172:25, 1173:2, 1173:9, 1174:7, 1174:9, 1175:1, 1178:25, 1179:1, 1179:3, 1179:4, 1179:11, 1179:18, 1179:21
**cap** [1] - 1169:22
**capabilities** [1] - 1268:23
**capacity** [2] - 1187:2, 1194:3
**captured** [1] - 1264:9
**card** [61] - 1071:21, 1071:25, 1086:4, 1086:5, 1086:8, 1086:10, 1086:17, 1086:18, 1086:20, 1086:21, 1089:13, 1089:17, 1089:19, 1090:17, 1091:2, 1091:3, 1091:17, 1099:11, 1100:8, 1100:17, 1100:22, 1101:3, 1101:5, 1101:7, 1101:8, 1101:9, 1101:13, 1101:20, 1101:21, 1102:8, 1102:11, 1128:1, 1130:16, 1131:12, 1131:15, 1155:18, 1155:21, 1157:24, 1181:8, 1181:11, 1181:17, 1181:19, 1181:21, 1181:22, 1206:10, 1216:1, 1216:6, 1216:14, 1217:18, 1217:19, 1217:20, 1217:22, 1217:24, 1218:4, 1218:7, 1229:6, 1230:25, 1231:3, 1231:12, 1278:4
**cards** [9] - 1155:12, 1155:14, 1155:25, 1157:21, 1217:14, 1217:16, 1217:22, 1217:23, 1230:21
**care** [6] - 1071:1, 1072:5, 1072:7, 1128:3, 1128:5, 1137:11

**Carol** [2] - 1230:4, 1236:19
**carried** [2] - 1147:18, 1202:20
**carries** [2] - 1124:12, 1176:4
**carry** [12] - 1099:4, 1099:5, 1099:6, 1110:25, 1124:10, 1124:14, 1147:7, 1147:13, 1147:17, 1173:16
**carrying** [4] - 1234:18, 1234:19, 1234:21, 1240:7
**cars** [2] - 1154:9, 1185:9
**cart** [2] - 1147:17, 1176:3
**case** [12] - 1098:12, 1124:20, 1129:15, 1130:17, 1182:2, 1187:5, 1195:16, 1220:4, 1220:16, 1230:5, 1276:5, 1280:3
**cash** [25] - 1070:13, 1070:15, 1124:1, 1124:6, 1124:10, 1124:13, 1124:14, 1124:19, 1124:25, 1125:22, 1127:23, 1128:6, 1128:7, 1141:25, 1142:17, 1144:22, 1145:1, 1145:3, 1176:19, 1226:7, 1246:25, 1257:2, 1257:9, 1257:10, 1261:3
**cashed** [1] - 1125:2
**Cathy** [1] - 1079:24
**caused** [1] - 1067:18
**cents** [2] - 1125:5
**certain** [8] - 1084:18, 1098:13, 1119:14, 1206:11, 1213:23, 1233:24
**certainly** [10] - 1198:2, 1198:19, 1211:13, 1216:13, 1224:14, 1235:4, 1246:2, 1253:1, 1258:22, 1259:4
**certificate** [2] - 1226:25, 1277:20
**certified** [1] - 1242:5
**cetera** [12] - 1109:1, 1122:2, 1147:7, 1162:5, 1162:6, 1163:5, 1211:9,

1264:19
**CFO** [7] - 1203:13, 1205:18, 1210:18, 1211:21, 1221:6, 1239:7, 1239:12
**chain** [1] - 1228:19
**challenge** [4] - 1116:3, 1116:23, 1116:25, 1118:15
**challenging** [2] - 1118:16
**chance** [2] - 1092:11, 1191:23
**change** [11] - 1072:23, 1085:17, 1085:19, 1123:7, 1126:5, 1127:13, 1129:24, 1149:21, 1173:6, 1226:1, 1226:4
**changed** [2] - 1210:7, 1260:20
**changing** [3] - 1077:11, 1122:18
**characterize** [2] - 1162:16, 1242:3
**charge** [4] - 1125:8, 1141:9, 1141:12, 1143:22
**charged** [4] - 1180:24, 1181:1, 1216:9, 1216:18
**charger** [1] - 1176:1
**charges** [6] - 1216:8, 1216:9, 1216:15, 1217:17, 1218:4, 1218:7
**Chase** [6] - 1070:21, 1071:7, 1071:8, 1071:9, 1072:16, 1072:17
**chasing** [2] - 1151:24, 1155:20
**cheaper** [1] - 1141:22
**cheating** [1] - 1260:8
**check** [28] - 1070:3, 1070:12, 1070:16, 1075:1, 1082:2, 1082:5, 1082:7, 1082:11, 1123:17, 1123:19, 1124:6, 1124:17, 1124:25, 1125:2, 1125:3, 1128:7, 1128:12, 1137:10, 1137:12, 1137:14, 1141:25, 1144:2, 1144:21, 1152:23, 1198:3, 1214:7, 1235:22
**checkbook** [1] - 1222:17

**checking** [6] - 1070:5, 1070:6, 1071:10, 1071:11, 1153:1, 1153:6
**checks** [31] - 1069:13, 1069:14, 1070:4, 1070:10, 1082:4, 1082:6, 1122:12, 1123:11, 1123:20, 1123:25, 1125:16, 1125:21, 1139:25, 1142:18, 1153:5, 1176:17, 1198:3, 1198:13, 1203:15, 1211:13, 1211:14, 1215:8, 1215:12, 1215:13, 1235:11, 1235:15, 1235:19, 1235:20, 1235:21, 1244:21, 1244:22
**Chief** [1] - 1195:2
**chief** [3] - 1190:1, 1197:15, 1202:6
**China** [3] - 1114:5, 1114:10, 1116:1
**choosing** [1] - 1215:18
**chose** [1] - 1109:14
**Chris** [1] - 1215:18
**Cindy** [2] - 1205:6, 1205:8
**Cirillo** [2] - 1152:17, 1152:20
**cited** [1] - 1192:1
**Citibank** [5] - 1070:21, 1071:8, 1071:9, 1071:15, 1072:22
**City** [5] - 1065:1, 1109:24, 1109:25, 1110:1, 1141:23
**claims** [2] - 1206:17
**clarify** [1] - 1186:8
**clear** [4] - 1174:23, 1208:21, 1210:23, 1281:5
**cleared** [1] - 1244:22
**clearly** [1] - 1229:4
**clicked** [1] - 1136:5
**client** [3] - 1191:7, 1191:8, 1192:15
**clock** [1] - 1213:10
**closed** [1] - 1127:24
**closet** [1] - 1087:25
**code** [8] - 1087:15, 1087:18, 1087:20, 1087:22, 1087:23, 1087:24, 1087:25
**COFFEE** [2] - 1060:12, 1060:12
**coffee** [10] - 1088:10,

1136:6, 1136:17, 1136:18, 1142:23, 1143:2, 1143:12, 1145:11, 1170:23, 1176:15
**Coffee** [29] - 1146:22, 1146:23, 1194:23, 1198:20, 1199:6, 1218:24, 1228:1, 1232:7, 1232:8, 1235:5, 1235:6, 1235:13, 1235:14, 1238:4, 1239:10, 1239:21, 1244:11, 1245:15, 1246:23, 1246:25, 1247:1, 1249:3, 1251:20, 1251:21, 1252:1, 1262:20, 1269:24, 1273:3, 1274:19
**College** [1] - 1194:19
**colloquy** [1] - 1186:9
**column** [7] - 1204:8, 1204:14, 1204:25, 1205:4, 1205:12, 1205:21, 1208:16
**coming** [2] - 1140:1, 1192:21
**comments** [2] - 1280:21, 1280:23
**commit** [1] - 1259:17
**commitment** [1] - 1223:15
**commitments** [1] - 1223:19
**committee** [2] - 1254:20, 1254:24
**common** [1] - 1137:6
**commonly** [1] - 1243:25
**communicate** [2] - 1114:23, 1115:1
**communicating** [3] - 1178:7, 1191:18, 1191:24
**communication** [3] - 1162:4, 1163:4, 1163:9
**communications** [2] - 1240:14, 1240:22
**comp** [1] - 1206:16
**compactor** [5] - 1136:12, 1136:15, 1143:15, 1143:17, 1175:16
**companies** [18] - 1077:18, 1077:20, 1078:23, 1082:9, 1082:15, 1082:19, 1083:7, 1091:13,

1136:6, 1140:19, 1140:20, 1142:24, 1143:12, 1145:12, 1150:4, 1201:7, 1260:19
**company** [72] - 1062:13, 1062:16, 1063:1, 1067:5, 1074:11, 1074:18, 1077:5, 1078:22, 1081:3, 1083:25, 1088:10, 1091:11, 1091:24, 1122:12, 1127:7, 1136:10, 1138:16, 1143:2, 1149:13, 1149:14, 1149:15, 1149:18, 1153:15, 1176:11, 1176:14, 1176:17, 1176:19, 1200:19, 1200:21, 1205:19, 1211:25, 1213:13, 1214:23, 1215:5, 1217:19, 1217:21, 1217:23, 1218:8, 1221:9, 1222:8, 1225:16, 1226:1, 1226:10, 1236:20, 1237:5, 1239:8, 1241:25, 1242:16, 1242:20, 1242:24, 1244:1, 1248:6, 1249:25, 1250:4, 1251:4, 1251:24, 1253:11, 1253:12, 1254:17, 1254:18, 1255:15, 1255:17, 1256:7, 1259:12, 1259:18, 1263:2, 1265:11, 1271:13, 1275:6, 1279:25
**company's** [2] - 1077:4, 1242:5
**comparing** [1] - 1110:16
**comparison** [2] - 1262:7, 1262:12
**compensation** [1] - 1211:1
**compiled** [1] - 1276:3
**complain** [2] - 1209:19, 1209:23
**complained** [1] - 1215:21
**complaints** [1] - 1090:12
**complete** [3] - 1212:20, 1244:23, 1244:24
**Complete** [1] -

1213:18
**completely** [2] - 1078:20, 1199:23
**comply** [2] - 1206:11, 1256:13
**comprehensive** [1] - 1200:18
**compressors** [1] - 1067:21
**Computer** [1] - 1060:17
**computer** [96] - 1083:14, 1083:15, 1083:17, 1083:19, 1083:20, 1083:22, 1083:24, 1083:25, 1084:8, 1084:9, 1089:5, 1106:10, 1107:3, 1107:5, 1126:3, 1126:8, 1131:8, 1131:9, 1131:11, 1131:13, 1131:14, 1131:16, 1131:18, 1131:23, 1131:25, 1132:1, 1132:2, 1132:3, 1132:10, 1132:23, 1132:24, 1133:10, 1133:12, 1133:17, 1133:19, 1133:23, 1134:1, 1134:14, 1134:23, 1147:2, 1147:6, 1163:19, 1163:21, 1163:23, 1163:25, 1164:1, 1164:7, 1164:9, 1164:12, 1164:14, 1164:22, 1164:25, 1165:5, 1165:12, 1166:6, 1166:8, 1166:17, 1166:23, 1167:1, 1167:9, 1167:13, 1167:18, 1167:20, 1167:22, 1167:25, 1168:4, 1168:7, 1168:8, 1168:16, 1172:6, 1179:1, 1179:4, 1214:20, 1214:24, 1215:1, 1233:5, 1233:14, 1234:13, 1270:15, 1270:20, 1270:22, 1270:25, 1271:3, 1271:5, 1271:9, 1271:24, 1271:25, 1272:9, 1272:11, 1272:12, 1272:13
**Computer-Assisted** [1] - 1060:17

**computers** [8] - 1084:4, 1132:8, 1132:22, 1133:14, 1146:3, 1146:6, 1167:11, 1233:4
**conceivable** [1] - 1151:25
**conceived** [1] - 1199:22
**concern** [2] - 1217:5, 1219:4
**concerned** [5] - 1189:24, 1209:17, 1215:4, 1215:5, 1217:7
**concerning** [2] - 1221:10, 1236:10
**concerns** [5] - 1212:25, 1213:8, 1223:23, 1224:10, 1232:11
**concluded** [1] - 1193:16
**condition** [1] - 1077:12
**confused** [4] - 1066:9, 1096:6, 1166:13, 1263:24
**conjunction** [1] - 1193:20
**connected** [6] - 1073:15, 1078:9, 1078:22, 1079:11, 1083:6, 1184:3
**connecting** [1] - 1184:2
**connection** [3] - 1081:4, 1125:21, 1135:1
**consent** [13] - 1187:22, 1188:1, 1188:6, 1188:16, 1188:19, 1188:22, 1190:14, 1191:20, 1191:25, 1192:1, 1192:15, 1193:22, 1210:20
**consider** [4] - 1068:5, 1191:24, 1227:16, 1235:2
**considered** [1] - 1227:14
**consisted** [1] - 1123:22
**consistency** [1] - 1259:15
**consists** [1] - 1254:20
**constantly** [4] - 1215:10, 1259:5, 1275:13

**construct** [1] - 1074:24
**construction** [4] - 1121:16, 1122:1, 1155:19, 1177:7
**constructive** [3] - 1190:12, 1190:17, 1190:25
**construed** [1] - 1192:1
**consultation** [1] - 1210:19
**Consulting** [1] - 1202:25
**cont'd** [3] - 1060:1, 1220:1, 1256:5
**contact** [2] - 1197:20, 1239:13
**contacted** [2] - 1121:24, 1239:11
**contained** [1] - 1226:22
**container** [3] - 1118:11, 1163:4
**contains** [1] - 1130:22
**content** [1] - 1146:16
**contents** [1] - 1146:14
**continue** [1] - 1128:24
**Continued** [4] - 1117:11, 1153:21, 1185:19, 1219:12
**continued** [1] - 1201:25
**Continuing** [5] - 1118:3, 1129:3, 1196:11, 1261:8, 1265:1
**contract** [8] - 1202:7, 1253:9, 1253:14, 1253:16, 1254:8, 1265:13, 1265:25, 1266:4
**contractor** [1] - 1201:12
**contractors** [1] - 1155:22
**contracts** [1] - 1277:12
**contractual** [1] - 1199:20
**control** [11] - 1173:2, 1173:8, 1198:2, 1198:4, 1198:5, 1213:16, 1222:24, 1242:18, 1243:5, 1248:13, 1278:12
**controlled** [1] - 1199:17
**controls** [4] - 1195:6, 1241:18, 1259:23, 1259:24

**convenience** [1] - 1153:9
**convenient** [1] - 1128:15
**conversation** [6] - 1140:13, 1147:5, 1147:8, 1170:23, 1232:4, 1245:1
**coordinate** [1] - 1223:2
**copied** [1] - 1089:5
**copies** [4] - 1261:12, 1262:3, 1276:18, 1278:4
**copy** [3] - 1226:11, 1235:22, 1258:4
**core** [2] - 1254:20, 1254:24
**corner** [1] - 1183:24
**corporate** [7] - 1208:7, 1226:25, 1244:6, 1244:10, 1245:2, 1245:8, 1277:22
**Corporate** [8] - 1243:2, 1243:6, 1243:7, 1243:8, 1243:9, 1243:11, 1243:14, 1245:7
**Correct** [2] - 1192:21, 1211:5
**correct** [51] - 1066:11, 1088:24, 1123:6, 1154:10, 1156:23, 1157:7, 1157:8, 1158:7, 1158:9, 1158:17, 1159:16, 1159:17, 1162:2, 1166:14, 1167:21, 1169:7, 1169:10, 1174:24, 1175:4, 1175:5, 1175:6, 1176:6, 1176:9, 1192:12, 1215:20, 1216:18, 1220:5, 1221:13, 1224:1, 1239:2, 1239:18, 1243:24, 1244:2, 1246:10, 1247:19, 1247:23, 1248:1, 1253:24, 1253:25, 1254:1, 1254:3, 1262:1, 1262:23, 1263:19, 1263:22, 1263:23, 1265:4, 1267:18, 1276:1, 1280:2, 1281:4
**correcting** [1] - 1215:23
**correction** [1] - 1215:22

**corrections** [1] - 1215:9
**correctly** [1] - 1213:15
**corresponded** [2] - 1238:21, 1238:23
**cost** [3] - 1250:11, 1250:18, 1251:2
**costs** [2] - 1189:12, 1192:21
**counsel** [26] - 1186:21, 1187:9, 1187:17, 1187:23, 1188:2, 1188:5, 1189:14, 1190:6, 1190:14, 1190:20, 1191:12, 1191:19, 1192:9, 1193:10, 1194:3, 1230:5, 1231:19, 1232:2, 1232:13, 1240:3, 1240:4, 1240:13, 1240:20, 1240:22, 1259:9, 1259:13
**Counsel** [1] - 1107:7
**counter** [1] - 1241:22
**couple** [12] - 1075:9, 1084:21, 1100:21, 1102:21, 1103:7, 1105:19, 1110:21, 1132:16, 1147:21, 1167:2, 1175:11, 1226:24
**course** [7] - 1067:9, 1156:1, 1188:8, 1248:23, 1256:13, 1275:9, 1281:20
**COURT** [327] - 1060:20, 1060:22, 1061:1, 1061:3, 1061:6, 1061:9, 1065:5, 1066:22, 1066:24, 1069:15, 1069:20, 1069:24, 1072:21, 1075:15, 1075:19, 1076:1, 1076:3, 1078:19, 1085:25, 1086:24, 1087:1, 1088:7, 1088:10, 1088:14, 1088:16, 1092:7, 1092:14, 1093:20, 1093:23, 1094:24, 1095:4, 1098:10, 1098:15, 1098:20, 1098:24, 1099:3, 1099:8, 1099:19, 1101:17, 1101:20, 1101:25, 1102:2, 1102:5, 1102:7, 1102:10, 1102:14,

1103:20, 1103:23, 1104:2, 1104:5, 1104:9, 1104:11, 1104:13, 1104:16, 1104:19, 1104:23, 1105:1, 1105:4, 1105:7, 1106:12, 1106:15, 1106:18, 1106:20, 1106:22, 1106:25, 1107:2, 1107:5, 1107:7, 1107:9, 1108:16, 1108:19, 1108:24, 1109:11, 1110:14, 1111:8, 1111:15, 1111:17, 1111:19, 1111:21, 1115:13, 1116:7, 1116:10, 1118:19, 1118:22, 1118:24, 1120:19, 1121:7, 1121:11, 1121:17, 1121:19, 1122:23, 1124:11, 1124:14, 1124:16, 1125:11, 1125:14, 1125:17, 1128:1, 1128:6, 1128:9, 1128:11, 1128:15, 1128:18, 1128:21, 1128:23, 1131:2, 1131:4, 1132:12, 1132:16, 1132:19, 1132:21, 1137:2, 1137:8, 1139:1, 1139:5, 1139:10, 1139:14, 1140:13, 1140:17, 1140:23, 1141:2, 1141:11, 1142:3, 1142:7, 1142:10, 1142:14, 1142:16, 1143:16, 1144:8, 1144:11, 1146:14, 1146:18, 1147:4, 1150:11, 1150:15, 1150:17, 1151:23, 1152:6, 1152:25, 1153:19, 1161:10, 1161:15, 1161:17, 1161:20, 1163:14, 1165:19, 1165:22, 1165:25, 1167:3, 1167:6, 1167:8, 1167:12, 1167:15, 1170:9, 1172:11, 1172:13, 1174:6, 1174:10, 1174:12, 1174:14, 1174:16, 1174:21, 1175:10, 1176:23, 1178:18, 1178:21, 1180:8, 1182:18,

1182:21, 1182:24, 1183:6, 1183:9, 1183:15, 1183:17, 1183:20, 1184:6, 1184:19, 1184:21, 1185:1, 1185:4, 1185:11, 1185:14, 1185:17, 1186:3, 1186:6, 1186:11, 1186:18, 1186:25, 1187:3, 1187:6, 1187:9, 1187:14, 1187:16, 1187:22, 1188:1, 1188:4, 1188:8, 1188:12, 1188:17, 1188:23, 1189:2, 1189:5, 1189:10, 1189:19, 1189:21, 1190:3, 1190:5, 1190:11, 1190:15, 1190:23, 1191:4, 1191:9, 1191:13, 1191:16, 1192:5, 1192:10, 1192:19, 1192:25, 1193:3, 1193:8, 1193:14, 1193:17, 1193:21, 1193:25, 1194:4, 1194:11, 1196:8, 1201:15, 1202:1, 1202:3, 1204:19, 1206:25, 1207:9, 1207:12, 1207:18, 1208:11, 1208:20, 1208:24, 1210:21, 1211:3, 1211:6, 1211:11, 1211:16, 1213:22, 1214:10, 1214:18, 1216:20, 1217:3, 1219:8, 1219:11, 1221:14, 1221:19, 1221:23, 1222:1, 1224:2, 1224:7, 1224:9, 1225:12, 1230:7, 1230:11, 1231:23, 1231:25, 1232:10, 1232:17, 1232:20, 1232:23, 1236:9, 1236:14, 1236:22, 1236:25, 1237:6, 1237:8, 1237:13, 1237:16, 1237:20, 1237:25, 1238:8, 1238:10, 1238:13, 1238:17, 1240:8, 1240:10, 1241:3, 1245:6, 1245:10, 1248:22, 1248:24, 1249:6, 1249:11, 1249:14,

1249:17, 1255:11, 1255:18, 1255:24, 1256:3, 1257:9, 1258:14, 1258:19, 1259:10, 1259:15, 1260:4, 1260:9, 1260:16, 1260:20, 1260:23, 1261:4, 1262:5, 1262:12, 1262:17, 1262:21, 1263:24, 1264:3, 1264:6, 1264:12, 1264:14, 1264:17, 1264:21, 1264:23, 1267:20, 1267:24, 1268:1, 1269:3, 1272:13, 1272:16, 1281:9, 1281:18, 1281:21
**court** [1] - 1186:2
**Court** [4] - 1060:14, 1102:20, 1183:5, 1256:12
**cover** [1] - 1200:19
**CPA** [6] - 1060:6, 1194:20, 1195:8, 1241:24, 1242:1
**crates** [1] - 1118:12
**CRAZY** [1] - 1060:11
**create** [2] - 1211:15, 1212:15
**credit** [24] - 1089:13, 1089:17, 1089:19, 1090:17, 1112:12, 1112:16, 1112:21, 1112:24, 1113:2, 1206:10, 1216:1, 1216:6, 1216:14, 1217:14, 1217:16, 1217:18, 1217:19, 1218:7, 1229:6, 1230:21, 1230:25, 1231:2, 1231:12, 1278:4
**Cricket** [4] - 1112:15, 1112:24, 1112:25, 1130:11
**cricket** [1] - 1112:20
**Criseidy** [1] - 1233:9
**criteria** [1] - 1223:10
**critical** [2] - 1227:16, 1229:5
**CROSS** [5] - 1154:1, 1163:16, 1175:12, 1176:24, 1238:18
**cross** [1] - 1236:15
**CROSS-EXAMINATION** [5] - 1154:1, 1163:16, 1175:12, 1176:24,

1238:18
**crowd** [1] - 1219:7
**CRR** [1] - 1060:14
**Cruz** [1] - 1254:21
**Cuban** [1] - 1141:5
**CUPS** [1] - 1060:11
**curious** [3] - 1088:14, 1167:7, 1167:8
**current** [3] - 1232:15, 1264:9, 1264:10
**custody** [2] - 1278:12, 1278:22
**custom** [3] - 1198:11, 1199:15, 1251:3
**custom-designed** [1] - 1198:11
**custom-right** [1] - 1251:3
**customer** [5] - 1070:10, 1196:7, 1196:9, 1256:10, 1278:14
**customers** [6] - 1140:9, 1140:16, 1196:6, 1247:1, 1274:21
**cut** [10] - 1184:23, 1211:13, 1211:14, 1214:7, 1215:8, 1215:12, 1235:11, 1238:8, 1260:17
**cuts** [1] - 1144:2
**cutting** [1] - 1215:13
**cylinder** [1] - 1180:19
**cylinders** [2] - 1180:18, 1180:24

# D

**D-25** [1] - 1272:19
**daily** [2] - 1258:24, 1259:2
**dangerous** [1] - 1169:24
**data** [13] - 1130:10, 1211:9, 1212:13, 1225:10, 1225:16, 1225:18, 1243:9, 1244:25, 1245:13, 1245:15, 1245:16, 1260:19, 1265:5
**date** [17] - 1067:9, 1067:10, 1092:21, 1093:18, 1093:20, 1093:25, 1094:8, 1099:19, 1119:25, 1227:8, 1234:16, 1234:20, 1236:3, 1260:2, 1266:6, 1268:2, 1269:5

**dated** [6] - 1268:10, 1269:20, 1270:8, 1272:23, 1273:7, 1281:12
**dates** [14] - 1065:19, 1068:10, 1068:17, 1076:8, 1112:18, 1120:3, 1120:19, 1120:23, 1120:24, 1133:2, 1164:19, 1168:2, 1177:19, 1245:3
**day-to-day** [1] - 1233:1
**daylight** [1] - 1156:8
**days** [5] - 1121:1, 1129:24, 1177:20, 1222:6
**deal** [2] - 1187:14, 1217:5
**dealt** [1] - 1214:20
**debate** [1] - 1251:2
**December** [16] - 1203:2, 1218:15, 1218:16, 1226:12, 1233:13, 1251:16, 1263:5, 1268:10, 1269:1, 1269:20, 1270:8, 1272:24, 1273:8, 1273:25
**decide** [1] - 1191:1
**decided** [2] - 1104:9, 1202:19
**decision** [6] - 1103:23, 1103:25, 1104:5, 1252:8, 1252:18, 1252:24
**decisions** [1] - 1213:11
**declarant** [1] - 1146:15
**declare** [1] - 1142:5
**declines** [1] - 1188:21
**deductions** [2] - 1196:7, 1196:9
**deemed** [3] - 1192:1, 1223:7, 1223:9
**Defendant's** [6] - 1269:15, 1269:18, 1275:15, 1275:16, 1281:8, 1281:9
**defendant's** [1] - 1281:7
**defendants** [1] - 1147:25
**Defendants** [4] - 1060:2, 1060:5, 1060:7, 1060:10
**defendants'** [1] - 1189:12

**definitely** [8] - 1065:8, 1093:15, 1094:13, 1112:6, 1113:20, 1116:5, 1181:6, 1279:15
**definition** [1] - 1199:21
**degrees** [1] - 1200:11
**delay** [2] - 1191:23, 1219:4
**delegate** [1] - 1225:1
**delete** [1] - 1173:6
**deleted** [1] - 1175:1
**deliver** [1] - 1248:6
**delivered** [3] - 1083:4, 1084:25, 1248:2
**delivering** [1] - 1247:25
**demand** [4] - 1221:3, 1221:7, 1221:8, 1221:10
**demographic** [2] - 1211:8, 1212:19
**demographic-type** [2] - 1211:8, 1212:19
**demonstrate** [1] - 1210:9
**denied** [3] - 1100:20, 1101:4, 1232:9
**deploy** [2] - 1198:6, 1198:7
**deposit** [3] - 1070:5, 1128:12, 1142:18
**depot** [2] - 1089:18, 1090:20
**describe** [5] - 1078:14, 1242:1, 1248:10, 1277:9, 1277:23
**described** [5] - 1066:5, 1197:15, 1228:24, 1256:14, 1256:17
**describing** [1] - 1244:18
**description** [1] - 1064:6
**design** [2] - 1199:15
**designed** [4] - 1198:11, 1200:22, 1201:11, 1224:24
**designing** [1] - 1196:22
**desk** [11] - 1067:24, 1145:21, 1145:22, 1163:24, 1180:10, 1183:14, 1183:23, 1184:1, 1184:2, 1184:3, 1184:9
**desks** [7] - 1145:18,

1145:19, 1146:4, 1146:6, 1184:7, 1184:15, 1184:17
**detailing** [1] - 1132:7
**determination** [2] - 1246:6, 1253:3
**determine** [10] - 1070:19, 1203:17, 1214:11, 1214:16, 1215:20, 1216:17, 1224:15, 1238:7, 1246:4, 1248:13
**determined** [2] - 1243:23, 1246:9
**developed** [1] - 1201:21
**development** [3] - 1201:23, 1201:24, 1201:25
**device** [4] - 1130:21, 1130:22, 1162:8, 1172:6
**devices** [1] - 1172:15
**Devine** [10] - 1195:14, 1228:9, 1241:11, 1241:12, 1242:6, 1243:22, 1247:22, 1247:25, 1263:4, 1263:18
**DEVINE** [2] - 1060:5, 1060:6
**Devine's** [2] - 1226:22, 1247:22
**die** [1] - 1098:3
**died** [4] - 1131:25, 1132:4, 1133:5, 1133:12
**difference** [9] - 1061:20, 1114:12, 1114:13, 1120:10, 1140:5, 1143:8, 1162:18, 1243:3, 1262:5
**different** [19] - 1078:7, 1079:5, 1079:10, 1096:17, 1099:6, 1108:25, 1109:2, 1114:15, 1126:18, 1126:21, 1135:5, 1140:9, 1165:12, 1210:12, 1213:24, 1214:12, 1248:25, 1249:25
**differently** [1] - 1246:5
**differing** [1] - 1122:4
**difficult** [1] - 1140:2
**difficulties** [1] - 1221:16
**digits** [1] - 1217:20
**DiMeglio** [1] - 1265:7

**Din** [1] - 1192:4
**direct** [9] - 1154:12, 1161:8, 1161:23, 1163:2, 1204:1, 1228:16, 1230:5, 1267:17, 1274:17
**DIRECT** [2] - 1061:11, 1194:12
**directed** [1] - 1246:2
**direction** [3] - 1179:11, 1232:16, 1248:20
**directly** [4] - 1083:10, 1104:4, 1145:4, 1196:25
**director** [8] - 1204:23, 1205:1, 1205:12, 1205:22, 1207:23, 1208:8, 1209:16
**dirty** [1] - 1149:6
**disable** [1] - 1158:21
**disabled** [1] - 1249:15
**disagree** [1] - 1093:11
**disagreed** [1] - 1210:4
**disappear** [1] - 1141:22
**disbursed** [1] - 1203:15
**disbursement** [2] - 1221:8, 1278:4
**disbursements** [13] - 1198:3, 1203:4, 1203:14, 1216:4, 1216:16, 1223:5, 1229:6, 1230:22, 1231:3, 1231:5, 1231:12, 1246:15, 1252:6
**disclosed** [1] - 1161:19
**discovery** [1] - 1161:14
**discrepancies** [2] - 1213:9, 1213:14
**discuss** [5] - 1191:8, 1202:12, 1258:25, 1259:4, 1281:19
**discussed** [6] - 1199:6, 1199:16, 1202:11, 1207:21, 1226:13, 1250:9
**discussing** [1] - 1200:23
**discussion** [12] - 1096:13, 1158:19, 1202:14, 1207:3, 1216:11, 1244:12, 1250:10, 1250:11, 1251:18, 1251:20, 1280:20, 1280:25

**discussions** [6] - 1198:15, 1198:17, 1198:19, 1198:21, 1244:14, 1244:16
**dispatcher** [3] - 1081:12, 1081:18, 1084:15
**dispose** [1] - 1166:13
**dispute** [3] - 1093:14, 1161:11, 1161:21
**disputing** [1] - 1098:15
**disrespectfully** [1] - 1190:11
**disseminate** [1] - 1257:12
**distinctions** [1] - 1137:8
**DISTRIBUTION** [1] - 1060:11
**distribution** [1] - 1123:11
**divided** [1] - 1079:9
**dividing** [1] - 1079:4
**document** [8] - 1102:19, 1116:24, 1228:25, 1261:22, 1275:14, 1276:6, 1276:8, 1276:10
**documentation** [6] - 1212:8, 1224:17, 1227:5, 1230:22, 1231:2, 1231:15
**documents** [27] - 1227:3, 1228:8, 1229:7, 1230:8, 1230:17, 1230:18, 1232:6, 1235:10, 1240:18, 1240:24, 1259:12, 1262:1, 1262:13, 1262:17, 1262:19, 1274:25, 1275:19, 1275:22, 1275:25, 1276:4, 1276:11, 1276:15, 1276:19, 1277:9, 1278:15, 1278:25
**dollar** [4] - 1125:6, 1231:5, 1269:24, 1273:3
**dollars** [4] - 1069:18, 1073:1, 1120:17, 1128:4
**done** [17] - 1085:6, 1135:14, 1136:6, 1136:8, 1138:9, 1145:9, 1145:11, 1148:19, 1152:14, 1168:10, 1210:4, 1212:5, 1215:16,

1223:1, 1245:23, 1245:24, 1245:25
**door** [26] - 1067:12, 1078:4, 1078:16, 1078:17, 1086:14, 1086:15, 1087:13, 1087:23, 1112:25, 1140:22, 1140:25, 1141:4, 1145:23, 1145:24, 1157:11, 1157:23, 1157:24, 1158:1, 1158:6, 1158:11, 1174:18, 1181:7, 1181:15, 1181:19, 1181:20, 1182:7
**doors** [4] - 1078:14, 1085:19, 1158:17, 1181:9
**doubles** [1] - 1275:1
**down** [19] - 1075:20, 1090:7, 1103:14, 1109:1, 1110:25, 1114:18, 1140:23, 1151:24, 1190:7, 1205:12, 1205:21, 1206:10, 1207:23, 1221:11, 1225:9, 1225:15, 1232:3, 1245:2, 1269:5
**download** [3] - 1131:20, 1279:13, 1279:15
**downloaded** [3] - 1130:20, 1131:6, 1131:23
**downstairs** [1] - 1126:10
**dozens** [1] - 1201:7
**DP** [1] - 1065:2
**draft** [1] - 1266:9
**drill** [1] - 1098:4
**drive** [2] - 1165:23, 1165:25
**drop** [2] - 1091:15, 1092:3
**dropped** [2] - 1094:20, 1139:23
**due** [2] - 1190:8, 1223:21
**duly** [2] - 1061:7, 1194:8
**duplicate** [3] - 1224:5, 1235:22, 1246:23
**During** [1] - 1195:9
**during** [17] - 1067:9, 1085:14, 1088:19, 1156:1, 1159:18, 1160:3, 1160:6, 1160:8, 1160:19,

1160:21, 1160:23, 1177:23, 1221:19, 1243:14, 1251:2, 1259:2, 1275:9
**duties** [6] - 1088:19, 1196:2, 1196:18, 1213:19, 1241:15, 1256:24

---

# E

**e-mail** [48] - 1113:6, 1113:11, 1113:15, 1113:23, 1114:13, 1114:19, 1115:6, 1115:7, 1115:8, 1115:9, 1115:11, 1115:15, 1115:19, 1117:2, 1118:15, 1118:17, 1133:18, 1133:19, 1133:22, 1134:4, 1134:15, 1135:6, 1162:16, 1162:20, 1162:22, 1162:23, 1204:15, 1204:17, 1205:3, 1228:19, 1229:13, 1229:15, 1230:13, 1230:19, 1231:16, 1232:4, 1258:10, 1258:11, 1268:9, 1269:20, 1270:5, 1270:8, 1272:23, 1273:7, 1281:12, 1281:24, 1281:25
**e-mailed** [1] - 1224:25
**e-mails** [5] - 1113:3, 1113:5, 1114:9, 1114:11, 1118:13
**early** [4] - 1214:15, 1250:25, 1251:4, 1251:6
**early-stage** [1] - 1251:4
**earn** [2] - 1260:8, 1260:13
**earned** [6] - 1072:25, 1120:4, 1142:1, 1170:1, 1211:2, 1223:20
**earning** [1] - 1069:6
**ease** [1] - 1204:19
**easily** [1] - 1280:4
**East** [2] - 1060:14, 1062:17
**easy** [1] - 1224:12
**educational** [1] - 1194:18
**EDWARDS** [1] - 1060:14

**EF18414XY** [1] - 1270:6
**effect** [1] - 1222:17
**effort** [3] - 1213:14, 1245:12, 1280:11
**eight** [1] - 1147:23
**Eighteen** [1] - 1209:15
**either** [30] - 1064:3, 1071:8, 1086:19, 1104:6, 1112:3, 1112:7, 1116:2, 1126:24, 1132:19, 1163:1, 1172:24, 1176:17, 1176:19, 1179:17, 1182:2, 1210:15, 1212:8, 1215:21, 1220:20, 1224:22, 1228:14, 1230:19, 1233:22, 1246:23, 1258:11, 1258:24, 1260:24, 1262:9, 1267:22, 1278:13
**elapsed** [1] - 1133:8
**electric** [5] - 1064:9, 1143:21, 1143:22, 1175:25, 1178:16
**electrician** [1] - 1155:17
**electronic** [2] - 1158:6, 1245:16
**electronically** [6] - 1179:5, 1224:4, 1224:24, 1225:2, 1235:6, 1262:19
**elevator** [4] - 1087:15, 1110:24, 1110:25, 1174:17
**elevators** [1] - 1087:14
**elicited** [1] - 1208:25
**elsewhere** [1] - 1208:12
**Emil** [21] - 1180:23, 1197:9, 1198:22, 1200:6, 1202:13, 1207:5, 1207:15, 1209:11, 1209:24, 1210:20, 1213:12, 1215:14, 1216:13, 1216:23, 1217:1, 1217:12, 1236:20, 1238:7, 1239:22, 1246:22
**Emil's** [2] - 1218:8, 1233:25
**employed** [12] - 1062:20, 1160:3, 1160:6, 1194:22, 1194:24, 1195:9,

1195:13, 1205:9,
1206:23, 1207:8,
1213:12, 1239:5
**employee** [37] -
1077:6, 1108:8,
1122:25, 1123:1,
1123:3, 1123:4,
1143:9, 1144:1,
1144:6, 1144:19,
1152:22, 1160:13,
1160:17, 1176:11,
1176:14, 1190:3,
1192:20, 1205:18,
1206:2, 1207:2,
1211:25, 1212:1,
1212:12, 1213:15,
1213:22, 1213:25,
1214:2, 1214:6,
1214:14, 1215:18,
1215:20, 1233:9,
1234:1, 1234:9,
1234:10, 1236:3,
1262:8
**employees** [12] -
1067:22, 1087:6,
1123:21, 1173:12,
1178:12, 1211:2,
1211:4, 1213:6,
1215:7, 1215:11,
1261:11, 1276:24
**employer** [4] -
1062:22, 1109:15,
1206:17, 1214:8
**employers** [1] -
1104:7
**employment** [3] -
1120:19, 1212:8,
1275:9
**empty** [3] - 1169:17,
1177:10
**encompassed** [1] -
1275:25
**encompassing** [1] -
1230:20
**encounter** [1] -
1211:20
**encountered** [1] -
1212:22
**end** [8] - 1068:4,
1139:13, 1139:19,
1181:4, 1201:5,
1248:15, 1250:25,
1251:4
**ended** [1] - 1266:14
**endlessly** [1] - 1199:7
**ends** [1] - 1167:2
**engagement** [2] -
1265:14, 1265:16
**engineer** [1] - 1196:23
**enhanced** [1] -

1242:24
**enter** [9] - 1102:8,
1211:12, 1223:13,
1223:17, 1223:19,
1223:20, 1225:1,
1271:2, 1271:4
**entered** [33] - 1102:8,
1195:16, 1203:16,
1212:2, 1212:3,
1212:13, 1218:16,
1220:16, 1222:22,
1223:6, 1223:7,
1224:5, 1225:5,
1235:16, 1235:21,
1235:23, 1243:9,
1246:2, 1246:4,
1246:11, 1246:12,
1246:13, 1246:24,
1251:15, 1251:19,
1253:10, 1253:14,
1264:9, 1265:13,
1266:18, 1270:20,
1271:8, 1271:10
**Enterprise** [14] -
1200:16, 1201:3,
1222:12, 1242:17,
1242:25, 1243:4,
1245:14, 1245:20,
1246:14, 1247:9,
1248:3, 1248:7,
1248:12, 1249:23
**enterprise** [3] -
1198:12, 1200:17,
1250:1
**entire** [1] - 1151:24
**entrance** [1] - 1174:9
**entries** [4] - 1101:4,
1213:17, 1223:24,
1224:6
**entry** [12] - 1157:17,
1163:5, 1210:6,
1212:13, 1217:15,
1220:2, 1225:19,
1225:20, 1226:1,
1226:16, 1226:20,
1254:21
**envelope** [1] - 1128:13
**environmental** [1] -
1065:1
**equal** [3] - 1254:4,
1254:5
**equation** [1] - 1249:5
**equipment** [5] -
1083:5, 1083:9,
1090:21, 1091:1,
1099:18, 1127:1,
1127:3, 1144:24,
1158:21, 1159:10,
1159:13, 1181:3,
1196:12, 1196:22,

1223:15
**erase** [1] - 1110:5
**erasing** [1] - 1110:6
**ERP** [11] - 1200:13,
1200:15, 1200:22,
1200:24, 1201:4,
1201:7, 1249:4,
1249:7, 1249:9,
1252:3, 1252:22
**ERPs** [3] - 1248:25,
1249:21, 1249:23
**Espinal** [2] - 1067:12,
1157:10
**ESQ** [4] - 1060:2,
1060:5, 1060:7,
1060:10
**established** [2] -
1123:6, 1210:12
**establishes** [1] -
1110:13
**estimate** [2] - 1258:17,
1267:17
**et** [12] - 1109:1,
1122:2, 1147:7,
1162:5, 1162:6,
1163:5, 1211:9,
1264:19
**Eugene** [39] - 1067:24,
1074:2, 1089:5,
1089:10, 1090:2,
1090:3, 1096:13,
1099:24, 1104:18,
1114:4, 1114:10,
1115:25, 1151:7,
1154:15, 1170:5,
1173:19, 1178:1,
1178:3, 1179:25,
1180:14, 1196:13,
1196:15, 1196:17,
1199:6, 1199:25,
1207:24, 1209:24,
1215:6, 1216:13,
1216:25, 1225:22,
1239:22, 1253:1,
1258:2, 1258:4,
1259:4, 1265:20,
1275:5, 1275:12
**evaluates** [1] -
1196:11
**evaluating** [1] -
1251:23
**evaluation** [1] -
1250:24
**event** [6] - 1065:21,
1065:23, 1065:25,
1066:4, 1066:9,
1223:23
**eventually** [3] -
1092:3, 1212:6,
1212:9

**everywhere** [4] -
1172:17, 1172:18,
1172:19, 1174:9
**evidence** [1] - 1208:13
**evidentiary** [2] -
1191:22, 1240:13
**exact** [5] - 1076:8,
1122:20, 1125:3,
1245:3, 1281:25
**exactly** [13] - 1067:10,
1069:17, 1084:21,
1101:13, 1109:16,
1217:24, 1228:15,
1232:5, 1261:16,
1267:12, 1267:16,
1267:23, 1268:16
**EXAMINATION** [13] -
1061:11, 1118:1,
1129:1, 1154:1,
1163:16, 1175:12,
1176:24, 1178:22,
1185:5, 1194:12,
1238:18, 1261:6,
1264:24
**examination** [1] -
1243:23
**examine** [1] - 1186:16
**examined** [3] -
1061:8, 1194:9,
1235:10
**example** [5] - 1116:14,
1116:20, 1126:20,
1211:24, 1223:14
**except** [6] - 1159:13,
1172:7, 1234:10,
1235:23, 1246:5,
1254:5
**Except** [2] - 1192:13,
1192:22
**exception** [1] -
1235:21
**excessive** [1] -
1216:15
**exchange** [3] -
1118:6, 1118:20,
1123:25
**exclusively** [1] -
1109:3
**excuse** [4] - 1071:24,
1073:25, 1113:4,
1184:16
**excused** [2] - 1184:21,
1185:14
**executive** [6] -
1204:23, 1204:25,
1205:12, 1205:22,
1208:8, 1209:16
**exert** [1] - 1198:2
**Exhibit** [30] - 1092:13,
1092:18, 1099:16,

1099:17, 1100:15,
1102:19, 1116:13,
1116:16, 1118:5,
1119:6, 1130:18,
1161:9, 1161:23,
1163:3, 1182:9,
1183:13, 1204:1,
1204:6, 1228:17,
1228:20, 1229:8,
1268:5, 1269:15,
1269:18, 1275:14,
1275:15, 1275:16,
1281:6, 1281:8
**exhibit** [7] - 1092:17,
1163:2, 1204:3,
1208:22, 1228:21,
1268:4, 1269:16
**Exhibits** [3] - 1203:20,
1203:24, 1203:25
**existed** [2] - 1136:10,
1248:2
**existing** [1] - 1241:24
**exists** [1] - 1132:25
**expect** [1] - 1221:9
**expected** [2] - 1221:6,
1227:1
**expenditure** [1] -
1192:23
**expense** [2] - 1223:17,
1257:2
**expenses** [3] -
1089:20, 1090:14,
1090:18
**expensive** [2] -
1250:2, 1250:8
**experience** [1] -
1208:7
**experienced** [1] -
1221:17
**explain** [10] - 1094:14,
1101:12, 1120:9,
1124:18, 1137:1,
1137:2, 1217:4,
1223:21, 1243:19,
1260:4
**explained** [1] -
1211:23
**explanation** [1] -
1190:15
**explore** [1] - 1220:10
**extend** [1] - 1193:6
**extent** [6] - 1108:19,
1121:7, 1187:11,
1220:9, 1255:16,
1281:23
**extra** [1] - 1188:11
**extremely** [1] -
1248:15
**EZELL** [1] - 1060:3
**Ezell** [15] - 1091:7,

1091:8, 1123:10,
1127:5, 1127:19,
1150:7, 1150:9,
1152:3, 1153:10,
1205:23, 1205:25,
1206:4, 1206:8,
1207:1, 1208:5

## F

fabricate [1] - 1101:11
face [2] - 1180:10
facility [13] - 1087:10,
1088:4, 1165:6,
1171:20, 1172:7,
1172:16, 1173:6,
1176:9, 1177:3,
1177:11, 1181:8,
1182:12, 1276:22
fact [12] - 1116:3,
1164:12, 1202:20,
1209:20, 1220:21,
1226:14, 1226:16,
1229:13, 1232:12,
1233:6, 1233:20,
1238:2
factory [1] - 1090:3
facts [2] - 1086:25,
1144:12
fair [5] - 1154:3,
1155:1, 1225:4,
1225:8, 1251:14
fairly [1] - 1233:24
fake [1] - 1129:7
familiar [9] - 1118:22,
1198:8, 1200:12,
1239:9, 1243:2,
1243:7, 1248:9,
1268:12, 1270:1
family [2] - 1127:16,
1201:4
far [6] - 1111:1,
1169:8, 1189:24,
1209:16, 1247:6,
1276:15
fascinating [1] -
1255:11
fashion [1] - 1235:24
fashioned [1] - 1158:2
father [4] - 1115:25,
1173:15, 1173:17,
1196:13
faucet [1] - 1126:5
favor [5] - 1126:7,
1199:11, 1199:25,
1200:3, 1263:7
favors [1] - 1126:16
fax [2] - 1073:9,
1073:13
features [1] - 1242:24

February [8] -
1220:20, 1222:5,
1252:20, 1253:15,
1267:18, 1267:21,
1269:10
fee [7] - 1253:19,
1253:20, 1253:23,
1253:24, 1254:1,
1254:9
feeds [1] - 1249:10
fees [1] - 1192:17
feet [4] - 1111:3,
1111:5, 1111:6
FELDMAN [4] -
1060:5, 1176:22,
1176:25, 1178:17
fellow [1] - 1187:17
few [7] - 1084:21,
1101:8, 1107:13,
1152:1, 1160:25,
1178:1, 1222:5
field [1] - 1253:6
figure [3] - 1078:21,
1098:18, 1098:20
figured [1] - 1096:23
figuring [1] - 1214:12
file [13] - 1103:10,
1103:12, 1256:8,
1275:1, 1276:18,
1276:21, 1277:1,
1277:2, 1277:10,
1277:25, 1278:1,
1278:16, 1279:1
filed [5] - 1102:20,
1137:20, 1228:5,
1228:6, 1277:13
files [4] - 1159:8,
1225:3, 1228:11
filing [3] - 1103:14,
1263:15, 1277:4
filings [4] - 1263:13,
1263:16, 1263:19,
1266:6
filled [1] - 1206:13
filter [1] - 1077:11
finally [1] - 1218:22
Financial [1] -
1204:12
financial [32] -
1072:19, 1190:1,
1195:2, 1195:6,
1200:20, 1202:6,
1207:21, 1208:17,
1222:23, 1224:13,
1225:5, 1225:16,
1225:18, 1241:17,
1242:11, 1243:21,
1243:22, 1244:3,
1244:5, 1248:5,
1256:21, 1256:23,

1259:23, 1260:14,
1260:18, 1263:2,
1266:1, 1274:22,
1278:2, 1278:7,
1280:9
financials [4] -
1243:17, 1243:20,
1257:9, 1266:8
financing [1] -
1259:24
fine [2] - 1075:20,
1106:17, 1128:17,
1158:19, 1183:8
finish [1] - 1177:14
finished [1] - 1151:25
Finkel [6] - 1102:20,
1128:23, 1153:19,
1161:10, 1181:25,
1268:9
FINKEL [31] - 1060:2,
1065:4, 1072:20,
1086:23, 1086:25,
1092:6, 1093:18,
1108:14, 1108:18,
1108:23, 1141:10,
1142:2, 1142:6,
1142:9, 1142:13,
1146:13, 1147:3,
1150:10, 1150:14,
1152:4, 1152:24,
1153:20, 1154:2,
1161:13, 1161:16,
1161:18, 1161:22,
1163:12, 1180:6,
1182:15, 1208:10
fix-it [1] - 1154:4
fixed [6] - 1109:5,
1109:6, 1119:18,
1159:15, 1167:5,
1278:6
fixing [2] - 1107:22,
1154:9
fixture [1] - 1077:11
flat [1] - 1109:1
FLAVORS [1] -
1060:11
Flavors [4] - 1142:21,
1142:22, 1142:25,
1176:12
flip [2] - 1273:11,
1273:15
flips [1] - 1094:21
floor [8] - 1075:7,
1077:19, 1084:11,
1108:10, 1145:16,
1152:9, 1152:10,
1174:13
Florida [5] - 1089:25,
1090:1, 1090:3,
1090:10, 1096:19
flow [3] - 1200:21,
1257:9, 1257:11
flows [1] - 1257:2
fluctuate [1] - 1267:6
focal [1] - 1226:10
folders [2] - 1228:11,
1228:12
follow [4] - 1185:9,
1225:24, 1237:18,
1245:18
follow-up [2] -

1241:5, 1252:18,
1253:17, 1257:20,
1268:15, 1268:19,
1269:15, 1270:7,
1276:5, 1276:6,
1280:19
five [15] - 1062:5,
1062:7, 1076:9,
1080:5, 1100:18,
1101:4, 1121:1,
1125:24, 1126:20,
1127:13, 1129:24,
1133:9, 1141:18,
1144:4, 1235:11
fix [19] - 1092:25,
1107:24, 1108:7,
1108:10, 1108:11,
1108:12, 1119:23,
1126:5, 1126:6,
1140:12, 1141:6,
1151:2, 1154:4,
1159:18, 1165:21,
1167:4, 1167:13,
1167:17, 1167:20
fixed [6] - 1109:5,
fixing
flat
FLAVORS
Flavors
flip
flips
floor
Florida
flow
flows
fluctuate
focal
folders
follow
follow-up

1237:18, 1245:18
following [1] -
1213:22
follows [2] - 1061:8,
1194:10
food [2] - 1090:15,
1252:22
forced [1] - 1157:12
forensic [2] - 1271:13,
1271:17
forget [4] - 1068:10,
1134:19, 1135:2,
1207:15
forgive [2] - 1068:18,
1248:10
fork [1] - 1176:3
formation [2] -
1226:25, 1277:20
former [1] - 1109:15
forth [6] - 1101:11,
1155:19, 1202:20,
1218:22, 1218:25,
1219:7
forward [7] - 1192:6,
1192:10, 1193:2,
1240:1, 1255:12,
1264:11, 1279:17
forwarded [2] -
1281:2, 1281:25
four [21] - 1065:12,
1065:15, 1066:19,
1075:9, 1125:24,
1127:13, 1139:19,
1147:21, 1147:23,
1147:24, 1177:10,
1199:8, 1216:21,
1217:20, 1231:10,
1235:1, 1241:9,
1241:10, 1241:12,
1279:1
frequently [2] -
1275:13
Friday [2] - 1137:10,
1144:2
Friedman [90] -
1066:13, 1068:1,
1070:10, 1073:17,
1075:4, 1079:19,
1080:19, 1081:6,
1082:21, 1082:25,
1083:8, 1085:11,
1087:9, 1097:18,
1102:25, 1104:13,
1104:25, 1105:1,
1106:7, 1107:13,
1107:19, 1110:8,
1114:21, 1114:24,
1115:1, 1119:8,
1119:12, 1124:9,
1124:10, 1124:12,

1125:14, 1138:3, 1143:4, 1145:3, 1145:4, 1145:8, 1148:2, 1148:15, 1149:22, 1151:8, 1153:14, 1155:2, 1155:4, 1162:5, 1168:18, 1170:3, 1170:12, 1170:25, 1171:16, 1177:22, 1178:1, 1180:12, 1180:23, 1180:25, 1181:5, 1182:11, 1182:22, 1182:25, 1183:7, 1187:13, 1187:20, 1187:22, 1187:25, 1188:5, 1188:15, 1188:17, 1191:20, 1192:22, 1197:9, 1197:11, 1197:13, 1199:9, 1200:6, 1202:15, 1207:10, 1210:1, 1213:16, 1214:1, 1214:20, 1217:22, 1232:22, 1233:2, 1234:12, 1239:22, 1258:7, 1258:10, 1259:8, 1266:3, 1272:6, 1275:3

**Friedman's** [19] - 1066:20, 1083:7, 1089:13, 1103:25, 1105:11, 1108:7, 1124:17, 1157:6, 1190:8, 1190:13, 1197:22, 1205:1, 1205:3, 1234:6, 1270:14, 1270:20, 1270:22, 1271:8, 1272:17

**friend** [1] - 1127:8

**friends** [2] - 1062:9, 1107:16

**front** [11] - 1078:17, 1086:16, 1087:13, 1132:12, 1176:4, 1203:19, 1203:20, 1203:23, 1228:17, 1230:8, 1281:11

**fuel** [2] - 1062:15, 1082:10

**Fuel** [57] - 1062:23, 1074:10, 1074:12, 1074:13, 1074:14, 1074:15, 1074:17, 1074:20, 1075:1, 1075:2, 1075:6, 1075:8, 1076:7, 1076:18, 1076:19,

---

1081:2, 1081:3, 1082:17, 1082:22, 1082:23, 1083:1, 1083:2, 1083:8, 1083:11, 1083:12, 1084:2, 1084:3, 1084:7, 1084:10, 1084:13, 1091:12, 1091:14, 1109:20, 1127:9, 1127:10, 1136:21, 1136:23, 1136:25, 1137:5, 1137:6, 1137:7, 1137:9, 1137:14, 1140:6, 1143:6, 1143:24, 1144:5, 1145:5, 1145:6, 1152:12, 1152:15, 1171:18

**Fuel's** [1] - 1083:3

**fulfill** [1] - 1154:7

**full** [18] - 1061:13, 1061:15, 1074:11, 1118:25, 1119:2, 1120:2, 1160:4, 1160:13, 1160:17, 1169:17, 1194:14, 1203:6, 1203:9, 1208:6, 1211:9, 1220:9, 1222:18, 1223:17

**full-scale** [1] - 1222:18

**full-time** [4] - 1160:4, 1160:13, 1160:17, 1211:9

**fully** [1] - 1252:3

**function** [1] - 1280:1

**functionality** [1] - 1249:2

**functions** [5] - 1241:25, 1242:1, 1248:11, 1249:9, 1249:12

**funded** [1] - 1237:5

**funds** [1] - 1192:24

**furniture** [1] - 1184:14

**future** [2] - 1060:23, 1223:19

## G

**gain** [1] - 1157:9

**gained** [1] - 1157:16

**games** [2] - 1134:6, 1260:19

**gap** [2] - 1263:6, 1263:21

**garbage** [8] - 1132:25, 1136:12, 1136:15,

---

1143:15, 1143:17, 1151:17, 1166:14

**gas** [6] - 1126:13, 1126:15, 1126:17, 1126:25, 1169:19

**gate** [1] - 1086:15

**Gates** [1] - 1119:6

**gauges** [6] - 1099:6, 1169:19, 1169:20, 1169:21, 1169:23

**GEFELL** [1] - 1060:7

**Gene's** [1] - 1119:22

**general** [6] - 1125:1, 1197:16, 1216:8, 1229:2, 1229:3, 1274:13

**generally** [5] - 1223:12, 1227:1, 1241:20, 1277:9, 1277:13

**generate** [2] - 1279:22, 1280:4

**generated** [4] - 1222:23, 1227:15, 1241:19, 1266:13

**generates** [1] - 1263:14

**generating** [1] - 1264:3

**gentleman** [2] - 1201:12, 1246:16

**GEOFFREY** [2] - 1060:8

**George's** [1] - 1169:5

**Georgia** [1] - 1138:24

**girl** [1] - 1079:24

**given** [12] - 1125:18, 1218:23, 1220:7, 1220:24, 1225:23, 1226:11, 1228:7, 1233:11, 1234:1, 1234:8, 1243:21, 1254:7

**Global** [1] - 1090:23

**glorified** [1] - 1222:17

**gloves** [1] - 1149:6

**Gmail** [1] - 1115:16

**goal** [1] - 1279:21

**GOLDFARB** [2] - 1186:4, 1186:8

**Goldfarb** [1] - 1186:4

**Google** [1] - 1164:16

**GPS** [1] - 1175:20

**grabbed** [4] - 1094:7, 1094:15, 1095:3, 1101:10

**graduate** [1] - 1194:19

**grant** [3] - 1210:15, 1210:17, 1210:19

**granted** [1] - 1210:16

---

**granting** [1] - 1191:25

**GRANTZ** [10] - 1098:9, 1106:11, 1106:14, 1106:17, 1107:8, 1111:7, 1186:22, 1187:11, 1187:15, 1187:18

**greasy** [1] - 1149:6

**great** [1] - 1237:17

**greater** [3] - 1213:14, 1218:24, 1220:11

**groups** [1] - 1233:22

**grown** [1] - 1243:3

**guess** [20] - 1078:1, 1096:8, 1108:18, 1110:21, 1114:15, 1114:20, 1121:19, 1122:8, 1127:16, 1147:12, 1148:10, 1149:16, 1159:1, 1162:22, 1170:22, 1220:20, 1233:12, 1245:5, 1269:11, 1269:12

**guessing** [2] - 1269:11, 1271:21

**guidance** [1] - 1232:23

**guided** [1] - 1232:7

**guy** [12] - 1064:12, 1068:17, 1074:16, 1106:3, 1109:3, 1109:8, 1133:10, 1151:20, 1151:22, 1152:8, 1154:4, 1173:24

**guys** [2] - 1097:3, 1173:23

## H

**H&A** [6] - 1078:15, 1078:16, 1078:19, 1079:3, 1079:13, 1151:20

**H&A's** [1] - 1078:9

**half** [4] - 1074:4, 1074:6, 1078:16, 1134:11

**hallway** [4] - 1110:24, 1146:10, 1180:9

**hallways** [1] - 1067:23

**hand** [6] - 1061:6, 1123:19, 1147:17, 1174:19, 1194:7, 1224:4

**handed** [1] - 1180:23

**handle** [1] - 1242:9

**handled** [3] - 1206:16, 1246:5

---

**handles** [1] - 1249:9

**handling** [1] - 1241:24

**hang** [1] - 1065:19

**hanged** [1] - 1139:16

**happy** [2] - 1090:8, 1162:14

**hard** [6] - 1139:2, 1141:2, 1165:23, 1165:25, 1167:3, 1276:18

**harder** [1] - 1224:15

**Hawthorne** [4] - 1063:11, 1063:12, 1063:14, 1153:15

**head** [1] - 1277:6

**hear** [9] - 1061:14, 1085:25, 1108:17, 1116:15, 1139:3, 1139:10, 1191:1, 1207:1, 1215:6

**heard** [9] - 1108:20, 1156:16, 1171:8, 1172:8, 1185:1, 1230:24, 1239:1, 1270:23, 1280:20

**hearing** [18] - 1137:25, 1138:1, 1138:12, 1138:16, 1138:19, 1139:11, 1191:22, 1192:11, 1193:2, 1193:7, 1193:8, 1193:9, 1193:24, 1240:5, 1240:13, 1240:16, 1255:13, 1280:19

**hearsay** [1] - 1146:13

**heart** [1] - 1132:4

**heat** [3] - 1088:13, 1119:20, 1119:22

**heating** [10] - 1064:7, 1074:16, 1078:24, 1083:5, 1084:10, 1099:4, 1107:25, 1108:5, 1119:10, 1141:6

**Heating** [1] - 1077:22

**heavy** [2] - 1067:14, 1147:12

**Hector** [1] - 1079:16

**HELLER** [1] - 1060:10

**help** [16] - 1066:1, 1066:13, 1084:20, 1085:4, 1085:8, 1085:13, 1092:25, 1097:22, 1127:11, 1147:11, 1149:21, 1191:1, 1206:9, 1206:25, 1274:5

**helped** [11] - 1066:12, 1067:13, 1067:14,

1074:24, 1084:17,
1094:8, 1095:2,
1136:12, 1160:2,
1172:8, 1234:11
**helping** [2] - 1148:21,
1254:18
**herself** [1] - 1207:9
**HERSKO** [2] - 1060:8,
1060:8
**Herzog** [3] - 1277:1,
1278:21
**hi** [3] - 1143:21,
1143:23, 1238:22
**Hi** [4] - 1175:25,
1176:1, 1176:2,
1176:3
**hi-lo** [2] - 1143:21,
1143:23
**Hi-Lo** [4] - 1175:25,
1176:1, 1176:2,
1176:3
**hide** [1] - 1135:10
**higher** [3] - 1201:5,
1205:18, 1208:8
**higher-end** [1] -
1201:5
**higher-level** [1] -
1205:18
**Hillel** [1] - 1186:20
**hire** [1] - 1239:25
**hired** [7] - 1209:11,
1239:18, 1239:20,
1239:24, 1241:24,
1242:4, 1246:22
**hires** [1] - 1211:9
**historical** [5] -
1225:15, 1244:20,
1244:24, 1264:15,
1279:21
**history** [1] - 1244:23
**hmm** [3] - 1072:18,
1078:13, 1092:23
**hold** [1] - 1081:12
**holiday** [1] - 1262:10
**home** [16] - 1064:2,
1064:3, 1089:17,
1090:20, 1127:12,
1130:17, 1130:21,
1132:6, 1141:22,
1141:23, 1165:18,
1166:3, 1166:9,
1243:3
**home-grown** [1] -
1243:3
**honest** [1] - 1212:16
**honestly** [3] -
1068:15, 1102:18,
1216:24
**Honor** [48] - 1060:18,
1060:25, 1065:4,

1072:20, 1093:18,
1108:14, 1108:18,
1108:23, 1120:22,
1128:17, 1141:10,
1142:2, 1142:6,
1142:9, 1153:18,
1161:14, 1163:13,
1163:15, 1175:9,
1175:11, 1176:21,
1178:17, 1182:15,
1184:20, 1184:25,
1186:15, 1186:19,
1186:22, 1187:4,
1187:19, 1188:10,
1188:15, 1189:4,
1189:6, 1189:16,
1189:25, 1190:10,
1191:3, 1208:23,
1209:3, 1230:10,
1236:7, 1236:13,
1237:19, 1238:9,
1238:15, 1281:10,
1281:16
**hope** [1] - 1199:1
**hor** [1] - 1061:17
**hor-hey** [1] - 1061:17
**Hot** [2] - 1133:20,
1133:23
**hotel** [1] - 1090:15
**Hotmail** [1] - 1113:16
**hotmail.com** [1] -
1133:25
**hour** [6] - 1110:21,
1111:10, 1111:11,
1122:8, 1153:16,
1212:23
**hourly** [3] - 1122:6,
1123:1, 1123:3
**hours** [23] - 1110:21,
1111:9, 1121:5,
1122:5, 1123:7,
1212:9, 1213:5,
1213:10, 1213:11,
1213:23, 1214:11,
1214:17, 1215:2,
1215:20, 1227:17,
1236:3, 1262:7,
1262:8, 1264:9,
1264:19, 1267:5
**house** [20] - 1072:9,
1073:13, 1084:10,
1119:18, 1119:22,
1126:4, 1126:1,
1126:10, 1126:12,
1126:13, 1126:18,
1126:22, 1127:14,
1133:14, 1140:12,
1140:25, 1141:1,
1166:18, 1166:20
**houses** [2] - 1126:21,

1141:5
**human** [1] - 1226:6
**hundred** [6] - 1069:10,
1128:4, 1203:1,
1215:10, 1250:13,
1250:18
**hundred-person** [1] -
1215:10
**hunts** [1] - 1081:3
**husband** [2] -
1127:12, 1127:16

---

## I

**i.e** [2] - 1199:16,
1260:3
**icon** [1] - 1113:18
**idea** [17] - 1080:3,
1081:15, 1101:9,
1102:15, 1110:6,
1121:11, 1126:4,
1138:9, 1139:16,
1148:13, 1150:6,
1152:5, 1152:16,
1153:11, 1166:21,
1178:13, 1192:7
**identified** [2] - 1207:9,
1276:12
**identify** [1] - 1229:4
**ignorance** [1] - 1261:4
**imagine** [1] - 1081:24
**immediate** [1] -
1239:5
**impasse** [2] - 1190:19,
1190:20
**impedes** [1] - 1232:13
**implement** [9] -
1195:6, 1199:16,
1202:18, 1250:5,
1250:7, 1252:8,
1252:19, 1252:24,
1255:4
**implementation** [4] -
1253:19, 1254:2,
1255:2, 1259:23
**implemented** [16] -
1199:22, 1200:10,
1200:22, 1200:25,
1202:5, 1202:21,
1248:16, 1248:18,
1248:20, 1252:3,
1252:16, 1252:17,
1254:25, 1259:24,
1265:24, 1266:1
**implementing** [7] -
1198:16, 1199:11,
1200:4, 1200:23,
1201:10, 1254:11,
1254:24
**important** [1] - 1225:4

**improper** [3] -
1192:23, 1196:10,
1223:18
**improperly** [1] -
1260:2
**inaccurate** [1] -
1243:24
**inadequate** [3] -
1201:4, 1244:19,
1249:8
**inch** [1] - 1092:22
**incidentally** [1] -
1265:15
**includes** [1] - 1172:22
**income** [5] - 1140:3,
1142:5, 1243:25,
1257:1, 1257:10
**increased** [1] -
1218:18
**incur** [1] - 1090:14
**Indeed** [2] - 1239:14,
1239:16
**indeed** [1] - 1239:15
**independent** [1] -
1201:12
**independently** [1] -
1278:8
**indicate** [1] - 1217:10
**indicated** [3] -
1217:12, 1230:16,
1230:18
**indicating** [4] -
1078:17, 1156:17,
1227:17, 1236:3
**Indicating** [2] -
1183:16, 1183:19
**indicating)** [4] -
1094:20, 1172:23,
1173:10, 1227:6
**individually** [1] -
1106:16
**individuals** [1] -
1206:11
**industry** [1] - 1250:2
**industry-specific** [1] -
1250:2
**inefficiency** [1] -
1190:7
**inexperienced** [1] -
1209:12
**inflate** [1] - 1260:13
**inform** [1] - 1144:17
**information** [100] -
1073:3, 1073:8,
1129:17, 1129:23,
1203:5, 1206:13,
1206:15, 1206:18,
1207:2, 1207:13,
1208:24, 1210:10,
1210:14, 1211:8,

1211:12, 1211:15,
1212:4, 1212:7,
1212:18, 1212:19,
1221:15, 1221:20,
1221:25, 1223:2,
1223:3, 1223:7,
1224:3, 1225:2,
1225:5, 1226:14,
1226:15, 1226:16,
1226:19, 1228:6,
1229:4, 1235:13,
1236:10, 1236:17,
1236:18, 1236:22,
1236:25, 1237:4,
1237:10, 1237:23,
1237:24, 1238:6,
1244:10, 1244:20,
1244:25, 1245:8,
1245:19, 1246:10,
1246:12, 1246:24,
1247:2, 1247:4,
1247:8, 1247:15,
1247:18, 1247:25,
1248:1, 1248:5,
1248:7, 1252:5,
1255:6, 1255:15,
1255:23, 1256:2,
1256:6, 1256:14,
1256:15, 1256:17,
1258:18, 1258:20,
1259:21, 1261:15,
1262:13, 1262:14,
1263:3, 1263:12,
1263:14, 1263:25,
1264:7, 1264:8,
1264:14, 1266:11,
1266:12, 1266:13,
1267:5, 1267:7,
1267:11, 1274:24,
1275:12, 1277:22,
1279:14, 1279:23,
1280:4, 1280:5
**informative** [1] -
1274:5
**initial** [2] - 1198:15,
1198:18
**initiated** [2] - 1201:19,
1201:20
**injunction** [15] -
1195:16, 1195:18,
1210:6, 1210:8,
1217:15, 1218:14,
1218:17, 1219:5,
1220:3, 1220:16,
1225:21, 1226:2,
1226:17, 1226:20,
1233:16
**input** [3] - 1245:20,
1247:5, 1247:8
**inquiry** [1] - 1231:18

**inside** [6] - 1094:19, 1145:2, 1159:9, 1159:11, 1179:16, 1179:17
**inspection** [3] - 1065:1, 1065:2
**inspector** [3] - 1109:25, 1110:1
**install** [8] - 1065:8, 1065:9, 1136:12, 1143:17, 1175:16, 1195:5, 1241:18
**installed** [5] - 1134:15, 1175:24, 1242:10, 1242:14, 1254:9
**installing** [2] - 1065:3, 1242:9
**installments** [3] - 1253:21, 1254:4, 1254:6
**instance** [3] - 1143:19, 1212:18, 1227:14
**instead** [4] - 1110:16, 1127:18, 1200:25, 1230:7
**instituted** [1] - 1260:1
**instructed** [1] - 1066:13
**instructions** [4] - 1066:20, 1280:14, 1281:2, 1281:23
**instrument** [1] - 1172:5
**insulting** [1] - 1212:17
**insurance** [2] - 1206:12, 1212:18
**insurance-type** [1] - 1206:12
**integrated** [1] - 1166:17
**intended** [1] - 1249:3
**intent** [1] - 1198:11
**intentionally** [2] - 1158:21, 1159:2
**interacted** [1] - 1272:22
**interested** [3] - 1137:11, 1147:9, 1190:15
**interests** [3] - 1188:5, 1188:25, 1190:9
**interfere** [2] - 1232:10, 1259:16
**interim** [1] - 1221:14
**interior** [1] - 1159:23
**Internet** [4] - 1164:2, 1164:3, 1164:16, 1179:2

**interrupt** [4] - 1088:17, 1202:3, 1245:6, 1249:18
**interview** [4] - 1089:13, 1239:11, 1241:7, 1241:9
**interviewed** [1] - 1241:6
**introduce** [1] - 1186:20
**introduced** [3] - 1148:16, 1207:14, 1239:24
**inventory** [5] - 1222:24, 1242:19, 1243:5, 1248:13, 1256:8
**investigate** [1] - 1126:11
**investment** [1] - 1072:13
**investor** [3] - 1197:15, 1197:23, 1207:5
**invited** [1] - 1090:25
**invoice** [4] - 1224:18, 1235:12, 1256:9, 1256:10
**invoices** [8] - 1203:16, 1224:25, 1228:12, 1247:1, 1256:10, 1274:21, 1278:6
**invoicing** [2] - 1274:20, 1278:24
**involved** [13] - 1123:25, 1152:17, 1153:10, 1177:13, 1193:17, 1198:15, 1198:17, 1198:19, 1198:21, 1226:7, 1251:7, 1252:24, 1253:2
**involvement** [1] - 1152:12
**Iona** [1] - 1194:19
**iPhone** [11] - 1111:25, 1112:1, 1113:5, 1129:4, 1129:5, 1129:7, 1130:7, 1130:8, 1130:20, 1160:21, 1160:24
**irrelevant** [1] - 1261:22
**Isaac** [1] - 1246:17
**Isaac's** [1] - 1246:19
**Israeli** [1] - 1201:11
**issue** [11] - 1078:20, 1168:2, 1170:4, 1190:19, 1190:21, 1190:22, 1214:7, 1267:2, 1279:25,

1280:24
**issued** [4] - 1091:2, 1155:21, 1203:17, 1226:24
**issues** [7] - 1191:2, 1212:23, 1213:25, 1215:24, 1217:6, 1263:8, 1265:4
**Istremia** [1] - 1071:19
**IT** [3] - 1196:11, 1198:5, 1254:22
**item** [1] - 1223:17, 1244:17, 1256:8
**items** [2] - 1235:1, 1235:8
**itself** [1] - 1151:13

## J

**Jack** [3] - 1080:1, 1080:2, 1148:25
**January** [4] - 1218:17, 1263:5, 1264:11, 1265:10
**Janz** [1] - 1081:8
**Javier** [2] - 1067:12, 1157:10
**Jay** [2] - 1230:4, 1271:14
**Jersey** [8] - 1127:18, 1156:15, 1157:13, 1190:21, 1194:17, 1206:14, 1236:5, 1277:22
**job** [16] - 1063:21, 1064:6, 1082:18, 1087:7, 1107:18, 1109:18, 1109:22, 1109:24, 1119:11, 1123:22, 1135:17, 1195:1, 1202:18, 1207:17, 1216:6, 1239:16
**jobs** [2] - 1143:24, 1248:13
**John** [1] - 1151:16
**joined** [2] - 1239:4, 1256:20
**jokes** [1] - 1178:9
**Jones** [2] - 1205:6, 1205:8
**Jordan** [3] - 1209:6, 1209:8, 1224:23
**Jorge** [4] - 1061:16, 1101:3, 1115:18, 1140:11
**JORGE** [2] - 1060:3, 1061:7
**JOSHUA** [1] - 1060:14
**joshuabedwards**

**1980@gmail.com** [1] - 1060:15
**JRIT** [1] - 1202:25
**JS1567@hotmail. com** [1] - 1115:14
**Judge** [6] - 1117:7, 1192:13, 1211:18, 1211:23, 1249:19, 1249:21
**judgment** [1] - 1199:14
**July** [5] - 1141:21, 1257:23, 1257:24, 1281:13, 1281:24
**June** [7] - 1141:21, 1194:25, 1202:2, 1239:2, 1257:15, 1257:18, 1257:20

## K

**keep** [9] - 1073:17, 1129:14, 1142:4, 1156:17, 1161:11, 1169:23, 1205:21, 1224:24, 1277:13
**keeping** [1] - 1227:22
**kept** [3] - 1094:22, 1149:18, 1236:18
**key** [62] - 1085:22, 1085:23, 1086:5, 1086:8, 1086:10, 1086:14, 1086:15, 1086:17, 1086:18, 1086:19, 1087:3, 1087:11, 1087:14, 1087:15, 1094:6, 1094:17, 1094:19, 1096:16, 1099:11, 1100:8, 1100:22, 1100:24, 1155:12, 1155:14, 1155:25, 1157:18, 1157:20, 1157:21, 1157:22, 1157:23, 1157:25, 1158:2, 1158:12, 1158:13, 1158:16, 1159:7, 1171:10, 1181:8, 1181:11, 1181:15, 1181:21, 1181:24, 1182:5, 1182:6, 1182:7, 1233:8, 1233:9, 1233:10, 1233:11, 1233:19, 1233:23, 1233:25, 1234:3, 1234:6, 1234:7, 1234:8, 1254:17, 1254:18
**keypad** [1] - 1179:10

**keys** [11] - 1087:2, 1087:10, 1087:12, 1094:15, 1094:16, 1094:25, 1095:12, 1100:17, 1158:18, 1159:14, 1233:19
**kids** [1] - 1068:20
**kind** [11] - 1069:21, 1075:17, 1172:6, 1211:2, 1219:1, 1221:3, 1221:7, 1236:17, 1242:9, 1267:7, 1279:8
**kitchen** [1] - 1126:9, 1174:19
**knowing** [2] - 1167:14, 1237:22
**knowledge** [9] - 1178:12, 1206:12, 1208:14, 1222:7, 1233:18, 1234:7, 1239:23, 1263:20, 1270:21
**known** [7] - 1061:17, 1062:6, 1062:8, 1062:9, 1080:13, 1148:1, 1148:2
**knows** [3] - 1093:23, 1127:21, 1278:25
**Koenig** [14] - 1197:1, 1197:3, 1199:9, 1200:8, 1201:9, 1234:2, 1239:11, 1239:13, 1239:23, 1241:7, 1250:17, 1275:4, 1275:11
**Koenig's** [1] - 1197:5

## L

**L-shape** [2] - 1094:17, 1184:7
**labor** [1] - 1267:3
**lack** [2] - 1202:11, 1262:25
**lacking** [1] - 1236:25
**lady** [6] - 1138:19, 1138:23, 1138:24, 1139:13, 1139:15, 1147:14
**laid** [1] - 1267:6
**laptop** [3] - 1234:13, 1234:18, 1234:21
**large** [2] - 1177:11, 1203:22
**largely** [2] - 1202:16, 1266:12
**largest** [1] - 1203:20
**Larry** [6] - 1080:10, 1080:11, 1080:13,

*SCHREIBER v. FRIEDMAN   15-CV-6861*                    14

1080:14, 1254:20, 1254:23
**last** [34] - 1063:4, 1063:5, 1063:7, 1063:8, 1065:21, 1065:23, 1065:25, 1066:4, 1066:9, 1066:15, 1085:25, 1152:11, 1164:18, 1164:22, 1167:25, 1170:11, 1172:11, 1184:20, 1192:14, 1198:23, 1204:4, 1217:19, 1222:5, 1234:21, 1235:11, 1240:15, 1246:17, 1246:19, 1255:24, 1256:3, 1257:14, 1275:8, 1275:10, 1280:17
**late** [4] - 1060:19, 1060:24, 1100:12, 1214:15
**lateral** [2] - 1278:16, 1279:1
**launch** [62] - 1220:8, 1220:17, 1220:24, 1221:1, 1221:4, 1221:11, 1221:17, 1221:22, 1222:6, 1222:8, 1222:15, 1222:16, 1222:20, 1223:1, 1223:3, 1223:4, 1223:11, 1223:17, 1223:24, 1224:14, 1224:18, 1224:21, 1224:24, 1225:2, 1225:5, 1225:17, 1228:1, 1235:5, 1235:6, 1235:13, 1235:14, 1235:16, 1235:18, 1236:11, 1236:18, 1236:21, 1237:9, 1237:11, 1237:24, 1238:3, 1238:4, 1238:6, 1244:11, 1245:3, 1245:13, 1245:15, 1245:17, 1245:21, 1246:3, 1246:7, 1246:23, 1246:25, 1247:1, 1247:4, 1248:25, 1249:3, 1251:3, 1251:20, 1251:21, 1252:1
**Launch** [52] - 1198:8, 1198:10, 1198:16, 1198:20, 1199:6, 1199:11, 1200:1,

1200:4, 1200:10, 1200:24, 1201:19, 1202:8, 1202:21, 1202:24, 1203:3, 1203:4, 1203:7, 1208:5, 1209:17, 1209:20, 1210:5, 1210:7, 1212:2, 1212:4, 1218:19, 1218:24, 1262:20, 1262:22, 1263:1, 1264:1, 1264:7, 1264:13, 1264:15, 1265:3, 1266:21, 1266:23, 1267:8, 1268:23, 1274:1, 1274:15, 1279:12, 1279:13, 1279:18, 1279:22, 1280:1, 1280:12, 1280:15, 1280:22, 1281:1, 1281:3
**Laurence** [4] - 1080:7, 1080:12, 1080:14
**law** [5] - 1227:19, 1235:25, 1262:4, 1264:18, 1280:8
**laws** [1] - 1280:5
**lawsuit** [6] - 1240:5, 1240:8, 1240:10, 1251:10, 1251:12
**lawyer** [10] - 1102:20, 1110:11, 1135:21, 1135:22, 1136:3, 1161:4, 1183:5, 1188:24, 1193:3, 1232:12
**lawyers** [1] - 1269:3
**laying** [1] - 1189:17
**lead** [2] - 1201:15, 1225:12
**leading** [2] - 1201:14, 1225:11
**leaking** [1] - 1126:6
**leaks** [1] - 1064:14
**learn** [4] - 1217:25, 1218:2, 1218:3, 1218:4
**learned** [1] - 1250:17
**learning** [1] - 1276:5
**least** [6] - 1081:19, 1111:10, 1111:11, 1121:7, 1233:5, 1250:9
**leave** [3] - 1060:22, 1103:2, 1251:24
**leaves** [1] - 1128:19
**leaving** [4] - 1118:19, 1146:22, 1146:23, 1232:11

**ledger** [1] - 1216:8
**left** [24] - 1068:3, 1086:5, 1093:15, 1094:8, 1096:24, 1097:25, 1099:13, 1099:22, 1099:25, 1101:7, 1101:15, 1103:2, 1103:18, 1107:12, 1110:1, 1112:18, 1133:3, 1136:8, 1136:22, 1137:18, 1152:2, 1164:24, 1171:5, 1174:19
**left-hand** [1] - 1174:19
**legal** [4] - 1232:6, 1232:23, 1277:12
**lend** [1] - 1155:18
**lent** [1] - 1089:17
**less** [6] - 1121:12, 1121:13, 1208:4, 1250:2, 1259:5
**lesson** [1] - 1214:3
**letter** [7] - 1186:12, 1229:10, 1229:13, 1229:16, 1229:24, 1230:12, 1265:14
**Lety** [2] - 1277:18, 1279:3
**level** [3] - 1198:13, 1205:18, 1208:8
**levels** [1] - 1250:1
**liability** [1] - 1206:17
**license** [5] - 1064:22, 1064:24, 1064:25, 1065:2, 1065:8
**licensed** [1] - 1064:19
**life** [1] - 1120:14
**light** [2] - 1077:11, 1126:5
**lights** [1] - 1067:21
**likely** [4] - 1112:9, 1125:19, 1138:14, 1166:19
**limited** [10] - 1191:20, 1203:5, 1203:16, 1209:21, 1211:21, 1215:25, 1216:7, 1222:16, 1227:13, 1274:21
**Lincoln** [1] - 1280:6
**line** [4] - 1073:16, 1100:18, 1100:19, 1182:10
**list** [1] - 1140:24
**listed** [4] - 1204:6, 1207:21, 1209:5, 1209:16
**listen** [2] - 1139:1, 1144:16

**listing** [1] - 1204:22
**litigation** [1] - 1190:21
**live** [6] - 1068:19, 1120:14, 1125:22, 1125:23, 1126:19, 1127:15
**lives** [3] - 1068:24, 1125:24, 1127:16
**LLC** [10] - 1060:11, 1060:12, 1060:12, 1176:12, 1176:15, 1199:3, 1199:5, 1215:21, 1241:10, 1251:9
**Lo** [4] - 1175:25, 1176:1, 1176:2, 1176:3
**lo** [2] - 1143:21, 1143:23
**load** [3] - 1067:14, 1068:3, 1084:24
**loan** [6] - 1236:17, 1236:21, 1237:2, 1237:4, 1237:24, 1238:7
**loans** [1] - 1236:10, 1236:18, 1236:20, 1237:1, 1237:3, 1237:4, 1237:8, 1238:4
**located** [11] - 1062:16, 1063:10, 1071:16, 1159:9, 1163:19, 1165:5, 1166:18, 1245:21, 1256:15, 1274:25, 1276:21
**location** [3] - 1164:23, 1172:25, 1177:23
**locked** [3] - 1078:9, 1233:17, 1270:22
**locks** [2] - 1085:17, 1085:19
**locksmith** [1] - 1085:20
**log** [5] - 1100:16, 1133:23, 1133:24, 1221:15, 1221:20
**log-in** [2] - 1221:15, 1221:20
**Logistics** [1] - 1196:6
**logistics** [1] - 1254:23
**look** [35] - 1069:13, 1083:21, 1083:22, 1083:25, 1092:20, 1100:17, 1104:5, 1120:22, 1130:18, 1131:3, 1132:13, 1136:1, 1136:2, 1161:24, 1162:4, 1166:21, 1173:1,

1177:9, 1182:25, 1184:5, 1184:8, 1184:10, 1185:9, 1203:23, 1204:22, 1208:16, 1209:5, 1229:8, 1259:13, 1268:12, 1269:7, 1269:14, 1272:12, 1275:16
**Look** [3] - 1192:19, 1193:14, 1208:11
**looked** [5] - 1089:4, 1164:16, 1184:13, 1234:18
**looking** [11] - 1092:16, 1110:11, 1190:16, 1190:25, 1206:10, 1220:21, 1224:16, 1232:16, 1238:5, 1272:7, 1272:8
**looks** [2] - 1273:10, 1273:12
**loose** [1] - 1260:17
**loosely** [1] - 1277:23
**lose** [1] - 1112:22
**loss** [1] - 1280:1
**lost** [8] - 1112:3, 1112:8, 1112:14, 1112:23, 1113:13, 1130:11, 1167:2
**loud** [1] - 1139:6
**low** [2] - 1248:15, 1251:4
**low-end** [2] - 1248:15, 1251:4
**lower** [1] - 1251:2
**lower-cost** [1] - 1251:2
**lunch** [5] - 1090:15, 1156:4, 1156:5, 1184:22

---

## M

**M&S** [1] - 1082:8
**M-e-g-l-i-o** [1] - 1265:8
**M-I-S-Y-S** [1] - 1222:13
**machine** [38] - 1065:24, 1067:19, 1088:15, 1090:2, 1090:4, 1090:8, 1094:6, 1094:7, 1094:12, 1094:19, 1095:3, 1095:9, 1096:4, 1096:10, 1096:14, 1096:16, 1096:17, 1096:19, 1096:20, 1096:23, 1096:24, 1097:1,

1097:3, 1097:4, 1097:5, 1097:7, 1097:10, 1097:12, 1129:12, 1129:14, 1129:21, 1129:22, 1129:24, 1159:11, 1174:14, 1180:3
**machinery** [5] - 1064:13, 1067:22, 1154:10, 1154:11, 1176:6
**machines** [16] - 1088:12, 1093:17, 1094:5, 1096:17, 1097:13, 1122:1, 1129:11, 1129:18, 1135:11, 1136:13, 1136:17, 1136:18, 1159:15, 1159:18, 1159:20, 1164:17
**Mail** [2] - 1133:20, 1133:23
**mail** [50] - 1113:6, 1113:11, 1113:15, 1113:18, 1113:23, 1114:13, 1114:19, 1115:6, 1115:7, 1115:8, 1115:9, 1115:11, 1115:15, 1115:19, 1117:2, 1118:15, 1118:17, 1133:18, 1133:19, 1133:22, 1134:3, 1134:4, 1134:15, 1135:6, 1162:16, 1162:20, 1162:22, 1162:23, 1204:15, 1204:17, 1205:3, 1228:19, 1229:13, 1229:15, 1230:13, 1230:19, 1231:16, 1232:4, 1258:10, 1258:11, 1268:9, 1269:20, 1270:5, 1270:8, 1272:23, 1273:7, 1281:12, 1281:24, 1281:25
**mailed** [2] - 1224:25, 1225:1
**mails** [5] - 1113:3, 1113:5, 1114:9, 1114:11, 1118:13
**main** [2] - 1078:10, 1237:4
**maintain** [7] - 1130:21, 1148:22, 1227:19, 1236:1, 1236:2, 1262:4, 1264:19
**maintained** [2] -

1236:11, 1276:19
**maintaining** [1] - 1148:18
**maintenance** [1] - 1254:9
**major** [1] - 1194:19
**majority** [3] - 1218:9, 1218:10, 1218:12
**man** [8] - 1068:18, 1137:11, 1141:4, 1147:10, 1152:22, 1189:13, 1190:8, 1194:6
**man's** [1] - 1248:12
**manage** [1] - 1251:25
**management** [3] - 1215:22, 1226:7, 1242:11
**manager** [7] - 1150:22, 1196:24, 1204:12, 1207:22, 1208:17, 1215:19, 1254:20
**mangled** [1] - 1245:19
**manner** [1] - 1199:18
**Manriquez** [2] - 1277:18, 1279:4
**manually** [1] - 1224:5
**manufacturer** [1] - 1201:8
**manufacturers** [1] - 1252:23
**manufacturing** [3] - 1196:23, 1200:18, 1242:19
**March** [6] - 1068:8, 1092:22, 1100:20, 1257:15, 1257:17, 1258:17
**Maria** [1] - 1141:5
**marked** [1] - 1203:19
**marketing** [1] - 1197:8
**marketplace** [1] - 1251:24
**Marquez** [1] - 1279:3
**Marquis** [1] - 1279:7
**match** [1] - 1092:1
**matches** [2] - 1237:23, 1238:2
**material** [2] - 1248:14, 1256:9
**materials** [2] - 1178:14, 1272:17
**matter** [7] - 1137:8, 1209:1, 1210:6, 1232:15, 1232:24, 1255:13, 1281:18
**matters** [6] - 1216:1, 1230:25, 1232:19, 1232:21, 1232:22,

1241:3
**MAURICE** [1] - 1060:10
**Max** [1] - 1063:2
**Max's** [1] - 1063:8
**Mayer** [14] - 1197:1, 1197:3, 1199:6, 1200:8, 1209:24, 1216:14, 1239:11, 1239:23, 1250:16, 1253:1, 1258:2, 1258:4, 1259:5, 1265:20
**MB** [70] - 1074:10, 1074:12, 1074:13, 1074:14, 1074:15, 1074:17, 1074:20, 1075:1, 1075:2, 1075:6, 1075:8, 1076:7, 1076:18, 1076:19, 1079:6, 1079:23, 1081:16, 1081:21, 1081:25, 1082:2, 1082:5, 1082:6, 1082:8, 1082:17, 1082:22, 1082:23, 1083:1, 1083:2, 1083:8, 1083:10, 1083:12, 1084:3, 1084:7, 1084:9, 1084:13, 1091:11, 1091:14, 1107:21, 1108:6, 1108:8, 1109:20, 1121:21, 1121:23, 1123:14, 1127:9, 1127:10, 1136:21, 1136:23, 1136:25, 1137:5, 1137:6, 1137:7, 1137:9, 1137:14, 1140:6, 1143:6, 1143:24, 1144:5, 1145:5, 1145:6, 1152:12, 1160:7, 1160:18, 1171:18
**mean** [17] - 1071:15, 1076:25, 1091:20, 1095:24, 1096:12, 1125:1, 1134:22, 1184:22, 1201:20, 1212:16, 1227:13, 1231:1, 1231:3, 1240:20, 1243:19, 1252:1
**meaning** [1] - 1244:21
**means** [4] - 1065:6, 1096:7, 1158:24, 1208:25
**meant** [1] - 1230:20

**mechanic** [8] - 1064:11, 1107:21, 1107:22, 1109:2, 1109:23, 1148:18, 1149:2, 1149:3
**mechanical** [1] - 1060:16
**mechanically** [1] - 1074:24
**mechanically-wise** [1] - 1074:24
**mechanics** [8] - 1075:9, 1075:10, 1076:14, 1108:11, 1108:12, 1108:25, 1224:2
**mechanism** [2] - 1127:17, 1131:7
**medium** [1] - 1201:7
**medium-sized** [1] - 1201:7
**meet** [8] - 1148:4, 1148:25, 1149:8, 1149:10, 1149:12, 1150:7, 1150:19, 1241:5
**meeting** [3] - 1226:12, 1240:4, 1258:2
**Meglio** [10] - 1195:22, 1265:7, 1265:8, 1265:9, 1265:13, 1265:16, 1265:19, 1265:22, 1266:6, 1266:10
**MEGLIO** [1] - 1195:22
**members** [14] - 1177:22, 1199:3, 1199:5, 1215:21, 1239:21, 1241:9, 1241:10, 1248:6, 1251:9, 1257:12, 1258:21, 1258:25, 1265:16, 1265:18
**memory** [1] - 1183:3
**mention** [2] - 1132:10, 1132:24
**mentioned** [19] - 1132:19, 1132:23, 1165:11, 1178:24, 1180:18, 1181:19, 1195:8, 1216:20, 1243:6, 1248:9, 1249:22, 1249:23, 1256:20, 1259:23, 1261:9, 1265:7, 1278:11, 1278:21, 1279:3
**Mercedes** [1] - 1254:22
**merchandise** [1] -

1116:8
**mess** [2] - 1096:8, 1159:2
**message** [3] - 1162:17, 1162:21, 1273:2
**messes** [1] - 1135:4
**messing** [1] - 1158:25
**met** [8] - 1106:8, 1140:21, 1148:5, 1148:15, 1149:9, 1150:18, 1197:13, 1240:3
**metal** [6] - 1088:12, 1088:13, 1158:2, 1158:16
**method** [1] - 1201:11
**mic** [1] - 1163:10
**mice** [1] - 1248:9
**MICHAEL** [2] - 1060:5
**microcenter** [1] - 1168:16
**microphone** [2] - 1114:17, 1117:5
**mid** [2] - 1236:15, 1251:16
**mid-2014** [2] - 1202:5, 1245:5
**mid-afternoon** [1] - 1236:15
**mid-December** [1] - 1251:16
**middle** [3] - 1141:21, 1163:3, 1229:25
**might** [14] - 1068:9, 1082:25, 1091:6, 1102:11, 1125:18, 1127:22, 1129:24, 1130:24, 1162:18, 1184:12, 1217:10, 1227:1, 1277:21, 1278:5
**migrate** [1] - 1245:7
**migrated** [3] - 1245:3, 1245:8, 1245:9
**Mike** [10] - 1195:14, 1226:22, 1227:20, 1228:6, 1241:10, 1242:6, 1243:22, 1263:4, 1263:7, 1266:12
**Mike's** [1] - 1227:6
**million** [2] - 1231:10
**mind** [1] - 1235:8
**mine** [3] - 1095:24, 1137:13, 1248:21
**mine's** [4] - 1101:1, 1158:14, 1172:10, 1172:12
**mines** [1] - 1140:16

mingle [2] - 1111:14, 1111:17
mingled [1] - 1111:15
mingling [1] - 1146:9
minute [2] - 1188:7, 1219:8
minutes [4] - 1128:18, 1152:1, 1226:11, 1238:11
missing [11] - 1128:23, 1230:3, 1230:17, 1230:18, 1231:16, 1237:14, 1237:15, 1255:12, 1262:5, 1263:25, 1279:22
Misys [9] - 1222:13, 1242:18, 1248:10, 1248:12, 1248:16, 1249:1, 1249:8, 1249:10, 1251:3
Mobile [2] - 1112:11, 1113:1
modified [1] - 1175:3
module [1] - 1249:8
Molina [2] - 1215:18, 1233:9
moment [9] - 1075:19, 1191:10, 1192:14, 1219:9, 1236:8, 1236:15, 1255:2, 1273:7, 1279:12
Monday [1] - 1255:3
monetary [1] - 1221:7
money [12] - 1069:6, 1069:21, 1125:4, 1127:24, 1128:3, 1140:4, 1154:11, 1169:25, 1260:9, 1260:12, 1260:25, 1261:1
monitor [5] - 1172:21, 1172:22, 1178:24, 1179:8, 1179:13
monitors [1] - 1179:9
month [5] - 1141:20, 1141:22, 1254:7, 1257:16, 1271:21
monthly [4] - 1092:4, 1254:6, 1254:9, 1257:3
months [17] - 1065:12, 1065:15, 1065:16, 1065:17, 1068:14, 1103:7, 1133:9, 1136:24, 1144:4, 1144:14, 1145:2, 1168:3, 1177:20, 1239:5, 1254:2, 1257:21, 1257:22

moon [2] - 1125:16, 1145:8
moot [1] - 1265:4
morning [10] - 1065:23, 1067:20, 1067:23, 1087:5, 1087:6, 1097:5, 1128:16, 1162:5, 1180:15, 1274:12
mortgage [1] - 1072:22
most [10] - 1076:17, 1112:9, 1125:19, 1138:14, 1166:19, 1190:10, 1216:6, 1217:18, 1222:25, 1263:3
motion [11] - 1189:11
move [34] - 1078:19, 1085:13, 1094:8, 1095:2, 1097:23, 1098:24, 1099:9, 1109:11, 1110:2, 1110:23, 1111:12, 1111:13, 1111:23, 1125:11, 1142:20, 1150:12, 1151:23, 1176:4, 1179:8, 1179:11, 1184:19, 1185:8, 1192:6, 1192:10, 1208:13, 1208:21, 1255:21, 1255:25, 1256:4, 1256:12, 1269:12, 1272:19, 1274:12, 1276:17
moveable [1] - 1179:12
moved [7] - 1085:2, 1146:21, 1179:18, 1179:19, 1185:7, 1185:9, 1205:10
moving [2] - 1156:14, 1204:25
MR [153] - 1060:18, 1060:21, 1060:25, 1061:2, 1061:12, 1065:4, 1070:1, 1072:20, 1076:4, 1078:21, 1086:23, 1086:25, 1088:18, 1092:6, 1092:15, 1093:18, 1093:22, 1095:5, 1098:9, 1098:12, 1098:22, 1099:10, 1099:21, 1102:16, 1105:9, 1106:11, 1106:14, 1106:17, 1106:23, 1107:3,

1107:8, 1107:10, 1108:14, 1108:18, 1108:23, 1109:13, 1110:17, 1111:7, 1111:22, 1116:12, 1118:2, 1120:21, 1128:17, 1129:2, 1132:18, 1132:20, 1141:10, 1142:2, 1142:6, 1142:9, 1142:13, 1146:13, 1147:3, 1150:10, 1150:14, 1152:2, 1152:4, 1152:24, 1153:17, 1153:20, 1154:2, 1161:13, 1161:16, 1161:18, 1161:22, 1163:12, 1163:15, 1163:17, 1166:4, 1167:16, 1170:10, 1174:22, 1175:8, 1175:11, 1175:13, 1176:21, 1176:22, 1176:25, 1178:17, 1178:20, 1178:23, 1180:6, 1182:15, 1182:23, 1183:8, 1183:11, 1183:12, 1184:20, 1184:24, 1185:2, 1185:6, 1185:13, 1185:16, 1186:4, 1186:8, 1186:19, 1186:22, 1187:1, 1187:4, 1187:7, 1187:11, 1187:15, 1187:18, 1187:19, 1187:25, 1188:2, 1188:7, 1188:10, 1188:15, 1188:21, 1190:10, 1190:13, 1190:18, 1191:3, 1191:6, 1191:11, 1191:18, 1192:7, 1192:12, 1193:1, 1193:5, 1193:6, 1193:12, 1193:15, 1193:19, 1193:22, 1194:2, 1201:14, 1208:10, 1225:11, 1238:15, 1238:19, 1240:9, 1240:11, 1241:4, 1248:23, 1249:19, 1249:20, 1255:14, 1255:22, 1256:1, 1256:5, 1259:11, 1259:19, 1261:7, 1264:25, 1268:8, 1276:9, 1281:10, 1281:16, 1281:20, 1281:25

MS [27] - 1139:4, 1186:15, 1189:6, 1189:16, 1189:20, 1189:25, 1190:4, 1192:13, 1192:22, 1194:13, 1201:17, 1207:20, 1208:15, 1208:23, 1209:3, 1211:17, 1214:19, 1220:1, 1222:4, 1225:13, 1230:10, 1231:24, 1236:7, 1236:13, 1237:18, 1237:21, 1238:9
must [4] - 1121:14, 1124:19, 1139:5, 1180:15

# N

N&S [21] - 1062:23, 1065:11, 1065:17, 1073:8, 1082:4, 1082:7, 1103:7, 1109:18, 1136:25, 1137:5, 1137:13, 1141:15, 1143:8, 1144:5, 1152:19, 1152:21, 1153:10, 1171:18
name [41] - 1061:13, 1061:15, 1063:2, 1063:5, 1063:7, 1063:8, 1067:6, 1074:11, 1075:12, 1079:16, 1079:25, 1081:2, 1093:7, 1093:8, 1141:5, 1194:14, 1195:21, 1198:22, 1198:23, 1204:6, 1204:8, 1204:10, 1204:11, 1204:13, 1204:22, 1205:1, 1205:14, 1205:21, 1207:23, 1208:17, 1209:5, 1209:6, 1217:19, 1218:12, 1218:23, 1228:14, 1236:3, 1238:21, 1246:16, 1246:17, 1246:19
names [11] - 1063:4, 1075:11, 1075:15, 1076:1, 1137:12, 1137:14, 1140:17, 1141:3, 1141:4, 1201:2, 1276:23
Napolitano [2] - 1209:6, 1209:8
nature [4] - 1130:23, 1195:7, 1202:14,

1206:18
near [1] - 1094:12
necessary [6] - 1154:6, 1199:24, 1221:21, 1222:14, 1246:9, 1246:13
need [30] - 1064:18, 1065:2, 1065:8, 1075:20, 1084:3, 1088:11, 1090:25, 1128:3, 1128:6, 1132:20, 1134:2, 1147:2, 1147:11, 1186:6, 1189:23, 1191:8, 1191:22, 1194:5, 1210:4, 1210:9, 1232:18, 1232:23, 1244:24, 1244:25, 1262:14, 1264:7, 1264:17, 1275:9, 1277:13
needed [29] - 1084:7, 1084:13, 1089:4, 1089:7, 1089:16, 1094:21, 1095:6, 1095:11, 1127:22, 1127:24, 1146:12, 1146:21, 1182:7, 1196:11, 1196:12, 1207:16, 1210:13, 1210:24, 1212:17, 1212:19, 1220:10, 1224:15, 1246:4, 1246:7, 1248:19, 1263:13, 1266:23, 1274:15, 1275:6
needs [2] - 1127:1, 1127:11
negotiator [1] - 1197:16
neighbor [2] - 1140:22, 1140:25
neighborhood [2] - 1148:3, 1177:12
NELKIN [70] - 1061:2, 1061:12, 1070:1, 1076:4, 1078:21, 1088:18, 1092:15, 1093:22, 1095:5, 1098:12, 1098:18, 1098:22, 1099:10, 1099:21, 1102:16, 1105:9, 1106:23, 1107:3, 1107:10, 1109:13, 1110:17, 1111:22, 1116:12, 1118:2, 1120:21, 1128:17, 1129:2, 1132:18, 1132:20, 1139:4, 1152:2,

1153:17, 1178:20, 1178:23, 1182:23, 1183:8, 1183:11, 1183:12, 1184:20, 1185:16, 1186:15, 1188:10, 1189:6, 1189:16, 1189:20, 1189:25, 1190:4, 1192:13, 1192:22, 1193:6, 1193:19, 1194:13, 1201:17, 1207:20, 1208:15, 1208:23, 1209:3, 1211:17, 1214:19, 1220:1, 1222:4, 1225:13, 1230:10, 1231:24, 1236:7, 1236:13, 1237:18, 1237:21, 1238:9, 1281:25

**Nelkin** [19] - 1139:1, 1154:13, 1165:11, 1175:15, 1177:1, 1183:6, 1185:2, 1185:7, 1186:14, 1189:5, 1230:4, 1268:9, 1269:21, 1270:8, 1271:14, 1271:15, 1271:23, 1281:22, 1281:23

**Nelkin's** [1] - 1242:15
**nervous** [1] - 1075:18
**net** [1] - 1243:25
**Net** [1] - 1201:6
**never** [37] - 1083:25, 1089:11, 1091:1, 1096:6, 1104:25, 1105:20, 1109:5, 1126:16, 1136:24, 1138:9, 1145:4, 1145:5, 1165:9, 1169:23, 1174:23, 1175:1, 1175:3, 1176:13, 1176:17, 1176:19, 1177:25, 1198:12, 1218:11, 1231:2, 1243:9, 1245:15, 1245:16, 1247:7, 1249:4, 1251:21, 1251:22, 1252:1, 1252:3, 1275:23, 1276:2

**new** [24] - 1112:16, 1112:21, 1113:2, 1113:9, 1132:1, 1133:6, 1133:9, 1152:17, 1152:18, 1153:5, 1153:7, 1153:8, 1196:6, 1211:9, 1211:13,

1211:24, 1212:1, 1239:25, 1255:19, 1265:24, 1265:25, 1279:16, 1279:17, 1279:22

**New** [12] - 1060:15, 1090:10, 1090:11, 1127:18, 1141:23, 1156:15, 1157:13, 1190:21, 1194:17, 1206:14, 1236:5, 1277:22

**Newark** [4] - 1136:7, 1142:24, 1175:16, 1175:23

**Next** [1] - 1205:14
**next** [39] - 1060:23, 1086:15, 1101:2, 1105:10, 1106:22, 1107:2, 1107:16, 1107:17, 1107:18, 1110:2, 1112:25, 1117:11, 1140:22, 1140:25, 1141:4, 1151:25, 1153:21, 1156:12, 1163:2, 1170:19, 1171:1, 1179:13, 1185:15, 1185:19, 1188:17, 1204:10, 1205:12, 1208:16, 1208:17, 1211:20, 1219:12, 1249:22, 1259:6, 1272:16, 1273:11, 1273:15, 1273:19, 1273:22

**next-door** [1] - 1140:22
**nice** [2] - 1147:6, 1147:14
**Nick** [2] - 1063:3, 1063:5
**nick** [1] - 1063:6
**Nicole** [2] - 1277:1, 1278:11
**night** [6] - 1121:6, 1182:12, 1182:22, 1183:1, 1204:4, 1240:15
**nine** [2] - 1069:10, 1159:20
**nineteen** [1] - 1209:15
**NLRB** [2] - 1267:3, 1280:3
**nobody** [5] - 1068:14, 1102:7, 1102:8, 1168:25, 1280:21
**Nodding** [1] - 1133:13
**none** [6] - 1202:17,

1216:10, 1216:12, 1216:21, 1216:24, 1222:25
**nonetheless** [1] - 1200:10
**normal** [1] - 1088:19
**normally** [2] - 1067:20, 1169:19
**notes** [3] - 1139:5, 1165:13, 1249:23
**nothing** [19] - 1105:16, 1135:9, 1137:11, 1138:10, 1141:21, 1145:5, 1164:2, 1164:11, 1164:15, 1165:17, 1170:22, 1172:3, 1172:4, 1172:14, 1177:10, 1178:17, 1210:4, 1279:15, 1279:17
**notice** [1] - 1188:16
**nspeck@gmail.com** [1] - 1204:15
**number** [20] - 1070:25, 1089:5, 1092:17, 1101:3, 1120:10, 1129:13, 1130:19, 1139:17, 1139:25, 1154:13, 1184:15, 1184:17, 1213:23, 1213:24, 1214:10, 1215:9, 1217:20, 1218:11, 1249:22, 1250:15
**numbers** [11] - 1067:24, 1070:17, 1070:18, 1070:24, 1070:25, 1072:8, 1073:2, 1129:11, 1129:12, 1129:16, 1180:11
**numerous** [1] - 1130:22
**Nussbaum** [6] - 1186:5, 1186:10, 1272:22, 1272:23, 1273:9, 1274:14

## O

**o'clock** [2] - 1121:6, 1281:17
**object** [1] - 1193:11
**objected** [1] - 1106:13
**Objection** [2] - 1201:14, 1208:10
**objection** [30] - 1065:24, 1072:20, 1086:23, 1092:6,

1093:18, 1098:9, 1106:11, 1106:13, 1106:15, 1108:14, 1108:22, 1111:7, 1141:10, 1142:2, 1142:6, 1142:9, 1142:13, 1146:13, 1147:3, 1150:10, 1150:14, 1152:4, 1152:24, 1180:6, 1182:15, 1187:16, 1187:19, 1193:12, 1225:11, 1259:7
**objectionable** [2] - 1108:21, 1182:21
**observe** [2] - 1177:23, 1178:7
**observed** [4] - 1077:15, 1093:10, 1096:18, 1110:15
**obstructed** [1] - 1191:5
**obtain** [1] - 1266:24
**obtained** [3] - 1266:12, 1277:21, 1278:5
**obtaining** [1] - 1219:1
**obtuse** [1] - 1253:5
**obviously** [2] - 1161:20, 1193:18
**occasion** [7] - 1088:3, 1175:25, 1178:3, 1206:7, 1234:15, 1257:6, 1257:13
**occasional** [1] - 1090:20
**occasions** [1] - 1206:5
**occur** [3] - 1163:9, 1177:19, 1251:18
**October** [3] - 1248:17, 1250:7, 1250:19
**odd** [1] - 1211:2
**odds** [1] - 1167:2
**off-the-shelf** [1] - 1200:24
**offhand** [1] - 1277:5
**office** [109] - 1064:1, 1066:12, 1075:7, 1076:24, 1076:25, 1077:1, 1077:2, 1077:3, 1077:4, 1077:7, 1077:9, 1077:15, 1078:5, 1078:6, 1078:25, 1079:1, 1079:23, 1080:9, 1080:17, 1080:21, 1083:15, 1084:25, 1085:1, 1085:2, 1087:16,

1087:21, 1087:22, 1087:24, 1088:2, 1088:4, 1088:20, 1088:24, 1088:25, 1091:16, 1105:11, 1105:13, 1105:14, 1105:18, 1105:19, 1105:21, 1106:2, 1107:11, 1110:18, 1136:16, 1145:7, 1145:14, 1145:15, 1145:17, 1145:18, 1152:8, 1152:9, 1155:5, 1156:18, 1156:20, 1156:22, 1157:2, 1163:19, 1163:24, 1164:8, 1170:4, 1170:13, 1170:17, 1170:20, 1171:4, 1172:22, 1173:13, 1174:11, 1174:12, 1174:13, 1174:16, 1174:18, 1175:16, 1175:19, 1176:14, 1178:25, 1179:15, 1184:12, 1226:22, 1227:6, 1233:2, 1233:4, 1233:8, 1233:10, 1233:17, 1233:18, 1233:23, 1234:3, 1234:9, 1234:10, 1270:22, 1271:2, 1271:4, 1271:9, 1271:14, 1271:15, 1271:18, 1271:25, 1272:2, 1272:3, 1272:4, 1272:6, 1272:17, 1276:23, 1277:4, 1277:16
**OFFICE** [1] - 1060:12
**officer** [3] - 1190:1, 1195:2, 1202:6
**offices** [3] - 1080:24, 1184:13, 1275:2
**often** [5] - 1124:22, 1127:20, 1127:21, 1164:14
**oftentimes** [3] - 1213:9, 1224:16, 1224:18
**oil** [2] - 1083:4, 1083:5, 1083:6, 1126:18, 1148:5, 1148:6, 1149:13, 1149:15
**old** [7] - 1098:6, 1099:1, 1113:3, 1114:1, 1133:11, 1158:2, 1209:14

**old-fashioned** [1] - 1158:2
**once** [29] - 1084:2, 1113:12, 1114:4, 1115:25, 1124:25, 1127:2, 1127:20, 1127:21, 1133:18, 1139:17, 1145:2, 1145:7, 1160:11, 1185:9, 1210:11, 1212:5, 1215:7, 1218:14, 1220:7, 1225:8, 1225:14, 1230:23, 1232:3, 1242:13, 1244:19, 1244:22, 1254:8, 1266:24, 1267:10
**one** [113] - 1061:19, 1071:19, 1073:14, 1074:6, 1074:13, 1077:2, 1077:4, 1079:4, 1079:12, 1084:13, 1085:3, 1087:4, 1088:3, 1094:5, 1096:12, 1096:18, 1096:21, 1096:23, 1097:7, 1097:11, 1103:5, 1104:6, 1109:23, 1112:7, 1112:21, 1115:22, 1119:18, 1120:7, 1126:20, 1132:17, 1132:19, 1133:5, 1133:6, 1133:9, 1134:7, 1134:14, 1134:17, 1141:6, 1143:12, 1143:19, 1145:20, 1147:17, 1147:18, 1149:24, 1149:25, 1150:4, 1152:2, 1152:11, 1155:17, 1157:24, 1163:1, 1168:20, 1168:21, 1173:12, 1179:16, 1180:19, 1181:21, 1182:2, 1183:16, 1183:21, 1184:18, 1184:24, 1185:2, 1188:7, 1189:24, 1193:10, 1199:16, 1201:10, 1202:10, 1202:16, 1203:22, 1205:3, 1205:5, 1207:15, 1207:23, 1209:3, 1210:11, 1213:19, 1216:3, 1216:24, 1227:6, 1228:4, 1233:17, 1234:10, 1242:8, 1244:23, 1244:25,

1250:9, 1250:10, 1250:11, 1250:13, 1251:12, 1253:19, 1254:1, 1257:15, 1257:17, 1257:18, 1257:20, 1260:1, 1260:4, 1269:23, 1277:25, 1278:1, 1281:2
**One** [1] - 1205:20
**one-time** [3] - 1210:11, 1253:19, 1254:1
**ongoing** [2] - 1178:5, 1251:21
**Online** [3] - 1242:17, 1242:21, 1243:4
**open** [10] - 1067:12, 1071:12, 1078:9, 1087:5, 1087:8, 1091:20, 1109:22, 1113:18, 1121:5, 1134:3, 1157:23, 1174:18, 1186:2, 1190:6, 1244:20, 1245:7, 1256:9, 1256:10
**opened** [6] - 1067:20, 1091:19, 1115:22, 1157:11, 1158:1, 1165:22
**opening** [2] - 1108:9, 1109:17
**opens** [3] - 1113:18, 1134:3, 1157:24
**operating** [2] - 1187:20, 1192:3
**operation** [1] - 1222:18
**operational** [1] - 1267:13
**Operations** [1] - 1196:12
**opinion** [2] - 1196:10, 1199:14
**options** [1] - 1251:2
**Oracle** [1] - 1201:5
**order** [11] - 1064:17, 1089:6, 1133:16, 1178:16, 1218:15, 1220:3, 1248:14, 1251:15, 1253:6, 1254:21
**ordering** [1] - 1089:8
**orders** [8] - 1150:23, 1150:24, 1151:3, 1222:22, 1246:25, 1247:2, 1256:11, 1274:21
**Orenstein** [4] -

1192:13, 1211:18, 1211:23, 1249:21
**original** [2] - 1224:17, 1231:10
**ought** [1] - 1232:7
**ourselves** [1] - 1279:21
**outrageous** [1] - 1215:9
**outs** [1] - 1255:19
**outside** [11] - 1179:17, 1179:19, 1195:10, 1195:12, 1195:19, 1195:21, 1227:2, 1242:5, 1263:5, 1263:10, 1265:11
**outstanding** [2] - 1244:22, 1263:8
**overhear** [2] - 1280:23
**overheard** [1] - 1280:20
**overlap** [1] - 1249:1
**overlapping** [2] - 1249:11, 1249:15
**overrule** [1] - 1146:16
**Overruled** [8] - 1141:11, 1142:3, 1142:10, 1142:14, 1147:4, 1150:15, 1152:6, 1152:25
**overruled** [8] - 1065:5, 1072:21, 1086:24, 1087:1, 1111:8, 1146:15, 1150:17
**overseas** [1] - 1199:17
**oversees** [1] - 1196:23
**overtime** [5] - 1170:1, 1214:14, 1227:18, 1262:9, 1267:6
**own** [9] - 1061:25, 1062:1, 1095:16, 1135:6, 1138:21, 1152:21, 1232:6, 1279:5
**owned** [7] - 1075:2, 1081:16, 1082:25, 1098:5, 1109:20, 1168:23, 1207:6
**owner** [1] - 1253:10
**owners** [1] - 1103:16
**owns** [7] - 1063:1, 1079:13, 1098:16, 1108:8, 1109:21, 1141:5, 1168:25
**oxygen** [6] - 1066:20, 1066:23, 1088:5, 1157:6, 1168:17, 1168:18

# P

**P-L-E-X** [1] - 1252:15
**P.C** [1] - 1060:8
**pack** [1] - 1123:20
**packed** [1] - 1156:22
**packing** [1] - 1096:19
**Page** [2] - 1275:16, 1275:18
**page** [32] - 1092:16, 1092:21, 1093:3, 1100:17, 1101:2, 1105:10, 1117:11, 1118:4, 1153:21, 1163:3, 1182:9, 1182:10, 1183:13, 1183:15, 1183:17, 1183:18, 1183:20, 1185:19, 1219:12, 1228:20, 1229:1, 1229:8, 1230:9, 1231:9, 1231:23, 1232:1, 1270:5, 1273:12, 1273:15, 1273:19, 1273:22
**pages** [1] - 1276:4
**paid** [38] - 1070:2, 1074:25, 1075:1, 1083:10, 1090:17, 1090:18, 1105:17, 1122:8, 1122:9, 1122:10, 1122:21, 1127:17, 1136:20, 1141:24, 1143:5, 1145:1, 1160:17, 1193:23, 1202:24, 1202:25, 1212:6, 1213:11, 1213:24, 1214:4, 1215:11, 1227:17, 1227:18, 1236:3, 1253:20, 1253:21, 1254:1, 1254:4, 1262:9, 1262:10, 1264:19
**paint** [2] - 1151:18
**pallets** [1] - 1176:4
**papa** [12] - 1185:16, 1220:2, 1225:14, 1225:19, 1228:9, 1228:16, 1230:12, 1233:2, 1234:12, 1235:1, 1236:10, 1238:20
**PAPA** [1] - 1194:8
**Papa** [31] - 1186:16, 1186:18, 1186:24, 1187:2, 1188:3, 1189:7, 1189:8, 1190:1, 1191:21, 1192:17, 1192:20,

1193:8, 1193:21, 1193:23, 1194:14, 1194:15, 1194:16, 1195:23, 1203:19, 1209:5, 1209:19, 1211:18, 1261:25, 1268:3, 1269:12, 1269:18, 1272:20, 1275:4, 1275:15, 1277:8, 1279:24
**Papa's** [3] - 1186:25, 1188:5, 1193:16
**paper** [5] - 1073:20, 1225:3, 1226:25, 1261:12, 1269:7
**papers** [2] - 1115:24, 1277:22
**paperwork** [2] - 1206:13, 1239:25
**paragraph** [3] - 1110:2, 1182:10, 1229:25
**Paragraph** [2] - 1130:19, 1275:18
**parked** [1] - 1185:10
**parking** [1] - 1185:10
**Parness** [6] - 1186:21, 1193:19, 1194:1, 1194:5, 1281:12
**part** [16] - 1073:17, 1087:7, 1089:4, 1119:13, 1134:21, 1148:21, 1148:23, 1161:14, 1193:25, 1194:2, 1211:9, 1214:15, 1217:18, 1254:5, 1256:23, 1278:6
**part-time** [1] - 1211:9
**participated** [1] - 1253:4
**particular** [4] - 1063:20, 1064:8, 1168:8, 1180:3
**particularly** [2] - 1109:21, 1209:2
**parties** [1] - 1226:15
**parting** [1] - 1229:1
**partner** [3] - 1232:19, 1232:21, 1232:22
**partners** [3] - 1102:17, 1199:8, 1216:21
**parts** [16] - 1064:17, 1083:21, 1083:23, 1084:1, 1089:6, 1089:9, 1089:10, 1089:11, 1089:14, 1091:14, 1091:15, 1091:21, 1141:13, 1166:8, 1166:13,

1166:17
**pass** [3] - 1139:5, 1236:13, 1255:4
**passed** [2] - 1133:11, 1186:12
**passkey** [2] - 1158:8, 1158:15
**password** [38] - 1113:19, 1113:20, 1133:25, 1134:2, 1134:19, 1135:3, 1135:6, 1135:8, 1164:10, 1164:11, 1218:23, 1219:1, 1266:17, 1266:20, 1266:24, 1267:10, 1268:13, 1268:14, 1268:15, 1268:17, 1268:19, 1268:21, 1268:22, 1269:1, 1269:13, 1270:1, 1270:3, 1270:7, 1270:11, 1270:14, 1273:6, 1273:10, 1274:1, 1274:2, 1274:7, 1279:12
**passwords** [4] - 1134:22, 1135:5, 1220:5, 1269:24
**past** [4] - 1158:11, 1207:23, 1258:10, 1259:16
**Paul** [2] - 1229:12, 1238:21
**Paulding** [1] - 1061:24
**Pause** [3] - 1188:9, 1188:14, 1219:10
**pause** [1] - 1219:8
**pay** [24] - 1090:16, 1144:18, 1144:19, 1144:20, 1145:3, 1192:16, 1193:3, 1212:11, 1214:3, 1214:4, 1214:16, 1215:20, 1253:22, 1261:10, 1261:15, 1261:18, 1261:21, 1261:23, 1262:2, 1262:3, 1262:22, 1262:24, 1266:13, 1278:3
**payable** [7] - 1228:11, 1238:7, 1249:10, 1258:22, 1274:22, 1278:14, 1278:23
**paycheck** [4] - 1122:3, 1212:10, 1215:7, 1215:23
**paychecks** [1] - 1122:3

**Paychex** [11] - 1263:6, 1263:11, 1263:12, 1263:14, 1263:16, 1264:3, 1264:8, 1264:10, 1266:14, 1279:9
**paying** [5] - 1102:24, 1103:3, 1103:5, 1120:15, 1213:15
**payment** [6] - 1193:13, 1215:25, 1221:3, 1221:11, 1221:12, 1260:11
**payments** [3] - 1216:6, 1223:16, 1261:10
**payroll** [57] - 1198:4, 1198:14, 1203:5, 1203:16, 1203:17, 1210:25, 1211:9, 1212:18, 1212:20, 1213:19, 1214:16, 1215:10, 1215:24, 1222:17, 1223:6, 1226:5, 1226:23, 1227:9, 1227:11, 1227:12, 1227:13, 1227:14, 1227:16, 1227:18, 1228:1, 1234:11, 1235:4, 1235:21, 1235:23, 1236:1, 1236:2, 1246:5, 1252:6, 1261:9, 1261:21, 1262:3, 1262:6, 1262:11, 1262:25, 1263:5, 1263:8, 1263:16, 1263:19, 1263:21, 1263:25, 1264:3, 1264:10, 1265:4, 1266:7, 1266:10, 1267:5, 1277:15, 1277:17, 1279:6, 1279:8, 1279:9
**payrolls** [1] - 1266:15
**pays** [2] - 1193:9, 1193:11
**penalize** [1] - 1213:15
**people** [15] - 1075:22, 1076:24, 1097:8, 1101:24, 1132:17, 1140:14, 1140:19, 1140:20, 1140:21, 1141:3, 1152:8, 1153:16, 1164:7, 1177:16, 1178:11
**per** [5] - 1215:8, 1234:8, 1238:5, 1241:9, 1262:15

**perceived** [1] - 1241:10
**percent** [1] - 1203:1
**Perhaps** [1] - 1208:21
**perhaps** [1] - 1274:21
**period** [10] - 1168:3, 1177:18, 1216:14, 1221:18, 1221:19, 1239:6, 1245:4, 1254:2, 1263:21, 1266:16
**periods** [2] - 1260:25, 1266:13
**permission** [2] - 1186:16, 1187:12
**permitted** [1] - 1182:21
**permutation** [1] - 1151:24
**person** [10] - 1140:11, 1167:7, 1167:8, 1189:24, 1209:11, 1209:13, 1212:3, 1212:9, 1215:10, 1227:22
**person's** [1] - 1212:4
**personal** [11] - 1095:13, 1097:14, 1098:1, 1098:2, 1130:23, 1171:22, 1171:23, 1172:3, 1172:4, 1208:14, 1217:22
**personally** [2] - 1083:16, 1089:12
**perspective** [1] - 1259:15
**perusing** [1] - 1092:19
**Perusing** [1] - 1161:25
**ph** [4] - 1061:17, 1071:19, 1254:22, 1254:23
**ph)** [1] - 1246:20
**pharmacy** [2] - 1112:15, 1112:19
**phone** [58] - 1063:15, 1063:16, 1063:18, 1063:19, 1073:11, 1073:16, 1097:22, 1111:23, 1111:24, 1112:2, 1112:13, 1112:14, 1112:15, 1112:16, 1112:21, 1112:22, 1112:25, 1113:1, 1113:2, 1113:3, 1113:9, 1113:11, 1113:13, 1113:14, 1113:15, 1113:17, 1113:21, 1113:22, 1114:1,

1114:3, 1114:7, 1114:9, 1114:16, 1114:23, 1115:2, 1117:1, 1117:3, 1117:5, 1117:6, 1130:5, 1130:6, 1130:8, 1130:10, 1130:11, 1138:17, 1138:20, 1138:21, 1138:22, 1138:24, 1139:12, 1139:15, 1162:11, 1162:12, 1232:4, 1238:23
**photographs** [7] - 1130:19, 1130:22, 1160:19, 1160:23, 1161:1, 1161:4, 1161:12
**photos** [13] - 1129:4, 1129:5, 1129:7, 1129:10, 1130:1, 1130:13, 1130:21, 1131:6, 1131:20, 1135:11, 1135:12, 1160:25, 1161:5
**phrase** [1] - 1269:3
**physical** [1] - 1274:25
**physically** [5] - 1079:12, 1165:20, 1166:18, 1175:21, 1225:1
**pick** [20] - 1068:1, 1088:4, 1089:18, 1090:24, 1091:14, 1091:21, 1097:16, 1099:18, 1103:1, 1104:14, 1104:25, 1105:1, 1138:4, 1151:16, 1151:17, 1155:5, 1155:6, 1156:2, 1159:7, 1180:13
**picked** [8] - 1068:2, 1096:25, 1099:24, 1099:25, 1100:6, 1146:7, 1155:8, 1169:4
**picking** [1] - 1096:5
**picture** [5] - 1129:14, 1129:16, 1145:21, 1183:14, 1210:23
**pictures** [9] - 1135:16, 1135:20, 1135:21, 1135:24, 1135:25, 1136:1, 1136:4, 1184:11, 1184:12
**piece** [5] - 1129:23, 1159:10, 1176:6, 1249:16, 1269:7
**pin** [1] - 1269:5

**pipe** [1] - 1099:5
**place** [26] - 1063:24, 1063:25, 1067:20, 1078:16, 1084:6, 1085:10, 1087:8, 1088:5, 1100:20, 1101:14, 1109:25, 1138:20, 1144:16, 1148:12, 1148:13, 1148:18, 1151:12, 1151:13, 1151:21, 1152:17, 1152:18, 1169:4, 1218:14, 1256:2, 1268:2
**Place** [1] - 1119:7
**placed** [2] - 1213:13, 1221:8
**Plainfield** [13] - 1067:6, 1159:24, 1163:19, 1163:22, 1164:23, 1165:3, 1165:6, 1171:20, 1172:7, 1172:16, 1177:2, 1205:11, 1276:19
**plaintiff** [6] - 1161:18, 1186:15, 1189:7, 1189:18, 1276:3, 1276:11
**Plaintiff** [2] - 1195:23, 1275:18
**Plaintiff's** [5] - 1203:20, 1203:24, 1203:25, 1228:16, 1268:4
**plaintiff's** [2] - 1092:15, 1191:19
**plane** [1] - 1090:10
**planning** [5] - 1189:14, 1198:12, 1200:16, 1200:17, 1250:1
**planning-type** [1] - 1250:1
**plant** [4] - 1196:23, 1196:24, 1215:19, 1254:20
**plates** [1] - 1173:16
**platform** [1] - 1201:5
**play** [4] - 1216:3, 1260:19, 1280:6, 1280:7
**players** [2] - 1254:17, 1254:18
**Plaza** [1] - 1060:14
**plenty** [1] - 1141:16
**Plex** [22] - 1252:13, 1252:14, 1252:15, 1252:16, 1252:19, 1252:21, 1252:22,

1252:25, 1253:6, 1253:10, 1253:11, 1254:11, 1254:16, 1254:19, 1254:24, 1254:25, 1255:16, 1255:23, 1255:25, 1256:4, 1256:6, 1256:12

**plug** [4] - 1131:8, 1131:9, 1165:17

**plumber** [1] - 1155:18

**plumbing** [4] - 1064:7, 1074:16, 1099:4, 1109:2

**pluming** [1] - 1108:5

**plural** [1] - 1233:6

**plus** [1] - 1141:13

**Point** [2] - 1071:20, 1081:3

**point** [25] - 1068:5, 1103:3, 1158:8, 1166:25, 1182:8, 1189:25, 1197:22, 1209:25, 1216:24, 1218:18, 1220:15, 1225:25, 1226:9, 1226:10, 1233:7, 1244:11, 1245:12, 1250:20, 1251:14, 1253:7, 1253:9, 1255:12, 1255:15, 1268:19, 1279:19

**pointing** [1] - 1209:1

**police** [9] - 1092:8, 1092:11, 1092:20, 1093:20, 1097:1, 1099:15, 1099:20, 1110:12, 1182:16

**poor** [1] - 1248:12

**poor-man's** [1] - 1248:12

**poorly** [2] - 1199:22

**position** [6] - 1145:22, 1190:13, 1190:16, 1214:2, 1214:6, 1239:12

**possess** [1] - 1276:18

**possession** [6] - 1230:1, 1234:13, 1262:2, 1278:12, 1278:19, 1278:22

**possibility** [4] - 1102:1, 1121:24, 1124:8, 1135:15

**possible** [10] - 1080:6, 1093:2, 1100:14, 1118:21, 1121:4, 1121:23, 1124:5, 1130:24, 1147:24, 1182:14

**potential** [1] - 1212:25

**pour** [1] - 1143:22

**practically** [1] - 1103:22

**practice** [5] - 1124:22, 1124:24, 1189:11, 1259:16, 1267:4

**preceding** [1] - 1215:17

**precision** [1] - 1069:21

**preference** [1] - 1250:16

**preferred** [1] - 1201:11

**preliminary** [15] - 1195:16, 1195:18, 1210:6, 1210:8, 1217:15, 1218:14, 1218:16, 1219:5, 1220:3, 1220:15, 1225:21, 1226:2, 1226:17, 1226:20, 1233:15

**premise** [2] - 1084:6, 1101:9

**premises** [3] - 1156:11, 1157:13, 1160:11

**prepaid** [1] - 1112:25

**preparation** [5] - 1193:17, 1240:2, 1240:19, 1241:1, 1256:21

**prepare** [17] - 1132:7, 1189:22, 1195:5, 1234:11, 1240:17, 1241:17, 1242:6, 1243:16, 1243:17, 1248:1, 1256:23, 1257:1, 1257:3, 1257:5, 1257:14, 1262:14

**prepared** [7] - 1191:20, 1243:21, 1247:22, 1251:22, 1266:6, 1266:11, 1278:8

**preparing** [4] - 1240:15, 1248:5, 1262:15, 1264:10

**presence** [1] - 1272:15

**present** [9] - 1085:24, 1086:2, 1182:11, 1191:4, 1233:18, 1256:25, 1258:3, 1272:2, 1272:4

**president** [2] - 1196:21, 1208:2

**press** [2] - 1113:18, 1114:17

**pressed** [1] - 1163:10

**pretty** [3] - 1216:15, 1258:24, 1259:2

**prevented** [2] - 1199:23, 1263:1

**previously** [6] - 1162:2, 1204:3, 1220:13, 1228:22, 1245:21, 1266:25

**primarily** [7] - 1196:21, 1198:13, 1202:13, 1202:18, 1203:4, 1243:4, 1244:15

**primary** [8] - 1195:3, 1196:2, 1196:17, 1197:7, 1197:14, 1237:2, 1260:1, 1262:13

**principal** [1] - 1255:14

**principles** [2] - 1223:12, 1241:20

**print** [1] - 1123:18

**printer** [2] - 1073:14

**printout** [1] - 1225:22

**problem** [15] - 1083:8, 1141:6, 1187:10, 1188:19, 1189:23, 1210:14, 1217:8, 1219:1, 1219:2, 1249:19, 1258:14, 1258:16, 1259:20, 1269:10, 1280:3

**problems** [10] - 1090:7, 1126:17, 1177:19, 1209:25, 1211:20, 1211:24, 1212:15, 1212:22, 1213:1, 1215:24

**proceed** [1] - 1190:6

**proceeded** [1] - 1194:9

**proceeding** [1] - 1226:11

**proceedings** [1] - 1128:20

**Proceedings** [1] - 1060:16

**process** [11] - 1196:23, 1198:14, 1213:12, 1215:15, 1215:17, 1215:23, 1253:21, 1254:13, 1254:15, 1255:1

**processed** [3] - 1206:12, 1223:6, 1228:1

**processes** [1] -

1224:8

**processing** [3] - 1214:16, 1221:25, 1222:17

**procuring** [1] - 1196:22

**produce** [2] - 1131:5, 1263:7

**produced** [7] - 1060:17, 1224:13, 1266:15, 1274:23, 1278:2, 1279:9, 1280:9

**produces** [1] - 1249:25

**product** [3] - 1248:15, 1260:10, 1260:15

**production** [4] - 1196:24, 1200:20, 1248:14, 1259:12

**products** [2] - 1201:4, 1250:3

**profess** [1] - 1235:9

**professionally** [1] - 1241:17

**program** [7] - 1201:19, 1202:8, 1203:7, 1218:19, 1220:8, 1253:6, 1266:21

**programmer** [1] - 1199:17

**programs** [3] - 1114:15, 1164:5, 1224:11

**progress** [1] - 1223:16

**prohibited** [1] - 1219:5

**project** [2] - 1199:21, 1199:23

**pronounced** [1] - 1199:1

**Pronto** [3] - 1077:22, 1084:10, 1151:22

**pronto** [4] - 1078:24, 1078:25, 1079:21, 1091:14

**proof** [3] - 1098:5, 1098:8, 1098:10

**proper** [1] - 1199:17

**properly** [3] - 1200:21, 1215:11, 1263:9

**proposal** [2] - 1191:11, 1202:7

**proposed** [2] - 1191:25, 1251:1

**prorated** [1] - 1253:18

**prove** [1] - 1239:25

**provide** [5] - 1193:10, 1258:1, 1258:7, 1258:20, 1280:14

**provided** [6] - 1159:22, 1187:17, 1187:23, 1188:4, 1230:19, 1258:18

**provider** [2] - 1112:10, 1263:6

**providing** [4] - 1259:7, 1259:20, 1280:20, 1280:25

**public** [1] - 1242:5

**publishing** [1] - 1239:8

**Pump** [3] - 1077:21, 1078:3, 1151:20

**pumps** [1] - 1064:14

**punch** [6] - 1213:23, 1214:1, 1214:2, 1214:4

**punched** [4] - 1213:9, 1214:15, 1262:8

**purchase** [4] - 1090:20, 1090:21, 1223:15, 1256:11

**purchases** [4] - 1198:14, 1203:4, 1223:6, 1252:6

**purchasing** [1] - 1200:19

**purported** [1] - 1243:22

**purpose** [6] - 1092:5, 1094:25, 1135:23, 1155:23, 1191:21, 1244:7

**purposes** [8] - 1193:4, 1193:5, 1193:6, 1247:21, 1247:25, 1248:5, 1262:6, 1276:4

**push** [1] - 1117:5

**put** [29] - 1085:4, 1087:15, 1103:14, 1113:19, 1113:23, 1128:12, 1131:12, 1133:25, 1142:17, 1142:18, 1143:21, 1155:9, 1156:19, 1157:2, 1169:19, 1169:22, 1175:20, 1179:10, 1189:15, 1217:17, 1218:5, 1218:11, 1218:14, 1246:7, 1255:16, 1255:23, 1256:2, 1256:6, 1275:14

**puts** [2] - 1192:15, 1201:4

**putting** [6] - 1122:1, 1261:17, 1274:24, 1275:3, 1276:8,

1276:10

**Q**

QC [1] - 1196:24
quarter [2] - 1227:10, 1266:7
quarterly [3] - 1257:5, 1257:14, 1258:5
questions [23] - 1106:14, 1106:16, 1126:11, 1152:2, 1153:18, 1154:13, 1162:1, 1163:12, 1175:11, 1176:21, 1177:1, 1189:3, 1211:19, 1216:25, 1217:2, 1217:9, 1217:13, 1230:9, 1238:9, 1240:17, 1242:15, 1249:21, 1253:5
QuickBooks [50] - 1201:3, 1222:12, 1222:19, 1222:20, 1222:22, 1222:23, 1222:24, 1222:25, 1223:3, 1223:8, 1223:25, 1235:22, 1235:23, 1236:21, 1236:23, 1237:23, 1238:3, 1242:16, 1242:17, 1242:21, 1242:25, 1243:4, 1245:13, 1245:17, 1245:20, 1246:4, 1246:7, 1246:10, 1246:13, 1246:23, 1246:24, 1247:9, 1247:14, 1247:16, 1247:19, 1248:3, 1248:7, 1249:7, 1249:9, 1249:10, 1249:16, 1249:23, 1256:16, 1256:18, 1266:15, 1267:9, 1274:23, 1274:24
Quicken [1] - 1248:25
quit [8] - 1103:21, 1104:11, 1104:12, 1104:19, 1133:1, 1138:8, 1138:12, 1138:14
quite [3] - 1210:21, 1213:22, 1261:2
quizzical [1] - 1173:1
quotes [2] - 1212:19, 1230:3

**R**

raining [1] - 1147:6
raise [1] - 1061:6
Raise [1] - 1194:7
raising [1] - 1108:22
ran [3] - 1210:14, 1223:4, 1246:6
Raphael [1] - 1186:20
rare [2] - 1084:16, 1128:2
rarely [1] - 1210:20
ratchets [1] - 1098:3
rate [1] - 1212:11
rather [3] - 1109:15, 1261:22, 1278:18
RDR [1] - 1060:14
re [1] - 1242:3
re-characterize [1] - 1242:3
reached [1] - 1198:12
read [19] - 1060:24, 1097:9, 1097:10, 1106:10, 1106:23, 1106:25, 1113:3, 1113:5, 1113:6, 1132:15, 1133:18, 1208:13, 1225:23, 1230:7, 1231:23, 1258:11, 1270:11, 1275:20, 1279:5
reader [2] - 1086:17, 1086:18
readily [1] - 1267:7
readiness [3] - 1255:3, 1255:7, 1255:9
reading [1] - 1229:22
ready [4] - 1065:24, 1087:6, 1087:8, 1097:5
real [2] - 1198:22, 1258:12
really [17] - 1060:21, 1122:7, 1142:11, 1149:23, 1189:16, 1197:21, 1203:10, 1218:12, 1220:11, 1222:25, 1223:18, 1229:17, 1251:21, 1274:3, 1274:5, 1274:7, 1280:13
reason [18] - 1087:20, 1088:20, 1094:1, 1094:2, 1103:14, 1105:21, 1112:14, 1127:22, 1138:1, 1167:6, 1186:6, 1190:5, 1233:21, 1233:22, 1234:2,

1258:13, 1279:18, 1279:20
reasons [1] - 1089:3
reassemble [1] - 1167:1
receipt [15] - 1091:15, 1092:1, 1092:2, 1092:3, 1092:5, 1169:14, 1169:15, 1180:18, 1180:20, 1180:22, 1180:25, 1181:3, 1226:10, 1236:20, 1261:3
receipts [8] - 1091:5, 1091:7, 1091:25, 1098:25, 1206:10, 1258:24, 1261:3, 1278:5
receivable [5] - 1247:2, 1249:10, 1258:23, 1278:13, 1278:24
receivables [1] - 1261:2
receive [16] - 1073:8, 1137:22, 1170:1, 1188:16, 1226:16, 1227:12, 1227:15, 1228:8, 1229:5, 1233:7, 1233:25, 1234:7, 1243:10, 1260:10, 1261:10, 1274:14
received [28] - 1169:16, 1176:17, 1176:19, 1181:3, 1221:3, 1221:6, 1226:20, 1228:3, 1228:10, 1229:18, 1233:9, 1233:19, 1233:25, 1234:8, 1243:8, 1261:18, 1266:17, 1266:20, 1267:10, 1267:12, 1268:23, 1268:25, 1269:2, 1269:9, 1273:8, 1273:10, 1275:10, 1275:12
receiving [1] - 1243:13
recent [1] - 1271:13
recently [3] - 1250:24, 1258:16, 1277:21
reception [1] - 1174:18
receptive [1] - 1210:3
recess [1] - 1128:20
Recess [5] - 1185:18, 1191:15, 1238:12
recipient [1] - 1226:13

recognition [1] - 1260:1
recognize [1] - 1184:10, 1184:11, 1205:3, 1228:21, 1260:7, 1260:14, 1268:7, 1270:11, 1272:23, 1272:25, 1274:6
recognizing [2] - 1260:3, 1260:20
recollection [17] - 1122:17, 1122:20, 1124:21, 1124:22, 1148:20, 1168:6, 1202:4, 1267:20, 1267:21, 1268:25, 1269:4, 1269:7, 1270:3, 1270:4, 1273:6, 1273:25, 1274:3
recommendation [1] - 1191:7
reconcile [4] - 1230:25, 1231:1, 1231:2, 1231:3
reconvene [2] - 1185:15, 1189:11
record [14] - 1182:23, 1182:24, 1186:12, 1188:13, 1191:14, 1198:13, 1199:4, 1216:4, 1227:14, 1227:16, 1279:14, 1279:16, 1279:17, 1279:18
recorded [9] - 1060:16, 1134:22, 1172:25, 1213:6, 1214:25, 1236:21, 1238:3, 1238:4
recording [2] - 1172:15, 1216:7
records [37] - 1098:19, 1142:8, 1224:24, 1226:10, 1227:11, 1227:12, 1227:13, 1227:18, 1227:23, 1230:2, 1235:2, 1235:4, 1236:1, 1236:2, 1236:5, 1262:4, 1262:11, 1262:25, 1264:4, 1264:19, 1265:4, 1274:17, 1274:18, 1275:6, 1275:11, 1277:11, 1277:14, 1277:16, 1277:19, 1278:12, 1278:18, 1278:19,

1278:22, 1279:6, 1279:8, 1279:21, 1280:9
recreation [1] - 1135:24
recross [1] - 1185:1
RECROSS [1] - 1185:5
RECROSS-EXAMINATION [1] - 1185:5
recurring [1] - 1253:24
redirect [1] - 1178:18
REDIRECT [1] - 1178:22
redirected [1] - 1179:4
reevaluated [3] - 1251:1, 1251:6
reevaluating [1] - 1251:7
refer [1] - 1228:10
reference [1] - 1204:19
referenced [1] - 1093:20
referred [2] - 1243:25, 1247:5
referring [13] - 1165:13, 1173:18, 1198:24, 1199:2, 1236:19, 1245:16, 1251:13, 1263:4, 1268:22, 1275:24, 1276:7, 1276:16
refers [1] - 1270:5
reflect [2] - 1108:20, 1274:3
reflected [1] - 1142:12
refresh [6] - 1268:25, 1269:4, 1269:6, 1273:6, 1273:25, 1274:3
refuses [1] - 1188:19
refuting [1] - 1196:7
Refuting [1] - 1196:9
regard [8] - 1204:10, 1212:22, 1213:5, 1214:24, 1215:25, 1217:14, 1221:4, 1227:11
regarding [7] - 1186:9, 1192:3, 1223:5, 1229:6, 1252:6, 1265:4, 1267:5
regardless [1] - 1101:21
regular [1] - 1158:2
regulatory [1] -

1206:13
**reinstitute** [1] - 1280:12
**related** [2] - 1135:12, 1278:13
**relates** [1] - 1255:13
**relating** [1] - 1275:6
**relation** [1] - 1137:5
**relationship** [3] - 1062:8, 1207:1, 1260:24
**relaxed** [1] - 1075:21
**relevance** [4] - 1098:9, 1098:17, 1111:7, 1261:24
**relevant** [3] - 1098:10, 1098:21, 1098:22
**relied** [1] - 1252:5
**reluctant** [1] - 1250:7
**rely** [3] - 1247:18, 1252:4, 1255:17
**relying** [1] - 1238:6
**remain** [2] - 1129:20, 1164:22
**remained** [2] - 1233:15, 1233:17
**remaining** [1] - 1231:16
**remember** [89] - 1062:13, 1065:21, 1067:6, 1067:10, 1069:6, 1069:17, 1069:23, 1070:11, 1070:12, 1070:15, 1073:1, 1073:21, 1073:23, 1074:3, 1075:12, 1075:15, 1076:1, 1079:25, 1082:17, 1084:21, 1101:24, 1102:9, 1102:18, 1112:8, 1112:12, 1112:18, 1112:19, 1116:1, 1116:5, 1116:7, 1117:7, 1117:9, 1118:6, 1118:13, 1118:18, 1119:25, 1121:20, 1124:2, 1124:3, 1124:23, 1125:16, 1126:8, 1130:11, 1130:22, 1131:21, 1133:2, 1136:2, 1136:3, 1136:22, 1138:14, 1145:14, 1145:18, 1145:20, 1146:3, 1147:6, 1147:19, 1147:20, 1148:15, 1149:20, 1149:22, 1150:9, 1164:19,

1168:14, 1170:6, 1170:7, 1171:1, 1177:3, 1182:20, 1183:2, 1228:15, 1229:15, 1229:17, 1232:4, 1234:16, 1245:3, 1261:16, 1261:17, 1267:12, 1267:16, 1268:16, 1269:8, 1271:21, 1271:22, 1274:8, 1274:11, 1277:5, 1277:7
**remembers** [1] - 1110:15
**remit** [1] - 1228:4
**remitted** [1] - 1228:4
**remitting** [4] - 1263:8, 1264:11, 1264:20, 1267:1
**remove** [12] - 1066:1, 1066:12, 1084:18, 1084:20, 1105:10, 1145:14, 1165:6, 1165:22, 1171:19, 1172:5, 1172:6, 1172:9
**removed** [3] - 1110:20, 1146:12, 1165:24
**removing** [2] - 1066:10
**rent** [2] - 1061:25, 1151:21
**rented** [5] - 1066:25, 1088:6, 1168:25, 1169:1, 1169:11
**rents** [1] - 1081:3
**repair** [1] - 1159:18
**repaired** [1] - 1159:15
**repairing** [1] - 1064:15
**repairs** [2] - 1064:10, 1082:24
**repeat** [3] - 1088:21, 1123:2, 1255:8
**repeatedly** [1] - 1232:5
**repeating** [1] - 1279:20
**replace** [2] - 1140:5, 1246:23
**report** [16] - 1092:9, 1092:11, 1092:20, 1092:21, 1093:10, 1093:21, 1097:1, 1099:15, 1099:20, 1105:11, 1110:12, 1139:18, 1182:17, 1224:16, 1257:14
**reported** [2] - 1260:18,

1263:22
**Reporter** [1] - 1060:14
**reporting** [3] - 1092:24, 1264:20, 1267:1
**reports** [16] - 1196:25, 1203:17, 1210:25, 1211:7, 1223:4, 1223:7, 1228:3, 1243:8, 1243:10, 1243:13, 1243:16, 1246:3, 1257:3, 1257:5, 1257:7, 1279:9
**represent** [6] - 1186:4, 1187:8, 1188:5, 1188:25, 1189:8, 1190:9
**representation** [3] - 1190:20, 1192:8, 1193:23
**represented** [7] - 1138:16, 1187:2, 1187:23, 1191:21, 1230:4, 1231:19, 1232:2
**representing** [6] - 1186:23, 1187:12, 1188:3, 1192:19, 1232:7
**represents** [2] - 1232:8
**request** [1] - 1157:6
**requested** [2] - 1216:9, 1232:2
**require** [3] - 1064:21, 1064:24, 1064:25
**required** [10] - 1223:16, 1225:18, 1227:19, 1235:12, 1235:25, 1236:2, 1236:4, 1262:4, 1262:16, 1264:18
**requirements** [1] - 1154:7
**requiring** [1] - 1267:4, 1280:5
**reside** [2] - 1061:21, 1194:16
**resident** [2] - 1237:11, 1264:1
**resides** [1] - 1224:19
**resolve** [5] - 1189:11, 1189:12, 1213:14, 1214:7, 1214:9
**resolving** [1] - 1194:4
**resource** [5] - 1198:12, 1200:16, 1200:17, 1248:12, 1250:1

**resources** [2] - 1199:16, 1226:6
**respect** [6] - 1210:5, 1224:13, 1261:10, 1274:19, 1277:10, 1278:17
**respectfully** [3] - 1188:21, 1190:10, 1191:6
**respond** [3] - 1230:12, 1231:18, 1231:20
**responded** [1] - 1230:15
**response** [9] - 1074:8, 1075:5, 1076:12, 1079:22, 1175:15, 1177:1, 1210:2, 1242:15, 1267:3
**responsibilities** [9] - 1082:18, 1195:4, 1196:18, 1197:5, 1197:7, 1225:25, 1226:8, 1241:16, 1256:24
**responsibility** [5] - 1212:1, 1226:5, 1226:6, 1259:22, 1261:21
**responsible** [4] - 1196:22, 1213:19, 1254:11, 1263:18
**responsive** [1] - 1144:12
**rest** [1] - 1079:9
**restate** [3] - 1243:17, 1243:19, 1244:3
**restated** [1] - 1244:3
**restatement** [1] - 1278:7
**restating** [3] - 1243:20, 1243:25, 1244:5
**restored** [2] - 1265:3, 1265:5
**restraining** [1] - 1220:3, 1251:15
**result** [1] - 1226:1
**retain** [2] - 1262:16, 1280:5
**retained** [2] - 1264:22, 1265:9
**retaining** [1] - 1267:2
**retention** [3] - 1265:19, 1265:21, 1279:25
**retrain** [2] - 1279:20, 1279:21
**retraining** [1] - 1218:15
**return** [11] - 1067:1,

1088:5, 1169:21, 1169:22, 1191:14, 1228:5, 1228:6, 1238:11, 1263:7, 1266:7, 1266:10
**returned** [5] - 1067:5, 1101:17, 1157:5, 1159:7, 1171:3
**returning** [1] - 1112:21
**returns** [12] - 1226:22, 1226:23, 1227:9, 1227:10, 1230:2, 1232:18, 1242:7, 1247:22, 1248:1, 1258:17, 1277:14, 1280:10
**revenue** [6] - 1260:2, 1260:3, 1260:7, 1260:8, 1260:14, 1260:21, 1260:25, 1261:2
**revenues** [1] - 1260:19
**review** [8] - 1215:17, 1216:4, 1216:16, 1240:18, 1240:24, 1243:23, 1261:18, 1261:22
**reviewed** [4] - 1212:7, 1266:8, 1278:7, 1280:10
**reviewer** [1] - 1066:18
**revisited** [1] - 1250:20
**rewind** [4] - 1173:14, 1174:1, 1174:3, 1174:10
**rewound** [2] - 1173:20, 1174:23
**RICHARD** [2] - 1060:2, 1060:5
**Richard** [1] - 1150:13
**rights** [3] - 1187:21, 1192:2, 1192:3
**risk** [3] - 1192:15, 1213:13, 1251:25
**Rivera** [28] - 1066:1, 1077:13, 1077:15, 1084:17, 1091:5, 1100:3, 1100:5, 1100:11, 1101:8, 1110:9, 1126:12, 1127:5, 1146:9, 1146:11, 1146:20, 1147:11, 1149:8, 1149:9, 1153:12, 1154:17, 1156:11, 1156:14, 1157:16, 1172:8, 1205:16, 1205:19, 1208:5,

1243:13
**RIVERA** [1] - 1060:3
**Rivera's** [10] -
1126:22, 1145:20,
1145:21, 1184:2,
1205:14, 1220:5,
1221:15, 1221:20,
1266:17, 1267:10
**RIVERS** [1] - 1060:12
**Rivers** [200] - 1065:9,
1065:14, 1065:15,
1065:17, 1065:22,
1066:2, 1066:11,
1066:12, 1066:15,
1067:16, 1067:18,
1068:6, 1069:7,
1070:16, 1072:23,
1073:22, 1073:23,
1074:1, 1074:3,
1074:9, 1074:19,
1074:21, 1074:24,
1082:8, 1083:14,
1083:15, 1083:18,
1083:21, 1084:18,
1085:13, 1087:12,
1088:2, 1088:20,
1088:22, 1089:9,
1089:11, 1089:14,
1089:16, 1089:22,
1090:22, 1091:11,
1093:1, 1093:4,
1095:11, 1095:16,
1099:18, 1100:10,
1102:17, 1102:22,
1102:23, 1103:3,
1104:3, 1104:6,
1105:4, 1107:12,
1110:3, 1111:24,
1112:18, 1117:2,
1118:25, 1119:2,
1119:5, 1119:11,
1119:13, 1119:17,
1120:1, 1120:2,
1120:13, 1120:14,
1120:15, 1120:16,
1120:25, 1121:1,
1121:8, 1121:16,
1121:22, 1121:25,
1122:10, 1122:13,
1122:18, 1123:15,
1127:17, 1129:8,
1130:9, 1130:20,
1133:3, 1133:4,
1134:12, 1135:12,
1136:8, 1136:9,
1136:13, 1136:23,
1137:15, 1137:18,
1138:22, 1138:24,
1141:15, 1146:22,
1146:23, 1148:18,
1151:7, 1157:13,

1158:22, 1159:19,
1159:23, 1160:4,
1160:14, 1160:17,
1163:18, 1164:22,
1165:6, 1168:19,
1170:1, 1170:11,
1171:21, 1174:13,
1177:22, 1178:12,
1180:24, 1181:7,
1181:13, 1186:21,
1186:23, 1187:2,
1187:12, 1187:17,
1187:20, 1187:23,
1188:3, 1188:4,
1190:2, 1190:3,
1190:20, 1192:2,
1192:20, 1192:21,
1193:9, 1193:10,
1194:23, 1194:24,
1195:1, 1195:4,
1195:9, 1195:10,
1195:18, 1196:1,
1196:3, 1196:16,
1196:18, 1197:3,
1197:12, 1197:14,
1199:9, 1200:23,
1202:6, 1202:24,
1205:10, 1205:18,
1206:2, 1206:6,
1206:20, 1207:8,
1208:2, 1209:19,
1222:19, 1225:9,
1225:18, 1227:23,
1229:5, 1232:7,
1232:8, 1232:12,
1232:14, 1233:2,
1235:2, 1235:16,
1236:11, 1237:1,
1239:1, 1239:4,
1239:10, 1239:21,
1243:15, 1244:7,
1248:16, 1250:6,
1252:7, 1256:21,
1256:24, 1257:12,
1258:21, 1259:25,
1265:16, 1270:15,
1274:19, 1276:19
**Rivers'** [3] - 1083:24,
1192:9, 1192:23
**Rivers's** [6] - 1089:19,
1100:16, 1114:3,
1230:1, 1261:11,
1277:10
**Road** [1] - 1071:20
**Robert** [1] - 1081:8
**Rogosnitzky** [3] -
1198:24, 1204:18,
1221:4
**ROI** [1] - 1196:12
**role** [15] - 1081:20,

1145:6, 1197:14,
1197:17, 1197:22,
1197:25, 1204:8,
1204:10, 1204:13,
1204:22, 1207:3,
1216:2, 1216:4,
1246:21, 1247:22
**roll** [2] - 1205:21,
1208:16
**room** [9] - 1087:22,
1126:10, 1163:23,
1163:24, 1172:22,
1174:19, 1241:12,
1275:1
**ROSENBLATT** [5] -
1186:19, 1187:1,
1194:2, 1259:11,
1259:19
**Rosenblatt** [7] -
1186:20, 1191:22,
1193:9, 1193:20,
1193:23, 1193:25,
1240:14
**Rosenblatt's** [1] -
1193:13
**Rosenkowski** [1] -
1198:23
**rough** [1] - 1142:1
**roughly** [4] - 1072:25,
1082:18, 1100:21,
1108:1
**rounding** [1] -
1214:14
**Route** [1] - 1175:23
**row** [1] - 1100:18
**rules** [1] - 1214:14
**rumors** [1] - 1156:16
**run** [11] - 1173:13,
1203:16, 1211:7,
1246:3, 1248:14,
1255:12, 1258:22,
1258:23, 1258:24,
1258:25
**running** [3] - 1273:20,
1274:1, 1274:4
**runs** [3] - 1126:15,
1126:24, 1151:13

## S

**sage** [11] - 1249:24,
1249:25, 1250:5,
1250:8, 1250:17,
1250:21, 1251:6,
1251:7, 1251:18,
1252:8
**Sage** [1] - 1201:4
**salaried** [1] - 1122:25,
1123:3
**salaries** [1] - 1211:4

**salary** [7] - 1072:23,
1073:17, 1122:9,
1122:10, 1122:11,
1122:17, 1123:6
**SALCEDO** [2] -
1060:3, 1061:7
**Salcedo** [12] - 1061:2,
1061:3, 1061:16,
1092:8, 1101:3,
1102:22, 1132:22,
1154:3, 1163:18,
1175:14, 1178:24,
1182:12
**sale** [1] - 1260:12
**Sales** [1] - 1197:8
**sales** [1] - 1260:13
**Samsung** [3] -
1063:19, 1112:2,
1130:8
**Sandra** [4] - 1086:6,
1099:12, 1100:9,
1101:8
**sat** [1] - 1164:15
**satisfied** [1] - 1107:7
**Saturdays** [1] - 1121:3
**save** [3] - 1131:11,
1131:14, 1131:18
**saved** [1] - 1131:13
**savings** [1] - 1071:11
**saw** [9] - 1094:5,
1173:12, 1177:25,
1178:1, 1178:3,
1204:4, 1217:19,
1239:24, 1268:20
**scale** [1] - 1222:18
**scan** [1] - 1212:7
**scanned** [2] -
1224:18, 1224:20
**scanning** [1] -
1224:21
**scene** [1] - 1170:17
**SCHAFHAUSER** [57] -
1060:18, 1060:21,
1060:25, 1163:15,
1163:17, 1166:4,
1167:16, 1170:10,
1174:22, 1175:8,
1184:24, 1185:2,
1185:6, 1185:13,
1187:4, 1187:7,
1187:19, 1187:25,
1188:2, 1188:7,
1188:15, 1188:21,
1190:10, 1190:13,
1190:18, 1191:3,
1191:6, 1191:11,
1191:18, 1192:7,
1192:12, 1193:1,
1193:5, 1193:12,
1193:15, 1193:22,

1201:14, 1225:11,
1238:15, 1238:19,
1240:9, 1240:11,
1241:4, 1248:23,
1249:19, 1249:20,
1255:14, 1255:22,
1256:1, 1256:5,
1261:7, 1264:25,
1268:8, 1276:9,
1281:10, 1281:16,
1281:20
**Schafhauser** [8] -
1163:14, 1191:17,
1192:14, 1229:12,
1229:23, 1231:4,
1232:3, 1238:21
**Schafhauser's** [3] -
1228:14, 1230:12,
1231:18
**schedule** [4] -
1218:11, 1230:20,
1230:21, 1248:13
**scheduling** [1] -
1200:20
**Schreiber** [33] -
1067:23, 1089:5,
1090:3, 1090:17,
1090:18, 1090:24,
1101:10, 1154:14,
1154:15, 1154:18,
1154:21, 1155:1,
1156:16, 1170:5,
1178:3, 1179:25,
1180:1, 1189:18,
1192:16, 1195:23,
1195:25, 1196:13,
1196:15, 1199:25,
1200:3, 1207:24,
1208:1, 1217:4,
1239:22, 1241:5,
1241:8, 1253:2
**Schreiber's** [4] -
1196:2, 1196:13,
1196:17, 1208:17
**Schreibers** [4] -
1173:10, 1177:23,
1199:9, 1201:9
**Schreiber** [9] -
1119:14, 1119:16,
1121:21, 1121:24,
1265:21, 1265:25,
1275:5, 1275:12
**Schreibers** [1] -
1275:11
**scope** [3] - 1199:21,
1202:7, 1222:16
**screaming** [3] -
1067:24, 1067:25,
1180:10
**screen** [2] - 1100:16,

1113:18
**screw** [2] - 1089:18, 1135:2
**screwdrivers** [2] - 1098:3, 1099:6
**screws** [1] - 1167:2
**SD** [2] - 1130:16, 1131:12
**se** [4] - 1234:8, 1238:5, 1241:9, 1262:15
**search** [1] - 1130:5
**seat** [4] - 1061:9, 1128:21, 1191:16, 1194:11
**second** [21] - 1152:9, 1155:21, 1158:11, 1159:11, 1174:13, 1182:9, 1182:10, 1183:13, 1183:15, 1183:17, 1183:18, 1183:20, 1184:1, 1204:22, 1250:25, 1255:3, 1255:7, 1255:9, 1257:21, 1267:14, 1270:5
**seconds** [1] - 1100:21
**security** [3] - 1113:20, 1178:25, 1179:1
**see** [61] - 1075:18, 1079:4, 1080:23, 1088:14, 1091:9, 1093:3, 1100:17, 1111:19, 1128:9, 1130:5, 1131:3, 1131:22, 1145:7, 1161:8, 1162:6, 1163:5, 1166:5, 1167:5, 1167:17, 1172:21, 1173:1, 1173:15, 1179:8, 1179:19, 1179:24, 1182:2, 1183:14, 1183:23, 1184:1, 1197:25, 1202:7, 1203:14, 1203:15, 1203:19, 1204:6, 1204:8, 1204:15, 1204:23, 1204:25, 1214:24, 1215:3, 1221:9, 1221:10, 1234:15, 1242:20, 1253:23, 1257:17, 1265:2, 1268:15, 1269:24, 1271:2, 1271:4, 1272:7, 1273:3, 1273:13, 1273:17, 1273:20, 1273:23, 1281:16
**seeing** [3] - 1126:8,

1212:1, 1276:6
**seem** [1] - 1279:20
**sell** [1] - 1148:6
**send** [7] - 1063:24, 1072:2, 1083:9, 1113:11, 1113:13, 1114:9, 1258:12
**sending** [3] - 1063:25, 1117:7, 1118:13
**sense** [2] - 1104:19, 1121:25
**sent** [3] - 1118:15, 1118:16, 1119:13
**separate** [9] - 1070:22, 1071:4, 1077:25, 1078:11, 1078:12, 1078:20, 1079:8, 1079:9, 1175:25
**serve** [1] - 1201:7
**SERVE** [1] - 1060:11
**server** [1] - 1275:1
**service** [14] - 1083:4, 1083:5, 1083:9, 1087:22, 1112:10, 1141:13, 1141:18, 1141:24, 1143:12, 1143:14, 1163:23, 1163:24, 1172:22
**serviced** [4] - 1127:1, 1127:3, 1127:5
**SERVICES** [1] - 1060:12
**Services** [1] - 1176:15
**services** [2] - 1159:23, 1207:7
**set** [11] - 1066:25, 1094:6, 1094:15, 1094:22, 1094:25, 1095:11, 1096:16, 1098:3, 1129:16, 1207:7, 1214:10
**sets** [2] - 1196:6, 1262:13
**settlement** [1] - 1266:1
**several** [5] - 1077:3, 1077:18, 1111:9, 1232:2, 1247:23
**shape** [4] - 1094:17, 1146:2, 1160:12, 1184:7
**share** [2] - 1207:6, 1207:13
**sheet** [2] - 1257:2, 1257:10
**shelf** [1] - 1200:24
**shifted** [1] - 1192:18
**ship** [3] - 1260:2, 1260:6, 1260:15

**shipment** [1] - 1260:21
**shipped** [2] - 1260:10, 1260:18
**shipping** [2] - 1254:22, 1260:3
**ships** [2] - 1260:22, 1260:23
**shocking** [1] - 1207:7
**short** [1] - 1178:20
**shortly** [1] - 1233:12
**shots** [1] - 1100:16
**show** [1] - 1269:13
**showed** [3] - 1102:12, 1149:17, 1273:7
**showing** [1] - 1261:4
**shows** [4] - 1101:13, 1120:6, 1120:8, 1179:9
**shut** [4] - 1221:11, 1221:16, 1225:8, 1225:15
**shutting** [1] - 1245:2
**sic]** [1] - 1168:16
**sick** [2] - 1080:6, 1262:9
**side** [9] - 1120:11, 1140:6, 1140:8, 1141:7, 1145:24, 1150:2, 1174:20, 1220:20, 1267:22
**sided** [1] - 1202:16
**sign** [10] - 1091:15, 1092:2, 1094:17, 1133:25, 1134:23, 1162:15, 1220:4, 1220:10, 1266:9
**sign-in** [1] - 1134:23
**sign-off** [1] - 1266:9
**signed** [3] - 1220:9, 1230:1, 1265:14
**significant** [1] - 1231:5
**signing** [1] - 1198:3
**silver** [3] - 1173:13, 1173:15, 1173:16
**Silvia** [3] - 1205:23, 1207:15, 1207:16
**simply** [3] - 1214:7, 1223:24, 1275:21
**SINGLE** [1] - 1060:10
**sit** [2] - 1087:23, 1106:9
**site** [3] - 1063:21, 1064:4, 1239:16
**sitting** [1] - 1188:17
**situation** [1] - 1224:10
**six** [8] - 1092:19, 1121:1, 1144:4, 1236:4, 1254:2,

1254:4, 1254:5, 1257:16
**six-month** [1] - 1257:16
**size** [1] - 1177:12
**sized** [1] - 1201:7
**sliding** [1] - 1078:17
**small** [1] - 1281:11
**smaller** [2] - 1269:14, 1272:19
**sold** [2] - 1098:13, 1169:5
**sole** [1] - 1201:12
**SOLOMON** [1] - 1060:10
**solution** [1] - 1200:18
**someone** [14] - 1091:2, 1095:25, 1096:10, 1097:15, 1139:15, 1181:10, 1181:13, 1221:7, 1224:22, 1224:23, 1232:7, 1242:4, 1253:6
**sometime** [1] - 1202:5
**sometimes** [25] - 1073:9, 1109:8, 1115:5, 1115:7, 1121:2, 1121:5, 1125:12, 1126:4, 1127:19, 1127:20, 1134:19, 1135:2, 1135:4, 1141:25, 1142:17, 1144:15, 1144:21, 1145:1, 1210:3, 1210:24
**Sometimes** [1] - 1211:7
**somewhere** [6] - 1105:2, 1132:6, 1165:7, 1166:3, 1166:9, 1166:18
**son** [5] - 1127:12, 1133:16, 1134:25, 1151:7, 1177:25
**SONIA** [1] - 1060:3
**sonia** [1] - 1086:12
**Sonia** [35] - 1076:20, 1079:24, 1085:24, 1086:2, 1086:10, 1086:21, 1094:8, 1095:2, 1097:22, 1100:22, 1102:4, 1106:8, 1107:14, 1111:16, 1111:18, 1154:19, 1154:20, 1157:16, 1158:8, 1159:7, 1170:22, 1207:14, 1207:15, 1209:12, 1212:7,

1216:13, 1220:4, 1224:22, 1224:23, 1224:25, 1225:1, 1228:3, 1228:15, 1243:12
**Sonia's** [6] - 1078:6, 1100:25, 1158:4, 1158:13, 1218:23
**sons** [2] - 1134:20, 1135:5
**Sonya** [8] - 1123:18, 1123:19, 1124:6, 1125:13, 1125:18, 1126:18, 1127:15, 1268:18
**Sonya's** [2] - 1145:14, 1277:4
**Sorry** [1] - 1202:3
**sorry** [43] - 1060:21, 1061:15, 1069:15, 1085:25, 1088:7, 1088:17, 1106:12, 1111:15, 1116:16, 1132:20, 1139:4, 1139:10, 1144:8, 1149:12, 1154:20, 1160:1, 1161:10, 1165:19, 1168:4, 1184:22, 1196:8, 1198:23, 1202:1, 1208:23, 1218:3, 1221:18, 1225:13, 1227:4, 1228:9, 1240:9, 1245:6, 1246:12, 1249:18, 1250:11, 1255:8, 1259:10, 1261:5, 1263:24, 1264:23, 1275:4, 1277:14, 1281:9
**sort** [4] - 1124:7, 1172:6, 1184:2, 1211:8
**sounds** [2] - 1180:15, 1255:11
**South** [13] - 1067:6, 1159:24, 1163:19, 1163:22, 1164:23, 1165:2, 1165:6, 1171:20, 1172:7, 1172:16, 1177:2, 1205:10, 1276:19
**space** [7] - 1078:9, 1078:11, 1078:12, 1078:14, 1078:15, 1078:18, 1079:6, 1079:8, 1080:15, 1278:3
**Spanish** [3] - 1061:18, 1178:9

**speaking** [1] - 1162:12
**speaks** [1] - 1178:9
**specific** [5] - 1173:17, 1230:20, 1230:21, 1234:16, 1250:2
**specifically** [9] - 1157:16, 1210:5, 1223:5, 1229:6, 1230:2, 1246:25, 1252:22, 1266:22, 1280:21
**specificity** [1] - 1267:24
**specifics** [1] - 1210:24
**speculate** [1] - 1208:12
**speed** [1] - 1197:21
**Spence** [6] - 1150:13, 1151:9, 1151:11, 1152:3, 1152:7, 1152:11
**spend** [1] - 1151:24
**spoken** [1] - 1238:23
**SS000001** [1] - 1275:19
**SS12192** [1] - 1275:19
**staff** [4] - 1068:2, 1212:3, 1223:4, 1254:16
**staffs** [1] - 1224:8
**stage** [2] - 1251:4, 1255:1
**stages** [1] - 1201:23
**stamped** [1] - 1275:19
**stand** [4] - 1061:5, 1128:19, 1128:22, 1146:15
**start** [13] - 1060:23, 1062:11, 1070:24, 1087:7, 1100:18, 1113:22, 1140:23, 1149:1, 1154:9, 1177:13, 1228:20, 1236:15, 1267:14
**started** [13] - 1062:13, 1067:24, 1074:3, 1074:18, 1103:7, 1121:25, 1141:14, 1141:15, 1144:4, 1180:10, 1180:11, 1197:19, 1198:18
**starting** [3] - 1229:1, 1263:14, 1279:9
**state** [4] - 1061:13, 1061:15, 1194:14, 1280:5
**statement** [9] - 1110:11, 1182:15, 1225:4, 1243:21,

1257:1, 1257:2, 1257:10, 1257:16, 1263:2
**statements** [24] - 1072:2, 1072:4, 1102:21, 1195:6, 1200:20, 1222:24, 1224:13, 1241:18, 1241:19, 1243:22, 1243:24, 1244:3, 1244:6, 1256:21, 1256:23, 1257:20, 1258:1, 1258:5, 1258:7, 1260:14, 1274:22, 1278:2, 1278:8, 1280:9
**status** [1] - 1281:22
**stay** [6] - 1064:2, 1064:3, 1108:10, 1141:23, 1213:20, 1281:21
**steam** [1] - 1180:16
**stenography** [1] - 1060:16
**step** [1] - 1251:14
**steps** [2] - 1233:14, 1279:13
**Steven** [20] - 1189:18, 1195:23, 1196:2, 1196:13, 1199:6, 1200:3, 1208:17, 1209:24, 1215:6, 1216:13, 1239:22, 1241:5, 1241:8, 1253:2, 1258:2, 1258:4, 1259:5, 1265:21, 1265:25, 1275:5
**still** [18] - 1077:3, 1098:6, 1099:19, 1104:17, 1114:13, 1121:6, 1121:15, 1156:8, 1157:10, 1165:1, 1166:8, 1166:11, 1166:18, 1180:24, 1224:19, 1232:22, 1234:6, 1235:2
**stipulation** [1] - 1191:25
**stop** [9] - 1067:18, 1094:17, 1099:8, 1102:24, 1140:3, 1144:16, 1180:8, 1216:25
**stopped** [5] - 1139:24, 1139:25, 1141:15, 1251:21
**storage** [2] - 1130:21, 1130:22

**store** [7] - 1078:3, 1090:23, 1169:5, 1169:6, 1169:9, 1169:22, 1178:16
**stored** [5] - 1072:9, 1225:5, 1235:6, 1262:20, 1270:22
**storefront** [1] - 1078:1
**storefronts** [1] - 1077:25
**straight** [1] - 1166:5
**Street** [1] - 1062:18
**street** [6] - 1077:19, 1078:2, 1078:6, 1140:21, 1141:1, 1175:22
**strike** [1] - 1255:20
**Stroz** [1] - 1281:25
**structure** [1] - 1079:12
**stub** [2] - 1261:21, 1266:15
**stubs** [9] - 1261:10, 1261:15, 1261:18, 1261:23, 1262:2, 1262:3, 1262:23, 1262:24, 1278:3
**stuff** [13] - 1068:1, 1077:12, 1079:9, 1090:24, 1100:1, 1102:13, 1117:10, 1147:10, 1156:2, 1156:3, 1172:3, 1173:16, 1183:4
**subject** [2] - 1255:13, 1272:16
**submitted** [1] - 1263:4
**submitting** [1] - 1263:1
**subscription** [1] - 1253:17
**subsequent** [2] - 1157:5, 1230:19
**subsequently** [2] - 1217:25, 1242:18
**subset** [2] - 1245:8, 1245:9
**substantive** [1] - 1241:3
**successful** [3] - 1247:7, 1255:7, 1255:10
**suddenly** [2] - 1140:2, 1149:17
**Sue** [2] - 1277:1, 1278:21
**suggestion** [9] - 1190:6, 1190:12, 1190:17, 1190:18, 1190:23, 1190:25, 1191:17, 1191:19

**suitable** [1] - 1251:4
**suite** [2] - 1201:5, 1250:3
**Suite** [1] - 1201:6
**suited** [1] - 1252:22
**sum** [1] - 1254:3
**summary** [2] - 1216:7, 1235:24
**summer** [2] - 1141:19, 1141:20
**Sundays** [1] - 1121:2
**sundown** [2] - 1156:6
**supervision** [1] - 1247:13
**supply** [6] - 1084:10, 1143:22, 1169:5, 1169:6, 1169:9, 1178:16
**Supply** [1] - 1077:22
**support** [4] - 1209:11, 1216:9, 1230:22, 1280:9
**supported** [1] - 1231:15
**supporting** [2] - 1229:7, 1231:2
**supports** [1] - 1196:11
**supposedly** [1] - 1101:5
**surface** [1] - 1232:25
**surfaced** [1] - 1251:3
**suspend** [1] - 1281:18
**sustained** [2] - 1092:7, 1150:11
**Sustained** [2] - 1142:7, 1208:11
**swipe** [6] - 1093:11, 1181:17, 1181:20, 1181:22, 1182:6
**swore** [1] - 1131:1
**sworn** [1] - 1061:8
**sworn/affirmed** [1] - 1194:9
**Sylvia** [12] - 1076:21, 1079:24, 1091:15, 1123:12, 1124:6, 1124:25, 1125:13, 1125:19, 1125:21, 1127:11, 1128:7, 1154:17
**SYLVIA** [1] - 1060:3
**system** [83] - 1119:10, 1198:5, 1198:7, 1198:8, 1198:10, 1198:12, 1198:16, 1199:11, 1199:15, 1200:1, 1200:4, 1200:10, 1200:13, 1200:15, 1200:17, 1200:24, 1201:3,

1201:11, 1208:5, 1209:20, 1210:5, 1210:7, 1211:3, 1211:13, 1214:11, 1215:3, 1219:6, 1220:11, 1220:24, 1221:4, 1221:11, 1222:9, 1222:11, 1222:12, 1222:18, 1222:22, 1225:6, 1225:8, 1225:14, 1236:11, 1243:1, 1243:3, 1243:7, 1243:8, 1243:9, 1243:11, 1243:14, 1243:16, 1244:6, 1244:10, 1244:11, 1244:23, 1244:25, 1245:13, 1245:14, 1245:20, 1245:21, 1246:14, 1247:5, 1247:9, 1248:3, 1248:7, 1248:12, 1249:7, 1250:6, 1250:16, 1250:21, 1251:8, 1251:25, 1252:3, 1252:4, 1252:8, 1252:22, 1253:10, 1254:8, 1254:11, 1255:16, 1255:19, 1265:24, 1274:23, 1274:24, 1279:16
**systems** [13] - 1195:5, 1200:24, 1201:2, 1201:10, 1222:14, 1241:18, 1242:9, 1242:11, 1242:12, 1242:13, 1250:1

## T

**T-Mobile** [2] - 1112:11, 1113:1
**table** [1] - 1146:1
**tablet** [6] - 1133:20, 1133:22, 1134:2, 1134:4, 1134:6, 1134:8
**tamper** [1] - 1096:4
**tampered** [9] - 1096:1, 1096:2, 1096:7, 1096:10, 1096:22, 1096:23, 1097:8, 1097:10
**tampering** [3] - 1158:20, 1158:24, 1158:25
**tank** [24] - 1066:20, 1066:23, 1067:13, 1067:14, 1088:5,

1088:6, 1088:8, 1088:11, 1157:6, 1168:20, 1168:21, 1168:24, 1168:25, 1169:1, 1169:3, 1169:8, 1169:13, 1169:15, 1169:17, 1169:21
**tanks** [4] - 1067:1, 1067:8, 1168:17, 1168:18
**tape** [2] - 1173:14, 1173:20
**taping** [1] - 1174:14
**tasks** [3] - 1242:8, 1247:4, 1256:20
**taste** [1] - 1250:9
**tax** [25] - 1073:20, 1142:18, 1226:22, 1226:23, 1227:2, 1227:9, 1228:5, 1230:1, 1232:18, 1232:19, 1232:21, 1232:22, 1242:6, 1247:22, 1248:1, 1258:17, 1263:1, 1263:19, 1264:3, 1266:7, 1266:10, 1277:14, 1277:21, 1280:10
**taxes** [7] - 1142:12, 1142:19, 1228:3, 1263:8, 1263:16, 1263:21, 1264:11
**taxing** [1] - 1206:14
**teach** [1] - 1214:3
**teacher** [1] - 1069:5
**team** [1] - 1271:17
**technically** [1] - 1207:8
**temporary** [3] - 1218:15, 1220:3, 1251:15
**ten** [4] - 1076:11, 1092:5, 1096:17, 1177:17
**tend** [1] - 1061:19
**tendency** [1] - 1223:16
**term** [2] - 1200:12, 1242:2
**terminal** [2] - 1148:5
**terminate** [1] - 1217:11
**terminated** [2] - 1103:17, 1217:7
**terms** [3] - 1197:16, 1198:5, 1249:2
**terrible** [1] - 1073:5
**testified** [12] - 1061:8,

1123:3, 1142:23, 1168:17, 1170:3, 1175:14, 1176:8, 1177:2, 1208:1, 1242:14, 1266:17, 1267:17
**testifies** [1] - 1190:9
**testify** [7] - 1188:24, 1189:7, 1189:13, 1192:17, 1194:6, 1194:9, 1240:16
**testimony** [28] - 1101:12, 1101:14, 1101:15, 1103:21, 1108:11, 1108:15, 1108:16, 1108:21, 1109:14, 1109:16, 1111:9, 1125:12, 1131:17, 1137:17, 1139:2, 1164:19, 1167:4, 1170:6, 1171:15, 1175:24, 1189:16, 1191:1, 1191:5, 1193:16, 1234:5, 1240:2, 1240:12, 1240:19
**text** [18] - 1073:9, 1073:11, 1114:4, 1114:6, 1114:8, 1114:13, 1114:19, 1115:5, 1117:4, 1117:8, 1117:9, 1162:16, 1162:18, 1162:20, 1273:2, 1273:12
**texts** [3] - 1114:11, 1114:12, 1115:4
**THE** [480] - 1060:20, 1060:22, 1061:1, 1061:3, 1061:6, 1061:9, 1065:5, 1065:7, 1066:22, 1066:23, 1066:24, 1069:15, 1069:17, 1069:20, 1069:23, 1069:24, 1072:21, 1075:15, 1075:17, 1075:19, 1075:25, 1076:1, 1076:2, 1076:3, 1078:19, 1085:25, 1086:2, 1086:24, 1087:1, 1087:7, 1088:9, 1088:10, 1088:12, 1088:14, 1088:15, 1088:16, 1092:7, 1092:14, 1093:20, 1093:23, 1094:24, 1095:1, 1095:4, 1098:10, 1098:15,

1098:20, 1098:24, 1099:2, 1099:3, 1099:4, 1099:8, 1099:19, 1101:17, 1101:19, 1101:20, 1101:23, 1101:25, 1102:1, 1102:2, 1102:4, 1102:5, 1102:6, 1102:7, 1102:9, 1102:10, 1102:12, 1102:14, 1102:15, 1103:20, 1103:22, 1103:23, 1103:25, 1104:2, 1104:4, 1104:5, 1104:8, 1104:9, 1104:10, 1104:11, 1104:12, 1104:13, 1104:14, 1104:16, 1104:17, 1104:19, 1104:22, 1104:23, 1104:24, 1105:1, 1105:3, 1105:4, 1105:6, 1105:7, 1106:12, 1106:15, 1106:18, 1106:19, 1106:20, 1106:21, 1106:22, 1106:25, 1107:1, 1107:2, 1107:5, 1107:6, 1107:7, 1107:9, 1108:16, 1108:19, 1108:24, 1109:11, 1110:14, 1111:8, 1111:15, 1111:16, 1111:17, 1111:18, 1111:19, 1111:20, 1111:21, 1115:11, 1115:13, 1116:7, 1116:8, 1116:10, 1116:11, 1118:19, 1118:21, 1118:22, 1118:23, 1118:24, 1120:19, 1121:7, 1121:10, 1121:11, 1121:14, 1121:17, 1121:18, 1121:19, 1122:23, 1122:24, 1124:11, 1124:12, 1124:14, 1124:15, 1124:16, 1125:11, 1125:13, 1125:14, 1125:15, 1125:17, 1128:1, 1128:2, 1128:6, 1128:8, 1128:9, 1128:10, 1128:11, 1128:15, 1128:18, 1128:21, 1128:23, 1131:2, 1131:3, 1131:4, 1132:12, 1132:16,

1132:19, 1132:21, 1137:2, 1137:4, 1137:8, 1137:10, 1139:1, 1139:5, 1139:10, 1139:11, 1139:14, 1140:13, 1140:16, 1140:17, 1140:20, 1140:23, 1140:25, 1141:2, 1141:4, 1141:11, 1141:12, 1142:3, 1142:4, 1142:7, 1142:10, 1142:11, 1142:14, 1142:15, 1142:16, 1143:16, 1143:17, 1144:8, 1144:9, 1144:11, 1144:13, 1146:14, 1146:17, 1146:18, 1146:19, 1147:4, 1147:5, 1150:11, 1150:15, 1150:16, 1150:17, 1151:23, 1152:5, 1152:6, 1152:25, 1153:1, 1153:19, 1161:10, 1161:15, 1161:17, 1161:20, 1163:14, 1165:19, 1165:21, 1165:22, 1165:24, 1165:25, 1166:1, 1167:3, 1167:5, 1167:6, 1167:7, 1167:8, 1167:10, 1167:12, 1167:14, 1167:15, 1170:9, 1172:11, 1172:12, 1172:13, 1172:14, 1174:6, 1174:8, 1174:10, 1174:11, 1174:12, 1174:13, 1174:14, 1174:15, 1174:16, 1174:17, 1174:21, 1175:10, 1176:23, 1178:18, 1178:21, 1180:8, 1182:18, 1182:21, 1182:24, 1183:2, 1183:6, 1183:9, 1183:15, 1183:16, 1183:17, 1183:19, 1183:20, 1184:6, 1184:19, 1184:21, 1185:1, 1185:4, 1185:11, 1185:14, 1185:17, 1186:3, 1186:6, 1186:11, 1186:18, 1186:25, 1187:3, 1187:6, 1187:9, 1187:14, 1187:16, 1187:22,

1188:1, 1188:4, 1188:8, 1188:12, 1188:17, 1188:23, 1189:1, 1189:2, 1189:3, 1189:5, 1189:10, 1189:19, 1189:21, 1190:3, 1190:5, 1190:11, 1190:15, 1190:23, 1191:4, 1191:9, 1191:13, 1191:16, 1192:5, 1192:10, 1192:19, 1192:25, 1193:3, 1193:8, 1193:14, 1193:17, 1193:21, 1193:25, 1194:4, 1194:11, 1196:8, 1196:9, 1201:15, 1202:1, 1202:2, 1202:3, 1204:19, 1204:21, 1206:25, 1207:5, 1207:9, 1207:11, 1207:12, 1207:14, 1207:18, 1208:11, 1208:20, 1208:24, 1210:21, 1210:25, 1211:3, 1211:5, 1211:6, 1211:7, 1211:11, 1211:12, 1211:16, 1213:22, 1213:25, 1214:10, 1214:13, 1214:18, 1216:20, 1216:23, 1217:3, 1219:8, 1219:11, 1221:14, 1221:18, 1221:19, 1221:21, 1221:23, 1221:24, 1222:1, 1222:3, 1224:2, 1224:5, 1224:7, 1224:8, 1224:9, 1225:12, 1230:7, 1230:11, 1231:23, 1231:25, 1232:10, 1232:15, 1232:17, 1232:18, 1232:20, 1232:21, 1232:23, 1232:25, 1236:9, 1236:14, 1236:19, 1236:22, 1236:24, 1236:25, 1237:2, 1237:6, 1237:7, 1237:8, 1237:12, 1237:13, 1237:14, 1237:16, 1237:20, 1237:25, 1238:8, 1238:10, 1238:13, 1238:17, 1240:8, 1240:10, 1241:3, 1245:6, 1245:9,

1245:10, 1248:22,
1248:24, 1249:3,
1249:6, 1249:7,
1249:11, 1249:13,
1249:14, 1249:15,
1249:17, 1255:11,
1255:18, 1255:24,
1256:3, 1257:9,
1257:10, 1258:14,
1258:16, 1258:19,
1259:10, 1259:15,
1259:20, 1260:4,
1260:6, 1260:9,
1260:12, 1260:16,
1260:17, 1260:20,
1260:22, 1260:23,
1261:1, 1261:4,
1262:5, 1262:7,
1262:12, 1262:15,
1262:17, 1262:19,
1262:21, 1263:24,
1264:2, 1264:3,
1264:5, 1264:6,
1264:8, 1264:12,
1264:13, 1264:14,
1264:16, 1264:17,
1264:18, 1264:21,
1264:22, 1264:23,
1267:20, 1267:23,
1267:24, 1267:25,
1268:1, 1269:3,
1269:9, 1272:13,
1272:15, 1272:16,
1281:9, 1281:18,
1281:21
**theirs** [1] - 1103:24
**themselves** [1] -
1258:25
**therefore** [1] - 1162:10
**thereof** [1] - 1202:11
**third** [4] - 1182:10,
1227:10, 1259:22,
1273:12
**Thirty** [1] - 1116:18
**Thirty-three** [1] -
1116:18
**thousand** [5] -
1069:18, 1073:1,
1235:11, 1250:13,
1250:18
**threaders** [1] - 1099:5
**threads** [1] - 1098:4
**three** [27] - 1065:16,
1066:19, 1075:9,
1075:13, 1075:14,
1106:14, 1106:15,
1111:12, 1111:13,
1116:18, 1130:2,
1134:10, 1139:18,
1139:21, 1147:21,

1184:10, 1216:20,
1228:10, 1248:25,
1257:8, 1257:11,
1257:21, 1263:6,
1266:13, 1266:14
**threw** [4] - 1166:1,
1166:2, 1166:6,
1166:16
**throughout** [3] -
1245:24, 1245:25
**throwing** [1] - 1250:15
**thrown** [2] - 1072:6,
1250:14
**tie** [1] - 1241:21
**timeframe** [1] -
1269:14
**timing** [2] - 1065:19,
1129:13
**tips** [2] - 1120:7,
1120:8
**tired** [1] - 1138:6
**title** [4] - 1195:1,
1196:21, 1208:3,
1209:1
**today** [19] - 1118:11,
1163:5, 1192:6,
1192:17, 1193:4,
1193:5, 1193:13,
1193:14, 1194:5,
1204:4, 1224:19,
1235:3, 1240:2,
1240:6, 1240:17,
1260:7, 1261:17,
1268:10, 1276:13
**together** [14] -
1090:24, 1091:1,
1122:1, 1125:22,
1125:23, 1126:21,
1175:23, 1196:1,
1196:16, 1197:12,
1207:16, 1218:11,
1241:13
**tomorrow** [3] -
1162:5, 1193:15,
1260:7
**took** [25] - 1084:24,
1085:9, 1090:10,
1098:13, 1098:15,
1111:9, 1135:12,
1156:2, 1156:25,
1159:6, 1159:12,
1160:25, 1165:17,
1165:19, 1166:6,
1166:16, 1166:22,
1167:8, 1169:3,
1169:13, 1173:2,
1214:1, 1215:23,
1219:6, 1266:14
**tool** [6] - 1094:7,
1095:3, 1095:8,

1172:5
**tools** [38] - 1068:2,
1095:7, 1095:13,
1095:15, 1095:16,
1095:20, 1095:23,
1096:25, 1097:14,
1097:25, 1098:3,
1098:6, 1099:1,
1099:2, 1099:5,
1099:24, 1100:6,
1103:1, 1104:14,
1104:25, 1105:2,
1105:11, 1138:4,
1155:5, 1155:6,
1155:8, 1159:6,
1171:14, 1171:17,
1171:20, 1171:22,
1171:23, 1171:25,
1172:1, 1172:5,
1180:13
**top** [6] - 1159:20,
1163:25, 1180:3,
1183:24, 1204:13,
1277:6
**top-right** [1] - 1183:24
**topic** [1] - 1255:11
**tops** [1] - 1209:15
**torch** [2] - 1066:25
**total** [3] - 1212:24,
1224:5, 1231:10
**totaling** [1] - 1254:4
**totally** [1] - 1251:25
**touch** [2] - 1097:4,
1173:5
**touched** [1] - 1097:12
**track** [3] - 1142:4,
1161:11, 1206:10
**traded** [5] - 1112:2,
1112:3, 1112:6,
1112:8, 1112:9
**trailer** [2] - 1116:6,
1116:8
**trained** [1] - 1090:5
**training** [1] - 1167:12
**transactions** [1] -
1223:11
**transcript** [3] -
1060:16, 1060:24,
1108:20
**Transcription** [1] -
1060:17
**transfer** [6] - 1130:10,
1160:12, 1244:18,
1244:25, 1245:13,
1245:16
**transferred** [7] -
1130:6, 1244:11,
1244:13, 1245:15,
1245:17, 1245:20,
1246:10

**transferring** [3] -
1224:3, 1244:19,
1244:20
**transfers** [1] - 1131:17
**translates** [1] - 1114:8
**transport** [2] -
1144:23, 1147:15
**trash** [1] - 1175:16
**travel** [2] - 1089:22,
1089:24
**tray** [4] - 1173:13,
1173:15, 1173:16
**trends** [1] - 1151:21
**trial** [1] - 1233:22
**tried** [2] - 1102:2,
1158:21
**trip** [1] - 1090:14
**trips** [2] - 1147:20,
1147:21
**TRO** [8] - 1212:24,
1212:25, 1213:20,
1219:4, 1251:19,
1266:18, 1270:20,
1271:9
**TROs** [1] - 1233:12
**trouble** [1] - 1073:4
**truck** [11] - 1068:3,
1084:24, 1085:9,
1099:6, 1109:1,
1109:8, 1144:24,
1149:2, 1149:3,
1171:12, 1171:13
**trucks** [10] - 1107:22,
1107:24, 1108:8,
1108:10, 1108:11,
1109:1, 1109:5,
1109:6, 1109:11,
1154:9
**true** [4] - 1121:12,
1182:13, 1182:19,
1252:5
**try** [17] - 1073:7,
1086:4, 1096:8,
1123:24, 1137:2,
1144:3, 1154:8,
1166:25, 1168:2,
1168:4, 1170:8,
1173:1, 1173:5,
1253:9, 1277:13,
1277:20, 1280:14
**trying** [17] - 1073:3,
1078:21, 1093:11,
1098:18, 1098:20,
1101:13, 1102:8,
1104:20, 1139:1,
1161:10, 1165:21,
1167:4, 1207:12,
1225:3, 1237:9,
1238:8, 1272:7
**turn** [25] - 1091:5,

1091:7, 1091:25,
1092:13, 1093:3,
1099:14, 1099:16,
1099:17, 1100:15,
1101:2, 1102:19,
1110:3, 1116:13,
1116:16, 1118:4,
1119:6, 1125:10,
1155:25, 1161:3,
1179:23, 1182:9,
1183:13, 1268:4,
1272:9, 1281:5
**turned** [18] - 1099:12,
1100:8, 1101:5,
1112:13, 1112:22,
1113:1, 1155:12,
1158:9, 1158:15,
1161:12, 1161:13,
1179:3, 1179:21,
1179:23, 1220:25,
1232:3, 1267:13,
1267:14
**twenty** [2] - 1177:17,
1209:15
**Twenty** [2] - 1062:5,
1062:7
**Twenty-five** [2] -
1062:5, 1062:7
**twice** [3] - 1093:15,
1101:14, 1115:25
**two** [149] - 1065:9,
1065:14, 1065:15,
1065:16, 1065:17,
1065:22, 1066:1,
1066:10, 1066:12,
1066:15, 1066:18,
1067:16, 1067:18,
1068:6, 1068:14,
1069:7, 1070:7,
1070:8, 1070:16,
1070:22, 1072:23,
1073:22, 1073:23,
1074:1, 1074:3,
1074:9, 1074:19,
1074:21, 1074:24,
1082:8, 1083:13,
1083:17, 1083:21,
1083:24, 1084:18,
1085:13, 1087:12,
1088:2, 1088:19,
1088:22, 1089:11,
1089:15, 1089:19,
1089:22, 1090:21,
1091:11, 1092:22,
1093:1, 1093:4,
1093:5, 1095:15,
1095:16, 1099:17,
1100:10, 1100:16,
1101:22, 1101:23,
1102:5, 1102:7,

1102:17, 1102:22, 1102:23, 1103:3, 1103:13, 1104:3, 1104:6, 1104:20, 1107:12, 1110:3, 1118:12, 1127:2, 1130:2, 1132:18, 1134:10, 1136:24, 1139:21, 1141:5, 1144:14, 1145:2, 1145:12, 1145:19, 1147:18, 1147:21, 1149:25, 1152:2, 1155:13, 1155:15, 1155:16, 1155:25, 1157:13, 1157:21, 1158:17, 1158:22, 1159:19, 1159:23, 1160:4, 1160:13, 1160:17, 1163:18, 1164:22, 1165:6, 1168:14, 1168:19, 1170:1, 1170:11, 1171:20, 1174:13, 1176:8, 1177:22, 1178:12, 1179:6, 1179:11, 1179:16, 1180:24, 1181:7, 1181:13, 1184:7, 1184:18, 1199:9, 1201:9, 1203:22, 1214:5, 1215:23, 1224:8, 1224:11, 1228:4, 1228:10, 1235:8, 1239:9, 1239:21, 1243:15, 1244:7, 1248:16, 1250:6, 1252:7, 1257:16, 1257:20, 1274:10, 1274:11, 1275:2, 1278:16, 1279:1, 1279:2

**Two** [126] - 1083:15, 1089:9, 1089:14, 1095:11, 1105:4, 1111:24, 1112:18, 1114:3, 1117:2, 1118:25, 1119:2, 1119:5, 1119:11, 1119:13, 1119:17, 1120:1, 1120:2, 1120:13, 1120:14, 1120:15, 1120:16, 1120:25, 1121:1, 1121:8, 1121:16, 1121:22, 1121:25, 1122:10, 1122:13, 1122:18, 1123:15, 1127:17, 1129:8, 1130:9, 1130:20, 1133:3, 1133:4,

1134:12, 1135:12, 1136:8, 1136:9, 1136:13, 1136:23, 1137:15, 1137:18, 1138:22, 1138:24, 1141:15, 1146:22, 1146:23, 1148:18, 1151:7, 1186:21, 1186:23, 1187:1, 1187:12, 1187:17, 1187:20, 1187:23, 1188:3, 1188:4, 1190:1, 1190:3, 1190:20, 1192:2, 1192:8, 1192:20, 1192:21, 1192:23, 1193:9, 1193:10, 1194:23, 1194:24, 1195:1, 1195:4, 1195:9, 1195:10, 1195:18, 1196:1, 1196:3, 1196:16, 1196:18, 1197:3, 1197:12, 1197:14, 1199:8, 1200:23, 1202:6, 1202:24, 1205:10, 1205:18, 1206:2, 1206:6, 1206:20, 1207:8, 1208:2, 1209:19, 1222:19, 1225:9, 1225:18, 1227:23, 1229:5, 1230:1, 1232:7, 1232:8, 1232:12, 1232:13, 1233:2, 1235:2, 1235:16, 1236:11, 1237:1, 1239:1, 1239:4, 1256:21, 1256:24, 1257:12, 1258:21, 1259:25, 1261:11, 1265:16, 1270:15, 1274:19, 1276:19, 1277:10

**TWO** [1] - 1060:12

**type** [15] - 1063:18, 1064:24, 1077:12, 1147:7, 1154:4, 1162:8, 1163:7, 1183:4, 1198:12, 1206:12, 1207:7, 1211:8, 1212:19, 1250:1

**types** [5] - 1135:12, 1162:11, 1163:10, 1213:14, 1257:7

---

## U

**ultimately** [4] - 1214:4, 1218:16,

1231:4, 1239:17

**unable** [2] - 1167:20, 1280:1

**unaccounted** [2] - 1231:11, 1234:6

**uncollected** [1] - 1258:24

**under** [9] - 1187:20, 1192:2, 1203:15, 1204:22, 1224:22, 1247:13, 1250:10, 1250:11, 1254:8

**underlying** [3] - 1215:2, 1224:18, 1227:16

**understood** [7] - 1125:12, 1169:8, 1186:9, 1186:23, 1199:8, 1208:20, 1242:6

**underway** [1] - 1160:12

**undue** [1] - 1213:13

**unduly** [1] - 1213:15

**unemployed** [1] - 1109:14

**unemployment** [8] - 1103:10, 1103:15, 1137:20, 1137:22, 1138:7, 1138:8, 1139:20, 1139:24

**unfair** [1] - 1267:3

**units** [2] - 1077:25, 1078:23

**unless** [3] - 1221:12, 1223:22, 1233:18

**unload** [1] - 1085:8

**unloaded** [3] - 1085:9, 1118:11, 1163:4

**unnecessary** [2] - 1199:15, 1199:23

**unpaid** [2] - 1244:21, 1258:23

**unwillingness** [1] - 1190:8

**up** [88] - 1061:3, 1065:15, 1067:14, 1067:20, 1068:1, 1068:2, 1068:3, 1077:7, 1077:9, 1077:10, 1077:13, 1078:5, 1078:25, 1083:21, 1084:14, 1084:24, 1086:5, 1087:5, 1087:8, 1087:16, 1088:4, 1088:13, 1089:4, 1089:18, 1090:24, 1091:14, 1091:21, 1096:5, 1096:8,

1096:25, 1097:16, 1099:18, 1099:24, 1099:25, 1100:6, 1100:19, 1101:13, 1103:1, 1104:14, 1104:21, 1104:25, 1105:1, 1113:18, 1113:22, 1120:22, 1121:5, 1134:3, 1135:2, 1135:4, 1138:4, 1139:16, 1143:22, 1146:7, 1149:17, 1151:16, 1151:17, 1155:5, 1155:6, 1155:8, 1156:2, 1157:24, 1158:25, 1159:2, 1159:7, 1162:22, 1162:23, 1165:22, 1169:4, 1174:17, 1176:4, 1180:13, 1186:6, 1186:18, 1193:21, 1196:6, 1197:21, 1204:13, 1207:7, 1215:10, 1222:5, 1237:18, 1243:1, 1245:18, 1273:20, 1274:1, 1274:4, 1278:3, 1278:25

**upgraded** [2] - 1242:17, 1242:23

**upset** [2] - 1217:1, 1217:12

**upstairs** [8] - 1077:1, 1078:8, 1085:10, 1089:1, 1089:3, 1152:9, 1173:13, 1174:11

**usage** [1] - 1254:9

**useful** [3] - 1129:17, 1129:23, 1209:2

**User** [1] - 1101:3

**user** [1] - 1218:23

**utilize** [2] - 1214:20, 1243:14

**utilized** [1] - 1243:16

---

## V

**Valley** [1] - 1194:17

**value** [1] - 1262:23

**van** [4] - 1144:25, 1147:16, 1155:10, 1156:20

**Vanessa** [1] - 1254:21

**variety** [1] - 1254:8

**various** [3] - 1161:11, 1200:11, 1206:5

**vehicle** [3] - 1144:17,

1144:23, 1171:17

**vendor** [10] - 1203:15, 1224:25, 1228:11, 1228:12, 1235:5, 1244:21, 1256:10, 1263:10, 1274:21, 1278:14

**vendors** [1] - 1211:13

**veracity** [1] - 1098:23

**verbal** [4] - 1074:8, 1075:5, 1076:12, 1079:22

**verify** [2] - 1216:4, 1216:17

**version** [1] - 1266:9

**versus** [3] - 1109:12, 1213:10, 1262:8

**vertical** [1] - 1279:2

**video** [5] - 1110:5, 1110:6, 1172:15, 1173:14, 1175:3

**videocameras** [2] - 1185:8

**videos** [4] - 1172:25, 1173:3, 1173:6, 1175:1

**view** [2] - 1211:14, 1212:14

**Vincent** [2] - 1186:16, 1194:15

**VINCENT** [1] - 1194:8

**violation** [2] - 1280:5, 1280:8

**visit** [2] - 1085:15, 1125:25

**visited** [1] - 1176:9

**visiting** [1] - 1177:23

**visits** [1] - 1145:12

**volume** [3] - 1227:3, 1227:5, 1278:25

**voluminous** [2] - 1277:24, 1278:15

**volunteer** [1] - 1238:15

---

## W

**W-2** [6] - 1073:19, 1120:6, 1120:15, 1120:16, 1121:12, 1227:14

**W-2s** [2] - 1226:23, 1227:15

**W-2would** [1] - 1121:12

**W-4** [1] - 1212:8

**wage** [1] - 1212:23

**wages** [3] - 1120:7, 1120:8, 1236:4

**wait** [7] - 1094:24,

1101:20, 1103:20, 1106:12, 1112:22
**waiting** [4] - 1109:16, 1186:7, 1186:13, 1240:16
**waive** [2] - 1192:5, 1192:8
**waiver** [2] - 1192:2, 1192:4
**waives** - 1193:10
**walk** [6] - 1078:2, 1078:7, 1110:24, 1111:1, 1111:2, 1249:1
**walked** [1] - 1164:8
**walking** [4] - 1078:2, 1148:21, 1179:20, 1180:9
**wall** [4] - 1151:18, 1184:4, 1184:9
**walls** [3] - 1172:21, 1177:10
**wants** [4] - 1089:16, 1189:7, 1192:22, 1258:14
**Wardes** [1] - 1254:23
**warning** [1] - 1220:24
**waste** [1] - 1190:24
**water** [2] - 1064:14
**ways** [2] - 1114:16, 1214:12
**wear** [2] - 1149:6, 1241:21
**wears** [2] - 1129:21, 1129:25
**week** [13] - 1069:11, 1069:12, 1087:11, 1128:4, 1139:17, 1151:24, 1203:18, 1215:9, 1233:12, 1259:3, 1261:23, 1280:17
**weekly** [1] - 1258:20
**weeks** [11] - 1066:19, 1103:13, 1139:19, 1139:21, 1177:20, 1214:5, 1215:23, 1257:16, 1263:6
**welding** [4] - 1088:15, 1169:5, 1169:6, 1169:9
**whacked** [1] - 1129:15
**whatsoever** [1] - 1221:1
**whispering** [2] - 1139:2, 1139:6
**whole** [6] - 1076:16, 1132:15, 1197:19, 1220:11, 1250:3, 1251:2

**wholesale** [1] - 1148:6
**wife** [12] - 1068:20, 1068:21, 1069:2, 1071:1, 1071:2, 1072:5, 1072:7, 1128:2, 1128:8, 1128:13, 1140:2
**Willett** [1] - 1071:20
**willing** [2] - 1188:24, 1189:3
**window** [1] - 1144:13
**windows** [1] - 1146:1
**winter** [1] - 1143:22
**wire** [1] - 1143:22
**wires** [3] - 1096:1, 1099:6, 1099:7
**wiring** [1] - 1122:2
**wise** [1] - 1074:24
**wish** [1] - 1060:18
**withdraw** [1] - 1164:19
**withdrawn** [7] - 1160:20, 1164:18, 1240:11, 1241:1, 1241:2, 1268:8, 1276:9
**withheld** [2] - 1228:4, 1228:5
**WITNESS** [153] - 1065:7, 1066:23, 1069:17, 1069:23, 1075:17, 1075:25, 1076:2, 1086:2, 1088:9, 1088:12, 1088:15, 1095:1, 1099:2, 1099:4, 1101:19, 1101:23, 1102:1, 1102:4, 1102:6, 1102:9, 1102:12, 1102:15, 1103:22, 1103:25, 1104:4, 1104:8, 1104:10, 1104:12, 1104:14, 1104:17, 1104:22, 1104:24, 1105:3, 1105:6, 1106:19, 1106:21, 1107:1, 1107:6, 1111:16, 1111:18, 1111:20, 1115:11, 1116:8, 1116:11, 1118:21, 1118:23, 1121:10, 1121:14, 1121:18, 1122:24, 1124:12, 1124:15, 1125:13, 1125:15, 1128:2, 1128:8, 1128:10, 1131:3, 1137:4, 1137:10, 1139:11, 1140:16,

1140:20, 1140:25, 1141:4, 1141:12, 1142:4, 1142:11, 1142:15, 1143:17, 1144:9, 1144:13, 1146:17, 1146:19, 1147:5, 1150:16, 1152:5, 1153:1, 1165:21, 1165:24, 1166:1, 1167:5, 1167:7, 1167:10, 1167:14, 1172:12, 1172:14, 1174:8, 1174:11, 1174:13, 1174:15, 1174:17, 1183:2, 1183:16, 1183:19, 1189:1, 1189:3, 1196:9, 1202:2, 1204:21, 1207:5, 1207:11, 1207:14, 1210:25, 1211:5, 1211:7, 1211:12, 1213:25, 1214:13, 1216:23, 1221:18, 1221:21, 1221:24, 1222:3, 1224:5, 1224:8, 1232:15, 1232:18, 1232:21, 1232:25, 1236:19, 1236:24, 1237:2, 1237:7, 1237:12, 1237:14, 1245:9, 1249:3, 1249:7, 1249:13, 1249:15, 1257:10, 1258:16, 1259:20, 1260:6, 1260:12, 1260:17, 1260:22, 1261:1, 1262:7, 1262:15, 1262:19, 1264:2, 1264:5, 1264:8, 1264:13, 1264:16, 1264:18, 1264:22, 1267:23, 1267:25, 1269:9, 1272:15
**witness** [18] - 1061:1, 1061:5, 1061:7, 1128:19, 1128:22, 1182:16, 1186:7, 1186:13, 1186:14, 1186:17, 1187:6, 1187:9, 1187:23, 1188:2, 1189:15, 1194:8, 1230:7, 1236:13
**Witness** [2] - 1128:19, 1128:22
**witnesses** [1] - 1189:17
**wonder** [1] - 1147:2

**wondered** [1] - 1161:20
**wooden** [1] - 1118:12
**word** [5] - 1096:7, 1116:25, 1158:20, 1229:22
**words** [4] - 1162:4, 1162:8, 1162:10, 1275:20
**worker** [1] - 1122:6
**worker's** [1] - 1206:16
**workers** [4] - 1093:5, 1096:18, 1135:16, 1178:8
**works** [6] - 1125:25, 1129:14, 1129:24, 1196:6, 1207:10, 1254:21
**world** [4] - 1068:18, 1134:21, 1208:7
**worst** [1] - 1068:17
**wrench** [5] - 1159:13, 1171:9, 1171:10, 1171:11, 1171:19
**wrenches** [5] - 1098:3, 1099:5, 1159:5, 1159:9, 1159:12
**write** [4] - 1110:16, 1117:4, 1186:12, 1198:13
**writes** [2] - 1114:18, 1117:6
**writing** [4] - 1114:14, 1279:5
**written** [2] - 1203:15, 1235:15
**wrote** [2] - 1183:5, 1231:16

## Y

**year** [18] - 1068:15, 1074:4, 1074:6, 1119:3, 1127:21, 1134:10, 1134:11, 1160:13, 1168:14, 1177:21, 1220:22, 1243:23, 1244:1, 1253:17, 1253:24, 1257:21, 1257:22
**years** [25] - 1062:5, 1062:7, 1062:12, 1076:9, 1076:11, 1080:5, 1127:2, 1134:10, 1148:3, 1149:1, 1149:9, 1149:11, 1150:8, 1168:3, 1168:14, 1226:23, 1235:11,

1236:4, 1247:23, 1274:10, 1274:11
**Yehuda** [1] - 1254:22
**yesterday** [1] - 1152:20
**York** [4] - 1060:15, 1090:10, 1090:11, 1141:23
**Yossi** [12] - 1198:22, 1198:24, 1204:18, 1204:20, 1204:21, 1210:15, 1210:17, 1219:5, 1244:15, 1245:1, 1246:22
**young** [1] - 1209:12
**yourself** [1] - 1068:5

## Z

**Zerega** [3] - 1148:5, 1148:7, 1148:8