788

```
                     UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK

       STEVEN SCHREIBER,              ) Civil Action
                                      ) No. 15-6861 (CBA-JO)
                      Plaintiff,      )
                                      ) CIVIL CAUSE
       vs.                            ) FOR HEARING
                                      )
       EMIL FRIEDMAN, et al.,         )
                                      ) Brooklyn, New York
                      Defendants.     ) August 2, 2016
                                        9:30 a.m.
       _____

                 TRANSCRIPT OF EVIDENTIARY HEARING
                            HELD BEFORE
                 THE HONORABLE JAMES ORENSTEIN
                 UNITED STATES MAGISTRATE JUDGE
       _____

                     A P P E A R A N C E S


       For the Plaintiff:            Jay Philip Nelkin, Esq.
                                     Carol Nelkin, Esq.


       For Defendants Emil Friedman  Paul Hans Schafhauser, Esq.
       and New York Best Coffee, Inc.:



       For Defendants E&I Investors  David B. Grantz, Esq.
       Group, LLC, E&J Funding Co., LLC,
       E&J Management Inc., and
       E & Jeryg Management Corp., LLC:

       _____

       Proceedings reported by machine shorthand, transcript produced
       by computer-aided transcription.
       _____

       Court Reporter:              Hollis Driscoll, CSR, FCRR
                                    Official Court Reporter
                                    United States Courthouse, Room N362
                                    225 Cadman Plaza East
                                    Brooklyn, New York  11201
                                    718-613-2272
```

789

APPEARANCES (Cont'd):


For Defendant 24 Hour Oil          David Grantz, Esq.
Delivery Corp., MB Fuel
Transport, MB Fuel Transport
I, Associated Fuel Oil Corp.,
Light Trucking Corp.; 165 Street
Realty Corp.; Park Avenue Associates:


For Defendants Sylvia Ezell,       Richard Avery Finkel, Esq.
Sonia Rivera, and Jorge Salcedo:


For Defendants Michael Devine      Richard Bruce Feldman, Esq.
and Michael Devine, CPA:


For Defendants Geoffrey Hersko     Andrew W. Gefell, Esq.
and Geoffrey S. Hersko, P.C.:


For Defendants Solomon Birnbaum,   Maurice Heller, Esq.
Single Serve Beverages Distribution,
Crazy Cups, 26 Flavors, LLC,
Office Coffee Services, LLC, and
Two Rivers Coffee, LLC:


                    *        *        *

*Proceedings*                                                       790

1          THE COURT:  Everybody ready to go?

2          MR. SCHAFHAUSER:  Yes, Your Honor.

3          MR. GRANTZ:  I'd like to make an application with

4    respect to the machines from yesterday.

5          THE COURT:  Yes.

6          MR. GRANTZ:  On July 8 Your Honor said to us that we

7    should image the machines and we did make them available on

8    July 11th I believe.  They weren't imaged for another week by

9    the plaintiff.  Then we weren't given them back for another

10   few days.  Then we looked at them for the privileged

11   materials.  So, what we're concerned about is Your Honor has

12   now given them the privileged materials which we provided a

13   log.  We want to make sure they don't look at our privileged

14   materials and that those materials are clawed back.

15         THE COURT:  You identify the items and, frankly, I

16   saw -- well, I saw some problems with that.  In the Stroz

17   report you had identified something and they said it just

18   doesn't exist -- excuse me, let me finish, I listened to you.

19         Also, there was one thing on the log that was

20   actually several thousand items; unacceptable.  So, provide me

21   for in camera review the things you say are privileged, I'll

22   take a look at them.

23         MR. GRANTZ:  Fine.

24         THE COURT:  But you can make a motion under 502, you

25   can make the request to them to claw it back.

*Proceedings*                                              791

1          MR. GRANTZ:  We will make the request.

2          THE COURT:  It is all under protective order already

3    so I am not terribly worried that there's any prejudice that's

4    going to flow to you over doing this in an orderly way given

5    that you took however many months that you did before doing

6    what you were supposed to do to start looking for privileged

7    material.  So, to some extent, if there's a problem, it is one

8    of your own making.

9          MR. NELKIN:  Your Honor.

10         THE COURT:  Yes.

11         MR. NELKIN:  Beyond that, the machine that they're

12   talking about was in their possession the whole time and in

13   use and the stuff was put on to the machine after the imaging

14   order.

15         THE COURT:  All right.  I made the ruling.

16         MR. GRANTZ:  Thank you, Your Honor.

17         THE COURT:  All right.  Am I correct that one of the

18   problems that was -- I want to get Mr. Nussbaum back on the

19   stand, but one of the issues was continued problems getting

20   Launch running?

21         MR. NELKIN:  Yes.

22         THE COURT:  Okay.  I think yesterday,

23   Mr. Schafhauser, one suggestion you made and, frankly,

24   there has been nothing stopping you from doing this but you

25   might as well get Mr. Nussbaum and all the people who are

*Proceedings*                                                    792

1   necessary to be in the same room together, if he says he can

2   make it happen, get them together, do it after he's off the

3   stand.

4             MR. SCHAFHAUSER:  I made that offer before, Your

5   Honor.  Yesterday was not the first time, just for the record.

6             THE COURT:  I heard you saying it as if you were

7   permitted by the Court as if I had done something to prevent

8   you all from doing something on consent to have you discharge

9   your duties under the preliminary injunction.  To the extent

10  that you found something in the record that you want to hang

11  your hat on as an excuse for not doing that, I am going to

12  tell you right now you can do it.

13            MR. SCHAFHAUSER:  Thank you, Your Honor.

14            THE COURT:  Let's get moving with the witness.

15            MR. SCHAFHAUSER:  Your Honor, just to clarify what I

16  was saying --

17            THE COURT:  I don't need a clarification since we're

18  moving forward.

19            MR. SCHAFHAUSER:  But, Your Honor, Your Honor has

20  implied that --

21            THE COURT:  I imply nothing.  I have said what I

22  mean.  Have a seat.  Let's move forward with Mr. Nussbaum.

23            MR. SCHAFHAUSER:  May I just respond?

24            THE COURT:  You may send a letter after we're done.

25  I want you to have an opportunity to say what you want to say

1   after the witness is completed.

2            MR. NELKIN:  Your Honor.

3            THE COURT:  There's an application?

4            MR. NELKIN:  There's something I need to draw the

5   Court's attention to.  I can draw it at a break.

6            THE COURT:  Let's get the witness going.

7            You want to continue with your cross?

8            MR. SCHAFHAUSER:  Yes, Your Honor.

9            (Witness resumes the stand.)

10  B E N Z I O N    N U S S B A U M,   having been previously

11  duly sworn was examined and testified as follows:

12  CROSS-EXAMINATION (Cont'd.)

13  BY MR. SCHAFHAUSER:

14  Q    Mr. Nussbaum, when we broke yesterday I believe we were

15  in the middle of Exhibit 85, Plaintiff's Exhibit 85.  Will you

16  please turn to Plaintiff's Exhibit 85.

17            And we were looking at I believe the second set of

18  descriptive entries as to what you did and we were talking

19  about Mr. Papa's laptop and Mr. Papa's computer.  You remember

20  generally where we left off, right?

21  A    I do.

22  Q    Now, what I'd like to ask you is could you flip please to

23  the next page.  These are not numbered so let me do it this

24  way.

25  A    Just give me the date that's attached to the item.

1   Q    Okay.  It says February -- I'm sorry, it's the same

2   February through April description and then we'll move on from

3   there.

4            Now, I'm looking at the page which on the top says:

5   "11 May Fix Server."  There are a number of descriptive

6   entries which say "11 May Fix Server" on the top and then it

7   goes on from there, do you see that?

8   A    I do.

9   Q    Okay.  Now, first of all, let's start with "Fix Server,"

10  what server were you fixing?

11  A    It usually had to do with the domain server that also had

12  the QuickBooks file in it.

13  Q    And at whose direction were you fixing this?

14  A    It was usually Vince Papa.

15  Q    Vince Papa, okay.

16           Then you have "Fix Nicole," what does that refer

17  to?

18  A    That was her computer, I had to fix an issue that was

19  caused by -- I remember that particular case, I can say for

20  sure if it's that one, the plaintiff tried to I think it was

21  install a printer and he made a total mess out of the

22  computer, I had to go there and actually fix it.

23  Q    Okay.  So, then a couple of entries down it says:  "Fix

24  Vincent."  What did you do on that occasion?

25  A    It might have been -- I can't remember every one.  I mean

1   the Nicole one stands out because it took a while, I had to

2   rebuild the machine basically, but "Fix Vincent" could have

3   been a network issue, it could have been a printing issue, I

4   can't say for sure.

5   Q    Let me ask you this, the time descriptions that you have

6   here in several instances talk about you working on Vincent

7   Papa's computer, you've seen that?

8   A    Correct.

9   Q    I see no reference here to you fixing Friedman's

10  computer, Mr. Steven Schreiber's computer; why is that?

11  A    Mr. Friedman didn't really do a lot of work except the

12  payroll on his computer, it wasn't really issues, and Steven

13  Schreiber didn't really allow me access to his computer so I

14  didn't -- except when sometimes he called me and I told him

15  what to do, I wasn't really able to touch it.

16  Q    What about I see no reference for Mr. Eugene Schreiber's

17  computer either?

18  A    It was also the same.

19  Q    The same meaning what?

20  A    I really didn't have access.  Sometimes he would call me,

21  I would tell him what to do.  I didn't really have access to

22  his computer.

23  Q    By the way, during this period did Mr. Papa complain

24  about the services that you were performing for Two Rivers?

25  A    No.  Neither did anyone else.

1  Q    Let me --

2         THE COURT:  Don't volunteer please.  If he has a

3  question, he will ask it.  If he doesn't have a question, wait

4  for him to have a question.

5  Q    Let me go to Exhibit D-23 in the smaller book.

6         I think Mr. Nelkin asked you about this yesterday

7  and you talked about QuickBooks Enterprise?

8  A    Correct.

9  Q    Who had access to QuickBooks Enterprise, to your

10 knowledge?

11 A    The actual program or the file?  It's not the same thing.

12 Q    Okay.  Well, let's start with the program and then we'll

13 get to the file.  Who had access to the program?

14 A    Whoever Vincent instructed me to install the program but

15 then Vince was the admin, he gave out user name and passwords.

16 Actually logging into the program Vince controlled.

17 Q    Now, who had access to the QuickBooks Enterprise file?

18 A    Well, the file is a shared file that the program opens,

19 so I set that up on the domain server.  It wasn't on any of

20 the other servers because those other servers are only for

21 SQL.  It was on the domain server, it was a shared folder, I

22 had access as an admin and Vince Papa had access to the file.

23 Q    Did Mr. Steven Schreiber have access to the QuickBooks

24 program?

25 A    To the program, yes, as far as I know.  I mean you'd have

1   to ask Vince about that, he controlled it.

2   Q    Okay.  I'd like you to turn please to Plaintiff's Exhibit

3   47 which is entitled Declaration of Steven Schreiber.

4        On the first page -- are you with me?

5   A    Yes.

6   Q    Okay.  There is an allegation by Mr. Schreiber in his

7   declaration in paragraphs 8 and 9 that Mr. Salcedo removed a

8   computer from Two Rivers on or about March 2nd, 2015.

9        Do you see that generally?

10  A    I do.

11  Q    Okay.  Were you aware of that allegation before I just

12  said that to you?

13  A    No.  I mean the last couple of days.

14  Q    The last couple -- were you made aware of that incident

15  at the time?

16  A    No, I was not.

17  Q    And you were working for Two Rivers at that time on

18  computer issues, yes?

19  A    Correct.

20  Q    And do I have it correct that no one came to you and

21  said, where's this computer?

22  A    Correct.

23  Q    And the first time it came to your attention was after

24  this lawsuit was filed, that's correct?

25  A    Yeah, yes.

1           THE COURT:  Are you going into him as your own

2   witness now?  I don't recall this coming up on direct.  It is

3   fine, just -- excuse me -- that's fine but don't ask leading

4   questions if you're going to do that please.

5           MR. SCHAFHAUSER:  Very well.  Thank you.

6   Q    Would you please turn now to exhibit -- I know we're

7   jumping around, Mr. Nussbaum, I apologize, I'm doing the best

8   I can.  Could you please turn to Exhibit 2, Defendant's

9   Exhibit 2.  It's in the larger binder.

10          MR. SCHAFHAUSER:  Your Honor, may I approach to give

11  him that binder?

12          THE COURT:  Of course.  (Pause.)

13  Q    (Handing.)  Thank you.

14          Mr. Nussbaum, in the second paragraph of this

15  correspondence there's a reference to an administrative

16  password?

17  A    Correct.

18  Q    Coffee dollar sign 12 and then a small s (coffee$12s), do

19  you see that?

20  A    I do.

21  Q    Is that the same administrative password that you had

22  previously given to Mr. Koenig?

23  A    Yes.

24  Q    Okay.  Now, if you would flip over to the fourth page of

25  this exhibit, you'll see it says Declaration of Benzion

1   Nussbaum, do you see that?

2   A    I do.

3   Q    And flip to the third page of that declaration, is that

4   in fact your signature?

5   A    It is.

6   Q    Okay.  And you see it has a date of December 15, 2015?

7   A    Yes.

8   Q    Okay.  Is it correct that you signed this declaration on

9   or about that date?

10  A    I did.

11  Q    Okay.  I just -- okay.

12          One other thing that I would ask you in that

13  Exhibit 2; if you would go back to the second page of this

14  Exhibit 2, the Defendant's Exhibit 2, in the middle of that

15  e-mail there is a password that's identified as Mr. Friedman's

16  password, do you see that?

17  A    I do.

18  Q    Okay.  Do you recognize that as Mr. Friedman's password?

19  A    To my recollection, that's what it was.

20  Q    Are you aware of any other passwords for Mr. Friedman

21  other than this password?

22  A    No.

23  Q    Now, let me ask you to turn please, Mr. Nussbaum, to

24  Exhibit 110.

25  A    Plaintiff, defendant?

1  Q    I apologize, Plaintiff's Exhibit 110.

2  A    Okay.

3  Q    I just showed you a declaration that you signed on

4  December 15th, 2015.  When you were talking yesterday with

5  Mr. Nelkin, is that what you were referring to as, quote, the

6  first declaration or the first affidavit, the December 15th

7  declaration?

8  A    Probably, yeah.

9  Q    Okay.  And this is your second declaration that you're

10 aware of in this case?

11 A    Yes.

12 Q    Okay.  Now, let's go to the last page, start at the end,

13 you were asked yesterday about the fax information; do you

14 recall when you signed this signature page?

15 A    It was on a Friday, exactly I don't remember, but it was

16 a Friday and I was trying to get it over to you -- to my

17 lawyer trying to get it out to you to file it.

18 Q    Do you recall there were issues about transmitting that

19 fax --

20 A    Yes.

21 Q    -- signature?

22 A    My printer wasn't working properly.

23              THE COURT:  Stop.

24              MR. SCHAFHAUSER:  Sorry.

25              THE COURT:  Once again, I know I haven't had to tell

1  you since yesterday so you may have forgotten, let whoever is

2  asking the questions finish the question before you start to

3  answer so we have a clear record.

4          THE WITNESS:  Okay.

5          THE COURT:  Go ahead.

6          MR. SCHAFHAUSER:  Okay.

7  Q    Do you recall that your declaration was finalized some

8  period of time before you actually got this signature printed

9  on your printer and sent to me?

10 A    Yes.

11 Q    And how long a period of time was it?

12 A    It was a few hours at least.

13 Q    Okay.  And you recall that the issue was that Shabbas was

14 about to start in I think three minutes or four minutes?

15 A    Something like that.  I hung up on the phone because when

16 I saw the time.

17 Q    You hung up on me because I was in a panic to get your

18 signature page, right?

19 A    Correct.

20 Q    Okay.  And you had to go because of the Sabbath?

21 A    Correct.

22 Q    Okay.  But the document had been finalized hours before,

23 right?

24 A    Correct.

25 Q    Do you recall speaking about this declaration with me and

1   with Mr. Friedman?

2   A    I recall being asked for it.

3   Q    Okay.  So, let's go to -- you were asked for it and when

4   you were asked for it, please tell me what you did to identify

5   the computers the first time you went to these facilities?

6   A    I went to the facility, I turned on the computers and

7   looked at what they were, just tech speak but -- I mean as a

8   technical person you can easily tell what the computer is for.

9   I didn't search them, there might be some other documents

10  obviously but that's not what the word "use" normally means

11  and I wrote down on a piece of paper and then I went to my

12  lawyer and we put together a declaration.

13  Q    Let me stop you please right there because you said

14  something I want to understand.  What do you mean "the word

15  'use' normally means?"

16        What do you understand the word "use" to mean in

17  this context, what did you mean it --

18  A    The computer is in a business, people sometimes log in

19  and go shopping but nobody is going to say that that's the use

20  of the computer in a business, it is used for the business.

21  Q    So, your understanding was that this implied some degree

22  of regularity of the use of this computer?

23  A    Correct.

24  Q    Okay.

25        THE COURT:  "Use" means use for a particular

1   purpose?

2          THE WITNESS:  Right.  Well, for a business.

3          THE COURT:  Okay.  I understand better now.

4   Thank you.

5          Go ahead.

6   Q    My question is this, regardless of what you understood

7   the word "use" to mean, I want to go back to you went to,

8   let's start with the Bronx facility; before we get to what you

9   did in the Bronx facility, how many times had you been at the

10  Bronx facility before the visit when you were asked to do this

11  analysis?

12  A    I used to go about every two weeks.

13  Q    So, over the course of the years give me a number, if you

14  could?

15  A    A few hundred times.

16  Q    Okay.  And you went to the Bronx facility a few hundred

17  times primarily to do computer work on these computers,

18  correct?

19  A    Correct.

20  Q    And when you went to the Bronx facility, how long --

21  withdrawn.

22          I think you testified you went a few days before you

23  signed this declaration, right?

24  A    Yes.

25  Q    Do you remember how long before, was it a week, ten days,

1   two days, anything more specific or --

2   A     It was within the week.

3   Q     Within the week, okay.

4         How long of a period of time did you spend in the

5   Bronx facility on the day that you were there for the purpose

6   of looking at these computers?

7   A     I was there a number of hours, four, five hours at least.

8   Q     Four, five hours at least.

9         How much time did you spend going through each

10  computer?

11  A     I mean I opened it up, I looked at the programs on the

12  screen, I looked at the basic but I didn't do actual full

13  searches on them.  So, it could have been 20 minutes, you

14  know, I don't remember every computer.

15        MR. NELKIN:  Your Honor, he testified as to what he

16  did and how long he spent yesterday.

17        THE COURT:  Is there an objection?

18        MR. NELKIN:  An objection to it's contrary to prior

19  testimony.

20        THE COURT:  I'm sure you'll make argument based on

21  that.  If there's an objection, make it.  If not, let him

22  conduct his examination please.

23        MR. SCHAFHAUSER:  Thank you.

24  Q     All right.  So, let's go now to the Brooklyn facility.

25  How long before you signed the declaration did you go to the

*B. Nussbaum - cross - Schafhauser*                    805

1   Brooklyn facility?

2   A    Well, it was the day after I went to the Bronx so it was

3   within the same week.

4   Q    Okay.  And how long of a period did you spend at the

5   Brooklyn facility on whatever the day was?

6   A    I was there a few hours.  I spent on each computer -- is

7   that part of the question?

8   Q    That was going to be my next question but on each -- how

9   much time did you spend on each computer?

10  A    Also about the same, enough to identify what they were.

11  Q    About -- you said about 20 minutes or so?

12  A    Could be 15 minutes.  I mean, you know, I didn't record

13  the exact amount of time, enough that I would know what they

14  were for.

15          THE COURT:  Can I ask because I'm not really

16  following the testimony; what takes the 15 minutes -- let me

17  finish -- you open it up, you look to see what programs there

18  are?

19          THE WITNESS:  Right.

20          THE COURT:  That strikes me as taking less than a

21  minute but I may not appreciate what you're doing.

22          THE WITNESS:  I opened up the documents list, I

23  didn't actually research.  I opened up the documents, I looked

24  at the folders, what the names were.  I didn't actually do a

25  search of what they were.  It takes time.

1          THE COURT:  You opened up documents?

2          THE WITNESS:  You open a document -- you open the

3   documents folder, you look at the names of the files, so I

4   didn't actually do a search.

5          THE COURT:  And what were you trying to understand

6   by looking at the names -- excuse me, let the question finish,

7   you must.  What were you trying to see if you opened up a

8   folder to look at the names of the documents, just what they

9   were named, what information --

10         THE WITNESS:  Yeah, basically if I see anything

11  that's not related to what I think the computer is for.

12         THE COURT:  How do you know that based on the file

13  name?

14         THE WITNESS:  Yeah, if the file name is -- if it is

15  a real estate computer, I see something about oil, I'll see

16  it.

17         THE COURT:  And if I have something that's not

18  related to oil but I have a docket folder, a docket -- sorry,

19  a document file name that is "This is about real estate" --

20         THE WITNESS:  Yeah.

21         THE COURT:  -- but it's not about real estate, you

22  can't tell?

23         THE WITNESS:  No, I didn't do searches.

24         THE COURT:  Okay.  Go ahead.

25         MR. SCHAFHAUSER:  Thank you.

1   Q    You testified yesterday I think, just picking up on the

2   Court's question, something about you looked at icons?

3   A    I did look at the icons, that's initially how you decide

4   what to look -- how I decided that I should look to see if

5   there's anything real estate because we had the real estate

6   program on there, you assume it is used for real estate, you

7   look at the documents, if you see anything that's not real

8   estate.  I didn't do a full search, no, I did not.

9   Q    Mr. Nussbaum, these computers were computers that you had

10  worked on in the past, correct?

11  A    Correct.

12  Q    So, this was not the first time you were looking at these

13  computers?

14  A    Correct.

15  Q    And many of these computers you had actually worked on

16  repeatedly, correct?

17  A    Yes.

18  Q    How often had you worked on -- let's start with

19  Ms. Rivera's computer; how often had you worked on

20  Ms. Rivera's computer before you conducted this analysis?

21  A    Many times.

22  Q    Can you give me a number of many times, what does many

23  times mean, your best --

24  A    Over the years I can't, I mean many, many times.

25  Q    Very well.  Okay.

B. Nussbaum - cross - Schafhauser                   808

1        Ms. Ezell's computer; how often had you worked on

2   Ms. Ezell's computer before you conducted this analysis?

3   A    Also many, many times.  I mean I can't speculate or just

4   make up a number.

5   Q    All right.  Let's move on.

6        You testified then that you dealt with your

7   attorney, Mr. Goldfarb, right?

8   A    Yes.

9   Q    Okay.  Before the time that you submitted your

10  declaration did you go back to the facilities to check on what

11  you had done?

12  A    Within that week?

13  Q    Yes?

14  A    No.

15  Q    Okay.  Have you since been back to the facilities to

16  check on what you've done?

17  A    Yeah.

18  Q    Okay.  When were you back to check on what you've done?

19  A    Last week I think it was.

20  Q    Okay.  You were in both the Bronx facility and the

21  Brooklyn facility?

22  A    Yes.

23  Q    Okay.  How long were you in the Bronx facility last week?

24  A    Two hours.

25  Q    Okay.  And what did you do during those two hours?

1   A    I was asked by my lawyer to just look over everything

2   again so I did.

3   Q    And please tell me what you -- when you say you looked it

4   over again, what did you do?

5   A    I looked through the computers again.  Did I go through

6   the same way that I did when I made the declaration, probably

7   not, but I did go through every computer again and look at

8   them.

9   Q    Okay.  And then you went to the Brooklyn facility as

10  well?

11  A    Yes.

12  Q    How long were you in the Brooklyn facility last week?

13  A    Also about, I mean probably two hours, an hour and a

14  half.

15  Q    I take it you did the same double-check, for lack of a

16  better phrase?

17  A    Yes.

18  Q    Okay.  Now, the question, and I don't know whether I

19  heard the answer when you were asked on direct, this is my

20  question:  Having gone back last week to the Brooklyn facility

21  and the Bronx facility, was there anything that you observed

22  in either of those facilities or on the computers located in

23  the facilities that would change anything set forth in your

24  declaration?

25  A    No.

*B. Nussbaum - cross - Schafhauser*                    810

1  Q    So, do I have it correct that your review last week

2  was consistent with what you said in your declaration in

3  May of 2016?

4  A    Yes.

5  Q    All right.  So, let's go to the details of your

6  declaration please.  So, I'm still on Exhibit 110,

7  Mr. Nussbaum, Plaintiff's 110, paragraph three, if you would

8  take a look at that.

9         You say that Two Rivers' data is stored remotely and

10  therefore even computers which are used for Two Rivers'

11  business would generally contain little if any unique and

12  material information -- I'll stop there, we can all read the

13  rest of the words.

14         My question is this:  Can you please explain to me

15  the basis upon which you say that Two Rivers' data is as a

16  general matter stored remotely; what do you mean by --

17  A    Well, I was referring to the Launch system which is

18  stored on wherever Yossi keeps it.

19  Q    So, that's a reference to the data on the Launch?

20  A    No, I wasn't referring to what they might have on the

21  computers within the South Plainfield facility, I haven't been

22  there, I haven't made a declaration regarding that.

23  Q    All right.  And when you say "Yossi;" the Launch data, so

24  far as you understand, was in the custody, possession and

25  control of Mr. Rogosnitzky?

1    A    Yes.

2    Q    Okay.  And I think yesterday you testified -- well,

3    forget about what you testified, let me ask the question.

4         Is it correct that Mr. Rogosnitzky is the one who

5    has a backup of Launch data, so far as you know?

6    A    Its software has a server, so he completely manages the

7    program, the backup.  That's how a software service works.

8    Q    Okay.

9    A    If you use QuickBooks online, you don't do backups, it's

10   all done by QuickBooks, you just expect your data to be there

11   when -- as long as you pay them.

12   Q    Now, by contrast to Launch, there is also a backup for

13   QuickBooks, correct?

14   A    Correct, there was a backup being done, Vince used to

15   back up to his local desktop and then there was also -- he

16   asked me to set up iDrive later on when he had to do the high

17   quality check.

18   Q    You mentioned iDrive, I hate to detour from your

19   declaration but since you mention it, would you flip back a

20   few exhibits to Exhibit 96.

21        Are you with me on Exhibit 96, Mr. Nussbaum?

22   A    I am.

23   Q    And this appears to be some kind of an e-mail from an

24   outfit called iDrive to you, yes?

25   A    Yes.

B. Nussbaum - cross - Schafhauser                                812

1   Q     Ben@brooklynbeans is you, correct?

2   A     Correct.

3   Q     Okay.  Could you tell me what this is?

4   A     iDrive is a cloud storage company that allows you to back

5   things up into the cloud.

6   Q     And this has a date of Friday, August 14th, 2015, do you

7   see that?

8   A     Right, this was after Vince -- the e-mail we looked at

9   yesterday regarding he asked me about a quality -- he had to

10  have an outside backup so I set this up.

11  Q     Just so we can peg the date, is this document the

12  document that led to you putting the iDrive backup for

13  QuickBooks at Mr. Papa's request?

14  A     Well, this is just showing that I signed up the iDrive,

15  the e-mail --

16  Q     I mangled the question, let me try again a different way.

17        Did you install the iDrive for the QuickBooks backup

18  shortly after you received this e-mail from iDrive?

19  A     Yes.  Well -- yes.

20  Q     So, this would place approximately when iDrive was

21  installed as a backup for QuickBooks?

22  A     Yes.

23  Q     And you did that, correct?

24  A     Yes.

25  Q     Now, have you ever become aware as to whether the

B. Nussbaum - cross - Schafhauser                    813

1   QuickBooks information that was backed up became inaccessible

2   to Two Rivers in any way?

3   A    They were totally in control of it.

4   Q    All right.  So, let's go back now to your declaration

5   which, as you know, is Exhibit 110, we were in the middle of

6   it.

7   A    Yes.

8   Q    You were asked by Mr. Nelkin about paragraph ten, so

9   let's jump to paragraph ten.

10          Do you recall being asked about paragraph ten by

11  Mr. Nelkin?

12  A    I do.

13  Q    And he asked you about Ms. Rivera's computer, do you

14  remember that?

15  A    Yes.

16  Q    Could you take a look at paragraph eight where it says:

17          "Moreover, except as set forth above with respect to

18  the computer previously used by Ms. Rivera," do you see that?

19  A    Yes.

20  Q    And does that refresh your recollection -- well,

21  withdrawn.

22          When you were referring in paragraph ten to such

23  computers, is it correct that you were excepting Ms. Rivera's

24  computer as you said at the beginning of this discussion?

25  A    Yes.

1   Q     Let's now focus on the paragraph smack in the middle of

2   that, paragraph nine.  You say that, "except for Ms. Rivera's

3   computer as set forth above, they could not have been used for

4   Two Rivers' business because they could not have been used to

5   directly access Two Rivers' stored data."

6          You see those words, right?

7   A     Yes.

8   Q     Please explain to me as a non-technical person what

9   you mean by "they could not have been used to directly access

10  Two Rivers' stored data"?

11  A     When you have a computer that's not part of the network

12  that contains the data, the only way to actually access the

13  data is to join the computer to the network.  So, if the

14  computer is located outside the firewall, one way would be

15  through a VPN.

16  Q     The VPN -- tell me what a VPN is?

17  A     VPN is a virtual private network, it creates a tunnel

18  between the two computers which you actually need licensing

19  for to buy VPN licenses and set it up which we did not have to

20  connect the remote computer as part of the network.

21  Q     So, is it correct --

22  A     We could have done it with Remote Desktop if you have a

23  computer but, again, that would have been opened up, you would

24  have to open up the firewall for that.  It is not a safe thing

25  to do, it is not something generally you do.

1   Q    I want to focus on this a little more.  Let's go back to

2   paragraph eight:  "Except as set forth above with the computer

3   previously used by Ms. Rivera -- what I'd like you to now do

4   is go to your list and identify exactly which computer you're

5   referring to in that paragraph.

6   A    The computer that was removed.

7   Q    All right.

8        So, I'm on page three, there's a heading,

9   Office Used By Sonia Rivera.

10       And the fourth entry there says:  "There was also a

11  computer removed from active use."

12       Is that the computer that you're referring to in

13  paragraph nine?

14  A    Yes.

15  Q    I'm sorry, paragraph eight, forgive me.

16  A    Yes.

17  Q    Now, except for that computer, is it your testimony

18  that every other computer set forth on pages three and four of

19  your declaration could not have been used to directly access

20  Two Rivers' stored data because they had no VPN hookup?

21  A    You couldn't join -- right, there was no way to join

22  those computers to the network.

23       THE COURT:  Can I ask a question to clarify; because

24  of the IP address?

25       THE WITNESS:  Yes, the firewall, right, the IP,

1   right.

2          THE COURT:  But don't computers on the same router

3   share an IP address?

4          THE WITNESS:  We're talking about the computers in

5   the Bronx.

6          THE COURT:  I see.  But multiple computers in the

7   same IP address --

8          THE WITNESS:  If the administrator opens up sharing

9   between them.  You can't just -- even if they're on the same

10  IP, that doesn't necessarily mean one computer can access

11  another.

12         THE COURT:  Right.  But you're saying in your

13  affidavit that what's keeping other computers from accessing

14  the data is that there's an IP specific filter?

15         THE WITNESS:  Right.

16         THE COURT:  And multiple computers using the same

17  router have the same IP address, correct?

18         THE WITNESS:  They have the same outside IP address,

19  they have their own inside IP address, two different

20  addresses.

21         THE COURT:  Where does it say anything about inside

22  versus outside, is that something I missed or you're telling

23  me that now?

24         THE WITNESS:  The only thing that's relevant is the

25  outside IP address.

B. Nussbaum - cross - Schafhauser                817

1          THE COURT:  Is the outside IP address?

2          THE WITNESS:  Right.

3          THE COURT:  Okay, got it.

4   Q    Again I want to pick up on the Court's question because I

5   too need a little help on this.  Let's go back to your

6   testimony now, just now about the inside IP address.  Please

7   explain to me what the inside IP address would do vis-a-vis

8   one of these other computers accessing information that would

9   be accessible on Ms. Rivera's computer?

10  A    Every computer within a local LAN gets its own IP address

11  but those are all within a firewall, there's no firewall

12  blocking one from the next, as long as you open up sharing

13  between the files and stuff then you would be able to access,

14  for example, the QuickBooks file which was under the main

15  controller and sharing it so everybody could open the

16  QuickBooks program on their computer and could access the file

17  that was sitting on the domain controller.  The computers

18  outside the network, meaning when it hits what's called the

19  WAN, the wireless area network address, that's the address

20  that sees the street, the internet, you can't get in unless

21  you -- from another network unless you create a VPN or you

22  open up, which is extremely not safe to do, not something

23  generally you do.

24  Q    So, let's go back to this, except for Ms. Rivera's

25  computer that we've now focussed on here; were the other

1    computers that you have listed on pages three and four as

2    being in the Bronx and Brooklyn facility, were they hooked up

3    either by a network or by some other mechanism with

4    Ms. Rivera's computer; do you understand my question?

5    A    No.

6    Q    Let me try again.

7         Let's start with the oil computer, for instance,

8    that's in Ms. Rivera's office?

9    A    Yes.

10   Q    Could Ms. Rivera, based on what you know from the setup

11   of these computers, did Ms. Rivera transfer from one computer

12   to another of these computers data relating to Two Rivers,

13   that's my question?

14   A    What do you mean by data, are you referring to the Launch

15   system or e-mails?

16   Q    Let's start with the Launch system.

17   A    No.  The oil computer was actually -- the oil system is

18   actually on a separate network from the other offices, the

19   other stuff.

20   Q    And what is that network called, that separate network?

21   A    It's a different address, it's .2.1 as opposed to .1.1,

22   it is a different suffix.

23   Q    Just so I'm clear, if Ms. Rivera using her computer that

24   was, as you say, removed from active use, before it was

25   removed from active use if Ms. Rivera accessed something on

1  Launch, the Two Rivers Launch system, she could not

2  disseminate or transfer that information from that computer to

3  any of the other computers, correct?

4  A    Again, you're referring to when the computer was plugged

5  in?

6  Q    Yes, when it was plugged in?

7  A    She couldn't have, she couldn't have connected it to any

8  of the oil computers, that was a completely separate network.

9  Now, as far as the data, the data was not on her computer,

10 there was no data referring to the Launch system on the local

11 computer, it all sat either on the server or in the cloud

12 depending on where Yossi had it when he had it.  You could

13 take a screen shot, nothing stops you from doing that.

14 Q    Very well.

15       To go back to paragraph ten, you say:  "The only way

16 such computers could have been used to access Two Rivers'

17 information would have been via Remote LogMeIn, e.g. LogMeIn,

18 in which case all records and data would be on the remote

19 computer, not those computers."

20       This is my question, which of these computers had

21 LogMeIn?

22 A    I set it up on the old corporate computer so she could

23 use it to access when she wasn't at the facility anymore, she

24 could access the computer that was in Two Rivers.

25 Q    Okay.  So, that's the third entry under Office Use By

1   Sonia Rivera, right?

2   A     Right.

3   Q     And I take it that LogMeIn was also on the computer that

4   was removed from active use from Ms. Rivera, yes?

5   A     I don't recall setting up as a client to log out.  I mean

6   they had the host on it because that's what she logged into.

7   Q     Very well.  So -- all right.

8         So, let's go back.  So, other than the old corporate

9   computer, are there any other computers set forth on pages

10  three and four of your declaration that had LogMeIn?

11  A     LogMeIn connected to Two Rivers?

12  Q     Yes, connected to Two Rivers?

13  A     Because you use LogMeIn -- you know, I use it to fix

14  things sometimes but that's a different account not connected.

15  Q     Are there any other computers set forth in your

16  declaration other --

17  A     I didn't install the client on any other computer.  You

18  can also access LogMeIn through a browser but I had nothing to

19  do with that.

20        THE COURT:  Sir --

21  Q     Let me try again.

22        THE COURT:  Sir, stop interrupting the questions.

23        THE WITNESS:  Okay.

24        THE COURT:  We're going to have to go to written

25  answers to written questions if this continues.

1          Please continue.

2          MR. SCHAFHAUSER:  Thank you, Your Honor.

3   Q    Other than the computer that you identify, did any other

4   computers have LogMeIn access to Two Rivers' data?

5   A    I didn't install the LogMeIn client on any of the other

6   ones.

7   Q    Thank you.

8          Now, Mr. Nussbaum, there's been an allegation

9   that data was deleted from the computer systems belonging to

10  Two Rivers so I'd like to turn to that subject now.

11         Did you ever delete data or cause data to be deleted

12  from Two Rivers' computer systems?

13  A    No.

14  Q    Let's go to the Launch specifically.  Did you ever

15  delete data or cause data to be deleted from Launch belonging

16  to Two Rivers?

17  A    No.

18  Q    Do you know whether anyone else deleted data from the

19  Launch system for Two Rivers?

20  A    I know Yossi, from my understanding, he moved his program

21  off of -- his database off of their server after I was fired

22  and I didn't have access.  We were talking about this

23  yesterday.

24  Q    And you found out about that after the fact, right?

25  A    Right.

1    Q    Okay.

2    A    But that doesn't change the data, it just moved it

3    somewhere else.

4    Q    I'm asking now a specific question about deleting data.

5    Do you know -- withdrawn.

6              Is it possible to delete data from the Launch system

7    used by Two Rivers?

8    A    You're referring to from the front end where people use

9    it?

10   Q    The way people use it, yes?

11   A    The way the program is built you can only void

12   transactions, you can't actually delete anything.

13   Q    Please explain what you mean by "you can only void

14   transactions"?

15   A    Once you enter something and you hit save, the only way

16   to remove it is just you can void it which it will still be

17   there as a voided transaction, it doesn't get deleted.

18   Q    What about backdating something, is it possible to

19   backdate let's say a check on the Launch coffee system?

20   A    Again, you don't make checks in the Launch coffee system,

21   you make transactions.

22   Q    Okay.  Is it possible to backdate a transaction on

23   Two Rivers --

24   A    The transaction date -- the date of transaction would

25   have two dates, the date that you entered it and also whatever

B. Nussbaum - cross - Schafhauser                              823

1    date the invoice is put in that you enter in based upon the

2    invoice and then you could produce the check but the check is

3    based on the transaction.  You can't actually make checks like

4    a checkbook, you make transactions.

5    Q    So, just so I understand, your testimony is one cannot

6    backdate transactions on the Launch system?

7    A    Right, the program keeps a date of when you entered it

8    and you can see that.

9    Q    And that date remains regardless?

10   A    That is the computer's date, yeah.

11   Q    And what is the basis of your understanding and

12   testimony?

13   A    I spent a lot of time going through it because I had to

14   show Cindy how to use it and the other people, I think I

15   showed it to Steven, to Vince.

16   Q    Now, let me ask you please to turn to exhibit

17   Plaintiff's 76.

18          You say in your e-mail on that date, and let's focus

19   on the first sentence:  "Your e-mail displays a complete lack

20   of understanding how a domain works.  I have provided

21   everything that you need."

22          And that was apparently a response to an e-mail from

23   Mr. Schreiber, do you see that?

24   A    Yes.  Yes, I do.

25   Q    Now, what is it that you were talking about there?

1   A    The administrator password.  Once you have that, you have

2   access to everything within the whole company, all the

3   computers, everything, so you don't need anything more than

4   that.  Generally you don't keep people's local passwords.  No

5   admin keeps people's individual passwords on their computer,

6   you just have an administrative password.

7   Q    Up above in that same exhibit it says:  "Sandra should

8   have the FingerTec password."

9        Do you see that?

10  A    Yes.

11  Q    What is FingerTec?

12  A    FingerTec is the time clock that kept track of people

13  clocking in and out.  Vince also had it but Sandra was the one

14  who dealt with it.

15  Q    Very well.

16       A couple of moments ago, by the way, I asked you

17  about the deletion of data from the Launch and I think I asked

18  you about -- you said the front end and I never asked you

19  about the -- what is the back end?

20  A    The back end is the database itself.

21  Q    Okay.  So, please explain to me what you're referring to

22  in terms of the database itself.

23  A    All right.  I can just talk in general about databases,

24  I'm no expert on SQL.

25  Q    I'm less of an expert than you are, Mr. Nussbaum, I

1   assure you.  Can you please tell me to the best of your

2   understanding?

3   A    A database keeps track with sequence numbers of

4   everything you enter, when you entered it, what it is and it

5   is in one big file and it is controlled by a database engine

6   which in this case was SQL server which is a Microsoft

7   database engine.

8   Q    And do you have an understanding as to whether it was

9   possible for whoever controlled the database to make deletions

10  of Launch data on the database?

11  A    I can only talk about databases in general.  In general,

12  you mess with the database file, you're going to mess up the

13  sequence number, it will not open afterwards, everything

14  that's in that sequence number, you try to take things out,

15  you're going to destroy the database.

16          THE COURT:  What happens if you just alter what's in

17  it?

18          THE WITNESS:  From the front end?

19          THE COURT:  From the back end?

20          THE WITNESS:  You can't because they mess up the

21  sequence number.

22          THE COURT:  What if you just take a line and --

23          THE WITNESS:  The computer is going to look and see

24  it is missing a sequence number.

25          THE COURT:  Fair enough.  I understand the extent to

B. Nussbaum - cross - Schafhauser                826

1   which you're answering my question.

2         Thank you.

3   Q    Now, talking about the back end and the database,

4   where -- withdrawn.

5         Who had the database?

6   A    Well, it was at the time located on the server and Yossi

7   also had it remotely.

8   Q    So, the server was in South Plainfield, correct?

9   A    Yes.

10  Q    Okay.  And other than the server that was located in

11  South Plainfield, it was with Mr. Rogosnitzky, correct?

12  A    Right.

13  Q    You did not have access to the database, correct?

14  A    What do you mean by access?  I mean it was on a computer,

15  if I was there I could have opened up the computer but I would

16  have no idea -- I'm not a database person so I would have no

17  idea how to deal with it.

18  Q    You would have no idea how to --

19  A    How to deal with the database on the server.

20  Q    Well, would you have an idea about how to delete things

21  from the database?

22  A    No, not at all.

23  Q    All right.

24        Could I ask you please to turn to Defendant's

25  Exhibit 8, I believe it is.

1   A    In the big binder?

2   Q    In the -- yes.

3              MR. SCHAFHAUSER:  Your Honor, may I have 30 seconds

4   to --

5              THE COURT:  Sure.

6              MR. SCHAFHAUSER:  -- just check something?

7              THE COURT:  Yes.

8              (Pause in the proceedings.)

9   Q    All right.  So, Exhibit 8, the first page, there's an

10  e-mail from Mr. Koenig to a J. Rogos, do you see that?

11  A    Yes.

12  Q    That's Yossi, right?

13  A    Right.

14  Q    Putting aside the particulars of this e-mail, were you

15  aware at the time that there was some sort of issue that arose

16  involving Mr. Rogosnitzky and the folks at Two Rivers?

17  A    No.  I knew he had been there and had spoken with them.

18  Q    If you would look please at -- see the date is Friday,

19  October 2nd, 2015 at 5:08 p.m. is the date of the e-mail in

20  this package.

21  A    I don't see --  October 2nd?

22  Q    October 2nd at 5:08 p.m.

23  A    I got it.

24  Q    And the subject is Passwords, do you see that?

25  A    I do.

1  Q    Okay.  In the second paragraph Mr. Rogosnitzky

2  says something about Mr. Friedman raising a security

3  information (sic) in that he has personal information which

4  sharing these passwords will then allow access to as these

5  passwords allow access to computers on the network.

6            Do you see that?

7  A    I do.

8            (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    EXAMINATION BY

2    MR. SCHAFHAUSER: (Continuing.)

3    Q    Do you recall having any discussions about whether

4    Mr. Friedman had concerns about personal information on the --

5    A    I do not.  I never told me about it.

6    Q    What did he tell you?

7    A    He told me that if we --

8             MR. NELKIN:  Objection.  Hearsay.

9             THE COURT:  Are you offering it for the truth of

10   what Yossi said?

11            MR. SCHAFHAUSER:  I withdraw the question.

12   Q    Now, flip over a couple of -- let me ask you this before

13   we flip over.

14            What was your understanding as to the issue that

15   Mr. Friedman had raised?

16            THE COURT:  To the extent you had it from somebody

17   other than Yossi.  Just on your own knowledge.

18            THE WITNESS:  I understood the issue for my myself.

19   They had personal stuff on there.

20            THE COURT:  Did you have any source of information

21   for that other Yossi.

22            THE WITNESS:  They had an issue with it?

23            THE COURT:  Yes.

24            THE WITNESS:  I believe he spoke to me,

25   Mr. Friedman.

1          THE COURT:  So we'll hear about it from
2    Mr. Friedman.
3          Go ahead.
4    Q    Okay what did Mr. Friedman tell you --
5          THE COURT:  We'll hear about it from Mr. Friedman.
6    Q    Okay.  Let me then move on to a couple of pages later.
7          There's another e-mail in which Mr. Koenig says,
8    "You will remove all non-TRC-related data from the server."
9    You said, "Separate.  Does this mean remove?"
10         And number two, "After the removal of the
11   information, you will share all passwords with all partners."
12         Do you see that?
13   A    I do.
14   Q    Okay.  Now, do you have an understanding as to whether
15   the parties had discussed the removal of all non-TRC-related
16   data from the server?
17         MR. NELKIN:  Objection.
18         THE COURT:  Look, if you're asking him to comment on
19   somebody else's e-mails, why don't we just get the principals.
20   The e-mails speak for themselves.  If he knows about something
21   firsthand I'll hear about it from him.
22         Let me ask you.  Did you know anything about this
23   firsthand, or you just heard about it from others.
24         THE WITNESS:  Yossi spoke to me and Mr. Friedman
25   spoke to me.

1          THE COURT:  The document speaks for themselves.  Why

2    don't you move on to the next item.

3          MR. SCHAFHAUSER:  Okay.

4    EXAMINATION BY

5    MR. SCHAFHAUSER:

6    (Continuing.)

7    Q    Now, putting aside what the document says.  We already

8    went through this.

9          On October 7th, Mr. Friedman instructed you to give

10   a password; right?

11   A    Right.

12   Q    And you did so; right?

13   A    Correct.

14   Q    And, that document is -- take a look so we're on the same

15   page it's D-28?

16   A    (Complying).

17   Q    Is that when you gave Mr. Friedman, I'm sorry, the server

18   password per Mr. Friedman's instructions?

19   A    That's it's for the server.  It's also the domain

20   password.  It's the password to everything.

21   Q    Now, do you recall that there was some kind of reason for

22   the delay between when you were originally asked for the

23   password and the date on which you gave this password?

24   A    Yeah, because when you have the domain password, you have

25   access to everybody's computers.

*B. Nussbaum - Cross/Mr. Schafhauser*                832

1    Q    And do you know what the reason for the delay was?

2    A    And Mr. Friedman didn't want people to have access to his

3    personal stuff on his computers.

4    Q    Okay.  Let's move on to another area here.

5         The allegation is that Launch was discontinued in or

6    about February 2016.  I don't know the exact date but

7    somewhere in there.

8    A    Neither do I.

9    Q    I'm just trying to frame this line of questioning.

10        Did you have any involvement in the discontinuation

11   of Launch this year?

12   A    No.

13   Q    Did you have any prior knowledge that Launch would be

14   discontinued this year?

15   A    No.

16   Q    Now, let's take a look at Exhibit 9, Defendant's

17   Exhibit 9, sorry.

18        Am I correct that this is an e-mail from Yossi to

19   you?

20   A    Yes.

21   Q    Okay.

22   A    Yes.

23   Q    Please explain to me the circumstances surrounding this

24   e-mail as best you can?

25   A    I got a subpoena from the Nelkin, from the plaintiffs,

1   and he wanted to know regarding e-mails and stuff regarding

2   some documents which I asked him if he might have copies

3   because I didn't have copies of everything.

4   Q     You asked him who?

5   A     Yossi.

6   Q     Okay.

7   A     Copies of stuff so I can supply it to him.  He told me he

8   didn't want to be involved; z him money.

9   Q     Okay.

10          MR. NELKIN:  Objection to what he's told.

11          THE COURT:  I'm sorry.

12          MR. NELKIN:  Objection to what he's told to

13   Mr. Rogosnitzky.

14          THE COURT:  Since it's fruitless trying to enforce

15   the ruling, you asked the same question after I've made

16   ruling, Mr. Schafhauser, I'll take it for what it's worth

17   which is questionable.  I think that's the more efficient way

18   to move in light of how it's been proceeding this morning.  In

19   that sense only it's overruled.

20          Please continue.

21          MR. NELKIN:  So, your Honor, I don't have to keep

22   objecting to hearsay?

23          THE COURT:  To what end?

24          MR. NELKIN:  I'm just asking.

25          THE COURT:  You're not preserving record for

1    anything.  I will take the hearsay for the minimal, if any,

2    value to has.

3            Go ahead.

4            MR. SCHAFHAUSER:  Your Honor, my question was what

5    were the circumstances.

6            THE COURT:  Go ahead.  On to the next one, please.

7    EXAMINATION BY

8    MR. SCHAFHAUSER:

9    (Continuing.)

10   Q    Let's try, please, to Exhibit 13.

11   A    (Complying).

12   Q    Will you please take a look at -- are you with me at

13   Plaintiff's Exhibit 13?

14   A    Plaintiff's.

15   Q    Plaintiff's Exhibit 13.  Mr. Nussbaum, the main part of

16   this first page contains e-mails of July 16, 2014.

17           Do you see that?

18   A    Am I on the wrong?

19   Q    I'm sorry.  Exhibit 13 in the big plaintiff's exhibit

20   book.

21           Okay.  Let me try.  It's on the top to says,

22   "Brooklyn," and then, "forward receipt for your payment."

23   A    Yes.

24   Q    Okay.  Do you see that?

25   A    Yeah.

1    Q    Just so we're on the same page.

2         In the middle of the page, it says, "Ben Nussbaum to

3    Silver at July 16, 2014."

4         Do you see that?

5    A    I do.

6    Q    Okay.  I want to go back to the top of the page.  There's

7    an e-mail, it purports to be from you to Steven Schreiber on

8    Tuesday, December 15, 2015, at 9:13 p.m.

9         Do you see that?

10   A    I did.

11   Q    Were you e-mailing Steven Schreiber on December 15, 2015?

12   A    I guess.

13   Q    Do you recall a reason why you were e-mailing him on that

14   date?

15   A    No.  I don't remember these e-mails I can't even see what

16   they are.

17   Q    Well, let me ask a different question.  After the first

18   hearing, whenever the date was that you were in court, did you

19   communicate at all with Mr. Schreiber?

20   A    No.

21   Q    All right.  Let's go to another area.  You were asked by

22   Mr. Nelkin about Mr. Friedman's laptop and you gave him

23   advice; correct?

24   A    Yes.

25   Q    And your advice to him was what?

*B. Nussbaum - Cross/Mr. Schafhauser*          **836**

1  A    He called me, he told the battery was dead.  He acquired

2  an old laptop and I told him it was just not worth it to put

3  in the money to try to get it fixed.

4  Q    And do you know whether he followed that advice?

5  A    I assume so.

6          MR. SCHAFHAUSER:  Your Honor, if now is a good time

7  perhaps for a midmorning break, I'm looking through my notes

8  to see if there is something else.

9          THE COURT:  You'll wrap up right afterwards?

10          MR. SCHAFHAUSER:  That's my goal, to wrap up.

11          THE COURT:  Anybody else have cross?

12          MR. GRANTZ:  Yes.

13          MR. BERGSON:  Yes.

14          MR. HELLER:  Yes.

15          MR. FINKEL:  Yes.

16          THE COURT:  All right.  So we'll get you off the

17  stand in about half an hour or so, but right now let's take a

18  15-minute break.

19          MR. SCHAFHAUSER:  Thank you, your Honor.

20          (Witness leaves the witness stand.)

21          (A recess in the proceedings was taken.)

22          (Witness takes the witness stand.)

23          THE COURT:  All right.  Go ahead Mr. Schafhauser.

24  EXAMINATION BY

25  MR. SCHAFHAUSER:

1  (Continuing.)

2  Q    Mr. Nussbaum, can we go back to Plaintiff's Exhibit 110.

3  Your declaration.

4  A    (Complying).

5  Q    The computers that are listed, are they connected to a

6  router?

7  A    Yes.

8  Q    Which computers are connected to a router?

9  A    All computers are connected to a router.

10       MR. NELKIN:  Asked and answered.

11       THE COURT:  Overruled.

12  A    All the computers when they're on.

13  Q    Each computer, however, has an individual IP address;

14  correct?

15  A    Well, internal IP address.

16  Q    An internal IP address.

17       Do the computers in your declaration -- let's focus

18  on the Bronx computers first because I realize there's two

19  facilities.

20       The Bronx facilities, do they have the same external

21  IP address?

22  A    There's two different external IP addresses.

23  Q    Okay.  And please tell me what the two different external

24  IP addresses are?

25  A    I don't remember exactly the numbers but they were one

1    digit off.  One was dot 66 and one was dot 67.

2    Q     Putting aside the numbers, why were there two different

3    external IP addresses for the Bronx facility?

4    A     The oil company stuff was kept separate from the other

5    computers on a separate router.

6    Q     So the --

7              And the second router, what was the second router

8    used for?

9              I'm sorry, what was the second external IP address

10   used for?

11   A     Sylvia's computer was attached to that.  The corporate

12   computer was attached to that.  I mean, the coffee one was

13   attached to that.

14   Q     I'm sorry.

15   A     When the coffee one was attached to that.

16   Q     Which one are you referring to now as, "The coffee one"?

17   A     The one that Sonya used for coffee that was brought from

18   the Bronx to Two Rivers and back to the Bronx.

19   Q     I want to be very specific.

20             The one that had this separate second external IP

21   address, those are the old corporate computers under office

22   used by Sonya Rivera?

23   A     When it was plugged in.

24   Q     When it was plugged in.  The other one, when it was

25   plugged in, was the last entry on the Sonya Rivera office;

1    right?

2    A    Right.

3    Q    And then you mentioned Sylvia's computer.  You're now

4    talking on Page 4 at the top it says, "One computer used for

5    oil companies and trucking," that one?

6    A    Right.

7    Q    Okay.  So those three computers were hooked up to the

8    same external IP address; correct?

9    A    Correct.

10   Q    The other computers, if I now understand your testimony

11   correctly, all of the other computers in the Bronx facility

12   were hooked up to a separate different external IP address;

13   correct?

14   A    The oil computers, yes.

15   Q    Okay.  Well, were any of the other computers hooked up to

16   the -- what you've referred to as, "the second external IP

17   address," that Sonya/Sylvia computers were hooked up to?

18   A    Not that I recall.

19   Q    Okay.  Now, is it correct that if the computers are not

20   hooked up to the same external IP address, there cannot be a

21   transmission of information between those computers?

22   A    Well, right.  Not through the network unless you start

23   some kind of VPN.

24   Q    Not through the network.  Very well.

25            Now, let's go again to the Brooklyn facility.  Were

1   any of the computers in the Brooklyn facility hooked up to an

2   external IP address that plugged into the Two Rivers network?

3   A    How could it be, it's in a different location.

4   Q    Okay.  Let me try again.

5         Were any of the computers -- what external IP

6   address, if any, were the Brooklyn computers hooked up to?

7   A    I don't remember offhand.  It's dot 90.  I don't

8   remember.

9   Q    Did they have the same external IP address, all of those

10  computers?

11  A    Yes.

12  Q    And none of those computers were linked or routed to the

13  Two Rivers Launch coffee system; correct, in Brooklyn?

14  A    Correct.

15  Q    Now, we talked a few moments ago about Launch, and I

16  didn't follow through on a line on Launch.

17        I asked you about the deletion of data from a

18  Launch.  Let me ask you now about changing information.  I

19  think the Court had asked you a question.  We talked about the

20  front end and then the back end.  This is my question.

21        If someone could make edits or changes on the Launch

22  system on the back end --

23        THE COURT:  I think this witness has testified quite

24  reasonably that he doesn't know about SQL; right?

25        THE WITNESS:  I have no experience with SQL.

1      THE COURT:  So his explanation about what he can or

2    can't do with it doesn't help me.

3      MR. SCHAFHAUSER:  In that case nothing further,

4    Mr. Nussbaum.  Thank you.

5      THE COURT:  Anyone else.

6    CROSS-EXAMINATION

7    BY MR. GRANTZ:

8    Q    Good morning, Mr. Nussbaum.

9         The two trucking computers that are referenced in

10   Exhibit 110 and the dispatch office, what are those trucking

11   computer computers used for?

12   A    I assume dispatch.  I never really dealt with them.

13   Q    Do you know what type of programs are on them?

14   A    It's not the oil program.  It's some kind of program

15   called -- I can't remember the exact name.

16   Q    When you look at those computers, did you investigate the

17   type of programs they were?

18   A    Well, I know there's no oil computers because I never

19   installed them.  I saw the program, it was actually open, but

20   I dealt with, I mean, the dispatch guys --

21   Q    Who uses those computers?

22   A    The names?  I think it was a guy Bobby used to use it.  I

23   don't remember the other guy's name.

24   Q    You were questioned about the expertise of people who

25   worked for Mr. Friedman and Two Rivers in terms of computers

1   by Mr. Nelkin.

2          Do you recall that testimony?

3   A    About the expertise of who?

4   Q    Well, about anyone who works for Two Rivers Coffee about

5   computer issues.

6          Do you recall that?

7   A    Vaguely, yeah.

8   Q    Okay.  You testified that Mr. Friedman didn't have a lot

9   of expertise in computers.

10         Do you remember that?

11  A    Yes.

12  Q    Does Mr. Schreiber have knowledge about computer issues

13  and what level of knowledge do you think he has?

14  A    Way more than anybody else but less than he thinks.

15  Q    Why do you say way, "more than anybody else"?

16  A    Because I know from dealing with him.

17  Q    Did he show you something on the computer?  Did he

18  demonstrate to you his knowledge?

19  A    I worked with him.  He set up the offsite office.  I know

20  he has more knowledge than anybody else.

21  Q    When you say you, "Set it up"?

22  A    He plugged in and set up the router.  I know he ordered

23  the router.  I believe he got e-mail when he bought a new

24  router.

25  Q    Did he set up the server?

1   A    In Passaic, that I set up.  The domain server, I set up.

2   Q    Why do you say, "He thinks he knows more than"?

3   A    Because he tried to do things and he messed things up.

4   Q    Did he mess something up that he was working on that you

5   had to fix?

6   A    Yes, that was the code that we discussed earlier.  That

7   was in particular that I remember.

8   Q    If he was given a password, that password that you

9   provided in December of 2014, was he capable of accessing the

10  server and the other programs on the Two Rivers network?

11  A    He had access to everything.

12            THE COURT:  I think you're talking past each other.

13            You're talking about, I think, what is possible for

14  somebody to do with that information.  He's asking you to

15  speculate about what somebody else would have been able to do.

16            Are you able to speculate about that?

17            THE WITNESS:  I won't speculate about that.

18            THE COURT:  Okay.

19  EXAMINATION BY

20  MR. GRANTZ:  (Continuing.)

21  Q    You said you unplugged the two computers that were

22  Sonya's computers in the Bronx office; right?

23  A    Yes.

24  Q    And after you unplugged them, you placed them in

25  Mr. Friedman's office?

*B. Nussbaum - Cross/Mr. Finkel*                    **844**

1  A    Correct.

2  Q    After that, did you visit the Bronx office and see those

3  computers sitting there?

4  A    Yes, multiple times.

5  Q    And did you ever see them moved out of that location?

6  A    No.

7  Q    Did anyone ask you after December 2015 to plug those two

8  computers in?

9  A    No.

10 Q    Did you plug those two computers in for any reason?

11 A    I don't recall doing so, no.

12       MR. GRANTZ:  I have nothing further.  Thank you.

13 CROSS-EXAMINATION

14 BY MR. FINKEL:

15 Q    Good morning, Mr. Nussbaum.

16       You testified earlier concerning changes being made

17 in the Launch program, and my understanding is you said

18 changes cannot be made, they can be voided; is that correct?

19 A    Once you save a transaction, you can't remove it.  It can

20 only be provided.

21 Q    Okay.  Can you make changes in the transaction?

22 A    Make an edit.

23 Q    Yes.

24 A    It would keep a record.

25 Q    Okay.  When it would keep a record, would it also keep a

1   record if you void a transaction?

2   A    Yes.

3   Q    Could you tell us what that record is?

4        MR. FINKEL:  Well, withdrawn.

5   Q    Does that record save the date of the change or the

6   voiding?

7   A    Yes.  You would have to put in a reason why you voided

8   it.

9   Q    Does it also disclose the operator who created the change

10  or the void?

11  A    Yes, it does.

12  Q    And that remains with the program?

13  A    Yes.

14  Q    That remains in the database?

15  A    Right.

16  Q    Now, there was some testimony about the Brooklyn Beans

17  e-mail addresses.

18       Do you recall that?

19  A    I do.

20  Q    Do you recall who set up, and who was responsible, for

21  the Brooklyn Beans e-mail addresses?

22  A    Steven Schreiber was the admin on the account.

23  Q    When you say, "He was the admin," what does that mean?

24  A    That means he's the one who sets up the e-mail and has

25  full access to everybody who has an e-mail on the

1   Brooklyn Beans account.

2   Q    And that would also mean, would it not, that he has the

3   administrative password for those e-mails?

4   A    To the e-mails, yeah.

5   Q    So that would mean he could get in and use anyone's

6   e-mail address, isn't that correct?

7   A    He can send an e-mail to someone else, yes.

8   Q    I direct your attention to Plaintiff's Exhibit 13.

9   A    (Complying).

10  Q    Do you have that page in front of you, sir?

11  A    I do.

12  Q    Okay.  And just to confirm, this indicates at the top

13  line.  This says, "Forward receipt of your payment," with a

14  reference number, one message; correct?

15  A    Right.

16  Q    Below that, it appears to disclose an e-mail that says

17  Ben Nussbaum, ben@Brooklyn; correct?

18  A    Correct.

19  Q    And then it says to Steven Schreiber, Steven@brooklyn;

20  correct?

21  A    Right.

22  Q    To the right, it has a date, December 15, 2015; correct?

23  A    Correct.

24  Q    Now, if I tell you, that based upon your testimony

25  earlier on direct with Mr. Nelkin, and cross by

*B. Nussbaum - Cross/Mr. Finkel*          **847**

1   Mr. Schafhauser, that the court appearance when you were first

2   in the court was on December the 14th?

3          THE COURT:  I do get this.

4   Q    Okay.

5          THE COURT:  So you can move on to the next area.

6          MR. FINKEL:  Please, your Honor.

7          THE COURT:  Would you have set an e-mail?

8          THE WITNESS:  I have no answers after October.  I

9   think I indicated that.

10          THE COURT:  Go on now, please.

11  Q    You testified also that you recently responded to an

12  inquiry and had access to Sylvia Ezell's computer.

13          Do you recall that testimony concerning?

14  A    Regarding what.

15  Q    Concerning copying of e-mails?

16  A    Right.  By your instruction, unless she called me based

17  on your instruction.

18  Q    Okay.  And you did what based upon what you understood

19  the instructions were?

20  A    I installed Thunderbird on the computer to make it easier

21  to copy the e-mails into files, into PDFs, so that you can get

22  then.

23  Q    And the only thing that that affected was copying

24  e-mails; is that correct?

25  A    That's what I did.

*B. Nussbaum - Cross/Mr. Heller*                    **848**

1   Q    Okay.  And did that action cause any deletions or

2   alterations in any data whatsoever?

3   A    No, it just pulls e-mails from the server.  It has

4   nothing to do with e-mails on the AOL server.  It pulls them

5   to the local computer to make them easier to PDF them.

6   Q    The original e-mails remain on the AOL servers; is that

7   correct?

8   A    Correct, it's IMAP.  It makes a copy.

9   Q    And during that process, did you access or attempt to

10  access any Two Rivers data?

11  A    No.

12  Q    Do you know why you were asked to do that, to copy those

13  e-mails from the AOL server onto her --

14  A    She told me you wanted them.

15          MR. FINKEL:  No further questions.

16          THE COURT:  Anyone else.

17          MR. HELLER:  One question.  Round of questions.

18  CROSS-EXAMINATION.

19  BY MR. HELLER:

20  Q    Mr. Nussbaum, I think you were asked earlier on direct

21  examination by Mr. Nelkin about how you can send an e-mail

22  that has a legend at the bottom that says, "Sent from my

23  iPhone," from a device other than an iPhone.

24          Do you recall that?

25  A    Yes.

1  Q    When you send an e-mail from an iPhone, does that

2  register in your e-mail client at your desktop?

3  A    It depends if you have set it up as IMAP or POP.  That's

4  the protocol you're using.

5  Q    There is a program that would actually show?

6  A    Pretty much everybody now uses IMAP because it mirrors

7  the e-mail on any device.  You use it to mirrors any folder

8  including the sent folder.

9  Q    So, in other words, that item that e-mail that was sent

10 from the iPhone would show up in the --

11 A    It's going to be in the main server.  The client is also

12 just a copy of what's on the server.

13 Q    If you went into your sent items, you would see that sent

14 e-mail; correct?

15 A    If you're using IMAP, which is what everybody uses

16 nowadays.  POP is old technology.

17 Q    The clients generally, the e-mail clients, have the

18 ability to resend an item; correct?

19 A    Correct.

20 Q    So if you resent that item, which was shown in your

21 e-mail client as an e-mail that was originally sent from an

22 iPhone, it would also say, "Sent from my iPhone"?

23 A    Unless you went and cleaned up the e-mail, yes.

24 Q    So even if you sent if from your desktop, it would also

25 say, "Sent from my iPhone:

1   A    Correct.

2          MR. HELLER:  I have no further questions.

3          THE COURT:  Anyone else.  Redirect.

4   REDIRECT EXAMINATION

5   BY MR. NELKIN:

6   Q    In response to Mr. Heller's question, are you saying that

7   if you -- wouldn't there be some message that showed that it

8   was being forwarded?

9   A    Unless you cleaned up -- what do you mean?  That it's

10  resent.

11  Q    If we see one single message that says, "Sent from my

12  iPhone"; right?

13  A    Not if you delete the top line which I do it my myself

14  sometimes when I resend something.  I remove the top line so I

15  don't have a bunch a lines that say "forward, forward,

16  forward."  I do it all the time.

17  Q    Won't it show on the incoming computer where it came

18  from?

19  A    No.

20  Q    Won't it show it came from your computer?

21  A    It will not.

22          THE COURT:  Anything else?

23          MR. NELKIN:  Yes, your Honor.

24  Q    It's your testimony, I understand, that there were two

25  separate systems in the Bronx, one more oil and one or two --

1   A     Two IPs.

2   Q     If you weren't on the oil IP, could you access the

3   information on that system?

4   A     No, it's an external IP, no.

5   Q     So if Mrs. Ezell had only one computer, and it wasn't

6   hooked up to the oil thing, then are you telling us that she

7   couldn't access any information?

8   A     She didn't -- she worked with the computer stuff which is

9   on the network.  She couldn't access the oil program, no.  She

10  doesn't have it on her computer and she couldn't access it.

11  Q     Do you know who the bookkeepers are for the oil company?

12  A     I know Sylvia does work, as far as I know.  I know Sonya

13  does the same kind of work, but I don't know exactly.  I know

14  the bookkeepers I don't know if they do the same kind of work.

15  Q     What is on the oil system?

16  A     Like we spoke yesterday, it's orders, addresses of

17  people, what they ordered, how much oil.

18  Q     Wouldn't that be useful for a bookkeeper to able to

19  access?

20  A     I think she got those reports from Sonya.  You have to

21  ask her.

22  Q     How is Sonya hooked up to the oil?

23  A     Sonya had a computer that is connected to the oil system.

24  Q     That was Sonya's computer?

25  A     Yes, Sonya's, in her office, yes.

*B. Nussbaum - Redirect/Mr. Nelkin*          **852**

1   Q    And that would used for bookkeeping?

2   A    I assume.  I have no idea what she used it to for.  It

3   was used for the oil company program in the database.

4   Q    Which one is it in your list?

5   A    The oil computer by Sonya.

6   Q    Now, with respect to the December 15th e-mail,

7   Plaintiff's Exhibit 13.

8   A    Okay.

9   Q    If Mr. Schreiber had simply forwarded -- well let me ask

10  you this.

11          Do you recognize relevant e-mail below?

12  A    That's an e-mail that probably from the Brooklyn Beans

13  account.

14  Q    Okay.  So you're not disputing that you and Sylvia had

15  that exchange?

16  A    Correct.

17  Q    Okay.

18          MR. NELKIN:  No further questions, your Honor.

19          THE COURT:  Thank you.  You're excused.

20          MR. NELKIN:  No further questions on that exhibit.

21          THE COURT:  Just a few more minutes, I'm sure.

22  Q    How many different ways are there to transfer data from a

23  computer to another computer.

24  A    You could physically transfer it if you have physical

25  access.

*B. Nussbaum - Redirect/Mr. Nelkin*          **853**

1    Q    A flash drive?

2    A    Yes, physical access.

3    Q    Okay.  And could you e-mail from one computer to another?

4    A    You could e-mail.  It depends on the size of the file.

5    Obviously, most e-mail does not allow large files to be

6    e-mailed.

7    Q    It's your testimony that there's no way to use the normal

8    version of Logmein to transfer?

9    A    Logmein doesn't have the transfer.  If you want to go

10   install something else on computer and use that because it's

11   as if you're sitting in front of the computer.  You can use

12   that to do the transfer, but I don't believe anybody had the

13   ability to install stuff on the computers in Two Rivers.  I

14   think that's what the e-mail exchange with the password was

15   about.

16   Q    Do you know that they had it or they didn't have it?

17   A    They didn't haven't it.

18   Q    What about the other computers?

19   A    They were all the same, all domain computers.  Only if

20   you had the password you do it.  Exactly why we discussed.

21   That was the whole thing where he needed the admin password.

22   He wanted to install a program?

23   Q    Can a password be changed back and forth to the same

24   password?

25   A    Depends how you have it set.  Usually it doesn't allow to

1   you use the same password consecutively.

2   Q    But it can be done if you're the administrator, can't it?

3   A    If you turn off that setting in the end server.

4   Q    It make the password work and not work and work again?

5   A    Well, if you know what old password was.  You would have

6   to know it.

7   Q    Okay.  And if you gave someone the password the day after

8   a computer was wiped, and they then could access that

9   computer, would they be able to access the data on that

10  computer.

11  A    Again, if it was wiped?

12  Q    Yes.

13  A    If it was wiped, it's not there.  I'm not sure what

14  you're asking me.

15  Q    I'm just asking if the --

16          THE COURT:  It's rhetorical point he's trying to

17  make for my benefit don't worry about answering.

18  Q    You testified that when you went to --

19          Well, how many days before you prepared your

20  affidavit did you go to the --

21  A    It was within the week.  I don't remember that.

22  Q    You don't remember.

23          Do you remember when you were told to prepare the

24  affidavit?

25  A    A few days after.  I did not go the next day.

*B. Nussbaum - Redirect/Mr. Nelkin*          855

1    Q    You didn't go the next day?

2    A    No.  I work part time.

3    Q    Did you go the day after the next day?

4    A    I might have.  It was within the week that I handed over

5    the affidavit.  I don't know.

6    Q    The order came out on asking for that affidavit at the

7    end of the 9th.

8    A    I wasn't ordered to give the affidavit.  They decided to

9    ask me for an affidavit.

10   Q    You testified that you couldn't --

11             Well, have you ever used software without licensing

12   or obtaining the proper licensing?

13             MR. SCHAFHAUSER:  Objection, your Honor.

14             THE COURT:  What's that question?  What was at that

15   question?

16   Q    You testified you couldn't use anything without a

17   license, that didn't have a license?

18   A    Regarding what?  VPN he's talking about because that's

19   the router.  You have to buy a license on VPN.  I wasn't

20   talking about software.  You have to buy license for VPN

21   router.  I' we're I'm not sure what you're getting into.

22   Q    So your testimony is that you could use software without

23   a licensing but just not the VPN.

24   A    Until it activates.  Usually you have 30 days, 60 days,

25   I'm not sure what it has to do with anything.

*B. Nussbaum - Redirect/Mr. Nelkin*          **856**

1   Q    Now, your testimony -- what is the difference between an

2   executive director and a director on the Launch system?

3   A    The ability to create transactions.  That makes

4   transactions in the general ledger.

5   Q    Like printing?

6   A    No, printing checks.

7   Q    Printing checks?

8   A    Right.

9   Q    And?

10  A    Not printing out, you can print out documents or those

11  stuff.

12  Q    And was it your decision to make -- were you the one that

13  made the decision to decide that the three partners besides

14  Mr. Friedman and the CFO couldn't print checks?

15  A    Generally, the only one who does that is the bookkeeper.

16  Mr. Friedman, I was told, and I think that was understood over

17  the years, he may have done payroll.  In order to do the

18  payroll, you have to have the ability.

19          THE COURT:  The question was, was it anyone else's

20  decision other than yours to do that?

21          THE WITNESS:  No, it was based upon what I knew they

22  had to do.

23  Q    Okay.  So you as a part time IT person earning roughly --

24  A    I was told what they had to do on the program.

25          THE COURT:  Who told you?

*B. Nussbaum - Redirect/Mr. Nelkin*        857

1          THE WITNESS:  Mr. Friedman told me he was going to

2    be doing the payroll and I understood from everybody that

3    Sonya Rivera was the bookkeeper.  There was no argument about

4    that.

5    Q    So you got the information to do it from Mr. Friedman?

6    A    And from normal being in the company and talking to

7    people.  There was no arguments back then about this.  There

8    was never brought up as an issue until recently.

9    Q    And what payroll systems would have been on

10   Mr. Friedman's computer to do payroll?

11   A    It's all in Launch, it's part of Launch system.  Lunch

12   systems pulls directly from the clock, creates the --

13   Q    Do you know if Mr. Friedman had an Intuit Payroll System

14   on his computer?

15   A    No, he did not.  I never saw one.

16   Q    Are you certain that the one in his office did not have

17   one?

18   A    I never saw anything like that.  I can tell you he

19   doesn't have the capability to install something like that.

20   Q    Could Mr. Rogosnitzky install that remotely for him?

21   A    You ask me if it's technically possible, yeah.  Would he,

22   no.  The payroll is done from Launch.

23   Q    If there was an Intuit Payroll System on Mr. Friedman's

24   computer that references Mr. Friedman, would that indicate to

25   you that it might not be Mr. Friedman's computer?

1    A    It might be.

2    Q    You mentioned that no one ever came to you about the

3    missing computer?

4    A    Correct.

5    Q    Did anyone come to ask you about the two other computers

6    that left Two Rivers?

7    A    I knew they left.  I installed the computer in the office

8    in Brooklyn and Sonya's computer I replugged back in the

9    Bronx.  So, I mean, there wasn't any discussion.  I mean, I

10   knew about it.

11   Q    But no one complained to you about it?

12   A    No one every complained anybody, no.

13   Q    No complaints from anyone about the missing computer?

14   A    I didn't hear anything about that.

15   Q    I'd like to -- if you make an edit on the Launch system,

16   does that --

17   A    After you save something.  Before you save it, it doesn't

18   matter.  But once you save it, it creates an entry in the

19   general ledger.

20   Q    Would we see both the earlier edit as well?

21   A    You see the audit history.  I think there are some

22   pictures of what that is.

23   Q    So I'm saying we see what the previous entry was or not?

24   A    I assume so, yeah.  Once you make, you can't just change

25   the general ledger.

B. Nussbaum - Redirect/Mr. Nelkin          859

1    Q    If you could turn to Exhibit 44, please.

2         Under description, it says, "Edit account checks"?

3    A    Where?  What page are we on.

4    Q    The first page of Exhibit 44.  Plaintiff's Exhibit 44.

5    In the big box that's highlighted up there, to says under

6    description, under the shaded, lighter shaded boxes, to box

7    edit account checks sort of in the middle?

8    A    You edit in the cancel check edit.

9         THE COURT:  Here.

10   Q    I'm looking dead center, an inch and a half to two inches

11   below that?

12        THE COURT:  At that point?

13        THE WITNESS:  Edit account checks, yes.

14   Q    But I only see one entry there, I don't see the prior

15   entry.

16   A    There was prior entry.  If you make any change, you click

17   another entry.

18   Q    I guess my point is, if someone made a change, would we

19   be able to observe that change and know who made it?

20   A    It's going to change in the general ledger, wouldn't it?

21   Q    I don't know.

22   A    Of course you would be able to edit it when the books

23   balance.

24   Q    Let's just say they changed the date of the check?

25   A    You can change the date of the check.  Again, you don't

*B. Nussbaum - Redirect/Mr. Nelkin*                    **860**

1    make checks individually you.  Make transactions.  The

2    transaction still has a date and you don't make changes

3    independent of a transaction, you can't.  Some programs you

4    can.  Launch you cannot.

5    Q    Do you know if the books actually balanced?

6    A    I don't know, I'm not an accountant.  I don't know

7    anything about books.

8    Q    I would like to turn to Exhibit 45 and I believe it's

9    talking about check 5886?

10   A    5886.  Okay.

11   Q    Do you see where it says that under check number?

12   A    I do.

13                (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. NELKIN (Cont'd.):

2   Q    And can you see the date there?

3   A    11/14/2013?

4   Q    The one below it, yeah, the one for Sonia Rivera?

5   A    Yes.

6   Q    Okay.  And there's something above it for Sonia Rivera?

7   A    Yeah, 11/22.

8   Q    Now, there are two entries on this one.

9   A    Okay.  I can't see the full date, but okay.

10  Q    Can you explain to me why when it says "edit," there's

11  only one entry instead of on here there are obviously two

12  separate people?

13  A    It was printed twice.

14  Q    Okay.  And can you tell what dates it was printed?

15  A    I can't really see the dates, so I can't -- it's blacked

16  out.

17  Q    Okay.  And can you see where the check is in the check

18  number on the column?  I think it's about ten down or so.

19  A    I do.

20  Q    And can you tell me what date it says for the check date.

21  A    11/22/2013.

22  Q    No, keep going down.  This is check 36 or 3886.

23  A    Five, five.

24  Q    I can come point you to where.

25       THE COURT:  Yes, please.

*B. Nussbaum - Redirect/Nelkin*                                      862

1    Q    (Indicating.)  5335, can you tell me what date is next to

2    that one?

3    A    11/15.

4    Q    And what is the date printed or that the check was

5    printed?

6    A    Is that 11/14?

7    Q    Yes.

8    A    Okay.

9    Q    So it shows an action on one date with the different date

10   for the --

11   A    You can print the check a different date than the --

12   Q    So could you backdate a check?

13   A    You can, but you can't backdate a transaction.  Again,

14   you don't make checks.  You make transactions.  So when you

15   actually print the check, you can backdate it, but you will

16   still see the date the transaction it is attached to.

17   Q    When you say "you will see the transaction," what does

18   that mean?

19   A    If you look over here, if you open the check, it says

20   "view source."  You click "view source."  It opens the actual

21   transaction that created that check.  And that's going to have

22   a date on it.

23   Q    Which will show the date the check was created?

24   A    When the transaction was created.

25   Q    Okay.

*B. Nussbaum - Redirect/Nelkin*                          863

1  A    And you don't make checks independent from a transaction.

2  Q    And can you edit that?

3  A    The transaction?

4  Q    Yes.

5  A    What do you mean by edit it?  You put it in.  You can't

6  edit it without voiding the check, no.  You have to void it

7  and then make a new transaction.

8  Q    Could the audit trail be left blank so that you couldn't

9  see who the user was?

10 A    I assume not.  This is the way it was designed.  You

11 asked me about the program, back to the same thing, I'm not --

12 Q    Okay.  But you testified earlier that you --

13 A    I testified earlier about the front end of the program

14 which I -- that would be something you would have to do in the

15 back end.

16 Q    Now, it is your testimony that you never observed anyone

17 at any of the other companies with a laptop?

18 A    Besides the one that was sitting in the -- out in the

19 cafeteria in the company.

20 Q    What is the one sitting?

21 A    That's the minicomputer that we discussed.

22 Q    And except for that one, you never seen anything?

23 A    No.

24 Q    Now, if Mr. Friedman had bought a laptop for his own

25 use --

1   A     Right.

2   Q     -- used it while he was traveling, would you have known

3   about that?

4   A     Probably.  I mean, generally he would call me if there

5   was some kind of issue.

6   Q     If there was an issue?

7   A     Right.

8   Q     But what if there wasn't an issue?

9   A     I mean, any time he had to print something, there was

10  also issues, he would call me.  So yes, if it was possible

11  that there was never an issue, you know, obviously I can't

12  testify what I don't know.

13  Q     Okay.  On your bills, there are a number of entries for

14  "fixed server"?

15  A     Right.

16  Q     What was your task when you are you were figuring the

17  server?

18  A     Connection issue, usually had to do with the QuickBooks

19  file when it lost the connection.  That was mostly referring

20  to the domain server.  It really doesn't have anything to do

21  with the SQL server except plugging it in and getting on the

22  network.

23  Q     When you responded to the request with respect to

24  Ms. Ezell's e-mails?

25  A     Right.

1   Q    Did her program, her computer already have that program?

2   A    No, it didn't.  I installed it.

3   Q    So had you to install something on it?

4   A    Right.

5   Q    And what was the mechanism by which you installed it?

6   A    You go to the website and you download the program.

7   Q    Now, you testified that if you interfered with the

8   database, that then you wouldn't be open able to open the

9   database again?

10  A    I testified that that's my understanding, you know, on

11  the back-end basis.

12  Q    Okay.  So if, but if someone gave you a password after

13  someone had done something --

14  A    Not a password issue.  You have to be really an expert on

15  how the sequence was working the database.  It has nothing to

16  do with a password.

17  Q    I understand if you suddenly got access to that database

18  by someone giving you a password, but it had become corrupted

19  in some way, then you wouldn't be able to utilize --

20  A    The front end wouldn't work.  It wouldn't work.

21  Q    What type of communications did you have with

22  Mr. Rogosnitzky?

23  A    Mostly phone.

24  Q    Did you have any e-mails with him?

25  A    I believe I turned them over to you in the batch that I

1   had with him.

2   Q    What e-mails did you use for your work?

3   A    Mostly "Brooklyn bean," but if people initiated with my

4   regular, my private e-mail, then I used that.

5   Q    And would we find Two Rivers information on that?

6   A    Except for mostly just questions asking me to come and do

7   something.

8   Q    And what e-mail would you use to deal with the other

9   companies?

10  A    I generally used by personal e-mail.

11  Q    Personal e-mail?  Now, when you would go to the different

12  companies and was that because you were called for, like, a

13  service call?

14  A    I would be called to fix something in particular, yeah.

15  Q    Okay.  So, and was it your practice to come in, fix the

16  computer and then leave?

17  A    Also talk to somebody, I mean, but --

18  Q    But you wouldn't have had occasion to review the programs

19  on the computer, would you?

20  A    I don't know what you mean by that.

21  Q    Well, you are coming to a fix a particular problem?

22  A    Right.

23  Q    You are not there to study the computer; is that correct?

24  A    Okay.

25          MR. FELDMAN:  Your Honor, objection.  I think this

1   is far beyond what the cross was, the whole area.

2           MR. NELKIN:  Well, he testified that when he learned

3   about what was on the computers by his coming into work on the

4   computers.

5   A    Well --

6           THE COURT:  This is beyond the course.  Move on.

7           MR. NELKIN:  Your Honor, if I could have two minutes

8   to review my notes, then we will be done.

9           THE COURT:  And you will be done in less than that,

10  I'm sure.

11          (Brief pause.)

12  BY MR. NELKIN:

13  Q    You testified that there was an attempt to completely

14  replicate the Launch system; is that correct?

15  A    Mirror it, mirror it, yes.

16  Q    I'm asking about the status now.

17  A    Well, it's in the cloud, so you probably have a mirror.

18  Q    Do you know if he has mirroring or he doesn't have

19  mirroring?

20  A    I assume that's how he runs it.  The software has a

21  service, speak to him about his, referring to your service.

22  Q    And so that mirroring, you mean it's actually in two

23  locations, one in the mirror location?

24  A    Well, if physically, it's two copies that are mirroring

25  each other.  Actual locations could be two different places be

1   could be the same place.

2   Q    And have you accessed the system to figure out if it's

3   working or not or if it's the same or not?

4   A    No, if it's mirroring, it would have to be the same.

5   Q    Could it have been altered between the time it was

6   transferred and now in any way, shape or form?

7   A    What do you mean by "altered"?

8   Q    Could someone have done anything to the system to the

9   data on the system?

10  A    Again, you are asking me to talk about altering back-end

11  SQL database.  It's the same question again.

12  Q    When you say "back-end SQL database," I thought SQL

13  something is that's actually installed like on a type of

14  physical --

15  A    It was a plan, an engine that runs a SQL database.

16          THE COURT:  I think he's saying he doesn't know.

17          MR. NELKIN:  Okay, that's fair.

18          THE COURT:  Move on.  I think nothing further,

19  correct?

20          MR. NELKIN:  Just one.

21          THE COURT:  Last question.

22  Q    Did you do anything to observe whether or not, to

23  determine whether or not people had put flash drives into any

24  of these computers?

25  A    Again, I was there two weeks as I testified.  So I didn't

1    see it when I was there.

2              THE COURT:  You didn't do anything to check that,

3    correct?

4              THE WITNESS:  I wouldn't even know how to check it.

5              THE COURT:  Okay, you wouldn't know how to check it.

6    Okay, thank you.  You are excused.

7              THE WITNESS:  Thank you.

8              THE COURT:  Call your next witness, please.

9              MR. NELKIN:  I call Michael Devine.

10             THE COURT:  Raise your right hand, please.

11             (Witness sworn.)

12   **M I C H A E L   D E V I N E**, called as a witness, having been

13   first duly sworn, was examined and testified as follows:

14             THE COURT:  Have a seat, please.

15   DIRECT EXAMINATION

16   BY MR. NELKIN:

17   Q    Mr. Devine, can you please state your full name.

18   A    Michael Devine.

19   Q    And where do you live?

20   A    77 Puritan Avenue, Yonkers, New York.

21   Q    Okay.  Mr. Devine, what is your profession?

22   A    I'm a CPA.

23   Q    Okay.  And do you do that through -- on your own or do

24   you have a company?

25   A    It's a company.

1   Q     And is it incorporated?

2   A     No.

3   Q     Okay.  Does it have any type of malpractice insurance?

4   A     No.

5   Q     Okay.  Now, can you tell me which companies -- well,

6   first off, were you the accountant for Two Rivers?

7   A     Yes.

8   Q     And for how many years were you the accountant?

9   A     2012 through the end of '15.

10  Q     Okay.  And did you start becoming the accountant at the

11  time that Two Rivers was formed?

12  A     Yes.

13  Q     Did Two Rivers ever have an accountant before you?

14  A     Not that I am aware of.

15  Q     And what were your tasks for Two Rivers?

16  A     Office would prepare payroll tax returns, probably

17  year-end income tax returns.  If there was any questions, I

18  would consult with them, any general questions, prepare the

19  sale tax returns.  At the beginning, we did the accounting,

20  preparing the books and records.  But then subsequently when

21  Vince Papa came on, he changed, he corrected all the filings

22  and went back and redid everything from the beginning.

23  Q     And how did you obtain the information that you needed

24  from Two Rivers that you needed to perform your work?

25  A     I received bank statements.  I received inventory

1    information, accounts receivable and accounts payable.

2    Q    And who did you receive those from?

3    A    I received it from many people.  I received it from

4    Mayer, Steven Schreiber, Mr. Friedman, Sonia.

5    Q    Did you ever receive anything from Sonia Ezell?

6    A    Regarding -- at what point, sir?

7    Q    At any point.

8    A    Yes.

9    Q    What did you receive from her?

10   A    I don't recall.

11   Q    And how did you receive this information?

12   A    I would have received the information through e-mail.

13   Q    From all of those people?

14   A    Sometimes.

15   Q    How else would you have received it?

16   A    Could have been mailed to me.

17   Q    Okay.  Do you recall any instance where anyone mailed you

18   anything?

19   A    Don't recall exactly, but I'm sure I received mail.

20   Q    Okay.  And if you had received mail, would you have

21   retained that mail?

22   A    Yes.

23   Q    Okay.  Where would you have retained it?

24   A    In the files.

25   Q    Okay.  Now, you've produced certain information, certain

1   documents to Two Rivers, haven't you?

2   A     Yes.

3   Q     Did you produce any mail?

4   A     I believe so.

5   Q     Okay.  Do you remember what you produced?

6   A     Not off the top of my head, no.

7   Q     Okay.  And how did you produce that to Two Rivers?

8   A     I provided hard copies in the file.

9   Q     Okay.  Who did you provide them to?

10  A     My attorney.

11  Q     And do you know who your attorney provided them to?

12  A     I assume to you.

13  Q     Okay.  I will represent to you that I only received a

14  flash drive from your attorney yesterday.  But other than

15  that, I haven't --

16  A     I produced all the records.

17         THE COURT:  No representations, please.  Just ask

18  questions.

19         MR. NELKIN:  Fine, okay.

20  A     I produced all the records that I believe I was asked to

21  produce to the best of my knowledge.

22  Q     Okay.  Did you -- what computer systems did you use to do

23  your work?

24  A     What type of would?

25  Q     Your Two Rivers work.

1  A    Specifically?  I'm not sure of the question.

2           THE COURT:  Well, I take it you have done work for

3  Two Rivers over the years?

4           THE WITNESS:  Yes.

5           THE COURT:  You have used computers?

6           THE WITNESS:  Yes.

7           THE COURT:  Answer the question, please.  What kinds

8  of computers?  It's not a difficult question, I don't think.

9  But if it is unclear --

10          THE WITNESS:  It's a Dell computer.

11          THE COURT:  I'm sorry?

12          THE WITNESS:  A Dell computer.

13          THE COURT:  Any others?

14          THE WITNESS:  That's it.

15          THE COURT:  Okay.  See, that's easy.  Just listen to

16 the question and answer it, we will have a very clear record.

17          THE WITNESS:  Okay.

18          THE COURT:  Go ahead.

19 BY MR. NELKIN:

20 Q    And on those computers, what type of computer programs

21 did you use.

22 A    Pro Series and CFS software.

23 Q    What is Pro Series?

24 A    It's a tax program that prepares personal income tax

25 returns.

1  Q     And does it maintain any sort of files?

2  A     Maintains the data that creates the tax return.

3  Q     Okay.  Did you produce any of that material?

4  A     Yes.

5  Q     Okay.  What are other -- what is the next program you

6  used?

7  A     CFS payroll, after-the-fact payroll software.

8  Q     Okay.  And what will does that do?

9  A     It produces the quarterly 941s, 940, W-2, W3s and State

10 of New Jersey unemployment insurance reports on an employee

11 basis.

12 Q     What about 1099s?

13 A     It can produce 1099s as well, yes.

14 Q     Okay.  And does it save files?

15 A     Yes.

16 Q     Okay.  And would every W-2 and 1099 that was produced be

17 saved in that system?

18 A     Yes.

19 Q     Okay.  Did you produce any W-2s and 1099s?

20 A     Yes.

21 Q     Okay.  And what other computer systems did you use?

22 A     I believe that, I don't think there was any other

23 computer systems I have, we have.

24 Q     What about Intuit payroll system?

25 A     I don't use Intuit payroll.

1  Q     Okay.  Could you turn to Exhibit 133.

2  A     Which book?

3            THE WITNESS:  This one?  (Indicating.)

4            THE COURT:  The one that has 133 in it.

5  Q     Do you remember, recall this e-mail chain?

6  A     Yes.

7  Q     Can you explain to me what this e-mail chain is.

8  A     I was asked to find a payroll service for the various

9  companies.  So I contacted Intuit to find a payroll service

10 that could be used to process the weekly payrolls.  When I

11 contacted Intuit, I have an account with them.  So I was the

12 lead person on the e-mail.  They -- I ordered the payroll

13 software and I gave it to Sylvia and Sonia in the Bronx and it

14 was used to process the weekly payrolls.

15 Q     And so you are saying that they used an Intuit payroll

16 system to do the --

17 A     Yeah, back sometime in '12, maybe early '13.  I'm not

18 really sure exactly when it was used.

19 Q     So, and now, if you can turn to the, I think it's the

20 fifth page, "I think it was ordered by Michael Devine and Emil

21 Friedman, provided to Michael Devine and Emil Friedman."

22       I just ask you what it meant by "being ordered by Emil

23 Friedman"?

24 A     I actually provided the facilitation of getting the

25 program for Mr. Friedman.

1    Q    Okay.  And when it says it was provided to you and to

2    Mr. Friedman, what is that?

3    A    I believe it was because I have an account with Intuit.

4    Q    Do you use this program for -- whether for Two Rivers or

5    for anyone else?

6    A    QuickBooks?

7    Q    No.

8    A    Or this particular program which we are referring to

9    here?

10   Q    This particular program.

11   A    No.

12   Q    What type of reports report does this generate?

13   A    It would create the calculation of the gross to net

14   salaries and calculate the taxes due for each employee.

15   Q    Okay.  And who would have that report and who would that

16   report be provided to?  Who would produce that report, first

17   off, for Two Rivers?

18   A    I imagine Sonia would.

19   Q    Okay.  And who would she provide it to?

20   A    She would send it to us every week.

21   Q    Okay.  So we would see some sort of Intuit payroll report

22   every week?

23   A    It was a weekly summary showing the list of the

24   employees, their gross salaries, their Social Security,

25   federal, state deductions.

1   Q     Okay.

2   A     And we used that to submit the weekly taxes.

3   Q     And who at your company would that have been provided to?

4   A     It would have been sent to me and/or my associate Sava

5   (ph).

6   Q     Okay.  And is Sava also an accountant?

7   A     Yes.

8   Q     And what is her full name?

9   A     Sava Mahmoud.  Let me spell it.  M-A-H-M-O-U-D.

10  Q     Now, what would you transmit back to Two Rivers, type of

11  reports?

12  A     What would I transmit back?  I would technically assemble

13  the reports on a quarterly basis and file the quarterly 941s

14  and the New Jersey unemployment insurance reports.

15  Q     Okay.  And would you also provide them with the W-2s and

16  the 1099s?

17  A     Yes.

18  Q     Okay.  If someone had been an independent contractor for

19  Two Rivers, would we expect to see a 1099 for them?

20  A     If the information was provided to me.

21  Q     Okay.  And now, can you tell me what your relationship is

22  with each of the defendants.  How long have you known

23  Mr. Friedman, for instance?

24  A     I believe probably 20 years.

25  Q     Twenty years?  And do you work for a number of his

1    companies?

2    A    Yes.

3    Q    Okay.  And what companies are those?

4    A    24 Hour Oil, Delivery, MB Fuel, E&I Investors, E&J

5    Funding, Office Coffee, 26 Flavors.

6    Q    Any others?

7    A    Can't think of anything else.

8    Q    In addition to the defendants, do you do work for any

9    other Friedman companies?

10   A    Not sure.  I don't have any other -- I'm not sure what

11   you are asking.

12   Q    Well, do you do -- are there any other company that is

13   you know about besides the ones in this case that --

14   A    That I provide services for?

15   Q    Yes.

16   A    No.

17   Q    Just to be clear, do you do work for -- you said you did

18   E&I Investors?

19   A    Yes.

20   Q    E&J Funding?

21   A    Yes.

22   Q    E&J Management?

23   A    No.

24   Q    E & Jeryg Management?

25   A    No.

1   Q      Okay.  24 Hour Oil?

2   A      Yes.

3   Q      MB Fuel Transport?

4   A      Yes.

5   Q      MB Fuel Transport I?

6   A      That's not Mr. Friedman's company.

7   Q      Okay.  Do you know whose company it is?

8   A      Longstar, Robert Chance.

9   Q      Okay.  Do you know if Mr. Friedman or any other defendant

10  is a partner in it?

11  A      He's not a partner in it.

12  Q      Okay.  Is he an investor in it?

13  A      No.

14  Q      Does he have any connection, Mr. Friedman have any

15  connection to it?

16  A      No.

17  Q      Does anyone, does anyone else have a -- any other

18  defendant have a connection to MB Fuel Transport I?

19  A      What exactly might be the connection?  Are they owners or

20  partners?

21  Q      Any business dealings that you know of?

22  A      There might be business dealings.

23  Q      But you are an ware of them?

24  A      I'm not sure what you are referring to.

25           THE COURT:  I don't think it's a tough question.

1   Any question connection that you are aware of between any of

2   the defendants and MB I?  I'm trying to save you some time.

3           THE WITNESS:  They might provide services for each

4   other.

5           THE COURT:  Just what you know, anything that you

6   know.

7           THE WITNESS:  They might provide services.

8           THE COURT:  They might?

9           THE WITNESS:  Yes.

10          THE COURT:  You know, I'm not trying to be

11  difficult.  I want to make sure you understand.  Might, of

12  course they might.  I could tell you that.  What do you know

13  about?

14          THE WITNESS:  Off the top of my head, I don't recall

15  at the moment exact details.

16          THE COURT:  What do you know about without having to

17  get to details?  What connections are you aware of?

18          THE WITNESS:  Well, the trucking company would

19  provide services for 24 Hour.  They would do the service for

20  them.  They would also do the trucking work.  That's the

21  relationship you are referring to, I guess.  That's what they

22  do.

23          THE COURT:  I don't know about Mr. Nelkin.  Since

24  you are having difficulty with the question, I'm trying to

25  make it as broad as possible and you can narrow it down.  Do

1    you do work for them, MB I?

2              THE WITNESS:  Yes.

3              THE COURT:  Okay, go ahead.

4    BY MR. NELKIN:

5    Q    Can you tell me who the employees of MB Fuel Transport

6    are?

7    A    Not off the top of my head.

8    Q    Where would we find the records of that?

9    A    I would have them in my office.

10   Q    Okay.  Do you know if Sylvia Ezell is an employee of MB

11   Fuel Transport I?

12   A    I don't recall.

13   Q    Okay.  Do you know who Sylvia Ezell works for, who she is

14   employed by?

15   A    I'm not sure at the moment; I don't recall.

16   Q    How long have you known Ms. Ezell?

17   A    Probably know her about 20 years as well.

18   Q    Okay.  So around -- and what company was she working for

19   when you first met her?

20   A    I don't remember.

21   Q    Okay.  Do you know who her -- what person employed her?

22   A    Most likely Larry Ahearn.

23   Q    Could it have been Richard Spence?

24   A    I don't believe so.

25   Q    Do you know Richard Spence?

1  A    I knew of him, yes.

2  Q    Did you ever do work for Richard Spence?

3  A    No.

4  Q    Did you ever do any work for any of Richard Spence's

5  companies?

6  A    No.

7  Q    How do you know Richard Spence?

8  A    He was an individual who was selling beer.  He had a beer

9  company and he would sell beer to various businesses,

10 storefronts, restaurant storefront, delis and grocery stores.

11 Q    And how would that have brought you into contact with

12 him?

13 A    Because at the time, Laurence Ahearn was in the beer

14 business.

15 Q    Were they in the beer business together?

16 A    No.

17       MR. SCHAFHAUSER:  Objection, Your Honor.  I'm not

18 sure how this relates to the purpose of --

19       THE COURT:  I will allow a brief amount of leeway to

20 connect it up.

21 Q    Do you do any work for Associated Fuel Corp.?

22 A    Yes.

23 Q    Okay.  Do you know who owns Associated Fuel Corp.?

24 A    Yes.

25 Q    Who?

 1   A    Laurence Ahearn.

 2   Q    What about Mr. Friedman?

 3   A    No.

 4   Q    Does he have any role in that company?

 5   A    No.

 6   Q    Does he have any relationship with that company?

 7   A    He's friends with Laurence Ahearn.

 8   Q    Do you know who the employees of Associated Fuel are?

 9   A    Not off the top of my head.

10   Q    Do you know if Mr. Friedman has an e-mail that references

11   Associated Fuel?

12   A    I don't know.

13   Q    What about Light Trucking Corp.?  Do you do any work for

14   them?

15   A    Yes.

16   Q    Okay.  Does Mr. Friedman have any ownership in that?

17   A    No.

18   Q    Okay.  Does he have any -- do any of the other defendants

19   have any ownership in that?

20   A    No, Laurence Ahearn owns it.

21   Q    What about Jack Ahearn?

22   A    Laurence and John, sorry, two of them own it together.

23   Q    And just to be clear on Associated Fuel, would that be

24   John, also?

25   A    No.

1   Q    So John's only in Light?

2   A    Yes.

3   Q    Okay.

4   A    It's out of business, by the way, at the moment.

5   Q    Light's out of business?

6   A    Yes.

7   Q    What about 165th Street Realty?  Do you do work for them?

8   A    Yes.

9   Q    And is Mr. Friedman an owner of that?

10  A    Yes.

11  Q    Okay.  And who are the other owners?

12  A    Jessica Ahearn and Josefina (ph) Ahearn.

13  Q    What about John or Laurence?

14  A    They aren't owners.

15  Q    What is the connection between the two Ahearns you just

16  mentioned and John and Laurence?

17  A    Which two Ahearns I mentioned?

18  Q    Josefina and --

19  A    That's their wives.

20  Q    Which woman goes with which?

21  A    Josefina is the wife of Laurence Ahearn and Jessica

22  Ahearn is the wife of John Ahearn.

23  Q    What about Park Avenue Associates?  Do you do any

24  business for them?

25  A    It's been out of business for over 20 years.

1  Q    For over 20 years?  Can you explain why --

2  A    Let me correct; maybe 18 or 17 years.

3  Q    Okay.  Would it be in a position to provide -- do work

4  for Two Rivers?

5  A    Could you go back to the question of Park Avenue

6  Associates?

7  Q    You said it was out of business.

8  A    Park Avenue ASSOCIATES LLC is out of business.

9  Q    Okay.  Are there any other Park Avenue entities you are

10 aware of?

11 A    MB Fuel Transport had a d/b/a with Park Avenue

12 Associates, "doing business as."

13 Q    So Park Avenue Associates is also MB?

14 A    It's a trading name, doing business as.

15 Q    And which MB Fuel?

16 A    MB Fuel Transport I, MB Fuel Transport.

17 Q    Transport?  Okay.  What about New York Best Coffee?  Do

18 you do business for them?

19 A    Yes.

20 Q    Okay.  Now, who were the owners of Park Avenue Associates

21 LLC?

22 A    It's been a long time ago, 17, 18 years.  It's out of

23 business.

24 Q    Okay.  Do you do business for New York Best Coffee, Inc.?

25 A    Yes.

1   Q      Okay.  And does Mr. Friedman own that?

2   A      Yes.

3   Q      Does anyone else own that?

4   A      Not that I'm aware of.

5   Q      Okay.  And when I asked you if Mr. Friedman owns it, I'm

6   asking if he owns it directly.  Does he own any of these

7   companies indirectly?

8   A      No, not that I'm aware of.

9   Q      Okay.  How long have you known John Ahearn?

10  A      Over 20 years, 30 years.

11  Q      Okay.  Do you do business with him?

12  A      I filed his taxes, yes.

13  Q      Have you ever engaged in any business transactions with

14  him?

15  A      I'm his accountant.  When you say -- I'm not sure what

16  you mean by "business transactions."

17  Q      Have you ever done any real estate transactions involving

18  him?

19  A      No.

20  Q      Have you ever done any transactions, real estate

21  transactions with anyone named Ahearn?

22  A      Yes.

23  Q      Please describe those transactions.

24  A      I have purchased an interest in a house that we own

25  together.

1   Q    Which house?

2   A    I have a house in Connecticut, second home.

3   Q    What is the address?

4   A    Ten Old Bogus Road in Fairfield.  I purchased -- I

5   purchased out their ownership.

6   Q    So you own it completely yourself?

7   A    Yes.

8   Q    Okay.  And did you ever own it as tenants in common?

9   A    Yes.

10  Q    For how long?

11           MR. GRANTZ:  Judge, I am going to object to the

12  relevancy of this.

13           THE COURT:  What is the relevance?  You are trying

14  to establish close ties.  Beyond that, anything else?

15           MR. NELKIN:  I'm just trying to figure out his

16  relationship to the different people, but I will move on.

17           THE COURT:  I think so, yeah.

18           MR. NELKIN:  Okay.

19  Q    Have you ever done any transactions with Mr. Salcedo?

20  A    Yes.

21  Q    What?

22  A    Owned a house many years ago.  I can't recall how long

23  ago, with, I guess with the -- right, I did, I did own a house

24  with John or Laurence; I forgot.  It's got to be 25, 30 years

25  ago.  I sold a house to them, to George, yes.

*M. Devine - Direct/Mr. Nelkin*                                    888

1   Q    You are saying you sold it 25 years ago?

2   A    I don't remember exactly when, exact date.  It was along

3   time ago.

4   Q    Okay.

5   A    We owned it one third each and George, George purchased

6   it from us.

7   Q    Have you -- do you have any relationship with Ms. Ezell

8   besides interacting her with business?

9   A    No.

10  Q    Okay.  What about Ms. Rivera?

11  A    No.

12  Q    Okay.  What about Mr. Hersko?

13  A    No.

14  Q    Okay.  Do you do business for any other coffee companies

15  besides Two Rivers?

16  A    Yes.  I said that before.

17  Q    Okay.  Which ones?

18  A    Office Coffee, 26 Flavors.

19  Q    Okay.  And does Mr. Friedman own those?

20  A    Yes.

21  Q    Does he own them directly or indirectly?

22  A    Indirectly.

23  Q    Okay.  Who does he own them through?

24  A    E&I Investors.

25  Q    Has E&I Investors ever owned any part of Two Rivers?

1   A    I believe in the beginning when it was first started I

2   had listed it as an owner on the tax return.  I had thought

3   that was going to be the entire owner of the shares and it

4   subsequently, it was put back to Mr. Friedman's name.

5   Q    Okay.  Do you know what tax return was filed?

6   A    For Two Rivers?

7   Q    Yeah.  Did it list E&I or not?

8   A    I guess it did.

9   Q    And was that corrected?

10  A    Yes, it was.

11  Q    Okay.  And where would we find the final versions of

12  these tax returns?

13  A    I have produced them.

14  Q    Did you produce the signed versions?

15  A    I don't have any signed versions.

16  Q    Okay.  Who did you provide the -- who filed those tax

17  returns?

18  A    When you say "who filed them," they were submitted by me.

19  I prepared them.

20  Q    Who submitted them to the government?

21  A    I submitted to the government.  It was filed

22  electronically.

23  Q    And what records happens when you produce it

24  electronically, when you file electronically?

25  A    You get a receipt in the IRS that it's been received.

1    Q    And doesn't there have to be some sort of signed version?

2    A    No.  There's no signed tax return.

3    Q    Well, who certifies for the company that it's truthful

4    and accurate?

5    A    There's an e-authorization form that's submitted.  That's

6    it.

7    Q    And who signs that?

8    A    I believe Mr. Friedman signed it.

9    Q    And do you have copies of those?

10   A    I would imagine I have them, yes.

11   Q    Okay.  Did you produce those?

12   A    I don't recall.

13   Q    Okay.  Would you think that that was a type of books and

14   records?

15   A    No, I wouldn't think it was books and records.

16   Q    You would think that the signed authorization to file a

17   company's tax return are not the books --

18   A    It's not my authorization.  It was for the authorization

19   to submit with the return.

20   Q    What form is that?

21   A    I believe it's 8879.

22   Q    Doesn't the 879 have to be submitted to the government?

23   A    No, absolutely not.

24   Q    Okay.  So that's -- your testimony is that's just a form

25   that you keep?

1  A   Yes.

2  Q   And that's not a book and records of Two Rivers?

3  A   I don't believe so.

4      THE COURT:  All right.  We will have a further

5 conversation about that later.  Go on.

6      MR. NELKIN:  Okay, I will move on, Your Honor.

7  Q   Now, it's my understanding you recently produced a flash

8 drive to Two Rivers or to your lawyer who produced it.  Can

9 you tell me what was on that flash drive?

10  A   The weekly payrolls that were sent to me from Two Rivers

11 from Sonia from 2000, I guess, '12 through the end of '15.

12  Q   And did you produce copies of -- how they were submitted

13 to you, the e-mails?

14  A   Yes.

15  Q   Okay.  And how did you gather that up and prepare it?

16  A   I searched my assistant's computer.

17  Q   Had you done that before this -- well, when did you

18 search it?

19  A   I didn't do it before, but I first produced the records

20 because I had thought there was no need to give it to them

21 since they already had the records.  Those records were

22 already provided to Mr. Vince Papa, so I didn't think there

23 was a need to give them to him again.  In fact, I kept seeing

24 that there was -- a letter stating that I wasn't providing all

25 the books and records.  I couldn't understand what they were

1    trying to looking for.

2              So the only thing I could think about would be these

3    weekly payrolls, but you already had the information.

4    Mr. Papa had that in order to produce the financial records at

5    Two Rivers.  So I then asked Sava to search her computer,

6    print out every single weekly payroll that she could find and

7    I put them on a disc and I provided it to you.

8    Q    What systems of Two Rivers did you have access to?

9    A    I had access to one system, but I never used or activated

10   it.

11   Q    And how did you have access to it, what computers?

12   A    I was given a user name and a log-in.

13   Q    Okay.  Do you remember what those were?

14   A    No, I don't remember at all.  I don't even know if I

15   accessed it once or twice, maybe.  I never utilized it.

16   Q    Okay.  And do you know what functionality it had for you?

17   A    No.  I didn't utilize it.  I relied on Mr. Vincent Papa's

18   records since he was the comptroller.

19   Q    Do you know why it was given to you?

20   A    I believe it was given to me so I could use it to review

21   the activity, but I never did.

22   Q    Do you remember when Vince Papa joined the company?

23   A    Sometime in '13, maybe June, July, I'm not sure.

24   Q    What did you do before that period of time to get

25   information?

1  A    I would get the -- I think I answered that question

2  previously.

3        THE COURT:  Why don't you answer it again and leave

4  it to me to determine if you should answer a question, please.

5        THE WITNESS:  Okay.

6  A    I received a monthly bank statements.  I was receiving

7  the accounts receivable data, accounts payable data and

8  information.

9  Q    And would you still have retained that information?

10 A    I believe so.

11 Q    So you would have Two Rivers's bank statements?

12 A    Yes.

13 Q    Did you produce those?

14 A    Yes.

15 Q    You produced Two Rivers's bank statements?

16 A    Yes.

17 Q    When did you do that?

18 A    I think it was back in December or January or February,

19 whenever I was requested to turn over all the books and

20 records.  And I did that to the best of my ability.

21 Q    And are you testifying that each of the categories that

22 you just mentioned you turned over to Two Rivers?

23 A    I produced them.

24 Q    And what systems would you have accessed before Vince

25 Papa came on at Two Rivers?

*M. Devine - Direct/Mr. Nelkin*                                       894

1    A    I didn't access any systems.

2    Q    Okay.  Do you know if Mr. Friedman had any payroll

3    capability on his computer?

4    A    I don't know.

5    Q    Okay.  What type of files do you maintain at your office

6    for Two Rivers?

7    A    I have hard copies.

8    Q    Okay.  How extensive are they?

9    A    There's copies of the tax returns, copies of the 941s,

10   the W-2s, W3s, general ledgers.

11   Q    Did you produce the general ledgers?

12   A    No.

13   Q    Why not?

14   A    You asked me to produce them, to give --

15   Q    No, did you?

16   A    As part of turned over the records?

17   Q    Yes.

18   A    Yes.

19   Q    Okay.  And do you know the volume of material that you

20   turned over?

21   A    It was quite extensive.

22   Q    One box, two boxes?

23   A    It was a huge box, about this high, full of records

24   (indicating), and then subsequently another flash drive with a

25   substantial amount of records.

1  Q    All right.  And were you ever given access to QuickBooks?

2  A    Which QuickBooks?

3  Q    Any QuickBooks related to Two Rivers.

4  A    That we discussed earlier that they audited for the

5  payroll package.  I didn't have access to the QuickBooks

6  Enterprise if that's what you are asking me.

7  Q    What would you estimate the cost of turning over all the

8  documents related to Two Rivers would be?

9          MR. GRANTZ:  Objection.

10          THE COURT:  Sustained.

11  Q    If your lawyer referenced -- represented to the Court

12  that it cost hundreds of thousands of dollars to produce all

13  Two Rivers's material, do you have any understanding as to how

14  those numbers would have been calculated?

15          MR. SCHAFHAUSER:  Objection.

16          MR. GRANTZ:  Objection.

17          THE COURT:  Overruled.

18  A    I don't know what it would cost.  I have no idea.

19  Q    Okay.  But it's your belief that -- well, what other

20  documents do you have besides that relate to Two Rivers

21  besides the ones that you turned over?

22  A    I believe I have turned over all records, to the best of

23  my knowledge, that I have.

24  Q    Do you have any other information or -- any other

25  documents that relate to Two Rivers besides the ones that you

1    turned over?

2    A     Not that I'm aware of.

3    Q     What about the Form 8879s?

4    A     That I should have those.

5    Q     Okay.  Besides those, and how many of those are there?

6    A     '12, '13, '14, I guess three.

7    Q     Okay.  And how many pages are they?

8    A     One page.

9    Q     Okay.  So except for those three pages of documents, is

10   it your testimony that you've turned over all material related

11   to Two Rivers?

12   A     To the best of my knowledge, I produced everything.  I

13   have no reason to withhold any documents.

14   Q     Okay.  Did you do -- if, as part of your accounting work,

15   would you have to reconcile expenses for a company?

16   A     No.

17   Q     Would you have to review the expenses for a company?

18   A     No.

19   Q     Would you have to review income from a company?

20   A     No.

21   Q     So how -- well, what type of -- describe the accounting

22   work you did besides tax accounting work for Two Rivers.

23   A     Prepared the quarterly payroll tax returns.

24   Q     Did you do -- well, to prepare an income tax statement,

25   don't you have to know what the company's expenses are?

1    A    Yes.

2    Q    And don't you have to know what their income is?

3    A    Yes.  I obtain that information from the bank statements

4    that I gathered and the accounts receivable information which

5    I just testified previously to.  It's part of the records.

6    Q    What if they were paid in cash for something?

7    A    I would have no idea.

8    Q    And what if they paid for something in cash?

9    A    I don't know.

10   Q    Well, to make sure that, I mean, the tax return was

11   accurate, wouldn't you have to investigate in some way the

12   documentation that was being provided to you?

13   A    I'm not providing an audit or a review.  I'm providing

14   the information that's provided to me.

15   Q    What information was provided to you by Two Rivers to

16   prepare the tax returns?  I know you said bank statements;

17   what else?

18   A    I received the general ledger and I received the trial

19   balance.

20   Q    And what information is on a general ledger?

21   A    General ledger has all the activity, transactions for

22   income, expenses.

23   Q    Okay.  And so that would represent a record of what the

24   company had done, its income and expenses, correct?

25   A    Yes.

*M. Devine - Direct/Mr. Nelkin*                                   898

1   Q    Okay.  What's on a trial balance?

2   A    It's the same information.

3   Q    Okay.  Now, do you know if Two Rivers did business with

4   any of these other defendants?

5   A    I believe they did, yes.

6   Q    Okay.  Now, would the business that they did be reflected

7   on those companies's trial balances and general ledgers?

8   A    They should be.

9   Q    Okay.  And if you did the work for those companies, would

10  you have possession of those general ledgers and trial

11  balances?

12  A    I should.

13  Q    Okay.  Now, do you know if the payroll taxes were

14  properly calculated for Two Rivers?

15  A    I believe they were.

16  Q    Okay.  Do you know if taxes were always paid from the

17  start?

18  A    I didn't receive any notices that they weren't.

19  Q    Did you ever have any discussions with anyone as to

20  whether taxes had or hadn't been paid?

21  A    I don't recall.

22  Q    And did you transmit the -- did you make the payments for

23  the tax payments for Two Rivers?

24  A    Our office did, yes.

25  Q    Okay.  Describe that process.

1    A    You go onto the EFT system and you submit federal taxes,

2    and you go onto the State of New Jersey and you submit the

3    state withholding taxes.  They are withheld every week.

4    Q    And how are those -- how was that payment made?

5    A    It's made electronically.

6    Q    Who made it?

7    A    We made it from my office.

8    Q    Whose funds were used to make it?

9    A    Two Rivers coffee.

10   Q    Did they provide you with a check or did they provide you

11   with -- what was the mechanism by which their funds were given

12   to the government?

13   A    Electronically.  It was an electronic withdrawal from the

14   bank account.

15   Q    Okay.  And who made that?

16   A    Our office made it.

17   Q    Okay.  So you had access to the Two Rivers bank account?

18   A    For submitting payroll taxes.

19   Q    Okay.  What records relate to that authorization?

20   A    I was authorized by Mr. Friedman to submit the payroll

21   taxes.

22   Q    I guess my question is, what type of banking

23   documentation --

24   A    There is no banking documentation.

25   Q    So just again, walk me through the process by which you,

1  who are not -- well, are you a signer on any Two Rivers

2  account?

3  A     No.

4  Q     Are you a signer on any defendant account?

5  A     No.

6  Q     What mechanism would allow you to have funds removed

7  electronically from Two Rivers's account and transmitted to

8  someone else and how would you do that?

9  A     You establish an account with the State of New Jersey for

10  the state withholding taxes.  You set up a PIN, a password.

11        THE COURT:  I think he's asking you how get the

12  money out of the Two Rivers account.  How do you do it?

13        THE WITNESS:  You log onto the State of New Jersey

14  the EFT which is the federal website.  You put in the federal

15  ID number, your name, the password and then you tell the

16  system how much money to withdraw from the account each week

17  based upon the information that was provided to me by Sonia

18  who did the weekly payroll.

19        THE COURT:  And you provided the routing number and

20  the account number?

21        THE WITNESS:  That's already in the system once you

22  set it up.  It gets established once you set it up.  And every

23  week I would get the report that tells how much tax was

24  withhold for the employees and we transmit it every week.

25        THE COURT:  So you are not taking money out

1   yourself?  You are authorizing New Jersey to take money out?

2           THE WITNESS:  Oh, yes, correct.

3           THE COURT:  Okay, go on.

4   BY MR. NELKIN:

5   Q    And what records relate to that account being set up?

6   A    It's a -- let's see.  It's, you have to establish an

7   account with the EFTPS system.  It's done online.

8   Q    Did you save any hard copies of that?

9   A    I don't think so, no.

10  Q    So did you save anything that recorded your password or

11  things of that nature?

12  A    Yes.

13  Q    And where would we find that?

14  A    That was all provided to Mr. Vincent Papa.

15  Q    Okay.  When was it provided?

16  A    When I resigned, I believe in the late 2015.

17  Q    But you didn't maintain any records of setting up the

18  accounts with the State of New Jersey or the government?

19  A    I don't recall.  It was usually done online.  It would

20  just be processed and that was it.

21  Q    Do you know where the State of New Jersey requires

22  payroll records to typically be kept?

23  A    In the place in the office, place of business.

24  Q    Okay.  Were Two Rivers's records kept in their place of

25  business?

1   A     Some of them were.

2   Q     Some of them were?  Which ones were?

3   A     I would imagine the timecards were.  It's the records of

4   employees working their hours.

5   Q     Where else might they have been kept?

6   A     I had some in my office.  I had a permit that allowed

7   that.  The State of New Jersey requires a permit to keep

8   records out of the State of New Jersey.

9   Q     Can you turn to Exhibit 76, I believe.  I'm sorry.

10            THE COURT:  Which one?

11            MR. NELKIN:  I apologize.

12  Q     While I'm looking for that number, let me just ask you a

13  question.  Why did you have that permit?

14  A     Because I had the 941s and the New Jersey reports and the

15  weekly payroll reports in my office.  I thought that was the

16  requirements.

17  Q     Did you have to do something special to get the permit?

18  A     You have to fill out an application.

19  Q     Okay.  And did you keep any records of that application?

20  A     I believe I did.

21  Q     Okay.  And where would we find that?

22  A     He believe it was produced.

23  Q     The application and --

24  A     I believe so.

25  Q     Okay.  Now, if -- why did you need to -- is it -- well,

*M. Devine - Direct/Mr. Nelkin*                                        903

1   is it your testimony that you felt you need a permit because

2   you were retaining a copy of those records?

3   A    Yes, that was my understanding.

4   Q    Okay, turn to Exhibit 61, please.  Is that the permit you

5   are talking about?

6   A    Yes.

7   Q    Okay.  Who instructed you to get that permit?

8   A    I don't recall.

9   Q    You don't recall?  Was it Mr. Friedman?

10  A    I don't remember.

11  Q    Was it Mr. Schreiber?

12  A    I don't remember.

13  Q    Okay.  You don't recall anyone who instructed you?  And

14  do you know what the requirements are for maintaining

15  New Jersey records?

16  A    Specifically, no.

17  Q    Okay.  So even though you were the repository for the

18  records, you didn't determine what your requirements were with

19  respect to the records?

20  A    I assumed that because I was keeping the weekly payroll

21  reports and the quarterly 941s and New Jersey payroll reports,

22  I was in need to obtain this permit.

23  Q    Okay.  Did anyone assist you in obtaining the permit?

24            MR. GRANTZ:  Objection.

25            THE COURT:  Overruled.

1   A    I would imagine one of the individuals in my office.

2   Q    How many individuals are there in your office?

3   A    There's three other employees.

4   Q    Besides Sava you mentioned, who are the others?

5   A    Linda Rothenberg, Lauretta Gitano (ph).

6   Q    And what do those individuals do?

7   A    They do many tasks.

8   Q    Do they do any tasks with respect to Two Rivers?

9   A    They might have.

10  Q    What are their job titles?

11  A    One is an accountant and one is administrative.

12  Q    The first one is an accountant?

13  A    Yes.

14  Q    Okay.  And by "administrative," she handles just other

15  tasks in the office?

16  A    Yes.

17  Q    Okay.  Now, do you know if they ever communicated Two

18  Rivers?

19  A    Yes.

20  Q    How would they have communicated?

21  A    Telephone, e-mails.

22  Q    Okay.  Did you review their e-mails to see if there was

23  any Two Rivers material in it?

24  A    Yes.

25  Q    You did?  When did you do that?

1    A    I did it the first time, the first request, and I just

2    subsequently I did it again last night to review all the

3    e-mails that referred to the account to see if I was missing

4    anything.  I believe I turned them all over, but I went

5    through it once again and I put it on a flash drive in case I

6    was missing any.  And I provided that this morning.

7    Q    You provided it this morning?

8    A    Just turned it over.  I went there, I think, I believe

9    all the records I gave previously I produced were there, but

10   just to be sure, I did it again.

11   Q    And do you know, can you just describe what type of

12   material you produced to your attorney today.

13   A    E-mails.

14   Q    And e-mails from who?

15   A    E-mails from Two Rivers, bank statements, bank recs,

16   payroll, payrolls.

17   Q    Just to be clear, when I asked you before if you had

18   produced certain materials like bank statements, had you

19   produced those before today?

20   A    Yes.

21   Q    Okay.  Was there any type of material that we will find

22   on this disc, any category of material that you had not

23   produced before?

24   A    I'm not sure.

25   Q    Are they Bates stamped, the documents you provided today?

*M. Devine - Direct/Mr. Nelkin*                                    906

1          THE COURT:  Why don't you review the documents over

2    the lunch break, which we are about to take.

3          MR. NELKIN:  Okay.

4    Q    If we can just take a look at this permit.  It says to

5    me, "And location where payroll records will be maintained

6    outside of New Jersey."  It is your testimony you didn't have

7    the complete records; that's correct?

8    A    Correct.

9    Q    Okay.  Do you know if you had any 2012 payroll records?

10   A    Yes.

11   Q    Okay.  What about -- and who would have had the timecards

12   and log-in sheets?

13   A    I don't know.

14         MR. NELKIN:  Your Honor, if you want to go to lunch?

15         THE COURT:  Why don't we take our break now and

16   reconvene at 2:00.

17         (Recess taken.)

18         (Continued on the next page.)

19

20

21

22

23

24

25

*Colloquy*                                                              **907**

1              A F T E R N O O N   S E S S I O N

2              THE COURT:  Mr. Devine, why won't don't you come

3    up.

4              MR. NELKIN:  Your Honor before you do that, can I

5    raise a matter with you?

6              THE COURT:  What is it?

7              MR. NELKIN:  There were several developments during

8    lunch that I think merit the Court's attention.  The first one

9    has to do with the boxes that are over there.  We were given

10   them at lunch.  We asked about what the boxes were yesterday.

11   But it turns out those were the documents that were delivered

12   to Two Rivers on Friday.

13             THE COURT:  I'm sorry, I don't know what you're

14   talking about.

15             MR. NELKIN:  A letter was sent to this court asking

16   that this hearing be cancelled.

17             THE COURT:  Yes.

18             MR. NELKIN:  Because there were documents that were

19   delivered.

20             THE COURT:  Okay.

21             MR. NELKIN:  And in Defendant's Exhibit 31 you have

22   that letter where it represents --

23             THE COURT:  What is it that you want?

24             MR. NELKIN:  Those documents were represented as not

25   being books and records.

1          THE COURT:  Okay.

2          MR. NELKIN:  In fact, what they are we discovered

3   last night with the copy set that we had, was that they were

4   the documents or at least thousands of pages of documents that

5   were delivered as the books and records of Two Rivers.

6          THE COURT:  Can you tell me what it is you're asking

7   for.

8          MR. NELKIN:  I'm assuming sanctions because

9   behavioral what they did was they did simply.

10          THE COURT:  We'll take up sanctions after the

11   witness is on the stand.

12          MR. NELKIN:  Okay.

13   DIRECT EXAMINATION (Cont'd.)

14   BY MR. NELKIN:

15   Q    Mr. Devine, you sent over a flash drive containing

16   payroll records?

17   A    Yes.

18   Q    Okay.  I have that cover letter here and it says that on

19   the cover it says that they're from 8/3/2013 to 12/24/2014 is

20   the first thing, and that there were paper copies from 12/31

21   to 12/4/2015?

22   A    Okay.

23   Q    Now, I think that might have been a typo because when I

24   turn to the attachment it looks like they start on 8/3/2012?

25   A    Okay.

*M. Devine - Direct/Mr. Nelkin*                                    **909**

1    Q    But my question is, where are the documents that precede

2    that date in either August of 2012 or August of 2013.  Those

3    payroll records?

4    A    I'm not sure.  That's the first payroll record that I

5    could find, August 12, 2012.

6    Q    But you were the accountant from the inception of the

7    company you testified?

8    A    Yes.

9    Q    And you were handling payroll?

10   A    Yes.

11   Q    And, in fact, you wrote to the State of New Jersey to say

12   you would have the payroll records at your office?

13   A    Yes.

14   Q    And I asked you if taxes were paid, and you said yes.

15   And so, I'm just wondering where all the payroll records are

16   from at least an eight-month period, if not a year and

17   eight-month period?

18   A    I don't know when the payroll first started.

19   Q    You're saying the company was in business over eight

20   months without payroll.

21            MR. FINKEL:  Objection.

22            THE COURT:  Overruled.

23   A    I'm not sure when the payroll occurred.

24            THE COURT:  When did the company start in business?

25            THE WITNESS: I don't remember the exact date.

1    THE COURT:  I'm not asking you the exact date, sir.
2  To the best of your recollection, when do you know?
3    THE WITNESS:  I thought it was some time in August
4  or September of '12.
5    THE COURT:  Okay.
6    THE WITNESS:  That's what I thought is when it
7  started that's interest memory.
8  Q    Could it have been December of 2011?
9  A    I don't recall when it actually started.  I thought it
10  was in 2012 it started.  2011, I don't know.
11  Q    And you have tax returns for all the years that you
12  prepared?
13  A    Yes.
14  Q    And were those have had to address the payroll for that
15  period?
16  A    Yes.
17  Q    Okay.  Thank you.
18    Now, Mr. Devine, during the break, your attorney
19  handed me this box and said that these were all the records
20  that had been produced to Two Rivers by you with the exception
21  of ones that are either on two flash drives.  But we know
22  what's on the flash drives they were the payroll records and
23  e-mails that you found.
24    THE COURT:  For purposes of clarity.  When you're
25  referring to this box, is it the same set of three boxes that

1    I have one bearing a Defendant's Exhibit 36 sticker?

2              MR. NELKIN:  It looks like it's Defendant's

3    Exhibit 36.

4              THE COURT:  Okay.  Are all three boxes Exhibit 36?

5              MR. SCHAFHAUSER:  I believe Defendant's Exhibit 36

6    is the one box that Mr. Feldman handed up.  And Defendant's

7    Exhibit 42-A and 42-B are --

8              THE COURT:  Oh, I see the stickers here, yes.

9              MR. FELDMAN:  I provided those to Mr. Nelkin.  Those

10   are not all.  There was a production directly to Mr. Nelkin.

11             MR. NELKIN:  The flash drive.

12             MR. FELDMAN:  As well as Bates Stamp number as well.

13             THE COURT:  I would like to know what box he's

14   referring to.  We'll take up later the boxes you're referring

15   to in your question is Defendant's Exhibit 36.

16             MR. NELKIN:  Yes.

17             THE COURT:  Go ahead.

18             MR. NELKIN:  I'm unaware of any Bates Stamp.

19             THE COURT:  Go ahead, please.

20   EXAMINATION BY

21   MR. NELKIN:

22   (Continuing.)

23   Q    So, during lunch, I did my best to look through this box

24   to see what types of documents it is.  I have a number of

25   questions about it.

1              One is, I didn't see any W-2 or 1099 for

2    Mr. Friedman.  Are there any 1099s or W-2s for Mr. Friedman?

3    A    I don't think.

4    Q    Can you tell me why that is?

5    A    It was on the K-1.

6    Q    I'm not understanding that.  Why would that not

7    require -- why would he not require a 1099?

8    A    I reported it on his K-1 as guaranteed payment to him.

9    Q    A guaranteed payment to him.  And by, "Guaranteed

10   payment," what do you mean?

11   A    It was income he took from the company.  That's how it

12   was reported.

13   Q    Okay.  What amount did you report?

14   A    I don't remember off the top of my head.

15   Q    Are you Mr. Friedman's personal accountant?

16   A    Yes.

17   Q    Did you prepare tax returns for him as well?

18   A    Yes.

19   Q    Do you know what amounts that were related to Two Rivers

20   that you reported for him?

21   A    Whatever was on those K-1s.

22   Q    What about any interest you received from Two Rivers?

23   A    That was all reported as well.

24   Q    Okay.  And would that be on the K-1 in here?

25   A    No, the interest would have been recorded as an expense

*M. Devine - Direct/Mr. Nelkin*                913

1    on Two Rivers.

2              THE COURT:  It seems to me quite inefficient to

3    question this witness about what would or wouldn't be in a box

4    that you haven't had time to thoroughly examine yet.

5              MR. NELKIN:  Okay.

6              THE COURT:  I'm wondering if it makes sense to

7    excuse this witness until you've had a chance to review the

8    documents and call him back afterwards, and we'll complete the

9    hearing in the meantime with other witnesses.

10             MR. NELKIN:  Let me ask a couple more questions and

11   then I was going to ask that anyway.  I have a couple of

12   questions.

13             THE COURT:  Okay.

14   EXAMINATION BY

15   MR. NELKIN:

16   (Continuing.)

17   Q    My question is, is there were a number of documents that

18   were in that box.  I was just wondering if you could tell me

19   if you know what that document is and who generated it.  One

20   is called, "A List of Outstanding Invoices."

21   A    I would have to see it.

22   Q    Okay.  One thing, "Checks in Number Order"?

23   A    Sounds like that would have come from Sonya.

24   Q    "Bank Reconciliation Report"?

25   A    That would have come from Sonya.

1    Q    "Check and Deposit Register"?

2    A    Same.  Sent from Sonya.

3    Q    "Bank Reconciliation List"?

4    A    That would come from Sonya as well.

5    Q    "Non-cleared Bank Transactions"?

6    A    Also from Sonya.

7    Q    Okay.  And do you know what each of those reports are?  I

8    mean, does that title mean something to you?

9    A    Some of them.

10   Q    Okay.  Which ones means something to you?

11   A    The bank reconciliation.

12   Q    What is that report?

13   A    Reconciling the bank statement for the month.

14   Q    Is that a report that Sonya generated?

15   A    Yes.

16   Q    Okay.  And how did she send it to you?

17   A    E-mail.

18   Q    Okay.  What other reports meant something to you?

19   A    The non-cleared checks would be the checks that had not

20   cleared the bank that were issued in that particular month or

21   a prior month.

22   Q    Was that a report that she generated for you?

23   A    Yes.

24   Q    Any others that she sent that to you by e-mail as well?

25   A    Yes.

1   Q     Is that something that -- and by bank reconciliation

2   report, or bank reconciliation list, those are both the same

3   type of report?

4   A     I believe they are.

5   Q     Okay.  And did she send those to you every month?

6   A     Yes.

7   Q     Okay.  And would you have retained all of those?

8   A     Yes.

9   Q     Okay.  And what about the check and deposit register?

10  A     I think that's just a listing of the deposits and the

11  check for the month.

12  Q     Would that be something Sonya sent to you every month?

13  A     Yes.

14  Q     What about, "Checks in Number Order"?

15  A     Again, I think some of the stuff is repetitive.  I think

16  it's a listing of the checks as the report states in numerical

17  order.

18  Q     Are these things that she generated on her computer?  I

19  mean, is this some sort of report that she prepared?

20  A     I believe so, yes.

21  Q     Okay.  And the list of outstanding invoices?

22  A     I think that was also from there, as well.

23  Q     She would send that to you by e-mail would that be

24  something that she sent to you every month?

25  A     I believe so.

*M. Devine - Direct/Mr. Nelkin*                    **916**

1   Q    Would we expect to find in your records a complete set

2   from the time you started to?

3   A    For whatever was provided to me, if she sent it to me

4   it's there, yes.

5   Q    Okay.  Who maintained the W-4s for the company?

6   A    I don't know exactly.  Maybe Sonya.  Maybe -- I would

7   imagine Sonya would.

8   Q    But you don't know?

9   A    Not for sure.

10  Q    Your office didn't?

11  A    We may have gotten copies of them.  We did not maintain

12  them and we request with new hires, when new people were

13  hired.

14  Q    Would you have retained any that you were provided?

15  A    Yes.

16  Q    Okay.  Did you have any role in Two Rivers' insurance,

17  workers' compensation, or any other type of insurance.

18  A    Only handling audits.

19  Q    Did you do audits for Two Rivers?

20  A    I think I might have, yes.

21  Q    What would you have done as part your you at this time

22  work?

23  A    I would have provided the insurance company with the

24  requested information.  They would usually ask for payroll or

25  annual sales for the policy period.

*M. Devine - Direct/Mr. Nelkin*                    917

1   Q    Okay.  And would that type of -- would you have generated

2   some sort of report or would you -- what would your role be

3   once you were requested it do an audit?

4   A    The audit is an annual request from the insurance company

5   based upon estimated premiums.

6   Q    And did you generate any sort of documentation related to

7   the audit?

8   A    Yes.  We would provide them copies of the 941s and I

9   think I asked for the sales figures?

10  Q    How would you have transmitted that to the insurance

11  company?

12  A    It was most likely transmitted electronically most

13  likely.

14  Q    Okay.  And is that?

15  A    It could have been done by mail, but most of the time it

16  was electronic.  And I believe that's the new procedure, it

17  was electronically.

18  Q    Did you do that each year for Two Rivers?

19  A    I did it each year.  I did it for any year that I was

20  requested.

21  Q    Do you recall which years you might have done it or not

22  done it?

23  A    Not off the top of my head.

24  Q    Did you do it for more than one insurance company per

25  year?

*M. Devine - Direct/Mr. Nelkin*                918

1   A    I guess there would have mostly likely been a workers'

2   compensation or other liability audit, insurance audit.  I'm

3   not sure if they're two different insurance companies or not.

4   Q    Would you consider those copies to be books and records?

5   A    Yes.

6   Q    Okay.  And do you know if you produced any of those audit

7   materials?

8   A    I believe I have produced those.

9   Q    Okay.

10            THE COURT:  In this latest round or earlier?

11            THE WITNESS:  I believe it was earlier.

12  Q    Are you the accountant for any of Mr. Friedman's

13  relatives?

14  A    Define relative.

15  Q    Anyone?

16            THE COURT:  Do you not know the meaning of the word,

17  sir?  I'm just curious.  I take it you could tell me who some

18  of your relatives are; correct?

19            THE WITNESS:  Direct relatives, yes.

20            THE COURT:  Okay.  Answer his question.

21  A    No.

22  Q    Okay.  Is there anyone that you know that has a

23  connection to Mr. Friedman that are the accountant for?

24  A    Yes.

25  Q    Okay.  Please tell me who those people are?

1    A    Brian Sanders.

2    Q    Okay.  And anyone else?

3    A    Not that I can think of.

4    Q    How is Mr. Sanders related -- is Mr. Sanders related to

5    Mr. Friedman?

6    A    His son-in-law.

7    Q    When you were asked why --

8    A    I don't think that's a direct relative, is it?

9    Son-in-law?

10         THE COURT:  So I just want to make sure I understand

11   your testimony, sir.  He asked you if you do work for any of

12   Mr. Friedman's relatives.  You know that you worked for his

13   son-in-law --

14         THE WITNESS:  Yes.

15         THE COURT:  -- and you didn't think that was

16   responsive?

17         THE WITNESS:  I thought it was directly:  A son,

18   daughter, sister, brother that's what I was thinking directly.

19         THE COURT:  Thank you for letting me know.  Go

20   ahead.

21   Q    Assuming that we didn't limit it to someone who is an

22   immediate blood relative but had any connection to

23   Mr. Friedman whether business or familial, could you tell me

24   if you do any accounting work nor any other individuals?

25   A    Not that I can think of.

*M. Devine - Direct/Mr. Nelkin*                            **920**

1   Q    Do you do accounting for the Ahearns?

2   A    Yes.

3   Q    Aren't they connected to Mr. Friedman --

4   A    They're not a relative of Mr. Friedman.

5   Q    -- or a business relationship of Mr. Friedman is I think

6   I've specified in my question.

7   A    I'm sorry, I heard relative.

8   Q    Okay.  Is there anyone who has a business relationship

9   with Mr. Friedman that you do the accounting work for?

10  A    Yes.

11  Q    Who?

12  A    Ahearns.

13  Q    Anyone else?

14  A    For Office Coffee, 26 Flavors.

15  Q    Is that Mr. Birnbaum?

16  A    Yes.

17  Q    What about any other defendant?  Ms. Rivera?

18  A    No.

19  Q    Ms. Ezell?

20  A    No.

21  Q    But you do it for Mr. Birnbaum?

22  A    Yes.  For the Office Coffee and his 26 Flavors.

23  Q    What about Mr. Salcedo?

24  A    I don't do any work for him.

25  Q    What about Joseph Friedman?  Do you do any accounting for

1    Joseph Friedman?

2    A    No.

3    Q    What about -- do you do the accounting work for

4    Mr. Friedman's charities?

5    A    Yes.

6    Q    What about Dov Sandberg?

7    A    No.

8    Q    If I wanted to find out who Sonya or Sylvia was employed

9    by, where would I find those records?

10        Would your office have those records?

11   A    Yes.

12   Q    Okay.  Where in your office would we find those?  What

13   type of materials or files would they be in?

14   A    There would be a W-2 or there would be a quarterly

15   payroll report listing them as employees.

16   Q    But would they be listed as a Two Rivers employee, or

17   would they be in some other file?

18   A    I believe Sonya was a Two Rivers employee at one time.

19   Q    If I wanted to find out if she worked for any of the

20   defendants that you do accounting work would that be in your

21   files?

22   A    Yes.

23   Q    Same thing for Sylvia?

24   A    Yes.

25   Q    Okay.  You mentioned that Mr. Jans owned the MB Fuel

1  Transport One?

2  A    Correct.

3  Q    And I think you testified that you didn't have any other

4  partners?

5  A    Correct.

6  Q    Could you tell me how it came about that that company was

7  formed did you have new role in that?

8  A    Yes.

9  Q    Okay.  How did -- well, did MB Fuel itself preexist

10 MB Fuel One?

11 A    Yes.

12 Q    And do they have any connection?

13 A    They no longer wanted to do the work, the trucking work,

14 so they were going out of business.  They offered it to Robert

15 Jans if he wanted to give it a shot.

16 Q    Is MB Fuel still in business?

17 A    Legally it is but there's no more work at this point.

18 Q    Does it have any employees?

19 A    At this point, no.

20 Q    Do you know if Sylvia Ezell works for MB Fuel One?

21 A    I don't believe so.

22 Q    And do you have any idea who she works for?

23 A    I don't remember off the top of my head.

24 Q    Okay.  Now, if -- explain to me again why you

25 don't -- well, I'll come back to that one.

1          Can you tell me if any of these defendants have any

2    other doing business names that you're aware of?

3          Did 24-Hour Oil have any doing business names?

4    A    I think they do business as Associated.  They do business

5    as Morningside.  They do business as Brook Oil.

6    Q    What about Terminal Oil?

7    A    They might do business as Terminal Oil, yes.

8    Q    What about or Clickable Oil?

9    A    Clickable.  Yes, Clickable.  Perfect.

10   Q    Perfect Fuel?

11   A    Those are the very d/b/a's that I can think of.

12   Q    Can you remember any other d/b/a's for any of these other

13   companies?

14   A    I know Office Coffee has a d/b/a.  I can't remember what

15   it is.

16   Q    It can be Single Serve Beverage?

17   A    Yes.

18   Q    What about Crazy Cups?

19   A    I'm not sure if that's -- I don't know if that's one of

20   them or not.

21   Q    Do you know if Crazy Cups has ever been associated with

22   Two Rivers?

23   A    I don't remember.

24   Q    In your box, I saw some accounts for a company -- a

25   Two Rivers bank account that said Trays and it might have had

*M. Devine - Direct/Mr. Nelkin*                    **924**

1    Crazy Cups on it.

2            Do you know anything about that?

3    A    I don't.

4    Q    Okay.  I don't know if I asked you this, but are you -- I

5    think I asked you if you were in business with any of the

6    defendants but if I didn't, are you in business with any of

7    the defendants?

8    A    No.

9    Q    Do you have any interest in any of the defendant

10   companies?

11   A    No.

12   Q    Are you an officer of any of the defendant companies?

13   A    No.

14   Q    Are you employed by any of the defendant companies?

15   A    No.

16   Q    Okay.  Have you ever been employed by any of the

17   companies?

18   A    No.

19   Q    Have you ever been an officer of any of these companies?

20   A    No.

21   Q    Have you ever had an ownership in any of these companies?

22   A    No.

23   Q    Can you tell me what clickableoil.com is?

24   A    clickableoil.com. It's a d/b/a for 24 Hours.

25   Q    Can you tell me why you might be listed as the president

1    for a company called clickableoil.com?

2    A    Must be a mistake because I'm not.  Never was.

3    Q    Okay.  So you've never been -- were you ever a creditor

4    of a company called clickableoil.com?

5    A    No.

6    Q    Do you know someone named Nicholas Cirillo?

7    A    Yes.

8    Q    Who is he?

9    A    He's a client of mine.

10   Q    Do you know if he ever had a company called

11   clickableoil.com?

12   A    Yes.

13   Q    And you testified that Clickable Oil is doing a business

14   as 24 Hour?

15            MR. SCHAFHAUSER:  Objection to the relevance and

16   scope of this line, your Honor.

17            THE COURT:  How is it relevant?

18            MR. NELKIN:  I'm trying to figure out who the

19   companies are because I'd like to ask some questions about

20   where their records might be and he's listed as being an

21   officer of one of them.

22            THE COURT:  Are you saying the records of those

23   companies?

24            MR. NELKIN:  Well, he testified that 24-Hour Oil

25   was -- that clickableoil.com was a doing business as 24-Hour

1    Oil.

2            THE COURT:  As one of the defendants.

3            MR. NELKIN:  As one of the defendants.  I asked him

4    if he was an owner or creditor and he said no.

5            THE COURT:  You are trying to establish his

6    connection to documents of clickableoil.com.

7            MR. NELKIN:  Which I understand is 24-Hour.

8            THE COURT:  How is that not relevant?

9            MR. SCHAFHAUSER:  He's now explained where he's

10   doing.  I withdraw the objection.

11           THE COURT:  Go ahead.

12   EXAMINATION BY

13   MR. NELKIN:

14   (Continuing.)

15   Q    Can you tell me how Nicholas Cirillo and 24-Hour Oil are

16   related?

17   A    Some time, I'm not sure of the exact time period when it

18   was, but 24-Hour purchased the assets of Clickable Oil.

19   Q    Okay.  And you don't know when?

20   A    Can I guess seven years ago, six years ago.  I don't

21   remember the exact date.

22   Q    And did Mr. Cirillo or any of the previous people

23   associated with that company retain any interests?

24   A    No.

25   Q    Okay.  And is there documentation that relates to that

*M. Devine - Direct/Mr. Nelkin*                927

1    that you're aware of?

2    A    There would have been a closing statement regarding the

3    sale.

4    Q    Okay.  And do you know whether any of the documents were

5    involved in that sale besides 24-Hour Oil?

6    A    No, just 24-Hour.

7    Q    What about Mr. Friedman?

8    A    Mr. Friedman owns 24-Hour Oil.

9    Q    Then he would have been involved?

10   A    Yes.

11   Q    What about the Ahearns?

12   A    No, they worked there, but they had nothing to do with

13   the ownership.

14   Q    Who owns 24-Hour Oil?

15   A    Mr. Friedman.

16   Q    Does he own it solely?

17   A    Yes.

18   Q    Okay.  Were you the go-between between Mr. Cirillo and

19   24-Hour Oil?

20   A    No.

21        MR. SCHAFHAUSER:  Objection as to the form.

22        THE COURT:  Overruled.

23   Q    Did you have anything to do with that transaction?

24   A    No.

25   Q    Do you know why you might have been listed as a creditor

*M. Devine - Direct/Mr. Nelkin*                    **928**

1    of the old company?

2    A    I have no idea.  I'm sorry, can I go on.

3          THE COURT:  Go ahead.

4    A    I might have been listed as a creditor because I was owed

5    accounting fees maybe from that standpoint.

6    Q    Do you know the amount that you might have been owed?

7    A    20,000.

8    Q    Okay.

9    A    I was probably listed because I went through a

10   bankruptcy.  So I was probably listed in the bankruptcy.

11   Q    And were there any other companies or entities related to

12   Mr. Cirillo that ultimately became owned by any of the

13   defendants?

14   A    Not that I'm aware of.

15   Q    Okay.  Do you know the official addresses of the

16   defendants?

17   A    Which defendant?

18   Q    Well, do you know the official address of 24-Hour Oil?

19   A    I believe it's 431 East 165th Street, Bronx, New York.

20   Q    And any of the other defendants that are located at that

21   address?

22   A    Light Trucking is located there.  165th Street Realty is

23   located there.

24   Q    What about Associated Fuel?

25   A    Associated Fuel Corp. is not located there, no.

*M. Devine - Direct/Mr. Nelkin*                    **929**

1   Q     Where are they located?

2   A     Someplace in Hawthorne.  I don't know the address off the

3   top of my head.  Someplace in Hawthorne.

4   Q     Who is housed in that office?

5   A     Which office?

6   Q     The one in Hawthorne?

7   A     Lawrence Ahearn and his son.

8   Q     Now, I think you testified that Associated Fuel was doing

9   business as 24-Hour Oil a few minutes ago?

10  A     Yes, it's a trade name.

11  Q     Okay.  So 24-Hour Oil has more than one location?

12  A     No.

13  Q     What takes place in Hawthorne?

14  A     The entity at Hawthorne is Associated Fuel Corp., it's a

15  separate entity altogether.

16  Q     How does it relate to 24-Hour Oil?

17  A     It has no relationship with 24-Hour Oil.

18  Q     When I asked you if Associated Fuel was --

19        Well, when you told me that Associated Fuel was

20  doing business as --

21        Well, that 24-Hour Oil was doing business as

22  Associated Fuel, you're saying that 24-Hour Oil has no

23  relationship with Associated Fuel Corp. of Hawthorne?

24  A     Correct.

25  Q     But Associated Fuel Corp. of Hawthorne is owned by the

1    Ahearns?

2    A    My Lawrence Ahearn.

3    Q    Okay.  And Lawrence Ahearn works for 24-Hour Oil?

4    A    He does.

5    Q    Does Associated Fuel Corp. of Hawthorne have any

6    relationship with any of the other defendants?

7    A    They maybe used the MB Fuel to do some transportation

8    work.

9    Q    Now, where is Mr. Lawrence Ahearn, where is his office?

10   A    His office is in Hawthorne.

11   Q    Does he have an office at 431?

12   A    Yes.

13   Q    Okay.  Do you know how he allocates his time?

14   A    I don't.

15   Q    Okay.  And can you tell me what the business of

16   24-Hour Oil is?

17   A    They sell residential and commercial heating oil.

18   Q    Okay.  Can you tell me what the business of

19   Associated Fuel Corp. of Hawthorne is?

20   A    It's a similar business.  They sell residential fuel oil.

21   Q    Okay.  But they have no connection?

22   A    No.  They're separate entities.

23   Q    Okay.  Did you do the taxes for Associated Fuel Corp. of

24   Hawthorne?

25   A    Yes.

1    Q    Are there any other oil companies that you're aware of

2    that are owned by the Ahearns or Mr. Friedman that are not

3    located either at 431, 165th Street, or the location at

4    Hawthorne?

5    A    No.

6    Q    Do you know if Mr. Friedman has any interest in

7    Associated Fuel Corp. of Hawthorne?

8    A    No, he has no interest.

9    Q    Does he -- has he loaned them any money?

10   A    I don't know.  He might have.  I don't know.  I don't

11   recall.

12   Q    Do any of his companies have an interest?

13   A    No.

14   Q    Does Mr. Cirillo have an interest in that company?

15   A    No.

16   Q    Are there any other owners in that company?

17   A    No.

18   Q    Do you know if that company has any loans outstanding?

19   A    Yes.

20   Q    Do you know who they're to?

21   A    I know one is to Lawrence Ahearn himself.  And I know one

22   is to -- the person -- what was his name Steve something.  He

23   was the one who sold the business to Associated.  I can't

24   think of his last name.

25   Q    What was the name of the business sold to Associated

1  called?

2  A    N&S Fuel.

3  Q    N&S Fuel.  Can you spell?

4  A    N&S.

5  Q    Did that have a relationship to any of these other

6  entities?

7  A    No, other than Associated.

8  Q    What about NRG Energy?

9           MR. FELDMAN:  Objection to relevancy.

10          MR. NELKIN:  I am trying to figure out where there

11  might be offices that have computers that are related.

12          THE COURT:  I'm trying to see if there is a more

13  efficient way to go about this.  Part of the problem is the

14  deficits in providing full discovery as required before now in

15  trying to overcome that as well as determine what other

16  remedial measures, if any, might be necessary.

17          So, to explore that appropriately, there has to be

18  some leeway but it isn't necessarily the most efficient way to

19  go about it.  That's why I was suggesting that perhaps we

20  suspend this witness while you go through the documents.

21          MR. NELKIN:  There aren't any documents related to

22  any of these three companies.

23          THE COURT:  It might require a deposition before we

24  can get at it and I don't know that I need to sit at the

25  deposition.  I am trying to figure out really and I need to

1    have this conversation with all counsel what the most

2    efficient way to do it is so that they can get what they're

3    really entitled to so I can make a decision what they need to

4    make as to allegations of past violations of my orders and

5    Judge Amon's orders.

6              I think for now I'm going to allow the questioning

7    so that we can get through the witness.  We'll have a

8    discussion if there is a better way to go about this.

9              Go ahead.

10   EXAMINATION BY

11   MR. NELKIN:

12   (Continuing.)

13   Q    Mr. Devine, do you know anything about NRG Fuel?

14   A    Yes.

15   Q    Who are they?

16   A    They're a client of mine.

17   Q    What do they do?

18   A    They're a wholesale and retail distributor of fuel oil.

19   Q    Same business as 24-Hour and same business as

20   Associated Fuel?

21   A    Yes.

22   Q    Is there any connection between NRG and any of these

23   other companies?

24   A    There's no ownership interest.

25   Q    That's not what I asked?

1      THE COURT:  I'm sorry.  There are a number of these
2  businesses you've talked about.  They're all residential fuel
3  oil?
4      THE WITNESS:  Yes.
5      THE COURT:  Are they competitors?
6      THE WITNESS:  Yes.
7      THE COURT:  Go ahead.
8  Q    So you're saying that Associated Fuel competes with
9  24-Hour which has a doing business as Associated Fuel?
10 A    Yes.
11 Q    That doesn't strike you as confusing?
12     THE COURT:  Don't argue the case here.
13     MR. NELKIN:  Fine.
14 Q    What markets do they compete in?
15 A    Bronx, Westchester.
16 Q    So if I was to look in the phone book and look for
17 Associated Fuel, would I hit the doing business, or would I
18 hit the actual company?
19     MR. FELDMAN:  Objection.
20 A    I don't know.
21 Q    Okay.
22     THE COURT:  Overruled.
23 Q    Now, has NRG ever been connected to any of these
24 entities?  Did they ever do any business transactions?
25 A    They might sell fuel to each other, yes.

1   Q     Did they have a creditor or debtor relationship?

2   A     Yes.

3   Q     You did the books for all these companies?

4   A     Yes.

5   Q     And taxes?

6   A     Yes.

7   Q     And we probably see records in their, general ledgers?

8               THE COURT:  I ask you to --

9               THE WITNESS:  Yes.

10              THE COURT:  I ask you to wait.  I apologize.  Let me

11  take one moment.

12              (A recess in the proceedings was taken.)

13              THE COURT:  Do you know where Mr. Finkel is?

14              MR. SCHAFHAUSER:  He's in the restroom.

15              THE COURT:  Okay.  Let's continue.  My apologies for

16  the interruption.

17  EXAMINATION BY

18  MR. NELKIN:

19  (Continuing.)

20  Q     Mr. Devine, does Nicholas Cirillo have any interest in

21  NRG?

22  A     Yes.

23  Q     So he's still in the fuel business?

24  A     Yes.

25  Q     Where are your -- where is your office what address?

*M. Devine - Direct/Mr. Nelkin*          **936**

1      MR. BERGSON:  Objection.  Asked and answered.  I

2  think that's one of the first questions.

3      THE COURT:  Do you know where his office is?

4  Q    How many addresses have you had as an office?

5  A    I've had two offices in the last 20 years.

6  Q    What?

7  A    438 Fifth Avenue, Pelham, New York.  And 340 Fifth

8  Avenue, Pelham, New York.

9  Q    What is current?

10 A    340 Fifth Avenue, Pelham, New York.

11 Q    I have a Pennsylvania Department of State business entity

12 filing history document that shows that you were the president

13 of clickableoil.com and that your address is 438 Fifth Avenue

14 Pelham, New York.

15      Do you know anything about that document?

16 A    I was never a officer of that entity.

17 Q    Do you ever file business registrations for companies?

18 A    Yes.

19 Q    Have you filed any for any of the defendants?

20 A    Yes.

21 Q    Okay.  Which ones have you filed for?

22 A    Light Trucking, MB, 24-Hour, Associated.

23 Q    When you say Associated?

24 A    Associate Fuel Oil Corp.

25 Q    Okay.

1    A    Office Coffee, 26 Flavors.

2    Q    What about any of the Brooklyn companies that

3    Mr. Friedman?

4    A    No.

5    Q    Have you ever filed any for clickableoil.com?

6    A    I might have.

7    Q    Do you have any idea how your name could have been

8    accidentally listed as president?

9    A    I have no idea because I never was.  Never had any

10   ownership in that company.

11   Q    Who was the president of clickableoil.com?

12   A    Nick Cirillo.

13   Q    But now it's a doing business as for 24-Hour Oil?

14   A    Yes, 24-Hour purchased the access from that entity.

15   Q    Okay.

16   A    And took the name with it.

17   Q    Who is the president of it now?

18   A    Of which company?

19   Q    The company now known as Clickable Oil in the present

20   day?

21   A    24-Hour purchased the assets of Clickable Oil.

22   Clickable Oil is no longer around.

23   Q    So Pennsylvania think it's an active corporation, that's

24   a mistake?

25             MR. SCHAFHAUSER:  Objection.

*M. Devine - Direct/Mr. Nelkin*                    **938**

1        THE COURT:  Overruled.  It's not an active

2   corporation.

3        THE WITNESS:  Hasn't been active for years.

4   Q    Okay.  Is there a difference between Clickable Oil and

5   clickableoil.com?

6   A    Yes.

7   Q    What is the difference?

8   A    Clickable Oil is a d/b/a for 24-Hour.  clickableoil.com

9   was a legal entity that sold assets.

10  Q    When did clickableoil.com cease It exist?

11  A    2008.  2009 maybe.  2007.  I don't even remember the

12  exact date, it's awhile ago.

13  Q    Do you know if Mr. Friedman has a credit card for

14  Clickable -- that uses the name clickableoil.com as part of

15  his account description?

16  A    I don't know.  I'm not sure.

17  Q    Okay.  Do you know if -- have you seen any documentation

18  for any of the defendants that shows any transactions with

19  clickableoil.com?

20  A    There would be transactions as far as sales of fuel oil.

21  Q    How did can that be?

22  A    For a d/b/a?  For Clickable Oil?

23  Q    But what about for clickableoil.com?

24  A    No, there is no activity.  It's been out of business.

25  Q    So if I see any charge for Clickable or clickableoil.com,

1   is it going to be referring to 24-Hour?

2   A    I would imagine so, yes.

3   Q    Just to be clear, clickableoil.com ceased to exist around

4   2008?

5   A    I believe so.

6   Q    Park Avenue ceased to exist around 18 years ago?

7   A    Park Avenue Associates, LLC, yes.

8   Q    The doing business Park Avenue still exists?

9   A    At the present time, no.

10  Q    So there's no doing business Park Avenue?

11  A    No.

12  Q    In any form?

13  A    No, that company is phased out.

14  Q    As of when?

15  A    Probably I would say about six to nine months ago.  Maybe

16  a year.

17  Q    Would there be documents that show that?

18  A    There's no more activity in the company.

19  Q    Could that company have become inactive as of December

20  22, 2004?

21  A    Which company is that, sir.

22  Q    Park Avenue Associates, LLC?

23  A    It's possible.

24  Q    Okay.  And I'm unclear.  What ceased to exist about a

25  year ago with respect to Park Avenue?

*M. Devine - Direct/Mr. Nelkin*          **940**

1    A    The company stopped operating.

2    Q    So it continued to operate despite being dissolved?

3    A    I didn't say it was dissolve.

4         THE COURT:  What happened in 2004?

5         THE WITNESS:  Park Avenue Associates, LLC stopped

6    doing business.  They lost the work and they closed up the

7    company.

8         THE COURT:  In '04?

9         THE WITNESS:  Yes.

10        THE COURT:  What was last year?

11        THE WITNESS:  Last year was the MB Fuel Transport.

12        THE COURT:  Park Avenue.

13        THE WITNESS:  MB Fuel Transport was doing business

14   as Park Avenue.

15        THE COURT:  Got it.  I have got what you were

16   saying.

17   Q    Did MB Fuel cease to exist a year ago?

18   A    They stopped operating, yes.

19   Q    So there's no more MB Fuel?

20   A    No.

21   Q    As of when?

22   A    Some time in '15.  Some time in early '15 I would

23   imagine.

24   Q    Do you know why they stopped operating?

25   A    The company was losing money.

1   Q    What happened to their assets?

2   A    I believe they've been sold off.

3   Q    To who?

4   A    They were sold to another -- I don't know the name of the

5   company.  I think it was that they were sold to a company

6   called Bay Port.

7   Q    Who owns Bay Port?

8   A    I have no idea.

9   Q    What were the assets that were sold?

10  A    They were sold some equipment, trucks.

11  Q    What happened to all their computers and things like

12  that?

13  A    I don't know.

14  Q    Okay.  Do you know what happened to their employees?

15  A    Excuse me.

16  Q    What happened to their employees?

17  A    I don't know.

18  Q    Was there some kind of with winding-up document for tax

19  purposes?

20  A    It hasn't been done yet.

21  Q    Hasn't been done yet.  Who is doing that work?

22  A    I will be working on that.

23  Q    Are there documents that relate to that transaction?

24  A    Yes.

25  Q    And just to be clear, you may have said this already.

1    You don't know who the owners of Bay Port are?

2    A    I don't do their accounting work, I don't know.

3    Q    Does Mr. Friedman have any relationship with them?

4    A    No.

5    Q    Mr. Cirillo?

6    A    No.

7    Q    The Ahearns?

8    A    No.

9    Q    Do you know anything about the address 1066 Zerega?

10   A    That was an old company that was operating out of there

11   that was an oil company.

12   Q    What company was that?

13   A    I think it was Oil Masters if I remember correctly.

14   Don't hold me do it.  I think it's Oil Masters or Oil Sale,

15   something like that.

16   Q    Did Mr. Cirillo -- did Mr. Cirillo have any interest in a

17   company that operated out of that address?

18   A    Many, many years ago CIBRO was operating out of that

19   bricks.

20   Q    What is CIBRO?

21   A    CIBRO was a large public corporation.  I don't know if

22   they were public, they were a large fuel company.

23   Q    What happened to them?

24   A    I believe they went bankrupt.

25   Q    Was there any cause for them to go bankrupt?

1    A    I have no idea.  I wasn't involved with that.

2    Q    Does Mr. Friedman or any defendants have any interaction

3    with any of the CIBRO companies?

4    A    Not that I'm aware of.

5    Q    What about the Ahearns?

6    A    Not that I'm aware of.

7    Q    What about Mr. Cirillo?

8    A    I believe he worked there.  It was his family.

9    Q    His family, okay.

10        Now, do you know if any of the defendants ever

11   operated out of Bogart address?

12   A    Yes.

13   Q    Who?

14   A    I believe it was Associated Fuel Oil Corp.

15   Q    Any other companies?

16   A    I can't recall at this time.  It's the only one that

17   comes to mind.

18   Q    What about any beer hauling companies?

19   A    That's possible, yes.

20   Q    Could it have been Mr. Ahearn's beer?

21   A    That's possible, yes.

22   Q    Could it have been any companies related to Mr. Spence?

23   A    I don't know.

24   Q    Could there have been any other trucking companies that

25   operated out of that address?

1   A    I don't remember.

2   Q    And the Associated Fuel that operated out of there, which

3   Associated Fuel do you mean?

4   A    Associated Fuel Oil Corp.

5   Q    The one that's now in Hawthorne?

6   A    Correct.

7   Q    And, at the time that they were operating out of there,

8   do you know if either Mrs. Ezell or Ms. Rivera worked for

9   them?

10  A    I don't believe they did.

11  Q    Okay.  Do you know where Ms. Ezell and Ms. Rivera live

12  now?

13  A    I believe it's 1562 Bogart Avenue.

14  Q    Same address as these companies used to operate out of?

15  A    Yes.

16  Q    Did the Ahearns ever live at that address?

17  A    Yes.

18  Q    Which of the Ahearns?

19  A    Both of them.

20  Q    Both of them?

21  A    John and Lawrence.

22  Q    Did they live at the same unit or?

23  A    No, separate.

24  Q    Do you know which units they lived in?

25  A    One lived in 1562-A, one lived in 1562-B.  I get them

1    mixed up.

2    Q    Do you know if they were living in there and operating

3    the companies at the same time?

4    A    No, it was a separate location.

5    Q    Separate location?

6    A    Yes.

7    Q    Or separate time?

8    A    Separate location.

9    Q    Well, they lived at that address?

10   A    They lived at 1562-A and 1562-B.

11   Q    Okay.  What about the companies?

12   A    It was at 1562, it's a different address.

13   Q    They had a residence and an office basically in the same

14   building?

15   A    It wasn't the same building.

16            THE COURT:  All next to each other?

17            THE WITNESS:  Yes.

18            THE COURT:  Okay.

19   Q    But all with the same 1562 or so Bogart?

20   A    They were just different addresses.

21   Q    But different only by a letter or absence of a letter?

22            THE COURT:  I think we get it.

23            MR. NELKIN:  Okay.  Thanks.

24   Q    Are there any other fuel companies that are associated

25   with Mr. Friedman that you have not named?

1    A    Not that I'm aware of.

2    Q    Okay.  Let me extend that to all of the defendants.

3         Do any other oil companies, or any aspect of the oil

4    business that you haven't mentioned already, that have a

5    relationship with any defendant whether present or historical?

6    A    It's all that I can think of.

7    Q    Would your records at your office tell us if there are

8    some that you might be forgetting?

9    A    Depending on how far back you're referring to.

10   Q    Okay.  Are there any other companies that are associated

11   with these defendants that we have not named today?

12   A    Repeat the question.

13   Q    Are there any other companies that are associated with

14   any of the defendants that you're aware of that we have not

15   named today?

16        MR. BERGSON:  Objection, your Honor.

17        THE COURT:  Overruled.

18   A    I can't think of any presently.

19   Q    Can you think of any company that Mr. Friedman has a

20   relationship with or an interest in that has not been named

21   today?

22   A    Not that I can think of.

23   Q    Do you know if Mr. Mr. Friedman has any interest in an

24   elevator company or a wire company?

25   A    No idea.

1   Q    What about a food company?

2   A    I think there is an interest in a food company, yes.

3   Q    Do you know the name of that food company?

4   A    Off the top of my head I don't I remember without seeing

5   the K-1.

6   Q    K-1, okay.  All the companies that Mr. Friedman has an

7   interest in, would we expect to see a K-1 on his tax return?

8   A    I would imagine.

9   Q    Okay.  Do you remember if there is which defendants

10  provided Mr. Friedman with a K-1?

11  A    E&I Investors, E&J Funding, 24-Hour, MB Fuel Transport,

12  Office Coffee.  No, not Office Coffee, it would go to the

13  entity, I'm sorry.  And Two Rivers.

14  Q    You told me before?

15  A    Not Two Rivers, I'm sorry, no, I take that back.  It's to

16  an entity as well.  That would be it.

17  Q    So Mr. Mr. Friedman didn't get a K-1, or did get a K-1

18  from Two Rivers?

19  A    From '13 and '14 it was through his entity.

20            THE COURT:  I'm not sure I understand that answer.

21            THE WITNESS:  The entity has ownership E&I Investors

22  and it was passed on through there to Mr. Friedman.

23  Q    I thought you testified that E&I Investors didn't hold

24  the interest in Two Rivers and that was a mistake?

25  A    In 2012.  In '13 and '14 it was to his name individually.

1    Q    Was it ever correctly to him through an entity?

2    A    In 2012 I believe it was.

3    Q    Okay.  Can you tell me if any of these other companies

4    were ever gave Mr. Friedman a 1099 or W-2?

5    A    24-Hour gave.

6    Q    Gave them what?

7    A    W-2.

8    Q    Okay.  Any other company?

9    A    I believe that's the only entity.

10   Q    All right.  Is there any other of the defendants that

11   gave that reported Mr. Friedman's income on its tax return the

12   way you said Two Rivers did as either guaranteed income or

13   some other form that doesn't require a W-2 or 1099?

14   A    No, not that I can think of.

15   Q    Now, have you ever been to the office at 431?

16   A    Yes.

17   Q    How many times?

18   A    A hundred times.

19   Q    When was the last time you were there?

20   A    I haven't been there in probably five years.  Four or

21   five years.

22   Q    In the times that you were going there, how many times

23   did you go a year to make up the hundred times?  Is that over

24   a --

25   A    Once a month.

1  BY MR. NELKIN (Cont'd.):

2  Q    So you basically were going there roughly once a month

3  for around eight, nine years and then you stopped going.  Why

4  did you have to go so much before and why did you stop going?

5  A    I just changed the nature of how I was handling the

6  account.

7  Q    What differed between the way you handled the account

8  historical and the way you handled it now?

9  A    They were basically dropping off the information in my

10  office instead of me going there.

11  Q    And by dropping off the information --

12  A    Drop off the bank statements and mail.

13  Q    Okay.  So basically they were providing to you either in

14  hardcopy or electronically?

15  A    Yes.

16  Q    What about for any of the other defendants?  How long --

17  did you ever go to any of their offices?

18  A    No.

19  Q    So you never went to the Brooklyn office?

20  A    No.

21  Q    You have never been to the offices in Newark for any of

22  the other --

23  A    I was in the offices in Newark one time.

24  Q    When was that?

25  A    I don't recall exactly.  It must have been maybe late

*M. Devine - Direct/Mr. Nelkin*                    950

1   2012 or maybe late 2012.  I don't recall exactly.

2   Q    Do you remember the occasion that required you to go

3   there?

4   A    They asked me to come for a meeting.

5   Q    What was the meeting about?

6   A    I don't recall the details.

7   Q    Do you recall the general nature of the meeting?

8            THE COURT:  It does seem far afield.

9            MR. NELKIN:  What?  All right, fine.

10           THE COURT:  If you don't have something to ask

11  about, go ahead.

12  Q    Is there any difference in the type of accounting work

13  you provided historically when you were visiting on a monthly

14  basis versus now, any different tasks?

15  A    I really don't recall any difference.

16           THE COURT:  Sorry, I must take another moment.

17  Forgive me, please.  I will be right back.

18           (Recess taken.)

19           THE COURT:  Apologize for the interruption.

20  Continue.

21  BY MR. NELKIN:

22  Q    Mr. Devine, I think you testified you are not the

23  accountant for any of Mr. Friedman's companies that are based

24  in Brooklyn?

25  A    That's correct.

1    Q     Okay.  Do you know who is?

2    A     I'm not sure.

3    Q     Okay.  You haven't had any interactions in your role as

4    personal accountant, anyone on there?

5    A     They would just provide me the K-1s, Mr. Friedman.

6    Q     And you don't know who generated those?

7    A     All I need is the K- 1s to do the returns.

8    Q     With respect to MB Fuel I, Mr. Chance (ph), do you know

9    what Mr. Chance's role was before he formed MB Fuel I?

10   A     Not sure, no.

11   Q     No, no, do you know who he worked for?

12   A     I believe he worked for MB Fuel I.  MB Fuel.

13   Q     He worked for MB Fuel?

14   A     I think.  I'm not -- I don't know exactly; I'm not sure.

15   I'm not sure.

16   Q     Could he have been the dispatcher for MB Fuel?

17   A     He could have been, yes.

18   Q     Okay.  And does MB Fuel I do the same type of business

19   that MB Fuel used to do?

20   A     Yes.

21   Q     Okay.  So MB Fuel couldn't make money and decide to go

22   out of business I think you testified.  Do you know if MB

23   Fuel I is making money?

24   A     They are closing up, too.

25   Q     They are closing up, too?

1    A    Yeah, in April.

2    Q    Why haven't they closed up?  What's stretching it out?

3    A    Just they are in the process of wrapping everything up.

4    Q    And are they selling?

5    A    They are just closing up.

6    Q    So they are just going to shut down?

7    A    Yes.

8    Q    And what's going to take -- how is that process taking

9    place?

10   A    I don't know I am not involved in it at this point.

11   Q    Do you know who is?

12   A    I think you have to ask Mr. Chance.

13   Q    How do you know that it's closing up?

14   A    Well, I was told to file the final payroll return, so

15   there is no more employees.  There's no more payroll.

16   Q    So you are the accountant for them?

17   A    Yes.

18   Q    How many employees have they had?

19   A    Eight or nine.

20   Q    Okay.  Do you know if they have any debts to any of the

21   defendants?

22   A    I don't know.

23   Q    Would the tax records show that?

24   A    If there are any debts, it would show up, yes.

25   Q    Do you know what the official office address of Two

1    Rivers is?

2    A    The official address?

3    Q    Yes.

4    A    I believe it's 33 Nicholas Avenue, I think.

5    Q    And do you know whose residence that is?

6    A    Mr. Friedman.

7    Q    Okay.  Have you ever received any mail that was sent to

8    Mr. Friedman at that address?

9    A    Yes.

10   Q    Okay.  What type of mail have you received?

11   A    I would say some tax forms probably came in.

12   Q    Where would they have come in from, what agency?

13   A    The IRS or the State of New Jersey or I would imagine.

14   Q    And would they be something that would require action?

15   A    If they did, it was taken -- I would have taken care of

16   it.  He would have sent it to me, I would have resolved the

17   issue.

18   Q    What about the Department of Labor mailings?

19   A    I don't think those came to me.

20   Q    You mean being -- being redirected from Mr. Friedman?

21   A    Right.  I don't believe those came to me.

22   Q    Now, did you prepare invoices for Two Rivers?

23   A    Yes.

24   Q    Okay.  Were they itemized?

25   A    No.

1  Q    So they were just --

2  A    It was a flat fee.

3  Q    Flat fee?  What was your flat fee?

4  A    It was a thousand dollars per month.

5  Q    Per month?  Now, if I saw some invoice for something

6  other than a thousand dollars per month, either less or more,

7  what would that be attributable to?

8  A    It might have been for some other service that was

9  requested.

10  Q    And that had been itemized?

11  A    Yes.

12  Q    Okay.  Do you know roughly how much you were paid by Two

13  Rivers?

14  A    Approximately 12, I guess 13,000 a year, 12, maybe 12 to

15  15,000.

16  Q    And they issue you any type of documents a K-1 -- not a

17  K- 1, a 1099 or a W-2?

18  A    No, I don't believe so.

19  Q    Why wouldn't they have issued you a 1099?

20  A    I don't know.

21  Q    Well, aren't you the person that generated the 1099s?

22  A    Yes.

23  Q    So, then, shouldn't you know?

24  A    I guess one should have been reported and it wasn't.

25  Q    Who is the tax partner for Two Rivers?

1   A    Mr. Friedman.

2   Q    Okay.  And did you interact with Mr. Friedman on tax

3   matters?

4   A    Yes.

5   Q    Did you interact with anyone else on tax matters?

6   A    Yes.

7   Q    Who?

8   A    I had spoken to Mayer, I had spoken to Steven Schreiber

9   and spoken to Eugene Schreiber.

10  Q    But who was your primary point of dealing with on tax

11  matters?

12  A    I dealt with all of them.

13  Q    Okay.  What would you have dealt with Mr. Schreiber?  I'm

14  sorry, Mr. Steven Schreiber?

15  A    Questions on the tax return that he may have had.

16  Q    And what about Mr. Eugene Schreiber?

17  A    Same thing.

18  Q    What about Mr. Koenig?

19  A    As well, the same thing.

20  Q    Okay.  Aside from questions they might have had about the

21  tax returns, would you have had any other dealings with them

22  related to taxes?

23  A    If they called me up for a question, then yes.

24  Q    What about Mr. Friedman?  What were your dealings with

25  Mr. Friedman related to Two Rivers and taxes?

1  A     If he had questions about the return, I would address the

2  questions.

3  Q     Okay.  Well, who provided you with the information to

4  prepare the return and ensured that you had everything that

5  you needed?

6  A     Vincent Papa.

7  Q     All right.  And then who reviewed the return before it

8  was filed?

9  A     I guess I would have sent it to Mr. Friedman.

10  Q     Okay.  Now, do you know if -- how did you generate the

11  bills?  Were they prepared on a computer to Two Rivers?

12  A     Yes.

13  Q     And would you have copies of those both on your computer

14  and in hardcopy?

15  A     I don't believe so.

16  Q     Would you have copies retained in any form?

17  A     I don't believe I have copies.  I sent them.  I might

18  have -- there might have been some e-mails that I sent to

19  Sonia because she was requesting copies of the invoices, so

20  they may have been e-mailed to her.

21  Q     Would you have deleted the files you created them on?

22  A     No, I wouldn't -- I probably didn't save the invoice.

23  Q     Then how could you have sent it to somebody?

24  A     I printed the invoice out and I sent it as an e-mail.

25  Q     Well, if you sent it as an e-mail, I'm assuming you mean

1  sent it as an attachment?

2  A    Yes.

3  Q    So wouldn't you have had to save it?

4  A    I guess it would be in my e-mails, then, if it was sent.

5  Q    But wouldn't it have had to be saved somewhere else so

6  you could make it an attachment to an e-mail?

7  A    No -- I guess I would have scanned it, yes, I guess you

8  are right.

9          THE COURT:  I'm trying to understand.  So you would

10  generate an invoice, but you weren't taking any steps to save

11  the invoices.  How did you follow up to make sure you were

12  paid?

13         THE WITNESS:  They paid every month.

14         THE COURT:  But you never checked?  You wouldn't

15  have the invoice saved so that you could say, oh, here is my

16  outstanding invoices?

17         THE WITNESS:  No.  They were very good.  They were

18  paying every month.

19         THE COURT:  Do you do this with all of your clients?

20         THE WITNESS:  Yeah.

21         THE COURT:  Okay.

22         THE WITNESS:  Yeah, my regular practice.

23  BY MR. NELKIN:

24  Q    So we are not going to see invoice for any of these other

25  defendants that you worked for?

1   A     No.

2   Q     Okay.  Do you think it's possible your computer might

3   have saved an image in some form?

4   A     Of an invoice?

5   Q     Yeah.

6   A     It's possible.

7   Q     Okay.  Now, how did Two Rivers pay you?

8   A     They paid me with a check.

9   Q     Okay.  And what records were kept of the fact that they

10  paid you?

11  A     You have the canceled check that goes back to the client.

12  Q     What about on your end?

13  A     I just deposited it in the bank.

14  Q     And what type of records does your bank provide you with?

15  A     I get a bank statement every month from the bank.

16  Q     And does it show your checks on it?

17  A     The checks I receive?

18  Q     Yes.

19  A     No, it shows my deposits.

20  Q     And are all your clients on flat rate?

21  A     Most of them.

22  Q     Most of them?

23  A     Yes.

24  Q     So we would see a bunch of thousand-dollar deposits into

25  your account?

1   A    Not necessarily.

2   Q    What would we see?

3   A    I would take a bunch of checks, batch them and make a

4   deposit.

5   Q    So you are saying we would just see a single deposit?  It

6   wouldn't show the individual checks broken down?

7   A    No.

8            THE COURT:  How are you -- I'm missing something,

9   because I don't understand how you can possibly be accounting

10  for your income when you report your own taxes if you don't

11  have records.

12           THE WITNESS:  I deposit everything in my bank

13  account.

14           THE COURT:  No, no, but when it comes time to figure

15  out what you owe the government for your taxes and you tally

16  it up, what records do you go on?

17           THE WITNESS:  I have all my bank statements with all

18  my deposits.  It goes in my business account.

19           THE COURT:  I see.

20           THE WITNESS:  Every check I get, I deposit in my

21  account.

22           THE COURT:  But, for instance, do other clients give

23  you 1099s?

24           THE WITNESS:  Yes.

25           THE COURT:  So it's just Mr. Friedman who doesn't?

1          THE WITNESS:  No, some do; some don't.

2          THE COURT:  Some do; some don't?

3          THE WITNESS:  Yeah.

4          THE COURT:  Okay.

5          THE WITNESS:  I wouldn't go off the 1099s to report

6    my income.

7          THE COURT:  Okay.

8          THE WITNESS:  I would report whatever --

9          THE COURT:  Of course.

10         THE WITNESS:  Sometimes they are not accurate

11   anyway.

12         THE COURT:  The 1099s aren't accurate?

13         THE WITNESS:  Sometimes they are not accurate.

14   There is timing issues.  Get paid maybe one year, come back

15   another year.

16         THE COURT:  Okay.

17   BY MR. NELKIN:

18   Q    Is there a penalty for not issuing a 1099?

19   A    I believe there is.

20   Q    Do you know what it is?

21   A    $50, I think.

22   Q    Is it $50 one time or $50 per day?

23   A    One time.

24   Q    Is there any penalty that requires you to perhaps be

25   responsible for the fact that someone else didn't pay their

1   taxes, your duty to report it?

2   A    I'm not sure.

3   Q    Have any of your clients ever been audited?

4   A    Yes.

5   Q    Any of the defendants ever been audited?

6   A    Yes.

7   Q    Which ones?

8   A    24 Hour had an audit.  Light Trucking had an audit.

9   That's as best I can remember right now.

10  Q    Do you remember when they had their audits?

11  A    Six, seven years ago.

12  Q    Was Mr. Friedman involved in the companies at the time?

13  A    Yes.

14  Q    Okay.  Do you remember the outcome of the audits?

15  A    The outcome was very minor, minor change.

16  Q    Did they owe money?

17  A    Very little.

18  Q    But they did owe money?

19  A    Yes.

20  Q    Okay.  Are there any records related to that?

21  A    Don't have any longer.

22  Q    Why don't you have them any longer?

23  A    Case is closed.  I don't keep those records after that.

24  Q    How long is a tax record required to be retained?

25  A    I keep everything five, six years.

1    Q    I thought it was seven that it had to be retained.

2         THE COURT:  Is there a question?

3    Q    Is it seven years it has to be retained?

4    A    I don't think it's seven.

5    Q    Has Mr. Friedman ever been audited?

6    A    I believe so.

7    Q    Do you remember when?

8    A    Four or five years ago.

9    Q    Do you remember the outcome of that?

10   A    I think there was a balance due to New Jersey.

11   Q    Was it a larger balance?

12   A    I think there might have been around 30, 40,000.

13   Q    In taxes?

14   A    Yes.

15   Q    And do you know what the reason was that that discrepancy

16   was attributable to?

17   A    It was a mistake I made.

18   Q    What was the mistake?

19   A    I picked up the wrong information on the K-1.

20   Q    From which company?

21   A    I don't recall.  It was nothing that he omitted.  It was

22   my mistake.

23   Q    It was your mistake?

24   A    Yes.

25   Q    And did you -- who was responsible for the penalties in

Case 1:15-cv-06861-CBA-JO  Document 439  Filed 07/10/17  Page 176 of 304 PageID #:
14867

*M. Devine - Direct/Mr. Nelkin*                                        963


1    the end?

2    A    Mr. Friedman paid them.

3    Q    Did he ever express any concern to you that you had made

4    a mistake that had cost him money?

5    A    No.

6    Q    And he continued to use you as his accountant?

7    A    Yes.

8    Q    Do you remember how much the penalties were?

9    A    I don't; a couple thousand, probably a couple thousand

10   dollars.

11   Q    Does New Jersey have a 25 percent penalty for making a

12   mistake on your taxes?

13   A    I'm not sure.

14   Q    Do you still have the records related to that audit?

15   A    I probably do.

16   Q    Okay.  So what type of records, if any, show what work

17   you did for Two Rivers?

18   A    As I testified before, I was following the -- preparing

19   for receiving the information prepared --

20   Q    I'm not talking about the work that the papers that you

21   generated for Two Rivers or for the government.  I'm asking

22   what type of documentation on your side shows that Two Rivers

23   hired you to do work and that you were paid to do work?

24   A    I believe the operating agreement requested it.

25   Q    Was there any retainer agreement that you had?

*Joshua B. Edwards, RDR, CRR*
*Official Court Reporter*

1    A    No.

2    Q    Was there any contract that you had?

3    A    No.

4    Q    Was there any information that you provided them as far

5    as your billing rates?

6    A    It was variable, like I said, a thousand a month.

7    Q    And who made that arrangement with you?

8    A    Mr. Friedman.

9    Q    Okay.  Now, you said it was in the operating agreement.

10   You mean the Two Rivers operating agreement?

11   A    I he have believe so, yes.

12   Q    And what do you understand that said?

13   A    That requests that I be the accountant for the firm.

14   Q    Okay.  Do you know if there were any other operating

15   agreements in Mr. Friedman companies that had that same

16   provision?

17   A    No.

18   Q    What about Office Coffee?

19   A    Office Coffee, yes.

20   Q    Any others?

21   A    Not that I'm aware of.

22   Q    What about -- well, I will come back to that.  Now, did

23   you have the same arrangement with -- well, did each of the

24   defendants have the same rate with you.

25   A    The same monthly rate?

1   Q    Yes.

2   A    It was different amounts.

3   Q    Okay.  What determined which amount a company paid?

4   A    Based on the amount of time.

5   Q    And did the companies require differing amounts of work?

6   A    Yes.

7   Q    Why?

8            MR. FELDMAN:  Objection.  I don't know what this has

9   to do with the scope -- I'm sorry.  Objection, Your Honor.

10           THE COURT:  Okay.

11           MR. NELKIN:  I'm just trying to figure out what type

12  of records he has and why one has, you know, a different rate

13  and what type of work he did for Two Rivers versus --

14           THE COURT:  Sustained.  Move on.

15  Q    Under the operating agreement, were you required to give

16  the partners any type of financial reports?

17  A    I believe I was.

18  Q    Did you?

19  A    I don't think so; I don't remember.

20  Q    Why not?

21  A    I don't think I got around to doing it.

22  Q    Okay.  So the operating agreement required you to be

23  hired as their accountant and to perform certain tasks, but

24  you never got around to performing the task that it specified

25  that you should perform?

*M. Devine - Direct/Mr. Nelkin*                                     966

1   A    I performed the rest of the tasks.

2   Q    But the ones as far as generating the financial reports,

3   you never did?

4   A    It's improper to prepare the financial reports.  It's the

5   comptroller.

6   Q    But what did the operating agreement specify?

7   A    I don't remember specifically.

8   Q    The -- did you ever communicate with Mr. Papa about

9   documents?

10  A    I'm sure we communicated.

11  Q    Did you recently send him a letter asking him if he was

12  in need of any documents?

13  A    Yes.

14  Q    And what did you ask him?

15  A    I asked him if he was missing any records, any payroll

16  records.

17  Q    And why did you do that?

18  A    Because I was hearing that Two Rivers was still looking

19  for records that I was withholding, so I had no idea what they

20  were.  I was trying to get to the bottom of it and I spoke to

21  my attorney.  He said to send him an e-mail and ask him what

22  exactly they are looking for and I will gladly provide them.

23  And that's why I sent the e-mail to him.  So I don't know

24  exactly what they were looking for.  Whatever they say I am

25  missing I will provide.  I don't know what it is.

1    Q    But wasn't it your testimony that you already provided

2    everything you had?

3    A    Yes.  That's why I don't know what else you are looking

4    for.

5    Q    So what did you just produce today that you hadn't

6    provided before?

7    A    I went back to my associate's computer and went through

8    it and double-checked it last night and put everything on a

9    disc to be sure that I didn't omit anything in case something

10   was not provided in the previous.  I double-checked it.

11   Q    The stuff that you provided today, was it only the stuff

12   that you provided -- that you found last night?

13   A    I'm sorry; can you repeat the question?

14   Q    Your attorney gave me a flash drive today.

15   A    Yes.

16   Q    And I understand that it contains documents that you

17   found last night.

18   A    A lot of these documents are probably repetitive that you

19   already have.

20   Q    But this flash drive, how did you prepare it?

21   A    I went into the computer and searched for all Two Rivers

22   e-mails.

23   Q    And you prepared a new flash drive?

24   A    Yes.

25   Q    Okay.  By downloading onto the flash drive?

1   A    Yes.

2   Q    And you prepared that sometime last night?

3   A    Yes.

4   Q    If I was to see on that flash drive any save dates that

5   precede last night, could you explain that?

6   A    They were forwarded to my e-mail and I transferred them

7   on to a disc.

8   Q    Where were they forwarded from?

9   A    From my associate in my office.

10  Q    And when was that done?

11  A    It was done yesterday.

12  Q    So I guess what I'm saying is, the save date to the disc

13  for all the documents should be from yesterday and no earlier;

14  is that correct?

15  A    Yes.

16  Q    Okay.  So if I see a save date that precedes that date,

17  would that be something that you could explain to me?

18  A    What I did was I went back to double-check to make sure I

19  had not omitted any of the previous records that I thought I

20  provided to you.

21  Q    Okay.  And when did you prepare --

22           THE COURT:  Just so I understand the answer, are you

23  saying you just gave a second version of everything or --

24           THE WITNESS:  Yes.

25           THE COURT:  Let me finish the question.

1          THE WITNESS:  Sorry.

2          THE COURT:  Or a second version that had everything

3    including things that you knew you had already provided

4    before?

5          THE WITNESS:  Yes.

6          THE COURT:  Or only things that you knew hadn't been

7    provided before?

8          THE WITNESS:  No, I included everything.  Whatever,

9    whatever was on my computer, I double-checked it.  And I'm

10   fairly certain that I already provided it, but just to be

11   sure, I put them on there as a second.

12         THE COURT:  Did you do anything different this time

13   than from the second time?

14         THE WITNESS:  No.  Oh, the first time they were

15   printed out, individually printed out hard copies.

16         THE COURT:  But I mean, is there anything different

17   between what you provided this time and last time?

18         THE WITNESS:  Shouldn't be.

19         THE COURT:  Shouldn't be, okay, because you did the

20   same steps, okay.

21         THE WITNESS:  I just put it digitally this time

22   rather than last time it was hard copies.

23         THE COURT:  All right.

24   BY MR. NELKIN:

25   Q    Now, do you know what's in this box?

1        THE COURT:  You have to redirect.  What box?

2    Q    The box that was produced before.

3    A    I don't remember exactly what's in there.

4        THE COURT:  Is it marked somehow?

5        MR. NELKIN:  Exhibit 36, Defendant's Exhibit 36.

6        THE COURT:  Thank you.

7    Q    Can you tell me why -- well, did you receive bank

8    statements every month?

9    A    I believe so.

10   Q    Okay.  And -- and -- and you would retain those, correct?

11   So if I only see a few bank statements in this box, can you

12   explain that?

13   A    Then they weren't provided to me.

14   Q    But I thought you said you got them every month.

15   A    Whatever I received, I turned over.

16   Q    Okay.  Are you familiar with something called Paycheck

17   Withholding Calculator?

18   A    Yes.

19   Q    What is that?

20   A    That is a software package that I explained to you, CFS

21   who does payroll calculations.

22   Q    CFS?

23   A    That's one of the software programs they use in my

24   office.

25   Q    They use in your office?

1    A    Yes.

2    Q    And what does that generate, what type of report?

3    A    It generates an I41, the W-2s, W-3s and it can also

4    perform the gross to net calculation for salaries.

5    Q    And that's something you prepare?

6    A    Yes, if requested by the client, yes.

7    Q    Okay.  And is that, that program store the reports that

8    are generated?

9    A    Yes, it has the history of the payrolls for each company.

10   Q    Okay.  But does it generate a report for individual

11   people?

12   A    No.

13   Q    I'm looking at one that says, it's a 2013 Paycheck

14   Withholding Calculator and it's for an employee named Shlomo

15   Bauman and it says at the bottom it's prepared by Michael

16   Devine, CPA at 340 Fifth Avenue.  It's a single page which I'm

17   happy to show you.

18   A    Right.

19   Q    But is that -- what type of report is that?

20   A    That is basically a request from a client asking for a

21   breakdown on an individual salary how much -- based on a gross

22   salary what the net payroll would be.  There's a program does

23   the calculation.

24   Q    And so, do you have that for each of the Two Rivers

25   employees?

1   A    No.

2   Q    Why not?

3   A    Because they have the Intuit.  They had the Intuit

4   QuickBooks payroll calculator.

5   Q    So if they had the Intuit QuickBooks calculator, then why

6   do they require you to generate anything?

7   A    What date was that?

8   Q    2013 for this one.

9   A    I'm not sure why, then, because you have the QuickBooks

10  payroll calculator would be a feature that they only have to

11  put the hours in and do the calculation to check the check,

12  unless I was asked for a hypothetical situation, how much

13  would an individual generate with X salary.

14  Q    And that's a function that your program could generate?

15  A    Yes.

16  Q    And what would the steps be taken to generate it?

17  A    You put in the gross salary and you put in the parameters

18  if they are single, if they are married and then you calculate

19  all the deductions, what state they live in.

20  Q    Okay.  And how did that differ from whatever Two Rivers's

21  capability was to generate?

22  A    It probably didn't.

23  Q    So even though Two Rivers had the ability sometimes they

24  asked you to do it?

25  A    Not sure why they asked.

1   Q    Okay.  Did you produce any Paycheck Withholding

2   Calculator records?

3   A    Not sure what you mean by payroll calculator records.

4   Q    Well, you just identified this report as something you

5   are familiar with?

6   A    Right.

7   Q    And so I'm asking if you produced any similar documents?

8   A    If I provided those documents to you, you are saying?  Is

9   that the question?

10  Q    Or to Two Rivers.

11  A    I am not sure if we did or not.

12  Q    If you did, would it be in either this Defendant's

13  Exhibit 36 box or on the flash drives?

14  A    It's definitely not in the flash drives.  The flash

15  drives that you provided was the weekly payrolls.

16  Q    Okay.  So then it would have to be in this box or it

17  wasn't provided?

18  A    Yes, correct.

19  Q    Okay.

20          MR. GRANTZ:  Can we take a short break?

21          THE COURT:  Why don't we take our mid-afternoon

22  break, 15 minutes.

23          (Recess taken.)

24          THE COURT:  All right, go ahead.  Go ahead,

25  Mr. Nelkin.

1  BY MR. NELKIN:

2  Q    Mr. Devine, you said that Two Rivers used to provide you

3  with information so you could prepare the quarterly payroll

4  reports?

5  A    Yes.

6  Q    What information would they provide you about each

7  employee?

8  A    The weekly salaries.

9  Q    Okay.  Would they give you Social Security numbers or

10 anything like that?

11 A    They would have to, yes.

12 Q    And would that go in the quarterly payroll report?

13 A    I'm not sure if it was listed on the report or not.

14 Q    Well, why would they have to give you the Social Security

15 numbers?

16 A    It's required to be reported on the quarterly forms and

17 it's required on the W-2s at the year end.

18 Q    Okay.  Now, I have an e-mail from Sava (ph) at your

19 office saying she needs all Two Rivers Social Security

20 numbers.  It says, "They keep changing names and my system is

21 all messed up now."

22      Would she have been inputting Social Security

23 numbers into your system.

24 A    Yes.

25 Q    And what would she have been inputting them into?

1    A     Into the payroll, the payroll CFS payroll package that we

2    have.

3    Q     Okay.  And would that be storing them?

4    A     Yes, it's an after-the-fact payroll reporting system.

5    Q     So if I wanted to use that CSF system to print up

6    something about a particular employee, could I press a button

7    and it would do it based on the inputted information?

8    A     Yes.

9    Q     Okay.  So if we wanted to recreate payroll records that

10   we were having difficulty finding, could we ask that system to

11   print up all the -- for each employee all the records?

12   A     I believe so.

13   Q     And is that information contained in what you gave us?

14   A     The summary, the summaries payrolls are included in all

15   the payroll -- with the payroll records that was provided to

16   you.

17   Q     But is there more information we could get out of that

18   system if we took the trouble and asked it to do it for us?

19   A     I believe so.

20   Q     Okay, thank you.

21          Now, I have a list of payments that Two Rivers may

22   have made to you at some point.  And when I look at it, I have

23   got multiple entries on this report for February 5, 2015.  One

24   is for a thousand dollars, one is for a thousand dollars and

25   another one is for $3,275.

1           If I wanted to try and figure out what those were

2    for, whether they were for a particular month or what

3    accounted for the difference not being -- for the amount not

4    being a thousand dollars, is there anyplace I could look for

5    that information?

6    A    The thousand dollars may have been for a prior month.  It

7    may be behind one month.

8           THE COURT:  He's not asking you to explain what it

9    might have been.  He's asking you where you could find the

10   information that would provide the explanation.

11   A    I guess it would be in the QuickBooks file, in the

12   QuickBooks Enterprise file.

13   Q    Whose QuickBooks Enterprise file?

14   A    Two Rivers.

15   Q    Well, but what about on your side?  Is there anything on

16   your side that would allow us to figure out what those charges

17   were for?

18   A    Anything on my side?  I don't think I would have

19   anything.

20   Q    Okay.  So if someone on the Two Rivers side failed to

21   input the invoice that you sent them, there's nothing that we

22   could do to remedy that?

23   A    No.

24   Q    Okay.  Now, did you ever do anything make any

25   calculations with respect to Two Rivers's inventory?

1   A    I didn't make any calculations.  The inventory was

2   provided to me.

3   Q    What was the reason it was provided to you?

4   A    I believe it was needed for the -- for the year-end

5   filing.

6   Q    Do you pay taxes based on inventory?

7   A    It could be a factor.

8   Q    Well, is there any specific charge related to the taxing

9   of inventory?

10  A    It could be an issue.

11  Q    Okay.  And who provided that information to you?

12  A    I think it was Mayer; I'm not sure.

13  Q    And would you have retained any records related to that?

14  A    I should.

15  Q    Okay.  Was that provided to Two Rivers?

16  A    I believe it was.

17  Q    When?

18  A    I don't recall well, was it provided in this box that we

19  have been referring to?

20          THE COURT:  Exhibit 36?

21          MR. NELKIN:  36.

22  A    I'm not sure where it's in, but I'm not sure where it

23  would be.

24  Q    Have you ever provided anything to Two Rivers since this

25  lawsuit started besides the documents in Defendant's

*M. Devine - Direct/Mr. Nelkin*                    978

1  Exhibit 36 and the two flash drives that you have provided?

2  A    Yes.

3  Q    What?

4  A    I sent a box of records to Vince Papa right -- shortly

5  after.

6  Q    I believe the testimony is that Defendant's 36 --

7  A    It was a box sent directly to Two Rivers back in December

8  of 2015.

9          MR. NELKIN:  Can we stipulate on the record that

10  Defendant's 36 is the same as the box that was sent to Two

11  Rivers?

12          MR. FELDMAN:  I believe so, yes.

13          MR. NELKIN:  Okay.

14  Q    So it's now agreed that this box is the same box that you

15  sent.  So besides that box and the two flash drives, have you

16  ever provided any other information to Two Rivers?

17  A    I they have been provided tax returns.

18  Q    Since this lawsuit started?

19  A    Oh, no.

20  Q    Thank you.  Did anyone ever question your inventory

21  calculations?

22  A    It wasn't my inventory calculation.

23  Q    Well, did anyone ever question Two Rivers's inventory

24  numbers?

25  A    Not sure.

1   Q      Not sure?  Did you ever have any interaction with any
2   auditor for Two Rivers?
3   A      Yes.
4   Q      Who?
5   A      I forget his name, but they were doing an audit on the
6   company.
7   Q      Could it be Robert Kirschenblatt?
8   A      Yes.
9   Q      And was he at Joel Sammet?
10  A      Yes.
11  Q      Did he ever ask you for any particular documents or
12  records?
13  A      I don't remember.
14  Q      You don't remember?  Did he ever complain to you that he
15  was missing records or documents?
16  A      I don't recall.
17  Q      Did you have any communications back and forth with him
18  that have been recorded in any way, whether they are e-mail or
19  letters?
20  A      I don't remember.  I know I was waiting for information
21  from him in order to do the tax return.  That's all I
22  remember.  Those are the communications, but I think they
23  were -- I think it was over the phone.
24  Q      Okay.  Did you ever send him any information?
25  A      I don't remember.

1    Q    Did any of these companies have any silent partners that

2    we haven't discovered today, mentioned today that you are

3    aware of?

4    A    Not that I'm aware of.

5    Q    Okay.  Can you tell me how Mr. Friedman became involved

6    with 24 Hour Oil?

7    A    I believe he started the company sometime in '94, '95.

8    Q    He formed the company?  Did he buy the assets or any

9    assets to form the company or did he just start from scratch?

10   A    I don't remember.  I think it was from scratch.

11   Q    Okay.  Do you know how he acquired his interest in --

12   well, do you know if he has an interest in 431 East 165th

13   Street?

14   A    Yes.

15   Q    Do you know how he acquired that?

16   A    I don't remember.

17   Q    Do you know who he acquired it from?

18   A    I don't remember.

19   Q    Okay.  Could it have been from Mr. Spence?

20   A    No.

21   Q    Why do you say that?

22   A    He never had any ownership.

23   Q    Mr. Spence never had any ownership?  How do you know

24   Mr. Spence?

25   A    He was in the beer business.

1        MR. SCHAFHAUSER:  Objection; relevance.  We are now

2   going back 20 years, Your Honor.

3        THE COURT:  I will allow it.  Connect the dot.

4        MR. NELKIN:  Yes, I'm just trying to run through the

5   companies again.  You just have a couple of names and then,

6   but --

7   Q    Can you just tell me how -- so the only business you are

8   aware of with Mr. Spence was beer?

9   A    Yes.

10  Q    Do you recall if Mr. Spence ever got into any trouble?

11  A    Yes.

12       MR. FELDMAN:  Objection.

13       THE COURT:  What is the --

14       MR. NELKIN:  It has to do with what companies he's

15  involved in.

16       THE COURT:  Give me a proffer.

17       MR. NELKIN:  He has testified that he doesn't know

18  how Mr. Friedman got involved with this building that all

19  these entities are housed in.  And I believe the record shows

20  that Mr. Spence historically owned them and that he owned the

21  companies that they now own.  And I simply would like to know

22  if this witness can connect those dots for me.

23       THE COURT:  What does Mr. Spence's past history of

24  trouble, as you put it, have to do with it?

25       MR. NELKIN:  Well, the witness is aware that

1   Mr. Spence got into trouble.  He got into trouble because of

2   activities at certain companies.

3              THE COURT:  Look, you have something in mind, help

4   me understand it.

5              MR. NELKIN:  Okay, there was a giant money

6   laundering operation that operated out of 431.  It was -- the

7   government arrested a number of people, including at least one

8   of the defendants, and put notices of pendency and everything

9   against the property that were not removed until well after it

10  appears Mr. Friedman became involved in those.  And he now

11  operates a number of these companies.

12             THE COURT:  "He" who?

13             MR. NELKIN:  Mr. Friedman.

14             THE COURT:  Okay.

15             MR. NELKIN:  Now operates a number of the companies

16  that operated historically out of this business.  He owns the

17  building that Mr. Spence owned.  He's in the same businesses

18  that Mr. Spence --

19             THE COURT:  So the idea is to show the web of

20  relationships that makes it appropriate, in your view, to look

21  past corporate --

22             MR. NELKIN:  Absolutely.

23             THE COURT:  -- niceties in attributing knowledge of

24  one to the other for purposes of discharge of their

25  obligations under the preliminary injunction?

1              MR. NELKIN:  Yes.

2              THE COURT:  For that purpose, I will allow it.

3              MR. NELKIN:  Thank you, Your Honor.

4    BY MR. NELKIN:

5    Q    Can you tell me what you know about Mr. Spence's legal

6    problems?

7    A    From what I heard, he was laundering money.

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M. Devine - direct/Mr. Nelkin                           984

1    BY MR. NELKIN:

2    Q     How did you hear that?

3    A     It was all over the newspaper.

4    Q     Did you know Mr. Spence before that?

5    A     Yes, I did.

6    Q     Okay.  Do you know if any of the defendants knew him

7    before that?

8    A     John Ahearn, Lawrence Ahearn knew him.  Silvia knew him.

9    I think that's it.

10   Q     Okay.  And did you know all of them at the same time?

11   A     Yes.

12   Q     Did you work -- how did you know them?

13   A     Well, the Ahearns were clients of mine.

14   Q     Okay.  Were they in business with Mr. Spence?

15   A     No.

16   Q     Did they do business with Mr. Spence?

17   A     In the beer business.  They used to buy beer from him

18   when they had the beer business.

19   Q     How did you know Ms. Ezell?

20   A     Well, she was working for Jack and Larry.

21   Q     Did she work for Mr. Spence?

22   A     I don't know.

23   Q     Do you know if she was arrested along with Mr. Spence?

24             MR. FINKEL:  Objection, your Honor.

25             THE COURT:  What's that?

M. Devine - direct/Mr. Nelkin                           985

1          MR. FINKEL:  As your Honor well knows, the fact that

2    someone was arrested is not a relevant question.

3          THE COURT:  It doesn't establish guilt.  He is

4    establishing relationships among them.

5          MR. FINKEL:  The fact that one is arrested --

6          THE COURT:  Overruled.  Have a seat.  I have

7    overruled the objection.  Go ahead.

8    A    What was the question?

9    Q    At the time she was arrested who was she working for?

10   A    I don't remember.

11   Q    You said she worked for Jack and Larry?

12   A    Yes.  I don't know what company it was at the time.

13   Q    But it's your belief she was working for them at the time

14   that Mr. Spence was arrested?

15         MR. FINKEL:  Objection.  He is asking for

16   speculation, your Honor.

17         THE COURT:  I'm sorry.  Repeat the question.

18         MR. NELKIN:  I said, is it your belief that she was

19   working for the Ahearns at the time that Mr. Spence was

20   arrested.

21         THE COURT:  Don't speculate.

22         MR. FINKEL:  Objection, your Honor.

23         THE COURT:  The objection is overruled.

24         You said you had knowledge about it.

25   A    I'm not sure exactly who she was working for.  I think it

1   was -- I'm not a hundred percent sure.  It's many years ago.

2   My memory is not that good.

3   Q    Where were the Ahearns operating at the time that

4   Mr. Spence was arrested, what address?

5   A    They were at 431 East 165th Street.

6   Q    What businesses were they running at that time?

7   A    I think it was a beer business, wholesale beer, I

8   believe.

9   Q    Did they have any other businesses of which you are

10  aware?

11  A    Hard to remember all the way that far back.

12  Q    Do you know if any -- what businesses Mr. Spence was

13  running at 431 at the time?

14  A    He might have had his own beer business there as well.  I

15  don't recall exactly.

16  Q    Did he have any fuel businesses?

17  A    Yes, he did.  Yes, he did.

18  Q    Do you remember the name?

19  A    You jarred my memory, yes.

20  Q    Do you remember the name?

21  A    I don't remember it.

22  Q    At the time --

23  A    He had some sort of beer business.  I don't remember.

24  Q    At the time your clients were operating out of 431 who

25  were they -- did they have an ownership in the building?

1    A     Yes.

2              MR. SCHAFHAUSER:  Objection, your Honor.

3              THE COURT:  Overruled.

4    A     Yes, I believe they owned the building.

5    Q     Did they own all of it?

6    A     I'm not sure of the percentage.

7    Q     Do you know if they were in partnership with Mr. Spence?

8    A     No.  He was not a partner in the building.

9    Q     He had no ownership in the building?

10   A     No.

11   Q     Okay.  Do you know when Mr. Friedman acquired an

12   ownership in the building?

13   A     I'm not sure of the exact date.

14   Q     Do you know if it was before or after Mr. Spence was

15   arrested?

16   A     It must have been after.

17   Q     Okay.  Besides hearing about -- reading about it in the

18   papers, was there any other information about Mr. Spence being

19   arrested that you obtained?

20   A     Well, he was charged, and everyone else was found not

21   guilty.

22   Q     Well --

23   A     There were no charges against anybody else is what I

24   heard.  Everything was dropped.  All of the charges were

25   dropped except for against Mr. Spence, that was the outcome of

*M. Devine - direct/Mr. Nelkin*                                    988

1    it.

2    Q    Did you -- were you aware that Ms. Ezell was arrested?

3             MR. FINKEL:  Objection, your Honor.

4             THE COURT:  He has already answered that.

5             MR. NELKIN:  I apologize.

6             THE COURT:  You said yes, right?

7             THE WITNESS:  Yeah.

8             THE COURT:  Go ahead.

9             MR. NELKIN:  Okay.

10   BY MR. NELKIN:

11   Q    I have a couple of questions about different companies

12   that operated out of that location.  I would just like to ask

13   you if you can tell me if you are aware of any relationship

14   with those companies to Mr. Spence, the Ahearns, or

15   Mr. Friedman.

16            THE COURT:  This is 431?

17            MR. NELKIN:  431.

18   Q    165th Realty Corp.?

19   A    Yes.  That's the owner of the property.

20   Q    Okay.  Who were the owners of that company?

21   A    Presently?

22   Q    Let's start with presently.

23   A    I believe it's -- well, I answered that earlier.  That's

24   the Joseph Ahearn, Jessica Ahearn, and Mr. Friedman.

25   Q    Has that always been the ownership of that company?

*M. Devine - direct/Mr. Nelkin*                                    989

1    A    It has not always been, no.

2    Q    Who else has been an owner of that company?

3    A    John and Lawrence were most likely owners at one time.

4    Q    Do you know when their ownership ceased?

5    A    No.

6    Q    What about Panaflex Corporation?

7    A    No idea.  Never heard of it.

8    Q    Do you know if 24 Hour Oil Delivery Corp. Ever had any

9    dealings with 165th Street Realty Corp.?

10   A    They were a tenant.  They paid rent.

11   Q    Did they ever loan them money in either direction?

12   A    I'm not sure.

13   Q    Do you know anything about a UCC between -- regarding

14   165th Street Realty Corp. Related to that property?

15   A    No.

16   Q    What about for 24 Hour Oil related to that property?

17             MR. GRANTZ:  Objection to relevance.

18             THE COURT:  Overruled.

19   A    I don't know.

20   Q    Do you know if 24 Hour Oil ever had any loans or ever had

21   any financial dealings with NRG?

22   A    Yes.

23   Q    What did they have?

24   A    24 Hour would purchase oil from them.

25   Q    Did they ever loan each other money?

*M. Devine - direct/Mr. Nelkin*                              990

1    A    I don't think so.

2    Q    Do you know if Mr. Friedman ever had any mortgages with

3    165th Street Realty Corp.?

4    A    I don't know.

5    Q    Were you aware of any order of forfeiture related to

6    Mr. Spence or any of his assets?

7              MR. SCHAFHAUSER:  Objection to relevance.

8              THE COURT:  Overruled.

9    A    I don't know the details.

10   Q    Were you aware of an order of forfeiture in any way,

11   shape, or form?

12   A    I heard that he forfeited a lot of assets, but I don't

13   know what the details were.

14   Q    Do you know of any liens or notice of pendency against

15   any of his assets?

16   A    No.

17   Q    Do you know of any restrictions on the transfer or

18   dissipation of his assets?

19   A    No.

20   Q    Do you know of any restrictions on the transfer of any

21   right, title, and interest held by Richard Spence in the real

22   property in the building known as 431 East 165th Street, the

23   Bronx?

24   A    No.

25   Q    Okay.  Have you ever heard of Light Trucking Company?

*M. Devine - direct/Mr. Nelkin*                                         991

1  A     Yes.

2  Q     Do you know if Mr. Spence was ever involved in that?

3  A     No.

4  Q     Do you know if the other defendants were ever involved in

5  that?

6            MR. FELDMAN:  Objection.

7            THE COURT:  Overruled.

8            MR. FELDMAN:  We have been through it.

9            THE COURT:  It's asked and answered?

10           MR. NELKIN:  If he answered it, fine.

11           THE COURT:  Okay.  Good.

12  Q     Dynamic Oil Company?

13  A     I don't know.

14  Q     Have you ever heard of Dynamic Oil Company.

15  A     I heard of it.  I don't know.

16  Q     Did you ever do any work for them?

17  A     I don't remember.

18  Q     You don't remember?

19  A     No.  It's a long time.

20  Q     Do you know who owned Dynamic Oil Company?

21  A     No.

22  Q     Do you know of any restraining order against Mr. Spence?

23  A     No.

24  Q     Do you know of any restraining order against Light

25  Trucking Company?

1    A    No.

2    Q    Do you know of any restraining order against Dynamic Oil

3    Company?

4    A    No.

5    Q    Do you know of any restraining order against 165th Street

6    Realty Corp.?

7    A    I don't remember.

8    Q    You don't remember?

9    A    (Shook head.)

10   Q    Is it possible there was one?

11        Have you ever heard of Morningside Fuel Corp.?

12   A    Yes.

13   Q    What is Morningside Fuel Corp.?

14        MR. SCHAFHAUSER:  Objection.  This is not even a

15   party to the case.

16        THE COURT:  We are hearing about a lot of entities

17   that are not parties to the case.  Why is that particular one

18   a relevant objection?

19        MR. SCHAFHAUSER:  He asked --

20        THE COURT:  Why is this a relevance objection, if

21   others aren't?

22        MR. SCHAFHAUSER:  I have been standing up and

23   objecting to others.

24        THE COURT:  I explained my rationale.  So what's

25   my --

1          MR. SCHAFHAUSER:  The difference here -- and I don't

2   understand what your Honor just said.

3          THE COURT:  What's different?

4          MR. SCHAFHAUSER:  The difference here is that we are

5   talking about -- previously we were talking about 20 years

6   ago, and I stood up and objected; but now we are talking about

7   nondefendants who are not the subject of the application.

8          THE COURT:  Right.  Here is the problem.  I'm

9   learning through this hearing about all sorts of relationships

10  that aren't often done that make it hard to accept the

11  position that you seem to be taking that there is, you know,

12  firm borders between one entity and another that can cabin who

13  might be deemed responsible for the computers that we are

14  trying to find out about.  Without a full understanding of

15  this picture, I can't understand who might or might not be

16  responsible for providing the information that hasn't been

17  provided to date.

18         So that's why I'm allowing it.

19         MR. SCHAFHAUSER:  Very well, your Honor.

20  BY MR. NELKIN:

21  Q    What do you know about Morningside Fuel Corp.?

22  A    It was an entity that was owned by Mr. Morty Katzner.

23  Q    Did it ever have any other owners?

24  A    Not that I'm aware of.

25  Q    Who is Morty Katzner?

M. Devine - direct/Mr. Nelkin                                    994

1   A    He was an individual in the fuel oil business.

2   Q    Did you ever do work for Morningside Fuel?

3   A    No.

4   Q    Did you do work for Morty Katzner?

5   A    No.

6   Q    Do you know what business -- if Morningside Fuel ever did

7   any business with the Ahearns?

8   A    They may have sold fuel to each other.  I'm not sure.

9   Q    What about with 165th Street Realty Corp.?

10  A    I don't know.

11  Q    Or Light Trucking?

12  A    I don't know.

13  Q    Or Park Avenue?

14  A    I don't know.

15  Q    Do you know MJL Realty?

16  A    It's not ringing a bell.

17  Q    Do you know if any of the defendants had a relationship

18  with MJL Realty?

19         THE COURT:  He doesn't know.

20  A    I don't know.  I don't remember the company.

21  Q    Brook Petroleum?

22  A    Brook Petroleum is the d/b/a of 24 Hour.

23  Q    Okay.  Can you tell me why Mr. Ahearn -- the two Ahearns,

24  165th Street Realty, Light Trucking, and Park Avenue would be

25  on one side of a lawsuit and Brook Petroleum and would be on

1  the other side?

2  A    The other side of what?

3  Q    Of a lawsuit.

4  A    I don't remember.

5  Q    Do you know if the Ahearns had any -- well, I guess

6  they -- were the Ahearns involved from the start with 24 Hour

7  Oil?

8  A    They were working there in the beginning, yes.

9  Q    But they were employees?

10  A    Yes.

11  Q    Were they ever owners?

12  A    No.

13  Q    Did Associated Fuel Oil Corp. Ever operate out of 165th

14  Street Realty?

15  A    I don't recall.

16  Q    And all right.  Did NRG Heat operate out of -- do you

17  know what address they operated out of?

18  A    It's 2 Madison Avenue in Larchmont, New York.

19  Q    And can you tell me if you are aware of any trouble that

20  Mr. Cirillo got into?

21  A    No.

22  Q    Are you aware of any trouble that Cybro got into?

23  A    No.

24  Q    All right.  Can you tell me how Mr. Friedman became

25  involved with the Ahearns?

M. Devine - direct/Mr. Nelkin                    996

1   A     I don't know.

2   Q     Do you remember how Mr. Friedman became involved with

3   Ms. Ezell?

4   A     I'm not sure of the exact relationship.  I don't know.

5   Q     Do you know what role Ms. Ezell played for the Ahearns?

6   A     She did bookkeeping for their beer companies.

7   Q     Okay, and did she do any other work for them?

8   A     I believe it was just bookkeeping.

9   Q     What is it that you understood she was arrested for?

10              MR. FINKEL:  Objection.

11              THE COURT:  Basis?

12              MR. FINKEL:  I'm sure that Mr. Nelkin is well aware

13  that the case --

14              THE COURT:  What's the basis of the objection, not

15  what he is aware of.  I'm sorry.

16              MR. FINKEL:  I will withdraw the objection.

17              THE COURT:  Oh, okay.  Then go ahead.

18  A     I don't remember.

19  Q     Okay.  So it's your testimony that you thought she was

20  working for the Ahearns and she was suddenly arrested.

21              The Ahearns were your client at the time?

22  A     Uh-huh.

23  Q     And you have no idea what she was arrested for?

24  A     I don't remember the details.

25              THE COURT:  Look, the charges if any against

1   Ms. Ezell are not the subject.  The relationships among the

2   various players are.

3            MR. NELKIN:  The relationships were.

4            THE COURT:  So move on.

5            MR. NELKIN:  Okay.  Fine.  I think I'm pretty much

6   done.  Give me one minute.  I think I'm done, your Honor.

7            THE COURT:  Okay.

8   (Pause.)

9   BY MR. NELKIN:

10  Q    When did you first meet Mr. Friedman and when?

11  A    Some 20 years ago.

12  Q    Okay.  What were the circumstances?

13  A    I believe he was looking for an accountant to handle the

14  24 Hour Oil company he was starting.

15  Q    Who referred him to you?

16  A    I believe it was -- I think it was Jack Ahearn.

17  Q    Do you know how he met Mr. Ahearn?

18  A    I don't.

19  Q    I just have one last question about companies that were

20  operating out of Mr. Friedman's office in Brooklyn.  If I

21  did -- all I want you to tell me is are you aware of the

22  company, and do you know if Mr. Friedman or any other

23  defendant had any involvement in the company.

24            1671 Lincoln, LLC?

25  A    Is your question are any of the defendants partners or

*M. Devine - direct/Mr. Nelkin*                                        998

1   owners, have any ownership in that?

2   Q    I want to ask you if you have heard of the company.

3   A    I heard of the company.

4   Q    Do you do work for the company?

5   A    I don't.

6   Q    Do you know who the owners are in the company?

7   A    No.

8   Q    How have you heard of the company?

9   A    I receive a K-1 in preparation of Mr. Friedman's tax

10  return.

11  Q    Showing if he has an interest in it?

12  A    Yes.

13  Q    1911 Albemarle Owners Corp.?

14  A    Same.

15  Q    1911 Albemarle Holding, LLC?

16  A    That one I'm not sure.

17  Q    2611 Pitkin, LLC?

18  A    Same thing.  I receive a K-1 in preparation of

19  Mr. Friedman's tax return.

20  Q    324 Bradford, LLC?

21  A    Same thing.  I receive a K-1.  I don't do any work.

22  Q    350 Lefferts Realty, LLC?

23  A    Same response.

24  Q    354 Ocean Avenue?

25            THE WITNESS:  I'm sorry.  Do I have to answer each

1    one, your Honor?

2              THE COURT:  If he doesn't have a follow-up question,

3    I assume that's sufficient for his purposes.

4              THE WITNESS:  Okay.

5    Q    354 Ocean Avenue Realty Corp., LLC?

6    A    Same.

7    Q    553 Ocean Realty, LLC?

8    A    Same.

9    Q    946 Saint Marks Associates, LLC?

10   A    Same.

11   Q    All Borough Housing, LLC?

12   A    Same.

13   Q    E & Jeryg Management Corp.?

14   A    Same.

15   Q    Emil Friedman East 17th, LLC?

16   A    Same.

17   Q    Emil Friedman Washington Avenue, LLC?

18   A    Same.

19   Q    Frozen Pastry Product Corp., LL -- just corp.

20   A    Same.

21   Q    Lenox Associates, LLC?

22   A    Same.

23   Q    SG Realty Company, LLC?

24   A    Same.

25   Q    Okay.  You didn't mention any of those when I asked you

1    before.

2              Is this just refreshing your memory?

3    A    I don't do any work for them.

4    Q    But I asked you if Mr. Friedman had any interest in any

5    other companies that you are aware of.

6    A    Oh, I must have misunderstood the question then.  Sorry.

7    Q    Now that you understand it, can you tell me if there are

8    any other companies that I haven't mentioned that he gets a

9    K-1 for?

10   A    That you didn't mention?

11   Q    Yes.

12   A    165th Street Realty, MB Fuel Transport.  It's hard to

13   remember all of them from the top of my head, sir.

14   Q    Would his tax return show that?

15   A    Office Coffee.  No.  Office Coffee doesn't.  E&I

16   Investors, E&I Funding.

17   Q    Does E& -- you said E&I Funding?

18   A    Yes.

19   Q    Is there an E&J Funding and an E&I Funding?

20   A    It's E&J Funding, correct.  I'm sorry.  It's not E&I.

21   It's E&J.

22   Q    So there is only one entity E&I, E&I Investors?

23   A    Right.

24   Q    And there is only one entity E&J Funding?

25   A    Yes.

*M. Devine - direct/Mr. Nelkin*                                    1001

1    Q     Have you ever heard of a company called E&J Management?

2    A     Yes.

3    Q     Is that a real company?

4    A     I'm not sure of the actual name of the company.

5    Q     Okay.  Well what do you understand E&J Management to be?

6    A     It's a management company.

7    Q     Okay.  Who owns it?

8    A     I think Mr. Friedman and I think Mr. Sandberg.

9    Q     Okay, and do they give -- does Mr. Friedman get a K-1

10   from them?

11   A     Yes.

12   Q     Does he get a K-1 from a company called E & Jeryg?

13   A     You know, the names are so similar.  There is only one

14   company, and I'm not sure of the exact name.

15   Q     Do you know if E & Jeryg has subsidiaries?

16   A     No.

17   Q     Does it -- do any of these companies that we have

18   mentioned today have any subsidiaries?

19   A     Not that I'm aware of.

20   Q     Do any of them have any parents?

21   A     No.

22   Q     Is there any other company that you can think of that has

23   a relationship that Mr. Friedman has an interest in or gets a

24   K-1 from?

25   A     There might be.  I can't keep -- I can't remember all of

1    them in my head.

2    Q    What about the Ahearns, any other companies that we

3    haven't mentioned that they might have an interest in?

4    A    No.

5    Q    How do you communicate with Mr. Friedman?

6    A    Telephone.

7    Q    Do you ever e-mail him?

8    A    Occasionally.

9    Q    Does he ever e-mail you?

10   A    Occasionally.

11   Q    Okay.  And one last question.

12        Do you know if Mr. Friedman gets any K-1s from any

13   businesses related to Joseph Friedman?

14   A    I don't know.

15   Q    Do you know if Joseph Friedman is a member in any of the

16   companies that we have mentioned?

17   A    No idea.

18   Q    Do you have any records that would show who Mr. Friedman

19   or his companies have loaned money to?

20   A    I'm not sure.

21   Q    How would you find that out?

22   A    I would have to look on the balance sheet and see if

23   there is any outstanding loans to him.

24   Q    Okay, or to the companies?

25   A    Right.

M. Devine - direct/Mr. Nelkin                          1003

1    Q    Okay.  And one last thing is:  Do you know if all of the

2    defendants have filed tax returns?

3    A    To the best of my knowledge.

4    Q    How do you know about -- well, what do you know about E&J

5    Funding?

6    A    That entity files tax returns.

7    Q    How do you know that?

8    A    Because I file them.

9    Q    I thought you said you didn't do any work for E&J

10   entities.

11   A    Not E&J Management, E&J Funding.

12   Q    I thought I asked you about all the E&J, the Brooklyn

13   entities; but let's just be clear.

14        Do you do work for E&J Funding?

15   A    Yes.

16   Q    What work do you do for them?

17   A    Year-end tax return.

18   Q    Okay, and do you have all those records?

19   A    I have the tax returns, yes.

20   Q    Do you have all the other records that might pertain to

21   their business, the general ledgers and things of that sort?

22   A    Yeah, I have records, yes.

23   Q    What about E&I Investors?

24   A    I have records on that company as well.

25   Q    What about E&J Management?

*M. Devine - direct/Mr. Nelkin*                                    1004

1    A    No.

2    Q    Is there any other company in Brooklyn that Mr. Friedman

3    has an interest in that you do work for?

4    A    No.

5    Q    So just E&I Investors Group and just E&J Funding?

6    A    Yes.

7    Q    You don't know who does the work for the other company?

8    A    No.

9    Q    Do you know why you do the work for all of Mr. Friedman's

10   companies except for just a couple?

11   A    No.

12              (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    MR. NELKIN:  I think I'll pass the witness.

2    THE COURT:  Okay.  Who would like to question?

3    MR. FELDMAN:  Just a few questions.

4 CROSS-EXAMINATION

5 BY MR. FELDMAN:

6 Q    You mentioned an individual, Robert Kirschenblatt; he is

7 an accountant, Robert Kirschenblatt?

8 A    Yes, he's an auditor.

9 Q    An auditing firm?

10 A    An auditing firm, yes.

11 Q    Was he hired to do some work on behalf of Two Rivers?

12 A    Yes.

13 Q    What work was he hired to do?

14 A    To perform an audit.

15 Q    For what year?

16 A    I believe it was 2014.

17 Q    And what was the purpose of that audit, if you know?

18 A    The purpose of the audit was so they could sell the

19 company.  They needed audited financial statements in order to

20 sell the company.

21 Q    Did he complete his audit?

22 A    I don't believe so.

23 Q    Were you in communication with him in connection with the

24 audit?

25 A    I was in communication with him looking for the documents

M. Devine - cross - Feldman                          1006

1   to complete the tax returns.

2   Q    Okay.  And was the plaintiff, Mr. Schreiber, in

3   communication with Mr. Kirschenblatt?

4   A    He must have been, he was in their offices.

5   Q    How about Vincent Papa?

6   A    Yes.

7   Q    And did you ever refuse to provide any records to

8   Mr. Kirschenblatt?

9   A    No.

10  Q    Was he also asked to review Two Rivers' financials for

11  2013?

12  A    Yes.

13  Q    And do you know whether he completed that?

14  A    I believe he completed the review, yes.

15  Q    And can you explain to the Court the difference between

16  the review and an audit?

17  A    A review is a little less involved where you don't have

18  to fully document all the actual records.  An audit is more

19  sensitive where they'll go more in depth as far as verifying

20  receivables, payables, outstanding balance.

21  Q    And the least comprehensive is a compilation?

22  A    Yes.

23  Q    And on the level of compilation, review or audit, what

24  were you asked to do, if any?

25  A    It was not either.

M. Devine - cross - Feldman                                    1007

1   Q    None of those?

2   A    It was just basically for preparation of tax returns.

3   Q    Okay.  And after Vincent Papa was hired -- and he was

4   hired in 2013 I think you said?

5   A    Yes.

6   Q    From that moment on you were getting reports that he

7   generated in connection with your services; is that right?

8   A    That's correct.

9   Q    And did you rely upon the information that he provided?

10  A    Yes.

11  Q    In terms of doing your -- providing your services?

12  A    That's correct.

13  Q    Okay.  And did you have communications with Mr. Papa once

14  he became employed or any time after he became employed by Two

15  Rivers in connection with his recharacterization or his

16  verifying of Two Rivers' books and records?

17  A    Yes.

18  Q    And what was that about, can you explain what occurred

19  and for what purpose?

20  A    When he was hired he came in and he made corrections to

21  all the books and records, he found mistakes in many areas and

22  he corrected -- accounts receivable was wrong, inventory was

23  wrong with a number of account balances that were incorrect.

24  He came and made all the adjustments to the books and records?

25  Q    So, those adjustments were his?

1   A    Yes.

2   Q    When did he complete these adjustments?

3   A    This would have been sometime in '13.

4   Q    Because the adjustments had to be completed by the time

5   he issued his review?

6   A    I'm not sure of the exact time frame when all the

7   adjustments were made.

8   Q    Do you know whether either Steven Schreiber or Eugene

9   Schreiber or Mayer Koenig were involved in this work that

10  Mr. Papa was doing in terms of these adjustments?

11  A    I would imagine they would have been.

12  Q    Okay.  Well, you told the Court that Mr. Koenig was

13  involved with the inventory; is that right?

14  A    Yes.

15  Q    So, was an adjustment that Mr. Papa did to the inventory

16  of Two Rivers?

17  A    Yes.

18  Q    So, did he review it, to your knowledge, and either

19  adjust it upward or downward?

20  A    Yes, he made an adjustment to the inventory, the cost of

21  goods sold, equipment.

22  Q    And was Steven Schreiber involved in any aspect that

23  required him to provide information to Mr. Papa?

24  A    I'm not aware if he was or not.

25  Q    Okay.  Now, when you generated your tax returns and filed

M. Devine - cross - Feldman                                    1009

1    them, did you send copies of them to Steve Schreiber, Eugene

2    Schreiber and Mayer Koenig?

3    A    Yes.

4    Q    So, they had the tax returns in realtime; is that right?

5    A    Yes.

6    Q    Did they ask -- did they approach you with any questions

7    or communicate with you any questions about any of them?

8    A    There were questions.

9    Q    And you answered all of them, did you not?

10   A    Yes.

11   Q    And did an issue come up concerning Mr. Schreiber's

12   request for treatment of his income?

13   A    Yes.

14   Q    And would you describe what that issue was about to the

15   Court?

16   A    There were payments to Steven Schreiber that he was

17   trying to classify as expenses.

18   Q    And what would be the tax effect of reclassifying income

19   as reimbursement of expenses to him?

20   A    So he wouldn't have to pay income taxes on it.

21   Q    And did he suggest -- withdrawn.

22        Did your office ask for backup?

23   A    Yes.

24   Q    Were you ever provided with that?

25   A    No.

M. Devine - cross - Feldman                        1010

1  Q    Was that a source of upsetment by Mr. Schreiber --

2            THE COURT:  Counsel, so I can understand what I'm

3  hearing, how does this relate to the purpose of the hearing?

4  I'm not going to stop you from doing it, I want to understand

5  how it relates to our inquiry here as opposed to the

6  underlying merits of the case.

7            MR. FELDMAN:  I'm just trying to connect the fact

8  that the plaintiff has had all the financial records of Two

9  Rivers at their disposal going down to the level of detail of

10  income and reimbursement of expenses, of adjustments.

11            THE COURT:  So, Mr. Schreiber's motives in seeking

12  information helps me understand the information that he had?

13            MR. FELDMAN:  Correct.

14            THE COURT:  I understand what your theory purports

15  to be.

16            MR. FELDMAN:  Thank you, Your Honor.

17            THE COURT:  Or what you purport the theory to be I

18  should say.

19            MR. FELDMAN:  Okay.

20  Q    So, tax returns were transmitted by you to Mr. Schreiber,

21  his dad and Mayer Koenig on a regular basis, right?

22  A    Yes.

23  Q    In addition to the tax returns, did you provide --

24  withdrawn.

25            You've testified that you didn't have access to the

1  Launch system, is that right, that you had access but you

2  never used it?

3  A    Yes, I had access, I never -- I may have gone on there

4  one time, two times just to navigate the program but I could

5  never navigate the software and I never utilized it.

6  Q    What system was Vincent Papa using to generate these

7  reports once he was hired by Two Rivers that he then sent to

8  you?

9  A    QuickBooks Enterprise.

10  Q    And do you know how he populated the QuickBooks

11  Enterprise with the information concerning Two Rivers?

12  A    He punched in and entered all the information, all the

13  data.

14  Q    So, he literally went line item by line item, income,

15  expenses, assets liabilities and inputted it?

16  A    From the very beginning.

17  Q    From the very -- so, he went back to the creation of

18  Two Rivers --

19            MR. NELKIN:  Objection.

20            THE COURT:  Overruled.

21            MR. NELKIN:  What is the foundation for his

22  knowledge.

23            THE COURT:  How do you know?

24            THE WITNESS:  Because he provided me with the

25  financial documents.

1          MR. NELKIN:  But did you --

2          THE COURT:  Do it on redirect.

3          MR. NELKIN:  Okay.

4          THE COURT:  Go ahead.

5   Q    Do you know how long that process was of populating the

6   QuickBooks Enterprise when he undertook that endeavor?

7   A    No.

8   Q    But it was a period of time, right?

9   A    Yes.

10  Q    And did he pose questions to you along the way seeking

11  information about any entries that he was interested in

12  making?

13  A    I don't recall exactly.

14  Q    Okay.  And at some point in time he was using that on a

15  going forward basis, the QuickBooks Enterprise, correct?

16  A    Correct.

17  Q    Did you have anything to do with any of the entries in

18  the QuickBooks Enterprise?

19  A    No.

20  Q    Did you have anything to do with the generation of the

21  information that you then used to create the 941s and 940s?

22  A    That information didn't come from Vincent Papa, that came

23  from Sonia, the weekly payroll reports.

24  Q    Did you have anything to do with the generation of that,

25  the underlying information?

*M. Devine - cross - Finkel*                                    1013

1    A    No.

2    Q    Okay.  You got it and then you just processed it; is that

3    right?

4    A    That's correct.

5    Q    Now, Mr. Nelkin asked you that this paycheck withholding

6    calculator, the CFS, he asked you what more information could

7    you get off of that payroll system; does that mean that you

8    could push a button and get more detailed information like by

9    the week or by the employee or something?

10   A    Yes.

11   Q    The information that you provided to the plaintiff was of

12   a more general nature?

13   A    Yes.

14   Q    But it contained that information?

15   A    Correct.

16   Q    So, if they had a problem with it -- withdrawn.

17            MR. FELDMAN:  Just give me one moment, Your Honor.

18            THE COURT:  Sure.

19            (Pause in the proceedings.)

20            MR. FELDMAN:  I have nothing further, Your Honor.

21            THE COURT:  Anyone else?

22            MR. FINKEL:  Yes, Your Honor.

23            THE COURT:  Go ahead.

24   CROSS-EXAMINATION

25   BY MR. FINKEL:

M. Devine - cross - Schafhauser                    1014

1  Q     Good afternoon.

2           Mr. Nelkin asked you several questions about Silvia

3  Ezell, do you recall those questions?

4  A     Yes.

5  Q     And do you recall questions concerning whether or not she

6  was arrested?

7  A     Yes.

8  Q     And you are aware that there came a time that she was

9  arrested; is that correct?

10 A     Yes.

11 Q     And you're also aware that all charges were dismissed

12 against her on the government's motion; is that correct?

13 A     That's correct.

14           MR. FINKEL:  No further questions.

15           THE COURT:  All right.  Anyone else?

16           MR. SCHAFHAUSER:  Thank you.

17 CROSS-EXAMINATION

18 BY MR. SCHAFHAUSER:

19 Q     Mr. Devine, could you please turn to Defendant's

20 Exhibit 6 which is in the -- you should have it, I think

21 you're in the right book, Defendant's Exhibit 6.

22           Do you recall testifying on direct about you being

23 mentioned in the operating agreement, do you recall that

24 testimony?

25 A     Yes.

1   Q    Okay.  Take a look at this and if first question I'll ask

2   you is whether you recognize this in fact as the operating

3   agreement that you were referring to?

4   A    Yes.

5   Q    Okay.  Could you please turn to page 12, Section 7.3.

6   A    Yes.

7   Q    Okay.  We can all read the words but is this what you

8   were referring to when you testified that you recalled that

9   you were mentioned and retained pursuant to the operating

10  agreement?

11  A    Correct.

12  Q    Okay.  Let me now focus you on Section 8.1, it says:

13          "The accountant shall cause to be prepared and filed

14  all necessary federal, state and local income tax returns" and

15  then it goes on.

16          The accountant in that you understood to be you,

17  correct?

18  A    Yes.

19  Q    And for what years did you prepare tax returns for

20  Two Rivers?

21  A    '12, '13 and '14 and through September 30th, '15 for the

22  payroll taxes.

23  Q    Okay.  And in addition -- well -- okay.

24          So, let me now flip the page if I may with you to

25  Section 9.2 on page 13, it says and I'll -- among other things

1   it says:

2          "The accountant shall furnish to each member within

3   90 days of the end of each fiscal year during the term of the

4   company a form K-1 in the member's name."

5          I'll stop there.  Do you see those words?

6   A    Yes.

7   Q    Okay.  Did you in fact provide form K-1s to the company's

8   members?

9   A    I did.

10  Q    Okay.  And it was also for '12, '13, '14 and through 9/30

11  of 2015; is that correct?

12  A    No, there's no K-1 for '15.

13  Q    Okay, but for '12, '13 and '14 you prepared the K-1s for

14  each of the members, right?

15  A    Yes.

16  Q    And so I'm clear, who are the members for whom you

17  prepared those K-1s?

18  A    Mr. Friedman, Mr. Steven Schreiber, Mr. Mayer Koenig and

19  Mr. Eugene Schreiber.

20  Q    Okay.  Now, I thought I heard you say on your direct

21  testimony that you had access to Launch but you never used

22  Launch, did I hear that correctly?

23  A    Yes.

24  Q    Did you ever derive information from Launch for purposes

25  of preparing the company's tax returns or the members' K-1s?

1  A    No.

2  Q    For the last year that you did it, 2014, who provided you

3  the information to plug in to the tax return and K-1 forms?

4  A    Mr. Vincent Papa.

5  Q    Okay.  And where did he derive that information from?

6  A    From his QuickBooks Enterprise system.

7  Q    And did he ever indicate to you that he required separate

8  information from Launch for purposes of you preparing tax

9  returns to be filed on behalf of Two Rivers, LLC?

10  A    No.

11  Q    What about the members, did any of the members say that

12  you should access Launch to prepare the K-1s that they would

13  be filing?

14  A    No.

15  Q    And you never did so, correct?

16  A    I never utilized the system.

17  Q    You never utilized the Launch system, it was all based on

18  the QuickBooks Enterprise system?

19  A    Correct.

20  Q    And that's the information on which you relied, correct?

21  A    Yes.

22  Q    And that is also the information that the members and

23  Mr. Papa knew you were relying on when you were doing your

24  accounting functions under this operating agreement, correct?

25  A    That's correct.

1  Q    Now, Mr. -- I wrote the name down, Mr. Greenblatt I

2  believe, there was an auditor that was just mentioned; what

3  was that gentleman's name?

4  A    Robert Kirschenblatt.

5  Q    Kirschenblatt, Mr. Kirschenblatt.  Did you interact with

6  Mr. Kirschenblatt as well regarding the company's financial

7  information?

8  A    I don't recall.

9  Q    Okay.  Did you communicate with him at all?

10  A    Yes.

11  Q    What did you communicate with him about regarding

12  Two Rivers?

13  A    I was looking for the audited financial statement in

14  order to prepare the '14 tax return and I couldn't prepare it

15  without it so I was waiting on that information.

16  Q    And do you have any understanding as to the source of the

17  information that was set forth in that gentleman's audited

18  financial statement?

19  A    No, it was never completed.

20  Q    I think Mr. Feldman had asked you a question about a

21  transfer of information.  I wanted to ask you a question in

22  that regard.

23        Do you recall a gentleman by the name of Isaac?

24  A    No.

25  Q    Okay.  Do you have any knowledge as to whether or when

1  information was transferred onto the QuickBooks Enterprise

2  system?

3  A    It was sometime shortly after Mr. Papa was hired.

4  Q    Do you know who did that work?

5  A    Mr. Papa.

6  Q    And what is the basis of your knowledge that he did that

7  work?

8  A    Well, he provided me with the financial statement

9  subsequent.

10 Q    Now, during the period of time that you were the

11 accountant for Two Rivers, did any of the members of Two

12 Rivers assert a claim that you had not performed your

13 functions as set forth under the Two Rivers operating

14 agreement properly?

15 A    I don't recall.

16 Q    Well, you were asked by Mr. Nelkin about certain tasks

17 that you were to undertake under the operating agreement, do

18 you remember that testimony generally?

19 A    Yes.

20 Q    Let's go back to 9.2 on page 13.  Subparagraph (b) talks

21 about financial statements prepared on a federal income tax

22 basis by a CPA; do you see that?

23 A    Yes.

24 Q    Okay.  Did you prepare those documents?

25 A    Not -- the financial statements, no.

1  Q    Okay.  Do you know who prepared those documents?

2  A    Vince Papa.

3  Q    And for what years did Mr. Papa prepare those documents?

4  A    '12, '13, '14.

5  Q    Did Mr. Papa and you ever have a conversation as to why

6  he was preparing those documents as opposed to you?

7  A    No.

8  Q    Did anyone complain that he was producing the documents

9  instead of you?

10  A    No.

11  Q    Okay.  Now, let's go to sub item (1), balance sheet and

12  then sub item (2), statement of income.  Did you ever prepare

13  a balance sheet or statement of income and loss with respect

14  to the company?

15  A    I might have.

16  Q    Okay.  Well, do you recall one way or the other?

17  A    I probably did one time, yes.

18  Q    Do you know whether anyone else prepared a balance sheet

19  and/or a statement of income with respect to the company?

20  A    Mr. Papa.

21  Q    Do you know that for a fact or are you --

22  A    Yes.

23       THE COURT:  Can I ask one question so I understand;

24  these things that are described in 9.2 that Mr. Papa did

25  rather than you, was that because somebody told you not to do

*M. Devine - cross - Schafhauser*                               1021

1   it and let Mr. Papa do it or --

2            THE WITNESS:  Well --

3            THE COURT:  How did that happen?

4            THE WITNESS:  When he became the CFO, he was hired,

5   he just prepared -- he just did the work.

6            THE COURT:  No one told you not to do it?

7            THE WITNESS:  Right.

8            THE COURT:  Okay.  Go ahead.

9   Q    Mr. Devine, there is a looseleaf set I see right at the

10  edge of the --

11  A    This?

12  Q    Yes, there's a clip and there's an Exhibit 39 which,

13  you'll have to forgive me, is not in the binder yet but I'll

14  get there.

15           MR. NELKIN:  Did we get that?

16           MR. SCHAFHAUSER:  Yes, you did, I had given it to

17  you earlier today.

18           Yes, it's right there (indicating.)

19  Q    Have you ever seen Exhibit 39, Defendant's Exhibit 39

20  before?

21  A    Yes.

22  Q    When did you first see that?

23  A    A couple of weeks ago.

24  Q    Okay.  Do you know who prepared this document?

25  A    It looks like it came from Two Rivers, Vincent Papa.

M. Devine - cross - Schafhauser                          1022

1   Q     This is my question, because I see that it says January

2   through December 2015; I think you testified earlier today

3   that at some point you resigned, right?

4   A     Yes.

5   Q     When did you resign?

6   A     The day of the TRO hearing, December 12th, 13th, 14th,

7   one of those days.

8   Q     Whatever the hearing date was, that's when you resigned?

9   A     Yes.

10  Q     And after that date you did -- well, let me ask you this

11  question, did you do any more work or render any more services

12  to Two Rivers after that date?

13  A     I did.

14  Q     What did you do?

15  A     I was requested to file the last two weeks payroll tax

16  returns, submit the tax deposits for them because they weren't

17  capable of handling it at that point so I offered to do it for

18  them.

19  Q     Who asked you to do that?

20  A     I believe it was Mr. Vincent Papa.

21  Q     And you did so?

22  A     Yes, I got an approval from I believe the management at

23  Two Rivers, Mr. Steven Schreiber, Mr. Eugene Schreiber I

24  believe agreed to it.

25  Q     Very well.  And what information did you receive to

M. Devine - cross - Schafhauser                                    1023

1   perform that task?

2   A    The same weekly payroll information with the amount of

3   federal tax that needed to be transmitted as well as the state

4   and local taxes that had to be transmitted.

5   Q    And Mr. Papa provided that to you?

6   A    Yes.

7   Q    Now, one of the issues that came up was the location of

8   signed tax returns.  I want to touch on that.

9         Do you have in your custody, possession and control

10  tax returns for Two Rivers Coffee, LLC that bear your or

11  anyone else's physical signature?

12  A    No.

13  Q    Why not?

14  A    The returns are submitted electronically.

15  Q    Could you please turn with me to Exhibit 61, Plaintiff's

16  Exhibit 61.  This was another document about which you were

17  asked on direct.

18        The second page, which has the Department of Labor

19  and Work Force Development imprimatur, do you see that it says

20  Two Rivers Coffee, LLC and then there's a Lakewood address,

21  right?

22  A    Yes.

23  Q    Okay.  And did I hear you correctly that you understood

24  that to be Friedman's residence?

25  A    Yes.

M. Devine - cross - Schafhauser                    1024

1   Q    Okay.  And do you have an understanding as to why

2   Friedman's residence was designated as the residence for --

3   I'm sorry, the office of Two Rivers Coffee, LLC?

4   A    There was a problem with the mail service at the Newark

5   location.

6   Q    And what was the problem with the mail?

7   A    They -- it was my understanding they weren't receiving

8   all the mail, so to properly receive the mail they wanted to

9   use that location, that address.

10  Q    And when you say "they," who is "they"?

11  A    I believe it was Eugene Schreiber.

12  Q    So, just so I'm understanding this correctly, Eugene

13  Schreiber suggested to Mr. Friedman or to you that his

14  residence be listed?

15  A    I believe so.

16  Q    And when did that occur?

17  A    I would imagine it would have had to have been in 2012

18  sometime, 2011.

19       THE COURT:  Maybe I didn't understand the question;

20  Mr. Schreiber told you that or you heard from Mr. Friedman

21  that Mr. Schreiber told Mr. Friedman?

22       THE WITNESS:  I heard from Mr. Friedman that

23  Mr. Schreiber told him they were having trouble with the mail

24  service at that location.

25  Q    All right.  Did you have a discussion with Mr. Schreiber

1  about that?

2  A    I don't remember that.

3  Q    All right.  Did you have a discussion with any of the

4  other members of Two Rivers about the office address or rather

5  the business address of Two Rivers Coffee?

6  A    No.

7  Q    Well, did anyone ever challenge you in putting down

8  Friedman's residence as the Two Rivers business address on

9  documents that you prepared while you were working as the

10 accountant for Two Rivers Coffee, LLC?

11 A    No.

12 Q    You were asked on direct about Mr. Spence and a number of

13 things that occurred.  I don't want to go back to that long

14 line of questioning except to ask a single -- I think a single

15 question; how long ago was that that Mr. Spence was indicted?

16 A    Twenty-one, twenty-two years ago.

17 Q    All right.  You were also asked about an audit of

18 Mr. Friedman and, if my notes are correct -- well, let me just

19 ask the question.

20        Mr. Friedman was audited how long ago?

21 A    I think, from recollection, it was 2011 tax year, 2012.

22 Q    All right.  And there was some kind of mistake that was

23 made?

24 A    Yes.

25 Q    And the mistake was a mistake that you said you made,

1    right?

2    A    Yes.

3    Q    Mr. Friedman didn't make the mistake?

4    A    That's correct.

5    Q    Mr. Friedman paid a penalty as a result of a mistake you

6    made?

7    A    That's correct.

8    Q    And Mr. Friedman didn't complain to you about that

9    mistake and the penalty he paid, do I have that correct?

10   A    That's correct.

11   Q    And that was the last time that Mr. Friedman was audited

12   so far as you know, right?

13   A    That's correct.

14   Q    Now, when you interacted with Mr. Papa for purposes of

15   doing your accountant work for Two Rivers, what kind of

16   financial information did he have accessible to him, if you

17   know?

18   A    He would have to have had all the books and records in

19   order to prepare the general ledger, the trial balances, the

20   income statement and the balance sheet.

21   Q    And where were those books and records so far as you know

22   maintained?

23   A    At Two Rivers.

24   Q    Did he have, for instance -- he had an office I take it

25   within the South Plainfield facility, right?

1    A    Yes.

2    Q    How big was the office?

3    A    I don't know the size of the office.

4    Q    Okay.

5    A    I was never there.

6    Q    Oh, you were never there?

7    A    Yes.

8    Q    Very well.  That short-circuits a line of questioning.

9         Did he describe to you the kinds of financial

10   information on which he was relying for purposes of feeding

11   you the tax return information?

12   A    Not that I recall.

13   Q    Did he ever tell you that what was located on QuickBooks

14   that he was giving you was in any way insufficient to prepare

15   the company's tax information?

16   A    No.

17   Q    Now, you mentioned you resigned the date of the hearing,

18   December 12, '13?

19   A    Somewhere around there.

20   Q    Somewhere around there.

21        As of that time -- incidentally, were you in court

22   on the day of the hearing?

23   A    I was not.

24   Q    You were not.

25        But I take it you learned about what happened?

1   A     Yes.

2   Q     Okay.  Did Mr. Friedman communicate with you about

3   obtaining materials in response to the hearing?

4   A     I don't remember, I don't think so.

5   Q     You don't remember.  Did you -- you received

6   communication from your counsel, I'm not asking now -- on this

7   I'm not asking you what your counsel told you; did you

8   communicate, yes or no, with your counsel about what should be

9   produced?

10  A     Yes.

11  Q     Okay.  And so, you learned through counsel what was

12  necessary to be produced, yes?

13  A     Yes.

14        MR. SCHAFHAUSER:  Your Honor, I'm just checking my

15  notes, I may be near the finish line.

16        THE COURT:  Okay.

17        (Pause in the proceedings.)

18        MR. SCHAFHAUSER:  I have nothing further, Your

19  Honor.

20        THE COURT:  Can we get a sense of how long everybody

21  has left?

22        MR. FELDMAN:  I think ten minutes max.

23        MR. NELKIN:  The same.

24        MR. HELLER:  I have about two minutes, Your Honor.

25        THE COURT:  Because there are also a number of

M. Devine - cross - Schafhauser                    1029

1    issues that we postponed from earlier in the day that I want

2    to get to.

3          I'm open to suggestions about -- I don't want to

4    keep the staff here unnecessarily long.  Any objection to

5    allowing Mr. Devine to step down, we take up the issues that

6    you want to get to today, you resume in the morning?

7          Can you rejoin us in the morning?

8          THE WITNESS:  If I have to.

9          THE COURT:  Look, if it is going to be really brief,

10   we'll get through it but if we're going through it, I want to

11   accommodate Mr. Devine.

12         MR. FELDMAN:  I'm going to be pretty brief.

13         THE COURT:  Everyone please, he's going to be off

14   the stand in 15 minutes.

15   CROSS-EXAMINATION (Cont'd.)

16   BY MR. FELDMAN:

17   Q    Mr. Devine, I wanted to clear up some questions about the

18   E&I, E&J and E & Jeryg companies.  At the beginning of your

19   testimony you testified you weren't the accountant for those

20   entities in Brooklyn, later you testified you were the

21   accountant for some of them.  Are you the accountant for E&I

22   Investors?

23   A    Yes.

24   Q    Are you the accountant for E&J Funding?

25   A    Yes.

M. Devine - cross - Schafhauser                     1030

1    Q    Are you the accountant for E & Jeryg Management?

2    A    No.

3    Q    With respect to 24 Hour Oil, are you the accountant for

4    that company?

5    A    Yes.

6    Q    Did you prepare a tax return for them?

7    A    Yes.

8    Q    Did they have their own bank accounts?

9    A    Yes.

10   Q    With respect to MB Fuel, were you the accountant for that

11   entity?

12   A    Yes.

13   Q    Did you prepare the tax returns for that entity?

14   A    Yes.

15   Q    Did they maintain their own bank accounts?

16   A    Yes.

17   Q    MB Fuel I, were you the accountant for that entity?

18   A    Yes.

19   Q    Did they maintain their own bank accounts?

20   A    Yes.

21   Q    Did you prepare the tax returns for that company?

22   A    Yes.

23   Q    Associated Fuel Oil Corp., were you the accountant for

24   that company?

25   A    Yes.

M. Devine - cross - Schafhauser                    1031

1   Q    And did you prepare the tax returns for that company?

2   A    Yes.

3   Q    Did they maintain their own bank accounts?

4   A    Yes.

5   Q    Light Trucking, were you the accountant for that company?

6   A    Yes.

7   Q    Did they maintain their own bank accounts?

8   A    Yes.

9   Q    Did you prepare the tax returns for that company?

10  A    Yes.

11  Q    165 Ridge Street Realty, were you the accountant for that

12  company?

13  A    Yes.

14  Q    Did you prepare the tax returns for that company?

15  A    Yes.

16  Q    Did they maintain their own bank accounts?

17  A    Yes.

18  Q    Park Avenue, were you the accountant for that company?

19  A    Park Avenue Associates, LLC?

20  Q    Yes?

21  A    Yes.

22  Q    Did they have their own tax return?

23  A    Yes.

24  Q    I mean did they have their own bank accounts, excuse me?

25  A    Yes.

*M. Devine - cross - Heller*                                    1032

1       MR. FELDMAN:  I have no further questions, Your

2  Honor.

3  CROSS-EXAMINATION

4  BY MR. HELLER:

5  Q    Good afternoon, Mr. Devine.

6       You testified that you are the accountant for Office

7  Coffee Services, LLC, correct.

8  A    Yes.

9  Q    And you also prepared the tax return for Office Coffee

10 Services, LLC?

11 A    Yes.

12 Q    You're the accountant for 26 Flavors, LLC as well?

13 A    Yes.

14 Q    And you prepared the tax returns for 26 Flavors, LLC?

15 A    Yes.

16 Q    Have you ever served as the accountant or prepared the

17 tax returns for Solomon Birnbaum individually?

18 A    No.

19 Q    What is Crazy Cups?

20 A    I believe it is a d/b/a.

21 Q    A d/b/a for which entity?

22 A    I'm not sure which entity.

23 Q    Okay.  And what about office -- sorry, what about Single

24 Serve Beverages Distribution, what is that?

25 A    Also a d/b/a.

1    Q    Do you know for which entity?

2    A    I think it is 26 Flavors.

3    Q    Okay.

4              MR. HELLER:  I have no further questions.

5              THE COURT:  All right.

6              Redirect.

7    REDIRECT EXAMINATION

8    BY MR. NELKIN:

9    Q    Mr. Devine, are you aware of any instances where checks

10   made out to one company were deposited in another company's

11   account?

12   A    No.

13   Q    So, you wouldn't know about -- well, I will move on.

14             You testified you never accessed Launch or rarely

15   accessed Launch?

16   A    Correct.

17   Q    How would you know whether the information from Launch

18   was populated into the QuickBooks program if you never

19   accessed the Launch program?

20   A    I relied on the information that Vince Papa provided me.

21   Q    But how would you know its source?

22   A    I don't.

23   Q    So, what's your basis for testifying that it was all line

24   by line moved in?

25   A    He would have had to have -- he would have had to have

1  put that information into the QuickBooks Enterprise system to

2  produce the records.

3  Q    But do you know where he got it from?  You didn't observe

4  him do it?

5  A    No, I did not.

6  Q    And you never accessed the Launch system?

7  A    I did not.

8            THE COURT:  It is an assumption you made?

9            THE WITNESS:  Because of the production when I was

10  given --

11            THE COURT:  I want to know, you're testifying from

12  knowledge or making assumptions about what you think must have

13  happened?

14            THE WITNESS:  Based on knowledge after receiving the

15  final product.

16            THE COURT:  Go ahead.

17  Q    And what's the basis of your knowledge?

18  A    I was provided the general ledger and the trial balance.

19  Q    But that just meant --

20            THE COURT:  I get it.  Move on.

21            MR. NELKIN:  Fine.

22  Q    Now, you testified you made a mistake with Friedman's

23  taxes, correct?

24  A    Yes.

25  Q    It resulted in a penalty.  You were asked about a

M. Devine - redirect - Nelkin                    1035

1  commune -- interaction with Mr. Schreiber where he complained
2  about the way that you were calculating taxes?
3  A    Yes.
4  Q    Okay.  And did he tell you that he thought you were
5  making a mistake?
6  A    Yes.
7  Q    And did you ultimately change the amounts?
8  A    No.
9  Q    You left it in place, you never issued a new adjusted --
10 A    I issued it based on the information provided to me.
11 Q    Was that different than the initial way that you had
12 prepared it?
13 A    I don't believe I changed it.  It was based on the
14 information that was provided to me, that's what the number
15 was used to prepare the 1099.
16 Q    Regardless of whatever his complaint was, it was not
17 changed is your testimony?
18 A    That's correct.
19 Q    Okay.  You were asked about the operating agreement and a
20 couple of provisions and this is on Defendant's Exhibit 6 and
21 page 12.
22        (Pause.)
23        If three of the four partners had sought to remove
24 you as the accountant, did they have that power?
25        MR. FELDMAN:  Objection.

M. Devine - redirect - Nelkin                          1036

1       THE DEFENDANT:  On what basis?

2       MR. FELDMAN:  How would he know what the power of

3   the members was.

4       THE COURT:  I think it's only -- you're asking about

5   his understanding of the agreement that's in evidence.

6       MR. NELKIN:  Yes.

7       THE COURT:  Okay.

8       THE WITNESS:  I'm not sure where --

9       THE COURT:  Page 12, Exhibit 6.

10      THE WITNESS:  The operating agreement?

11      THE COURT:  Yes.

12  Q    I'm asking about paragraph 7.3, in the last sentence it

13  says:  "The accountant may only be replaced by the unanimous

14  consent of the members."

15      THE COURT:  I take it it is stipulated by everyone

16  that the answer is no, three people can't do it, correct?

17      Anybody disagree?

18      (No response.)

19      THE COURT:  Let's move on to things that this

20  witness can provide testimony about.

21  Q    8.2 specifies there are certain tax elections that the

22  accountant shall make; did you make any of those elections?

23  A    Let's see, I adopted the calendar year, number (A), yes.

24  Yes, the method of accounting was the same for tax and book

25  purposes.

M. Devine - redirect - Nelkin                                    1037

1   Q    And what about the distribution of property?

2   A    I don't believe that was an issue, I don't think that

3   came up.

4   Q    What about amortizing organizational expenses?

5   A    I don't recall that one.

6   Q    Okay.  For the ones you did do, did you discuss that with

7   anybody?

8   A    Well, as far as (A) goes, it is mandatory to be a

9   calendar year unless you can have justification for a

10  different year under partnership taxation rules.

11  Q    I'm just asking if you discussed it with anybody?

12  A    I don't recall if I had discussion.

13  Q    Okay.  What about adopting the method of accounting?

14  A    I don't recall if I had a discussion either.

15  Q    Okay.  And 8.3 specifies that Mr. Friedman is the tax

16  partner; is that correct?

17  A    That's what it states.

18  Q    Does that require him to give the other partners

19  information?

20            THE COURT:  Look, he's here for a limited time now.

21            MR. NELKIN:  All right, fine.

22            THE COURT:  We can all read the document.  Ask him

23  things that he can provide testimony about please.

24            (Continued on next page.)

25

*M. Devine - redirect/Mr. Nelkin*                    1038

1          THE COURT:  Look he's here for a limited time now.

2          MR. NELKIN:  Fine.

3          THE COURT:  We can all read the document.  Ask him

4    things that he can provide can provide.

5    EXAMINATION BY

6    MR. NELKIN:

7    (Continuing.)

8    Q    Is Vince Papa a CPA?

9    A    I'm not sure.

10   Q    Okay.  So to the extent in 9.2, well, certainly it says,

11   "The accountant shall furnish it," but it says it has to be by

12   a certified public accountant.  You don't know?

13         THE COURT:  Do you have any questions about this

14   witness's knowledge, not about what's in the agreement.

15   Please.

16   Q    What percentage of income of yours was derived from

17   Mr. Friedman and the --

18         MR. FELDMAN:  Objection.

19         MR. SCHAFHAUSER:  Beyond the scope.

20         THE COURT:  It is beyond the scope.  Sustained.

21   Q    Do you ever receive any information from the Corporate's

22   system?

23         MR. FELDMAN:  Objection, beyond the scope.  He

24   wasn't asked that question.

25         THE COURT:  Sustained.

*M. Devine - redirect/Mr. Nelkin*                    1039

1   Q    Do you know why there were multiple accounting systems?

2          MR. FELDMAN:  Objection.

3          THE COURT:  I don't think that's beyond the scope.

4   Q    You testified that there was a QuickBooks system and

5   there was a Launch system.  Do you know why they had two

6   systems?

7   A    I don't know why.

8   Q    You testified that you filed the returns, did you prepare

9   any amended returns?

10  A    Yes.

11  Q    How could we tell when the returns were filed?

12  A    I'd have to look on the return as to what date was on

13  there, I would imagine.

14  Q    Do you have some record that shows when a return was

15  filed?

16  A    Yes.

17  Q    And did you provide that?

18  A    Yes.

19  Q    Okay.  And did you -- with respect to the returns, do you

20  know how many amended returns were filed?

21  A    I think two.

22  Q    Two amended returns?

23          Do you remember what years they were filed in?

24  A    '13 and '15?

25  Q    And were those provided?

M. Devine - redirect/Mr. Nelkin          1040

1   A    Yes.

2   Q    Okay.

3        THE COURT:  You both seem to know what you're

4   talking about.

5        This is Two Rivers?

6        THE WITNESS:  Yes.

7        THE COURT:  Two Rivers?

8   Q    Who had control of the Two Rivers banking accounts?

9        MR. BERGSON:  Objection.

10       THE COURT:  Beyond the scope.

11  Q    You asked two companies' checking accounts and they had

12  separate accounts.  Do you know who controlled those accounts

13  is what you were asked about?

14  A    Which accounts are you referring to.

15  Q    Mr. Grantz asked you about a number of accounts banking

16  accounts they had separate accounts and that they were

17  independent.  I'm just asking if you know who had control of

18  those accounts, what individuals?

19  A    I would imagine it's different individuals for each

20  company.

21  Q    For the ones you were asked about, can you tell me which?

22  A    Ask me which one and I'll respond to which one you're

23  referring to.

24  Q    24-Hour Oil?

25  A    I believe that was Emil Friedman.

*Colloquy*                                                          1041

1    Q     Emil Friedman?  MB Fuel?

2    A     Was probably John Ahearn, Lawrence Ahearn.

3    Q     What about E&J Companies?

4    A     I don't know.

5    Q     You were asked about how long ago and what information

6    you had about Ms. Ezell's arrest?

7               THE COURT:  We've covered that.

8               MR. NELKIN:  I just wanted to ask him about that.

9               THE COURT:  Move on.  We covered that.  Enough about

10   that.

11              MR. NELKIN:  I think that's all.

12              THE COURT:  Thank you.  You're excused.

13              THE WITNESS:  I can go?

14              THE COURT:  You can go.

15              THE WITNESS:  Thank you.

16              (Witness leaves the witness stand.)

17              THE COURT:  All right.  Not to preclude anyone else,

18   but I recall from the morning there was some matters that

19   Mr. Schafhauser and Finkel wanted to raise and after the lunch

20   break Mr. Nelkin.

21              Mr. Schafhauser.

22              MR. SCHAFHAUSER:  I'm honestly trying to remember.

23              THE COURT:  Okay.

24              MR. SCHAFHAUSER:  You're seeing puzzlement on my

25   face.  My recollection was that what I sought to raise, your

*Colloquy*                                                      1042

1    Honor had said I could write a letter but I will raise it.

2            The issue that I was trying to raise yesterday and

3    I'll raise now is with Mr. Nussbaum, of course.  I would like

4    Mr. Nussbaum to help it reinstitute Launch.  What I understood

5    from plaintiff's position was that if Mr. Nussbaum is a agent

6    of Mr. Friedman he is enjoined from accessing two Rivers's

7    systems.

8            THE COURT:  Preliminary injunction regulates rights

9    and responsibilities among the parties.

10           MR. SCHAFHAUSER:  That's correct.

11           THE COURT:  You can all agree, can you not, to make

12   keeping in mind that part of the injunction is to is for

13   Mr. Friedman to take all steps necessary to make -- to ensure

14   the access to Two Rivers Launch.

15           MR. SCHAFHAUSER:  Well.

16           THE COURT:  So there's nothing that stops you.

17           MR. SCHAFHAUSER:  Very well.

18           THE COURT:  Just do it.

19           MR. SCHAFHAUSER:  Very well.  Thank you.

20           THE COURT:  Everybody who needs to be sitting

21   together to make it happen, get together.  There's nothing in

22   the preliminary injunction that bars it.  Counsel should be

23   present to make sure that there are no disputes that you can't

24   resolve.

25           MR. NELKIN:  With respect to that, your Honor, I

*Colloquy*                                                                    1043

1   think my client has an issue with Mr. Nussbaum having access

2   to their system.  If we can have instructions to just tell us

3   how to get on.

4        THE COURT:  Have him sit down with the Stroz people

5   and you and her just get it done.

6        MR. NELKIN:  Fair enough.

7        THE COURT:  Mr. Finkel.

8        MR. FINKEL:  I have nothing.

9        THE COURT:  Mr. Nelkin.

10        MR. NELKIN:  Your Honor, we have an issue with a

11   letter that was sent to the Court that said that the documents

12   ranging from TRC-1 to TRC-4620 do not constitute the books and

13   records of the company.  The issue that we have with that is

14   upon review, it appears that those documents, at least

15   thousands of pages of them in consecutive order, are simply

16   the only files that were return as the books and records of

17   the company but with files randomly removed at certain

18   intervals which we have tracked.

19        THE COURT:  Honestly, I'm not following.  First of

20   all, is this the same Box 36 that we have been talking about?

21        MR. NELKIN:  It's the two underneath.

22        THE COURT:  42-A and B.

23        MR. NELKIN:  Right.

24        THE COURT:  Okay.

25        MR. NELKIN:  There was a previous production to --

*Colloquy*                                                    1044

1   as part of right after, a day or two after, the initial

2   hearing.  They delivered certain boxes to the custody of

3   Mr. Papa.

4           THE COURT:  Okay.

5           MR. NELKIN:  They later delivered a Bates-stamped

6   version of those documents which had an EF range.  I think

7   it's now a Defendant's Exhibit 1.  It's sitting over there,

8   it's those two boxes, and then the small white box on top of

9   it.

10          THE COURT:  That's a different configuration of

11  what's in 42-A and B?

12          MR. NELKIN:  Yes.

13          THE COURT:  Okay.

14          MR. NELKIN:  As I understand it, and I believe the

15  parties can stipulate, those two boxes with the white box on

16  top in which there are multiple sets represents the documents

17  that were delivered by Mr. Friedman's counsel to Two Rivers in

18  accordance with the instructions of your order to deliver

19  books and records to two.

20          THE COURT:  Okay.  First of all, sorry to interrupt.

21  Are you saying that they are not what was delivered?

22          MR. NELKIN:  No.

23          THE COURT:  So you got that?

24          MR. NELKIN:  We got that.

25          THE COURT:  Okay.

*Colloquy*                                                    1045

1        MR. NELKIN:  And within that box, there are a number

2   of folders that are basically in alphabetical order starting

3   with something like Acme or Acorn of different folders that

4   appear to be Two Rivers folders containing to be folders

5   delivered to Two Rivers.

6        Friday, they sent a letter to your Honor saying that

7   they had produced a whole bunch of new documents and out of an

8   abundance of caution they were producing a new change TRC-1

9   through 4,000 something that was not books and records.

10       THE COURT:  That's 42-A and B?

11       MR. NELKIN:  Yes.

12       THE COURT:  Okay.  There's an overlap between the

13  two documents.

14       MR. NELKIN:  So, basically, TRC-5 they put three or

15  four pages in front of the beginning through 3649 in a row

16  appears to match the EF range 2695 through 6411 roughly.

17       THE COURT:  Okay.

18       MR. NELKIN:  Except that at certain intervals, which

19  we've mapped out, they've pulled certain files.  They pulled a

20  file called Acorn, they pulled a file called Advanced.

21       THE COURT:  They pulled things that you got earlier?

22       MR. NELKIN:  We got earlier.  But, basically, what

23  they said was they represented that those were books and

24  records.

25       THE COURT:  Okay.

*Colloquy*                                                              1046

1          MR. NELKIN:  And they produced and represented to

2     your court and to the plaintiff that these were not books and

3     records.

4          THE COURT:  But every -- I'm sorry, if I'm being

5     dense here.

6          Is everything that is produced in 42-A and B

7     previously produced to you and represented to be books and

8     records.

9          MR. NELKIN:  We have not -- that was represented to

10    be books and records.  We haven't gone through --

11         THE COURT:  Okay.

12         MR. NELKIN:  -- the remaining and cross checked to

13    see it.

14         THE COURT:  So you're saying, if I'm following,

15    there may be a document or any number of documents in 42-A and

16    B not represented as books and records that were previously

17    produced to you as books and records; correct.

18         MR. NELKIN:  I believe I am not sure I follow.

19         THE COURT:  Originally, earlier on in number one.

20         MR. NELKIN:  Yes.

21         THE COURT:  They produced a document.

22         MR. NELKIN:  Yes.

23         THE COURT:  And said this is part of the books and

24    records.

25         MR. NELKIN:  Correct.

1    THE COURT:  And now they've produced the same

2    document in 42-A and B and said it's not books and records.

3           MR. NELKIN:  Correct.

4           THE COURT:  What's the problem there?  You've

5    already got them saying that that document is books and

6    records.

7           MR. NELKIN:  I guess our issue is the following.

8           First off, we have an issue with them telling the

9    Court and us that these are not books and records forcing us

10   to go and review them and figure out that everything in there

11   constitutes a book and record under anyone's definition.

12          And two, we have an issue with them apparently

13   producing documents that they've pulled at intervals different

14   files so they're no longer in the order that they were.

15          THE COURT:  But you have the original order, right?

16   I'm really struggling to understand.

17          If they had never produced 42-A and B --

18          MR. NELKIN:  Yes.

19          THE COURT:  -- and all you had was number one --

20          MR. NELKIN:  Yes.

21          THE COURT:  -- would there be a problem?

22          They would be in order, they would be without the

23   deletions, and they'd be represented as books and records.

24          Would that by itself be a problem?

25          MR. NELKIN:  We still have to see what's in here.

*Colloquy*                                                    1048

1          THE COURT:  Wait.  Wait.  Please.  Before 42-A and B

2    get to you.

3          MR. NELKIN:  Okay.

4          THE COURT:  You have a large, apparently, a larger

5    grouping of records purported to be books and records.

6          MR. NELKIN:  Yes.

7          THE COURT:  That by itself I take is not an

8    approximate.

9          MR. NELKIN:  That's not a problem.

10          THE COURT:  Okay.  Then you get some of the same

11    documents and you say these aren't books and records and it's

12    not, it's missing some of the documents in the first

13    production.  Why can't you just ignore anything duplicative in

14    42-A and B other than the fact that they're putting you to the

15    burden of doing that which I understand they shouldn't do

16    without walking you through it.

17          Leaving that aside, is there any problem.

18          MR. NELKIN:  Our main concern with that is the

19    additional time --

20          THE COURT:  Okay.  So if they do an inventory of

21    42-A and B and it correlates to the Bates numbers in Number 1

22    and map it out for you.  Say:  This was previously produced as

23    EC number whatever, does that --

24          MR. NELKIN:  If it also correlates with their other

25    production which is they have two EF productions, and we would

*Colloquy* **1049**

1   like them to cross index and just tell us, here is one uniform

2   set of documents so that we don't have to go and figure out

3   what's in order and what's out of order.

4        THE COURT:  Other than the burden of essentially

5   de-duplicating --

6        MR. NELKIN:  Yes.

7        THE COURT:  -- anything else you're concerned about?

8        MR. NELKIN:  We have an issue with them

9   misrepresenting that they're books and records.

10        THE COURT:  If there's something that you think

11   qualifies as books and records that's in there uniquely and

12   hasn't been produced, I get the concern.

13        MR. NELKIN:  Okay.

14        THE COURT:  But I take it if at any point whether in

15   42-A and B or Number 1, a document produced in both sides was

16   described as parts of the books and records they have to live

17   with that, right.

18        MR. NELKIN:  They have to live.

19        THE COURT:  Do you disagree?

20        MR. SCHAFHAUSER:  I'm waiting for my chance to

21   explain this.

22        THE COURT:  And I'm going to give you a you chance.

23   I want to take it step by step.  To some extent, it's not a

24   nonissue.

25        MR. SCHAFHAUSER:  I think it's a nonissue.

*Colloquy*                                                    1050

1          THE COURT:  You don't disagree in Number 1 you said

2   it's books and records, and in 42 it's not it's not, right?

3          MR. SCHAFHAUSER:  Well, yes.

4          THE COURT:  Okay.

5          MR. SCHAFHAUSER:  I'm not quibbling and that's,

6   well --

7          THE COURT:  Okay.

8          MR. SCHAFHAUSER:  I will respond but I do want to

9   respond.

10         THE COURT:  I will absolutely let you respond.  So I

11  don't think that's a concern.

12         Anything else.

13         MR. NELKIN:  We do have a concern that now wee now

14  have two separate EF range.  EF-1 to a thousand something and

15  EF-1 to 10,000 something.

16         THE COURT:  In other words, you have two EF-1s?

17         MR. NELKIN:  Two.

18         THE COURT:  That are different documents.

19         MR. NELKIN:  Yes.

20         THE COURT:  Okay, that needs to be correct.

21         MR. NELKIN:  We have a production that's labeled TRC

22  which sounds like it's coming from Two Rivers.

23         THE COURT:  It sounds to me only because you're

24  going to infer something but you can stipulate what it is or

25  isn't.

*Colloquy*                                                    1051

1          MR. NELKIN:  The two EF ranges is the problem.

2          THE COURT:  I want to hear your response just so I

3    understand.

4          Any problem with providing a map of that correlates

5    EF to TRC?

6          MR. SCHAFHAUSER:  I may be able to give that map in

7    five seconds.

8          (A brief pause in the proceedings was held.)

9          MR. SCHAFHAUSER:  My colleague, Ms. Matthews, is

10   better equipped to answer.

11         THE COURT:  I'm sorry, you don't want her to speak.

12         MS. MATTHEWS:  I was going to say the Exhibit 1

13   that's been marked EF-1 through whatever is an error.  I don't

14   know why the vendor Bates-stamped EF.  They were produced to

15   the plaintiff as originals with no Bates Stamps on them.  And

16   when we needed a copy set, for some reason, the vendor put an

17   EF Bates stamp.

18         THE COURT:  Why don't you produce them with a

19   different range.

20         MS. MATTHEWS:  Yes we can do that.

21         The EF documents that are produced as part of 42-A

22   and B are credit card backup information that are Vince Papa

23   requested.

24         The TRC or backup documents are the ones that

25   Mr. Nelkin referred to as quote, unquote, "Not books and

1  records."

2  THE COURT:  Why don't you do that.  I don't think

3  this needs to be a problem.  To the extent you got two EF

4  ranges and a TRC range that duplicates one or both of some

5  documents in the EF range, why don't you reproduce one of the

6  EF ranges with a different prefix and map out, right, what

7  anything that appears in more than one of these ranges just

8  map out which is duplicated and where it appears in each set.

9  MR. SCHAFHAUSER:  We're happy to do that.  If I may

10  just I didn't mean to interrupt you.

11  THE COURT:  Go ahead.

12  MR. SCHAFHAUSER:  Basically, what we attempted to do

13  is essentially what your Honor heard from Mr. Devine that he

14  did which is he produced documents in December and out of an

15  abundance of caution he did it again on his flash drive.  I

16  didn't do it with a flash drive, we didn't do it with a flash

17  drive, but what we took to heart.

18  Certainly, I heard what your Honor had to say on the

19  Friday before we broke and we redoubled our efforts and we

20  went back and we made the decision out of, just as I said,

21  "out of an abundance of caution," even if one might not deem

22  some of this a quote, "book and record," out of an abundance

23  of caution and send we took.

24  But ultimately it was at my directive to take an

25  expansive view of things to out of an abundance of caution or

1   produce it.  That's why we reproduced something.

2         THE COURT:  In terms of whether they called it books

3   and records or not, I don't know that that phrasing has any

4   significance as long as there's not a dispute about

5   authenticity.

6         MR. NELKIN:  The issue is that, your Honor, they

7   have taken the position that they're only required to produce

8   books and records that there is some bigger universe that

9   relate to Two Rivers that is not books and records.  So,

10  therefore, we're concerned about.

11        THE COURT:  Look, if you find something that they

12  say isn't a book and record and they're uniquely is not a book

13  and record, and there's no corresponding document that's books

14  and records, and you think, a-ha, a now they're leaving out

15  something and they may be leaving out a lot more you bring

16  that to my attention.

17        MR. NELKIN:  Okay.  Will do.

18        Can we have an explanation as to why there's 15

19  missing folders at intervals in the ones that they produced.

20        MS. MATTHEWS:  If I knew you got an original I

21  didn't send it to you.

22        MR. NELKIN:  You knew we got --

23        THE COURT:  Look.

24        MR. NELKIN:  Fine.

25        THE COURT:  Not worth going into commentary about

Colloquy                                    1054

1    how you guys are getting along.

2         MR. NELKIN:  Your Honor, can we also request that

3    Mr. Devine's attorney produce Bates-stamped documents so we

4    can show what we actually received from him.

5         THE COURT:  I'm sorry.  Say that again.

6         MR. NELKIN:  We received documents from Mr. Devine.

7         THE COURT:  They're not Bates-stamped.

8         MR. NELKIN:  We can't strap --

9         THE COURT:  You're --

10        MR. FELDMAN:  The Court required us to deliver these

11   to Two Rivers.  These are Two Rivers records which we did.

12        THE COURT:  Give him a set that's Bates-stamped.

13   You're going to need to be able to refer to documents in some

14   way.

15        MR. NELKIN:  I have a question.

16        Your Honor, you have ordered that the Stroz images

17   be provided to the plaintiff.  We have not yet received them.

18   We understand that they're not getting ready to produce some

19   sort of in camera review for some portion of them.

20        THE COURT:  I thought we took care of this.

21        MR. GRANTZ:  We did.  We took care of it.  Whether

22   Stroz gave it to them or not.

23        MR. NELKIN:  We want to make sure we're entitled to

24   look at the images and received the images from Stroz.

25        THE COURT:  That's whole point of the order.

*Colloquy*                                                              1055

1          Okay.  Anything else for tonight.

2          MR. SCHAFHAUSER:  The only question I had, your

3   Honor, was one of what comes next.

4          I think Mr. Nelkin had said this afternoon they

5   wanted to review the box and perhaps continue with Mr. Devine.

6   Is that happening tomorrow, or are we going on to something

7   else?

8          MR. NELKIN:  We will look at the box, and if we feel

9   that there's any that requires to have Mr. Devine we'll ask

10  that he come back at a later time?

11         THE COURT:  Who is tomorrow?

12         MR. NELKIN:  Tomorrow is Mr. Salcedo.

13         THE COURT:  And because we're not spending the whole

14  day, guys.  We need to speed it up.

15         MR. NELKIN:  That's all we have.

16         THE COURT:  You're not calling anyone on your side?

17         MR. NELKIN:  Let me confer with counsel on that.

18         THE COURT:  Okay.

19         (A brief pause in the proceedings was held.)

20         MR. NELKIN:  The only issue if they're going to

21  recall some of our witnesses as a part of their case.

22         THE COURT:  I guess my question is a big part of the

23  reason we're here is the difficulty you say you've had

24  accessing Two Rivers Launch and getting materials from them.

25  Somebody going to testify about that?

*Colloquy*                                                     1056

1          MR. NELKIN:  I will have someone to testify about
2    that.
3          THE COURT:  Who.
4          MR. NELKIN:  I guess Mr. Schreiber.
5          THE COURT:  Am I going do hear from Mr. Papa from
6    anyone?
7          MR. SCHAFHAUSER:  I would call Mr. Papa if he
8    doesn't, but --
9          THE COURT:  Okay.  So we have Mr. Salcedo,
10   Mr. Schreiber, and then you're resting.
11         MR. NELKIN:  We may call.  I will confer with
12   counsel and we'll talk about Mr. Papa.  Mr. Papa will be next
13   up for one of us.
14         THE COURT:  Okay.  Have a good night, everybody.
15   See you in the morning.
16         (WHEREUPON, this matter was adjourned to August 3,
17   2016, at 9:30 a.m.)
18
19                           *   *   *
20
21
22
23
24
25

1057

1                    I N D E X

2    WITNESS                                PAGE

3

4

5        B E N Z I O N   N U S S B A U M

6        CROSS-EXAMINATION (Cont'd.)        793

7        BY MR. SCHAFHAUSER

8        CROSS-EXAMINATION                  841

9        BY MR. GRANTZ

10       CROSS-EXAMINATION                  844

11       BY MR. FINKEL

12       CROSS-EXAMINATION                  848

13       BY MR. HELLER

14       REDIRECT EXAMINATION               850

15       BY MR. NELKIN

16

17

18       M I C H A E L   D E V I N E

19       DIRECT EXAMINATION                 869

20       BY MR. NELKIN

21       CROSS-EXAMINATION                  1005

22       BY MR. FELDMAN

23       CROSS-EXAMINATION                  1013

24       BY MR. FINKEL

25

1058

CROSS-EXAMINATION                        1014

BY MR. SCHAFHAUSER

CROSS-EXAMINATION (Cont'd.)              1029

BY MR. FELDMAN

CROSS-EXAMINATION                        1032

BY MR. HELLER

REDIRECT EXAMINATION                     1033

BY MR. NELKIN


                    E   X   H   I   B   I   T   S

                                            PAGE


        None

*Schreiber v. Friedman, Et Al   15-CV-6861      8/2/16*                    1

## $

**$3,275** [1] - 975:25
**$50** [3] - 960:21, 960:22

## '

**'04** [1] - 940:8
**'12** [8] - 875:17, 891:11, 896:6, 910:4, 1015:21, 1016:10, 1016:13, 1020:4
**'13** [12] - 875:17, 892:23, 896:6, 947:19, 947:25, 1008:3, 1015:21, 1016:10, 1016:13, 1020:4, 1027:18, 1039:24
**'14** [8] - 896:6, 947:19, 947:25, 1015:21, 1016:10, 1016:13, 1018:14, 1020:4
**'15** [7] - 870:9, 891:11, 940:22, 1015:21, 1016:12, 1039:24
**'94** [1] - 980:7
**'95** [1] - 980:7
**'use'** [1] - 802:15

## 1

**1** [7] - 954:17, 1020:11, 1044:7, 1048:21, 1049:15, 1050:1, 1051:12
**1.1** [1] - 818:21
**10,000** [1] - 1050:15
**1005** [1] - 1057:21
**1013** [1] - 1057:23
**1014** [1] - 1058:1
**1029** [1] - 1058:3
**1032** [1] - 1058:5
**1033** [1] - 1058:7
**1066** [1] - 942:9
**1099** [10] - 874:16, 877:19, 912:1, 912:7, 948:4, 948:13, 954:17, 954:19, 960:18, 1035:15
**1099s** [9] - 874:12, 874:13, 874:19, 877:16, 912:2, 954:21, 959:23, 960:5, 960:12
**11** [2] - 794:5, 794:6
**11/14** [1] - 862:6

**11/14/2013** [1] - 861:3
**11/15** [1] - 862:3
**11/22** [1] - 861:7
**11/22/2013** [1] - 861:21
**110** [7] - 799:24, 800:1, 810:6, 810:7, 813:5, 837:2, 841:10
**11201** [1] - 788:25
**11th** [1] - 790:8
**12** [9] - 798:18, 909:5, 954:14, 1015:5, 1027:18, 1035:21, 1036:9
**12/24/2014** [1] - 908:19
**12/31** [1] - 908:20
**12/4/2015** [1] - 908:21
**12th** [1] - 1022:6
**13** [8] - 834:10, 834:13, 834:15, 834:19, 846:8, 852:7, 1015:25, 1019:20
**13,000** [1] - 954:14
**133** [2] - 875:1, 875:4
**13th** [1] - 1022:6
**14th** [3] - 812:6, 847:2, 1022:6
**15** [9] - 799:6, 805:12, 805:16, 835:8, 835:11, 846:22, 973:22, 1029:14, 1053:18
**15,000** [1] - 954:15
**15-6861** [1] - 788:3
**15-minute** [1] - 836:18
**1562** [3] - 944:13, 945:12, 945:19
**1562-A** [2] - 944:25, 945:10
**1562-B** [2] - 944:25, 945:10
**15th** [3] - 800:4, 800:6, 852:6
**16** [2] - 834:16, 835:3
**165** [2] - 789:6, 1031:11
**165th** [16] - 884:7, 928:19, 928:22, 931:3, 980:12, 986:5, 988:18, 989:9, 989:14, 990:3, 990:22, 992:5, 994:9, 994:24, 995:13, 1000:12
**1671** [1] - 997:24
**17** [2] - 885:2, 885:22
**17th** [1] - 999:15

**18** [3] - 885:2, 885:22, 939:6
**1911** [2] - 998:13, 998:15
**1s** [1] - 951:7

## 2

**2** [8] - 788:7, 798:8, 798:9, 799:13, 799:14, 995:18, 1020:12
**2.1** [1] - 818:21
**20** [11] - 804:13, 805:11, 877:24, 881:17, 884:25, 885:1, 886:10, 936:5, 981:2, 993:5, 997:11
**20,000** [1] - 928:7
**2000** [1] - 891:11
**2004** [2] - 939:20, 940:4
**2007** [1] - 938:11
**2008** [2] - 938:11, 939:4
**2009** [1] - 938:11
**2011** [4] - 910:8, 910:10, 1024:18, 1025:21
**2012** [11] - 870:9, 906:9, 909:2, 909:5, 910:10, 947:25, 948:2, 950:1, 1024:17, 1025:21
**2013** [5] - 909:2, 971:13, 972:8, 1006:11, 1007:4
**2014** [5] - 834:16, 835:3, 843:9, 1005:16, 1017:2
**2015** [14] - 797:8, 799:6, 800:4, 812:6, 827:19, 835:8, 835:11, 844:7, 846:22, 901:16, 975:23, 978:8, 1016:11, 1022:2
**2016** [4] - 788:7, 810:3, 832:6, 1056:17
**22** [1] - 939:20
**225** [1] - 788:24
**24** [16] - 789:4, 878:4, 879:1, 880:19, 924:24, 925:14, 961:8, 980:6, 989:8, 989:16, 989:20, 989:24, 994:22, 995:6, 997:14,

**1030:3
**24-Hour** [31] - 923:3, 925:24, 925:25, 926:7, 926:15, 926:18, 927:5, 927:6, 927:8, 927:14, 927:19, 928:18, 929:9, 929:11, 929:16, 929:17, 929:21, 929:22, 930:3, 930:16, 933:19, 934:9, 936:22, 937:13, 937:14, 937:21, 938:8, 939:1, 947:11, 948:5, 1040:24
**25** [3] - 887:24, 888:1, 963:11
**26** [9] - 789:19, 878:5, 888:18, 920:14, 920:22, 937:1, 1032:12, 1032:14, 1033:2
**2611** [1] - 998:17
**2695** [1] - 1045:16
**2:00** [1] - 906:16
**2nd** [4] - 797:8, 827:19, 827:21, 827:22

## 3

**3** [1] - 1056:16
**30** [5] - 827:3, 855:24, 886:10, 887:24, 962:12
**30th** [1] - 1015:21
**31** [1] - 907:21
**324** [1] - 998:20
**33** [1] - 953:4
**340** [2] - 936:7, 936:10, 971:16
**350** [1] - 998:22
**354** [2] - 998:24, 999:5
**36** [15] - 861:22, 911:1, 911:3, 911:4, 911:5, 911:15, 970:5, 973:13, 977:20, 977:21, 978:1, 978:6, 978:10, 1043:20
**3649** [1] - 1045:15
**3886** [1] - 861:22
**39** [3] - 1021:12, 1021:19

## 4

**4** [1] - 839:4

**4,000** [1] - 1045:9
**40,000** [1] - 962:12
**42** [1] - 1050:2
**42-A** [11] - 911:7, 1043:22, 1044:11, 1045:10, 1046:6, 1046:15, 1047:2, 1047:17, 1048:1, 1048:14, 1048:21, 1049:15, 1051:21
**42-B** [1] - 911:7
**431** [12] - 928:19, 930:11, 931:3, 948:15, 980:12, 982:6, 986:5, 986:13, 986:24, 988:16, 988:17, 990:22
**438** [2] - 936:7, 936:13
**44** [3] - 859:1, 859:4
**45** [1] - 860:8
**47** [1] - 797:3

## 5

**5** [1] - 975:23
**502** [1] - 790:24
**5335** [1] - 862:1
**553** [1] - 999:7
**5886** [2] - 860:9, 860:10
**5:08** [2] - 827:19, 827:22

## 6

**6** [4] - 1014:20, 1014:21, 1035:20, 1036:9
**60** [1] - 855:24
**61** [3] - 903:4, 1023:15, 1023:16
**6411** [1] - 1045:16
**66** [1] - 838:1
**67** [1] - 838:1

## 7

**7.3** [2] - 1015:5, 1036:12
**718-613-2272** [1] - 788:25
**76** [2] - 823:17, 902:9
**77** [1] - 869:20
**793** [1] - 1057:6
**7th** [1] - 831:9

## 8

**8** [4] - 790:6, 797:7,

*Schreiber v. Friedman, Et Al*   15-CV-6861      8/2/16 _____ 2

826:25, 827:9
**8.1** [1] - 1015:12
**8.2** [1] - 1036:21
**8.3** [1] - 1037:15
**8/3/2012** [1] - 908:24
**8/3/2013** [1] - 908:19
**841** [1] - 1057:8
**844** [1] - 1057:10
**848** [1] - 1057:12
**85** [3] - 793:15, 793:16
**850** [1] - 1057:14
**869** [1] - 1057:19
**879** [1] - 890:22
**8879** [1] - 890:21
**8879s** [1] - 896:3

## 9

**9** [3] - 797:7, 832:16, 832:17
**9.2** [4] - 1015:25, 1019:20, 1020:24, 1038:10
**9/30** [1] - 1016:10
**90** [2] - 840:7, 1016:3
**940** [1] - 874:9
**940s** [1] - 1012:21
**941s** [7] - 874:9, 877:13, 894:9, 902:14, 903:21, 917:8, 1012:21
**946** [1] - 999:9
**96** [2] - 811:20, 811:21
**9:13** [1] - 835:8
**9:30** [2] - 788:7, 1056:17
**9th** [1] - 855:7

## A

**a-ha** [1] - 1053:14
**a.m** [2] - 788:7, 1056:17
**ability** [6] - 849:18, 853:13, 856:3, 856:18, 893:20, 972:23
**able** [12] - 795:15, 817:13, 843:15, 843:16, 851:18, 854:9, 859:19, 859:22, 865:8, 865:19, 1051:6, 1054:13
**absence** [1] - 945:21
**absolutely** [3] - 890:23, 982:22, 1050:10
**abundance** [5] - 1045:8, 1052:15,

1052:21, 1052:22, 1052:25
**accept** [1] - 993:10
**access** [59] - 795:13, 795:20, 795:21, 796:9, 796:13, 796:17, 796:22, 796:23, 814:5, 814:9, 814:12, 815:19, 816:10, 817:13, 817:16, 819:16, 819:23, 819:24, 820:18, 821:4, 821:22, 824:2, 826:13, 826:14, 828:4, 828:5, 831:25, 832:2, 843:11, 845:25, 847:12, 848:9, 848:10, 851:2, 851:7, 851:9, 851:10, 851:19, 852:25, 853:2, 854:8, 854:9, 865:17, 892:8, 892:9, 892:11, 894:1, 895:1, 895:5, 899:17, 937:14, 1010:25, 1011:1, 1011:3, 1016:21, 1017:12, 1042:14, 1043:1
**accessed** [8] - 818:25, 868:2, 892:15, 893:24, 1033:14, 1033:15, 1033:19, 1034:6
**accessible** [2] - 817:9, 1026:16
**accessing** [5] - 816:13, 817:8, 843:9, 1042:6, 1055:24
**accidentally** [1] - 937:8
**accommodate** [1] - 1029:11
**accordance** [1] - 1044:18
**account** [31] - 820:14, 845:22, 846:1, 852:13, 859:2, 859:7, 859:13, 875:11, 876:3, 899:14, 899:17, 900:2, 900:4, 900:7, 900:9, 900:12, 900:16, 900:20, 901:5, 901:7, 905:3, 923:25, 938:15,

949:6, 949:7, 958:25, 959:13, 959:18, 959:21, 1007:23, 1033:11
**accountant** [47] - 860:6, 870:6, 870:8, 870:10, 870:13, 877:6, 886:15, 904:11, 904:12, 909:6, 912:15, 918:12, 918:23, 950:23, 951:4, 952:16, 963:6, 964:13, 965:23, 997:13, 1005:7, 1015:13, 1015:16, 1016:2, 1019:11, 1025:10, 1026:15, 1029:19, 1029:21, 1029:24, 1030:1, 1030:3, 1030:10, 1030:17, 1030:23, 1031:5, 1031:11, 1031:18, 1032:6, 1032:12, 1032:16, 1035:24, 1036:13, 1036:22, 1038:11, 1038:12
**accounted** [1] - 976:3
**accounting** [18] - 870:19, 896:14, 896:21, 896:22, 919:24, 920:1, 920:9, 920:25, 921:3, 921:20, 928:5, 942:2, 950:12, 959:9, 1017:24, 1036:24, 1037:13, 1039:1
**accounts** [24] - 871:1, 893:7, 897:4, 901:18, 923:24, 1007:22, 1030:8, 1030:15, 1030:19, 1031:3, 1031:7, 1031:16, 1031:24, 1040:8, 1040:11, 1040:12, 1040:14, 1040:15, 1040:16, 1040:18
**accurate** [5] - 890:4, 897:11, 960:10, 960:12, 960:13
**Acme** [1] - 1045:3
**Acorn** [2] - 1045:3, 1045:20
**acquired** [5] - 836:1, 980:11, 980:15, 980:17, 987:11
**Action** [1] - 788:3

**action** [3] - 848:1, 862:9, 953:14
**activated** [1] - 892:9
**activates** [1] - 855:24
**active** [7] - 815:11, 818:24, 818:25, 820:4, 937:23, 938:1, 938:3
**activities** [1] - 982:2
**activity** [4] - 892:21, 897:21, 938:24, 939:18
**actual** [7] - 796:11, 804:12, 862:20, 867:25, 934:18, 1001:4, 1006:18
**addition** [3] - 878:8, 1010:23, 1015:23
**additional** [1] - 1048:19
**address** [54] - 815:24, 816:3, 816:7, 816:17, 816:18, 816:19, 816:25, 817:1, 817:6, 817:7, 817:10, 817:19, 818:21, 837:13, 837:15, 837:16, 837:21, 838:9, 838:21, 839:8, 839:12, 839:17, 839:20, 840:2, 840:6, 840:9, 846:6, 887:3, 910:14, 928:18, 928:21, 929:2, 935:25, 936:13, 942:9, 942:17, 943:11, 943:25, 944:14, 944:16, 945:9, 945:12, 952:25, 953:2, 953:8, 956:1, 986:4, 995:17, 1023:20, 1024:9, 1025:4, 1025:5, 1025:8
**addresses** [10] - 816:20, 837:22, 837:24, 838:3, 845:17, 845:21, 851:16, 928:15, 936:4, 945:20
**adjourned** [1] - 1056:16
**adjust** [1] - 1008:19
**adjusted** [1] - 1035:9
**adjustment** [2] - 1008:15, 1008:20
**adjustments** [7] - 1007:24, 1007:25,

1008:2, 1008:4, 1008:7, 1008:10, 1010:10
**admin** [6] - 796:15, 796:22, 824:5, 845:22, 845:23, 853:21
**administrative** [6] - 798:15, 798:21, 824:6, 846:3, 904:11, 904:14
**administrator** [3] - 816:8, 824:1, 854:2
**adopted** [1] - 1036:23
**adopting** [1] - 1037:13
**Advanced** [1] - 1045:20
**advice** [3] - 835:23, 835:25, 836:4
**affected** [1] - 847:23
**affidavit** [8] - 800:6, 816:13, 854:20, 854:24, 855:5, 855:6, 855:8, 855:9
**afield** [1] - 950:8
**after-the-fact** [2] - 874:7, 975:4
**afternoon** [4] - 973:21, 1014:1, 1032:5, 1055:4
**afterwards** [3] - 825:13, 836:9, 913:8
**agency** [1] - 953:12
**agent** [1] - 1042:5
**ago** [27] - 824:16, 840:15, 885:22, 887:22, 887:23, 887:25, 888:1, 888:3, 926:20, 929:9, 938:12, 939:6, 939:15, 939:25, 940:17, 942:18, 961:11, 962:8, 986:1, 993:6, 997:11, 1021:23, 1025:15, 1025:16, 1025:20, 1041:5
**agree** [1] - 1042:11
**agreed** [2] - 978:14, 1022:24
**agreement** [17] - 963:24, 963:25, 964:9, 964:10, 965:15, 965:22, 966:6, 1014:23, 1015:3, 1015:10, 1017:24, 1019:14, 1019:17, 1035:19, 1036:5, 1036:10, 1038:14

*Schreiber v. Friedman, Et Al   15-CV-6861      8/2/16* ___ 3

**agreements** [1] - 964:15
**ahead** [27] - 801:5, 803:5, 806:24, 830:3, 834:3, 834:6, 836:23, 873:18, 881:3, 911:17, 911:19, 919:20, 926:11, 928:3, 933:9, 934:7, 950:11, 973:24, 985:7, 988:8, 996:17, 1012:4, 1013:23, 1021:8, 1034:16, 1052:11
**Ahearn** [27] - 881:22, 882:13, 883:1, 883:7, 883:20, 883:21, 884:12, 884:21, 884:22, 886:9, 886:21, 929:7, 930:2, 930:3, 930:9, 931:21, 984:8, 988:24, 994:23, 997:16, 997:17, 1041:2
**Ahearn's** [1] - 943:20
**Ahearns** [24] - 884:15, 884:17, 920:1, 920:12, 927:11, 930:1, 931:2, 942:7, 943:5, 944:16, 944:18, 984:13, 985:19, 986:3, 988:14, 994:7, 994:23, 995:5, 995:6, 995:25, 996:5, 996:20, 996:21, 1002:2
**aided** [1] - 788:22
**al** [1] - 788:6
**Albemarle** [2] - 998:13, 998:15
**allegation** [4] - 797:6, 797:11, 821:8, 832:5
**allegations** [1] - 933:4
**allocates** [1] - 930:13
**allow** [11] - 795:13, 828:4, 828:5, 853:5, 853:25, 882:19, 900:6, 933:6, 976:16, 981:3, 983:2
**allowed** [1] - 902:6
**allowing** [2] - 993:18, 1029:5
**allows** [1] - 812:4
**alphabetical** [1] - 1045:2
**alter** [1] - 825:16
**alterations** [1] - 848:2

**altered** [2] - 868:5, 868:7
**altering** [1] - 868:10
**altogether** [1] - 929:15
**amended** [3] - 1039:9, 1039:20, 1039:22
**Amon's** [1] - 933:5
**amortizing** [1] - 1037:4
**amount** [9] - 805:13, 882:19, 894:25, 912:13, 928:6, 965:3, 965:4, 976:3, 1023:2
**amounts** [4] - 912:19, 965:2, 965:5, 1035:7
**analysis** [3] - 803:11, 807:20, 808:2
**Andrew** [1] - 789:15
**annual** [2] - 916:25, 917:4
**answer** [12] - 801:3, 809:19, 873:7, 873:16, 893:3, 893:4, 918:20, 947:20, 968:22, 998:25, 1036:16, 1051:10
**answered** [8] - 837:10, 893:1, 936:1, 988:4, 988:23, 991:9, 991:10, 1009:9
**answering** [2] - 826:1, 854:17
**answers** [2] - 820:25, 847:8
**anyplace** [1] - 976:4
**anyway** [2] - 913:11, 960:11
**AOL** [3] - 848:4, 848:6, 848:13
**apologies** [1] - 935:15
**apologize** [6] - 798:7, 800:1, 902:11, 935:10, 950:19, 988:5
**appear** [1] - 1045:4
**appearance** [1] - 847:1
**APPEARANCES** [1] - 789:1
**application** [6] - 790:3, 793:3, 902:18, 902:19, 902:23, 993:7
**appreciate** [1] - 805:21
**approach** [2] - 798:10, 1009:6

**appropriate** [1] - 982:20
**appropriately** [1] - 932:17
**approval** [1] - 1022:22
**approximate** [1] - 1048:8
**April** [2] - 794:2, 952:1
**area** [5] - 817:19, 832:4, 835:21, 847:5, 867:1
**areas** [1] - 1007:21
**argue** [1] - 934:12
**argument** [2] - 804:20, 857:3
**arguments** [1] - 857:7
**arose** [1] - 827:15
**arrangement** [2] - 964:7, 964:23
**arrest** [1] - 1041:6
**arrested** [16] - 982:7, 984:23, 985:2, 985:5, 985:9, 985:14, 985:20, 986:4, 987:15, 987:19, 988:2, 996:9, 996:20, 996:23, 1014:6, 1014:9
**aside** [5] - 827:14, 831:7, 838:2, 955:20, 1048:17
**aspect** [2] - 946:3, 1008:22
**assemble** [1] - 877:12
**assert** [1] - 1019:12
**assets** [12] - 926:18, 937:21, 938:9, 941:1, 941:9, 980:8, 980:9, 990:6, 990:12, 990:15, 990:18, 1011:15
**assist** [1] - 903:23
**assistant's** [1] - 891:16
**associate** [3] - 877:4, 936:24, 968:9
**associate's** [1] - 967:7
**associated** [6] - 923:21, 926:23, 945:24, 946:10, 946:13, 1030:23
**Associated** [34] - 789:5, 882:21, 882:23, 883:8, 883:11, 883:23, 923:4, 928:24, 928:25, 929:8, 929:14, 929:18, 929:19, 929:22,

929:23, 929:25, 930:5, 930:19, 930:23, 931:7, 931:23, 931:25, 932:7, 933:20, 934:8, 934:9, 934:17, 936:22, 936:23, 943:14, 944:2, 944:3, 944:4, 995:13
**ASSOCIATES** [1] - 885:8
**Associates** [12] - 789:6, 884:23, 885:6, 885:12, 885:13, 885:20, 939:7, 939:22, 940:5, 999:9, 999:21, 1031:19
**assume** [9] - 807:6, 836:5, 841:12, 852:2, 858:24, 863:10, 867:20, 872:12, 999:3
**assumed** [1] - 903:20
**assuming** [3] - 908:8, 919:21, 956:25
**assumption** [1] - 1034:8
**assumptions** [1] - 1034:12
**assure** [1] - 825:1
**attached** [6] - 793:25, 838:11, 838:12, 838:13, 838:15, 862:16
**attachment** [3] - 908:24, 957:1, 957:6
**attempt** [2] - 848:9, 867:13
**attempted** [1] - 1052:12
**attention** [5] - 793:5, 797:23, 846:8, 907:8, 1053:16
**attorney** [9] - 808:7, 872:10, 872:11, 872:14, 905:12, 910:18, 966:21, 967:14, 1054:3
**attributable** [2] - 954:7, 962:16
**attributing** [1] - 982:23
**audit** [22] - 858:21, 863:8, 897:13, 917:3, 917:4, 917:7, 918:2, 918:6, 961:8, 963:14, 979:5, 1005:14, 1005:17,

929:23, 929:25, 930:5, 930:19, 930:23, 931:7, 931:23, 931:25, 932:7, 933:20, 934:8, 934:9, 934:17, 936:22, 936:23, 944:2, 944:3, 944:4, 995:13
**1005:18**, 1005:21, 1005:24, 1006:16, 1006:18, 1006:23, 1025:17
**audited** [9] - 895:4, 961:3, 961:5, 962:5, 1005:19, 1018:13, 1018:17, 1025:20, 1026:11
**auditing** [2] - 1005:9, 1005:10
**auditor** [3] - 979:2, 1005:8, 1018:2
**audits** [4] - 916:18, 916:19, 961:10, 961:14
**August** [7] - 788:7, 812:6, 909:2, 909:5, 910:3, 1056:16
**authenticity** [1] - 1053:5
**authorization** [5] - 890:5, 890:16, 890:18, 899:19
**authorized** [1] - 899:20
**authorizing** [1] - 901:1
**available** [1] - 790:7
**Avenue** [33] - 789:6, 869:20, 884:23, 885:5, 885:8, 885:9, 885:11, 885:13, 885:20, 936:7, 936:8, 936:10, 936:13, 939:6, 939:7, 939:8, 939:10, 939:22, 939:25, 940:5, 940:12, 940:14, 944:13, 953:4, 971:16, 994:13, 994:24, 995:18, 998:24, 999:5, 999:17, 1031:18, 1031:19
**Avery** [1] - 789:9
**aware** [43] - 797:11, 797:14, 799:20, 800:10, 812:25, 827:15, 870:14, 880:1, 880:17, 885:10, 886:4, 886:8, 896:2, 923:2, 927:1, 928:14, 931:1, 943:4, 943:6, 946:1, 946:14, 964:21, 980:3, 980:4, 981:8, 981:25, 986:10, 988:2, 988:13,

*Schreiber v. Friedman, Et Al   15-CV-6861      8/2/16* _____ 4

990:5, 990:10, 993:24, 995:19, 995:22, 996:12, 996:15, 997:21, 1000:5, 1001:19, 1008:24, 1014:8, 1014:11, 1033:9
**awhile** [1] - 938:12

## B

**back-end** [3] - 865:11, 868:10, 868:12
**backdate** [6] - 822:19, 822:22, 823:6, 862:12, 862:13, 862:15
**backdating** [1] - 822:18
**backed** [1] - 813:1
**backup** [11] - 811:5, 811:7, 811:12, 811:14, 812:10, 812:12, 812:17, 812:21, 1009:22, 1051:22, 1051:24
**backups** [1] - 811:9
**balance** [12] - 859:23, 897:19, 898:1, 962:10, 962:11, 1002:22, 1006:20, 1020:11, 1020:13, 1020:18, 1026:20, 1034:18
**balanced** [1] - 860:5
**balances** [4] - 898:7, 898:11, 1007:23, 1026:19
**Bank** [2] - 914:3, 914:5
**bank** [34] - 870:25, 893:6, 893:11, 893:15, 897:3, 897:16, 899:14, 899:17, 905:15, 905:18, 913:24, 914:11, 914:13, 914:20, 915:1, 915:2, 923:25, 949:12, 958:13, 958:14, 958:15, 959:12, 959:17, 970:7, 970:11, 1030:8, 1030:15, 1030:19, 1031:3, 1031:7, 1031:16, 1031:24
**banking** [4] - 899:22, 899:24, 1040:8, 1040:15

**bankrupt** [2] - 942:24, 942:25
**bankruptcy** [2] - 928:10
**bars** [1] - 1042:22
**based** [20] - 804:20, 806:12, 818:10, 823:1, 823:3, 846:24, 847:16, 847:18, 856:21, 900:17, 917:5, 950:23, 965:4, 971:21, 975:7, 977:6, 1017:17, 1034:14, 1035:10, 1035:13
**basic** [1] - 804:12
**Basis** [1] - 996:11
**basis** [14] - 810:15, 823:11, 865:11, 874:11, 877:13, 950:14, 996:14, 1010:21, 1012:15, 1019:6, 1019:22, 1033:23, 1034:17, 1036:1
**batch** [2] - 865:25, 953:3
**Bates** [11] - 905:25, 911:12, 911:18, 1044:5, 1048:21, 1051:14, 1051:15, 1051:17, 1054:3, 1054:7, 1054:12
**Bates-stamped** [5] - 1044:5, 1051:14, 1054:3, 1054:7, 1054:12
**battery** [1] - 836:1
**Bauman** [1] - 971:15
**Bay** [3] - 941:6, 941:7, 942:1
**bean** [1] - 866:3
**Beans** [4] - 845:16, 845:21, 846:1, 852:12
**bear** [1] - 1023:10
**bearing** [1] - 911:1
**became** [9] - 813:1, 928:12, 980:5, 982:10, 995:24, 996:2, 1007:14, 1021:4
**become** [3] - 812:25, 865:18, 939:19
**becoming** [1] - 870:10
**beer** [17] - 882:8, 882:9, 882:13, 882:15, 943:18, 943:20, 980:25,

981:8, 984:17, 984:18, 986:7, 986:14, 986:23, 996:6
**BEFORE** [1] - 788:9
**beginning** [8] - 813:24, 870:19, 870:22, 889:1, 995:8, 1011:16, 1029:18, 1045:15
**behalf** [2] - 1005:11, 1017:9
**behavioral** [1] - 908:9
**behind** [1] - 976:7
**belief** [3] - 895:19, 985:13, 985:18
**bell** [1] - 994:16
**belonging** [2] - 821:9, 821:15
**below** [4] - 846:16, 852:11, 859:11, 861:4
**Ben** [2] - 835:2, 846:17
**ben@Brooklyn** [1] - 846:17
**Ben@ brooklynbeans** [1] - 812:1
**benefit** [1] - 854:17
**Benzion** [1] - 798:25
**BERGSON** [4] - 836:13, 936:1, 946:16, 1040:9
**Best** [3] - 788:16, 885:17, 885:24
**best** [12] - 798:7, 807:23, 825:1, 832:24, 872:21, 893:20, 895:22, 896:12, 910:2, 911:23, 961:9, 1003:3
**better** [4] - 803:3, 809:16, 933:8, 1051:10
**between** [19] - 814:18, 816:9, 817:13, 831:22, 839:21, 856:1, 868:5, 880:1, 884:15, 927:18, 933:22, 938:4, 949:7, 969:17, 989:13, 993:12, 1006:15, 1045:12
**Beverage** [1] - 923:16
**Beverages** [2] - 789:18, 1032:24
**beyond** [9] - 791:11, 867:1, 867:6,

887:14, 1038:19, 1038:20, 1038:23, 1039:3, 1040:10
**big** [6] - 825:5, 827:1, 834:19, 859:5, 1027:2, 1055:22
**bigger** [1] - 1053:8
**billing** [1] - 964:5
**bills** [2] - 864:13, 956:11
**binder** [4] - 798:9, 798:11, 827:1, 1021:13
**Birnbaum** [4] - 789:18, 920:15, 920:21, 1032:17
**blacked** [1] - 861:15
**blank** [1] - 863:8
**blocking** [1] - 817:12
**blood** [1] - 919:22
**Bobby** [1] - 841:22
**Bogart** [3] - 943:11, 944:13, 945:19
**Bogus** [1] - 887:4
**book** [11] - 796:5, 834:20, 875:2, 891:2, 934:16, 1014:21, 1036:24, 1047:11, 1052:22, 1053:12
**bookkeeper** [3] - 851:18, 856:15, 857:3
**bookkeepers** [2] - 851:11, 851:14
**bookkeeping** [3] - 852:1, 996:6, 996:8
**books** [44] - 859:22, 860:5, 860:7, 870:20, 890:13, 890:15, 890:17, 891:25, 893:19, 907:25, 908:5, 918:4, 935:3, 1007:16, 1007:21, 1007:24, 1026:18, 1026:21, 1043:12, 1043:16, 1044:19, 1045:9, 1045:23, 1046:2, 1046:7, 1046:10, 1046:16, 1046:17, 1046:23, 1047:2, 1047:5, 1047:9, 1047:23, 1048:5, 1048:11, 1049:9, 1049:11, 1049:16, 1050:2, 1051:25, 1053:2, 1053:8, 1053:9, 1053:13

**borders** [1] - 993:12
**Borough** [1] - 999:11
**bottom** [3] - 848:22, 966:20, 971:15
**bought** [2] - 842:23, 863:24
**Box** [1] - 1043:20
**box** [30] - 859:5, 859:6, 894:22, 894:23, 910:19, 910:25, 911:6, 911:13, 911:23, 913:3, 913:18, 923:24, 969:25, 970:1, 970:2, 970:11, 973:13, 973:16, 977:18, 978:4, 978:7, 978:10, 978:14, 978:15, 1044:8, 1044:15, 1045:1, 1055:5, 1055:8
**boxes** [10] - 859:6, 894:22, 907:9, 907:10, 910:25, 911:4, 911:14, 1044:2, 1044:8, 1044:15
**Bradford** [1] - 998:20
**break** [9] - 793:5, 836:7, 836:18, 906:2, 906:15, 910:18, 973:20, 973:22, 1041:20
**breakdown** [1] - 971:21
**Brian** [1] - 919:1
**bricks** [1] - 942:19
**brief** [5] - 882:19, 1029:9, 1029:12, 1051:8, 1055:19
**Brief** [1] - 867:11
**bring** [1] - 1053:15
**broad** [1] - 880:25
**broke** [2] - 793:14, 1052:19
**broken** [1] - 959:6
**Bronx** [26] - 803:8, 803:9, 803:10, 803:16, 803:20, 804:5, 805:2, 808:20, 808:23, 809:21, 816:5, 818:2, 837:18, 837:20, 838:3, 838:18, 839:11, 843:22, 844:2, 850:25, 858:9, 875:13, 928:19, 934:15, 990:23

Schreiber v. Friedman, Et Al   15-CV-6861      8/2/16 _____ 5

**Brook** [4] - 923:5, 994:21, 994:22, 994:25
**Brooklyn** [28] - 788:6, 788:25, 804:24, 805:1, 805:5, 808:21, 809:9, 809:12, 809:20, 818:2, 834:22, 839:25, 840:1, 840:6, 840:13, 845:16, 845:21, 846:1, 852:12, 858:8, 866:3, 937:2, 949:19, 950:24, 997:20, 1003:12, 1004:2, 1029:20
**brother** [1] - 919:18
**brought** [3] - 838:17, 857:8, 882:11
**browser** [1] - 820:18
**Bruce** [1] - 789:12
**building** [10] - 945:14, 945:15, 981:18, 982:17, 986:25, 987:4, 987:8, 987:9, 987:12, 990:22
**built** [1] - 822:11
**bunch** [4] - 850:15, 958:24, 959:3, 1045:7
**burden** [2] - 1048:15, 1049:4
**business** [89] - 802:18, 802:20, 803:2, 810:11, 814:4, 879:21, 879:22, 882:14, 882:15, 884:4, 884:5, 884:24, 884:25, 885:7, 885:8, 885:12, 885:14, 885:18, 885:23, 885:24, 886:11, 886:13, 886:16, 888:8, 888:14, 898:3, 898:6, 901:23, 901:25, 909:19, 909:24, 919:23, 920:5, 920:8, 922:14, 922:16, 923:2, 923:3, 923:4, 923:5, 923:7, 924:5, 924:6, 925:13, 925:25, 929:9, 929:20, 929:21, 930:15, 930:18, 930:20, 931:23, 931:25, 933:19,

934:9, 934:17, 934:24, 935:23, 936:11, 936:17, 937:13, 938:24, 939:8, 939:10, 940:6, 940:13, 946:4, 951:18, 951:22, 959:18, 980:25, 981:7, 982:16, 984:14, 984:16, 984:17, 984:18, 986:7, 986:14, 986:23, 994:1, 994:6, 994:7, 1003:21, 1025:5, 1025:8
**businesses** [8] - 882:9, 934:2, 982:17, 986:6, 986:9, 986:12, 986:16, 1002:13
**button** [2] - 975:6, 1013:8
**buy** [5] - 814:19, 855:19, 855:20, 980:8, 984:17
**BY** [52] - 793:13, 829:1, 831:4, 834:7, 836:24, 841:7, 843:19, 844:14, 848:19, 850:5, 861:1, 867:12, 869:16, 873:19, 881:4, 901:4, 908:14, 911:20, 913:14, 926:12, 933:10, 935:17, 949:1, 950:21, 957:23, 960:17, 969:24, 974:1, 983:4, 984:1, 988:10, 993:20, 997:9, 1005:5, 1013:25, 1014:18, 1029:16, 1032:4, 1033:8, 1038:5, 1057:7, 1057:9, 1057:11, 1057:13, 1057:15, 1057:20, 1057:22, 1057:24, 1058:2, 1058:4, 1058:6, 1058:8

## C

**cabin** [1] - 993:12
**Cadman** [1] - 788:24
**cafeteria** [1] - 863:19
**calculate** [2] - 876:14, 972:18

**calculated** [2] - 895:14, 898:14
**calculating** [1] - 1035:2
**calculation** [5] - 876:13, 971:4, 971:23, 972:11, 978:22
**calculations** [4] - 970:21, 976:25, 977:1, 978:21
**Calculator** [3] - 970:17, 971:14, 973:2
**calculator** [5] - 972:4, 972:5, 972:10, 973:3, 1013:6
**calendar** [2] - 1036:23, 1037:9
**camera** [2] - 790:21, 1054:19
**cancel** [1] - 859:8
**canceled** [1] - 958:11
**cancelled** [1] - 907:16
**cannot** [4] - 823:5, 839:20, 844:18, 860:4
**capability** [3] - 857:19, 894:3, 972:21
**capable** [2] - 843:9, 1022:17
**card** [2] - 938:13, 1051:22
**care** [3] - 953:15, 1054:20, 1054:21
**Carol** [1] - 788:14
**case** [15] - 794:19, 800:10, 819:18, 825:6, 841:3, 878:13, 905:5, 934:12, 961:23, 967:9, 992:15, 992:17, 996:13, 1010:6, 1055:21
**cash** [2] - 897:6, 897:8
**categories** [1] - 893:21
**category** [1] - 905:22
**CAUSE** [1] - 788:4
**caused** [1] - 794:19
**caution** [5] - 1045:8, 1052:15, 1052:21, 1052:23, 1052:25
**CBA** [1] - 788:3
**CBA-JO** [1] - 788:3
**cease** [2] - 938:10, 940:17
**ceased** [4] - 939:3, 939:6, 939:24, 989:4
**center** [1] - 859:10

**certain** [13] - 857:16, 871:25, 905:18, 965:23, 969:10, 982:2, 1019:16, 1036:21, 1043:17, 1044:2, 1045:18, 1045:19
**certainly** [2] - 1038:10, 1052:18
**certified** [1] - 1038:12
**certifies** [1] - 890:3
**CFO** [2] - 856:14, 1021:4
**CFS** [6] - 873:22, 874:7, 970:20, 970:22, 975:1, 1013:6
**chain** [2] - 875:5, 875:7
**challenge** [1] - 1025:7
**chance** [3] - 913:7, 1049:20, 1049:22
**Chance** [3] - 879:8, 951:8, 952:12
**Chance's** [1] - 951:9
**change** [13] - 809:23, 822:2, 845:5, 845:9, 858:24, 859:16, 859:18, 859:19, 859:20, 859:25, 961:15, 1035:7, 1045:8
**changed** [6] - 853:23, 859:24, 870:21, 949:5, 1035:13, 1035:17
**changes** [5] - 840:21, 844:16, 844:18, 844:21, 860:2
**changing** [2] - 840:18, 974:20
**charge** [2] - 938:25, 977:8
**charged** [1] - 987:20
**charges** [5] - 976:16, 987:23, 987:24, 996:25, 1014:11
**charities** [1] - 921:4
**check** [39] - 808:10, 808:16, 808:18, 809:15, 811:17, 822:19, 823:2, 827:6, 859:8, 859:24, 859:25, 860:9, 860:11, 861:17, 861:20, 861:22, 862:4, 862:11, 862:12, 862:15, 862:19, 862:21, 862:23,

863:6, 869:2, 869:4, 869:5, 899:10, 914:1, 915:9, 915:11, 958:8, 958:11, 959:20, 968:18, 972:11
**checkbook** [1] - 823:4
**checked** [5] - 957:14, 967:8, 967:10, 969:9, 1046:12
**checking** [2] - 1028:14, 1040:11
**checks** [21] - 822:20, 823:3, 856:6, 856:7, 856:14, 859:2, 859:7, 859:13, 860:1, 862:14, 863:1, 913:22, 914:19, 915:14, 915:16, 958:16, 958:17, 959:3, 959:6, 1033:9
**CIBRO** [4] - 942:18, 942:20, 942:21, 943:3
**Cindy** [1] - 823:14
**circuits** [1] - 1027:8
**circumstances** [3] - 832:23, 834:5, 997:12
**Cirillo** [13] - 925:6, 926:15, 926:22, 927:18, 928:12, 931:14, 935:20, 937:12, 942:5, 942:16, 943:7, 995:20
**Civil** [1] - 788:3
**CIVIL** [1] - 788:4
**claim** [1] - 1019:12
**clarification** [1] - 792:17
**clarify** [2] - 792:15, 815:23
**clarity** [1] - 910:24
**classify** [1] - 1009:17
**claw** [1] - 790:25
**clawed** [1] - 790:14
**cleaned** [2] - 849:23, 850:9
**clear** [11] - 801:3, 818:23, 873:16, 878:17, 883:23, 905:17, 939:3, 941:25, 1003:13, 1016:16, 1029:17
**cleared** [3] - 914:5, 914:19, 914:20
**click** [2] - 859:16, 862:20

**Clickable** [12] - 923:8, 923:9, 925:13, 926:18, 937:19, 937:21, 937:22, 938:4, 938:8, 938:14, 938:22, 938:25
**clickable** [1] - 923:9
**clickableoil.com** [18] - 924:23, 924:24, 925:1, 925:4, 925:11, 925:25, 926:6, 936:13, 937:5, 937:11, 938:5, 938:8, 938:10, 938:14, 938:19, 938:23, 938:25, 939:3
**client** [13] - 820:5, 820:17, 821:5, 849:2, 849:11, 849:21, 925:9, 933:16, 958:11, 971:6, 971:20, 996:21, 1043:1
**clients** [8] - 849:17, 957:19, 958:20, 959:22, 961:3, 984:13, 986:24
**clip** [1] - 1021:12
**clock** [2] - 824:12, 857:12
**clocking** [1] - 824:13
**close** [1] - 887:14
**closed** [3] - 940:6, 952:2, 961:23
**closing** [5] - 927:2, 951:24, 951:25, 952:5, 952:13
**cloud** [4] - 812:4, 812:5, 819:11, 867:17
**Co** [1] - 788:18
**code** [1] - 843:6
**Coffee** [25] - 788:16, 789:19, 789:20, 842:4, 878:5, 885:17, 885:24, 888:18, 920:14, 920:22, 923:14, 937:1, 947:12, 964:18, 964:19, 1000:15, 1023:10, 1023:20, 1024:3, 1025:5, 1025:10, 1032:7, 1032:9
**coffee** [10] - 798:18, 822:19, 822:20, 838:12, 838:15, 838:16, 838:17,

840:13, 888:14, 899:9
**coffee$12s** [1] - 798:18
**colleague** [1] - 1051:9
**column** [1] - 861:18
**coming** [4] - 798:2, 866:21, 867:3, 1050:22
**comment** [1] - 830:18
**commentary** [1] - 1053:25
**commercial** [1] - 930:17
**common** [1] - 887:8
**commune** [1] - 1035:1
**communicate** [8] - 835:19, 966:8, 1002:5, 1009:7, 1018:9, 1018:11, 1028:2, 1028:8
**communicated** [3] - 904:17, 904:20, 966:10
**communication** [4] - 1005:23, 1005:25, 1006:3, 1028:6
**communications** [4] - 865:21, 979:17, 979:22, 1007:13
**companies** [69] - 839:5, 863:17, 866:9, 866:12, 870:5, 875:9, 878:1, 878:3, 878:9, 882:5, 886:7, 888:14, 898:9, 918:3, 923:13, 924:10, 924:12, 924:14, 924:17, 924:19, 924:21, 925:19, 925:23, 928:11, 931:1, 931:12, 932:22, 933:23, 935:3, 936:17, 937:2, 943:3, 943:15, 943:18, 943:22, 943:24, 944:14, 945:3, 945:11, 945:24, 946:3, 946:10, 946:13, 947:6, 948:3, 950:23, 961:12, 964:15, 965:5, 980:1, 981:5, 981:14, 981:21, 982:2, 982:11, 982:15, 988:11, 988:14, 996:6, 997:19, 1000:5,

1000:8, 1001:17, 1002:2, 1002:16, 1002:19, 1002:24, 1004:10, 1029:18
**Companies** [1] - 1041:3
**companies'** [1] - 1040:11
**companies's** [1] - 898:7
**Company** [7] - 990:25, 991:12, 991:14, 991:20, 991:25, 992:3, 999:23
**company** [116] - 812:4, 824:2, 838:4, 851:11, 852:3, 857:6, 863:19, 869:24, 869:25, 877:3, 878:12, 879:6, 879:7, 880:18, 881:18, 882:9, 883:4, 883:6, 890:3, 892:22, 896:15, 896:17, 896:19, 897:24, 909:7, 909:19, 909:24, 912:11, 916:5, 916:23, 917:4, 917:11, 917:24, 922:6, 923:24, 925:1, 925:4, 925:10, 926:23, 928:1, 931:14, 931:16, 931:18, 934:18, 937:10, 937:18, 937:19, 939:13, 939:18, 939:19, 939:21, 940:1, 940:7, 940:25, 941:5, 942:10, 942:11, 942:12, 942:17, 942:22, 946:19, 946:24, 947:1, 947:2, 947:3, 948:8, 962:20, 965:3, 971:9, 979:6, 980:7, 980:8, 980:9, 985:12, 988:20, 988:25, 989:2, 994:20, 997:14, 997:22, 997:23, 998:2, 998:3, 998:4, 998:6, 998:8, 1001:1, 1001:3, 1001:4, 1001:6, 1001:12, 1001:14, 1001:22, 1003:24, 1004:2, 1004:7,

1005:19, 1005:20, 1016:4, 1020:14, 1020:19, 1030:4, 1030:21, 1030:24, 1031:1, 1031:5, 1031:9, 1031:12, 1031:14, 1031:18, 1033:10, 1040:20, 1043:13, 1043:17
**company's** [7] - 890:17, 896:25, 1016:7, 1016:25, 1018:6, 1027:15, 1033:10
**compensation** [2] - 916:17, 918:2
**compete** [1] - 934:14
**competes** [1] - 934:8
**competitors** [1] - 934:5
**compilation** [2] - 1006:21, 1006:23
**complain** [4] - 795:23, 979:14, 1020:8, 1026:8
**complained** [3] - 858:11, 858:12, 1035:1
**complaint** [1] - 1035:16
**complaints** [1] - 858:13
**complete** [7] - 823:19, 906:7, 913:8, 916:1, 1005:21, 1006:1, 1008:2
**completed** [5] - 793:1, 1006:13, 1006:14, 1008:4, 1018:19
**completely** [4] - 811:6, 819:8, 867:13, 887:6
**Complying)** [4] - 831:16, 834:11, 837:4, 846:9
**comprehensive** [1] - 1006:21
**comptroller** [2] - 892:18, 966:5
**computer** [129] - 788:22, 793:19, 794:18, 794:22, 795:7, 795:10, 795:12, 795:13, 795:17, 795:22, 797:8, 797:18, 797:21, 802:8, 802:18, 802:20, 802:22, 803:17, 804:10, 804:14,

805:6, 805:9, 806:11, 806:15, 807:19, 807:20, 808:1, 808:2, 809:7, 813:13, 813:18, 813:24, 814:3, 814:11, 814:13, 814:14, 814:20, 814:23, 815:2, 815:4, 815:6, 815:11, 815:12, 815:17, 815:18, 816:10, 817:9, 817:10, 817:16, 817:25, 818:4, 818:7, 818:11, 818:17, 818:23, 819:2, 819:4, 819:9, 819:11, 819:19, 819:22, 819:24, 820:3, 820:9, 820:17, 821:3, 821:9, 821:12, 824:5, 825:23, 826:14, 826:15, 837:13, 838:11, 838:12, 839:3, 839:4, 841:11, 842:5, 842:12, 842:17, 847:12, 847:20, 848:5, 850:17, 850:20, 851:5, 851:8, 851:10, 851:23, 851:24, 852:5, 852:23, 853:3, 853:10, 853:11, 854:8, 854:9, 854:10, 857:10, 857:14, 857:24, 857:25, 858:3, 858:7, 858:8, 858:13, 865:1, 866:16, 866:19, 866:23, 872:22, 873:10, 873:12, 873:20, 874:21, 874:23, 891:16, 892:5, 894:3, 915:18, 956:11, 956:13, 958:2, 967:7, 967:21, 969:9
**computer's** [1] - 823:10
**computer-aided** [1] - 788:22
**computers** [84] - 802:5, 802:6, 803:17, 804:6, 807:9, 807:13, 807:15, 809:5,

809:22, 810:10, 810:21, 813:23, 814:18, 815:22, 816:2, 816:4, 816:6, 816:13, 816:16, 817:8, 817:17, 818:1, 818:11, 818:12, 819:3, 819:8, 819:16, 819:19, 819:20, 820:9, 820:15, 821:4, 824:3, 828:5, 831:25, 832:3, 837:5, 837:8, 837:9, 837:12, 837:17, 837:18, 838:5, 838:21, 839:7, 839:10, 839:11, 839:14, 839:15, 839:17, 839:19, 839:21, 840:1, 840:5, 840:6, 840:10, 840:12, 841:9, 841:11, 841:16, 841:18, 841:21, 841:25, 842:9, 843:21, 843:22, 844:3, 844:8, 844:10, 853:13, 853:18, 853:19, 858:5, 867:3, 867:4, 868:24, 873:5, 873:8, 873:20, 892:11, 932:11, 941:11, 993:13

**concern** [5] - 963:3, 1048:18, 1049:12, 1050:11, 1050:13

**concerned** [3] - 790:11, 1049:7, 1053:10

**concerning** [6] - 844:16, 847:13, 847:15, 1009:11, 1011:11, 1014:5

**concerns** [1] - 829:4

**conduct** [1] - 804:22

**conducted** [2] - 807:20, 808:2

**confer** [2] - 1055:17, 1056:11

**configuration** [1] - 1044:10

**confirm** [1] - 846:12

**confusing** [1] - 934:11

**connect** [5] - 814:20, 882:20, 981:3, 981:22, 1010:7

**connected** [10] -

819:7, 820:11, 820:12, 820:14, 837:5, 837:8, 837:9, 851:23, 920:3, 934:23

**Connecticut** [1] - 887:2

**connection** [17] - 864:18, 864:19, 879:14, 879:15, 879:18, 879:19, 880:1, 884:15, 918:23, 919:22, 922:12, 926:6, 930:21, 933:22, 1005:23, 1007:7, 1007:15

**connections** [1] - 880:17

**consecutive** [1] - 1043:15

**consecutively** [1] - 854:1

**consent** [2] - 792:8, 1036:14

**consider** [1] - 918:4

**consistent** [1] - 810:2

**constitute** [1] - 1043:12

**constitutes** [1] - 1047:11

**consult** [1] - 870:18

**Cont'd** [8] - 789:1, 793:12, 861:1, 908:13, 949:1, 1029:15, 1057:6, 1058:3

**contact** [1] - 882:11

**contacted** [2] - 875:9, 875:11

**contain** [1] - 810:11

**contained** [2] - 975:13, 1013:14

**containing** [2] - 908:15, 1045:4

**contains** [3] - 814:12, 834:16, 967:16

**context** [1] - 802:17

**continue** [6] - 793:7, 821:1, 833:20, 935:15, 950:20, 1055:5

**Continued** [4] - 860:13, 906:18, 983:8, 1004:12

**continued** [5] - 791:19, 828:8, 940:2, 963:6, 1037:24

**continues** [1] - 820:25

**Continuing** [11] - 829:2, 831:6, 834:9, 837:1, 843:20, 911:22, 913:16, 926:14, 933:12, 935:19, 1038:7

**contract** [1] - 964:2

**contractor** [1] - 877:18

**contrary** [1] - 804:18

**contrast** [1] - 811:12

**control** [5] - 810:25, 813:3, 1023:9, 1040:8, 1040:17

**controlled** [5] - 796:16, 797:1, 825:5, 825:9, 1040:12

**controller** [2] - 817:15, 817:17

**conversation** [3] - 891:5, 933:1, 1020:5

**copies** [22] - 833:2, 833:3, 833:7, 867:24, 872:8, 890:9, 891:12, 894:7, 894:9, 901:8, 908:20, 916:11, 917:8, 918:4, 956:13, 956:16, 956:17, 956:19, 969:15, 969:22, 1009:1

**copy** [7] - 847:21, 848:8, 848:12, 849:12, 903:2, 908:3, 1051:16

**copying** [2] - 847:15, 847:23

**Corp** [35] - 788:19, 789:4, 789:5, 789:6, 789:6, 882:21, 882:23, 883:13, 928:25, 929:14, 929:23, 929:25, 930:5, 930:19, 930:23, 931:7, 936:24, 943:14, 944:4, 988:18, 989:8, 989:9, 989:14, 990:3, 992:6, 992:11, 992:13, 993:21, 994:9, 995:13, 998:13, 999:5, 999:13, 999:19, 1030:23

**corp** [1] - 999:19

**corporate** [5] - 819:22, 820:8, 838:11,

838:21, 982:21

**Corporate's** [1] - 1038:21

**Corporation** [1] - 989:6

**corporation** [3] - 937:23, 938:2, 942:21

**correct** [115] - 791:17, 795:8, 796:8, 797:19, 797:20, 797:22, 797:24, 798:17, 799:8, 801:19, 801:21, 801:24, 802:23, 803:18, 803:19, 807:10, 807:11, 807:14, 807:16, 810:1, 811:4, 811:13, 811:14, 812:1, 812:2, 812:23, 813:23, 814:21, 816:17, 819:3, 826:8, 826:11, 826:13, 831:13, 832:18, 835:23, 837:14, 839:8, 839:9, 839:13, 839:19, 840:13, 840:14, 844:1, 844:18, 846:6, 846:14, 846:17, 846:18, 846:20, 846:22, 846:23, 847:24, 848:7, 848:8, 849:14, 849:18, 849:19, 850:1, 852:16, 858:4, 866:23, 867:14, 868:19, 869:3, 885:2, 897:24, 901:2, 906:7, 906:8, 918:18, 922:2, 922:5, 929:24, 944:6, 950:25, 968:14, 970:10, 973:18, 1000:20, 1007:8, 1007:12, 1010:13, 1012:15, 1012:16, 1013:4, 1013:15, 1014:9, 1014:12, 1014:13, 1015:11, 1015:17, 1016:11, 1017:15, 1017:19, 1017:20, 1017:24, 1017:25, 1025:18, 1026:4, 1026:7, 1026:9, 1026:10, 1026:13, 1032:7, 1033:16,

1034:23, 1035:18, 1036:16, 1037:16, 1042:10, 1046:17, 1046:25, 1047:3, 1050:20

**corrected** [3] - 870:21, 889:9, 1007:22

**corrections** [1] - 1007:20

**correctly** [6] - 839:11, 942:13, 948:1, 1016:22, 1023:23, 1024:12

**correlates** [3] - 1048:21, 1048:24, 1051:4

**correspondence** [1] - 798:15

**corresponding** [1] - 1053:13

**corrupted** [1] - 865:18

**cost** [5] - 895:7, 895:12, 895:18, 963:4, 1008:20

**counsel** [10] - 933:1, 1010:2, 1028:6, 1028:7, 1028:8, 1028:11, 1042:22, 1044:17, 1055:17, 1056:12

**couple** [15] - 794:23, 797:13, 797:14, 824:16, 829:12, 830:6, 913:10, 913:11, 963:9, 981:5, 988:11, 1004:10, 1021:23, 1035:20

**course** [7] - 798:12, 803:13, 859:22, 867:6, 880:12, 960:9, 1042:3

**COURT** [394] - 788:1, 790:1, 790:5, 790:15, 790:24, 791:2, 791:10, 791:15, 791:17, 791:22, 792:6, 792:14, 792:17, 792:21, 792:24, 793:3, 793:6, 796:2, 798:1, 798:12, 800:23, 800:25, 801:5, 802:25, 803:3, 804:17, 804:20, 805:15, 805:20, 806:1, 806:5, 806:12, 806:17, 806:21, 806:24, 815:23,

*Schreiber v. Friedman, Et Al   15-CV-6861      8/2/16* _____ 8

816:2, 816:6,
816:12, 816:16,
816:21, 817:1,
817:3, 820:20,
820:22, 820:24,
825:16, 825:19,
825:22, 825:25,
827:5, 827:7, 829:9,
829:16, 829:20,
829:23, 830:1,
830:5, 830:18,
831:1, 833:11,
833:14, 833:23,
833:25, 834:6,
836:9, 836:11,
836:16, 836:23,
837:11, 840:23,
841:1, 841:5,
843:12, 843:18,
847:3, 847:5, 847:7,
847:10, 848:16,
850:3, 850:22,
852:19, 852:21,
854:16, 855:14,
856:19, 856:25,
859:9, 859:12,
861:25, 867:6,
867:9, 868:16,
868:18, 868:21,
869:2, 869:5, 869:8,
869:10, 869:14,
872:17, 873:2,
873:5, 873:7,
873:11, 873:13,
873:15, 873:18,
875:4, 879:25,
880:5, 880:8,
880:10, 880:16,
880:23, 881:3,
882:19, 887:13,
887:17, 891:4,
893:3, 895:10,
895:17, 900:11,
900:19, 900:25,
901:3, 902:10,
903:25, 906:1,
906:15, 907:2,
907:6, 907:13,
907:17, 907:20,
907:23, 908:1,
908:6, 908:10,
909:22, 909:24,
910:1, 910:5,
910:24, 911:4,
911:8, 911:13,
911:17, 911:19,
913:2, 913:6,
913:13, 918:10,
918:16, 918:20,
919:10, 919:15,
919:19, 925:17,

925:22, 926:2,
926:5, 926:8,
926:11, 927:22,
928:3, 932:12,
932:23, 934:1,
934:5, 934:7,
934:12, 934:22,
935:8, 935:10,
935:13, 935:15,
936:3, 938:1, 940:4,
940:8, 940:10,
940:12, 940:15,
945:16, 945:18,
945:22, 946:17,
947:20, 950:8,
950:10, 950:16,
950:19, 957:9,
957:14, 957:19,
957:21, 959:8,
959:14, 959:19,
959:22, 959:25,
960:2, 960:4, 960:7,
960:9, 960:12,
960:16, 962:2,
965:10, 965:14,
968:22, 968:25,
969:2, 969:6,
969:12, 969:16,
969:19, 969:23,
970:1, 970:4, 970:6,
973:21, 973:24,
976:8, 977:20,
981:3, 981:13,
981:16, 981:23,
982:3, 982:12,
982:14, 982:19,
982:23, 983:2,
984:25, 985:3,
985:6, 985:17,
985:21, 985:23,
987:3, 988:4, 988:6,
988:8, 988:16,
989:18, 990:8,
991:7, 991:9,
991:11, 992:16,
992:20, 992:24,
993:3, 993:8,
994:19, 996:11,
996:14, 996:17,
996:25, 997:4,
997:7, 999:2,
1005:2, 1010:2,
1010:11, 1010:14,
1010:17, 1011:20,
1011:23, 1012:2,
1012:4, 1013:18,
1013:21, 1013:23,
1014:15, 1020:23,
1021:3, 1021:6,
1021:8, 1024:19,
1028:16, 1028:20,

1028:25, 1029:9,
1029:13, 1033:5,
1034:8, 1034:11,
1034:16, 1034:20,
1036:4, 1036:7,
1036:9, 1036:11,
1036:15, 1036:19,
1037:20, 1037:22,
1038:1, 1038:3,
1038:13, 1038:20,
1038:25, 1039:3,
1040:3, 1040:7,
1040:10, 1041:7,
1041:9, 1041:12,
1041:14, 1041:17,
1041:23, 1042:8,
1042:11, 1042:16,
1042:18, 1042:20,
1043:4, 1043:7,
1043:9, 1043:19,
1043:22, 1043:24,
1044:4, 1044:10,
1044:13, 1044:20,
1044:23, 1044:25,
1045:10, 1045:12,
1045:17, 1045:21,
1045:25, 1046:4,
1046:11, 1046:14,
1046:19, 1046:21,
1046:23, 1047:1,
1047:4, 1047:15,
1047:19, 1047:21,
1048:1, 1048:4,
1048:7, 1048:10,
1048:20, 1049:4,
1049:7, 1049:10,
1049:14, 1049:19,
1049:22, 1050:1,
1050:4, 1050:7,
1050:10, 1050:16,
1050:18, 1050:20,
1050:23, 1051:2,
1051:11, 1051:18,
1052:2, 1052:11,
1053:2, 1053:11,
1053:23, 1053:25,
1054:5, 1054:7,
1054:9, 1054:12,
1054:20, 1054:25,
1055:11, 1055:13,
1055:16, 1055:18,
1055:22, 1056:3,
1056:5, 1056:9,
1056:14
**court** [6] - 835:18,
847:1, 847:2,
907:15, 1027:21,
1046:2
**Court** [11] - 788:23,
788:23, 792:7,
840:19, 895:11,

1006:15, 1008:12,
1009:15, 1043:11,
1047:9, 1054:10
**Court's** [4] - 793:5,
807:2, 817:4, 907:8
**Courthouse** [1] -
788:24
**cover** [2] - 908:18,
908:19
**covered** [2] - 1041:7,
1041:9
**CPA** [5] - 789:12,
869:22, 971:16,
1019:22, 1038:8
**Crazy** [5] - 789:19,
923:18, 923:21,
924:1, 1032:19
**create** [4] - 817:21,
856:3, 876:13,
1012:21
**created** [5] - 845:9,
862:21, 862:23,
862:24, 956:21
**creates** [4] - 814:17,
857:12, 858:18,
874:2
**creation** [1] - 1011:17
**credit** [2] - 938:13,
1051:22
**creditor** [5] - 925:3,
926:4, 927:25,
928:4, 935:1
**cross** [6] - 793:7,
836:11, 846:25,
867:1, 1046:12,
1049:1
**CROSS** [18] - 793:12,
841:6, 844:13,
848:18, 1005:4,
1013:24, 1014:17,
1029:15, 1032:3,
1057:6, 1057:8,
1057:10, 1057:12,
1057:21, 1057:23,
1058:1, 1058:3,
1058:5
**CROSS-**
**EXAMINATION** [18] -
793:12, 841:6,
844:13, 848:18,
1005:4, 1013:24,
1014:17, 1029:15,
1032:3, 1057:6,
1057:8, 1057:10,
1057:12, 1057:21,
1057:23, 1058:1,
1058:3, 1058:5
**CSF** [1] - 975:5
**CSR** [1] - 788:23
**Cups** [5] - 789:19,

923:18, 923:21,
924:1, 1032:19
**curious** [1] - 918:17
**current** [1] - 936:9
**custody** [3] - 810:24,
1023:9, 1044:2
**Cybro** [1] - 995:22

## D

**D-23** [1] - 796:5
**D-28** [1] - 831:15
**d/b/a** [9] - 885:11,
923:14, 924:24,
938:8, 938:22,
994:22, 1032:20,
1032:21, 1032:25
**d/b/a's** [2] - 923:11,
923:12
**dad** [1] - 1010:21
**data** [42] - 810:9,
810:15, 810:19,
810:23, 811:5,
811:10, 814:5,
814:10, 814:12,
814:13, 815:20,
816:14, 818:12,
818:14, 819:9,
819:10, 819:18,
821:4, 821:9,
821:11, 821:15,
821:18, 822:2,
822:4, 822:6,
824:17, 825:10,
830:8, 830:16,
840:17, 848:2,
848:10, 852:22,
854:9, 868:9, 874:2,
893:7, 1011:13
**database** [25] -
821:21, 824:20,
824:22, 825:3,
825:5, 825:7, 825:9,
825:10, 825:12,
825:15, 826:3,
826:5, 826:13,
826:16, 826:19,
826:21, 845:14,
852:3, 865:8, 865:9,
865:15, 865:17,
868:11, 868:12,
868:15
**databases** [2] -
824:23, 825:11
**date** [53] - 793:25,
799:6, 799:9, 812:6,
812:11, 822:24,
822:25, 823:1,
823:7, 823:9,
823:10, 823:18,

827:18, 827:19, 831:23, 832:6, 835:14, 835:18, 845:5, 846:22, 859:24, 859:25, 860:2, 861:2, 861:9, 861:20, 862:1, 862:4, 862:9, 862:11, 862:16, 862:22, 862:23, 888:2, 909:2, 909:25, 910:1, 926:21, 938:12, 968:12, 968:16, 972:7, 987:13, 993:17, 1022:8, 1022:10, 1022:12, 1027:17, 1039:12

**dates** [4] - 822:25, 861:14, 861:15, 968:4

**daughter** [1] - 919:18

**David** [2] - 788:18, 789:4

**days** [11] - 790:10, 797:13, 803:22, 803:25, 804:1, 854:19, 854:25, 855:24, 1016:3, 1022:7

**de** [1] - 1049:5

**de-duplicating** [1] - 1049:5

**dead** [2] - 836:1, 859:10

**deal** [3] - 826:17, 826:19, 866:8

**dealing** [2] - 842:16, 955:10

**dealings** [6] - 879:21, 879:22, 955:21, 955:24, 989:9, 989:21

**dealt** [6] - 808:6, 824:14, 841:12, 841:20, 955:12, 955:13

**debtor** [1] - 935:1

**debts** [2] - 952:20, 952:24

**December** [18] - 799:6, 800:4, 800:6, 835:8, 835:11, 843:9, 844:7, 846:22, 847:2, 852:6, 893:18, 910:8, 939:19, 978:7, 1022:2, 1022:6, 1027:18, 1052:14

**decide** [3] - 807:3, 856:13, 951:21

**decided** [2] - 807:4, 855:8

**decision** [5] - 856:12, 856:13, 856:20, 933:3, 1052:20

**Declaration** [2] - 797:3, 798:25

**declaration** [25] - 797:7, 799:3, 799:8, 800:3, 800:6, 800:7, 800:9, 801:7, 801:25, 802:12, 803:23, 804:25, 808:10, 809:6, 809:24, 810:2, 810:6, 810:22, 811:19, 813:4, 815:19, 820:10, 820:16, 837:3, 837:17

**deductions** [2] - 876:25, 972:19

**deem** [1] - 1052:21

**deemed** [1] - 993:13

**Defendant** [1] - 789:4

**defendant** [11] - 799:25, 879:9, 879:18, 900:4, 920:17, 924:9, 924:12, 924:14, 928:17, 946:5, 997:23

**DEFENDANT** [1] - 1036:1

**Defendant's** [20] - 798:8, 799:14, 826:24, 832:16, 907:21, 911:1, 911:2, 911:5, 911:6, 911:15, 970:5, 973:12, 977:25, 978:6, 978:10, 1014:19, 1014:21, 1021:19, 1035:20, 1044:7

**Defendants** [7] - 788:7, 788:15, 788:18, 789:9, 789:12, 789:15, 789:18

**defendants** [35] - 877:22, 878:8, 880:2, 883:18, 898:4, 921:20, 923:1, 924:6, 924:7, 926:2, 926:3, 928:13, 928:16, 928:20, 930:6,

936:19, 938:18, 943:2, 943:10, 946:2, 946:11, 946:14, 947:9, 948:10, 949:16, 952:21, 957:25, 961:5, 964:24, 982:8, 984:6, 991:4, 994:17, 997:25, 1003:2

**deficits** [1] - 932:14

**define** [1] - 918:14

**definitely** [1] - 973:14

**definition** [1] - 1047:11

**degree** [1] - 802:21

**delay** [2] - 831:22, 832:1

**delete** [6] - 821:11, 821:15, 822:6, 822:12, 826:20, 850:13

**deleted** [6] - 821:9, 821:11, 821:15, 821:18, 822:17, 956:21

**deleting** [1] - 822:4

**deletion** [2] - 824:17, 840:17

**deletions** [3] - 825:9, 848:1, 1047:23

**delis** [1] - 882:10

**deliver** [2] - 1044:18, 1054:10

**delivered** [8] - 907:11, 907:19, 908:5, 1044:2, 1044:5, 1044:17, 1044:21, 1045:5

**Delivery** [3] - 789:4, 878:4, 989:8

**Dell** [2] - 873:10, 873:12

**demonstrate** [1] - 842:18

**dense** [1] - 1046:5

**Department** [3] - 936:11, 953:18, 1023:18

**Deposit** [1] - 914:1

**deposit** [5] - 915:9, 959:4, 959:5, 959:12, 959:20

**deposited** [2] - 958:13, 1033:10

**deposition** [2] - 932:23, 932:25

**deposits** [5] - 915:10, 958:19, 958:24, 959:18, 1022:16

**depth** [1] - 1006:19

**derive** [2] - 1016:24, 1017:5

**derived** [1] - 1038:16

**describe** [6] - 886:23, 896:21, 898:25, 905:11, 1009:14, 1027:9

**described** [2] - 1020:24, 1049:16

**description** [4] - 794:2, 859:2, 859:6, 938:15

**descriptions** [1] - 795:5

**descriptive** [2] - 793:18, 794:5

**designated** [1] - 1024:2

**designed** [1] - 863:10

**desktop** [3] - 811:15, 849:2, 849:24

**Desktop** [1] - 814:22

**despite** [1] - 940:2

**destroy** [1] - 825:15

**detail** [1] - 1010:9

**detailed** [1] - 1013:8

**details** [7] - 810:5, 880:15, 880:17, 950:6, 990:9, 990:13, 996:24

**determine** [4] - 868:23, 893:4, 903:18, 932:15

**determined** [1] - 965:3

**detour** [1] - 811:18

**Development** [1] - 1023:19

**developments** [1] - 907:7

**device** [2] - 848:23, 849:7

**Devine** [27] - 789:12, 789:12, 869:9, 869:17, 869:18, 869:21, 875:20, 875:21, 907:2, 908:15, 910:18, 933:13, 935:20, 950:22, 971:16, 974:2, 1014:19, 1021:9, 1029:5, 1029:11, 1029:17, 1032:5, 1033:9, 1052:13, 1054:6, 1055:5, 1055:9

**Devine's** [1] - 1054:3

**differ** [1] - 972:20

**differed** [1] - 949:7

**difference** [9] - 856:1,

938:4, 938:7, 950:12, 950:15, 976:3, 993:1, 993:4, 1006:15

**different** [37] - 812:16, 816:19, 818:21, 818:22, 820:14, 835:17, 837:22, 837:23, 838:2, 839:12, 840:3, 852:22, 862:9, 862:11, 866:11, 867:25, 887:16, 918:3, 945:12, 945:20, 945:21, 950:14, 965:2, 965:12, 969:12, 969:16, 988:11, 993:3, 1035:11, 1037:10, 1040:19, 1044:10, 1045:3, 1047:13, 1050:18, 1051:19, 1052:6

**differing** [1] - 965:5

**difficult** [2] - 873:8, 880:11

**difficulty** [3] - 880:24, 975:10, 1055:23

**digit** [1] - 838:1

**digitally** [1] - 969:21

**direct** [11] - 798:2, 809:19, 846:8, 846:25, 848:20, 918:19, 919:8, 1014:22, 1016:20, 1023:17, 1025:12

**DIRECT** [3] - 869:15, 908:13, 1057:19

**direction** [2] - 794:13, 989:11

**directive** [1] - 1052:24

**directly** [10] - 814:5, 814:9, 815:19, 857:12, 886:6, 888:21, 911:10, 919:17, 919:18, 978:7

**director** [2] - 856:2

**disagree** [3] - 1036:17, 1049:19, 1050:1

**disc** [5] - 892:7, 905:22, 967:9, 968:7, 968:12

**discharge** [2] - 792:8, 982:24

**disclose** [2] - 845:9, 846:16

**discontinuation** [1] - 832:10

*Schreiber v. Friedman, Et Al   15-CV-6861      8/2/16* ___ 10

discontinued [2] - 832:5, 832:14
discovered [2] - 908:2, 980:2
discovery [1] - 932:14
discrepancy [1] - 962:15
discuss [1] - 1037:6
discussed [6] - 830:15, 843:6, 853:20, 863:21, 895:4, 1037:11
discussion [7] - 813:24, 858:9, 933:8, 1024:25, 1025:3, 1037:12, 1037:14
discussions [2] - 829:3, 898:19
dismissed [1] - 1014:11
dispatch [3] - 841:10, 841:12, 841:20
dispatcher [1] - 951:16
displays [1] - 823:19
disposal [1] - 1010:9
dispute [1] - 1053:4
disputes [1] - 1042:23
disputing [1] - 852:14
disseminate [1] - 819:2
dissipation [1] - 990:18
dissolve [1] - 940:3
dissolved [1] - 940:2
Distribution [2] - 789:18, 1032:24
distribution [1] - 1037:1
distributor [1] - 933:18
DISTRICT [2] - 788:1, 788:1
docket [2] - 806:18
document [23] - 801:22, 806:2, 806:19, 812:11, 812:12, 831:1, 831:7, 831:14, 913:19, 936:12, 936:15, 941:18, 1006:18, 1021:24, 1023:16, 1037:22, 1038:3, 1046:15, 1046:21, 1047:2, 1047:5, 1049:15, 1053:13
documentation [7] - 897:12, 899:23,

899:24, 917:6, 926:25, 938:17, 963:22
documents [70] - 802:9, 805:22, 805:23, 806:1, 806:3, 806:8, 807:7, 833:2, 856:10, 872:1, 895:8, 895:20, 895:25, 896:9, 896:13, 905:25, 906:1, 907:11, 907:18, 907:24, 908:4, 909:1, 911:24, 913:8, 913:17, 926:6, 927:4, 932:20, 932:21, 939:17, 941:23, 954:16, 966:9, 966:12, 967:16, 967:18, 968:13, 973:7, 973:8, 977:25, 979:11, 979:15, 1005:25, 1011:25, 1019:24, 1020:1, 1020:3, 1020:6, 1020:8, 1025:9, 1043:11, 1043:14, 1044:6, 1044:16, 1045:7, 1045:13, 1046:15, 1047:13, 1048:11, 1048:12, 1049:2, 1050:18, 1051:21, 1051:24, 1052:5, 1052:14, 1054:3, 1054:6, 1054:13
dollar [2] - 798:18, 958:24
dollars [8] - 895:12, 954:4, 954:6, 963:10, 975:24, 976:4, 976:6
domain [10] - 794:11, 796:19, 796:21, 817:17, 823:20, 831:19, 831:24, 843:1, 853:19, 864:20
done [35] - 792:7, 792:24, 808:11, 808:16, 808:18, 811:10, 811:14, 814:22, 854:2, 856:17, 857:22, 865:13, 867:8, 867:9, 868:8, 873:2, 886:17, 886:20, 887:19, 891:17,

897:24, 901:7, 901:19, 916:21, 917:15, 917:21, 917:22, 941:20, 941:21, 968:10, 968:11, 993:10, 997:6, 1043:5
dot [4] - 838:1, 840:7, 981:3
dots [1] - 981:22
double [2] - 809:15, 967:8, 967:10, 968:18, 969:9
double-check [2] - 809:15, 968:18
double-checked [3] - 967:8, 967:10, 969:9
Dov [1] - 921:6
down [12] - 794:23, 802:11, 861:18, 861:22, 880:25, 952:6, 959:6, 1010:9, 1018:1, 1025:7, 1029:5, 1043:4
download [1] - 865:6
downloading [1] - 967:25
downward [1] - 1008:19
draw [2] - 793:4, 793:5
Driscoll [1] - 788:23
drive [16] - 853:1, 872:14, 891:8, 891:9, 894:24, 905:5, 908:15, 911:11, 967:14, 967:20, 967:23, 967:25, 968:4, 1052:15, 1052:16, 1052:17
drives [8] - 868:23, 910:21, 910:22, 973:13, 973:14, 973:15, 978:1, 978:15
drop [1] - 949:12
dropped [2] - 987:24, 987:25
dropping [2] - 949:9, 949:11
due [2] - 876:14, 962:10
duly [2] - 793:11, 869:13
duplicated [1] - 1052:8
duplicates [1] - 1052:4
duplicating [1] -

1049:5
duplicative [1] - 1048:13
during [8] - 795:23, 808:25, 848:9, 907:7, 910:18, 911:23, 1016:3, 1019:10
duties [1] - 792:9
duty [1] - 961:1
Dynamic [2] - 991:12, 991:14, 991:20, 992:2

## E

E&I [20] - 788:18, 878:4, 878:18, 888:24, 888:25, 889:7, 947:11, 947:21, 947:23, 1000:15, 1000:16, 1000:17, 1000:19, 1000:20, 1000:22, 1003:23, 1004:5, 1029:18, 1029:21
E&J [23] - 788:18, 788:19, 878:4, 878:20, 878:22, 947:11, 1000:19, 1000:20, 1000:21, 1000:24, 1001:1, 1001:5, 1003:4, 1003:9, 1003:11, 1003:12, 1003:14, 1003:25, 1004:5, 1029:18, 1029:24, 1041:3
e-authorization [1] - 890:5
e-mail [63] - 799:15, 811:23, 812:8, 812:15, 812:18, 823:18, 823:19, 823:22, 827:10, 827:14, 827:19, 830:7, 832:18, 832:24, 835:7, 842:23, 845:17, 845:21, 845:24, 845:25, 846:6, 846:7, 846:16, 847:7, 848:21, 849:1, 849:2, 849:7, 849:9, 849:14, 849:17, 849:21, 849:23, 852:6, 852:11, 852:12, 853:3, 853:4, 853:5, 853:14, 866:4,

866:8, 866:10, 866:11, 871:12, 875:5, 875:7, 875:12, 883:10, 914:17, 914:24, 915:23, 956:24, 956:25, 957:6, 966:21, 966:23, 968:6, 974:18, 979:18, 1002:7, 1002:9
e-mailed [2] - 853:6, 956:20
e-mailing [2] - 835:11, 835:13
e-mails [29] - 818:15, 830:19, 830:20, 833:1, 834:16, 835:15, 846:3, 846:4, 847:15, 847:21, 847:24, 848:3, 848:4, 848:6, 848:13, 864:24, 865:24, 866:2, 891:13, 904:21, 904:22, 905:3, 905:13, 905:14, 905:15, 910:23, 956:18, 957:4, 967:22
e.g [1] - 819:17
early [2] - 875:17, 940:22
earning [1] - 856:23
easier [2] - 847:20, 848:5
easily [1] - 802:8
East [6] - 788:24, 928:19, 980:12, 986:5, 990:22, 999:15
EASTERN [1] - 788:1
easy [1] - 873:15
EC [1] - 1048:23
edge [1] - 1021:10
Edit [1] - 859:2
edit [12] - 844:22, 858:15, 858:20, 859:7, 859:8, 859:13, 859:22, 861:10, 863:2, 863:5, 863:6
edits [1] - 840:21
EF [12] - 1044:6, 1045:16, 1048:25, 1050:14, 1051:1, 1051:5, 1051:14, 1051:17, 1051:21, 1052:3, 1052:5, 1052:6

**EF-1** [3] - 1050:14, 1050:15, 1051:13
**EF-1s** [1] - 1050:16
**effect** [1] - 1009:18
**efficient** [4] - 833:17, 932:13, 932:18, 933:2
**efforts** [1] - 1052:19
**EFT** [2] - 899:1, 900:14
**EFTPS** [1] - 901:7
**eight** [8] - 813:16, 815:2, 815:15, 909:16, 909:17, 909:19, 949:3, 952:19
**eight-month** [2] - 909:16, 909:17
**either** [17] - 795:17, 809:22, 818:3, 819:11, 909:2, 910:21, 931:3, 944:8, 948:12, 949:13, 954:6, 973:12, 989:11, 1006:25, 1008:8, 1008:18, 1037:14
**elections** [2] - 1036:21, 1036:22
**electronic** [2] - 899:13, 917:16
**electronically** [10] - 889:22, 889:24, 899:5, 899:13, 900:7, 917:12, 917:17, 949:14, 1023:14
**elevator** [1] - 946:24
**EMIL** [1] - 788:6
**Emil** [8] - 788:15, 875:20, 875:21, 875:22, 999:15, 999:17, 1040:25, 1041:1
**employed** [7] - 881:14, 881:21, 921:8, 924:14, 924:16, 1007:14
**employee** [10] - 874:10, 876:14, 881:10, 921:16, 921:18, 971:14, 974:7, 975:6, 975:11, 1013:9
**employees** [14] - 876:24, 881:5, 883:8, 900:24, 902:4, 904:3, 921:15, 922:18, 941:14, 941:16,

952:15, 952:18, 971:25, 995:9
**end** [29] - 800:12, 822:8, 824:18, 824:19, 824:20, 825:18, 825:19, 826:3, 833:23, 840:20, 840:22, 854:3, 855:7, 863:13, 863:15, 865:11, 865:20, 868:10, 868:12, 870:9, 870:17, 891:11, 958:12, 963:1, 974:17, 977:4, 1003:17, 1016:3
**endeavor** [1] - 1012:6
**Energy** [1] - 932:8
**enforce** [1] - 833:14
**engaged** [1] - 886:13
**engine** [3] - 825:5, 825:7, 868:15
**enjoined** [1] - 1042:6
**ensure** [1] - 1042:13
**ensured** [1] - 956:4
**enter** [3] - 822:15, 823:1, 825:4
**entered** [4] - 822:25, 823:7, 825:4, 1011:12
**Enterprise** [15] - 796:7, 796:9, 796:17, 895:6, 976:12, 976:13, 1011:9, 1011:11, 1012:6, 1012:15, 1012:18, 1017:6, 1017:18, 1019:1, 1034:1
**entire** [1] - 889:3
**entities** [10] - 885:9, 928:11, 930:22, 932:6, 934:24, 981:19, 992:16, 1003:10, 1003:13, 1029:20
**entitled** [3] - 797:3, 933:3, 1054:23
**entity** [23] - 929:14, 929:15, 936:11, 936:16, 937:14, 938:9, 947:13, 947:16, 947:19, 947:21, 948:1, 948:9, 993:12, 993:22, 1000:22, 1000:24, 1003:6, 1030:11, 1030:13, 1030:17, 1032:21,

1032:22, 1033:1
**entries** [8] - 793:18, 794:6, 794:23, 861:8, 864:13, 975:23, 1012:11, 1012:17
**entry** [10] - 815:10, 819:25, 838:25, 858:18, 858:23, 859:14, 859:15, 859:16, 859:17, 861:11
**equipment** [2] - 941:10, 1008:21
**equipped** [1] - 1051:10
**error** [1] - 1051:13
**Esq** [9] - 788:13, 788:14, 788:15, 788:18, 789:4, 789:9, 789:12, 789:15, 789:18
**essentially** [2] - 1049:4, 1052:13
**establish** [5] - 887:14, 900:9, 901:6, 926:5, 985:3
**established** [1] - 900:22
**establishing** [1] - 985:4
**estate** [9] - 806:15, 806:19, 806:21, 807:5, 807:6, 807:8, 886:17, 886:20
**estimate** [1] - 895:7
**estimated** [1] - 917:5
**et** [1] - 788:6
**Eugene** [9] - 795:16, 955:9, 955:16, 1008:8, 1009:1, 1016:19, 1022:23, 1024:11, 1024:12
**evidence** [1] - 1036:5
**EVIDENTIARY** [1] - 788:9
**exact** [14] - 805:13, 832:6, 841:15, 880:15, 888:2, 909:25, 910:1, 926:17, 926:21, 938:12, 987:13, 996:4, 1001:14, 1008:6
**exactly** [19] - 800:15, 815:4, 837:25, 851:13, 853:20, 871:19, 875:18, 879:19, 888:2, 916:6, 949:25,

950:1, 951:14, 966:22, 966:24, 970:3, 985:25, 986:15, 1012:13
**examination** [2] - 804:22, 848:21
**EXAMINATION** [36] - 793:12, 829:1, 831:4, 834:7, 836:24, 841:6, 843:19, 844:13, 848:18, 850:4, 869:15, 908:13, 911:20, 913:14, 926:12, 933:10, 935:17, 1005:4, 1013:24, 1014:17, 1029:15, 1032:3, 1033:7, 1038:5, 1057:6, 1057:8, 1057:10, 1057:12, 1057:14, 1057:19, 1057:21, 1057:23, 1058:1, 1058:3, 1058:5, 1058:7
**examine** [1] - 913:4
**examined** [2] - 793:11, 869:13
**example** [1] - 817:14
**except** [15] - 795:11, 795:14, 813:17, 814:2, 815:2, 815:17, 817:24, 863:22, 864:21, 866:6, 896:9, 987:25, 1004:10, 1025:14, 1045:18
**excepting** [1] - 813:23
**exception** [1] - 910:20
**exchange** [2] - 852:15, 853:14
**excuse** [7] - 790:18, 792:11, 798:3, 806:6, 913:7, 941:15, 1031:24
**excused** [3] - 852:19, 869:6, 1041:12
**executive** [1] - 856:2
**Exhibit** [58] - 793:15, 793:16, 796:5, 797:2, 798:8, 798:9, 799:13, 799:14, 799:24, 800:1, 810:6, 811:20, 811:21, 813:5, 826:25, 827:9, 832:16, 832:17, 834:10, 834:13, 834:15, 834:19, 837:2, 841:10,

846:8, 852:7, 859:1, 859:4, 860:8, 875:1, 902:9, 903:4, 907:21, 911:1, 911:3, 911:4, 911:5, 911:7, 911:15, 970:5, 973:13, 977:20, 978:1, 1014:20, 1014:21, 1021:12, 1021:19, 1023:15, 1023:16, 1035:20, 1036:9, 1044:7, 1051:12
**exhibit** [6] - 798:6, 798:25, 823:16, 824:7, 834:19, 852:20
**exhibits** [1] - 811:20
**exist** [6] - 790:18, 938:10, 939:3, 939:6, 939:24, 940:17
**exists** [1] - 939:8
**expansive** [1] - 1052:25
**expect** [4] - 811:10, 877:19, 916:1, 947:7
**expense** [1] - 912:25
**expenses** [10] - 896:15, 896:17, 896:25, 897:22, 897:24, 1009:17, 1009:19, 1010:10, 1011:15, 1037:4
**experience** [1] - 840:25
**expert** [3] - 824:24, 824:25, 865:14
**expertise** [3] - 841:24, 842:3, 842:9
**explain** [17] - 810:14, 814:8, 817:7, 822:13, 824:21, 832:23, 861:10, 875:7, 885:1, 922:24, 968:5, 968:17, 970:12, 976:8, 1006:15, 1007:18, 1049:21
**explained** [2] - 926:9, 970:20, 992:24
**explanation** [3] - 841:1, 976:10, 1053:18
**explore** [1] - 932:17
**express** [1] - 963:3
**extend** [1] - 946:2
**extensive** [2] - 894:8, 894:21
**extent** [7] - 791:7,

792:9, 825:25,
829:16, 1038:10,
1049:23, 1052:3
**external** [14] - 837:20,
837:22, 837:23,
838:3, 838:9,
838:20, 839:8,
839:12, 839:16,
839:20, 840:2,
840:5, 840:9, 851:4
**extremely** [1] - 817:22
**Ezell** [17] - 789:9,
851:5, 871:5,
881:10, 881:13,
881:16, 888:7,
920:19, 922:20,
944:8, 944:11,
984:19, 988:2,
996:3, 996:5, 997:1,
1014:3
**Ezell's** [5] - 808:1,
808:2, 847:12,
864:24, 1041:6

## F

**face** [1] - 1041:25
**facilitation** [1] -
875:24
**facilities** [7] - 802:5,
808:10, 808:15,
809:22, 809:23,
837:19, 837:20
**facility** [25] - 802:6,
803:8, 803:9,
803:10, 803:16,
803:20, 804:5,
804:24, 805:1,
805:5, 808:20,
808:21, 808:23,
809:9, 809:12,
809:20, 809:21,
810:21, 818:2,
819:23, 838:3,
839:11, 839:25,
840:1, 1026:25
**fact** [16] - 799:4,
821:24, 874:7,
891:23, 908:2,
909:11, 958:9,
960:25, 975:4,
985:1, 985:5,
1010:7, 1015:2,
1016:7, 1020:21,
1048:14
**factor** [1] - 977:7
**failed** [1] - 976:20
**fair** [3] - 825:25,
868:17, 1043:6
**Fairfield** [1] - 887:4

**fairly** [1] - 969:10
**familial** [1] - 919:23
**familiar** [2] - 970:16,
973:5
**family** [2] - 943:8,
943:9
**far** [16] - 796:25,
810:24, 811:5,
819:9, 851:12,
867:1, 938:20,
946:9, 950:8, 964:4,
966:2, 986:11,
1006:19, 1026:12,
1026:21, 1037:8
**fax** [2] - 800:13,
800:19
**FCRR** [1] - 788:23
**feature** [1] - 972:10
**February** [5] - 794:1,
794:2, 832:6,
893:18, 975:23
**federal** [7] - 876:25,
899:1, 900:14,
1015:14, 1019:21,
1023:3
**fee** [3] - 954:2, 954:3
**feeding** [1] - 1027:10
**fees** [1] - 928:5
**FELDMAN** [30] -
866:25, 911:9,
911:12, 932:9,
934:19, 965:8,
978:12, 981:12,
991:6, 991:8,
1005:3, 1005:5,
1010:7, 1010:13,
1010:16, 1010:19,
1013:17, 1013:20,
1028:22, 1029:12,
1029:16, 1032:1,
1035:25, 1036:2,
1038:18, 1038:23,
1039:2, 1054:10,
1057:22, 1058:4
**Feldman** [3] - 789:12,
911:6, 1018:20
**felt** [1] - 903:1
**few** [13] - 790:10,
801:12, 803:15,
803:16, 803:22,
805:6, 811:20,
840:15, 852:21,
854:25, 929:9,
970:11, 1005:3
**Fifth** [5] - 936:7,
936:10, 936:13,
971:16
**fifth** [1] - 875:20
**figure** [11] - 868:2,
887:15, 925:18,

932:10, 932:25,
959:14, 965:11,
976:1, 976:16,
1047:10, 1049:2
**figures** [1] - 917:9
**figuring** [1] - 864:16
**file** [31] - 794:12,
796:11, 796:13,
796:17, 796:18,
796:22, 800:17,
806:12, 806:14,
806:19, 817:14,
817:16, 825:5,
825:12, 853:4,
864:19, 872:8,
877:13, 889:24,
890:16, 921:17,
936:17, 952:14,
976:11, 976:12,
976:13, 1003:8,
1022:15, 1045:20
**filed** [19] - 797:24,
886:12, 889:5,
889:16, 889:18,
889:21, 936:19,
936:21, 937:5,
956:8, 1003:2,
1008:25, 1015:13,
1017:9, 1039:8,
1039:11, 1039:15,
1039:20, 1039:23
**files** [16] - 806:3,
817:13, 847:21,
853:5, 871:24,
874:1, 874:14,
894:5, 921:13,
921:21, 956:21,
1003:6, 1043:16,
1043:17, 1045:19,
1047:14
**filing** [3] - 936:12,
977:5, 1017:13
**filings** [1] - 870:21
**fill** [1] - 902:18
**filter** [1] - 816:14
**final** [3] - 889:11,
952:14, 1034:15
**finalized** [2] - 801:7,
801:22
**financial** [16] - 892:4,
965:16, 966:2,
966:4, 989:21,
1005:19, 1010:8,
1011:25, 1018:6,
1018:13, 1018:18,
1019:8, 1019:21,
1019:25, 1026:16,
1027:9
**financials** [1] -
1006:10

**Fine** [1] - 997:5
**fine** [11] - 790:23,
798:3, 872:19,
934:13, 950:9,
991:10, 1034:21,
1037:21, 1038:2,
1053:24
**FingerTec** [2] - 824:8,
824:11, 824:12
**finish** [6] - 790:18,
801:2, 805:17,
806:6, 968:25,
1028:15
**FINKEL** [21] - 836:15,
844:14, 845:4,
847:6, 848:15,
909:21, 984:24,
985:1, 985:5,
985:15, 985:22,
988:3, 996:10,
996:12, 996:16,
1013:22, 1013:25,
1014:14, 1043:8,
1057:11, 1057:24
**Finkel** [4] - 789:9,
935:13, 1041:19,
1043:7
**fired** [1] - 821:21
**firewall** [5] - 814:14,
814:24, 815:25,
817:11
**firm** [4] - 964:13,
993:12, 1005:9,
1005:10
**first** [37] - 792:5,
794:9, 797:4,
797:23, 800:6,
802:5, 807:12,
823:19, 827:9,
834:16, 835:17,
837:18, 847:1,
859:4, 869:13,
870:6, 876:16,
881:19, 889:1,
891:19, 904:12,
905:1, 907:8,
908:20, 909:4,
909:18, 936:2,
969:14, 997:10,
1015:1, 1021:22,
1043:19, 1044:20,
1047:8, 1048:12
**firsthand** [2] - 830:21,
830:23
**fiscal** [1] - 1016:3
**five** [6] - 804:7, 804:8,
861:23, 948:20,
948:21, 961:25,
962:8, 1051:7
**Fix** [6] - 794:5, 794:6,

794:9, 794:16,
794:23, 795:2
**fix** [7] - 794:18,
794:22, 820:13,
843:5, 866:14,
866:15, 866:21
**fixed** [2] - 836:3,
864:14
**fixing** [3] - 794:10,
794:13, 795:9
**flash** [24] - 853:1,
868:23, 872:14,
891:7, 891:9,
894:24, 905:5,
908:15, 910:21,
910:22, 911:11,
967:14, 967:20,
967:23, 967:25,
968:4, 973:13,
973:14, 978:1,
978:15, 1052:15,
1052:16
**flat** [4] - 954:2, 954:3,
958:20
**Flavors** [9] - 789:19,
878:5, 888:18,
920:14, 920:22,
937:1, 1032:12,
1032:14, 1033:2
**flip** [7] - 793:22,
798:24, 799:3,
811:19, 829:12,
829:13, 1015:24
**flow** [1] - 791:4
**focus** [5] - 814:1,
815:1, 823:18,
837:17, 1015:12
**focussed** [1] - 817:25
**folder** [6] - 796:21,
806:3, 806:8,
806:18, 849:7, 849:8
**folders** [6] - 805:24,
1045:2, 1045:3,
1045:4, 1053:19
**folks** [1] - 827:16
**follow** [4] - 840:16,
957:11, 999:2,
1046:18
**follow-up** [1] - 999:2
**followed** [1] - 836:4
**following** [5] - 805:16,
963:18, 1043:19,
1046:14, 1047:7
**follows** [2] - 793:11,
869:13
**food** [3] - 947:1,
947:2, 947:3
**FOR** [1] - 788:5
**Force** [1] - 1023:19
**forcing** [1] - 1047:9

**forfeited** [1] - 990:12
**forfeiture** [2] - 990:5, 990:10
**forget** [2] - 811:3, 979:5
**forgetting** [1] - 946:8
**forgive** [3] - 815:15, 950:17, 1021:13
**forgot** [1] - 887:24
**forgotten** [1] - 801:1
**Form** [1] - 896:3
**form** [13] - 868:6, 890:5, 890:20, 890:24, 927:21, 939:12, 948:13, 956:16, 958:3, 980:9, 990:11, 1016:4, 1016:7
**formed** [4] - 870:11, 922:7, 951:9, 980:8
**forms** [3] - 953:11, 974:16, 1017:3
**forth** [11] - 809:23, 813:17, 814:3, 815:2, 815:18, 820:9, 820:15, 853:23, 979:17, 1018:17, 1019:13
**forward** [8] - 792:18, 792:22, 834:22, 846:13, 850:15, 850:16, 1012:15
**forwarded** [4] - 850:8, 852:9, 968:6, 968:8
**foundation** [1] - 1011:21
**four** [10] - 801:14, 804:7, 804:8, 815:18, 818:1, 820:10, 948:20, 962:8, 1035:23, 1045:15
**fourth** [2] - 798:24, 815:10
**frame** [2] - 832:9, 1008:6
**frankly** [2] - 790:15, 791:23
**Friday** [7] - 800:15, 800:16, 812:6, 827:18, 907:12, 1045:6, 1052:19
**FRIEDMAN** [1] - 788:6
**Friedman** [130] - 788:15, 795:11, 799:20, 802:1, 828:2, 829:4, 829:15, 829:25, 830:2, 830:4, 830:5, 830:24, 831:9,

831:17, 832:2, 841:25, 842:8, 856:14, 856:16, 857:1, 857:5, 857:13, 857:24, 863:24, 871:4, 875:21, 875:23, 875:25, 876:2, 877:23, 878:9, 879:9, 879:14, 883:2, 883:10, 883:16, 884:9, 886:1, 886:5, 888:19, 890:8, 894:2, 899:20, 903:9, 912:2, 918:23, 919:5, 919:23, 920:3, 920:4, 920:5, 920:9, 920:25, 921:1, 927:7, 927:8, 927:15, 931:2, 931:6, 937:3, 938:13, 942:3, 943:2, 945:25, 946:19, 946:23, 947:6, 947:10, 947:17, 947:22, 948:4, 951:5, 953:6, 953:8, 953:20, 955:1, 955:2, 955:24, 955:25, 956:9, 959:25, 961:12, 962:5, 963:2, 964:8, 964:15, 980:5, 981:18, 982:10, 982:13, 987:11, 988:15, 988:24, 990:2, 995:24, 996:2, 997:10, 997:22, 999:15, 999:17, 1000:4, 1001:8, 1001:9, 1001:23, 1002:5, 1002:12, 1002:13, 1002:15, 1002:18, 1004:2, 1016:18, 1024:13, 1024:20, 1024:21, 1024:22, 1025:18, 1025:20, 1026:3, 1026:5, 1026:8, 1026:11, 1028:2, 1037:15, 1038:17, 1040:25, 1041:1, 1042:6, 1042:13
**Friedman's** [26] - 795:9, 799:15, 799:18, 831:18, 835:22, 843:25,

857:10, 857:23, 857:25, 879:6, 889:4, 912:15, 918:12, 919:12, 921:4, 948:11, 950:23, 997:20, 998:9, 998:19, 1004:9, 1023:24, 1024:2, 1025:8, 1034:22, 1044:17
**friends** [1] - 883:7
**front** [9] - 822:8, 824:18, 825:18, 840:20, 846:10, 853:11, 863:13, 865:20, 1045:15
**Frozen** [1] - 999:19
**fruitless** [1] - 833:14
**fuel** [28] - 879:3, 879:5, 879:18, 881:5, 881:11, 885:16, 930:20, 933:18, 934:2, 934:25, 935:23, 938:20, 942:22, 945:24, 951:8, 951:9, 951:12, 951:13, 951:16, 951:18, 951:19, 951:21, 951:23, 986:16, 994:1, 994:8
**Fuel** [59] - 789:4, 789:5, 789:5, 878:4, 882:21, 882:23, 883:8, 883:11, 883:23, 885:11, 885:15, 921:25, 922:9, 922:10, 922:16, 922:20, 923:10, 928:24, 928:25, 929:8, 929:14, 929:18, 929:19, 929:22, 929:23, 929:25, 930:5, 930:7, 930:19, 930:23, 931:7, 932:2, 932:3, 933:13, 933:20, 934:8, 934:9, 934:17, 936:24, 940:11, 940:13, 940:17, 940:19, 943:14, 944:2, 944:3, 944:4, 947:11, 992:11, 992:13, 993:21, 994:2, 994:6, 995:13, 1000:12, 1030:10, 1030:17, 1030:23, 1041:1

**full** [9] - 804:12, 807:8, 845:25, 861:9, 869:17, 877:8, 894:23, 932:14, 993:14
**fully** [1] - 1006:18
**function** [1] - 972:14
**functionality** [1] - 892:16
**functions** [2] - 1017:24, 1019:13
**funding** [2] - 878:5, 878:20
**Funding** [13] - 788:18, 947:11, 1000:16, 1000:17, 1000:19, 1000:20, 1000:24, 1003:5, 1003:11, 1003:14, 1004:5, 1029:24
**funds** [2] - 899:8, 899:11, 900:6
**furnish** [2] - 1016:2, 1038:11

## G

**gather** [1] - 891:15
**gathered** [1] - 897:4
**Gefell** [1] - 789:15
**general** [22] - 810:16, 824:23, 825:11, 856:4, 858:19, 858:25, 859:20, 870:18, 894:10, 894:11, 897:18, 897:20, 897:21, 898:7, 898:10, 935:7, 950:7, 1003:21, 1013:12, 1026:19, 1034:18
**generally** [11] - 793:20, 797:9, 810:11, 814:25, 817:23, 824:4, 849:17, 856:15, 864:4, 866:10, 1019:18
**generate** [12] - 876:12, 917:6, 956:10, 957:10, 971:2, 971:10, 972:6, 972:13, 972:14, 972:16, 972:21, 1011:6
**generated** [11] - 913:19, 914:14, 914:22, 915:18, 917:1, 951:6, 954:21, 963:21,

971:8, 1007:7, 1008:25
**generates** [1] - 971:3
**generating** [1] - 966:2
**generation** [2] - 1012:20, 1012:24
**gentleman** [1] - 1018:23
**gentleman's** [2] - 1018:3, 1018:17
**Geoffrey** [2] - 789:15, 789:15
**George** [3] - 887:25, 888:5
**giant** [1] - 982:5
**Gitano** [1] - 904:5
**given** [13] - 790:9, 790:12, 791:4, 798:22, 843:8, 892:12, 892:19, 892:20, 895:1, 899:11, 907:9, 1021:16, 1034:10
**gladly** [1] - 966:22
**go-between** [1] - 927:18
**goal** [1] - 836:10
**Goldfarb** [1] - 808:7
**goods** [1] - 1008:21
**government** [8] - 889:20, 889:21, 890:22, 899:12, 901:18, 959:15, 963:21, 982:7
**government's** [1] - 1014:12
**GRANTZ** [17] - 790:3, 790:6, 790:23, 791:1, 791:16, 836:12, 841:7, 843:20, 844:12, 887:11, 895:9, 895:16, 903:24, 973:20, 989:17, 1054:21, 1057:9
**Grantz** [3] - 788:18, 789:4, 1040:15
**Greenblatt** [1] - 1018:1
**grocery** [1] - 882:10
**gross** [5] - 876:13, 876:24, 971:4, 971:21, 972:17
**Group** [2] - 788:18, 1004:5
**grouping** [1] - 1048:5
**guaranteed** [3] - 912:8, 912:9, 948:12
**Guaranteed** [1] - 912:9

*Schreiber v. Friedman, Et Al   15-CV-6861       8/2/16*       14

**guess** [22] - 835:12, 859:18, 880:21, 887:23, 889:8, 891:11, 896:6, 899:22, 918:1, 926:20, 954:14, 954:24, 956:9, 957:4, 957:7, 968:12, 976:11, 995:5, 1047:7, 1055:22, 1056:4
**guilt** [1] - 985:3
**guilty** [1] - 987:21
**guy** [1] - 841:22
**guys** [3] - 841:20, 1054:1, 1055:14

## H

**half** [3] - 809:14, 836:17, 859:10
**hand** [1] - 869:10
**handed** [3] - 855:4, 910:19, 911:6
**handing** [1] - 798:13
**handle** [1] - 997:13
**handled** [2] - 949:7, 949:8
**handles** [1] - 904:14
**handling** [4] - 909:9, 916:18, 949:5, 1022:17
**hang** [1] - 792:10
**Hans** [1] - 788:15
**happy** [2] - 971:17, 1052:9
**hard** [7] - 872:8, 894:7, 901:8, 969:15, 969:22, 993:10, 1000:12
**Hard** [1] - 986:11
**hardcopy** [2] - 949:14, 956:14
**hat** [1] - 792:11
**hate** [1] - 811:18
**hauling** [1] - 943:18
**Hawthorne** [14] - 929:2, 929:3, 929:6, 929:13, 929:14, 929:23, 929:25, 930:5, 930:10, 930:19, 930:24, 931:4, 931:7, 944:5
**head** [12] - 872:6, 880:14, 881:7, 883:9, 912:14, 917:23, 922:23, 929:3, 947:4, 992:9, 1000:13, 1002:1
**heading** [1] - 815:8

**hear** [9] - 830:1, 830:5, 830:21, 858:14, 984:2, 1016:22, 1023:23, 1051:2, 1056:5
**heard** [21] - 792:6, 809:19, 830:23, 920:7, 983:7, 987:24, 989:7, 990:12, 990:25, 991:14, 991:15, 992:11, 998:2, 998:3, 998:8, 1001:1, 1016:20, 1024:20, 1024:22, 1052:13, 1052:18
**HEARING** [2] - 788:5, 788:9
**hearing** [15] - 835:18, 907:16, 913:9, 966:18, 987:17, 992:16, 993:9, 1010:3, 1022:6, 1022:8, 1027:17, 1027:22, 1028:3, 1044:2
**hearsay** [2] - 829:8, 833:22, 834:1
**heart** [1] - 1052:17
**Heat** [1] - 995:16
**heating** [1] - 930:17
**HELD** [1] - 788:9
**held** [3] - 990:21, 1051:8, 1055:19
**Heller** [1] - 789:18
**HELLER** [9] - 836:14, 848:17, 848:19, 850:2, 1028:24, 1032:4, 1033:4, 1057:13, 1058:6
**Heller's** [1] - 850:6
**help** [4] - 817:5, 841:2, 982:3, 1042:4
**helps** [1] - 1010:12
**Hersko** [3] - 789:15, 789:15, 888:12
**high** [2] - 811:16, 894:23
**highlighted** [1] - 859:5
**himself** [1] - 931:21
**hired** [11] - 916:13, 963:23, 965:23, 1005:11, 1005:13, 1007:3, 1007:4, 1007:20, 1011:7, 1019:3, 1021:4
**hires** [1] - 916:12
**historical** [2] - 946:5, 949:8
**historically** [3] -

950:13, 981:20, 982:16
**history** [4] - 858:21, 936:12, 971:9, 981:23
**hit** [2] - 822:15, 934:17, 934:18
**hits** [1] - 817:18
**hold** [2] - 942:14, 947:23
**Holding** [1] - 998:15
**Hollis** [1] - 788:23
**home** [1] - 887:2
**honestly** [2] - 1041:22, 1043:19
**Honor** [63] - 790:2, 790:6, 790:11, 791:9, 791:16, 792:5, 792:13, 793:2, 793:8, 798:10, 804:15, 821:2, 827:3, 833:21, 834:4, 836:6, 836:19, 847:6, 850:23, 852:18, 855:13, 866:25, 867:7, 882:17, 891:6, 906:14, 907:4, 925:16, 946:16, 965:9, 981:2, 983:3, 984:24, 985:1, 985:16, 985:22, 987:2, 988:3, 993:2, 993:19, 997:6, 999:1, 1010:16, 1013:17, 1013:20, 1013:22, 1028:14, 1028:19, 1028:24, 1032:2, 1042:1, 1042:25, 1043:10, 1045:6, 1052:13, 1052:18, 1053:6, 1054:2, 1054:16, 1055:3
**HONORABLE** [1] - 788:10
**hooked** [10] - 818:2, 839:7, 839:12, 839:15, 839:17, 839:20, 840:1, 840:6, 851:6, 851:22
**hookup** [1] - 815:20
**host** [1] - 820:6
**Hour** [15] - 789:4, 878:4, 879:1, 880:19, 925:14, 961:8, 980:6, 989:8, 989:16, 989:20,

989:24, 994:22, 995:6, 997:14, 1030:3
**hour** [2] - 809:13, 836:17
**hours** [11] - 801:12, 801:22, 804:7, 804:8, 805:6, 808:24, 808:25, 809:13, 902:4, 972:11
**Hours** [1] - 924:24
**house** [6] - 886:24, 887:1, 887:2, 887:22, 887:23, 887:25
**housed** [2] - 929:4, 981:19
**Housing** [1] - 999:11
**huge** [1] - 894:23
**hundred** [2] - 803:15, 803:16, 948:18, 948:23, 986:1
**hundreds** [1] - 895:12
**hung** [2] - 801:15, 801:17
**hypothetical** [1] - 972:12

## I

**I'** [1] - 855:21
**I41** [1] - 971:3
**icons** [2] - 807:2, 807:3
**ID** [1] - 900:15
**idea** [19] - 826:16, 826:17, 826:18, 826:20, 852:2, 895:18, 897:7, 922:22, 928:2, 937:7, 937:9, 941:8, 943:1, 946:25, 966:19, 982:19, 989:7, 996:23, 1002:17
**identified** [3] - 790:17, 799:15, 973:4
**identify** [5] - 790:15, 802:4, 805:10, 815:4, 821:3
**iDrive** [9] - 811:16, 811:18, 811:24, 812:4, 812:12, 812:14, 812:17, 812:18, 812:20
**ignore** [1] - 1048:13
**image** [2] - 790:7, 958:3
**imaged** [1] - 790:8

**images** [3] - 1054:16, 1054:24
**imagine** [1] - 876:18, 890:10, 902:3, 904:1, 916:7, 939:2, 940:23, 947:8, 953:13, 1008:11, 1024:17, 1039:13, 1040:19
**imaging** [1] - 791:13
**IMAP** [4] - 848:8, 849:3, 849:6, 849:15
**immediate** [1] - 919:22
**implied** [2] - 792:20, 802:21
**imply** [1] - 792:21
**imprimatur** [1] - 1023:19
**improper** [1] - 966:4
**inaccessible** [1] - 813:1
**inactive** [1] - 939:19
**Inc** [3] - 788:16, 788:19, 885:24
**inception** [1] - 909:6
**inch** [1] - 859:10
**inches** [1] - 859:10
**incident** [1] - 797:14
**incidentally** [1] - 1027:21
**included** [2] - 969:8, 975:14
**including** [3] - 849:8, 969:3, 982:7
**income** [24] - 870:17, 873:24, 896:19, 896:24, 897:2, 897:22, 897:24, 912:11, 948:11, 948:12, 959:10, 960:6, 1009:12, 1009:18, 1009:20, 1010:10, 1011:14, 1015:14, 1019:21, 1020:12, 1020:13, 1020:19, 1026:20, 1038:16
**incoming** [1] - 850:17
**incorporated** [1] - 870:1
**incorrect** [1] - 1007:23
**independent** [4] - 860:3, 863:1, 877:18, 1040:17
**index** [1] - 1049:1
**indicate** [2] - 857:24, 1017:7
**indicated** [1] - 847:9
**indicates** [1] - 846:12

*Schreiber v. Friedman, Et Al   15-CV-6861      8/2/16* _____15

indicating [4] - 862:1, 875:3, 894:24, 1021:18
indicted [1] - 1025:15
indirectly [3] - 886:7, 888:21, 888:22
individual [9] - 824:5, 837:13, 882:8, 959:6, 971:10, 971:21, 972:13, 994:1, 1005:6
individually [4] - 860:1, 947:25, 969:15, 1032:17
individuals [6] - 904:1, 904:2, 904:6, 919:24, 1040:18, 1040:19
inefficient [1] - 913:2
infer [1] - 1050:24
information [97] - 800:13, 806:9, 810:12, 813:1, 817:8, 819:2, 829:4, 829:20, 830:11, 839:21, 840:18, 843:14, 851:3, 851:7, 857:5, 866:5, 870:23, 871:1, 871:11, 871:12, 871:25, 877:20, 892:3, 892:25, 893:8, 893:9, 895:24, 897:3, 897:4, 897:14, 897:15, 897:20, 898:2, 900:17, 916:24, 949:9, 949:11, 956:3, 962:19, 963:19, 964:4, 974:3, 974:6, 975:7, 975:13, 975:17, 976:5, 976:10, 977:11, 978:16, 979:20, 979:24, 987:18, 993:16, 1007:9, 1008:23, 1010:12, 1011:11, 1011:12, 1012:11, 1012:21, 1012:22, 1012:25, 1013:6, 1013:8, 1013:11, 1013:14, 1016:24, 1017:3, 1017:5, 1017:8, 1017:20, 1017:22, 1018:7, 1018:15, 1018:17, 1018:21, 1019:1,

1022:25, 1023:2, 1026:16, 1027:10, 1027:11, 1027:15, 1033:17, 1033:20, 1034:1, 1035:10, 1035:14, 1037:19, 1038:21, 1041:5, 1051:22
initial [2] - 1035:11, 1044:1
initiated [1] - 866:3
injunction [5] - 792:9, 982:25, 1042:8, 1042:12, 1042:22
input [1] - 976:21
inputted [2] - 975:7, 1011:15
inputting [2] - 974:22, 974:25
inquiry [2] - 847:12, 1010:5
inside [4] - 816:19, 816:21, 817:6, 817:7
install [11] - 794:21, 796:14, 812:17, 820:17, 821:5, 853:10, 853:13, 853:22, 857:19, 857:20, 865:3
installed [7] - 812:21, 841:19, 847:20, 858:7, 865:2, 865:5, 868:13
instance [5] - 818:7, 871:17, 877:23, 959:22, 1026:24
instances [2] - 795:6, 1033:9
instead [3] - 861:11, 949:10, 1020:9
instructed [4] - 796:14, 831:9, 903:7, 903:13
instruction [2] - 847:16, 847:17
instructions [4] - 831:18, 847:19, 1043:2, 1044:18
insufficient [1] - 1027:14
insurance [11] - 870:3, 874:10, 877:14, 916:16, 916:17, 916:23, 917:4, 917:10, 917:24, 918:2, 918:3
interact [3] - 955:2, 955:5, 1018:5
interacted [1] - 1026:14

interacting [1] - 888:8
interaction [3] - 943:2, 979:1, 1035:1
interactions [1] - 951:3
interest [25] - 886:24, 910:7, 912:22, 912:25, 924:9, 931:6, 931:8, 931:12, 931:14, 933:24, 935:20, 942:16, 946:20, 946:23, 947:2, 947:7, 947:24, 980:11, 980:12, 990:21, 998:11, 1000:4, 1001:23, 1002:3, 1004:3
interested [1] - 1012:11
interests [1] - 926:23
interfered [1] - 865:7
internal [2] - 837:15, 837:16
internet [1] - 817:20
interrupt [2] - 1044:20, 1052:10
interrupting [1] - 820:22
interruption [2] - 935:16, 950:19
intervals [4] - 1043:18, 1045:18, 1047:13, 1053:19
intuit [3] - 874:24, 874:25, 875:9
Intuit [9] - 857:13, 857:23, 875:11, 875:15, 876:3, 876:21, 972:3, 972:5
inventory [13] - 870:25, 976:25, 977:1, 977:6, 977:9, 978:20, 978:22, 978:23, 1007:22, 1008:13, 1008:15, 1008:20, 1048:20
investigate [2] - 841:16, 897:11
investor [1] - 879:12
Investors [13] - 788:18, 878:4, 878:18, 888:24, 888:25, 947:11, 947:21, 947:23, 1000:16, 1000:22, 1003:23, 1004:5, 1029:22
invoice [10] - 823:1, 823:2, 954:5,

956:22, 956:24, 957:10, 957:15, 957:24, 958:4, 976:21
invoices [5] - 915:21, 953:22, 956:19, 957:11, 957:16
Invoices [1] - 913:20
involved [19] - 833:8, 927:5, 927:9, 943:1, 952:10, 961:12, 980:5, 981:15, 981:18, 982:10, 991:2, 991:4, 995:6, 995:25, 996:2, 1006:17, 1008:9, 1008:13, 1008:22
involvement [2] - 832:10, 997:23
involving [2] - 827:16, 886:17
IP [32] - 815:24, 815:25, 816:3, 816:7, 816:10, 816:14, 816:17, 816:18, 816:19, 816:25, 817:1, 817:6, 817:7, 817:10, 837:13, 837:15, 837:16, 837:21, 837:22, 837:24, 838:3, 838:9, 838:20, 839:8, 839:12, 839:16, 839:20, 840:2, 840:5, 840:9, 851:2, 851:4
iPhone [8] - 848:23, 849:1, 849:10, 849:22, 849:25, 850:12
IPs [1] - 851:1
IRS [2] - 889:25, 953:13
Isaac [1] - 1018:23
issue [31] - 794:18, 795:3, 801:13, 827:15, 829:14, 829:18, 829:22, 857:8, 864:5, 864:6, 864:8, 864:11, 864:18, 865:14, 953:17, 954:16, 977:10, 1009:11, 1009:14, 1037:2, 1042:2, 1043:1, 1043:10, 1043:13, 1047:7, 1047:8, 1047:12, 1049:8, 1053:6, 1055:20

issued [5] - 914:20, 954:19, 1008:5, 1035:9, 1035:10
issues [11] - 791:19, 795:12, 797:18, 800:18, 842:5, 842:12, 864:10, 960:14, 1023:7, 1029:1, 1029:5
issuing [1] - 960:18
IT [1] - 856:23
item [9] - 793:25, 831:2, 849:9, 849:18, 849:20, 1011:14, 1020:11, 1020:12
itemized [2] - 953:24, 954:10
items [3] - 790:15, 790:20, 849:13
itself [5] - 824:20, 824:22, 922:9, 1047:24, 1048:7

---

## J

Jack [4] - 883:21, 984:20, 985:11, 997:16
JAMES [1] - 788:10
Jans [2] - 921:25, 922:15
January [2] - 893:18, 1022:1
jarred [1] - 986:19
Jay [1] - 788:13
Jersey [18] - 874:10, 877:14, 899:2, 900:9, 900:13, 901:1, 901:18, 901:21, 902:7, 902:8, 902:14, 903:15, 903:21, 906:6, 909:11, 953:13, 962:10, 963:11
Jeryg [7] - 788:19, 878:24, 999:13, 1001:12, 1001:15, 1029:18, 1030:1
Jessica [3] - 884:12, 884:21, 988:24
JO [1] - 788:3
job [1] - 904:10
Joel [1] - 979:9
John [11] - 883:22, 883:24, 884:13, 884:16, 884:22, 886:9, 887:24, 944:21, 984:8,

*Schreiber v. Friedman, Et Al*   15-CV-6861   8/2/16 ───── 16

989:3, 1041:2
**John's** [1] - 884:1
**join** [3] - 814:13, 815:21
**joined** [1] - 892:22
**Jorge** [1] - 789:9
**Josefina** [3] - 884:12, 884:18, 884:21
**Joseph** [5] - 920:25, 921:1, 988:24, 1002:13, 1002:15
**JUDGE** [1] - 788:10
**Judge** [2] - 887:11, 933:5
**July** [5] - 790:6, 790:8, 834:16, 835:3, 892:23
**jump** [1] - 813:9
**jumping** [1] - 798:7
**June** [1] - 892:23
**justification** [1] - 1037:9

## K

**K-1** [21] - 912:5, 912:8, 912:24, 947:5, 947:6, 947:7, 947:10, 947:17, 954:16, 962:19, 998:9, 998:18, 998:21, 1000:9, 1001:9, 1001:12, 1001:24, 1016:4, 1016:12, 1017:3
**K-1s** [8] - 912:21, 951:5, 1002:12, 1016:7, 1016:13, 1016:17, 1016:25, 1017:12
**Katzner** [3] - 993:22, 993:25, 994:4
**keep** [14] - 824:4, 833:21, 844:24, 844:25, 861:22, 890:25, 902:7, 902:19, 961:23, 961:25, 974:20, 1001:25, 1029:4
**keeping** [3] - 816:13, 903:20, 1042:12
**keeps** [4] - 810:18, 823:7, 824:5, 825:3
**kept** [7] - 824:12, 838:4, 891:23, 901:22, 901:24, 902:5, 958:9
**kind** [10] - 811:23, 831:21, 839:23, 841:14, 851:13,

851:14, 864:5, 941:18, 1025:22, 1026:15
**kinds** [2] - 873:7, 1027:9
**Kirschenblatt** [9] - 979:7, 1005:6, 1005:7, 1006:3, 1006:8, 1018:4, 1018:5, 1018:6
**knowledge** [21] - 796:10, 829:17, 832:13, 842:12, 842:13, 842:18, 842:20, 872:21, 895:23, 896:12, 982:23, 985:24, 1003:3, 1008:18, 1011:22, 1018:25, 1019:6, 1034:12, 1034:14, 1034:17, 1038:14
**known** [6] - 864:2, 877:22, 881:16, 886:9, 937:19, 990:22
**knows** [3] - 830:20, 843:2, 985:1
**Koenig** [9] - 798:22, 827:10, 830:7, 955:18, 1008:9, 1008:12, 1009:2, 1010:21, 1016:18

## L

**labeled** [1] - 1050:21
**Labor** [2] - 953:18, 1023:18
**lack** [2] - 809:15, 823:19
**Lakewood** [1] - 1023:20
**LAN** [1] - 817:10
**laptop** [5] - 793:19, 835:22, 836:2, 863:17, 863:24
**Larchmont** [1] - 995:18
**large** [4] - 853:5, 942:21, 942:22, 1048:4
**larger** [3] - 798:9, 962:11, 1048:4
**Larry** [3] - 881:22, 984:20, 985:11
**last** [31] - 797:13, 797:14, 800:12, 808:19, 808:23, 809:12, 809:20,

810:1, 838:25, 868:21, 905:2, 908:3, 931:24, 936:5, 940:10, 940:11, 948:19, 967:8, 967:12, 967:17, 968:2, 968:5, 969:17, 969:22, 997:19, 1002:11, 1003:1, 1017:2, 1022:15, 1026:11, 1036:12
**late** [3] - 901:16, 949:25, 950:1
**latest** [1] - 918:10
**launch** [1] - 867:14
**Launch** [51] - 791:20, 810:17, 810:19, 810:23, 811:5, 811:12, 818:14, 818:16, 819:1, 819:10, 821:14, 821:15, 821:19, 822:6, 822:19, 822:20, 823:6, 824:17, 825:10, 832:5, 832:11, 832:13, 840:13, 840:15, 840:16, 840:18, 840:21, 844:17, 856:2, 857:11, 857:22, 858:15, 860:4, 1011:1, 1016:21, 1016:22, 1016:24, 1017:8, 1017:12, 1017:17, 1033:14, 1033:15, 1033:17, 1033:19, 1034:6, 1039:5, 1042:4, 1042:14, 1055:24
**laundering** [2] - 982:6, 983:7
**Laurence** [1] - 882:13, 883:1, 883:7, 883:20, 883:22, 884:13, 884:16, 884:21, 887:24
**Lauretta** [1] - 904:5
**law** [3] - 919:6, 919:9, 919:13
**Lawrence** [10] - 929:7, 930:2, 930:3, 930:9, 931:21, 944:21, 984:8, 989:3, 1041:2
**lawsuit** [5] - 797:24, 977:25, 978:18, 994:25, 995:3
**lawyer** [5] - 800:17, 802:12, 809:1,

891:8, 895:11
**lead** [1] - 875:12
**leading** [1] - 798:3
**learned** [3] - 867:2, 1027:25, 1028:11
**learning** [1] - 993:9
**least** [8] - 801:12, 804:7, 804:8, 908:4, 909:16, 982:7, 1006:21, 1043:14
**leave** [2] - 866:16, 893:3
**leaves** [2] - 836:20, 1041:16
**leaving** [3] - 1048:17, 1053:14, 1053:15
**led** [1] - 812:12
**ledger** [9] - 856:4, 858:19, 858:25, 859:20, 897:18, 897:20, 897:21, 1026:19, 1034:18
**ledgers** [6] - 894:10, 894:11, 898:7, 898:10, 935:7, 1003:21
**leeway** [2] - 882:19, 932:18
**Lefferts** [1] - 998:22
**left** [6] - 793:20, 858:6, 858:7, 863:8, 1028:21, 1035:9
**legal** [2] - 938:9, 983:5
**legally** [1] - 922:17
**legend** [1] - 848:22
**Lenox** [1] - 999:21
**less** [6] - 805:20, 824:25, 842:14, 867:9, 954:6, 1006:17
**letter** [11] - 792:24, 891:24, 907:15, 907:22, 908:18, 945:21, 966:11, 1042:1, 1043:11, 1045:6
**letters** [1] - 979:19
**letting** [1] - 922:17
**level** [3] - 842:13, 1006:23, 1010:9
**liabilities** [1] - 1011:15
**liability** [1] - 918:2
**license** [4] - 855:17, 855:19, 855:20
**licenses** [1] - 814:19
**licensing** [4] - 814:18, 855:11, 855:12, 855:23
**liens** [1] - 990:14
**light** [1] - 833:18

**Light** [11] - 789:6, 883:13, 884:1, 928:22, 936:22, 961:8, 990:25, 991:24, 994:11, 994:24, 1031:5
**light's** [1] - 884:5
**lighter** [1] - 859:6
**likely** [5] - 881:22, 917:12, 917:13, 918:1, 989:3
**limit** [1] - 919:21
**limited** [2] - 1037:20, 1038:1
**Lincoln** [1] - 997:24
**Linda** [1] - 904:5
**line** [14] - 825:22, 832:9, 840:16, 846:13, 850:13, 850:14, 925:16, 1011:14, 1025:14, 1027:8, 1028:15, 1033:23, 1033:24
**lines** [1] - 850:15
**linked** [1] - 840:12
**List** [2] - 913:20, 914:3
**list** [8] - 805:22, 815:4, 852:4, 876:23, 889:7, 915:2, 915:21, 975:21
**listed** [13] - 818:1, 837:5, 889:2, 921:16, 924:25, 925:20, 927:25, 928:4, 928:9, 928:10, 937:8, 974:13, 1024:14
**listen** [1] - 873:15
**listened** [1] - 790:18
**listing** [3] - 915:10, 915:16, 921:15
**literally** [1] - 1011:14
**live** [7] - 869:19, 944:11, 944:16, 944:22, 972:19, 1049:16, 1049:18
**lived** [5] - 944:24, 944:25, 945:9, 945:10
**living** [1] - 945:2
**LL** [1] - 999:19
**LLC** [34] - 788:18, 788:19, 789:19, 789:19, 789:20, 885:8, 885:21, 939:7, 939:22, 940:5, 997:24, 998:15, 998:17, 998:20, 998:22, 999:5, 999:7, 999:9,

**loan** [2] - 989:11, 989:25
**loaned** [2] - 931:9, 1002:19
**loans** [3] - 931:18, 989:20, 1002:23
**local** [7] - 811:15, 817:10, 819:10, 824:4, 848:5, 1015:14, 1023:4
**located** [11] - 809:22, 814:14, 826:6, 826:10, 928:20, 928:22, 928:23, 928:25, 929:1, 931:3, 1027:13
**location** [14] - 840:3, 844:5, 867:23, 906:5, 929:11, 931:3, 945:4, 945:5, 945:8, 988:12, 1023:7, 1024:5, 1024:9, 1024:24
**locations** [2] - 867:23, 867:25
**log** [7] - 790:13, 790:19, 802:18, 820:5, 892:12, 900:13, 906:12
**log-in** [2] - 892:12, 906:12
**logged** [1] - 820:6
**logging** [1] - 796:16
**Logmein** [12] - 819:17, 819:21, 820:3, 820:10, 820:11, 820:13, 820:18, 821:4, 821:5, 853:8, 853:9
**longstar** [1] - 879:8
**Look** [1] - 996:25
**look** [39] - 790:13, 790:22, 805:17, 806:3, 806:8, 807:3, 807:4, 807:7, 809:1, 809:7, 810:8, 813:16, 825:23, 827:18, 830:18, 831:14, 832:16, 834:12, 841:16, 862:19, 906:4, 911:23, 934:16,

**looked** [9] - 790:10, 802:7, 804:11, 804:12, 805:23, 807:2, 809:3, 809:5, 812:8
**looking** [18] - 791:6, 793:17, 794:4, 804:6, 806:6, 807:12, 836:7, 859:10, 892:1, 902:12, 966:18, 966:22, 966:24, 967:3, 971:13, 997:13, 1005:25, 1018:13
**looks** [3] - 908:24, 911:2, 1021:25
**looseleaf** [1] - 1021:9
**losing** [1] - 940:25
**loss** [1] - 1020:13
**lost** [2] - 864:19, 940:6
**lunch** [7] - 857:11, 906:2, 906:14, 907:8, 907:10, 911:23, 1041:19

## M

**M-A-H-M-O-U-D** [1] - 877:9
**machine** [4] - 788:21, 791:11, 791:13, 795:2
**machines** [2] - 790:4, 790:7
**Madison** [1] - 995:18
**MAGISTRATE** [1] - 788:10
**Mahmoud** [1] - 877:9
**mail** [76] - 799:15, 811:23, 812:8, 812:15, 812:18, 823:18, 823:19, 823:22, 827:10, 827:14, 827:19, 830:7, 832:18, 832:24, 835:7, 842:23, 845:17, 845:21, 845:24, 845:25, 846:6, 846:7, 846:16, 847:7, 848:21, 849:1, 849:2, 849:7,

849:9, 849:14, 849:17, 849:21, 849:23, 852:6, 852:11, 852:12, 853:3, 853:4, 853:5, 853:14, 866:4, 866:8, 866:10, 866:11, 871:12, 871:19, 871:20, 871:21, 872:3, 875:5, 875:7, 875:12, 883:10, 914:17, 914:24, 915:23, 917:15, 949:12, 953:7, 953:10, 956:24, 956:25, 957:6, 966:21, 966:23, 968:6, 974:18, 979:18, 1002:7, 1002:9, 1024:4, 1024:6, 1024:8, 1024:23
**mailed** [4] - 853:6, 871:16, 871:17, 956:20
**mailing** [2] - 835:11, 835:13
**mailings** [1] - 953:18
**mails** [29] - 818:15, 830:19, 830:20, 833:1, 834:16, 835:15, 846:3, 846:4, 847:15, 847:21, 847:24, 848:3, 848:4, 848:6, 848:13, 864:24, 865:24, 866:2, 891:13, 904:21, 904:22, 905:3, 905:13, 905:14, 905:15, 910:23, 956:18, 957:4, 967:22
**main** [4] - 817:14, 834:15, 849:11, 1048:18
**maintain** [9] - 874:1, 894:5, 901:17, 916:11, 1030:15, 1030:19, 1031:3, 1031:7, 1031:16
**maintained** [3] - 906:5, 916:5, 1026:22
**maintaining** [1] - 903:14
**maintains** [1] - 874:2
**malpractice** [1] - 870:3

**Management** [10] - 788:19, 788:19, 878:22, 878:24, 999:13, 1001:1, 1001:5, 1003:11, 1003:25, 1030:1
**management** [2] - 1001:6, 1022:22
**manages** [1] - 811:6
**mandatory** [1] - 1037:8
**mangled** [1] - 812:16
**map** [5] - 1048:22, 1051:4, 1051:6, 1052:6, 1052:8
**mapped** [1] - 1045:19
**March** [1] - 797:8
**marked** [2] - 970:4, 1051:13
**markets** [1] - 934:14
**Marks** [1] - 999:9
**married** [1] - 972:18
**Masters** [2] - 942:13, 942:14
**match** [1] - 1045:16
**material** [10] - 791:7, 810:12, 874:3, 894:19, 895:13, 896:10, 904:23, 905:12, 905:21, 905:22
**materials** [9] - 790:11, 790:12, 790:14, 905:18, 918:7, 921:13, 1028:3, 1055:24
**matter** [4] - 810:16, 858:18, 907:5, 1056:16
**matters** [4] - 955:3, 955:5, 955:11, 1041:18
**Matthews** [1] - 1051:9
**MATTHEWS** [3] - 1051:12, 1051:20, 1053:20
**Maurice** [1] - 789:18
**max** [1] - 1028:22
**Mayer** [7] - 871:4, 955:8, 977:12, 1008:9, 1009:2, 1010:21, 1016:18
**MB** [41] - 789:4, 789:5, 878:4, 879:3, 879:5, 879:18, 880:2, 881:1, 881:5, 881:10, 885:11, 885:13, 885:15, 885:16, 921:25, 922:9, 922:10,

922:16, 922:20, 930:7, 936:22, 940:11, 940:13, 940:17, 940:19, 947:11, 951:8, 951:9, 951:12, 951:13, 951:16, 951:18, 951:19, 951:21, 951:22, 1000:12, 1030:10, 1030:17, 1041:1
**mean** [55] - 792:22, 794:25, 796:25, 797:13, 802:7, 802:14, 802:16, 802:17, 803:7, 804:11, 805:12, 807:23, 807:24, 808:3, 809:13, 810:16, 814:9, 816:10, 818:14, 820:5, 822:13, 826:14, 830:9, 838:12, 841:20, 845:23, 846:2, 846:5, 850:9, 858:9, 862:18, 863:5, 864:4, 864:9, 866:17, 866:20, 867:22, 868:7, 886:16, 897:10, 912:10, 914:8, 915:19, 944:3, 953:20, 956:25, 964:10, 969:16, 973:3, 1013:7, 1031:24, 1052:10
**meaning** [3] - 795:19, 817:18, 918:16
**means** [5] - 802:10, 802:15, 802:25, 845:24, 914:10
**meant** [3] - 875:22, 914:18, 1034:19
**meantime** [1] - 913:9
**measures** [1] - 932:16
**mechanism** [4] - 818:3, 865:5, 899:11, 900:6
**meet** [1] - 997:10
**meeting** [3] - 950:4, 950:5, 950:7
**member** [2] - 1002:15, 1016:2
**member's** [1] - 1016:4
**members** [10] - 1016:8, 1016:14, 1016:16, 1017:11, 1017:22, 1019:11, 1025:4, 1036:3,

1036:14
**members'** [1] - 1016:25
**memory** [4] - 910:7, 986:2, 986:19, 1000:2
**mention** [3] - 811:19, 999:25, 1000:10
**mentioned** [19] - 811:18, 839:3, 858:2, 884:16, 884:17, 893:22, 904:4, 921:25, 946:4, 980:2, 1000:8, 1001:18, 1002:3, 1002:16, 1005:6, 1014:23, 1015:9, 1018:2, 1027:17
**merit** [1] - 907:8
**merits** [1] - 1010:6
**mess** [5] - 794:21, 825:12, 825:20, 843:4
**message** [3] - 846:14, 850:7, 850:11
**messed** [2] - 843:3, 974:21
**met** [2] - 881:19, 997:17
**method** [2] - 1036:24, 1037:13
**Michael** [7] - 789:12, 789:12, 869:9, 869:18, 875:20, 875:21, 971:15
**Microsoft** [1] - 825:6
**mid** [1] - 973:21
**mid-afternoon** [1] - 973:21
**middle** [6] - 793:15, 799:14, 813:5, 814:1, 835:2, 859:7
**midmorning** [1] - 836:7
**might** [50] - 791:25, 794:25, 802:9, 810:20, 833:2, 855:4, 857:25, 858:1, 879:19, 879:22, 880:3, 880:7, 880:8, 880:11, 880:12, 902:5, 904:9, 908:23, 916:20, 917:21, 923:7, 923:25, 924:25, 925:20, 927:25, 928:4, 928:6, 931:10, 932:11,

932:16, 932:23, 934:25, 937:6, 946:8, 954:8, 955:20, 956:17, 956:18, 958:2, 962:12, 976:9, 986:14, 993:13, 993:15, 1001:25, 1002:3, 1003:20, 1020:15, 1052:21
**mind** [3] - 943:17, 982:3, 1042:12
**mine** [3] - 925:9, 933:16, 984:13
**minicomputer** [1] - 863:21
**minimal** [1] - 834:1
**minor** [2] - 961:15
**minute** [2] - 805:21, 997:6
**minutes** [13] - 801:14, 804:13, 805:11, 805:12, 805:16, 852:21, 867:7, 929:9, 973:22, 1028:22, 1028:24, 1029:14
**mirror** [4] - 867:15, 867:17, 867:23
**mirroring** [5] - 867:18, 867:19, 867:22, 867:24, 868:4
**mirrors** [2] - 849:6, 849:7
**misrepresenting** [1] - 1049:9
**missed** [1] - 816:22
**missing** [11] - 825:24, 858:3, 858:13, 905:3, 905:6, 959:8, 966:15, 966:25, 979:15, 1048:12, 1053:19
**mistake** [17] - 925:2, 937:24, 947:24, 962:17, 962:18, 962:22, 962:23, 963:4, 963:12, 1025:22, 1025:25, 1026:3, 1026:5, 1026:9, 1034:22, 1035:5
**mistakes** [1] - 1007:21
**misunderstood** [1] - 1000:6
**mixed** [1] - 945:1
**MJL** [2] - 994:15, 994:18
**moment** [7] - 880:15, 881:15, 884:4,

935:11, 950:16, 1007:6, 1013:17
**moments** [2] - 824:16, 840:15
**money** [18] - 833:8, 836:3, 900:12, 900:16, 900:25, 901:1, 931:9, 940:25, 951:21, 951:23, 961:16, 961:18, 963:4, 982:5, 983:7, 989:11, 989:25, 1002:19
**month** [23] - 909:16, 909:17, 914:13, 914:20, 914:21, 915:5, 915:11, 915:12, 915:24, 948:25, 949:2, 954:4, 954:5, 954:6, 957:13, 957:18, 958:15, 964:6, 970:8, 970:14, 976:2, 976:6, 976:7
**monthly** [3] - 893:6, 950:13, 964:25
**months** [3] - 791:5, 909:20, 939:15
**moreover** [1] - 813:17
**morning** [9] - 833:18, 841:8, 844:15, 905:6, 905:7, 1029:6, 1029:7, 1041:18, 1056:15
**Morningside** [6] - 923:5, 992:11, 992:13, 993:21, 994:2, 994:6
**mortgages** [1] - 990:2
**Morty** [3] - 993:22, 993:25, 994:4
**most** [10] - 853:5, 881:22, 917:12, 917:15, 932:18, 933:1, 958:21, 958:22, 989:3
**mostly** [5] - 864:19, 865:23, 866:3, 866:6, 918:1
**motion** [2] - 790:24, 1014:12
**motives** [1] - 1010:11
**move** [18] - 792:22, 794:2, 808:5, 830:6, 831:2, 832:4, 833:18, 847:5, 867:6, 868:18, 887:16, 891:6, 965:14, 997:4,

1033:13, 1034:20, 1036:19, 1041:9
**moved** [4] - 821:20, 822:2, 844:5, 1033:24
**moving** [2] - 792:14, 792:18
**MR** [328] - 790:2, 790:3, 790:6, 790:23, 791:1, 791:9, 791:11, 791:16, 791:21, 792:4, 792:13, 792:15, 792:19, 792:23, 793:2, 793:4, 793:8, 793:13, 798:5, 798:10, 800:24, 801:6, 804:15, 804:18, 804:23, 806:25, 821:2, 827:3, 827:6, 829:2, 829:8, 829:11, 830:17, 831:3, 831:5, 833:10, 833:12, 833:21, 833:24, 834:4, 834:8, 836:6, 836:10, 836:12, 836:13, 836:14, 836:15, 836:19, 836:25, 837:10, 841:3, 841:7, 843:20, 844:12, 844:14, 845:4, 847:6, 848:15, 848:17, 848:19, 850:2, 850:5, 850:23, 852:18, 852:20, 855:13, 861:1, 866:25, 867:2, 867:7, 867:12, 868:17, 868:20, 869:9, 869:16, 872:19, 873:19, 881:4, 882:17, 887:11, 887:15, 887:18, 891:6, 895:9, 895:15, 895:16, 901:4, 902:11, 903:24, 906:3, 906:14, 907:4, 907:7, 907:15, 907:18, 907:21, 907:24, 908:2, 908:8, 908:12, 908:14, 909:21, 911:2, 911:5, 911:9, 911:11, 911:12, 911:16, 911:18,

911:21, 913:5, 913:10, 913:15, 925:15, 925:18, 925:24, 926:3, 926:7, 926:9, 926:13, 927:21, 932:9, 932:10, 932:21, 933:11, 934:13, 934:19, 935:14, 935:18, 936:1, 937:25, 945:23, 946:16, 949:1, 950:9, 950:21, 957:23, 960:17, 965:8, 965:11, 969:24, 970:5, 973:20, 974:1, 977:21, 978:9, 978:12, 978:13, 981:1, 981:4, 981:12, 981:14, 981:17, 981:25, 982:5, 982:13, 982:15, 982:22, 983:1, 983:3, 983:4, 984:1, 984:24, 985:1, 985:5, 985:15, 985:18, 985:22, 987:2, 988:3, 988:5, 988:9, 988:10, 988:17, 989:17, 990:7, 991:6, 991:8, 991:10, 992:14, 992:19, 992:22, 993:1, 993:4, 993:19, 993:20, 996:10, 996:12, 996:16, 997:3, 997:5, 997:9, 1005:1, 1005:3, 1005:5, 1010:7, 1010:13, 1010:16, 1010:19, 1011:19, 1011:21, 1012:1, 1012:3, 1013:17, 1013:20, 1013:22, 1013:25, 1014:14, 1014:16, 1014:18, 1021:15, 1021:16, 1028:14, 1028:18, 1028:22, 1028:23, 1028:24, 1029:12, 1029:16, 1032:1, 1032:4, 1033:4, 1033:8, 1034:21, 1035:25, 1036:2, 1036:6, 1037:21, 1038:2, 1038:6, 1038:18, 1038:19, 1038:23, 1039:2,

1040:9, 1041:8, 1041:11, 1041:22, 1041:24, 1042:10, 1042:15, 1042:17, 1042:19, 1042:25, 1043:6, 1043:8, 1043:10, 1043:21, 1043:23, 1043:25, 1044:5, 1044:12, 1044:14, 1044:22, 1044:24, 1045:1, 1045:11, 1045:14, 1045:18, 1045:22, 1046:1, 1046:9, 1046:12, 1046:18, 1046:20, 1046:22, 1046:25, 1047:3, 1047:7, 1047:18, 1047:20, 1047:25, 1048:3, 1048:6, 1048:9, 1048:18, 1048:24, 1049:6, 1049:8, 1049:13, 1049:18, 1049:20, 1049:25, 1050:3, 1050:5, 1050:8, 1050:13, 1050:17, 1050:19, 1050:21, 1051:1, 1051:6, 1051:9, 1052:9, 1052:12, 1053:6, 1053:17, 1053:22, 1053:24, 1054:2, 1054:6, 1054:8, 1054:10, 1054:15, 1054:21, 1054:23, 1055:2, 1055:8, 1055:12, 1055:15, 1055:17, 1055:20, 1056:1, 1056:4, 1056:7, 1056:11, 1057:7, 1057:9, 1057:11, 1057:13, 1057:15, 1057:20, 1057:22, 1057:24, 1058:2, 1058:4, 1058:6, 1058:8

**MS** [3] - 1051:12, 1051:20, 1053:20

**multiple** [6] - 816:6, 816:16, 844:4, 975:23, 1039:1, 1044:16

**must** [8] - 806:7, 925:2, 949:25, 950:16, 987:16, 1000:6, 1006:4, 1034:12

## N

**N&S** [3] - 932:2, 932:3, 932:4

**N362** [1] - 788:24

**name** [31] - 796:15, 806:13, 806:14, 806:19, 841:15, 841:23, 869:17, 877:8, 885:14, 889:4, 892:12, 900:15, 929:10, 931:22, 931:24, 931:25, 937:7, 937:16, 938:14, 941:4, 947:3, 947:25, 979:5, 986:18, 986:20, 1001:4, 1001:14, 1016:4, 1018:1, 1018:3, 1018:23

**named** [8] - 806:9, 886:21, 925:6, 945:25, 946:11, 946:15, 946:20, 971:14

**names** [10] - 805:24, 806:3, 806:6, 806:8, 841:22, 923:2, 923:3, 974:20, 981:5, 1001:13

**narrow** [1] - 880:25

**nature** [4] - 901:11, 949:5, 950:7, 1013:12

**navigate** [2] - 1011:4, 1011:5

**near** [1] - 1028:15

**necessarily** [3] - 816:10, 932:18, 959:1

**necessary** [5] - 792:1, 932:16, 1015:14, 1028:12, 1042:13

**need** [18] - 792:17, 793:4, 814:18, 817:5, 823:21, 824:3, 891:20, 891:23, 902:25, 903:1, 903:22, 932:24, 932:25, 933:3, 951:7, 966:12, 1054:13, 1055:14

**needed** [8] - 853:21, 870:23, 870:24, 956:5, 977:4, 1005:19, 1023:3, 1051:16

**needs** [4] - 974:19,

1042:20, 1050:20, 1052:3

**Nelkin** [23] - 788:13, 788:14, 796:6, 800:5, 813:8, 813:11, 832:25, 835:22, 842:1, 846:25, 848:21, 880:23, 911:9, 911:10, 973:25, 996:12, 1013:5, 1014:2, 1019:16, 1041:20, 1043:9, 1051:25, 1055:4

**NELKIN** [176] - 791:9, 791:11, 791:21, 793:2, 793:4, 804:15, 804:18, 829:8, 830:17, 833:10, 833:12, 833:21, 833:24, 837:10, 850:5, 850:23, 852:18, 852:20, 861:1, 867:2, 867:7, 867:12, 868:17, 868:20, 869:9, 869:16, 872:19, 873:19, 881:4, 887:15, 887:18, 891:6, 901:4, 902:11, 906:3, 906:14, 907:4, 907:7, 907:15, 907:18, 907:21, 907:24, 908:2, 908:8, 908:12, 908:14, 911:2, 911:11, 911:16, 911:18, 911:21, 913:5, 913:10, 913:15, 925:18, 925:24, 926:3, 926:7, 926:13, 932:10, 932:21, 933:11, 934:13, 935:18, 945:23, 949:1, 950:9, 950:21, 957:23, 960:17, 965:11, 969:24, 970:5, 974:1, 977:21, 978:9, 978:13, 981:4, 981:14, 981:17, 981:25, 982:5, 982:13, 982:15, 982:22, 983:1, 983:3, 983:4, 984:1, 985:18, 988:5, 988:9, 988:10, 988:17,

991:10, 993:20, 997:3, 997:5, 997:9, 1005:1, 1011:19, 1011:21, 1012:1, 1012:3, 1021:15, 1028:23, 1033:8, 1034:21, 1036:6, 1037:21, 1038:2, 1038:6, 1041:8, 1041:11, 1042:25, 1043:6, 1043:10, 1043:21, 1043:23, 1043:25, 1044:5, 1044:12, 1044:14, 1044:22, 1044:24, 1045:1, 1045:11, 1045:14, 1045:18, 1045:22, 1046:1, 1046:9, 1046:12, 1046:18, 1046:20, 1046:22, 1046:25, 1047:3, 1047:7, 1047:18, 1047:20, 1047:25, 1048:3, 1048:6, 1048:9, 1048:18, 1048:24, 1049:6, 1049:8, 1049:13, 1049:18, 1050:13, 1050:17, 1050:19, 1050:21, 1051:1, 1053:6, 1053:17, 1053:22, 1053:24, 1054:2, 1054:6, 1054:8, 1054:15, 1054:23, 1055:8, 1055:12, 1055:15, 1055:17, 1055:20, 1056:1, 1056:4, 1056:11, 1057:15, 1057:20, 1058:8

**net** [3] - 876:13, 971:4, 971:22

**network** [21] - 795:3, 814:11, 814:13, 814:17, 814:20, 815:22, 817:18, 817:19, 817:21, 818:3, 818:18, 818:20, 819:8, 828:5, 839:22, 839:24, 840:2, 843:10, 851:9, 864:22

**never** [41] - 824:18, 829:5, 841:12, 841:18, 857:8, 857:15, 857:18, 863:16, 863:22, 864:11, 892:9, 892:15, 892:21,

925:2, 925:3, 936:16, 937:9, 949:19, 949:21, 957:14, 965:24, 966:3, 980:22, 980:23, 1011:2, 1011:3, 1011:5, 1016:21, 1017:15, 1017:16, 1017:17, 1018:19, 1027:5, 1027:6, 1033:14, 1033:18, 1034:6, 1035:9, 1047:17

**Never** [1] - 989:7

**new** [10] - 842:23, 863:7, 916:12, 917:16, 922:7, 967:23, 1035:9, 1045:7, 1045:8

**NEW** [1] - 788:1

**New** [30] - 788:6, 788:16, 788:25, 869:20, 874:10, 877:14, 885:17, 885:24, 899:2, 900:9, 900:13, 901:1, 901:18, 901:21, 902:7, 902:8, 902:14, 903:15, 903:21, 906:6, 909:11, 928:19, 936:7, 936:8, 936:10, 936:14, 953:13, 962:10, 963:11, 995:18

**Newark** [3] - 949:21, 949:23, 1024:4

**newspaper** [1] - 984:3

**next** [21] - 793:23, 805:8, 817:12, 828:8, 831:2, 834:6, 847:5, 854:25, 855:1, 855:3, 860:13, 862:1, 869:8, 874:5, 906:18, 945:16, 983:8, 1004:12, 1037:24, 1055:3, 1056:12

**niceties** [1] - 982:23

**Nicholas** [4] - 925:6, 926:15, 935:20, 953:4

**Nick** [1] - 937:12

**Nicole** [2] - 794:16, 795:1

**night** [8] - 905:2, 908:3, 967:8, 967:12, 967:17,

968:2, 968:5, 1056:14
**nine** [5] - 814:2, 815:13, 939:15, 949:3, 952:19
**nobody** [1] - 802:19
**non** [5] - 814:8, 830:8, 830:15, 914:5, 914:19
**non-cleared** [2] - 914:5, 914:19
**non-technical** [1] - 814:8
**non-TRC-related** [2] - 830:8, 830:15
**nondefendants** [1] - 993:7
**None** [1] - 1058:13
**none** [2] - 840:12, 1007:1
**nonissue** [2] - 1049:24, 1049:25
**normal** [2] - 853:7, 857:6
**normally** [2] - 802:10, 802:15
**notes** [4] - 836:7, 867:8, 1025:18, 1028:15
**nothing** [17] - 791:24, 792:21, 819:13, 820:18, 841:3, 844:12, 848:4, 865:15, 868:18, 927:12, 962:21, 976:21, 1013:20, 1028:18, 1042:16, 1042:21, 1043:8
**notice** [1] - 990:14
**notices** [2] - 898:18, 982:8
**nowadays** [1] - 849:16
**NRG** [7] - 932:8, 933:13, 933:22, 934:23, 935:21, 989:21, 995:16
**Number** [5] - 913:22, 915:14, 1048:21, 1049:15, 1050:1
**number** [37] - 794:5, 803:13, 804:7, 807:22, 808:4, 825:13, 825:14, 825:21, 825:24, 830:10, 846:14, 860:11, 861:18, 864:13, 877:25, 900:15, 900:19, 900:20, 902:12, 911:12, 911:24,

913:17, 934:1, 982:7, 982:11, 982:15, 1007:23, 1025:12, 1028:25, 1035:14, 1036:23, 1040:15, 1045:1, 1046:15, 1046:19, 1047:19, 1048:23
**numbered** [1] - 793:23
**numbers** [10] - 825:3, 837:25, 838:2, 895:14, 974:9, 974:15, 974:20, 974:23, 978:24, 1048:21
**numerical** [1] - 915:16
**Nussbaum** [25] - 791:18, 791:25, 792:22, 793:14, 798:7, 798:14, 799:1, 799:23, 807:9, 810:7, 811:21, 821:8, 824:25, 834:15, 835:2, 837:2, 841:4, 841:8, 844:15, 846:17, 848:20, 1042:3, 1042:4, 1042:5, 1043:1

## O

**object** [1] - 887:11
**objected** [1] - 993:6
**objecting** [2] - 833:22, 992:23
**Objection** [10] - 984:24, 985:15, 985:22, 987:2, 988:3, 989:17, 990:7, 991:6, 992:14, 996:10
**objection** [40] - 804:17, 804:18, 804:21, 829:8, 830:17, 833:10, 833:12, 855:13, 866:25, 882:17, 895:9, 895:15, 895:16, 903:24, 909:21, 925:15, 926:10, 927:21, 932:9, 934:19, 936:1, 937:25, 946:16, 965:8, 965:9, 981:1, 981:12, 985:7, 985:23, 992:18, 992:20, 996:14, 996:16, 1011:19,

1029:4, 1035:25, 1038:18, 1038:23, 1039:2, 1040:9
**obligations** [1] - 982:25
**observe** [3] - 859:19, 868:22, 1034:3
**observed** [2] - 809:21, 863:16
**obtain** [3] - 870:23, 897:3, 903:22
**obtained** [1] - 987:19
**obtaining** [3] - 855:12, 903:23, 1028:3
**obviously** [4] - 802:10, 853:5, 861:11, 864:11
**occasion** [3] - 794:24, 866:18, 950:2
**Occasionally** [2] - 1002:8, 1002:10
**occur** [1] - 1024:16
**occurred** [3] - 909:23, 1007:18, 1025:13
**Ocean** [3] - 998:24, 999:5, 999:7
**October** [5] - 827:19, 827:21, 827:22, 831:9, 847:8
**OF** [2] - 788:1, 788:9
**offer** [1] - 792:4
**offered** [2] - 922:14, 1022:17
**offering** [1] - 829:9
**offhand** [1] - 840:7
**office** [55] - 818:8, 838:21, 838:25, 841:10, 842:19, 843:22, 843:25, 844:2, 851:25, 857:16, 858:7, 870:16, 881:9, 888:18, 894:5, 898:24, 899:7, 899:16, 901:23, 902:6, 902:15, 904:1, 904:2, 904:15, 909:12, 916:10, 921:10, 921:12, 929:4, 929:5, 930:9, 930:10, 930:11, 935:25, 936:3, 936:4, 945:13, 946:7, 948:15, 949:10, 949:19, 952:25, 964:19, 968:9, 970:24, 970:25, 974:19, 997:20, 1009:22,

1024:3, 1025:4, 1026:24, 1027:2, 1027:3, 1032:23
**Office** [15] - 789:19, 815:9, 819:25, 878:5, 920:14, 920:22, 923:14, 937:1, 947:12, 964:18, 1000:15, 1032:6, 1032:9
**officer** [4] - 924:12, 924:19, 925:21, 936:16
**offices** [7] - 818:18, 932:11, 936:5, 949:17, 949:21, 949:23, 1006:4
**Official** [1] - 788:23
**official** [4] - 928:15, 928:18, 952:25, 953:2
**offsite** [1] - 842:19
**often** [4] - 807:18, 807:19, 808:1, 993:10
**Oil** [54] - 789:4, 789:5, 878:4, 879:1, 923:3, 923:5, 923:6, 923:7, 923:8, 925:13, 925:24, 926:1, 926:15, 926:18, 927:5, 927:8, 927:14, 927:19, 928:18, 929:9, 929:11, 929:16, 929:17, 929:21, 929:22, 930:3, 930:16, 936:24, 937:13, 937:19, 937:21, 937:22, 938:4, 938:8, 938:22, 942:13, 942:14, 943:14, 944:4, 980:6, 989:8, 989:16, 989:20, 991:12, 991:14, 991:20, 992:2, 995:7, 995:13, 997:14, 1030:3, 1030:23, 1040:24
**oil** [33] - 806:15, 806:18, 818:7, 818:17, 819:8, 838:4, 839:5, 839:14, 841:14, 841:18, 850:25, 851:2, 851:6, 851:9, 851:11, 851:15, 851:17, 851:22, 851:23, 852:3,

852:5, 930:17, 930:20, 931:1, 933:18, 934:3, 938:20, 942:11, 946:3, 989:24, 994:1
**Old** [1] - 887:4
**old** [8] - 819:22, 820:8, 836:2, 838:21, 849:16, 854:5, 928:1, 942:10
**omit** [1] - 967:9
**omitted** [2] - 962:21, 968:19
**once** [15] - 800:25, 822:15, 824:1, 844:19, 858:18, 858:24, 892:15, 900:21, 900:22, 905:5, 917:3, 948:25, 949:2, 1007:13, 1011:7
**one** [147] - 790:19, 791:7, 791:17, 791:19, 791:23, 794:20, 794:25, 795:1, 797:20, 799:12, 811:4, 814:14, 816:10, 817:8, 817:12, 818:11, 823:5, 824:13, 825:5, 834:6, 837:25, 838:1, 838:12, 838:15, 838:16, 838:17, 838:20, 838:24, 839:5, 845:24, 846:14, 848:17, 850:11, 850:25, 851:5, 852:4, 853:3, 856:12, 856:15, 857:15, 857:16, 857:17, 858:2, 858:11, 858:12, 859:14, 861:4, 861:8, 861:11, 862:2, 862:9, 863:18, 863:20, 863:22, 867:23, 868:20, 875:3, 875:4, 888:5, 892:9, 894:22, 896:8, 902:10, 904:1, 904:11, 904:12, 907:8, 911:1, 911:6, 912:1, 913:19, 913:22, 917:24, 921:18, 922:25, 923:19, 925:21, 926:2, 926:3, 929:6,

929:11, 931:21,
931:23, 935:11,
936:2, 943:16,
944:5, 944:25,
949:23, 954:24,
960:14, 960:22,
960:23, 965:12,
970:23, 971:13,
972:8, 975:23,
975:24, 975:25,
976:7, 982:7,
982:24, 985:5,
989:3, 992:10,
992:17, 993:12,
994:25, 997:6,
997:19, 998:16,
999:1, 1000:22,
1000:24, 1001:13,
1002:11, 1003:1,
1011:4, 1013:17,
1020:16, 1020:17,
1020:23, 1021:6,
1022:7, 1023:7,
1025:16, 1033:10,
1037:5, 1040:22,
1046:19, 1047:19,
1049:1, 1052:4,
1052:5, 1052:7,
1052:21, 1055:3,
1056:13
**One** [4] - 839:4, 922:1,
922:10, 922:20
**ones** [15] - 821:6,
878:13, 888:17,
895:21, 895:25,
902:2, 910:21,
914:10, 936:21,
961:7, 966:2,
1037:6, 1040:21,
1051:24, 1053:19
**online** [3] - 811:9,
901:7, 901:19
**open** [13] - 805:17,
806:2, 814:24,
817:12, 817:15,
817:22, 825:13,
841:19, 862:19,
865:8, 1029:3
**opened** [7] - 804:11,
805:22, 805:23,
806:1, 806:7,
814:23, 826:15
**opens** [3] - 796:18,
816:8, 862:20
**operate** [4] - 940:2,
944:14, 995:13,
995:16
**operated** [8] - 942:17,
943:11, 943:25,
944:2, 982:6,

982:16, 988:12,
995:17
**operates** [2] - 982:11,
982:15
**operating** [25] - 940:1,
940:18, 940:24,
942:10, 942:18,
944:7, 945:2,
963:24, 964:9,
964:10, 964:14,
965:15, 965:22,
966:6, 986:3,
986:24, 997:20,
1014:23, 1015:2,
1015:9, 1017:24,
1019:13, 1019:17,
1035:19, 1036:10
**operation** [1] - 982:6
**operator** [1] - 845:9
**opportunity** [1] -
792:25
**opposed** [3] - 818:21,
1010:5, 1020:6
**Order** [2] - 913:22,
915:14
**order** [25] - 791:2,
791:14, 855:6,
856:17, 892:4,
915:17, 979:21,
990:5, 990:10,
991:22, 991:24,
992:2, 992:5,
1005:19, 1018:14,
1026:19, 1043:15,
1044:18, 1045:2,
1047:14, 1047:15,
1047:22, 1049:3,
1054:25
**ordered** [7] - 842:22,
851:17, 855:8,
875:12, 875:20,
875:22, 1054:16
**orderly** [1] - 791:4
**orders** [3] - 851:16,
933:4, 933:5
**ORENSTEIN** [1] -
788:10
**organizational** [1] -
1037:4
**original** [3] - 848:6,
1047:15, 1053:20
**originally** [3] - 831:22,
849:21, 1046:19
**originals** [1] - 1051:15
**outcome** [4] - 961:14,
961:15, 962:9,
987:25
**outfit** [1] - 811:24
**outside** [8] - 812:10,
814:14, 816:18,

816:22, 816:25,
817:1, 817:18, 906:6
**outstanding** [5] -
915:21, 931:18,
957:16, 1002:23,
1006:20
**Outstanding** [1] -
913:20
**overcome** [1] - 932:15
**overlap** [1] - 1045:12
**overruled** [8] - 833:19,
837:11, 895:17,
903:25, 938:1,
985:7, 985:23,
1011:20
**Overruled** [9] -
909:22, 927:22,
934:22, 946:17,
985:6, 987:3,
989:18, 990:8, 991:7
**owe** [3] - 959:15,
961:16, 961:18
**owed** [2] - 928:4,
928:6
**own** [31] - 791:8,
798:1, 816:19,
817:10, 829:17,
863:24, 869:23,
883:22, 886:1,
886:3, 886:6,
886:24, 887:6,
887:8, 887:23,
888:19, 888:21,
888:23, 927:16,
959:10, 981:21,
986:14, 987:5,
1030:8, 1030:15,
1030:19, 1031:3,
1031:7, 1031:16,
1031:22, 1031:24
**owned** [13] - 887:22,
888:5, 888:25,
921:25, 928:12,
929:25, 931:2,
981:20, 982:17,
987:4, 991:20,
993:22
**owner** [6] - 884:9,
889:2, 889:3, 926:4,
988:19, 989:2
**owners** [12] - 879:19,
884:11, 884:14,
885:20, 931:16,
942:1, 988:20,
989:3, 993:23,
995:11, 998:1, 998:6
**Owners** [1] - 998:13
**ownership** [16] -
883:16, 883:19,
887:5, 924:21,

927:13, 933:24,
937:10, 947:21,
980:22, 980:23,
986:25, 987:9,
987:12, 988:25,
989:4, 998:1
**owns** [9] - 882:23,
883:20, 886:5,
886:6, 927:8,
927:14, 941:7,
982:16, 1001:7

━━━━━━━━━━━━
**P**
━━━━━━━━━━━━

**P.C** [1] - 789:15
**p.m** [3] - 827:19,
827:22, 835:8
**package** [4] - 827:20,
895:5, 970:20, 975:1
**page** [35] - 793:23,
794:4, 797:4,
798:24, 799:3,
799:13, 800:12,
800:14, 801:18,
815:8, 827:9, 828:8,
831:15, 834:16,
835:1, 835:2, 835:6,
846:10, 859:3,
859:4, 860:13,
875:20, 896:8,
906:18, 971:16,
983:8, 1004:12,
1015:5, 1015:24,
1015:25, 1019:20,
1023:18, 1035:21,
1036:9, 1037:24
**PAGE** [2] - 1057:2,
1058:11
**Page** [1] - 839:4
**pages** [9] - 815:18,
818:1, 820:9, 830:6,
896:7, 896:9, 908:4,
1043:15, 1045:15
**paid** [17] - 897:6,
897:8, 898:16,
898:20, 909:14,
954:12, 957:12,
957:13, 958:8,
958:10, 960:14,
963:2, 963:23,
965:3, 989:10,
1026:5, 1026:9
**Panaflex** [1] - 989:6
**panic** [1] - 801:17
**papa** [9] - 870:21,
891:22, 892:4,
892:22, 893:25,
901:14, 956:6,
966:8, 978:4
**Papa** [34] - 794:14,

794:15, 795:23,
796:22, 1006:5,
1007:3, 1007:13,
1008:10, 1008:15,
1008:23, 1011:6,
1012:22, 1017:4,
1017:23, 1019:3,
1019:5, 1020:2,
1020:3, 1020:5,
1020:20, 1020:24,
1021:1, 1021:25,
1022:20, 1023:5,
1026:14, 1033:20,
1038:8, 1044:3,
1051:22, 1056:5,
1056:7, 1056:12
**Papa's** [3] - 793:19,
795:7, 812:13
**papa's** [2] - 793:19,
892:17
**paper** [2] - 802:11,
908:20
**papers** [2] - 963:20,
987:18
**paragraph** [16] -
798:14, 810:7,
813:8, 813:9,
813:10, 813:16,
813:22, 814:1,
814:2, 815:2, 815:5,
815:13, 815:15,
819:15, 828:1,
1036:12
**paragraphs** [1] - 797:7
**parameters** [1] -
972:17
**parents** [1] - 1001:20
**Park** [20] - 789:6,
884:23, 885:5,
885:8, 885:9,
885:11, 885:13,
885:20, 939:6,
939:8, 939:10,
939:22, 939:25,
940:5, 940:12,
940:14, 994:13,
994:24, 1031:18,
1031:19
**park** [1] - 939:7
**part** [20] - 805:7,
814:11, 814:20,
834:15, 855:2,
856:23, 857:11,
888:25, 894:16,
896:14, 897:5,
916:21, 932:13,
938:14, 1042:12,
1044:1, 1046:23,
1051:21, 1055:21,
1055:22

**particular** [12] -
794:19, 802:25,
843:7, 866:14,
866:21, 876:8,
876:10, 914:20,
975:6, 976:2,
979:11, 992:17
**particulars** [1] -
827:14
**parties** [4] - 830:15,
992:17, 1042:9,
1044:15
**partner** [5] - 879:10,
879:11, 954:25,
987:8, 1037:16
**partners** [9] - 830:11,
856:13, 879:20,
922:4, 965:16,
980:1, 997:25,
1035:23, 1037:18
**partnership** [2] -
987:7, 1037:10
**parts** [1] - 1049:16
**party** [1] - 992:15
**pass** [1] - 1005:1
**Passaic** [1] - 843:1
**passed** [1] - 947:22
**password** [35] -
798:16, 798:21,
799:15, 799:16,
799:18, 799:21,
824:1, 824:6, 824:8,
831:10, 831:18,
831:20, 831:23,
831:24, 843:8,
846:3, 853:14,
853:20, 853:21,
853:23, 853:24,
854:1, 854:4, 854:5,
854:7, 865:12,
865:14, 865:16,
865:18, 900:10,
900:15, 901:10
**Passwords** [1] -
827:24
**passwords** [7] -
796:15, 799:20,
824:4, 824:5, 828:4,
828:5, 830:11
**past** [5] - 807:10,
843:12, 933:4,
981:23, 982:21
**Pastry** [1] - 999:19
**Paul** [1] - 788:15
**Pause** [1] - 997:8
**pause** [8] - 798:12,
827:8, 867:11,
1013:19, 1028:17,
1035:22, 1051:8,
1055:19

**pay** [5] - 811:11,
958:7, 960:25,
977:6, 1009:20
**payable** [2] - 871:1,
893:7
**payables** [1] - 1006:20
**paycheck** [1] - 1013:5
**Paycheck** [3] - 970:16,
971:13, 973:1
**paying** [1] - 957:18
**payment** [6] - 834:22,
846:13, 899:4,
912:8, 912:9, 912:10
**payments** [4] -
898:22, 898:23,
975:21, 1009:16
**payroll** [67] - 795:12,
856:17, 856:18,
857:2, 857:9,
857:10, 857:22,
870:16, 874:7,
874:24, 874:25,
875:8, 875:9,
875:12, 875:15,
876:21, 892:6,
894:2, 895:5,
896:23, 898:13,
899:18, 899:20,
900:18, 901:22,
902:15, 903:20,
903:21, 905:16,
906:5, 906:9,
908:16, 909:3,
909:4, 909:9,
909:12, 909:15,
909:18, 909:20,
909:23, 910:14,
910:22, 916:24,
921:15, 952:14,
952:15, 966:15,
970:21, 971:22,
972:4, 972:10,
973:3, 974:3,
974:12, 975:1,
975:4, 975:9,
975:15, 1012:23,
1013:7, 1015:22,
1022:15, 1023:2
**Payroll** [2] - 857:13,
857:23
**payrolls** [8] - 875:10,
875:14, 891:10,
892:3, 905:16,
971:9, 973:15,
975:14
**PDF** [1] - 848:5
**PDFs** [1] - 847:21
**peg** [1] - 812:11
**Pelham** [4] - 936:7,
936:8, 936:10,

936:14
**penalties** [2] - 962:25,
963:8
**penalty** [6] - 960:18,
960:24, 963:11,
1026:5, 1026:9,
1034:25
**pendency** [2] - 982:8,
990:14
**Pennsylvania** [2] -
936:11, 937:23
**people** [23] - 791:25,
802:18, 822:8,
822:10, 823:14,
824:12, 832:2,
841:24, 851:17,
857:7, 861:12,
866:3, 868:23,
871:3, 871:13,
887:16, 916:12,
918:25, 926:22,
971:11, 982:7,
1036:16, 1043:4
**people's** [2] - 824:4,
824:5
**per** [6] - 831:18,
917:24, 954:4,
954:5, 954:6, 960:22
**percent** [2] - 963:11,
986:1
**percentage** [2] -
987:6, 1038:16
**perfect** [1] - 923:9
**Perfect** [1] - 923:10
**perform** [6] - 870:24,
965:23, 965:25,
971:4, 1005:14,
1023:1
**performed** [2] - 966:1,
1019:12
**performing** [2] -
795:24, 965:24
**perhaps** [4] - 836:7,
932:19, 960:24,
1055:5
**period** [13] - 795:23,
801:8, 801:11,
804:4, 805:4,
892:24, 909:16,
909:17, 910:15,
916:25, 926:17,
1012:8, 1019:10
**permit** [10] - 902:6,
902:7, 902:13,
902:17, 903:1,
903:4, 903:7,
903:22, 903:23,
906:4
**permitted** [1] - 792:7
**person** [8] - 802:8,

814:8, 826:16,
856:23, 875:12,
881:21, 931:22,
954:21
**personal** [9] - 828:3,
829:4, 829:19,
832:3, 866:10,
866:11, 873:24,
912:15, 951:4
**pertain** [1] - 1003:20
**Petroleum** [3] -
994:21, 994:22,
994:25
**ph** [3] - 884:12, 951:8,
974:18
**ph)** [2] - 877:5, 904:5
**phased** [1] - 939:13
**Philip** [1] - 788:13
**phone** [4] - 801:15,
865:23, 934:16,
979:23
**phrase** [1] - 809:16
**phrasing** [1] - 1053:3
**physical** [4] - 852:24,
853:2, 868:14,
1023:11
**physically** [2] -
852:24, 867:24
**pick** [1] - 817:4
**picked** [1] - 962:19
**picking** [1] - 807:1
**picture** [1] - 993:15
**pictures** [1] - 858:22
**piece** [1] - 802:11
**PIN** [1] - 900:10
**Pitkin** [1] - 998:17
**place** [8] - 812:20,
868:1, 901:23,
901:24, 929:13,
952:9, 1035:9
**placed** [1] - 843:24
**places** [1] - 867:25
**Plainfield** [4] - 810:21,
826:8, 826:11,
1026:25
**plaintiff** [9] - 790:9,
794:20, 799:25,
1006:2, 1010:8,
1013:11, 1046:2,
1051:15, 1054:17
**Plaintiff** [2] - 788:4,
788:13
**Plaintiff's** [3] -
793:15, 793:16,
797:2, 800:1, 810:7,
823:17, 834:13,
834:15, 837:2,
846:8, 852:7, 859:4,
1023:15
**plaintiff's** [3] - 834:14,

834:19, 1042:5
**plaintiffs** [1] - 832:25
**plan** [1] - 868:15
**played** [1] - 996:5
**players** [1] - 997:2
**Plaza** [1] - 788:24
**plug** [3] - 844:7,
844:10, 1017:3
**plugged** [7] - 819:4,
819:6, 838:23,
838:24, 838:25,
840:2, 842:22
**plugging** [1] - 864:21
**point** [16] - 854:16,
859:12, 859:18,
861:24, 871:6,
871:7, 922:17,
922:19, 952:10,
955:10, 975:22,
1012:14, 1022:3,
1022:17, 1049:14,
1054:25
**policy** [1] - 916:25
**POP** [2] - 849:3,
849:16
**populated** [2] -
1011:10, 1033:18
**populating** [1] -
1012:5
**Port** [3] - 941:6, 941:7,
942:1
**portion** [1] - 1054:19
**pose** [1] - 1012:10
**position** [4] - 885:3,
993:11, 1042:5,
1053:7
**possession** [4] -
791:12, 810:24,
898:10, 1023:9
**possible** [14] - 822:6,
822:18, 822:22,
825:9, 843:13,
857:21, 864:10,
880:25, 939:23,
943:19, 943:21,
958:2, 958:6, 992:10
**possibly** [1] - 959:9
**postponed** [1] -
1029:1
**power** [2] - 1035:24,
1036:2
**practice** [2] - 866:15,
957:22
**precede** [2] - 909:1,
968:5
**precedes** [1] - 968:16
**preclude** [1] - 1041:17
**preexist** [1] - 922:9
**prefix** [1] - 1052:6
**prejudice** [1] - 791:3

*Schreiber v. Friedman, Et Al   15-CV-6861      8/2/16* _____ 23

**preliminary** [4] - 792:9, 982:25, 1042:8, 1042:22
**premiums** [1] - 917:5
**preparation** [3] - 998:9, 998:18, 1007:2
**prepare** [31] - 854:23, 870:16, 870:18, 891:15, 896:24, 897:16, 912:17, 953:22, 956:4, 966:4, 967:20, 968:21, 971:5, 974:3, 1015:19, 1017:12, 1018:14, 1019:24, 1020:3, 1020:12, 1026:19, 1027:14, 1030:6, 1030:13, 1030:21, 1031:1, 1031:9, 1031:14, 1035:15, 1039:8
**prepared** [23] - 854:19, 889:19, 896:23, 910:12, 915:19, 956:11, 963:19, 967:23, 968:2, 971:15, 1015:13, 1016:13, 1016:17, 1019:21, 1020:1, 1020:18, 1021:5, 1021:24, 1025:9, 1032:9, 1032:14, 1032:16, 1035:12
**prepares** [1] - 873:24
**preparing** [5] - 870:20, 963:18, 1016:25, 1017:8, 1020:6
**present** [4] - 937:19, 939:9, 946:5, 1042:23
**Presently** [1] - 988:21
**presently** [2] - 946:18, 988:22
**preserving** [1] - 833:25
**president** [5] - 924:25, 936:12, 937:8, 937:11, 937:17
**press** [1] - 975:6
**pretty** [3] - 849:6, 997:5, 1029:12
**prevent** [1] - 792:7
**previous** [5] - 858:23, 926:22, 967:10, 968:19, 1043:25
**previously** [11] -

793:10, 798:22, 813:18, 815:3, 893:2, 897:5, 905:9, 993:5, 1046:7, 1046:16, 1048:22
**primarily** [1] - 803:17
**primary** [1] - 955:10
**principals** [1] - 830:19
**print** [8] - 856:10, 856:14, 862:11, 862:15, 864:9, 892:6, 975:5, 975:11
**printed** [8] - 801:8, 861:13, 861:14, 862:4, 862:5, 956:24, 969:15
**printer** [3] - 794:21, 800:22, 801:9
**printing** [5] - 795:3, 856:5, 856:6, 856:7, 856:10
**private** [2] - 814:17, 866:4
**privileged** [5] - 790:10, 790:12, 790:13, 790:21, 791:6
**pro** [1] - 873:22
**Pro** [1] - 873:23
**problem** [15] - 791:7, 866:21, 932:13, 993:8, 1013:16, 1024:4, 1024:6, 1047:4, 1047:21, 1047:24, 1048:9, 1048:17, 1051:1, 1051:4, 1052:3
**problems** [4] - 790:16, 791:18, 791:19, 983:6
**procedure** [1] - 917:16
**proceeding** [1] - 833:18
**proceedings** [7] - 827:8, 836:21, 935:12, 1013:19, 1028:17, 1051:8, 1055:19
**Proceedings** [1] - 788:21
**process** [8] - 848:9, 875:10, 875:14, 898:25, 899:25, 952:3, 952:8, 1012:5
**processed** [2] - 901:20, 1013:2
**produce** [25] - 823:2, 872:3, 872:7, 872:21, 874:3, 874:13, 874:19,

876:16, 889:14, 889:23, 890:11, 891:12, 892:4, 893:13, 894:11, 894:14, 895:12, 967:5, 973:1, 1034:2, 1051:18, 1053:1, 1053:7, 1054:3, 1054:18
**produced** [41] - 788:21, 871:25, 872:5, 872:16, 872:20, 874:16, 889:13, 891:7, 891:8, 891:19, 893:15, 893:23, 896:12, 902:22, 905:9, 905:12, 905:18, 905:19, 905:23, 910:20, 918:6, 918:8, 970:2, 973:7, 1028:9, 1028:12, 1045:7, 1046:1, 1046:6, 1046:7, 1046:17, 1046:21, 1047:1, 1047:17, 1048:22, 1049:12, 1049:15, 1051:14, 1051:21, 1052:14, 1053:19
**produces** [1] - 874:9
**producing** [3] - 1020:8, 1045:8, 1047:13
**Product** [1] - 999:19
**product** [1] - 1034:15
**production** [6] - 911:10, 1034:9, 1043:25, 1048:13, 1048:25, 1050:21
**productions** [1] - 1048:25
**profession** [1] - 869:21
**proffer** [1] - 981:16
**program** [41] - 796:11, 796:12, 796:13, 796:14, 796:16, 796:18, 796:24, 796:25, 807:6, 811:7, 817:16, 821:20, 822:11, 823:7, 841:14, 841:19, 844:17, 845:12, 849:5, 851:9, 852:3, 853:22, 856:24, 863:11, 863:13, 865:1, 865:6, 873:24, 874:5,

875:25, 876:4, 876:8, 876:10, 971:7, 971:22, 972:14, 1011:4, 1033:18, 1033:19
**programs** [9] - 804:11, 805:17, 841:13, 841:17, 843:10, 860:3, 866:18, 873:20, 970:23
**proper** [1] - 855:12
**properly** [4] - 800:22, 898:14, 1019:14, 1024:8
**property** [6] - 982:9, 988:19, 989:14, 989:16, 990:22, 1037:1
**protective** [1] - 791:2
**protocol** [1] - 849:4
**provide** [29] - 790:20, 872:9, 876:19, 877:15, 878:14, 880:3, 880:7, 880:19, 885:3, 889:16, 899:10, 917:8, 951:5, 958:14, 966:22, 966:25, 974:2, 974:6, 976:10, 1006:7, 1008:23, 1010:23, 1016:7, 1036:20, 1037:23, 1038:4, 1039:17
**provided** [70] - 790:12, 823:20, 843:9, 844:20, 872:8, 872:11, 875:21, 875:24, 876:1, 876:16, 877:3, 877:20, 891:22, 892:7, 897:12, 897:14, 897:15, 900:17, 900:19, 901:14, 901:15, 905:6, 905:7, 905:25, 911:9, 916:3, 916:14, 916:23, 947:10, 950:13, 956:3, 964:4, 967:1, 967:6, 967:10, 967:11, 967:12, 968:20, 969:3, 969:7, 969:10, 969:17, 970:13, 973:8, 973:15, 973:17, 975:15, 977:2, 977:3, 977:11, 977:15,

977:18, 977:24, 978:1, 978:16, 978:17, 993:17, 1007:9, 1009:24, 1011:24, 1013:11, 1017:2, 1019:8, 1023:5, 1033:20, 1034:18, 1035:10, 1035:14, 1039:25, 1054:17
**providing** [8] - 891:24, 897:13, 932:14, 949:13, 993:16, 1007:11, 1051:4
**provision** [1] - 964:16
**provisions** [1] - 1035:20
**public** [3] - 942:21, 942:22, 1038:12
**pulled** [5] - 1045:19, 1045:20, 1045:21, 1047:13
**pulls** [3] - 848:3, 848:4, 857:12
**punched** [1] - 1011:12
**purchase** [1] - 989:24
**purchased** [7] - 886:24, 887:4, 887:5, 888:5, 926:18, 937:14, 937:21
**Puritan** [1] - 869:20
**purport** [1] - 1010:17
**purported** [1] - 1048:5
**purports** [2] - 835:7, 1010:14
**purpose** [8] - 803:1, 804:5, 882:18, 983:2, 1005:17, 1005:18, 1007:19, 1010:3
**purposes** [9] - 910:24, 941:19, 982:24, 999:3, 1016:24, 1017:8, 1026:14, 1027:10, 1036:25
**pursuant** [1] - 1015:9
**push** [1] - 1013:8
**put** [22] - 791:13, 802:12, 823:1, 836:2, 845:7, 863:5, 868:23, 889:4, 892:7, 900:14, 905:5, 967:8, 969:11, 969:21, 972:11, 972:17, 981:24, 982:8, 1034:1, 1045:14, 1051:16
**putting** [6] - 812:12,

827:14, 831:7,
838:2, 1025:7,
1048:14
**puzzlement** [1] -
1041:24

## Q

**qualifies** [1] - 1049:11
**quality** [2] - 811:17,
812:9
**quarterly** [9] - 874:9,
877:13, 896:23,
903:21, 921:14,
974:3, 974:12,
974:16
**questionable** [1] -
833:17
**questioned** [1] -
841:24
**questioning** [4] -
832:9, 933:6,
1025:14, 1027:8
**questions** [36] - 798:4,
801:2, 820:22,
820:25, 848:15,
848:17, 850:2,
852:18, 852:20,
866:6, 870:17,
870:18, 872:18,
911:25, 913:10,
913:12, 925:19,
936:2, 955:15,
955:20, 956:1,
956:2, 988:11,
1005:3, 1009:6,
1009:7, 1009:8,
1012:10, 1014:2,
1014:3, 1014:5,
1014:14, 1029:17,
1032:1, 1033:4,
1038:13
**quibbling** [1] - 1050:5
**QuickBooks** [38] -
794:12, 796:7,
796:9, 796:17,
796:23, 811:9,
811:10, 811:13,
812:13, 812:17,
812:21, 813:1,
817:14, 817:16,
864:18, 876:6,
895:1, 895:2, 895:3,
895:5, 972:4, 972:5,
972:9, 976:11,
976:12, 976:13,
1011:9, 1011:10,
1012:6, 1012:15,
1012:18, 1017:6,
1017:18, 1019:1,

1027:13, 1033:18,
1034:1, 1039:4
**quite** [3] - 840:23,
894:21, 913:2
**quote** [3] - 800:5,
1051:25, 1052:22

## R

**raise** [7] - 869:10,
907:5, 1041:19,
1041:25, 1042:1,
1042:2, 1042:3
**raised** [1] - 829:15
**raising** [1] - 828:2
**randomly** [1] -
1043:17
**range** [6] - 1044:6,
1045:16, 1050:14,
1051:19, 1052:4,
1052:5
**ranges** [4] - 1051:1,
1052:4, 1052:6,
1052:7
**ranging** [1] - 1043:12
**rarely** [1] - 1033:14
**rate** [4] - 958:20,
964:24, 964:25,
965:12
**rates** [1] - 964:5
**rather** [3] - 969:22,
1020:25, 1025:4
**rationale** [1] - 992:24
**read** [4] - 810:12,
1015:7, 1037:22,
1038:3
**reading** [1] - 987:17
**ready** [2] - 790:1,
1054:18
**real** [11] - 806:15,
806:19, 806:21,
807:5, 807:6, 807:7,
886:17, 886:20,
990:21, 1001:3
**realize** [1] - 837:18
**really** [17] - 795:11,
795:12, 795:13,
795:15, 795:20,
795:21, 805:15,
841:12, 861:15,
864:20, 865:14,
875:18, 932:25,
933:3, 950:15,
1029:9, 1047:16
**realtime** [1] - 1009:4
**Realty** [19] - 789:6,
884:7, 928:22,
988:18, 989:9,
989:14, 990:3,
992:6, 994:9,

994:15, 994:18,
994:24, 995:14,
998:22, 999:5,
999:7, 999:23,
1000:12, 1031:11
**reason** [10] - 831:21,
832:1, 835:13,
844:10, 845:7,
896:13, 962:15,
977:3, 1051:16,
1055:23
**reasonably** [1] -
840:24
**rebuild** [1] - 795:2
**recalled** [1] - 1015:8
**receipt** [3] - 834:22,
846:13, 889:25
**receivable** [4] - 871:1,
893:7, 897:4,
1007:22
**receivables** [1] -
1006:20
**receive** [13] - 871:2,
871:5, 871:9,
871:11, 898:18,
958:17, 970:7,
998:9, 998:18,
998:21, 1022:25,
1024:8, 1038:21
**received** [23] - 812:18,
870:25, 871:3,
871:12, 871:15,
871:19, 871:20,
872:13, 889:25,
893:6, 897:18,
912:22, 953:7,
953:10, 970:15,
1028:5, 1054:4,
1054:6, 1054:17,
1054:24
**receiving** [4] - 893:6,
963:19, 1024:7,
1036:14
**recently** [4] - 847:11,
857:8, 891:7, 966:11
**recess** [2] - 836:21,
935:12
**Recess** [3] - 906:17,
950:18, 973:23
**recharacterization** [1]
- 1007:15
**reclassifying** [1] -
1009:18
**recognize** [3] -
799:18, 852:11,
1015:2
**recollection** [5] -
799:19, 813:20,
910:2, 1025:21,
1041:25

**reconcile** [1] - 896:15
**Reconciliation** [2] -
913:24, 914:3
**reconciliation** [3] -
914:11, 915:1, 915:2
**reconciling** [1] -
914:13
**reconvene** [1] -
906:16
**record** [21] - 792:5,
792:10, 801:3,
805:12, 833:25,
844:24, 844:25,
845:1, 845:3, 845:5,
873:16, 897:23,
909:4, 961:24,
978:9, 981:19,
1039:14, 1047:11,
1052:22, 1053:12,
1053:13
**recorded** [3] - 901:10,
912:25, 979:18
**records** [118] - 819:18,
870:20, 872:16,
872:20, 881:8,
889:23, 890:14,
890:15, 891:2,
891:19, 891:21,
891:25, 892:4,
892:18, 893:20,
894:16, 894:23,
894:25, 895:22,
897:5, 899:19,
901:5, 901:17,
901:22, 901:24,
902:3, 902:8,
902:19, 903:2,
903:15, 903:18,
903:19, 905:9,
906:5, 906:7, 906:9,
907:25, 908:5,
908:16, 909:3,
909:12, 909:15,
910:19, 910:22,
916:1, 918:4, 921:9,
921:10, 925:20,
925:22, 935:7,
946:7, 952:23,
958:9, 958:14,
959:11, 959:16,
961:20, 961:23,
963:14, 963:16,
965:12, 966:15,
966:16, 966:19,
968:19, 973:2,
973:3, 975:9,
975:11, 975:15,
977:13, 978:4,
979:12, 979:15,
1002:18, 1003:18,

1003:20, 1003:22,
1003:24, 1006:7,
1006:18, 1007:16,
1007:21, 1007:24,
1010:8, 1026:18,
1026:21, 1034:2,
1043:13, 1043:16,
1044:19, 1045:9,
1045:24, 1046:3,
1046:8, 1046:10,
1046:16, 1046:17,
1046:24, 1047:2,
1047:6, 1047:9,
1047:23, 1048:5,
1048:11, 1049:9,
1049:11, 1049:16,
1050:2, 1052:1,
1053:3, 1053:8,
1053:9, 1053:14,
1054:11
**recreate** [1] - 975:9
**recs** [1] - 905:15
**redid** [1] - 870:22
**redirect** [4] - 850:3,
970:1, 1012:2,
1033:6
**REDIRECT** [4] - 850:4,
1033:7, 1057:14,
1058:7
**redirected** [1] - 953:20
**redoubled** [1] -
1052:19
**refer** [2] - 794:16,
1054:13
**reference** [5] - 795:9,
795:16, 798:15,
810:19, 846:14
**referenced** [2] - 841:9,
895:11
**references** [2] -
857:24, 883:10
**referred** [4] - 839:16,
905:3, 997:15,
1051:25
**referring** [27] - 800:5,
810:17, 810:20,
813:22, 815:5,
815:12, 818:14,
819:4, 819:10,
822:8, 824:21,
838:16, 864:19,
867:21, 876:8,
879:24, 880:21,
910:25, 911:14,
939:1, 946:9,
977:19, 1015:3,
1015:8, 1040:14,
1040:23
**reflected** [1] - 898:6
**refresh** [1] - 813:20

**refreshing** [1] - 1000:2
**refuse** [1] - 1006:7
**regard** [1] - 1018:22
**regarding** [11] -
810:22, 812:9,
833:1, 847:14,
855:18, 871:6,
927:2, 989:13,
1018:6, 1018:11
**regardless** [3] - 803:6,
823:9, 1035:16
**register** [2] - 849:2,
915:9
**Register** [1] - 914:1
**registrations** [1] -
936:17
**regular** [3] - 866:4,
957:22, 1010:21
**regularity** [1] - 802:22
**regulates** [1] - 1042:8
**reimbursement** [2] -
1009:19, 1010:10
**reinstitute** [1] - 1042:4
**rejoin** [1] - 1029:7
**relate** [8] - 895:20,
895:25, 899:19,
901:5, 929:16,
941:23, 1010:3,
1053:9
**related** [26] - 806:11,
806:18, 830:8,
830:15, 895:3,
895:8, 896:10,
912:19, 917:6,
919:4, 926:16,
928:11, 932:11,
932:21, 943:22,
955:22, 955:25,
961:20, 963:14,
977:8, 977:13,
989:14, 989:16,
990:5, 1002:13
**relates** [3] - 882:18,
926:25, 1010:5
**relating** [1] - 818:12
**relationship** [19] -
877:21, 880:21,
883:6, 887:16,
888:7, 920:5, 920:8,
929:17, 929:23,
930:6, 932:5, 935:1,
942:3, 946:5,
946:20, 988:13,
994:17, 996:4,
1001:23
**relationships** [5] -
982:20, 985:4,
993:9, 997:1, 997:3
**relative** [5] - 918:14,
919:8, 919:22,

920:4, 920:7
**relatives** [4] - 918:13,
918:18, 918:19,
919:12
**relevance** [6] - 887:13,
925:15, 981:1,
989:17, 990:7,
992:20
**relevancy** [1] - 887:12,
932:9
**relevant** [4] - 816:24,
852:11, 925:17,
926:8, 985:2, 992:18
**relied** [3] - 892:17,
1017:20, 1033:20
**rely** [1] - 1007:9
**relying** [2] - 1017:23,
1027:10
**remain** [1] - 848:6
**remaining** [1] -
1046:12
**remains** [3] - 823:9,
845:12, 845:14
**remedial** [1] - 932:16
**remedy** [1] - 976:22
**remember** [80] -
793:19, 794:19,
794:25, 800:15,
803:25, 804:14,
813:14, 835:15,
837:25, 840:7,
840:8, 841:15,
841:23, 842:10,
843:7, 854:21,
854:22, 854:23,
872:5, 875:5,
881:20, 888:2,
892:13, 892:14,
892:22, 903:10,
903:12, 909:25,
912:14, 922:23,
923:12, 923:14,
923:23, 926:21,
938:11, 942:13,
944:1, 947:4, 947:9,
950:2, 961:9,
961:10, 961:14,
962:7, 962:9, 963:8,
965:19, 966:7,
970:3, 979:13,
979:14, 979:20,
979:22, 979:25,
980:10, 980:16,
980:18, 985:10,
986:11, 986:18,
986:20, 986:21,
986:23, 991:17,
991:18, 992:7,
992:8, 994:20,
995:4, 996:2,

996:18, 996:24,
1000:13, 1001:25,
1019:18, 1025:2,
1028:4, 1028:5,
1039:23, 1041:22
**remote** [2] - 814:20,
819:18
**Remote** [2] - 814:22,
819:17
**remotely** [4] - 810:9,
810:16, 826:7,
857:20
**removal** [2] - 830:10,
830:15
**remove** [6] - 822:16,
830:8, 830:9,
844:19, 850:14,
1035:23
**removed** [9] - 797:7,
815:6, 815:11,
818:24, 818:25,
820:4, 900:6, 982:9,
1043:17
**render** [1] - 1022:11
**rent** [1] - 989:10
**repeat** [2] - 946:12,
967:13
**Repeat** [1] - 985:17
**repeatedly** [1] -
807:16
**repetitive** [2] - 915:15,
967:18
**replaced** [1] - 1036:13
**replicate** [1] - 867:14
**replugged** [1] - 858:8
**Report** [1] - 913:24
**report** [28] - 790:17,
876:12, 876:15,
876:16, 876:21,
900:23, 912:13,
914:12, 914:14,
914:22, 915:2,
915:3, 915:16,
915:19, 917:2,
921:15, 959:10,
960:5, 960:8, 961:1,
971:2, 971:10,
971:19, 973:4,
974:12, 974:13,
975:23
**reported** [8] - 788:21,
912:8, 912:12,
912:20, 912:23,
948:11, 954:24,
974:16
**Reporter** [2] - 788:23,
788:23
**reporting** [1] - 975:4
**reports** [20] - 851:20,
874:10, 876:12,

877:11, 877:13,
877:14, 902:14,
902:15, 903:21,
914:7, 914:18,
965:16, 966:2,
966:4, 971:7, 974:4,
1007:6, 1011:7,
1012:23
**repository** [1] - 903:17
**represent** [2] - 872:13,
897:23
**representations** [1] -
872:17
**represented** [8] -
895:11, 907:24,
1045:23, 1046:1,
1046:7, 1046:9,
1046:16, 1047:23
**represents** [2] -
907:22, 1044:16
**reproduce** [1] - 1052:5
**reproduced** [1] -
1053:1
**request** [10] - 790:25,
791:1, 812:13,
864:23, 905:1,
916:12, 917:4,
971:20, 1009:12,
1054:2
**requested** [9] -
893:19, 916:24,
917:3, 917:20,
954:9, 963:24,
971:6, 1022:15,
1051:23
**requesting** [1] -
956:19
**requests** [1] - 964:13
**require** [8] - 912:7,
932:23, 948:13,
953:14, 965:5,
972:6, 1037:18
**required** [11] - 932:14,
950:2, 961:24,
965:15, 965:22,
974:16, 974:17,
1008:23, 1017:7,
1053:7, 1054:10
**requirements** [3] -
902:16, 903:14,
903:18
**requires** [4] - 901:21,
902:7, 960:24,
1055:9
**research** [1] - 805:23
**resend** [2] - 849:18,
850:14
**resent** [2] - 849:20,
850:10
**residence** [7] -

945:13, 953:5,
1023:24, 1024:2,
1024:14, 1025:8
**residential** [3] -
930:17, 930:20,
934:2
**resign** [1] - 1022:5
**resigned** [4] - 901:16,
1022:3, 1022:8,
1027:17
**resolve** [1] - 1042:24
**resolved** [1] - 953:16
**respect** [15] - 790:4,
813:17, 852:6,
864:23, 903:19,
904:8, 939:25,
951:8, 976:25,
1020:13, 1020:19,
1030:3, 1030:10,
1039:19, 1042:25
**respond** [5] - 792:23,
1040:22, 1050:8,
1050:9, 1050:10
**responded** [2] -
847:11, 864:23
**response** [6] - 823:22,
850:6, 998:23,
1028:3, 1036:18,
1051:2
**responsibilities** [1] -
1042:9
**responsible** [5] -
845:20, 960:25,
962:25, 993:13,
993:16
**responsive** [1] -
919:16
**rest** [2] - 810:13, 966:1
**restaurant** [1] - 882:10
**resting** [1] - 1056:10
**restraining** [4] -
991:22, 991:24,
992:2, 992:5
**restrictions** [2] -
990:17, 990:20
**restroom** [1] - 935:14
**result** [1] - 1026:5
**resulted** [1] - 1034:25
**resume** [1] - 1029:6
**resumes** [1] - 793:9
**retail** [1] - 933:18
**retain** [2] - 926:23,
970:10
**retained** [11] - 871:21,
871:23, 893:9,
915:7, 916:14,
956:16, 961:24,
962:1, 962:3,
977:13, 1015:9
**retainer** [1] - 963:25

*Schreiber v. Friedman, Et Al*   15-CV-6861      8/2/16 _____ 26

**retaining** [1] - 903:2
**return** [28] - 874:2, 889:2, 889:5, 890:2, 890:17, 890:19, 897:10, 947:7, 948:11, 952:14, 955:15, 956:1, 956:4, 956:7, 979:21, 998:10, 998:19, 1000:14, 1003:17, 1017:3, 1018:14, 1027:11, 1030:6, 1031:22, 1032:9, 1039:12, 1039:14, 1043:19
**returns** [44] - 870:16, 870:17, 870:19, 873:25, 889:12, 889:17, 894:9, 896:23, 897:16, 910:11, 912:17, 951:7, 955:21, 978:17, 1003:2, 1003:6, 1003:19, 1006:1, 1007:2, 1008:25, 1009:4, 1010:20, 1010:23, 1015:14, 1015:19, 1016:25, 1017:9, 1022:16, 1023:8, 1023:10, 1023:14, 1030:13, 1030:21, 1031:1, 1031:9, 1031:14, 1032:14, 1032:17, 1039:8, 1039:9, 1039:11, 1039:19, 1039:20, 1039:22
**review** [23] - 790:21, 810:1, 866:18, 867:8, 892:20, 896:17, 896:19, 897:13, 904:22, 905:2, 906:1, 913:7, 1006:10, 1006:14, 1006:16, 1006:17, 1006:23, 1008:5, 1008:18, 1043:14, 1047:10, 1054:19, 1055:5
**reviewed** [1] - 956:7
**rhetorical** [1] - 854:16
**Richard** [8] - 789:9, 789:12, 881:23, 881:25, 882:2, 882:4, 882:7, 990:21
**Ridge** [1] - 1031:11
**rights** [1] - 1042:8
**ringing** [1] - 994:16
**Rivera** [19] - 789:9,

813:18, 815:3, 815:9, 818:10, 818:11, 818:23, 818:25, 820:1, 820:4, 838:22, 838:25, 857:3, 861:4, 861:6, 888:10, 920:17, 944:8, 944:11
**Rivera's** [9] - 807:19, 807:20, 813:13, 813:23, 814:2, 817:9, 817:24, 818:4, 818:8
**rivers** [3] - 866:5, 870:6, 870:11
**Rivers** [148] - 789:20, 795:24, 797:8, 797:17, 813:2, 818:12, 819:1, 819:24, 820:11, 820:12, 821:10, 821:16, 821:19, 822:7, 822:23, 827:16, 838:18, 840:2, 840:13, 841:25, 842:4, 843:10, 848:10, 853:13, 858:6, 870:13, 870:15, 870:24, 872:1, 872:7, 872:25, 873:3, 876:4, 876:17, 877:10, 877:19, 885:4, 888:15, 888:25, 889:6, 891:2, 891:8, 891:10, 892:5, 892:8, 893:22, 893:25, 894:6, 895:3, 895:8, 895:20, 895:25, 896:11, 896:22, 897:15, 898:3, 898:14, 898:23, 899:9, 899:17, 900:1, 900:12, 904:8, 904:18, 904:23, 905:15, 907:12, 908:5, 910:20, 912:19, 912:22, 913:1, 916:19, 917:18, 921:16, 921:18, 923:22, 923:25, 947:13, 947:15, 947:18, 947:24, 948:12, 953:1, 953:22, 954:13, 954:25, 955:25, 956:11, 958:7,

963:17, 963:21, 963:22, 964:10, 965:13, 966:18, 967:21, 971:24, 972:23, 973:10, 974:2, 974:19, 975:21, 976:14, 976:20, 977:15, 977:24, 978:7, 978:11, 978:16, 979:2, 1005:11, 1007:15, 1008:16, 1010:9, 1011:7, 1011:11, 1011:18, 1015:20, 1017:9, 1018:12, 1019:11, 1019:12, 1019:13, 1021:25, 1022:12, 1022:23, 1023:10, 1023:20, 1024:3, 1025:4, 1025:5, 1025:8, 1025:10, 1026:15, 1026:23, 1040:5, 1040:7, 1040:8, 1042:14, 1044:17, 1045:4, 1045:5, 1050:22, 1053:9, 1054:11, 1055:24
**Rivers'** [13] - 810:9, 810:10, 810:15, 814:4, 814:5, 814:10, 815:20, 819:16, 821:4, 821:12, 916:16, 1006:10, 1007:16
**Rivers's** [9] - 893:11, 893:15, 895:13, 900:7, 901:24, 972:20, 976:25, 978:23, 1042:6
**Road** [1] - 887:4
**Robert** [6] - 879:8, 922:14, 979:7, 1005:6, 1005:7, 1018:4
**Rogos** [1] - 827:10
**Rogosnitzky** [8] - 810:25, 811:4, 826:11, 827:16, 828:1, 833:13, 857:20, 865:22
**role** [1] - 883:4, 916:16, 917:2, 922:7, 951:3, 951:9, 996:5
**Room** [1] - 788:24
**room** [1] - 792:1
**Rothenberg** [1] - 904:5

**roughly** [4] - 856:23, 949:2, 954:12, 1045:16
**round** [2] - 848:17, 918:10
**routed** [1] - 840:12
**router** [13] - 816:2, 816:17, 837:6, 837:8, 837:9, 838:5, 838:7, 842:22, 842:23, 842:24, 855:19, 855:21
**routing** [1] - 900:19
**row** [1] - 1045:15
**rules** [1] - 1037:10
**ruling** [3] - 791:15, 833:15, 833:16
**run** [1] - 981:4
**running** [3] - 791:20, 986:6, 986:13
**runs** [2] - 867:20, 868:15

## S

**Sabbath** [1] - 801:20
**safe** [2] - 814:24, 817:22
**Saint** [1] - 999:9
**salaries** [4] - 876:14, 876:24, 971:4, 974:8
**salary** [4] - 971:21, 971:22, 972:13, 972:17
**Salcedo** [6] - 789:9, 797:7, 887:19, 920:23, 1055:12, 1056:9
**sale** [3] - 870:19, 927:3, 927:5
**Sale** [1] - 942:14
**sales** [3] - 916:25, 917:9, 938:20
**Sammet** [1] - 979:9
**sanctions** [2] - 908:8, 908:10
**Sandberg** [2] - 921:6, 1001:8
**Sanders** [1] - 919:1
**sanders** [2] - 919:4
**Sandra** [2] - 824:7, 824:13
**sat** [1] - 819:11
**Sava** [6] - 877:4, 877:6, 877:9, 892:5, 904:4, 974:18
**save** [16] - 822:15, 844:19, 845:5, 858:17, 858:18, 874:14, 880:2,

901:8, 901:10, 956:22, 957:3, 957:10, 968:4, 968:12, 968:16
**saved** [4] - 874:17, 957:5, 957:15, 958:3
**saw** [8] - 790:16, 801:16, 841:19, 857:15, 857:18, 923:24, 954:5
**scanned** [1] - 957:7
**Schafhauser** [7] - 788:15, 791:23, 833:16, 836:23, 847:1, 1041:19, 1041:21
**SCHAFHAUSER** [71] - 790:2, 792:4, 792:13, 792:15, 792:19, 792:23, 793:8, 793:13, 798:5, 798:10, 800:24, 801:6, 804:23, 806:25, 821:2, 827:3, 827:6, 829:2, 829:11, 831:3, 831:5, 834:4, 834:8, 836:6, 836:10, 836:19, 836:25, 841:3, 855:13, 882:17, 895:15, 911:5, 925:15, 926:9, 927:21, 935:14, 937:25, 981:1, 987:2, 990:7, 992:14, 992:19, 992:22, 993:1, 993:4, 993:19, 1014:16, 1014:18, 1021:16, 1028:14, 1028:18, 1038:19, 1041:22, 1041:24, 1042:10, 1042:15, 1042:17, 1042:19, 1049:20, 1049:25, 1050:3, 1050:5, 1050:8, 1051:6, 1051:9, 1052:9, 1052:12, 1055:2, 1056:7, 1057:7, 1058:2
**SCHREIBER** [1] - 788:3
**Schreiber** [41] - 795:13, 796:23, 797:3, 797:6, 823:23, 835:7, 835:11, 835:19, 842:12, 845:22,

846:19, 852:9,
871:4, 903:11,
955:8, 955:9,
955:13, 955:14,
955:16, 1006:2,
1008:8, 1008:9,
1008:22, 1009:1,
1009:2, 1009:16,
1010:1, 1010:20,
1016:18, 1016:19,
1022:23, 1024:11,
1024:13, 1024:20,
1024:21, 1024:23,
1024:25, 1035:1,
1056:4, 1056:10
**Schreiber's** [4] -
795:10, 795:16,
1009:11, 1010:11
**scope** [7] - 925:16,
965:9, 1038:19,
1038:20, 1038:23,
1039:3, 1040:10
**scratch** [2] - 980:9,
980:10
**screen** [2] - 804:12,
819:13
**search** [6] - 802:9,
805:25, 806:4,
807:8, 891:18, 892:5
**searched** [2] - 891:16,
967:21
**searches** [2] - 804:13,
806:23
**seat** [3] - 792:22,
869:14, 985:6
**second** [16] - 793:17,
798:14, 799:13,
800:9, 828:1, 838:7,
838:9, 838:20,
839:16, 887:2,
968:23, 969:2,
969:11, 969:13,
1023:18
**seconds** [2] - 827:3,
1051:7
**Section** [3] - 1015:5,
1015:12, 1015:25
**Security** [5] - 876:24,
974:9, 974:14,
974:19, 974:22
**security** [1] - 828:2
**see** [87] - 794:7, 795:9,
795:16, 797:9,
798:19, 798:25,
799:1, 799:6,
799:16, 805:17,
806:7, 806:10,
806:15, 807:4,
807:7, 812:7,
813:18, 814:6,

816:6, 823:8,
823:23, 824:9,
825:23, 827:10,
827:18, 827:21,
827:24, 828:6,
830:12, 834:17,
834:24, 835:4,
835:9, 835:15,
836:8, 844:2, 844:5,
849:13, 850:11,
858:20, 858:21,
858:23, 859:14,
860:11, 861:2,
861:9, 861:15,
861:17, 862:16,
862:17, 863:9,
869:1, 873:15,
876:21, 877:19,
901:6, 904:22,
905:3, 911:8,
911:24, 912:1,
913:21, 932:12,
935:7, 938:25,
947:7, 957:24,
958:24, 959:2,
959:5, 959:19,
968:4, 968:16,
970:11, 1002:22,
1016:5, 1019:22,
1021:9, 1021:22,
1022:1, 1023:19,
1036:23, 1046:13,
1047:25, 1056:15
**seeing** [3] - 891:23,
947:4, 1041:24
**seeking** [2] - 1010:11,
1012:10
**seem** [3] - 950:8,
993:11, 1040:3
**sees** [1] - 817:20
**sell** [6] - 882:9,
930:17, 930:20,
934:25, 1005:18,
1005:20
**selling** [2] - 882:8,
952:4
**send** [14] - 792:24,
846:7, 848:21,
849:1, 876:20,
914:16, 915:5,
915:23, 966:11,
966:21, 979:24,
1009:1, 1052:23,
1053:21
**sense** [3] - 833:19,
913:6, 1028:20
**sensitive** [1] - 1006:19
**sent** [39] - 801:9,
848:22, 849:8,
849:9, 849:13,

849:21, 849:22,
849:24, 849:25,
850:11, 877:4,
891:10, 907:15,
908:15, 914:2,
914:24, 915:12,
915:24, 916:3,
953:7, 953:16,
956:9, 956:17,
956:18, 956:23,
956:24, 956:25,
957:1, 957:4,
966:23, 976:21,
978:4, 978:7,
978:10, 978:15,
1011:7, 1043:11,
1045:6
**sentence** [2] - 823:19,
1036:12
**Separate** [1] - 830:9
**separate** [20] - 818:18,
818:20, 819:8,
838:4, 838:5,
838:20, 839:12,
850:25, 861:12,
929:15, 930:22,
944:23, 945:4,
945:5, 945:7, 945:8,
1017:7, 1040:12,
1040:16, 1050:14
**September** [2] - 910:4,
1015:21
**sequence** [6] - 825:3,
825:13, 825:14,
825:21, 825:24,
865:15
**Series** [2] - 873:22,
873:23
**Serve** [3] - 789:18,
923:16, 1032:24
**served** [1] - 1032:16
**Server** [3] - 794:5,
794:6, 794:9
**server** [29] - 794:10,
794:11, 796:19,
796:21, 811:6,
819:11, 821:21,
825:6, 826:6, 826:8,
826:10, 826:19,
830:8, 830:16,
831:17, 831:19,
842:25, 843:1,
843:10, 848:3,
848:4, 848:13,
849:11, 849:12,
854:3, 864:14,
864:17, 864:20,
864:21
**servers** [3] - 796:20,
848:6

**service** [10] - 811:7,
866:13, 867:21,
875:8, 875:9,
880:19, 954:8,
1024:4, 1024:24
**services** [8] - 795:24,
878:14, 880:3,
880:7, 880:19,
1007:7, 1007:11,
1022:11
**Services** [3] - 789:19,
1032:7, 1032:10
**Set** [1] - 842:21
**set** [36] - 793:17,
796:19, 809:23,
811:16, 812:10,
813:17, 814:3,
814:19, 815:2,
815:18, 819:22,
820:9, 820:15,
842:19, 842:22,
842:25, 843:1,
845:20, 847:7,
849:3, 853:25,
900:10, 900:22,
901:5, 908:3,
910:25, 916:1,
1018:17, 1019:13,
1021:9, 1049:2,
1051:16, 1052:8,
1054:12
**sets** [2] - 845:24,
1044:16
**setting** [3] - 820:5,
854:3, 901:17
**setup** [1] - 818:10
**seven** [5] - 926:20,
961:11, 962:1,
962:3, 962:4
**several** [4] - 790:20,
795:6, 907:7, 1014:2
**SG** [1] - 999:23
**Shabbas** [1] - 801:13
**shaded** [2] - 859:6
**shall** [4] - 1015:13,
1016:2, 1036:22,
1038:11
**shape** [2] - 868:6,
990:11
**share** [2] - 816:3,
830:11
**shared** [2] - 796:18,
796:21
**shares** [1] - 889:3
**sharing** [4] - 816:8,
817:12, 817:15,
828:4
**sheet** [5] - 1002:22,
1020:11, 1020:13,
1020:18, 1026:20

**sheets** [1] - 906:12
**Shlomo** [1] - 971:14
**Shook** [1] - 992:9
**shopping** [1] - 802:19
**short** [2] - 973:20,
1027:8
**short-circuits** [1] -
1027:8
**shorthand** [1] -
788:21
**shortly** [3] - 812:18,
978:4, 1019:3
**shot** [2] - 819:13,
922:15
**show** [18] - 823:14,
842:17, 849:5,
849:10, 850:17,
850:20, 862:23,
939:17, 952:23,
952:24, 958:16,
959:6, 963:16,
971:17, 982:19,
1000:14, 1002:18,
1054:4
**showed** [3] - 800:3,
823:15, 850:7
**Showing** [1] - 998:11
**showing** [2] - 812:14,
876:23
**shown** [1] - 849:20
**shows** [7] - 862:9,
936:12, 938:18,
958:19, 963:22,
981:19, 1039:14
**shut** [1] - 952:6
**sic** [1] - 828:3
**side** [9] - 963:22,
976:15, 976:16,
976:18, 976:20,
994:25, 995:1,
995:2, 1055:16
**sides** [1] - 1049:15
**sign** [1] - 798:18
**signature** [6] - 799:4,
800:14, 800:21,
801:8, 801:18,
1023:11
**signed** [13] - 799:8,
800:3, 800:14,
803:23, 804:25,
812:14, 889:14,
889:15, 890:1,
890:2, 890:8,
890:16, 1023:8
**signer** [2] - 900:1,
900:4
**significance** [1] -
1053:4
**signs** [1] - 890:7
**silent** [1] - 980:1

**Silver** [1] - 835:3
**Silvia** [2] - 984:8, 1014:2
**similar** [3] - 930:20, 973:7, 1001:13
**simply** [4] - 852:9, 908:9, 981:21, 1043:15
**Single** [3] - 789:18, 923:16, 1032:23
**single** [7] - 850:11, 892:6, 959:5, 971:16, 972:18, 1025:14
**sister** [1] - 919:18
**sit** [2] - 932:24, 1043:4
**sitting** [7] - 817:17, 844:3, 853:11, 863:18, 863:20, 1042:20, 1044:7
**situation** [1] - 972:12
**six** [4] - 926:20, 939:15, 961:11, 961:25
**size** [2] - 853:4, 1027:3
**smack** [1] - 814:1
**small** [2] - 798:18, 1044:8
**smaller** [1] - 796:5
**Social** [5] - 876:24, 974:9, 974:14, 974:19, 974:22
**software** [12] - 811:6, 811:7, 855:11, 855:20, 855:22, 867:20, 873:22, 874:7, 875:13, 970:20, 970:23, 1011:5
**sold** [12] - 887:25, 888:1, 931:23, 931:25, 938:9, 941:2, 941:4, 941:5, 941:9, 941:10, 994:8, 1008:21
**solely** [1] - 927:16
**Solomon** [2] - 789:18, 1032:17
**someone** [7] - 840:21, 846:7, 854:7, 859:18, 865:12, 865:13, 865:18, 868:8, 877:18, 900:8, 919:21, 925:6, 960:25, 976:20, 985:2, 1056:1
**someplace** [2] - 929:2, 929:3

**sometime** [7] - 875:17, 892:23, 968:2, 980:7, 1008:3, 1019:3, 1024:18
**sometimes** [9] - 795:14, 795:20, 802:18, 820:14, 850:14, 871:14, 960:10, 960:13, 972:23
**somewhere** [5] - 822:3, 832:7, 957:5, 1027:19, 1027:20
**son** [5] - 919:6, 919:9, 919:13, 919:17, 929:7
**son-in-law** [3] - 919:6, 919:9, 919:13
**Sonia** [13] - 789:9, 815:9, 820:1, 861:4, 861:6, 871:4, 871:5, 875:13, 876:18, 891:11, 900:17, 956:19, 1012:23
**Sonya** [20] - 838:17, 838:22, 838:25, 851:12, 851:20, 851:22, 851:23, 852:5, 857:3, 913:23, 913:25, 914:2, 914:4, 914:6, 914:14, 915:12, 916:6, 916:7, 921:8, 921:18
**Sonya's** [4] - 843:22, 851:24, 851:25, 858:8
**Sonya/Sylvia** [1] - 839:17
**sorry** [34] - 794:1, 800:24, 806:18, 815:15, 831:17, 832:17, 833:11, 834:19, 838:9, 838:14, 873:11, 883:22, 902:9, 907:13, 920:7, 928:2, 934:1, 947:13, 947:15, 950:16, 955:14, 965:9, 967:13, 969:1, 985:17, 996:15, 998:25, 1000:20, 1024:3, 1032:23, 1044:20, 1046:4, 1051:11, 1054:5
**Sorry** [1] - 1000:6
**sort** [11] - 827:15,

**859:7, 874:1, 876:21, 890:1, 915:19, 917:2, 917:6, 986:23, 1003:21, 1054:19
**sorts** [1] - 993:9
**sought** [2] - 1035:23, 1041:25
**sounds** [3] - 913:23, 1050:22, 1050:23
**source** [6] - 829:20, 862:20, 1010:1, 1018:16, 1033:21
**South** [4] - 810:21, 826:8, 826:11, 1026:25
**speaking** [1] - 801:25
**speaks** [1] - 831:1
**special** [1] - 902:17
**specific** [5] - 804:1, 816:14, 822:4, 838:19, 977:8
**specifically** [4] - 821:14, 873:1, 903:16, 966:7
**specified** [2] - 920:6, 965:24
**specifies** [2] - 1036:21, 1037:15
**specify** [1] - 966:6
**speculate** [5] - 808:3, 843:15, 843:16, 843:17, 985:21
**speculation** [1] - 985:16
**spell** [1] - 1055:14
**spell** [2] - 877:9, 932:3
**Spence** [34] - 881:23, 881:25, 882:2, 882:7, 943:22, 980:19, 980:23, 980:24, 981:8, 981:10, 981:20, 982:1, 982:17, 982:18, 984:4, 984:14, 984:16, 984:21, 984:23, 985:14, 985:19, 986:4, 986:12, 987:7, 987:14, 987:18, 987:25, 988:14, 990:6, 990:21, 991:2, 991:22, 1025:12, 1025:15
**Spence's** [3] - 882:4, 981:23, 983:5
**spend** [4] - 804:4, 804:9, 805:4, 805:9
**spending** [1] -

**1055:13
**spent** [3] - 804:16, 805:6, 823:13
**spoken** [4] - 827:17, 955:8, 955:9
**SQL** [10] - 796:21, 824:24, 825:6, 840:24, 840:25, 864:21, 868:11, 868:12, 868:15
**staff** [1] - 1029:4
**Stamp** [2] - 911:12, 911:18
**stamp** [1] - 1051:17
**stamped** [6] - 905:25, 1044:5, 1051:14, 1054:3, 1054:7, 1054:12
**Stamps** [1] - 1051:15
**stand** [9] - 791:19, 792:3, 793:9, 836:17, 836:20, 836:22, 908:11, 1029:14, 1041:16
**standing** [1] - 992:22
**standpoint** [1] - 928:5
**stands** [1] - 795:1
**start** [18] - 791:6, 794:9, 796:12, 800:12, 801:2, 801:14, 803:8, 807:18, 818:7, 818:16, 839:22, 870:10, 898:17, 908:24, 909:24, 980:9, 988:22, 995:6
**started** [9] - 889:1, 909:18, 910:7, 910:9, 910:10, 916:2, 977:25, 978:18, 980:7
**starting** [2] - 997:14, 1045:2
**State** [10] - 874:9, 899:2, 900:9, 900:13, 901:18, 901:21, 902:7, 902:8, 909:11, 953:13
**state** [8] - 869:17, 876:25, 899:3, 900:10, 936:11, 972:19, 1015:14, 1023:3
**statement** [11] - 896:24, 914:13, 927:2, 958:15, 1018:13, 1018:18, 1019:8, 1020:12, 1020:13, 1020:19,

**1026:20
**statements** [15] - 870:25, 893:6, 893:11, 893:15, 897:3, 897:16, 905:15, 905:18, 949:12, 959:17, 970:8, 970:11, 1005:19, 1019:21, 1019:25
**States** [1] - 788:24
**states** [2] - 915:16, 1037:17
**STATES** [2] - 788:1, 788:10
**stating** [1] - 891:24
**status** [1] - 867:16
**step** [2] - 1029:5, 1049:23
**steps** [4] - 957:10, 969:20, 972:16, 1042:13
**Steve** [2] - 931:22, 1009:1
**Steven** [17] - 795:10, 795:12, 796:23, 797:3, 823:15, 835:7, 835:11, 845:22, 846:19, 871:4, 955:8, 955:14, 1008:8, 1008:22, 1009:16, 1016:18, 1022:23
**STEVEN** [1] - 788:3
**Steven@brooklyn** [1] - 846:19
**sticker** [1] - 911:1
**stickers** [1] - 911:8
**still** [11] - 810:6, 822:16, 860:2, 862:16, 893:9, 922:16, 935:23, 939:8, 963:14, 966:18, 1047:25
**stipulate** [3] - 978:9, 1044:15, 1050:24
**stipulated** [1] - 1036:15
**stood** [1] - 993:6
**stop** [7] - 800:23, 802:13, 810:12, 820:22, 949:4, 1010:4, 1016:5
**stopped** [5] - 940:1, 940:5, 940:18, 940:24, 949:3
**stopping** [1] - 791:24
**stops** [2] - 819:13, 1042:16
**storage** [1] - 812:4

*Schreiber v. Friedman, Et Al   15-CV-6861        8/2/16*                29

store [1] - 971:7
stored [6] - 810:9, 810:16, 810:18, 814:5, 814:10, 815:20
storefront [1] - 882:10
storefronts [1] - 882:10
stores [1] - 882:10
storing [1] - 975:3
strap [1] - 1054:8
Street [17] - 789:6, 884:7, 928:19, 928:22, 931:3, 980:13, 986:5, 989:9, 989:14, 990:3, 990:22, 992:5, 994:9, 994:24, 995:14, 1000:12, 1031:11
street [1] - 817:20
stretching [1] - 952:2
strike [1] - 934:11
strikes [1] - 805:20
Stroz [5] - 790:16, 1043:4, 1054:16, 1054:22, 1054:24
struggling [1] - 1047:16
study [1] - 866:23
stuff [14] - 791:13, 817:13, 818:19, 829:19, 832:3, 833:1, 833:7, 838:4, 851:8, 853:13, 856:11, 915:15, 967:11
sub [2] - 1020:11, 1020:12
subject [4] - 821:10, 827:24, 993:7, 997:1
submit [6] - 877:2, 890:19, 899:1, 899:2, 899:20, 1022:16
submitted [8] - 808:9, 889:18, 889:20, 889:21, 890:5, 890:22, 891:12, 1023:14
submitting [1] - 899:18
subparagraph [1] - 1019:20
subpoena [1] - 832:25
subsequent [1] - 1019:9
subsequently [4] - 870:20, 889:4, 894:24, 905:2

subsidiaries [2] - 1001:15, 1001:18
substantial [1] - 894:25
suddenly [2] - 865:17, 996:20
sufficient [1] - 999:3
suffix [1] - 818:22
suggest [1] - 1009:21
suggested [1] - 1024:13
suggesting [1] - 932:19
suggestion [1] - 791:23
suggestions [1] - 1029:3
summaries [1] - 975:14
summary [2] - 876:23, 975:14
supply [1] - 833:7
supposed [1] - 791:6
surrounding [1] - 832:23
suspend [1] - 932:20
sustained [4] - 895:10, 965:14, 1038:20, 1038:25
sworn [3] - 793:11, 869:11, 869:13
Sylvia [10] - 789:9, 847:12, 851:12, 852:14, 875:13, 881:10, 881:13, 921:8, 921:23, 922:20
Sylvia's [2] - 838:11, 839:3
system [51] - 810:17, 818:15, 818:16, 818:17, 819:1, 819:10, 821:19, 822:6, 822:19, 822:20, 823:6, 840:13, 840:22, 851:3, 851:15, 851:23, 856:2, 857:11, 858:15, 867:14, 868:2, 868:8, 868:9, 874:17, 874:24, 875:16, 892:9, 899:1, 900:16, 900:21, 901:7, 974:20, 974:23, 975:4, 975:5, 975:10, 975:18, 1011:1, 1011:6, 1013:7, 1017:6,

1017:16, 1017:17, 1017:18, 1019:2, 1034:1, 1034:6, 1038:22, 1039:4, 1039:5, 1043:2
System [2] - 857:13, 857:23
systems [14] - 821:9, 821:12, 850:25, 857:9, 857:12, 872:22, 874:21, 874:23, 892:8, 893:24, 894:1, 1039:1, 1039:6, 1042:7

───────── T ─────────

talks [1] - 1019:20
tally [1] - 959:15
task [3] - 864:16, 965:24, 1023:1
tasks [8] - 870:15, 904:7, 904:8, 904:15, 950:14, 965:23, 966:1, 1019:16
tax [78] - 870:16, 870:17, 870:19, 873:24, 874:2, 889:2, 889:5, 889:12, 889:16, 890:2, 890:17, 894:9, 896:22, 896:23, 896:24, 897:10, 897:16, 898:23, 900:23, 910:11, 912:17, 941:18, 947:7, 948:11, 952:23, 953:11, 954:25, 955:2, 955:5, 955:10, 955:15, 955:21, 961:24, 978:17, 979:21, 998:9, 998:19, 1000:14, 1003:2, 1003:6, 1003:17, 1003:19, 1006:1, 1007:2, 1008:25, 1009:4, 1009:18, 1010:20, 1010:23, 1015:14, 1015:19, 1016:25, 1017:3, 1017:8, 1018:14, 1019:21, 1022:15, 1022:16, 1023:3, 1023:8, 1023:10, 1025:21, 1027:11, 1027:15, 1030:6, 1030:13, 1030:21,

1031:1, 1031:9, 1031:14, 1031:22, 1032:9, 1032:14, 1032:17, 1036:21, 1036:24, 1037:15
taxation [1] - 1037:10
taxes [27] - 876:14, 877:2, 886:12, 898:13, 898:16, 898:20, 899:1, 899:3, 899:18, 899:21, 900:10, 909:14, 930:23, 935:5, 955:22, 955:25, 959:10, 959:15, 961:1, 962:13, 963:12, 977:6, 1009:20, 1015:22, 1023:4, 1034:23, 1035:2
taxing [1] - 977:8
tech [1] - 802:7
technical [2] - 802:8, 814:8
technically [2] - 857:21, 877:12
technology [1] - 849:16
Telephone [1] - 1002:6
telephone [1] - 904:21
ten [9] - 803:25, 813:8, 813:9, 813:10, 813:22, 819:15, 861:18, 887:4, 1028:22
tenant [1] - 989:10
tenants [1] - 887:8
term [1] - 1016:3
Terminal [2] - 923:6, 923:7
terms [5] - 824:22, 841:25, 1007:11, 1008:10, 1053:2
terribly [1] - 791:3
testified [43] - 793:11, 803:22, 804:15, 807:1, 808:6, 811:2, 811:3, 840:23, 842:8, 844:16, 847:11, 854:18, 855:10, 855:16, 863:12, 863:13, 865:7, 865:10, 867:2, 867:13, 868:25, 869:13, 897:5, 909:7, 922:3, 925:13, 925:24, 929:8, 947:23, 950:22, 951:22,

963:18, 981:17, 1010:25, 1015:8, 1022:2, 1029:19, 1029:20, 1032:6, 1033:14, 1034:22, 1039:4, 1039:8
testify [3] - 864:12, 1055:25, 1056:1
testifying [4] - 893:21, 1014:22, 1033:23, 1034:11
testimony [31] - 804:19, 805:16, 815:17, 817:6, 823:5, 823:12, 839:10, 842:2, 845:16, 846:24, 847:13, 850:24, 853:7, 855:22, 856:1, 863:16, 890:24, 896:10, 903:1, 906:6, 919:11, 967:1, 978:6, 996:19, 1014:24, 1016:21, 1019:18, 1029:19, 1035:17, 1036:20, 1037:23
THE [498] - 788:10, 790:1, 790:5, 790:15, 790:24, 791:2, 791:10, 791:15, 791:17, 791:22, 792:6, 792:14, 792:17, 792:21, 792:24, 793:3, 793:6, 796:2, 798:1, 798:12, 800:23, 800:25, 801:4, 801:5, 802:25, 803:2, 803:3, 804:17, 804:20, 805:15, 805:19, 805:20, 805:22, 806:1, 806:2, 806:5, 806:10, 806:12, 806:14, 806:17, 806:20, 806:21, 806:23, 806:24, 815:23, 815:25, 816:2, 816:4, 816:6, 816:8, 816:12, 816:15, 816:16, 816:18, 816:21, 816:24, 817:1, 817:2, 817:3, 820:20, 820:22, 820:23, 820:24, 825:16, 825:18, 825:19, 825:20,

825:22, 825:23,
825:25, 827:5,
827:7, 829:9,
829:16, 829:18,
829:20, 829:22,
829:23, 829:24,
830:1, 830:5,
830:18, 830:24,
831:1, 833:11,
833:14, 833:23,
833:25, 834:6,
836:9, 836:11,
836:16, 836:23,
837:11, 840:23,
840:25, 841:1,
841:5, 843:12,
843:17, 843:18,
847:3, 847:5, 847:7,
847:8, 847:10,
848:16, 850:3,
850:22, 852:19,
852:21, 854:16,
855:14, 856:19,
856:21, 856:25,
857:1, 859:9,
859:12, 859:13,
861:25, 867:6,
867:9, 868:16,
868:18, 868:21,
869:2, 869:4, 869:5,
869:7, 869:8,
869:10, 869:14,
872:17, 873:2,
873:4, 873:5, 873:6,
873:7, 873:10,
873:11, 873:12,
873:13, 873:14,
873:15, 873:17,
873:18, 875:3,
875:4, 879:25,
880:3, 880:5, 880:7,
880:8, 880:9,
880:10, 880:14,
880:16, 880:18,
880:23, 881:2,
881:3, 882:19,
887:13, 887:17,
891:4, 893:3, 893:5,
895:10, 895:17,
900:11, 900:13,
900:19, 900:21,
900:25, 901:2,
901:3, 902:10,
903:25, 906:1,
906:15, 907:2,
907:6, 907:13,
907:17, 907:20,
907:23, 908:1,
908:6, 908:10,
909:22, 909:24,
909:25, 910:1,

910:3, 910:5, 910:6,
910:24, 911:4,
911:8, 911:13,
911:17, 911:19,
913:2, 913:6,
913:13, 918:10,
918:11, 918:16,
918:19, 918:20,
919:10, 919:14,
919:15, 919:17,
919:19, 925:17,
925:22, 926:2,
926:5, 926:8,
926:11, 927:22,
928:3, 932:12,
932:23, 934:1,
934:4, 934:5, 934:6,
934:7, 934:12,
934:22, 935:8,
935:9, 935:10,
935:13, 935:15,
936:3, 938:1, 938:3,
940:4, 940:5, 940:8,
940:9, 940:10,
940:11, 940:12,
940:13, 940:15,
945:16, 945:17,
945:18, 945:22,
946:17, 947:20,
947:21, 950:8,
950:10, 950:16,
950:19, 957:9,
957:13, 957:14,
957:17, 957:19,
957:20, 957:21,
957:22, 959:8,
959:12, 959:14,
959:17, 959:19,
959:20, 959:22,
959:24, 959:25,
960:1, 960:2, 960:3,
960:4, 960:5, 960:7,
960:8, 960:9,
960:10, 960:12,
960:13, 960:16,
962:2, 965:10,
965:14, 968:22,
968:24, 968:25,
969:1, 969:2, 969:5,
969:6, 969:8,
969:12, 969:14,
969:16, 969:18,
969:19, 969:21,
969:23, 970:1,
970:4, 970:6,
973:21, 973:24,
976:8, 977:20,
981:3, 981:13,
981:16, 981:23,
982:3, 982:12,
982:14, 982:19,

982:23, 983:2,
984:25, 985:3,
985:6, 985:17,
985:21, 985:23,
987:3, 988:4, 988:6,
988:7, 988:8,
988:16, 989:18,
990:8, 991:7, 991:9,
991:11, 992:16,
992:20, 992:24,
993:3, 993:8,
994:19, 996:11,
996:14, 996:17,
996:25, 997:4,
997:7, 998:25,
999:2, 999:4,
1005:2, 1010:2,
1010:11, 1010:14,
1010:17, 1011:20,
1011:23, 1011:24,
1012:2, 1012:4,
1013:18, 1013:21,
1013:23, 1014:15,
1020:23, 1021:2,
1021:3, 1021:4,
1021:6, 1021:7,
1021:8, 1024:19,
1024:22, 1028:16,
1028:20, 1028:25,
1029:8, 1029:9,
1029:13, 1033:5,
1034:8, 1034:9,
1034:11, 1034:14,
1034:16, 1034:20,
1036:1, 1036:4,
1036:7, 1036:8,
1036:9, 1036:10,
1036:11, 1036:15,
1036:19, 1037:20,
1037:22, 1038:1,
1038:3, 1038:13,
1038:20, 1038:25,
1039:3, 1040:3,
1040:6, 1040:7,
1040:10, 1041:7,
1041:9, 1041:12,
1041:13, 1041:14,
1041:15, 1041:17,
1041:23, 1042:8,
1042:11, 1042:16,
1042:18, 1042:20,
1043:4, 1043:7,
1043:9, 1043:19,
1043:22, 1043:24,
1044:4, 1044:10,
1044:13, 1044:20,
1044:23, 1044:25,
1045:10, 1045:12,
1045:17, 1045:21,
1045:25, 1046:4,
1046:11, 1046:14,

1046:19, 1046:21,
1046:23, 1047:1,
1047:4, 1047:15,
1047:19, 1047:21,
1048:1, 1048:4,
1048:7, 1048:10,
1048:20, 1049:4,
1049:7, 1049:10,
1049:14, 1049:19,
1049:22, 1050:1,
1050:4, 1050:7,
1050:10, 1050:16,
1050:18, 1050:20,
1050:23, 1051:2,
1051:11, 1051:18,
1052:2, 1052:11,
1053:2, 1053:11,
1053:23, 1053:25,
1054:5, 1054:7,
1054:9, 1054:12,
1054:20, 1054:25,
1055:11, 1055:13,
1055:16, 1055:18,
1055:22, 1056:3,
1056:5, 1056:9,
1056:14

**themselves** [2] -
830:20, 831:1

**theory** [2] - 1010:14,
1010:17

**therefore** [2] - 810:10,
1053:10

**they've** [4] - 941:2,
1045:19, 1047:1,
1047:13

**thinking** [1] - 919:18

**thinks** [2] - 842:14,
843:2

**third** [3] - 799:3,
819:25, 888:5

**thoroughly** [1] - 913:4

**thousand** [12] -
790:20, 954:4,
954:6, 958:24,
963:9, 964:6,
975:24, 976:4,
976:6, 1050:14

**thousand-dollar** [1] -
958:24

**thousands** [3] -
895:12, 908:4,
1043:15

**three** [17] - 801:14,
810:7, 815:8,
815:18, 818:1,
820:10, 839:7,
856:13, 896:6,
896:9, 904:3,
910:25, 911:4,
932:22, 1035:23,

1036:16, 1045:14

**Thunderbird** [1] -
847:20

**ties** [1] - 887:14

**timecards** [2] - 902:3,
906:11

**timing** [1] - 960:14

**title** [2] - 914:8, 990:21

**titles** [1] - 904:10

**today** [15] - 905:12,
905:19, 905:25,
946:11, 946:15,
946:21, 967:5,
967:11, 967:14,
980:2, 1001:18,
1021:17, 1022:2,
1029:6

**together** [8] - 792:1,
792:2, 802:12,
882:15, 883:22,
886:25, 1042:21

**tomorrow** [3] -
1055:6, 1055:11,
1055:12

**tonight** [1] - 1055:1

**took** [9] - 791:5,
795:1, 912:11,
937:16, 975:18,
1052:17, 1052:23,
1054:20, 1054:21

**top** [20] - 794:4, 794:6,
834:21, 835:6,
839:4, 846:12,
850:13, 850:14,
872:6, 880:14,
881:7, 883:9,
912:14, 917:23,
922:23, 929:3,
947:4, 1000:13,
1044:8, 1044:16

**total** [1] - 794:21

**totally** [1] - 813:3

**touch** [2] - 795:15,
1023:8

**tough** [1] - 879:25

**track** [2] - 824:12,
825:3

**tracked** [1] - 1043:18

**trade** [1] - 929:10

**trading** [1] - 885:14

**trail** [1] - 863:8

**transaction** [20] -
822:17, 822:22,
822:24, 823:3,
844:19, 844:21,
845:1, 860:2, 860:3,
862:13, 862:16,
862:17, 862:21,
862:24, 863:1,
863:3, 863:7,

927:23, 941:23
**Transactions** [1] - 914:5
**transactions** [20] - 822:12, 822:14, 822:21, 823:4, 823:6, 856:3, 856:4, 860:1, 862:14, 886:13, 886:16, 886:17, 886:20, 886:21, 886:23, 887:19, 897:21, 934:24, 938:18, 938:20
**TRANSCRIPT** [1] - 788:9
**transcript** [1] - 788:21
**transcription** [1] - 788:22
**transfer** [10] - 818:11, 819:2, 852:22, 852:24, 853:8, 853:9, 853:12, 990:17, 990:20, 1018:21
**transferred** [3] - 868:6, 968:6, 1019:1
**transmission** [1] - 839:21
**transmit** [4] - 877:10, 877:12, 898:22, 900:24
**transmitted** [6] - 900:7, 917:10, 917:12, 1010:20, 1023:3, 1023:4
**transmitting** [1] - 800:18
**transport** [8] - 879:3, 879:5, 879:18, 881:5, 881:11, 885:16, 885:17
**Transport** [8] - 789:5, 885:11, 922:1, 940:11, 940:13, 947:11, 1000:12
**transportation** [1] - 930:7
**traveling** [1] - 864:2
**Trays** [1] - 923:25
**TRC** [6] - 830:8, 830:15, 1050:21, 1051:5, 1051:24, 1052:4
**TRC-1** [2] - 1043:12, 1045:8
**TRC-4620** [1] - 1043:12
**TRC-5** [1] - 1045:14
**treatment** [1] -

1009:12
**trial** [6] - 897:18, 898:1, 898:7, 898:10, 1026:19, 1034:18
**tried** [2] - 794:20, 843:3
**TRO** [1] - 1022:6
**trouble** [8] - 975:18, 981:10, 981:24, 982:1, 995:19, 995:22, 1024:23
**trucking** [7] - 839:5, 841:9, 841:10, 880:18, 880:20, 922:13, 943:24
**Trucking** [10] - 789:6, 883:13, 928:22, 936:22, 961:8, 990:25, 991:25, 994:11, 994:24, 1031:5
**trucks** [1] - 941:10
**truth** [1] - 829:9
**truthful** [1] - 890:3
**try** [9] - 812:16, 818:6, 820:21, 825:14, 834:10, 834:21, 836:3, 840:4, 976:1
**trying** [28] - 800:16, 800:17, 806:5, 806:7, 832:9, 833:14, 854:16, 880:2, 880:10, 880:24, 887:13, 887:15, 892:1, 925:18, 926:5, 932:10, 932:12, 932:15, 932:25, 957:9, 965:11, 966:20, 981:4, 993:14, 1009:17, 1010:7, 1041:22, 1042:2
**Tuesday** [1] - 835:8
**tunnel** [1] - 814:17
**turn** [20] - 793:16, 797:2, 798:6, 798:8, 799:23, 821:10, 823:16, 826:24, 854:3, 859:1, 860:8, 875:1, 875:19, 893:19, 902:9, 903:4, 908:24, 1014:19, 1015:5, 1023:15
**turned** [12] - 802:6, 865:25, 893:22, 894:16, 894:20, 895:21, 895:22,

896:1, 896:10, 905:4, 905:8, 970:15
**turning** [1] - 895:7
**turns** [1] - 907:11
**twenty** [2] - 1025:16
**Twenty** [1] - 877:25
**twenty-one** [1] - 1025:16
**twenty-two** [1] - 1025:16
**twice** [2] - 861:13, 892:15
**two** [76] - 803:12, 804:1, 808:24, 808:25, 809:13, 814:18, 816:19, 822:25, 830:10, 837:18, 837:22, 837:23, 838:2, 841:9, 843:21, 844:7, 844:10, 850:24, 850:25, 851:1, 858:5, 859:10, 861:8, 861:11, 866:5, 867:7, 867:22, 867:24, 867:25, 868:25, 870:6, 870:11, 883:22, 884:15, 884:17, 894:22, 910:21, 918:3, 936:5, 974:19, 975:21, 976:14, 976:20, 976:25, 977:15, 977:24, 978:1, 978:7, 978:10, 978:15, 978:16, 978:23, 979:2, 994:23, 1011:4, 1022:15, 1025:16, 1028:24, 1039:5, 1039:21, 1039:22, 1040:11, 1042:6, 1043:21, 1044:1, 1044:8, 1044:15, 1044:19, 1045:13, 1047:12, 1048:25, 1050:14, 1050:16, 1050:17, 1051:1, 1052:3
**Two** [157] - 789:20, 795:24, 797:8, 797:17, 810:9, 810:10, 810:15, 813:2, 814:4, 814:5, 814:10, 815:20, 818:12, 819:1, 819:16, 819:24, 820:11, 820:12,

821:4, 821:10, 821:12, 821:16, 821:19, 822:7, 822:23, 827:16, 838:18, 840:2, 840:13, 841:25, 842:4, 843:10, 848:10, 853:13, 858:6, 870:13, 870:15, 870:24, 872:1, 872:7, 872:25, 873:3, 876:4, 876:17, 877:10, 877:19, 885:4, 888:15, 888:25, 889:6, 891:2, 891:8, 891:10, 892:5, 892:8, 893:11, 893:15, 893:22, 893:25, 894:6, 895:3, 895:8, 895:13, 895:20, 895:25, 896:11, 896:22, 897:15, 898:3, 898:14, 898:23, 899:9, 899:17, 900:1, 900:7, 900:12, 901:24, 904:8, 904:17, 904:23, 905:15, 907:12, 908:5, 910:20, 912:19, 912:22, 913:1, 916:16, 916:19, 917:18, 921:16, 921:18, 923:22, 923:25, 947:13, 947:15, 947:18, 947:24, 948:12, 952:25, 953:22, 954:12, 954:25, 955:25, 956:11, 958:7, 963:17, 963:21, 963:22, 964:10, 965:13, 966:18, 967:21, 971:24, 972:20, 972:23, 973:10, 974:2, 1005:11, 1006:10, 1007:14, 1007:16, 1008:16, 1010:8, 1011:7, 1011:11, 1011:18, 1015:20, 1017:9, 1018:12, 1019:11, 1019:13, 1021:25, 1022:12, 1022:23, 1023:10, 1023:20, 1024:3, 1025:4, 1025:5,

1025:8, 1025:10, 1026:15, 1026:23, 1040:5, 1040:7, 1040:8, 1042:14, 1044:17, 1045:4, 1045:5, 1050:22, 1053:9, 1054:11, 1055:24
**type** [31] - 841:13, 841:17, 865:21, 868:13, 870:3, 872:24, 873:20, 876:12, 877:10, 890:13, 894:5, 896:21, 899:22, 905:11, 905:21, 915:3, 916:17, 917:1, 921:13, 950:12, 951:18, 953:10, 954:16, 958:14, 963:16, 963:22, 965:11, 965:13, 965:16, 971:2, 971:19
**types** [1] - 911:24
**typically** [1] - 901:22
**typo** [1] - 908:23

**U**

**UCC** [1] - 989:13
**ultimately** [3] - 928:12, 1035:7, 1052:24
**unacceptable** [1] - 790:20
**unanimous** [1] - 1036:13
**unaware** [1] - 911:18
**unclear** [2] - 873:9, 939:24
**under** [17] - 790:24, 791:2, 792:9, 817:14, 819:25, 838:21, 859:2, 859:5, 859:6, 860:11, 965:15, 982:25, 1017:24, 1019:13, 1019:17, 1037:10, 1047:11
**underlying** [2] - 1010:6, 1012:25
**underneath** [1] - 1043:21
**understood** [9] - 803:6, 829:18, 847:18, 856:16, 857:2, 996:9, 1015:16, 1023:23, 1042:4

*Schreiber v. Friedman, Et Al   15-CV-6861     8/2/16* ____ 32

**undertake** [1] - 1019:17
**undertook** [1] - 1012:6
**unemployment** [2] - 874:10, 877:14
**uniform** [1] - 1049:1
**unique** [1] - 810:11
**uniquely** [2] - 1049:11, 1053:12
**unit** [1] - 944:22
**UNITED** [2] - 788:1, 788:10
**United** [1] - 788:24
**units** [1] - 944:24
**universe** [1] - 1053:8
**unless** [8] - 817:20, 817:21, 839:22, 847:16, 849:23, 850:9, 972:12, 1037:9
**unnecessarily** [1] - 1029:4
**unplugged** [2] - 843:21, 843:24
**unquote** [1] - 1051:25
**up** [98] - 796:19, 798:2, 801:15, 801:17, 804:11, 805:17, 805:22, 805:23, 806:1, 806:7, 807:1, 808:4, 811:15, 811:16, 812:5, 812:10, 812:14, 813:1, 814:19, 814:23, 814:24, 816:8, 817:4, 817:12, 817:22, 818:2, 819:22, 820:5, 824:7, 825:12, 825:20, 826:15, 836:9, 836:10, 839:7, 839:12, 839:15, 839:17, 839:20, 840:1, 840:6, 842:19, 842:21, 842:22, 842:25, 843:1, 843:3, 843:4, 845:20, 845:24, 849:3, 849:10, 849:23, 850:9, 851:6, 851:22, 857:8, 859:5, 882:20, 891:15, 900:10, 900:22, 901:5, 901:17, 907:3, 908:10, 911:6, 911:14,

940:6, 941:18, 945:1, 948:23, 951:24, 951:25, 952:2, 952:3, 952:5, 952:13, 952:24, 955:23, 957:11, 959:16, 962:19, 974:21, 975:5, 975:11, 992:22, 993:6, 999:2, 1009:11, 1023:7, 1029:5, 1029:17, 1037:3, 1055:14, 1056:13
**upsetment** [1] - 1010:1
**upward** [1] - 1008:19
**useful** [1] - 851:18
**user** [3] - 796:15, 863:9, 892:12
**uses** [4] - 841:21, 849:6, 849:15, 938:14
**utilize** [2] - 865:19, 892:17
**utilized** [4] - 892:15, 1011:5, 1017:16, 1017:17

---

## V

**vaguely** [1] - 842:7
**value** [1] - 834:2
**variable** [1] - 964:6
**various** [3] - 875:8, 882:9, 997:2
**vendor** [2] - 1051:14, 1051:16
**verifying** [2] - 1006:19, 1007:16
**version** [5] - 853:8, 890:1, 968:23, 969:2, 1044:6
**versions** [3] - 889:11, 889:14, 889:15
**versus** [3] - 816:22, 950:14, 965:13
**via** [1] - 819:17
**view** [4] - 862:20, 982:20, 1052:25
**Vince** [19] - 794:14, 794:15, 796:15, 796:16, 796:22, 797:1, 811:14, 812:8, 823:15, 824:13, 870:21, 891:22, 892:22, 893:24, 978:4, 1020:2, 1033:20, 1038:8, 1051:22

**Vincent** [14] - 794:24, 795:2, 795:6, 796:14, 892:17, 901:14, 956:6, 1006:5, 1007:3, 1011:6, 1012:22, 1017:4, 1021:25, 1022:20
**violations** [1] - 933:4
**virtual** [1] - 814:17
**vis** [2] - 817:7
**vis-a-vis** [1] - 817:7
**visit** [2] - 803:10, 844:2
**visiting** [1] - 950:13
**void** [6] - 822:11, 822:13, 822:16, 845:1, 845:10, 863:6
**voided** [3] - 822:17, 844:18, 845:7
**voiding** [2] - 845:6, 863:6
**volume** [1] - 894:19
**volunteer** [1] - 796:2
**VPN** [12] - 814:15, 814:16, 814:17, 814:19, 815:20, 817:21, 839:23, 855:18, 855:19, 855:20, 855:23
**vs** [1] - 788:5

---

## W

**W-2** [8] - 874:9, 874:16, 912:1, 921:14, 948:4, 948:7, 948:13, 954:17
**W-2s** [6] - 874:19, 877:15, 894:10, 912:2, 971:3, 974:17
**W-3s** [1] - 971:3
**W-4s** [1] - 916:5
**W3s** [2] - 874:9, 894:10
**wait** [4] - 796:3, 935:10, 1048:1
**waiting** [3] - 979:20, 1018:15, 1049:20
**walk** [1] - 899:25
**walking** [1] - 1048:16
**WAN** [1] - 817:19
**ware** [1] - 879:23
**Washington** [1] - 999:17
**ways** [1] - 852:22
**web** [1] - 982:19
**website** [2] - 865:6, 900:14

**wee** [1] - 1050:13
**week** [20] - 790:8, 803:25, 804:2, 804:3, 805:3, 808:12, 808:19, 808:23, 809:12, 809:20, 810:1, 854:21, 855:4, 876:20, 876:22, 899:3, 900:16, 900:23, 900:24, 1013:9
**weekly** [14] - 875:10, 875:14, 876:23, 877:2, 891:10, 892:3, 892:6, 900:18, 902:15, 903:20, 973:15, 974:8, 1012:23, 1023:2
**weeks** [4] - 803:12, 868:25, 1021:23, 1022:15
**Westchester** [1] - 934:15
**whatsoever** [1] - 848:2
**WHEREUPON** [1] - 1056:16
**white** [2] - 1044:8, 1044:15
**whole** [7] - 791:12, 824:2, 853:21, 867:1, 1045:7, 1054:25, 1055:13
**wholesale** [2] - 933:18, 986:7
**wife** [2] - 884:21, 884:22
**winding** [1] - 941:18
**winding-up** [1] - 941:18
**wiped** [3] - 854:8, 854:11, 854:13
**wire** [1] - 946:24
**wireless** [1] - 817:19
**withdraw** [4] - 829:11, 900:16, 926:10, 996:16
**withdrawal** [1] - 899:13
**withdrawn** [8] - 803:21, 813:21, 822:5, 826:4, 845:4, 1009:21, 1010:24, 1013:16
**withheld** [1] - 899:3
**withhold** [2] - 896:13, 900:24
**withholding** [4] -

899:3, 900:10, 966:19, 1013:5
**Withholding** [3] - 970:17, 971:14, 973:1
**WITNESS** [104] - 801:4, 803:2, 805:19, 805:22, 806:2, 806:10, 806:14, 806:20, 806:23, 815:25, 816:4, 816:8, 816:15, 816:18, 816:24, 817:2, 820:23, 825:18, 825:20, 825:23, 829:18, 829:22, 829:24, 830:24, 840:25, 843:17, 847:8, 856:21, 857:1, 859:13, 869:4, 869:7, 873:4, 873:6, 873:10, 873:12, 873:14, 873:17, 875:3, 880:3, 880:7, 880:9, 880:14, 880:18, 881:2, 893:5, 900:13, 900:21, 901:2, 909:25, 910:3, 910:6, 918:11, 918:19, 919:14, 919:17, 934:4, 934:6, 935:9, 938:3, 940:5, 940:9, 940:11, 940:13, 945:17, 947:21, 957:13, 957:17, 957:20, 957:22, 959:12, 959:17, 959:20, 959:24, 960:1, 960:3, 960:5, 960:8, 960:10, 960:13, 968:24, 969:1, 969:5, 969:8, 969:14, 969:18, 969:21, 988:7, 998:25, 999:4, 1011:24, 1021:2, 1021:4, 1021:7, 1024:22, 1029:8, 1034:9, 1034:14, 1036:8, 1036:10, 1040:6, 1041:13, 1041:15, 1057:2
**witness** [20] - 792:14, 793:1, 793:6, 798:2, 836:20, 836:22, 840:23, 869:8, 869:11, 869:12, 908:11, 913:3,

Schreiber v. Friedman, Et Al   15-CV-6861      8/2/16       33

913:7, 932:20,
933:7, 981:22,
981:25, 1005:1,
1036:20, 1041:16
**Witness** [4] - 793:9,
836:20, 836:22,
1041:16
**witness's** [1] -
1038:14
**witnesses** [2] - 913:9,
1055:21
**wives** [1] - 884:19
**woman** [1] - 884:20
**wondering** [3] -
909:15, 913:6,
913:18
**word** [5] - 802:10,
802:14, 802:16,
803:7, 918:16
**words** [6] - 810:13,
814:6, 849:9,
1015:7, 1016:5,
1050:16
**workers'** [2] - 916:17,
918:1
**works** [7] - 811:7,
823:20, 842:4,
881:13, 922:20,
922:22, 930:3
**worried** [1] - 791:3
**worry** [1] - 854:17
**worth** [3] - 833:16,
836:2, 1053:25
**wrap** [2] - 836:9,
836:10
**wrapping** [1] - 952:3
**write** [1] - 1042:1
**written** [2] - 820:24,
820:25
**wrote** [3] - 802:11,
909:11, 1018:1

**Y**

**year** [26] - 832:11,
832:14, 870:17,
909:16, 917:18,
917:19, 917:25,
939:16, 939:25,
940:10, 940:11,
940:17, 948:23,
954:14, 960:14,
960:15, 974:17,
977:4, 1005:15,
1016:3, 1017:2,
1025:21, 1036:23,
1037:9, 1037:10
**Year** [1] - 1003:17
**year-end** [2] - 870:17,
977:4

**Year-end** [1] - 1003:17
**years** [40] - 803:13,
807:24, 856:17,
870:8, 873:3,
877:24, 877:25,
881:17, 884:25,
885:1, 885:2,
885:22, 886:10,
887:22, 887:24,
888:1, 910:11,
917:21, 926:20,
936:5, 938:3, 939:6,
942:18, 948:20,
948:21, 949:3,
961:11, 961:25,
962:3, 962:8, 981:2,
986:1, 993:5,
997:11, 1015:19,
1020:3, 1025:16,
1039:23
**yesterday** [19] - 790:4,
791:22, 792:5,
793:14, 796:6,
800:4, 800:13,
801:1, 804:16,
807:1, 811:2, 812:9,
821:23, 851:16,
872:14, 907:10,
968:11, 968:13,
1042:2
**Yonkers** [1] - 869:20
**YORK** [1] - 788:1
**York** [12] - 788:6,
788:16, 788:25,
869:20, 885:17,
885:24, 928:19,
936:7, 936:8,
936:10, 936:14,
995:18
**Yossi** [12] - 810:18,
810:23, 819:12,
821:20, 826:6,
827:12, 829:10,
829:17, 829:21,
830:24, 832:18,
833:5
**yourself** [2] - 887:6,
901:1

**Z**

**Zerega** [1] - 942:9