1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2

3  -----------------------------------X
                                   :
4  STEVEN SCHREIBER,               :
                                   :
5                Plaintiff,     :
                                 :  15-CV-6861 (CBA)
6          v.               :
                                 :  October 12, 2018
7  EMIL FRIEDMAN, et al,      :  Brooklyn, New York
                                 :
8                Defendants.    :
                                 :
9  -----------------------------------X

10      TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
         BEFORE THE HONORABLE JAMES ORENSTEIN
11          UNITED STATES MAGISTRATE JUDGE

12
  APPEARANCES:
13

14  For the Plaintiff:        RAPHAEL MARK ROSENBLATT, ESQ.
                        Rosenblatt Law PC
15                      c/o Creizman LLC
                        565 Fifth Avenue, 7th Floor
16                      New York, New York 10017

17  For Nelkin & Nelkin:     NICOLE ISOBEL HYLAND, ESQ.
                        TYLER MAULSBY, ESQ.
18                      Frankfurt Kurnit Klein & Selz
                        480 Madison Avenue
19                      New York, New York 10022

20                      JAY P. NELKIN, ESQ.
                      CAROL NELKIN, ESQ.
21                      Nelkin & Nelkin
                      5417 Chaucer
22                      Houston, Texas 77005

23

24

25  (Appearances continue on next page.)


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

```
 1                                                              2

 2

 3   APPEARANCES CONTINUED:

 4
     For the Defendant:          PAUL H. SCHAFHAUSER, ESQ.
 5                               Chiesa Shahinian & Giantomasi PC
                                 11 Times Square
 6                               New York, NY 10036

 7
     For Defendant Ezell:        RICHARD AVERY FINKEL, ESQ.
 8   (Telephonically)            Richard A. Finkel, Esq &
                                     Associates PLLC
 9                               270 Madison Avenue
                                 Suite 1203
10                               New York, New York 10016

11   For Defendant Devine:       RICHARD BRUCE FELDMAN, ESQ.
     (Telephonically)            Rosenberg Feldman Smith, LLP
12                               551 Fifth Avenue, 24th Floor
                                 New York, New York 10176
13

14   For E&I, et al.:            DAVID GRANTZ, ESQ.
     (Telephonically)            Meyner & Landis
15                               One Gateway Center
                                 Newark, New Jersey 07102
16

17   For Interested Party:       NICHOLAS FASO, ESQ.
                                 Cullen and Dykman LLP
18                               99 Washington Avenue
                                 Suite 2020
19                               Albany, New York 12210

20
     Court Transcriber:          SHARI RIEMER, CET-805
21                               TypeWrite Word Processing Service
                                 211 N. Milton Road
22                               Saratoga Springs, New York 12866

23

24

25
```

3

1  (Proceedings began at 9:35 a.m.)

2  **(MICROPHONES GO IN AND OUT DURING CONFERENCE)**

3  THE CLERK:  Civil Cause for Status Conference,

4  Schreiber v. Emil Friedman, et al., Docket Number 15-CV-6861.

5  Will the parties please state their appearances for

6  the record starting with the plaintiffs?

7  MR. ROSENBLATT:  Good morning, Your Honor; Raphael

8  Rosenblatt, Rosenblatt Law PC.  I'm here on behalf of Eugene

9  Schreiber, Steven Schreiber, and Two Rivers Coffee.

10  THE COURT:  Good morning to all of you.

11  MR. E. SCHREIBER:  Eugene Schreiber.

12  THE COURT:  Good morning.

13  MR. S. SCHREIBER:  Steven Schreiber.

14  THE COURT:  Good morning.

15  MS. HYLAND:  Do you want to go first?

16  MR. SCHAFHAUSER:  Either way.

17  MS. HYLAND:  You go first.

18  MR. SCHAFHAUSER:  Good morning, Your Honor.  Paul

19  Schafhauser of Chiesa Shahinian & Giantomasi for the Friedman

20  defendants.

21  THE COURT:  Good morning.

22  MS. HYLAND:  Nicole Hyland of Frankfurt Kurnit Klein

23  & Selz for Nelkin & Nelkin.

24  THE COURT:  Good morning.

25  MS. HYLAND:  Good morning.

4

1          MR. MAULSBY:  Tyler Maulsby of Frankfurt Kurnit

2   Klein & Selz also for Nelkin & Nelkin.

3          THE COURT:  Good morning.

4          MS. NELKIN:  Your Honor, I'm Carol Nelkin.

5          THE COURT:  Good morning.

6          MR. NELKIN:  Your Honor, good morning, Jay Nelkin.

7          THE COURT:  Good morning.

8          MR. FASO:  Good morning, Your Honor; Nicholas Faso,

9   Cullen & Dykman for Mayer Koenig.

10          THE COURT:  Good morning.  And I understand we have

11   Mr. Finkel, Mr. Feldman, and Mr. Grantz listening in by

12   telephone.  Good morning to all of you.

13          UNIDENTIFIED:  Good morning.

14          THE COURT:  All right, folks.  So I guess I'll be

15   hearing you all on the issue about the nature of the

16   discharge.  You've submitted your papers.  We've got two other

17   somewhat related issues.  There's a Rule 67 request from the

18   defendants and the motion for reconsideration.  I'm -- let's

19   start with the motion for reconsideration.

20          I'm not sure exactly what you want me to reconsider,

21   Ms. Hyland?  It --

22          MS. HYLAND:  Should I stand or do -- what do you

23   prefer?

24          THE COURT:  It -- do whatever you prefer to do.

25          MS. HYLAND:  Okay.

1          THE COURT:  But you have asked me to reconsider what

2   somebody might read into something but not the words

3   themselves; is that correct?

4          MS. HYLAND:  Well, it is the words themselves.

5          THE COURT:  What words do you want me to reconsider?

6          MS. HYLAND:  So in the August 30th order, there are

7   references to a conflict of interest and citations to Rule 1.7

8   and to the provision -- the court rules that talk about the

9   power of the court to discipline lawyers for violations of

10  those rules.  And the way that we read that order, it could

11  reasonably be inferred as a finding that there was a violation

12  of 1.7.

13         THE COURT:  Did I make a finding?

14         MS. HYLAND:  Pardon?

15         THE COURT:  Does the order say I've made a finding?

16         MS. HYLAND:  Well, the -- let me pull up the order.

17         THE COURT:  No, no, no.  You've read it.  I've read

18  it.  We both know it does not.

19         MS. HYLAND:  Well, I believe that it -- that's how

20  we interpreted it, that it was a finding.

21         THE COURT:  You're entitled to interpreted it -- to

22  interpret it as seems reasonable to you, but it's simply not

23  explicit in the order.  And I'm not going to reconsider an

24  order I didn't make.

25         MS. HYLAND:  The -- well, if you read it in

6

1   conjunction with the August 31st order which is in the docket

2   which mentions the word "disqualification" that to me --

3            THE COURT:  Well, at the -- at the time --

4            MS. HYLAND:  -- indicates --

5            THE COURT:  Look, it -- what should be reconsidered

6   is the order -- the docket order entered on August 30th which

7   was made without benefit of the knowledge that your clients

8   had sued their own client and were continuing to represent

9   them.  Had I known that during -- I don't know how long that

10  conference was, but it lasted some time.  And I know this is

11  your first time here --

12           MS. HYLAND:  Yes.

13           THE COURT:  -- but your clients themselves have been

14  with me for many conferences, as have all the other lawyers --

15  okay, well, not all the other lawyers.  I don't think Mr.

16  Rosenblatt has been here -- once before maybe.  Anyway.

17           MR. ROSENBLATT:  A while ago.

18           THE COURT:  But the lawyers were here often, and

19  when they had something to say they would stand up to let me

20  know that they wanted to be heard.  That wasn't happening with

21  Ms. Nelkin and Mr. Nelkin saying, wait, Judge, before you go

22  any further, we want to be heard and move to withdraw.  Mr. --

23  or, I'm sorry, Professor Green, also not present but

24  apparently knowing better what was going on, tells me that,

25  you know, I made a mistake by not knowing their intention,

1    that they did intend to move to withdraw even though two weeks

2    earlier, in the letter he says I may have forgotten, they had

3    called their clients frauds and yet not sought to withdraw.

4    So it may be that at some point they were planning to withdraw

5    or seek to withdraw, but they certainly had plenty of

6    opportunities before I raised the subject.

7              So what should be reconsidered is the -- and I think

8    vacated rather than be considered is the order saying that on

9    consent they withdraw because I did that not knowing what the

10   facts were and not having the benefit of it.  As to whether

11   they were disqualified, at the time they were clearly

12   disqualified because they were suing their clients.

13             MS. HYLAND:  Well, I think there's a -- there's a

14   difference between being in a position where it's appropriate

15   at that point to withdraw -- which they -- they're -- that was

16   their intent coming to that conference --

17             THE COURT:  And how am I to know that?

18             MS. HYLAND:  They -- it would have been better if

19   they had brought it up affirmatively themselves --

20             THE COURT:  But --

21             MS. HYLAND:  -- before you asked them the question.

22   But when you did ask them the question --

23             THE COURT:  I -- what --

24             MS. HYLAND:  -- they said immediately, yes, we'd

25   like to -- we want to withdraw.  And --

8

```
1          THE COURT:  Yes, it was obvious from context that
2   they would have to, that they would have to consent to
3   withdraw once I raised it, as I had.  What had prevented them
4   from making their wishes known before that?
5          MS. HYLAND:  I'd like to -- you know, I mean I -- we
6   can -- if you'd like to ask them to explain the reasons why
7   the timing to --
8          THE COURT:  I'm not asking why they didn't.  I'm
9   just asking what prevented them?  Because they -- as you say,
10  they had the intention to do so.
11         MS. HYLAND:  They believed they --
12         THE COURT:  So what prevented them from acting on
13  that intention before -- you know, at any point between August
14  13th I believe it was when they filed their letter, the one
15  that Professor Green says I wasn't aware --
16         MS. HYLAND:  Well --
17         THE COURT:  Excuse me.
18         MS. HYLAND:  I'm just -- okay.  Yes.
19         THE COURT:  Between August 13th when they described
20  their client's activities as fraudulent in a letter that
21  Professor Green says I'm not aware of, between that date and
22  the moment when they responded affirmatively to my question
23  about whether they consent to withdraw on August 30th, between
24  those two times what prevented them from acting on their
25  intention to withdraw?
```

9

1          MS. HYLAND:  I want to just correct the time line.

2   It was -- August 13th was when Eugene Schreiber filed his

3   letter, and then there was --

4          THE COURT:  Right, August 14th?

5          MS. HYLAND:  August 13th was when Eugene Schreiber

6   filed his letter.  Then there were two subsequent letters that

7   had been filed by -- on the -- by Schreibers, the Schreibers.

8          THE COURT:  I'm sorry.  It's August 20th.

9          MS. HYLAND:  And August 20th is when --

10          THE COURT:  Forgive me.

11          MS. HYLAND:  -- is -- so --

12          THE COURT:  I am so, so terribly sorry for having

13   that date wrong.

14          MS. HYLAND:  I just wanted to make sure that --

15          THE COURT:  And I -- and I welcome -- no, I do

16   welcome the correction.  So in the 10 days --

17          MS. HYLAND:  So there were 10 -- yeah, so --

18          THE COURT:  In the 10 days between the time that

19   your clients wrote that the Schreibers and TRC, Two Rivers

20   Coffee, were acting in bad faith and were fraudulently seeking

21   to first negotiate the lowest fee possible and then structure

22   the agreement so that they could evade their resulting

23   obligations to pay the reduced fee any outstanding expenses

24   between -- in the 10 days between filing that letter, which

25   again, I apparently wasn't unaware of according to Professor

10

1   Green --

2           MS. HYLAND:  I'm not sure what you mean what -- that

3   he said you were unaware of it.

4           THE COURT:  But not unaware, I may have forgotten

5   that it had happened.

6           MS. HYLAND:  Well, I think the only point --

7           THE COURT:  So --

8           MS. HYLAND:  The only point --

9           THE COURT:  The 10 days between the filing of that

10  letter and their response -- their affirmative response to my

11  question of whether they would consent to withdraw, what had

12  prevented them from making their intention known to me?

13          MS. HYLAND:  I don't think anything prevented them.

14  I think that they believed that their work had been completed.

15  There was a conference scheduled that they planned to attend

16  at which they planned to formally request withdrawal, and they

17  believed that that would occur --

18          THE COURT:  I take it your clients know --

19          MS. HYLAND:  That would occur --

20          THE COURT:  -- that every motion has to be made in

21  writing on the docket, as has been the practice in this case.

22  One of the reasons Mr. Schafhauser made his Rule 67 motion,

23  belated as it is the day before we get here and put such

24  burdens on you, is he knows he -- he knows he couldn't just

25  show up and ask for the Rule.

1          MS. HYLAND:  Can -- but can I -- can I just --

2          THE COURT:  That's been clear to your clients.

3          MS. HYLAND:  Can I finish my response though

4    because --

5          THE COURT:  Yes.

6          MS. HYLAND:  -- one of the reasons that they did not

7    formally move to withdraw prior to that -- first, there was

8    going to be a conference at which they planned to raise these

9    issues.  And that was going to happen before any motion

10   would -- please let me finish -- would be heard.  Their

11   clients had indicated to them they did not want to terminate

12   the attorney-client relationship.  They had agreed to waive

13   the conflict, not using the words waiver of conflict, but

14   agreed using the terms in the rule, the waiver rule, that says

15   I agree in writing that you -- I want you to continue being my

16   lawyer despite knowing I have a conflict of interest.

17          So there was -- even if there was a conflict the

18   client had said -- and even said on the record at the

19   conference that he did not want the Schreibers to be

20   terminated yet.  He wanted to ensure that they were still

21   working for him at that point, and the Schreibers did not want

22   to do anything that would allow them to be accused of doing --

23   of abandoning the client when the client had said they didn't

24   want to be -- them to be terminated.  They wanted to address

25   all those things with you here in person at the conference.

12

1

2          THE COURT:  Thank you so much.  It's a terribly

3   illuminating colloquy we're having.

4          MS. HYLAND:  In what way?

5          THE COURT:  Thank you so much for your input.  Now I

6   know what they are saying is the reason they did not make a

7   motion to withdraw.  And you're saying that it is a waivable

8   conflict to sue your own client and --

9          MS. HYLAND:  Well --

10          THE COURT:  -- continue in the litigation?  That's

11   waivable?

12          MS. HYLAND:  Well, remember, the -- during the

13   time --

14          THE COURT:  It's waivable?  Again, it's just a yes

15   or no.  I just want to know your position on it.

16          MS. HYLAND:  Yes, it's waivable.

17          THE COURT:  Waive the conflict of --

18          MS. HYLAND:  Yes.

19          THE COURT:  -- of suing your own client?

20          MS. HYLAND:  Yes.

21          THE COURT:  All right.  Anyone else wish to be heard

22   on this?

23          MR. ROSENBLATT:  I'm not sure that I need to

24   elaborate at all, Judge.  I'll just note that as Your Honor

25   points out, they filed their notice of charging lien.  They

1  sued their own clients while they remained counsel of record

2  and never even submitted any kind of correspondence to Your

3  Honor indicating that they intended to withdraw, that they

4  intended to seek at least a ruling from Your Honor whether or

5  not they could continue on to finalize the settlement, those

6  types of things.  So that's it.  I don't need to say more than

7  that.  I think it's pretty clear that they created a conflict

8  by filing a notice of charging lien and suing their clients,

9  and obviously the discharge would have been for cause in our

10 view.

11          THE COURT:  I'm not --

12          MS. HYLAND:  Can --

13          THE COURT:  Wait, I'm not addressing for cause at

14 this point.  I'm talking about the motion for reconsideration.

15          MR. ROSENBLATT:  Understood.  So I don't have

16 anything really to say about that.

17          THE COURT:  Right.

18          MR. ROSENBLATT:  Other than --

19          MS. HYLAND:  But can I -- can I just finish my

20 thought?

21          THE COURT:  Absolutely.

22          MS. HYLAND:  I just wanted to be clear.  During the

23 10 days, they had not sued the client.  They did not sue --

24 file the lawsuit which was a -- is a fee dispute with the

25 client -- until hours before the conference at which they

1   intended to request to be relieved as counsel.

2           THE COURT:  And there was no --

3           MS. HYLAND:  Before that they did serve a notice of

4   charging lien, but it is definitely not a conflict to serve a

5   notice of charging lien at the end of a litigation when a

6   settlement has been inked and is enforceable in order to

7   ensure that the funds -- the settlement proceeds are not lost

8   and the charging lien is not lost if there's a fee dispute.

9   That is not a conflict of interest, so the --

10          THE COURT:  Did -- okay.  I'm sorry.  You -- tell me

11  when you're ready for me to ask a question.

12          MS. HYLAND:  Okay.  Go -- yes, I'm ready.

13          THE COURT:  Okay.  Did it create or reflect a

14  conflict of interest on August 20th when in making an argument

15  as to whether I should take action in this case that would

16  affect the rights of the parties in this case the Nelkins

17  wrote that the Schreibers were acting in bad faith and were

18  fraudulently seeking to first negotiate the lowest fee

19  possible and then structure the agreement so that they could

20  pay their resulting obligations to pay the reduced fee any

21  outstanding expenses?  So to characterize their own clients as

22  engaged in -- as acting in bad faith and fraudulently, is --

23  does that create or reflect a conflict of interest?

24          MS. HYLAND:  It may be a conflict of interest, but

25  it is a conflict that the clients had waived by requesting and

15

1 insisting that the Nelkins continue to represent them in the

2 litigation.

3         THE COURT: Did they get advanced consent, informed

4 consent in writing, that -- to the conflict of counsel calling

5 their own clients frauds who act in bad faith?

6         MS. HYLAND: Well, they had --

7         THE COURT: Did they get -- I'm just asking a

8 factual question here.

9         MS. HYLAND: Right.

10         THE COURT: Did they in advance get informed written

11 consent to that?

12         MS. HYLAND: They had informed the clients that they

13 intended to bring this action, that they intended to make

14 these claims before --

15         THE COURT: I'm going to interrupt you because you

16 are so very clearly not answering my question.

17         MS. HYLAND: I will answer it. I promise.

18         THE COURT: No, no. Why don't you start then with

19 the answer?

20         MS. HYLAND: Okay.

21         THE COURT: And then I will of course listen to

22 backfilling.

23         MS. HYLAND: Okay.

24         THE COURT: What else you think I need to know about

25 it. But, please, did they get advanced written consent from

1   the client to call the client to the magistrate judge

2   overseeing pretrial matters in the case calling them, their

3   clients, frauds who are acting in bad faith?

4            MS. HYLAND:  What they --

5            THE COURT:  Did they or did they not, please?

6            MS. HYLAND:  They did in the sense that they have

7   written consent from the client insisting that they continue

8   to represent them despite having told them that this is what

9   they planned to do.  So the answer is yes, they planned to do

10  this.

11           THE COURT:  To being called frauds?

12           MS. HYLAND:  To make the -- to respond -- to respond

13  to the accusations that have been made.

14           THE COURT:  By the way, you simply are not answering

15  my question.  Your clients, in their capacity as counsel for

16  the Schreibers or for Mr. Steven Schreiber, called Mr.

17  Schreiber a fraud and said that he had acted in bad faith.

18  Had he obtained -- had your clients obtained informed written

19  consent in advance to so labeling their clients?

20           MS. HYLAND:  Not to -- not technically to labeling

21  the clients, but they -- but they did inform them that -- in

22  advance that they intended to defend themselves against the

23  accusations that were -- the first shot was fired here

24  publicly in this case on the Friedman suit by the Schreibers.

25  The Nelkins were responding to that, and they had informed the

1    Schreibers' counsel, Mr. Parness, that they intended to make

2    these arguments.  Mr. Parness even put it in a letter, a copy

3    of a letter, a written letter, from the Nelkins to this Court

4    where they outlined what they intended to do which was to

5    defend themselves against the accusations of the Schreibers,

6    including making the point that they believed that the

7    Schreibers had not acted in good faith in the way they've

8    handled the fee dispute.

9                 THE COURT:  All right.

10              MS. HYLAND:  So they did tell them that.  They did

11   tell them that was their intent, and the Schreibers

12   nevertheless continued to insist that they remain their

13   counsel with respect to the settlement because they didn't --

14   nobody wanted the settlement to get blown up.  That was the --

15   that was the compromise that the Schreibers made was, yes, we

16   have a fee dispute, which they raised with you first, but we

17   still want the Nelkins to be representing us because they're

18   doing a great job in this case on this settlement.  We don't

19   want to lose them even though we have this dispute which,

20   again, it was the Schreibers that raised it with you.  The

21   Nelkins would not have brought it up or not -- and not have

22   defended themselves had the Schreibers not written those

23   letters to you raising this issue before you.

24              THE COURT:  Thank you so very much.

25              MS. HYLAND:  Okay.

18

1           THE COURT:  Grateful for it.

2           Anyone else wish to be heard on the motion for

3   reconsideration?  All right.  On the motion for

4   reconsideration as to the August 30th order, I think it's --

5   well, let me make sure I'm not mistaking my dates here.

6   You're referring to the August 30th written order, Docket No.

7   558, correct?

8           MS. HYLAND:  So there's -- yes.

9           THE COURT:  Okay.

10           MS. HYLAND:  There's the August 30th written order.

11           THE COURT:  Okay.  Yes.  Okay.

12           MS. HYLAND:  Sorry.

13           THE COURT:  So and then there's the August 31st

14   order.  I am denying that motion because it is predicated on

15   something that is not there.  I have not made any finding that

16   there was a violation of the rule.  There certainly -- or

17   rather, to be clear, it is simply not in the order that you

18   are challenging that needs to be reconsidered.  It's not

19   there.  How you interpret it is your business.  But I am

20   vacating so much of the minute order of August 30th, Docket

21   556, that purported to relieve the Nelkins on consent because

22   it was -- it was predicated on an assumption -- or rather on a

23   lack of knowledge that was material.  So they were

24   disqualified as of the time of the later order that I entered

25   because they had a conflict of interest that I don't think was

1  effectively waived, certainly to be sued by their own counsel

2  and I'm not sure is waivable.  But in any event, there is no

3  need to reconsider that order because what is characterized as

4  the basis for reconsideration is a mischaracterization of the

5  order itself -- the orders themselves.  So the motion is

6  denied, but I vacate the finding -- the portion of Docket 556

7  that said they're relieved on consent.

8          Okay.  Let's turn to the Rule 67 issue.  Folks,

9  before I ask for arguments on it, my recollection and

10  certainly what the docket reflected as of August 30th was that

11  the parties and appearing non-party at that time -- appearing

12  non-parties, Koenig and Nelkin & Nelkin, all agreed in

13  principle to allow the defendants to deposit funds and

14  otherwise secure their obligations under the signed settlement

15  agreement and then to be dismissed without prejudice to any

16  person's -- any person's position in the disputes among the

17  plaintiffs and counsel.  What is keeping you all from

18  effecting that?

19          MR. SCHAFHAUSER:  Happy to address that, Your Honor.

20  That was what was represented by all of the counsel in court

21  on the 30th.  We then -- I -- me, I prepared a stipulation

22  after that in keeping with Your Honor's directive to prepare a

23  stipulation and get this thing done.  I circulated it, and

24  there were competing arguments, for lack of a better word,

25  between the Schreibers and the Nelkins who each wanted to

1  insert provisions that -- again, I don't want to -- I don't

2  want to characterize the dispute.  But --

3          THE COURT:  I just want to know what --

4  substantively what is it you can't agree on that's

5  preventing --

6          MR. SCHAFHAUSER:  It never got done because I

7  circulated it, comments were exchanged, and it's a --

8          THE COURT:  I'm not -- I'm not interested in the

9  process.  Forgive me, but I'm really just trying to find out

10  substantively what provision can't be agreed on.

11          MR. SCHAFHAUSER:  Substantively, as I understand the

12  Schreibers' position, the Schreibers in their letter to Your

13  Honor on September 6th said, in order to -- and I'm quoting

14  from Docket 562, in order to agree to the stipulation the

15  Schreiber parties require a language that makes it absolutely

16  clear that they can continue to run Two Rivers without

17  interference or threats from the Nelkins.  We propose language

18  for this effect -- to this effect today and the Nelkins

19  rejected it.  By contrast, the Nelkins also filed a submission

20  with Your Honor on --

21          THE COURT:  That's --

22          MR. SCHAFHAUSER:  -- September 6th, Docket 566.

23          THE COURT:  Thank you.  That's what I was looking

24  for.

25          MR. SCHAFHAUSER:  In which the Nelkins say at page

1   2, the attached stipulation contains minimal corrections and

2   additions the additional draft requested by Nelkin & Nelkin.

3   But then they say this stipulation, however, was not agreeable

4   to the Schreiber parties who refused to sign a stipulation

5   unless it either prevented Koenig from receiving the payments

6   due to him under the settlement or conceded to them equity and

7   benefits which would force Koenig and the other parties to

8   violate the charging lien prior to the resolution of the fee

9   dispute between Nelkin & Nelkin and the Schreiber parties.

10  The point being, Your Honor, that we -- I prepared a

11  stipulation that was intended to effectuate exactly what Your

12  Honor directed, and I'm caught up in a dispute.

13         THE COURT:  I know you're trying -- okay.  Perhaps

14  folks at the Nelkin and Schreiber table could tell me what you

15  disagree about specifically.  I'm really not getting it, and

16  I'm sorry for being so dense.

17         MR. ROSENBLATT:  I'll keep it focused, I hope.  The

18  issue for the Schreibers is if the shares that are going to be

19  surrendered by the settling parties are simply held under the

20  authority of the court.  Their hands are tied with regard to

21  making certain decisions as to running the company.  The issue

22  of paying bills more than $2,000.

23         THE COURT:  Yeah.

24         MR. ROSENBLATT:  So all of those things.

25         THE COURT:  So you want the shares held by whom?

22

1          MR. ROSENBLATT:  We don't mind if the shares are

2     held by the Court.  The issue is that we'd like some sort of

3     ruling or carve-out that are allowed to -- that because the

4     ownership is no longer with the settling defendants that

5     they're considered now the majority rule, that they can

6     make --

7          THE COURT:  Well, why does the Court need to hold

8     the shares -- and maybe this is more on the Nelkins' side, why

9     can't the shares be distributed and you preserve your rights

10    to get whatever you want from the company and the Schreibers?

11         MS. HYLAND:  I'm going to stand because everyone

12    else is standing.

13         THE COURT:  I really don't care.  However you're

14    comfortable.

15         MS. HYLAND:  The purpose of the charging lien is to

16    secure all of the proceeds of the settlement until the fee

17    dispute is resolved.  The bulk of the settlement are -- is the

18    transfer of the shares.  So --

19         THE COURT:  Well, what's going to the shares that

20    will put them beyond your reach?

21         MS. HYLAND:  Well, the concern might -- would be

22    that things would be done such as transfer of the shares to

23    another party.  So --

24         THE COURT:  Why don't you enter into -- enter into a

25    stipulation that they can't transfer the shares to another

23

1   party?

2          MS. HYLAND:  I think that's what we were trying to

3   do.

4          THE COURT:  Is that okay?

5          MS. HYLAND:  Was to enter into a stipulation that

6   said --

7          THE COURT:  Okay.

8          MS. HYLAND:  -- they couldn't do -- they couldn't --

9   there were certain things that we were concerned about doing

10  it.

11         THE COURT:  That's what I'm trying to figure out.

12  What is it you want?  Because, look, I understand there is a

13  fee dispute.

14         MS. HYLAND:  Uh-huh (affirmative).

15         THE COURT:  The merits of which are not before me

16  right now.  I'm trying to figure out what keeps you from --

17  and from everybody at this table preserving their interests in

18  that fee dispute while letting the defendants go on their way?

19         MS. HYLAND:  We -- that's exactly what we want to

20  do.

21         THE COURT:  So you want to make sure that they can't

22  transfer the shares?

23         MS. HYLAND:  Transfer the shares or do other --

24         THE COURT:  Well, what other things?

25         MS. HYLAND:  Do you want to -- can I have Mr.

24

1   Maulsby address the other things?

2            THE COURT:  You can have whoever you want.

3            MS. HYLAND:  Because he's more familiar with those

4   points than I am.

5            MR. MAULSBY:  There are certain things that come

6   with control of the company that are prohibited now with Mr.

7   Koenig and -- such as raising their salary, paying out large

8   distributions, encumbering the company in the shares.  There

9   are just different things that would lower the value of the

10  company and lower the value of the shares.  And as long as

11  there's something -- we're not interested in preventing them

12  from operating their business.  We just want to make sure that

13  they can't, you know, get all of the benefits of the -- of

14  the -- around the charging lien by basically raiding the

15  company in different ways to take all the money or all of the

16  value out of the company either by large distribution --

17           THE COURT:  How about this, folks.  If you have a

18  notice for actions that would concern -- a provision to

19  provide notice to you of certain specified actions and if you

20  object to it you have a -- you know, dispute resolution

21  provision that freezes the action for a short period of time

22  while you seek to resolve the dispute, would that work?

23           MR. ROSENBLATT:  It would, and we have no problem

24  that in -- the only issue is every day operating-type things.

25  Obviously, they wouldn't want to have to clear it with the

25

1  Nelkins --

2          THE COURT:  Of course, that's why I'm saying beyond

3  a certain level, right?

4          MR. ROSENBLATT:  Right.  Things such as, you know,

5  filing for bankruptcy or incurring significant debt or --

6          THE COURT:  Yeah.

7          MR. ROSENBLATT:  -- transferring shares, those kinds

8  of things, we would have no problem.

9          THE COURT:  Right.  But I mean you could -- I think

10  if you guys were to sit down, I know the well has been

11  poisoned between you, and that's really unfortunate.  But I

12  think you've got a shared interest here, which is on one side

13  of this table or the other somebody could lose really big if

14  the settlement goes away and you're all forced to continue

15  litigating and eat up the -- in litigation costs any benefit

16  that you might get later on or if one side, you know, loses

17  completely on the fee dispute, yeah, there's some real risks

18  here that you can avoid by coming up with a way forward of

19  just saying what's the real concern?  Day-to-day or you pay a

20  vendor, really, you're going to worry about that?  I don't

21  think so.  So say, look, if there is, you know, certain

22  defined action, bankruptcy, transferring shares, there's a

23  freeze on it pending a dispute resolution to occur within X

24  days.  If there is a payment exceeding X number of dollars, if

25  there a salary raised exceeding X number of dollars, dispute

1  resolution mechanism.  Everything else, go ahead and run the

2  business.  You think you guys could come up with that in

3  principle?  Any objection in principle to that idea?

4          MS. HYLAND:  Well, can I ask a question?

5          THE COURT:  Yeah.

6          MS. HYLAND:  When you say -- sorry.  When you say

7  dispute resolution, I think the issue is what is the agreement

8  about whether or not that action is permitted?  That's the

9  issue, you know.  Our position is the lien, the charging lien

10 over the shares would prevent them, for example, from selling

11 the company or selling the shares or raiding the company.  But

12 what is the arbitrator who is going to be determining that --

13 is it to maintain the status quo?  I think that's the

14 agreement that we're going to have trouble reaching because --

15         THE COURT:  Well, it will either be, yeah, you

16 shouldn't do this because that would vitiate the charging

17 lien, or it really wouldn't vitiate the charging lien and

18 you -- you're thinking the sky is falling.  So they can go

19 ahead and do it.

20         MS. HYLAND:  So the standard would be -- and I agree

21 with -- I think that makes sense.  It -- anything that would

22 violate the charging lien would be -- would be --

23         THE COURT:  I think that's right.  Do you guys

24 disagree with that?

25         MR. ROSENBLATT:  No.

1          THE COURT:  Okay.  So -- okay.  So please within a

2    week let me have the stipulation among all of the parties and

3    non-parties here so that the defendants can discharge their

4    obligations under the settlement agreement without prejudice

5    to those in dispute about the fee and with a dispute

6    resolution mechanism that allows the company to operate with

7    vitiating the -- any arguments that somebody could make under

8    the charging lien.  All right?

9          MS. HYLAND:  Can I ask another question?  Does that

10   resolve the Koenig funds?  Did -- is there any dispute about

11   whether those should be -- what should happen with those?

12         MR. SCHAFHAUSER:  Your Honor, I think that's all

13   in -- and for Ms. Hyland's benefit I don't think she was

14   involved at all in that.

15         THE COURT:  Okay.

16         MR. SCHAFHAUSER:  It's all in -- you know, we have

17   two documents that addresses all of that.  And in addition, it

18   addresses -- you know, there's Exhibits A through O that need

19   to be exchanged and pieces of paper.  It's all there.  It's

20   all there.

21         THE COURT:  So there's a lot more -- and I'm sure a

22   lot of it is there, but I'm trying to identify any substantive

23   issues that anybody anticipates.  Now in terms of payments to

24   Koenig, it -- there is payments and there's equity, right?

25         MS. HYLAND:  I think that there is.

28

1          MR. NELKIN:  And, Your Honor, I concede that.

2          MS. HYLAND:  Yes.

3          MR. NELKIN:  It's basically Mr. Koenig is being

4    bought out and his equity's being transferred to the

5    Schreibers.

6          THE COURT:  Right, so --

7          MR. NELKIN:  So basically, we do not object to money

8    being paid to Mr. Koenig as long as there's some sort of

9    status quo that protects the --

10         THE COURT:  The shares.

11         MR. NELKIN:  -- shares.

12         THE COURT:  But that's going to be wrapped up in

13   what we just discussed, right?

14         MS. HYLAND:  Well, that's our position.  I just

15   wanted to make sure that the Schreibers agree with that.

16         MR. NELKIN:  The Schreibers have had differing

17   opinions on that and --

18         MS. HYLAND:  Yeah.

19         THE COURT:  But once the shares are transferred, to

20   whom are they transferred?

21         MS. HYLAND:  To the Schreibers.

22         MR. NELKIN:  Schreibers.

23         MS. HYLAND:  I believe.

24         THE COURT:  Okay.  So is there any objection in

25   principle to having some check on what the Schreibers can do

29

1  with their shares, whether the ones they have now or those

2  they get from Koenig?

3              MS. HYLAND:  No.

4              THE COURT:  Okay.  So I think you guys can work this

5  out.

6              MS. HYLAND:  Okay.

7              THE COURT:  All right.  And I think that moots the

8  Rule 67 issue.

9              MR. SCHAFHAUSER:  Hopefully it does, Your Honor.  I

10 would just ask again for some kind of an -- you said a week.

11             THE COURT:  Yeah.

12             MR. SCHAFHAUSER:  But some kind of outside date if

13 we can't get this resolved that I can file a motion to try to

14 get it.

15             THE COURT:  You can file your motion.  Let's --

16             MR. SCHAFHAUSER:  I'm not looking to file motions.

17 I'd love to get the stipulation.

18             THE COURT:  I know.  I get it.  You can file it.  I

19 will tell you, Mr. Schafhauser, I'm not sure what you

20 anticipate that the motions would accomplish.  As I read Rule

21 67, it provides a mechanism for you to take some property

22 shares, money, otherwise deposited with the Court.

23             MR. SCHAFHAUSER:  Yes.

24             THE COURT:  But I don't know that it achieves any

25 protection for you, and that's -- so what is it you're trying

30

1  to achieve?

2          MR. SCHAFHAUSER:  Under the -- I'll answer the

3  question.  What I'm trying to achieve, Your Honor, is that

4  under the settlement once my client delivers the items that I

5  proposed to deposit into court, my client has complied with

6  the terms of the settlement agreement and therefore -- and

7  again, I don't want to get into details, but the clock starts

8  ticking on the 120-day period that Mr. Nelkin referenced in

9  one of his letters.  And once that 120-day period passes, the

10 case is over.  The releases become effective as to my client,

11 and people need to file a stipulation of dismissal with

12 prejudice.  The clock needs to start running once my client

13 delivers out of its possession into court all of the benefits

14 and then the clock starts running.  That's what we're trying

15 to accomplish.

16         THE COURT:  So -- and I'm -- I think I may have

17 misperceived what you anticipated would happen.  So you're not

18 saying -- or you're not anticipating that by virtue of the

19 deposit you would be out of the case?

20         MR. SCHAFHAUSER:  No, absolutely not.

21         THE COURT:  Okay.  It would just -- it would just,

22 as you say, start the clock ticking so that you could later

23 make a motion to enforce the settlement because you had done

24 partial performance?

25         MR. SCHAFHAUSER:  Well, I would have -- yes,

31

1   although I would have done complete performance --

2              THE COURT:  Yeah.

3              MR. SCHAFHAUSER:  -- after 120 days.  It's a -- it's

4   a convoluted thing but --

5              THE COURT:  I understand.

6              MR. SCHAFHAUSER:  But I'm trying to get the clock

7   starting ticking on my performance.  I want to be able -- my

8   client's performance, that's what I'm trying to accomplish so

9   that I can come back in four months and say, Your Honor, we

10  complied and under the terms of this settlement we now are

11  entitled to releases and a dismissal with prejudice.  That's

12  the goal of this.  That would be the goal of the motion.

13             THE COURT:  The other -- the other question I would

14  have -- and, you know, it's premature at this point but --

15             MR. SCHAFHAUSER:  I understand.

16             THE COURT:  -- to get everybody thinking about this,

17  is -- and I haven't done any research onto this -- into this

18  question, can you apply Rule 67 to the terms of a executory

19  settlement as opposed to the money or property claimed in the

20  complaint?

21             MR. SCHAFHAUSER:  It's a thorny question, one that

22  I've considered, Your Honor.  In all candor, it's a thorny

23  question, and that's something I had planned to address in my

24  motion.  I would rather -- I would rather not address it.  I

25  would rather get it done.

32

1          THE COURT:  Okay.  Mr. Nelkin, if you wish to be

2    heard, I will of course hear from you.  But today you are here

3    as a client, and you have a lawyer -- and a talented one.  So

4    if you wish to be heard, fine.  But --

5          MR. NELKIN:  No.

6          THE COURT:  -- you might want to check with your

7    lawyer to see who should do the talking.

8          MR. ROSENBLATT:  Your Honor, I just wanted to

9    clarify something while they're talking.  I just wanted to

10   confirm that what we're --

11         THE COURT:  Hold on.  So let them talk, and then

12   they'll be able to hear you.

13         MR. ROSENBLATT:  Not a problem.

14                    [Pause in proceedings.]

15         MS. HYLAND:  He's just going to respond to one of

16   the points, Your Honor.

17         THE COURT:  Okay.  Go ahead.

18         MR. NELKIN:  Your Honor, and I think Mr. Schafhauser

19   will back me up on this.  I believe the settlement by its

20   terms was binding and effective on August 16th, and so it's

21   not executory.  It's just there's performance that flows out

22   of it.

23         THE COURT:  I may -- I may have used -- you're not

24   correcting Mr. Schafhauser, you're correcting me, and I think

25   rightly so.  I may have misused the term.

33

1          MR. NELKIN:  Okay.  I just -- it's that --

2          MR. SCHAFHAUSER:  He is correct as to the way it

3   reads, yes, Your Honor.

4          THE COURT:  Okay.  Okay.

5          MR. ROSENBLATT:  Your Honor, if I may?  I'm sorry.

6          THE COURT:  Go ahead.

7          MR. ROSENBLATT:  I just wanted to clarify that under

8   what we're talking about in terms of mechanism that the shares

9   actually would be transferred to the Schreibers as part of

10  this whole settlement, but then there would be the checks on

11  their authority to do certain things.  I just wanted to

12  confirm that that's what we're talking about, that the shares

13  actually would be transferred and then with the checks in

14  place.

15         MS. HYLAND:  And that was not -- okay.  I'm glad

16  that you clarified.  I thought that they were going to be

17  deposited with the Court so they could remain subject to the

18  charging lien, and then if they intended to take certain

19  action they would give notice and then we would have a

20  resolution process.

21         THE COURT:  As a practical matter, I honestly don't

22  see the difference.  My strong preference -- to the extent it

23  matters, and honestly, I don't think it does -- is that you

24  don't deposit it -- deposit something with the Court.  This is

25  not the Court's property, and if you have appropriate -- I

34

1   mean, look, if they transfer the shares improperly you unwind

2   that in a second -- or not in a second but you unwind it.

3   You'd be crazy to do that, and I don't know why you need the

4   Court to be holding something that effective -- has effective

5   controls on.

6           MS. HYLAND:  We haven't had a chance obviously to

7   discuss it.

8           MR. SCHAFHAUSER:  Your Honor, may I just address

9   that?

10          THE COURT:  Yeah, okay.

11          MR. SCHAFHAUSER:  Because I went through this with

12  counsel earlier.  One solution to that issue that I had

13  previously proposed and I propose it again is that the

14  transfer be subject to Nelkin & Nelkin's rights under the

15  charging lien and that the charging lien attaches even if the

16  shares are with the Schreibers.  So everybody's --

17          THE COURT:  It flows -- it flows with it.

18          MR. SCHAFHAUSER:  -- rights are preserved.  Right.

19          THE COURT:  Work --

20          MS. HYLAND:  I mean it makes sense to me.

21          THE COURT:  Work it out.

22          MS. HYLAND:  Yeah.

23          THE COURT:  I think it's best done without

24  needlessly putting something in the Court if for no other

25  reason than it imposes burdens on the clerk's office.

35

1          MS. HYLAND:  Okay.

2          THE COURT:  But I just think it's an added security

3    that you just don't need to protect everybody's legitimate

4    interest.

5          MS. HYLAND:  Okay.  Well, we'll try to work that

6    out.

7          MR. FASO:  Your Honor?

8          THE COURT:  Okay.  All right.  Yes, Mr. Faso?

9          MR. FASO:  May I be heard on one substantive aspect

10   of this which I think impacts Mr. Koenig?

11         THE COURT:  Yeah.

12         MR. FASO:  The funds that Mr. Koenig is to receive

13   for his equity are not subject to the Nelkins' charging lien.

14   They've taken that position.

15         THE COURT:  Right.

16         MR. FASO:  They will be paid into court along with

17   the funds from the defendants.  In fact, I believe those --

18         THE COURT:  Well, I think -- hopefully they'd be

19   paid to your client.

20         MR. FASO:  And that's what I wanted to raise.

21         THE COURT:  Yeah.

22         MR. FASO:  I believe that there may be some

23   competing views on that.  It's our position that they could be

24   paid directly to Mr. Koenig without necessarily --

25         THE COURT:  Okay.  Anybody care to tell me why it

1   shouldn't be paid directly to Koenig?

2        MR. SCHAFHAUSER:  I believe Mr. Parness, who is not

3   here -- not believe, I know Mr. Parness' position had been

4   that the Schreibers object, and I don't know whether Mr.

5   Rosenblatt is attuned to that issue.  But Mr. Parness wrote

6   that in writing.

7        THE COURT:  Yeah, but Mr. Rosenblatt, why -- what

8   would be the problem of Mr. Koenig having the money as opposed

9   to the Court?

10       MR. ROSENBLATT:  I think the concern -- and I -- in

11  theory I don't think there's a problem.  I think the concern

12  is that the Nelkins are sort of injecting themselves to have

13  it both ways.  Mr. Koenig gets bought out and he divests

14  himself of the company, but then his equity doesn't transfer

15  over because that's considered a benefit to the Schreibers.

16  I -- that's why I was trying to clarify the issue of the

17  shares.  If Mr. Koenig's shares are going to be transferred

18  subject to whatever limitations then I don't think we have a

19  problem.

20       THE COURT:  Right.  But the concern about

21  transferring the shares over is so that the -- your clients

22  can run the business.

23       MR. ROSENBLATT:  Correct.

24       THE COURT:  All right.  So if we have a way of going

25  forward with that so that they can run the business,

37

1    regardless of where the physical shares are located -- if

2    there is such a thing as physical shares these days, I don't

3    know -- but your clients will have what they need to run the

4    business.  The ultimate ownership of both funds and shares is

5    subject to resolution as part of the fee litigation.

6              MR. ROSENBLATT:  Right.

7              THE COURT:  But is there any reason why Mr. Koenig

8    shouldn't get his funds while that's all going forward as long

9    as everybody's interest in the shares are protected?

10             MR. ROSENBLATT:  I don't think in theory that's a

11   problem.  Can I just confer with my clients for a second?

12             THE COURT:  Yeah.

13                    [Pause in proceedings.]

14             MR. ROSENBLATT:  I'm sorry.  Just --

15             THE COURT:  Go ahead.

16             MR. ROSENBLATT:  I think that their concern is --

17   and I may be misstating it, so I want to make sure I get this

18   right.  But I think their concern is that because the charging

19   lien is so broadly worded my clients have to sort of --

20   originally the contemplation was that their -- some of the

21   settlement proceeds going to them were going to be going to

22   Mr. Koenig to buy out his interest.  Because they're now not

23   able to get any money because of the charging lien, they have

24   to go out-of-pocket in order to cover the buyout of Mr. Koenig

25   in order to transfer his equity in the company.

38

1          Am I saying that correctly?

2          MR. S. SCHREIBER:  I can explain, Your Honor.

3          THE COURT:  Go ahead.

4          MR. S. SCHREIBER:  Part of the way the Nelkins

5   structured the settlement was that we'd be buying Friedman's

6   equity with a creditor.  Mr. Schafhauser can say that.  But as

7   soon as the charging lien was filed, three minutes later I got

8   a letter, as your attorneys we need to make you aware of --

9   aware of your obligations under the settlement.  You owe Mr.

10  Friedman $110,000, Mr. Eugene owes Friedman $110,000.  You owe

11  Koenig $20,000, but that was supposed to be with the intent

12  that it's coming from the settlement proceeds and like a

13  credit off of -- for tax purposes.  That's the way they did

14  it.  So it's basically it was my feeling a trap.  They put the

15  charge lien.  They say, oh, now you're in violation of the

16  settlement because you owe all this money to Friedman.

17          THE COURT:  Wait, how are you in violation of the

18  lien?

19          MR. S. SCHREIBER:  Because I owe -- because the

20  settlement can't -- I'm not in violation of the lien.  I'm in

21  violation of the settlement agreement because I owe Friedman

22  all this money now.  But we have to let you know we're holding

23  all that money so you don't have the money to pay Friedman.

24  So therefore, Friedman's going to sue you.  Mr. Schafhauser

25  can --

1          THE COURT:  Are you --

2          MR. SCHAFHAUSER:  I'm happy to address it.

3          THE COURT:  Yeah.

4          MR. SCHAFHAUSER:  This gets a little convoluted.

5   But basically, when the Koenig dispute was resolved the

6   resolution was as follows.  About a million dollars -- it's

7   997- and change, about a million dollars was to be paid to Mr.

8   Koenig to buy Mr. Koenig out.  The total amount to be paid by

9   Mr. Friedman and the Friedman entities, if I can use that

10  phrase, is 2.75 million in cash under this settlement

11  agreement.

12          So 1.75 million was to go essentially to the

13  Schreiber parties and Two Rivers, however, and 1 million was

14  to go to Mr. Koenig.  Part of the 1.75 million, though, there

15  were credits that were to be given to Mr. Friedman for the

16  sale of his equity and for the sale of the promissory note of

17  6.5 million, roughly.  And so there were credits going back --

18  the principal amount.  I see the smile.  But there were

19  credits going back and forth, and Your Honor is beginning to

20  see why this settlement agreement took so long to negotiate

21  and finalize.

22          But in any event, I think those are -- frankly,

23  those are credits that are intended to occur simultaneously

24  with the payments to be made to the Schreibers.  My position

25  would be -- and just to answer the question that Mr. Schreiber

1  I think was posing is under the document that we drafted and

2  this counsel has seen, the payment would go into court.  The

3  credit essentially would be deemed made as well, and that

4  would be it.  The transaction would have occurred upon the

5  payment into court which would again trigger the 120-day

6  period that I referred to earlier.

7          THE COURT:  If you -- if you transferred it to --

8  I'm getting a little lost here.  If it's not paid into the

9  Court but paid to the appropriate parties -- so you've got

10  some going to -- oh, I guess the money you want paid into the

11  Court?

12          MR. SCHAFHAUSER:  They -- well, I think -- I think

13  the Nelkins are objecting to the payment of 1.5 million to the

14  Schreibers.  That's the issue.

15          THE COURT:  Yeah, but if --

16          MR. SCHAFHAUSER:  I don't think they object -- I'm

17  sorry.

18          THE COURT:  Okay.  If it's paid into the Court, the

19  amount that's paid into court is 1.5?

20          MR. SCHAFHAUSER:  Well, it will -- it will be a net

21  amount.  Essentially, it will be a net amount.  We're talking

22  about --

23          THE COURT:  Need to have gotten 100,000 more than is

24  actually being deposited in the Court, right?

25          MR. SCHAFHAUSER:  This -- I have to think clearly

41

1  about how this works under the settlement agreement.  The --

2          MR. NELKIN:  It was on top of the 1.75.  It was 1.6.

3

4          MR. SCHAFHAUSER:  It was -- so it would have been --

5  right, it would have been a net payment.  It would have

6  been --

7          THE COURT:  Yeah, so the net amount is paid into the

8  Court.

9          MR. SCHAFHAUSER:  The net amount is paid into the

10  Court.

11          THE COURT:  Bear with me.

12          MR. SCHAFHAUSER:  And Mr. Friedman is deemed to have

13  been received by --

14          THE COURT:  From them.

15          MR. SCHAFHAUSER:  -- paying only the net from the --

16          THE COURT:  Bear with me, please.

17          MR. SCHAFHAUSER:  Okay.  Sorry.

18          THE COURT:  The net amount is paid into the Court.

19          MR. SCHAFHAUSER:  Yes.

20          THE COURT:  Friedman is deemed to have obtained from

21  the Schreibers that difference, the --

22          MR. SCHAFHAUSER:  Correct.

23          THE COURT:  -- $100,000-whatever.

24          MR. SCHAFHAUSER:  Correct.

25          THE COURT:  Would the Nelkins take the position that

42

1  that violates the charging lien?

2          MR. NELKIN:  No.  We said we had already told them

3  that we would not.

4          THE COURT:  So is there anybody who thinks that any

5  party or non-party would be violation of any legal obligation

6  if the payment proceeds as Mr. Schafhauser and I have

7  described?  An amount being -- a net amount being paid into

8  the Court, the amount owed to Friedman being deemed paid.

9  That's fine?  Fine?

10          MR. ROSENBLATT:  Net amount we're talking, yes.

11          THE COURT:  Yeah.

12          MR. ROSENBLATT:  But, yes.

13          THE COURT:  Anybody have an objection to that?

14  Sounds like not.  I think you guys can work it out.  I think

15  you actually have.

16          Mr. Faso, I don't mean to exclude you.

17          MR. FASO:  Yes, Your Honor.  I believe that works it

18  out.

19          THE COURT:  Okay.

20          MR. FASO:  The final issue with respect to Mr.

21  Koenig is there's one small reimbursement payment coming from

22  the Schreibers to him.  So we would suggest that the

23  stipulation provide that that payment be made in addition to

24  the direct payment from --

25          THE COURT:  Out of what funds?

43

1          MR. FASO:  From the Schreibers.  It's about

2     20,000 --

3          THE COURT:  But they have to -- they have to --

4     they're not -- in other words if there was no fee dispute, the

5     Schreibers would pay that $20,000 out of funds that are coming

6     in -- you know, a much greater pot of money that's coming in.

7     They wouldn't have to dig into money that's currently sitting

8     in their pocket.  They'd just take it out of what's coming in,

9     right?

10          MR. FASO:  Where they decide to take it out from is

11     not addressed in the --

12          THE COURT:  Of course not.  But as a practical

13     matter, without the charging lien the 20,000 that you're

14     talking about could come right out of money coming to them

15     from the charging lien.  They wouldn't have to dig into their

16     pockets to pay it.

17          MR. FASO:  That would be acceptable.

18          THE COURT:  Of course it would for you.  But with

19     the charging lien, the only way that that 20,000 gets to you

20     is if they dig into their pocket for money that they may not

21     ever get.

22          MR. FASO:  Actually, Your Honor, I don't believe

23     that the charging lien -- that those funds are subject to the

24     charging lien so --

25          THE COURT:  Well, where is it coming from?  Where is

44

1  the 20,000 coming from?

2          MR. FASO:  For reimbursement from Two Rivers

3  Coffee --

4          THE COURT:  Where are they getting it from to pay

5  you?

6          MR. FASO:  From Two Rivers Coffee's funds.

7          THE COURT:  Right.  They have to dig into their

8  pockets in a way that they wouldn't have to do.  And you're

9  not --

10         MS. HYLAND:  Well, they would have actually.  The

11 way that the settlement was contemplated is that was going to

12 come out of the --

13         MR. NELKIN:  That's not coming from the defendants,

14 Your Honor.

15         MR. SCHAFHAUSER:  I don't believe what Mr. Faso is

16 referring to, Your Honor, is part of the settlement.

17         MR. NELKIN:  It's Exhibit A-1.  It's the

18 reimbursement fund.

19         MR. SCHAFHAUSER:  Oh, there's an exhibit between you

20 guys?  Okay.  Okay.  I stand corrected.  There's an exhibit

21 that Mr. -- I stand corrected.

22         MR. ROSENBLATT:  Your Honor is right that that was

23 what we had intended in terms of from the monies that were

24 being received some of that would be diverted to be Mr.

25 Koenig, $20,000.  I mean again we're talking --

1        THE COURT:  How about the $20,000 that we're talking

2   about that is supposed to go to Mr. Koenig comes out of the

3   amount that would otherwise be deposited in the Court?

4        MR. ROSENBLATT:  Amendment, that makes sense.

5        THE COURT:  Yeah, any problem with that?

6        MS. HYLAND:  That -- just to explain that was never

7   the original plan.  The plan was always that the money would

8   not come out of those funds.  It would come directly from the

9   Schreibers because, without getting too much into the details

10  of the settlement, that 1.75 that was being deposited was

11  earmarked for a different purpose and so those funds were

12  always going to come for the Schreibers.

13       THE COURT:  We all know that money is fungible.

14       MS. HYLAND:  Yeah.

15       THE COURT:  And we all know --

16       MS. HYLAND:  But we only have a lien on that 1.75.

17       THE COURT:  Yeah.

18       MS. HYLAND:  We don't have a lien on the -- sorry,

19  on the funds that are sitting in the Schreibers' pockets.

20  So --

21       THE COURT:  Of course you don't.

22       MS. HYLAND:  Yes.

23       THE COURT:  I get that.  Look, if you want -- if you

24  want this to break down over $20,000 you can.  Absolutely.

25       MS. HYLAND:  Can I talk to my --

46

1        THE COURT:  But it's going to break down over

2  $20,000.

3        MS. HYLAND:  Can I -- can I have a minute?

4        THE COURT:  Of course you can.

5        MS. HYLAND:  Okay.

6        THE COURT:  Take two if it will get us past this.

7                  [Pause in proceedings.]

8        MS. HYLAND:  We are willing to have the 20,000 paid

9  from the 1.75.

10       THE COURT:  Okay.  It's just -- it seems like a very

11  sensible way out.  Okay.  So that takes cares of your issues,

12  and I think that takes care of the Schreibers' issues.

13       Are there any issues that you have with the

14  proposal?  I know there's some mechanisms to be hammered

15  out --

16       MS. HYLAND:  Yes.

17       THE COURT:  -- about what the dispute resolution is,

18  but in principle what we've got is something that gets the

19  defendants out of the case, gets Koenig the payment, the

20  funds -- the funds payments, gets the Koenig shares

21  transferred and the Friedman shares transferred to either the

22  Schreibers or to the Court, but.  But in either event in a way

23  that allows the Schreibers to run the business subject to

24  certain defined actions having a grace period in which you can

25  object and trigger a dispute resolution mechanism.

1          Am I, A, correctly summarized it, and, B, summarized

2    something that is acceptable to everybody?

3          MR. ROSENBLATT:  From our point of view, the

4    Schreibers, yes, I think that's right, Your Honor.

5          THE COURT:  Okay.  Ms. Hyland.  Ms. Hyland.

6          MS. HYLAND:  Yeah, just that it's -- that those

7    shares -- just adding one component which is that the dispute

8    resolution would be to determine that the charging lien is not

9    being violated.

10          THE COURT:  It's not -- yeah, that's the -- that's

11    the issue that would be --

12          MS. HYLAND:  Yeah.

13          THE COURT:  -- subject to the dispute resolution

14    mechanism.

15          MS. HYLAND:  Correct.

16          THE COURT:  And, Mr. Schafhauser?

17          MR. SCHAFHAUSER:  I -- yes, although there's a

18    couple of clarifications --

19          THE COURT:  Okay.

20          MR. SCHAFHAUSER:  -- I need to make so we don't have

21    to do this one more time.  Under the settlement agreement,

22    certain documents I think were to be held by Nelkin & Nelkin

23    anticipating hopefully an issue that won't be an issue.  I

24    don't know whether the Schreibers have an issue with Nelkin &

25    Nelkin holding those certain documents at this point or

1  whether we can agree to some compromise so we can resolve that

2  issue.

3          THE COURT:  I'm sorry.  Which documents are we

4  talking about?  What kind of documents?

5          MR. SCHAFHAUSER:  Submissions to various

6  [inaudible].

7          THE COURT:  Okay.

8          MR. SCHAFHAUSER:  Submissions to, you know, the

9  courts, the State Court in New Jersey.  I'm holding documents.

10  They're holding documents.  And again, after the passage of

11  the magic 120-day period everybody's filing various documents

12  with various tribunals.  I just don't want there to be an

13  issue as to who is holding what, and I was hoping to address

14  that.

15          MR. ROSENBLATT:  Well, I'm not 100 percent sure

16  exactly what documents Mr. Schafhauser is talking about, but I

17  just don't want to put my clients in a position where they're

18  relying on the Nelkins for any legal process.  Filing back to

19  it, if it's a question of moving them over to me and having me

20  file them or Mr. Parness, I'm -- we're happy to do that if

21  that's not an issue with anybody.  I'm not --

22          THE COURT:  Want to hold onto documents?

23          MS. HYLAND:  Do I?

24          THE COURT:  Yeah, the Nelkins?

25          MR. NELKIN:  No.

1          MS. HYLAND:  They're -- the settlement agreement

2   provides for that, but, I mean, I'm sure we can -- I'm sure we

3   can --

4          THE COURT:  But it provides for that is the -- for

5   the Nelkins to hold them in their role as counsel.

6          MS. HYLAND:  As counsel.

7          THE COURT:  So if they're replaced as counsel it

8   should go to the current counsel, right?

9          MS. HYLAND:  I'm sure we can work -- yes.

10         MR. SCHAFHAUSER:  Very well.  Thank you.

11         THE COURT:  Okay.  Good.  No, you're being careful,

12   so that's good.  Anything else?

13         MR. SCHAFHAUSER:  I don't believe so, Your Honor.

14   I'm hopeful that we can work this out.

15         THE COURT:  All right.  And, Mr. Faso, any

16   clarifications?

17         MR. FASO:  No, Your Honor.

18         THE COURT:  Sorry, sir, are you -- who are you?

19         MR. KOENIG:  Me?

20         THE COURT:  Yeah.

21         MR. KOENIG:  I'm Mr. Koenig.

22         THE COURT:  Oh, Mr. Koenig, welcome.

23         MR. KOENIG:  I have a beard now.

24         THE COURT:  Yeah.  Yeah, welcome.  I just want to

25   have a record of who is at the table.

1          Okay.  All right.  Good.  So I will eagerly

2   anticipate seeing this stipulation within a week.  If you're

3   still working on it and expect to get there but you need a

4   little more time, let me know that.  If for any reason this

5   falls apart, God forbid -- but if it does you will have my

6   leave, of course, to file your Rule 37 motion unless it's on

7   consent.  But if it's not on consent -- if you can't reach

8   this agreement it won't be on consent -- please file a letter

9   in a week that just reports that and has an agreed-on briefing

10  schedule.  Okay?

11          MR. SCHAFHAUSER:  Yes, Your Honor.

12          THE COURT:  Okay.  All right.  So that leaves us

13  with the issue of termination for cause -- and which I --

14  which I think needs to be resolved before we can really

15  understand the posture in which any of the other fee-related

16  disputes are proceeding.  I've got your arguments.

17          I don't know if you want to be heard further on

18  that.  I will tell you I'm not going to resolve it today.  I

19  want to give it some greater consideration and likely write on

20  it.  But -- so I'll happily hear from you today if you -- if

21  you want to have argument on it.  If you think it's best done

22  separately, I'll -- I'm happy to consider that.  But my

23  threshold question on that is whether you folks all think that

24  the prospect of settling the fee dispute is exhausted?

25          MR. ROSENBLATT:  I'll speak to that, Judge.

1          THE COURT:  Yeah.

2          MR. ROSENBLATT:  We had hoped that we could move the

3   ball forward on trying to resolve the issue.  We've been in --

4   I've been in contact with Ms. Hyland.  We made a settlement

5   offer which actually improved upon a prior offer that we had

6   made without having received movement from the Nelkins.  Their

7   response to us was we're not moving.  So I think it's been

8   exhausted.  And I --

9          THE COURT:  You disagree?

10         MS. HYLAND:  Well, the major dispute over the fee

11  issue is the value of the company, and there's a vast

12  disparity between how the Schreibers are valuing the company

13  for the purposes of determining the Nelkins' contingency and

14  what the Nelkins genuinely believe the value of the company

15  is.  What I have proposed is that we agree on a completely

16  independent and neutral appraiser to come up with a number so

17  we can at least be in the same ballpark, and then I think we

18  might have a chance of just knowing --

19         THE COURT:  In other words not to be binding but to

20  just inform the negotiations?

21         MS. HYLAND:  Right.  Right.  And I've proposed that,

22  and I have not received a response.

23         THE COURT:  What do you think?

24         MR. SCHAFHAUSER:  Well, we're still considering that

25  proposal, Judge.  But, I mean, frankly we've got an evaluation

52

1  that we believe is legitimate and was done by --

2          THE COURT:  But, look, I honestly would hate to see

3  this issue get resolved -- not because I have a sense of where

4  it ends it up.  I really don't.  But I do think that there is

5  a threshold issue here that could result in a windfall for one

6  side or the other that would be far less preferable to what

7  I'm sure you could reach as a consensual resolution.  There is

8  a fair resolution here, but it may be precluded by either the

9  legal outcome of the question of -- you know, the nature of

10  the separation between client and counsel or by the way it

11  would affect the bargaining positions.

12          MS. HYLAND:  I'm having trouble -- given that the

13  major dispute is over the value of the company and the parties

14  are so far apart on what that is because they're relying on

15  completely different valuations done at different times for

16  different purposes and we don't really have a proper valuation

17  that probably would be the correct valuation, I don't

18  understand the reluctance because I would think both sides

19  would want to hammer that number down and figure it out.  And

20  I would love to be able to agree to a process, put everything

21  off, have that process happen.  I think that could really

22  result in a -- in a settlement.

23          THE COURT:  You know, I almost never do what I'm

24  about to suggest, but I'm going to ask you to consider it.  I

25  think I have the authority, pretty sure I do, to order you to

53

1   mediation, and I'm considering doing that.

2          If either side wants to be heard about why that

3   shouldn't happen, I will certainly hear you because I'm

4   usually very reluctant to force anyone to a bargaining table

5   because I think it's not terribly useful.  But I think the

6   stakes are very high here, and not just that they're high but

7   that we could have close to an all-or-nothing result which I

8   don't think is the right result in fairness.  Perhaps the law

9   would require it, but I don't think it's the satisfying

10  result.  And I do think that we have skilled mediators at our

11  disposal who could advance the ball.  So I'll hear you, but --

12          MS. HYLAND:  We don't object to mediation.  We're --

13  we'd be fine with mediation.  I think it would be good to have

14  a procedure for the parties to select a mediator if that's

15  okay with the other side.

16          THE COURT:  Well, first of all, let me hear from Mr.

17  Rosenblatt.

18          MR. ROSENBLATT:  We have no objection to mediation,

19  Judge.

20          THE COURT:  Okay.

21          MR. ROSENBLATT:  I mean I -- as to whether we can

22  agree, I hope we would be able to.  If not, maybe the -- maybe

23  what we can do is confer.

24          THE COURT:  Yes.

25          MR. ROSENBLATT:  And if we can't agree in a very

54

1    short amount of time the Court will --

2              THE COURT:  Yeah, yeah.  So that's what I'm going to

3    suggest.  We'll set a -- set a deadline for you to agree on

4    a -- either on a mediator or a process for selecting the

5    mediator.  If you can reach either of those agreements, great.

6    But if not, then I'll step in and send you to the court's

7    sponsored mediation program, and I'll work with the person who

8    heads our mediation program to make sure that we find somebody

9    who is in a position to -- yeah, have some background that

10   will be relevant to this dispute.  Okay.

11             How long would you like to work with each other in

12   either finding a mediator or agreeing on the process for

13   selection?

14             MS. HYLAND:  Your Honor, I have a question.

15             THE COURT:  Yeah.

16             MS. HYLAND:  Is it possible for you to also order an

17   appraisal procedure?

18             THE COURT:  I don't -- I honestly don't.

19             MS. HYLAND:  Okay.

20             THE COURT:  I mean at least not at this stage.

21   Maybe that -- well, no, I don't think I can really.  I'd have

22   to give it some thought, but that would really be here's

23   what's going to get you in the -- in the view of one side at

24   least get you to a settlement.  I'm not sure I can wade into

25   that where I'm ordering it to happen.

55

1              MS. HYLAND:  Okay.

2              THE COURT:  I can order you to mediate.  I don't

3    think I can order specific things done to advance --

4              MS. HYLAND:  Okay.

5              THE COURT:  If you -- if you think that's wrong, you

6    know, it's a top-of-the-head reaction.

7              MS. HYLAND:  I --

8              THE COURT:  If you think that's wrong, I'll of

9    course hear you.  But I'd like you to try first to agree on

10   either a mediator or a process for selecting one.

11             MS. HYLAND:  Okay.

12             THE COURT:  If some ancillary dispute to that comes

13   up I'll -- of course I'll hear you.

14             MS. HYLAND:  Okay.

15             THE COURT:  Okay.  How long would you like to get

16   back to me on that?

17             MS. HYLAND:  Two weeks?

18             MR. SCHAFHAUSER:  Two weeks.

19             THE COURT:  Okay.  So that's -- today's the 12th, is

20   it?

21             MS. HYLAND:  Yes.

22             THE COURT:  Okay.  So by the 26th.  And just going

23   back to the stip, I'm going to get that by October 19th.

24             Okay.  I think we've gotten as far as we can today.

25   Is there anything that we haven't addressed that we need to

56

1   take up, Ms. Hyland?

2           MS. HYLAND:  What -- so what's the status on the

3   for-cause issue?  Is that going to be held in abeyance pending

4   this?

5           THE COURT:  Yeah.  No, for -- that's really the crux

6   of the --

7           MS. HYLAND:  Right.

8           THE COURT:  -- fee dispute.  I mean not the crux,

9   but I think it's a threshold issue, two various ways of

10  addressing it, and of course the fee dispute raises some

11  procedural issues that we've touched on already which is --

12  one of which is is this right forum for doing it?  I've gotten

13  your respective views on whether there's any relief that can

14  be properly be sought in this case as opposed to the separate

15  lawsuit.  So that would also be a threshold issue, and then of

16  course there's the ultimate fee dispute.  But I think before

17  those issues can be decided we need to know what was the basis

18  for the separation between client and counsel.  If it was for

19  cause, obviously, that leads in one direction.

20          MS. HYLAND:  Right.

21          THE COURT:  If it's not, that leads in a different

22  one, and I'm hoping to avoid resolving that if you guys can

23  reach an agreement through a mediator.

24          MS. HYLAND:  Okay.  Okay.

25          THE COURT:  Okay.  All right.  Anything else for

57

1  today, folks?

2         MR. SCHAFHAUSER:  No, thank you.

3         THE COURT:  Thank you, all.  I'm not going to put

4  this down for another conference until I get your various

5  submissions in one week and two weeks.  So thank you, all.

6         MR. SCHAFHAUSER:  Thank you.

7         MS. HYLAND:  Thank you.

8         MR. ROSENBLATT:  Thank you for your time, Your

9  Honor.

10  (Proceedings concluded at 10:40 a.m.)

11                       *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

58

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5  _____

6                    Shari Riemer, CET-805

7  Dated:  October 15, 2018