UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


STEVEN SCHREIBER, et al.,    *   Case No. 15-CV-06861 (CBA)
                           *
            Plaintiffs,   *   Brooklyn, New York
                           *   November 29, 2018
     v.                 *
                           *
EMIL FRIEDMAN, et al.,     *
                           *
           Defendants.   *
                           *
* * * * * * * * * * * * * * *

TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE JAMES ORENSTEIN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:          RAPHAEL M. ROSENBLATT, ESQ.
                        Rosenblatt Law, PC
                        21 Court Plaza South, Suite 305
                        Hackensack, NJ  07601

For the Defendants,         NICOLE I. HYLAND, ESQ.
  Nelkin & Nelkin:        TYLER MAULSBY, ESQ.
                        Frankfurt Kurnit Klein &
                         Selz, PC
                        488 Madison Avenue, 10th Floor
                        New York, NY  10022


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

INDEX

WITNESSES FOR THE

PLAINTIFF:                        Direct   Cross

Carol Nelkin                         38      --

Steven Schreiber                     43      46

3

1          (Proceedings commenced at 9:39 a.m.)

2          THE CLERK:  Civil cause for a status conference,

3  Schreiber vs. Friedman, et al., docket no. 15-CV-6861.  Would

4  the parties please state their appearances for the record.

5          MR. ROSENBLATT:  Good morning.  Raphael Rosenblatt

6  from Rosenblatt Law, PC on behalf of Eugene Schreiber and --

7          THE COURT:  Good morning.

8          MR. ROSENBLATT:  -- Steven Schreiber and Two Rivers

9  Coffee.  Both of the Schreibers are here accompanying me in

10  court today.

11          THE COURT:  Good morning to all of you.

12          MR. S. SCHREIBER:  Good morning, Your Honor.

13          THE COURT:  Good morning.

14          MR. E. SCHREIBER:  Good morning.

15          MS. HYLAND:  Nicole Hyland, of Frankfurt Kurnit

16  Klein & Selz, representing Nelkin & Nelkin.  And my clients

17  are also here with me today.

18          THE COURT:  Good morning.

19          MS. NELKIN:  Good morning.

20          MR. MAULSBY:  Tyler Maulsby, Frankfurt Kurnit Klein

21  & Selz also on behalf of Nelkin & Nelkin.

22          THE COURT:  Good morning.

23          THE COURT:  All right, folks.  So we've got the

24  issue of the stipulation.  And let's just go item by item,

25  unless you have anything to report about any progress you've

4

1    made since we last were together.

2              MR. ROSENBLATT:  We did have a mediation session

3    yesterday, Your Honor.

4              THE COURT:  Yeah.  How did that go?

5              MR. ROSENBLATT:  It went for I'd say a total of

6    about almost 7:00, 7:30 at night.

7              MS. HYLAND:  7 o'clock, yeah.

8              MR. ROSENBLATT:  Yeah.

9              THE COURT:  Any problems?

10             MR. ROSENBLATT:  We made some incremental progress.

11   We were not able to settle, but there was some significant

12   amount of dialog back and forth.  Some different proposals

13   were floated, but unfortunately we didn't -- weren't able to

14   push anything past the finish line, so.

15             THE COURT:  Okay.  So push forward here.

16             MR. ROSENBLATT:  Okay.

17             THE COURT:  I saw that -- this is unrelated in a

18   sense, but I saw that you --

19             MS. HYLAND:  Right.

20             THE COURT:  -- withdrew the separate litigation.

21             MS. HYLAND:  Right.

22             THE COURT:  Any significance to that that I should

23   be aware of?

24             MS. HYLAND:  The significance is that under the

25   rules there's 90 days to serve.  We have never served that

5

1    complaint.

2              THE COURT:  I see.

3              MS. HYLAND:  And the deadline to serve was coming

4    right up before the mediation.  We didn't really want to

5    precipitate any, you know, issues, so we just have withdrawn

6    without prejudice hoping that this can be resolved.  And if

7    not, then we may have to go forward then.

8              THE COURT:  Okay.  Is there still some hope you

9    think for further mediation or settlement efforts?

10             MS. HYLAND:  Well, our understanding is that we may

11   be receiving a mediator's proposal.

12             THE COURT:  Oh, okay.

13             MS. HYLAND:  So I'm not sure what the status of that

14   is.  But, you know, we worked very hard yesterday.  It was a

15   very long day.  We made some progress.  I hope that eventually

16   we can or --

17             THE COURT:  I hope so too.

18             MS. HYLAND:  Yeah.

19             THE COURT:  And as always, just to reiterate, I'm

20   available to help in whatever way you think possible.  You

21   know, we'll let the bigger issue play out as best it can.  If

22   there's mediator's proposal coming, that's great.

23             But if you think that either a session with me or

24   referring it to another magistrate judge -- because, you know,

25   I'm involved in other things -- whatever you think, if there's

6

1    some way to make progress on settlement, obviously that's the

2    best way we could get this done.

3            All right.  But any progress on the issues regarding

4    the stipulation or there's still hope?

5            MS. HYLAND:  I did have a question.

6            There were two -- there was what we refer to as

7    stipulation one and stipulation two.

8            And I was wondering what the status was on the stip

9    one because I believe that that was -- the idea was that we

10   were going to have that signed and filed, which we did, and

11   that was going to get rid of the defendants and have the funds

12   deposited.  And then stip two would be resolved through this

13   process of deciding which of the parties --

14           THE COURT:  I'll be honest, I get so lost in all the

15   papers here --

16           MS. HYLAND:  I know.

17           THE COURT:  -- that I haven't honestly paid

18   attention to that distinction.

19           MS. HYLAND:  Okay.

20           THE COURT:  But once we settle -- not settle -- but

21   once we resolve all the issues with this, I'll make sure all

22   the stips are entered in their final form.

23           MS. HYLAND:  Okay.  Great.  All right.  Great.

24   Thank you.

25           THE COURT:  Yeah.  Thanks for bringing that to my

1    attention because I might well have lost track of it.

2            Okay.  So what I propose to do is just go in order

3    through the various, you know, specific issues you've got here

4    from you both on them and tell you my resolution, rather than

5    just hear from each of you on all of them at once.

6            So let's start with the -- I think it's paragraph

7    2(a), the kind of equity that if transferred or conveyed or

8    otherwise sent to somebody else requires notice.

9            Maybe I'm missing something here, but let me ask

10   you, Mr. Rosenblatt, wouldn't any sharers or, you know, equity

11   in the company be fungible?

12           I mean is there any real distinction between those

13   attributable to Friedman and Koenig interests and those

14   attributable to your clients?

15           MR. ROSENBLATT:  Can I just have one second?

16           THE COURT:  Yeah.

17       (Pause.)

18           MR. ROSENBLATT:  I think the issue there, Judge, is

19   in terms of what would be recovered so to say pursuant to the

20   settlement agreement because the Schreibers were already

21   holding their 23 percent interest in the company.

22           And so I think that the issue was with regard to the

23   charging lien what's covered would be that the shares that are

24   coming in --

25           THE COURT:  But this is -- this is just about the

1    notice provision.

2              MR. ROSENBLATT:  Right.

3              THE COURT:  If you want -- if you want to convey

4    shares, everybody agrees that there are some shares that if

5    conveyed there must first be notice to the Nelkins, right?

6              MS. HYLAND:  Yes.

7              THE COURT:  The dispute is about whether that

8    requirement applies to the transfer of any shares or just

9    those attributable to what's recovered here.

10             What I'm trying to figure out is how would you

11   really know?  I mean, what distinguishes -- once a share is

12   transferred, what distinguishes it as having come from one

13   client or another?  They're fungible, right?

14             MR. ROSENBLATT:  They are.  I think if I may -- I

15   think the issue was more the diluting part of it rather than

16   the -- rather than the specific shares as indicated.

17             THE COURT:  Okay.  Wait.  Let me turn to the

18   language in the --

19             MR. ROSENBLATT:  So in other words --

20             THE COURT:  Give me a moment.

21             MR. ROSENBLATT:  Yeah.

22             THE COURT:  I just want to turn to the language in

23   the stip.

24        (Pause.)

25             THE COURT:  So your proposal is transferring,

9

1    selling, conveying, pledging, assigning, mortgaging,

2    encumbering or disposing of any portion of the Friedman

3    membership interest or the Koenig membership interest.

4           And their proposal is transferring, et cetera, any

5    portion of Two Rivers' equity or converting any portion of the

6    Two Rivers' equity into debt.  So what am I missing here?

7           MR. ROSENBLATT:  Well, I think there's two things.

8           One I think is terming it Two Rivers' equity I think

9    is a little bit over broad in terms of I think the issue of

10   the loan forgiveness and all of those other things that go

11   into the equity of the company rather than specifically

12   shares.

13          And I know it may be a little bit nuanced, but --

14          THE COURT:  Okay.

15          MR. ROSENBLATT:  Yeah.

16          THE COURT:  What can't you do without notice that

17   you should be able to do without notice under the Nelkins'

18   proposal?

19          MR. ROSENBLATT:  Well, one is dilute, that we --

20          THE COURT:  How --

21          MR. ROSENBLATT:  Yeah.

22          THE COURT:  What would you be doing that would

23   dilute that would be forbidden?

24          MR. ROSENBLATT:  Well, if they wanted to bring in an

25   investor, for example, and assign shares over or something

1    like that.  If they wanted to issue more shares of stock, that

2    would be diluting it if it was going to someone else.  So --

3            THE COURT:  And if the idea is to preserve the value

4    of the equity in the company so that it's available should

5    they prevail, why isn't that something that requires notice?

6            MR. ROSENBLATT:  Well, again it's an issue of them

7    being able to make business decisions that they believe are

8    appropriate --

9            THE COURT:  Yes.  But there's nothing -- look -- and

10   I want to be clear because there's somewhere -- I'm going to

11   listen to each of you on all of these, but there's somewhere

12   I'm hard pressed to see one side's, the merit on one side, and

13   I'm hard pressed to see the merit on the other.  But let me

14   say all of this about all of them.

15           There's nothing in any of this that's going to

16   prevent Two Rivers from operating in the way it sees fit if

17   after notice there's no problem.

18           MR. ROSENBLATT:  Right.

19           THE COURT:  It's just a question of notice.

20           MR. ROSENBLATT:  Right.  No.  We understand that.  I

21   mean, they --

22           THE COURT:  So they're not prevented from

23   transferring shares.

24           MR. ROSENBLATT:  Right.  We understand that.  I

25   mean, I think the issue really is that given, frankly

1   speaking, the way things are now, the Schreibers are concerned

2   that anything that triggers notice is going to involve some

3   kind of dispute that requires -- a resolve that requires

4   coming to the Court to have resolution.

5           So the idea is to try to somewhat narrow the scope

6   of what requires notice in and of itself because of that

7   concern that it will interfere with their ability to run the -

8   -

9           THE COURT:  Right.  But the other concern -- and

10  this is a global thing so we might as well put it up front --

11          MR. ROSENBLATT:  Of course.

12          THE COURT:  -- the other concern is that if it's

13  something other than the normal day-to-day operations that

14  could affect the overall value of what you guys are fighting

15  over, that's something that should fairly result in notice.

16  And if there's a dispute -- as you're right there may well be

17  -- then you have the dispute and you resolve it.

18          But if it's -- you know, my approach to all of

19  these, you know, granulars, generally is if it's -- if it

20  relates to something that could materially affect the value of

21  what is at issue in this litigation, there should be notice.

22          MR. ROSENBLATT:  I understand.

23          THE COURT:  If it, on the other hand, is just this

24  is how you run a business day to day, it shouldn't.

25          MR. ROSENBLATT:  Right.

12

```
1                THE COURT:  But bringing in new investors, that's --
2       yeah, that's something that's going to affect what you're
3       fighting over.
4                MR. ROSENBLATT:  Understood.
5                THE COURT:  So.
6                MR. ROSENBLATT:  So I think -- I think really again
7       the nuance was two things.  One was how they define equity and
8       it's a little bit I think overbroad.  But if we want to call
9       it the shares of Two Rivers, membership interest in Two Rivers
10      --
11               THE COURT:  Well.
12               MR. ROSENBLATT:  -- I don't think we have a problem
13      with that.  I think equity may be a little bit --
14               THE COURT:  But if -- look, the one thing you told
15      me that you want to do that you can't --
16               MR. ROSENBLATT:  Yeah.  Yeah.
17               THE COURT:  -- doesn't fall within that definition
18      if you want to bring in new investors.
19               MR. ROSENBLATT:  Right.
20               THE COURT:  So already I'm very skeptical of what
21      you're proposing and it doesn't seem to be in line with the
22      neutral principle that I think we can agree on.
23               MR. ROSENBLATT:  Yes.  No.  We can agree on that.
24      And --
25               THE COURT:  So why do we need to redefine equity?
```

1           MR. ROSENBLATT:  Okay.

2           THE COURT:  Okay.  Good.  All right.  So I'm going

3      to accept the Nelkins' proposal on paragraph 2(a).

4           And let just reiterate, just to make sure we've got

5      this on the record and I'm not getting this wrong, the reason

6      we're here, by my understanding, is that everyone here agrees

7      that I'm going to make a decision on each of these disputes

8      and that's the way it's going to be and you're all going to

9      accept that, correct?

10          MR. ROSENBLATT:  Yes.

11          MS. HYLAND:  Yes.

12          THE COURT:  Okay.  Good.  All right.  Okay.  So

13     2(a), I'm accepting the Nelkins' version.

14          Two(c), a single debt versus aggregate.  And it's --

15     Mr. Rosenblatt, give me some sense of what you're worried

16     about requiring notice?

17          MR. ROSENBLATT:  Well, this one goes to really more

18     specifically than running the business.

19          THE COURT:  Right.

20          MR. ROSENBLATT:  In other words, they do a lot of

21     inventory, my understanding is in excess of $250,000 in any

22     given month to get inventory selling.  They may use lines of

23     credit.

24          They may need just things that they would do in the

25     normal course that in order to trigger the notice and have

14

1    them wait and then run to the Court for disposition and all

2    that kind of stuff, they may lose their business opportunity

3    to do that.

4              And so we're concerned that aggregate debt of

5    $250,000 is -- it's just it's not workable for them to run

6    their business.

7              THE COURT:  What is a typical month's worth of

8    aggregate debt?

9              MR. S. SCHREIBER:  What do you mean by aggregate

10   debt?  We --

11             MR. ROSENBLATT:  Well --

12             THE COURT:  Well, if you don't know, I'm surprised.

13             MR. ROSENBLATT:  Well, no.

14             THE COURT:  Because why are we fighting about it if

15   you don't even know that you have that kind of debt?

16             MR. S. SCHREIBER:  Hold it, Your Honor.  I'll

17   explain.  We are a coffee company.  So we buy about $100,000

18   worth of coffee a day.  And we need it -- we order it at 4

19   p.m.  We get it at 8 a.m.

20             If I have to give notice that I'm ordering coffee

21   because it's $110,000 or a number like that, the opportunity

22   is lost.  Our business is -- we get an order from a customer

23   on Monday, we have to ship on Wednesday.  There's no time to,

24   you know, wait for the Nelkin's to pick fights with me.

25             But in all honesty, we're driving the same train.

1      It's in my best interest for the company to succeed.  I think

2      the Nelkins don't trust me.  But why would I fight for three

3      years, give up, and then just sabotage it.  I think that's the

4      --

5              THE COURT:  It's not sabotaging it.  It's about

6      hiding assets, that's really what this is about.

7              MR. S. SCHREIBER:  They were my attorneys for three

8      years.  I'm her son-in-law.  I think there should be a little

9      more trust involved with --

10              THE COURT:  Look, I couldn't agree more that there

11      should be more trust, but all of you have squandered it.  All

12      of you.  That's why we're here Mr. Schreiber.

13              Every one of you has done things in this litigation

14      to squander any claim on the trust of an opposing party, so

15      let's not -- let's not waste time with how there should be

16      more trust.  I couldn't agree more.  I certainly understand

17      why there isn't at this point.  Look, I'm going to --

18              MR. ROSENBLATT:  If I --

19              THE COURT:  Wait.  Here's my proposal.  And I may

20      have a similar proposal for some of these others.

21              I'm going to accept the aggregate debt, but on this

22      one impose a fee switching provision.  If after notice

23      somebody comes to court and loses, they're paying fees for the

24      other side. Because you're absolutely right.

25              In the normal course, you're going to aggregate

1    probably more debt than $250,000.  My strong expectation is

2    that if there is notice we're doing this, there's going to be

3    a lot of times when you say, oh, yeah, that's just how they

4    run the business and they're not going to have any objection.

5            And they might even say you don't even have to give

6    us notice for this particular kind of debt down the road.  And

7    that will go a long way towards building back the trust that

8    has been lost.

9            But if you can't, and if they make a frivolous

10   motion to say don't let them incur this, and all it's doing is

11   frustrating your ability to run the business, they're going to

12   end up paying your fees.  Understood?

13           MS. HYLAND:  Yes.

14           MR. ROSENBLATT:  If I may, Judge, for one second?

15           THE COURT:  Yeah.

16           MR. ROSENBLATT:  I mean, I think the only concern

17   with regard to aggregate is sort of how it's defined.

18           I mean, is it $250,000 of debt at all with regard to

19   any vendor total accumulation?  Is it in regard to one vendor?

20           In other words, if they deal with the same vendor

21   every month and/or every week and they incur a 110 line of

22   credit or whatever it is, then that builds up very, very

23   quickly.  And so --

24           THE COURT:  Here, Mr. Rosenblatt, is what I will

25   confess completely mystifies me.  That is a perfectly

1    reasonable question.

2         I cannot imagine that you had not already had that

3    discussion and done your best to resolve it because I'm sure

4    there's a way to define out certain kinds of debt.  And we

5    should not be here without all of you having exhausted the

6    possibility of doing that.

7         MS. HYLAND:  May I address --

8         MR. ROSENBLATT:  We have had -- I'm sorry.  We have

9    had that conversation, and that's --

10        THE COURT:  So you know the answer?

11        MR. ROSENBLATT:  Right.  But that's -- that was why

12   our proposal didn't have anything with regard to aggregate

13   because we were concerned about that very question, so.

14        THE COURT:  Okay.  Well, I'm accepting the Nelkins'

15   proposal with the caveat that there's fee switching for a

16   failed request to block an action.  And I will be open as we

17   go forward.  You know, we're going to learn a lot going

18   forward as which of these are imposing needless burdens and

19   which aren't.

20        If you persuade me that this is imposing a needless

21   burden, even without them coming to court, I will certainly

22   hear you.  And again I do expect everybody to be reasonable.

23        And let me say this.  You guys -- I won't go back

24   into it -- you've done a lot to make each other distrustful.

25   I get that.

1          This is an opportunity in implementing this to show

2     that you actually are being reasonable and have the same goal,

3     which is let the business succeed, protect the Nelkins'

4     legitimate interest in preserving the stakes that they're

5     fighting for until the resolution of the merits.

6          And my guess is if you work in good faith to

7     implement this, as you go along you will find that there are

8     some notices that are going to be required that you really

9     don't need to get and don't need to impose on the Schreiber's

10    to provide and you'll agree to change it.

11         Yeah.

12         MS. HYLAND:  Just a point of clarification.  You

13    said fee switching for a failed effort to block.  Is it also

14    fee shifting if it's a successful effort to block on this one?

15    I'm just wondering if it goes both ways.

16         THE COURT:  I don't think it should be, but I'll

17    hear you out on that.  Because what I have in mind is avoiding

18    frivolous actions to prevent them from doing something that

19    they're entitled to do.

20         If they give you notice and you say we're concerned

21    about that and you're persuaded that they shouldn't, I don't

22    know if that needs fee switching necessarily, because first of

23    all it wasn't part of the proposal initially, and this is

24    really to guard against excesses in seeking remedies based on

25    notice.  I'm not stating it well.

1            MS. HYLAND:  No.  I get it.

2            THE COURT:  Yeah.

3            MS. HYLAND:  I completely understand.

4            THE COURT:  You get the idea.  It's to keep you from

5    using it as a weapon, the notice provision.

6            MS. HYLAND:  Could we build in at least

7    discretionary fee switching the other way just in case there's

8    a really unreasonable --

9            THE COURT:  I'm not going to do that now because I

10   just don't see that what's going on creates an incentive for

11   that.

12           MS. HYLAND:  Okay.

13           THE COURT:  Right.  The idea of the stipulation is

14   to create the right incentives for both sides to run the

15   business in a normal way, not hide assets, and not, on your

16   side, use the notice provision as a weapon.

17           MS. HYLAND:  Okay.

18           THE COURT:  I don't think you have an incentive to

19   do that necessarily.  I don't think fee switching for the

20   successful motion is necessary, but again you can change my

21   mind.

22           If we go forward and you're coming back time after

23   time to block them from doing something that they shouldn't, I

24   may well see the merit in that and I'll impose it.

25           MS. HYLAND:  Okay.

1              THE COURT:  All right.  All right.  2(d), so

2      payments of $50,000 outside the ordinary course in -- that's

3      the Nelkins' proposal.  Schreiber's propose 250,000.  Here I

4      just need to get from both sides what you think is likely to

5      come up that might exceed 50,000?

6              MR. ROSENBLATT:  Well, just by way of example, what

7      we talked about a few minutes ago.

8              THE COURT:  Yeah.

9              MR. ROSENBLATT:  I mean, their inventory is in the

10     hundreds of thousands of dollars, not in --

11             THE COURT:  That's the ordinary course of business?

12             MR. ROSENBLATT:  Right.  But again we're concerned

13     that -- again, just given the way things have gone, we're

14     concerned that if they want to make a payment to a vendor of

15     $110,000 they have to give notice.  Or if they want to buy a

16     machine, for example --

17             THE COURT:  But wait.  Let's stick with --

18             MR. ROSENBLATT:  Okay.

19             THE COURT:  -- take one at a time.  Let's stick with

20     the vendor.

21             MR. ROSENBLATT:  Okay.

22             THE COURT:  Would you say that if they are making a

23     purchase of $100,000 from a vendor under your proposed

24     language, they would have to provide notice?

25             MS. HYLAND:  Oh, I'm sorry.  I thought you were

1    asking him.

2                THE COURT:  No.  I'm asking -- I'm asking you.

3                MS. HYLAND:  Right.  So our language is that on

4    behalf of Two Rivers for more than $50,000 for any transaction

5    or for any payment at all at any amount outside the ordinary

6    course of business.

7                THE COURT:  Oh, okay.  So you're just a flat 50,000

8    no matter what?

9                MS. HYLAND:  It's 50,000 no matter what.  And that's

10   based on --

11               THE COURT:  I misunderstood.  Okay.

12               THE COURT:  That's based on the fact that, you know,

13   as the Nelkin's have represented the Schreiber's for more than

14   three years, they're very familiar with the actual expenses,

15   they have all of the records of the expenses of the company,

16   and 50,000 is actually quite high compared to their regular

17   expenses.  So I don't know where the 100,000 comes from, but

18   we --

19               THE COURT:  Okay.

20               MR. S. SCHREIBER:  May I speak, Your Honor?

21               THE COURT:  Go ahead.

22               MR. S. SCHREIBER:  So I do -- I approve every single

23   purchase order.  And our purchase order is anywhere from

24   100,000 for coffee and cocoa and tea a day, so I'm -- my rent

25   is almost $50,000 a month, so how in the world I'm going to go

1     every single --

2              THE COURT:  Okay.  Wait.  Wait.

3              MR. S. SCHREIBER:  I can't run a business this way.

4              THE COURT:  Look, this is just a question of what's

5     ordinary.

6              MR. S. SCHREIBER:  I'm sorry, but --

7              THE COURT:  No, it's fine.  So this is just -- one

8     of you is telling me facts that can't be supported.

9              MR. S. SCHREIBER:  I run a business --

10             THE COURT:  Yes.  So somebody show me a document

11    with --

12             MR. S. SCHREIBER:  I can show -- I don't have my

13    phone.  I could have shown you --

14             THE COURT:  Try not to interrupt, Mr. Schreiber.

15             MR. S. SCHREIBER:  I'm sorry.  I apologize.

16             THE COURT:  Somebody show me a document that shows

17    an ordinary, you know, coffee purchase.

18             MS. HYLAND:  Can I also add one thing?  I apologize,

19    but it's important.

20             THE COURT:  Yeah.

21             MS. HYLAND:  We did offer during the negotiations to

22    carve out certain expenses, coffee, tea, chocolate, things

23    like that from this -- from this 50,000 limit and to have a

24    higher limit for those.  That was rejected.

25             THE COURT:  Mr. Schreiber, Steven Schreiber, Eugene

23

1    Schreiber, stop talking when somebody else is talking.  If you

2    want to stay in this courtroom, you'll allow people to talk

3    uninterrupted.  Do you both understand that?

4            MR. S. SCHREIBER:  Yes.

5            MR. E. SCHREIBER:  Yes.

6            THE COURT:  Good.

7            Go ahead, Ms. Hyland.

8            MS. HYLAND:  So we -- in the -- there were very

9    extensive negotiations over this and one of the things we --

10   that issue was raised and we did offer to carve out coffee,

11   tea, cocoa, and we said tell us if there are other categories

12   where you need a higher limit, and that was rejected -- that

13   offer.  So we really didn't have a lot to work with.

14           THE COURT:  Okay.  Well, guys, go back to the table,

15   give me a proposal that has carve outs for specific types.

16           Is there a problem, Mr. Schreiber?  Mr. Schreiber,

17   Steven Schreiber, is there a problem?

18           MR. S. SCHREIBER:  No, Your Honor.

19           THE COURT:  Your answer to that question is

20   inconsistent with your actions in the courtroom.

21           MR. S. SCHREIBER:  I'll just tell you my honest

22   opinion.  I run a coffee company.  My lawyers are nitpicking

23   and saying they know my business.  It's just the documents are

24   going to come from me.  And I run the business every day.  I

25   live and breathe it.  I fought for it.  I mortgaged off

24

1   things.  And they tell me they know my business better than

2   me.  I'm sorry.  I'm just emotional.  That's it.  I apologize.

3           THE COURT:  Look, you're emotional.  They're

4   distrustful.  I get it.  That's why you've got lawyers on both

5   sides who can take the emotion out of it.

6           Now, look, it makes sense.  You don't want to have

7   to run to them every time you're buying some coffee.  Ms.

8   Hyland just told me they offered to carve that out.

9           Mr. Rosenblatt, is that untrue?

10          MR. ROSENBLATT:  There were discussions about carve

11  outs, but --

12          THE COURT:  Did they offer to carve out supplies

13  like that?

14          MR. ROSENBLATT:  I believe there was a discussion of

15  that, yes.

16          THE COURT:  I'm not asking if there was discussion

17  about it.  I'm asking if they offered it?

18          MR. ROSENBLATT:  I honestly don't remember the

19  specifics.

20          THE COURT:  Dispute what Ms. Hyland's told me.

21          MR. ROSENBLATT:  I'm not disputing it.

22          THE COURT:  So why on earth wouldn't you take that

23  if that's the concern?  Because the only thing that your

24  client is getting so upset about that he won't let opposing

25  counsel speak without interrupting, and the only thing that's

1    upsetting him so much that he won't let me make a ruling

2    without visibly and audibly expressing his dissatisfaction

3    with it, is the very thing that you don't dispute Ms. Hyland

4    said she would carve out.

5              So what else is there that you're worried about?

6              MR. ROSENBLATT:  Well, again I think that the issue

7    really is one that the Schreiber's understand the --

8              THE COURT:  Specifics, please.  Don't tell me the

9    issue is something that -- just tell me, what is it that you

10   want to buy that costs more than $50,000 that they're not

11   willing to carve out?

12             MR. S. SCHREIBER:  Okay.  Your Honor, may I speak,

13   please.

14             THE COURT:  Sure.

15             MR. S. SCHREIBER:  Thank you.  I'll let you know

16   what's involved.  There was the K-cup.  The K-cup, it seems

17   very simple, just put into the coffee machine and coffee comes

18   out, but it's a lot of little things that go inside.  There's

19   a filter inside there.  The filter comes from Spain.  I pay

20   $79,000 to $80,000 just to get the filter here.  Okay?  That's

21   one.  That needs to be almost monthly that we have to buy just

22   the one item.

23             There's coffee.  There's lids.  The lids are being

24   ordered, million lids per order.  The lids can go up to 50 to

25   60 to $80,000.  Depends on the season or depends on the order

1    just for that little lid that goes on the K-cup.

2          There's cups.  The cups we order by millions,

3    trailer loads.  Okay?  Those can cost anywhere from 78 to

4    $80,000 per trailer load.  So if you understand, there's

5    boxes.  We have 150 some odd flavors of boxes that we keep in

6    inventory.  Okay?

7          When we get an order from -- I'll just give you an

8    example -- from Amazon Monday morning, by Wednesday afternoon,

9    the thing has to be shipped.  A simple item like a label that

10   goes on Amazon box, that has to be printed, the ink, it's a

11   million and one things that goes into this process.  I can't

12   every time I'm missing some item -- Your Honor, I'm sorry --

13         THE COURT:  I'll hear you even if you don't shout

14   it.

15         MR. S. SCHREIBER:  I have no intention to shout.  I

16   apologize.  But it's impossible to run a business.

17         If you would come to the office one day and you see

18   what goes on there, you will go, you guys, how do you do this?

19   It's very difficult to run -- every little item I got to

20   approve, Mr. Nelkin can you please approve this?  I can't run

21   it.

22         I've got a charge backs.  We have a person who just

23   works on charge backs constantly.  If I'm late for a half a

24   day for a pickup I get a charge back.  I get -- I lose money.

25         THE COURT:  That's why you people are going to sit

1    down and decide the carveouts, because contrary to your

2    protestation, Mr. Schreiber, I don't assume that it's a very

3    simple thing.

4              What I assume is that the lawyers on both sides are

5    speaking to me honestly about the course of their

6    negotiations, and that Ms. Hyland has, in fact, offered to

7    relieve you of the burden of giving notice for these things.

8              Am I misstating that?

9              MS. HYLAND:  We offered to carve those out from the

10   50,000 and put them under the 250,000, yes.

11             MR. ROSENBLATT:  Again, just to clarify.  I mean,

12   they're saying --

13             MS. HYLAND:  That they had proposed.

14             MR. ROSENBLATT:  -- almost every aspect of their

15   business involves payments of more than $50,000, so carve outs

16   wouldn't even --

17             THE COURT:  You haven't yet identified a single

18   thing despite multiple requests from me that they're not

19   willing to carve out that you need to have carved out.  Last

20   chance, tell me something that they have not been willing to

21   carve out that you need carved out?

22             MR. ROSENBLATT:  Well, anything other than coffee,

23   tea and cocoa.  I mean, that's what they talked about carving

24   out.  And my point and the Schreibers' point is it's almost

25   every aspect of their business.  The lids, the cups, the ink,

1      the boxes, I mean, everything that goes into it.  And so

2      carve-outs may become --

3                  THE COURT:  Go ahead.  Go ahead.

4                  MS. HYLAND:  The reason -- the way the negotiation

5      went was we suggested this number.  They said we have that

6      expense in coffee.  We came back and said, we'll carve out

7      coffee --

8                  THE COURT:  All right.

9                  MS. HYLAND:  -- and we'll throw in tea and cocoa,

10     and tell us what else you want us to carve out.

11                 THE COURT:  All right.  All right.  All right.  All

12     right.  Sit down.  Sit down.

13                 MS. HYLAND:  Sorry.

14                 THE COURT:  Here's what's going to happen.

15                 By tomorrow, you will give them from the last month

16     any ordinary course of business invoice greater than $50,000.

17     And Ms. Hyland will then tell you which ones she's willing to

18     carve out and which ones no.  And you'll write me a letter and

19     you'll tell me what you've agreed on.

20                 My guess is you are not going to want to come back

21     here and have me go through it myself because you can all be

22     assured that if it's something that is a regular business

23     expense that, you know, exceeds $50,000, then I'm not going to

24     require a notice for it.

25                 If it is not a regular business expense, even if it

1    exceeds $50,000, I am.  Send me proposed language by next

2    week, please.

3         (Pause.)

4              THE COURT:  And given the concern about interference

5    with the ordinary course, I'm going to impose fee switching on

6    this one as well once we have the language in place.

7              Okay.  Moving on to paragraph 2(e), about hiring

8    family members.  And in 2(e), am I correct that the dispute is

9    about -- oh, I'm sorry -- there's clearly dispute about

10   whether there's a salary cutoff.  Is there also a dispute

11   about the scope of who's a family member for purposes of this

12   paragraph?

13             MS. HYLAND:  Yes.  Our definition is broader than

14   their definition.

15             THE COURT:  Under your definition, could they hire

16   your clients?  Laugh, but --

17             MS. HYLAND:  It's unlikely to happen.

18             THE COURT:  -- but it strikes me as the height of

19   chutzpah --

20             MS. HYLAND:  Oh, I'm sorry.  I didn't mean to --

21             THE COURT:  -- for the Nelkin's in these

22   circumstances to say we don't trust them to hire relatives.

23             MS. HYLAND:  Well, it's not that they --

24             THE COURT:  Why are we here if not for the fact that

25   they hired relatives?

1          MS. HYLAND:  Well, yes.

2          But I think the issue here is that again the

3   Nelkin's are very familiar with the Schreibers' business.

4   They know that none -- there are no family members that would

5   be legitimately having positions at this company because

6   that's not what they do.

7          So any hiring of a family member would raise a red

8   flag and they just want notice of it so they can ensure that

9   it's not something else.

10          THE COURT:  So they've got a bunch of extra

11   inventory that they need moved and a nephew is on summer

12   vacation.  So for a couple of weeks the nephew is clearing out

13   the inventory and gets a couple of hundred bucks, that

14   requires notice?

15          MS. HYLAND:  Not a realistic scenario because there

16   is no nephew that would have been hired.  So I actually had

17   the same question.  And that's just not a scenario that would

18   happen.

19          This is really about, you know, if they were to put

20   someone on the payroll, there would not -- it's just a red

21   flag that there might not be a legitimate basis to do that and

22   there might be another reason why they have someone on their

23   books.

24          THE COURT:  If they hired as an intern and given a

25   stipend of, you know, 500 a week or 1,000 a week, you're

```
 1    concerned that your clients won't be able to recover the

 2    amount in controversy?

 3            MS. HYLAND:  We're not concerned about something

 4    like that, no.

 5            THE COURT:  So why does the $100,000 salary cutoff

 6    not make sense?

 7            MS. HYLAND:  Well, I mean, I can talk to my clients

 8    about the 100,000.  I think we were more concerned about the

 9    definition of what's a family member.  But I can confer with

10    them about it.

11            THE COURT:  Who is it you don't want them to hire?

12        (Pause.)

13            MS. HYLAND:  One of the issues, for example, is they

14    could put -- they could put a spouse onto the payroll and then

15    increase --

16            THE COURT:  It's a family business.

17            MS. HYLAND:  -- and increase -- yes, but those

18    spouses wouldn't -- they might be, you know, no-show types of

19    jobs because those spouses don't actually have any skills that

20    would be involved in running a coffee business or being part

21    of a coffee -- that's not their -- that's not their

22    profession.

23            So the concern would be the only reason you'd be

24    doing that is to have a no-show job just to increase your own

25    compensation through your spouse.
```

1           THE COURT:  Ms. Hyland, really no disrespect, but

2      we've been litigating this case for three years with a law

3      firm that sends two lawyers to every proceeding, which has

4      always struck me as unnecessary, who happen to be mother and

5      son.

6           I don't think this is a case where it really helps

7      you to draw attention to the idea that perhaps there are

8      unnecessary expenses being charged to favor family members.

9           Narrower -- I'm adopting the Schreibers' proposal.

10          MS. HYLAND:  Okay.

11          THE COURT:  All right.  2(f), a major decision under

12     the operating agreement.

13          It looks to me -- forgive me if I'm getting this

14     wrong -- that the difference between the two proposals on 2(f)

15     is that the Schreiber's want to be exempt from notifying the

16     Nelkin's of actions that are also permitted by this

17     stipulation.  I'm unable to discern what those actions might

18     be that you're trying to cover here.

19          MR. ROSENBLATT:  Well, I think --

20          THE COURT:  A specific example?

21          MR. ROSENBLATT:  I don't.  I think it really just

22     means to the extent that such as Your Honor with regards to

23     the family member issue, that obviously that's going to be

24     permitted under the stipulation.

25          It may not be a major decision as to finding any

```
 1    other documents and we just want to -- it was just sort of a

 2    belt and suspenders approach I made to make it clear --

 3              THE COURT:  Look, if this is belt and suspenders,

 4    you don't need it.  A belt will do.

 5              All right.  Self-dealing in paragraph 2(g).  Okay.

 6              So, Ms. Hyland, give me -- what's the rough edge of

 7    this?  What are you trying to get notice of that the

 8    Schreibers' proposal won't give you notice of?

 9              MS. HYLAND:  You know, if there is any transaction,

10    a loan, for example, to --

11              THE COURT:  But to whom?

12              MS. HYLAND:  Right.  -- to either Steven, Eugene or

13    their spouses or other family members --

14              THE COURT:  But that's covered under both proposals,

15    isn't it?

16              MS. HYLAND:  They just -- no, they only have Steven

17    and Eugene or any entity --

18              THE COURT:  Okay.  So it's the spouses or other

19    family members?

20              MS. HYLAND:  Right.

21              THE COURT:  Okay.

22              MS. HYLAND:  Spouses and other family members.  And

23    then we also have an ownership interest, controlling interest,

24    or if they're employed or compensated by that entity.

25              THE COURT:  Okay.  Is there -- Mr. Rosenblatt, is
```

1    there anything you have in mind that the Schreiber's would

2    need to do that would be precluded or that would require

3    notice under the Nelkins' version?

4                 MR. ROSENBLATT:  Well, we just -- we just think the

5    Nelkins' version is way over broad in terms of the scope that

6    --

7                 THE COURT:  What is it that --

8                 MR. ROSENBLATT:  I don't know that we anticipate

9    anything that implicates either proposal to be honest.  I just

10   think it's --

11                THE COURT:  Let's do --

12                MR. ROSENBLATT:  The concern was that the Nelkin

13   version is particularly over broad.

14                THE COURT:  But look, is there something that you

15   say, look, to run our business, the normal course, we need to

16   do something that would require notice under this?

17                What do you have in mind that would require notice

18   just in day-to-day operations of the business?

19                MR. ROSENBLATT:  No.  They're not engaged in any

20   self-dealing, whether defined by the --

21                THE COURT:  Under their proposal?

22                MR. ROSENBLATT:  They're not engaged in any of that.

23                THE COURT:  So what is it -- what's it going to --

24                MR. ROSENBLATT:  Again --

25                THE COURT:  Because, you know, the thing with the

1        aggregate expenses, I really get that.

2               MR. ROSENBLATT:  Right.

3               THE COURT:  You know, that could be a disabling

4        thing if every time you have to give them notice.  We're not

5        going to -- we're not going to have that.

6               But, you know, part of the point here is to build up

7        trust by running the business in a way that won't raise red

8        flags.

9               MR. ROSENBLATT:  I understand.  I mean --

10              THE COURT:  So --

11              MR. ROSENBLATT:  Again, just to reiterate.  I mean,

12       the issue really when we were discussing this and trying to

13       come to some language that was acceptable to both sides was in

14       view of where we are presently -- and with the hope that we

15       will be able to build trust and everything else -- but in view

16       of where we are presently, we didn't want to have provisions

17       that were overly broad and were maybe somewhat ambiguous with

18       regard to family members and who's this and that and so --

19              THE COURT:  Let me ask you this.  Do you think you

20       will ever -- under the Nelkins' proposal for 2(g), will you

21       ever have to give them notice?

22              MR. ROSENBLATT:  I don't -- I don't think so.  No.

23              THE COURT:  Then we're going to use the Nelkins'

24       proposal because it's not going to cost you.

25              MR. ROSENBLATT:  Okay.

1          THE COURT:  All right.  Compensation under 2(h),

2     what is -- Mr. Rosenblatt, what's the compensation that you

3     would want to have go forward without notice here that you

4     anticipate happening?

5          MR. ROSENBLATT:  So at the direction of their then

6     counsel, my clients took distributions, annual distributions

7     in the amount of 208,000, which was obviously more than was

8     set forth in the operating agreement.  Because of the way it

9     was structured, the counsel advised that it was okay to do

10    that and not in violation of the operating agreement.

11         And so that's what my clients did.  And so they're

12    proposing simply that their three percent cost of living raise

13    from their current salary be allowed.  They're not going to

14    pay themselves bonuses.  In other words, they're just --

15         THE COURT:  Oh, in other words -- so the number in

16    the Nelkins' proposal is 104,000?

17         MR. ROSENBLATT:  Correct.

18         THE COURT:  And they doubled it this year?

19         MR. S. SCHREIBER:  No.  It was three years ago.

20         MR. ROSENBLATT:  They doubled it three years ago at

21    the direction of their counsel saying that it was okay to do

22    it.  In terms of distribution, that that would not be a

23    violation of the operating agreement.

24         And so they did it and have been doing it for the

25    past few years.  Obviously, the Nelkin proposal would halve

1          their salary and cap their salary, which again they've been

2          doing --

3                    THE COURT:  When you say the prior counsel, you mean

4          the Nelkin's?

5                    MR. ROSENBLATT:  The Nelkins' version of what

6          they've submitted.

7                    THE COURT:  No.  No.  The Nelkins --

8                    MR. ROSENBLATT:  Yes.  Yes.

9                    THE COURT:  -- were the Nelkin's the prior counsel

10         who said --

11                   MR. ROSENBLATT:  Yes.

12                   THE COURT:  -- take the 208,000?

13                   MR. ROSENBLATT:  Yes.

14                   THE COURT:  We need to have a hearing.  Go back to

15         the table, resolve this, because I'm going to put all of you

16         on the stand if you're saying that's not true.

17                   Come join me on the witness stand, Ms. Nelkin.

18         You're saying it's not true and you're saying it in a way that

19         is meant to avoid being captured on the transcript.  Come join

20         me, please.

21                   MS. NELKIN:  Your Honor, I'll be happy to testify

22         with regard to this.

23                   THE COURT:  Raise your right hand.

24                        CAROL NELKIN, Sworn

25                   THE COURT:  Have a seat.

1          Mr. Rosenblatt, do you want to inquire?

2          MR. ROSENBLATT:  Thank you, Your Honor.  Can I just

3     have one second to confer with my clients?

4          THE COURT:  Mm-hmm.

5          (Pause.)

6          THE COURT:  All right.  Go ahead, Mr. Rosenblatt.

7                         DIRECT EXAMINATION

8     BY MR. ROSENBLATT:

9     Q    Ms. Nelkin, do you recall a proceeding before the Bais

10    Din of America involving Mayer Koenig?

11    A    Mr. Koenig at the very end served a hazmana if that's

12    what you're referring to.

13    Q    There was a proceeding before the Bais Din of America,

14    correct?

15    A    Are you talking about that involved all the Schreiber's

16    and Mr. Koenig?

17    Q    It involved all of the parties, right?  Mr. Koenig served

18    his hazmana and he asserted the position that any increase in

19    salary to $208,000 by the Schreiber's was improper and in

20    violation of the operating agreement, do you remember that?

21    A    Mr. Koenig served a hazmana before the Bais Din of

22    America.  There was never any hearing.  There was never -- so

23    I'm not sure what you're talking about with regard to the Bais

24    Din of America.

25    Q    Did Mr. Koenig ever take a position in connection with

Nelkin - Direct                                39

1    this case that the Schreiber's were not entitled to increase

2    their compensation beyond $104,000?

3    A    I don't recall ever having a conversation with Mr. Koenig

4    or his lawyers with regard to that.

5    Q    So at no point -- your testimony is that at no point did

6    you advise the Schreiber's that they could take distributions

7    of $208,000?

8    A    In this case, we were very careful not to advise the

9    Schreiber's with regard to anything dealing with such matters.

10        Mr. Parness was their attorney for that because Mr.

11   Friedman was raising issues about the nepotism.  So Mr.

12   Parness may have advised them with regard to this, but we were

13   very careful not to give that kind of advice.

14   Q    So you would never -- you're saying that you never told

15   the Schreiber's that they should have taken higher salaries or

16   higher distributions earlier than they did three years ago?

17   A    I do not recall ever discussing that with the

18   Schreiber's.

19   Q    You don't recall ever telling them that they could take

20   distributions of $208,000?

21   A    We would not give them advice like that.  Mr. Parness was

22   their counsel for matters dealing with Two Rivers.

23   Q    Even back three years ago Mr. Parness was their counsel?

24   A    I believe Mr. Parness has been their counsel certainly

25   since we were involved in this lawsuit, or maybe shortly

1    thereafter.  I'm not exactly certain when.

2             MR. ROSENBLATT:  I have no more questions for her,

3    but I'd ask that Mr. Steven be allowed to testify.

4             THE COURT:  We'll get to Mr. Schreiber.  But you

5    don't want to ask the question that is at the heart of the

6    dispute?

7             MR. ROSENBLATT:  Well, let me ask.

8             THE COURT:  I will if you don't.

9    BY MR. ROSENBLATT:

10   Q    Is it your position that a distribution of $208,000 would

11   be in violation of the operating agreement?

12   A    I believe that the operating agreement does set a lower

13   amount than that, yes.

14   Q    As a salary?

15   A    I don't have it in front of me.  I believe that it sets

16   out a number as to what their salary is and that their salary

17   is $104,000.

18   Q    And if the Schreiber's took that salary, not as a salary

19   but as a distribution, that would be impermissible according

20   to you?

21   A    I don't have that in front of me.  I don't know honestly

22   the distinction that you're making between salary and

23   distribution.

24             Again, those were things that Mr. Parness or their

25   corporate counsel or anyone else was advising them.  We were

1    advising them with regard to issues involved in this

2    particular lawsuit.  We were not involved in these kinds of

3    day-to-day matters.

4    Q    So you never advised the Schreiber's about day-to-day

5    matters in regard to Two Rivers?

6    A    As to the amount of their salary, I don't believe so.

7    Q    Not my question.  You said you never advised them about

8    day-to-day matters in Two Rivers.  Is that your testimony?

9    A    If it involved the lawsuit or some issue that was

10   involved in the lawsuit, it might have come up.  But something

11   like you're talking about absolutely that was Mr. Parness' or

12   theirs. I mean, I'm not saying that they had to speak to Mr.

13   Parness about that.  And I really don't know.

14          But we were simply dealing with issues that were --

15   that were relevant to the lawsuit.  And we were pretty careful

16   to do that because Mr. Friedman was raising those very issues

17   that Judge Orenstein mentioned with regard to family members.

18   Q    And the issue of how much they were entitled to be paid

19   as managing members of the Two Rivers was not part of the

20   lawsuit, was never raised as part of the lawsuit?

21   A    I don't believe it came up that way.

22   Q    So you never gave advice to the Schreiber's about how

23   much money they could take in distribution?

24   A    No.

25          THE COURT:  Further?

Nelkin - Direct                                          42

1          MR. ROSENBLATT:  I have no more questions.

2          THE COURT:  Ms. Hyland, you wish to inquire?

3          MS. HYLAND:  No.

4          THE COURT:  Okay.  Before you go, just I have

5     another question.

6          THE WITNESS:  Yes.

7          THE COURT:  During the course of the lawsuit, did

8     you have any knowledge about what compensation, however

9     characterized, the Schreiber's were receiving from Two Rivers?

10         THE WITNESS:  I always thought it was $104,000.

11    That was my understanding.  I don't know that we ever talked

12    about it in length.  I mean, as you well know Mr. Schreiber is

13    my son-in-law.

14         And that's -- that's what the operating agreement

15    says and that's what I understood.  I don't think I really

16    inquired of him beyond that.

17         THE COURT:  Okay.  You're excused.

18       (Witness excused.)

19         THE COURT:  Steve Schreiber.

20         Of course, counsel, if you think Eugene Schreiber or

21    Jay Nelkin should testify in this, I'll be happy to bring them

22    up at your request.

23              STEVEN SCHREIBER, Sworn

24         THE COURT:  Have a seat, please.

25         Mr. Rosenblatt.

Schreiber - Direct                                          43

1          MR. ROSENBLATT:  Thank you.

2                    DIRECT EXAMINATION

3     BY MR. ROSENBLATT:

4     Q    Mr. Schreiber, you've heard what transpired here with

5     regard to the distributions from Two Rivers.  How did you come

6     about -- let me ask you this.

7          Do you currently take $208,000 as a distribution from Two

8     Rivers as an annual distribution?

9     A    It's $4,000 a year.

10    Q    4,0000 --

11    A    4,000 a week.

12    Q    Four thousand dollars a week?

13    A    Yes.

14    Q    Okay.  Why do you do that?

15    A    It's been my opinion, and my counsel told me I can -- I

16    will say without offending anyone my mother-in-law was in my

17    house every week, stayed in my house, but she told me, you

18    know, now that Friedman is out, you guys can run your

19    business.  You're an MBA.  Your father's an engineer.  You can

20    finally live with a liveable salary.  You should take money

21    out.  It's about time.  I said, honestly the company's not

22    doing well.  We have legal fees.  I don't want to.

23              And then the conversation came up again, oh, you

24    should do it.  I said, you know, at a point, I said, you know,

25    I should.  I don't want to rock the boat with Friedman.  He's

1    a wealthy person.  I don't want to do it.

2            But it came a point where I decided, you know.  I

3    asked my counsel again, my mother-in-law, and she says, yeah,

4    what's the big deal.  Just you both will make a resolution and

5    you can raise your salaries.  So we started I think in the

6    beginning of 2016.

7    Q    Was there such a resolution?

8    A    I believe so, yes.

9    Q    And was it discussed with Mr. Koenig as well what was

10   going to be done?

11   A    Yes.  Mr. Koenig.  You can see the books and records of

12   the company.  He's taken $4,000 a week up to last week or so,

13   two weeks ago.

14   Q    And again this was done with the discussion with your

15   counsel?

16   A    One hundred percent.  A lot of Mr. Parness, I will say

17   the truth, was a figurehead in this case and the Nelkin's were

18   advising him of how things should be done.  He would always

19   get their approval before, because as you know, they were

20   aligned.

21           So it might, you know, they spoke to each other.  I

22   cleared it with them.  I cleared it with Hill.  I said, you

23   know -- he said, I don't want to do anything to mess up the

24   Nelkins' case.  If they say it's fine, then you guys can do

25   it, so.

1    Q    Was this conversation or was this advice to take this

2    $4,000 a week, was that ever put in writing by the Nelkin's?

3    A    I've learned that what -- with my experience -- that

4    attorneys write things that they want to be seen in court and

5    things they don't, they say to me.  So now I see that's -- why

6    that wasn't the case.

7              But we also have a CFO in the company, Mr. Papa, who

8    would -- he's like our gatekeeper in the company.  I can't

9    write a check myself.  I don't know how.  And he wouldn't

10   approve it and he cleared it and he wouldn't do it otherwise.

11             It's just that's not how we run our company.  We are

12   -- our books, now after we got Mr. Friedman out, are so clean

13   that if I wanted to give you a check for a dollar I don't know

14   how. I can't.

15   Q    So when Ms. Nelkin talked about how she never asked you

16   what salary distributions you were making, did she ever ask

17   you?

18   A    She put in the complaint that I was underpaid and Mr.

19   Friedman is constraining me by giving me small salaries.  And

20   that's part of the relief she said when she -- this fee

21   dispute came up.  You guys were able to increase your

22   salaries, so now, you know, as far as the benefits and others

23   and all that and, therefore, we're entitled to compensation

24   because you raised your salary for the past three years.

25   Q    So --

Schreiber - Cross                                    46

1    A    So for her to say this now is very --

2    Q    So they were aware?

3    A    One hundred and ten percent.

4             MR. ROSENBLATT:  I have nothing further.

5             THE COURT:  Counsel?

6             MS. HYLAND:  Just a minute.  Could I have a minute?

7         (Pause.)

8             THE COURT:  If you could, just be sure to be near a

9    microphone.

10            MS. HYLAND:  Oh, I'll stand here.

11            THE COURT:  Okay.

12                          CROSS-EXAMINATION

13   BY MS. HYLAND:

14   Q    Good morning, Mr. Schreiber.  You testified that you had

15   a conversation with Mrs. Nelkin about -- where she said to you

16   you should pay yourself more money?

17   A    Mm-hmm.

18   Q    When did that conversation take place?

19   A    It was probably a few months after the Friedman

20   injunction or the TRO, whatever, when one of those things were

21   put into place.  And I said now is not the time.  I don't feel

22   comfortable.

23   Q    Okay.  And what specifically did she say to you?

24   A    Ms. Hyland, you have to understand, I traveled all around

25   the world with her.  She was in my house every day.  This is

Schreiber - Cross                                        47

1    not like I'm calling Mr. Rosenblatt and he bills me by the

2    hour.  This was my life.  She lived in my house.  She

3    discussed with my wife.

4              She even told my wife about the -- you can bring my

5    wife here to testify about this because she heard it on the

6    Saturday dinner table.

7    Q    Okay.  And what specifically did she say?

8    A    She said I don't know why you guys are not taking a

9    higher salary.  What are you guys waiting for?  I said because

10   I own the business.  And if I can do without a higher salary,

11   I'd rather invest it in the business, because we're

12   constrained with Mr. Friedman, and we can't get financing and

13   we have to pay bills.  I'd rather pay for coffee than put

14   money in my bank account.

15             But it came a point where I said I need to.  And her

16   response was I don't know what you were waiting for until now.

17   And then I gave her the response was because the best interest

18   of the company came first.  But now I feel it's necessary.  I

19   feel I'm fighting for the company.  And the company was able

20   to pay me and I took it.

21   Q    Can you -- I just ask you limit your response to the

22   questions.  I may ask a follow-up question.  So my --

23   A    I'm sorry.  This is the first time I've done this.

24   Q    That's all right.  At the time that she --

25             THE COURT:  Excuse me, Ms. Hyland.  I'm going to

1    require this of all counsel.  Please don't in the future

2    interrupt a witness's answer.

3               MS. HYLAND:  I apologize.

4               THE COURT:  Wait for it to be completed.  And then

5    if you think an application to me is appropriate, make it, but

6    do not instruct a witness how the witness should or should not

7    answer, please.

8               MS. HYLAND:  I apologize.

9    BY MS. HYLAND:

10   Q    At the time that you state that this conversation took

11   place, what was your salary?

12   A    It was many conversations.  It was probably 20-25

13   conversations about the salary issue alone.  My salary was

14   $2,000 a week.

15   Q    So at the time -- at the time that a decision was made on

16   the preliminary or the TRO, your salary was $2,000 a week?

17   A    Yes.

18   Q    And were you taking distributions as well?

19   A    No.

20   Q    Did you have any other compensation other than the

21   $2,000?

22   A    You have to understand this company is an LLC.  If you --

23   the structure of the company is the profits flow down to the

24   partners.  So, for example, if we made a million dollars

25   profit, and I owned 11 and a half percent, I am liable for the

1    taxes of $110,000.

2            So it was the company policy, as in the operating

3    agreement, to reimburse the members for their tax liabilities

4    of that year, which as you should know, I withheld it.  I

5    think for two or three years I did not even take those

6    distributions because the company was not financially viable

7    for me to do it, so I deferred that.

8    Q    Other than that, were you taking any other compensation

9    at the time --

10   A    No.

11   Q    -- that the TRO was issued?

12   A    No.

13   Q    So just the 2,000 a week and then this tax?

14   A    Not even that tax.

15   Q    Not even the tax, okay.

16   A    It was allowed in the operating agreement, but I deferred

17   it because I used my wife's salary to help me get through

18   because the company needed the money more than I did.

19   Q    And at what point did you decide to -- after you -- when

20   did you raise your salary or your compensation to $4,000 a

21   week?

22   A    I think it was the January of 2016, I believe.  No, 2017.

23   Q    And --

24   A    Because this case was filed in December of 2015, right?

25   So it was a year and a month after.

Schreiber - Cross                                    50

1    Q    And how many conversations did you have with Ms. Nelkin

2    leading up to your decision to raise your compensation?

3    A    Like said, Ms. Hyland, she has a bedroom in my house.

4    How many conversations?  She sat at my table for -- thousands,

5    that's the answer.  If you want a clear answer, thousands.

6    Q    And who else -- thousands of conversations --

7    A    Yes.

8    Q    -- between December of 2015 and January of 2016?

9    A    About everything, yes.  Not about compensation, but this

10   case.  Actually what was -- repeat the question.

11        THE COURT:  Look, you're both engaging -- you're

12   engaging in some hyperbole -- you're following up on it.  It's

13   not particularly germane.  Move on.

14        MS. HYLAND:  Okay.

15   BY MS. HYLAND:

16   Q    Who else was involved in these conversations regarding

17   this compensation and salary?

18   A    My wife, Mr. Papa, Mr. Parness, my father, Eugene, Mr.

19   Koenig.  You could see the books and records of the company.

20   My wife.

21   Q    And did you discuss this issue of your compensation or

22   your salary with Mr. Parness as well?

23   A    Only when he -- he only said I'm -- he said I have a

24   limited role as the nominal defendant in this case, and I

25   don't want to rock the boat, so you'll have to get clearance

1    from the Nelkin's.

2    Q    And did you -- did you discuss with -- other than as you

3    say Ms. Nelkin's asking you why don't you raise your salary,

4    did you specifically talk about whether and to what extent

5    you'd be permitted to raise your salary or compensation under

6    the operating agreement with Ms. Nelkin?

7    A    One hundred percent.  She said I can -- since Mr.

8    Friedman is out of the company, we don't need his vote anymore

9    and we can just do it.  She said I don't know why you waited

10   so long.  To the word, when I took the salary, I said, you

11   know, we increased the salary this week.  Her response to me

12   was I don't know you guys waited so long to do that.  He's

13   been out for a year already.

14   Q    I'm confused.  I apologize.  I'm confused about the time

15   frame.

16   A    Like I said, January, 2017 is the first time I --

17   Q    2017?

18   A    Yes.

19   Q    Oh, I thought you said --

20   A    A year and a month from when we filed it, which we filed

21   December of 2015, so 13 months after.

22   Q    Okay.  I thought you had said January, 2016.

23   A    No.

24   Q    And any of these communications -- again, any of these

25   communications, anything in writing confirming --

Schreiber - Cross                                    52

1          MS. HYLAND:  May I have an instruction to allow me

2     to finish my sentence -- my question?

3          THE COURT:  Let her finish.  I didn't hear an

4     interruption, but --

5          THE WITNESS:  I didn't say anything.

6          THE COURT:  Okay.  Go ahead.

7     BY MS. HYLAND:

8     Q    Is there an email, any communication whatsoever in

9     writing regarding -- with either of the Nelkin's regarding

10    compensation or salary or distributions?

11    A    No offense to attorneys, but I think they know how to

12    cover --

13         THE COURT:  Mr. Schreiber, answer the question.

14    Don't make a speech.

15         THE WITNESS:  Yes, sir.  Yes, sir.  No question?

16         THE COURT:  There was, yeah.

17         THE WITNESS:  If there's an email?

18    BY MS. HYLAND:

19    Q    Can you --

20         THE COURT:  Is there any --

21         MS. HYLAND:  I'm sorry.  I'm sorry.

22         THE COURT:  Is there anything in writing that

23    reflects this advice that you testified to?

24         THE WITNESS:  There might be.  They even helped me

25    draft the resolution for Mr. Parness.

Schreiber - Cross                                              53

1    BY MS. HYLAND:

2    Q     Who helped you draft the resolution?

3    A     I called my mother-in-law and I said Mr. Parness is

4    drafting some resolution between the members for a salary

5    increase and I had the conversation with her.  I don't -- she

6    didn't put her name on it, but she was involved.

7    Q     So Mr. Parness was the one who drafted the resolution?

8    A     With the help of the Nelkins.

9              MS. HYLAND:  No more questions.

10             THE COURT:  Okay.  Well, I have a couple again.

11   People can follow up as they thing appropriate.

12             Were there emails back and forth about -- containing

13   the draft language for a resolution allowing you to take a

14   greater distribution?

15             THE WITNESS:  I don't think so.  Most of it was on

16   the phone because --

17             THE COURT:  Okay.  Because you mentioned that Ms.

18   Nelkin helped to draft the language.

19             THE WITNESS:  Yes.  She'd say tell Hill to write it

20   this way, things like that.

21             THE COURT:  I see.  Okay.

22             THE WITNESS:  So it's -- Your Honor, it was a more

23   casual relationship then so it wasn't as formalized as I

24   discuss with Mr. Rosenblatt.

25             THE COURT:  No.  I get that.  I get that.  I'm just

Schreiber - Cross                                          54

1    trying to find out if there's going to be anything in writing

2    before the actual resolution --

3                 THE WITNESS:  No.

4                 THE COURT:  -- either a draft of the resolution or

5    something else that was sent back and forth by email?

6                 THE WITNESS:  No.

7                 THE COURT:  Okay.

8                 THE WITNESS:  It was a simple resolution.

9                 THE COURT:  All right.  Thank you.

10                Anything further?  Redirect?

11                MR. ROSENBLATT:  Not from me.  No.

12                THE COURT:  All right.  You're excused.

13           (Witness excused.)

14                THE COURT:  Does anybody see any benefit to be

15   gained by calling either Eugene Schreiber or Jay Nelkin to

16   further elaborate on this?  I'm happy to do it if anyone

17   wants, but I think I -- okay.

18                MR. ROSENBLATT:  I mean, Eugene Schreiber was a

19   party to these conversations.  I don't know if Your Honor

20   needs --

21                THE COURT:  I anticipate.

22                MR. ROSENBLATT:  I don't think we need the

23   accumulative testimony, but I'm just prepared to --

24                THE COURT:  Right.  I anticipate that the testimony

25   from Eugene Schreiber and Jay Nelkin would be essentially

1    cumulative of what I've heard, but if I'm mistaken about that,

2    I'm happy to hear it.  If anyone wants to call them, please

3    do.

4              MS. HYLAND:  Just one minute.

5         (Pause.)

6              MS. HYLAND:  Nothing further.

7              THE COURT:  Okay.  So I don't -- I'm not in a

8    position I don't think to make a credibility determination as

9    between the two witnesses who are telling me irreconcilable

10   stories about this.

11             If I were to need to make a factual determination,

12   which I think I would have to do to resolve this, I would want

13   to hear from other witnesses including Mr. Parness and Mr.

14   Papa because according to Mr. Schreiber's version of events

15   would both be percipient witnesses to the advice that was

16   allegedly provided.

17             This is a terribly distasteful dispute even more so

18   than the rest of those before me.

19             I'm going -- you're going to be negotiating new

20   language on paragraph 2(d).  I'm going to ask you to take a

21   final crack at 2(h) as well.  If you can't resolve it, I will

22   reconvene and we'll have Mr. Papa and Mr. Parness here to

23   provide their accounts.

24             Let's move on to 2(i).  Mr. Rosenblatt, what is it

25   you're concerned about being required to provide notice about

Schreiber - Cross                                    56

1     that you anticipate will actually come up?

2              MR. ROSENBLATT:  Just have one second if I could?

3              THE COURT:  Yeah.  This is about additional

4     compensation to the Schreibers.

5          (Pause.)

6              MR. ROSENBLATT:  Assuming 2(h) is in line with the

7     $208,000 salary, there isn't a problem in terms of additional

8     compensation.

9              THE COURT:  But really, whatever the resolution of

10    2(h) is, 2(i) would be -- the disputed part of 2(i) would be

11    superfluous, right?

12             MR. ROSENBLATT:  I think it would drive the bus,

13    yes, on 2(i).

14             THE COURT:  Okay.  So I'm going to take the

15    Schreibers' version of 2(i) recognizing that --

16             MS. HYLAND:  Schreiber's or Nelkin's?  I'm sorry.

17             THE COURT:  I'm sorry.  Forgive me.  The Nelkin's

18    version of 2(i) recognizing that really what you're fighting

19    about is in 2(h).

20             All right.  And 2(l).  Ms. Hyland, the language

21    that's in dispute is an additional provision requiring

22    notification for any action that can reasonably be expected to

23    deprive Nelkin & Nelkin of any benefits of its charging lien.

24    What is it that you think would be covered by that that

25    wouldn't be covered by the rest of the agreement?

Schreiber - Cross                                          57

1           MS. HYLAND:  It's a -- it is a catchall because

2      there are things we may not be able to anticipate that could

3      substantially reduce the value.

4           And so it's -- we just -- the whole purpose of this

5      is to effectuate a charging lien.  And since we're doing this

6      instead of having a charging lien, we want to make sure that

7      it accomplishes that goal.

8           THE COURT:  I get that.  But I'm hard pressed to see

9      how this can provide any effective protection.  You are doing

10     an admiral job of identifying the things that might affect

11     your clients' interest and putting them into the agreement.

12          If it escapes your imagination -- no, I mean this

13     quite sincerely -- if it escapes your imagination, even with

14     the best of intentions on the other side, it might not occur

15     to them that the action under consideration would be such that

16     it would reasonably be expected to deprive your clients of the

17     benefits of their lien.

18          So I don't know how this is one that can be policed.

19     Because if you find out about an action for which you weren't

20     provided notice, you'd say wait, there were supposed to do it

21     under this catchall.  And they'd say we didn't think it would

22     have that affect.

23          So I'm not going to adopt it.  Not because I don't

24     get the concern, but I think if you want this notice

25     protection, you have to identify specifically what you want.

Schreiber - Cross                    58

1          And so I'm open to you coming back and saying, oh,

2     we've learned about this going forward, this should be part of

3     the notice provision.

4              MS. HYLAND:  Okay.  That works.

5              THE COURT:  2(l), doing the Nelkins' version.

6              MS. HYLAND:  I think you meant --

7              THE COURT:  Yeah.  I've got this backwards.  2(i) is

8     going to be the Nelkins' and 2(l) is the Schreibers'.

9          Okay.  You have in paragraph 3 a dispute about

10    timing.  I think as a practical matter, two calendar days may

11    not work out, five business days is probably longer than

12    needed, let's make it two business days.

13         And then paragraph 4, I think this is our last one,

14    again I'm going to go with two business days.  I'm going to

15    suggest two things about paragraph 4 and ask you to take a

16    crack at it since I'm giving you some homework on some of

17    these other paragraphs.

18         First, paragraph 4 doesn't really specify what marks

19    an objection that you've been unable to resolve, so that may

20    lead to some fights about whether an objection is, you know,

21    coming to court with an objection is timely.

22             MS. HYLAND:  Mm-hmm.

23             THE COURT:  I don't off the top of my head have a

24    suggestion on that.  You know, maybe something like, you know,

25    a final email or letter that says, you know, unless you do X,

1    we will consider this unresolved.  But put a deadline of no

2    less than 24 hours on that.  You know, something like that.

3    But just that we avoid any fights about whether coming to

4    court is done in a timely fashion under Paragraph 4.

5              MS. HYLAND:  Okay.

6              THE COURT:  The other thing I'm going to suggest is

7    I've identified two provisions that are subject to fee

8    switching, if the objection to the action is unsuccessful, to

9    2(d) and 2(h).  I'm not inviting suggestions for others.

10             But I do think that writing that into the agreement

11   will best be accomplished in paragraph 4 since that concerns

12   you coming to court.

13             MR. ROSENBLATT:  I just -- while we're on the topic

14   of that issue, I know typically if there's going to be some

15   sort of motion practice or anything like that there's a

16   request for a pre-motion conference.

17             THE COURT:  Yes.

18             MR. ROSENBLATT:  Would we be able to do this on

19   letter to the Court?

20             THE COURT:  I would prefer it to be done on letter.

21   And I don't want to presume too much -- let me know when

22   you're ready if you need to --

23             MS. HYLAND:  I apologize.

24             THE COURT:  No, that's fine.

25             I don't want to presume too much.  I think it will

1    be most efficient to write into the agreement that those

2    objections will be made to me and I'll resolve them, but I

3    can't direct you to do that.

4           I'm just thinking it's an efficient way rather than

5    bring it to me in the first instance because I'm more familiar

6    with it and then have it -- have the objections to Judge Amon.

7           You could do that, of course.  But I think what

8    you're looking for and the reason you've come to me to resolve

9    these issues is really because just this is the quickest way

10   to get it done and you need a decision more than you need a

11   particular decision.  So that's a suggestion.  Consider it.

12   you know, use it or not.

13          All right, folks.  Look, you should be -- I'm not

14   going to suggest anything in this case is simple, but you

15   should either reach an agreement or not quickly.  You know

16   this issue well.

17          Can I have the proposed -- the redraft of 2(d) and

18   2(h) and paragraph 4, can I have that done within a week?

19          MS. HYLAND:  When would we get the invoices, because

20   we would need those to redo the redraft?

21          THE COURT:  Oh, yeah.

22          THE COURT:  Monday.

23          MR. ROSENBLATT:  We can have it by Monday?

24          MS. HYLAND:  And so we would then have a redraft

25   due?

1            THE COURT:  By Friday?

2            MS. HYLAND:  Friday?  Okay.

3            THE COURT:  Will that work?  Because, I mean, you

4     can get a lot done without --

5            MR. ROSENBLATT:  That's fine.

6            THE COURT:  Okay.

7            MR. ROSENBLATT:  I think that's fine.

8            THE COURT:  Okay.  So invoices Monday, draft on

9     Friday.

10           Okay, folks.  Thank you all.  Is there anything else

11    that we should be taking up today?  Have I missed something?

12           MS. HYLAND:  I don't see any.

13           MR. ROSENBLATT:  No, I don't think so.  Just to

14    revisit the first stipulation issue, Your Honor will revisit

15    all that after -- now that we're done, right?

16           THE COURT:  Which one?

17           MR. ROSENBLATT:  The issue about depositing the

18    funds in court and all that kind of stuff.  I know that was

19    not addressed today, but --

20           THE COURT:  Remind me what the dispute is.

21           MR. ROSENBLATT:  So I think the issue was there were

22    two separate stipulations.  Ms. Hyland raised it at the

23    beginning.  There was the stipulation that --

24           THE COURT:  Yeah.  I know.  I thought it was just

25    something I hadn't signed, but --

Schreiber - Cross                                    62

1              MR. ROSENBLATT:  Yeah.  Yeah.  Yeah.

2              MS. HYLAND:  Yes.

3              MR. ROSENBLATT:  There was --

4              THE COURT:  Is there something in dispute that I

5    need to resolve?

6              MR. ROSENBLATT:  No.  No, there isn't.

7              THE COURT:  Oh, yeah.  Yeah.  Once --

8              MR. ROSENBLATT:  I was just -- there was just some

9    facts --

10             THE COURT:  Once I sign off on that, I'm going to

11   sign off on that.  But unless -- am I missing that there is an

12   interest in having that done sooner?

13             MS. HYLAND:  Yes.

14             THE COURT:  There is?  Okay.

15             MR. ROSENBLATT:  Yeah.  I think -- I think just to

16   give up comfort to all of the parties --

17             THE COURT:  Sure.  Sure.  Sure.

18             MR. ROSENBLATT:  -- (indiscernible) defendants and

19   that kind of thing.

20             THE COURT:  No problem.  Does anyone know off the

21   top of their head which docket entry it is so I can find it

22   and make sure I get --

23             MS. HYLAND:  I have 603-1.

24             MR. ROSENBLATT:  Yeah.

25             MR. MAULSBY:  Yes.

Schreiber - Cross                                    63

1          THE COURT:  603-1.  Okay.  I'll take care of that.

2          MR. ROSENBLATT:  Thank you.  We appreciate Your

3     Honor's time.

4          THE COURT:  Thank you all.  Have a very good day.

5          MS. HYLAND:  Thank you, Your Honor.

6          MR. MAULSBY:  Thank you.

7          (Proceedings concluded at 11:16 a.m.)

8      I, CHRISTINE FIORE, court-approved transcriber and

9     certified electronic reporter and transcriber, certify that

10    the foregoing is a correct transcript from the official

11    electronic sound recording of the proceedings in the above-

12    entitled matter.

13

14    *Christine Fiore*

15    _____          December 3, 2018

16       Christine Fiore, CERT

17

18

19

20

21

22

23

24