1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   --------------------------------------x
    STEVEN SCHREIBER,
3
                        Plaintiff,
4
            versus                          15 CV 6861 (CBA)(JO)
5
    EMIL FRIEDMAN, et al.,
6                                           U.S. Courthouse
                        Defendants.         Brooklyn, New York
7   --------------------------------------x
                                            September 20, 2019
8                                           10:30 a.m.

9            Transcript of Civil Cause for Motion Hearing

10  Before:    HONORABLE JAMES ORENSTEIN,
                            District Court Magistrate Judge
11

12                          APPEARANCES

13  Attorney for Plaintiff:
    ROSENBLATT LAW P.C.
14  21 Main Street
    Court Plaza South, Suite 305
15  Hackensack, New Jersey 07601
    BY:  RAPHAEL M. ROSENBLATT, ESQ.
16

17  Attorney for Defendant:
    FRANKFURT KURNIT KLEIN & SELZ P.C.
18  488 Madison Avenue
    New York, New York 10022
19  BY:  NICOLE I. HYLAND, ESQ.
         TYLER MAULSBY, ESQ.

20  Also Present:
    CAROL NELKIN
21  JAY NELKIN
    EUGENE SCHREIBER
22  STEVEN SCHREIBER

23  Official Court Reporter:
    MICHELE NARDONE, CSR -- email:  Mishrpr@aol.com
24
    Proceedings recorded by mechanical stenography.  Transcript
25  produced by computer-aided transcription.

        MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1          (In open court.)

2          THE COURT:  Good morning, everybody.  Have a seat,

3     please.

4          THE CLERK:  Civil cause for a motion hearing,

5     Schreiber versus Friedman, et al., Docket number 15 Civil 6861.

6          Would you all please state your appearances for the

7     record, starting with the plaintiff.

8          MR. ROSENBLATT:  Thank you.  Good morning, Your Honor.

9     Raphael Rosenblatt, from Rosenblatt Law P.C., on behalf of

10    Eugene Schreiber and Steven Schreiber, both of whom are here

11    with me in the courtroom today.

12         THE COURT:  Good morning to all of you.

13         For the defense -- forgive me, for Nelkin?

14         MR. HYLAND:  Nicole Hyland of Frankfurt Kurnit Klein &

15    Selz, on behalf of Nelkin & Nelkin.

16         MR. MAULSBY:  Tyler Maulsby, Frankfurt Kurnit Klein &

17    Selz, on behalf of Nelkin & Nelkin.

18         MR. HYLAND:  Good morning.  You can identify

19    yourselves, or not.

20         MR. JAY NELKIN:  Jay Nelkin, Nelkin & Nelkin.

21         MS. CAROL NELKIN:  Good morning, Your Honor.  I'm

22    Carol Nelkin.

23         THE COURT:  Good morning to all of you.  All right.

24    Folks, so we have the motion.

25         Just to take care of a housekeeping issue, Ms. Hyland,

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   you can imagine my surprise when I saw the letter in which you

2   purported to believe that the order on the stipulation had

3   eliminated the current motion, this surprise arising very much

4   because, if I'm not mistaken, you yourself and also certainly

5   your clients had explicitly agreed that would not be the case.

6           So I'm going to give you the benefit of assuming that

7   it was a misrecollection and it was a mistake.  But I take it

8   now you agree the issue properly remains before the court,

9   notwithstanding Judge Amon's order.

10          MR. HYLAND:  Our position is that Judge Amon's order

11  dismissed all the pending motions with prejudice.

12          THE COURT:  But that's clearly not what you agreed to,

13  and I will tell you this.  That is absolutely not what Judge

14  Amon or I intended the order to do.

15          MR. HYLAND:  Okay.

16          THE COURT:  So by Monday, please, submit a letter that

17  puts in the language that you will agree would -- could be

18  substituted in to correct the clerical error, pursuant to

19  Rule 60(a), in Judge Amon's order so that there is no doubt

20  left on the record that the current motion is properly before

21  the court.

22          MR. HYLAND:  Yes, Your Honor.

23          THE COURT:  If you don't wish to do so, of course, you

24  know, I can draft it or Judge Amon can and make, you know, make

25  the correct order pursuant to Rule 60(a).

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1    I take it you have no disagreement with the court's

2    authority to do that, right?

3    MR. HYLAND:  I would have to look at the case law on

4    that and examine that.  I don't know.

5    THE COURT:  In any event, please include the language

6    that, regardless of whether you think the court can or should

7    do that, includes language that you will not dispute produces

8    the result that had the order been entered in that way, you

9    would not and could not take the position that the order had

10   extinguished the motion.

11   MR. HYLAND:  I'm just making a note, Your Honor.

12   THE COURT:  Yes, of course.

13   MR. HYLAND:  May I respond to one of the --

14   THE COURT:  You may respond to anything you want.

15   MR. HYLAND:  You stated that we agreed that that was

16   not the intent, and I just want to be very clear that we were

17   instructed to put in a joint letter.  We don't know what the

18   intent of the parties were at the time that they filed the

19   stipulation.  We accepted their representation to us that that

20   was their intent, but we didn't have any particular intent

21   because we didn't file the stipulation.

22   THE COURT:  Okay.

23   MR. HYLAND:  I just want to be clear about that.

24   THE COURT:  Let me tell you this, that slicing the

25   salami that finely gives me some pause that goes beyond the

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1    immediate content of the representation.

2           It is always my hope that I don't have to actively,

3    you know, examine the words of counsel to figure out how many

4    ways counsel might intend it to be -- to be interpreted to

5    preserve a nonexplicit intention they would later pull out of

6    their pocket.

7           MR. HYLAND:  I don't --

8           THE COURT:  It is simply not consistent with what was

9    going on at the time, to say that the intention of the parties

10   was to extinguish this motion; and it was absolutely not the

11   court's intention to do so.

12          MR. HYLAND:  I understand that now.

13          THE COURT:  So, please, by Monday, whatever else you

14   are going to say about the case law, about your intentions,

15   about what good faith you have been acting in at all times --

16   because as I said, I'm prepared to give you the benefit of the

17   doubt on that -- please just provide the language that you will

18   never contest, suffices to make clear that the instant motion

19   was not intended to be extinguished by the court's order on the

20   stipulation, so that the court can, pursuant to Rule 60(a),

21   make the correction necessary to avoid further needless

22   litigation on that issue.

23          Because what I don't intend to be something that

24   continues to go on in this case is gotcha litigation, where

25   your clients say, aha, we got you to say something that you

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   didn't mean and therefore you are stuck with it.

2          MR. HYLAND:  I just want to be clear that's not what

3   I'm saying.

4          THE COURT:  I appreciate that.

5          MR. HYLAND:  That is not what I'm saying.

6          THE COURT:  I appreciate that, and I'm glad to hear

7   that, because then there won't be any question going forward

8   that the issue is properly before the court.

9          MR. HYLAND:  I understand what you are saying.

10         THE COURT:  I take it that you agree that the court

11  can take action now, to make sure that the instant motion is

12  properly before the court now.

13         MR. HYLAND:  I accept your understanding.  I don't

14  know.

15         THE COURT:  I'm not asking you to accept my

16  understanding.  I'm asking if you are going to contest it.

17         MR. HYLAND:  I don't know.  I don't know.  I haven't

18  looked into that issue, but I understand what you are saying

19  and I understand what you are asking me to do.

20         THE COURT:  Well, I will also note then that it is

21  hard for me to understand that it was never your intent to

22  mislead the court and then say but we are not going to accept

23  that you can undo what may have been a misimpression, even if

24  we didn't intentionally cause it.

25         MR. HYLAND:  I don't know if -- because I have to look

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1    at the case law, I don't know if the timing has expired for the

2    Schreibers to --

3         THE COURT:  Here is what you don't need case law to

4    understand at all:  Whether your clients will take the position

5    that if the court's orders on the stipulation, by virtue of a

6    clerical error, mistake of understanding of what you guys all

7    intended, extinguished a motion that it did not intend to

8    extinguish, that it can undo that error under Rule 60(a).

9         Regardless of what case law says about it, you can

10   tell me if your clients will take the position that the motion

11   remains extinguished or was extinguished and remains so,

12   notwithstanding the court's understanding.

13        MR. HYLAND:  Will you give me time to consult with my

14   clients about that?

15        THE COURT:  Yes, absolutely.  Take a moment.

16        (Pause.)

17        THE COURT:  All right.  Ms. Hyland?

18        MR. HYLAND:  Your Honor, I think we will need more

19   time to look into this and come back to the court on it.

20        THE COURT:  To be clear, I will certainly give you

21   time to get back.  The issue that you want to preserve the

22   ability to get back to me on is whether your clients can

23   continue to take the -- wrongfully take the position that the

24   court may not resolve the motion we are here to argue today.

25        MR. HYLAND:  Our --

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1          THE COURT:  Wait.

2          MR. HYLAND:  Sorry, I didn't know if you were

3     finished.

4          THE COURT:  No, I'm trying to come up with the words.

5          Your clients are trying to preserve their position to

6     say that the court extinguished the motion and cannot resolve

7     it, whether under a Rule 60 correction to its earlier order or

8     any other means, even if its intention at all times was to

9     preserve its ability to resolve the motion on the merits.

10    That's that your clients wish to think about and preserve their

11    ability to contest, right?

12         MR. HYLAND:  I don't know that I would frame it

13    exactly that way.

14         THE COURT:  I'm sure you would not; and I'm asking

15    you, my having framed it that way, so that I can understand

16    what you are asking to do.

17         Is that a fair characterization of what your clients

18    wish to think about and preserve for now their ability to do;

19    and that is a yes-or-no question, please.  I will, of course,

20    listen to any explanation after I hear the word yes or no.

21         MR. HYLAND:  Yes.

22         THE COURT:  Okay.

23         MR. HYLAND:  Because it's our understanding that this

24    was a voluntarily dismissal that was filed by the Schreibers.

25    They filed the stipulation of dismissal.  That dismissal said

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   we are dismissing all pending motions with prejudice, and this

2   is a pending motion.

3         Whether they intended to do that or not isn't really

4   relevant because, even if they made a mistake, they had a

5   remedy; and that was to come to the court and file a motion to

6   correct that or vacate that.  The time for them to do that

7   expired.

8         THE COURT:  Very good.

9         MR. HYLAND:  I would like to make my record.

10        There may be jurisdictional reasons why that's a final

11   determination.  We have to look -- I would be remiss if I did

12   not look into that first, before committing on the record today

13   to what you are asking me, Your Honor.

14        THE COURT:  Fair enough.  I understand the position

15   you are taking.

16        I don't think you would be remiss in the slightest if

17   what your clients wished to do was to make sure that the court

18   resolved something on the merits that it always intended to

19   resolve on the merits, notwithstanding the possibility that it

20   framed an order in a way that did not capture its intentions.

21        To my mind, many parties, particularly parties who are

22   themselves lawyers, would be avid to avoid having the court

23   believe that that was their intention and would direct their

24   counsel to waive any possible argument to preserve such a

25   position.  They have no obligation to do that.  I just wanted

Schreiber v. Friedman

1  to make clear, that is what your clients, who are officers of

2  the court, actually wish to do; and, if that's what they wish

3  to do -- and you would be remiss in not preserving them their

4  right to do something that they wish to do -- then, of course,

5  when you send your letter on Monday with the language you can

6  include any argument on it that you think.

7          MR. HYLAND:  Yes, Your Honor.

8          THE COURT:  Okay.  Let's hear, recognizing that you

9  think there are no arguments to be had -- and you are, of

10  course, free, consistent with that position, to stay silent on

11  the motion -- I will entertain oral argument.

12          It's your motion, Mr. Rosenblatt.  I will hear you.

13          MR. ROSENBLATT:  Thank you, Your Honor.  I will keep

14  it very brief because I think we have really expressed our

15  position straightforward in the motion papers.

16          We have attached declarations of both Eugene and

17  Steven, and attached relevant documentation that shows that the

18  Nelkins began their relationship with my clients as their

19  advocates and once money became involved and their fee became

20  an issue, became their staunchest adversaries.

21          There is a pattern of conduct here in which the

22  Nelkins put their own interests before those of their clients,

23  violated a number of rules of professional conduct in doing so,

24  including RPC 1.1, avoiding harm to the client; RPC 1.5, about

25  fees and the reasonableness of fees; 1.7, conflicts of

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   interest, in which the lawyer's judgment will be adversely

2   affected by the lawyer's own financial, business, property, or

3   other personal interests; business transactions, under 1.8, in

4   which they attempted to take equity in their client's company

5   without informed consent and without proper disclosures; and

6   RPC 3.3, candor to the tribunal, when, in fact, they had filed

7   a complaint against their own client and appeared in court the

8   same day, never advising the court that that had been done,

9   never seeking leave to withdraw, and, frankly, just keeping it

10  a secret from everybody, including the clients that they had

11  just sued.

12          There are practical effects to all of their conduct.

13  Aside from the fact that the settlement in this case was

14  delayed by more than six months because the charging lien that

15  was filed confused the other side about how to proceed in terms

16  of paying out the settlement, in terms of turning over the

17  equity of the shares in the company that were going to be

18  surrendered, many other issues that came before this court that

19  had to be litigated and discussed, even this motion practice

20  today.

21          There was delay, severe prejudice to my clients.  And

22  it could have been avoided so easily.  That's what's really

23  amazing about all of this.  If in fact the Nelkins are to be

24  believed that my clients were so obstinate and were so -- were

25  refusing to pay their counsel fees, which is not the case, but,

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   even assuming that were true, the Nelkins had remedies besides

2   self-help and vigilante justice.

3          They could have gone to the court.  Your Honor saw all

4   of the proceedings and saw what was going on; and they could

5   have moved before the court and said, Your Honor, we have

6   problems, we are having some problems with our clients, we

7   don't want to prejudice them, but we need to get the court's

8   relief; and there were so many avenues that they could have

9   pursued that would have preserved their clients' while also

10  preserving their rights.  But, instead, they didn't do that.

11  Instead, once money became an issue, they tried to take a piece

12  of their client's business; and, again, the facts of who raised

13  that issue are, frankly, kind of irrelevant, whether my clients

14  raised it or the Nelkins raised it, that's not a fact issue --

15          THE COURT:  Which is it?

16          MR. ROSENBLATT:  Well, our position is that the

17  Nelkins raised it, and the proof of that, so to say, is the

18  fact that there were not the disclosures that would otherwise

19  be required under 1.8; that if in fact the Schreibers had

20  suggested that outcome, you would think, particularly in view

21  of the amount of the fee involved, that the Nelkins would have

22  bent over backwards to make disclosures and said, Are you sure

23  you want to do this?  We are taking an interest in the company

24  that you fought so hard to protect.  Are you sure you want to

25  do this?  Please go see another attorney and talk to them.

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1    But that's not what happened.  In fact, we don't have

2    any of those disclosures.

3    And the notion that RPC 1.8 was not violated because

4    that -- my clients had the sense not to allow that and because

5    the transaction never went through, I don't think that's how

6    you get around Rule 1.8 and its obligations for informed

7    consent.

8    THE COURT:  Let me ask about that.  So you are saying

9    that the rule applies if counsel raises or participates in a

10   discussion about the issue without proper disclosures, even if

11   the contemplated transaction never happens.  Because I

12   thought -- I thought, and not having, honestly, looked at that

13   rule prior to today, I thought that here is what you may not do

14   absent informed consent.

15   MR. ROSENBLATT:  I think you are right.  I think your

16   reading of that is correct.

17   THE COURT:  So if you may not do it absent of informed

18   consent, the violation would be doing it combined with the

19   absence of informed consent.  If it's never consummated, how do

20   you get to that violation?

21   MR. ROSENBLATT:  Well, again, I think your question is

22   right in terms of the fact that it didn't take place means that

23   they didn't overtly violate RPC 1.8.  In other words, you can't

24   violate it if you don't go into business with your clients.

25   THE COURT:  So how can that be the basis for your

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1  motion?  I know there are other bases.

2          MR. ROSENBLATT:  It's not.  My point is it's evidence

3  of one of a number of RPC violations.

4          THE COURT:  Okay.  I understand.  So as part of the

5  mix of circumstances that support a conclusion as to other

6  claimed violations, but you are not complaining that they

7  violated 1.8 itself.

8          MR. ROSENBLATT:  Correct.

9          THE COURT:  Good.  That wasn't clear to me.

10          MR. ROSENBLATT:  There was no explicit violation of

11  1.8, to clarify that.

12          THE COURT:  All right.

13          MR. ROSENBLATT:  Just moving to the legal standard,

14  the case law that's set forth in our moving papers, our reply

15  papers -- and, frankly, even in the Nelkin papers -- show that

16  an attorney owes a duty of loyalty to his or her client; and

17  that duty is paramount and, obviously, an attorney is entitled

18  to collect a fee and, obviously, an attorney has certain

19  remedies to help them enforce that fee.

20          THE COURT:  Including suing the clients, under the

21  proper circumstances, yes?

22          MR. ROSENBLATT:  Including suing the client under the

23  proper circumstances --

24          THE COURT:  There is no disagreement with that

25  proposition.

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1          MR. ROSENBLATT:  They have the right to do that, but

2     subject to certain rules, subject to certain disclosures,

3     subject to certain requirements.  And, frankly, I'm not

4     convinced that this is the case it should have happened in

5     because, again, the Nelkins' complaint, at least in their

6     papers, is that the Schreibers were refusing to pay their fee,

7     the settlement was being done, it had -- this fee issue had to

8     be resolved, they had no other choice but to file the charges

9     and call their clients fraudsters and acting in bad faith on

10    the record in front of full view of the opposition sue them;

11    but, in fact, that's not the case.

12         THE COURT:  Wait.  I want to separate two arguments

13    that you are making there and see if you are making either or

14    both.

15         Are you saying that, regardless of the circumstances

16    surrounding their filing of the lawsuit and other factors that

17    you rely on, that one potential basis for granting the motion

18    is simply that they sued for fees because it hadn't gotten to

19    the point where they could properly do that?

20         MR. ROSENBLATT:  I'm saying -- I'm actually kind of

21    making two arguments.

22         THE COURT:  I know you are.  I'm trying to untangle

23    them.

24         MR. ROSENBLATT:  So let me clarify.

25         THE COURT:  Look, I absolutely get the argument,

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1  because that's clear on its face, that you are saying the way

2  they went about suing, and other circumstances as well

3  predating the lawsuit, support a disqualification for cause.

4          MR. ROSENBLATT:  Correct.

5          THE COURT:  What that doesn't say is whether you also

6  think they would be disqualified for cause simply for having

7  filed a lawsuit prior to there being a sufficient predicate for

8  doing so.

9          MR. ROSENBLATT:  As an alternative grounds, is that

10  what you are saying?

11          THE COURT:  Yeah.

12          MR. ROSENBLATT:  Yes, I do.

13          THE COURT:  So, even if they had done it the way

14  lawyers should, including withdrawing before filing suit, give

15  whatever notice, based on the state of negotiations between

16  your client and the Nelkins at the time they filed the

17  lawsuit -- and leaving aside procedural things, like whether

18  they should have withdrawn -- it would have been a basis for

19  disqualification and forfeiture of their fee to sue for their

20  fees.

21          MR. ROSENBLATT:  Okay.  Well, let me answer it this

22  way.

23          THE COURT:  No, I know.  Don't answer it a particular

24  way because that's a yes-or-no question so I understand what

25  argument, what relief you are seeking and the basis for it.

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1    Are you making that argument -- that's simply suing at

2    that stage in the negotiations -- by itself was a basis for

3    disqualification and forfeiture of the fee?

4         MR. ROSENBLATT:  I think my answer is no but with a

5    qualification.

6         THE COURT:  Okay.

7         MR. ROSENBLATT:  And the qualification is that the

8    circumstance that we are looking at is that they sued without

9    having those preconditions met.  The act of suing, in and of

10   itself, I don't believe, is grounds for qualifications.

11        THE COURT:  That's really what I am asking.  Go on.

12        MR. ROSENBLATT:  That's not what I'm saying, but I am

13   saying that under the circumstances of this case, these facts,

14   the very act of suing --

15        THE COURT:  That I get.  Yes, I understand that to be

16   your argument.

17        MR. ROSENBLATT:  Okay.  That's fine.

18        Again, as we set forth in our papers, that lawsuit

19   really was the culmination of bad actions by the Nelkins, that

20   put their interests way before those of their clients and

21   prejudiced their clients; and what I was sort of veering into

22   when I started this line of argument was the legal standards

23   set forth in our papers, and even in Nelkins' papers, show that

24   when you don't -- when you put your interests above those of

25   your client, that is grounds for disqualification for cause.

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1              And, in fact, the case law that is rife throughout

2      both sets of papers are cases where an attorney represented,

3      say, for example, two criminal defendants in the same case, or

4      there was representation, concurrent representation in a matter

5      or by a firm, or there was representation of one client who

6      sued another client, a former client.  So we are not even

7      talking about a direct adverse conflict.  We are talking about

8      a situation in which attorneys were disqualified for cause

9      because they created situations in which their loyalty

10     necessarily was divided and they couldn't favor one client over

11     another, let alone themselves.

12             So this case goes even further than those cases in

13     which counsel has been disqualified for cause, because here it

14     was a direct conflict with their client that was created; and

15     it's important to note -- excuse me.  It's important to note

16     that in one of the cases that we cited in our reply papers the

17     court talked about sort of the due of loyalty, about suing a

18     client for fees while also representing them.

19             This was in the criminal context, but the court was

20     clear to note that it's often possible for an attorney to

21     separate him or herself from a fee dispute, suing a client for

22     fees, while also putting their interests first in the case in

23     which they are representing him.  For example, a criminal case

24     they still need to be zealous advocates for their clients, yet

25     they can still sue them for fees down the road or at the same

Schreiber v. Friedman

1    time they represent them; and that, in and of itself, is not a

2    disqualifying conflict, which I think may answer, in a

3    roundabout way, Your Honor's prior question about the act of

4    suing itself.

5         But what's clear from all of the case law is that when

6    you put your interests above those of your client, particularly

7    when it causes prejudice, particularly when it causes delay,

8    particularly when it's based, frankly, on fiction in terms of

9    the valuations and the things that you are demanding, and you

10   don't protect yourself -- and particularly when you are talking

11   about a fee of this magnitude, whatever it may be --

12        THE COURT:  Well, we don't know what it is?  We know

13   what they have claimed, yes?

14        MR. ROSENBLATT:  We know what they have claimed.

15        THE COURT:  Before I forget it, just as a factual

16   matter, I know the settlement with the defendants had a number

17   of components, monetary and otherwise.  Just compare for me --

18   because I have lost sight of the relationship between the

19   claimed fee and the monetary portion of the settlement.

20        MR. ROSENBLATT:  Well, the claimed fee was based on a

21   number of factors.

22        THE COURT:  Just what's the amount, if you know?

23        MR. ROSENBLATT:  Their claimed fee was -- the number

24   that came out, in terms of their discussions, the final number

25   was 2.75 million, which would value the settlement at around 8,

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1    which the Nelkins claim was a discount to the actual --

2              THE COURT:  I know, but the amount that they are

3    seeking fees, you are saying, is 2.75?

4              MR. ROSENBLATT:  That's the amount.

5              THE COURT:  I didn't intend this to be a difficult

6    question for anyone.  Is that in dispute?

7              MR. HYLAND:  We don't know the value of the

8    settlement.  So we don't know what the one-third would be.

9              We did have settlement negotiations where we reached

10   an agreement in principle on 2.75 million, but that was a

11   settlement discussion.

12             THE COURT:  But then maybe the way to ask it -- and

13   I'm sorry to derail your argument.  I just don't want to lose

14   sight of this.  This has gone on for so long, and I have

15   forgotten some of the things.

16             MR. ROSENBLATT:  That's all right.

17             THE COURT:  The claimed fee is -- I don't mean to be

18   contentious at all about this; I just want to understand -- pay

19   us in cash a percentage of the overall value of the monetary

20   and nonmonetary components of the settlement, correct?

21             MR. HYLAND:  They would be owed a cash payment for

22   one-third of the value of the settlement, whatever that would

23   turn out to be.

24             THE COURT:  All right.  Let me ask you one other

25   question on this line, and I will let you go on.

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1        How much of the -- how much -- wrong question.

2        How much cash came over with this settlement?

3        MR. ROSENBLATT:  1.75 million, which is being held by

4   the court.

5        THE COURT:  Right.

6        MR. ROSENBLATT:  Ballpark.

7        THE COURT:  Right, and everything else was

8   nonmonetary?

9        MR. ROSENBLATT:  It was nonmonetary, yes.

10        MR. HYLAND:  There was another, I believe, million

11   dollars that was paid; and that money was used by the

12   Schreibers to buy out Mr. Koenig.

13        THE COURT:  That was paid in cash?

14        MR. HYLAND:  I believe so.

15        THE COURT:  So there is about 2.75 in cash payments?

16        MR. JAY NELKIN:  Your Honor, I think it was 2.8.

17        THE COURT:  2.8 in cash paid, and the total value, I

18   know, is in dispute.  So if you can say -- and, please,

19   ballpark figures -- what you each think the overall value of

20   the settlement was.

21        MR. ROSENBLATT:  My clients' view, the whole

22   settlement is maybe $3 million.

23        THE COURT:  Okay.

24        MR. ROSENBLATT:  But that's the whole value of the

25   settlement.

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1      THE COURT:  And the Nelkins?

2      MR. HYLAND:  We have seen valuations of the equity

3  somewhere -- anywhere between 6 million and 25 million.

4      THE COURT:  What do you think it's worth?

5      MR. HYLAND:  20 million, 22 million.

6      THE COURT:  You say it's worth 20 million?

7      MR. HYLAND:  That's our best guess based on the

8  information we have.

9      THE COURT:  So they have two-point --

10     MR. HYLAND:  They haven't asked for that.

11     THE COURT:  What are you asking for?

12     MR. HYLAND:  They have said all along that they would

13  agree to the settlement proposal made by the Schreibers of

14  2.75 million.

15     THE COURT:  So almost, it's not exactly equal to the

16  total cash paid as part of the settlement.

17     MR. HYLAND:  Coincidently.

18     THE COURT:  Coincidently.  All right.

19     I'm sorry.  I took you off track.  Go ahead.

20     MR. ROSENBLATT:  That's okay.  And I hope -- I know

21  Your Honor will, but feel free to interject if there is a

22  specific question.

23     THE COURT:  You know me well.  You know that.

24     MR. ROSENBLATT:  I do.  Frankly, I think I'm actually

25  wrapping up, because, as I mentioned, this is a classic case --

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1    unfortunately, not classic because it's unusual and to the

2    degree in egregiousness of what the Nelkins did in terms of

3    putting their interests above those of their clients; but this

4    is a case that falls right within the rubric of putting your

5    own interests above those of your clients and prejudicing your

6    client as a result and, frankly, taking a lot of the court's

7    time, the defendants' time, delaying the settlement, harming my

8    clients' business in terms of their ability to do expand their

9    business and run their business because this money has been

10   tied up.  The charging lien has prejudiced them.

11          And, certainly, we submit that the court should not

12   countenance this type of behavior and should find that they

13   were discharged for cause and vacate the charging lien and

14   just -- obviously Your Honor is going to give me an

15   opportunity, but, to the extent I could respond to any argument

16   they are going to make, I would ask for that.

17          THE COURT:  Before you turn -- I have a question.  The

18   relief you want is disqualification and for them to forfeit any

19   fee.

20          MR. ROSENBLATT:  Yes.

21          THE COURT:  My recollection from some months ago, when

22   the issue was starting to emerge, was that your clients had not

23   yet paid costs, you know, vouchers from vendors that the

24   Nelkins engaged on your clients' behalf during the litigation.

25          Have your clients now paid those?

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1        MR. ROSENBLATT:  Yes.  So -- well, yes and no.  They

2   have entered into a payment plan.  The largest outstanding

3   invoice was to Stroz Friedberg, which is the forensic company

4   that was doing the computer.

5        THE COURT:  I know.

6        MR. ROSENBLATT:  They have entered into a payment plan

7   with Stroz.  They resolved that amount and have started

8   payment.

9        THE COURT:  I don't need to know chapter and verse

10  after that, but the bottom line is your clients are assuming

11  responsibility for the cost; and this dispute is -- will --

12  there is no resolution of this dispute that leaves the Nelkins

13  shouldering the costs for outside vendors.

14       MR. ROSENBLATT:  My clients are paying the outside

15  vendors, yes.

16       THE COURT:  You know that that's not the question I

17  asked.

18       MR. ROSENBLATT:  No, it isn't.

19       THE COURT:  So please answer the question.

20       MR. ROSENBLATT:  Yes.

21       THE COURT:  Are you waiving any argument that the

22  resolution of this motion should include the Nelkins having to

23  pay costs that they incurred and paid on behalf of your

24  clients?  I assume that's not what you are seeking.  Right?

25       MR. ROSENBLATT:  No.  Well, we are not --

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1          THE COURT:  I'm not safe in making that assumption?

2          MR. ROSENBLATT:  Can I clarify?

3          THE COURT:  And folding that into the analysis of your

4     motion?

5          MR. ROSENBLATT:  I just want to clarify my answer.

6          THE COURT:  Yes.

7          MR. ROSENBLATT:  We are not seeking that in this case

8     at all; but, to the extent that down the road -- and I don't

9     know whether my clients will have claims against the Nelkins

10    for anything else besides their fee at some point --

11         THE COURT:  I think your clients are trying to resolve

12    the matter here with finality.

13         MR. ROSENBLATT:  Absolutely.

14         THE COURT:  So you are not trying to preserve some

15    later claim?

16         MR. ROSENBLATT:  No.

17         THE COURT:  So what am I missing?  It sounds like you

18    are saying your clients are going to make things right with the

19    vendors and not leave the Nelkins holding the bag on that in

20    any way, and you are not trying to preserve their ability to do

21    that.  That's what I infer.

22         Tell me if there is some daylight between that and

23    what you are saying.

24         MR. ROSENBLATT:  You are correct.

25         THE COURT:  Okay.

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1          MR. ROSENBLATT:  Which, but I just wanted to clarify

2   that to the extent my clients are out of pocket for things they

3   paid during the course of this litigation that the Nelkins

4   continued them to -- for example, Stroz and the way Stroz was

5   managed -- my clients are not preserving any claims in this

6   case.  We want it done, but to the extent they may make a claim

7   down the road for something --

8          THE COURT:  That who may make a claim?

9          MR. ROSENBLATT:  The client, the Schreibers.

10         THE COURT:  For example -- and I'm not at all

11  suggesting there should be anything down the road; quite the

12  contrary.

13         MR. ROSENBLATT:  Understood.

14         THE COURT:  I strongly wish you guys would work it out

15  here and get out of each other's lives, to the extent you can.

16         If there is something in the nature of malpractice or

17  some other affirmative claim you might seek to recover from

18  them what you paid to vendors.

19         MR. ROSENBLATT:  Correct.

20         THE COURT:  But you are not seeking to have them bear,

21  in the first instance --

22         MR. ROSENBLATT:  Correct.

23         THE COURT:  -- the responsibility to pay the vendors.

24         MR. ROSENBLATT:  Correct.

25         THE COURT:  Got it.

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1     MR. ROSENBLATT:  I just didn't want it to be on the

2     record that somehow I had waived.

3          THE COURT:  I'm not trying to go that far.  I just

4     want to make sure that, in terms of outstanding bills from the

5     vendors, in the first instance, your clients are committed to

6     taking care of those and not seeking to leave the Nelkins

7     responsible for that, regardless of any later claim you may

8     have that they have damaged you in some way by causing you to

9     incur those costs.

10         MR. ROSENBLATT:  Correct.

11         THE COURT:  With that, let me turn to you.

12         MR. ROSENBLATT:  Thank you, Your Honor, for your time.

13         THE COURT:  Ms. Hyland, I will hear you.

14         MR. HYLAND:  Thank you, Your Honor.  Today the

15    Schreibers are asking this court to deprive the Nelkins of any

16    fee for the more than three and a half years of work, the

17    effort, the time, the energy, and the passion that the Nelkins

18    invested in this case on behalf of the Schreibers.  They want

19    to take all of that away.  That's an extreme result and extreme

20    penalty, to find that a lawyer is terminated for cause and to

21    forfeit their entire fee.

22         So we get that there is a lot at stake here today, but

23    what is at stake here today pales in comparison to what was at

24    stake four years ago for the Schreibers.  Four years ago, for

25    the Schreibers, they were about to lose their entire business,

Schreiber v. Friedman

1    a business they founded, they created, they worked hard.  They

2    poured their time, their effort, their energy, their passion

3    into making into a successful business.  They were about to

4    lose it all because they made a bad decision to associate with

5    someone, Mr. Friedman, who took advantage of them and turned on

6    them and was about to take everything they had.

7         The Nelkins stepped in, and they are the ones that

8    rescued the Schreibers from that situation.  They stepped in,

9    when no other law firm would do it on a contingency.  They came

10   in and they worked hard and they devoted themselves to making

11   sure that the Schreibers did not lose their business.

12        And, at the end of that process, they didn't just

13   rescue and save the equity that the Schreibers were going to

14   lose, their minority interest.  They got them the entire

15   company.  They got rid of this bad actor.  They extricated the

16   Schreibers from this relationship.  They got the entire

17   business plus enough money, a million dollars, to buy out the

18   fourth partner, the one who -- I don't know if you remember --

19   was the holdout in the settlement, Mr. Koenig.  So they got rid

20   of all of the partners.

21        The Schreibers now control the entire business, and

22   they have never said -- and it was undisputed -- that this was

23   a great result for them.  They were very happy with this

24   result.

25        THE COURT:  Sorry for the interruption.  I understand

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   the rhetorical appeal of framing it in that way, and I'm not

2   trying to keep you from doing it; but I just want to make sure

3   I'm not misunderstanding.  You are not contending that the

4   quality of the work done before the events giving rise to the

5   motions themself is -- the decision as to whether the motion

6   should be granted shouldn't turn on my assessment -- or

7   ultimately Judge Amon's assessment -- of the quality of the

8   work that your clients did, right?

9           MR. HYLAND:  I think it's relevant.

10          THE COURT:  You really want this to be a referendum,

11  in part, on how well your clients performed and how much of the

12  result is due to their efforts as opposed to other factors?

13  That's what you want?

14          MR. HYLAND:  I'm saying all the factors are relevant

15  here because this is about achieving a fair result.

16          THE COURT:  If you want the discussion in resolving

17  this, really, of how much of the result is solely due to the

18  fine quality of your clients' work as opposed to other factors,

19  all right.  I understand that's what you want.  Go ahead.

20          I'm surprised to hear it, for a number of reasons.

21  One of them being I would have thought that that's not really

22  the legal analysis, but that's not the only reason; and now I

23  know your position, and I will certainly take it into account.

24          MR. HYLAND:  The point I'm trying to make is this, the

25  result that was achieved for the Schreibers, no one has

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1    disputed was a great result.  That's what I'm saying.  They

2    didn't lose this case.  They won everything.

3          But they are trying to do to the Nelkins what almost

4    happened to the Schreibers.  They want to take everything away

5    that the Nelkins have earned over the last three and a half

6    years; and that's -- my point is that that is an extreme

7    remedy, an extreme penalty, and it is also something that is an

8    intensive fact analysis before a lawyer should be found to have

9    been terminated for cause.

10         Here, first of all, for the record, a lot of the

11   grounds for termination for cause that the Schreibers are

12   relying on, this court has said will not be considered because

13   Mr. Rosenblatt stood in this courtroom in February and said,

14   I'm not going to submit any declarations, I'm only going to

15   rely on the public record and on communications between the

16   Nelkins and the Schreibers.  Then the Schreibers turned around

17   and submitted declarations with narratives about things that

18   were not in the public record and were not in the

19   communications, including secret recordings that we didn't know

20   about and that we have not had an opportunity to even look

21   into, as to whether there were more recordings.  We have had no

22   discovery on that.  All of that Your Honor has said you won't

23   consider.

24         So we are left with purely just the public record and

25   communications between the clients and the Nelkins.

Schreiber v. Friedman

1        So I want to get to the grounds that the Schreibers

2   had set forth for the basis for their termination.  First, they

3   say they, the Nelkins, violated Rule 1.8(a), governing business

4   transactions with clients.

5        THE COURT:  Well, you heard it's about that as a basis

6   for release.

7        MR. HYLAND:  Thank you.

8        THE COURT:  So it won't take up much of your time.

9        MR. HYLAND:  That was what I was basically going to

10  say, that it is not a grounds for termination for cause here.

11       THE COURT:  Okay.

12       MR. HYLAND:  Another ground that they point to is they

13  claim that the Nelkins prevented the Schreibers from getting

14  independent counsel for either the settlement or their dispute,

15  their fee disputes with the Nelkins.  So they prevented us from

16  doing that.  They refused to allow us to get independent

17  counsel.

18       Of course, this is contradicted by their own

19  statements in their declaration and by all of the evidence that

20  has been put in, to show that they absolutely consulted with

21  independent counsel, Mr. Weiss first and then Mr. Parness; that

22  my clients, the Nelkins, urged them to consult with independent

23  counsel on several occasions about both the settlement and the

24  fee issues; and that my clients met with Mr. Weiss, spoke to

25  him multiple times, and had multiple communications with

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   Mr. Parness about these issues.  So the idea that they

2   prevented the Schreibers from getting independent counsel is

3   clearly contradicted by the record.

4          Another ground that they assert for termination of

5   cause is that the Nelkins tried to impose upon them an

6   excessive fee.  Now, they have, the Nelkins have a one-third

7   contingency arrangement.  That's a pretty standard fee.  So

8   clearly that's not excessive in and of itself.

9          What the Schreibers are claiming is that the Nelkins

10  intentionally inflated the value of the equity in order to

11  inflate the valve their fees and that they imposed that on the

12  Schreibers and the Nelkins should be terminated on that ground.

13  What actually happened and what we put in our papers is that

14  the Nelkins, based on information primarily learned from the

15  Schreibers about the value of the company, reached what they

16  believed was a good-faith assessment of the value of the

17  settlement; and they calculated their contingency based on

18  that.

19         THE COURT:  To the extent that you guys now think the

20  settlement is worth 20-some-odd million, when in relation to

21  the negotiations of the settlement, the length of the

22  settlement, did they come to that understanding?

23         MR. HYLAND:  Throughout the entire litigation, from

24  the beginning of the ligation.

25         THE COURT:  So at the time of the settlement, when it

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   was being negotiated, they thought it was worth, the settlement

2   would be worth about 20 million?

3          MR. HYLAND:  Twenty, twenty-five million, somewhere

4   around there.

5          THE COURT:  So I will clearly have to segregate from

6   any analysis of this motion my recollections of what they said

7   about the matter.  Go on.

8          MR. HYLAND:  Okay.  The settlement included the equity

9   as well as a number of other factors.

10          THE COURT:  In terms of what the settlement was worth,

11   I should clearly not take into account anything they said

12   during the settlement negotiations about what they thought the

13   settlement was worth.

14          MR. HYLAND:  Okay.  I'm not familiar with what they

15   said.

16          THE COURT:  No.  They are, but it doesn't matter

17   because, I take it, you agree I should not take that into

18   account.  Or should I?

19          MR. HYLAND:  I don't know what was said.  So it's hard

20   for me to know what --

21          THE COURT:  It's a legal issue.  Do you think it's

22   relevant to the analysis?

23          MR. HYLAND:  No, I don't think so.  I don't think so.

24          THE COURT:  All right.  Go ahead.

25          MR. HYLAND:  The question here is whether or not they

Schreiber v. Friedman

1    had a good-faith basis to have a view, based on the information

2    they had, as to the general range of the value of this equity

3    that was a major part of the settlement.

4            THE COURT:  I will, of course, not take that into

5    account.

6            MR. HYLAND:  Take what into account?

7            THE COURT:  Things that were said during the

8    settlement negotiations.  That's off for the analysis.

9            MR. HYLAND:  Okay.  The Schreibers argue that it was

10   improper for them to value the equity in the company as high as

11   they did because they should have known it was less than that.

12   One of the things that the Schreibers point to as evidence of

13   that is a report that the Schreibers claim the Nelkins'

14   commission asked, which we referred to as the Zak report.  It's

15   an appraisal that, in fact, was commissioned by another lawyer,

16   Mr. Eisenberg, a tax lawyer that the Schreibers hired to help

17   them structure the settlement in a tax-advantaged way for them.

18           So they are now trying to impose the Zak valuation,

19   which was lower than the valuation that my clients believed was

20   a fair valuation.  They are trying to sort of tie the Nelkins

21   to that valuation and say they should somehow be bound by it,

22   or they did something wrong by assessing a different valuation;

23   and the reality is the Nelkins were not the ones who

24   commissioned that report, and that report, first of all, says

25   specifically that it was created solely for tax-planning

Schreiber v. Friedman

1   purposes and that if it were used for any other purpose it

2   would likely result in an erroneous outcome.  It was also --

3       THE COURT:  I don't think it would bear a whole lot on

4   the outcome of this motion; but use this for taxes but for

5   God's sake don't use it for anything else is --

6       MR. HYLAND:  I'm not a tax expert, and we don't even

7   have an opinion on that report.

8       THE COURT:  Okay.  Move on.  It's not terribly

9   relevant.  Move on, please.

10      MR. HYLAND:  Okay.  The other thing that the

11  Schreibers claim as a grounds for termination for cause is that

12  the Nelkins impermissibly or improperly threatened to withdraw

13  from the representation, and the reason they are arguing this,

14  I understand, is because they are trying to analogize this

15  situation to the Holcombe case, which you determined, decided.

16  Absolutely not.  The Nelkins did not impermissibly threaten to

17  withdraw.

18      What happened here is that when the fee dispute

19  started to arise and the Schreibers became unhappy with the

20  idea that they might have to pay the Nelkins some money --

21      THE COURT:  Wait.  Wait a minute.

22      MR. HYLAND:  Sorry.

23      THE COURT:  You are saying they became unhappy with

24  the idea of paying any fee?

25      MR. HYLAND:  Yeah.  They did not want to go out of

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   pocket.  So the idea was --

2           THE COURT:  That's not what I asked.

3           MR. HYLAND:  Oh, I'm sorry.

4           THE COURT:  What you said was they became unhappy with

5   the idea of paying the Nelkins any fee.  Is that really your

6   position, that they never intended to pay any fee?

7           MR. HYLAND:  No, no, no.  That's not my position.  If

8   I misspoke, I misspoke.

9           THE COURT:  So I'm not confusing your position with

10  the thing that you actually said.

11          MR. HYLAND:  Then if I misspoke, I misspoke.

12          THE COURT:  Should I allow you to correct that?

13          MR. HYLAND:  Your Honor.

14          THE COURT:  Should I?

15          MR. HYLAND:  I would appreciate it.  Thank you.

16          THE COURT:  Should the court also be allowed to

17  correct misstatements?

18          MR. HYLAND:  I think we --

19          THE COURT:  And should it be the same standard for

20  both?

21          MR. HYLAND:  I think it's apples and oranges.

22          THE COURT:  I see.  Move on, please.  I will, of

23  course, allow you to correct a misstatement.

24          MR. HYLAND:  I appreciate that.

25          The Schreibers did not want to go personally out of

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1    pocket to pay the Nelkins any of the fee because, as you know,

2    the settlement was not just going to be a cash payment.  There

3    was also an equity portion.  So there could be a result -- and

4    this was anticipated -- where the cash portion would not cover

5    the full value of the fee; and the Schreibers did not want to

6    go out of pocket for that.  That's my only point, that they

7    didn't want to pay additional amounts beyond what they were

8    receiving in the settlement.

9            So when they realized that there was going to be a

10   component of this fee that might require an additional payment

11   beyond what they were receiving in the settlement, that's when

12   the relationship started to deteriorate.

13           THE COURT:  In going into the settlement or even into

14   the litigation, did the Nelkins and the clients discuss that,

15   hey, what we might try and do, and this is going to be okay,

16   right, is we will keep any money that we get as a fee and you

17   will be left with the equity.  In other words, go through the

18   litigation but don't expect to get any cash in your pocket out

19   of this because that's all going to go to counsel and you

20   should be satisfied with getting the Friedmans out.  That was

21   the contemplation?

22           MR. HYLAND:  That was contemplated, and that was part

23   of the purpose of the cash payment, was to pay the fees --

24   maybe I have got it wrong.  Hold on one second.

25           (Pause.)

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1          MR. HYLAND:  I'm sorry.  I apologize.  I'm trying to

2     understand.

3          (Pause.)

4          MR. HYLAND:  I'm not sure we are in disagreement, but

5     let me try to make it clear.

6          From the beginning the agreement was one-third

7     contingency on the value of the settlement, whether equity,

8     cash, or some combination of those things.  It was always

9     possible that there would be enough cash paid that it could

10    amount to that one-third.

11         THE COURT:  That quickly became apparent during the

12    settlement negotiations -- and I'm comfortable saying this

13    because it doesn't get into the negotiations so much as the

14    deal that ultimately emerged.

15         MR. HYLAND:  Right.

16         THE COURT:  That the monetary portion would only be a

17    component, and there would be other parts of it.

18         MR. HYLAND:  That was always known, that there would

19    be some equity, because that was the whole purpose of the

20    litigation, was to save the equity of the company.

21         THE COURT:  Before you conferred with your clients you

22    said yes, it was -- there was transparency between counsel and

23    client, that one possible outcome would be the clients get

24    nothing of a monetary nature out of the litigation because all

25    of the money goes to counsel as their fee.  You said that was,

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   in fact, contemplated.

2          Do you now wish to, having consulted with your

3   clients, correct an inadvertent error on that, or is that still

4   their position?

5          MR. HYLAND:  I believe there was always a possibility

6   that the moneys that were paid would either mostly or

7   completely be used for the fee.

8          THE COURT:  That was something that the clients

9   understood?

10          MR. HYLAND:  That's not what happened here.

11          THE COURT:  Excuse me, please.  That was something

12   that the clients understood going into it?

13          MR. HYLAND:  Yes, yeah.

14          THE COURT:  All right.  Go on.

15          MR. HYLAND:  Here, to be clear, there were other cash

16   components.  For example, the million dollars that the

17   Schreibers used to pay Koenig.  I believe there was another

18   small amount of money that the Schreibers got.  So, but the

19   bulk of the -- at least the 1.75, that was supposed to be

20   used -- and it was understood that that was going to be used --

21   towards the fees.

22          So at this point, when it became evident that the

23   value of the contingency fee was going to be larger than the

24   cash component that would be available to pay the Nelkins,

25   partly because the million dollars was being used to pay

Schreiber v. Friedman

 1  Koenig, things deteriorated; and there were a lot of

 2  conversations between the Nelkins and the Schreibers, where, in

 3  particular, Steven Schreiber, became incredibly abusive.  If

 4  you have read -- and I'm sure you have -- Carol Nelkin's

 5  declaration, she talks about how the types of things that he

 6  said to her, how painful that was for her, how traumatic it was

 7  for her to hear those things; and this happened over and over

 8  again during this period of time.

 9          And because of that, the Nelkins, as any reasonable

10  attorney would, said a couple of things.  One thing that they

11  said to the Schreibers is, in substance, You don't seem happy

12  with us.  Do you want us to withdraw?  Do you want other

13  counsel?  The other thing they said at certain points was, We

14  can't continue to represent you if you are going to be abusive

15  in this way.

16          THE COURT:  I just want to pause.  Forgive me, please,

17  for the interruption.

18          But, to the extent you are going into communications

19  between them, I think there is not a privilege issue that

20  attaches -- I'm not bothered about that -- but, at the outset

21  of your argument, you were very insistent, and understandably

22  so, on keeping out from my consideration communications between

23  them.  What I hope to avoid is a situation where one side or

24  another is saying you can consider communications between the

25  Nelkins and the clients but only some of them.

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1      MR. HYLAND:  When we stood here in February --

2      THE COURT:  I understand what you are going to say on

3  this, but I'm asking you a somewhat different question.  Are

4  you saying that I should consider partly because -- maybe

5  entirely -- because of the timing of when it was brought to my

6  attention, I should consider some communications between the

7  Nelkins and the Schreibers but not others?

8      MR. HYLAND:  I believe that it's proper for you to

9  consider the communications that are described in Carol

10  Nelkin's --

11      THE COURT:  Please answer my question, because you

12  understand it and you understand that I'm trying to get a

13  commitment one way or the other so I have a clear record on

14  that.

15      MR. HYLAND:  Yes.  I have never said that you

16  shouldn't consider communication.

17      THE COURT:  So the position you are advocating now is

18  that I should consider some but not all communications between

19  the Nelkins and the Schreibers?

20      MR. HYLAND:  Yes.

21      THE COURT:  Okay.

22      MR. HYLAND:  Let me explain why.

23      THE COURT:  Yes.

24      MR. HYLAND:  Because when we stood here in February

25  you asked Mr. Rosenblatt, Do you intend to rely on anything

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   other than the documents or the public record, and he said no.

2            THE COURT:  Yes.

3            MR. HYLAND:  Can I finish, please?

4            THE COURT:  Here is what you can do.  You can tell me

5   if this is yet another example of where, regardless of what the

6   court's understanding was, you want to -- or its intention, you

7   want to trap people to a certain --

8            MR. HYLAND:  Absolutely not.

9            THE COURT:  Okay.  So, look, again --

10           MR. HYLAND:  Can I please finish what I was saying?

11           THE COURT:  Please.  Okay.  Yes.  I don't want to be

12   unfair.  Please finish what you are saying, but I will come

13   back to this, because it is a terribly dissatisfactory position

14   you are advocating.

15           MR. HYLAND:  Let me try to explain it better then.  On

16   that same day when Mr. Rosenblatt said, I'm not putting in any

17   declarations, I made very clear that we would be putting in

18   declarations, and I believed it was proper to do so; and we

19   asked for discovery, and we asked that we be able to examine

20   any declarations that were put in.  Because Mr. Rosenblatt was

21   opposing discovery and did not want to have to do that, he

22   said, I'm not putting in any declarations.  We never made that

23   representation.  We said the opposite, and that's what we did;

24   and I think we are entitled to have our declarations

25   considered.

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1     THE COURT:  Well, you are entitled to have them

2   considered based on that order, but, to the extent that the

3   motion may turn on who said what to whom when and with what

4   intention, in your conversations with each other -- I'm not

5   talking about stuff that's filed on the public docket and

6   positions; I don't think you need any discovery for that, and

7   there are no two sides about it.  It is what it is -- but I

8   certainly anticipated that the motion would be decided on the

9   merits without getting into who said what to whom when about

10  what.

11     And I think everybody would agree, if we are looking

12  at it as an issue, that we are not going to have some of the

13  conversations but not others.  Of course, if any of it is

14  considered, perhaps discovery into who said what when, to

15  develop a full record, is appropriate; but what I think is not

16  geared to a fair resolution on the merits is regardless of the

17  timing of when they were presented take into account these

18  portions of the conversations but not others.

19     So I'm happy to exclude all of them, everything

20  outside of what was filed on the docket during the litigation.

21  I'm also having to take into account everyone's take on who

22  said what when; but I think we risk an unfair resolution if we

23  just take into account some.  Do you disagree with that?

24     MR. HYLAND:  I don't know.  Evidence is excluded for

25  all kinds of reasons all the time.

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1    THE COURT:  Yes, and, as with some of our prior

2  conversation this morning, I was asking the question not about

3  what you think the law is on this but in this instance what you

4  think is fair; and I take it you don't need to do legal

5  research to find out what you think is fair or what your

6  clients think is fair.

7    MR. HYLAND:  We are responding to an accusation, an

8  accusation that my clients threatened improperly to withdraw.

9  If that's going to be a basis for a determination, we have to

10  be able to respond to that.  That's all I'm saying.

11    THE COURT:  I will do my best not to ask any further

12  questions, Ms. Hyland, because it's very difficult to get a

13  direct response to a simple question.  So please finish.

14    MR. HYLAND:  I --

15    THE COURT:  So please finish your arguments, and I

16  will listen to you until you are done.

17    MR. HYLAND:  Okay.  What I was getting to and what I

18  was getting at is to the extent that this alleged improper

19  threat to withdraw is relevant to the determination, we are

20  just trying to explain what happened; and what happened was

21  with all of the abuse, the verbal abuse, the Nelkins said maybe

22  you don't want us as your lawyers and maybe we shouldn't be

23  your lawyers.  When that happened, there were threats, and

24  these are their claims and, I believe, these are reflected in

25  the e-mails, so they are proper, that the Schreibers made

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   accusing the Nelkins of abandoning them, of threatening them.

2           I'm just trying to explain the reason why those

3   incidents took place.  It wasn't like the Holcombe case, where

4   the lawyer threatened to withdraw because the client wasn't

5   complying with the lawyer's view of the settlement, you know,

6   the client didn't want to settle and the lawyer did, or vice

7   verse.  That is not the type of thing that happened here.  It

8   was not an improper threat to withdraw.  It was simply a

9   conversation that the Nelkins were having about whether it was

10  a good idea for them to continue representing the Schreibers

11  under the circumstances.

12          So at that point, when the relationship was breaking

13  down, the Nelkins had a choice:  To stay in and keep fighting

14  or to get out.  Having been threatened that if they tried to

15  get out they would be accused of abandoning their clients, and

16  also because they were so close to negotiating this settlement,

17  they stayed in and they stuck with it and they finished the

18  settlement.  They never put their interests above their

19  clients' in the course of that representation.  They did

20  everything they could to get the settlement done and to

21  complete it, despite the barrage and despite the fraught nature

22  of the relationship.

23          Then, 22 minutes after that settlement became

24  effective, Mr. Eugene Schreiber wrote a letter to this court

25  accusing the Nelkins of charging an excessive fee, of being

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1    unjust, and asking the court to intervene.  That letter was

2    followed by two more letters by Mr. Parness, now the

3    Schreibers' new lawyer of record in the case, also presenting

4    the court with the -- or asking the court to intervene in this

5    fee dispute, asking for a declaratory judgment that the Nelkins

6    were not entitled to the fee.  That is when the Nelkins

7    responded, not before then, not -- they did not come to the

8    court.  They did not disclose what was going on to anyone.

9    They didn't want to jeopardize the settlement, which would have

10   been jeopardized potentially if they had come to the court and

11   tried to get this resolved by the court before the right time.

12          Everything they did at that point was in response to

13   what the Schreibers did, the Schreibers represented by their

14   own counsel, the Schreibers who had stopped communicating

15   directly with the Nelkins.  At that point, and under the case

16   law, that amounts to a decision to sever the attorney-client

17   relationship that the Schreibers made.  They were no longer

18   talking to their lawyers, they had a new lawyer, they had a new

19   lawyer of record in the case; and they were presenting the

20   dispute to the court to resolve.

21          That, at that point the Nelkins believed, and

22   reasonably believed, that the relationship was over.  They had

23   accomplished everything that they had been asked to do in this

24   case.  They had settled the case, and the settlement was final,

25   and the defendants were obligated to pay it.  At that point,

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   when they realized that their clients had spent -- waited 22

2   minutes after that settlement had been finalized to come to the

3   court, they realized that, okay, they no longer want us as

4   their lawyers, this is over now; and they were also ordered by

5   the court to respond to that letter, which they did.

6          They have a right, under Rule 1.6, when being accused

7   of wrongdoing and in order to collect a fee when that fee is

8   being denied to them, to respond to that and to give a

9   full-throated response without -- so that they are not waiving

10  their arguments.  They have a right to do that under the rules,

11  and what they did was proper.

12         The main argument here is that they didn't technically

13  get relieved as counsel, but the case law says that if you are

14  discharged by your client the fact that you have not yet been

15  formally relieved as counsel does not mean the relationship is

16  not over.  It is over upon discharge, and at that point on, if

17  you have a fee dispute, you are allowed to defend yourself and

18  you are allowed to assert your right to your fee.  The

19  Schreibers have also claimed that having asserted a charging

20  language is a statutory right that can be asserted by a lawyer

21  even while they still represent a client, very clearly under

22  the case law.

23         The Schreibers have argued that the Nelkins did

24  something wrong by delaying in moving to fix their charging

25  lien, meaning delaying in moving to ask that their fee be

Schreiber v. Friedman

1    determined.  A lawyer has two options, once they have a

2    charging lien:  They can move to fix the charging lien, or they

3    can commence a plenary action.  Those are essentially legally

4    equivalent.  So, on the one hand, the Schreibers are saying you

5    should have moved to fix your charging lien, but you shouldn't

6    have filed a plenary action; and the case law says otherwise.

7    It says, yes, you absolutely can at this point, at this stage,

8    under these circumstances the lawyer can commence the plenary

9    action to collect their fee.

10          It was not at all intended to be secret.  They filed

11   it.  They told the court and they told the Schreibers that they

12   were going to file it.  They broadcast it to them before they

13   did it, to the court and the Schreibers, before they did it.

14   They filed it shortly before they were about to appear in

15   court, and they identified it as a related matter in this case

16   so that it would wind up before Your Honor.  There is nothing

17   secretive about that.  It was entirely a transparent thing.

18          What they regret is that when they got in here -- and

19   sometimes it's hard to say what you want to say when you are in

20   here and you are not answering a direct question.  It was very

21   difficult for them, when they got in here, to figure out the

22   opening to bring this up with the court.  So it didn't come up.

23   It didn't come up that day, but they believed they had done

24   what they were supposed to do by identifying it as a related

25   action so that it would come before Your Honor; and that was

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1    done before they came into court that day.  So there was not

2    ever any intent to be secretive about it.

3         I also would like to point out that our position is

4    that -- and I think it's well supported -- that by the

5    Schreibers' actions, as I have said, they discharged the

6    Nelkins; but there is case law -- and we do cite it in our

7    brief -- that says even if the Nelkins -- even if a client is

8    still a current client it is not a conflict, if you have a fee

9    dispute, to commence a legal proceeding to collect your fee.

10   The case law says that, and even Mr. Rosenblatt acknowledged

11   that today when he was making his arguments.

12        So whether or not the court agrees that they were

13   discharged or not discharged, the filing of a fee complaint

14   against the client under the case law is permitted.  It's not a

15   violation of the ethics rules.  It is not a breach of any

16   fiduciary duty.

17        THE COURT:  No --

18        MR. HYLAND:  Sorry.

19        THE COURT:  No.  It's not going to be terribly useful

20   to me.  Continue, please.

21        MR. HYLAND:  I think I have addressed all of the

22   arguments that the Schreibers have made as grounds for

23   termination for cause.

24        We submit that termination for cause and complete

25   forfeiture is not just, is not the remedy, an appropriate

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1    remedy here, and is not warranted by the evidence or the law.

2    Thank you, Your Honor.

3           THE COURT:  Thank you.

4           Mr. Rosenblatt, briefly.

5           MR. ROSENBLATT:  Yes.  I will try and keep it brief.

6           I just want to correct just a couple of things for the

7    record.  I don't know that they are particularly relevant.  I

8    just want to make sure the record is clear.

9           When we were here back in February -- I think Your

10   Honor will recall; I certainly have the transcript -- I never

11   said I wasn't going to submit any declaration.  What is I said

12   is I would submit communications and proposed settlement

13   offers, an agreement between the Nelkins and their clients, the

14   Schreibers, which is what I did.  I basically kept my

15   declarations limited to just Eugene and Steven, submitted just

16   communications between them and Mr. Parness, who was

17   intervening on behalf of the Schreibers at a certain point, and

18   proposed settlement agreements; and then my declaration was

19   limited to transcripts and docket entries and things that were

20   public record.  So I really did abide by that.

21          In addition, I didn't say that I wasn't waiving any

22   right to present any other evidence, but I didn't.  So I just

23   want to make that clear for the record.

24          In addition, just to be clear, with regard to the

25   proposed settlements, beginning with the first settlement

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   statement that the Nelkins provided in June of 2018 when the

2   settlement was being finalized in the underlying case and they

3   were trying to formulate a settlement, every single time it

4   represented, or least from the beginning it represented a cash

5   payment to them and equity in the company.  It was never just

6   the Schreibers take equity, the Nelkins take the cash, and

7   everybody go on their way.  There was an equity component to it

8   at that point.  Only later, when it become clear that my

9   clients were not going to consent to an equity component, the

10  Nelkins then asked for the cash, all of the cash and an

11  additional payment of a million dollars over a period of time

12  that required out-of-pocket payments.  So I just wanted to

13  clarify that for the record as well.

14         The notion that the Nelkins somehow tacitly believed

15  there was a technical discharge or there was a technical

16  severing of the attorney-client relationship is somewhat

17  laughable because they kept appearing in this court, including

18  on the day that they sued their own clients, and never

19  disclosed it to the court.  Now, I heard what counsel said

20  about not being able to say what you want to say in this

21  courtroom; and, Your Honor, I will say this.  Your Honor

22  certainly puts counsel through their paces, but I have never

23  seen Your Honor not allow a party to say what they want to say

24  about what's going on; and certainly something like filing a

25  complaint against your own client while you are appearing in

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1  court on the same day, the notion that it wasn't intended to be

2  secret and that it was entirely transparent -- were counsel's

3  words -- I think, are -- let's just say are belied by what

4  actually happened.

5       The thought that they submitted a full-throated

6  response -- again, counsel's words -- to the Schreibers'

7  objections to the prepared fee arrangement, again, a little bit

8  belied by what actually happened.  We are not talking about a

9  full-throated response.  We are talking about never making a

10  motion to withdraw, never trying to get out of the case by

11  claiming or asserting to the court that a breakdown in

12  communications occurred.  Rather, they simply took it upon

13  themselves to say, oh, well, the representation is terminated

14  and so why don't we put a letter on the record, in full view of

15  the judge, in full view of the adversary, that calls our

16  clients fraudsters acting in bad faith.

17       Again, this is beyond the pale; and counsel started

18  her arguments by saying that finding discharge for cause is an

19  extreme remedy.  Well, yes, it is; and that's why we are here,

20  because what the Nelkins did was so extreme and so beyond what

21  attorneys should be doing and even in the cases that we talked

22  about and I mentioned before, it talks about putting an

23  attorney's interests above those of his or her client, this

24  goes beyond this turned the client into an adversary.  And,

25  again, the cases are paramount that that is grounds for

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1   discharge for cause, and that's what happened here.

2           We submit, Your Honor, that our motion should be

3   granted; that the Nelkins should be found to be discharged for

4   cause; and that the charging lien should be vacated.  Thank

5   you.

6           THE COURT:  Ms. Rosenblatt, it's your motion.  I'm

7   going to ask you to try to work out the cost, if it's an issue;

8   but I would like to get the transcript of this submitted,

9   please.  Obviously, you should split.  If you can't agree on

10  it, let me know.

11          MR. ROSENBLATT:  Okay.

12          THE COURT:  So I can take that part of the record.

13          So just to recap, I will get the letter by Monday that

14  has the language that the Nelkins agree would suffice to

15  effect, under Rule 60(a), the correction of the clerical error

16  that might lead anybody to claim that the instant motion was

17  extinguished.

18          MR. HYLAND:  Your Honor, may I make one request about

19  that?

20          THE COURT:  Please don't.  I will give you your

21  course.

22          I am directing you to submit the language that you

23  agree will effect that result, along with, of course, any

24  arguments that you wish me to consider as to whether the court

25  should or can enter such an order.  What I don't think is

MICHELE NARDONE, CSR -- Official Court Reporter

Schreiber v. Friedman

1  fairly subject to dispute is that if the court thinks it's

2  appropriate it should be done in an effective way, and I just

3  want to make sure that if that happens it is done in a way that

4  your clients not later claim is ineffective, because that's

5  terribly inefficient, because there will be yet another

6  clerical error or inadvertent statement to be corrected.  And

7  I'm sure we don't want to go through multiple iterations of the

8  dispute.

9          Yes?  Go ahead.

10         MR. HYLAND:  Our office is in the middle, today, of a

11 move from midtown to downtown, and I'm just asking for one

12 extra day, so it's not Monday.

13         THE COURT:  Of course.

14         MR. HYLAND:  Thank you.

15         THE COURT:  So I will get that letter by Tuesday, and

16 then I won't put a time limit on it, but, please, quickly order

17 the transcript and submit it on the record; and then I will

18 address the motion in writing in due course.

19         Thank you all.  Have a good day.

20         MR. HYLAND:  Thank you, Your Honor.

21         MR. ROSENBLATT:  Thank you, Your Honor.

22         (End of proceedings.)

23                        o O o

24 Certified to be a true and accurate transcript.
   /s/ Michele Nardone
   _____
25 MICHELE NARDONE, CSR -- Official Court Reporter