UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
STEVEN SCHREIBER, et al.,                                    MEMORANDUM
                                    Plaintiffs,              AND ORDER
            - against -
EMIL FRIEDMAN, et al.,                                       15-CV-6861 (CBA) (JO)
                                    Defendants.
------------------------------------------------------------X

James Orenstein, Magistrate Judge:

        Plaintiff Steven Schreiber, together with his father Eugene Schreiber (collectively, the

"Schreibers") and the company in which the two men are partners, plaintiff Two Rivers Coffee, LLC

("TRC"), seek the vacatur of a charging lien that attorneys Jay and Carol Nelkin and their law firm,

Nelkin & Nelkin, P.C. (the "Firm" or, collectively with the two attorneys, the "Nelkins") have

asserted against them for their legal work in this action on the ground that they discharged the

Nelkins for cause. *See* Docket Entry ("DE") 623.[1] For the reasons set forth below, I now grant the

motion.[2]

---

[1] In the original Complaint asserting derivative claims, Steven Schreiber named TRC as a nominal
defendant. *See* DE 1 (Complaint) ¶¶ 1-2. As described below, I later granted a consent motion to
realign TRC as a plaintiff for purposes of effectuating a settlement agreement. *See* DE 539. I exclude
TRC from all references to the "defendants" below.

[2] The Federal Magistrates Act empowers me to decide the motion, rather than recommend a
resolution, because it arises from my supervision of pretrial matters in the underlying action and is
not one of the motions the statute specifies a magistrate judge may not decide. *See* 28 U.S.C.
§ 636(b)(1)(A). Because this decision is dispositive of the Nelkins' rights to enforce their charging
lien, the court should arguably review this decision *de novo* upon the lodging of any timely objections.
*See* Fed. R. Civ. P. 72(b)(3); *Sutton v. New York City Transit Auth.*, 462 F.3d 157, 159 n.2 (2d Cir. 2006)
(expressing uncertainty as to magistrate judge's authority to determine amount of charging lien).
That is what I recommended under comparable circumstances in an earlier case. *See Holcombe v. US
Airways Grp., Inc.*, 2017 WL 10084142, at *9 (E.D.N.Y. Aug. 4, 2017), *aff'd*, 747 F. App'x 875, 877 (2d
Cir. 2018), *cert. denied*, 139 S. Ct. 2639 (2019). During the pendency of this motion, however, another
court in the circuit applied the clearly erroneous standard applicable to non-dispositive rulings in
reviewing a magistrate judge's decision on the amount of a charging lien, and the circuit court upheld
the decision without comment on the appropriate standard of review. *See Joffe v. King & Spalding
LLP*, 2019 WL 4722673, at *2 (S.D.N.Y. Sept. 25, 2019), *aff'd*, 2020 WL 5494489 (2d Cir. Sept. 11,
2019).

I.  Background

I assume the reader's general familiarity with the facts and procedural history of this case but briefly summarize the background that informs the instant motion. In 2011, the Schreibers co-founded TRC, which specialized in the sale and distribution of single-serve coffee pods and related products. They eventually brought in two additional investors as their partners in the company: defendant Emil Friedman ("Friedman") and non-party Mayer Koenig ("Koenig"). In May 2015, the Schreibers became concerned that Friedman – who by then had amassed a controlling interest in TRC – was misappropriating funds and converting company assets for himself. *See* DE 623-2 (Declaration of Steven Schreiber) ("S. Schreiber Decl.") ¶¶ 7-9; DE 629 (Declaration of Carol Nelkin) ("C. Nelkin Decl.") ¶ 40.

To protect their interests, the Schreibers engaged the Firm as counsel to represent themselves and, derivatively, TRC. The Schreibers agreed that the Firm would receive "one-third of the total recovery ... (including any funds, increased equity or other benefits), by virtue of a settlement or final judgment in the litigation." DE 623-3 (Engagement Letter) ¶ II.A; *see* S. Schreiber Decl. ¶ 12; C. Nelkin Decl. ¶¶ 23, 26-27.[3]

On December 2, 2015, the Nelkins filed the original Complaint in this case on behalf of Steven Schreiber, asserting forty separate claims against Friedman and several of his individual and corporate associates. *See* DE 1. After years of litigation during which the Nelkins performed a great deal of work, the Schreibers, Koenig, and TRC agreed to a settlement in principle with Friedman and the other defendants.[4] In essence, the agreement provided for the Schreibers to regain sole

---

[3] Steven Schreiber's wife is Carol Nelkin's daughter and Jay Nelkin's sister. *See* S. Schreiber Decl. ¶ 2; C. Nelkin Decl. ¶ 16; DE 632 (Declaration of Jay Nelkin) ("J. Nelkin Decl.") ¶ 4. The familial relationships among the litigants have no bearing on the legal analysis below.

[4] Steven Schreiber and the defendants first reached an agreement in principle to settle the case at a conference before me on September 25, 2017. *See* DE 502. Koenig did not directly participate in

control of TRC: Friedman would surrender his 60 percent membership in the company, forgive his loan to the company for a fraction of its nominal value, and pay a total of approximately $2.75 million in cash – one million dollars of which Friedman would pay to Koenig directly so that the Schreibers could buy out Koenig's 17 percent stake in the company, as well. *See* DE 540 (letter describing settlement in principle); DE 567 ("8/30/18 Tr.") at 13-14; S. Schreiber Decl. ¶¶ 7, 30-33; DE 623-16 (Declaration of Eugene Schreiber) ("E. Schreiber Decl.") ¶¶ 5, 32-33; C. Nelkin Decl. ¶¶ 67, 73; DE 623-7 (June 3 Settlement Statement); DE 646 ("9/20/19 Tr.") at 19-22.[5]

As the parties and their counsel worked to consummate the settlement in principle, the Schreibers and the Nelkins began to disagree about how the Nelkins would be compensated for their work. In particular, the parties[6] disagreed about the settlement's monetary value, which would determine the amount of the Nelkins' contingency fee. *See* S. Schreiber Decl. ¶ 33.

The Nelkins provided their view of that value in a "settlement statement" they gave the Schreibers on June 3, 2018. They valued the settlement at over eight million dollars based on (among other things) the nominal $6.5 million value of Friedman's loan to TRC that the settlement

those negotiations. Over the next six months, as the parties sought to finalize a written agreement, Koenig and the Schreibers disputed the allocation of the settlement proceeds in a way that threatened to scuttle the deal. *See* DE 512 (S. Schreiber's letter); DE 514 (Koenig's letter); DE 523 (minute entry dated Mar. 22, 2018). After three more months of negotiations, the parties and Koenig reached another agreement in principle to resolve the case. *See* DE 534; DE 535; DE 541. As part of that agreement, the parties and interested non-parties agreed to allow TRC (for whom attorney Hillel Parness appeared as counsel of record) to take over the derivative claims by realigning it as a named plaintiff rather than a nominal defendant. *See* DE 538; DE 539; DE 541; Order dated Aug. 13, 2018.

[5] The precise amount of Friedman's total payment is not a matter of public record. See DE 613 (redacting portion of stipulation specifying amount the parties agreed to deposit with the court pending resolution of the Nelkins' asserted lien). The approximation set forth above was made on the public record by TRC's counsel without contradiction from any other party. *See* 8/30/18 Tr. at 13-14; *see also* 9/20/19 Tr. at 21. The precision of that approximation amount does not affect my analysis.

[6] From this point forward I will use "parties" to refer collectively to the Schreibers and the Nelkins, and not to the named parties to the underlying action.

eliminated (including unpaid interest and penalties dating back to the start of the action in December 2015); the preservation of the two original partners' respective interests in TRC and their recovery of the remaining interests in the company; the cancellation of an agreement that required TRC to sell goods to the defendants at a loss; and the continuation of salary, benefits, and distribution for Steven and Eugene Schreiber after December 2015. Based on that valuation, the Nelkins sought $2.75 million dollars in fees, comprising a cash payment of $1.75 million plus a 28.5 percent ownership interest in TRC. The Nelkins characterized their demand – which represented nearly all of the cash and just under half of the 60 percent ownership interest in TRC that Friedman would surrender directly to the Schreibers under the terms of the settlement – as a significant discount of what they were actually owed under the engagement letter that provided for them to receive a third of the Schreibers' recovery. *See id.* ¶¶ 7, 33-37; E. Schreiber Decl. ¶¶ 5, 34-36; C. Nelkin Decl. ¶¶ 67, 95-97; J. Nelkin Decl. ¶¶ 13-16; DE 623-7 (June 3 Settlement Statement); 8/30/18 Tr. at 14; 9/20/19 Tr. at 19-22.

The Schreibers rejected the Nelkins' demand and disputed their valuation of the Settlement Agreement. *See* S. Schreiber Decl. ¶ 34; E. Schreiber Decl. ¶ 56; DE 623-8 (June 4, 2018 emails).[7] Despite the disagreement, the parties continued to negotiate paying the Nelkins' fee through some combination of cash and equity in TRC, including options for the Schreibers to buy the equity back from the Nelkins at fixed prices within a prescribed time. *See* S. Schreiber Decl. ¶¶ 39-40; DE 623-9

---

[7] One example of the parties' disagreement about the settlement's value concerns the value of TRC itself. The Schreibers rely on an appraisal, conducted for tax planning purposes, that valued a 100% membership interest in the company at roughly $1,934,000. *See* DE 623-5 (Zak Evaluation). The Nelkins dismiss that valuation as irrelevant and instead rely on a pre-litigation offer to buy the company as well as a report, that they commissioned once the instant dispute arose, that concludes full ownership of TRC is worth between $9 and $16.5 million and that the overall settlement is worth anywhere from $16,766,500 to $26,336,500. *See* C. Nelkin Decl. ¶¶ 57, 84-92; J. Nelkin Decl. ¶ 66; DE 630-13; DE 630-53. Resolving the instant motion does not require a determination as to which side has more accurately ascertained the settlement's value.

(June 8 Settlement Statement); DE 623-10 (June 10 Settlement Statement). They did not reach an agreement.

As the negotiations failed, communications among the Nelkins and Schreibers grew vituperative. *See* DE 623-8; C. Nelkin Decl. ¶ 105. The Schreibers complain that whenever they asked to discuss the fee dispute with the court, the Nelkins threatened to withdraw in ways that would upset the settlement with the defendants and harm the Schreibers' interests. *See* S. Schreiber Decl. ¶¶ 42, 44. For example, the Schreibers assert that on June 10, 2018, the Nelkins threatened to withdraw if the Schreibers tried to address the fee dispute with the court, and further suggested that if they did withdraw, the underlying settlement agreement would be off the table and the Schreibers would be left without an attorney to handle the rest of the underlying litigation and deadlines. *See id.*; E. Schreiber Decl. ¶ 37; *see also* C. Nelkin Decl. ¶ 107. Likewise, on July 10, 2018, when the Schreibers sought to participate in a status conference with this court, the Nelkins again threatened to withdraw and told the Schreibers that their participation at the conference would jeopardize the underlying settlement. *See* DE 535 (Minute Entry scheduling next telephone conference for July 11, 2018); DE 630-26 (July 10, 2018 Emails); *see also* DE 623-12 (additional July 10, 2018 Emails). The Nelkins do not dispute these conversations occurred but reject their characterization as threats to withdraw. Instead, they contend that the volatility of their communications with the Schreibers led them to do no more than ask whether the Schreibers wished to terminate their representation. *See* C. Nelkin Decl. ¶¶ 103-104; J. Nelkin Decl. ¶ 55.

Eventually, the Schreibers asked independent counsel to help them resolve their fee dispute with the Nelkins. On June 25, 2018, they brought an attorney and friend named Jerry Weiss to a meeting with the Nelkins. *See* S. Schreiber Decl. ¶ 45; C. Nelkin Decl. ¶¶ 112-115.[8] The following

---

[8] The Nelkins claim that they encouraged the Schreibers to consult with independent counsel. *See* DE 630-24 (June 8, 2018 email from Jay Nelkin to the Schreibers encouraging the Schreibers to

month, the parties enlisted the help of attorney Hillel Parness ("Parness"). *See* S. Schreiber Decl.

¶ 52; C. Nelkin Decl. ¶ 135; J. Nelkin Decl. ¶¶ 37-41. By July 19, 2018, relations between the

Schreibers and Nelkins had deteriorated to the point that Parness became the conduit for relaying

messages between them. *See id.*; DE 623-13 (July 19 and 20, 2018 emails). Despite this breakdown in

communication, the Nelkins continued to represent the Schreibers as counsel of record in the

underlying action and reminded the Schreibers that if they wished to obtain new counsel for the

underlying action, they would need to do so in writing and with an order of the court approving

substitution of counsel. *See* S. Schreiber Decl. ¶¶ 53, 76; DE 623-13; *see also* C. Nelkin Decl. ¶¶ 112-

115.

On July 10, 2018, the parties came close to resolving their dispute on terms providing for the

Schreibers to pay the Nelkins an amount of cash over a period of years that was essentially identical

to the cash proceeds of the settlement (which would be held in escrow). *See* S. Schreiber Decl. ¶ 49;

C. Nelkin Decl. ¶ 122; DE 623-11 (July 10 Settlement Statement); DE 630-25; DE 630-26; 9/20/19

Tr. at 22. The deal foundered when the Schreibers refused to provide personal guarantees for the

payment. *See* S. Schreiber Decl. ¶ 56; J. Nelkin Decl. ¶ 16.

With no deal in sight, the Nelkins warned the Schreibers that they were running out of time.

In an email to Parness on August 6, 2018, Jay Nelkin wrote:

> Please advise the Schreibers that we are now starting to receive authorizations from
> the various attorneys for the Defendants with regard to filing the motion to realign
> [parties] …. Once the remaining authorizations and signatures are obtained which we
> anticipate could be as soon as tomorrow, then the motion can be filed with the
> Court. If we do not at that time have an agreement with the Schreibers with all
> necessary documents signed and returned to us, we will proceed to also file a notice
> of a charging lien for the non-discounted amount of our fees based upon the May 6,
> 2015 Engagement Letter and will pursue our remedies for all amounts owed in fees

---

review settlement documents with other counsel). Notwithstanding that supposed encouragement,
the Nelkins refused to speak with Weiss at the meeting on June 25, 2018, until he confirmed that he
was representing the Schreibers in some capacity. *See* DE S. Schreiber Decl. ¶ 45; C. Nelkin Decl.
¶¶ 112-115.

and expenses through the courts. *I certainly hope that you have advised the Schreibers that the filing of a charging lien will impact the distribution of any benefits resulting from the settlement and would not be limited to the payment of any settlement payments.* Obviously, we would prefer to have this matter resolved, but it is now up to the Schreibers as to whether they want to do that or not.

DE 623-14 (emphasis added).

Later that day, Jay Nelkin again reminded Parness that if no resolution of the fee dispute occurs "before the Effective Date of the settlement agreement resolving the [underlying action], [the Firm] will enforce the terms of its Engagement Letter using all the tools available to it including but not limited to a charging lien, a retaining lien and one or more plenary actions in which we will seek all available remedies." *Id.* The next day, August 7, 2018, Jay Nelkin sent yet another email asking Parness to tell the Schreibers that the Nelkins would file the motion to realign parties within days and would at that point file a charging lien "and pursue all other available avenues of relief." DE 544-1.

On August 13, 2018, with the fee dispute still unresolved, the parties to the underlying action reported that they had executed a global settlement agreement that provided for dismissal of the underlying action and that was contingent on certain events, including the realignment of TRC as a plaintiff. *See* DE 540. On the same day, Jay Nelkin filed his notice of appearance as counsel of record for Eugene Schreiber, and then immediately filed, on behalf of Steven and Eugene Schreiber, as well as TRC, a "joint unopposed" motion to realign TRC as a plaintiff in the underlying action. *See* DE 538; DE 539.[9]

---

[9] The motion allowed TRC to assert on its own behalf claims that Stephen Schreiber, the sole original plaintiff, had previously asserted on a derivative basis; it also allowed for a quicker resolution by avoiding the need for judicial review of the settlement of derivative claims. *See* DE 539; Fed. R. Civ. P. 23.1. The Nelkins also now argue that the defendants had requested the realignment to preserve the settlement's confidentiality. *See* C. Nelkin Decl. ¶ 149.

Once I granted the realignment motion, Parness filed a notice of appearance on behalf of plaintiff TRC. *See* DE 541. Then, even though Jay Nelkin had just filed his appearance for Eugene Schreiber, Parness also filed a letter on behalf of Eugene Schreiber asking for a conference to discuss the fee dispute. *See* DE 542. This was the first time the issue of the fee dispute was raised to this court and to the other parties to the underlying action. *See* DE 545. I denied this request noting that all the parties to the underlying action had just submitted papers to begin the process of formalizing their settlement, to which it appeared that Eugene Schreiber had no objections. *See* August 13, 2018 Order; *see also* DE 538; DE 539.

On August 15, 2018, two days after the realignment and Eugene Schreiber's letter, the Nelkins filed notice of a charging lien as to Steven and Eugene Schreiber and TRC's claims in the underlying action, which was served on all parties involved in the action and for the first time acknowledged the existence of the fee dispute. By the Notice's terms, the charging lien attached to any "settlement, verdict, report, determination, decision, judgment or final order in their favor and the proceeds thereof in whatever hands they may come…." DE 544-2 (the "Notice"). The Notice further stated that

> the [Nelkins] demand that no distributions or transfers of proceeds, funds, property, equity, debt, credits, or benefits of any kind for awards, attorney's fees, disbursements, settlement payments, settlement requirements or pursuant to the settlement agreement in this case or its exhibits be made to Steven Schreiber, Eugene Schreiber, [TRC], the Parness Law Firm or to the Parness Law Firm, PLLC Attorney Trust Account IOLA or to any other person or entity for the benefit of Steven Schreiber, Eugene Schreiber, [TRC], the Parness Law Firm, or the Parness Law Firm, PLLC Trust Account IOLA until the [Nelkins'] lien is determined and duly enforced.

*Id.* Moreover, in a letter accompanying the Notice, the Nelkins warned that

> [T]he distribution or transfer by any person, including any Defendant or Mr. Koenig or their agents, of any equity, debt, settlement funds, credits or any other benefit to Steven Schreiber, Eugene Schreiber, [TRC], the Parness Law Firm or to the Parness Law Firm, PLLC Attorney Trust Account IOLA or any other person or entity for the benefit of [any of these individuals and entities] is covered by the charging lien

… including but not limited to the transfer of equity to them as a result of any
payment to Mr. Koenig or his attorneys.

*Id.*

The Nelkins also sent the Schreibers a letter on the same day warning them that while they

intended the charging lien to halt the disbursement of funds and other benefits to the Schreibers

pending the fee dispute's resolution, the Schreibers' obligations to make payments to a number of

individuals under the settlement agreement remained in effect because the court had granted the

motion for realignment.[10] *See* DE 544-3. Thus, because these payments were supposed to be made

by the defendants as part of their settlement with the Schreibers, the Nelkins warned that the

Schreibers would now have to take other measures to meet their payment obligations. *Id.*

As the Nelkins' anticipated, *see id.*, as a result of the charging lien, all distributions to be made

pursuant to the underlying settlement agreement halted. On August 20, 2018, the defendants filed a

letter to the court stating that while they took "no position" on the fee dispute, and were "ready,

willing and able to comply with the terms of the Settlement Agreement," they had "been prevented

---

[10] Specifically, the Nelkins wrote:

> As you know, Judge Orenstein granted the Motion to Realign [TRC] ... on August
> 13, 2018. Under the terms of the Settlement Agreement ... the Effective Date of the
> Settlement Agreement is three days thereafter.... As you know, under the terms of
> the Settlement Agreement, a number of tasks are to be performed as of the Effective
> Date [including three payments made to individuals and entities].... Under the terms
> of the Settlement Agreement, [these three payments] were to be off set as credits
> against the payment of settlement funds by certain ... Defendants. However, in light
> of ... your expressed unwillingness to abide by the terms of the Engagement Letter ...
> it became necessary for me to serve a Notice of Charging Lien prior to the Effective
> Date on behalf of [the Firm].... Because the effect of a Charging Lien is to halt the
> transfer of settlement funds and other property or benefits ... until the dispute
> between us is resolved, I do not believe that the Defendants will make the payments
> anticipated to serve as credits for the payments you are obligated to make on the
> Effective Date.

*See* DE 544-3.

from making any payments or delivering any benefits to" the Schreibers and TRC "'until the [Nelkins'] lien is determined and duly enforced.'" *See* DE 545 (quoting Notice); *see also* DE 548; DE 549. Accordingly, on August 29, 2018, Friedman moved on the defendants' behalf for leave to make their disbursements directly to the court in order to discharge their obligations under the settlement agreement and be dismissed from the case. *See* DE 554; Fed. R. Civ. P. 67.[11] The parties to the underlying action and the Nelkins eventually did enter into a stipulation that allowed the defendants to perform their obligations under the settlement agreement without prejudice to the resolution of the fee dispute between the Nelkins and the Schreibers – but not until another four months had passed. *See* DE 612 (Proposed Stipulation).[12]

On August 15, 2018 – the same day that the Nelkins notified the parties of the charging lien and brought the fee dispute into the open – Parness filed a motion on behalf of TRC seeking declaratory judgment and determination of attorneys' fees. *See* DE 544. In response, Jay Nelkin – who continued to serve as Steven Schreiber's counsel of record and had filed a notice of appearance as Eugene Schreiber's counsel of record just two days earlier – filed an appearance for the Firm and a letter accusing the Schreibers of fraud, bad faith, and attempts to tarnish the Nelkins' reputation.

---

[11] The motion also noted that when the defendants negotiated the settlement agreement and entered into it, they did so

> without ever being told that the benefits for which they bargained under the Settlement Agreement might be jeopardized and/or held in abeyance, or that the disposition of those benefits might be the subject of costly and time-consuming additional court proceedings, because of [the] fee dispute[.]

DE 554. Moreover, the motion stated that absent a prompt resolution of the fee dispute, the charging lien prevented the defendants from obtaining the benefits that they had negotiated under the settlement agreement for the foreseeable future. *See id.*

[12] I granted the parties' motion to deposit funds with this court by Order dated December 27, 2018. *See* DE 613; DE 614. The parties to the underlying action thereafter took the remaining steps to consummate the settlement agreement. On May 3, 2019, they submitted a Stipulation and Consent Order to dismiss the case with prejudice. *See* DE 636. The court approved the stipulation and entered the consent order on May 28, 2019. *See* DE 640.

*See* DE 85; DE 538; DE 546; DE 547; DE 556. At the time Jay Nelkin accused his own clients the Schreibers of fraud, Carol Nelkin also continued to serve as Steven Schreiber's counsel of record. *See* DE 48; DE 556.

I held a status conference to address the motions surrounding the fee dispute on August 30, 2018. *See* DE 556. Jay Nelkin appeared on behalf of the Firm. Parness appeared on behalf of the Schreibers and TRC for purposes of the fee dispute but noted – without any contradiction – that the Nelkins continued to represent the Schreibers in the as-yet unresolved lawsuit against the defendants. *See* 8/30/18 Tr. at 3. Recognizing that it was untenable for the Nelkins to continue serving as the Schreibers' counsel of record, I terminated that representation without prejudice to the Schreibers' right to seek relief on the ground that they were discharging the Nelkins for cause. *See id.* at 9-10; DE 556. In doing so, I cautioned the Nelkins that "if this dispute … is interfering with the ability to consummate the settlement including by means of [asserting] the charging lien … as opposed to other remedies at counsel's disposal [then this] might be viewed as a basis for the client to fire counsel for cause." 8/30/18 Tr. at 7. Indeed, I was explicit in telling Jay Nelkin that "[i]f you're interfering with their rights, if you're acting contrary to their interest and if they fire you for cause then of course you forfeit any fee and I'm sure that's not a result anyone wants to see happen." *Id.*

When I terminated the Nelkins' representation of the Schreibers and made the statements described above, I did not know, and the Nelkins did not mention, a critical fact. Earlier that day, before the conference began, the Nelkins had filed a lawsuit against the Schreibers – who were still their clients – accusing them of fraud and breach of contract as well as other claimed violations relating to the fee dispute. *See Nelkin & Nelkin, P.C. v. Schreiber, et al.*, CV 18-4930 (MKB), DE 1 (Complaint); *see also* DE 557 (Notice of Related Case). Had I known at the time of the conference on August 30, 2018, that the Nelkins had just sued their own clients, I would not have discussed

whether anyone consented to terminating the Nelkins' representation of the Schreibers but would instead have simply disqualified them. Accordingly, at a subsequent conference on October 12, 2018, I noted that a portion of my minute order from August 30, 2018 should be vacated. *See* DE 591; DE 592 ("10/18/18 Tr.") at 7.

In an effort to avoid the need for judicial resolution of the fee dispute, I referred the Nelkins and Schreibers to mediation. *See* Order dated October 29, 2018. They again failed to reach an agreement. On March 7, 2019, the Schreibers filed the instant motion to vacate the charging lien on the basis of the Nelkins' discharge for cause. *See* DE 623. The parties to the motion completed the briefing on April 15, 2019. *See* DE 623-1 (supporting memorandum); DE 631 (memorandum in opposition) ("Opp."); DE 635 (reply memorandum). I heard oral arguments on September 20, 2019. *See* DE 644 (minute order); DE 646 (9/20/19 Tr.).

## II.     Discussion

### A.     Ancillary Jurisdiction

This court has, and may in its discretion exercise, ancillary jurisdiction over the instant motion and the litigants' fee dispute. *See Cluett, Peabody & Co. v. CPC Acquisition Co.*, 863 F.2d 251, 256 (2d Cir. 1988) (describing the point as "well settled"); *see also Louima v. City of New York*, 2004 WL 2359943, at *55 (E.D.N.Y. Oct. 5, 2004). The exercise of such jurisdiction has "two separate, though sometimes related purposes: (1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 379-80 (1994) (citations omitted); *accord Garcia v. Teitler*, 443 F.3d 202, 208 (2d Cir. 2006) ("[A]ncillary jurisdiction is aimed at enabling a court to administer justice within the scope of its jurisdiction.") (internal quotation marks omitted). This court has been exercising ancillary jurisdiction over the pending fee dispute, consistent with both

purposes, ever since notice of the fee dispute first surfaced in the underlying action and halted the distribution of payment pursuant to the underlying settlement agreement. *See* DE 545.

Several factors, moreover, weigh in favor of this court properly maintaining ancillary jurisdiction within its discretion, including "(1) familiarity with the subject matter of the suit, especially with the amount and quality of work performed by the attorneys; (2) a court's responsibility to protect officers of the court in such matters as fee disputes; (3) the convenience of the parties; and (4) judicial economy." *Levitt v. Brooks*, 669 F.3d 100, 104 (2d Cir. 2012) (citing *Cluett*, 863 F.2d at 256). This court's familiarity with the proceedings that date back to December 2015 (and its responsibility for the settlement funds that all of the litigants agreed to deposit with the court), its responsibility to protect (and supervise) officers of the court, the parties' convenience, and judicial economy all favor resolving the fee dispute in this court rather than litigating it elsewhere. *See Garcia*, 443 F.3d at 208 (explaining that "the termination of the attorney/client relationship relates to the 'protection of the court's own officers.'") (citing *National Equip. Rental, Ltd. v. Mercury Typesetting Co.*, 323 F.2d 786 n.1 (2d Cir. 1963)).

B.     Stipulation of Dismissal

The Nelkins contend that the instant motion is not properly before the court because the court approved the stipulation of dismissal filed by the parties to the underlying action. *See* DE 641; *see also* DE 636; DE 640. The dismissal of an action with prejudice, however, does not divest a court of jurisdiction to determine a pending fee dispute. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 398 (1990) (holding that the petitioner's voluntary dismissal did not divest the district court of jurisdiction to decide respondents' Rule 11 motion that was fully briefed and filed before the underlying case was dismissed); *see also In re Austrian & German Bank Holocaust Litig.*, 317 F.3d 91, 97-99 (2d Cir. 2003) ("Whenever a district court has federal jurisdiction over a case, it retains ancillary jurisdiction after dismissal to adjudicate collateral matters such as attorney's fees."); *Rolex Watch,*

*U.S.A., Inc. v. Bulova Watch Co.*, 820 F. Supp. 60, 61 (E.D.N.Y. 1993) ("Courts within this circuit have the power to decide attorney fee disputes after the root claim has been decided or dismissed.") (citing *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 64-65 (2d Cir.1991)).

Notwithstanding the court's authority to resolve a fee dispute after stipulated dismissal, the Nelkins argue that the language of the court's order in this case had the effect of ending its oversight of the fee dispute – even if that is not what the court intended. Specifically, the Nelkins predicate their argument on the court's order that "all pending motions ... filed by plaintiff Steve[n] Schreiber ... shall be withdrawn and dismissed with prejudice and without fees and costs." DE 636; *see* DE 641. As explained below, I disagree.

The record is clear that the parties to the stipulation of dismissal (whose number did not include the Nelkins) never intended to dismiss the pending motion and the Nelkins' argument to the contrary is not only disingenuous but also improper. Indeed, the stipulating parties made that fact explicit in response to the court's inquiry. *See* Order dated May 7, 2019 (directing the stipulating parties to "to file a joint status report … clarifying whether the parties intend the requested order to effect the withdrawal of their motion to disqualify counsel, DE 623, or otherwise to resolve the pending fee litigation"); DE 638 ("The parties agree that the Stipulation was <u>not</u> intended to withdraw the pending motion to disqualify counsel [docket entry 623] or otherwise in any way dispose of or resolve the fee dispute pending before this Court.") (emphasis and brackets in original); *see also* DE 642, Ex B (email from defendant Friedman's counsel confirming that the settling parties did not intend the stipulation to resolve the fee dispute between the Schreibers and the Nelkins).[13]

---

[13] The Nelkins participated in negotiating the stipulation and taking other concurrent steps to finalize the settlement agreement, in their capacity as Steven Schreiber's counsel. If, unbeknownst to their own client and the defendants, the Nelkins intentionally crafted the stipulation's language so as to frustrate the Schreibers' ability to vindicate their rights in an anticipated fee dispute, such an

Thus, when the court approved the stipulation, it ordered, in pertinent part, that "[a]ll pending motions, including all discovery and/or sanctions motion(s) filed by plaintiff Steve Schreiber, including ECF Nos. 168, 282 and 305, shall be withdrawn and dismissed with prejudice and without fees or costs." DE 640. The instant motion – which is not a motion filed only by Steven Schreiber, but rather filed jointly by Steven and Eugene Schreiber and TRC – was not among those the court explicitly identified as being withdrawn or dismissed. The omission of the instant motion from the list of those resolved by the stipulation was no accident; to the contrary, the court could not possibly have resolved a dispute between the Schreibers and the Nelkins on the basis of a stipulation that the Nelkins did not execute and that did not purport to affect their rights or responsibilities.[14]

---

affirmative betrayal of their client's interests would suffice to estop them from making the argument on which they now rely, and would be more aptly cited in a referral to the appropriate disciplinary authorities. If, as I hope is the more accurate explanation, the Nelkins did not anticipate the instant dispute and instead are seizing on the stipulation's language as a matter of expedience, their argument is merely cynical rather than sanctionable. Either way, it is plainly contrary to the record.

[14] Moreover, even if the best reading of the dismissal order is that it dismissed the instant motion notwithstanding the stipulating parties' and the court's intent, the court can and should exercise its authority to correct an error rather than amplify it. Specifically, "the court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." Fed. R. Civ. P. 60(a). "In deciding whether Rule 60(a) applies, courts distinguish between changes that implement the result intended by the court at the time the order was entered and changes that alter the original meaning to correct a legal or factual error, because Rule 60(a) allows for the former, but not the latter." *Rezzonico v. H&R Block, Inc.*, 182 F.3d 144, 150-51 (2d Cir. 1999) (citations and quotations omitted); *see also Paddington Partners v. Bouchard*, 34 F.3d 1132, 1140 (2d Cir. 1994) ("An error in a judgment that accurately reflects the decision of the court or jury as rendered is not 'clerical' within the terms of Rule 60(a)."). While I conclude that the record suffices to refute the Nelkins' argument that the court's order adopting the stipulation resulted in the dismissal of the instant motion, if that is incorrect then the order plainly does not reflect the stipulating parties' or the court's intent. Under such circumstances, I respectfully recommend that the court exercise its authority under Rule 60(a) to correct the order so as to more explicitly specify its intent not to dismiss the instant motion.

C.    Analysis

Under New York law, "'notwithstanding the terms of the agreement between them, a client has an absolute right, at any time, with or without cause, to terminate the attorney-client relationship by discharging the attorney.'" *Louima*, 2004 WL 2359943, at *59 (quoting *Campagnola v. Mulholland, Minion & Roe*, 76 N.Y.2d 38, 43 (1990)). An attorney who is discharged without cause before a case ends "may recover either (1) in *quantum meruit*, the fair and reasonable value of the services rendered, or (2) a contingent portion of the former client's ultimate recovery, but only if both of the parties have so agreed." *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 (2d Cir. 2004). However, where the attorney's discharge "is for cause, the attorney has no right to compensation or a retaining lien, notwithstanding a specific retainer agreement." *Garcia*, 2004 WL 1636982, at *5 (quoting *Campagnola*, 76 N.Y.2d at 44); *see also Williams v. Hertz Corp.*, 427 N.Y.S.2d 825, 825-26 (App. Div. 1980) (holding that "an attorney who is discharged for cause or misconduct has no right to the payment of fees and no retaining lien on his client's papers"). Likewise, an attorney loses his right to enforce a charging lien if the attorney is discharged for cause. *See Adams v. City of New York*, 2014 WL 4649666, at *2 (E.D.N.Y. Sept. 16, 2014) ("[I]t is well-settled that an attorney loses his right to enforce a charging lien if the attorney … is discharged for cause.") (citations and quotation marks omitted). In such a case, "[t]he burden rests with the client to demonstrate that there was just cause to terminate the attorney-client relationship." *Louima*, 2004 WL 2359943, at *60 (citing *Casper v. Lew Lieberbaum & Co.*, 1999 WL 335334, at *6 (S.D.N.Y. May 26, 1999)).

New York case law does not explicitly define "cause" for termination, but it does establish that the term "means that the attorney has engaged in some kind of misconduct, has been unreasonably lax in pursuing the client's case, or has otherwise improperly handled the case." *Garcia*, 2004 WL 1636982, at *5; *see Louima*, 2004 WL 2359943, at *60 (finding that when an attorney is

"terminated for misconduct, the charging lien is forfeited"). Examples of the kind of attorney misconduct that support a finding of termination for cause include the following:

> (1) the attorney's failure to perform under the employment contract; (2) his lack of diligence in so performing; (3) his lack of ordinary skill or care in so performing; (4) his making of demands on the client which violate the terms or exceed the scope of the contract; (5) his taking of actions contrary to the client's interests or objectives; (6) his indulging in some sort of unprofessional conduct while handling the client's affairs; (7) his venting of personal or economic hostility toward the client; and (8) his loss of the client's trust and confidence.

*Garcia*, 2004 WL 1636982, at *6 (quoting 31 Am. Jur. Proof of Facts 2d 125 § 7 (Aug. 2003)).

Regardless of whether, when, or why a client chooses to exercise his right discharge counsel for cause, "[a]n attorney who violates a disciplinary rule may be discharged for cause and is not entitled to fees for services rendered." *Jay Deitz & Associates of Nassau Cty., Ltd. v. Breslow & Walker, LLP*, 59 N.Y.S.3d 443, 447 (App. Div. 2017); *see Doviak v. Finkelstein & Partners, LLP*, 934 N.Y.S.2d 467, 470 (App. Div. 2011) (same; citing *Quinn v. Walsh*, 795 N.Y.S.2d 647 (2005); *In re Satin*, 696 N.Y.S.2d 223, 224 (App. Div. 1999); *Yannitelli v. D. Yannitelli & Sons Const. Corp.*, 668 N.Y.S.2d 613, 613 (App. Div.), *lv. denied*, 92 N.Y.2d 875 (N.Y. 1998), *cert. denied*, 525 U.S. 1178 (1999);[15] *Pessoni v. Rabkin*, 633 N.Y.S.2d 338 (App. Div. 1995); *Matter of Winston*, 625 N.Y.S.2d 927 (1995)).

The attorney's violation of a disciplinary rule may result in the forfeiture of her fees even if the misconduct is not discovered until after her discharge. *See*, *e.g.*, *Brill & Meisel v. Brown*, 979 N.Y.S.2d 283, 285 (App. Div. 2014) (citing *Coccia v. Liotti*, 896 N.Y.S.2d 90, 100 (App. Div.), *lv. dismissed*, 906 N.Y.S.2d 811 (N.Y. 2010)); *Doviak*, 934 N.Y.S.2d at 470 (quoting same).

The Schreibers had ample reason to discharge the Nelkins for cause, even before belatedly learning that their own counsel of record had filed a lawsuit against them without bothering to first

---

[15] In *Yannitelli*, the court observed that there is "no meaningful distinction between this case [where the lower court declared that an attorney had forfeited his right to collect fees from a former client] and cases where the attorney was formally discharged." *Id.* Regardless of how and when the representation ended, the attorney's misconduct "forfeited any entitlement to fees." *Id.*

seek leave to withdraw from representing them in this action. First, the record plainly demonstrates that the Nelkins threatened to, and to an extent did, interfere with their clients' right to settle with the defendants. Rather than rely on their legal rights to seek appropriate relief based on the engagement agreement and applicable law, the Nelkins sought to force the Schreibers to accede to their demands by threatening to withdraw and then by asserting a charging lien knowing – and explicitly pointing out to the Schreibers in a threatening manner – that doing so would block the Schreibers' ability to effectuate the settlement agreement with the defendants. *See* DE 623-14 (Aug. 6, 2018, email from Jay Nelkin to Parness warning that "the filing of a charging lien will impact the distribution of any benefits resulting from the settlement and would not be limited to the payment of any settlement payments" and making the thinly veiled threat that "we would prefer to have this matter resolved, but it is now up to the Schreibers as to whether they want to do that or not"); DE 544-3 (Aug. 15, 2018, letter from the Nelkins to the Schreibers explicitly pointing out that "the effect of a Charging Lien is to halt the transfer of settlement funds and other property or benefits" and thus warning that "until the dispute between us is resolved, I do not believe that the Defendants will make the payments anticipated to serve as credits for the payments you are obligated to make on the Effective Date" under the settlement agreement).

The Nelkins thus repeatedly threatened the Schreibers not simply with enforcing their perceived right to a fee, but with scuttling the resolution of the underlying litigation with the defendants that the Schreibers had concluded was in their interest. Standing alone, that interference with the Schreibers' right to settle warranted discharging the Nelkins for cause. *See Holcombe*, 2017 WL 1184104, at *7; *Louima*, 2004 WL 2359943, at *60 (citing *Dagny Mgmt. Corp. v. Oppenheimer & Meltzer*, 606 N.Y.S.2d 337, 339 (App. Div. 1993)); *Garcia*, 2004 WL 1636982, at *6 (citing *Sokoloff v. Sokoloff*, 371 N.Y.S.2d 106 (N.Y. Fam. Ct. 1975)).

Relatedly, the Nelkins improperly threatened to withdraw if the Schreibers sought to raise the brewing fee dispute with the court. Specifically the Schreibers assert, and the Nelkins do not dispute, that during a telephone call on June 10, 2018, the Nelkins threatened that if the Schreibers asked me to address the fee dispute, they would withdraw, which would prevent the Schreibers from concluding a settlement with the defendants and leave them without counsel to litigate the remainder of the case in compliance with court-ordered deadlines. *See* S. Schreiber Decl. ¶¶ 42, 44; E. Schreiber Decl. ¶ 37; C. Nelkin Decl. ¶¶ 103-104, 107; J. Nelkin Decl. ¶ 55. Likewise, on July 10, 2018, the day before a scheduled telephone conference with the court, the Schreibers wrote to their counsel that they felt a need to participate in the conference and asked the Nelkins to so advise me. *See* DE 630-26. Jay Nelkin responded by telling his client that "[t]he conference call is a status conference for attorneys" and warning that the Schreibers would "likely jeopardize the settlement" if they did appear – but then cynically advised his clients that "you are free to jeopardize or reject the settlement if you choose." *Id.* Such threats were improper and bolster the justification for discharging the Nelkins for cause. *See Holcombe*, 2017 WL 1184104, at *7 (citing *Garcia*, 2004 WL 1636982, at *6).

Further, the Nelkins knowingly labored under a manifest conflict of interest, in violation of Rule 1.7 of the New York Rules of Professional Conduct. *See* N.Y. Rules of Prof'l Conduct 1.7, 22 N.Y.C. R.R. § 1200. To be sure, a mere fee dispute does not, standing alone, create a disqualifying conflict of interest. But the circumstances of this case go far beyond such an anodyne disagreement: rather than simply protect their own interest in recovering the fee to which they were entitled, the Nelkins took affirmative steps to prejudice the Schreibers' interests in the underlying lawsuit as a way to coerce the Schreibers into giving up their right to adjudicate the amount they owed.

The Nelkins had ample opportunity to withdraw from the case in light of the fee dispute. But rather than do so, they remained as counsel of record and, while serving in that capacity,

accused their own clients – on the public docket of this case before the settlement was finalized – of making false statements, acting in bad faith, and engaging in fraud. *See* DE 547. Those accusations served only the Nelkins' interest in coercing the Schreibers to pay the fee the Nelkins' demanded and were manifestly antithetical to the Schreibers' interests in resolving the claims against the defendants to their satisfaction. Had the parties to the lawsuit failed to settle – as the Nelkins' own actions made more likely – the Schreibers' at that point faced the prospect of having the credibility of their trial testimony being impeached with their own attorneys' words.

The Nelkins deepened the already disqualifying conflict of interest on August 30, 2018, when – hours before the start of a conference in this case – they filed suit against their clients. *See Nelkin & Nelkin*, CV 18-4930 (MKB), DE 1 (Complaint); *see also* DE 557.[16] The Nelkins observe that they had right to file such a suit. *See* Opp. 22 (citing *Pierce & Weiss, LLP v. Subrogation Partners LLC,* 701 F. Supp. 2d 245, 252 (E.D.N.Y. 2010)). As the case on which the Nelkins rely makes clear, however, while a firm may sue a client for fees, it may not simultaneously represent both the original client and the attorneys suing that client absent informed consent. *See Pierce & Weiss*, 701 F. Supp. 2d at 252 (citing *Cinema 5 Ltd. v. Cinerama, Inc. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976)). That is exactly what happened here: Jay Nelkin represented the Firm in filing a lawsuit against Steven and Eugene Schreiber while simultaneously representing both men in this case and without

---

[16] It is of no moment that neither the Schreibers nor I knew of the Nelkins' lawsuit at the conference on August 30, 2018. By that point, as discussed above, the Nelkins had already engaged in sufficient misconduct to warrant discharge for cause, and in terminating their representation at that conference I made explicit that I was doing so without prejudice to the Schreibers' right to characterize the termination as a discharge for cause. *See* 8/30/18 Tr. at 10-11. In addition, while the state of the Schreibers' knowledge of their lawyers' lawsuit against them would be relevant in determining, as a factual matter, the basis for the Schreibers' decision to discharge counsel, it would have no bearing on the related but distinct question of whether the Nelkins, by violating their obligations under the Rules of Professional Conduct, forfeited their right to collect a fee. As explained above, applicable case law makes clear that such misconduct can result in forfeiture even if it remains unknown until after the representation ends.

securing their consent. As the court noted in *Pierce & Weiss*, "suing one client on behalf of the other is 'prima facie improper.'" *Id.* (quoting *Cinema 5 Ltd.*, 528 F.2d at 1387).[17]

The Nelkins try to escape a finding that they violated the proscription against conflicts of interest by arguing that the Schreibers had effectively terminated their representation much earlier than August 30, 2018. *See* Opp., at 12, 21. I wholly reject that argument as being contrary to the record. First, the Nelkins' assertion that they stopped serving as the Schreibers' counsel when the settlement became effective on August 13, 2018, is at odds with the record of the conference on August 30, 2018 (by which time they had already sued the Schreibers).[18] The conference started with Parness expressing the view, without contradiction, that the Nelkins continued to represent the Schreibers. *See* 8/30/18 Tr., at 3. Moments later, when I asked Jay Nelkin, "Do you seek to be relieved?" he responded not by saying that there was no need because he had already been terminated, but rather by simply saying, "Yes, Your Honor." *Id.* at 9. Second, the claim is fundamentally at odds with the fact that on the same day that the Nelkins now claim to have ended their representation of the Schreibers, Jay Nelkin filed his notice of appearance for Eugene Schreiber. In doing so, he not only identified himself as Eugene Schreiber's counsel of record, but

---

[17] The Nelkins' reliance on other case law is similarly misplaced. *See* Opp., at 22-23 (citing *United States v. White*, 174 F.3d 290, 296 n.9 (2d Cir. 1999) (citing *United States v. O'Neil*, 118 F.3d 65, 71-72 (2d Cir. 1997) for the proposition that "in other context ... disputes between defendants and their attorneys do not necessarily constitute conflicts of interest.")). In *O'Neil*, an attorney's civil lawsuit to recover fees from a client he was representing in a criminal case did not create a conflict because the lawyer's interest in securing a fee did not diverge from his client's interest in zealous representation in the criminal case. *See* 118 F.3d at 71-73. In contrast, as described above, the Nelkins' actions in this court in pursuit of their claimed fee directly impeded the Schreibers' ability to settle the case and threatened their prospects in achieving their litigation goals if the settlement fell through.

[18] The Nelkins assert that the settlement agreement's effective date was August 13, 2018, the day the order was entered. *See* Opp. at 12. Before litigating this motion, however, the Nelkins noted that by its terms, the settlement did not take effect until August 15, 2018. *See* DE 544-3. The difference is important: if the Nelkins' representation ended on August 13, 2018, as they now claim (it did not), then the Schreibers were not their clients on August 15, 2018, when the Nelkins filed the charging lien that interfered with the Schreibers' attempt to settle with the defendants.

also explicitly reaffirmed his continuing role as counsel of record for "Steven Schreiber individually and derivatively." *See* DE 538. Finally, before the instant motion gave them an incentive to say otherwise, the Nelkins had explicitly disavowed the proposition that they could be discharged in the way they now describe. To the contrary, they told both the Schreibers and Parness that displacing them would require a writing from the Schreibers and permission from the court. *See* DE 623-12; DE 623-13.

The Nelkins diligently served the Schreibers for years in litigating a difficult case and bringing it to the brink of a resolution that well served their clients' interests. If, at that point, their disagreement with the Schreibers over the amount of a reasonable fee had led them to withdraw, I would not question either their decision or their right to try to vindicate their desire to secure a fee that others might find excessive.[19] But rather than seeking to assert their rights in an orderly fashion

---

[19] Although the Schreibers seek to bolster their request for relief by characterizing the Nelkins' claimed fee as excessive, I need not and do not resolve that issue. To be sure, the Schreibers' outrage is understandable: after engaging the Nelkins to help them dislodge Friedman and his associates from their ruinous hold on TRC, the Schreibers were reasonably dismayed to have the Nelkins demand a fee that would effectively deprive the Schreibers of any monetary relief and saddle them yet again with unwanted business partners. Further, the Schreibers have a reason to argue that the Nelkins unfairly seek to inflate the value of the settlement – and thereby inflate their fee – by characterizing the settlement's resolution of Friedman's loan to TRC as being worth the loan's nominal value. The Nelkins having vigorously and persuasively litigated the proposition that the loan was a sham that resulted from Freidman's self-dealing, it is hardly a surprise that the Schreibers objected to a resolution of the fee dispute that would have left them with essentially nothing more than the forgiveness of that loan. Nevertheless, because the Nelkins' actions warrant discharge for cause and the vacatur of the charging lien for other reasons, there is no need to determine in this proceeding whether the claimed fee they have forfeited would have been excessive.

Similarly, my conclusion that the Nelkins improperly interfered with the Schreibers' right to settle and labored under a disqualifying conflict of interest obviates the need to address or resolve the Schreibers' many other complaints about the Nelkins' conduct, including claims that they engaged in abusive communications with the Schreibers, improperly sought to enter into a business partnership with the Schreibers without securing informed consent, and violated the duty of candor to the tribunal. To be sure, the Nelkins' conduct needlessly raised all of these concerns (though the Schreibers are hardly blameless in creating the toxic relationship between counsel and client), but none of them, independently or combined with one another, would warrant the extreme form of relief the Schreibers seek.

that need not have prejudiced their clients' right – a process that could and should have begun with the Nelkins seeking leave to withdraw long before August 30, 2018 – the Nelkins improperly and unethically resorted to self-help regardless of the risk to their clients. By doing so, they earned a discharge for cause and forfeited their right to collect a fee.

III.     Conclusion

For the reasons set forth above, I grant the plaintiffs' motion to disqualify their counsel for cause and vacate counsel's charging lien.

SO ORDERED.

Dated:  Brooklyn, New York
         September 16, 2020

                                    _____/s/_____
                                    James Orenstein
                                    U.S. Magistrate Judge